# EXHIBIT A



## AIA° Document A102™ – 2017

**Standard (Modified) Form of Agreement Between Owner and Contractor** *where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price*

**AGREEMENT** made as of the **17** day of July, in the year 2020

**BETWEEN the Owner:**

| A3 Development LLC | A3 Restaurant, LLC | A3 Amenities, LLC |
|---|---|---|
| 17780 Collins Avenue | 17780 Collins Avenue | 17780 Collins Avenue |
| Sunny Isles Beach, FL 33160 | Sunny Isles Beach, FL 33160 | Sunny Isles Beach, FL 33160 |

**and the Contractor:**

Suffolk Construction Company, Inc.
One Biscayne Tower, Suite #2700,
2 South Biscayne Boulevard
Miami, FL 33131
Telephone Number (305) 374-1107
www.suffolk.com

**for the following Project:**

Estates at Acqualina, South Tower, Villa, Beach Side Amenities, Guest Suites and Cabanas
17901 Collins Avenue,
Sunny Isles Beach, Florida 33160

A 52 floor tower (South Tower) containing a total of 155 +/- luxury Residences, 8 Guest Suites, 6 Cabanas, a Villa, Beach Side Amenities and Common Areas, as more specifically set forth in **ARTICLES 2 and 4** below and elsewhere in the Contract Documents.

**The Architect:**

CFE Architects, PA
Cohen Freedman Encinosa & Associates
8085 NW 155 Street
Miami Lakes, FL 33016

Attn: Stuart Cohen

**The Owner and Contractor agree as follows:**

Owner _____    Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**TABLE OF ARTICLES**

1 THE CONTRACT DOCUMENTS

2 THE WORK OF THIS CONTRACT

3 RELATIONSHIP OF THE PARTIES

4 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

5 CONTRACT SUM

6 CHANGES IN THE WORK

7 COSTS TO BE REIMBURSED

8 COSTS NOT TO BE REIMBURSED

9 DISCOUNTS, REBATES AND REFUNDS

10 SUBCONTRACTS AND OTHER AGREEMENTS

11 ACCOUNTING RECORDS

12 PAYMENTS

13 DISPUTE RESOLUTION

14 TERMINATION OR SUSPENSION

15 MISCELLANEOUS PROVISIONS

16 ENUMERATION OF CONTRACT DOCUMENTS

Owner _____    Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

## ARTICLE A.  TRANSITION

**§ A.1**     Owner has terminated the Construction Agreement with Coastal Construction ("Coastal") effective Friday July 24, 2020, prior to the completion of the Project. Owner has engaged Contractor to provide the construction services to complete the Project pursuant to this Agreement following the termination of Coastal.

**§ A.1.1   COMMENCEMENT OF THE WORK.**  The Work shall commence upon the execution of this Agreement and the Owner's issuance of a written Notice to Proceed ("NTP"), which the Owner agrees to issue within five (5) days after signing this Agreement; provided however, that the NTP shall not be effective, and the Contractor shall have no obligation to commence Work, until owner has fulfilled the following conditions precedent and has delivered the following to the Contractor: (1) transfer of the existing building permit and other required permits, if applicable, into Contractors' name copies of all permits required to be obtained by the Owner for the commencement of the Work, if any; (2) reasonable access to the site and any adjacent area needed to perform the Work; and (3) certificates of insurance for all insurance required to be provided by the Owner.

**§ A.2     MOBILIZATION PAYMENT.**  For the Contractor's performance of the Work as described in this Agreement, the Owner shall pay the Contractor (i) Pursuant to the terms of the agreement (ii) a one time mobilization payment at the time of mobilization in the amount of Five Hundred Thousand Dollars ($500,000.00) to be credited against the fixed General Conditions line item and paid by Owner in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) the first month, and the remaining balance of Two Hundred Fifty Thousand Dollars ($250,000.00) after sixty (60) days of Contractor's Work on the Project. This Five Hundred Thousand Dollars ($500,000.00) Mobilization Payment is included in the Guaranteed Maximum Price set forth in **§ 5.4** below.

**§ A.3     EXISTING SUBCONTRACTS.**  Upon execution of this Agreement, Contractor shall endeavor to subcontract with all subcontractors and suppliers previously under contract with Coastal.  In connection with the takeover of the Work, Contractor shall, to the extent possible, either (A) take assignment of any subcontract, purchase order and agreement formerly held by Coastal that is simultaneously modified (in a written assignment and Amendment documents) to the satisfaction of Owner, Contractor and Subcontractor); OR (B) enter into new subcontracts and or purchase orders (using Contractor's standard subcontract, purchase order or agreement forms, as applicable) for any remaining portion of the Subcontractor's scope of work; provided, however, the terms and conditions of any such assignment and amendment and/or new subcontract shall be subject to the prior review and approval of the Owner as provided for in this Agreement; OR (C) Contractor may retain other non-Coastal subcontractors or material suppliers or additional subcontractors or material suppliers, as needed and determined by Contractor to complete the Project.

**§ A.4     INSURANCE.**  Upon execution of this Agreement, Owner shall name Contractor as an additional insured on all insurance policies that the Owner is maintaining with respect to the Project and Owner shall be required to enroll any non-Coastal Subcontractors in the OCIP, including but not limited to the Owner OCIP and Contractor's Pollution Policy.

## ARTICLE 1  THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (Modified General, Supplementary and other Conditions), Drawings, Design Documents, Addenda issued prior to execution of this Agreement, other documents and Exhibits listed in this Agreement and Modifications issued after execution of this Agreement, all of which form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations, or agreements, either written or oral. An enumeration of the Contract Documents, other than a Modification, appears in **Article 16.**

A list of the Drawings and Reports depicting the Work to be performed and which make up this Agreement is attached hereto as **Exhibit "A."**

## ARTICLE 2  THE WORK OF THIS CONTRACT

Owner _____

Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission  This draft was produced by AIA software at 09:43 15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service  To report copyright violations, e-mail copyright@aia.org.

**§ 2.1**    The Contractor shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

**§ 2.1.1**    The Work includes but is not limited to a 52 floor tower containing a total of 155 units ("South Tower Units"), luxury Residences, 8 Guest Suites, 6 Cabanas, (hereinafter "South Tower") a Villa including a Restaurant, Common Elements and Beach Side Amenities, Guest Suites and Cabanas, South of Gridline G3 (as identified on **Exhibit "E"**), which include but are not limited to the following:

> Circus Maximus (including skating rink, bowling, theater, sitting area, concession area, teens' room, children's room, game room, golf simulator, race car simulator, restrooms, bicycle storage, relaxation/social room) - 1st Level of Amenity Villa; Pool Bar and Grill - 1st Level of Amenity Villa; Night Club/Lounge 3rd and 4th Level of Amenity Villa; Heated Spa - 1st Level of Exterior Patio; Pool Deck – Lower - 1st Level of Exterior Patio; Heated Lap Pool - 1st Level of Exterior Patio; Pool Deck — 1st Level of Exterior Patio; Pool Deck – Upper – 2nd Level of Exterior Patio; Heated Pool - 2nd Level of Exterior Patio; Multipurpose Room – 4th Level of Amenity Villa; Multi-Function Room – 4th Level of Amenity Villa; East Roof Terrace - 4th Level of Amenity Villa; West Roof Terrace - 4th Level of Amenity Villa; and Fitness Area (including gym, massage/treatment area, salt room, experience showers, steam room, sauna, relaxation/social room and restrooms) - 5th Level of Amenity Villa. The Villas and Amenities shall subsequently be referred to as the "Villa and the Beach Side Amenities".

The Common Elements, all as more particularly set forth in the Contract Documents.

**§ 2.1.2**    The South Tower is Owned by A3 Development LLC, whose address is 17780 Collins Avenue, Sunny Isles Beach, FL 33160.  A3 Development LLC does not own the Villa, Beach Side Amenities, Guest Suites and Cabanas.

**§ 2.1.3**    The Legal Description for the South Tower is set forth in **Exhibit "B"** attached hereto and incorporated herein.

**§ 2.1.4**    The Villa, Beach Side Amenities, Guest Suites and Cabanas, are owned by A3 Amenities, LLC, whose address is 17780 Collins Avenue, Sunny Isles Beach, FL 33160.  A3 Amenities, LLC does not own the South Tower.

**§ 2.1.5**    The Legal Description for the Villa, Beach Side Amenities, Guest Suites and Cabanas, is set forth in **Exhibit "C"** attached hereto and incorporated herein.

**§ 2.1.6**    The Restaurant is owned by A3 Restaurant, LLC whose address is 17780 Collins Avenue, Sunny Isles Beach, FL 33160.  A3 Restaurant, LLC does not own the South Tower, the Villa, Beach Side Amenities, Guest Suites or Cabanas.

**§ 2.1.7**    The South Tower is Owned by A3 Development LLC, the Villa, Beach Side Amenities, Guest Suites and Cabanas, is owned by A3 Amenities, LLC, and the Restaurant is owned by A3 Restaurant, LLC, all of whom shall collectively be referred to throughout the Agreement as "Owner."  The South Tower is dependent on the proper construction and success of the Villa, Beach Side Amenities, Guest Suites and Cabanas and the Restaurant. Likewise, the Villa, Beach Side Amenities, Guest Suites, Cabanas, and the Restaurant are dependent on the proper construction and success of the South Tower. The South Tower, the Villa, Beach Side Amenities, Guest Suites, Cabanas, and the Restaurant are dependent on the proper construction and success of the North Tower (part of this overall Project but covered by a separate Agreement with Contractor and a separate Owner (A3 North Development, LLC)). Likewise, the North Tower is dependent on the proper construction and success of the South Tower, the Villa, Beach Side Amenities, Guest Suites, Cabanas, and the Restaurant. It is the intention of the parties to this Agreement to include all components of the Work for the South Tower, the Villa, Beach Side Amenities, Guest Suites, Cabanas, and the Restaurant, necessary for the performance of the Work in accordance with the Contract Documents to complete a Luxury Oceanfront Condominium with Villa, Beach Side Amenities, Guest Suites, Cabanas, and Restaurant. All Contractor duties, responsibilities and obligations contained in the Contract Documents, for the benefit of the Owner,

Owner _____    Contractor _____

Modified AIA Document A101™ – 2017. Copyright © 1915, 1918, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects", "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 43 15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

including but not limited to warranties, shall apply to all four Owners, A3 Development LLC, A3 Amenities, LLC, A3 North Development, LLC and A3 Restaurant, LLC (hereinafter collectively "Owners") and the Owner shall be jointly and severally liable to the Contractor for the obligations set forth in this Agreement. Owners are all specifically intended third party beneficiaries of this Agreement including but not limited to all warranties contained in this Agreement. All Contractor duties, responsibilities and obligations owed to any one Owner in this Agreement or by Law shall be owed to all other Owners (A3 Development LLC, A3 Amenities, LLC, A3 North Development, LLC and A3 Restaurant, LLC), each of which are specifically intended, third party beneficiaries of this Agreement. Notwithstanding, the Owners shall designate one Owner as the entity solely authorized to direct Contractor in the performance of its Work.

All Work for A3 Development LLC, A3 Amenities, LLC, A3 North Development, LLC and A3 Restaurant, LLC shall be referred to as the "Entire Project."

### § 2.1.8   PRIOR WORK
Contractor acknowledges that significant Work was performed by other contractors and subcontractors prior to commencement of the Work by Contractor and or prior to execution of this Agreement (the "Prior Work").

§ 2.1.8.1  Contractor in the capacity of a licensed general contractor and not a design professional has specifically inspected, investigated and examined the Project records (including but not limited to photographs, City inspection logs, Architect weekly reports, and the Draper schedule), consulted with Project professionals (including but not limited to the Architect and Engineers), consulted with Subcontractors and suppliers, and inspected, investigated and examined the Prior Work and, after such inspection, investigation and examination, accepts Prior Work in its "as is" condition. Contractor represents to Owner that said Prior Work is sufficient and acceptable for the Work that is the subject of this Agreement. Contractor acknowledges that by constructing its Work upon the Prior Work, Contractor is accepting the Prior Work substrate and shall be fully responsible for the Prior Work and subsequent Work. Contractor expressly assumes responsibility for and expressly warrants the Prior Work in accordance with all duties, responsibilities, obligations and warranties set forth in the Contract Documents.

In addition, in the event any defect or deficiency in the Prior Work is discovered prior or after the execution of Agreement, in which the Subcontractor performing the defective and/or deficient Work has not agreed to an assignment of its subcontract from Coastal to Contractor and has refused to enter into a new subcontract with Contractor, Contractor shall be entitled to deduct the costs associated with correction of said Prior Work from the Contingency. If Contingency has been exhausted, then the costs associated with correction of said Prior Work shall be paid by Contractor.

§ 2.1.8.2  The weekend prior to starting Work, Owner and Contractor agree to mutually and diligently document the status of the Prior Work through photographs and video graphics or other means necessary to ascertain the status of the Prior Work.

### § 2.2   RESPONSIBILITY FOR THE CONSTRUCTION OF THE WORK
The Contractor, in full and complete satisfaction of its role as general contractor, hereby accepts responsibility for the completion of the Work as provided by the Contract Documents, and will perform the procurement of materials and equipment required by the Contract Documents, construction coordination, construction, supervision and project management as may be required in order to construct the Work in accordance with the Contract Documents such that the finished Work shall be performed and completed and the Work will be performed in accordance with all required state and local code requirements as are described in the Contract Documents. Notwithstanding, the foregoing shall not be construed to impose any design responsibility on Contractor except where such design responsibility is an existing contractual requirement of the Contractor pursuant to Florida law in performance of the Work or the Contract Documents.

§ 2.3    The Contractor shall schedule and attend regular meetings with the Owner and Architect as required for the timely and proper completion of the Project, but in no event less than weekly (once every week). The following people shall attend the meeting on behalf of Contractor: Project Executive and General Superintendent

Modified AIA Document A103™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963 1967, 1974, 1978, 1987. 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No 78133344419 which expires on 06/17/2021  is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations e-mail copyright@aia.org

In entering into the Contract, the Contractor represents and warrants that it has considered the consequences of any foreseeable labor or material shortages, and time requirements for procurement, installation, and construction completion.

**§ 2.4**     The Contractor hereby represents and warrants to the Owner that the Contractor has and will continue, to the extent appropriate during the Project: (1) to evaluate the scope, schedule and budget established by the Owner, for the Project in order, among other things, (a) to assess the quality and soundness of such program, schedule and budget, (b) to identify and evaluate alternatives to the Owner's schedule so as to reduce the time required for construction, (c) to evaluate and recommend alternative materials and systems and methods of achieving the Owner's program schedule and cost requirements or other design parameters, and (2) as and when requested by the Owner and the Architect and the Owner's consultants to discuss and review the cost, scope and schedule any suggested revisions to same.

**§ 2.5**     The Contractor hereby represents and warrants to the Owner that (a) the Contractor (as a construction professional and not as a design professional) has carefully reviewed and shall continue to review the Drawings (including all notes and specifications contained in the Drawings), designs and other Contract Documents, (b) the responsibilities of the Contractor are properly identified and assigned therein, and (c) the Contractor will timely bring to the attention of Owner (via written notification) if it discovers that the Drawing (including all notes and specifications contained in the Drawings) contain any errors, omissions, inconsistencies, or areas of conflict or overlap in the Work to be performed by the Contractor, with sufficient advanced notice so as not to delay the progress of the Work.

**§ 2.6**     The Contractor shall assist the Owner in coordinating and integrating the activities of the Architect, Contractor, Owner, and other persons or entities participating in the construction of the Project.

**§ 2.7**     The Contractor hereby represents and warrants that the Contractor has particular expertise and experience in the construction of Luxury, Oceanfront Condominiums and associated amenities in this jurisdiction, similar to the Project and in the performance of the Work and other services required hereunder. Contractor understands that the purchasers of these units typically require a high level of customizations and this may require performing Work out of sequence.

**ARTICLE 3   RELATIONSHIP OF THE PARTIES**
The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect. Further, Contractor acknowledges it shall undertake its obligations to Owner in performing the Work and utilizing the Contractor's best efforts, skill and judgment in furthering the Work and the interests of the Project and Owner, as required by the Contract Documents; to furnish efficient business administration and supervision; to furnish at all times a sufficient supply of workers and skilled personnel, materials and equipment to perform its obligations herein, and to perform the Work in an expeditious and economical manner consistent with the Project's and Owner's best interests in accordance with the Contract Documents. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents.

**ARTICLE 4   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION**

**§ 4.1**     Subject to a NTP issued pursuant to § A.1.1, the date of commencement of the Work pursuant to this Agreement shall be agreed to be the later of the day the governmental authority having jurisdiction of the Project transfers the building construction permit from the Contractor that performed the Prior Work to the Contractor or Monday, July 27, 2020 (the "Commencement Date").

**§ 4.1.1**   The Contract Time shall be measured from the Commencement Date.

**§ 4.2**     **PROJECT PHASES**  The Entire Project shall be performed in Two (2) Phases under two Agreements.  Phase I (this Agreement) shall consist of the South Tower, the Podium, the Villa, Beach Side Amenities, Guest Suites and Cabanas and Common Areas. Phase II (separate Agreement) shall consist of the North Matt, Podium and the North Tower (all as more specifically set forth in the Contract Documents).

Owner _____          Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963. 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

### § 4.3   SUBSTANTIAL COMPLETION

**§ 4.3.1**   Contractor shall achieve Substantial Completion (as defined in § 9.8 of the AIA Document A201™–2017, Modified General Conditions), for each component of the Work on or before forty-five (45) calendar days from the TCO dates set forth in § 4.4.2 below subject to adjustment of the Contract Time as provided in the Contract Documents.

**§ 4.3.2**   Substantial Completion shall be as defined in § 9.8 of the AIA Document A201™–2017, Modified General Conditions. The Contractor shall achieve Final Completion of the entire Work no later than ninety (90) days after Substantial Completion; provided, however, that if Final Completion is delayed for reasons that are beyond the control of the Contractor and those for whom Contractor is responsible, the Contractor may request, before expiration of such ninety (90) day period, additional time (but not an increase in the Contract Sum to achieve Final Completion, in which event the Owner shall not unreasonably deny Contractor's request for such additional time.

### § 4.4   TCO LIQUIDATED DAMAGES

**§ 4.4.1**   To the extent Contractor is unable to continue the Work due to the Owner's failure to timely obtain any of the permits required to be obtained by the Owner pursuant to the Contract Documents, or is delayed in the performance of the Work by an act or neglect of the Owner or Architect, or employees of either, or other causes beyond the control of the Contractor ("Excusable Delay") the Contractor shall be permitted to seek an adjustment to the Contract Time and or the Contract Sum for such Excusable Delay, provided Contractor has timely submitted its Claim in accordance with the requirements of the Contract Documents.

Notwithstanding the above, Contractor shall be entitled to an extension of time, (but no increase to the GMP) in the event of Concurrent Delays as follows:  a Concurrent delay exists to the extent of and for the duration wherein any unexcused delay by the Contractor (or those for whom Contractor is responsible) occurs concurrently with an Excusable Delay.

**§ 4.4.2**   The parties agree that time is of the essence in the performance of this Agreement.  In the event Contractor has not completed the Work as required to receive a Temporary Certificate of Occupancy (TCO) by the dates set forth below, subject to any adjustment of the Contract Time as provided in the Contract Documents, the Owner shall be entitled to collect Liquidated Damages. TCO shall be defined as the point Contractor has completed the Work to the status the City of Sunny Isles Beach Building Department will issue a TCO, or equivalent, and the Owner can utilize the Project for its intended purpose and Contractor has completed all of Contractor's contractual and legal obligations, allowing Owner to close units. In addition to receipt of the TCO, the units and common areas shall be sufficiently complete (with the exception of minor punch list and not having the appearance of a construction site). Should reasons outside Contractor's responsibility and control prevent the issuance of the TCO or Owner's closing of units (i.e. beneficial occupancy for closing), the delay shall be deemed an Excusable Delay until such reasons are satisfied for purposes of the liquidated damages and Contractor shall not be entitled to additional time or money unless the TCO delay extends beyond November 8, 2021.

All dates set forth in this Article shall be subject to extensions of time that Contractor may be entitled to pursuant to the Contract Documents.

TCO Liquidated Damages shall apply, should Contractor fail to complete the Work as required to receive a TCO by the following dates, subject to adjustments as provided in the Contract Documents:

| | |
|---|---|
| August 19, 2021 | South Tower and Lap Pool; |
| October 11, 2021 | Restaurant (not TCO but available for stocking, staffing and cooking) |
| November 08, 2021 | Villa, Beach Side Amenities, Guest Suites and Cabanas. |

The TCO date for the South Tower and Lap Pool is August 5, 2021, but Contractor and Owner have agreed to a fourteen (14) calendar day grace period prior to the assessment of liquidated damages or the award of bonus. Thus liquidated damages for the South Tower and Lap Pool will begin on August 19,

Owner _____                                        Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43 15 ET on 06/23/2020 under Order No. 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

2021. Likewise, bonus for the early TCO for the South Tower and Lap Pool will be calculated based upon July 22, 2021.

With regard to the Restaurant: Contractor shall obtain all required approvals to permit the Restaurant to be available for stocking, staffing and cooking (non-servable to public) by September 27, 2021, but Contractor and Owner have agreed to a fourteen (14) calendar day grace period prior to the assessment of liquidated damages. All authorities having jurisdiction approvals for the serving of food by October 11, 2021. Thus liquidated damages for the Restaurant will begin on October 11, 2021. There is a One Hundred Thousand Dollar ($100,000.00) on-time bonus for allowing the Restaurant to open for stocking, staffing and cooking by September 27, 2021, contingent on the Restaurant receiving the TCO by October 25, 2021.

The TCO date for the Villa, Beach Side Amenities, Guest Suites and Cabanas and Restaurant is October 25, 2021, but Contractor and Owner have agreed to a fourteen (14) calendar day grace period prior to the assessment of liquidated damages or the award of bonus. Thus, liquidated damages for the Villa, Beach Side Amenities, Guest Suites and Cabanas will begin on November 08, 2021. Likewise, bonus for the early TCO for the Villa, Beach Side Amenities, Guest Suites and Cabanas will be calculated based upon October 11, 2021.

Note: At the time of execution of this Agreement, there is an ongoing global pandemic caused by COVID-19. Contractor has considered the impact of COVID-19 on this Project in agreeing to the above dates and agrees that Contractor is not entitled to an extension of the above dates due to COVID-19 impacts unless the governmental authorities having jurisdiction of the Project prevent the continuation of the Work.

Contractor and Owner agree that, because of the nature of the Work, the inability of the parties to precisely calculate actual damages for delay and the impossibility of determining these damages, and in lieu of actual delay damages, the Parties agree on the following amounts:

See Chart below, setting forth the "TCO Liquidated Damages."

In no event shall the total amount of TCO Liquidated Damages which Contractor may be liable for the Project exceed an amount equal to seventy-five percent (75%) of Contractor's Fee.

Recovery of such TCO Liquidated Damages shall be Owner's sole and exclusive remedy in the event of Contractor's unexcused delay in achieving TCO. With regard to delays in reaching Substantial Completion and Final Completion of the Project, Owner is not entitled to delay damages, however, Owner's remedies are as set forth in the Contract Documents. In the case of unexcused delay in achieving Substantial Completion and or Final Completion, Owner's remedies are set forth in the Contract Documents but do not include liquidated damages or actual damages for delay.

In the event the Contractor achieves TCO for the South Tower and Lap Pool prior to July 22, 2021, the Owners shall pay the Contractor a Bonus of Fifteen Thousand Dollars ($15,000.00) per day for each day prior to July 22, 2021.

In the event the Contractor achieves TCO for the Restaurant by no later than September 27, 2021, the Owners shall pay the Contractor a Bonus of One Hundred Thousand Dollars ($100,000.00). The Restaurant bonus date is not subject to any time extensions.

In the event the Contractor achieves TCO for the Villa, Beach Side Amenities, Guest Suites and Cabanas prior to October 11, 2021, the Owners shall pay the Contractor a Bonus of Five Thousand Dollars ($5,000.00) per day for each day prior to October 11, 2021.

TCO for the Villa, Beach Side Amenities, Guest Suites and Cabanas shall control the maximum amount of any Bonus that Contractor can earn for early TCO of the Work in the South Tower and Lap Pool. In no event shall Contractor be entitled to an Early TCO Bonus for the Work in the South Tower and Lap Pool greater than six (6) months prior to

Owners                                             Contractor

Modified AIA Document A101™– 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

when a TCO is received for the Villa, Beach Side Amenities, Guest Suites and Cabanas.  For example, if Contractor obtains an Early TCO for the Work in the South Tower and Lap Pool eight (8) months early and eight months prior to the TCO for the Villa, Beach Side Amenities, Guest Suites and Cabanas, Contractor's Early TCO Bonus is capped at six (6) months.

**§ 4.4.2.1**  The per diem TCO Liquidated Damages amount set forth above are broken down into component parts as set forth in the below table.  The per diem TCO Liquidated Damages amount set forth above shall be calculated as provided in the below tables by the number of condominium units ("Units") for which Contractor has achieved Unit TCOs as of each day following the TCO dates set forth above, as adjusted pursuant to the terms of the Contract Documents:

|  | # of Units | Days 15-30 | | Days 31-45 | | Day 46 and on | |
|---|---|---|---|---|---|---|---|
|  |  | Unit Value | Total | Unit Value | Total | Unit Value | Total |
| Villa, Beach Side Amenities and Restaurant | 1 | $5,000 | $5,000 | $7,500 | $7,500 | $10,000 | $10,000 |
| Guest Suites and Cabanas | 14 | $150 | $2,100 | $225 | $3,150 | $300 | $4,200 |
| South Tower Standard Units/Tower Suites | 149 | $150 | $22,350 | $225 | $33,525 | $300 | $44,700 |
| South Tower Lap Pool/Amenity Deck | 1 | $1,350 | $1,350 | $2,025 | $2,025 | $2,700 | $2,700 |
| South Tower Single Family Style | 2 | $300 | $600 | $450 | $900 | $600 | $1,200 |
| South Tower Penthouse | 2 | $300 | $600 | $450 | $900 | $600 | $1,200 |
| Total Per Day | 169 |  | $32,000 |  | $48,000 |  | $64,000 |

### § 4.4.3  THE VILLA, BEACH SIDE AMENITIES, GUEST SUITES AND CABANAS AND SOUTH TOWER

The South Tower, Villa, Beach Side Amenities, Guest Suites and Cabanas have their own Liquidated Damage assessment as set forth in the table above pertaining to the Work (as set forth in the table in **§ 4.4.2.1** above).  Liquidated Damages for delays in the Villa, Beach Side Amenities, Guest Suites and Cabanas achieving TCO shall be as set forth in the table in **§ 4.4.2.1** above.  The above notwithstanding, Owner herein provides Contractor with a Fourteen (14) grace period pertaining to liquidated damages for the late TCO of the Villa, Beach Side Amenities, Guest Suites and Cabanas.  In other words, Liquidated Damages for the Villa, Beach Side Amenities, Guest Suites and Cabanas shall not begin to accrue unless Contractor has failed to reach TCO of the Villa, Beach Side Amenities, Guest Suites and Cabanas by November 08, 2021, subject to any adjustment of the Contract Time as provided in the Contract Documents.

**§ 4.4.4**  It is hereby agreed that the amount of all above per diem assessments for Liquidated Damages (for the Units and the Villa, Beach Side Amenities, Guest Suites, Cabanas and Restaurant) are reasonable, are not penalties and are not excessive in light of the circumstances known to the Parties at the time this Agreement is executed and the difficulty in ascertaining future actual damages at the time this Agreement is executed. Contractor herein covenants not to challenge the per diem amount of the Liquidated Damages in any subsequent dispute.

**§ 4.4.5**  Any Subcontract Agreements providing for TCO Liquidated Damages at a per diem amount lower than the per diem amount set forth in this Agreement is subject to Owner's prior written approval.

**§ 4.4.6**  The aforesaid provisions shall not affect the Owner's right to terminate this Agreement as provided in the Contract Documents nor limit any of the other remedies available to the Owner as hereinabove provided, and as provided in the Contract Documents.  The Owner's exercise of its right to terminate this Agreement for cause and not convenience shall not release the Contractor from its obligation to pay TCO Liquidated Damages in the amount set forth herein nor shall it release Contractor of its obligations to diligently pursue, at Contractor's sole cost and expense, the appropriate claim against its culpable Subcontractors, suppliers, manufacturers or Subcontractor Default Insurance, for the benefit of Owner.

Owner _____          Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 4.4.7**   Assessment of Liquidated Damages shall be immediately due and payable to the Owner or, at the Owner's option, may be deducted from payments then due, or future payments that may thereafter become due and owing to Contractor provided, however, that Owner may not make such deductions until the Contract Time has expired.

**§ 4.5    LIQUIDATED COMPENSATION TO CONTRACTOR FOR EXTENSIONS OF CONTRACT TIME**
Following timely and proper Notice and submission of a Claim resulting in Contractor's Excusable Delay as provided in the Contract Documents, Contractor shall be entitled to the lesser of either 1) Contractor's actual business day per diem expenses (supported by back up documents excluding those based on stipulated rates which are not subject to audit as to rates, but are subject to audit for the hours) or 2) a business day per diem amount of Forty-Two Thousand, Eight Hundred Dollars per business day ($42,800.00), as full and final payment for Contractor's daily General Conditions and General Requirements ("Excusable Delay Cost"). Saturdays are not considered a business day. The above notwithstanding, Contractor herein provides Owner with an aggregate five (5) business day grace period pertaining to Contractor's Excusable Delay during the construction of the Project. In other words, Contractor's daily General Conditions and General Requirements shall not be chargeable against Owner for the first five (5) business days of time. Thereafter, Contractor shall be entitled to said sum per business day, for each business day of time awarded to Contractor as an adjustment to the Contract Time, to cover Contractor's business day daily General Conditions and General Requirements.

**§ 4.5.1**   It is hereby agreed that the above amount for Contractor's Excusable Delay Cost is reasonable, is not a penalty and is not excessive in light of the circumstances known to the parties at the time this Agreement is executed and the difficulty in ascertaining future actual damages at the time this Agreement is executed. Owner herein covenants not to challenge the per diem amount of Contractor's Excusable Delay Cost in any subsequent dispute.

**§ 4.6**   Saturdays are not considered a business or work day and shall be used by Contractor to make up for lost time.

**ARTICLE 5   CONTRACT SUM**

**§ 5.1**   The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Work under this Agreement. The Contract Sum is the Cost of the Work as defined in **Article 7** plus the Contractor's Fee as set forth below, and subject to the Final Guaranteed Maximum Price ("Final GMP") as provided in **§ 5.2.1** below.

**§ 5.1.1   THE CONTRACTOR'S FEE**

The Contractor's total lump sum fee for its overhead and profit for the proper performance of the Work shall be Four Million, One Hundred Eighty-Three Thousand, Three Hundred Eight Dollars ($4,183,308.00) (hereinafter "Contractor's Fee"). Contractor's Fee shall be calculated on the Cost of the Work (excluding Prior Work), General Conditions, General Requirements, and SDI, but Contractor shall not be entitled to Fee on Payment and Performance Bond Premiums, Contingency (unless correcting Prior Work and Prior Buy-Out), Insurance Premiums (other than SDI Premiums), and the Florida Statute 558 Warranty Fee. The Contractor's Fee shall be the Contractor's sole compensation for its own profit and for all other costs incurred in connection with the performance of the Work.

The Contractor's Fee is subject to a five percent (5%) retainage withholding as set forth in the Contract Documents.

**§ 5.1.2   GENERAL REQUIREMENTS AND GENERAL CONDITIONS**

**§ 5.1.2.1** The Contractor's total lump sum for General Requirements and General Conditions (collectively referred to as "General Conditions") for the Work shall be Fourteen Million, Eight Hundred Forty-One Thousand, Eight Hundred Twenty-Five Dollars and no/100 ($14,841,825.00) for Phase I. A detailed breakdown identifying all items that make up Contractor's General Conditions is attached hereto as **Exhibit "D"** and is incorporated herein. The General Conditions amount for Phase II assumes shared cost with Phase II.

**§ 5.1.2.2** The above General Conditions shall be the Contractor's sole compensation for its own General Conditions for all costs incurred in connection with the performance of the Work that do not constitute Costs of the Work or

Owner _____   Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1931, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:13 ET on 06/23/2020 under Order No 7813334410 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Contractor's Fee. Contractor's Fee and General Conditions excludes Payment and Performance Bond Premiums, Contingency, Insurance Premiums, SDI Premiums, and the Florida Statute 558 Warranty Fee (0.25%) shall be applied to all Work, inclusive of all Prior Work and Contractor's subsequent Work (See Exhibit D), Contractor's Fee and General Conditions includes Pre-Construction Services, Quality Assurance, Unit Finish Coordinator, BIM Modeling and Scheduler and any other items not expressly listed herein.

The Contractor's General Conditions, Contractor's insurance and Contractor's bonds are not subject to retainage withholding.

**§ 5.1.2.3** The General Conditions shall be billed as per **Exhibit "K,"** subject to adjustment as provided herein.

**§ 5.1.2.4** Contractor shall provide the following staffing for the Work as part of Contractor's General Conditions:

| | | |
|---|---|---|
| Edward Janus | 100% | From the date hereof until Final Completion for the South Tower Units, South Tower In-Ground Pool with Related Amenity Deck, the Villa, Beach Side Amenities, Guest Suites and Cabanas. |
| Andrew Frank | 100% | From the date hereof until Final Completion of the South Tower Units, South Tower In-Ground Pool with Related Amenity Deck, the Villa, Beach Side Amenities, Guest Suites and Cabanas. |
| Iyad Masri | 100% | From the date hereof until TCO for the South Tower Units, South Tower In-Ground Pool with Related Amenity Deck, the Villa, Beach Side Amenities, Guest Suites and Cabanas. |
| Jennifer Taka | 100% | From the date hereof until Final Completion of the South Tower Units, South Tower In-Ground Pool with Related Amenity Deck, the Villa, Beach Side Amenities, Guest Suites and Cabanas. [Jennifer Taka or other to be approved by Owner] |
| Jeffrey Keller | 100% | From the date hereof until TCO for the South Tower Units, South Tower In-Ground Pool with Related Amenity Deck, the Villa, Beach Side Amenities, Guest Suites and Cabanas. |

**§ 5.1.2.5** In the event any of the above identified individuals leave the Project or their time on the Project is less than agreed, Contractor shall pay to Owner a sum equal to 3.0 times 1 year of base salary plus the stipulated burden for each such individual who leaves or whose time is reduced. (hereinafter the "Bounty") unless he or she is discharged by Contractor, or leaves the employ of Contractor (including all affiliates) or is placed on leave of absence or becomes Disabled (as defined herein). The term "Disabled" means when one or more of the identified individuals suffers from a physical or mental ailment or condition that causes that individual to be incapable of making decisions for Contractor and otherwise unable to perform the construction services, responsibilities and obligations of Contractor set forth herein. This Bounty shall remain in effect through the receipt of South Tower TCO for typical units and the Villa and Beachside Amenities.

Replacements for any of the above listed individuals must have Owner's prior written approval and once approved, the replacements shall be subject to the same Bounty set forth above. Further, Owner may request changes of personnel based on performance, in which case Contractor shall, within Seven (7) calendar days, replace the individual with adequate personnel subject to Owners written approval, which approval shall not be unreasonable withheld, with same Bounty for the replaced individual(s).

Contractor agrees to maintain a competent, full-time staff dedicated to the Project, including a qualified project manager, project superintendent and necessary assistants, to coordinate and provide general direction of the Work and to monitor and coordinate progress of the Subcontractors' work on the Project.  Contractor represents to Owner that

Owner _____        Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951 1958, 1961 1963, 1967 1974 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects" "AIA, the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43 15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents" Terms of Service. To report copyright violations e-mail copyright@aia.org.

the supervisory and managerial personnel identified above will be assigned to this Project, and such persons are identified in Exhibit "D."

Contractor's supervisory and managerial personnel identified on Exhibit "D" shall be present as set forth in Exhibit "D," and in that portion of the building under construction (as opposed to in the office) ninety percent (90%) of their time, inspecting, managing and supervising the Work to ensure compliance with Contractor's Quality Assurance / Quality Control Program identified in Exhibit "W," and Contractor's Construction Schedule (Exhibit "F").

Exhibit "D" shall show the stipulated rates, planned timing and durations of all General Conditions and General Requirements of key personnel that will be assigned to the Project by the Contractor. Subject to the exception set forth herein, Contractor may not change or decrease any such personnel listed on the attached Exhibit "D" without the prior written consent of the Owner, whose consent to an equally qualified replacement shall not be unreasonably withheld. No less than Seven (7) calendar days prior to making any changes to the planned personnel that will be assigned to the Project by the Contractor, Contractor must notify Jules Trump in writing and via email of any changes to the timing or duration of key personnel listed in Exhibit "D". If requested by the Owner in writing and for reasonable cause, the Contractor shall, within Seven (7) calendar days of receipt of the written request, change any staff associated with the Project to another individual reasonably acceptable to Owner. Contractor agrees and represents that the level of staffing, administrative resources and other conditions of General Conditions shall be sufficient to the Project and shall be maintained as provided therein throughout completion of the Work.

Exhibit "I" shall show Contractor's stipulated rates. Exhibit "I1" shall show Liberty's stipulated rates.

### § 5.1.3   CONTRACTOR'S FEE AND CONTRACTOR'S GENERAL CONDITIONS FOR CHANGES IN THE WORK:
Contractor shall be entitled to a markup of two point seven five percent (2.75%) of the actual costs of the extra Work (subject to back up supporting documents) which markup shall constitute payment in full for Contractor's Fee and Contractor's General Conditions for the extra Work and the markups for SDI, Contractor's Payment and Performance Bond, the 558 Warranty Fee, and other insurance as set forth in § 7.6.1 and Section § 7.6.1.2.

If additional personnel are required to implement significant Changes in the Work or Tier/Level 4 or Tier/Level 5 unit customizations (as defined in § 1.1 of the AIA Document A201™ 2017, Modified General Conditions), Contractor shall be entitled to an increase in its General Conditions for the additional personal for the period to implement the Change, subject to Owner's written approval.

Contractor and Owner acknowledge and understand that there will be Unit Customizations required by the individual unit buyers. With regard to Tier/Level 4 and Tier/Level 5 Unit Customizations, within five (5) calendar days of receipt, Contractor will thoroughly review and respond to Owner in writing, as to the individual requests and create schedule mitigation plans for any requests that may impact the Critical Path, including but not limited to: procure the work with extended hours/acceleration, modify staging and logistics plans to increase production, utilize additional subcontractors to increase manpower, include temporary Life Safety measures to eliminate impact to critical inspections and work with the Owner and design team to make design suggestions to minimize schedule and cost impacts. In the event that a Unit Customization request is either so extensive or received late in the process that it will undoubtedly impact the Critical Path, Contractor will shall, within five (5) calendar days of receipt, provide Owner a written narrative of the potential impact so the Owner may decide if the request should be completed after TCO.

### § 5.1.4   PROJECT CONTINGENCY ("CONTINGENCY")
The Guaranteed Maximum Price for Phase I includes a Contingency of Two Percent (2%) of the Guaranteed Maximum Price, which is a one-time item and shall not be increased for Change Orders that subsequently increase the Guaranteed Maximum Price and it shall not be replenished as expended or once fully expended. The Contingency shall be available to the Contractor for the performance of the Work. The Contractor may not access or utilize any of the Contingency without the prior written approval of Owner, which approval shall not be unreasonably withheld or delayed, in the form of a Change Order. Contractor shall reflect the Contingency amount and transfers thereto through the monthly requisition process. Transfers shall reflect a zero-sum adjustment to the GMP (subject to § 5.1.4.1.15), by subtraction from the Contingency for every addition to line items being increased or creation of new line items. Nothing provided herein shall cause the GMP to be construed as a "line item GMP." Contractor shall not be

Owner _____                              Contractor _____

Modified AIA Document A101™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

entitled to any additional Fee on the Project Contingency unless such Contingency use is associated with Prior Work. If Contingency is fully expended, any provisions in the Contract Documents allowing or requiring payment from Contingency shall then require payment from Contractor.

## § 5.1.4.1 PERMITTED USES OF CONTINGENCY

1.  Actual Subcontract costs that exceed the anticipated Subcontract costs set forth in the Schedule of Values.

2.  Overtime payable to Subcontractors (with respect to Subcontract costs) or to Contractor; provided that any overtime costs in excess of Ten Thousand Dollars ($10,000.00) in the aggregate for each Subcontractor shall be subject to prior written approval of the Owner, which approval shall not be unreasonably withheld, conditioned or delayed.

3.  Repairing and/or replacing any portion of the Work which is damaged or stolen, to the extent that such costs (1) are not covered and reimbursed by the insurance to be maintained by the Owner, Contractor, or a Subcontractor pursuant to the terms of this agreement or the applicable Subcontract, and (2) are not recoverable from the Subcontractor.

4.  Purchasing any materials or equipment, or performing any portion of the Work, which is (1) to be performed by a Subcontractor, (2) has not been included within the scope of the Work to be performed under a subcontract awarded pursuant to hereto and (3) is included as part of the Subcontract Costs in the Schedule of Values approved by the Owner.

5.  Unforeseen field conditions at the Project Site, provided that such unforeseen field conditions are not the responsibility of a Subcontractor under the terms of its Subcontract or allowable as an Owner Change Order under the terms of the Contract.

6.  Work necessary to correct field errors, provided that such field errors are not caused by and recoverable from one or more Subcontractors.

7.  Work necessary to correct minor damage (i.e. damage where the costs of restoration and repair is less than Ten Thousand Dollars ($10,000.00) and is within the deductible amount under the builder's risk insurance and not caused by the Contractor's or a Subcontractor's intentional misconduct) due to extraordinary weather conditions not reasonably anticipated, provided (and to the extent) that such damage was not due to the gross negligence of Contactors or applicable Subcontractor to take adequate preventative weather protection measures as required by this Agreement, the applicable Subcontract or the Contract Documents.

8.  Any other matters with respect to which the costs thereof may, pursuant to the express provisions of this Agreement.

9.  Costs incurred in connection with any Force Majeure event (it being agreed that Contractor's rights following Force Majeure events are those set forth in the Contract).

10. Not Used.

11. OCIP and Builder's Risk Insurance Deductibles (excluding named storm deductibles and deductibles required to be paid by Contractor under the Contract Documents): the first Five Hundred Thousand Dollars ($500,000.00) for the OCIP and Builder's Risk Insurance Deductibles (excluding named storm deductibles and deductibles required to be paid by Contractor under the Contract Documents) shall be funded from Contingency. Owner and Contractor shall aggressively pursue the culpable parties to reimburse Contingency for any deductible paid from Contingency.  Remainder of OCIP deductible and named storm deductibles to be paid by Owner.

12. Acceleration Costs for Named Storms: In the event of a named storm impacts the critical path of the Project Schedule, Contractor shall accelerate the Schedule to make up for the associated lost time.  Contractor shall submit the acceleration costs to the Builder's Risk carrier to pay for the acceleration costs, and if not paid by Builder's Risk, acceleration costs shall be funded from Contingency.  If contingency is exhausted, Owner shall issue Contractor a change order if it seeks acceleration

13. Claims related to Prior Work by and between Coastal and Subcontractors that do not constitute a pass through claim to the Owner under the terms of the Contract Documents,

Owners                                                      Contractor

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

shall be funded from Contingency, if Contractor is unable to recover the sum from the culpable party or available insurance, to the extent applicable.

14.    SDI – Contractor has included Two Million, Six Hundred Fifty Thousand Dollars ($2,650,000.00) (consisting of One Million, Eight Hundred Ninety Thousand Dollars ($1,890,000.00) for the South Tower / Villa and Seven Hundred Sixty Thousand Dollars ($760,000.00) for the North Tower) for SDI for Entire Project (including Prior Work) within the GMP. Four Hundred Sixty Thousand Dollars ($460,000.00) may be used from Contingency on Contractor's first draw to cover the shortage for payment of the SDI related to the South Tower / Villa. Owner shall negotiate with Coastal for a credit refund on the SDI policy. To the extent Owner is successful in recovering the sums from Coastal, the first Four Hundred Sixty Thousand Dollars ($460,000.00) recovered from Coastal attributable to the SDI refund shall be used to replenish the Contingency for the South Tower / Villa.

15.    Where the Contractor Documents permit Fee markup, Contractor is entitled to Fee markup in connection with the use of Contingency, which Fee shall be paid out of Contingency.

### § 5.1.4.2 PROHIBITED USES OF CONTRACTOR'S CONTINGENCY

1.    Design errors or omissions of the Architect and/or Owner Engineers with respect to the plans and specifications (it being agreed that such costs will be included with any approved change order).

2.    Change Orders approved by Owner (including, without limitation, Change Orders in connection with design changes and upgrades requested by the Owner).

3.    Increases to the cost of Work due to acts or omissions of Owner in breach of this Agreement (it being agreed that such increased costs would be at the Owner's cost).

4.    "Attic Stock" materials, which to the extent required by the Contract Documents shall be included in the GMP.

5.    Overtime costs directed by Owner, and which is not otherwise necessary to cause the Work to be completed according to the Progress Schedule and this Agreement. (It being agreed such costs would be at the Owner's cost).

6.    Ceremony expense (it being agreed that such ceremony expenses, if any, will be at the Owner's cost).

7.    Any gross negligence or willful misconduct of, or breach of the Contract Documents by, Contractor or any Subcontractor or employee, agent, officer, director or partner of Contractor or any Subcontractor (it being agreed that any increase in the Cost of the Work arising out of the foregoing shall be at the Contractor's Cost).

8.    Costs (in excess of applicable permitted deductibles) incurred in connection with any matter, which is covered by or is required to be covered by insurance to be maintained by the Contractor or any of the Subcontractors.

9.    Requirements mandated by authorities having jurisdiction, which are outside of the requirements of the Contract Documents (it being agreed that such costs will be included within an approved change order).

10.    Costs for any claims against the Builder's Risk Policy, which are within the deductible amount (it being agreed that such costs will be included within an approved change order).

11.    Additional Contractor personnel or General Conditions required by additional Work and unit customization (it being agreed that such costs will be included within an approved Change Order).

12.    SDI and Contractor's GL deductibles shall not be paid from Contingency and shall be paid by Contractor and shall not constitute a Cost of the Work.

To the extent that any portion of the Contingency remains unallocated on the date of Final Completion of the Work and after the issuance of Final Payment, the remaining, unused portion of the Contingency shall be rolled over to the North Tower Project Contingency.

Owner                                         Contractor

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 5.1.4.3** Contractor's General Conditions, Fee and Project Contingency are all cumulative of one another and all of which are shall be included in and subject to the Project's Guaranteed Maximum Price (including both Phases) as provided in § 5.2.1, below.

**§ 5.1.5.**  It is the intent and understanding of Contractor in providing a GMP for this Work, that the Contract Documents provide for the construction of the Work by the Contractor, including all devices, fasteners, materials or other work not shown in the Drawings but which are reasonably inferable therefrom and any and all incidental accessories necessary to complete the Work (even if not specified in the description of the Work, but necessary for proper installation and operation (not arising from a design deficiency in the design criteria of the equipment) of the Work as required by the Contract Documents), all of which shall be included as part of the Cost of the Work.  The expression "reasonably inferable" and similar terms in the Contract Documents shall be interpreted to mean reasonably inferable by a contractor familiar with the Work and exercising the care, skill and diligence of the Contractor by the Contract Documents. Notwithstanding, the foregoing shall not be construed to impose any design responsibility on Contractor except where such design responsibility is contractually required or an existing requirement of Florida law in the performance of the Work or the Contract Documents.

**§ 5.1.6**    To the extent that the Drawings and Specifications are anticipated to require further development by the Architect, Contractor shall include in the Guaranteed Maximum Price for such further development consistent with the Contract Documents and reasonably inferable therefrom as necessary to produce the indicated results (not arising from a design deficiency in the design criteria).  Such further development does not include changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order. Contractor will construct the Project in strict accordance with the Contract Documents.

**§ 5.1.7**    Limitations on a Subcontractor's overhead and profit for increases in the cost of its portion of the Work:

Subcontractor's overhead and profit is limited to a combined total of ten percent (10%) per § 7.2.4 of the AIA Document A201™ 2017, Modified General Conditions, unless the subcontract agreements from Coastal accepted by Contractor and Owner provide otherwise.

**§ 5.1.8**  Rental rates for Contractor-owned equipment shall not exceed the standard rental rate paid at the place of the Project and shall not include a mark-up for the Contractor's Fee or Contractor's General Conditions.  Rental rates shall be submitted in writing by Contractor to Owner for prior approval.

**§ 5.1.9**  Unit prices, if any: See **Exhibit "M"** attached hereto and incorporated herein.

**§ 5.2    GUARANTEED MAXIMUM PRICE ("GMP")**

**§ 5.2.1**  The Contractor guarantees that the Contract Sum (including Contractor's Fee, Contractor's General Conditions and the Contingency) for the Work shall not exceed the Guaranteed Maximum Price ("GMP").  There shall be a GMP for each Phase.  The GMP may be amended from time to time by additions and deductions by Change Order as provided in the Contract Documents.  Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Contractor without reimbursement by the Owner.

**§ 5.2.2**  Allowances, if any, which are included in the Guaranteed Maximum Price are identified on **Exhibit "G"** attached hereto.  Once an allowance item is fully purchased by Contractor, including all associated Subcontractor Work, and approved by Owner as set forth in the Contract Documents, the price will be included within the GMP and the former allowance Work will then be removed from the Allowance list.  Change Orders concluding the full Allowance scope in this Agreement shall recite that the affected Allowance is closed as an Allowance and included in the GMP.

**§ 5.2.3**  Contractor's Qualifications & Assumptions on which the GMP is based are reflected in and attached hereto as **Exhibit "H"**.

Owner _____                    Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43.15 ET on 06/23/2020 under Order No. 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violat ons, e-mail copyright@aia.org.

**§ 5.2.4** The Owner shall cause the preparation of revisions to the Contract Documents that incorporate the agreed-upon assumptions contained in § 5.2.3. The Owner shall promptly furnish such revised Contract Documents to the Contractor. The Contractor shall notify the Owner and Architect of any inconsistencies between the agreed-upon assumptions contained in § 5.2.3 and the revised Contract Documents.

**§ 5.2.5** The Contract Documents shall not be interpreted to require the Owner to pay the Contractor any more than the Cost of the Work plus the Contractor's Fee, the Contractor's General Conditions and the Contingency (as appropriated per the Contract Documents), not to exceed the GMP, as may be modified in accordance with the Contract Documents.

## § 5.3   SUBCONTRACTOR BUYOUT / VALUE ENGINEERING

**§ 5.3.1** Contractor shall work with the Owner to negotiate the most complete and economical deals with the Subcontractors that have not been "bought out" as of the date of this Agreement in order to establish and or achieve the GMP.

**§ 5.3.2** In addition, in order to control costs, the Contractor shall submit to the Owner, for the Owner's review for any unbought scope of Work , (i) a bid analysis and list of proposed Subcontractors for the performance of the several portions of the Work, (ii) the scope of Work to be performed under each respective subcontract, (iii) a detailed estimate of the Cost of the Work based on such bids, (iv) a list of alternate selections of persons or entities for each proposed Subcontractor and their respective bids, along with a list of the differences between the alternate bids and those set forth in the bid analysis, and (v) the instructions, clarifications, written responses, and other information given to or submitted by the bidders. The Contractor shall consult with the Owner before awarding the subcontract and shall provide the Owner with a copy of each proposed subcontract for the Owner's review. The Contractor shall provide the Owner with a complete copy of each executed subcontract.

**§ 5.3.3** Until the Subcontractor Buyout is complete, Contractor shall provide Owner with written ongoing budget updates on a weekly basis or as requested by Owner.

**§ 5.3.4** Value Engineering. Contractor shall participate in Value Engineering the Contract Documents with the Owner and the Architect with the goal of finding acceptable means for reducing the Cost of the Work.  Upon acceptance by Owner of recommendation for Value Engineering, the Contract Documents shall be modified to reflect such changes. All savings in connection with Value Engineering of the Work shall revert to Owner.

## § 5.4   THE GUARANTEED MAXIMUM PRICE ("GMP")

**§ 5.4.1** Contractor agrees to perform the Work in accordance with the Contract Documents for The Guaranteed Maximum Price of One Hundred Sixty-One Million, Nine Hundred Ninety-Eight Thousand, Three Hundred Thirty-Six Dollars (161,998,336.00).  This Guaranteed Maximum Price ("GMP") is made up of the following:

- The Sum of the previously submitted Coastal Requests to Award ("RTA") and Coastal Subcontractor agreements, executed subcontractor change orders and agreed upon allowances for items not yet purchased, all as delineated in **Exhibit "U,"** excluding General Conditions, more specifically identified on **Exhibit "T."**

- Less the value of all Work performed by the subcontractors under Coastal for Work performed through Tuesday, June 30, 2020, based upon Owner approved payment application through that date;

- Plus Contractor's Fee, General Conditions, General Requirements, SDI, Payment and Performance Bond Premiums, Contingency, Insurance Premiums and the Florida Statute 558 Warranty Fee.

Owners _____    Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

The following items are not included in the Guaranteed Maximum Price but will be addressed as a Change Order, which will be provided by Contractor to Owner for Owner's review and written acceptance within sixty (60) calendar days of execution of this Agreement:

- Scope adjustments for missing scope in the previously submitted Coastal RTA's and Coastal Subcontractor agreements for line items 2 through 16 (excluding General Conditions). Said adjustments must be established with documents from Contractor with Owner's right to dispute same; and

- Open Potential Change Orders and Change Events identified on **Exhibit "X."**

- Cost of Work, Contractor's Fee (**§ 5.1.1**), Contractor's Other Liability Insurance, Payment and Performance Bonds, and Project Contingency (**§ 5.1.4**) are based upon Prior Work through Tuesday June 30, 2020 and will be adjusted via a deductive Change Order to reflect additional Work in place by Coastal through date of Coastal termination.

Differences in means and methods from Coastal's means and methods to Contractor's means and methods shall not constitute a scope adjustment and shall not be basis for an increase Change Order.

Owner and Contractor agree that within sixty (60) calendar days from the execution of this Agreement, the Contractor shall identify all open Prior Work Subcontractor Claims, notify the Owner of said Claims and Owner and Contractor shall endeavor to close out such Prior Work Subcontractor Claims to the extent possible.

**§ 5.4.2**   Contractor represents to Owner that Contractor has compared and reviewed all general and specific details on the Drawings and that all conflicts, discrepancies, errors and omissions, which are within the commonly accepted knowledge base of a licensed general contractor, subcontractors, but not as a design professional to carry out the Work have been disclosed to the Owner to the extent the Contractor has become aware of the same during its review of the Drawings or Contract Documents prior to execution of this Agreement, and therefore Contractor warrants that 1) the GMP includes, without limitation, the cost of correcting all conflicts, discrepancies, errors, or omissions which Contractor identified; 2) that Contractor's review and comparison of all drawings has been taken into consideration the Project can be constructed in accordance with the Contract Documents and therefore the Contractor represents that the GMP represents the total cost of the Work; 3) that Contractor can complete the Project in the time set forth in the Agreement and the approved Project Schedule; and 4) that Contractor has considered all customary issues that could impact price and time, including the inefficiencies (but not a Work stoppage) pertaining to the COVID-19 pandemic.

**§ 5.4.3   Schedule of Values:** The Contractor shall provide to Owner, for Owner's written approval, a written Schedule of Values with supporting Subcontractor bids and scope of work used to establish each line item in the GMP, which Schedule of Values shall be used for all payment applications going forward and also shall form the basis of the subsequent Buy-Out Savings discussed in **§ 5.5.1** below.

## ARTICLE 6   CHANGES IN THE WORK

**§ 6.1**    Adjustments to the GMP on account of changes in the Work may be determined by any of the methods listed in **Article 7** of AIA Document A201™–2017, Modified General Conditions of the Contract for Construction.

**§ 6.2**    Adjustments to subcontracts shall either be fixed price, unit price or T&M, as agreed to by Owner and Contractor.

**§ 6.3**    In calculating adjustments to the GMP, the terms "cost" and "costs" as used in **Article 7** of AIA Document A201™–2017, Modified General Conditions of the Contract shall mean the Cost of the Work as defined in **Article 7** of this Agreement.

**§ 6.4**    As of the date of execution of this Agreement, to the best of Owner's knowledge, all pending or open Change Events and Change Order Requests are listed on **Exhibit "X."** Contractor is not responsible for pending or open Change Events and Change Order Requests not listed in **Exhibit "X".**

Owners _____                    Contractor _____

Modified AIA Document A102™– 2017. Copyright © 1920, 1925, 1951, 1958 1961 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and  AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 43 15 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents" Terms of Service. To report copyright violations, e-mail copyright@aia.org

**§ 6.4.1**   As applicable to Contractor, with regard to the items identified in **Exhibit X** for all Work other than Special Units: Contractor waives all Contractor claims, including but not limited to General Conditions on the items identified in **Exhibit X** for all Work other than Special Units.  Contractor is entitled to mark-ups for SDI or Subcontractor bonds premiums (as applicable), Contractor's bond premiums, 558 warranty fee premium and insurance premiums, Subcontractor costs, Contractor's General Requirements and Fee for the items identified in **Exhibit X**, in accordance with the Contract Documents.

**§ 6.4.2**   As applicable to Contractor, with regard to the items identified in **Exhibit X** for Special Units: Contractor is only entitled to mark-ups for SDI or Subcontractor bonds premiums (as applicable), Contractor's bond premiums, 558 warranty fee premium and insurance premiums, (all as set forth in the Contract Documents) and General Conditions as expressly approved by Owner in writing.  Contractor is entitled to mark-ups, Subcontractor costs, Contractor's General Requirements and Fee for the Special Units identified in **Exhibit X**, in accordance with the Contract Documents.

**§ 6.5**   With regard to the pending written change order requests, Contractor represents that Contractor has no claims as to any time impacts regarding pending change orders listed on **Exhibit "X."** The only items pending with regard to the pending written change order requests are in accordance with **§ 6.4**.  Specifically, with regard to **Exhibit "X,"** Contractor shall within fifteen (15) days from execution of this Agreement, notify Owner in writing if any documents or information is needed from Owner.  If any information or documents are subsequently required, Owner and Contractor shall timely comply with their respective obligations in accordance with the Contract Documents.

## ARTICLE 7   COSTS TO BE REIMBURSED
The Cost of the Work shall include the items listed below, unless specifically stated to be excluded.

### § 7.1   COST OF THE WORK

**§ 7.1.1**   The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work but excludes all Prior Work.  The Cost of the Work shall include only the items set forth in this **Article 7**.  However, to the extent any of the below items are included in categories of costs in Contractor's General Conditions as defined in **§ 5.1.2** above (**Exhibit "D"**), which is a fixed price item separate from the Cost of the Work, then the categories of costs included in Contractor's General Conditions (**Exhibit "D"**) are not recoverable as a separate Cost of the Work and are only recoverable under the lump sum General Conditions.  The Cost of the Work shall not impact Contractor's Fee, which Fee is a fixed price item separate from the Cost of the Work.

**§ 7.1.2**   Where, pursuant to the Contract Documents, any cost is subject to the Owner's prior approval, the Contractor shall obtain such approval in writing, prior to incurring the cost.

**§ 7.1.3**   Costs shall be at rates not higher than the standard paid at the place of the Project, except with prior written approval of the Owner.

**§ 7.1.4**   The Contractor shall use reasonable efforts to provide a minimum of three (3) bids/proposals for all Work (excluding Coastal Subcontractors accepted by Contractor and Owner) included in Cost of the Work for the Owner's review and consideration, prior to the Contractor procuring the Work for same.  The Contractor shall consult with the Owner before awarding the subcontract and shall provide the Owner with a copy of each Subcontractor bid and proposed subcontract for the Owner's review.  The recommendation of the bids, proposals, and Subcontractors for the Work included in the Cost of the Work shall be made solely by the Contractor, with the Owner promptly and timely providing final approval of the Contractor's recommendations in accordance with **§ 10.2** of this Agreement.  The Contractor shall provide the Owner with a complete copy of each executed subcontract agreement.

**§ 7.1.5**   Except as set forth in **§ 5.1.3 and § 5.1.7** above, there shall be zero ($0.00) mark-up on any reimbursable expenses or Cost of the Work as all mark-up is captured in either Contractor's Fee or Contractor's General Conditions, both of which are agreed upon fixed sums for this Agreement.

Owner _____          Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

## § 7.2    LABOR COSTS

### § 7.2.1    NOT USED

§ 7.2.2    Wages or salaries of the Contractor's management, professional, supervisory and administrative personnel, when stationed at the site and performing Work at the site. All on-site and off-site supervision and administration shall be a Cost of the Work and are included as part of Contractor's General Conditions.  For purposes of Change Orders or CCDs, Contractor's wages or salaries cost shall be billed at the stipulated rates set forth in **Exhibit "I"** (W-2 wages times 1.437).  The rates agreed to by Owner and Contractor shall include all fringes and other costs allowed under this Agreement. Owner shall have the exclusive right, within its sole discretion, to audit the hours but not the stipulated rate prior to Final Payment becoming due and Owner shall be entitled to a credit if the audit reflects actual hours lower than the hours billed.

§ 7.2.3    Wages and salaries of the Contractor's supervisory or administrative personnel engaged at factories, workshops or while traveling, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work, are included within General Conditions, except for Change Orders and Construction Change Directives. For purposes of Changes, wages or salaries cost shall be billed and paid at the stipulated rates set forth in **Exhibit "I"** (W-2 wages times 1.437).  The rates agreed to by Owner and Contractor shall include all fringes  and other costs allowed under this Agreement. Owner shall have the exclusive right, within its sole discretion, to audit the hours but not the stipulated rate prior to Final Payment becoming due and Owner shall be entitled to a credit if the audit reflects actual hours lower than the hours billed or labor burden higher than the agreed upon labor burden rate set forth above.

§ 7.2.4    Costs paid or incurred by the Contractor, as required by Law or collective bargaining agreements, for taxes, insurance, contributions, assessments, and benefits and, for personnel not covered by such collective bargaining agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries are included in the Cost of Work under § 7.2.1 through § 7.2.3 above. Owner and Contractor agree that the burden rate for these items shall be fixed for salaried employees and for hourly employees. A more specific breakdown of what constitutes these burden rates is attached hereto as **Exhibit "I"** and **"II"**.  The attached list may not be all inclusive.  Items omitted from the list are still included and part of Contractor's burden rate.  Owner shall have the exclusive right, within its sole discretion, to audit the hours but not the stipulated labor burden prior to Final Payment becoming due and Owner shall be entitled to a credit if the actual hours are lower than the hours billed or the stipulated rates higher than the agreed upon rate set forth above.

§ 7.2.5    The above agreed burden rates for labor costs, in lieu of actual costs, shall remain unchanged throughout the duration of this Agreement.  All Costs above in § 7.2.2 through § 7.2.5, are included in the lump sum General Conditions.

§ 7.2.6    Contractor's specific Manpower Staffing Plan showing all anticipated salaried and hourly staff positions as part of the Key Personnel is identified on Contractor's General Conditions Budget, attached hereto as **Exhibit "D"** and incorporated herein.

## § 7.3    SUBCONTRACT COSTS

§ 7.3.1    Payments made by the Contractor to Subcontractors in accordance with the requirements of the subcontracts. The subcontract agreements shall provide that Ten Percent (10%) as retainage shall be withheld for all payments due Subcontractors, unless the subcontract agreements from Coastal accepted by Contractor and Owner provide otherwise.

§ 7.3.2    Timely and valid claims made by Subcontractors to Contractor may only be considered legitimate Subcontractor costs under this Article 7 to the extent that the entitlement and quantum of each Subcontractor claim have been researched and validated as to amount and that the claim is consistent with this Agreement, the cost are reimbursable pursuant to the Agreement, and the Contractor concurs in writing with the Subcontractor's position based upon the Subcontractor's documented representations.

Owner

Contractor

Modified AIA Document A102™ – 2017, Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

## § 7.4    COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

**§ 7.4.1**   Costs, including transportation and storage at the site, of materials and equipment incorporated, or to be incorporated, in the completed construction. Owner must approve all advance payments for Subcontractors deposits and advances for Work deemed "long lead items," or "special order items" or other selected items pertaining to the Work.

**§ 7.4.2**   Costs of materials described in the preceding § 7.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

**§ 7.4.3**   Costs of replacement material but only where replacement material is necessitated by causes other than the negligence of Contractor or its Subcontractors or Suppliers.

## § 7.5    COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

**§ 7.5.1**   Costs of transportation, storage, installation, dismantling, maintenance, and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Contractor at the site and fully consumed in the performance of the Work. Costs of materials, supplies, temporary facilities, machinery, equipment, and tools, that are not fully consumed, shall be based on the cost or value of the item at the time it is first used on the Work site less the value of the item when it is no longer used at the Project site. Costs for items not fully consumed by the Contractor shall mean fair market value.

**§ 7.5.2**   Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by construction workers that are provided by the Contractor at the site, and the costs of transportation, installation, dismantling, minor repairs, and removal of such temporary facilities, machinery, equipment, and hand tools. Rates and quantities of equipment owned by the Contractor, or a related party as defined in § 7.8, shall be subject to the Owner's prior approval. The total rental cost of any Contractor-owned item may not exceed the purchase price of any comparable item.

**§ 7.5.3**   Costs of removal of debris from the site of the Work and its proper and legal disposal.

**§ 7.5.4**   Costs of the Contractor's site office, including general office equipment and supplies.

**§ 7.5.5**   Costs of materials and equipment suitably stored off the site at a mutually acceptable bonded location, subject to the Owner's and Lender's prior written approval.

**§ 7.5.6**   Rental and/or leasing of automobiles, including vehicle allowances provided by Contractor to those employees providing services in connection with the Work, but only with the Owner's prior written approval and as specifically identified within the Contractor's General Conditions Breakdown attached as **Exhibit "D"** and at the established rates identified within the Contractor's General Conditions Breakdown attached as **Exhibit "D."**

## § 7.6    MISCELLANEOUS COSTS

**§ 7.6.1**   SDI shall be billed and paid on the enrolled subcontractors and suppliers in SDI at an agreed upon stipulated rate one point three five percent (1.35%) of the enrolled Subcontractors and suppliers. The costs for the Payment and Performance Bond (if required by Owner) shall be paid for by the Owner as a Cost of the Work. There shall be no Contractor's Fee for the cost of Payment and Performance Bond, or insurance premiums (other than SDI).

**§ 7.6.1.1** The cost of all previous Subcontractor bonds are a Cost of the Work with the acknowledgement by the Owner that all previous subcontract bonds are acceptable to the Owner.  Subsequent Subcontractor bonds require Owner's prior written approval.

Owner _____     Contractor _____

Modified AIA Document A101™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission This draft was produced by AIA software at 09:43 15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021. is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations. e-mail copyright@aia.org.

**§ 7.6.1.2 Insurance.** Contractor-supplied insurance (other than Owner's OCIP which shall be fully paid by Owner ) shall be an agreed upon stipulated rate of point three five (.35%) of the Cost of the Work (including Contractor's Fee, Contractor's General Conditions, Cost of Contractor's Payment and Performance Bond, the 558 Warranty Fee, and the Contingency) for off-site and other insurance, and reimbursable as a Cost of the Work as set forth on the Contractor's Schedule of Values, to be paid as invoiced by Contractor pursuant to the terms of payment provisions set forth in the Contract Documents.  The insurance to be provided by Contractor is set forth in **Article 11** of the AIA Document A201™–2017, Modified General Conditions.

**§ 7.6.2**   Sales, use or similar taxes imposed by a governmental authority that are related to the Work and for which the Contractor is liable.

**§ 7.6.3**   Fees and assessments for the building permit and for other permits, licenses and inspections for which the Contractor is required by the Contract Documents to pay.

**§ 7.6.4**   Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by **§ 13.5.3** of the AIA Document A201™-2017, Modified General Conditions or by other provisions of the Contract Documents, and which do not fall within the scope of **§ 7.7.3**.

**§ 7.6.5**   Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents;

**§ 7.6.5.1** The cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent.  However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or subject to the GMP. If such royalties, fees and costs are excluded by the last sentence of **§ 3.17** of AIA Document A201™-2017, Modified General Conditions or other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

**§ 7.6.6**   Costs for electronic equipment and software, directly related to the Work and located at the site, with Owner's prior written approval.

**§ 7.6.7**   Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility in the Contract Documents.

**§ 7.6.8**   Legal and accounting support costs, including attorney's fees (as approved by Owner which will not be unreasonably withheld) with the exception of costs for disputes between the Owner and the Contractor, reasonably incurred by the Contractor in the performance of the Work with the Owner's prior written approval which will not be unreasonably withheld; provided, however, that such approved costs and fees shall not be deemed part of the Cost of the Work for purposes of the calculation of the Contractor's Fee.

**§ 7.6.9**   Subject to the Owner's prior approval, expenses incurred in accordance with the Contractor's standard written personnel policy for relocation and temporary living allowances of the Contractor's personnel required for the Work.

**§ 7.6.10**   That portion of the reasonable expenses of the Contractor's supervisory or administrative personnel incurred while traveling in discharge of duties connected with the Work including allocation of fuel cards for Contractor's personnel assigned to the Project.

## § 7.7    OTHER COSTS AND EMERGENCIES

**§ 7.7.1**   Other costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner.

Owner

Contractor

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 7.7.2**  Costs incurred in taking action to prevent threatened damage, injury, or loss, in case of an emergency affecting the safety of persons and property, as provided in Article 10 of AIA Document A201™–2017, Modified General Conditions. This provision (**§ 7.7.2**) is not applicable to expenses and costs related to Hurricane preparation, which costs and expenses are specifically addressed in **§ 15.13** below.

**§ 7.7.3**  Costs of repairing or correcting damaged or nonconforming Work executed by the Contractor, Subcontractors, or suppliers, provided that such damaged or nonconforming Work was not caused by the negligence of, or failure to fulfill an express responsibility of the Contractor, and only to the extent that the cost of repair or correction is not and cannot be recovered by the Contractor from insurance, sureties, Subcontractors, suppliers, or others. Unless otherwise provided herein, the foregoing, costs incurred by Contractor which are disallowable by this section shall be recovered by the use of Contingency, with Owner's prior written approval as provided in **§ 5.1.3**.

## § 7.8    RELATED PARTY TRANSACTIONS

**§ 7.8.1**  For purposes of **§ 7.8**, the term "related party" shall mean a parent, subsidiary, affiliate or other entity having common ownership or management with the Contractor; any entity in which any stockholder in, or management employee of, the Contractor owns any interest in excess of ten percent in the aggregate; or any person or entity which has the right to control the business or affairs of the Contractor. The term "related party" includes any member of the immediate family of any person identified above.

**§ 7.8.2**  If any of the costs to be reimbursed arise from a transaction between the Contractor and a related party, the Contractor shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred. If the Owner, after such notification, authorizes the proposed transaction in writing, then the cost incurred shall be included as a cost to be reimbursed, and the Contractor shall procure the Work, equipment, goods, or service, from the related party, as a Subcontractor, according to the terms of **Article 10** of this Agreement. If the Owner fails to authorize the transaction in writing, the Contractor shall procure the Work, equipment, goods, or service from some person or entity other than a related party according to the terms of **Article 10** of this Agreement. Notwithstanding the forgoing, Owner acknowledges that Liberty Equipment and Supply, LLC, ("LES"), Liberty Construction Services, LLC and Liberty-Conshor, LLC (collectively referred to as "**Liberty**") are Related Parties as defined under the Contract Documents. So long as Liberty's fees and rates are reasonable and consistent with fees and rates for similar work performed and or provided by similar subcontractors / vendors in the South Florida area, Owner and Contractor agree that Liberty may perform certain scopes of work for and rent certain equipment to the Contractor on the Project, subject to Owner's prior written approval. Owner and Contractor also agree Liberty Equipment and Supply is a Related Party which may rent certain equipment and/or provide equipment operators to Contractor and/or Subcontractors and that Liberty-Conshor is a concrete subcontractor which may perform cast-in-place concrete and related work. Work performed by Liberty as a subcontractor to Contractor shall be a Cost of the Work and shall be reimbursed in accordance with the schedule of labor, material, and equipment billing rates set forth in **Exhibit "11,"** so long as Liberty's fees and rates are reasonable and consistent with fees and rates for similar work performed and or provided by similar subcontractors / vendors in the South Florida area, and subject to Owner's prior written approval.

## ARTICLE 8   COSTS NOT TO BE REIMBURSED

**§ 8.1**    The Cost of the Work shall not include the items listed below:

    .1    Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the site office, except as may be specifically provided in **§ 7.2**, shall not be separately reimbursable;

    .2    Bonuses, profit sharing, incentive compensation, and any other discretionary payments, paid to anyone hired by the Contractor or paid to any Subcontractor or vendor, unless the Owner has provided prior written approval and not included in Contractor's General Conditions;

Owner

Contractor

Modified AIA Document A102™–2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09.43.15 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

.3    Expenses of the Contractor's principal office and offices other than the site office, except as specifically provided in § 7.5.4 and § 7.6.6 above, shall not be separately reimbursable;

.4    Overhead and general expenses, except as may be expressly included in **Article 7**;

.5    The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work;

.6    Costs of the Work due to the fault or negligence of the Contractor, its Subcontractors, or any other person or entity employed by the Contractor or Subcontractors, or under contract with them or performing work on the Project on behalf of them or under their supervision, or for whose acts the Contractor or its Subcontractors may be liable, including, but not limited to the costs of correcting damaged, defective or non-conforming work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and repairing damage to property not forming party of the Work. The Contractor specifically agrees that it shall receive no compensation, and the Cost of Work shall not include, any costs incurred by the Contractor in repairing or correcting, or supervising the correction or repair of, defective or non-conforming Work performed or supplied by any Subcontractor, material supplier, or any other person or entity employed by the Contractor, under contract with the Contractor, or performing Work on the Project on behalf of or under the supervision of the Contractor or Contractor's personnel and that the Contractor's sole remedy with respect to the recovery of such costs shall be whatever remedies are contained in the Contractor's subcontract agreements with its Subcontractors, suppliers and other persons or entities providing Work on the Project

.7    Costs for Subcontractor bonds; unless Subcontractor is previously agreed to in writing by the Owner as provided in § 7.6.1.2;

.8    Any cost not specifically and expressly described in **Article 7**, the General Conditions or General Requirements budget of the GMP; and

.9    Costs, other than costs included in Change Orders approved by the Owner or Construction Change Directives, that would cause the GMP to be exceeded.

## ARTICLE 9 DISCOUNTS, REBATES AND REFUNDS

§ 9.1    Contractor shall endeavor to obtain cash discounts for the benefit of the Owner. Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making the payment, the Contractor included them in an Application for Payment and received payment from the Owner, or (2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be obtained.

§ 9.2    Amounts that accrue to the Owner in accordance with the provisions of § 9.1 shall be credited to the Owner as a deduction from the Cost of the Work.

## ARTICLE 10 SUBCONTRACTS AND OTHER AGREEMENTS

§ 10.1    Those portions of the Work that the Contractor does not customarily perform with the Contractor's own personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner may designate specific persons from whom, or entities from which, the Contractor shall obtain bids. The Contractor shall obtain bids from Subcontractors, and from suppliers of materials or equipment fabricated especially for the Work, who are qualified to perform that portion of the Work in accordance with the requirements of the Contract Documents. The Contractor shall deliver such bids to the Architect and the Owner with an indication as to which bids the Contractor intends to accept. The Owner then has the right to review the Contractor's list of proposed Subcontractors and suppliers

Owner                Contractor

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

in consultation with the Architect and to object to any Subcontractor or supplier. Any advice of the Architect, or approval or objection by the Owner, shall not relieve the Contractor of its responsibility to perform the Work in accordance with the Contract Documents. The Contractor shall not be required to contract with anyone to whom the Contractor has reasonable objection.

§ 10.2    Unless otherwise stated in the Contract Documents: (a) the Owner's Representative shall attend and/or participate in all negotiations, including any final meeting, with those Subcontractors selected by the Contractor to bid on portions of the Work, unless otherwise agreed in writing by Owner's Representative on a case by case basis. Contractor shall keep the Owner's Representative advised of the date and time of all such meetings with Subcontractors to facilitate attendance by the Owner's Representative; and (b) the Contractor either prior to (if and to the extent reasonably possible) or as soon as practicable after award of this Agreement, shall furnish in writing to the Owner and the Owner's Representative: (i) the name, address and telephone numbers, trade, and subcontract amount for each recommended Subcontractor; (ii) the Scope of the Work to be performed by such Subcontractor; (iii) the names of all persons or entities proposed as manufacturers of the products identified in the Contract Documents (including those who are to furnish materials or equipment fabricated to a special design); (iv) where applicable, the name of the installing Subcontractor; and (v) the proposed subcontract agreement for each Subcontractor. The Owner may reply within seven (7) days to the Contractor in writing stating (1) whether the Owner or the Owner's Representative has reasonable objection to any such proposed person or entity and/or the Scope of the Work to be performed by such Subcontractor, or (2) that the Owner's Representative requires additional time for review. Failure of the Owner or Owner's Representative to reply in writing within the seven (7) day period shall constitute notice of no reasonable objection. If Owner has reasonable objection to a proposed Subcontractor and if Contractor adequately documents to Owner that another Subcontractor cannot be identified that meets or exceeds Contractor's financial requirements, to which the Owner does not object, without increasing the Cost of the Work, an appropriate Change Order will be issued to Contractor for any increase in the Cost of the Work resulting from Owner's reasonable objection of Contractor's recommended Subcontractor.

§ 10.3    Contractor hereby agrees that each subcontract agreement shall be in substantially the form attached hereto as **Exhibit "J."**

§ 10.4    The Contractor hereby assigns to the Owner and Owner's Lender, an option which Owner, at any time, may elect to accept after termination of the Contractor, those subcontract agreements and/or contracts for the supply of materials and/or equipment selected by Owner or its Lender, by notifying the Subcontractor and Contractor in writing, of all of Contractor's contract rights with respect to each such subcontract and each such contract for the supply of material and equipment pursuant to which each such Subcontractor or supplier provided Work, materials and equipment in connection with the Work in accordance with the Contract Documents, including but not limited to all Contractor's rights to make claims.  Nothing contained in this Article or Agreement shall be deemed to create any contractual relationship between the Owner and any Subcontractor, Sub-subcontractor, equipment or material supplier or to create any rights in any of them against the Owner.

§ 10.5    Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and shall not be awarded on the basis of cost plus a fee without the Owner's prior written approval. If a subcontract is awarded on the basis of cost plus a fee, the Contractor shall provide in the subcontract for the Owner to receive the same audit rights with regard to the Subcontractor as the Owner receives with regard to the Contractor in **Article 11.**

§ 10.6    The Contractor agrees to include provisions in any of its subcontracts involving allowance items, cost plus or unit price deals, a provision allowing Owner to audit quantities and units and to verify that any billings were properly made for this Work.

## ARTICLE 11  ACCOUNTING RECORDS
The Contractor shall keep full and detailed records and accounts related to the Cost of the Work, and exercise such controls, as may be necessary for proper financial management under this Contract and to substantiate all costs incurred. The accounting and control systems shall be satisfactory to the Owner and Owner's Lender. The Owner and the Owner's auditors shall, during regular business hours and upon reasonable notice, be afforded access to, and shall be permitted to audit and copy, the Contractor's records and accounts, including complete

Owner _____          Contractor _____

Modified AIA Document A102™ – 2017, Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43  15 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

documentation supporting accounting entries, books, job cost reports, correspondence, instructions, drawings, receipts, subcontracts, Subcontractor's proposals, Subcontractor's invoices, purchase orders, vouchers, memoranda, and other data relating to this Contract. The Contractor shall preserve these records for a period of four (4) years after Final Payment, or for such longer period as may be required by law. Such right of access may be exercised during the Work or after Substantial Completion of the Work, but in no event more than ninety (90) days from the submission of Final Payment from the Contractor with respect to records pertaining to contract performance, change orders, Claims, or payment audits including a final payment audit. Such right of access may also be exercised post termination if the Contract is terminated for default or convenience. This Section is applicable to all Change Orders or Claims by or against the Contractor and or a Subcontractor of any tier whether or not they affect the GMP. To the extent Contractor is able, Contractor agrees to include the provisions of this Section in all its contracts and all tier subcontracts with regard to any audits of payments received by the Contractor to verify that such payments were made and that such payments were made for the use required by the Project. Audits conducted under this Section shall be in accordance with generally accepted auditing standards and established procedures and guidelines of the reviewing audit agency. The Contractor agrees to the disclosure of all information and reports resulting from access to records under this Section to the Owner, provided that the Contractor is afforded the opportunity for an audit exit conference. If the Owner audits the Contractor's books and records and discovers actual costs or an error in the Contractor's favor by more than one percent (1%) of the Cost of the Work to date, the Contractor shall reimburse the Owner for the cost of such audit and the Contractor shall promptly refund the amount overpaid to the Owner. Notwithstanding the foregoing or anything contained in the Contract Documents to the contrary, the Owner's audit rights shall not extend to any unit prices, rates, lump sums, Contractor's lump sum General Conditions, General Requirements , established charges, lump sum change orders or fixed percentages or multipliers that were previously agreed to or stipulated by the parties in writing.

## ARTICLE 12  PAYMENTS

### § 12.1  PROGRESS PAYMENTS

§ 12.1.1  Based upon Applications for Payment submitted to the Owner and Architect by the Contractor, and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum, to the Contractor, as provided below and elsewhere in the Contract Documents and in compliance with Lender's requirements. Each Application for Payment shall use the Contractor's standard form of payment application using AIA forms G702 and G703. The Schedule of Values /Budget shall be the Schedule of Values initially submitted by Contractor and approved by Owner in writing, unless modified by Change Order. Each Application for Payment submitted by the Contractor shall be accompanied by substantiating data and lien waivers as provided in AIA Document A201™–2017.

§ 12.1.2  The period covered by each Application for Payment shall be one calendar month ending on the last day of the month.

§ 12.1.3  Owner's Representative, Contractor and Architect shall meet at the Project site between the 25th and 28th day of each month to review Contractor's "Pencil Draw" for that month's Application for Payment (which shall include all amounts through the end of the month), which shall be a preliminary draft of the Application for Payment prepared by Contractor. After that meeting, Contractor shall revise the Pencil Draw in accordance with any reasonable objection or recommendation of the Owner's Representative, Lender's third party inspecting engineer/architect ("Lender's Inspector"), or Architect that is consistent with the requirements of the Contract Documents. Such revised Pencil Draw shall be resubmitted by Contractor as the Application for Payment on or by the first (1st) day of a month. The Owner and Architect shall approve, if correct, and the Architect shall certify, if correct, the Application for Payment by the fifth (5th) of the month and the Owner shall make payment of the certified amount to the Contractor not later than the fifteenth (15th) day of the same month, provided the revised Pencil Draw is accurate, and provided further, Lender approves the Application for Payment and issues payment. If errors are found in the revised Pencil Draw, it shall be revised and resubmitted for review in accordance with this Section. If an Application for Payment is received by the Architect after the application date fixed above, payment for approved Work shall be made by the Owner not later than thirty (30) days after the Architect receives the Application for Payment.

Owner

Contractor

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 12.1.4** With each Application for Payment, the Contractor shall submit petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner's Representative, Lender's Inspector and or Architect to demonstrate that payments already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor plus payrolls for the period covered by the present Application for Payment, less (2) that portion of the progress payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment, as evidenced by copies of Contractor's payroll register certified by Contractor as to its accuracy as support for the fringe benefits and stipulated rates (any deviation in the payroll register from the Check Activity with Detail previously submitted to the Owner for the prior period must be agreed to by Owner in writing). In addition, as a further condition to payment of each progress payment, Contractor shall submit to Owner and Owner's Representative: (i) a sworn and certified Progress Payment Affidavit, which recites that all laborers, material suppliers and Subcontractors dealing with the Contractor have been paid in full through the date of the prior application for payment which has been received by Contractor from Owner, with the exception of disputed payments; (ii) a partial release of lien conditioned upon payment from Contractor for the current Application for Payment, (iii) partial releases of lien from all lienors providing Work on the applicable Application for Payment through the date of the last payment made, (iv) partial releases of lien conditioned only upon payment from all lienors providing Work on the applicable Application for Payment, through the date of the current Application for Payment, (v) any evidence of payment of any indebtedness incurred with respect to the Work of Contractor, as may be required by the Owner's Representative or Lender's Inspector and or Architect and such other evidence that Owner's Representative or Lender's Inspector and or Architect may reasonably require substantiating that all Work which is the subject of each such Application for Payment has been performed, and (vi) where required by any manufacturers for extended warranties, inspection certificates or other acceptable documentation confirming the acceptable completion of any and all required inspections for the Work performed for which payment is being made.

**§ 12.1.5** Each Application for Payment shall be based on the Schedule of Values approved by Owner unless subsequently amended by Change Order in accordance with the Contract Documents. If the Schedule of Values is subsequently amended by Change Order in accordance with the Contract Documents, the each subsequent Application for Payment shall be based on the Amended Schedule of Values. The Schedule of Values shall allocate the entire GMP among the various portions of the Work, except that the Contractor's Fee, the Contractor's General Conditions and the Contingency shall be shown as separate items. As individual subcontracts are executed, the actual subcontract value will be identified separately in the Schedule of Values in place of any estimates that made up the original GMP, with any remaining portion of the line item carried in the same scope of Work, to complete the Work in any particular division, as long as the GMP is not increased. The Schedule of Values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner, Owner's Representative, Lender's Inspector or Architect may require. This Schedule of Values and each update approved by the Owner's Representative shall be used as a basis for reviewing the Contractor's Applications for Payment.

**§ 12.1.5.1** The allocation of the GMP under this Section shall not constitute a separate guaranteed maximum price for the Cost of the Work of each individual line item in the schedule of values.

**§ 12.1.5.2** If the Contractor seeks to allocate costs from the Contingency to a line item in the Schedule of Values, the Contractor shall submit supporting documentation to the Owner, Owner's Representative, Lender's Inspector and or Architect.

**§ 12.1.6** Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the percentage of that portion of the Work, which has actually been completed.

**§ 12.1.7** In accordance with AIA Document A201™–2017, Modified General Conditions and subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

    .1    Take that portion of the GMP properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the GMP allocated to that portion of the Work in the Schedule of Values, as modified by executed

Modified AIA Document A101™ – 2017, Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43 13 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Change Order. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in § 7.3.9 of AIA Document A201™– 2017, Modified General Conditions, less retainage;

.2  Add that portion of the GMP properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in writing in advance by the Owner, Owner's Representative, Lender's Inspector and or Architect, suitably stored off the site at a location agreed upon in writing, less retainage;

.3  Add for General Conditions the amounts reflected on the schedule attached hereto as **Exhibit "K"**;

.4  Add the Contractor's Fee. The Contractor's Fee shall be computed upon the percentage of the Work completed to that point in time, less five percent (5%) retainage;

.5  Subtract the aggregate of previous payments made by the Owner;

.6  Subtract the shortfall, if any, indicated by the Contractor in the documentation required by § 12.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's auditors in such documentation;

.7  Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in § 9.5 of AIA Document A201™–2017, Modified General Conditions;

.8  Subtract the amount, if any, for Work that remains uncorrected and for which the Architect has previously withheld a Certificate for Payment as provided in Article 9 of AIA Document A201™–2017, as Modified;

.9  Subtract the amount, if any, for which the Contractor does not intend to pay a Subcontractor or material supplier, unless the Work has been performed or will be performed by others the Contractor intends to pay or amounts the Contractor deems appropriate to withhold from a subcontractor for failure to meet its contractual obligations;

.10  Subtract the amount, if any, for Work performed or defects discovered since the last payment application, any amount for which the Architect may withhold payment, or nullify a Certificate of Payment in whole or in part, as provided in Article 9 of AIA Document A201™ 2017, as Modified;

.11  Subtract the amount, if any, for the shortfall, if any, indicated by the Contractor in the documentation required by § 12.1.4 above to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's auditors in such documentation;

.12  Subtract retainage of ten percent (10%) from the Cost of the Work attributed to subcontractors; After the Work is 50% complete on a percentage of completion basis, then such retainage shall be reduced to zero until Substantial Completion, subject to Owner, Lender and Contractor approval or as otherwise required pursuant to the Subcontract Agreements; and.

.13  Subtract any other sums Owner is entitled to deduct pursuant to the Contract Documents, including but not limited to liquidated damages if applicable provided the Contract Time has expired.

**§ 12.1.8 RETAINAGE**

Owner                                                          Contractor

Modified AIA Document A102™–2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No. 7813334419 which expires on 05/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 12.1.8.1** For each progress payment made prior to Substantial Completion of the Work, as defined in the Contract Documents, determined and certified by Architect and or Owner, the Owner may withhold the following amount, as retainage, from the payment otherwise due:

> Owner shall withhold Ten Percent (10%) retainage on all amounts due Contractor for each Application, but only five percent (5%) on Contractor's Fee. No retainage shall be held on General Conditions, Insurance, including SDI, Bonds and Contractor's direct purchases/purchase orders (when previously approved by Owner in writing). Contractor shall withhold Ten Percent (10%) retainage from all amounts due Subcontractors and suppliers for each Application for Payment except as otherwise provided pursuant to §12.1.8.2. Owner shall release retainage held by Owner at Substantial Completion (as defined in the Contract Documents, determined and certified by Architect and or Owner), with the exception of one and one-half (1.5) times the remaining value of incomplete Work, subject to the provisions of the Contract Documents. Contractor may request in writing that Owner release part or all of retainage prior to Substantial Completion for Subcontractors and/or suppliers who have completed their respective portion of the Work in accordance with the Contract Documents prior to Substantial Completion.

**§ 12.1.8.2** Contractor shall withhold ten percent (10%) retainage from all amounts due Subcontractors and suppliers for each Application for Payment through Substantial Completion except as may be approved by Owner in writing or unless otherwise provided in this Agreement.

**§ 12.1.8.3** Except with the Owner's prior written approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and suitably stored at the site.

**§ 12.1.9** The Owner and the Contractor shall agree upon a mutually acceptable procedure for review and approval of payments to Subcontractors, and the percentage of retainage held on subcontracts, and the Contractor shall execute subcontracts in accordance with those agreements.

**§ 12.1.10** In taking action on the Contractor's Applications for Payment, Owner, Lender's Inspector and or Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Contractor and shall not be deemed to represent that the Owner, Owner's Representative, Lender's Inspector and/or Architect has made a detailed examination, audit, or arithmetic verification of the documentation submitted in accordance with § 12.2.4 or other supporting data; that the Owner, Owner's Representative, Lender's Inspector and/or Architect have made exhaustive or continuous on-site inspections; or that the Owner, Owner's Representative, Lender's Inspector and/or Architect have made examinations to ascertain how or for what purposes the Contractor has used amounts previously paid on account of the Contract. Such examinations, audits, and verifications, if required by Owner, will be performed by the Owner's auditors acting in the sole interest of the Owner. The Contractor shall make its records available at reasonable times and places for the Owner's audit.

**§ 12.1.10.1** The first Application for Payment shall include one hundred percent (100%) billing for the SDI (subject to § 5.1.4.1.14), Contractor's Payment and Performance Bond and stipulated insurance premiums that shall be billed in the first application after the execution of this Agreement.

**§ 12.1.11** In the event of any material default by the Contractor under the Contract Documents for which the Contractor has not cured or commenced to cure, the Owner may withhold any payment or part of any payment in the amount of the costs and damages incurred by Owner to correct, remedy and/or mitigate any Contractor defaults or the amount costs of damages, including Liquidated Damages (provided the Contract Time has expired), reasonably estimated to be incurred to correct, remedy and/or mitigate any Contractor defaults including, but not limited to: (1) defective Work not remedied; (2) claims or liens filed, unless bonded off; (3) failure of the Contractor to make payments in accordance with the terms of this Agreement and the subcontract agreements for properly performed Work by the Subcontractors or for labor, materials, or equipment; (4) failure to provide waivers of lien for all lienors giving notices unless Contractor and/or subcontractors as for lower tiers have a good faith dispute that prevents securing a waiver of lien; (5) damage to the Owner's property caused by Contractor, its Subcontractors or anyone working for Contractor, or to the real or personal property of any unit owners or tenants that is not corrected at the time of issuance of a Change

Owner _____   Contractor _____

Modified AIA Document A102™ – 2017; Copyright © 1920-1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43 15 ET on 06/23/2020 under Order No. 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Order, notwithstanding insurance coverage as required by the Contract Documents; (6) failure of the Work to progress satisfactorily or according to schedule; and (7) failure to carry out the Work in accordance with the Contract Documents.

## § 12.2    FINAL PAYMENT

**§ 12.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum inclusive of the Warranty Fee, shall be made by the Owner to the Contractor when:

   .1    the Contractor has fully complied with and performed all its obligations and or responsibilities under the Contract Document, except for the Contractor's responsibility to correct Work as provided in Article 12 of AIA Document A201™-2017, Modified General Conditions, and to satisfy other requirements, if any, which extend beyond final payment;

   .2    all punch list Work has been completed in accordance with the Contract Documents;

   .3    Contractor has obtained all applicable approvals from all governmental and other authorities having jurisdiction over the Work, unless such approvals are being withheld due to causes which are not within the Contractor's responsibility under the Contract Documents;

   .4    Contractor has complied with all other express requirements of the Contract Documents and the reasonable requirements of the Owner's Lender as a condition to final payment including but not limited to:

       .1    a written certification in the form of AIA Document G704 executed by the Contractor, Architect and Owner;

       .2    an affidavit of payment of debts and claims in the form of AIA Document G706 and G706A or Florida Statute 713.06(3)(d)1 conditioned upon payment and conditional release of liens executed by General Contractor and any other entity Lender reasonably requires in accordance with Lien Law.

       .3    receipt by Lender of evidence satisfactory to Lender that payment in full have been made for all obligations incurred in connection with the construction and completion of all off-site utilities and improvements (if any) as reasonably required by Lender or any Governmental Authority, to the extent it is within Contractor's Scope of Work and Contractor has been paid for that Work by Owner.

   .5    Contractor has submitted a final accounting for the Cost of the Work and a final Application for Payment;

   .6    Contractor has submitted a certificate of insurance evidencing that the insurance required by the Contract Documents will remain in force after Final Payment, and will continue through the remaining duration of the Project, and thereafter as required by the Contract Documents;

   .7    a final Certificate for Payment has been issued by the Architect and or Owner in accordance with § 12.2.2.2 below;

   .8    final lien waivers have been provided by the Contractor and all Subcontractors and material suppliers, conditioned only upon receipt of payments to be made out of the final payment;

Owner                         Contractor

Modified AIA Document A102™—2017. Copyright © 1920–1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43 15 ET on 06/23/2020 under Order No.7813334419 which expires on 05/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

    .9    a final affidavit has been delivered to the Owner meeting the requirements of Florida Statute 713.06;

    .10    a consent of surety has been delivered to the Owner consenting to Owner's release of final payment;

    .11    Contractor has submitted a set of final red-line drawings in electronic format for the Project;

    .12    Contractor has provided training to Owner's staff on the proper operation, use and maintenance of all equipment and systems for the Project (to the satisfaction of Owner);

    .13    Contractor has delivered to Owner all warranties, extended warranties and operating manuals for all equipment and components of the Project; and

    .14    all other requirements in § 9.10 of AIA Document A201™–2017, Modified General Conditions have been satisfied.

§ 12.2.2  Within thirty (30) days of the Owner's receipt of the Contractor's final accounting for the Cost of the Work, the Owner may conduct an audit of the Cost of the Work or notify the Architect that it will not conduct an audit.  Said audit shall be completed within ninety (90) days from submission of Contractor's final accounting.

§ 12.2.2.1  If the Owner conducts an audit of the Cost of the Work, the Owner shall, within ten (10) days after completion of the audit, submit a written report based upon the auditors' findings to the Architect.

§ 12.2.2.2  Within seven (7) days after receipt of the written report described in § 12.2.2.1, or receipt of notice that the Owner will not conduct an audit, and provided that the other conditions of § 12.3. have been met, the Architect will either issue to the Owner a final Certificate for Payment with a copy to the Contractor, or notify the Contractor and Owner in writing of the Architect's reasons for withholding a certificate as provided in Article 9 of AIA Document A201™–2017, Modified General Conditions. The time periods stated in this § 12.3.2 supersede those stated in Article 9 of AIA Document A201™–2017, Modified General Conditions. The Architect is not responsible for verifying the accuracy of the Contractor's final accounting.

§ 12.2.2.3  If the Owner's auditors' report concludes that the Cost of the Work, as substantiated by the Contractor's final accounting, is less than claimed by the Contractor, the Contractor shall be entitled to request mediation of the disputed amount without seeking an initial decision pursuant to Article 15 of AIA Document A201™–2017, Modified General Conditions. A request for mediation shall be made by the Contractor within thirty (30) days after the Contractor's receipt of a copy of the Architect's final Certificate for Payment. Failure to request mediation within this 30-day period shall result in the substantiated amount reported by the Owner's auditors becoming binding on the Contractor. Pending a final resolution of the disputed amount, the Owner shall pay the Contractor the amount certified in the Architect's final Certificate for Payment, provided Lender has approved and funded its portion for that portion of the Payment.

§ 12.2.3  The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment and Contractor's strict and full compliance with all conditions precedence to final payment contained throughout the Contract Documents, provided Lender has approved and funded its portion for that portion of the Payment.

§ 12.2.4  If, subsequent to final payment, and at the Owner's request, the Contractor incurs costs, described in Article 7 and not excluded by Article 8, to correct defective or nonconforming Work, the Owner shall reimburse the Contractor for such costs, and the Contractor's Fee applicable thereto, on the same basis as if such costs had been incurred prior to final payment, but not in excess of the GMP.

§ 12.2.5  The making of progress payments or final payment shall not constitute or be deemed to be a waiver by the Owner of any claims which the Owner may have against the Contractor under the provisions of this Agreement or

Owner                                                        Contractor

Modified AIA Document A102™–2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 43 15 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

otherwise: and provided, further, that the making of the final payment shall not be deemed a waiver by the Owner of any claims which the Owner may have against the Contractor for latent defects or any other defect or an incomplete item which is not readily apparent at the time such final payment is made; and provided further, that the making of final payment shall not be deemed a waiver by the Owner of any obligation of the Contractor under the provisions of the Contract Documents or otherwise to repair or correct any Work or materials that prove defective as a result of faulty materials, equipment or workmanship.

**§ 12.2.6** Acceptance of final payment by the Contractor, a Subcontractor or material or equipment supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment or as provided in this Agreement.

**§ 12.2.7** Where Lender is withholding draws to Owner for reasons unrelated to Contractor, Owner shall be obligated to fund Contractor for properly performed Work, where Contractor has complied with its obligations in the Contract Documents. Lender's requirements that exceed Contractor's obligations set forth in the Contract Document, shall not be a condition to payment to Contractor for properly performed Work, where Contractor has complied with its obligations in the Contract Documents.

## ARTICLE 13   DISPUTE RESOLUTION

**§ 13.1   INITIAL DECISION MAKER**
The Architect will serve as Initial Decision Maker pursuant to § 15.2 of AIA Document A201™–2017, Modified General Conditions.

**§ 13.2   BINDING DISPUTE RESOLUTION**
For any Claim subject to, but not resolved by mediation pursuant to § 15.3 of AIA Document A201™–2017, Modified General Conditions, the method of binding dispute resolution shall be subject to and decided by litigation exclusively in the state or federal courts of Miami-Dade County, Florida. Contractor and Owner consent to the exclusive venue of the state and federal courts of Miami-Dade County, Florida.

**§ 13.3   WAIVER OF TRIAL BY JURY**
IN THE EVENT OF LITIGATION, BOTH PARTIES HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH THEREOF, OR IN CONNECTION WITH THE WORK OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ANY ACTIONS OR INACTIONS OF EITHER PARTY.

## ARTICLE 14   TERMINATION OR SUSPENSION

**§ 14.1**   The Contract may be terminated or suspended by the Owner or the Contractor as provided in Article 14 of AIA Document A201™–2017, Modified General Conditions.

## ARTICLE 15   MISCELLANEOUS PROVISIONS

**§ 15.1**   Where reference is made in this Agreement to a provision of AIA Document A201™–2017, Modified General Conditions, or another Contract Document, the reference refers to that provision as Modified or supplemented by other provisions of the Contract Documents.

**§ 15.2**   Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

Owner _____   Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:13 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org

**§ 15.3    The Owner's Representative:**

> Oren Shmueli
> 17780 Collins Avenue
> 2nd Floor
> Sunny Isles Beach, FL  33160
> Phone: (305) 933-8301
> Fax: (305) 935-5705
> Email:  OrenS@trumpgroup.com
>
> Jules Trump
> 17780 Collins Avenue
> 2nd Floor
> Sunny Isles Beach, FL  33160
> Phone: (305) 933-8301
> Fax: (305) 935-5705
> Email:  jules@trumpgroup.com
>
> Oren Shmueli, Eric Bartos, Rick Chitwood and James A. Sikich, shall only have the authority to approve in writing Potential Change Orders or Construction Change Directives which do not exceed One Hundred Thousand Dollars ($100,000.00) each; provided such Potential Change Orders and Construction Change Directives do not exceed Two Million Dollars ($2,000,000.00) in the aggregate and further provided such Potential Change Orders and Construction Change Directives do not impact the critical path of the Project and time for TCOs and or Substantial Completion.  All other Potential Change Orders and Construction Change Directives, including, but not limited to Change Orders for materials, Change Orders for labor, and Change Orders that impact or potentially impact the critical path of the Project or the time for TCOs and or Substantial Completion, must be approved in writing in advance by Jules Trump.

**§ 15.4    The Contractor's Representatives:**

> Edward Janus, Vice President
> Suffolk Construction Company, Inc.
> One Biscayne Tower, Suite #2700,
> 2 South Biscayne Boulevard
> Miami, FL 33131
> Telephone Number (305) 374-1107
> ejanus@suffolk.com
>
> Peter Tuffo, President
> Suffolk  Construction Company, Inc.
> One Biscayne Tower, Suite #2700,
> 2 South Biscayne Boulevard
> Miami, Florida  33131
> Telephone Number (305) 374-1107
> ptuffo@suffolk.com

In the event of any default, a copy of the notice shall be provided to:

> Juan Diaz, General Counsel-SE
> Suffolk Construction Company, Inc. Legal Department
> 426 Clematis Street

Owner                                                                    Contractor

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 43 15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org

West Palm Beach, Florida 33401
idiaz@suffolk.com

**§ 15.5**   Owner's Construction Executives and Contractor's Representatives (Peter Tuffo (as needed), Chris Kennedy (as needed) Edward Janus, Iyad Masri, and Andrew Frank), shall meet weekly on site to discuss and review the status of the Project (budget, schedule, quality and any issues requiring attention) and this Agreement.

**§ 15.6**   Unless otherwise provided in this Agreement, neither the Owner's nor the Contractor's representative shall be changed without ten days' prior written notice to the other party.

**§ 15.7**   The Contractor represents and warrants the following to the Owner (in addition to any other representations and warranties contained in this Agreement and/or the Contract Documents), as a material inducement to the Owner to execute this Agreement, which representations and warranties shall survive the execution and delivery of this Agreement, any termination of this Agreement, and the final completion of the Work:

    .1   The Contractor is financially solvent, able to pay all debts as they mature, and possessed of sufficient working capital to complete the Work and perform all obligations hereunder;

    .2   The Contractor is able to furnish the plant, tools, materials, supplies, equipment, and labor required to complete the Work and perform its obligations hereunder and has sufficient experience and competence to do so;

    .3   The Contractor is authorized to do business in the State of Florida and is properly licensed by all necessary governmental and public authorities having jurisdiction over the Contractor and over the Work and the Project;

    .4   The Contractor's execution of this Agreement and performance thereof is within the Contractor's duly authorized powers;

    .5   The Contractor's duly authorized representative has visited the site of the Project, is familiar with the local conditions under which the Work is to be performed, and has correlated its observations with the requirements of the Contract Documents; and

    .6   The Contractor is a sophisticated contractor who possesses a high level of experience and expertise in the business administration, construction, construction management, and superintendence of projects of the size, complexity, and nature of the Work and will perform the Work with the care, skill, and diligence of such a duly licensed Florida General Contractor.

**§ 15.8   MODIFICATION**
No change or modification of this Agreement shall be valid unless in writing and signed by Jules Trump as authorized representative of Owner and the duly authorized representative of Contractor except as noted in § 15.2 and § 15.3 above.  No waiver of any of the provisions of this Contract shall be valid unless in writing and signed by the party against whom it is sought to be enforced.

**§ 15.9   SEVERABILITY AND WAIVER**
The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision.  The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

**§ 15.10   CHAPTER 558, FLORIDA STATUTES**
As between Owner and Contractor, the parties have agreed that the requirements set forth in Chapter 558, Florida Statutes, shall not apply to this Agreement unless there is a pending Chapter 558 claim by the condominium association or any unit owners in which case, the requirements set forth in Chapter 558, Florida Statutes, shall apply to this Agreement.

**§ 15.11   FINANCING**

Owner

Contractor

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects" "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 43 15 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Contractor understands and agrees that Owner's Lender(s) may control Owner's ability to provide any requisition, payment, change, certification, approval or other matter under the Contract Documents. Contractor agrees to comply with all reasonable requests of Lender. The Contractor agrees to execute a Contractor's Consent & Certificate (or other document) which has been previously provided to Contractor and attached as Exhibit "L" and other documents as the construction Lender may reasonably require binding the Contractor to continue and complete performance under the Contract Documents in the case of a default by the Owner under the construction loan (subject to the terms of the Contractor's Consent & Certificate attached as Exhibit "L"), provided the Agreement provides for payment of all amounts which are then due and owing from Owner to the Contractor under the Contract Documents, and continues to provide funds for the payment of the amounts which shall thereafter become due. Contractor shall deliver to Lender, for the duration of the Project, annual audited financial statements certified to Lender, within 120 days after each fiscal year end of Contractor. Nothing contained herein will relive the Owner from payment to Contractor in accordance with the Contract Documents.

§ 15.11.1 Contractor expressly subordinates to the Lender all contractual, constitutional and statutory construction liens to which Contractor may be or become entitled, to all liens and security interests securing the construction loan in place as of the date of execution of this Agreement. Contractor shall cooperate with Owner and Owner's lender to ensure that Contractor's lien rights are subordinated to Owner's Construction Lender.

Owner has the option with its Lender to increase the loan for an additional One Hundred Million Dollars ($100,000,000.00) on the entire Project (South Tower and Villa and North Tower). Owner agrees to limit the additional loan to Fifty Million Dollars ($50,000,000.00) on the South Tower and Villa portion of the Work. Notwithstanding, Owner may secure subsequent encumbrances on the South Tower and Villa in excess of the Fifty Million Dollar ($50,000,000.00) additional loan, at or after Substantial Completion, provided a minimum of Thirty Million Dollars ($30,000,000.00) in collateral remains in the South Tower and Villa, after all loans.

## § 15.12   ATTORNEY'S FEES
In the event that any litigation arises out of or under this Agreement, then the prevailing party in such litigation shall be entitled to recover the cost of such action including reasonable attorneys' fees and paralegal fees for all trial and appellate levels. In any suit, action, or other proceeding, including bankruptcy, arising out of or in any manner relating to the Contract Documents, including without limitation, (i) the enforcement or interpretation of a party's rights or obligations under the Contract Documents (whether in contract, tort, or both), or (ii) the declaration of any rights or obligations under the Contract Documents, the successful or prevailing party, as determined by the court, shall be entitled to recover from the losing party, as determined by the court, reasonable attorneys' fees, paralegal fees, and disbursements (including disbursements which would not otherwise be taxable as cost in the proceeding) and expert witness fees. All references in the Contract Documents to attorneys' fees shall be deemed to include all attorney and paralegal fees as well as through all post-judgment and appellate levels and in connection with collection, and bankruptcy proceedings.

§ 15.12.1 In addition to the above, the prevailing party shall be entitled to recover from the non-prevailing party, all litigation costs associated with discovery and production of Electronically Stored Information (ESI).

## § 15.13   INSURANCE AND BONDS

§ 15.13.1 The Contractor shall purchase and maintain insurance as set forth in Article 11 of the AIA Document A201™–2017, Modified General Conditions and in the Exhibits to this Agreement and elsewhere in the Contract Documents.

§ 15.13.2 The Contractor shall provide a AIA A311 Payment Bond and AIA 312 Performance Bond as set forth in Article 11 of the AIA Document A201™–2017, Modified General Conditions and in the Exhibits to this Agreement and elsewhere in the Contract Documents.

## § 15.14   HURRICANE AND TROPICAL STORM PREPARATION

Owner                                    Contractor

Modified AIA Document A102™–2017, Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43:15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

§ 15.14.1 Contractor acknowledges that its Work is being performed in South Florida and that the area is prone to Hurricanes and Tropical Storms. Contractor represents that it has anticipated Hurricanes and Tropical Storms and included in its schedule, time impacts associated with Hurricanes and Tropical Storms preparation and agrees not to seek additional time from Owner for time impacts associated with Hurricanes and Tropical Storms for preparation. Any delays associated with Tropical Storms and Hurricanes shall be an Excusable, non-compensable Delay, unless covered by Builder's Risk insurance.

§ 15.14.2 Attached hereto as **Exhibit "N"** is Contractor's Hurricane Plan identifying all steps Contractor shall take in the event of an approaching hurricane during performance of the Work. Said hurricane plan shall show how Contractor will undertake the procedures set forth in the Plan in order to protect the Project and all Work completed and stored as of that date, and how Contractor will implement the procedures set forth in the Plan to secure and protect equipment and materials. The parties agree that all hurricane warning or tropical storm de-mobilization and re-mobilization expenses shall first be submitted applicable insurance. If not paid by insurance, the de-mobilization and re-mobilization expenses shall be paid from Contingency if available. If Contingency is not available, Contractor shall bear all hurricane warning or tropical storm de-mobilization and re-mobilization expenses.

## § 15.15   CROSS DEFAULT PROVISIONS

§ 15.15.1 Contractor is entering into two (2) separate Agreements with different Owners related to construction of different components of the Project. The other agreement is with A3 North Development, LLC, as Owners of the North Tower of the overall Project. Notwithstanding anything to the contrary contained in this Agreement or the Contract Documents, a breach or default by Contractor or Owner of any covenant or other term or condition contained in the Agreement with A3 North Development LLC for the North Tower, or any other Agreement between Contractor and either A3 Development LLC, A3 Amenities, LLC and or A3 North Development, LLC and or A3 Restaurant, LLC, after the passage of all applicable notice and cure or grace periods, and the sureties rights under the Bond as for the Contractor shall, at the option of Owner or Contractor, be considered a default under this Agreement and the Contract Documents, in which event the Owner or Contractor shall be entitled (but in no event required) to apply all rights and remedies of the Owner or Contractor under the terms of this Agreement and the Other Agreements by reason of a default under said Other Agreements.

§ 15.15.2 A material breach or default by Contractor of any significant covenant or other term or condition contained in this Agreement, after the passage of all applicable notice and cure or grace periods, shall, at the option of either A3 Development LLC, A3 Amenities, LLC or A3 North Development, LLC and or A3 Restaurant, LLC, be considered a default under any other Agreements between Contractor and either A3 Development LLC, A3 Amenities, LLC and or A3 North Development, LLC and or A3 Restaurant, LLC, in which event either A3 Development LLC, A3 Amenities, LLC or A3 North Development, LLC and or A3 Restaurant, LLC, as applicable, shall be entitled (but in no event required) to apply all rights and remedies available to them, under the terms of this Agreement and the Other Agreements by reason of a default under this Agreement.

§ 15.15.3 "Other Agreements" means, collectively, all agreements and instruments between, among or by: Contractor, and, either A3 Development LLC, A3 Amenities, LLC, A3 North Development, LLC and or A3 Restaurant, LLC.

§ 15.15.4 Owner and Contractor expressly agree that Contractor's Payment and Performance Bonds and the Contract between Owner and Contractor are not assignable in whole and in part to the condominium association or any of the Unit owners or their assignees. Furthermore, it is expressly agreed that the condominium association and/or the Unit owners or assignees thereof are not intended nor shall they be construed as third-party beneficiaries to Contractor's Payment Bond, Performance Bond and the Contract. Any attempted assignment or assignment of Contractor's Payment Bond, Performance Bond or the Contract by Owner or its assignees to the condominium association and/or the Unit owners, shall be deemed null and void.

## ARTICLE 16   ENUMERATION OF CONTRACT DOCUMENTS

§ 16.1   This Agreement is comprised of the following documents:

Owner _____                              Contractor _____

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43 15 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

.1   This AIA Document A102™–2017, Modified Form of Agreement Between Owner and Contractor;

.2   AIA Document A201™–2017, Modified General Conditions of the Contract for Construction;

.3   Addenda, if any:

| Number | Pages |
|--------|-------|
|        |       |

Portions of Addenda relating to bidding or proposal requirements are not part of the Contract Documents unless the bidding or proposal requirements are also enumerated in this **Article 16.**

.4   Other Exhibits, which are incorporated herein and are considered part of the Contract Documents [Exhibits to be initialed within forty-eight (48) hours]:

Exhibit A:  List of Drawings (a more legible version of this Exhibit can be viewed or downloaded at https://link.edgepilot.com/s/293d15de/1FyGRcMyBUG17600ScrdZQ?u=https://www.dropbox.com/sh/vwkq4wgfgu7h02h/AABJ9xM0HENQal6gaJO8MTpua?dl=0 However, in all events, Exhibit A attached hereto shall govern.
Exhibit B:  Legal Description for the South Tower
Exhibit C:  Legal Description for the Villa, Beach Side Amenities, Guest Suites and Cabanas
Exhibit D:  General Conditions Breakdown
Exhibit E:  Site Plan with Grid Lines
Exhibit F:  Contractor's Construction Schedule
Exhibit G:  Allowance Items
Exhibit H:  Contractor's Qualifications and Assumptions;
Exhibit I:  Contractor's Stipulated Rates
Exhibit I1:  Liberty's Stipulated Rates
Exhibit J:  Suffolk Subcontract Form Agreement
Exhibit J1  Coastal Subcontract Form Agreement
Exhibit K:  Contractor's General Conditions Straight-Line Monthly Billings
Exhibit L:  Contractor's Consent & Certificate
Exhibit M:  Contractor's Unit Pricing List
Exhibit N:  Contractor's Hurricane Plan
Exhibit O:  Contractor Warranty and Extended Warranty Forms
Exhibit P:  OCIP Project Insurance Manual
Exhibit:P1:  Builder's Risk
Exhibit Q:  Contractor's Insurance Policies
Exhibit R:  Subcontractor Default Insurance Policy Specimen
Exhibit S:  Payment and Performance Bond Form
Exhibit T:  RTA Log
Exhibit U:  Schedule of Values
Exhibit V:  Geotechnical Report and Addenda
Exhibit W:  QAQC Document
Exhibit X:  Open Potential Change Orders
Exhibit Y:  Settlement Surveys

**Signatures on Next Page**

Owner                                    Contractor

Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43 15 ET on 06/23/2020 under Order No.7813334419 which expires on 06-17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

This Agreement entered into as of the day and year first written above.

| OWNER<br>A3 Development LLC | OWNER<br>A3 Amenities, LLC | OWNER<br>A3 Restaurant, LLC | CONTRACTOR<br>Suffolk Construction Company, Inc. |
|---|---|---|---|
| *(signature)* | *(signature)* | *(signature)* | *(signature)* |
| J TRUMP | J TRUMP | J TRUMP | |
| *(print name)* | *(print name)* | *(print name)* | *(print name)*<br>Juan Diaz |
| *(title)* | *(title)* | *(title)* | *(title)*<br>General Counsel-SE /<br>Asst. Secy |
| *(date)* | *(date)* | *(date)* | *(date)* July 17, 2020 |



Owner                                    Contractor

**Modified AIA Document A102™ – 2017. Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:43 15 ET on 06/23/2020 under Order No 7813334419 which expires on 06 17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service To report copyright violations e-mail copyright@aia.org.**



# AIA Document A201™ – 2017

## Modified General Conditions of the Contract for Construction

for the following PROJECT:

The Estates at Acqualina
17901 Collins Avenue,
Sunny Isles Beach, Florida 33160

THE OWNER:

A3 Development LLC
A3 Amenities, LLC
A3 Restaurant, LLC
17780 Collins Avenue
Sunny Isles Beach, FL 33160

THE CONTRACTOR:

Suffolk Construction Company, Inc.
One Biscayne Tower, Suite #2700,
2 South Biscayne Boulevard
Miami, FL 33131
Telephone Number (305) 374-1107
www.suffolk.com

THE ARCHITECT:

CFE Architects, PA
Cohen Freedman Encinosa & Associates
8085 NW 155 Street
Miami Lakes, FL 33016

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**TABLE OF ARTICLES**

1   GENERAL PROVISIONS

2   OWNER

3   CONTRACTOR

4   ARCHITECT

5   SUBCONTRACTORS

6   CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7   CHANGES IN THE WORK

8   TIME

9   PAYMENTS AND COMPLETION

10   PROTECTION OF PERSONS AND PROPERTY

11   INSURANCE AND BONDS

12   UNCOVERING AND CORRECTION OF WORK

13   MISCELLANEOUS PROVISIONS

14   TERMINATION OR SUSPENSION OF THE CONTRACT

15   CLAIMS AND DISPUTES

Owner _____ _____ _____                     Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44 22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**ARTICLE 1  GENERAL PROVISIONS**

**§ 1.1    Basic Definitions**
"Lender" means Owner's construction lender for the Project, Bank OZK (f/k/a Bank of the Ozarks).

The term "Custom Units" as used in this Agreement shall mean any residential condominium unit, which, as a result of requested modifications to design, deviates from the standard residential condominium unit floor plan layout(s) (i.e. Typical, Optional or Modified, with Options). Custom Units include units that deviate from standard residential condominium units either through a customization of floor plan layout and/or through a customization of materials, including, but not limited to, stone, cabinetry, appliances, plumbing fixtures, equipment and millwork. Buyer selections from standard finishes do not constitute a "Customization."

The term "Customization" shall include the following enumerated tiers of customization as determined by Owner: (1) Tier/Level 1 Customizations: Minor Architectural changes that affect door locations, appliances and/plumbing fixture selections without affecting wall partitions; (2) Tier/Level 2 Customizations: Architectural & MEP/FP changes that affect an isolated portion of the unit layout; (3) Tier/Level 3 Customizations: Significant Architectural & MEP/FP changes that affect various portions of the layout and ceilings; (4) Tier/Level 4 Customizations: Major Architectural & MEP/FP changes that include a unit design that combines two or more standard units; and (5) Tier/Level 5 Customizations: Extreme Architectural and MEP/FP changes that includes an extremely custom layout by combining three or more standard units.

The term "Special Units" shall mean Unit 3405-06-07, Unit 4205-6, PH-2. Further, Owner may subsequently designate, in writing, additional units as Special Units.

**§ 1.1.1    The Contract Documents**
The Contract Documents are enumerated in the AIA Document A102™–2017, Modified Form of Agreement between the Owner and Contractor (hereinafter the "Agreement") and consist of the Agreement, the Exhibits to the Agreement (identified in the Agreement), these modified General Conditions, Drawings, (including all notes and specifications contained in the Drawings) all Subcontractor and Manufacturer Warranties, Addenda issued prior to execution of the Contract, other documents listed in the Agreement, and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Agreement signed by both parties, (2) a Change Order, (3) a Construction Change Directive, or (4) a written order for a minor change in the Work issued by the Architect or the Owner.  Unless specifically enumerated in the Agreement, the Contract Documents do not include the advertisement or invitation to bid, Instructions to Bidders, sample forms, other information furnished by the Owner in anticipation of receiving bids or proposals, the Contractor's bid or proposal, or portions of Addenda relating to bidding or proposal requirements.  Any of the Contract Documents not attached hereto are hereby incorporated by reference and shall be deemed to be of the same force and effect as if attached hereto.

**§ 1.1.1.1** In the event of any conflict between and among the Contract Documents, the Documents shall be construed according to the following priorities:

| | |
|---|---|
| Highest Priority: | Amendments and Change Orders and Construction Change Authorization with later date having greater priority; |
| Second Priority | Contractor's Qualifications and Assumptions, attached as Exhibit H to the Owner-Contractor Agreement, but only as to those provision specifically noted therein as taking priority; |
| Third Priority: | Agreement |
| Fourth Priority | General Conditions; |
| Fifth Priority: | Remaining portion of Contractor's Qualifications and Assumptions, attached as Exhibit H to the Owner-Contractor Agreement; |
| Sixth Priority: | Addenda with later date having greater priority; and |
| Seventh Priority: | Drawings with detailed drawings taking precedence over large scale drawings. |

Owner                                                                   Contractor

Modified AIA Document A201™–2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects", "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations e-mail copyright@aia.org.

### § 1.1.2    The Contract

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations, or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Contractor and the Architect or the Architect's consultants, (2) between the Owner and a Subcontractor or a Sub-subcontractor, (3) between the Owner and the Architect or the Architect's consultants, or (4) between any persons or entities other than the Owner and the Contractor, it being specifically understood and agreed between the Parties that none of Contractor's subcontractors, sub-subcontractors, materialmen, or equipment suppliers shall be deemed to be third party beneficiaries of this Contract..

### § 1.1.3    The Work

The term "Work" means the construction and services required by the Contract Documents. The Contractor shall promptly commence the Work required hereby and fully and diligently execute the entire Work as described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.  Contractor represents to Owner that Contractor shall furnish at all times a sufficient supply of workers, materials, tools and equipment to complete the Work in strict accordance with the Contract Documents, and perform all general requirements and supervision for the construction of the Project in accordance with the Drawings (including all notes and specifications contained in the Drawings) prepared by Architect. "Work" includes all Work that is reasonably inferable therefrom as being necessary to perform and complete the Work in accordance with the Contract Documents for the construction of a luxury oceanfront condominium, resort, Villa, Beach Side Amenities, Guest Suites, Cabanas and common areas. It being understood that an item of Work is "reasonably inferable" if the item is known by Contractor or reasonably should be known by Contractor providing general contracting services on similar projects under the same conditions and in the same locale as the Project to be a component of a specific assembly indicated in the Contract Documents. All Work is to be performed in accordance with all applicable building codes, laws, ordinances, rules, and regulations. The Work includes all labor, materials, equipment, and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. Contractor shall not hinder or delay Owner or any separate Contractor of Owner in the performance of their respective obligations on the Project and conversely, Owner's separate subcontractors shall not hinder Contractor in performance of the Work.  Contractor agrees to comply with the reasonable requirements of Owner's Lender for the Project.

### § 1.1.4    The Project

The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner and by Separate Contractors. The Project is known as the Estates at Acqualina and consists of the South Tower, the Villa, Beach Side Amenities, Guest Suites, Cabanas, the Common Areas and the North Tower.

### § 1.1.5    The Drawings

The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules, incorporated specifications and diagrams.

### § 1.1.6    NOT USED

### § 1.1.7    Instruments of Service

Instruments of Service or Works for Hire are representations, in any medium of expression now known or later developed, of the tangible and intangible creative work performed by the Architect and the Architect's consultants for the benefit of the Owner under their respective professional services agreements. Instruments of Service or Works for Hire may include, without limitation, studies, surveys, models, sketches, drawings, and other similar materials.

### § 1.1.8    Initial Decision Maker

The Initial Decision Maker is the person identified in the Agreement to render initial decisions on Claims in accordance with § 15.2. The Initial Decision Maker shall not show partiality to the Owner or Contractor and shall not be liable for results of interpretations or decisions rendered in good faith.

Owner                                                                    Contractor

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09.44.22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

### § 1.1.9   Knowledge.

The terms "knowledge," "recognize" and "discover," their respective derivatives, and similar terms in the Contract Documents as used in reference to the Contractor shall be interpreted to mean that which the Contractor reasonably knows, reasonably recognizes, and reasonably discovers or should know, recognize or discover in exercising the reasonable care, skill, and diligence required by the Contract Documents in his capacity as a Contractor and not as a design professional. Analogously, the expression "reasonably inferable" and similar terms in the Contract Documents shall be interpreted to mean reasonably inferable by a contractor familiar with the Project and exercising the reasonable care, expertise, skill, and diligence required of the Contractor by the Contract Documents.

### § 1.1.10   Words such as "provide," "furnish," "furnish and install," "supply," "include" and similar terms shall, unless otherwise noted, be directions to Contractor to provide and pay for all labor, materials and services necessary and or inferable for the proper execution and completion of the Contractor's Work. The term "any" shall be interpreted as any and all whenever more than one item would be applicable for completion of the Work in accordance with the Contract Documents.

### § 1.2   Correlation and Intent of the Contract Documents

### § 1.2.1   The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required or reasonably inferable by one shall be as binding as if required or inferable by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

### § 1.2.1.1   The invalidity of any provision of the Contract Documents shall not invalidate the Agreement or its remaining provisions. If it is determined that any provision of the Contract Documents violates any law, or is otherwise invalid or unenforceable, then that provision shall be revised to the extent necessary to make that provision legal and enforceable. In such case the Contract Documents shall be construed, to the fullest extent permitted by law, to give effect to the parties' intentions and purposes in executing the Contract.

### § 1.2.2   Organization and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

### § 1.2.3   Subject to the priority of documents set forth in § 1.1.1.1, unless otherwise stated in the Contract Documents, words that have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings. In case of a conflict between the Drawings (including all notes and specifications contained in the Drawings), or conflicts within or between parts of the Contract Documents, or between any of the Contract Documents  and applicable standards, codes, and ordinances, the Contractor shall  provide in the following order of precedence (1) the better quality or greater quantity of Work, (2) comply with the more stringent requirement, and (3) provide that which is most beneficial to the Owner; with the Architect' making the final interpretation in the event of a conflict.  On the Drawings, given dimensions shall take precedence over scaled measurements, and large scale drawings over small scale drawings. Before ordering any materials or doing any Work, the Contractor shall verify measurements at the Project site and shall be responsible for the correctness of such measurements. The Contractor must call any such conflict or discrepancy that it becomes aware of (or should have become aware of) between the Contract Documents and/or between the Contract Documents and applicable standards, codes and ordinances and/or between the Contract Documents it discovers to the Owner's attention, in writing, prior to proceeding with the Work and in sufficient time so as to not to delay the progress.  No extra charge or compensation will be allowed on account of differences between actual dimensions encountered in the performance of the Work and the dimensions indicated on the Drawings. Contractor must verify all grades, elevations, dimensions, locations and quantities indicated on the Contract Drawings prior to the performance of Work. The Contractor shall, therefore, satisfy itself as to the accuracy of all grades, elevations, dimensions, locations and quantities.  In all cases of interconnection of its Work with existing or other Work, it shall verify at the site all grades, elevations, dimensions, locations and quantities relating to such existing or other Work.  Any errors due to the Contractor's failure to so verify all such grades, elevations, dimensions, locations and quantities shall be promptly rectified by the Contractor without

Owner _____                                      Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

any additional cost to the Owner. Any differences found shall be submitted to the Architect for resolution before proceeding with the Work and in such time so as not to delay the progress of the Work.

**§ 1.2.4** Whenever a product to be furnished by Contractor requires it to be in accordance with a Federal Specification, an ASTM Standard, an American National Standards Institute Specification or other Association Standard, including the requirement of compliance with any local certifications for products such as a Notice of Acceptance approving the product, the Contractor shall present an affidavit from the manufacturer to the extent Contractor is able to secure when provided by the manufacturer and, when requested by the Architect or Owner or as set forth in the Contract Documents, customary documents from the manufacturer certifying that the product complies with the particular Standard. When provided by the manufacturer and requested by the Architect or Owner, the specified support test data shall be submitted by the Contractor to substantiate compliance.

**§ 1.2.5** In the event any provision of the Contract Documents conflicts with any of the requirements or provisions of the loan documents, then the loan documents shall prevail and conflicting provision of the Contract Documents shall be modified to comply with the loan documents. Notwithstanding, in the event complying with the loan documents results in additional costs to Contractor, the Owner shall issue Contractor a Change Order for the additional costs to Contractor, if any.

**§ 1.3 Capitalization**
Terms capitalized in these Modified General Conditions include those that are (1) specifically defined, (2) the titles of numbered articles, or (3) the titles of other documents published by the American Institute of Architects.

**§ 1.4 Interpretation**

**§ 1.4.1** In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

**§ 1.4.2** The Agreement, Modified General Conditions, Addenda identified in § 16 of the Agreement, Additional Documents identified in § 16 of the Agreement and any other Exhibits to the Agreement, with the exception of the Drawings, shall be signed and initialed by the Owner and the Contractor. If either the Owner or Contractor both do not sign all of the aforementioned Documents, the Architect shall identify such unsigned Documents upon request and thereafter the parties agree to cooperate in good faith to execute said documents.

**§ 1.4.3** Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents. Claims for additional costs or extensions of time because of the failure of Contractor to familiarize itself with visible conditions at the Project site will not be allowed. The Contractor shall evaluate and satisfy itself as to the conditions and limitations under which the Work is to be performed, including, without limitation (1) the location, condition, layout and nature of the Project and surrounding areas; (2) any limitations as to access associated with the Project with the understanding that it shall be the Owners sole obligation to secure any rights agreements for adjoining properties; (3) anticipated labor supply and costs; (4) availability and cost of materials, tools and equipment; and (5) other similar issues. The Contractor shall be responsible for providing a safe place for the performance of the Work. The Owner shall not be required to make any adjustment in the GMP or grant an extension to the Contract Time in connection with any failure by the Contractor to comply with the requirements of this Article.

**§ 1.5 Ownership and Use of Drawings**

**§ 1.5.1** The Owner has the rights to the Drawings as provided in the Agreement between Owner and Architect necessary for construction of this Project. Upon the termination of the Agreement between Owner and Architect, or upon the request of the Owner during any stage of the services, the Architect is required to promptly deliver all such Architectural Drawings to the Owner. Architect, in turn, has certain rights pursuant to the Owner Architect Agreement including a non-exclusive license to reproduce the Architectural Drawings for purposes relating directly to the

Owner _____    Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Architect's performance of the services for the Project and for the Architect's archival records. As provided in the Owner Architect Agreement, the Owner may assign, delegate, sublicense, pledge or otherwise transfer the copyright granted in the Owner Architect Agreement to another party, including any buyer of the Project, such that the assignee and/or transferee may use and reproduce the Architectural Drawings to construct, complete, use and maintain the Project, including making future alterations or additions to the Project. It is understood, however, that the Architect and its consultants may use representations of the Project in its professional marketing materials, subject to the Owner's prior written approval, which shall not be unreasonably withheld. The Contractor, Subcontractors, Sub-subcontractors, and material or equipment suppliers shall not own or claim a copyright in the Drawings. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Owner's, Architect's or Architect's consultants' reserved rights. Notwithstanding the foregoing, the parties acknowledge and agree that with respect to the South Tower's Lobby and Grand Lobby concept and design, all artwork, drawings, specifications, materials, concepts, and designs in connection with same (the "Lobby Design"), are the exclusive property of a third-party ("Lobby Designer") and not the Property of Owner. Owner has a limited, non-exclusive license to use the Lobby Design solely for the purpose of carrying out the construction, development, marketing and commercial exploitation of the Project. Any use, transfer, grant, license, pledge, assignment, or reproduction of the Lobby Design for marketing purposes or commercial exploitation of the Project by Architect, Contractor, Subcontractors, Sub-subcontractors, and material or equipment suppliers shall be expressly prohibited and subject to the Owner's prior written approval, which shall be in its sole and absolute discretion.

**§ 1.5.2**   The Contractor, Subcontractors, Sub-subcontractors, and suppliers are authorized to use and reproduce Drawings provided to them, subject to any protocols established pursuant to § 1.7 and § 1.8 below, solely and exclusively for execution of the Work. All copies made under this authorization shall bear the copyright notice, if any, shown on the Drawings. The Contractor, Subcontractors, Sub-subcontractors, and suppliers may not use the Drawings on other projects or for additions to the Project outside the Scope of the Work without the specific written consent of the Owner, Architect, and the Architect's consultants.

**§ 1.5.3**   Contractor shall maintain electronically or at the Project Site , and shall make available to Owner, Owner's Representative and Architect, one record copy of the Drawings marked to indicate any deviations from the Contract Documents (the "As-Built Drawings") in good order.  The As-Built Drawings shall be prepared and updated during the prosecution of the Work.  The prints for As-Built Drawings used will be a set of black-line prints provided by Architect to Contractor at the start of construction.  It is agreed and understood that the Contractor makes no representations as to the accuracy or completeness nor assumes any liability for the Prior Work As-Builts but will nevertheless require accurate As-Built Drawings for Prior Work from Subcontractors and will notify the Owner of any discrepancies it discovers during the performance of the Work.  Contractor shall maintain said set in good condition and shall use colored pencils to mark-up said set with "as-built information" in a legible manner to show: (i) deviations from the Drawings made during construction; (ii) details in the Work not previously shown; (iii) changes to existing conditions or existing conditions found to differ from those shown on any existing drawings; (iv) the actual installed position of equipment, piping, conduits, light switches, electric fixtures, circuiting, ducts, dampers, access panels, control valves, drains, openings and stub-outs; and (v) such other information as either Owner, Owner's Representative or Architect may reasonably request.  At the completion of the Work, Contractor shall deliver all As-Built Drawings to Owner.  Final payment and any retention shall not be due and owing to Contractor until the final As-Built Drawings required above are delivered to Owner.

**§ 1.6**   **Notice**

**§ 1.6.1**   Except as otherwise provided in § 1.6.2, where the Contract Documents require one party to notify or give notice to the other party, such notice shall be provided in writing to the designated representative of the party to whom the notice is addressed and shall be deemed to have been duly served if delivered in person, by mail, by courier, overnight delivery or by electronic transmission.

**§ 1.6.2**   Notice of Claims as provided in § 15.1.3 shall be provided in writing and shall be deemed to have been duly served only if delivered to the designated representative of the party to whom the notice is addressed by either certified

Owner _____                                 Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

or registered mail, courier providing proof of delivery, overnight delivery or electronic mail with an electronic read receipt.

### § 1.7    Digital Data Use and Transmission

The parties shall agree upon protocols governing the transmission and use of Drawings or any other information or documentation in digital form. The parties will use AIA Document E203™–2013, Building Information Modeling and Digital Data Exhibit, to establish the protocols for the development, use, transmission, and exchange of digital data.

### § 1.8    Building Information Models Use and Reliance

Any use of, or reliance on, all or a portion of a building information model without agreement to protocols governing the use of, and reliance on, the information contained in the model and without having those protocols set forth in AIA Document E203™–2013, Building Information Modeling and Digital Data Exhibit, and the requisite AIA Document G202™–2013, Project Building Information Modeling Protocol Form, shall be at the using or relying party's sole risk and without liability to the other party and its contractors or consultants, the authors of, or contributors to, the building information model, and each of their agents and employees.

## ARTICLE 2   OWNER

### § 2.1    General

**§ 2.1.1**   The Owners are the entities identified as such in the Agreement and are referred to throughout the Contract Documents as if singular in number, hereinafter "Owner." The Owner has designated in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Article 4, the Architect does not have such authority. The term "Owner" means the Owners or the Owners' Representative.

**§ 2.1.2**   Owner shall provide Contractor with a copy of the Notice of Commencement that it will file and or record for the Project, as required by Florida law.

### § 2.2    Evidence of the Owner's Financial Arrangements

**§ 2.2.1**   Prior to commencement of the Work and upon written request by the Contractor, the Owner shall furnish to the Contractor reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Contract. The Contractor shall have no obligation to commence the Work until the Owner provides such evidence. If commencement of the Work is delayed under this § 2.2.1, the Contract Time shall be extended appropriately.

**§ 2.2.2**   Following commencement of the Work and upon written request by the Contractor, the Owner shall furnish to the Contractor reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Contract only if (1) the Owner fails to make payments to the Contractor as the Contract Documents require; (2) the Contractor identifies in writing a reasonable concern regarding the Owner's ability to make payment when due; (3) a cumulative total change in the Work materially increasing the GMP by more than twenty percent (20%) or (4) Owner fails to comply with § 15.11.1 of the AIA Document A102™–2017, Modified Form of Agreement.  If the Owner fails to provide such evidence, as required, within fourteen (14) business days of the Contractor's request, the Contractor may immediately stop the Work and, in that event, shall notify the Owner that the Work has stopped. However, if the request is made because a change in the Work materially changes the GMP under (3) above, the Contractor may immediately stop only that portion of the Work affected by the change until reasonable evidence is provided.  If the Work is stopped under this § 2.2.2, the Contract Time shall be extended appropriately and the GMP shall be increased by the amount of the Contractor's reasonable costs of shutdown, delay and start-up, as provided in the Contract Documents.

**§ 2.2.3**   After the Owner furnishes evidence of financial arrangements under this § 2.2, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor.

Owner _____                                                Contractor _____

Modified AIA Document A201™–2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 2.2.4**   Where the Owner has designated information furnished under this **§ 2.2** as "confidential," the Contractor shall keep the information confidential and shall not disclose it to any other person. However, the Contractor may disclose "confidential" information, after seven (7) days' notice to the Owner, where disclosure is required by law, including a subpoena or other form of compulsory legal process issued by a court or governmental entity, or by court or arbitrator(s) order. The Contractor may also disclose "confidential" information to its employees, consultants, sureties, Subcontractors and their employees, Sub-subcontractors, and others who need to know the content of such information solely and exclusively for the Project and who agree in writing to maintain the confidentiality of such information. Contractor shall provide Owner with advance written notice prior to disclosing any "confidential" information to those that need to know the content of such information (as set forth above) and to the extent possible, Owner shall be afforded seven (7) calendar days opportunity to object to the disclosure.

**§ 2.3**     **Information and Services Required of the Owner**

**§ 2.3.1**   Except for permits and fees which are the responsibility of the Contractor under the Contract Documents, including those required under **§ 3.7.1**, the Owner shall secure and pay for necessary building permit, approvals, easements, assessments, abutter agreements, if applicable, and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities. Fees for temporary certificates of occupancy and certificates of occupancy shall be paid by Owner.  Extension fees to be paid by the culpable party.

**§ 2.3.2**   The Owner has retained an architect and or engineer lawfully licensed to practice architecture and engineering, or an entity lawfully practicing architecture or engineering, in the jurisdiction where the Project is located. That person or entity is identified as the Architect in the Agreement and is referred to throughout the Contract Documents as if singular in number.

**§ 2.3.3**   If the employment of the Architect terminates, the Owner shall employ a successor whose status under the Contract Documents shall be that of the Architect.

**§ 2.3.4**   Owner shall furnish signed and sealed drawings of verified boundary survey, piling layout and as-built drawings for piling layout, initial benchmark elevation markers, settlement monitoring, and initial control lines. Final surveys to be performed jointly by Owner and Contractor, as required by local jurisdiction.

**§ 2.3.5**   Owner shall provide Contractor with a geotechnical report and a soil borings report and are attached hereto as Composite **Exhibit "V"**.

**§ 2.3.6**   Owner shall be responsible for obtaining any required easement plans and documentation and for the recording of easements for any utilities.

**§ 2.3.7**   Unless otherwise provided in the Contract Documents, the Owner shall furnish to the Contractor one copy of the Contract Documents for purposes of making reproductions pursuant to **§ 1.5.2**.

**§ 2.3.8**   The Owner shall furnish information or services required of the Owner by the Contract Documents with reasonable promptness. The Owner shall also furnish any other information or services under the Owner's control and relevant to the Contractor's performance of the Work with reasonable promptness after receiving the Contractor's written request for such information or services.

**§ 2.3.9**   The Contractor may not rely on the accuracy of any information furnished by the Owner and shall verify same prior to relying upon it. Contractor acknowledges that it has investigated the location of utilities and the conditions of the site. Contractor shall be responsible for utilizing industry standards locating services (e.g. Sunshine 811) for utility lines.

**§ 2.3.10** Unless otherwise provided in the Contract Documents, the Owner shall furnish to the Contractor one copy of the Contract Documents for purposes of making reproductions pursuant to **§ 1.5.2**.

Owner _____

Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 2.3.11** The Owner shall endeavor to cause the Architect to revise the Drawings to the extent necessary to incorporate the Contractor's Qualifications and Assumptions within ninety (90) calendar days of execution of the Final Guaranteed Maximum Price Amendment, but Owner shall not be responsible for any costs, damages or claims by the failure of the Architect to incorporate same within ninety (90) calendar days provided, however, if Contractor is not provided with conformed documents with that time frame, Contractor may perform the Work in accordance with the original Drawings and any addition costs shall be borne by the Owner.. Notwithstanding, the failure of the Architect to incorporate the Contractor's Qualifications and Assumptions shall not be deemed a waiver, relinquishment of the Contractors qualifications and assumption as set forth therein.

**§ 2.3.12** Owner shall engage a Threshold and/or special inspectors to provide required inspections at mutually agreed to intervals so as not to delay the progress of the Work. Owner shall provide Contractor with the name(s) of any inspectors hired pursuant to this Section. Inspection or approval by the Threshold and/or special inspectors shall not relieve Contractor of its contractual obligations to provide all Work in accordance with the Contract Documents and applicable Florida Law.

**§ 2.4     Owner's Right to Stop the Work**
If the Contractor fails to correct Work that is not in accordance with the requirements of the Contract Documents as required by § 12.2 or repeatedly fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by § 6.1.3. If the Owner issues an appropriate stop Work order in accordance with this paragraph, Contractor shall not be entitled to an increase in the Contract Time.

**§ 2.5     Owner's Right to Carry Out the Work**
If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a three (3) business day period after receipt of notice from the Owner or Owner's Representative to commence and continue correction of such default or neglect with diligence and promptness, the Owner may, without prejudice to other rights and remedies the Owner may have, complete such Contractor's Work, add manpower, or correct such defaults or neglect. The Architect may, pursuant to § 9.5.1, withhold or nullify a Certificate for Payment in whole or in part, to the extent reasonably necessary to reimburse the Owner for the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the additional services by the Architect and Owner's Representative made necessary by such default, neglect, or failure. If current and future payments are not sufficient to cover such amounts, the Contractor and its Surety shall pay the difference to the Owner. If the Contractor disagrees with the actions of the Owner or the Architect, or the amounts claimed as costs to the Owner, the Contractor may file a Claim pursuant to **Article 15**. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor and Surety shall pay the difference to the Owner. The Surety's obligations to the Owner under this section are set forth in the terms and conditions of the Performance Bond.

**ARTICLE 3  CONTRACTOR**

**§ 3.1     General**

**§ 3.1.1** The Contractor is the entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Contractor shall designate in writing a representative who shall have express authority to bind the Contractor with respect to all matters under this Contract. The term "Contractor" means the Contractor or the Contractor's authorized representative.

**§ 3.1.2** Contractor represents that it is a properly qualified and licensed Contractor in good standing with the jurisdiction within which the Project is located and is a corporation in good standing, organized and existing under the laws of the State of Florida within which the Project is located, Sunny Isles, Florida. Prior to commencement of the Work, Contractor shall provide the Owner with copies of the above current licenses. Contractor further represents that it has read, examined and understands the pertinent Contract Documents; that it is qualified and able to perform this Work; that it has a sufficient number of qualified personnel to assure timely and proper performance of this Work;

Owner _____

Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201" and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

that it has the proper tools and equipment to perform this Work; and that it is financially capable of fully performing the Work under this Contract. Further, Contractor represents that its employees and that Contractor will contractually require that its subcontractors be properly trained to timely and properly perform the Work that is the subject of the Contract Documents.

**§ 3.1.3**   The Contractor shall perform the Work in accordance with the Contract Documents.

**§ 3.1.4**   The Contractor shall not be relieved of its obligations to perform the Work in accordance with the Contract Documents and applicable Florida Law, either by tests, inspections, approvals, activities, duties, actions or inactions of the Threshold inspectors, special inspectors, the Architect, building department inspectors, building department officials or by persons or entities other than the Contractor.  Further, The Contractor shall not be relieved of its obligations to perform the Work in accordance with the Contract Documents and applicable Florida Law, by actions or inactions by the Architect, in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons or entities other than the Contractor. Notwithstanding, nothing contained herein is intended or construed to require the Contractor to undertake responsibilities related to design (unless otherwise required as part of the Work).

**§ 3.1.5**   Contractor's Scope of Work does not include: (1) architectural or engineering services unless expressly required pursuant to the Contract Documents, (e.g., shop drawings from specialty trade contractors), or Florida law; (2) costs related to any agreements made with adjacent property owners , if any; (3) air rights and air space encroachment fees; (4) removal of existing material, landscaping, fountains etc. which the Owner wishes to salvage; (5) Custom unit construction except as provided in §5.1.2.6 of the Agreement; (6) Utility connection fees; (7) Impact fees; and (8) Gas service to the gas meter (from gas meter to the buildings is Contractor).

**§ 3.1.6**   When Contractor frames for drywall and completes the MEP rough-in for the first typical floor (6th floor) of the Project, the Owner and Architect shall have the opportunity to walk through the floor and make any minor adjustments prior to framing and MEP rough-in for the remainder of the typical floors. This first typical floor framing and MEP rough-in must be completed with sufficient time in the schedule to allow Owner and Architect to review the same and for any issue to be addressed by Contractor, Owner and/or Architect so as not to delay the progress of the Work. Within five (5) business days of completion of the framing and MEP rough-in for the first typical floor, Owner and Architect shall deliver to Contractor notification of any comments.

**§ 3.1.7**   Contractor shall provide and has included as part of the GMP, dust and noise control consisting of, but not limited to the following items: car washing (necessitated due to performance of the Work), stucco removal, paint removal, window cleaning, street cleaning, screening and mesh, etc. caused by the Entire Project, as it relates to the construction of the Entire Project.

**§ 3.2**   **Review of Contract Documents and Field Conditions by Contractor**

**§ 3.2.1**   Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed, and correlated personal observations with requirements of the Contract Documents. The exactness of grades, elevations, dimensions, surface or disclosed conditions, locations and quantities given on any of the Contract Documents, issued by the Architect, Owner or the work installed by other contractors, or utilities are not guaranteed by the Architect or Owner, and no extra compensation will be allowed on account of differences between actual grades, elevations, dimensions, conditions locations and quantities and grades, elevations, dimensions, locations and quantities indicated on the Contract Documents subject to § 1.5.3 above.

**§ 3.2.2**   Because the Contract Documents are complementary, the Contractor shall, before starting each portion of the Work, carefully study and compare the various Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to § 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work, and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating construction coordination (not design coordination) and construction by the Contractor; however, the Contractor shall promptly, but in no event later than 48 hours, report to the Architect and Owner any

Owner                                          Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA   the AIA Logo, "A201," and "AIA Contract Documents"  are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

errors, inconsistencies or omissions discovered or those a reasonably prudent Contractor should have discovered in the exercise of its Work, by or made known to the Contractor as a request for information in such form as the Architect may require. It is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional, unless otherwise specifically provided in the Contract Documents.

**§ 3.2.3** The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, but the Contractor shall promptly, but in no event later than Forty-Eight (48) hours, report to the Architect and Owner any nonconformity discovered by or made known to the Contractor as a request for information in such form as the Architect may require. The Contractor shall be liable for damage, loss or expense to the Owner, including, without limitation, delays and the cost of correcting defective construction, resulting from the Contractor's performing any construction activity which it knows or should know involves such errors, inconsistency, omission or variation.

**§ 3.2.4** If the Contractor believes that additional cost or time is involved because of clarifications or instructions the Architect issues in response to the Contractor's notices or requests for information pursuant to § 3.2.2 and this Paragraph, the Contractor shall make a Claim as provided in Article 15. If the Contractor fails to perform the obligations of § 3.2.2 and this Paragraph, the Contractor shall not be entitled to any increase in the Contract Price or Contract Time and shall pay such costs and damages to the Owner, subject to § 15.1.7, as would have been avoided if the Contractor had performed such obligations.

**§ 3.2.5** The Contractor represents and warrants that the construction means, methods, procedures and techniques necessary to perform the Work will be consistent with and conform to: (1) good and sound practices within the construction industry; (2) generally prevailing and accepted industry standards applicable to the Work; (3) requirements of any warranties applicable to the Work; and (4) applicable, laws, codes, orders and ordinances which bear upon the Contractor's performance of the Work.

**§ 3.2.6** The Contractor shall coordinate and provide the project schedules in a manner to complete the Project in the most expeditious and economical manner possible and in accordance with the requirements set forth in § 3.10. The Contractor shall be responsible for the timely and proper finish of the Work and shall not commence any part of the Work until surfaces and substrates are in proper condition to receive the Work or specified systems and/or products.

**§ 3.2.7** Contractor shall be responsible for performing its Work in a safe manner and providing for the necessary safety requirements to ensure the protection of property and adjacent property, and the safety of the employees, licensees, invitees and reasonably anticipated visitors in or around the Project during performance of the Work in any area where Contractor is working. As between Contractor and any Subcontractor, each subcontractor shall be responsible for the acts and omissions and safety of its own employees and sub-subcontractors. Further, Contractor has reviewed local rules and ordinances regarding performing of construction work and agrees to comply therewith, including working hours and standards, all at no additional cost or expense to the Project or Owner. Contractor shall perform its Work so as not to damage adjacent or adjoining property in any way.

**§ 3.3   SUPERVISION AND CONSTRUCTION PROCEDURES**

**§ 3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention in the best interest of the Owner. The Contractor shall be solely responsible for, and have control over, construction means, methods, techniques, sequences, and procedures, and for construction coordinating all portions of the Work under the Contract. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences, or procedures, the Contractor shall evaluate the jobsite safety thereof and shall be responsible for the jobsite safety of such means, methods, techniques, sequences, or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and Architect, and shall propose alternative means, methods, techniques, sequences, or procedures. The Architect shall evaluate the proposed alternative solely for conformance with the design intent for the completed construction. Unless the Architect objects to the Contractor's proposed alternative, the Contractor shall perform the Work using its alternative means, methods, techniques, sequences, or procedures.

Owner

Contractor

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 3.3.2**   The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for, or on behalf of, the Contractor or any of its Subcontractors.

**§ 3.3.3**   The Contractor shall review and inspect portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work and will notify the Owner of any defective or deficient Prior Work. Contractor shall be primarily responsible to Owner to repair the defective or deficient Prior Work.  Contractor accepts and warrants those portions of the Prior Work already performed.

**§ 3.3.4**   Contractor has the responsibility to ensure that all material and equipment suppliers, manufacturers, and Subcontractors, and their respective agents and employees adhere to the requirements of the Contract Documents, and that they order and provide all materials, equipment and supplies in a timely manner. Contractor shall coordinate its Work with that of all others under its control or Owner's control working on or supplying the Project. Contractor shall be responsible for construction coordination, locations, and routing of all material and equipment as designed by the Owner, Architect, Engineers, and other consultants of the Owner. In areas and locations where the proper and most effective location and routing cannot be made as indicated or coordinated, Contractor shall contact Owner and Architect in writing and meet with all others involved before proceeding with installations, to plan the most effective and efficient method of overall installation.  Contractor shall pay all monthly utilities charges for construction until Substantial Completion excluding the portions of the Work Owner partially occupies prior to Substantial Completion. The Owner shall be responsible for any and all utility charges for bringing temporary and permanent power and water to the site including, but not limited to, hook-up fees, tap fees, meter fees, meters, valves, deposits, impact fees, and costs for additional transformers and FPL vault equipment, and for utility usage other than for construction, only after the Contractor achieves Substantial Completion.

**§ 3.3.5   Contractor's Compliance with Contract Documents**

The Contractor shall give all notices, and warrants and represents that the Work when completed will be constructed in compliance with the Contract Documents and that to the best of Contractor's knowledge as a licensed general contractor and not as a design professional, that the Work was performed in compliance with all applicable federal, state and local laws, codes, regulations, permits, decisions, orders, professional licenses, ordinances, and other legal requirements of the authorities have jurisdiction over the Project.  Where Contractor knows or should have known, as a licensed general contractor and not as a design professional, that any portion of the Work is not in compliance with any applicable federal, state and local laws, codes, regulations, permits, decisions, orders, professional licenses, ordinances, and other legal requirements of the authorities have jurisdiction over the Project, Contractor shall not perform that portion of the Work and shall, within five (5) calendar days of discovery, notify Owner and Architect, in writing.  Contractor shall bear responsibility for and bear all costs for Work that was not performed in accordance with the Contract Documents and all applicable laws, codes and ordinances, including the cost of replacing any Work with Work conforming therewith, including any attorney's fees or other expenses incurred by Owner in responding to any complaints, citations, court orders, administrative orders or similar governmental edicts or process. The provisions of this Section shall survive the completion and final payment or termination of this Contract.

**§ 3.4   Labor and Materials**

**§ 3.4.1**   Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work. In the case of a "Cost Plus" or "Guaranteed Maximum Price Contract," the phrases "Contractor shall provide and pay for," "at Contractor's expense," or "Contractor shall bear" as used herein or elsewhere in the Contract Documents shall mean "as a Cost of the Work."

**§ 3.4.2**   Except in the case of minor changes in the Work approved by the Architect in accordance with § 3.12.8 or ordered by the Architect in accordance with § 7.4, the Contractor may make substitutions only with the prior written consent of the Owner, after evaluation by the Architect and in accordance with a Change Order or Construction Change Directive.

Owner _____                              Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

§ 3.4.3   The Contractor shall enforce strict discipline and good order among the Contractor's employees, Subcontractors and other persons carrying out the Work. The Contractor shall not permit employment of unfit persons, persons not properly skilled in tasks assigned to them, or persons not authorized to work in the United States.

§ 3.5   **Warranty**

§ 3.5.1   The Contractor warrants to the Owner that the Work, materials and equipment furnished under the Contract will be of good quality as set forth in the Contract Documents and new unless otherwise required or permitted by the Contract Documents. The Contractor further warrants that the Work shall be free from defects not inherent in the quality required or permitted, consistent with industry standards for projects of similar type and quality, and will be performed in compliance  with all applicable laws, codes, regulations and that the Work will conform to the requirements of the Contract Documents. Work, materials, or equipment not conforming to these requirements, including substitutions not properly approved and authorized, shall be considered defective.  Notwithstanding, Contractor shall not be liable for the quality or suitability of materials or equipment specified pursuant to the Contract Documents, however, Contractor remains responsible for quality of workmanship and blending coordination in the installation of materials or equipment specified pursuant to the Contract Documents.  The blending requirements will require Contractor to remove defective pieces and blend colors to the closest extent possible to achieve a uniform appearance.   If required by the Architect or the Owner, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

§ 3.5.2   Contractor acknowledges that this Project is a continuation of the very successful and highly respected Acqualina brand.  The Acqualina brand is an ultra-luxurious, top end, five-star, five-diamond brand, committed to standards of excellence in both services and workmanship.  Industry standard construction levels of quality related to a typical construction project will not be satisfactory for this Project. Contractor shall only provide the highest quality of workmanship for this Project, and warrants and guarantees the Acqualina Brand standard for the Work and workmanship to be provided by Contractor and its subcontractors.  Contractor has visited the sales model and the Acqualina Resort and Spa and the Mansions at Acqualina and is familiar with the quality and level of workmanship, materials and finishes required for this Project. Contractor recognizes that the nature of constructing high-end, luxury residential condominiums is that the unit purchasers will be making changes to the units and accommodations need to be made for timing of choices of some finishes. These changes may impact the critical path of the Project and Contractor shall work with and cooperate with Owner to minimize any impacts these changes may have to the Critical Path of the Project, including but not limited to working out of sequence, if necessary.

To the extent Owner and Contractor are unable to mitigate impacts to the critical path of the Project based upon unit purchaser customizations, Contractor may seek a time extension and or additional compensation due to unit purchaser customizations if Contractor timely submits a request or Claim, as applicable, in accordance with the Delay and Extension of Time provisions and Claims provisions of the Contract Documents.

§ 3.5.3   Contractor represents and warrants to Owner that all labor, materials and/or services furnished, and all Work performed by the Contractor, will be free of defects in accordance with the time periods provided in § 718.203(2), Fla. Stat., as it pertains to the statutory warranties required of the Contractor and subcontractors and their suppliers unless otherwise provided in the Contract Documents for a longer period.  Contractor specifically agrees that the Villa and Amenities shall have a three (3) year statutory warranty from the date of completion of construction as to the roof, structural components mechanical elements and plumbing elements serving the Villa and Amenities and a contractual three (3) year warranty, to the extent provided in the previously executed and assigned Coastal subcontracts.  Any subsequently entered into subcontract agreements will also provide for a three (3) year contractual warranty, in addition to the three (3) year statutory warranty.

§ 3.5.4   These warranties are not in lieu of, but are in addition to, any other warranties, express or implied, which may be provided by law and by manufacturers, Subcontractors, and suppliers. Contractor shall provide to Owner all original warranties and guarantees from all Subcontractors, suppliers, manufacturers of equipment and materials installed in connection with the Project, together with any other warranties and guarantees required by the Contract Documents. Contractor and Subcontractor warranties shall expressly include all statutory warranties set forth in  Fla.

Owner

Contractor

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No. 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Stat. §718.203(2), as it pertains to the statutory warranties required of the Contractor and subcontractors  and their suppliers all of which are specifically and expressly incorporated herein by reference.

**§ 3.5.5**  Contractor shall obtain all required inspections or other required documentation by the suppliers and Manufacturers' representatives for equipment and supplies during the course of performing the Work and during the warranty period, in order to ensure that all Manufacturer warranties will be honored thorough out the Manufacturer's entire warranty period.

**§ 3.5.6**  Subcontractor and Material and Equipment Manufacturer Warranties: Contractor   shall   have   each subcontractor performing Work at this Project execute warranties for the periods provided in Fla. Stat. §718.203(2), as it pertains to the statutory warranties required of the Contractor and subcontractors  and their suppliers unless otherwise provided in the Contract Documents for a longer period of time.  Contractor shall also have the subcontractors and material or equipment manufacturers execute Extended Warranties if required by the Contract Documents.

**§ 3.5.7**  All material, equipment, special warranties and other warranties and guarantees required by the Contract Documents shall be issued in the names of A3 Development LLC, A3 Amenities, LLC A3 North Development, LLC and A3 Restaurant, LLC, and the assigns of A3 Development LLC, A3 Amenities, LLC A3 North Development, LLC and A3 Restaurant, LLC.  Further, all such warranties shall be assignable by A3 Development LLC, A3 Amenities, LLC A3 North Development, LLC and A3 Restaurant, LLC and may be enforced by the assignees.  The material, equipment, special warranties and other warranties and guarantees required by the Contract Documents shall be transferable to the Owner, and shall commence in accordance with § 9.8.

**§ 3.5.8**  The Contractor shall remove from the site portions of the Work, which are not in accordance with the requirements of the Contract Documents.  If the Contractor fails to commence to correct defective or nonconforming Work within three (3) business days from written notice to Contractor, the Owner may correct such defective or nonconforming Work.  If the Contractor commences to correct such defective or nonconforming Work but fails to diligently and continuously work on such correction, the Owner may upon an additional three (3) business days' notice to Contractor, correct such item at Contractor and Surety's sole cost and expense.  Owner may deduct such costs and consequential damages (only to the extent such consequential damages are covered and paid by applicable insurance) arising from correcting or completing said defective work, from any monies due Contractor. If the defective or nonconforming Work is discovered after final payment, and Contractor fails to cure or commence to cure within five (5) business days after receipt of written notice then Contractor and Surety shall pay such cost and expense, including any consequential damages (only to the extent such consequential damages are covered and paid by applicable insurance) and attorney's fees incurred. The Contractor and Surety shall bear all costs of correcting such defective Work and consequential damages (only to the extent such consequential damages are covered and paid by applicable insurance) arising therefrom.

**Warranty Forms**.  The Contractor must obtain the warranties required by the Contract Documents, for a minimum period of one (1) year after completion as defined in § 718.203(2), Fla. Stat., as it pertains to the statutory warranties required of the Contractor and subcontractors and their suppliers  or longer if required by § 718.203(2), Fla. Stat., as it pertains to the statutory warranties required of the Contractor and subcontractors and their suppliers  or the Contract Documents from all Subcontractors and suppliers.  The Contractor shall secure Extended Warranties set forth in the Contract Documents as **Exhibit "O"** ("Extended Warranty(ies)") from Subcontractors, suppliers and manufacturers for all items identified in **Exhibit "O"** and in the forms set forth in the Agreement. Manufacturer Extended Warranty forms may be in the manufacturer's standard form and shall be delivered to Owner for review and approval, which approval shall not be unreasonably withheld, prior to execution by the respective manufacturer.  In accordance with a properly authorized change order, Owner shall bear the cost for all extended warranties beyond the Extended Warranties identified in **Exhibit "O"** of the Agreement. Any warranties obtained by the Contractor or Subcontractors which deviate from the forms attached to the Agreement are subject to the written approval of the Owner.

**§ 3.5.9**  All warranty provisions in this Article are subject to Section § 11.5.5 of this Agreement (AIA A201).

**§ 3.5.10**  The warranty obligations of this Article shall survive completion and Final Payment or termination of this

Owner _____                              Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Contract for the Work performed to the date of termination.

**§ 3.5.11**  In the case of an Emergency, Contractor, within twenty four (24) hours of written notice by Owner and/or Architect, shall diligently and continuously pursue any necessary repairs or replacements of defects until corrected and will restore the Work to the condition required by the Contract Documents.  Contractor shall restore surface, subsurface, collateral and primary conditions disturbed during warranty work to their prior condition.  Contractor agrees that if Contractor fails to diligently pursue correction of any deficiency in a continuous and expeditious manner until completion, Owner may, in its sole discretion, correct such deficiencies at Contractor's and Surety's sole and exclusive expense and that such action shall not invalidate any conditions of the Contract Documents. Contractor shall indemnify and hold Owner harmless from any claims, loss, damages or expense, including consequential damages (only to the extent such consequential damages are covered by applicable insurance) due to defects in the Work.

**§ 3.5.12**  The Contractor, subject to applicable insurance, shall bear the cost of correcting destroyed or damaged construction including consequential damages (only to the extent such consequential damages are covered by applicable insurance), whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents without reimbursement from the Owner.

**§ 3.5.13**  If the Owner prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Owner may do so in writing instead of requiring its removal and correction, in which case the GMP will be reduced as appropriate and equitable, however, the foregoing is subject to the contractor's right to cure.  Such adjustment shall be effected whether or not final payment has been made.

**§ 3.5.14  Call Back Services**  For the duration of the Warranty Period, the Contractor shall respond within 72 hours of notice from Owner to provide call back services for the Work and equipment provided by Contractor.  This is a material term to protect Owner's reputation for delivery of high-end luxury condominium units.

**§ 3.5.15**  In the Final Guaranteed Maximum Price Amendment, Contractor shall include a Warranty & Quality Assurance cost in the amount of .0025 (.25%) (one quarter of one percent) of the GMP and on the value of the Prior Work (based upon total amount Owner paid to Coastal – to be provided by Owner).  Said amount shall be included as a separate line item as part of the Schedule of Values/Construction Budget in the Final Guaranteed Maximum Price Amendment, to cover the administration of Contractor's warranty obligations.  At the time of the initial Temporary Certificate of Occupancy, this figure shall be adjusted by adding in the value of all change orders issued after the date of the agreed upon Final Guaranteed Maximum Price Amendment. This lump sum of .0025 (.25%) (one quarter of one percent) of the initial estimated Cost of the Work in the Final Guaranteed Maximum Price Amendment, Prior Work and Change Orders will be billed fifty percent (50%) by the Contractor in the first Application for Payment following the initial Temporary Certificate of Occupancy for the South Tower, without any retainage withheld.  The remaining fifty percent (50%) will be billed by the Contractor with its final application for payment and paid as part of Final Payment.  Owner's payment of the .0025 (.25%) (one quarter of one percent) of the Final Guaranteed Maximum Price Amendment (excluding subsequent Change Orders) shall be Owner's full and final payment for all of Contractor's Warranty & Quality Assurance costs.

**§ 3.5.16**  Following Substantial Completion of the Work, the Contractor shall, at no cost to Owner, perform inspections every nine (9) months during the warranty period and shall, at no cost to Owner, perform any required corresponding repairs, necessary to maintain all warranties, including manufacturer warranties.

**§ 3.6      Taxes**
The Contractor shall pay sales, consumer, use and similar taxes for the Work provided by the Contractor that are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

**§ 3.7      Permits, Fees, Notices and Compliance with Laws**

Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 3.7.1**   As this is a takeover of a started Project, Permits needed for performing, continuing and completing the Work have already been issued.  Contractor shall be responsible for transferring and or procuring (if needed) all Permits required to continue and compete the Work.  Owner will assist Contractor, if needed, in transferring and or procuring (if needed) all Permits required to continue and compete the Work.   Any fees or costs associated with the transfer of the Permits shall be included in Contractor's Final Guaranteed Maximum Price Amendment.  The Contractor shall not be responsible for any delay in transferring or procuring the permits, where said delays are not caused by Contractor and any delay in transferring the permits (not caused by Contractor) shall be deemed an Excusable Delay.

With regard to any Permits not already obtained but needed for continuation and or completion of the Work, Contractor shall secure and pay for as a reimbursable Cost of the Work, all Trade Permits, extended working hours permits except as may be directed by Owner in its sole discretion and not pursuant to § 3.10.5, and permits identified in § 3.13.  Owner shall secure and pay for all other necessary approvals, easements, assessments and charges required for the construction, use or occupancy of permanent structures to be located on the site of the Project or for permanent changes to existing facilities including, but not limited to all Building Permits, FDOT, DEP, Dewatering, SFWMD, DERM, Fish and Wildlife, Miami-Dade Fire, HRS, FDEP, and FAA Permit Fees. Contractor shall assist Owner with respect to the coordination and application for all Owner required permits. Owner shall timely submit permit revisions to the Building Department, so as not to delay the Work.

**§ 3.7.2**   The Contractor shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities applicable to performance of the Work.

**§ 3.7.3**   If the Contractor performs Work it knew or should have known, as a reasonably prudent contractor in the performance of its duties pursuant to this Contract, to be contrary to applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

**§ 3.7.4   Investigation of Site / Concealed or Unknown Conditions**
If the Contractor encounters conditions at the site that are (1) subsurface or otherwise concealed physical conditions that differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, that differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, the Contractor shall promptly provide notice to the Owner and the Architect before conditions are further disturbed and in no event later than five (5) days after first observance of the conditions.  The Architect will promptly investigate such conditions and, if the Architect determines that they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the GMP or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of this Agreement is justified, the Architect shall promptly notify the Owner and Contractor in writing, stating the reasons. If either party disputes the Architect's determination or recommendation, that party may proceed as provided in Article 15.  No increase in the GMP or the Contract Time shall be allowed if the Contractor knew or should have known of concealed conditions through ordinary diligence prior to its execution of this Agreement.

**§ 3.7.5**   If, in the course of the Work, the Contractor encounters human remains or recognizes the existence of burial markers, archaeological sites or wetlands not indicated in the Contract Documents, the Contractor shall immediately suspend any operations that would affect them and shall notify the Owner and Architect of the same. Upon receipt of such notice, the Owner shall promptly take any action necessary to obtain governmental authorization required to resume the operations. The Contractor shall continue to suspend such operations until otherwise instructed by the Owner but shall continue with all other operations that do not affect those remains or features. Requests for adjustments in the GMP and Contract Time arising from the existence of such remains or features may be made in accordance with the Contract Documents.

**§ 3.7.6**   Owner shall not be required to make any adjustment in either the GMP or Contract Time if Contractor fails to comply with the requirements of this Article.

Owner _____

Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 3.7.7**   Owner assumes no responsibility or liability for the physical condition or safety at the Project Site or of any improvements thereon during construction.  Contractor shall be solely responsible for providing a safe place for the performance of the Work. As between Contractor and any Subcontractor, each subcontractor shall be responsible for the acts and omissions and safety of its own employees and sub-subcontractors. This provision is not intended to address Hazardous Materials as provided in § 10.3.

**§ 3.8     Allowances**

**§ 3.8.1**   The Contractor shall include in the Final Guaranteed Maximum Price Amendment, all Allowances as stated in the Contract Documents. Items covered by Allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection. A list of agreed upon Allowances is attached to the Agreement as **Exhibit "G."**

**§ 3.8.2**   Unless otherwise provided in the Contract Documents,

　　　.1     Allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;

　　　.2     Allowances included in the Work shall include Labor, Materials, Equipment, Supervision, Delivery, Unloading, Hoisting, Warehousing, Storage, Protection, Installation, Taxes, Permits, Freight, Accessories, and Subcontractor Fees, Bonds, SDI costs, and other insurance where applicable are included in the Allowance value as indicated in the GMP Amendment; and

　　　.3     Whenever costs are more than or less than Allowances, or if they are deleted, the GMP shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs of material and equipment incurred for the Allowance, and the Allowances under § 3.8.2.1 and (2) changes in Contractor's costs under § 3.8.2.2.

**§ 3.8.3**   Materials and equipment under an Allowance shall be selected by the Owner with reasonable promptness.

**§ 3.9**   Any unused Allowance amounts, on a line item basis, shall belong one hundred percent (100%) to Owner and Contractor shall issue a deductive Change Order to Owner.

**§ 3.10     Contractor's Construction and Submittal Schedules**

**§ 3.10.1**   Contractor's Initial Construction Schedule identifying (1) the date of commencement of the Work, interim schedule milestone dates, the date of Substantial Completion, the dates for TCOs and COs, and the date of Final Completion; (2) an apportionment of the Work by construction activity; and (3) the time required for completion of each portion of the Work is attached to the Agreement as **Exhibit "F"**.  Contractor has reviewed and contemplated all Work reflected in the drawings through and including Revision "P" dated June 04, 2020, as reflected on Exhibit "A," and all Open Potential Change Orders and Change Events identified on **Exhibit "X,"** and agrees that all dates set forth in Exhibit F can be met.  In addition, Contractor shall submit a "Base Construction Schedule" for the Project to Owner for Owner's written approval.  The Base Construction Schedule shall not exceed time limits current under the Contract Documents, shall be based upon a five (5) day work week, and shall be updated at appropriate intervals, which shall be no less than once per month as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

**§ 3.10.1.1** Contractor's Base Construction Schedule shall include a list of Owner requirements and actions which Contractor is aware of, that Owner must take care of so that the Project will not be delayed.  If Contractor learns of additional items or actions that Owner must take care of so that the Project will not be delayed, Contractor shall update Contractor's Construction Schedule to add the additional Owner requirements and actions.  In addition, Contractor shall provide Owner with a list of Owner requirements and actions, which Contractor is aware of, that Owner must take care of so that the Project will not be delayed.

Owner _____                    Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No. 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 3.10.1.2** Contractor shall provide the Owner with written notice that all utility connections including electric, water and sewer connections will be available not less than sixty (60) calendar days prior to the issuance of the Temporary Certificate of Occupancy for the South Tower.

**§ 3.10.2** Contractor shall also submit Contractor's Submittal Schedule to Owner for Owner's written approval. Thereafter, the Contractor, as necessary to maintain a current submittal schedule, shall submit an updated Submittal Schedule for the Owner and Architect's written approval. The Submittal Schedule shall (1) be coordinated with the Contractor's Construction Schedule, and (2) allow the Architect reasonable time to review submittals. If the Contractor fails to provide submittals in accordance with the approved Submittal Schedule, the Contractor shall not be entitled to any increase in Contract Sum or extension of Contract Time based on the time required for review of submittals.

**§ 3.10.3** The Contractor shall perform the Work in strict accordance with the Initial Construction, the Base Construction Scheduled and the Submittal Schedules submitted to the Owner and Architect and approved by Owner in writing, unless a revision to the Schedules was approved in writing by the Owner.

**§ 3.10.4** The Base Construction Schedule and all subsequently submitted updated Construction Schedules shall be in a detailed, precedence-style, critical path method (CPM) type format satisfactory to the Owner and the Architect which shall also: (1) provide a graphic representation of all activities and events that will occur during performance of the Work; (2) identify each phase of construction, Substantial Completion, Temporary Certificate of Occupancy Dates, Certificates of Occupancy and Final Completion; and (3) set forth dates that are critical in ensuring the timely and orderly completion of the Work in accordance with the requirements of the Contract Documents (hereinafter referred to as "Milestone Dates"). Contractor shall provide Owner with the original/planned, Base Construction Schedule in P6 native electronic files (.xer format) such that Owner may see Contractor's logic. Upon review and acceptance by the Owner and the Architect of the Base Construction Schedule, the Base Construction Schedule shall be deemed part of the Contract Documents and attached to the Agreement as **Exhibit "T"** and is incorporated in the Contract Documents.

**§ 3.10.5** The Contractor shall monitor the progress of the Work for conformance with the requirements of the Base Construction Schedule and shall promptly advise the Owner of any delays or potential delays. The accepted Base Construction Schedule shall be updated one time each month to reflect actual conditions and Contractor shall provide Owner with a copy of the updated, schedule, in P6 native electronic files (.xer format), and a list of all changes made to the schedule, at the time Contractor submits its monthly Payment Application. The updated Construction Schedule should include new start dates, new finish dates and the appropriate percent complete. No additional activities, changes to the Construction Schedules logic or changes to the Construction Schedules durations are to be included in the updated Construction Schedule. The Contractor may, at its option, provide fragnets with added activities and logic changes; however these changes are to be submitted in a separate document and as a separate electronic file. With all submissions, the .xer electronic file is to be submitted along with PDFs.

**§ 3.10.6.** In the event any progress report or schedule update indicates any delays or loss of time to the critical path, the Contractor shall propose an affirmative plan to correct the delay, including resequencing of the Work, overtime and/or additional labor, if necessary. In no event shall any progress report constitute an adjustment in the Contract Time, Milestone Dates, or the GMP unless any such adjustment is agreed to by the Owner and authorized pursuant to properly executed written Change Order. Contractor shall maintain such updated Construction Schedule on a current basis in accordance with the provisions of this Section and shall keep proper records available to inspection by Owner to substantiate actual activity, resources, duration and completion dates.

**§ 3.10.7** In the event the Owner or Architect determines that the performance of the critical path Work has not progressed as required by the Contract Documents, and that said delay cannot be corrected by re-sequencing the Work, then the Owner shall have the right to order the Contractor, in writing, to take corrective measures necessary to expedite the progress of construction, including, without limitation, (1) working additional shifts or overtime, (2) supplying additional manpower, equipment, and facilities, (3) re-sequencing the Work to avoid the effects of potential delay; and (4) other similar measures utilizing the most cost effective and reasonable acceleration methods

Owner _____        Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

possible to avoid delays and TCO Liquidated Damages (hereinafter referred to collectively as "Extraordinary Measures"). Such Extraordinary Measures shall continue until the progress of the Work complies with the stage of completion required by the Contract Documents and approved Construction Schedule. The Owner's right to require Extraordinary Measures is solely for the purpose of ensuring the Contractor's compliance with the Construction Schedule. In the event of an Excusable Delay and or Concurrent Delay, Contractor shall not be required to implement Extraordinary Measures until the issuance of a Change Order for such costs. The Contractor shall be responsible for TCO Liquidated Damages for delays for failure to complete the Work within the Contract Time provided Contractor is not entitled to a time extension. Extraordinary Measures required to keep the Project on schedule and to avoid critical path delays shall not be considered a Cost of the Work and shall not be a basis to increase the GMP. Should Contractor fail to perform the Extraordinary Measures as provided herein, the Owner shall give the Contractor a five (5) business day notice of default. If the Contractor does not commence and continue to correct the default as provided in this Section, then the Owner may supplement Contractor's crews, supply additional manpower, equipment and facilities, and/or other similar measures to avoid delays. Contractor and Surety shall be liable to Owner for all costs incurred by Owner pursuant to this Section. If Contractor does not perform its obligations pursuant to this Section, an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost incurred pursuant to this Section. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor and Surety shall pay the difference to the Owner.

§ 3.10.8  All time limits and obligations are of the essence in the Contract Documents.

§ 3.10.9  The Owner may exercise the rights furnished the Owner under or pursuant to this Section as frequently as the Owner deems necessary to ensure that the Contractor's performance of the critical path Work will comply with any Milestone Date and/or the Substantial Completion Date or TCO dates, as provided for in the Contract Documents.

### § 3.11  Documents and Samples at the Site

The Contractor shall maintain and keep available to the Owner, at the Project site, one copy of the Contract Documents, including the Drawings, Addenda, Change Orders, Construction Change Directives, and other Modifications, in good order and marked currently to indicate field changes and selections made during construction, and the approved Shop Drawings, Product Data, Samples, and similar required submittals. These shall be in electronic form or paper copy (as determined by Owner), available to the Architect and Owner, and delivered to the Owner upon completion of the Work as a record of the Work as constructed.

### § 3.12  Shop Drawings, Product Data and Samples

§ 3.12.1  Shop Drawings are drawings, diagrams, schedules, and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier, or distributor to illustrate some portion of the Work.

§ 3.12.2  Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams, and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

§ 3.12.3  Samples are physical examples that illustrate materials, equipment, or workmanship, and establish standards by which the Work will be judged.

§ 3.12.4  Shop Drawings, Product Data, Samples, and similar submittals are not Contract Documents. Their purpose is to demonstrate how the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents for those portions of the Work for which the Contract Documents require submittals. Review by the Architect is subject to the limitations of § 4.2.7. Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents. Submittals that are not required by the Contract Documents may be returned by the Architect without action.

§ 3.12.5  The Contractor shall review for compliance with the Contract Documents, approve, and submit to the Architect, Shop Drawings, Product Data, Samples, and similar submittals required by the Contract Documents, in accordance with the submittal schedule approved by the Architect or, in the absence of an approved submittal schedule,

Owner _____                         Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of Separate Contractors. The Contractor shall provide and submit all Shop Drawings as required by the Contract Documents, which Shop Drawings shall be in such form as to pass all inspections and approvals as required by all applicable governmental authorities.

**§ 3.12.6**  By submitting Shop Drawings, Product Data, Samples, and similar submittals, the Contractor represents to the Owner and Architect that the Contractor has (1) reviewed and approved them, (2) determined and verified materials, field measurements and field construction and all criteria related thereto, or will do so, and (3) checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

**§ 3.12.7**  The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples, or similar submittals, until the respective submittal has been approved by the Architect.

**§ 3.12.8**  The Work shall be in accordance with approved submittals. Contractor shall not be relieved of responsibility for deviations from the requirements of the Contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples, or similar submittals, unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and (1) the Architect has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction Change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

**§ 3.12.9**  The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Architect on previous submittals. In the absence of such written notice, the Architect's approval of a resubmission shall not apply to such revisions.

**§ 3.12.10**  The Contractor shall not be required to provide professional services that constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law.

**§ 3.12.10.1**  If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Architect will specify performance and design criteria that such services must satisfy and Contractor shall be entitled to rely on the same. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Architect. The Owner and the Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications and approvals performed or provided by such design professionals, provided the Owner and Architect have specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this **§ 3.12.10,** the Architect will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents.

**§ 3.12.10.2**  If the Contract Documents require the Contractor's design professional to certify that the Work has been performed in accordance with the design criteria, the Contractor shall furnish such certifications to the Architect at the time and in the form specified by the Architect.

**§ 3.13   Use of Site**
The Contractor shall confine operations at the site to areas permitted by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities and the Contract Documents and shall not unreasonably encumber the site with materials or equipment. If the Work requires the use of sidewalks, public ways or other areas

Owner _____                     Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06-17-2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

outside of the Owner's Project Site, the Owner shall be responsible for obtaining all necessary approvals for such work (with Contractor's assistance). The Contractor must secure all materials and equipment that are stored on the Project site and shall take all reasonable safety precautions necessary to protect such materials and equipment. The Contractor shall be responsible, as a Cost of the Work included as part of the GMP for all measures to protect the Project site and property adjacent to the Project, from the Contractor's Work. The Contractor shall be responsible for all damages and costs for failure to comply with this § 3.13.

§ 3.13.1   Any damages to any area of the site caused by the Contractor or any of the Contractor's subcontractors shall be corrected and returned to a condition satisfactory to the Owner. Notwithstanding Contractor will not be precluded from filing a claim against the property insurance for the damages.

§ 3.13.2   Except for the Contractor, no other entity for whom the Contractor is responsible, including all of its Subcontractors, and any other entity performing work for the Contractor shall erect any sign on the Project site without the prior written consent of the Owner.

§ 3.13.3   Contractor represents that it is familiar with the community in which the Project is being constructed. Contractor has included all adequate security, including but not limited to watchman security guards, measures to protect the site from theft and vandalism in the GMP and Owner shall not be responsible for any additional security costs.

## § 3.14   Cutting and Patching

§ 3.14.1   The Contractor shall be responsible for cutting, fitting, or patching required to complete the Work or to make its parts fit together properly. All areas requiring cutting, fitting, or patching shall be restored to the condition existing prior to the cutting, fitting, or patching, unless otherwise required by the Contract Documents.

§ 3.14.2   The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or Separate Contractors by cutting, patching, or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter construction by the Owner or a Separate Contractor except with written consent of the Owner and of the Separate Contractor. Consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold, from the Owner or a Separate Contractor, its consent to cutting or otherwise altering the Work.

## § 3.15   Cleaning Up and Repair

§ 3.15.1   The Contractor shall at all times keep the premises and surrounding area free from accumulation of waste materials and rubbish caused by its operations under the Contract Documents. At completion of the Work on a daily basis, the Contractor shall remove, all waste materials and rubbish, and shall secure and neatly organize the Contractor's tools, construction equipment, machinery and surplus materials from and about the Project generated by Contractor's performance of the Work.

§ 3.15.2   If the Contractor fails to clean up as provided in the Contract Documents, after three (3) business days written notice, the Owner may do so and the Owner shall be entitled to reimbursement from the Contractor or Owner may deduct the cost of cleanup from any amounts due Contractor.

§ 3.15.3   If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and the Owner, in its discretion, will allocate the cost among those responsible.

§ 3.15.4   Contractor agrees to immediately repair at its sole cost and expense all damages to the Property, including, but not limited to, any damages to real or personal property arising from or relating to Contractor's performance of the Work to the reasonable satisfaction of the Owner Contractor will not be precluded from filing a claim against the property insurance for the damages.

Owner _____                              Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

### § 3.16    Access to Work

The Contractor shall provide the Owner and Architect with access to the Work in preparation and progress wherever located.

### § 3.17    Royalties, Patents and Copyrights

The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and Architect harmless from loss on account thereof, except when due to the fault or neglect of Owner or any party for whom the Owner is responsible but shall not be responsible for defense or loss when a particular design, process, or product of a particular manufacturer or manufacturers is required by the Contract Documents, or where the copyright violations are contained in Drawings or other documents prepared by the Owner or Architect. However, if an infringement of a copyright or patent is discovered by, or made known to, the Contractor, the Contractor shall be responsible for the loss unless the information is promptly furnished to the Architect.

### § 3.18    Indemnification

**§ 3.18.1** To the fullest extent permitted by law, the Contractor shall defend, indemnify and hold harmless A3 Development LLC, A3 Amenities, LLC, A3 North Development, LLC and or A3 Restaurant, LLC, and each of their affiliates, and each of their respective partners, members, officers, directors, employees and agents (including but not limited to the Owner's Representatives, and the Owner's Lender) (collectively, the "Indemnified Party(ies)") (but excluding the Architect, engineer of record and all other licensed professionals) from and against all claims, demands, liabilities, damages, losses, fees, costs and/or expenses (including, but not limited to, reasonable attorneys' fees, at both the trial and appellate levels) caused in whole or in part provided that such claim, damage, loss or expense is attributed to bodily injury, sickness, disease or death, or to injury or destruction of tangible property (other than the Work itself) by any negligent act, omission or default of the Contractor (and/or any of Contractor's Subcontractors, Sub-subcontractors, materialmen or agents of any tier, or their respective employees) (collectively, the "Indemnitors") arising from and/or in connection with this Agreement and/or the performance and/or failure of the Work. Notwithstanding the foregoing, *provided, however,* that (a) Contractor's obligation to defend, pay, discharge, satisfy, indemnify and hold Indemnified Parties harmless from and against a Loss is limited to the portion of the Loss that is caused by an act, omission or default of Contractor or any Subcontractor, Sub-subcontractor (of any tier), or any employee, agent, or representative of any of them or any other Person for whom Contractor is responsible, and (b) Contractor is not obligated to defend, pay, discharge, satisfy, indemnify or hold the Indemnified Parties harmless from and against the portion of the Loss that is caused by the act, omission or default of the Indemnified Parties. Contractor's indemnification hereunder of an Indemnified Party(ies) shall not include claims of, or damages resulting from, the gross negligence, or willful, wanton or intentional misconduct of such Indemnified Party(ies), or for statutory violations or punitive damages except and to the extent the statutory violation or punitive damages are caused by or result from the negligent acts or omissions of the Contractor.  To the extent that the Contractor's obligation to indemnify as set forth herein arises in whole or in part from the acts, omissions, or default of an Indemnified Party(ies), such obligation shall be limited to the policy limit of available OCIP insurance and any other Subcontractor CGL insurance coverage (to the extent the Subcontractor is not enrolled in the OCIP or otherwise maintained a separate CGL policy), which sum the parties hereto acknowledge and agree bears a reasonable commercial relationship to this Agreement and shall be deemed part of the bid documents, if any.  Where the Contractor, any of its Subcontractors, Sub-subcontractors, materialmen or agents of any tier, or their respective employees are wholly at fault, then there shall be no monetary limit to Contractor's obligation of indemnity hereunder. It is further agreed and acknowledged that Contractors defense and indemnity obligations set forth herein of the Indemnified Parties exclude claims, losses, demands, liabilities, damages, fees, costs and/or expenses that are required to be insured by the OCIP and builder risk insurance policies.

**§ 3.18.2**  In any and all claims against the Indemnified Parties by any employee of the Contractor, or anyone for whose acts any of them may be liable, the indemnification obligation under this provision of this Contract shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or on behalf of the Contractor or any Subcontractor under Workers Compensation Acts, Disability Benefit Acts or other employee benefit acts.

Owner _____

Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 3.18.3**  The Parties hereto acknowledge and agree that, to the extent any portion of the indemnification provisions contained herein is deemed void or unenforceable in any action or proceeding, then such portion shall be considered severed such that it will not affect the remaining portions of these indemnification provisions.

**§ 3.18.4**  The Indemnitors' indemnity obligations under this Section shall also specifically include, without limitation, all claims, fines, penalties, damages, liability, costs, fees, expenses (including, without limitation, reasonable attorneys' fees and expenses), and punitive and consequential damages (if any and only to the extent covered and paid by insurance) arising out of, or in connection with or attributable to, any claims made against the Indemnified Parties for (i) bodily injury, sickness, disease, death, or destruction of tangible property caused by the negligent acts of Contractor and/or any of its Subcontractors and/or Sub-subcontractors, (ii) violation of or failure to comply with any law, statute, ordinance, rule, regulation, code or requirement of a public authority in the performance of the Work by the Contractor, and/or any of the Indemnitors, or any person or entity for whom they are responsible, (iii) Contractor's failure to comply with any provision of the Contract Documents including Warranty obligations, and obligations to correct damaged and defective work, (iv) means, methods, procedures, techniques, or sequences of execution or performance of the Work, and/or (v) failure to secure and pay for permits, fees, approvals, licenses, and inspections as required of Contractor under this Contract and/or the other the Contract Documents, or any violation of any permit or other approval of a public authority applicable to the Work, by the Contractor, a Subcontractor, or any person or entity for whom either is responsible.  Moreover, and without limiting the foregoing, the Indemnitor's indemnity obligations under this Section include any and all claims by third parties against Indemnified Parties for direct and consequential damages (only to the extent covered and paid by insurance) arising from and/or in connection with this Agreement and/or the negligent performance and/or failure of the Work.

It is further agreed and acknowledged that Contractor's defense and indemnity obligations set forth herein of the Indemnified Parties exclude claims, losses, demands, liabilities, damages, fees, costs and/or expenses that that are actually insured by the OCIP and Builder Risk Insurance policies.

**§ 3.18.5**  The Contractor shall indemnify and hold harmless all of the Indemnified Parties from and against any costs and expenses (including reasonable attorneys' fees for all trial and appellate levels) incurred by any of the Indemnified Parties in enforcing any of the Contractor's defense, indemnity and hold-harmless obligations under this Agreement.

**§ 3.18.6**  The Contractor shall include in all Subcontracts provisions by which each Subcontractor agrees to defend, indemnify and hold harmless Contractor and the Indemnified Parties from and against liability, damages, losses and costs, including, but not limited to, reasonable attorneys' fees for all trial and appellate levels, arising out of, in connection with, or resulting from the performance of the Work or any Subcontractor's obligations under the Contract Documents to the same extent and in the same manner as the Contractor is liable to Owner pursuant to this provision.

**§ 3.18.7**  The Owner shall indemnify, defend and hold harmless the Contractor from and against any damages, costs and expenses (including reasonable attorneys' fees) caused solely by the Owner in the performance of its duties pursuant to this Agreement. This indemnity obligation shall not extend to the acts of the Architect, Lender, or other contractors or consultants in the employ of Owner. The Owner's liability shall be limited to the extent of proceeds of OCIP insurance for any claims by Contractor against Owner.  Notwithstanding the foregoing, Owner's indemnification hereunder shall not include claims for punitive damages for Contractor's conduct.

**§ 3.18.8**  The provisions of this § 3.18 shall survive final completion and final payment or termination of this Agreement.  The Surety's responsibility under this Article is governed by § 11.5.5 of this Agreement.

## ARTICLE 4  ARCHITECT

### § 4.1   General

**§ 4.1.1**   The Architect is the person or entity retained by the Owner pursuant to § 2.3.2 and identified as such in the Agreement.  The term "Architect" in the Agreement, referred to throughout the Contract Documents as if singular in number, shall mean the Owner's Architect or such other independent professional design consultant designated in writing by the Owner.

Owner _____          Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06-17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 4.1.2**  Duties, responsibilities, and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified, or extended without written consent of the Owner and Architect. Consent shall not be unreasonably withheld.

**§ 4.1.3**  If the employment of the Architect is terminated, the Owner shall employ a successor architect and whose status under the Contract Documents shall be that of the Architect.

### § 4.2   Administration of the Contract

**§ 4.2.1**  The Architect will provide administration of the Contract as described in the Contract Documents, with authorities as described herein, during construction until the date the Architect issues the final Certificate for Payment. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents.

**§ 4.2.2**  The Architect will visit the site at intervals appropriate to the stage of construction, or as otherwise agreed with the Owner, to become generally familiar with the progress and quality of the portion of the Work completed, and to determine in general if the Work observed is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will not have control over, charge of, or responsibility for the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

**§ 4.2.3**  On the basis of the site visits, the Architect will keep the Owner reasonably informed about the progress and quality of the portion of the Work completed, and promptly report to the Owner (1) known deviations from the Contract Documents, (2) known deviations from the most recent construction schedule submitted by the Contractor, and (3) defects and deficiencies observed in the Work. The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of, and will not be responsible for acts or omissions of, the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

### § 4.2.4   Communications
The Owner and Contractor shall be able to communicate with each other, copying the Architect in all communications that relate to or affect the Architect's services or professional responsibilities. The Owner shall promptly notify the Architect of the substance of any direct communications between the Owner and the Contractor otherwise relating to the Project. Communications by and with the Architect's consultants shall be through the Architect. Communications by and with Subcontractors and suppliers shall be through the Contractor. However, Owner may communicate at any time and in any fashion, directly with Subcontractors, Sub-Subcontractors and suppliers regarding the Work performed on the Project provided Contractor is notified and allowed to participate. The Owner may, without the Contractor being notified, communicate directly with subcontractors as to the status of payments for the Work.  If the communication is in writing, Owner will provide a copy to Contractor.  Communications by and with Separate Contractors (if any) shall be through the Owner. The Contract Documents may specify other communication protocols.

**§ 4.2.5**  Based on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.

**§ 4.2.6**  The Architect, the Owner, and the Owner's Representative have authority to reject Work that does not conform to the Contract Documents. Whenever the Owner or Architect considers it necessary or advisable, the Architect or Owner will have authority to require inspection or testing of the Work in accordance with § 13.5.2 and § 13.5.3, whether or not the Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect or Owner to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

Owner                                                    Contractor

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09.44.22 ET on 06/23/2020 under Order No.7813334439 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 4.2.7**   The Architect will review and approve, or take other appropriate action upon, the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action will be taken in accordance with the submittal schedule approved by the Architect or, in the absence of an approved submittal schedule, with reasonable promptness while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review of the Contractor's submittals shall not relieve the Contractor of the obligations under § 3.3, § 3.5 and § 3.12. The Architect's review shall not constitute approval of safety precautions or of any construction means, methods, techniques, sequences, or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component. Contractor will not be responsible for Architect's failure to perform in accordance with the requirements of the Owner-Architect Contract and with the Contract Documents.  Contractor will not have control over or charge of and will not be responsible for acts or omissions of Architect, its employees, subcontractors or consultants.

**§ 4.2.8**   The Architect may prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in § 7.4.

**§ 4.2.9**   The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of Final Completion; issue Certificates of Substantial Completion pursuant to § 9.8; receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor pursuant to § 9.8; and issue a final Certificate for Payment pursuant to § 9.10, which final Certificate for Payment cannot be issued unless all requirements of the Agreement are performed pursuant to § 9.10.

**§ 4.2.10**   If the Owner and Architect agree, the Architect will provide one or more Project representatives to assist in carrying out the Architect's responsibilities at the site. The Owner shall notify the Contractor of any change in the duties, responsibilities and limitations of authority of the Project representatives.

**§ 4.2.11**   The Architect will interpret and decide matters concerning performance under, and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness.

**§ 4.2.12**   Interpretations and decisions of the Architect will be consistent with the intent of, and reasonably inferable from, the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either, and will not be liable for results of interpretations or decisions rendered in good faith.

**§ 4.2.13**   The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

**§ 4.2.14**   The Architect will review and respond to requests for information about the Contract Documents. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If appropriate, the Architect will prepare and issue supplemental Drawings in response to the requests for information.

**§ 4.2.15**   Should the Contractor request information, interpretations of Contract Documents, use of alternates, approval of samples (but not Shop Drawings) or make other similar requests (hereinafter "RFI" or "RFIs"), it shall do so in good faith, in writing, and with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of Separate Contractors. The Architect's response to RFIs will be made in writing and within ten (10) business days and Contractor shall contemplate Architect's response time when submitting RFI's so as to ensure no delays to the Project.  Contractor cannot abuse this provision by submitting repeated RFIs which, in the cumulative, cause a burden and render the Architect's responses within such ten (10) business days difficult. Additionally, the period shall be extended if the Architect is not able to respond due to the failure of Contractor to

Owner _____                    Contractor _____

**Modified AIA Document A201™ – 2017.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

provide adequate and accurate information to the Architect. Furthermore, should the Architect require compensation to review any Contractor requests which are abusive or unreasonable in number or timing, the Architect shall expedite its review of the RFIs provided Contractor agrees in writing to reimburse Owner for any architectural fees necessitated in responding to such RFIs. Repeated requests for incomplete or partially responded RFI's are not considered unreasonable or abusive. Contractor agrees that Owner may deduct any such architectural fees from any sums otherwise due Contractor. Notwithstanding the forgoing the Owner has agreed to require the Architect to provide a fulltime on site representative to expedite the flow of information between the various parties as necessary to support the construction activity including the expediting of submittals and RFIs.  Any time extension requests related to alleged untimely RFI responses must be timely submitted in accordance with the Delay and Extension of Time provisions and Claims provisions of the Contract Documents and must meet all of the requirements for a time extension as set forth in the Contract Documents.

§ 4.2.16  With regard to the submission and approval of Shop Drawings or other submittals, the period of time for response is provided in the Submittal Schedule. It is Contractor's responsibility to determine in advance the amount of time Architect will take to review Shop Drawings or submittals, and what information will be required for adequate review in accordance with the Project Schedule which shall generally mean no more than fifteen (15) calendar days. Contractor is further responsible for submitting thorough and complete requests for review or approval in sufficient time so as not to cause any delay to the Contractor's Work.  Contractor shall submit Shop Drawings in accordance with the Submittal Schedule. Contractor will not be entitled to an extension of the Contact Time or an increase in the GMP due to any delay on the part of Architect, unless Contractor's request for additional time and or price meets all requirements of the Contract Documents and in addition, Contractor can demonstrate by clear and convincing documentation that Contractor properly submitted the request in accordance with the approved Submittal Schedule, that Architect failed, due to no fault of Contractor, to respond in accordance with the approved Submittal Schedule, that said delay impacted the critical path of the Project by more than five (5) days, and that said delay could not have otherwise been avoided by Contractor.

§ 4.2.17  Notwithstanding any other provision to the Contract Documents, the Architect or its consultant(s) do not have authority to authorize changes to the Contract Documents.  Only Owner shall be authorized to execute Change Orders, or otherwise modify these Contract Documents. Should Contractor desire to change any materials, or equipment required by Construction Change Directives, Contractor must first notify the Owner and Architect of its intent to deviate from the Contract Documents by preparing a Construction Change Directive and obtain written approval for performance of any Work which changes or deviates from the Contract Documents.  Failure to obtain said approval in writing will bar Contractor from any claim for additional compensation, delays or arguing that the Architect or its consultants directed the work.

## ARTICLE 5  SUBCONTRACTORS

### § 5.1    Definitions

§ 5.1.1    A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a Separate Contractor or the subcontractors of a Separate Contractor.

§ 5.1.2    A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

### § 5.2    Award of Subcontracts and Other Contracts for Portions of the Work

§ 5.2.1    Unless otherwise stated in the Contract Documents, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner and Architect the information required by § 10.1 of the AIA Document A102™–2017, Modified Form of Agreement.

Owner _____               Contractor _____

Modified AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09.44.22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 5.2.2**   The Contractor shall not contract with a proposed person or entity to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

**§ 5.2.3**   The Contractor shall not substitute a Subcontractor, person, or entity for one previously selected if the Owner or Architect makes reasonable objection to such substitution.

**§ 5.3**   **Subcontractual Relations**

**§ 5.3.1**   With regard to Subcontractors not being assigned from Coastal, Contractor shall only engage new non-Coastal Subcontractors using the form Subcontract Agreement attached to the AIA Document A102™–2017, Modified Form of Agreement as **Exhibit "J"** which shall include by incorporation these AIA Document A201™– 2017, Modified General Conditions and the AIA Document A102™–2017, Modified Form of Agreement

**§ 5.3.2**   By written agreement, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work that the Contractor, by these Contract Documents, assumes toward the Owner and Architect. Each Subcontract Agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the Subcontract Agreement, the benefit of all rights, remedies, and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate and only to the extent possible, the Contractor shall require each Subcontractor to enter into similar written agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the Subcontract Agreement, copies of the Contract Documents to which the Subcontractor will be bound. .

**§ 5.3.3**   Contractor hereby agrees that each Subcontract Agreement shall contain provisions granting the Contractor the right to terminate the Subcontract Agreement at any time for the Contractor's convenience and without cause, and without exposure to lost profits or overhead.

**§ 5.3.4**   Contractor hereby agrees that the Owner has the right to direct the Contractor to terminate any Subcontractor at any time for the Owner's convenience and without cause.  If the Owner directs the Contractor to terminate any Subcontractor for convenience, an appropriate Change Order will be issued to Contractor for any increase in the Cost of the Work and time resulting from Owner's exercise of its right to direct the Contractor to terminate a Subcontractor for convenience. Each Subcontract agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that the subcontracting thereof will not prejudice such rights.

**§ 5.3.5**   Contractor hereby agrees that the Owner has the right to direct the Contractor to default a Subcontractor for any breach of the Contract Documents and/or to terminate any Subcontractor at any time based upon breach of the Agreement as set forth in **§ 14.2.1** to the extent that Contractor is in agreement that the Subcontractor is in default and unable to cure the default upon being given proper notice and an opportunity to cure. If a Subcontractor is terminated for cause, there shall be no increase to the GMP due to the termination of the Subcontractor. There shall be no similar change order for termination of a Subcontractor for cause.  Contractor shall promptly and diligently, at Contractor's sole cost and expense, report and/or make the appropriate claim, if appropriate against its SDI.

**§ 5.4**   **Contingent Assignment of Subcontracts and Third Party Beneficiary Requirements**

**§ 5.4.1**   The Contractor hereby assigns to the Owner and Owner's Lender, an option which Owner, at any time, may elect to accept after proper termination of the Contactor for Convenience or Contractor's default, for those subcontract agreements which the Owner accepts by notifying the Subcontractor and Contractor in writing, of all of Contractor's contract rights with respect to Subcontractors and material and equipment suppliers that contracted to provide Work, materials, equipment and or services to this Project in accordance with the Contract Documents, including but not

Owner _____   Contractor _____

Modified AIA Document A201™ – 2017, Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06-17-2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

limited to all Contractor's rights to make claims regarding quality of the Work, workmanship and warranties described in this Contract.

**§ 5.4.2**   It is further agreed that all non- Coastal Subcontracts and material and equipment purchase contracts entered into by Contractor or its Subcontractors or material suppliers, shall contain a provision stating that, if after termination of Contractor for Contractor's material default, subject to the sureties rights under the Bond, as it pertains to warranty or completion of the Work, the Owner may bring any claim directly against any Subcontractor of Contractor, including any surety bond furnished for or on behalf of such Subcontractor, for breach of contract, warranty rights, quality of workmanship (for the exception of consequential damages unless covered and paid by insurance), and create third party beneficiary rights of Owner and Owner's Lender in said agreements.  It is further agreed and understood that such assignment(s) and third party beneficiary rights are part of the consideration to Owner for entering into this Agreement with Contractor and may not be withdrawn, and Subcontractor or equipment and material suppliers shall be notified of Owner's rights.  Additionally, nothing contained in this Agreement shall constitute an assignment of Contractor's rights against the Owner or create any third party beneficiary rights in any Subcontractors or material and equipment suppliers of Contractor.  The purpose of this provision is to allow the Owner, and Owner's Lender after the termination of the Contractor and subject to the sureties rights under the Bond in addition to Contractor, to make claim for damage or indemnification directly against any Subcontractors or material and equipment suppliers that may be ultimately responsible for defects or deficiencies in the Work or materials and equipment for the exception of consequential damages unless covered and paid by insurance).  Additionally, this assignment is for the purpose of permitting Owner, and Owner's Lender to require any such Subcontractor or materials and equipment suppliers to complete the unperformed obligations under such Subcontract, should the Contractor be in material default or be terminated by Owner.

**§ 5.4.3**   The Owner shall have no obligation to pay, or to see to the payment of, any monies to any Subcontractor unless it has taken an assignment of the subcontracts as set forth in **§ 5.4.2** above (in which event payment obligations are subject to the assigned subcontract agreement).  Nothing in this Article or Agreement shall be deemed to create any contractual relationship between the Owner and any Subcontractor, material provider or supplier or to create any rights of any Subcontractor against the Owner for any actions, debts, obligations, responsibilities or liabilities occurring prior to any assignment executed pursuant to this Article.

**§ 5.4.4**   Upon assignment to the Owner under this **§ 5.4**, the Owner may further assign the subcontract to a successor contractor, Owner's Lender or other entity.

**ARTICLE 6   CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS AND CONTRACTOR'S RESPONSIBILITIES TO SEPARATE CONTRACTORS**

**§ 6.1     Owner's Right to Perform Construction and to Award Separate Contracts**

**§ 6.1.1**   The term "Separate Contractor(s)" shall mean other contractors retained by the Owner under separate agreements. The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces (not under Contractor's permit), and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation. Accordingly, the Owner will only employ Separate Contractors that will work in harmony with the Contractor and its subcontractors of all tiers and comply with Contractor's safety requirements. The Owner shall require Separate Contractor's by written agreement to provide liability insurance naming the Contractor as additional insured. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided in **Article 15.**

**§ 6.1.2**   When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

Owner _____          Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06-17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 6.1.3**   The Contractor shall provide for coordination of the activities of the Owner's forces and of each Separate Contractor with the Work of the Contractor. The Contractor shall participate with any Separate Contractors including public utility contractors and the Owner in reviewing their construction schedules. The parties acknowledge that the Contractor's schedule has included time for all known separate Owner contractors and all utility contractors to perform their work, based on Contractor's experience and knowledge.   The Contractor shall review those portions of the Contract Documents to be performed by the Owner's separate contractors and all utility contractors, if any, that may impact Contractor's performance of its Work, and that may be interrelated with the Work to be performed by the Contractor, and shall schedule its Work so as to cause no delay to the Work. This provision is not intended to address unit owner build-outs that are not part of the scope of Work of the Contract Documents. Notwithstanding, Contractor's Work at the Project takes precedence over any work to be performed by separate contractors and Contractor reserves the right to prevent the commencement or continuation of work performed by the separate contractors to the extent the activities impact the critical path.

**§ 6.1.4**   The Contractor shall coordinate its construction activities with the activities of Owner's separate contractors and utility contractors, and shall provide the necessary personnel and services which are included in the Contract Sum necessary to connect and coordinate its Work with theirs at the proper time and in a manner so as not to delay the Work or increase costs.

**§ 6.1.5**   The Contractor shall be responsible to meet with and review the requirements of all public utilities, including electric, water and sewer, and to include in its schedule appropriate time for such utilities to complete their work so as not to impact the Work of Contractor and not delay the schedule and date of Substantial Completion. There shall be no Claim by Contractor for delays caused by any utility contractors in the performance of any Work necessary for this Project if the delay is the result of Contractor's failure to timely schedule the commencement of the utility work in accordance with the schedule.

**§ 6.2**   **Mutual Responsibility**

**§ 6.2.1**   The Contractor shall afford the Owner, Separate Contractors and all utility contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents subject to Contractor's reasonable site logistic plan.

**§ 6.2.2**   If any part of the Work depends upon proper execution of work performed by Owner or Owner's separate contractors, or utility contractors, if any, the Contractor, its Subcontractors, and their respective Sub-subcontractors shall, prior to proceeding with the Work, inspect such Work and promptly report to Owner any apparent discrepancies or defects in such other work.  Failure of the Contractor, its Subcontractors, or their respective Sub-subcontractors to comply with these requirements shall bar any claims thereafter that defects in Contractor's Work, or delays in the schedule, are due to defects in the work performed by others.  Similarly, if any part of the work performed by Owner or Owner's separate contractors or utility contractors depends upon proper execution of Work performed by Contractor, its Subcontractors, and their respective Sub-subcontractors, Owner's separate contractors shall, prior to proceeding with the work, inspect such Work and promptly report to Contractor any apparent discrepancies or defects in such Work.  Failure of Owner's separate contractors or utility contractors to comply with these requirements shall bar any claims thereafter that defects in Owner's separate contractors' work are due to defects in the Work performed by Contractor.

**§ 6.2.3**   The Contractor shall reimburse the Owner for costs the Owner incurs that are payable to a Separate Contractor because of the Contractor's delays, improperly timed activities or defective construction and conversely, Owner shall reimburse Contractor for delays occasioned by Separate Contractors, if Contractor timely submits a Claim meeting the requirements of the Contract Documents. The Owner shall be responsible to the Contractor for costs the Contractor incurs because of a Separate Contractor's delays, improperly timed activities, damage to the Work or defective construction.

**§ 6.2.4**   The Contractor shall promptly remedy damage that the Contractor wrongfully causes to completed or partially completed construction or to property of the Owner or Separate Contractor as provided in § 10.2.5.

Owner _____                          Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09.44.22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 6.2.5**   The Owner and each Separate Contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in § 3.14.

**§ 6.3      Owner's Right to Clean Up**
If a dispute arises among the Contractor, Separate Contractors, and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up upon three (3) days' written notice and the Architect will allocate the cost among those responsible.

**ARTICLE 7   CHANGES IN THE WORK**

**§ 7.1      General**

**§ 7.1.1**   Contractor recognizes that the nature of constructing high-end, luxury residential condominiums is that the unit purchasers will be making changes to the units.  These changes may impact the critical path of the Project and Contractor shall work with and cooperate with Owner to minimize any impacts these changes may have to the Critical Path of the Project.  Contractor shall provide Owner with a written plan as to how these delays can be mitigated.  Any requests for a time extension and or additional compensation related to unit purchaser customizations or changes must be timely submitted in accordance with the Delay and Extension of Time provisions and Claims provisions of the Contract Documents and must meet all of the requirements for a time extension as set forth in the Contract Documents.

**§ 7.1.2**   Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or Field Directive for a minor change in the Work, subject to the limitations stated in this **Article 7** and elsewhere in the Contract Documents.

**§ 7.1.3**   A Change Order shall be based upon agreement between the Owner and Contractor and approved by Owner's Lender. A Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor. A Field Directive for a minor change in the Work may be issued by the Architect subject to authorization by the Owner.

**§ 7.1.4**   Changes in the Work shall be performed under applicable provisions of the Contract Documents. The Contractor shall proceed promptly with changes in the Work, unless otherwise provided in the Change Order, Construction Change Directive or Field Directive.

**§ 7.1.5**   A change increasing the GMP or the Contract Time shall be accomplished only by written Change Order, signed by the Owner and the Contractor, and approved by Owner's Lender (Lender's involvement only if the aggregate of the changes is greater than five million dollars ($5,000,000.00) and the Contingency has been exhausted (only to the extent Contingency is applicable to the changes as set forth in the Contract Documents).  Accordingly, Contractor shall have no Claim for an increase in the GMP or Contract Time if not reflected in a written Change Order.  Contractor may not claim course of conduct or dealings between the Parties and/or claim that Owner has been unjustly enriched by any alteration of or addition to the Work, whether or not there is in fact, any unjust enrichment to the Work, as the basis of any Claim to an increase in any amounts due under the Contract Documents or change in any time period provided for in the Contract Documents, unless reflected in a written Change Order.

**§ 7.1.6**   Where Contractor believes it is entitled to an adjustment to the GMP or Contract Time, or any combination thereof, due to discovery of any conditions or other circumstances, including but not limited to Owner requests, Owner or Architect directives, or responses to Requests for Information, Contractor shall provide Owner, with a copy to the Architect, with an Initial Written Notice of said Claim ("Initial Written Notice").  The Initial Written Notice must be sent immediately, but in no event more than five (5) business days after becoming aware of the occurrence or the event giving rise to such Claim.  Within no more than fifteen (15) calendar days of discovery, Contractor shall supplement the Initial Written Notice by submitting a written proposal to Owner and Architect providing detailed estimates and documentary support for Contractor's proposed adjustment to the Guaranteed Maximum Price or Contract Time, or any combination thereof, resulting from such change as set forth herein ("10 Day Supplement").  Where Contractor

Owner _____                     Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

is seeking an adjustment to the Contract Time, Contractor's 10 Day Supplement to the Initial Written Notice shall include a Time Impact Analysis. The time impact analysis shall describe in a detailed narrative, how the critical path of the Project was impacted. The time impact analysis shall be based upon logic and either 1) Contractor's Base Construction Schedule (its P6 Schedule), if previously agreed to by Owner in writing; or 2) **Exhibit F**. In all cases, Contractor shall include a plan for mitigation of the cost and time impacts within the 10 Day Supplement, along with all costs associated with the mitigation. If Contractor is unable to timely submit its 10 Day Supplement, Contractor shall notify Owner in writing during that ten (10) calendar day supplement period that Contractor requires additional time to submit its 10 Day Supplement ("Supplement Submission Extension Request"). At a minimum, Contractor's Supplement Submission Extension Request shall include a range of cost magnitude. Contractor shall also identify in said written Supplement Submission Extension Request, the amount of additional time the Supplement Submission Extension Request is seeking, which request is subject to Owner's written approval. In no event shall the total amount of the time to submit the 10 Day Supplement exceed thirty (30) total days from discovery; and in no event may the extra 15-day extension for 10 Day Supplement impact the critical path of the Project. The failure of Contractor to comply with either written notice requirement pursuant to this Article and elsewhere in the Contract Documents, shall constitute Contractor's waiver of any increase to the GMP or Contract Time, or any combination thereof.

**§ 7.1.7**   Contractor shall review all change order requests from subcontractors for scope, quantity and reasonableness prior to submitting same to Owner as a Change Order Request.

**§ 7.2    Change Orders**

**§ 7.2.1**   Notwithstanding anything in the Contract Documents to the contrary, the Contractor shall not be entitled to an adjustment to the GMP or Contract Time unless and until such adjustment is incorporated in a written Change Order signed by Owner and Contractor, and approved by Owner's Lender.

**§ 7.2.2**   All Claims arising out of or relating to a Change Order shall be deemed waived unless expressly reserved in such Change Order. Contractor is specifically prohibited from unilaterally preserving Claims, including Claims for extension of the Contract Time in a Change Order. Any Claims must be timely submitted by Contractor in accordance with the time limits set forth in § 7.1.6 above. Notwithstanding any other provision to the Contract, the Architect or its consultant will not have authority to authorize changes to the Contract Documents. Only Owner shall be authorized to execute Change Orders, or otherwise modify these Contract Documents (other than a Field Directive). Contractor must obtain written approval from the Owner as identified in § 15.3 of the Agreement for performance of any work which changes or deviates from the Contract Documents from Owner and failure to obtain said written approval will bar Contractor from any Claim for additional compensation, additional time, or arguing that the Architect or its consultants directed the Work.

**§ 7.2.3**   A Change Order is a written instrument signed by the Owner as identified in § 15.3 of the Agreement, and Contractor, and approved by Lender stating their agreement upon all of the following:

    .1    The change in the Work;
    .2    The amount of the adjustment, if any, in the GMP; and
    .3    The extent of the adjustment, if any, in the Contract Time.

Agreements and signatures on any Change Order shall constitute a final settlement of all matters which the Contractor knew or should have known relating to the change in the Work that is the subject of the Change Order, including but not limited to all direct and indirect costs associated with such change and all adjustments to the GMP and Contract Time.

**§ 7.2.4**   All Change Order requests, prior to performing any Change Order Work, must include documentation detailing the change and supporting the requested increase or decrease in the GMP and/or Contract Time. Such documentation must show: (i) all materials by quantity and price, (ii) all labor by unit price, (iii) insurance, (iv) permits, (v) payroll taxes and employee benefits from subcontractors, (vi) equipment by quantity and rate, (vii) Subcontractor markup (limited to 10% for overhead and profit) unless otherwise approved in writing by Owner, (viii) Contractor's Fee; (ix) a clear and concise statement of the basis for the claim, including dates and names of parties and people

Owner _____                     Contractor _____

Modified AIA Document A201™—2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

involved, with back up information, Contract Documents relied upon, including reference to sections of the Drawings, Daily reports, weather reports, meeting minutes, correspondence and the like, (x) a statement, showing the impact of the Change to the agreed upon Project Schedule; and (xi) a written plan as to how the costs and delays can be mitigated and all costs associated with said mitigation. Nothing contained herein shall prejudice Contractor's rights in providing supplemental information after the five (5) day period for submission as additional information becomes available. Any requested increase to GMP for the Contractor's General Condition costs shall be limited to actual on-site cost increases for General Conditions items incurred as a direct result of the change. Change Order requests that impact the critical path and seek additional time and or exceed five hundred thousand dollars ($500,000.00) shall not be considered unless and until submitted in writing to the Owner and the Architect, with a copy via email to Jules Trump (jules@trumpgroup.com), Oren Shmueli (OrenS@trumpgroup.com); Eric Bartos, (ericbartos@trumpgroup.com); Rick Chitwood, (rickc@trumpgroup.com); James A. Sikich, (JamesS@trumpgroup.com); and Jerry Campos, (jerryc@trumpgroup.com); ("Owner's Notice Group") and must also include a plan for mitigating impacts to the critical path.

**§ 7.2.4.1**  For any individual deductive Change Orders or Construction Change Directives under one million dollars ($1,000,000.00), subcontractor shall not be required to credit overhead or profit. Likewise, where the individual deductive Change Orders or Construction Change Directives is under one million dollars ($1,000,000.00), Contractor shall not be required to credit overhead and profit on the total cost of the deductive changed Work.

**§ 7.2.5**  Under no circumstances shall an increase in the cost of materials or labor be considered the basis for a Claims by the Contractor for additional compensation, no matter how severe the increase of the cost of the materials or labor to the Contractor. Notwithstanding, the Contractor may fund the increase through the use of Contingency in accordance with the provisions set forth in **§ 5.1.4** of the AIA Document A102™–2017, Modified Form of Agreement.

**§ 7.3**    **Construction Change Directives**

**§ 7.3.1**  A Construction Change Directive is a written order prepared by the Architect and signed by the Owner as identified in **§ 15.3** of the Agreement and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the GMP or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions, or other revisions, the GMP and Contract Time being adjusted accordingly. Contractor is required to perform the work contained in the Construction Change Directive. Notwithstanding the foregoing, Contractor shall not be required to proceed with a Construction Change Directive if the aggregate disputed total of the outstanding Construction Change Directives exceeds Five Million Dollars ($5,000,000.00), unless the parties are engaged in good faith negotiations, in which event Contractor shall proceed with the Work. Moreover, Owner and Contractor shall finalize Construction Change Directives within sixty (60) calendar days from issuance.

**§ 7.3.2**  A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

**§ 7.3.3**  If the Construction Change Directive provides for an adjustment to the GMP, the adjustment shall be based on one of the following methods:

  .1   Mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

  .2   Unit prices stated in the Contract Documents or subsequently agreed upon;

  .3   Cost to be determined in a manner agreed upon in writing by the parties and a mutually acceptable fixed or percentage fee; or

  .4   As provided in § 7.3.7.

Owner _____                                        Contractor _____

Modified AIA Document A201™–2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201" and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 7.3.4**  If the Contractor does not respond promptly or disagrees with the method for adjustment in the GMP contained in a Construction Change Directive, the Architect shall determine the adjustment on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the GMP, an amount for overhead and profit as set forth in the Agreement, or if no such amount is set forth in the Agreement, a reasonable amount. In such case, and also under § 7.3.3.3, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this § 7.3.4 shall be limited to the following:

  **.1** Costs of labor, including applicable payroll taxes, fringe benefits required by agreement or custom, workers' compensation insurance, provided that Subcontractors may not charge more than ten  percent (10%) for overhead and profit on their direct costs of the changed work unless otherwise approved in writing by the Owner;

  **.2** Costs of materials, supplies, and equipment, including cost of transportation, whether incorporated or consumed;

  **.3** Rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

  **.4** Costs of premiums for all bonds and insurance, permit fees, and sales, use, or similar taxes, directly related to the change as set forth in the Contract Documents; and

  **.5** Costs of supervision and field office personnel directly attributable to the change as set forth in the Contract Documents.

**§ 7.3.5**  If the Contractor disagrees with the adjustment in the Contract Time, the Contractor may make a Claim in accordance with applicable provisions of **Article 15**.

**§ 7.3.6**  Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect and Owner of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the GMP or Contract Time.

**§ 7.3.7**  A Construction Change Directive signed by the Contractor indicates the Contractor's agreement therewith, including adjustment in GMP and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**§ 7.3.8**  The amount of credit to be allowed by the Contractor to the Owner for a deletion or change that results in a net decrease in the GMP shall be actual net cost as confirmed by the Owner. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net change.

**§ 7.3.9**  Pending final determination of the total cost of a Construction Change Directive to the Owner, the Contractor may request payment for Work completed under the Construction Change Directive in Applications for Payment. The Architect will make an interim determination for purposes of monthly certification for payment for those costs and certify for payment the amount that the Architect determines, in the Architect's professional judgment, to be reasonably justified. The Architect's interim determination of cost shall adjust the GMP on the same basis as a Change Order, subject to the right of either party to disagree and assert a Claim in accordance with **Article 15**.

**§ 7.3.10**  When the Owner and Contractor agree with a determination made by the Architect concerning the adjustments in the GMP and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and the Architect will prepare a Change Order. Change Orders may be issued for all or any part of a Construction Change Directive.

Owner _____

Contractor _____

Modified AIA Document A201™—2017, Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents' Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 7.4    Field Directives for Minor Changes in the Work**
The Architect may clarify and or recommend minor changes in the Work that are not inconsistent with the intent of the Contract Documents and do not require an adjustment in the GMP or an extension of the Contract Time. If the Contractor believes that the proposed minor change in the Work will affect the GMP or Contract Time, the Contractor shall notify the Owner and shall not proceed to implement the change in the Work. If the Contractor performs the Work set forth in the Field Directive for a minor change without prior notice to the Owner that such change will affect the GMP or Contract Time, the Contractor waives any adjustment to the GMP or extension of the Contract Time.

**§ 7.5**    In the event of any dispute between Owner and Contractor arising out or relating to the requirements of the Contract, any modification, or the terms of a pending Change Order, Construction Change Directives or a field Directive, the Contractor shall continue to perform the Work, including any Work required by signed Change Orders, Construction Change Directives or Field Directive and Owner shall continue to make payments of undisputed sums in accordance with the Contract Documents, pending final resolution of such dispute.

## ARTICLE 8  TIME

**§ 8.1    Definitions**

**§ 8.1.1**    Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

**§ 8.1.2**    The date of commencement of the Work is the date established in the Agreement.

**§ 8.1.3**    The date of Substantial Completion is the date certified by the Architect in accordance with § 9.8.

**§ 8.1.4**    The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

**§ 8.1.5**    The term "business day" shall mean any weekday, Monday through Friday, which is not a federal, state or City holiday. Contractor may work on Saturdays, at Contractor's cost, as required to meet the Schedule and complete the Work within the Contract Time. Owner shall not be responsible for payment of overtime for Work performed on Saturdays without Owner's prior written approval.

**§ 8.2    Progress and Completion**

**§ 8.2.1**    Time limits stated in the Contract Documents are of the essence. By executing the Agreement, the Contractor confirms that the Contract Time is a reasonable period for performing the Work and that the time limits set forth in the Project schedule, including the Milestone Dates, are reasonable.

**§ 8.2.2**    The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, commence the Work prior to the effective date of insurance required to be furnished by the Contractor and Owner.

**§ 8.2.3**    The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time as set forth in the Agreement.

**§ 8.3    Delays and Extensions of Time**

**§ 8.3.1**    If the Contractor is delayed at any time in the commencement or progress of the Work by (1) an act or neglect of the Owner or Architect, or of an employee of either, or of a Separate Contractor; (2) by changes ordered in the Work; (3) by labor disputes, fire, unusual delay in deliveries impacting the Miami-Dade County construction industry, unavoidable or insurable casualties, or other causes beyond the Contractor's control (excluding the COVID-19 pandemic as to Work inefficiencies but not Work stoppage, which is already factored into Contractor's pricing and schedules); (4) by other causes that the Owner determines may justify delay, or (5) act of God and/or Force Majeure (excluding COVID-19 - addressed above), then the Contractor shall be permitted to seek an adjustment to the Contract

Owner _____                                          Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Time and or the Contract Sum for such compensable delays, provided Contractor has timely submitted its Claim in accordance with the requirements of the Contract Documents. If awarded as required by the Contract Documents, Contractor shall be entitled to reasonable and direct costs incurred by Contractor and subcontractors, if any, as a result of the delay, as supported by substantiated data by Change Order (following a Change Order request as required by the Contract Documents) for such reasonable time as the Owner may determine. Contractor's labor shall be chargeable at the stipulated labor rates set forth in Exhibit I.

§ 8.3.2   The Contractor further acknowledges and agrees that adjustments in the Contract Time will be permitted for a delay only to the extent such delay (1) is not caused, in whole or in part, by the Contractor, or its Subcontractors and material suppliers, (excluding concurrent delays); (2) could not be limited or avoided by the Contractor's timely notice to the Owner of the delay; (3) is of a duration not less than one (1) Business day; (4) impacts the critical path of the Project; and (5) was mitigated by the Contractor to the maximum extent practicable at no additional cost to Contractor unless otherwise provided in the Agreement. All foreseeable time impacts, including but not limited to time impacts from RFI's and Change Orders, must be submitted in writing to the Owner five (5) calendar days prior to the event giving rise to the delay. All unforeseeable time impacts, other than those associated with changes in the Work, must be submitted in writing to the Owner within five (5) business days of the event giving rise to the delay. Failure to so request an extension will constitute a waiver of any right for an extension of time.

§ 8.3.3   With respect to extension of time due to adverse weather conditions, Contractor has contemplated all weather impacts in its schedule and agrees it will not make a claim for additional time or additional compensation related to weather impacts other than as set forth in § 15.14.1 of the AIA Document A102™–2017, Modified Form of Agreement.

§ 8.3.4   The Contractor shall use its best efforts to avoid all labor conflicts, especially those between union and nonunion employees. All direct and consequential losses due to labor disputes except those of a national, state, or city wide nature and not directed at Contractor or its Subcontractors shall be borne by the Contractor

§ 8.3.5   Claims relating to time shall be made in accordance with applicable provisions of **Article 15**.

§ 8.3.6   **NOT USED**

§ 8.3.7   All schedule float is the property of Project and may not be used by Contractor absent prior written approval by Owner, which shall not be unreasonably withheld.

§ 8.3.8   In the event of Force Majeure, Contractor shall not be entitled to terminate the Contract except as permitted in § 14.1 and shall continue with the Work and all of its obligations pursuant to the Contract Documents, provided Owner complies with all of its obligations under the Contract Documents, including, but not limited to making claims to applicable insurance and in conjunction with Contractor as appropriate and making payment as required by the Contract Documents. For purposes hereof "Force Majeure" shall mean a delay caused by or resulting from acts of God, acts of terrorism, fire, flood, war or civil commotion, industry-wide strikes, labor disputes (whether lawful or not), restrictions or delays by any governmental or utility authority (including, but not limited to, interruption of or unavailability of electric, water, sewer or other utility service, and construction or development moratoria), Owner and or Contractor's inability to obtain required labor or materials after commercially reasonable efforts to do so, and such other actions or matters as are beyond Owner's control occurring on or affecting the Property or otherwise directly impacting the Property or its development. It is specifically acknowledged that any impacts (as it pertains to inefficiency of the Work and not as to a Work stoppage) due to the COVID-19 Pandemic, are not subject to this Force Majeure provision. A "Force Majeure" may not be caused, in whole or in part, by Contractor or anyone or any entity for whom Contractor is responsible.

### § 8.4    Owner's Delay and Entitlement to TCO Liquidated Damages

§ 8.4.1   The Contractor and Surety acknowledges that the Contract Time for the Substantial Completion of the Work requires that the Substantial Completion of the entire Work occur on or before specified date(s) as provided in Article 4 of the Agreement, subject to any extensions of the Contract Time. "Substantial Completion" is defined in §9.8 of these Modified General Conditions. The Contractor and Surety acknowledge and agree that the Owner will suffer

Owner _____

Contractor _____

Modified AIA Document A201™–2017, Copyright © 1911–1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09.44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents" Terms of Service. To report copyright violations, e-mail copyright@aia.org

financial loss in the event of delay and Owner shall be entitled to TCO Liquidated Damages as provided in §4.4 (and all sub parts) of the AIA Document A102™–2017, Modified Form of Agreement.

### § 8.5   CORONAVIRUS "COVID-19"

**§ 8.5.1**   At the time of execution of this Agreement, there is an ongoing worldwide pandemic caused by the virus referred to as Coronavirus or COVID-19 ("COVID-19").

**§ 8.5.2**   Contractor has factored COVID-19 impacts (as to inefficiencies and not as to a Work stoppage) into Contractor's GMP and Schedule and will not make a claim for additional compensation or time due to COVID-19 inefficiency impacts.

### ARTICLE 9   PAYMENTS AND COMPLETION

### § 9.1   Guaranteed Maximum Price ("GMP")

**§ 9.1.1**   The GMP is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

**§ 9.1.2**   If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed so that application of such unit prices to the actual quantities causes substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

### § 9.2   Schedule of Values
The Final Guaranteed Maximum Price Amendment shall include a written Schedule of Values with supporting Subcontractor bids and scope of work used to establish each line item in the Final Guaranteed Maximum Price Amendment Schedule of Values.  Once approved, the Schedule of Values shall be used as a basis for reviewing the Contractor's Applications for Payment, along with Contractor's cost records. Any changes to the Schedule of Values shall be submitted to the Architect and supported by such data to substantiate its accuracy as the Architect may require, and unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's subsequent Applications for Payment.

### § 9.3   Applications for Payment

**§ 9.3.1**   The Contractor shall submit to the Architect and Owner an itemized Application for Payment in accordance with **Article 12** of the Agreement and prepared in accordance with the Schedule of Values, for completed portions of the Work. The application shall be notarized, and supported by all data substantiating the Contractor's right to payment that the Owner, Architect or Owner's Lender may require, such as copies of all cost records, requisitions, and releases and waivers of liens from Subcontractors and suppliers, and shall reflect retainage. Along with the Contractor's Application for Payment, Contractor shall submit to Architect and Owner's Representative the following

> .1    a sworn and certified Progress Payment Affidavit which recites that all laborers, material suppliers and subcontractors of any tier dealing with the Contractor have been paid in full up through the date of the previous payment application unless otherwise noted therein;

> .2    partial releases of lien from Contractor, material suppliers and subcontractors and any lienors serving a Notice to Owner as required by this § 9.3, (conditional upon receipt and clearance of payment from the prior month) and evidence of proof of payment of any indebtedness incurred with respect to the previous month's Work of Contractor as may be required by Owner;

> .3    evidence that all Work has been performed per the schedule of values as required pursuant to the Contract Documents up to the time of the request for payment, and the Work has been inspected and accepted by the Architect and any governmental authorities required to inspect the Work, and such other evidence that the Owner or Lender may reasonably require

Owner _____                                                           Contractor _____

Modified AIA Document A201™ –2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institue of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06-17/2021, is not for resale, is licensed for one-time use only, and may be used in accordance with the AIA Contract Documents" Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Contractor to submit to the Lender, if any, and substantiating that all Work has been performed as required for payment.

.4    an updated Construction Schedule meeting the requirements of §3.10.4;

.5    all other requirements of §12.2 of the AIA Document A102™-2017, Modified Form of Agreement; and

.6    Any other document or information required elsewhere in the Contract Documents as a condition precedent to payment and such other evidence that the Owner or Owner's Lender may reasonably require.

### § 9.3.2   Release of Liens

Each release of lien given to the Owner shall waive and release any lien rights and claims of the lienors to the extent payment is made with respect to any Work performed through the date of that progress payment. Contractor shall submit a partial release of lien for the current Application for Payment, (conditional upon receipt and clearance of payment from the prior month) submit partial releases of lien from all lienors through the date of the last previous payment made, and submit a partial release of lien conditioned only upon payment from Contractor, through the date of the current Application for Payment.  For Final Payment, Contractor must submit a Final Release of Lien (conditional upon receipt and clearance of payment from the prior month) for itself and for all lienors.  Each Final Release of Lien shall include a provision for the release of all Claims and causes of action.

In addition, as Contractor is fully responsible for obtaining the Manufacturers' Warranties, Contractor shall be responsible for obtaining inspections or other acceptable documentation by the Manufacturers' representative for equipment and supplies prior to payment, and delivering, together with the final application for payment and supporting documentation all warranties and Extended Warranties required by the Contract Documents. If fully satisfied with the documentation submitted, and provided that the Work has passed all inspections as required by the Architect, Owner and all applicable governmental authorities, the Architect shall issue a certificate of authorization of payment to the Owner for the amount approved.

**§ 9.3.2.1** As provided in § 7.3.9, such applications may include requests for payment on account of changes in the Work that have been properly authorized by Construction Change Directives, or by interim determinations of the Architect, but not yet included in Change Orders.

**§ 9.3.2.2** Applications for Payment shall not include requests for payment for portions of the Work for which the Contractor does not intend to pay a Subcontractor or supplier, unless such Work has been performed by others whom the Contractor intends to pay, or unless Contractor has a good faith basis to withhold payment.  Notwithstanding, the Contractor shall not requisition the Owner for the payment that it does not intend to fund a subcontractor unless said sum is going to be utilized by Contractor to address the good faith dispute that pertains to the amount the Contractor is withholding from the Subcontractor.

**§ 9.3.3**   Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing and provided that Contractor has complied with the Contract Documents related to stored materials. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner and Owner's Lender to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable insurance, storage, and transportation to the site, for such materials and equipment stored off the site.

**§ 9.3.4**   The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information, and belief, be free and clear of liens, claims, security interests,

Owner _____                    Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

or encumbrances, in favor of the Contractor, Subcontractors, suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work during the period of the application for payment, unless otherwise required by Owner's Lender. Contractor shall furnish the most recently updated schedule with all Applications for Payment.

## § 9.4   Certificates for Payment

**§ 9.4.1**   The Architect will, within Five (5) days after receipt of the Contractor's Application for Payment, either (1) issue to the Owner a Certificate for Payment in the full amount of the Application for Payment, with a copy to the Contractor; or (2) issue to the Owner a Certificate for Payment for such amount as the Architect determines is properly due, and notify the Contractor and Owner of the Architect's reasons for withholding certification in part as provided in § 9.5.1; or (3) withhold certification of the entire Application for Payment, and notify the Contractor and Owner of the Architect's reason for withholding certification in whole as provided in § 9.5.1. In the event the Architect determines to make such revised Certificate of Payment, Architect shall also issue a written, itemized list of specific items for which it is withholding certification, the bases therefore and the specific dollar amounts withheld for each such item. All undisputed amounts shall be certified for payment by the Architect.

**§ 9.4.2**   The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data in the Application for Payment, that, to the best of the Architect's knowledge, information, and belief, the Work has progressed to the point indicated, the quality of the Work is in accordance with the Contract Documents, and that the Contractor is entitled to payment in the amount certified. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion, and to specific qualifications expressed by the Architect. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work; (2) reviewed construction means, methods, techniques, sequences, or procedures; (3) reviewed copies of requisitions received from Subcontractors and suppliers and other data requested by the Owner to substantiate the Contractor's right to payment; or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the GMP.

## § 9.5   Decisions to Withhold Certification

**§ 9.5.1**   The Architect or Owner may withhold or reject a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's or Owner's opinion the representations to the Owner required by § 9.4.2 cannot be made. If the Architect or Owner is unable to certify payment in the amount of the Application, the Architect or Owner will notify the Contractor and Owner as provided in § 9.4.1. If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner together with the written statement required in § 9.4.1 above. The Architect or Owner may also withhold a Certificate for Payment or, because of subsequently discovered evidence, and the Architect or Owner may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's or Owner's opinion to protect the Owner from loss for which the Contractor is responsible, because of:

    .1    defective Work (including but not limited to punch list Work) not remedied in a timely fashion following written notice from Owner or Architect;

    .2    third party claims or liens filed or reasonable evidence indicating probable filing of such claims related to or associated with Contractor or those for whom Contractor is responsible, unless security acceptable to the Owner is provided by the Contractor;

    .3    failure of the Contractor to make payments properly to Subcontractors or suppliers in accordance with the terms of the respective subcontract and purchase orders, respectively, for labor, materials or equipment;

Owner                                  Contractor

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

.4 reasonable evidence that the Work cannot be completed for the unpaid balance of the GMP;

.5 damage to the Owner or a Separate Contractor excluding damages covered by OCIP or builders' risk insurance;

.6 reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover the TCO Liquidated Damages for the anticipated delay;

.7 failure of the Work to progress satisfactorily or according to the Construction Schedule;

.8 failure to carry out the Work in accordance with the Contract Documents;

.9 failure to provide releases of lien for each Application for Payment in accordance with the Contract Documents;

.10 loss resulting from acts and omissions described in §3.3.2 excluding damages covered by OCIP or builders risk insurance; or

.11 any other repeated failure to perform a material obligation contained in the Contract Documents.

**§ 9.5.2** When either party disputes the Architect's decision regarding a Certificate for Payment under § 9.5.1, in whole or in part, that party may submit a Claim in accordance with **Article 15**.

**§ 9.5.3** When the reasons for withholding certification are removed, certification will be made for amounts previously withheld.

**§ 9.5.4** If the Architect withholds certification for payment under § 9.5.1.3, the Owner may, at its sole option, issue joint checks to the Contractor and to any Subcontractor or supplier to whom the Contractor failed to make payment for Work properly performed or material or equipment suitably delivered unless the Contractor notifies the Owner in writing that it has a good faith dispute with the subcontractor and material supplier and the basis of the dispute. If no good faith dispute exist, Contractor shall endorse said joint check over to the applicable Subcontractor. If the Owner makes payments by joint check, the Owner shall notify the Architect and the Contractor shall reflect such payment on the next Certificate for Payment.

### § 9.6 Progress Payments

**§ 9.6.1** After the Architect has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents, subject to § 9.5.1 of the Modified General Conditions and the requirements of Owner's Lender and shall so notify the Architect.

**§ 9.6.2** The Contractor shall pay each Subcontractor in accordance with the terms set forth in the Coastal Subcontracts and Contractor's Subcontracts, no later than ten (10) calendar days after receipt of payment from the Owner, unless the subcontract agreement requires payment sooner, in which event the subcontract agreement shall govern, the amount to which the Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of the Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner as it pertains to subcontracts issued to its subcontractors but not as to existing Coastal subcontract that have been assigned to Contractor. If for any reason, Contractor withholds funds from a Subcontractor, Contractor shall notify Owner in writing within five (5) calendar days of the amounts withheld and all reasons (with backup) as to why the funds were withheld. Further, if not paid out during the remainder of that billing cycle, said funds shall be returned to Owner on the next Payment Application, unless Contractor expressly represents they will be paid or will be incurred as part of

Owner          Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo "A201" and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

the Cost of the Work for the scope of Work for which the Contractor is withholding, during that subsequent billing cycle.

**§ 9.6.3**   The Owner has the right to request written evidence from the Contractor that the Contractor has properly paid Subcontractors and suppliers amounts paid by the Owner to the Contractor for subcontracted Work. If the Contractor fails to furnish such evidence within Five (5) calendar days, the Owner shall have the right to contact Subcontractors and suppliers to ascertain whether they have been properly paid. Neither the Owner nor Architect shall have an obligation to pay, or to see to the payment of money to, a Subcontractor or supplier, except as may otherwise be required by law.

**§ 9.6.4**   Contractor's payments to suppliers shall be treated in a manner similar to that provided in §§ 9.6.2, and 9.6.3.

**§ 9.6.5**   A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work that is not in accordance with the Contract Documents.

**§ 9.6.6**   Payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be utilized by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account.

**§ 9.6.7**   Owner may, in its discretion, make all or any portion of any progress payment by check payable jointly to the order of Contractor and any lienor giving timely notice, and deduct said sum from the balance then due Contractor unless the Contractor notifies the Owner in writing that it has a good faith dispute with the subcontractor and material supplier and the basis of the dispute.  However, such payment, if made, shall not create any third party beneficiary or other rights in such lienor.  In making such payments to lienors/subcontractors, the Owner shall require such lienor to execute partial waivers lien.

**§ 9.6.8   Transfer of Lien**
In the event any liens should be recorded against the Property by any subcontractors or material suppliers in connection with labor or services performed under this Agreement, the materials incorporated into or delivered to the Property for which payment has been received by the Contractor, Contractor shall defend, indemnify and hold the Owner harmless against all such liens and suits or other proceedings pertaining thereto including any and all costs and attorneys' fees, at both the trial and appellate level.  If any such liens are recorded then Contractor must immediately remove or transfer such lien, and in no event no later than seven (7) calendar days after it receives written notice from the lienor filing of the lien or from Owner, whichever is less, in accordance with the provisions of § 713.24, Fla. Stat. Should Contractor fail to remove or transfer such lien, the Owner may, at its option, do so and deduct the amount expended, including all costs and attorney's fees incurred from any payment then due or to become due to Contractor.

**§ 9.6.9   Payments to Subcontractors / Suppliers by the Owner.**

**§ 9.6.9.1** If the Owner fails to approve an application for payment for a cause which is the fault of the Contractor and not the fault of a particular subcontractor or supplier, or if the Contractor fails to make a payment which is properly due to a particular Subcontractor or supplier, the Owner may, after Ten (10) calendar days' written notice to Contractor, pay such Subcontractor and or supplier and Contractor jointly, less the amount to be retained under the applicable subcontract or purchase order, unless Contractor provides a reasonable good faith basis as to why payment is not due and owing, with Contractor to provide Owner with details and documentation as to why payment is not due and owing.

**§ 9.6.9.2** The Owner shall have no obligation to pay, or to see to the payment of, any monies to any subcontractor. Nothing contained in herein shall be deemed to create any contractual relationship between the Owner and any subcontractor or to create any rights in any subcontractor against the Owner.

**§ 9.6.10** No payments made under this Contract shall be evidence of performance of this Contract, either wholly or in part, and no payment including Final Payment shall be construed to be an acceptance of defective Work or improper

Owner _____        Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44.22 ET on 06/23/2020 under Order No. 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

materials, nor shall use of the Work by the Owner constitute acceptance of the Work hereunder or any part thereof or a waiver of any of the Owner's claims.

**§ 9.6.11**  The Owner shall release any payments withheld due to a lien or claim of lien if the Contractor obtains security acceptable to the Owner or a lien bond which is: (1) issued by a surety acceptable to the Owner and its Lender (if any), (2) in form and substance satisfactory to the Owner and its Lender, and (3) complies with Florida Statutes.  By posting a lien transfer bond or other acceptable security, however, the Contractor shall not be relieved of any other responsibilities or obligations under this Article or the Contract Documents.

**§ 9.6.12**  If the Owner is entitled to reimbursement or payment from the Contractor or Surety under or pursuant to the Contract Documents, such payment shall be made promptly upon written demand by the Owner. Notwithstanding anything contained in the Contract Documents to the contrary, if the Contractor or Surety fail to promptly make any undisputed payment due the Owner after such written notice, the Owner shall have an absolute right to offset such amount against the Contract Sum and may, in the Owner's reasonable discretion, elect either to: (1) deduct an amount equal to that which the Owner is entitled from any payment then or thereafter due the Contractor from the Owner; or (2) issue a written notice to the Contractor reducing the Contract Sum by an amount equal to that which the Owner is entitled.  Nothing contained herein shall be deemed an admission of liability by Contractor nor limit Contractor's right to contest same. Nothing contained in this Section requires consent of Surety or notice to surety of Owner's intent to take such action.

**§ 9.6.13**  If Owner and Contractor have more than one Contract between them, Owner may set off any sums due Owner from the other contract against any sums due Contractor under this Contract.  Said set off shall not relieve Contractor of its obligations to perform any and all of its obligations under these Contract Documents.

**§ 9.6.14**  Provided the Owner has fulfilled its payment obligations under the Contract Documents, the Contractor shall defend and indemnify the Owner from all loss, liability, damage or expense, including reasonable attorney's fees and litigation expenses, arising out of any lien claim or other claim for payment by any Subcontractor or supplier of any tier.  Upon receipt of notice of a lien claim or other claim for payment, the Owner shall notify the Contractor.  If approved by the applicable court, when required, the Contractor may substitute a surety bond for the property against which the lien or other claim for payment has been asserted.

**§ 9.7  Failure of Payment**
If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within five (5) calendar days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor all undisputed amounts within fourteen (14) calendar days after the date established in the Contract Documents, the amount certified by the Architect, then the Contractor may, upon fourteen (14) additional calendar days' notice to the Owner and Architect, suspend the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the GMP shall be increased by the amount of the Contractor's reasonable costs of shutdown, delay and start-up, plus interest as provided for in the Contract Documents.

**§ 9.8  Substantial Completion of the South Tower, Common Elements, South Tower In-Ground Pool with Related Amenity Deck, the Villa, Beach Side Amenities, Guest Suites and Cabanas**

**§ 9.8.1**  The South Tower may reach Substantial Completion separate from the Common Elements, the South Tower In-Ground Pool with Related Amenity Deck, the Villa, Beach Side Amenities, Guest Suites and Cabanas. Likewise, the Common Elements, the South Tower In-Ground Pool with Related Amenity Deck, the Villa, Beach Side Amenities, Guest Suites and Cabanas may reach Substantial Completion separate from the South Tower.  In order to achieve Substantial Completion, the South Tower, the Common Elements, the South Tower In-Ground Pool with Related Amenity Deck, the Villa, Beach Side Amenities, Guest Suites and Cabanas shall each be required to satisfy the following minimum requirements, as applicable, to be considered Substantially Complete.

> The South Tower: At a minimum, in order to reach Substantial Completion of the South Tower, the Work or designated portion thereof shall be sufficiently complete in accordance with the Contract Documents so that Owner can occupy, utilize, inhabit, the condominium units in the South

Owner                                                                                    Contractor

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44 22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Tower and would not prevent the issuance of a temporary certificate of occupancy that would prevent third party purchasers from occupying their units. All balconies and limited common elements within the Tower/Tower footprint, including, but not limited to, Two Hundred Forty-Four (244) parking spaces [remaining balance of Eighty-Nine (89) to be delivered with the North Tower], storage units, the South Tower Cabanas, South Grand Lobby and South Tower Porte Cochere and life safety, all shall be sufficiently complete such that they can be used for their intended purpose. In addition, Contractor shall provide Owner with vehicular ingress and egress. Moreover, all Work required by the Contract Documents identified in these Areas shall be sufficiently complete, such that they can be used for their intended purpose.

To the extent within Contractor's scope of work, Contractor has obtained all permits, licenses, certificates and government approvals required for such use of the above described areas.

<u>The Common Elements</u>: At a minimum, in order to reach Substantial Completion of the Common Elements, the Work or designated portion thereof shall be sufficiently complete in accordance with the Contract Documents so that Owner can occupy, utilize and inhabit the Common Elements for the purpose for which it is intended and would not prevent the issuance of a temporary certificate of occupancy that would prevent condominium units in the South Tower to be occupied by third party purchasers. This area is inclusive of:

> Restaurant & Kitchen Spaces
> Villa, Beachside Amenities, Guest Suites and Cabanas

To the extent within Contractor's scope of work, Contractor has obtained all permits, licenses, certificates and government approvals required for such use of the above-described areas.

<u>The South Tower In-Ground Pool with Related Amenity Deck</u>: At a minimum, in order to reach Substantial Completion of the South Tower In-Ground Pool with Related Amenity Deck the Work or designated portion thereof shall be sufficiently complete in accordance with the Contract Documents so that Owner can occupy, utilize and inhabit the South Tower In-Ground Pool with Related Amenity Deck for the purpose for which it is intended and would not prevent the issuance of a temporary certificate of occupancy that would prevent the condominium units in the South Tower to be occupied third party purchasers. This area is inclusive of Pool located in Area 12.

To the extent within Contractor's scope of work, Contractor has obtained all permits, licenses, certificates and government approvals required for such use of the above-described areas.

<u>The Villa, Beachside Amenities, Guest Suites and Cabanas</u>: At a minimum, in order to reach Substantial Completion of the Villa, Beachside Amenities, Guest Suites and Cabanas, the Work or designated portion thereof shall be sufficiently complete in accordance with the Contract Documents so that Owner can occupy, utilize and inhabit the Villa, Beachside Amenities, Guest Suites and Cabanas for the purpose for which it is intended and would not prevent the issuance of a temporary certificate of occupancy that would prevent  the condominium units in the South Tower to be occupied third party purchasers. This area is inclusive of the deliverables associated with Phase I of the Entire Project, which includes the Villa, Storage, Parking, Amenity Spaces, Pools, Water Features.

To the extent within Contractor's scope of work, Contractor has obtained all permits, licenses, certificates and government approvals required for such use of the above described areas.

Notwithstanding, if the temporary certificates of occupancy for the Work have not been issued through no fault in whole or in part of Contractor or its subcontractors (all tiers), then this requirement (TCO requirement) of Substantial Completion shall be deemed satisfied, but Contractor shall remain obligated to obtain temporary certificates of occupancy for the Work as set forth herein.

Owner _____    Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44.22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Specifically, and in addition to the foregoing, in order to achieve Substantial Completion for the Work within the area of Substantial Completion (South Tower, the Common Elements, the South Tower In-Ground Pool with Related Amenity Deck, the Villa, Beach Side Amenities, Guest Suites and Cabanas), Contractor must achieve the following additional, minimum requirements:

1. The exterior elements, such as Site cleanup within the area of Substantial Completion and restoration of all exterior elements including roof surfaces, ledges, gutters, windows, exterior facades (including without limitation removal of all excess materials, rock, sand, paving, debris, supplies, equipment, temporary structures, ladders, scaffolding, staging and/or trailers) has been completed subject to punch list items not preventing occupancy or use intended;

2. Paving (temporary or permanent to arrive at the South Tower Lobby), parking, exterior building finishes (attached to the Tower), interior spaces and finishes of the Work on the floors, the applicable condominium unit(s) receive(s) a temporary Certificate of Occupancy, and all mechanical, electrical, plumbing and technical systems required by the Contract Documents, as well any arrival lobby, and fire and life safety systems (which are not currently designed to be phased, however, Contractor will assist Owner and its consultants to determine and implement a permitted phased design in accordance with Article 7);

3. Completion of the items on the Substantial Completion List the Architect deems necessary for Substantial Completion relative to the area of Work;

4. The Work and applicable condominium unit(s) is/are ready for occupancy, completed in accordance with the Contract Documents and all unit purchaser customizations (if any) including, but not limited to: (1) unit spas; (2) low voltage system; (3) MEP trim out; (4) security systems; (5) finish painting; (6) kitchen and vanity tops; (7) wood and other designated flooring; (8) millwork; (9) kitchen cabinets; (10) and closet-build outs;

5. The Contractor has submitted the Contractor's Punch List with respect to such items and they have been completed, inspected and approved by the Architect and Owner as to scope, number, quality and content;

6. Completion of those items on the Substantial Completion Punch List the Architect deems necessary for Substantial Completion;

7. Subject to Punch List items not preventing occupancy for use intended, the Work is ready for occupancy, completed in accordance with the Plans and Specifications and the Contract Documents and, to the extent it is within the Contractor's scope of Work, all persons or entities having jurisdiction over the Project have issued the appropriate permits, authorizations and temporary certificates of occupancy for the construction of the Project.

8. All requirements related to partial occupancy or Turnover set forth in § 9.9.6 below have been performed by Contractor to the reasonable satisfaction of Owner.

**§ 9.8.2   Substantial Completion List**

When the Contractor considers that the entire Work is Substantially Complete, the Architect, Contractor and Owner and/or Owner's Representative shall inspect the Work within ten (10) days of Owner's receipt of written notice from Contractor and copied to Jules Trump. Based upon the Substantial Completion Inspection, the Architect shall prepare, coordinate, and submit to the Owner and Contractor a detailed list of all remaining Work to be completed or corrected in the Work (the "Substantial Completion List"). The Architect will identify all work necessary to be completed or corrected prior to issuance of the Substantial Completion Certificate, and the remaining items the Contractor shall correct prior to final payment. The Contractor shall commence within five (5) days and proceed in a diligent manner to correct all items listed as Substantial Completion items on the Substantial Completion List as a condition to the

Owner _____                                                      Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06-17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents™ Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Architect's Certification of Substantial Completion. The Contractor shall notify Owner and Architect when all items in the Substantial Completion List necessary for Substantial Completion are complete and correct, and request inspection by the Owner and Architect. The Architect will make an inspection to determine whether the Substantial Completion List is complete. If the Architect's inspection discloses any item, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. In such case, the Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion. After the second inspection, the Contractor shall be responsible for all costs incurred by Owner and Architect to re-inspect the Work a third, or fourth time to determine Substantial Completion. The Contractor's obligation to complete all Work in accordance with the Contract Documents shall not be deemed waived, excused, or otherwise satisfied by any failure of any person or entity to include, discover, or identify any incomplete or defective Work in any Punch List, completion list, or inspection report, including without limitation the Substantial Completion List.

**§ 9.8.3**   Owner may retain 200% of the monetized punchlist for correction/completion of the remaining work cost as agreed by Architect and Contractor punchlist, with Lender's approval. As items on such list are completed, Contractor shall be entitled to payment for 200% of the value of each such item as set forth on the list in accordance with the Application for Payment process.

**§ 9.8.4**   When the Work or designated portion thereof is Substantially Complete, and the Contractor has completed the items listed on the Substantial Completion List as necessary for the issuance of the Certificate of Substantial Completion, the Architect will prepare a Certificate of Substantial Completion that shall establish the date of Substantial Completion and responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance. Warranties required by the Contract Documents shall commence on the date of Completion of all of the Work as provided in § 718.203(2), Fla. Stat. as it pertains to the statutory warranties required of the Contractor and subcontractors and their suppliers.

**§ 9.8.5** The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate.

**§ 9.8.6   Unit Substantial Completion**

Contractor may obtain Unit Substantial Completion of individual condominium units prior to Substantial Completion of the Work. "Unit Substantial Completion" is the stage in the progress of the Work where an individual unit or unit(s) is sufficiently complete in accordance with the Contract Documents and so that the Owner shall be able to occupy, inhabit, and/or utilize such unit for its intended use and would not prevent the issuance of a temporary certificate of occupancy that would prevent the occupancy of such unit to third party purchasers. In order for the Contractor to achieve Unit Substantial Completion for any particular unit, Contractor must at least achieve the following minimum requirements: (1) receipt of a Temporary Certificate of Occupancy ("TCO") for such unit from the City of Sunny Isles Beach; (2) completion all other items including but not limited to balconies serving the respective units and any other limited common elements within the South Tower contemplated in the Drawings such as South Tower storage units, South Grand Lobby and South Tower Porte Cochere subject to Punch List items not preventing occupancy of use intended (but only as to liquidated damages and not Substantial Completion); (3) to the extent within Contractor's Scope of Work all permits, licenses, and certificates required for such use have been obtained for TCO; and (4) completion of all items required pursuant to   § 9.8.1 of the Modified General Conditions to achieve Substantial Completion are complete, including, but not limited to those items in § 9.8.1.3, except remaining units not ready for Substantial Completion.

**§ 9.8.6.1** Unit Substantial Completion shall partially reduce TCO Liquidated Damages based upon the amounts set forth for each unit in § 4.4.2.1 of the AIA Document A102™–2017, Modified Form of Agreement.

**§ 9.8.7**   Owner Requirements for TCO. At least thirty (30) days prior to issuance of the TCO, Contractor shall provide Owner with a list of requirements of which Contractor is or becomes aware and actions that Owner correct and/or

Owner _____                          Contractor _____

Modified AIA Document A201™–2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

address in sufficient time for Owner to perform so the Project will not be delayed. Contractor must include all such items and actions in its construction Schedule.

### § 9.9   Partial Occupancy or Use or Turnover of the Building to Owner

**§ 9.9.1**   The Contractor shall be responsible for operating and maintaining the Work and all systems and equipment that are part of the Work within the area covered by the TCO until the TCO is issued or until a mutually agreed upon earlier Turnover as set forth herein.

**§ 9.9.2**   The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy, use or turnover is consented to by the insurer as may be required and authorized by public authorities having jurisdiction over the Project. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the Architect as provided under § 9.8.5. Consent of the Contractor to partial occupancy, use or turnover shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Contractor or, if no agreement is reached, by decision of the Architect.

**§ 9.9.3**   Immediately prior to such partial occupancy, use or Turnover, the Owner, Contractor, and Architect shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work and all operating systems and equipment.

**§ 9.9.4**   Unless otherwise agreed upon, partial occupancy, use or turnover of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

**§ 9.9.5**   In the event of partial occupancy before Substantial Completion as provided above, the Contractor shall cooperate with the Owner in making available for the Owner's use and benefit (at Owner's proportional expense) such building services as heating, ventilating, cooling, water, lighting, telephone, elevators and security for the portion or portions to be occupied, and if the Work required to furnish such services is not entirely completed at the time the Owner desires to occupy the aforesaid portion or portions, the Contractor shall make every reasonable effort, at no additional cost to the Owner, to complete such Work and/or make temporary provisions for such Work as soon as possible so that the aforementioned building services may be put into operation and use. Contractor shall cooperate with Owner so as to minimize any inconvenience to residents, while Contractor is completing the remaining Work. To the extent compliance with this provision is going to result in added costs to Contractor, Contractor shall provide Owner in writing, with all costs for Owner's written approval, prior to Owner agreeing to pay such added costs.

**§ 9.9.6**   Prior to the time Turnover or any partial occupancy or use may occur from Contractor to Owner, the following minimum requirements must be met by Contractor and submitted to Owner:

    1.   Contractor's installers and operation and regular maintenance personnel have met with Owner's representative and the property manager(s) for the Project or other individuals as may be designated by Owner, at the Project site, to provide complete instructions and training needed for proper start-up, operation, shut-down and maintenance of that part of Work. Instructions by manufacturer's representatives are required where installers are not experts in operating/maintenance procedures, or as specified in the Construction Documents. For operational equipment, installers shall demonstrate startup, shut-down, emergency operations, noise and vibration adjustments, safety, economy/efficiency adjustments, and other applicable operations, and shall review maintenance and operating instructions which are required to be performed in order to maintain in force applicable warranties, guaranties and bonds;

Owner _____                           Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright.aia.org.

2. Contractor has provided Owner with three (3) heavy duty, bound, hard-cover books, properly identified on both the front and the spine of each binder and indexed, in suitable sets of manageable size, and one (1) electronic copy of same on a single flash drive in electronic format containing the following information related to all equipment and systems on the Project:

   1. Training, maintenance and operating manual information;
   2. emergency instructions;
   3. spare part listings;
   4. wiring diagrams;
   5. recommended "turn around" cycles;
   6. inspections procedures;
   7. all approved shop drawings, product data and any other applicable information on a single flash drive in electronic format;
   8. detailed information and records for maintenance performed on all equipment and systems on the Project, operated and maintained by Contractor prior to Substantial Completion as required to achieve specified warranty;
   9. All Subcontractor warranties fully assigned and executed in the form approved by the Owner;
   10. All Extended Warranties required by the Contract Documents fully assigned and executed in the form approved by the Owner;
   11. The Contractor's warranty; and
   12. A list of all Subcontractors, Sub-subcontractors and suppliers who performed Work on the individual unit or who furnished equipment or materials for use in the Unit, such list to include the name, address, email address, and telephone number of the responsible person at all such entities.

§ 9.9.7   No later than thirty (30) days after Turnover or any partial occupancy or use, Contractor shall provide Owner for each specific condominium unit, garage unit and cabanas, with three (3) heavy duty, bound, hard-cover books, properly identified on both the front and the spine of each binder and indexed, in suitable sets of manageable size, and one (1) electronic copy of same on a single flash drive in electronic format containing the following information:

   1. Training, maintenance and operating manual information;
   2. Emergency instructions;
   3. Spare part listings;
   4. Wiring diagrams;
   5. Recommended "turn around" cycles;
   6. Inspections procedures;
   7. All Subcontractor warranties fully assigned and executed in the form approved by the Owner;
   8. All Extended Warranties required by the Contract Documents fully assigned and executed in the form approved by the Owner;
   9. The Contractor's warranty; and
   10. A list of all Subcontractors, Sub-subcontractors and suppliers who performed Work on the individual unit or who furnished equipment or materials for use in the Unit, such list to include the name, address, email address, and telephone number of the responsible person at all such entities.

§ 9.9.8   No later than thirty (30) days after Turnover or any partial occupancy or use, Contractor shall provide Owner the Red Line drawings as required by the Contract Documents.

§ 9.9.9   The delivery, endorsement or assignment of such warranties shall not release the Contractor from obligations pursuant to the Contract Documents.

Owner _____                                    Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911–1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

§ 9.9.10  Prior to turnover, Contractor shall make the Work available for Owner to bring in perspective purchasers to view units and common area amenities.

§ 9.9.11  Compliance with the § 9.9 shall be a condition precedent to Final Completion and Final Payment.

§ 9.10    **Final Completion and Final Payment**

§ 9.10.1  Upon receipt of the Contractor's notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect and Owner will promptly make the Final Inspection, and shall prepare a Contractor's consolidated Final Punch List. All items in the Final Punch List shall be completed by the Contractor within ninety (90) calendar days after achieving Substantial Completion.  In addition, Contractor shall be responsible for promptly addressing all items on Unit-Purchaser Punch Lists.  Notwithstanding anything to the contrary contained in any Contract Document or any attachment thereto, Owner may withhold from payments to Contractor a sum equal to Two Hundred Fifty percent (200%) of the cost of the items on the Final Punch List and if any Final Punch List items are not corrected or completed within ninety (90) calendar days, the Owner has the right to use any amounts due on Final Payment to correct the Final Punch List items and deduct the amount actually due the Contractor. When the Architect finds and the Owner find the Work acceptable under the Contract Documents and the Contract fully performed, including the items contained in the Contractor's Final Punch list, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions listed in § 9.10.2 below, as conditions precedent to the Contractor's being entitled to final payment have been fulfilled.

§ 9.10.2  Neither Final Payment including any remaining retention, the Shared Unused Portion of the Contingency (if any), nor the Shared Buy-Out Savings Distribution (if any), shall become due until the Contractor satisfies the requirements of the Contract Documents. As used in the Contract Documents, "Final Completion" shall mean such time after Substantial Completion and the following express conditions precedent to Final Payment have been met:

    .1    the Architect has issued a Certificate of Final Completion;

    .2    all "punch list" items have been fully completed to the reasonable satisfaction of Owner and Architect, unless the failure of the same to issue is not due to the failure of Contractor to complete its scope of Work;

    .3    the final certificate of occupancy and all final governmental and utility authority permits have been issued, unless the final certificate of occupancy is delayed for reasons that are beyond the control of the Contractor and those for whom the Contractor is responsible;

    .4    Contractor has fully cleaned and restored the site with respect to all of the final punch list work;

    .5    all temporary utilities are disconnected;

    .6    Contractor has complied with all other requirements of the Contract Documents; and

    .7    Contractor has complied with all other reasonable requirements of Owner and or Owner's Lender.

§ 9.10.3  In addition to the above, Contractor shall have performed and or submitted (as applicable) to the Architect and Owner the following:

Owner _____

Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

.1     an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, or shall be paid out of Contractor's final payment or have not been paid in the event the Contractor has a good faith dispute with any subcontractor(s) that would preclude payment to the Subcontractor(s);

.2     consent of surety, if any, to final payment;

.3     documentation of any special warranties, such as manufacturers' warranties or specific Subcontractor warranties;

.4     evidence that all Punch List items have been fully completed to the satisfaction of the Architect and Owner to the extent such document is provided to the Contractor;

.5     all previously undelivered manufacturer and Subcontractor guarantees, warranties and manuals and documents;

.6     final and or conditional releases of lien, waivers of claim, satisfactions of liens or claims, and such other affidavits as may be reasonably required by the Owner to assure a lien-free and claim-free completion of the Work; Where Contractor is in a dispute with a Subcontractor and or supplier, consent of surety to Final Payment is acceptable.

.7     all original drawings in Contractor's possession;

.8     all Shop Drawings, revised Drawings and related information so that the Architect can issue final As-Built Drawings;

.9     To the extent Architect is missing any shop drawings and or submittals, Contractor will provide any such items requested in writing;

.10     evidence that all temporary utilities have been disconnected;

.11     the Contractor has fully cleaned and restored the site, including removal of all rubbish and construction debris;

.12     all final governmental permits for which Contract is responsible under the Contract Documents have been issued and all permits have been closed out,

.13     Contractor has complied with all partial occupancy or Turnover obligations set forth in § 9.9.6 of the AIA A201 Modified General Conditions above;

.14     Contractor has complied with all other requirements of the Contract Documents and all reasonable requirements of Owner's Lender (if any); and

.15     In addition, as Contractor is fully responsible for obtaining the Manufacturers' Warranties, Contractor shall be responsible for obtaining inspections or other acceptable documentation by the Manufacturers' representative, as required by the Contract Documents, for equipment and supplies prior to payment, and delivering, together with the final application for payment and supporting documentation all warranties and Extended Warranties required by the Contract Documents. If fully satisfied with the documentation submitted, and provided that the Work has passed all inspections as required by the Contract Documents and all applicable

Owner _____    Contractor _____

Modified AIA Document A201™ – 2017, Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44.22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

governmental authorities, the Architect shall issue a certificate of authorization of payment to the Owner for the amount approved.

**§ 9.10.4** The Contractor's obligation to complete all Work in accordance with the Contract Documents shall not be deemed waived, excused, or otherwise satisfied by any failure of any person or entity to include, discover, or identify any incomplete or defective Work in any punch list, completion list, or inspection report, including without limitation the Substantial Completion Punch List, or any further punch lists. Notwithstanding, in the event a punch list item(s) is not identified after the preparation of the Final Punch List, such item(s) shall be treated as warranty items and shall not preclude final payment.

**§ 9.10.5** Final payment may be withheld on account of (1) defective Work not remedied; (2) claims or liens filed, unless bonded off (excluding Prior Work liens, but not Prior Work listed in **Exhibit "X"**); (3) failure of the Contractor to make payments properly to Subcontractors or for labor, materials, or equipment; (4) failure to provide waivers of lien for all lienors giving notices (subject to sub sections (2) above); (5) damage to the Owner's property caused by Contactor, its Subcontractors or anyone working for Contractor, or to the real or personal property of any unit owners or tenants in which case a reasonable estimated amount of such damages shall be withheld from Contractor's payment until such damages are satisfactorily corrected, excluding losses covered by OCIP or the builders risk policies; (6) failure of the Work to progress satisfactorily or according to schedule; (7) failure to carry out the Work in accordance with the Contract Documents; or (8) lawsuits filed against Owner by Subcontractors and or Material or Equipment Suppliers related to this Project (provided Contractor and or Surety have not undertaken its indemnification obligation under this Agreement that includes but is not limited to providing Owner with a defense to the lawsuit of Owner and Contractor's mutually agreed upon selected attorneys, at Contractor and or Surety's expense. The parties will endeavor to use the same legal counsel to the extent possible, where there is no conflict present.

**§ 9.10.6** If Contractor has repeatedly failed to pay its Subcontractors or suppliers in accordance with their Subcontract agreements, Owner may, in its discretion, make all or any portion of any of the final payment by check payable jointly to the order of Contractor and any lienor giving timely notice, or may make such payment directly to such lienor and deduct said payment from the sum due Contractor unless Contractor has timely provided Owner in writing a good faith basis to dispute payment is due and owing subcontractor, subject to Owner's reasonable approval. However, such payment, if made, shall not create any third party beneficiary or other rights in such lienor. In the event there are claims, which exceed the final payment amount, no payment shall be made until Contractor deposits the amount of any such deficiency with the Owner.

**§ 9.10.7** If, after Substantial Completion of the Work, Final Completion thereof is materially delayed through no fault of the Contractor or those for whom the Contractor is responsible, and the Owner so confirms, the Owner may, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed shall be submitted by the Contractor to the Architect prior to certification of such payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of Claims.

**§ 9.10.8** The making of Final Payment shall not constitute a waiver of Claims by the Owner.

**§ 9.10.9** Acceptance of Final Payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of Claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

**§ 9.10.10** Unsold and or un-punched out (by the Unit-Purchaser) units at the time of Final Completion will not delay Final Payment. Should a unit purchaser after Final Completion and Final Payment generate a Unit-Purchaser Punch List, Contractor shall return to the site to address the subsequent Unit-Purchaser Punch List, but Contractor shall be compensated for its reasonable time to address the subsequent Unit-Purchaser Punch List. However, Contractor shall not be compensated for its reasonable time to address the subsequent Unit-Purchaser Punch List, if Contractor is still

Owner _____

Contractor _____

Modified AIA Document A201™—2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

working on-site.  In all events, warranty work is non-compensable (outside the 558 warranty fee as set forth in § 5.1.2.2 of the AIA Document A102™–2017, Modified Form of Agreement between Owner and Contractor).

**ARTICLE 10   PROTECTION OF PERSONS AND PROPERTY**

**§ 10.1    Safety Precautions and Programs**

**§ 10.1.1**  The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work.  The Contractor shall comply with all OSHA requirements and shall have a safety program in accordance with OSHA requirements.

**§ 10.1.2**  If the Contractor fails to maintain the safety precautions required by law or required by the Contract Documents , the Owner may take such steps as necessary and charge the Contractor therefore. The Contractor shall be responsible for payment of any fines or penalties levied by OSHA or other similar entities relating to its Subcontractors violation of safety or heath standards.

**§ 10.1.3**  Failure of Contractor to take any such action shall not relieve Subcontractor of its obligations in § 10.1.1.

**§ 10.2    Safety of Persons and Property**

**§ 10.2.1**  In any area where Contractor is working, the Contractor shall, and shall also contractually require its subcontractors, to take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to (1) all employees on the Work and other persons who may be affected thereby, (2) all the Work and all materials and equipment to be incorporated therein, (3) invitees, licensees, employees and reasonably anticipated visitors of the Project; and (4) other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, parking lots, pools, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction. Contractor shall comply with all OSHA regulations regarding job safety and all applicable laws, ordinances, rules, regulations and orders of any public authority having jurisdiction for the safety of persons or property or to protect them from damage, injury or loss.  All damage or loss to any property, to the extent caused in whole or in part by the Contractor, any subcontractor, any sub-subcontractor or anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, shall be remedied by the Contractor as a Cost of the Work, subject to § 7.7.2 and § 7.7.3 of the AIA Document A102–2017, Modified Form of Agreement between Owner and Contractor. Notwithstanding the foregoing, provided Contractor is issued a change order by the Owner to remediate the Work, Contractor shall proceed with the Work despite not having received payment from the OCIP and/or builders risk carrier.

**§ 10.2.1.1** With regard to all employees, licensees, invitees and any other person entering with Work site, Contractor shall provide all needed personal protection equipment to comply with the orders of authorities having jurisdiction issued to prevent and or reduce the spread of COVID-19.  In addition, Contractor shall provide all necessary wash stations and decontamination areas.

**§ 10.2.2**  The Contractor and its subcontractors shall comply with, and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities, bearing on safety of persons or property or their protection from damage, injury, or loss.

**§ 10.2.3**  The Contractor shall and shall contractually require its subcontractors to implement, erect, and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards; promulgating safety regulations; and notifying the owners and users of adjacent sites and utilities of the safeguards.

**§ 10.2.4**  When use or storage of explosives or other hazardous materials or equipment, or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

Owner _____        Contractor _____

Modified AIA Document A101™–2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44.22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 10.2.5** The Contractor shall promptly remedy damage and loss to property caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under the Contract Documents. The Contractor may make a Claim for the cost to remedy the damage or loss to the extent such damage or loss is attributable in whole or in part to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable in whole or in part to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under § 3.18, and the provisions of § 3.18 shall govern this Article.

**§ 10.2.6** Any damage to adjacent property or improvements shall be promptly repaired by the Contractor, if caused in whole or in part by Contractor or its Subcontractors, any Sub-subcontractor or anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable. The foregoing is not intended to prevent the Contractor from making claim against any insurance that may provide coverage to the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under § 3.18 and the provisions of § 3.18 shall govern this Article.

**§ 10.2.7** The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents and theft. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect.

**§ 10.2.8** The Contractor shall not permit any part of the construction or site to be loaded so as to cause damage or create an unsafe condition.

**§ 10.2.9   Injury or Damage to Person or Property**
If either party suffers injury or damage to person or property because of an act or omission of the other party, notice of the injury or damage, whether or not insured, shall be given to the other party and any appropriate insurer within a reasonable time not exceeding five (5) calendar days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

**§ 10.2.10** To the extent of any damage or loss to any property, caused in whole or in part by the Contractor, any subcontractor, any sub-subcontractor or anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, is covered by insurance, Contractor shall remedy the damage or loss to any property at Contractor's sole cost and expense, to be reimbursed when payment is received from the insurance carrier.

**§ 10.3   Hazardous Materials and Substances**

**§ 10.3.1** The Contractor is responsible for compliance with any requirements included in the Contract Documents regarding hazardous material. s Contractor shall not bring any hazardous material onto the Project site unless specifically required by the Contract Documents. If the Contractor encounters a hazardous material or substance not addressed in the Contract Documents and if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area, take precautions not to exacerbate the conditions, and notify in writing the Owner and Architect of the condition. Contractor shall comply with all applicable federal, state, and local environmental laws, codes, ordinances and regulation including but not limited to all OSHA requirements and regulations. Contractor shall promptly report the condition to the Owner and Architect in writing.

**§10.3.1.1** With the exclusion of Prior Work (as defined in § 2.1.8 of the AIA Document A102™–2017, Modified Form of Agreement) and information disclosed in the documents provided to Contractor, all of which Contractor is accepting responsibility for, Owner acknowledges that Contractor has not created or contributed to the creation of or existence of any hazardous or toxic material or any other type of hazard, contamination or pollution, latent or patent, or the release thereof, or the violation of any law or regulation thereto, or to the release prior to the date of commencement of performance of the Work (collectively the "Preexisting Conditions"). Therefore, Owner shall defend, indemnify and hold harmless Contractor, its subsidiaries and affiliates and any of their respective officers, directors, employees,

Owner _____

Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

agents and/or sureties from and against any claim, demand, cause of action, judgment or other obligation, including but not limited to those based in whole or in part on strict liability, that the Contractor has become an owner, operator, generator or transporter or disposer of a hazardous substance, or other potentially responsible party under CERCLA or any other federal or state environmental laws, based on the Preexisting Conditions, except to the extent the claim arises from the act or omission or misconduct of the Contractor or its suppliers, subcontractors, agents and anyone for whose acts they may be responsible. This section is not applicable to pre-construction subsurface conditions or anything was on site as required by the Contract Documents.

§10.3.1.2  With the exclusion of Prior Work (as defined in § 2.1.8 of the AIA Document A102™–2017, Modified Form of Agreement) and information disclosed in the documents provided to Contractor, all of which Contractor is accepting responsibility for, the responsibility for making any disclosures or reports to any third party and for taking any corrective, remedial or mitigation actions regarding the Preexisting Conditions shall be solely that of the Owner, except to the extent that the claim arises from act, omission or misconduct of Contractor. This section is not applicable to pre-construction subsurface conditions or anything was brought on site as required by the Contract Documents.

§ 10.3.2  Upon receipt of the Contractor's notice, or if Owner has a good faith reason to suspect, the Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the hazardous material or substance reported by the Contractor or suspected by the Owner and, in the event such material or substance is found to be present, to cause it to be rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of the material or substance or who are to perform the task of removal or safe containment of the material or substance. The Contractor and the Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Contractor or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor and the Architect have no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. By Change Order, the Contract Time shall be extended appropriately and the GMP shall be increased by the amount of the Contractor's reasonable additional costs of shutdown, delay, and start-up.

§ 10.3.3  The Owner shall indemnify, defend and hold harmless the Contractor, Subcontractors, and agents and employees of any of them from and against claims, damages, losses, and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in § 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss, or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), except to the extent that such damage, loss, or expense is due to the fault or negligence of the Contractor, or any Subcontractors or material suppliers to Contractor, or any lower tier subcontractors or suppliers, or any agents or employees of the Contractor, or any Subcontractors or material suppliers, or any lower tier subcontractors or suppliers, or any other entity working under Contractor or for whom Contractor is responsible for.

§ 10.3.4  The Owner shall not be responsible under this § 10.3 for hazardous materials or substances brought on the site or caused to be at the site by Contractor, or any Subcontractors or material suppliers to Contractor, or any lower tier subcontractors or suppliers, or any agents or employees of the Contractor, or any Subcontractors or material suppliers, or any lower tier subcontractors or suppliers, or any other entity working under Contractor or for whom Contractor is responsible for.  The Owner shall be responsible for materials or substances required by the Contract Documents, except to the extent of the Contractor's fault or negligence in the use and or handling of such materials or substances.

§ 10.3.5  The Contractor shall defend, indemnify, hold harmless and reimburse the Owner for the cost and expense the Owner incurs (1) for remediation of hazardous materials or substances brought to the site or negligently handled by the Contractor or any Subcontractors or material suppliers to Contractor, or any lower tier subcontractors or suppliers, or any agents or employees of the Contractor, or any Subcontractors or material suppliers, or any lower tier subcontractors or suppliers, or any other entity working under Contractor or for whom Contractor is responsible for, or (2) where the Contractor fails to perform its obligations under § 10.3.1. However, to the extent that the cost and

Owner _____

Contractor _____

Modified AIA Document A201™ - 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

expense are due to the Owner's negligence, without negligence on the part of the Contractor or any Subcontractors or material suppliers to Contractor, or any lower tier subcontractors or suppliers, or any agents or employees of the Contractor, or any Subcontractors or material suppliers, or any lower tier subcontractors or suppliers, or any other entity working under Contractor or for whom Contractor is responsible for, and if the Contractor is held liable by a government agency for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify defend and hold  the Contractor harmless for all cost fines and penalties  and expense thereby incurred.

### § 10.4   Emergencies
In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury, or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in **Article 15** and **Article 7**.

### ARTICLE 11   INSURANCE AND BONDS

**OWNER RECOMMENDS CONTRACTOR SHOW THIS SECTION TO INSURANCE AGENTS TO ENSURE MINIMUM COVERAGES AND LIMITATIONS ARE MET AND DECLARATION OF COVERAGE PAGES ARE PROPERLY SUBMITTED.**

### § 11.1   OWNER'S CONTROLLED INSURANCE PROGRAM
 Owner and Contractor acknowledge, understand and agree that Owner has arranged with Willis of Florida, Inc. (the "OCIP Administrator") to administer for this Project, an Owner Controlled Insurance Program ("OCIP") for Work performed on or at the Project Site, for the Commercial General Liability ("CGL"), and Excess Liability insurance policies. Contractor, Owner, and all eligible Subcontractors shall enroll in the OCIP.  The "Project Insurance Manual" has been made available to Contractor for its review, comment and approval, and is attached hereto as **Exhibit "P"** and is incorporated herein so as to become a part of the Contract Documents. In the event of a conflict between the terms of the Project Insurance Manual and this Agreement, the terms of this Agreement shall control. OCIP coverages shall apply only to those operations of each enrolled party performed at the Project Site in connection with the Work, and only to enrolled parties that are eligible for the OCIP.  The OCIP does not include insurance for off-Site activities or regularly established workplaces, plants, factories, offices, shops, warehouses, permanent yards or other off-Site locations of Contractor or any Subcontractor, even if such locations are for fabrication of materials to be used at the Site.

### § 11.1.1   Bid Procedure.  With regard to remaining Buy-Out, Owner has elected a "Bid Gross" method, which requires that Eligible Parties identify the total cost of first dollar General Liability and Umbrella/Excess coverage.  Eligible Parties shall include costs for insurance coverages provided under the OCIP in the Final GMP and subsequent change order pricing.   In calculating insurance costs, Eligible Parties shall use the limits of insurance specified in this Agreement. The Bid Gross method does not include the Contractor.

### § 11.1.2   OCIP-eligible subcontractors of all tiers shall include the cost of their insurance comparable to the OCIP Coverages in their base bids for the Project and shall also set forth with their base bids an OCIP deduction identifying the cost of their insurance comparable to the OCIP Coverages for each of its Subcontractor's identified insurance costs due to eligibility for OCIP Coverages. The Costs of OCIP Coverages shall include insurance premiums, related taxes and assessments, markup on the insurance premiums and losses retained through the use of a self-funded program, self-insured retention or deductible program.  The Contactor does not include the cost of their insurance comparable to the OCIP Coverages in its base proposal for the Project and, hence, does not owe an OCIP credit to the Owner.

### § 11.1.3   The Owner will remove the Subcontractor's and lower-tier Subcontractor's OCIP deduction from their bids/contract price through a reduction in the bid/contract price.  Subsequent change order proposals shall be submitted in the same manner with the cost of OCIP coverages included in the base change order price and associated cost of OCIP coverages included identified. The Owner is responsible for calculating, negotiating and agreeing upon the amount of the base change order price and associated cost of OCIP coverages included identified.

### § 11.1.4   A final audit will be conducted of the actual receipts and insurance costs. The insurance costs will be based upon the rates, credits and surcharges provided to the OCIP Administrator in accordance with the OCIP Manual and

Owner _____                                             Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

rates therein. These rates will be applied to the Enrolled Party's total Project receipts. The final adjustment will be calculated based upon the total receipts less those estimated at time of award and any change orders. The Owner is responsible for auditing, calculating, negotiating and agreeing upon the amount of the final cost of OCIP coverages included identified.  The Owner shall conduct the OCIP audits in a manner which does not delay final payment on the Project. Owner shall indemnify Contractor from the effects of any disputes between the Owner and Subcontractors arising out of any such audits.

§ 11.1.5  **Eligible Parties and Enrolled Parties.**  Each of the following, who will perform any labor at the Project Site, is an "Eligible Party": Contractor, all Subcontractors of all tiers, and any such other persons or entities as Owner may designate, in its sole and absolute discretion.  The OCIP Administrator will issue OCIP certificates of insurance to each Enrolled Party evidencing Commercial General Liability and Excess Liability.  Copies of the OCIP policies will be made available by the OCIP Administrator to any Enrolled Party upon written request by that Enrolled Party.

§ 11.1.6  **Excluded Parties and Their Insurance Obligations.**  Excluded Parties and Eligible Parties that are not enrolled in the OCIP shall obtain and maintain the insurance coverage specified in the Agreement as if an OCIP was not in place.  The OCIP Coverages do not cover the following "Excluded Parties":

    .1    Contractor and any Subcontractors of any tier that do not perform any actual labor on or at the Site including, without limitation, subcontractors who perform clean up services or provide temporary equipment, safety equipment, or barricade services;

    .2    Contractor and Subcontractors whose Work includes blasting operations and demolition by blasting or wrecking ball;

    .3    Hazardous Materials remediation, removal, and/or transportation companies and their consultants;

    .4    Architects, surveyors, engineers, and soil testing contractors, and their consultants;

    .5    Vendors, suppliers, material dealers, manufacturing representatives, truckers, haulers, drivers, common carriers, and others who do not perform Work at or on the Site or who merely transport, pick up, deliver, or carry materials, personnel, parts or equipment, or any other items or persons to or from the Site;

    .6    Material dealers; manufacturing representatives, equipment rental companies who perform equipment maintenance (does not apply to those who provide operators);

    .7    Contractors whose sole scope of work includes Exterior Insulation and Finish Systems

    .8    Guard services, janitorial services and food services companies; and

    .9    Any other person or entity that Owner, acting in its sole discretion, elects to exclude, even if otherwise eligible.

§ 11.1.7  **Owner's Obligations.**  For Eligible Parties, Owner shall (a) pay the costs of premiums for the OCIP coverages and (b) receive or pay, as the case may be, all adjustments to such costs, whether by way of dividends, retroactive adjustments, return premiums, other moneys due, audits or otherwise.  Contractor hereby assigns to Owner the right to receive all such adjustments and shall require each of its Subcontractors of every tier to assign to Owner the right to receive all such adjustments.  Owner's obligation to obtain insurance under the OCIP shall not relieve or limit, or be construed to relieve or limit, Contractor or any of its Subcontractors of any tier of any responsibility, liability, or obligation imposed by the Contract Documents, the OCIP insurance policies, the Project Insurance Manual, or by law, including, without limitation, any indemnification obligations which Contractor or any of its Subcontractors have to Owner. Nothing contained herein shall create a fiduciary duty from Owner to Contractor.

Owner                                 Contractor \_\_\_\_\_

Modified AIA Document A201™– 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44.22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 11.1.8  Contractor's Obligations.**  Contractor shall incorporate the terms of this Article 11 into all Subcontracts whether enrolled or excluded.  All Eligible Parties (unless excluded by Owner or OCIP Insurer) shall enroll in the OCIP and shall comply with all OCIP Administrator's instructions for properly enrolling in the OCIP.  The following provisions apply to Enrolled Parties only which Enrolled Parties:

.1    shall comply with and shall require all of its Subcontractors (of all tiers) that are Enrolled Parties to comply with the OCIP Administrator's instructions for enrolling in the OCIP.

.2    shall maintain enrollment in the OCIP, and shall endeavor to ensure all of its enrolled Subcontractors of all tiers enroll and maintain enrollment in the OCIP.  Enrollment shall take place within five (5) days of a receipt of a Notice to Proceed, and prior to commencement of any work.

.3    hereby assign to Owner the right to receive all adjustments to the cost of premiums for the OCIP Policies and shall require that each of its Subcontractors of every tier assign to Owner the right to receive all such adjustments.

.4    shall comply with all of the requirements set forth in this Section 13, the Project Insurance Manual, and the OCIP Policies.

.5    shall provide to each Subcontractor of all tiers a copy of the Project Insurance Manual and shall endeavor to ensure such Subcontractors' compliance with the provisions of the OCIP Policies (for Enrolled Parties), the Project Insurance Manual and this Article 11.  The failure of an Enrolled Party to provide each of its enrolled Subcontractors with a copy of the same shall not relieve the Enrolled Party, or any such enrolled Subcontractors of any of the obligations contained therein.

.6    hereby acknowledge that Owner and the OCIP Administrator are not agents, partners, or guarantors of the insurance companies providing the OCIP Policies (each individually referred to hereafter as "OCIP Insurer" and collectively, the "OCIP Insurers"), that other than deductibles or SIR's required under the Policies, neither Owner nor the OCIP Administrator is responsible for any claims or disputes between or among Contractor, its Subcontractors, and any OCIP Insurer(s), and that neither Owner nor the OCIP Administrator guarantees the solvency, or the availability of limits, of any OCIP Insurer(s) or OCIP Policy(ies).  Any type of insurance coverage or limits of liability in addition to the OCIP Policies that an Enrolled Party or its Subcontractors of any tier require for its or their own protection, or that is required by applicable laws or regulations, shall be such Enrolled Party's or its Subcontractors' sole responsibility.

.7    shall fully cooperate with, and require all of its Subcontractors (of all tiers) that are Enrolled Parties to fully cooperate with, the OCIP Administrator and the OCIP Insurers, as applicable, in its or their administration of the OCIP including, but not limited to: (1) Attending meetings held in connection with the OCIP; (2) Complying with all administrative, safety, insurance, and other requirements outlined herein or the Contract Documents; (3) complying with and following the claim reporting procedures established for the OCIP; (4) assisting and cooperating with the reporting, investigation, and adjustment of all claims and/or demands which Owner, Contractor, OCIP Administrator, and/or OCIP Insurers are called upon to adjust or defend against arising out of operations at the Project Site.

**§ 11.1.9**  OCIP Coverages shall apply only to the Work of each Enrolled Party performed on or at or within 2000 feet of the Project Site.  All of the insurance policies provided through the OCIP shall be primary insurance and non-contributing with any other insurance carried by the Enrolled Parties.  OCIP coverages shall not apply to ineligible and/or Excluded Parties.

Owner _____                                          Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09.44.22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 11.1.10** The OCIP shall provide only the following insurance to Enrolled Parties (this is a summary only ‑ for a more detailed listing, see the "Project Insurance Manual" attached hereto as **Exhibit "P"** and the actual policies):

    **.1**    **On-Site OCIP CGL Insurance.** CGL insurance insuring against claims for bodily injury, property damage, personal injury and advertising injury. The CGL insurance shall be no less comprehensive and no more restrictive than the coverage provided by Insurance Services Office ("ISO") form for CGL Insurance (CG 00-01-04-13). The CGL policy shall be on an occurrence basis with combined single limits of Five Million and 00/100 Dollars ($5,000,000.00) per occurrence, Five Million and 00/100 Dollars ($5,000,000.00) in the general aggregate. By its terms or appropriate endorsements, the CGL insurance shall include coverage for the following: Bodily Injury, Property Damage, Fire Legal Liability, Personal Injury, Blanket Contractual, Independent Contractors, and Premises Operations. The CGL policy shall include provisions for breach of conditions, cross-liability and severability of interests. The policy cannot be endorsed to exclude the perils of explosion (X), collapse (C) and underground (U) exposures. The CGL policy shall include Products & Completed Operations Liability coverage for any applicable statute of limitations or repose. The Products & Completed Operations Liability Coverage shall be in a minimum amount of Five Million and 00/100 Dollars ($5,000,000.00) per occurrence, and Five Million and 00/100 Dollars ($5,000,000.00) in the aggregate. The CGL policy shall include contractual liability insurance throughout the period of time that the Work is being performed. The CGL insurance policy provided under the OCIP shall be primary and non-contributory for all enrolled parties and the limits of liability apply to all insureds combined; and

    **.2**    **On-Site OCIP Excess Liability Insurance.** Excess Liability Insurance shall be on a per occurrence basis with a limit of liability of at least One Hundred Seventy Million and 00/100 Dollars ($170,000,000.00) per occurrence and One Hundred Seventy Million and 00/100 Dollars ($170,000,000.00) in the aggregate where applicable. Limits apply to all insureds combined. The Excess Liability insurance shall cover personal injury, bodily injury, property damage, premises/operations liability, contractual liability, advertising injury liability and Products & Completed Operations Liability coverage. The Excess Liability policy shall provide Products & Completed Operations Liability coverage for any applicable statute of limitations or repose. The Excess Liability policy shall establish the Additional Insureds as additional insureds under the Excess Liability policy, on a primary and noncontributory basis.

    Notwithstanding the above, the Owner agrees to increase the Excess Liability Insurance Limits to Three Hundred Million Dollars ($300,000,000.00) per occurrence and Three Hundred Million Dollars ($300,000,000.00) in the aggregate within sixty (60) calendar days of the Effective Date of this Agreement. If Owner fails to increase the limit, Contractor's shall provide Excess Liability Insurance Limits to Three Hundred Million Dollars ($300,000,000.00) per occurrence and Three Hundred Million Dollars ($300,000,000.00) in the aggregate, and Contractor's stipulated GL PD (excess) rate shall be increased from .35% to .55%. Contractor shall maintain said Excess Liability Insurance through expiration and the statute of repose, and the Excess Liability Insurance shall not have residential or wrap up exclusions.

**§ 11.1.11 OCIP Deductibles.** The OCIP's CGL Policy is an occurrence based policy and is subject to a deductible in the amount of $50,000.00 per occurrence. Deductibles shall be paid as set forth in § 5.1.4 of the AIA Document A102™–2017, Modified Form of Agreement.

**§ 11.1.12 Owner's Election to Modify or Discontinue the OCIP.** Owner may, for any reason, modify the OCIP Coverages, discontinue the OCIP, or request that Contractor or any of its Subcontractors of any tier withdraw from the OCIP upon thirty (30) days written notice. Upon such notice Contractor and/or one or more of its Subcontractors, as specified by Owner in such notice, shall obtain and thereafter maintain during the performance of the Work, all additional insurance required in this Agreement as a result of the OCIP not being in place or such party no longer being covered by the

Owner _____

Contractor _____

Modified AIA Document A201™–2017, Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA" the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may be used without permission. This draft was produced by AIA software at 09.44.22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

OCIP. The form, content, limits of liability, cost, and the insurer issuing such replacement insurance shall be subject to Owner's approval. Owner shall pay Contractor for the reasonable cost of replacement coverage required by this Section.

**§ 11.1.13 OCIP Termination.** If Owner terminates the OCIP for any reason, Contractor, Enrolled Parties, Eligible Parties that are not enrolled, and Excluded Parties shall not perform Work on or at the Project Site (including corrective, repair or warranty work) unless and until the insurance policies and coverages specified in this Article 11 are in effect.

**§ 11.1.14 OCIP Insurance Policies Establish the OCIP Coverages.** During the period of time in which an OCIP is in place, Owner will provide OCIP insurance coverages, subject to the deductibles, terms and conditions, exclusions, and limitations contained in the provisions of the OCIP policies. The OCIP Administrator shall make copies of the OCIP insurance policies available to any Eligible Party or Enrolled Party requesting to review such copies in writing. The summary descriptions of the OCIP Coverages in this Article, or elsewhere, are not intended to be complete or to alter or amend any provision of the actual OCIP Coverages. In the event that any provision of Article 11, the Contract Documents, the Project Insurance Manual or elsewhere, conflicts with the OCIP insurance policies, the provisions of the actual OCIP insurance policies shall govern. Owner's provision of the OCIP insurance policies meets Owner's obligation to provide OCIP insurance under the Agreement and, in the event of a conflict between the provisions of the policies and any summary or description of the provisions contained herein or otherwise, the provisions of the policy shall control and shall be conclusively presumed to fulfill Owner's obligation to provide OCIP insurance.

**§ 11.1.16 Contractor's Other Insurance Requirements.** Contractor shall procure, carry, maintain and pay for, the following insurance from commencement of the Work through Final Completion of the Work unless stated otherwise herein:

.1 **Workers' Compensation.** Statutory coverage and Employer's Liability with a One Million and 00/100 Dollars ($1,000,000.00) limit for each of the following exposures: bodily injury by accident (each accident); bodily injury by disease (each employee); and bodily injury by disease (policy limit). Worker's compensation must provide coverage in the state where the project is covered.

.2 **Off Site Commercial General Liability.** Commercial General Liability Insurance (CGL) (broad form coverage) insuring against claims for bodily injury, property damage, personal injury and advertising injury for operation performed off the Project Site that shall be no less comprehensive and no more restrictive than the coverage provided by Insurance Services Office ("ISO") form for Commercial General Liability Insurance (CG 00-01-04-13) (the "Off-Site CGL Policy"). The Off-Site CGL Policy shall be on an occurrence basis with combined single limits of:

| | |
|---|---|
| Each Occurrence | $1,000,000 |
| Damage to Rented Premises | $50,000 |
| Medical Expenses | $10,000 |
| Personal & Advertising Injury | $1,000,000 |
| General Aggregate | $2,000,000 |
| Products &Completed Operations Aggregate | $2,000,000 |

By its terms or appropriate endorsements, Contractor's Off-Site CGL Policy shall include coverage for Bodily Injury, Property Damage, Fire Legal Liability (not less than the replacement value of the portion of the premises occupied), Personal Injury, Blanket Contractual, Independent Contractors, and Premises Operations and products manufactured, assembled or otherwise worked upon away from the Project Site. The Off-Site CGL Policy shall include provisions for breach of conditions, cross-liability and severability of interests. The Off-Site CGL Policy shall include Products/Completed Operations Liability coverage for a period of two (2) years following completion of all of the Work covered under this

Owner _____          Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Agreement. The policy shall contain no exclusions and/or limitations for residential construction including condominiums. The Off-Site CGL Policy shall establish Owner and the Additional Insureds as additional insureds on a primary and noncontributory basis, by means of standard ISO endorsement CG2010 (11/85) or its equivalent CG2010 (10/01) and CG2037 (10/01). Any insurance or self-insurance maintained by Project Owner shall be excess of and non-contributory with the coverage afforded by the Contractor with their Off Site CGL policy.

.3 **Automobile Liability.** Automobile Liability Insurance insuring against claims for bodily injury and property damage and covering the ownership, maintenance or use of any auto or all owned/leased and non-owned and hired vehicles used in the performance of the Work, both on and off the Project Site, including loading and unloading. The coverage shall be provided by ISO form for Commercial Auto Coverage (CA-00-01-10-01) or equivalent. The limit shall be a combined single limit of a minimum of One Million and 00/100 Dollars ($1,000,000). The automobile liability insurance policy shall establish Owner and the Additional Insureds as additional insureds on a primary and noncontributory basis by means of a CA20480299 Designated Insured endorsement, or equivalent endorsement(s).

.4 **Off-Site Excess Liability.** Off-Site Excess Liability shall be an occurrence based, follow form with regard to coverage and endorsements specified in this agreement policy and have a limit in an amount not less than $25,000,000.00 per occurrence and $25,000,000.00 in the aggregate where applicable and "drop down" for defense and indemnity in the event of exhaustion of the underlying insurance. By its terms, the Off-Site Excess Policy shall cover:

    .1    Personal injury;
    .2    Contractual Liability;
    .3    X.C.U. Liability;
    .4    Off-Site CGL;
    .5    Automobile Liability;
    .6    Employer's Liability, and,
    .7    Owner and the Additional Insureds on a primary and noncontributory basis by means of an endorsement acceptable to Owner. The Off-Site Excess liability coverages are separate from the OCIP coverages. Any insurance or self-insurance maintained by Project Owner shall be excess of and non-contributory with the coverage afforded by the Contractor with their Off Site Excess Liability.

.5 **Contractual Liability Insurance.** This coverage shall be carried, on a blanket broad form basis, throughout the period of time that the Work is being performed and thereafter for a period of three (3) years and shall be in a minimum amount of Ten Million and 00/100 Dollars ($10,000,000). This coverage is to insure Contractor's indemnity under the Contract Documents, and shall insure against the risks enumerated therein.

.6 **Pollution Liability Insurance.** Contractor shall provide pollution liability insurance that provides coverage for liability arising from Contractor's construction activities, whether occurring at or away from the Project Site with per occurrence and aggregate limits of Five Million and 00/100 Dollars ($5,000,000). Contractor's pollution liability insurance shall cover property damage abatement/cleanup, whether on-site or off-site as well as bodily injury, repair and defense costs resulting from liability arising out of pollution conditions including, but not limited to, exposures arising from silica, water intrusion, petroleum related products, asbestos, lead paint, tank removal, removal of contaminated soil, EIFS, bacteria, fungi and mold. Contractor's pollution liability insurance policy shall cover liability of Contractor during the process of construction, installation, removal, storage, encapsulation, transport and disposal

Owner _____        Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

of Hazardous Waste, and shall include coverage for bodily injury and loss of damage to, or loss of use of property, arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the Project Site, the Project, the atmosphere, any water course or body of water. Contractor shall maintain its pollution liability insurance coverage from the Commencement Date of the Work through Substantial Completion of the Work and shall renew such coverage annually for the ten (10) years immediately following the date of Substantial Completion of the Work.

.7   **Professional Liability (Errors and Omissions)**. Contractor shall provide professional liability insurance that provides coverage for bodily injury, property damage, and/or financial damages as a result of wrongful acts arising out of the performance or failure to perform professional services, with limits of at least Five Million and 00/100 Dollars ($5,000,000.00) per claim and a deductible not to exceed Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00). Throughout the term of the Contract, the PL/E&O policy shall include full prior acts coverage. If written on a claims made policy form, then the policy retroactive date shall be on or before the date that Contractor first provided professional services to the Owner. Contractor's professional liability insurance policy shall be maintained for ten (10) years immediately following the date of Substantial Completion of the Work, provided such insurance is commercially and reasonably available. Coverage shall not include any exclusion or other limitations related to: Scope of the professional services; delays in project completion and cost overruns; who is authorized to notify the carrier of a claim ort potential claims; mold, fungus, asbestos, pollutants or other hazardous substances.

.8   **Property Insurance**. Contractor and Subcontractors are responsible for their tools equipment including, but not limited to, tools, construction trailers and their contents, temporary fencing, temporary structures, scaffolding, staging forms and other personal property and/or equipment that is used in performance of the Work but are not actually incorporated into the Work, whether owned, leased, rented or borrowed or in the care, custody or control of Contractor or any Subcontractor. Contractor acknowledges and agrees that Owner will not be responsible for any loss or damage to their tools and equipment. If insured, the Contractor's insurance policies covering tools and equipment will include a waiver of subrogation and any other rights of recovery in favor of Owner, their designated indemnitees and all Subcontractors by endorsement. If uninsured, the Contractor will hold harmless Owner, their designated indemnitees and all Subcontractors for loss or damage to their tools, materials and equipment.

.9   **Aviation/Aircraft**. If required by Owner, the operator of an aircraft of any kind, **including without limitations drones/unmanned aircraft**, must maintain liability insurance covering bodily injury and property damage on a Combined Single Limit basis, each Occurrence Limit and in the Aggregate (including passenger liability) with liability limits in an amount not less than One Million and 00/100 Dollars ($1,000,000). If non-employee passengers are carried, there cannot be a per-passenger sublimit. Prior to commencing operations, the operator must provide the Owner with a certificate of insurance naming the Owner, Lender, and as additional insureds on a primary and non-contributory basis. The operator of the aircraft and their insurer(s) must hold the Owner harmless and waive subrogation with respect to damage to the aircraft. If the aircraft is to be used to perform lifts at the Site, a "slung cargo" endorsement must be included to cover the full replacement value of any equipment being lifted.

§ 11.1.17 **Deductibles**. Contractor's Off-Site CGL, Automobile Liability, Off-Site Excess Liability insurance policies shall all be occurrence-based policies. Contractor shall be responsible to pay, or otherwise satisfy, all deductibles or self-insured retentions for Contractor's Off-Site CGL, Automobile Liability, Off-Site Excess Liability insurance policies. Owner is not responsible to pay for, or to satisfy, the deductibles or self-insured retentions applicable to Contractor's Off-Site CGL, Automobile Liability, Off-Site Excess Liability insurance policies or any other policies carried by Contractor.

Owner _____        Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09.44.22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org

**§ 11.1.18  Insurance Required by Florida Law.**  In addition to the foregoing, Contractor shall purchase and maintain, at its sole cost and expense, such insurance coverage and is required by Chapter 489, Florida Statutes.  In the event of a conflict between the insurance requirements of this Contract and the insurance requirements of Chapter 489, Florida Statutes, the most stringent requirements shall prevail.

**§ 11.1.19  Subcontractor's Other Insurance Requirements as Enrolled Parties.**  Contractor shall require all of its Subcontractors that are enrolled in the OCIP to procure and maintain throughout the performance of the Work the following insurance:

    .1   **Workers' Compensation.**  Statutory coverage and Employer's Liability with a One Million and 00/100 Dollars ($1,000,000.00) limit for each of the following exposures: bodily injury by accident (each accident); bodily injury by disease (each employee); and bodily injury by disease (policy limit). Worker's compensation must provide coverage in the state where the project is covered.

    .2   **Automobile Liability.**  Automobile Liability insurance with a limit of at least $1,000,000.00 combined single limit or $3,000,000 if hauling hazardous materials insuring against claims for bodily injury and property damage and covering the ownership, maintenance or use of any auto or all owned/leased and non-owned and hired vehicles used in the performance of the Subcontractors' Work on the Project, both on and off the Project Site, including loading and unloading, with limits established in Contractor's Subcontracts or otherwise required to enroll in the OCIP.  The Subcontractors' Automobile Liability insurance policies shall establish Owner and the Additional Insureds as additional insureds under the policy, on a primary and noncontributory basis by means of an endorsement form acceptable to Owner; and,

    .3   **Off-Site Commercial General Liability (CGL).**  Off-Site CGL Insurance covering all of the Work and operations performed by such Subcontractors for the Project off the Project Site with limits established in Contractor's Subcontracts, provided, however, that the Subcontractors' Off-Site CGL policies shall not have limits less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate where applicable..  The policy shall contain no exclusions and/or limitations for residential construction including condominiums. The Subcontractors' Off-Site CGL policies shall establish Owner and the Additional Insureds as additional insureds under the CGL policies, on a primary and noncontributory basis by means of an ISO endorsement CG 2010 11/85, or its equivalent CG2010 (10/01) and CG2037 (10/01).

**§ 11.1.20  Insurance Requirements of All Subcontractors Excluded from the OCIP.**  Contractor shall require all of its Subcontractors that are not enrolled in the OCIP to procure and maintain throughout the performance of the Work the following insurance:

    .1   **Comprehensive Commercial General Liability (CGL).**  CGL Insurance covering all of the Work and operations performed by such Subcontractors in connection with the Project (both on and off the Project Site) with limits established in Contractor's Subcontracts, provided, however, that the Subcontractors' CGL policies shall not have limits less than One Million and 00/100 Dollars ($1,000,000.00) per occurrence and Two Million and 00/100 Dollars ($2,000,000.00) in the aggregate where applicable and shall apply on a Per Project basis. The policy shall contain no exclusions and/or limitations for residential construction including condominiums. The Subcontractors' CGL policies shall establish Owner and the Additional Insureds as additional insureds under the CGL policies, on a primary and noncontributory basis by means of an ISO endorsement CG 2010 11/85, or its equivalent CG2010 (10/01) and CG2037 (10/01).

    .2   **Worker's Compensation.**  Worker's Compensation and Employer's Liability Insurance, as required by the laws of the State of Florida, or other applicable law, covering Contractor with limits that comply with Florida law.

Owner                             Contractor

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licenced for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

.3 **Automobile Liability.** Automobile liability insurance, with a limit of at least One Million and 00/100 Dollars ($1,000,000.00) or Three Million and 00/100 Dollars ($3,000,000.00) if hauling hazardous materials combined single limit, insuring against claims for bodily injury and property damage and covering the ownership, maintenance or use of any auto or all owned/leased and non-owned and hired vehicles used in the performance of the Subcontractors' Work on the Project, both on and off the Project Site, including loading and unloading, with limits established in Contractor's Subcontracts;

.4 **Off-Site Excess Liability.** Off-Site Excess Liability shall be an occurrence based policy and have a limit in an amount not less than Two Million and 00/100 Dollars ($2,000,000.00) per occurrence and Two Million and 00/100 Dollars ($2,000,000.00) in the aggregate where applicable and "drop down" for defense and indemnity in the event of exhaustion of the underlying insurance. By its terms, the Off-Site Excess Policy shall cover:

    .1    Personal injury;
    .2    Contractual Liability;
    .3    X.C.U. Liability;
    .4    Off-Site CGL;
    .5    Automobile Liability; and
    .6    Employer's Liability.
    .7    Owner and the Additional Insureds on a primary and noncontributory basis by means of an endorsement acceptable to Owner.

.5 The insurance required by Subcontractors Excluded from the OCIP shall be the primary insurance and non-contributory to any of the Owner's insurance. Any insurance or self-insurance maintained by Owner shall be excess of and non-contributory with the coverage afforded by the Subcontractors / Contractor.

**§ 11.2** Notwithstanding anything to the contrary herein, Contractor is not liable for any losses not covered by the OCIP or Property Insurance (e.g. Builder's Risk) if:

(i) The OCIP or Property Insurance Policies are cancelled (unless Contractor is responsible, in whole or in part, for the cancellation); or

(ii) The OCIP or Property Insurance carriers procured by Owner is / are insolvent or go into liquidation (Contractor is responsible if Contractor procured carrier is insolvent or goes into liquidation);

**§ 11.3 No Wrap-Up Exclusion.** No insurance policy shall contain any wrap-up exclusion or wrap-up excess endorsement that would bar or limit available coverage where the Named Insured is not enrolled in the OCIP. All insurance policies shall be primary to, and not contribute with, any OCIP insurance in any circumstance where the Named Insured is not enrolled in the OCIP.

**§ 11.4** All insurance policies provided by Contractor pursuant to this Contract shall be on an occurrence basis with the exception of Contractors Professional and Pollution Liability. Coverages shall be maintained without interruption from the date of commencement of the Work until two years after the date of Final Payment, except for completed operations coverage, which shall be maintained for Ten (10) years after Final Completion of the Project.

**§ 11.5** The insurance required by this Article to be furnished by Contractor and its subcontractors shall be issued by Insurance Companies having a general policy holders rating of a minimum by A.M. Best's of A; financial class IX or better and financial rating acceptable to Owner and Lender. Contractor shall require the foregoing carriers to include provisions in said policies waiving their rights of subrogation against Owner, to the extent applicable. Contractor hereby waives any and all rights of recovery against Owner for injury or loss due to any hazard or occurrence covered by any of the foregoing policies.

Owner _____           Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06 17/2021, is not for resale, is licensed for one time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 11.6**    The Contractor shall not commence or continue with any portion of the Work under the Contract until it has obtained all insurance required to be provided by Contractor under this Article 11 or the Agreement.  If not so provided, the Owner shall have the immediate right to procure the required insurance on behalf of the Contractor and charge the Contractor for the cost thereof, but the Owner shall have no obligation to do so.

**§ 11.7**    Unless otherwise expressly provided herein, the deductible on all insurance required of Contractor or its subcontractors under this Article 11 or the Agreement, are borne by the policy holder.

**§ 11.8**    Owner and Owner's Lender, if any, shall be identified as "additional insureds" and "named insured" on all general liability and other policies identified in this Article 11, including without limitation all policies covering completed and ongoing operations. The Contractor, Subcontractors and Sub-subcontractors commercial general liability policies shall also provide the following ISO endorsements: ISO CG 20 10 1185 or its equivalent.

**§ 11.9**    These certificates and the insurance policies required by this Article 11 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner and Owner's Lender. Within three (3) business days of the date the Contractor becomes aware of an impending or actual cancellation or expiration of any insurance required of Contractor by the Contract Documents, the Contractor shall provide notice to the Owner of such impending or actual cancellation or expiration. Upon receipt of notice from the Contractor, the Owner shall, unless the lapse in coverage arises from an act or omission of the Owner, have the right to stop the Work until the lapse in coverage has been cured by the procurement of replacement coverage by the Contractor. The furnishing of notice by the Contractor shall not relieve the Contractor of any contractual obligation to provide any required coverage.

**§ 11.10**    Contractor shall endeavor to furnish copies of such subcontractor insurance policies and or certificates and renewals of same to Owner upon request.

**§ 11.11**    Contractor's obligations under this Article 11 are material obligations. Failure by Contractor or its subcontractors to provide and maintain the insurance required by this Agreement shall be grounds for termination, and Contractor shall be liable for all losses, damages, costs and expenses associated with the failure to maintain the required insurance.

**§ 11.12**    Unless covered by Builder's Risk or OCIP insurance, the Contractor shall be responsible for all loss or damage Contractor or its Subcontractors cause to the Work, including the Contractor's materials delivered to site for incorporation therein and all property issued to the Contractor by the Owner for use or incorporation in the Work.

**11.13    PROPERTY INSURANCE**

**§ 11.13.1** The Owner has purchased property insurance covering the Work and other related property, which property insurance Contractor has reviewed and approved by Contractor and is attached hereto as **Exhibit "Q"**. In the event that such policy must be renewed or extended, such renewal or extension shall be upon substantially the same terms as the current policy. The parties agree that the builder's risk coverage is as provided in the Builders Rick Policy, a copy of which has been provided to Contractor. The Contractor has reviewed and is familiar with the terms, conditions, coverages and exclusions contained in the Builder's Risk Policy. The Owner shall name Contractor and Subcontractors and Vendors of every tier as an Additional Insured under Owner's Builder's Risk Policy. However the naming of the Contractor as an Additional Insured shall not limit, alter, modify or amend the Contactor's obligations to the Owner under the Contract Documents.

**§ 11.13.2** The Owner's Builders Risk insurance shall be maintained as currently presented, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until completion of the Project.

  .1    Deductibles; The Owner's Builder's Risk Insurance shall have a reasonable deductible, with such deductible amount to be determined at the sole discretion of the Owner and /or

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44 22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

Lender. In no event shall Contractor be responsible for a Builder's Risk Insurance deductible be in excess of Fifty Thousand Dollars ($50,000.00) per occurrence. The Contractor shall pay for any deductibles (excluding named storm deductibles) in accordance with §5.1.4 of the AIA Document A102™–2017, Modified Form of Agreement between Owner and Contractor. Named storm deductibles to be paid for by Owner.

.2      Any Owner's Builder's Risk insurance policy shall extend only to materials actually installed at the Project or at the premises ready for installation (unless otherwise agreed by the insurer). Any plant, materials, equipment, tools, or fixtures forming a part of the capital assets of the Contractor or belonging to any of it employees shall not be covered by the Builder's Risk Insurance maintained by Owner. Any such Builder's Risk insurance policy shall be subject to the usual limitations and exclusions normally contained in such policies of insurance including, without limitation, a reasonable deductible at the discretion of the Owner and/or lender. In the event of any loss or damage paid by the Builder's Risk policy, such proceeds shall be accepted and used by Owner's sole discretion for correction of the damage.

.3      Unless otherwise provided in the Contract Documents, the Builder's Risk insurance shall cover portions of the Work stored off the Site after written approval of the Owner at the value established in the approval, and also portions of the Work in transit.

**§ 11.13.3** A loss insured under the property or Builders Risk insurance for the Property shall be adjusted by the Owner, using reasonable discretion and not as a fiduciary for Contractor or any other interested party, and made payable to the Owner for the insureds, as their interest may appear, subject to requirements of any applicable mortgagee clause but will not settle such loss without Contractor's consent, which shall not be unreasonably withheld. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate written agreements where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

**§ 11.13.3.1** Prior to settlement of an insured loss, the Owner shall notify the Contractor of the terms of the proposed settlement as well as the proposed allocation of the insurance proceeds. The Contractor shall have 14 days from receipt of notice to object to the proposed settlement or allocation of the proceeds. If the Contractor does not object, the Owner shall settle the loss and the Contractor shall be bound by the settlement and allocation. Upon receipt, the Owner shall deposit the insurance proceeds in a separate account and make the appropriate distributions. Thereafter, if no other agreement is made or the Owner does not terminate the Contract for convenience, the Owner and Contractor shall execute a Change Order for reconstruction of the damaged or destroyed Work in the amount allocated for that purpose. If the Contractor timely objects to either the terms of the proposed settlement or the allocation of the proceeds, the Owner may proceed to settle the insured loss, and any dispute between the Owner and Contractor arising out of the settlement or allocation of the proceeds shall be resolved pursuant to Article 15, provided that prior to any such settlement, Owner shall furnish evidence that it possesses the financing to fund the difference between the Contractor's estimate of the cost of the reconstruction and the amount of the proposed settlement. Pending resolution of any dispute, the Owner may issue a Construction Change Directive for the reconstruction of the damaged or destroyed Work.

**§ 11.13.4** The Owner shall not be required to give bond for performance of the Owner's duties. The Owner may deposit in a separate account insurance proceeds so received, which the Owner shall distribute in accordance with the terms of any settlement reached with the Builder's Risk insurer. If after such loss no other special agreement is made and unless the Owner terminates the Contract for convenience, replacement of damaged property shall be performed by the Contractor in accordance with this Agreement and paid for by Owner.

**§ 11.14.  Subcontractor Default Insurance**
Upon execution of this Agreement, Contractor shall obtain Subcontractor Default Insurance ("SDI") with limits of $50 Million per default and $150 Million Aggregate and with a deductible not to exceed one million, four hundred thousand dollars ($1,400,000.00), subject to terms of the policy, which deductible is to be paid by Contractor (which deductible is not part of the Cost of the Work) which covers all enrolled Subcontractors and suppliers, a copy of the

Owner _____          Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09.44.22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

specimen policy is attached as **Exhibit "R"**.  Owner must approve in writing, which subcontractors are enrolled and not enrolled in SDI which shall not be unreasonably withheld. Notwithstanding, Contractor has the right at its sole discretion to not enroll a subcontractor into its SDI program. Coverage will be provided for the course of construction plus Ten (10) years following completion per the SDI policy. The premium will be promulgated at a rate of $13.50 per thousand of covered Subcontracts including taxes and fees and shall be considered a Cost of the Work and included in the GMP as provided in §7.6.1.1 of the AIA Document A102™–2017, Modified Form of Agreement.  Premium will be due within 30 days following the enrollment of the Project and upon invoice from Contractor based on the estimated total covered subcontracts multiplied by the $13.50 rate.  The Contractor retains the right to require a bond of a subcontractor at their sole discretion; however, subcontractor bonds shall not be Cost of the Work, unless agreed to in writing as provided in §7.6.1.2 of the AIA Document A102™–2017.  Contractor shall comply with all obligations required by the SDI policy including, but not limited to, timely submitting all notices required by the SDI and providing Owner with copies of all such notices.

At this point, certain subcontractors are already enrolled in SDI and certain subcontractors are not enrolled but instead have provided bonds.  Contractor agrees to maintain the status quo of those subcontractors.

**§ 11.15   Waivers of Subrogation**  Except for OCIP deductibles for losses due to negligence to the extent of Contractor's responsibility for deductibles under this Agreement, or breach of contract of a Contractor, Subcontractor, Sub-Subcontractor, or persons for which they are responsible, the Owner and Contractor waive all rights against each other and any of the Subcontractors, Sub-Subcontractors, agents and employees, each of the other for damaged caused  by any loss to the extent paid for by the Owner's Builder's Risk or the OCIP CGL insurance or by the other insurance obtained pursuant to this Article, except such rights as they have to proceeds of such insurance held by the Owner and the Contractor. The policies shall provide waivers of subrogation by endorsement or otherwise in compliance with the above provisions.

**§ 11.16   Maximum Deductible**  Contractor's maximum aggregate exposure for OCIP and Builder's Risk Insurance Deductibles for losses caused by the Contractor or anyone for whom Contractor is responsible shall not exceed Five Hundred Thousand Dollars ($500,000.00), excluding SDI. SDI Deductibles shall be paid by Contractor regardless of the total deductibles paid by Contractor for OCIP and Builder's Risk Insurance claims.

**§ 11.17   Performance of Bond and Payment of Bond**

**§ 11.17.1**  Contractor shall provide the Owner with a 100% performance bond in the amount of the GMP, [excluding the value of the Prior Work], utilizing 2010 AIA Form 312 Performance Bond Form, as modified pertaining to the exclusion of Prior Work, covering the faithful performance of the Contract, which shall incorporate the obligations of Surety referenced in the Contract Documents.

In addition, Contractor will provide the Owner with an unconditional payment bond in the amount of the GMP, in accordance with Florida Statute § 713.23, utilizing AIA 311 Payment Bond Form, covering the payment of all obligations thereunder.

The bonds shall be executed by a Surety that is licensed in Florida, subject to Owner's written approval, and shall remain in effect as required by the Contract Documents. The bonds shall designate Owner and Owner's Lender as dual obligees.  The bonds shall be effective as of the Commencement Date as defined in the AIA Document A102™–2017, Modified Form of Agreement between Owner and Contractor and shall cover all Work and obligations under the Contract Documents, excluding Prior Work. Copies of the Bonds are attached to the AIA Document A102™–2017, Modified Form of Agreement as **Exhibit "S"** and are incorporated herein.

The cost for the performance and payment bonds combined shall be a single charge of .7% of the GMP value.  The Cost of the bonds are included in the GMP.  There is no fee or mark up on the cost of the bonds.

**ARTICLE 12   UNCOVERING AND CORRECTION OF WORK**

Owner _____                                        Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

### § 12.1   Uncovering of Work

§ 12.1.1  If a portion of the Work is covered contrary to the Architect's or Owner's request or to requirements specifically expressed in the Contract Documents, it must, if requested in writing by the Architect or Owner, be uncovered for the Architect's or Owner's examination and be replaced at the Contractor's expense without change in the Contract Time.

§ 12.1.2  If a portion of the Work has been covered that the Architect or Owner has not specifically requested to examine prior to its being covered, the Architect or Owner may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, such costs of uncovering the Work, and the cost of correction shall be at the Contractor's expense.

### § 12.2   Correction of Work

### § 12.2.1   Before Substantial Completion

Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, discovered before Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections, the cost of uncovering and replacement, and compensation for the Architect's services and expenses made necessary thereby, and any attorney fees the Owner may incur, shall be at the Contractor's expense. The obligations of this section shall survive completion and final payment or termination of the Agreement.

### § 12.2.2   After Substantial Completion

In addition to Contractor's Warranty obligations under § 3.5, if, within the period provided in Fla. Stat. §718.203(2) as it pertains to the statutory warranties required of a Contractor and subcontractors, or any longer period provided in any Extended Warranty, any Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so. The Owner shall give such notice within a reasonable time. If the Contractor or Contractor's Surety fails to correct or commence to correct nonconforming Work and diligently work toward completion, within five (5) business days, after receipt of notice from the Owner or Architect, the Owner may correct the nonconforming Work in accordance with the Contract Documents. Contractor and Surety are obligated to reimburse Owner for all corrective costs, damages and consequential damages (to the extent covered by available insurance) incurred by Owner as a result of Contractor's and Surety's failure to correct nonconforming Work in accordance with this Paragraph.

§ 12.2.2.2  During the statutory period, for correction of Work or any longer period provided by § 718.203(2), Fla. Stat. or in an Extended Warranty shall be extended with respect to portions of Work first performed after Substantial Completion, by the period of time between Substantial Completion and the actual completion of that portion of the Work.

§ 12.2.3  The Contractor shall remove from the site portions of the Work that are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

§ 12.2.4  The Contractor shall bear the cost of correcting destroyed or damaged construction of the Owner or Separate Contractors, whether completed or partially completed, caused by the Contractor's correction or removal of Work that is not in accordance with the requirements of the Contract Documents.

§ 12.2.5  Nothing contained in this § 12.2 shall be construed to establish a period of limitation or expand the time period with respect to other obligations the Contractor has under the Contract Documents. Establishment of the warranty periods for correction of Work as set forth in the Contract Documents relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to

Owner _____            Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

**§ 12.2.6**  The provisions of § 12.2 shall survive completion and Final Payment or termination of the Contract.

**§ 12.3   Acceptance of Nonconforming Work**
If the Owner prefers to accept Work that is not in accordance with the requirements of the Contract Documents, the Owner may do so in writing instead of requiring its removal and correction, in which case the GMP will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made. If payments due to the Contractor are insufficient to cover the adjustment, Contractor shall pay the difference to the Owner.

## ARTICLE 13   MISCELLANEOUS PROVISIONS

**§ 13.1   Governing Law**
The Contract and the Contact Documents shall be governed by the law of the State of Florida without regard to conflicts of law provisions.

**§ 13.2   Successors and Assigns**

**§ 13.2.1**  Owner and Contractor respectively bind themselves, their partners, successors, assigns, and legal representatives to covenants, agreements, and obligations contained in the Contract Documents. Except as provided in § 13.2.2 and § 13.2.3, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

**§ 13.2.2**  Owner may, without consent of the Contractor, assign the Contract to Owner's Lender providing financing for the Project (if any), if the lender assumes the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate the assignment.

**§ 13.2.3**  With the exception of an assignment to the Condominium Association and any Unit Owner, Owner may, without consent of the Contractor, assign the Contract in whole or in part to A3 North Development, LLC, A3 Restaurant, LLC, or any other entity if said entity assumes the Owner's rights and obligations under the Contract Documents and provides Contractor with Proof of Financing satisfactory to the Contractor that said assignee has the financial ability to undertake the obligations of the Owner . The Contractor shall execute all consents reasonably required to facilitate the assignment.

**§ 13.3   Written Notice**

Written notice shall be deemed to have been duly served if delivered in person to the individual, to a member of the firm or entity, or to an officer of the corporation for which it was intended; or if delivered at, or sent by registered or certified mail, Federal Express or other overnight delivery, or by courier service providing proof of delivery to, the last business address known to the party giving notice. Addresses may be changed by written notice to the other party, such notice to be effective upon receipt. Owner, Architect, and Owner's Representative must all have received notice for Contractor's notice to be valid.

**§ 13.4   Rights and Remedies**

**§ 13.4.1**  Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights, and remedies otherwise imposed or available by law.

Owner                                                                 Contractor

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

§ 13.4.2  No action or failure to act by the Owner, Architect, or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed upon in writing.

§ 13.4.3  Any waiver by the Owner of any breach of the Contract Documents shall not be held to be a waiver of any other or subsequent breach, and any waiver by Owner of any right to terminate Contract shall not be held to be a waiver of any breach of the Contract Documents, but Owner retains all its rights to recover damages therefor.

## § 13.5    Tests and Inspections

§ 13.5.1 Tests, inspections, and approvals of portions of the Work shall be made as required by the Contract Documents and by applicable laws, statutes, ordinances, codes, rules, and regulations or lawful orders of public authorities. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections, and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority,  The Contractor shall give the Architect timely notice of when and where tests and inspections are to be made so that the Architect may be present for such procedures.

§ 13.5.2  If the Architect, Owner, Owner's Representative, or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection, or approval not included under § 13.5.1, the Owner may on its own arrange for such additional testing, inspection, or approval, or the Architect will, upon written authorization from the Owner, instruct the Contractor to make arrangements for such additional testing, inspection, or approval, by an entity acceptable to the Owner, and the Contractor shall give timely notice to the Architect of when and where tests and inspections are to be made so that the Architect may be present for such procedures. Such costs, except as provided in § 13.5.3, shall be at the Owner's expense.

§ 13.5.3  If procedures for testing, inspection, or approval under § 13.5.1 and § 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure, including those of repeated procedures, additional testing and additional testing of a larger sample of the Work (if applicable), and compensation for the services and expenses of the Architect, Architects consultants, Owner's consultants, including special and threshold inspectors or other engineers, shall be at the Contractor's expense. Owner may deduct such amounts from the balance due the Contractor.

§ 13.5.4  Required certificates of testing, inspection, or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Architect.

§ 13.5.5  If the Architect is to observe tests, inspections, or approvals required by the Contract Documents, the Architect will do so promptly and, where practicable, at the normal place of testing.

§ 13.5.6  Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

## § 13.6    Interest
Payments due and unpaid under the Contract Documents shall bear interest as provided in § 15.2 of the AIA Document A102™–2017, Modified Form of Agreement.

§ 13.7    All revisions made to the Drawings shall be performed by the Architect.  Revisions are to be processed in a timely manner, as provided in the Contract Documents, so as to not delay the progress of the Work.  Only revisions which are numbered and clouded, accompanied by a scope narrative outline, shall be considered as a revision to the Drawings.  All revisions to the Contract Drawings shall be noted by Contractor and submitted by Contractor to the Architect to be reflected in the As-Built Drawings maintained for the Project.  It shall be incumbent upon the Contractor to assist the Architect, if requested, to have permit revisions issued and executed by the Building Department in a timely manner so as not to delay the construction process, and the Contractor shall bear the cost of such revisions.

Owner _____

Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 13.9**   Regular meetings will be conducted and attended by all parties, including the Design Team.  Meetings will be held at the Contractor's field office compound.

**§ 13.10**   Any premium for Construction work on Saturdays, Sundays or after normal hours, shall be at no additional cost to the Owner, unless previously approved by Owner in writing.

**§ 13.11   Maintenance**
Various materials and finishes of materials exposed to the Florida environment will begin to deteriorate over time. Materials such as rooftop equipment, piping, conduits, etc., as well as finishes for stainless steel, wood, aluminum, etc. are all subject to deterioration. The Contractor is to provide the Owner a maintenance program for various products on the project to the extent obtainable from the suppliers / manufacturers.  All maintenance required prior to Substantial Completion or partial occupancy or Turnover will be performed by Contractor as part of the Work.

**§ 13.12   Signs**
Except to the extent directed or approved by Owner, Contractor shall place only one sign identifying Contractor with the name and insignia of Owner and Contractor and may place additional smaller signs, as necessary to identify the site, as approved by the City. The size and location of such sign shall be approved by Owner in writing prior to installation. This sign shall be kept in good condition free of dirt or damage by Contractor. Contractor agrees not to display on or about the Project any other sign, trademark or other advertisement without prior written consent from Owner. No subcontractor or other party in contract with Contractor may place a sign on the property or otherwise use any part of the property for advertisement purposes. Owner may require the sign to include information related to the Project lender. Owner may also direct Contractor to place additional signs, at Owner's sole discretion. To the extent Owner requires additional signs, such signs will be at Owner's expense and provided via Change Order.

**§ 13.13   No Agency Relationship**
It is understood that Contractor is not herein appointed the agent of Owner but is and shall remain an independent contractor. Accordingly, all aspects of Contractor's performance of the Agreement, except as specifically provided in the Agreement, shall be under the direction and control of Contractor.

**§ 13.14   Third Parties**
No provision in the Agreement shall create or give to third parties any claim or right of action against Owner.

**§ 13.15   Place of Work**
Contractor, under regulations prescribed by Owner, shall use only established roadways, and such temporary roadways as may be approved by Owner. When materials or equipment are transported in performance of the Work, vehicles shall not be loaded beyond the load limit as established by federal, state or local law regulations. When it is necessary to cross curbing and/or sidewalks, protection against damage shall be provided by Contractor, and any damage caused will be immediately repaired by Contractor, at Contractor's cost, and if not repaired by Contractor within five (5) calendar days after notice in writing, Owner may make such repairs and charge the amount of such repairs to the Contractor. All existing sidewalks, curbs parking lot areas and pavement disturbed, broken, removed, or otherwise damaged by Contractor during the performance of the Work under the Agreement, shall be replaced by the Contractor at its sole expense, subject to applicable insurance coverage if applicable Notwithstanding the foregoing, provided Contractor is issued a change order by the Owner to remediate the Work, Contractor shall proceed with the Work despite not having received payment from the OCIP and/or builders risk carrier. Replaced or repaired sidewalks, curbs, parking lot areas, and pavements shall be constructed of similar materials and by similar methods to the original construction. Replaced or repaired sidewalks, curbs and pavement shall be smoothly blended into the existing Work and shall not present depressions or humps and shall be acceptable to Owner.

**§ 13.16   Value Engineering.**
Contractor will assist Owner and Architect in suggesting alternates to the items specified in the Contract Documents, but the ultimate decision is that of the Owner and Architect to determine the cost, suitability, fitness and appropriateness for use of the items suggested by the Contractor.  All cost savings attributable to Value Engineering are set forth in **§ 5.3.4** of the AIA Document A102™–2017, Modified Form of Agreement.

Modified AIA Document A201™  2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org

**§ 13.17**   In order to avoid delays, the Contractor must provide the Owner with written notice that all utility connections including electric, water and sewer connections will be available not less than sixty (60) days prior to the issuance of the temporary Certificate of Occupancy.

## ARTICLE 14   TERMINATION OR SUSPENSION OF THE CONTRACT

### § 14.1   Termination by the Contractor

**§ 14.1.1**   The Contractor may terminate the Contract if the Architect fails to certify payment as provided in the Contract Documents for a period in excess of forty-five (45) calendar days through no fault of the Contractor, a Subcontractor, a Sub-subcontractor, their agents or employees, or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, or if the Owner fails to make payment through no fault of the Contractor, a Subcontractor, a Sub-subcontractor, their agents or employees, or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, as provided in the Agreement for a period in excess of forty-five (45) calendar days or fails to provide evidence of financing as set forth in the Agreement.

**§ 14.1.2** The Contractor may terminate the Contract if, through no act or fault of the Contractor, a Subcontractor, a Sub-subcontractor, their agents or employees, or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in § 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or one hundred twenty (120) calendar days in any 365-day period, whichever is less.

**§ 14.1.3**   The Contractor may terminate the Contract if the Work is stopped for a period of sixty (60) consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons or entities performing portions of the Work under contract with the Contractor because the Owner has repeatedly failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work.

**§ 14.1.4**   If one of the reasons described in § 14.1.1, § 14.1.2 or § 14.1.3 exists, the Contractor may, upon fourteen (14) days' written notice to the Owner and Architect, terminate the Contract if Owner fails to cure within the fourteen (14) additional days' written notice period, and recover from the Owner payment for Work executed, including Contractor's Fee for the Work executed and reasonable demobilization costs incurred by reason of such termination and the costs associated with the termination of subcontracts, purchase orders or other agreements entered into by the Contractor in furtherance of the Work.  However, in no event shall the Owner be liable to the Contractor for any additional sums, including but not limited to shared Contingency, lost profits or lost Fee on any Work not performed, lost or unearned General Conditions, lost or unearned General Requirements, home office overhead, or any other type of consequential, special, direct or indirect damages. Contractor hereby waives all such damages. Payments to the Contractor shall be reduced by any setoffs to which the Owner is entitled under this Contract.

### § 14.2   Termination by the Owner for Cause

**§ 14.2.1**   The Owner may terminate the Contract for Cause if the Contractor:

    .1    repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

    .2    fails to make payment to Subcontractors in accordance with the terms and conditions set forth in the subcontract agreements for labor, materials or equipment in accordance with the respective agreements between the Contractor and the Subcontractors and or suppliers;

    .3    repeatedly disregards applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of a public authority in the performance of the Work;

    .4    admits in writing its inability to pay its debts generally as they become due, or if the Contractor makes a general assignment for the benefit of its creditors, or if a receiver, liquidator, trustee or assignee is appointed on account of its bankruptcy or insolvency;

Owner _____        Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

.5    submits an Application for Payment, sworn statement, waiver of lien, affidavit or document which is intentionally falsified;

.6    if a construction lien is recorded against any part of the Project resulting from Contractor's non-payment of the lienor and not promptly bonded off by the Contractor in a manner satisfactory to the Owner after five (5) days written notice to Contractor; or

.7    otherwise is in material breach of a material provision of the Contract Documents that Contractor has failed to cure or commenced to cure after having been provided with written notice.

**§ 14.2.2**  When any of the above reasons exist, the Owner, may, without prejudice to any other remedy the Owner may have and after giving the Contractor fourteen (14) days' written notice, with an opportunity to Contractor to cure within an additional  seven (7) days' written notice, terminate the Agreement and take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor and may finish the Work by whatever reasonable method the Owner may deem expedient.

**§ 14.2.3**  If the Owner terminates the Contractor for Cause as provided in § 14.2.1, above, the amount, if any, to be due to the Contractor shall not cause the GMP to be exceeded, nor shall it exceed an amount calculated as follows:

.1    Take the Cost of the Work incurred by the Contractor to the date of termination;

.2    Add the corresponding percentage of the Contractor's Fee on the Work completed through the date of termination; and

.3    Subtract the aggregate of previous payments made by the Owner; and

.4    Subtract TCO Liquidated Damages and other back charges, costs to complete and damages permitted in the Contract Document and under Florida law.

The sum determined in accordance with the above shall be referred to as "Unpaid Balance."

**§ 14.2.4**  When the Owner terminates the Contract for Cause as provided in § 14.2.1, above, the Contractor shall not be entitled to receive further payment or the Unpaid Balance until the Owner completes all Work contemplated by the Contract Documents.

**§ 14.2.5**  If the Unpaid Balance of the GMP exceeds the costs of correcting and finishing the Work, including compensation for the Owner's Representative and/or Architect's services and expenses including reasonable attorney fees made necessary thereby, and other damages incurred by the Owner which are not expressly waived, such excess shall be paid to the Contractor. If such costs, expenses, reasonable attorney fees and damages exceed the Unpaid Balance, the Contractor or its Surety shall promptly pay the difference to the Owner. The amount to be paid to the Contractor or Owner, as the case may be, shall survive termination of the Contract. This provision shall in no way limit Owner's right to claims for any additional damages, including but not limited to, TCO Liquidated Damages, damages for defective or nonconforming Work, and all damages and setoffs allowable in accordance with this Agreement, for which the Contractor shall be liable.

**§ 14.2.6**  If, after notice of termination for Cause, it is determined for any reason, including by an arbitrator or a Court of competent jurisdiction, that the Contractor was not in default, and the termination of Cause was inappropriate, then the rights and obligations of the Owner and Contractor shall be the same as though the termination had been a Termination for Convenience, as set forth in § 14.4 below, with the exception that Owner shall pay Contractor's reasonable attorney's fees.

Owner _____         Contractor _____

Modified AIA Document A201™—2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44 22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service  To report copyright violations, e-mail copyright@aia.org.

**§ 14.2.7** The Owner's right to terminate the Contract, pursuant to this Section, shall be in addition to and not in limitation of any rights or remedies existing hereunder or pursuant thereto or at law or in equity.

**§ 14.3   SUSPENSION BY THE OWNER FOR CONVENIENCE**

**§ 14.3.1** The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work, in whole or in part for such period of time as the Owner may determine.

**§ 14.3.2** The GMP and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay, or interruption under **§ 14.3.1**. Adjustment of the GMP shall include profit.  No adjustment shall be made to the GMP due to a suspension, delay, or interruption to the extent:

    **.1**    that performance is, was, or would have been, so suspended, delayed, or interrupted, by another cause for which the Contractor is responsible; or

    **.2**    that an equitable adjustment is made or denied under another provision of the Contract Documents.

**§ 14.4   Termination by the Owner for Convenience**

**§ 14.4.1** The Owner may, with seven (7) calendar days' prior written notice, terminate the Contract for the Owner's convenience and without cause.

**§ 14.4.2** Upon receipt of notice from the Owner of such termination for the Owner's convenience, the Contractor shall

    **.1**    cease operations as directed by the Owner in the notice;

    **.2**    take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

    **.3**    except for Work directed to be performed in the termination notice or thereafter and prior to the effective date of termination stated in the termination notice, terminate all existing subcontracts and purchase orders (excluding those assigned to Owner or Lender in accordance with **§ 14.7** below) and enter into no further Subcontracts and purchase orders.

**§ 14.4.3** In case of such termination for the Owner's convenience, the Contractor shall receive, as its entire and sole compensation, (i) its actual and necessary reimbursable Cost of the Work performed through the date of termination, (ii) plus that portion of the Contractor's Fee earned on the Cost of the Work performed, determined by an audit of Contractor's records; (iii) demobilization costs and expenses; and (iv) all costs associated with terminating and/or assigning subcontract agreements, purchase orders and agreements entered in furtherance of the work.  In no event shall the Owner be liable to the Contractor for any additional sums, including but not limited to shared Contingency, lost profits or lost Fee on any Work not performed, lost or unearned General Conditions, lost or unearned General Requirements, home office overhead, or any other type of consequential, special, direct or indirect damages.  Contractor hereby waives all such damages. Payments to the Contractor shall be reduced by any setoffs to which the Owner is entitled under this Contract.  The Owner shall be credited for (i) payments previously made to the Contractor pursuant to this Agreement; and (ii) claims for damages that the Owner has against the Contractor under this Agreement and by law. In no event shall such amounts paid and payable hereunder exceed the GMP.

**§ 14.4.4** Contractor shall include in all its Subcontract Agreements and purchase orders, a similar provision allowing Contractor to terminate said subcontractor or supplier for convenience, without liability of the Owner. Contractor may not pass through to Owner any Subcontractor termination for convenience costs, expenses or charges to Owner and those costs, expenses or charges shall not constitute a Cost of the Work.

Owner _____           Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09.44.22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

§ 14.4.5  The remedy provided under this Section shall be Contractor's exclusive remedy under this Agreement and the Contract Documents against Owner.

§ 14.5  All warranties contained in the Contract Documents shall remain valid and in effect despite Owner's termination of Contractor for Cause.  In the event that the Contract is terminated for Convenience, all subcontractor and supplier warranties will be assigned to Owner and or its designee (without further recourse as to Contractor).

§ 14.6  The Owner's right to terminate the Contract shall be in addition to and not in limitation of any rights or remedies existing hereunder or pursuant thereto or at law or in equity.

§ 14.7  Upon termination of Contractor for Cause or termination of Contractor for Convenience, Contractor hereby assigns to the Owner and Owner's Lender, an option which Owner, at any time, may elect to accept, those subcontract agreements which the Owner accepts by notifying the Subcontractor and Contractor in writing, of all of Contractor's contract rights with respect to Subcontractors and material and equipment suppliers that contracted to provide Work, materials, equipment and or services to this Project in accordance with the Contract Documents, including but not limited to all Contractor's rights to make claims regarding quality of the Work, merchantability of the materials and equipment, feasibility and fitness for the particular purpose of materials, equipment, workmanship and warranties described in this Contract.

In addition, to the extent assignable Contractor also assigns to Owner and Owner's Lender, all permits, shop drawings, submittals, drawings, Instruments of Service, Works for Hire, copyrights, intellectual property rights, and software licenses contractor has obtained or is using with regard to this Project and all data bases related to this Project, including but not limited to use of the Building Information Modeling and current Digital Data for this Project and the Procore Project Management and Financial Management Software and current Digital Data for this Project, all of which Owner can continue to use following termination of this Agreement, upon payment of appropriate licensing fees. Nothing contained herein will require Contractor to assign any copyright, license, Instrument of Service, intellectual property or other similar items that are prohibited by the licensing agreement or applicable law.  This provision expressly survives termination of this Agreement. Contractor shall work with Owner and assist Owner in all related transfers and assignments.  Contractor is obligated to provide for and facilitate a smooth transfer and assignment of all information and documents above, including but not limited to all current Digital Data for this Project.  This obligation is a material term to this Agreement.

§ 14.8  Upon termination of Contractor for Cause or termination of Contractor for Convenience, Contractor shall provide all deliverables and take all steps, as set forth in § 9.9.5 through and including § 9.9.8.

§ 14.9  Certain provisions in the Contract Documents state that they survive termination of the Agreement. The absence of similar statements in other provisions is not intended to limit the survivability of other provisions following termination.  It is the intention of the Parties that other provisions of the Contract Documents survive termination, when applicable.

**ARTICLE 15  CLAIMS AND DISPUTE RESOLUTION**

**§ 15.1    Claims**
This Article is intended to address Claims as defined below, where other procedures set forth in the Contract Documents has not resolved the dispute.

**§ 15.1.1  Definition**
A Claim is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, a change in the Contract Time, or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. The responsibility to substantiate Claims shall rest with the party making the Claim. This § 15.1.1 does not require the Owner to file a Claim in order to impose liquidated damages in accordance with the Contract Documents. Submittal of a request for Change Order shall not be considered notice of a Claim required by this Article.

Owner _____                        Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations e-mail copyright@aia.org.

### § 15.1.2  NOTICE OF CLAIMS

**§ 15.1.2.1** Claims by either the Owner or Contractor must be initiated by written notice to the other party and to the Initial Decision Maker, with a copy sent to the Architect, if the Architect is not serving as the Initial Decision Maker. Claims by the Contractor for an increase to the Contract Time or GMP must be made immediately, but in no event more than five (5) business days after becoming aware of the occurrence or the event giving rise to such Claim, and must also be provided in writing via email to Jules Trump, (jules@trumpgroup.com), Oren Shmueli (OrenS@trumpgroup.com); Eric Bartos, (ericbartos@trumpgroup.com); Rick Chitwood, (rickc@trumpgroup.com); James A. Sikich, (JamesS@trumpgroup.com); and Jerry Campos, (jerryc@trumpgroup.com); ("Owner's Notice Group"), within the same time frame.

**§ 15.1.2.2** Contractor and Owner shall use their best efforts and act as expeditiously as possible, to mitigate the alleged or potential damages, delay, or other adverse consequences arising out of the condition that is the cause of such a Claim.

### § 15.1.3  Continuing Contract Performance

**§ 15.1.3.1** Pending final resolution of a Claim, except as otherwise agreed in writing or as provided elsewhere in the Contract Documents, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

**§ 15.1.3.2** The Contract Sum and Contract Time shall be adjusted in accordance with the Initial Decision Maker's decision, subject to the right of either party to proceed in accordance with this Article 15. The Architect will issue Certificates for Payment in accordance with the decision of the Initial Decision Maker.

### § 15.1.5  Claims for Additional Cost

If the Contractor wishes to make a Claim for an increase in the GMP, written notice as provided in § 15.1.2 shall be given before proceeding to execute the portion of the Work that is the subject of the Claim. Prior notice is not required for Claims relating to an emergency endangering life or property arising under § 10.4.

### § 15.1.6  Claims for Additional Time

**§ 15.1.6.1** If Contractor wishes to make a Claim for an increase in the Contract Time, written notice as provided in § 15.1.2 shall be given. In the case of a continuing delay, only one Claim is necessary.

**§ 15.1.6.2** If named storms are the basis for a Claim for additional time, such claim shall be made consistent with the provisions of § 7.1.6. and § 8.3.2. and in accordance with Delay and Extension of Time provisions and Claims provisions of the Contract Documents and must meet all of the requirements for a time extension as set forth in the Contract Documents. Such Claim shall be documented by data substantiating that the named storm had an adverse effect on the critical path of the scheduled construction.

### § 15.1.7  Mutual Waiver of Claims for Consequential Damages

The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Agreement. This mutual waiver includes:

    .1    damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

    .2    damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit, except anticipated profit, arising directly from the Work.

Owner _____  Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this § 15.1.7 shall be deemed to preclude an assessment of liquidated damages, when applicable, in accordance with the requirements of the Contract Documents.

This waiver of consequential damages does not apply to any consequential damages covered and paid by insurance. This waiver of consequential damages shall not inure to the benefit of insurance carriers for consequential damages that are covered by their respective insurance policies. Contractor shall not take any action that would impair Owner's right to damages against insurance carriers.

### § 15.2    Initial Decision

§ 15.2.1  Claims, excluding those where the condition giving rise to the Claim is first discovered after expiration of the period for correction of the Work, shall be referred to the Initial Decision Maker for initial decision. The Architect will serve as the Initial Decision Maker, unless otherwise indicated in the Agreement. Except for those Claims excluded by this § 15.2.1, an initial decision shall be required as a condition precedent to mediation of any Claim. If an initial decision has not been rendered within 30 days after the Claim has been referred to the Initial Decision Maker, the party asserting the Claim may demand mediation followed by litigation without a decision having been rendered. Unless the Initial Decision Maker and all affected parties agree, the Initial Decision Maker will not decide disputes between the Contractor and persons or entities other than the Owner.

§ 15.2.2  The Initial Decision Maker will review Claims and within ten days of the receipt of a Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Initial Decision Maker is unable to resolve the Claim if the Initial Decision Maker lacks sufficient information to evaluate the merits of the Claim or if the Initial Decision Maker concludes that, in the Initial Decision Maker's sole discretion, it would be inappropriate for the Initial Decision Maker to resolve the Claim.

§ 15.2.3  In evaluating Claims, the Initial Decision Maker may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Initial Decision Maker in rendering a decision. The Initial Decision Maker may request the Owner to authorize retention of such persons at the Owner's expense.

§ 15.2.4  If the Initial Decision Maker requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either (1) provide a response on the requested supporting data, (2) advise the Initial Decision Maker when the response or supporting data will be furnished or (3) advise the Initial Decision Maker that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Initial Decision Maker will either reject or approve the Claim in whole or in part.

§ 15.2.5  The Initial Decision Maker will render an initial decision approving or rejecting the Claim, or indicating that the Initial Decision Maker is unable to resolve the Claim. This initial decision shall (1) be in writing; (2) state the reasons therefor; and (3) notify the parties and the Architect, if the Architect is not serving as the Initial Decision Maker, of any change in the GMP or Contract Time or both. The initial decision is not binding on the Parties and is subject to mediation at the demand of either party and, if the parties fail to resolve their dispute through mediation, the initial decision is subject to litigation.

§ 15.2.6  Either party may file for mediation of an initial decision at any time, subject to the terms of § 15.2.6.1.

§ 15.2.6.1 Either party may, within 30 days from the date of an initial decision, demand in writing that the other party file for mediation within 60 days of the initial decision. If such a demand is made and the party receiving the demand fails to file for mediation within the time required, then both Parties waive their rights to mediate and may pursue litigation with respect to the initial decision. Contractor must continue with its Work when a Claim is pending before the Initial Decision Maker, or mediation or litigation.

Owner _____

Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09 44 22 ET on 06/23/2020 under Order No. 7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

**§ 15.2.7**  In the event of a Claim against the Contractor, the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

**§ 15.2.8**  If a Claim relates to or is the subject of a construction lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines.

### § 15.3   Mediation

**§ 15.3.1**  Claims, disputes, or other matters in controversy arising out of or related to the Contract except those waived shall be subject to mediation. Either party may, within thirty (30) days from the date of an initial decision, demand in writing that the other party mediate the Claim within sixty (60) days of the initial decision. If such a demand is made and the party receiving the demand fails to mediate the Claim within the time required, then both Parties waive their rights to mediate with respect to the initial decision, unless the Parties expressly agree in writing to another time period for mediation.

**§ 15.3.2**  The parties shall endeavor to resolve their Claims by mediation which, unless the Parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Mediation Procedures in effect on the date of the Agreement. A request for mediation shall be made in writing, delivered to the other party to the Contract, and filed with the person or entity administering the mediation and mediation shall be a condition precedent to the filing of litigation, provided the mediation takes place within ninety (90) days.

**§ 15.3.3**  The Parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

### § 15.4   Litigation

**§ 15.4.1**  Litigation of Claims, disputes or other matters in question between the Owner and Contractor arising out of or relating to this Contract or breach thereof, which are not resolved by mediation, shall be subject to and decided by litigation exclusively in the state or federal courts of Miami-Dade County, Florida, or the location of the Project at the discretion of the Owner. Contractor and Owner consent to the venue of the state and federal courts of Miami-Dade County, Florida.

**§ 15.4.2  Waiver of Trial by Jury.**  IN THE EVENT OF LITIGATION, BOTH PARTIES HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE CONTRACT, OR BREACH THEREOF, OR IN CONNECTION WITH WORK OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ANY ACTIONS OR INACTIONS OF EITHER PARTY.

**§ 15.5**   Attorney's Fee and Costs; See paragraph 15.11 of the AIA Document A102™–2017, Modified Form of Agreement between the Owner and Contractor.

### § 16   Miscellaneous

### § 16.1   Modification

No change or modification of the Contract shall be valid unless in writing and signed by all parties hereto, excluding Construction Change Directives, which do not require the signature of the Contractor. No waiver of any of the provisions of this Contract shall be valid unless in writing and signed by the party against whom it is sought to be enforced.

### § 16.2   Rights and Remedies

Owner _____          Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

The duties and obligations imposed by the Contract Documents and the rights and remedies available thereunder shall be in addition to and not in limitation of any duties, obligations, rights and remedies otherwise imposed or available by law. All indemnities, representations, and waivers made by Contractor in favor of Owner shall survive completion of the Work, the making of final payment, and any termination of the Agreement.

### § 16.3   Confidentiality

Contractor shall keep confidential and not disclose to any person or entity other than Owner and its principals, any information which is in any way related to the Contract Documents and the Project and which is expressly noted and clearly marked on the document as confidential, without Owner's prior written consent. The foregoing sentence shall not apply to information that employees of Contractor and Subcontractors reasonably need to perform the Contract Documents or is already in the public domain due to no fault of Contractor (with the understanding that even if in the public domain, Contractor is not authorized to release said confidential information) , or to information that Contractor or Subcontractor is required to disclose by valid subpoena or other valid compulsory legal process so long as Contractor and Subcontractor provides Owner with prompt written notice of any such legal process so that Owner may seek a protective order or other appropriate remedy and/or consent to such disclosure by Contractor or Subcontractor.

### § 16.4   FINANCING

§ 16.4.1  This Contract is subject to the review and approval of Owner's Lender(s). Contractor agrees to comply with all reasonable requests of Lender.

§ 16.4.2  Owner shall have the right to assign this Contract to the Lender as collateral security for the construction loan to be made by the Lender for the purposes of financing the Work. The language of such assignment is subject to the reasonable approval of Contractor and Lender.  In the event Owner defaults on its mortgage, the Lender will be entitled to use all drawings and other documents related to the Project to complete the Project and, in such event, the Contractor will perform its obligations hereunder for the Lender to the extent Lender elects to complete the Project or any part thereof, on the same terms and conditions as provided herein and Lender pays Contractor for sum then due for properly performed Work and continues to make payment in accordance with the term of the Agreement.  Contractor and any Subcontractor and material supplier working for Contractor will execute any and all documents that the Lender reasonably requires for the execution of the loan documents.

§ 16.4.3  Notwithstanding anything contained in any of the Contract Documents, in the event the employment of the Architect is terminated, the Contractor shall have no right to approve or object to any successor Architect appointed by the Owner or the Lender or to approve or reject any further or successive appointment of an Architect by the Owner or the Lender.

§ 16.4.4  Whenever any requisition, payment, change, certification, approval or any other matter under the Contract pertaining to disbursement of funds is subject to the decision or approval of the Architect and Owner; then in such event the decision of the design professional engaged by the Lender whenever so required by the terms of the building loan agreement and/or mortgage will control provided the forgoing is performed in accordance with the Contract Documents.  Notwithstanding the foregoing, this provision shall not modify the provisions in the Modified General Conditions which deal with the Contractor's right to contest a decision.  All approval as required hereunder must be timely and reasonable.

§ 16.4.5  If the Lender or the title company, as applicable, insuring the building loan mortgage will not or would not, at the time of a building loan advance is due and payable, insure the advance to be made by the mortgagee due to the existence of liens, encroachments or other encumbrances on the construction site premises created by Contractor or Contractor's subcontractors, the Architect or the Lender's supervising engineer shall not certify said payment to be due and payable until the Contractor has removed or effected the discharge of such liens, encroachments or other encumbrances by either payment or bonding in accordance with Chapter 713 of the Florida Statutes.

§ 16.4.6  The construction loan shall be evidenced by the recording of a mortgage in favor of Owner's Lender. Contractor acknowledges that its lien is automatically inferior to, and hereby subordinates its construction lien to any mortgage lien of Owner's Lender, including any modifications or amendments thereto.  Further, Owner has the right

Owner_____                                                Contractor_____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44.22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

to secure additional debt secured by a second mortgage, not to exceed one hundred million dollars ($100,000,000.00), which second mortgage would also be superior to Contractor's lien. In order to avoid any question of priority of lien, Contractor agrees that it has not and will not commence any Work under this Contract prior to Owner's Lender recording its mortgage and the recording of a notice of commencement.

**§ 16.5    Extended Work Hours**
Owner will endeavor to obtain approval from the City of Sunny Isles Beach for extended work hours.

**§ 16.6**    The Contractor has permission to photograph the Project and to use both interior and exterior photographs for marketing and promotional purposes, except where Owner's Contracts with designers prohibit same (the agreement between Owner and the designer of the lobby area expressly prohibit photography and use of the lobby area for promotional purposes).   Contractor shall obtain Owner's prior written approval prior to using interior photographs for marketing and promotional purposes.

**§ 16.7**    Unless otherwise specified in the Drawings, materials are to be furnished in standard manufacture colors.

**§ 16.8**    Vibration Monitoring, Settlement Monitoring, and Sediment Monitoring shall be provided by the Owner. Owner shall promptly deliver copies of any test reports to the Contractor.

**§ 16.9**    If approved by the City of Sunny Isles Beach, Contractor may use roads or paths adjacent to the Property, which may be closed during construction based on duration approved by City and may be available for Contractor's use at no cost to the Owner. Owner makes not promises or representations as to the availability of such access.

**§ 16.10**    Chapter 558 Florida Statutes requires that the following notice be given to any person entering into a contract for the design, construction or remodeling of a building.

CHAPTER 558 NOTICE OF CLAIM

CHAPTER 558 FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR BUILDING. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS CONTRACT A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

In the event of a claim by Owner relating directly or indirectly, to construction defects, the Contractor and its subcontractor(s) shall have notice and opportunity to inspect the Project and to make the repairs or replacements necessary to remedy the alleged defects. Contractor and its subcontractor(s) shall have all rights, notices, access and opportunity to cure any alleged construction defects as provided in Florida Statutes Chapter 558, which shall be deemed to be incorporated herein by this reference.

This Agreement entered into as of the day and year first written above.



| OWNER | OWNER | OWNER | CONTRACTOR |
|---|---|---|---|
| A3 Development LLC | A3 Amenities, LLC | A3 Restaurant, LLC | Suffolk Construction Company, Inc. |

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

area for promotional purposes). Contractor shall obtain Owner's prior written approval prior to using interior photographs for marketing and promotional purposes.

§ 16.7   Unless otherwise specified in the Drawings, materials are to be furnished in standard manufacture colors.

§ 16.8   Vibration Monitoring, Settlement Monitoring, and Sediment Monitoring shall be provided by the Owner. Owner shall promptly deliver copies of any test reports to the Contractor.

§ 16.9   If approved by the City of Sunny Isles Beach, Contractor may use roads or paths adjacent to the Property, which may be closed during construction based on duration approved by City and may be available for Contractor's use at no cost to the Owner. Owner makes not promises or representations as to the availability of such access.

§ 16.10   Chapter 558 Florida Statutes requires that the following notice be given to any person entering into a contract for the design, construction or remodeling of a building.

CHAPTER 558 NOTICE OF CLAIM

CHAPTER 558 FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR BUILDING. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS CONTRACT A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

In the event of a claim by Owner relating directly or indirectly, to construction defects, the Contractor and its subcontractor(s) shall have notice and opportunity to inspect the Project and to make the repairs or replacements necessary to remedy the alleged defects. Contractor and its subcontractor(s) shall have all rights, notices, access and opportunity to cure any alleged construction defects as provided in Florida Statutes Chapter 558, which shall be deemed to be incorporated herein by this reference.

This Agreement entered into as of the day and year first written above.

| OWNER A3 Development LLC | OWNER A3 Amenities, LLC | CONTRACTOR Suffolk Construction Company, Inc. |
|---|---|---|
| (signature) | (signature) | (signature) |
| (print name) J. TRUMP | (print name) J. TRUMP | (print name) Juan Diaz |
| (title) | (title) | (title) GENERAL COUNSEL. SE/ ASSI. SECY |

Owner ____ ___ ____          Contractor ____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44.22 ET on 06/23/2020 under Order No.7813334419 which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

| | | | |
|---|---|---|---|
| *(date)* | *(date)* | *(date)* | |

Owner _____     Contractor _____

Modified AIA Document A201™ – 2017. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997, 2007 and 2017 by The
American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, "A201," and "AIA Contract Documents" are
registered trademarks and may not be used without permission. This draft was produced by AIA software at 09:44:22 ET on 06/23/2020 under Order No.7813334419
which expires on 06/17/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of
Service. To report copyright violations, e-mail copyright@aia.org.

# Exhibit "A"

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020 | | | | | | | | | | | | | | | | Updated: | 7/7/2020 | | | | | | | | | | | | | | | | |
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 3 | SURVEY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 3 |
| 4 | 2013-059-NAVD | 85% CDs | BOUNDARY & TOPOGRAPHIC SURVEY | | | | | | | | | | | | | | 11/21/2017 | | | | | | | | | | | | | | | | | 1 |
| 5 | 2013-059-NGVD 1/2 | 85% CDs | ALTA/NSPS LAND TITLE SURVEY | | | | | | | | | | | | | | 1/16/2018 | | | | | | | | | | | | | | | | | 2 |
| 6 | 2013-059-NGVD 2/2 | 85% CDs | BOUNDARY & TOPOGRAPHIC SURVEY | | | | | | | | | | | | | | 1/16/2018 | | | | | | | | | | | | | | | | | 3 |
| 7 | ARCHITECTURE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 548 |
| 8 | A0.0 | PERMIT SET | COVER SHEET | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 9 | A0.1 | REVISION B UPDATED DWGS | GENERAL NOTES | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 2 |
| 10 | A0.1a | REVISION P UPDATED DWGS | INDEX OF DRAWINGS - Architecture | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | 1/30/2019 | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | 3/20/2020 | 4/17/2020 | 6/4/2020 | 6/5/2020 | 3 |
| 11 | A0.1b | REVISION P UPDATED DWGS | INDEX OF DRAWINGS - Architecture | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2019 | 1/30/2019 | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | 3/6/2020 | 4/17/2020 | 5/15/2020 | 6/5/2020 | 4 |
| 12 | A0.1c | REVISION O UPDATED DWGS | INDEX OF DRAWINGS - LS & FS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 5 |
| 13 | A0.1d | REVISION I UPDATED DWGS | INDEX OF DRAWINGS - Landscape & Structure | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 6 |
| 14 | A0.1e | REVISION I UPDATED DWGS | INDEX OF DRAWINGS - MEPs & Civil | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 7 |
| 15 | A0.1f | PERMIT SET | INDEX OF DRAWINGS - FA | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 8 |
| 16 | A0.2 | REVISION D UPDATED DWGS | BUILDING MATRIX AND LOCATION MAP WITH LEGAL DESCRIPTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2019 | | | | | | | | | | | | | | 9 |
| 17 | A0.2a | PERMIT SET | BUILDING DATA | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 10 |
| 18 | A0.3 | REVISION A UPDATED DWGS | OVERALL- SITE PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 11 |
| 19 | A0.4 | REVISIONI UPDATED DWGS | OVERALL- GARAGE FLOOR PLAN BASEMENT LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 12 |
| 20 | A0.5 | REVISION O UPDATED DWGS | OVERALL- GARAGE FLOOR PLAN LEVEL1 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 13 |
| 21 | A0.6 | REVISION O UPDATED DWGS | OVERALL- ARRIVAL DECK-LOBBY/ VILLA LEVEL PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 14 |
| 22 | A0.7 | REVISION O UPDATED DWGS | OVERALL- MEZZANINE LEVEL/ VILLA PLAN- ADMINISTRATION LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 15 |
| 23 | A0.8 | REVISION O UPDATED DWGS | OVERALL- 4TH LEVEL/ VILLA PLAN- LOUNGE LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 16 |
| 24 | A0.9 | REVISION O UPDATED DWGS | OVERALL- 5TH LEVEL/ VILLA PLAN- HEALTH CLUB | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 17 |
| 25 | A0.14 | REVISION D UPDATED DWGS | BASEMENT PARKING GARAGE PLAN- PARTIAL "1" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 18 |
| 26 | A0.15 | REVISION O UPDATED DWGS | BASEMENT PARKING GARAGE PLAN- PARTIAL "2" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | 5/15/2020 | | 19 |
| 27 | A0.16 | REVISION O UPDATED DWGS | BASEMENT PARKING GARAGE PLAN- PARTIAL "3" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | 5/15/2020 | | 20 |
| 28 | A0.17 | REVISION K UPDATED DWGS | PARKING GARAGE PLAN- PARTIAL "1" | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | 12/18/2018 | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | | | | 21 |
| 29 | A0.18 | REVISION O UPDATED DWGS | PARKING GARAGE PLAN- PARTIAL "2" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | | 5/15/2020 | | 22 |
| 30 | A0.19 | REVISION O UPDATED DWGS | PARKING GARAGE PLAN- PARTIAL "3" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | 9/10/2019 | | | | | | 5/15/2020 | | 23 |
| 31 | A0.20 | REVISION O UPDATED DWGS | PARKING GARAGE PLAN- PARTIAL "4" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | | 5/15/2020 | | 24 |
| 32 | A0.21 | REVISION J UPDATED DWGS | POOL DECK HARDSCAPE PLAN- PARTIAL "3" | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 25 |
| 33 | A0.22 | REVISION J UPDATED DWGS | POOL DECK HARDSCAPE PLAN- PARTIAL "4" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | | | 26 |
| 34 | A0.23 | REVISION O UPDATED DWGS | ENTRY/ ARRIVAL DECK HARDSCAPE PLAN- PARTIAL "1" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 27 |
| 35 | A0.23a | REVISION B UPDATED DWGS | ENTRY/ ARRIVAL DECK- INTERSTITIAL DRAIN FLOOR PLAN PARTIAL "1" | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 28 |
| 36 | A0.24 | REVISION O UPDATED DWGS | ENTRY/ ARRIVAL DECK HARDSCAPE PLAN- PARTIAL "2" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 29 |
| 37 | A0.24a | REVISION B UPDATED DWGS | ENTRY/ ARRIVAL DECK- INTERSTITIAL DRAIN FLOOR PLAN PARTIAL "2" | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 30 |
| 38 | A0.25 | REVISION J UPDATED DWGS | NORTH & SOUTH- HARDSCAPE PLAN- GARAGE LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | 7/25/2019 | 9/10/2019 | | | | | | | | 31 |
| 39 | A0.26 | REVISION M UPDATED DWGS | POOL DECKS HARDSCAPE PLAN- PARTIAL "3" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | 12/18/2018 | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 32 |
| 40 | A0.26a | REVISION M UPDATED DWGS | POOL DECK- INTERSTITIAL DRAIN FLOOR PLAN- PARTIAL "4" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | 3/6/2020 | | | | 33 |
| 41 | A0.27 | REVISION O UPDATED DWGS | POOL DECKS HARDSCAPE PLAN- PARTIAL "4" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | 12/18/2018 | 1/30/2019 | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 34 |
| 42 | A0.27a | REVISION M UPDATED DWGS | POOL DECK- INTERTIIAL DRAIN FLOOR PLAN- PARTIAL "4" | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | 3/6/2020 | | | | 35 |
| 43 | A1.0N | REVISION M UPDATED DWGS | NORTH TOWER- LOBBY LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | | | 36 |
| 44 | A1.0S | REVISION M UPDATED DWGS | SOUTH TOWER- LOBBY LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | 1/30/2019 | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | | | 37 |
| 45 | A1.1N | REVISION M UPDATED DWGS | NORTH TOWER- MEZZANINE LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | | | 38 |
| 46 | A1.1S | REVISION M UPDATED DWGS | SOUTH TOWER- MEZZANINE LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 39 |
| 47 | A1.2N | REVISION K UPDATED DWGS | NORTH TOWER- 4TH LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | 10/18/2019 | | | | | | 40 |
| 48 | A1.2S | REVISION I UPDATED DWGS | SOUTH TOWER- 4TH LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | 1/30/2019 | | | | 7/25/2019 | | | | | | | | | 41 |
| 49 | A1.3N | REVISION M UPDATED DWGS | NORTH TOWER- 5TH LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | | | | 10/18/2019 | | 3/6/2020 | | | | 42 |
| 50 | A1.3S | REVISION M UPDATED DWGS | SOUTH TOWER- 5TH LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | 1/30/2019 | | 5/1/2019 | | 7/25/2019 | | | | | 3/6/2020 | | | | 43 |
| 51 | A1.4N | REVISION K UPDATED DWGS | NORTH TOWER- 6TH THRU 49TH FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | | | | | | 44 |
| 52 | A1.4S | REVISION L UPDATED DWGS | SOUTH TOWER- 6TH THRU 12TH/ 17TH THRU 33RD TYPICAL LEVELS FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | 11/29/2019 | | | | | 45 |
| 53 | A1.4aN | REVISION K UPDATED DWGS | NORTH TOWER LEVEL 47TH AND 48TH FLOOR PLAN | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | | 46 |
| 54 | A1.4bN | REVISION I UPDATED DWGS | NORTH TOWER LEVEL 49TH FLOOR PLAN | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 47 |
| 55 | A1.4aS | REVISION F UPDATED DWGS | SOUTH TOWER- 6TH THRU 12/ 17TH THRU 33RD OPTIONAL LEVELS FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 48 |
| 56 | A1.5N | REVISION K UPDATED DWGS | NORTH TOWER- 17TH THRU 33RD OPTIONAL LEVELS FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | | | | | | 49 |
| 57 | A1.5S | REVISION L UPDATED DWGS | SOUTH TOWER- 14TH, 15TH& 16TH LEVELS FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | 3/1/2019 | | | | | | | 11/29/2019 | | | | | 50 |
| 58 | A1.6N | REVISION I UPDATED DWGS | NORTH TOWER- 50TH LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 51 |
| 59 | A1.6S | REVISION C UPDATED DWGS | SOUTH TOWER- 34TH THRU 46TH TYPICAL LEVELS FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 52 |
| 60 | A1.6aS | REVISION J UPDATED DWGS | SOUTH TOWER- 14TH THRU 16TH/ 34TH THRU 46TH OPTIONAL LEVELS FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | 9/10/2019 | | | | | | | | 53 |
| 61 | A1.7N | REVISION J UPDATED DWGS | NORTH TOWER- 51ST LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | | | | | | 54 |
| 62 | A1.7S | REVISION A UPDATED DWGS | SOUTH TOWER- 46TH LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 55 |
| 63 | A1.7aS | REVISION C UPDATED DWGS | SOUTH TOWER LEVEL 47TH FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 56 |
| 64 | A1.8N | REVISION J UPDATED DWGS | NORTH TOWER- 52ND LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | | | | | | 57 |
| 65 | A1.8S | REVISION O UPDATED DWGS | SOUTH TOWER- 48TH LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | | | 5/15/2020 | | 58 |
| 66 | A1.9N | REVISION J UPDATED DWGS | NORTH TOWER LEVEL 53RD MECHANICAL ROOF FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | | | | | | 59 |
| 67 | A1.9S | REVISION L UPDATED DWGS | SOUTH TOWER- 49TH LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 60 |
| 68 | A1.10N | REVISION J UPDATED DWGS | NORTH TOWER- 54TH LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | | | | | | 61 |
| 69 | A1.10S | REVISION L UPDATED DWGS | SOUTH TOWER- 50TH LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | 11/29/2019 | | | | | 62 |
| 70 | A1.11N | REVISION J UPDATED DWGS | NORTH TOWER LEVEL 55TH MAIN ROOF FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | | | | | | 63 |
| 71 | A1.11S | REVISION M UPDATED DWGS | SOUTH TOWER- 51ST LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 64 |
| 72 | A1.12N | REVISION L UPDATED DWGS | NORTH TOWER OVERALL ROOF FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | 11/29/2019 | | | | | 65 |
| 73 | A1.12S | REVISION O UPDATED DWGS | SOUTH TOWER- 52ND LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 66 |
| 74 | A1.13S | REVISION M UPDATED DWGS | SOUTH TOWER- OVERALL ROOF FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | 11/29/2019 | 3/6/2020 | | | | 67 |
| 75 | A2.0N | REVISION O UPDATED DWGS | NORTH TOWER- LOBBY LEVEL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | | | 5/15/2020 | | 68 |
| 76 | A2.0S | REVISION M UPDATED DWGS | SOUTH TOWER- LOBBY LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | | | 3/6/2020 | | | | 69 |
| 77 | A2.0V | REVISION O UPDATED DWGS | VILLA- AMENITIES FLOOR PLAN | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | 6/4/2020 | | 70 |
| 78 | A2.1N | REVISION M UPDATED DWGS | NORTH TOWER- LOBBY LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | | | 71 |
| 79 | A2.1S | REVISION M UPDATED DWGS | SOUTH TOWER LOBBY LEVEL FLOOR PLAN- SINGLE FAMILY UNIT 02 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | 1/30/2019 | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 72 |
| 80 | A2.1V | REVISION O UPDATED DWGS | VILLA- AMENITIES FLOOR PLAN | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | | | 6/4/2020 | | 73 |
| 81 | A2.2N | REVISION O UPDATED DWGS | NORTH TOWER- LOBBY LEVEL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 74 |
| 82 | A2.2S | REVISION O UPDATED DWGS | SOUTH TOWER LOBBY LEVEL FLOOR PLAN- SINGLE FAMILY UNIT 04 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 75 |
| 83 | A2.2V | REVISION O UPDATED DWGS | VILLA- RESTAURANT FLOOR PLAN | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | 4/17/2020 | 5/15/2020 | | 76 |
| 84 | A2.3aN | REVISION O UPDATED DWGS | NORTH TOWER CASA DI BARONA LEVEL 3 SINGLE FAMILY UNIT FLOOR PLAN SINGLE FAMILY GUEST SUITES | | | | | | | | | | | | | | | | | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | | | | 5/15/2020 | | 77 |
| 85 | A2.3bN | REVISION P UPDATED DWGS | North Tower San Remo Unit Floor Plan Guest suites 14&15/Level 4 | | | | | | | | | | | | | | | | | 12/18/2018 | | | | | | | | 10/18/2019 | 11/29/2019 | | | | 6/5/2020 | 78 |
| 86 | A2.3N | REVISION O UPDATED DWGS | NORTH TOWER- MEZZANINE LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 79 |
| 87 | A2.3S | REVISION M UPDATED DWGS | SOUTH TOWER- MEZZANINE LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 80 |
| 88 | A2.3V | REVISION O UPDATED DWGS | VILLA- MEZZANINE FLOOR PLAN | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | 10/31/2018 | | | | | | | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | 4/17/2020 | 5/15/2020 | | 81 |
| 89 | A2.4N | REVISION P UPDATED DWGS | NORTH TOWER- TYPICAL UNIT 02 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | | 6/5/2020 | 82 |
| 90 | A2.4aN | REVISION M UPDATED DWGS | NORTH TOWER TYPICAL UNIT 02 LEVEL 47TH AND 48TH | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | | | 83 |
| 91 | A2.4bN | REVISION M UPDATED DWGS | NORTH TOWER TYPICAL UNIT 02-LEVEL 49TH | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | | | 84 |
| 92 | A2.4cN | REVISION P UPDATED DWGS | NORTH TOWER RAVELLO UNIT 2 MODIFIED FLOOR PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | 11/29/2019 | 3/6/2020 | | | 6/5/2020 | 85 |
| 93 | A2.4S | REVISION M UPDATED DWGS | SOUTH TOWER MEZZANINE LEVEL FLOOR PLAN- SINGLE FAMILY UNIT 02 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 86 |
| 94 | A2.4V | REVISION O UPDATED DWGS | VILLA- LOUNGE FLOOR PLAN | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | 4/7/2020 | 5/15/2020 | | 87 |
| 95 | A2.5aN | REVISION M UPDATED DWGS | NORTH TOWER AMALFI UNIT 01 LEVEL 47 AND 48 TYPICAL FLOOR PLAN | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 88 |
| 96 | A2.5bN | REVISION M UPDATED DWGS | NORTH TOWER TS AMALFI UNIT 4901 LEVEL 49TH TYPICAL FLOOR PLAN | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 89 |
| 97 | A2.5cN | REVISION P UPDATED DWGS | NORTH TOWER AMALFI UNIT 01 MODIFIED FLOOR PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | 11/29/2019 | 3/6/2020 | | | 6/5/2020 | 90 |
| 98 | A2.5N | REVISION P UPDATED DWGS | NORTH TOWER- TYPICAL UNIT 02 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | | 6/5/2020 | 91 |
| 99 | A2.5S | REVISION O UPDATED DWGS | SOUTH TOWER MEZZANINE LEVEL FLOOR PLAN- SINGLE FAMILY UNIT 04 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 92 |
| 100 | A2.5V | REVISION O UPDATED DWGS | VILLA- HEALTH CLUB FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | 4/10/2020 | 5/15/2020 | | 93 |
| 101 | A2.6N | REVISION B UPDATED DWGS | NORTH TOWER- TOWER SUITE LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 94 |
| 102 | A2.6aS | REVISION E UPDATED DWGS | SOUTH TOWER 4TH LEVEL SERVICE SUITE AND VILLA DI ESTE UNIT 401 FLOOR PLAN | | | | | | | | | | | | | | | | | | 1/30/2019 | | | | | | | | | | | | | 95 |
| 103 | A2.6S | REVISION G UPDATED DWGS | SOUTH TOWER LEVEL 5 FLOOR PLAN SERVIC ESUITE AND VILLA DI ESTE UNIT FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | 1/30/2019 | | 5/1/2019 | | | | | | | | | | | 96 |
| 104 | A2.6V | REVISION O UPDATED DWGS | VILLA- ROOF FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | 4/17/2020 | 5/15/2020 | | 97 |
| 105 | A2.7N | REVISION B UPDATED DWGS | NORTH TOWER- TOWER SUITE LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 98 |
| 106 | A2.7S | REVISION E UPDATED DWGS | SOUTH TOWER 5TH LEVELS FLOOR PLAN- BOTTICELLY AND SERVICE SUITES UNIT 504 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | 1/30/2019 | | | | | | | | | | | | | 99 |
| 107 | A2.7aS | REVISION E UPDATED DWGS | SOUTH TOWER 4TH LEVEL FLOOR PLAN SERVICE SUITE AND BOTTICELLI UNIT 404 FLOOR PLAN | | | | | | | | | | | | | | | | | | 1/30/2019 | | | | | | | | | | | | | 100 |
| 108 | A2.8N | REVISION M UPDATED DWGS | NORTH TOWER- PENTHOUSE LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 101 |
| 109 | A2.8S | REVISION I UPDATED DWGS | SOUTH TOWER (6TH-12TH& 17TH- 33RD) LEVELS FLOOR PLAN- TYPICAL UNITS 01& 02 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 102 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 110 | A2.8aS | REVISION I UPDATED DWGS | SOUTH TOWER MODIFIED TYPICAL UNITS 01 AND 02 | | | | | | | | | | | | | | | | | | 1/30/2019 | | | | 7/25/2019 | | | | | | | | | 103 |
| 111 | A2.9N | REVISION M UPDATED DWGS | NORTH TOWER- PENTHOUSE LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 104 |
| 112 | A2.9S | REVISION I UPDATED DWGS | SOUTH TOWER (6TH-12TH& 17TH- 33RD) LEVELS FLOOR PLAN- TYPICAL UNITS 03 & 04 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 105 |
| 113 | A2.9aS | REVISION I UPDATED DWGS | SOUTH TOWER MODIFIED TYPICAL UNITS 03 AND 04 | | | | | | | | | | | | | | | | | | 1/30/2019 | | | | 7/25/2019 | | | | | | | | | 106 |
| 114 | A2.10N | REVISION M UPDATED DWGS | NORTH TOWER- PENTHOUSE LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 107 |
| 115 | A2.10S | REVISION I UPDATED DWGS | SOUTH TOWER (14TH-16TH& 34TH- 46TH) LEVELS FLOOR PLAN- UNIT 05 (TOSCANA) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 108 |
| 116 | A2.11N | REVISION M UPDATED DWGS | NORTH TOWER- PENTHOUSE LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 109 |
| 117 | A2.11S | REVISION I UPDATED DWGS | SOUTH TOWER (14TH-16TH& 34TH- 46TH) LEVELS FLOOR PLAN- UNIT 06 (POSITANO) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 110 |
| 118 | A2.12N | REVISION P UPDATED DWGS | NORTH TOWER- TYPICAL UNIT 02 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | | 6/5/2020 | 111 |
| 119 | A2.12S | REVISION M UPDATED DWGS | SOUTH TOWER (14TH-16TH& 34TH- 46TH) LEVELS FLOOR PLAN- UNIT 07 (MILANO) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 112 |
| 120 | A2.13N | REVISION P UPDATED DWGS | NORTH TOWER- TYPICAL UNIT 01 | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | | 6/5/2020 | 113 |
| 121 | A2.13S | REVISION I UPDATED DWGS | SOUTH TOWER 47TH LEVEL FLOOR PLAN- PENTHOUSE 05- CASA DI SOGNI | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 114 |
| 122 | A2.14S | REVISION B UPDATED DWGS | SOUTH TOWER 47TH LEVEL FLOOR PLAN- PENTHOUSE 07- CASA DI RICCHEZZE | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 115 |
| 123 | A2.14N | REVISION O UPDATED DWGS | NORTH TOWER PENTHOUSE OPTIONAL FLOOR PLAN AND RCP | | | | | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | 3/6/2020 | | 5/15/2020 | | 116 |
| 124 | A2.15S | REVISION L UPDATED DWGS | SOUTH TOWER 48TH LEVEL FLOOR PLAN- PENTHOUSE 01- CASA DI OCEANA (LOWER LEVEL) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | 11/29/2019 | | | | | 117 |
| 125 | A2.16S | REVISION I UPDATED DWGS | SOUTH TOWER 49TH LEVEL FLOOR PLAN- PENTHOUSE 01- CASA DI OCEANA (UPPER LEVEL) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 118 |
| 126 | A2.17S | REVISION L UPDATED DWGS | SOUTH TOWER 48TH LEVEL FLOOR PLAN- PENTHOUSE 02- CASA DI MARE (LOWER LEVEL) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 119 |
| 127 | A2.18S | REVISION L UPDATED DWGS | SOUTH TOWER 49TH LEVEL FLOOR PLAN- PENTHOUSE 02- CASA DI MARE (UPPER LEVEL) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | 11/29/2019 | | | | | 120 |
| 128 | A2.20S | REVISION I UPDATED DWGS | SOUTH TOWER OPTIONAL FLOOR PLAN- UFFIZI (UNIT 01)/ VECCHIO (UNIT 02)- GUEST SUITE | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 121 |
| 129 | A2.21S | REVISION I UPDATED DWGS | SOUTH TOWER OPTIONAL FLOOR PLAN- VECCHIO (UNIT 03)/ DONATELLO (UNIT 04)- GUEST SUITE | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 122 |
| 130 | A2.22S | REVISION I UPDATED DWGS | SOUTH TOWER OPTIONAL FLOOR PLAN- UFFIZI (UNIT 01)- BEDROOM OPTION/ BEDROOM AND | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 123 |
| 131 | A2.23S | REVISION I UPDATED DWGS | SOUTH TOWER OPTIONAL FLOOR PLAN- TOSCANA (UNIT 05)- BEDROOM/ BATH OPTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 124 |
| 132 | A2.24S | REVISION I UPDATED DWGS | SOUTH TOWER OPTIONAL FLOOR PLAN- POSITANO (UNIT 06)- FOYER CONNECTION OPTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 125 |
| 133 | A2.25S | REVISION I UPDATED DWGS | SOUTH TOWER OPTIONAL FLOOR PLAN- MILANO (UNIT 07)- BEDROOM/ BATH OPTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 126 |
| 134 | A2.45 | REVISION O UPDATED DWGS | NORTH SIDE- CABANA1 THRU3& POOL RESTROOM FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | 11/29/2019 | | | 5/15/2020 | | 127 |
| 135 | A2.46 | REVISION O UPDATED DWGS | SOUTH SIDE- CABANA4 THRU9& POOL RESTROOM FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | | | 5/15/2020 | | 128 |
| 136 | A2.47 | REVISION O UPDATED DWGS | NORTH SIDE - CABANA 1 THRU 3 & POOL RESTROOM RCP | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | 12/18/2018 | | 3/1/2019 | | | | | | | 11/29/2019 | | | 5/15/2020 | | 129 |
| 137 | A2.48 | REVISION O UPDATED DWGS | SOUTH SIDE - CABANA 4 THRU 9, POOL RESTROOM AND GRILL RCP | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | 10/18/2019 | | | | 5/15/2020 | | 130 |
| 138 | A2.60 | REVISION O UPDATED DWGS | MAIL ROOMS- NORTH TOWER& SOUTH TOWER | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 131 |
| 139 | A3.0 | REVISION O UPDATED DWGS | NORTH AND SOUTH TOWERS- WEST ELEVATIONS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 132 |
| 140 | A3.0V | REVISION O UPDATED DWGS | VILLA BUILDING- WEST ELEVATION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 133 |
| 141 | A3.1 | REVISION O UPDATED DWGS | SOUTH TOWER- NORTH ELEVATION AND SECTION- AA | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | 7/25/2019 | | | 10/18/2019 | | | | 5/15/2020 | | 134 |
| 142 | A3.1V | REVISION O UPDATED DWGS | VILLA BUILDING- EAST ELEVATION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 135 |
| 143 | A3.2 | REVISION O UPDATED DWGS | NORTH AND SOUTH TOWERS- EAST ELEVATION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 136 |
| 144 | A3.2V | REVISION O UPDATED DWGS | VILLA BUILDING- NORTH AND SOUTH ELEVATIONS | | | | 12/20/2017 | | 9/26/2018 | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 137 |
| 145 | A3.3 | REVISION O UPDATED DWGS | SOUTH TOWER- SOUTH ELEVATION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 138 |
| 146 | A3.3V | REVISION O UPDATED DWGS | VILLA BUILDING -NORTH ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 139 |
| 147 | A3.4 | REVISION O UPDATED DWGS | NORTH TOWER- NORTH ELEVATION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 140 |
| 148 | A3.5 | REVISION K UPDATED DWGS | NORTH TOWER- SOUTH ELEVATION AND SECTION- BB | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | 10/18/2019 | | | | | | 141 |
| 149 | A3.6 | REVISION C UPDATED DWGS | NORTH AND SOUTH TOWER- WEST BUILDING BASE ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 142 |
| 150 | A3.7 | PERMIT SET | SOUTH TOWER- WEST FACADE ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 143 |
| 151 | A3.8 | REVISION K UPDATED DWGS | NORTH AND SOUTH TOWERS- NORTH AND SOUTH FACADE ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | | | | | | 10/18/2019 | | | | | | 144 |
| 152 | A3.9 | REVISION F UPDATED DWGS | NORTH AND SOUTH TOWER- EAST BUILDING BASE ELEVATION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 145 |
| 153 | A3.10 | REVISION F UPDATED DWGS | SOUTH TOWER- EAST FACADE ELEVATION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 146 |
| 154 | A4.0 | REVISION M UPDATED DWGS | SOUTH TOWER- BUILDING SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | | | 147 |
| 155 | A4.0V | REVISION O UPDATED DWGS | VILLA BUILDING- BUILDING SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 148 |
| 156 | A4.1 | REVISION M UPDATED DWGS | NORTH TOWER- BUILDING SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | 9/10/2019 | | | | 3/6/2020 | | | | 149 |
| 157 | A4.1V | REVISION O UPDATED DWGS | VILLA BUILDING- BUILDING SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 150 |
| 158 | A4.2 | REVISION O UPDATED DWGS | NORTH AND SOUTH TOWERS- BUILDING SECTION | | | | 12/20/2017 | | 9/28/2018 | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 151 |
| 159 | A4.2V | REVISION O UPDATED DWGS | VILLA BUILDING- BUILDING SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | | | 3/6/2020 | | 5/15/2020 | | 152 |
| 160 | A4.3 | REVISION O UPDATED DWGS | VILLA- BUILDING SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 153 |
| 161 | A4.4 | REVISION D UPDATED DWGS | FLOWRIDER BUILDING SECTIONS - SOUTH TOWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 154 |
| 162 | A4.5 | REVISION O UPDATED DWGS | OVERALL NORTH AND SOUTH ARRIVAL DECK- BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | 3/6/2020 | | 5/15/2020 | | 155 |
| 163 | A4.6 | REVISION J UPDATED DWGS | NORTH AND SOUTH ARRIVAL DECK- BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | | | 156 |
| 164 | A4.7 | REVISION O UPDATED DWGS | SOUTH ARRIVAL DECK- BUILDING SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 157 |
| 165 | A4.8 | REVISION M UPDATED DWGS | NORTH ARRIVAL DECK- BUILDING SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | 3/6/2020 | | | | 158 |
| 166 | A4.9 | REVISION O UPDATED DWGS | OVERALL NORTH AND SOUTH ARRIVAL DECK- BUILDING SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | 5/15/2020 | | 159 |
| 167 | A4.10N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | 3/1/2019 | | | | 9/10/2019 | | | | | | | | 160 |
| 168 | A4.10S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 161 |
| 169 | A4.10V | REVISION O UPDATED DWGS | VILLA WEST- WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | | | | | 5/15/2020 | | 162 |
| 170 | A4.11N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 163 |
| 171 | A4.11S | REVISION L UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | 11/29/2019 | | | | | 164 |
| 172 | A4.11V | REVISION O UPDATED DWGS | VILLA- WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | 3/6/2020 | | 5/15/2020 | | 165 |
| 173 | A4.12N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 166 |
| 174 | A4.12S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 167 |
| 175 | A4.12V | REVISION O UPDATED DWGS | VILLA EAST WALL SECTION | | | | | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | 3/6/2020 | | 5/15/2020 | | 168 |
| 176 | A4.13N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 169 |
| 177 | A4.13S | REVISION L UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | 11/29/2019 | | | | | 170 |
| 178 | A4.13V | REVISION O UPDATED DWGS | VILLA EAST WALL SECTION | | | | | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | 3/6/2020 | | 5/15/2020 | | 171 |
| 179 | A4.14N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 172 |
| 180 | A4.14S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 173 |
| 181 | A4.15N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 174 |
| 182 | A4.15S | REVISION M UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 175 |
| 183 | A4.16N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | 3/1/2019 | | | | 9/10/2019 | | | | | | | | 176 |
| 184 | A4.16S | REVISION M UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | 3/6/2020 | | | | 177 |
| 185 | A4.17N | REVISION O UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | 3/1/2019 | | | | | | | | | | 5/15/2020 | | 178 |
| 186 | A4.17S | REVISION O UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | 11/29/2019 | | | 5/15/2020 | | 179 |
| 187 | A4.18N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | 3/1/2019 | | | | 9/10/2019 | | | | | | | | 180 |
| 188 | A4.18S | REVISION F UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 181 |
| 189 | A4.19N | REVISION F UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 182 |
| 190 | A4.19S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 183 |
| 191 | A4.20N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 184 |
| 192 | A4.20S | PERMIT SET | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 185 |
| 193 | A4.21N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 186 |
| 194 | A4.21S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 187 |
| 195 | A4.22N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 188 |
| 196 | A4.22S | PERMIT SET | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 189 |
| 197 | A4.23N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 190 |
| 198 | A4.23S | REVISION K UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | 10/18/2019 | | | | | | 191 |
| 199 | A4.24N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 192 |
| 200 | A4.24S | REVISION O UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | 3/6/2020 | | 5/15/2020 | | 193 |
| 201 | A4.25N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 194 |
| 202 | A4.25S | REVISION L UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | 11/29/2019 | | | | | 195 |
| 203 | A4.26N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 196 |
| 204 | A4.26S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 197 |
| 205 | A4.27N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 198 |
| 206 | A4.27S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 199 |
| 207 | A4.28N | REVISION F UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 200 |
| 208 | A4.28S | REVISION O UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | 10/18/2019 | | | | 5/15/2020 | | 201 |
| 209 | A4.29N | REVISION F UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 202 |
| 210 | A4.29S | REVISION M UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | 3/6/2020 | | | | 203 |
| 211 | A4.30N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 204 |
| 212 | A4.30S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 205 |
| 213 | A4.31N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 206 |
| 214 | A4.31S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 207 |
| 215 | A4.32N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 208 |
| 216 | A4.32S | REVISION O UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | 10/18/2019 | | | | 5/15/2020 | | 209 |
| 217 | A4.33N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 210 |
| 218 | A4.33S | REVISION M UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | | | 3/6/2020 | | | | 211 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 219 | A4.34N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 220 | A4.34S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 221 | A4.35N | REVISION K UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 222 | A4.35S | REVISION B UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 223 | A4.36N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 224 | A4.36S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 225 | A4.37N | REVISION F UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 226 | A4.37S | REVISION B UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 227 | A4.38N | REVISION F UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 228 | A4.38S | REVISION B UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 229 | A4.39N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 230 | A4.39S | REVISION C UPDATED DWGS | SOUTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 231 | A4.40N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 232 | A4.41N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 233 | A4.42N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 234 | A4.43N | REVISION D UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 235 | A4.44N | REVISION K UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 236 | A4.45N | REVISION J UPDATED DWGS | NORTH TOWER WALL SECTION | | | | 12/20/2017 | | | | | | | | |
| 237 | A4.61 | REVISION F UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS NORTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 238 | A4.62 | REVISION C UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS NORTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 239 | A4.63 | REVISION C UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS NORTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 240 | A4.64 | REVISION C UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS NORTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 241 | A4.65 | REVISION C UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS VILLA BLDG | | | | 12/20/2017 | | | | | | | | |
| 242 | A4.66 | REVISION C UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS SOUTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 243 | A4.67 | REVISION C UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS SOUTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 244 | A4.68 | REVISION C UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS SOUTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 245 | A4.69 | REVISION C UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS SOUTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 246 | A4.70 | REVISION B UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS SOUTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 247 | A4.71 | REVISION C UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS SOUTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 248 | A4.72 | REVISION B UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS SOUTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 249 | A4.73 | REVISION F UPDATED DWGS | PLANTER WINDOW WALL SECTIONS AND ELEVATIONS SOUTH TOWER | | | | 12/20/2017 | | | | | | | | |
| 250 | A4.74 | REVISION B UPDATED DWGS | VENTILATION PIT WALL SECTIONS | | | | 12/20/2017 | | | | | | | | |
| 251 | A4.75 | REVISION B UPDATED DWGS | VENTILATION PIT WALL SECTIONS | | | | 12/20/2017 | | | | | | | | |
| 252 | A4.76 | REVISION D UPDATED DWGS | BUILDING SECTIONS N.T. SINGLE FAMILY RESIDENCE TERRACE | | | | 12/20/2017 | | | | | | | | |
| 253 | A5.0N | REVISION O UPDATED DWGS | NORTH TOWER RCP LOBBY LEVEL | | | | 12/20/2017 | | | | | | | | |
| 254 | A5.0S | REVISION O UPDATED DWGS | SOUTH TOWER RCP LOBBY LEVEL | | | | 12/20/2017 | | | | | | | | |
| 255 | A5.0V | REVISION O UPDATED DWGS | VILLA- AMENITIES REFLECTED CEILING PLAN | | | | 12/20/2017 | | | | | | | | |
| 256 | A5.1N | REVISION O UPDATED DWGS | NORTH TOWER - LOBBY LEVEL - RCP | | | | 12/20/2017 | | | | | | | | |
| 257 | A5.1S | REVISION O UPDATED DWGS | SOUTH TOWER LOBBY LEVEL- REFLECTED CEILING FLOOR PLAN- SINGLE FAMILY UNIT 02 | | | | 12/20/2017 | | | | | | | | |
| 258 | A5.1V | REVISION O UPDATED DWGS | VILLA- AMENITIES REFLECTED CEILING PLAN | | | | 12/20/2017 | | | | | | | | |
| 259 | A5.2N | REVISION O UPDATED DWGS | NORTH TOWER- REFLECTED CEILING PLAN (MEZZANINE LEVEL)- SINGLE FAMILY UNIT- CASA DI BARONA | | | | 12/20/2017 | | | | | | | | |
| 260 | A5.2S | REVISION M UPDATED DWGS | SOUTH TOWER LOBBY LEVEL- REFLECTED CEILING FLOOR PLAN- SINGLE FAMILY UNIT 04 | | | | 12/20/2017 | | | | | | | | |
| 261 | A5.2V | REVISION O UPDATED DWGS | VILLA- RESTAURANT REFLECTED CEILING PLAN | | | | 12/20/2017 | | | | | | | | |
| 262 | A5.3N | REVISION O UPDATED DWGS | NORTH TOWER- REFLECTED CEILING PLAN (MEZZANINE LEVEL)- COMMON AREAS | | | | 12/20/2017 | | | | | | | | |
| 263 | A5.3aN | REVISION O UPDATED DWGS | NORTH TOWER-CASA DI BARONA LEVEL 3 SINGLE FAMILY UNIT FLOOR PLAN GUEST SUITES 11&12/LEVEL 4-RCP | | | | | | | | | | | | |
| 264 | A5.3bN | REVISION P UPDATED DWGS | NORTH TOWER-SAN REMO UNIT FLOOR PLAN GUEST SUITES 14&15/LEVEL 4- RCP | | | | | | | | | | | | |
| 265 | A5.3S | REVISION O UPDATED DWGS | SOUTH TOWER MEZZANINE LEVEL- RCP - COMMON AREAS | | | | 12/20/2017 | | | | | | | | |
| 266 | A5.3V | REVISION O UPDATED DWGS | VILLA- MEZZANINE REFLECTED CEILING PLAN | | | | 12/20/2017 | | | | | | | | |
| 267 | A5.4aN | REVISION I UPDATED DWGS | NORTH TOWER TYPICAL UNIT 02 RCP LVL 47&48 | | | | | | | | | | | | |
| 268 | A5.4bN | REVISION I UPDATED DWGS | NORTH TOWER TYPICAL UNIT 02 RCP LEVEL 49 | | | | | | | | | | | | |
| 269 | A5.4cN | REVISION P UPDATED DWGS | NORTH TOWER REVELLO UNIT 02 RCP | | | | | | | | | | | | |
| 270 | A5.4N | REVISION P UPDATED DWGS | NORTH TOWER - RCP (LEVELS 5th thru 46th) - TYPICAL UNIT 02 - RAVELLO | | | | 12/20/2017 | | | | | | | | |
| 271 | A5.4S | REVISION O UPDATED DWGS | SOUTH TOWER MEZZANINE LEVEL 3 - RCP - SINGLE FAMILY UNIT 02 UPPER LEVEL | | | | 12/20/2017 | | | | | | | | |
| 272 | A5.4V | REVISION O UPDATED DWGS | VILLA- LOUNGE REFLECTED CEILING PLAN | | | | 12/20/2017 | | | | | | | | |
| 273 | A5.5aN | REVISION I UPDATED DWGS | NORTH TOWER TYPICAL UNIT 01 LEVEL 47&48 RCP | | | | | | | | | | | | |
| 274 | A5.5bN | REVISION I UPDATED DWGS | NORTH TOWER TYPICAL UNIT 01 LEVEL 49 RCP | | | | | | | | | | | | |
| 275 | A5.5cN | REVISION P UPDATED DWGS | NORTH TOWER AMALFI UNIT 01 MODIFIED RCP | | | | | | | | | | | | |
| 276 | A5.5N | REVISION P UPDATED DWGS | NORTH TOWER- RCP (LEVELS 4th thru 47th LEVEL) - TYPICAL UNIT 01- AMALFI | | | | 12/20/2017 | | | | | | | | |
| 277 | A5.5S | REVISION M UPDATED DWGS | SOUTH TOWER MEZZANINE LEVEL 3RD - RCP - SINGLE FAMILY UNIT 04 UPPER LEVEL | | | | 12/20/2017 | | | | | | | | |
| 278 | A5.5V | REVISION O UPDATED DWGS | VILLA- HEALTH CLUB REFLECTED CEILING PLAN | | | | 12/20/2017 | | | | | | | | |
| 279 | A5.6N | REVISION I UPDATED DWGS | NORTH TOWER- RCP (TOWER SUITE LEVEL 49th)- TOWER SUITE UNIT- CASA DI PORTOFINO | | | | 12/20/2017 | | | | | | | | |
| 280 | A5.6S | REVISION I UPDATED DWGS | SOUTH TOWER 4TH LEVEL RCP SERVICE SUITE AND VILLA DI ESTE UNIT 401 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | |
| 281 | A5.6aS | REVISION I UPDATED DWGS | SOUTH TOWER (5th LEVEL)- RCP - VILLA DI ESTE AND SERVICE SUITES | | | | 12/20/2017 | | | | | | | | |
| 282 | A5.7N | REVISION I UPDATED DWGS | NORTH TOWER - TOWER SUITE - RCP (51st LEVEL) CASA Di PORTOFINO | | | | 12/20/2017 | | | | | | | | |
| 283 | A5.7S | REVISION I UPDATED DWGS | SOUTH TOWER (4th LEVEL) - RCP - BOTTICELLI AND SERVICE SUITES | | | | 12/20/2017 | | | | | | | | |
| 284 | A5.7aS | REVISION I UPDATED DWGS | SOUTH TOWER (5TH LEVEL)- RCP -UNIT BOTTICELLI AND SERVICE SUITES | | | | 12/20/2017 | | | | | | | | |
| 285 | A5.8N | REVISION M UPDATED DWGS | NORTH TOWER (LEVEL 50th) RCP - PENTHOUSE LOWER LEVEL - CASA Di SPIGGIA | | | | 12/20/2017 | | | | | | | | |
| 286 | A5.8S | REVISION C UPDATED DWGS | SOUTH TOWER (LEVELS 6th - 11th & 17th - 33rd) RCP - TYPICAL UNITS 01 & 02 | | | | 12/20/2017 | | | | | | | | |
| 287 | A5.8aS | REVISION J UPDATED DWGS | SOUTH TOWER (12th & 33rd LEVELS)- RCP - TYPICAL UNITS 01 & 02 | | | | 12/20/2017 | | | | | | | | |
| 288 | A5.9N | REVISION M UPDATED DWGS | NORTH TOWER- RCP (PENTHOUSE LEVEL 50th ) CASA DI SPIGGIA- LOWER LEVEL | | | | 12/20/2017 | | | | | | | | |
| 289 | A5.9S | REVISION C UPDATED DWGS | SOUTH TOWER (LEVELS 6th - 11th & 17th - 32rd) RCP - TYPICAL UNITS 03 & 04 | | | | 12/20/2017 | | | | | | | | |
| 290 | A5.9aS | REVISION J UPDATED DWGS | SOUTH TOWER (LEVELS 12th & 33rd) RCP - TYPICAL UNITS 03 & 04 | | | | 12/20/2017 | | | | | | | | |
| 291 | A5.10N | REVISION M UPDATED DWGS | NORTH TOWER- RCP (PENTHOUSE LEVEL 51st )- CASA DI SPIGGIA- UPPER LEVEL | | | | 12/20/2017 | | | | | | | | |
| 292 | A5.10S | REVISION C UPDATED DWGS | SOUTH TOWER RCP (LEVELS 14th - 15th & 34th - 45th) TYP. UNIT 05 - TOSCANA | | | | 12/20/2017 | | | | | | | | |
| 293 | A5.10aS | REVISION F UPDATED DWGS | SOUTH TOWER (16th LEVEL)- RCP- UNIT 05 - TOSCANA | | | | 12/20/2017 | | | | | | | | |
| 294 | A5.10bS | REVISION D UPDATED DWGS | SOUTH TOWER (45th LEVEL)- RCP- UNIT 05 - TOSCANA | | | | 12/20/2017 | | | | | | | | |
| 295 | A5.11N | REVISION M UPDATED DWGS | NORTH TOWER- RCP (PENTHOUSE LEVEL 51st) CASA DI SPIGGIA- UPPER LEVEL | | | | 12/20/2017 | | | | | | | | |
| 296 | A5.11S | REVISION C UPDATED DWGS | SOUTH TOWER RCP (LEVELS 14th - 15th & 34th - 44th) TYP. UNIT 06 - POSITANO | | | | 12/20/2017 | | | | | | | | |
| 297 | A5.11aS | REVISION D UPDATED DWGS | SOUTH TOWER (16th LEVEL) RCP- TYP. UNIT 06 - POSITANO | | | | 12/20/2017 | | | | | | | | |
| 298 | A5.11bS | REVISION D UPDATED DWGS | SOUTH TOWER (46th LEVEL) RCP- TYP. UNIT 06 - POSITANO | | | | 12/20/2017 | | | | | | | | |
| 299 | A5.11cS | REVISION O UPDATED DWGS | SOUTH TOWER CU 4106 RCP | | | | | | | | | | | | |
| 300 | A5.12N | REVISION P UPDATED DWGS | NORTH TOWER RCP - UNIT 02 OPTIONAL | | | | 12/20/2017 | | | | | | | | |
| 301 | A5.12S | REVISION C UPDATED DWGS | SOUTH TOWER RCP (LEVELS 14th - 15th & 34th - 44th) TYP. UNIT 07 - MILANO | | | | 12/20/2017 | | | | | | | | |
| 302 | A5.12aS | REVISION F UPDATED DWGS | SOUTH TOWER RCP (LEVEL 16th) TYP. UNIT 07 - MILANO | | | | 12/20/2017 | | | | | | | | |
| 303 | A5.12bS | REVISION D UPDATED DWGS | SOUTH TOWER RCP (LEVEL 45th) TYP. UNIT 07 - MILANO | | | | 12/20/2017 | | | | | | | | |
| 304 | A5.13N | REVISION P UPDATED DWGS | NORTH TOWER RCP - TYP. UNIT 01 OPTIONAL - AMALFI | | | | 12/20/2017 | | | | | | | | |
| 305 | A5.13S | REVISION C UPDATED DWGS | SOUTH TOWER RCP (46th LEVEL) PENTHOUSE 05 - CASA DI SOGNI | | | | 12/20/2017 | | | | | | | | |
| 306 | A5.13aS | REVISION M UPDATED DWGS | SOUTH TOWER RCP (46th LEVEL) PENTHOUSE 07 - CASA DI RICCHEZZE | | | | 12/20/2017 | | | | | | | | |
| 307 | A5.14N | REVISION D UPDATED DWGS | NORTH TOWER RCP (48th LEVEL) UNIT 02 - RAVELLO | | | | 12/20/2017 | | | | | | | | |
| 308 | A5.14S | REVISION C UPDATED DWGS | SOUTH TOWER RCP (47th LEVEL) PENTHOUSE 05 - CASA DI SOGNI | | | | 12/20/2017 | | | | | | | | |
| 309 | A5.14aS | REVISION C UPDATED DWGS | SOUTH TOWER RCP (47th LEVEL) PENTHOUSE 07 - CASA DI RICCHEZZE | | | | 12/20/2017 | | | | | | | | |
| 310 | A5.15N | REVISION D UPDATED DWGS | NORTH TOWER RCP (48th LEVEL) UNIT 01 - AMALFI | | | | 12/20/2017 | | | | | | | | |
| 311 | A5.15S | REVISION C UPDATED DWGS | SOUTH TOWER RCP (48th LEVEL) PENTHOUSE 01- CASA DI OCEANA (LOWER LEVEL) | | | | 12/20/2017 | | | | | | | | |
| 312 | A5.16S | REVISION C UPDATED DWGS | SOUTH TOWER RCP (49th LEVEL) PENTHOUSE 01 - CASA DI OCEANA (UPPER LEVEL) | | | | 12/20/2017 | | | | | | | | |
| 313 | A5.17S | REVISION C UPDATED DWGS | SOUTH TOWER RCP (48th LEVEL) PENTHOUSE 02 - CASA DI MARE (LOWER LEVEL) | | | | 12/20/2017 | | | | | | | | |
| 314 | A5.18S | REVISION C UPDATED DWGS | SOUTH TOWER RCP (49th LEVEL) PENTHOUSE 02- CASA DI MARE (UPPER LEVEL) | | | | 12/20/2017 | | | | | | | | |
| 315 | A5.20S | REVISION B UPDATED DWGS | SOUTH TOWER RCP - UFFIZI (UNIT 01)/ VECCHIO (UNIT 02) - GUEST SUITE OPTION | | | | 12/20/2017 | | | | | | | | |
| 316 | A5.20aS | REVISION E UPDATED DWGS | SOUTH TOWER MODIFIED PLAN RCP UFFEZI UNIT 01/VECCHIO UNIT 02 | | | | | | | | | | | | |
| 317 | A5.21S | REVISION B UPDATED DWGS | SOUTH TOWER RCP- VECCHIO (UNIT 03)/ DONATELLO (UNIT 04) - GUEST SUITE OPTION | | | | 12/20/2017 | | | | | | | | |
| 318 | A5.21aS | REVISION E UPDATED DWGS | SOUTH TOWER MODIFIED PLAN RCP VECCHIO UNIT 03/DONATELLO UNIT 04 | | | | | | | | | | | | |
| 319 | A5.22S | REVISION I UPDATED DWGS | SOUTH TOWER RCP - UFFIZI (UNIT 01) BEDROOM OPTION / BEDROOM & GUEST SUITE OPTION | | | | 12/20/2017 | | | | | | | | |
| 320 | A5.23S | REVISION B UPDATED DWGS | SOUTH TOWER RCP - TOSCANA (UNIT 05) - BEDROOM/ BATH OPTION | | | | 12/20/2017 | | | | | | | | |
| 321 | A5.24S | REVISION B UPDATED DWGS | SOUTH TOWER RCP - POSITANO (UNIT 06) - FOYER CONNECTION OPTION | | | | 12/20/2017 | | | | | | | | |
| 322 | A5.25S | REVISION B UPDATED DWGS | SOUTH TOWER RCP - MILANO (UNIT 07) - BEDROOM/ BATH OPTION | | | | 12/20/2017 | | | | | | | | |

| | Sheet No. | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 219 | A4.34N | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 212 |
| 220 | A4.34S | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 213 |
| 221 | A4.35N | | 7/20/2018 | | | 12/18/2018 | | | | | | | | 10/18/2019 | | | | | | 214 |
| 222 | A4.35S | | 7/20/2018 | | | | | | | | | | | | | | | | | 215 |
| 223 | A4.36N | | 7/20/2018 | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 216 |
| 224 | A4.36S | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 217 |
| 225 | A4.37N | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 218 |
| 226 | A4.37S | | 7/20/2018 | | | | | | | | | | | | | | | | | 219 |
| 227 | A4.38N | | 7/20/2018 | | | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 220 |
| 228 | A4.38S | | 7/20/2018 | | | | | | | | | | | | | | | | | 221 |
| 229 | A4.39N | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 222 |
| 230 | A4.39S | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 223 |
| 231 | A4.40N | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 224 |
| 232 | A4.41N | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 225 |
| 233 | A4.42N | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 226 |
| 234 | A4.43N | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 227 |
| 235 | A4.44N | | 7/20/2018 | | | 12/18/2018 | | | | | | | | 10/18/2019 | | | | | | 228 |
| 236 | A4.45N | | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | 9/10/2019 | | | | | | | | 229 |
| 237 | A4.61 | | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 230 |
| 238 | A4.62 | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 231 |
| 239 | A4.63 | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 232 |
| 240 | A4.64 | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 233 |
| 241 | A4.65 | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 234 |
| 242 | A4.66 | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 235 |
| 243 | A4.67 | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 236 |
| 244 | A4.68 | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 237 |
| 245 | A4.69 | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 238 |
| 246 | A4.70 | | 7/20/2018 | | | | | | | | | | | | | | | | | 239 |
| 247 | A4.71 | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 240 |
| 248 | A4.72 | | 7/20/2018 | | | | | | | | | | | | | | | | | 241 |
| 249 | A4.73 | | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 242 |
| 250 | A4.74 | | 7/20/2018 | | | | | | | | | | | | | | | | | 243 |
| 251 | A4.75 | | 7/20/2018 | | | | | | | | | | | | | | | | | 244 |
| 252 | A4.76 | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 245 |
| 253 | A5.0N | | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 246 |
| 254 | A5.0S | | | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 247 |
| 255 | A5.0V | | | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 6/4/2020 | | 248 |
| 256 | A5.1N | | | | 10/31/2018 | | | | | | | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 249 |
| 257 | A5.1S | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 250 |
| 258 | A5.1V | | | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 6/4/2020 | | 251 |
| 259 | A5.2N | | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 252 |
| 260 | A5.2S | 4/20/2018 | | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 253 |
| 261 | A5.2V | | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | 11/29/2019 | 3/20/2020 | 4/17/2020 | 5/15/2020 | | 254 |
| 262 | A5.3N | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 255 |
| 263 | A5.3aN | | | | | | | 3/1/2019 | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 256 |
| 264 | A5.3bN | | | | | | | 3/1/2019 | | | | | | 10/18/2019 | 11/29/2019 | | | | 6/5/2020 | 257 |
| 265 | A5.3S | | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 258 |
| 266 | A5.3V | | | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/20/2020 | 4/17/2020 | 5/15/2020 | | 259 |
| 267 | A5.4aN | | | | | | | | | | 7/25/2019 | | | | | | | | | 260 |
| 268 | A5.4bN | | | | | | | | | | 7/25/2019 | | | | | | | | | 261 |
| 269 | A5.4cN | | | | | | | | | | | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | 6/5/2020 | 262 |
| 270 | A5.4N | | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | 5/15/2020 | 6/5/2020 | 263 |
| 271 | A5.4S | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 264 |
| 272 | A5.4V | | | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | 4/7/2020 | 5/15/2020 | | 265 |
| 273 | A5.5aN | | | | | | | | | | 7/25/2019 | | | | | | | | | 266 |
| 274 | A5.5bN | | | | | | | | | | 7/25/2019 | | | | | | | | | 267 |
| 275 | A5.5cN | | | | | | | | | | | | | | 11/29/2019 | 3/6/2020 | | | 6/5/2020 | 268 |
| 276 | A5.5N | | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | 5/15/2020 | 6/5/2020 | 269 |
| 277 | A5.5S | 4/20/2018 | | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 270 |
| 278 | A5.5V | | | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | 4/10/2020 | 5/15/2020 | | 271 |
| 279 | A5.6N | | | | | | | | | | 7/25/2019 | | | | | | | | | 272 |
| 280 | A5.6S | 4/20/2018 | | | 10/31/2018 | | 1/30/2019 | | | | 7/25/2019 | | | | | | | | | 273 |
| 281 | A5.6aS | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | 5/1/2019 | | 7/25/2019 | | | | | | | | | 274 |
| 282 | A5.7N | | | | | | | | | | 7/25/2019 | | | | | | | | | 275 |
| 283 | A5.7S | 4/20/2018 | | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 276 |
| 284 | A5.7aS | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | 1/30/2019 | | | | 7/25/2019 | | | | | | | | | 277 |
| 285 | A5.8N | | | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 278 |
| 286 | A5.8S | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 279 |
| 287 | A5.8aS | | | | 10/31/2018 | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 280 |
| 288 | A5.9N | | | | | | | | | | | | | | | 3/6/2020 | | | | 281 |
| 289 | A5.9S | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 282 |
| 290 | A5.9aS | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 283 |
| 291 | A5.10N | | | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 284 |
| 292 | A5.10S | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 285 |
| 293 | A5.10aS | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 286 |
| 294 | A5.10bS | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 287 |
| 295 | A5.11N | | | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 288 |
| 296 | A5.11S | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 289 |
| 297 | A5.11aS | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 290 |
| 298 | A5.11bS | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 291 |
| 299 | A5.11cS | | | | | | | | | | | | | | | | | 5/15/2020 | | 292 |
| 300 | A5.12N | | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | | 6/5/2020 | 293 |
| 301 | A5.12S | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 294 |
| 302 | A5.12aS | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 295 |
| 303 | A5.12bS | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 296 |
| 304 | A5.13N | | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | | 5/15/2020 | 6/5/2020 | 297 |
| 305 | A5.13S | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 298 |
| 306 | A5.13aS | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 299 |
| 307 | A5.14N | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 300 |
| 308 | A5.14S | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 301 |
| 309 | A5.14aS | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 302 |
| 310 | A5.15N | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 303 |
| 311 | A5.15S | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 304 |
| 312 | A5.16S | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 305 |
| 313 | A5.17S | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 306 |
| 314 | A5.18S | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 307 |
| 315 | A5.20S | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 308 |
| 316 | A5.20aS | | | | | | 1/30/2019 | | | | | | | | | | | | | 309 |
| 317 | A5.21S | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 310 |
| 318 | A5.21aS | | | | | | 1/30/2019 | | | | | | | | | | | | | 311 |
| 319 | A5.22S | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 312 |
| 320 | A5.23S | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 313 |
| 321 | A5.24S | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 314 |
| 322 | A5.25S | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 315 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 323 | A5.35 | REVISION C UPDATED DWGS | GARAGE REFLECTED CEILING PLAN- BASEMENT LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 316 |
| 324 | A5.36 | REVISION I UPDATED DWGS | GARAGE REFLECTED CEILING PLAN- LEVEL1 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 317 |
| 325 | A5.37 | REVISION I UPDATED DWGS | GARAGE REFLECTED CEILING PLAN - LEVEL1 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 318 |
| 326 | A6.0 | REVISION O UPDATED DWGS | DOOR SCHEDULE | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | | | 5/15/2020 | | 319 |
| 327 | A6.1 | REVISION O UPDATED DWGS | DOOR SCHEDULE | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | 4/17/2020 | 5/15/2020 | | 320 |
| 328 | A6.2 | REVISION O UPDATED DWGS | DOOR SCHEDULE | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 321 |
| 329 | A6.3 | REVISION F UPDATED DWGS | DOOR SCHEDULE | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 322 |
| 330 | A6.4 | REVISION C UPDATED DWGS | DOOR SCHEDULE | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 323 |
| 331 | A6.5 | REVISION O UPDATED DWGS | DOOR SCHEDULE | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 324 |
| 332 | A6.5a | REVISION O UPDATED DWGS | DOOR SCHEDULE NORTH TOWER | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | 9/10/2019 | | | | 3/6/2020 | | 5/15/2020 | | 325 |
| 333 | A6.6 | REVISION 1 UPDATED DWGS | DOOR SCHEDULE AND DETAILS | | | | 12/20/2017 | 6/22/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 326 |
| 334 | A6.7 | REVISION B UPDATED DWGS | DOOR DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 327 |
| 335 | A6.8 | REVISION O UPDATED DWGS | ROOM FINISH SCHEDULE | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | | 5/15/2020 | | 328 |
| 336 | A6.9 | REVISION O UPDATED DWGS | ROOM FINISH SCHEDULE | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | 3/6/2020 | 4/17/2020 | 5/15/2020 | | 329 |
| 337 | A6.10 | REVISION O UPDATED DWGS | ROOM FINISH SCHEDULE | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 330 |
| 338 | A6.11 | REVISION B UPDATED DWGS | ROOM FINISH SCHEDULE | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 331 |
| 339 | A6.12 | REVISION B UPDATED DWGS | ROOM FINISH SCHEDULE | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 332 |
| 340 | A6.13 | REVISION L UPDATED DWGS | ROOM FINISH SCHEDULE | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | 11/29/2019 | | | | | 333 |
| 341 | A6.14 | REVISION L UPDATED DWGS | ROOM FINISH SCHEDULE | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | | | | | 334 |
| 342 | A6.15 | REVISION M UPDATED DWGS | ROOM FINISH SCHEDULE NORTH TOWER | | | | | | | | | | | | | 4/20/2019 | 7/20/2018 | | | | | | | | 7/25/2019 | 9/10/2019 | | | | 3/6/2020 | | | | 335 |
| 343 | A6.20 | REVISION O UPDATED DWGS | VILLA/ CABANAS/ GARAGE- SLIDING DOORS, WINDOWS AND DOORS | | | | 12/20/2017 | | | | | | | | | 6/22/2018 | | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 336 |
| 344 | A6.21S | REVISION F UPDATED DWGS | SOUTH TOWER- LOBBY LEVEL- WINDOWS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 337 |
| 345 | A6.22S | REVISION M UPDATED DWGS | SOUT TOWER LOBBY LEVEL SINGLE FAMILY UNITS SSF4-00/SSF2-00 SLIDING DOORS WINDOWS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | 1/30/2019 | | | | | | | | | 3/6/2020 | | | | 338 |
| 346 | A6.23S | REVISION C UPDATED DWGS | SOUTH TOWER- 3RD LEVEL (SSF4-00/ SSF2-00)& (SM-00)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 339 |
| 347 | A6.24S | REVISION I UPDATED DWGS | SOUTH TOWER- 4TH LEVEL (STY4-00)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 340 |
| 348 | A6.25S | REVISION I UPDATED DWGS | SOUTH TOWER- 5TH LEVEL (STY5-00)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 341 |
| 349 | A6.26S | REVISION C UPDATED DWGS | SOUTH TOWER- 6TH-11TH& 17TH-32ND LEVELS (STY-400)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 342 |
| 350 | A6.26aS | REVISION C UPDATED DWGS | SOUTH TOWER 12TH&33RD LEVELS(STY-400)-SLIDING DOORS,STOREFRONTS, AND DOORS | | | | 12/20/2018 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 343 |
| 351 | A6.27S | REVISION F UPDATED DWGS | SOUTH TOWER- 6TH-11TH, & 17TH-33RD LEVELS (STY-400)- OPTION UNITS- SLIDING DOORS, STOREFRONTS& DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | 1/30/2019 | 3/1/2019 | | | | | | | | | | | | 344 |
| 352 | A6.28S | REVISION C UPDATED DWGS | SOUTH TOWER- 14TH-16TH& 34TH-46TH LEVELS (STY-300)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 345 |
| 353 | A6.28aS | REVISION C UPDATED DWGS | SOUTH TOWER 16TH&45TH LEVELS (STY-300) SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 346 |
| 354 | A6.29S | REVISION C UPDATED DWGS | SOUTH TOWER- 14TH-15TH& 34TH-44TH LEVELS (STY-300)- OPTIONS - SLIDING DOORS, STOREFRONTS& DOORS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 347 |
| 355 | A6.29aS | REVISION C UPDATED DWGS | SOUTH TOWER LEVEL 16TH AND 45TH Option units sliding doors storefronts and doors- 16TH LEVEL STORFRONT DOORS SLIDING DOORS STOREFRONTS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 348 |
| 356 | A6.30S | REVISION M UPDATED DWGS | SOUTH TOWER- 47TH LEVEL (STS-00)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 349 |
| 357 | A6.31S | REVISION C UPDATED DWGS | SOUTH TOWER- 47TH LEVEL (STS-00)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 350 |
| 358 | A6.31aS | REVISION C UPDATED DWGS | SOUTH TOWER- 47TH LEVEL (STS-00)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 351 |
| 359 | A6.31bS | REVISION C UPDATED DWGS | SOUTH TOWER- 47TH LEVEL (STS-00)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 352 |
| 360 | A6.32S | REVISION K UPDATED DWGS | SOUTH TOWER- 48TH LEVEL (PH-01/ PH-02)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | | 353 |
| 361 | A6.33S | REVISION L UPDATED DWGS | SOUTH TOWER- 49TH LEVEL (PH-01/ PH-02)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | 11/29/2019 | | | | | 354 |
| 362 | A6.34S | REVISION J UPDATED DWGS | SOUTH TOWER- 50TH LEVEL (MECH) (SRF-00)- LOUVERS AND WINDOWS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | | | 355 |
| 363 | A6.35N | REVISION I UPDATED DWGS | NORTH TOWER- LOBBY LEVEL- WINDOWS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 356 |
| 364 | A6.36N | REVISION L UPDATED DWGS | NORTH TOWER- SINGLE FAMILY UNITS (NSF-00)- WINDOWS, STOREFRONTS AND SLIDING DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | | | | 11/29/2019 | | | | | 357 |
| 365 | A6.37N | REVISION I UPDATED DWGS | NORTH TOWER- 3RD LEVEL (NSF-00)& (NM-00)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 358 |
| 366 | A6.38N | REVISION J UPDATED DWGS | NORTH TOWER- 4TH THRU 48TH LEVELS (NTY-00)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | | | | | | 359 |
| 367 | A6.39N | REVISION I UPDATED DWGS | NORTH TOWER- 49TH LEVEL (NTY-00)- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 360 |
| 368 | A6.40N | REVISION I UPDATED DWGS | NORTH TOWER- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 361 |
| 369 | A6.41N | REVISION I UPDATED DWGS | NORTH TOWER- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 362 |
| 370 | A6.42N | REVISION J UPDATED DWGS | NORTH TOWER- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | | | | | | 363 |
| 371 | A6.43N | REVISION J UPDATED DWGS | NORTH TOWER- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | | | | | | 364 |
| 372 | A6.44aN | REVISION F UPDATED DWGS | NORTH TOWER- METAL LOUVERS, STOREFRONTS | | | | | | | | | | | | | | | | | | | 3/1/2019 | | | | | | | | | | | | 365 |
| 373 | A6.44N | REVISION I UPDATED DWGS | NORTH TOWER- SLIDING DOORS, STOREFRONTS AND DOORS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 366 |
| 374 | A6.45 | REVISION J UPDATED DWGS | DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 367 |
| 375 | A6.45N | REVISION B UPDATED DWGS | DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 368 |
| 376 | A6.46 | REVISION J UPDATED DWGS | DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | 9/10/2019 | | | | | | | | 369 |
| 377 | A7.0N | REVISION D UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 370 |
| 378 | A7.0S | REVISION F UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 371 |
| 379 | A7.0V | REVISION O UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 372 |
| 380 | A7.1N | REVISION D UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 373 |
| 381 | A7.1S | REVISION A UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 374 |
| 382 | A7.1V | REVISION O UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 375 |
| 383 | A7.2N | REVISION D UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 376 |
| 384 | A7.2S | REVISION O UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 377 |
| 385 | A7.2V | REVISION O UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 378 |
| 386 | A7.3N | REVISION D UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 379 |
| 387 | A7.3S | REVISION F UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 380 |
| 388 | A7.3V | REVISION O UPDATED DWGS | SERVICE ELEVATOR FLOOR PLANS AND SHAFT SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | 5/15/2020 | | 381 |
| 389 | A7.4S | PERMIT SET | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 382 |
| 390 | A7.5S | REVISION F UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 383 |
| 391 | A7.6S | REVISION A UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 384 |
| 392 | A7.7S | REVISION O UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 385 |
| 393 | A7.8S | REVISION F UPDATED DWGS | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 386 |
| 394 | A7.9S | PERMIT SET | GENERAL STAIRS NOTES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 387 |
| 395 | A7.10N | REVISION F UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 388 |
| 396 | A7.10S | REVISION F UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 389 |
| 397 | A7.10V | REVISION O UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 390 |
| 398 | A7.11N | REVISION D UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 391 |
| 399 | A7.11S | REVISION J UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | | | 392 |
| 400 | A7.11V | REVISION O UPDATED DWGS | STAIR SECTIONS (VILLAGE BUILDING) | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 393 |
| 401 | A7.12N | REVISION J UPDATED DWGS | STAIR No1 TOWER SECTION (NORTH TOWER) | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 394 |
| 402 | A7.12S | REVISION F UPDATED DWGS | STAIR No2 TOWER SECTIONS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 395 |
| 403 | A7.12V | REVISION O UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 396 |
| 404 | A7.13N | REVISION F UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 397 |
| 405 | A7.13S | REVISION C UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 398 |
| 406 | A7.14N | REVISION D UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 399 |
| 407 | A7.14S | REVISION F UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 400 |
| 408 | A7.15N | REVISION J UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 401 |
| 409 | A7.15S | REVISION O UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 402 |
| 410 | A7.16S | REVISION F UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 403 |
| 411 | A7.17S | REVISION C UPDATED DWGS | STAIR SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 404 |
| 412 | A7.18S | REVISION J UPDATED DWGS | BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | | | 405 |
| 413 | A7.19S | REVISION C UPDATED DWGS | BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 406 |
| 414 | A7.20N | REVISION C UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 407 |
| 415 | A7.20S | REVISION C UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 408 |
| 416 | A7.21N | REVISION C UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 409 |
| 417 | A7.21S | REVISION C UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 410 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 418 | A7.22N | REVISION D UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 411 |
| 419 | A7.22S | REVISION C UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 412 |
| 420 | A7.23N | REVISION D UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 413 |
| 421 | A7.23S | REVISION C UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 414 |
| 422 | A7.24S | REVISION C UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 415 |
| 423 | A7.25S | REVISION C UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 416 |
| 424 | A7.26S | REVISION C UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 417 |
| 425 | A7.27S | REVISION C UPDATED DWGS | ELEVATOR OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 418 |
| 426 | A7.28N | REVISION D UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 419 |
| 427 | A7.28S | REVISION F UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 420 |
| 428 | A7.29N | REVISION D UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 421 |
| 429 | A7.29S | REVISION C UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 422 |
| 430 | A7.30N | REVISION D UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 423 |
| 431 | A7.30S | REVISION F UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 424 |
| 432 | A7.31N | REVISION D UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 425 |
| 433 | A7.31S | REVISION C UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 426 |
| 434 | A7.32N | REVISION D UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 427 |
| 435 | A7.32S | REVISION F UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 428 |
| 436 | A7.33N | REVISION D UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 429 |
| 437 | A7.33S | REVISION C UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 430 |
| 438 | A7.34S | REVISION C UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 431 |
| 439 | A7.35S | REVISION F UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 432 |
| 440 | A7.36S | REVISION C UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 433 |
| 441 | A7.37S | REVISION C UPDATED DWGS | ELEVATOR OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 434 |
| 442 | A7.38S | REVISION C UPDATED DWGS | BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 435 |
| 443 | A7.39S | REVISION C UPDATED DWGS | BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 436 |
| 444 | A7.40N | REVISION D UPDATED DWGS | CHUTE OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 437 |
| 445 | A7.40S | REVISION C UPDATED DWGS | CHUTE OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 438 |
| 446 | A7.41N | REVISION D UPDATED DWGS | CHUTE OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 439 |
| 447 | A7.41S | REVISION C UPDATED DWGS | CHUTE OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 440 |
| 448 | A7.42N | REVISION J UPDATED DWGS | CHUTE OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 441 |
| 449 | A7.42S | REVISION C UPDATED DWGS | TRASH CHUTE No1 SECTIONS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 442 |
| 450 | A7.43S | REVISION C UPDATED DWGS | CHUTE OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 443 |
| 451 | A7.44S | REVISION C UPDATED DWGS | CHUTE OVERALL SECTIONS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 444 |
| 452 | A7.45S | REVISION C UPDATED DWGS | TRASH CHUTE No2 OVERALL SECTIONS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 445 |
| 453 | A7.46 | REVISION C UPDATED DWGS | ELEVATOR ENTRYWAY DETAILS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 446 |
| 454 | A7.47S | REVISION C UPDATED DWGS | TRASH CHUTE SECTIONS AND OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 447 |
| 455 | A7.48S | REVISION C UPDATED DWGS | TRASH CHUTE SECTIONS AND OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 448 |
| 456 | A7.49N | REVISION J UPDATED DWGS | TRASH CHUTE SECTIONS AND OVERHEAD PLANS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | | | 449 |
| 457 | A7.50S | REVISION D UPDATED DWGS | SOUTH TOWER PRIVATE ELEVATOR FLOOR PLANS & SHAFT SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | 12/18/2018 | | | | | | | | | | | | | | 450 |
| 458 | A7.51S | REVISION D UPDATED DWGS | SOUTH TOWER PRIVATE ELEVATOR FLOOR PLANS & SHAFT SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 451 |
| 459 | A7.60 | REVISION K UPDATED DWGS | STAIR TOWER No1 FLOOR PLANS, RCP & ROOF PLANS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | 10/18/2019 | | | | | | 452 |
| 460 | A7.61 | PERMIT SET | STAIR TOWER No1 BUILDING ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 453 |
| 461 | A7.62 | REVISION K UPDATED DWGS | STAIR TOWER No1 ELEVATIONS | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | 10/18/2019 | | | | | | 454 |
| 462 | A7.63 | REVISION K UPDATED DWGS | STAIR TOWER No1 BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | 10/18/2019 | | | | | | 455 |
| 463 | A7.64 | REVISION K UPDATED DWGS | STAIR TOWER No1 BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | 10/18/2019 | | | | | | 456 |
| 464 | A7.65 | REVISION K UPDATED DWGS | STAIR TOWER No1 BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | | | | 10/18/2019 | | | | | | 457 |
| 465 | A7.66 | REVISION K UPDATED DWGS | STAIR TOWER No1 BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | 10/18/2019 | | | | | | 458 |
| 466 | A7.67 | REVISION K UPDATED DWGS | TOWER STAIR OVERHEAD RCP & ROOF PLANS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | 10/18/2019 | | | | | | 459 |
| 467 | A7.68 | REVISION D UPDATED DWGS | STAIR TOWER No2 FLOOR PLAN, RCP & ROOF PLAN | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 460 |
| 468 | A7.69 | PERMIT SET | STAIR TOWER No2 BUILDING ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 461 |
| 469 | A7.70 | REVISION K UPDATED DWGS | STAIR TOWER No2 BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | | | | 10/18/2019 | | | | | | 462 |
| 470 | A7.71 | REVISION K UPDATED DWGS | STAIR TOWER No2 BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | 10/18/2019 | | | | | | 463 |
| 471 | A7.72 | REVISION K UPDATED DWGS | STAIR TOWER No2 BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | 10/18/2019 | | | | | | 464 |
| 472 | A7.73 | REVISION K UPDATED DWGS | TRELLIS OVERHEAD ROOF & ELEVATIONS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | 10/18/2019 | | | | | | 465 |
| 473 | A7.74 | REVISION K UPDATED DWGS | TRELLIS ARRIVAL COURT - SOUTH TOWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | 10/18/2019 | | | | | | 466 |
| 474 | A7.75 | REVISION K UPDATED DWGS | TRELLIS COLUMN DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | 10/18/2019 | | | | | | 467 |
| 475 | A7.76 | REVISION O UPDATED DWGS | PORTE COCHERE FLOOR PLAN, RCP & ROOF PLANDECK - (ARRIVAL DECK NORTH TOWER) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | 10/18/2019 | | | | 5/15/2020 | | 468 |
| 476 | A7.77 | REVISION O UPDATED DWGS | PORTE COCHERE RCP & BUILDING SECTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | 9/10/2019 | | 10/18/2019 | | | | 5/15/2020 | | 469 |
| 477 | A7.78 | REVISION J UPDATED DWGS | PORTE COCHERE ELEVATIONS & DETAILS (ARRIVAL DECK, NORTH TOWER) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 470 |
| 478 | A7.79 | REVISION O UPDATED DWGS | PORTE COCHERE FLOOR PLAN, RCP & ROOF PLANDECK - (ARRIVAL DECK SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | 10/18/2019 | | | | 5/15/2020 | | 471 |
| 479 | A7.80 | REVISION O UPDATED DWGS | PORTE COCHERE RCP & BUILDING SECTION - (ARRIVAL DECK SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | 9/10/2019 | | 10/18/2019 | | | | 5/15/2020 | | 472 |
| 480 | A7.81 | REVISION J UPDATED DWGS | PORTE COCHERE ELEVATIONS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 473 |
| 481 | A7.82 | REVISION B UPDATED DWGS | GUARD HOUSE FLOOR RCP ROOF ELEVATIONS & SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 474 |
| 482 | A7.83 | REVISION K UPDATED DWGS | GARAGE STAIR PLANS | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | | | | | | | 9/10/2019 | | 10/18/2019 | | | | | | 475 |
| 483 | A7.84 | REVISION 1 UPDATED DWGS | GARAGE STAIR PLANS | | | | 12/20/2017 | 6/22/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 476 |
| 484 | A7.85 | REVISION I UPDATED DWGS | MAIN DECK STAIR PLANS | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 477 |
| 485 | A7.86 | PERMIT SET | MAIN DECK STAIR PLANS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 478 |
| 486 | A7.87 | REVISION L UPDATED DWGS | GUARDEN TERRACE & MAIN POOL DECK RESTROOMS PLANS, RCP, ROOF, ELEVATIONS & SECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | 1/30/2019 | | | | | | | 10/18/2019 | 11/29/2019 | | | | | 479 |
| 487 | A7.88 | PERMIT SET | PEDESTRIAN BRIDGE FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 480 |
| 488 | A7.89 | REVISION B UPDATED DWGS | PEDESTRIAN BRIDGE SECTION ELEVATION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 481 |
| 489 | A7.90 | PERMIT SET | PEDESTRIAN BRIDGE SECTION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 482 |
| 490 | A7.91 | PERMIT SET | PEDESTRIAN BRIDGE RAMP SECTION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 483 |
| 491 | A7.92 | REVISION I UPDATED DWGS | STAIR SECTIONS AT GARAGE LEVEL AND DECK LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 484 |
| 492 | A7.93 | REVISION D UPDATED DWGS | STAIR SECTIONS AT DECK LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 485 |
| 493 | A7.94 | REVISION A UPDATED DWGS | MAIN DECK NORTH SOUTH STAIRS ELEATIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 486 |
| 494 | A7.95 | REVISION B UPDATED DWGS | DECK STAIR No5 AT WATER SLIDE POOL (NORTH TOWER) | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 487 |
| 495 | A7.96 | REVISION J UPDATED DWGS | GARAGE STAIR SECTIONS (NORTH TOWER) | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 488 |
| 496 | A7.97 | REVISION O UPDATED DWGS | PRIVATE GARAGE STAIR SECTIONS) | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 489 |
| 497 | A8.0 | PERMIT SET | ACCESSIBILITY LEGEND AND NOTES | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 490 |
| 498 | A8.1 | PERMIT SET | ACCESSIBILITY LEGEND AND NOTES | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 491 |
| 499 | A8.2 | REVISION B UPDATED DWGS | SITE ACCESSIBILITY DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 492 |
| 500 | A8.3 | REVISION J UPDATED DWGS | PARTITION DETAILS AROUND WET AREAS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | 9/10/2019 | | | | | | | | 493 |
| 501 | A8.4 | REVISION J UPDATED DWGS | ROOF DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 494 |
| 502 | A8.5 | REVISION O UPDATED DWGS | STUCCO DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | 5/15/2020 | | 495 |
| 503 | A8.6 | PERMIT SET | DRYWALL SOFFIT DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 496 |
| 504 | A8.7 | REVISION C UPDATED DWGS | PARTITION DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 497 |
| 505 | A8.8 | REVISION J UPDATED DWGS | RAILING SECTIONS & DETAILS | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 498 |
| 506 | A8.9 | REVISION A UPDATED DWGS | STAIR, DOOR SILL & TERRACE STUCCO DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 499 |
| 507 | A8.10 | REVISION J UPDATED DWGS | PARTITION DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | 9/10/2019 | | | | | | | | 500 |
| 508 | A8.11 | REVISION B UPDATED DWGS | CONCRETE WALL DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 501 |
| 509 | A8.11a | REVISION O UPDATED DWGS | WALL TYPES | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 502 |
| 510 | A8.12 | REVISION A UPDATED DWGS | WATERPROOFING DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 503 |
| 511 | A8.13 | PERMIT SET | EXPANSION JOINT DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 504 |
| 512 | A8.14 | REVISION O UPDATED DWGS | DRAIN & PLANTER WALL DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 505 |
| 513 | A9.0S | REVISION B UPDATED DWGS | SOUTH TOWER LEVEL 4 and 5 SUITES INTERIOR ELEVATIOh6 | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 506 |
| 514 | A9.1S | REVISION B UPDATED DWGS | SOUTH TOWER FAIR HOUSING PLAN \ | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 507 |
| 515 | A9.2S | REVISION B UPDATED DWGS | SOUTH TOWER FAIR HOUSING PLAN \ | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 508 |
| 516 | A9.3S | REVISION B UPDATED DWGS | SOUTH TOWER FAIR HOUSING PLAN \ | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 509 |
| 517 | A9.4S | REVISION B UPDATED DWGS | SOUTH TOWER FAIR HOUSING PLAN \ | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 510 |
| 518 | A9.5S | REVISION B UPDATED DWGS | SOUTH TOWER FAIR HOUSING PLAN \ | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 511 |
| 519 | A9.6S | REVISION B UPDATED DWGS | SOUTH TOWER FAIR HOUSING PLAN \ | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 512 |
| 520 | A9.7 | REVISION B UPDATED DWGS | PARTIAL CABANA FAIR HOUSING PLAN \ | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 513 |
| 521 | A9.8 | REVISION B UPDATED DWGS | PARTIAL CABANA FAIR HOUSING PLAN \ | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 514 |
| 522 | A9.9 | REVISION O UPDATED DWGS | LOBBY LEVEL FAIR HOUSING PLAN \ | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | 5/15/2020 | | 515 |
| 523 | A10.0 | PERMIT SET | AMERICAN WITH DISABILITIES ACT STANDARDS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 516 |
| 524 | A10.1 | PERMIT SET | AMERICAN WITH DISABILITIES ACT STANDARDS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 517 |
| 525 | A10.2 | PERMIT SET | AMERICAN WITH DISABILITIES ACT STANDARDS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 518 |
| 526 | A10.3 | PERMIT SET | AMERICAN WITH DISABILITIES ACT STANDARDS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 519 |
| 527 | A10.4 | PERMIT SET | AMERICAN WITH DISABILITIES ACT STANDARDS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 520 |
| 528 | A10.5 | PERMIT SET | AMERICAN WITH DISABILITIES ACT STANDARDS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 521 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 529 | A10.6 | PERMIT SET | ACCESSIBILITY REQUIREMENTS OF THE FAIR HOUSING ACT | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 522 |
| 530 | A10.7 | PERMIT SET | ACCESSIBILITY REQUIREMENTS OF THE FAIR HOUSING ACT | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 523 |
| 531 | A10.8 | PERMIT SET | ACCESSIBILITY REQUIREMENTS OF THE FAIR HOUSING ACT | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 524 |
| 532 | A11.0 | REVISION O UPDATED DWGS | PRE-CAST MOULDING DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | 10/18/2019 | | | | 5/15/2020 | | 525 |
| 533 | A11.1V | REVISION O UPDATED DWGS | PRE-CAST MOULDING DETAILS (VILLA BUILDING) | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | 5/15/2020 | | 526 |
| 534 | A11.2 | REVISION O UPDATED DWGS | PRE-CAST MOULDING DETAILS (TOWERS & VILLA) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 527 |
| 535 | A11.2V | REVISION O UPDATED DWGS | PRE-CAST MOULDING DETAILS(VILLA BUILDING) | | | | | | | | | | | | | | | | | 12/18/2018 | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 528 |
| 536 | A11.3 | PERMIT SET | PRE-CAST MOULDING DETAILS (NORTH & SOUTH TOWERRS) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 529 |
| 537 | A11.4 | PERMIT SET | CABANAS - PRE-CAST MOULDING DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 530 |
| 538 | A11.5 | PERMIT SET | MOULDING DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 531 |
| 539 | A12.0 | REVISION A UPDATED DWGS | OVERALL - GARAGE FLOOR PLAN - BASEMENT LEVEL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 532 |
| 540 | A12.1 | REVISION A UPDATED DWGS | GARAGE FLOOR PLAN - LEVEL 1 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 533 |
| 541 | A12.2 | REVISION A UPDATED DWGS | OVERALL - ARRIVAL DECK LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 534 |
| 542 | A12.3 | REVISION A UPDATED DWGS | OVERALL - BUILDING SECTIONS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 535 |
| 543 | A12.4 | REVISION A UPDATED DWGS | OVERALL - BUILDING SECTIONS (NORTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 536 |
| 544 | A12.5 | REVISION A UPDATED DWGS | OVERALL - BUILDING SECTIONS (NORTH & SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 537 |
| 545 | A12.6 | REVISION O UPDATED DWGS | OVERALL - VILLA BUILDING SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | 5/15/2020 | | 538 |
| 546 | A12.7 | REVISION A UPDATED DWGS | OVERALL - BUILDING SECTIONS (SOUTH TOWER LOWER LEVELS) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 539 |
| 547 | A12.8 | REVISION A UPDATED DWGS | OVERALL - BUILDING SECTIONS (NORTH TOWER LOWER LEVELS) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 540 |
| 548 | A12.9 | REVISION A UPDATED DWGS | OVERALL - BUILDING SECTIONS (NORTH & SOUTH TOWERS LOWER LEVELS) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 541 |
| 549 | A12.15 | REVISION M UPDATED DWGS | WATER FEATURE NO.7 FLOOR PLANS/SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 542 |
| 550 | A12.16 | REVISION O UPDATED DWGS | WATER FEATURE NO. 1 FLOOR PLANS/SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 543 |
| 551 | A12.17 | REVISION M UPDATED DWGS | WATER FEATURE NO. 5A AND 5B FLOOR PLANS/SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 544 |
| 552 | A12.18 | REVISION M UPDATED DWGS | WATER FEATURE NO.8 AND 9 FLOOR PLANS/SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 545 |
| 553 | A12.19 | REVISION M UPDATED DWGS | WATER FEATURE NO.6 FLOOR PLANS/SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 546 |
| 554 | A12.20 | REVISION M UPDATED DWGS | WATER FEATURE NO 2A AND 2B FLOOR PLANS/SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 547 |
| 555 | A12.21 | REVISION O UPDATED DWGS | WATER FEATURE NO 4 FLOOR PLANS/SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 548 |
| 556 | **CIVIL, PAVING & DRAINAGE, SEWER, WATER** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **38** |
| 557 | C1 | REVISION M UPDATED DWGS | ON- SITE PAVING AND DRAINAGE PLANS-COVER SHEET | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 1 |
| 558 | C2 | REVISION M UPDATED DWGS | ON- SITE UTILITY DEMOLITION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 2 |
| 559 | C3 | REVISION M UPDATED DWGS | ENTRY DRIVEWAY, EXIT DRIVEWAY, SIGNAGE& MARKING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 3 |
| 560 | C4 | REVISION O UPDATED DWGS | ON-SITE OVERALL UTILITY PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 4 |
| 561 | C5 | REVISION O UPDATED DWGS | ON- SITE GRADING& DRAINAGE PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 5 |
| 562 | C6 | REVISION M UPDATED DWGS | ON-SITE PAVING& DRAINAGE DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 6 |
| 563 | C7 | REVISION M UPDATED DWGS | PAVING& DRAINAGE DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | | | 7 |
| 564 | C8 | REVISION M UPDATED DWGS | PAVING& DRAINAGE DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 8 |
| 565 | C9 | REVISION M UPDATED DWGS | PAVING& DRAINAGE DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 9 |
| 566 | C10 | REVISION M UPDATED DWGS | PAVING& DRAINAGE DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 10 |
| 567 | C11 | REVISION M UPDATED DWGS | PAVING& DRAINAGE DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | | | 11 |
| 568 | C12 | REVISION M UPDATED DWGS | NORTH & SOUTH UPPER LEVEL FIRELANE EXHIBIT | | | | | | | | | | | | | | | | | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 12 |
| 569 | C13 | REVISION M UPDATED DWGS | NORTH & SOUTH LOWER LEVEL FIRELANE EXHIBIT | | | | | | | | | | | | | | | | | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 13 |
| 570 | C14 | REVISION M UPDATED DWGS | WB-62 PATHS NORTH ENTRY w/SOUTH EXIT PATHS & LOADING AREAS | | | | | | | | | | | | | | | | | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 14 |
| 571 | C15 | REVISION M UPDATED DWGS | WB-62 PATHS NORTH ENTRY w/SOUTH EXIT PATHS & NORTH LOADING AREAS | | | | | | | | | | | | | | | | | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 15 |
| 572 | C16 | REVISION M UPDATED DWGS | WB-62 PATHS NORTH ENTRY w/SOUTH EXIT PATHS & SOUTH LOADING AREAS | | | | | | | | | | | | | | | | | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 16 |
| 573 | CS1 | REVISION M UPDATED DWGS | COVER SHEET - SEWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 17 |
| 574 | CS2 | REVISION O UPDATED DWGS | SEWER LATERAL PLAN& PROFILES | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 18 |
| 575 | CS3 | REVISION O UPDATED DWGS | SEWER DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 19 |
| 576 | CS4 | REVISION O UPDATED DWGS | SEWER DETAILS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 20 |
| 577 | CS5 | REVISION M UPDATED DWGS | PRIVATE LIFT STATION DETAILS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 21 |
| 578 | CS6 | REVISION M UPDATED DWGS | PRIVATE LIFT STATION DETAILS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 22 |
| 579 | CS7 | REVISION M UPDATED DWGS | PRIVATE LIFT STATION DETAILS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 23 |
| 580 | CW1 | REVISION M UPDATED DWGS | WATER DISTRIBUTION COVER SHEET& NOTES | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 24 |
| 581 | CW2 | REVISION O UPDATED DWGS | WATER DISTRIBUTION SYSTEM PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 25 |
| 582 | CW3 | REVISION O UPDATED DWGS | ENLARGED DETAIL WATER PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 26 |
| 583 | CW4 | REVISION O UPDATED DWGS | WATER PROFILES AND DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 27 |
| 584 | CW5 | REVISION M UPDATED DWGS | WATER DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 28 |
| 585 | OSC-1 (F.D.O.T.) | REVISION M UPDATED DWGS | F.D.O.T. DRIVEWAY LOCATION SKETCH WITHIN 300 FEET | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 29 |
| 586 | OSC-2 (F.D.O.T.) | REVISION M UPDATED DWGS | F.D.O.T. ENTRY& EXIT DRIVEWAY PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 30 |
| 587 | OSC-3 (F.D.O.T.) | REVISION M UPDATED DWGS | F.D.O.T. ENTRY& EXITDRIVEWAY SIGNAGE & MARKING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 31 |
| 588 | OSC-4 (F.D.O.T.) | REVISION M UPDATED DWGS | F.D.O.T. NORTH &SOUTH UPPERLEVEL FIRELANE EXHIBIT | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 32 |
| 589 | OSC-5 (F.D.O.T.) | REVISION M UPDATED DWGS | F.D.O.T. LOWER LEVEL FIRELANE EXHIBIT | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 33 |
| 590 | OSC-6 (F.D.O.T.) | REVISION M UPDATED DWGS | F.D.O.T. LOADING AREA & WB-62 PATHS NORTH ENTRY SOUTH EXIT | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 34 |
| 591 | OSC-7 (F.D.O.T.) | REVISION M UPDATED DWGS | F.D.O.T. LOADING AREAS WB-62 PATHS NORTH ENTRY & SOUTH LOADING EXIT | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 35 |
| 592 | OSC-8 (F.D.O.T.) | REVISION M UPDATED DWGS | F.D.O.T. LOADING AREAS WB-62 PATHS NORTH ENTRY & SOUTH LOADING EXIT | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 36 |
| 593 | OSC-9 (F.D.O.T.) | REVISION M UPDATED DWGS | F.D.O.T. SITE TRIANGLE EXHIBIT | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 37 |
| 594 | OSC-10 (F.D.O.T.) | REVISION M UPDATED DWGS | F.D.O.T. DETAILS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | | | 38 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 595 | ELECTRICAL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 175 |
| 596 | E0.01 | REVISION P UPDATED DWGS | ELECTRICAL INDEX & SYMBOL LEGEND | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | 1/30/2019 | 3/1/2019 | | | 7/25/2019 | | | 11/18/2019 | 1/24/2020 | 3/20/2020 | 4/24/2020 | 5/15/2020 | 6/5/2020 | 1 |
| 597 | E1.00 | REVISION N UPDATED DWGS | GENERAL NOTES& LIGHTING FIXTURE SCHEDULE | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2019 | | | | | | | | | | 3/6/2020 | 4/24/2020 | | | 2 |
| 598 | E1.01 | REVISION A UPDATED DWGS | GARAGE LEVEL1- OVERALL ELECTRICAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 3 |
| 599 | E1.02 | PERMIT SET | LOBBY LEVEL/ ARRIVAL DECK- OVERALL ELECTRICAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4 |
| 600 | E2.00L | REVISION B UPDATED DWGS | BASEMENT LEVEL- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 5 |
| 601 | E2.00P | REVISION D UPDATED DWGS | BASEMENT LEVEL- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 6 |
| 602 | E2.01L | REVISION B UPDATED DWGS | BASEMENT LEVEL- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 7 |
| 603 | E2.01P | REVISION K UPDATED DWGS | BASEMENT LEVEL- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | 11/18/2019 | | | | | | 8 |
| 604 | E2.02L | REVISION C UPDATED DWGS | BASEMENT LEVEL- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 9 |
| 605 | E2.02P | REVISION D UPDATED DWGS | BASEMENT LEVEL- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 10 |
| 606 | E2.03L | REVISION C UPDATED DWGS | GARAGE LEVEL1- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 11 |
| 607 | E2.03P | REVISION P UPDATED DWGS | GARAGE LEVEL1- PARTIAL FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | 11/18/2019 | | 3/20/2020 | 4/24/2020 | | 6/5/2020 | 12 |
| 608 | E2.04L | REVISION N UPDATED DWGS | GARAGE LEVEL1- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | 4/24/2020 | | | 13 |
| 609 | E2.04P | REVISION M UPDATED DWGS | GARAGE LEVEL1- PARTIAL FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | 11/18/2019 | | 3/20/2020 | | | | 14 |
| 610 | E2.05L | REVISION C UPDATED DWGS | GARAGE LEVEL1- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 15 |
| 611 | E2.05P | REVISION M UPDATED DWGS | GARAGE LEVEL1- PARTIAL FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | 11/18/2019 | | 3/6/2020 | | | | 16 |
| 612 | E2.06L | REVISION C UPDATED DWGS | GARAGE LEVEL1- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 17 |
| 613 | E2.06P | REVISION N UPDATED DWGS | GARAGE LEVEL1- PARTIAL FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | 4/24/2020 | | | 18 |
| 614 | E2.07L | REVISION M UPDATED DWGS | LOBBY/ ARRIVAL DECK- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 19 |
| 615 | E2.07P | REVISION B UPDATED DWGS | LOBBY/ ARRIVAL DECK- PARTIAL FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 20 |
| 616 | E2.08L | REVISION M UPDATED DWGS | LOBBY/ ARRIVAL DECK- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 21 |
| 617 | E2.08P | REVISION B UPDATED DWGS | LOBBY/ ARRIVAL DECK- PARTIAL FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 22 |
| 618 | E2.09L | REVISION M UPDATED DWGS | LOBBY/ ARRIVAL DECK- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 23 |
| 619 | E2.09P | REVISION B UPDATED DWGS | LOBBY/ ARRIVAL DECK- PARTIAL FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 24 |
| 620 | E2.10L | REVISION M UPDATED DWGS | LOBBY/ ARRIVAL DECK- PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 25 |
| 621 | E2.10P | REVISION O UPDATED DWGS | LOBBY/ ARRIVAL DECK- PARTIAL FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | | | | | | | | 5/15/2020 | | 26 |
| 622 | E2.07LS | REVISION M UPDATED DWGS | PARTIAL ARRIVAL DECK LOBBY LIGHTING PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 27 |
| 623 | 2.08LS | REVISION M UPDATED DWGS | PARTIAL ARRIVAL DECK LOBBY LIGHTING PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 28 |
| 624 | 2.09LS | REVISION M UPDATED DWGS | PARTIAL ARRIVAL DECK LOBBY LIGHTING PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 29 |
| 625 | 2.10LS | REVISION M UPDATED DWGS | PARTIAL ARRIVAL DECK LOBBY LIGHTING PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 30 |
| 626 | E2.11 | PERMIT SET | MEZZANINE LEVEL- PARTIAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 31 |
| 627 | E2.12 | PERMIT SET | MEZZANINE LEVEL- PARTIAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 32 |
| 628 | E2.13L | REVISION C UPDATED DWGS | SOUTH TOWER LEVEL4 FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 33 |
| 629 | E2.13P | REVISION D UPDATED DWGS | SOUTH TOWER LEVEL4 FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 34 |
| 630 | E2.14L | REVISION C UPDATED DWGS | SOUTH TOWER LEVEL5 FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 35 |
| 631 | E2.14P | REVISION D UPDATED DWGS | SOUTH TOWER LEVEL5 FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 36 |
| 632 | E2.15L | REVISION B UPDATED DWGS | SOUTH TOWER LEVEL6- 12& 17- 33 FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 37 |
| 633 | E2.15P | REVISION D UPDATED DWGS | SOUTH TOWER LEVEL6- 12& 17- 33 FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 38 |
| 634 | E2.16 | PERMIT SET | SOUTH TOWER LEVEL6- 12& 17- 33 OPTIONAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 39 |
| 635 | E2.17L | REVISION B UPDATED DWGS | SOUTH TOWER LEVELS 14TH, 15TH& 16TH FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 40 |
| 636 | E2.17P | REVISION B UPDATED DWGS | SOUTH TOWER LEVELS 14TH, 15TH& 16TH FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 41 |
| 637 | E2.18 | PERMIT SET | SOUTH TOWER LEVEL 14- 16& 34- 46 OPTIONAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 42 |
| 638 | E2.19L | REVISION B UPDATED DWGS | SOUTH TOWER LEVELS 34 -46 FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 43 |
| 639 | E2.19P | REVISION D UPDATED DWGS | SOUTH TOWER LEVELS 34 -46 FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 44 |
| 640 | E2.20L | REVISION B UPDATED DWGS | SOUTH TOWER LEVEL 47 FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 45 |
| 641 | E2.20P | REVISION D UPDATED DWGS | SOUTH TOWER LEVEL 47 FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 46 |
| 642 | E2.21L | REVISION B UPDATED DWGS | SOUTH TOWER LEVEL 48 LOWER PENTHOUSE PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 47 |
| 643 | E2.21P | REVISION B UPDATED DWGS | SOUTH TOWER LEVEL 48 LOWER PENTHOUSE PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 48 |
| 644 | E2.22L | REVISION B UPDATED DWGS | SOUTH TOWER LEVEL 49 UPPER FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 49 |
| 645 | E2.22P | REVISION B UPDATED DWGS | SOUTH TOWER LEVEL 49 UPPER FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 50 |
| 646 | E2.23L | PERMIT SET | SOUTH TOWER LEVEL 50TH FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 51 |
| 647 | E2.23P | PERMIT SET | SOUTH TOWER LEVEL 50TH FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 52 |
| 648 | E2.24L | PERMIT SET | SOUTH TOWER LEVEL 51ST FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 53 |
| 649 | E2.24P | REVISION A UPDATED DWGS | SOUTH TOWER LEVEL 51ST FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | 4/20/2020 | | | | | | | | | | | | | | | | | | 54 |
| 650 | E2.25 | REVISION D UPDATED DWGS | SOUTH TOWER LEVEL 52 MAIN ROOF FLOOR PLAN- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 55 |
| 651 | E2.26 | PERMIT SET | SOUTH TOWER OVERALL ROOF PLAN- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 56 |
| 652 | E3.01 | REVISION P UPDATED DWGS | LOBBY LEVEL SOUTH TOWER FLOOR PLAN- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | | | | | 3/6/2020 | | | 6/5/2020 | 57 |
| 653 | E3.01L | REVISION M UPDATED DWGS | LOBBY LEVEL SOUTH TOWER FLOOR PLAN- LIGHTING | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 58 |
| 654 | E3.02 | REVISION P UPDATED DWGS | LOBBY LEVEL SOUTH TOWER FLOOR PLAN- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | 3/6/2020 | | | 6/5/2020 | 59 |
| 655 | E3.02L | REVISION M UPDATED DWGS | LOBBY LEVEL SOUTH TOWER FLOOR PLAN- LIGHTING | | | | | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 60 |
| 656 | E3.03 | REVISION I UPDATED DWGS | LOBBY LEVEL SOUTH TOWER FLOOR PLAN- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 61 |
| 657 | E3.04 | REVISION A UPDATED DWGS | MEZZANINE LEVEL SOUTH TOWER (LEVEL 3)- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2020 | | | | | | | | | | | | | | | | | | 62 |
| 658 | E3.05 | REVISION D UPDATED DWGS | MEZZANINE LEVEL SOUTH TOWER (LEVEL 3)- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 63 |
| 659 | E3.06 | REVISION D UPDATED DWGS | MEZZANINE LEVEL SOUTH TOWER (LEVEL 3)- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 64 |
| 660 | E3.07 | REVISION N UPDATED DWGS | 4TH& 5TH LEVEL SOUTH TOWER FLOOR PLAN- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | 1/30/2019 | | | | | | | | | | 4/7/2020 | | | 65 |
| 661 | E3.08 | REVISION N UPDATED DWGS | 4TH& 5TH LEVEL SOUTH TOWER FLOOR PLAN- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | 1/30/2019 | | | | | | | | | | 4/7/2020 | | | 66 |
| 662 | E3.09 | REVISION L UPDATED DWGS | SOUTH TOWER TYP. UNITS 1 & 2 POWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 67 |
| 663 | ~~E3.09L~~ | REVISION C UPDATED DWGS | TYPICAL UNITS (LVLS6 -12& 17 -33) SOUTH TOWER LIGHTING **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 664 | ~~E3.09P~~ | REVISION C UPDATED DWGS | TYPICAL UNITS (LVLS6 -12& 17 -33) SOUTH TOWER POWER **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 665 | E3.10 | REVISION L UPDATED DWGS | SOUTH TOWER TYP. UNITS 3 & 4 POWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 68 |
| 666 | ~~E3.10L~~ | REVISION C UPDATED DWGS | TYPICAL UNITS (LVLS6 -12& 17 -33) SOUTH TOWER LIGHTING **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 667 | ~~E3.10P~~ | REVISION C UPDATED DWGS | TYPICAL UNITS (LVLS6 -12& 17 -33) SOUTH TOWER POWER **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 668 | E3.11 | REVISION L UPDATED DWGS | TYPICAL UNITS (LVLS 14 -16& 34 -46) SOUTH TOWER- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 69 |
| 669 | ~~E3.11A~~ | REVISION C UPDATED DWGS | SOUTH TOWER- 'TOSCANA' UNIT LIGHTING FIXTURE SCHEDULE **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 670 | ~~E3.11L~~ | REVISION C UPDATED DWGS | SOUTH TOWER TYPICAL TOSCANA UNIT 05 LIGHTING FLOOR PLAN **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 671 | ~~E3.11P~~ | REVISION C UPDATED DWGS | SOUTH TOWER TYPICAL TOSCANA UNIT 05 POWER FLOOR PLAN **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 672 | E3.12 | REVISION L UPDATED DWGS | TYPICAL UNITS (LVLS 14 -16& 34 -46) SOUTH TOWER- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 70 |
| 673 | ~~E3.12A~~ | REVISION C UPDATED DWGS | SOUTH TOWER- 'POSITANO' UNIT LIGHTING FIXTURE SCHEDULE **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 674 | ~~E3.12L~~ | REVISION C UPDATED DWGS | SOUTH TOWER TYPICAL POSITANO UNIT 06 LIGHTING FLOOR PLAN **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 675 | ~~E3.12P~~ | REVISION C UPDATED DWGS | SOUTH TOWER TYPICAL POSITANO UNIT 06 POWER FLOOR PLAN **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 676 | E3.13 | REVISION L UPDATED DWGS | TYPICAL UNITS (LVLS 14 -16& 34 -46) SOUTH TOWER- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 71 |
| 677 | ~~E3.13A~~ | REVISION C UPDATED DWGS | SOUTH TOWER- 'MILANO' UNIT 07 LIGHTING FIXTURE SCHEDULE **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 678 | ~~E3.13L~~ | REVISION C UPDATED DWGS | SOUTH TOWER MILANO UNIT 07 LIGHTING FLOOR PLAN **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 679 | ~~E3.13P~~ | REVISION C UPDATED DWGS | SOUTH TOWER TYPICAL MILANO UNIT 07 POWER FLOOR PLAN **(DELETED SHEET)** | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 680 | E3.14 | REVISION M UPDATED DWGS | PENTHOUSE 4705 SOUTH TOWER (LEVEL 47)- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | 11/29/2019 | 3/6/2020 | | | | 72 |
| 681 | E3.15 | REVISION M UPDATED DWGS | PENTHOUSE 4707 SOUTH TOWER (LEVEL 47)- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | 11/29/2019 | 3/6/2020 | | | | 73 |
| 682 | E3.16 | REVISION D UPDATED DWGS | PENTHOUSE 01 SOUTH TOWER (LEVEL 48)- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 74 |
| 683 | E3.17 | REVISION D UPDATED DWGS | PENTHOUSE 01 SOUTH TOWER (LEVEL 49)- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 75 |
| 684 | E3.18 | REVISION L UPDATED DWGS | PENTHOUSE 02 SOUTH TOWER (LEVEL 48)- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | | | | | 11/29/2019 | | | | | 76 |
| 685 | E3.19 | REVISION L UPDATED DWGS | PENTHOUSE 02 SOUTH TOWER (LEVEL 49)- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | | | | | | | | 11/29/2019 | | | | | 77 |
| 686 | E3.20 | REVISION I UPDATED DWGS | OPTIONAL PLAN (GUEST SUITE OPTION) SOUTH TOWER- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 78 |
| 687 | E3.20A | REVISION I UPDATED DWGS | SOUTH TOWER MODIFIED UNITS PLAN ELECTRICAL & FIRE ALARM FLOOR PLANUFFIZI UNIT 01/VECCHIO UNIT 02 | | | | | | | | | | | | | | | | | | 1/30/2019 | | | | 7/25/2019 | | | | | | | | | 79 |
| 688 | E3.21 | REVISION I UPDATED DWGS | OPTIONAL PLAN (GUEST SUITE OPTION) SOUTH TOWER- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 80 |
| 689 | E3.21A | REVISION I UPDATED DWGS | ST-MODIFIED UNITS PLAN ELECTRICAL & FIRE ALARM FLOOR PLAN VECCHIO UNIT 03/DONATELLO UNIT 04 | | | | | | | | | | | | | | | | | | 1/30/2019 | | | | 7/25/2019 | | | | | | | | | 81 |
| 690 | E3.22 | REVISION I UPDATED DWGS | OPTIONAL PLAN (GUEST SUITE OPTION) SOUTH TOWER- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 82 |
| 691 | E3.23 | REVISION C UPDATED DWGS | OPTIONAL PLAN (GUEST SUITE OPTION) SOUTH TOWER- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 83 |
| 692 | E3.24 | REVISION A UPDATED DWGS | OPTIONAL PLAN (GUEST SUITE OPTION) SOUTH TOWER- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 84 |
| 693 | E3.25 | REVISION C UPDATED DWGS | OPTIONAL PLAN (GUEST SUITE OPTION) SOUTH TOWER- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 85 |
| 694 | E3.26 | REVISION O UPDATED DWGS | GARAGE LEVEL1 NORTH& SOUTH CABANA- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | 5/15/2020 | | 86 |
| 695 | E3.27L | REVISION O UPDATED DWGS | VILLA- AMENITIES LEVEL1 PARTIAL FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | 4/24/2020 | 5/15/2020 | | 87 |
| 696 | E3.27P | REVISION O UPDATED DWGS | VILLA- AMENITIES LEVEL1 PARTIAL FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | 4/24/2020 | 5/15/2020 | | 88 |
| 697 | E3.28P | REVISION O UPDATED DWGS | VILLA- AMENITIES LEVEL1 PARTIAL FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | 4/24/2020 | 5/15/2020 | | 89 |
| 698 | E3.29L | REVISION O UPDATED DWGS | VILLA LEVEL2- RESTAURANT FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/20/2020 | 4/17/2020 | 5/15/2020 | | 90 |
| 699 | E3.29P | REVISION O UPDATED DWGS | VILLA LEVEL2- RESTAURANT FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | 1/24/2020 | 3/20/2020 | 4/17/2020 | 5/15/2020 | | 91 |
| 700 | E3.30L | REVISION O UPDATED DWGS | VILLA LEVEL3- MEZZANINE FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/20/2020 | 4/17/2020 | 5/15/2020 | | 92 |

| A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020 | | | | | | | | | | | | | | | | Updated: | 7/7/2020 | | | | | | | | | | | | | | | | |
| 2 Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 701 E3.30P | REVISION O UPDATED DWGS | VILLA LEVEL3- MEZZANINE FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | 3/6/2020 | 4/17/2020 | 5/15/2020 | | 93 |
| 702 E3.31L | REVISION O UPDATED DWGS | VILLA LEVEL4- LOUNGE FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | 4/7/2020 | 5/15/2020 | | 94 |
| 703 E3.31P | REVISION O UPDATED DWGS | VILLA LEVEL4- LOUNGE FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | 4/7/2020 | 5/15/2020 | | 95 |
| 704 E3.32L | REVISION O UPDATED DWGS | VILLA LEVEL5- HEALTH CLUB FLOOR PLAN- LIGHTING | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | 4/10/2020 | 5/15/2020 | | 96 |
| 705 E3.32P | REVISION O UPDATED DWGS | VILLA LEVEL5- HEALTH CLUB FLOOR PLAN- POWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | 4/24/2020 | 5/15/2020 | | 97 |
| 706 E3.33 | REVISION O UPDATED DWGS | VILLA ROOF LEVEL- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | 4/17/2020 | 5/15/2020 | | 98 |
| 707 E3.34 | REVISION P UPDATED DWGS | ENLARGED 2ND LEVEL NORTH TOWER LOWER LEVEL- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | 11/18/2019 | | | | | 6/5/2020 | 99 |
| 708 E3.34A | REVISION M UPDATED DWGS | NORTH TOWER 2ND LEVEL GRAND LOBBY ELECTRICAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 100 |
| 709 E3.34B | REVISION I UPDATED DWGS | NORTH TOWER LEVEL 2 ELECTRICAL PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 101 |
| 710 E3.35 | REVISION P UPDATED DWGS | ENLARGED 3RD LEVEL NORTH TOWER UPPER LEVEL- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | 11/18/2019 | | | | | 6/5/2020 | 102 |
| 711 E3.35A | REVISION B UPDATED DWGS | NORTH TOWER GRAND LOBBY 3RD LEVEL LIGHTING FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 103 |
| 712 E3.36 | REVISION P UPDATED DWGS | NORTH TOWER- 4TH LEVEL -ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | 11/18/2019 | | 3/6/2020 | | | 6/5/2020 | 104 |
| 713 E3.37 | REVISION P UPDATED DWGS | NORTH TOWER- 5TH LEVEL -ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | 6/5/2020 | 105 |
| 714 E3.38 | REVISION P UPDATED DWGS | NORTH TOWER- 6TH THRU 49TH LEVEL -ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | 11/18/2019 | 1/24/2020 | | | | 6/5/2020 | 106 |
| 715 ~~E3.39~~ | REVISION C UPDATED DWGS | NORTH TOWER- 4TH THRU 49TH LEVEL- OPTIONAL- ELECTRICAL (DELETED SHEET) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 716 E3.38C | REVISION P UPDATED DWGS | NORTH TOWER 6 THRU 46 LEVEL TYPICAL FLOOR MODIFIED ELECTRICAL | | | | | | | | | | | | | | | | | | | | | | | | | | 1/24/2020 | | | | 6/5/2020 | 108 |
| 717 E3.39 | REVISION P UPDATED DWGS | NORTH TOWER LEVEL 4-46 OPTIONAL ELECTRICAL PLAN | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | 1/24/2020 | | | | 6/5/2020 | 109 |
| 718 E3.39A | REVISION P UPDATED DWGS | NORTH TOWER 4-46 OPTIONAL ELECTRICAL PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | 1/24/2020 | | | | 6/5/2020 | 110 |
| 719 E3.39L | PERMIT SET | NORTH TOWER- 4TH THRU 49TH LEVEL- OPTIONAL- LIGHTING | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 111 |
| 720 E3.39P | PERMIT SET | NORTH TOWER- 4TH THRU 49TH LEVEL- OPTIONAL- POWER | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 112 |
| 721 E3.40 | REVISION B UPDATED DWGS | NORTH TOWER- LEVEL 50- TOWER SUITE- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 113 |
| 722 E3.41 | REVISION M UPDATED DWGS | NORTH TOWER- LEVEL 51- PENTHOUSE- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 114 |
| 723 E3.42 | REVISION M UPDATED DWGS | NORTH TOWER- LEVEL 52- PENTHOUSE- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 115 |
| 724 E3.43L | PERMIT SET | NORTH TOWER- LEVEL 53- LIGHTING | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 116 |
| 725 E3.43P | PERMIT SET | NORTH TOWER- LEVEL 53- POWER | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 117 |
| 726 E3.44L | PERMIT SET | NORTH TOWER- LEVEL 54- MECHANICAL ROOF- LIGHTING | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 118 |
| 727 E3.44P | PERMIT SET | NORTH TOWER- LEVEL 54- MECHANICAL ROOF- POWER | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 119 |
| 728 E3.45 | REVISION B UPDATED DWGS | NORTH TOWER- LEVEL 55- MECHANICAL ROOF- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 120 |
| 729 E3.46 | REVISION A UPDATED DWGS | NORTH TOWER- LEVEL 56- MAIN ROOF PLAN- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 121 |
| 730 E4.01 | REVISION A UPDATED DWGS | SOUTH TOWER MAIN SWITCH GEAR ROOM- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 122 |
| 731 E4.02 | REVISION B UPDATED DWGS | SOUTH TOWER EMERGENCY GENERATOR ROOM- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 123 |
| 732 ~~E4.03~~ | REVISION C UPDATED DWGS | SOUTH TOWER ELECTRICAL ROOMS (DELETED SHEET) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 733 E4.03A | REVISION A UPDATED DWGS | SOUTH TOWER ELECTRICAL ROOMS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 124 |
| 734 E4.03B | REVISION A UPDATED DWGS | SOUTH TOWER ELECTRICAL ROOMS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 125 |
| 735 E4.04 | REVISION F UPDATED DWGS | NORTH TOWER MAIN SWITCH GEAR ROOM- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | | | | | | | | | | 126 |
| 736 E4.05 | PERMIT SET | NORTH TOWER EMERGENCY GENERATOR ROOM- ELECTRICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 127 |
| 737 E4.06 | PERMIT SET | NORTH TOWER ELECTRICAL ROOMS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 128 |
| 738 E4.07 | REVISION N UPDATED DWGS | VILLA BUILDING ELECTRICAL ROOMS | | | | 12/20/2017 | | 11/15/2018 | | | | | | | | | | 10/31/2018 | | | | | | | | | | 11/29/2019 | 3/6/2020 | 4/24/2020 | | | 129 |
| 739 E5.01 | REVISION O UPDATED DWGS | ELECTRICAL RISER DIAGRAM SOUTH TOWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | 11/18/2019 | | 3/6/2020 | 4/24/2020 | 5/15/2020 | | 130 |
| 740 E5.01A | REVISION I UPDATED DWGS | TELEPHONE RISER DIAGRAM SOUTH TOWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 131 |
| 741 E5.01B | REVISION D UPDATED DWGS | CATV RISER DIAGRAM SOUTH TOWER (DELETED SHEET) | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | |
| 742 E5.01C | REVISION 2 UPDATED DWGS | RADIO SIGNAL RISER DIAGRAM SOUTH TOWER | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | | | | | | | | | | | | | | | 132 |
| 743 E5.02 | REVISION I UPDATED DWGS | ELECTRICAL RISER DIAGRAM SOUTH TOWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 133 |
| 744 E5.02A | REVISION I UPDATED DWGS | TELEPHONE RISER DIAGRAM SOUTH TOWER | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 134 |
| 745 E5.02B | REVISION D UPDATED DWGS | CATV RISER DIAGRAM SOUTH TOWER (DELETED SHEET) | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | |
| 746 E5.02C | REVISION 2 UPDATED DWGS | RADIO SIGNAL RISER DIAGRAM SOUTH TOWER | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | | | | | | | | | | | | | | | 135 |
| 747 E5.03 | REVISION O UPDATED DWGS | NORTH TOWER AND PODIUM AND VILLA/AMENITY BUILDING ELECTRICAL PLAN | | | | 12/20/2017 | | 6/22/2018 | | | | | | | 6/22/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | 11/18/2019 | 1/24/2020 | 3/6/2020 | 4/24/2020 | 5/15/2020 | | 136 |
| 748 E5.03A | PERMIT SET | TELEPHONE RISER DIAGRAM NORTH TOWER | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 137 |
| 749 E5.03B | PERMIT SET | CATV RISER DIAGRAM NORTH TOWER | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 138 |
| 750 E5.03C | REVISION 2 UPDATED DWGS | RADIO SIGNAL RISER DIAGRAM NORTH TOWER | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | | | | | | | | | | | | | | | 139 |
| 751 E5.04 | REVISION K UPDATED DWGS | ELECTRICAL RISER DIAGRAM NORTH TOWER | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | 11/18/2019 | | | | | | 140 |
| 752 E5.04A | PERMIT SET | TELEPHONE RISER DIAGRAM NORTH TOWER | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 141 |
| 753 E5.04B | PERMIT SET | CATV RISER DIAGRAM NORTH TOWER | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 142 |
| 754 E5.04C | REVISION 2 UPDATED DWGS | RADIO SIGNAL RISER DIAGRAM NORTH TOWER | | | | 12/20/2017 | | 9/28/2018 | | | | | | | | | | | | | | | | | | | | | | | | | 143 |
| 755 E5.05 | REVISION N UPDATED DWGS | LANDSCPAPE LIGHTING LIGHTING CONTROL SYSTEM RISER AND PANEL SCHEDULE | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | | | 144 |
| 756 ~~E6.00~~ | REVISION C UPDATED DWGS | SOUTH TOWER UNIT & CABANA PANEL SCHEDULES (DELETED SHEET) | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | |
| 757 E6.00A | REVISION D UPDATED DWGS | SOUTH TOWER UNIT LOAD CAL.CUL.ATION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 145 |
| 758 E6.00B | REVISION B UPDATED DWGS | SOUTH TOWER UNITS METER CENTERS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 146 |
| 759 ~~E6.01~~ | REVISION C UPDATED DWGS | SOUTH TOWER UNIT PANEL SCHEDULES (DELETED SHEET) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 760 E6.01A | REVISION C UPDATED DWGS | SOUTH TOWER UNIT PANEL SCHEDULES | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 147 |
| 761 E6.01B | REVISION M UPDATED DWGS | SOUTH TOWER UNIT PANEL SCHEDULES UNITS 8-13 | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | 1/30/2019 | | | | | | | | | 3/6/2020 | | | | 148 |
| 762 E6.01C | REVISION E UPDATED DWGS | SOUTH TOWER UNIT PANEL SCHEDULES UNITS 14,15 AND UNIT 01 OPTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | 1/30/2019 | | | | | | | | | | | | | 149 |
| 763 E6.01D | REVISION E UPDATED DWGS | ST-UNIT PANEL SCHEDULES UNITS 2,3,4,5,6,7 OPTIONS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | 1/30/2019 | | | | | | | | | | | | | 150 |
| 764 E6.02 | REVISION N UPDATED DWGS | SOUTH ELECTRICAL PANELS (NORMAL) | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | 7/25/2019 | | | | | 3/6/2020 | 4/24/2020 | | | 151 |
| 765 E6.03 | REVISION I UPDATED DWGS | SOUTH ELECTRICAL PANELS (NORMAL) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 152 |
| 766 E6.04 | REVISION M UPDATED DWGS | SOUTH ELECTRICAL PANELS (EMERGENCY) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | 12/18/2018 | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 153 |
| 767 E6.05 | REVISION I UPDATED DWGS | SOUTH ELECTRICAL PANELS (EMERGENCY) | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 154 |
| 768 E6.06 | REVISION N UPDATED DWGS | MASTER ASSOCIATION ELECTRICAL PANELS (NORMAL) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | 7/25/2019 | | | 11/18/2019 | | 3/20/2020 | 4/24/2020 | | | 155 |
| 769 E6.07 | REVISION M UPDATED DWGS | MASTER ASSOCIATION & PRIVATE GARAGE ELECTRICAL PANELS (NORMAL) | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/20/2020 | | | | 156 |
| 770 E6.08 | REVISION O UPDATED DWGS | MASTER ASSOCIATION ELECTRCIAL PANELS (EMERGENCY) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | 3/1/2019 | | | | | | | | 3/6/2020 | | 5/15/2020 | | 157 |
| 771 E6.09 | REVISION O UPDATED DWGS | NORTH PODIUM ELECTRICAL PANELS (EMERGENCY) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 158 |
| 772 E6.10 | REVISION O UPDATED DWGS | AMENITY/VILLA BUILDING ELECTRICAL PANELS (NORMAL) | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | 1/24/2020 | 3/20/2020 | 4/24/2020 | 5/15/2020 | | 159 |
| 773 E6.11 | REVISION O UPDATED DWGS | AMENITY BUILDING ELECTRICAL PANELS (EMERGENCY) | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | 11/29/2019 | 3/20/2020 | 4/24/2020 | 5/15/2020 | | 160 |
| 774 E6.12 | REVISION M UPDATED DWGS | NORTH TOWER UNIT PANEL SCHEDULES | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 11/18/2019 | | 3/6/2020 | | | | 161 |
| 775 E6.12A | REVISION P UPDATED DWGS | NORTH TOWER TYPICAL UNITS LOAD CALCULATION AND PANEL SCHEDULES | | | | | | | | | | | | | | | | | | | | | | | | | 11/18/2019 | | | | | 6/5/2020 | 162 |
| 776 E6.12B | REVISION M UPDATED DWGS | NORTH TOWER NON TYPICAL UNITS LOAD CALCS AND PANEL SCHEDULES | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 163 |
| 777 E6.13 | REVISION N UPDATED DWGS | NORTH ELECTRICAL PANELS (NORMAL) | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | 11/18/2019 | | 3/6/2020 | 4/24/2020 | | | 164 |
| 778 E6.14 | REVISION I UPDATED DWGS | NORTH ELECTRICAL PANELS (NORMAL) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 165 |
| 779 E6.15 | REVISION M UPDATED DWGS | NORTH ELECTRICAL PANELS (EMERGENCY) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 11/18/2019 | | 3/6/2020 | | | | 166 |
| 780 E6.16 | REVISION K UPDATED DWGS | NORTH ELECTRICAL PANELS (NORMAL) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 11/18/2019 | | | | | | 167 |
| 781 E6.17 | REVISION O UPDATED DWGS | TENANTS ELECTRICAL PANELS (NORMAL) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 11/18/2019 | 1/24/2020 | 3/6/2020 | 4/24/2020 | 5/15/2020 | | 168 |
| 782 E7.01 | PERMIT SET | ELECTRICAL DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 169 |
| 783 E8.01 | REVISION O UPDATED DWGS | ENLARGED KITCHEN& PANTRY ROOM- POWER PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 11/18/2019 | | | 4/17/2020 | 5/15/2020 | | 170 |
| 784 E8.02 | REVISION O UPDATED DWGS | ENLARGED KITCHEN& RESTAURANT LEVEL2 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | 4/24/2020 | 5/15/2020 | | 171 |
| 785 E9.01 | REVISION C UPDATED DWGS | ARRIVAL DECK- LOBBY VILLA LEVEL- PHOTOMETRICS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 172 |
| 786 E9.02 | REVISION C UPDATED DWGS | ARRIVAL DECK- LOBBY VILLA LEVEL- PHOTOMETRICS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 173 |
| 787 E9.03 | REVISION C UPDATED DWGS | PARTIAL BASEMENT LIGHTING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 174 |
| 788 E9.04 | REVISION C UPDATED DWGS | PARTIAL BASEMENT LIGHTING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 175 |
| 789 **FIRE ALARM** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **47** |
| 790 FA0.00 | REVISION 1 UPDATED DWGS | NOTES, DETAILS& SYMBOL LEGEND- FIRE ALARM | | | | 12/20/2017 | 6/22/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 791 FA2.00 | REVISION C UPDATED DWGS | PARTIAL BASEMENT FIRE ALARM PLAN | | | | | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 2 |
| 792 FA2.01 | REVISION B UPDATED DWGS | BASEMENT LEVEL PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 3 |
| 793 FA2.02 | REVISION B UPDATED DWGS | BASEMENT LEVEL PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 4 |
| 794 FA2.03 | REVISION F UPDATED DWGS | GARAGE LEVEL1 PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 5 |
| 795 FA2.04 | REVISION F UPDATED DWGS | GARAGE LEVEL1 PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 6 |
| 796 FA2.05 | REVISION I UPDATED DWGS | GARAGE LEVEL1 PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 7 |
| 797 FA2.06 | REVISION C UPDATED DWGS | GARAGE LEVEL1 PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 8 |
| 798 FA2.07 | REVISION I UPDATED DWGS | ARRIVAL DECK LOBBY PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 9 |
| 799 FA2.08 | REVISION B UPDATED DWGS | ARRIVAL DECK LOBBY PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 10 |
| 800 FA2.09 | REVISION I UPDATED DWGS | ARRIVAL DECK LOBBY PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 11 |
| 801 FA2.10 | REVISION B UPDATED DWGS | ARRIVAL DECK LOBBY PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 12 |
| 802 FA2.11 | REVISION P UPDATED DWGS | MEZZANINE LEVEL PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | 6/5/2020 | 13 |
| 803 FA2.12 | REVISION B UPDATED DWGS | MEZZANINE LEVEL PARTIAL FLOOR PLAN- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 14 |
| 804 FA2.13 | REVISION M UPDATED DWGS | SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | 3/6/2020 | | | | 15 |
| 805 FA2.14 | REVISION M UPDATED DWGS | SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | 3/6/2020 | | | | 16 |
| 806 FA2.15 | REVISION M UPDATED DWGS | LEVEL6- 12& 17- 33 SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | 11/29/2019 | 3/6/2020 | | | | 17 |
| 807 FA2.16 | REVISION A UPDATED DWGS | LEVEL6- 12& 17- 33 SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | 4/20/2020 | | | | | | | | | | | | | | | | | | 18 |
| 808 FA2.17 | REVISION B UPDATED DWGS | LEVELS 14, 15& 16TH SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 19 |
| 809 FA2.18 | PERMIT SET | LEVELS 14- 16& 34- 46 (OPTIONAL) SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 20 |
| 810 FA2.19 | REVISION M UPDATED DWGS | LEVELS 34- 46 TYPICAL SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 21 |
| 811 FA2.20 | REVISION M UPDATED DWGS | LEVEL 47TH SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 22 |

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020 | | | | | | | | | | | | | | | | Updated: | 7/7/2020 | | | | | | | | | | | | | | | | |
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 812 | FA2.21 | REVISION M UPDATED DWGS | LEVEL 48TH SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 23 |
| 813 | FA2.22 | REVISION B UPDATED DWGS | LEVEL 49TH SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 24 |
| 814 | FA2.23 | REVISION B UPDATED DWGS | LEVEL 50TH SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 25 |
| 815 | FA2.24 | REVISION B UPDATED DWGS | LEVEL 51ST SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 26 |
| 816 | FA2.25 | REVISION D UPDATED DWGS | LEVEL 52ND SOUTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 27 |
| 817 | FA2.26 | REVISION O UPDATED DWGS | VILLA- AMENITIES LEVEL1- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 28 |
| 818 | FA2.27 | REVISION O UPDATED DWGS | VILLA- AMENITIES LEVEL1- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | 5/15/2020 | | 29 |
| 819 | FA2.28 | REVISION O UPDATED DWGS | VILLA- LEVEL2- RESTAURANT- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | 11/29/2019 | | | 5/15/2020 | | 30 |
| 820 | FA2.29 | REVISION O UPDATED DWGS | VILLA- LEVEL3- MEZZANINE- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 31 |
| 821 | FA2.30 | REVISION O UPDATED DWGS | VILLA- LEVEL4- LOUNGE- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 32 |
| 822 | FA2.31 | REVISION O UPDATED DWGS | VILLA- LEVEL5 -HEALTH CLUB- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | 4/10/2020 | 5/15/2020 | | 33 |
| 823 | FA2.32 | REVISION M UPDATED DWGS | NORTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 34 |
| 824 | FA2.33 | REVISION I UPDATED DWGS | NORTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 35 |
| 825 | FA2.34 | REVISION M UPDATED DWGS | LEVEL6- 48 NORTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 36 |
| 826 | FA2.35 | PERMIT SET | LEVEL6- 48 OPTIONAL NORTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 37 |
| 827 | FA2.36 | REVISION B UPDATED DWGS | LEVEL 49 NORTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 38 |
| 828 | FA2.37 | REVISION M UPDATED DWGS | LEVEL 50 PH LOWER NORTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 39 |
| 829 | FA2.38 | REVISION M UPDATED DWGS | LEVEL 51 PH UPPER NORTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 40 |
| 830 | FA2.39 | REVISION M UPDATED DWGS | LEVEL 52 ROOF NORTH TOWER- FIRE ALARM | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 41 |
| 831 | FA2.40 | REVISION B UPDATED DWGS | NORTH TOWER LE EL 51 ELECTRICAL PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 42 |
| 832 | FA2.41 | REVISION B UPDATED DWGS | NORTH TOWER LEVEL 54 ELECTRICAL PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 43 |
| 833 | FA2.42 | REVISION D UPDATED DWGS | NORTH TOWER LEVEL 55 ELECTRICAL PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 44 |
| 834 | FA5.01 | PERMIT SET | FIRE ALARM RISER DIAGRAM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 45 |
| 835 | FA5.02 | PERMIT SET | FIRE ALARM RISER DIAGRAM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 46 |
| 836 | FA5.03 | PERMIT SET | FIRE ALARM RISER DIAGRAM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 47 |
| 837 | FIRE PROTECTION | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 70 |
| 838 | FP0.01 | REVISION P UPDATED DWGS | FIRE PROTECTION INDEX AND NOTES | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | 1/30/2019 | | | | 7/25/2019 | | | 10/18/2019 | 1/24/2020 | 3/6/2020 | 4/28/2020 | 5/15/2020 | 6/5/2020 | 1 |
| 839 | FP1.01 | REVISION B UPDATED DWGS | OVERALL GARAGE/ SITE PLAN LEVEL1 FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 2 |
| 840 | FP2.01 | REVISION K UPDATED DWGS | BASEMENT LEVEL PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | 10/18/2019 | | | | | | 3 |
| 841 | FP2.01A | REVISION K UPDATED DWGS | BASEMENT LEVEL PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | 10/18/2019 | | | | | | 4 |
| 842 | FP2.02 | REVISION K UPDATED DWGS | BASEMENT LEVEL PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | 10/18/2019 | | | | | | 5 |
| 843 | FP2.03 | REVISION P UPDATED DWGS | GARAGE LEVEL1 PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | 10/18/2019 | | | | 5/15/2020 | 6/5/2020 | 6 |
| 844 | FP2.04 | REVISION O UPDATED DWGS | GARAGE LEVEL1 PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | 10/18/2019 | | | | 5/15/2020 | | 7 |
| 845 | FP2.05 | REVISION K UPDATED DWGS | GARAGE LEVEL1 PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | | 8 |
| 846 | FP2.06 | REVISION O UPDATED DWGS | GARAGE LEVEL1 PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | 10/18/2019 | | | | 5/15/2020 | | 9 |
| 847 | FP2.07 | REVISION B UPDATED DWGS | ARRIVAL DECK LOBBY PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 10 |
| 848 | FP2.08 | REVISION M UPDATED DWGS | ARRIVAL DECK LOBBY PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 11 |
| 849 | FP2.09 | REVISION B UPDATED DWGS | ARRIVAL DECK LOBBY PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 12 |
| 850 | FP2.10 | REVISION B UPDATED DWGS | ARRIVAL DECK LOBBY PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 13 |
| 851 | FP2.11 | REVISION M UPDATED DWGS | MEZZANINE LEVEL PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 14 |
| 852 | FP2.12 | REVISION B UPDATED DWGS | MEZZANINE LEVEL PARTIAL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 15 |
| 853 | FP2.23 | PERMIT SET | SOUTH TOWER- LEVEL 50 FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 16 |
| 854 | FP2.24 | PERMIT SET | SOUTH TOWER- LEVEL 51 FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 17 |
| 855 | FP2.25 | PERMIT SET | SOUTH TOWER- LEVEL 52 MAIN ROOF FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 18 |
| 856 | FP3.01 | REVISION M UPDATED DWGS | SOUTH TOWER- LOBBY LEVEL FLOOR PLAN (LEVEL 2) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 19 |
| 857 | FP3.02 | REVISION M UPDATED DWGS | SOUTH TOWER- LOBBY LEVEL FLOOR PLAN (LEVEL 2) FIRE PROTECTION PLAN/ SINGLE FAMILY UNIT 02 (LOWER LEVEL) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 20 |
| 858 | FP3.03 | REVISION M UPDATED DWGS | SOUTH TOWER- LOBBY LEVEL FLOOR PLAN (LEVEL 2) FIRE PROTECTION PLAN/ SINGLE FAMILY UNIT 04 (LOWER LEVEL) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 21 |
| 859 | FP3.04 | REVISION M UPDATED DWGS | SOUTH TOWER -MEZZANINE LEVEL (LEVEL 3) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 22 |
| 860 | FP3.05 | REVISION M UPDATED DWGS | SOUTH TOWER -MEZZANINE LEVEL (LEVEL 3) FIRE PROTECTION PLAN/ SINGLE FAMILY UNIT 02 (UPPER LEVEL) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 23 |
| 861 | FP3.06 | REVISION I- UPDATED DWGS | SOUTH TOWER -MEZZANINE LEVEL (LEVEL 3) FIRE PROTECTION PLAN/ SINGLE FAMILY UNIT 04 (UPPER LEVEL) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 24 |
| 862 | FP3.07 | REVISION C UPDATED DWGS | SOUTH TOWER- 4TH& 5TH LEVELS FLOOR PLAN - FIRE PROTECTION PLAN/ SERVICE SUITE AND VILLA DI ESTE UNIT FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 25 |
| 863 | FP3.08 | REVISION C UPDATED DWGS | SOUTH TOWER- 4TH& 5TH LEVELS FLOOR PLAN - FIRE PROTECTION PLAN/ SERVICE SUITE AND BOTTICELLI UNIT FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 26 |
| 864 | FP3.09 | REVISION C UPDATED DWGS | SOUTH TOWER- TYPICAL UNIT 01& 02 (LEVELS 6TH- 12TH& 17TH- 33RD) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 27 |
| 865 | FP3.10 | REVISION A UPDATED DWGS | SOUTH TOWER- TYPICAL UNIT 03& 04 (LEVELS 6TH- 12TH& 17TH- 33RD) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 28 |
| 866 | FP3.11 | REVISION B UPDATED DWGS | SOUTH TOWER- TYP. TOSCANA UNIT 05 (LEVELS 14TH- 16TH& 34TH- 46TH) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 29 |
| 867 | FP3.12 | REVISION A UPDATED DWGS | SOUTH TOWER- TYP. POSITANO UNIT 06 (LEVELS 14TH- 16TH& 34TH- 46TH) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 30 |
| 868 | FP3.13 | REVISION B UPDATED DWGS | SOUTH TOWER- TYP. MILANO UNIT 07 (LEVELS 14TH- 16TH& 34TH- 46TH) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 31 |
| 869 | FP3.13A | REVISION L UPDATED DWGS | SOUTH TOWER - LEVEL 46 FIRE PROTECTION FLOOR PLAN | | | | | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | 11/29/2019 | | | | | 32 |
| 870 | FP3.13B | REVISION M UPDATED DWGS | SOUTH TOWER - LEVEL 46 FIRE PROTECTION FLOOR PLAN | | | | | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | 3/6/2020 | | | | 33 |
| 871 | FP3.14 | REVISION B UPDATED DWGS | SOUTH TOWER- PENTHOUSE 4705 (LEVEL 47) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 34 |
| 872 | FP3.15 | REVISION B UPDATED DWGS | SOUTH TOWER- PENTHOUSE 4707 (LEVEL 47) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 35 |
| 873 | FP3.16 | REVISION B UPDATED DWGS | SOUTH TOWER- PENTHOUSE 01- LOWER LEVEL (LEVEL 48) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 36 |
| 874 | FP3.17 | REVISION B UPDATED DWGS | SOUTH TOWER- PENTHOUSE 01- UPPER LEVEL (LEVEL 49) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 37 |
| 875 | FP3.18 | REVISION L UPDATED DWGS | SOUTH TOWER- PENTHOUSE 02- LOWER LEVEL (LEVEL 48) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | 11/29/2019 | | | | | 38 |
| 876 | FP3.19 | REVISION L UPDATED DWGS | SOUTH TOWER- PENTHOUSE 02- UPPER LEVEL (LEVEL 49) FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | 11/29/2019 | | | | | 39 |
| 877 | FP3.20 | REVISION A UPDATED DWGS | SOUTH TOWER- OPTIONAL PLAN FIRE PROTECTION PLAN/ UFFIZI UNIT 01/ VECCHIO UNIT 02- GUEST SUITE OPTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 40 |
| 878 | FP3.20A | REVISION E UPDATED DWGS | SOUTH TOWER MODIFIED UNITS PLAN FFIRE PROTECTION FLOOR PLAN UFFIZI UNIT 01/VECCHIO UNIT 02 | | | | | | | | | | | | | | | | | | 1/30/2019 | | | | | | | | | | | | | 41 |
| 879 | FP3.21 | REVISION A UPDATED DWGS | SOUTH TOWER- OPTIONAL PLAN FIRE PROTECTION PLAN/ VECCIO UNIT 03/ DONATELLO UNIT 04- GUEST SUITE OPTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 42 |
| 880 | FP3.21A | REVISION E UPDATED DWGS | SOUTH TOWER MODIFIED UNITSW PLAN FIRE PROTECTION FLOOR PLAN VECCHIO UNIT 03/DONATELLO UNIT 04 | | | | | | | | | | | | | | | | | | 1/30/2019 | | | | | | | | | | | | | 43 |
| 881 | FP3.22 | REVISION A UPDATED DWGS | SOUTH TOWER- OPTIONAL PLAN FIRE PROTECTION PLAN/ UFFIZI UNIT 01 BEDROOM OPTION OR BEDROOM AND GUEST SUITE OPTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 44 |
| 882 | FP3.23 | REVISION A UPDATED DWGS | SOUTH TOWER- OPTIONAL PLAN FIRE PROTECTION PLAN/ TOSCANA UNIT 05- BEDROOM/ BATHROOM OPTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 45 |
| 883 | FP3.24 | REVISION A UPDATED DWGS | SOUTH TOWER- OPTIONAL PLAN FIRE PROTECTION PLAN/ POSITANO UNIT 06- FOYER CONNECTION OPTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 46 |
| 884 | FP3.25 | REVISION A UPDATED DWGS | SOUTH TOWER- OPTIONAL PLAN FIRE PROTECTION PLAN /MILANO UNIT 07- BEDROOM/ BATH OPTION | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 47 |
| 885 | FP3.26 | REVISION O UPDATED DWGS | VILLA- AMENITIES LEVEL1 PARTIAL FIRE PROTECTION FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | | 4/24/2020 | 5/15/2020 | | 48 |
| 886 | FP3.27 | REVISION O UPDATED DWGS | VILLA- AMENITIES LEVEL1 PARTIAL FIRE PROTECTION FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | | 4/24/2020 | 5/15/2020 | | 49 |
| 887 | FP3.28 | REVISION O UPDATED DWGS | VILLA- LEVEL2 RESTAURANT FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | 1/24/2020 | 3/6/2020 | 4/17/2020 | 5/15/2020 | | 50 |
| 888 | FP3.29 | REVISION O UPDATED DWGS | VILLA- LEVEL3 MEZZANINE FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | 3/6/2020 | 4/17/2020 | 5/15/2020 | | 51 |
| 889 | FP3.30 | REVISION O UPDATED DWGS | VILLA- LEVEL4 LOUNGE FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 52 |
| 890 | FP3.31 | REVISION O UPDATED DWGS | VILLA- LEVEL5 HEALTH CLUB FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | 4/24/2020 | 5/15/2020 | | 53 |
| 891 | FP3.32 | REVISION O UPDATED DWGS | VILLA- ROOF LEVEL FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 54 |
| 892 | FP3.33 | REVISION P UPDATED DWGS | ENLARGED 2ND LEVEL NORTH TOWER UNIT LOWER LEVEL- FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | 10/18/2019 | | | | | 6/5/2020 | 55 |
| 893 | FP3.34 | REVISION P UPDATED DWGS | ENLARGED 3RD LEVEL NORTH TOWER UNIT UPPER LEVEL- FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | 10/18/2019 | | | | | 6/5/2020 | 56 |
| 894 | FP3.35 | REVISION P UPDATED DWGS | ENLARGED 4TH LEVEL NORTH TOWER - FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 57 |
| 895 | FP3.36 | REVISION P UPDATED DWGS | ENLARGED 5TH LEVEL NORTH TOWER - FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 58 |
| 896 | FP3.37 | REVISION P UPDATED DWGS | ENLARGED 6TH- 49TH TYPICAL LEVEL NORTH TOWER - FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 59 |
| 897 | FP3.37C | REVISION P UPDATED DWGS | NORTH TOWER 6-46LEVEL TYPICAL FLOOR PLAN MODIFIED FIER PROTECTION PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | 11/29/2019 | | | | 6/5/2020 | 60 |
| 898 | FP3.38 | REVISION P UPDATED DWGS | ENLARGED 4TH- 49TH OPTIONAL FLOOR NORTH TOWER - FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 61 |
| 899 | FP3.38A | REVISION P UPDATED DWGS | ENLARGED OPTIONAL FIRE PROTECTION PLANS | | | | | | | | | | | | | | | | | | | | | | | | | 10/18/2019 | | | | | 6/5/2020 | 62 |
| 900 | FP3.39 | REVISION B UPDATED DWGS | ENLARGED LEVEL 50 TOWER SUITE NORTH TOWER - FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 63 |
| 901 | FP3.40 | REVISION M UPDATED DWGS | ENLARGED LEVEL 51 PH LOWER LEVEL NORTH TOWER - FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 64 |
| 902 | FP3.41 | REVISION M UPDATED DWGS | ENLARGED LEVEL 52 PH UPPER LEVEL NORTH TOWER - FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 65 |
| 903 | FP3.42 | REVISION B UPDATED DWGS | ENLARGED LEVEL 53 NORTH TOWER MECHANICAL ROOF- FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 66 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 904 | FP3.43 | REVISION B UPDATED DWGS | ENLARGED LEVEL 54 NORTH TOWER MECHANICAL ROOF- FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 67 |
| 905 | FP3.44 | REVISION B UPDATED DWGS | ENLARGED LEVEL 55 NORTH TOWER MECHANICAL ROOF- FIRE PROTECTION PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 68 |
| 906 | FP4.01 | REVISION C UPDATED DWGS | RISER DIAGRAM- FIRE PROTECTION | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 69 |
| 907 | FP4.02 | REVISION C UPDATED DWGS | FIRE PROTECTION DETAILS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 70 |
| 908 | FIRE SAFETY | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 6 |
| 909 | FS.1 | PERMIT SET | FIRE SAFING NOTES & DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 910 | FS.2 | PERMIT SET | FIRE SAFING NOTES & DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 911 | FS.3 | PERMIT SET | FIRE SAFING NOTES & DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 3 |
| 912 | FS.4 | PERMIT SET | FIRE SAFING NOTES & DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4 |
| 913 | FS.5 | PERMIT SET | FIRE SAFING NOTES & DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 5 |
| 914 | FS.6 | PERMIT SET | FIRE SAFING NOTES & DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 6 |
| 915 | INTERIOR DESIGN - LOBBIES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 42 |
| 916 | ID-L-00A | 100% CD's REV K | ID - LOBBIES - COVER SHEET | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 1/24/2019 | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 1 |
| 917 | ID-L-00B | REVISION O UPDATED DWGS | ID - LOBBY - DRAWING LIST | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 1/24/2019 | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 2 |
| 918 | ID-L-001 | REVISION O UPDATED DWGS | GENERAL SOUTH AND NORTH LOBBIES FLOOR PLAN | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 3 |
| 919 | ID-L-100 | 100% CD's REV K | SOUTH LOBBY FLOOR PLAN | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 4 |
| 920 | ID-L-101 | REVISION O UPDATED DWGS | SOUTH LOBBY EXTENSION FLOOR PLAN | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 5 |
| 921 | ID-L-102A | REVISION O UPDATED DWGS | SOUTH LOBBY-LOBBY LEVEL RCP | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 6 |
| 922 | ID-L-102B | REVISION O UPDATED DWGS | SOUTH LOBBY EXTENSION- LOBBY LEVEL RCP | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 7 |
| 923 | ID-L-103A | REVISION O UPDATED DWGS | SOUTH LOBBY MEZZANINE LEVEL RCP | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 8 |
| 924 | ID-L-103B | REVISION O UPDATED DWGS | SOUTH LOBBY EXTENSION-MEZZANINE LEVEL RCP | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 9 |
| 925 | ID-L-104 | 100% CD's REV K | SOUTH LOBBY PWER PLAN | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 10 |
| 926 | ID-L-105 | 100% CD's REV K | SOUTH LOBBY EXTENSION POWER PLAN | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 11 |
| 927 | ID-L-110 | 100% CD's REV K | NORTH LOBBY FLOOR PLAN | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 12 |
| 928 | ID-L-111A | REVISION O UPDATED DWGS | NORTH LOBBY-LOBBY LEVEL RCP | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 13 |
| 929 | ID-L-111B | REVISION O UPDATED DWGS | NORTH LOBBY-MEZZANINE LEVEL RCP | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 14 |
| 930 | ID-L-112 | 100% CD's REV K | NORTH LOBBY POWER PLAN | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 15 |
| 931 | ID-L-120 | 100% CD's REV K | N-S LOBBY FLOOR FINISH PLAN | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 16 |
| 932 | ID-L-121 | 100% CD's REV K | NORTH AND SOUTH LOBBY WALL FINISH PLAN | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 17 |
| 933 | ID-L-122 | 100% CD's REV K | NORTH AND SOUTH LOBBY FURNITURE AND MILLWORK PLAN | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 18 |
| 934 | ID-L-200 | REVISION O UPDATED DWGS | SOUTH LOBBY ELEVATIONS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 19 |
| 935 | ID-L-201 | REVISION O UPDATED DWGS | SOUTH LOBBY EXTENSION ELEVATIONS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 20 |
| 936 | ID-L-202 | 100% CD's REV K | SOUTH LOBBY EXTENSION RESTROOM ELEVATIONS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 21 |
| 937 | ID-L-203 | REVISION O UPDATED DWGS | SOUTH LOBBY MAIL ROOM ELEVATIONS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 22 |
| 938 | ID-L-210 | REVISION O UPDATED DWGS | NORTH LOBBY ELEVATIONS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 23 |
| 939 | ID-L-211 | REVISION O UPDATED DWGS | NORTH LOBBY ELEVATIONS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 24 |
| 940 | ID-L-212 | 100% CD's REV K | NORTH LOBBY RESTROOM ELEVATIONS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 25 |
| 941 | ID-L-213 | 100% CD's REV K | NORT LOBBY MAIL ROOM ELEVATIONS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 26 |
| 942 | ID-L-220 | 100% CD's REV K | PASSENGER ELEVATOR PLANS AND ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 27 |
| 943 | ID-L-300 | REVISION O UPDATED DWGS | SOUTH LOBBY PORTE COCHERE PLANS PORTE COCHERE ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 28 |
| 944 | ID-L-301 | REVISION O UPDATED DWGS | NORTH LOBBY PORTE COCHERE PLANS PORTE CHOCHERE ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 29 |
| 945 | ID-L-500A | REVISION O UPDATED DWGS | DETAILS-CEILING | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 30 |
| 946 | ID-L-500B | REVISION O UPDATED DWGS | DETAILS CEILING/WALL | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 31 |
| 947 | ID-L-500C | REVISION O UPDATED DWGS | DETAILS WALL SECTION AND DETAILS | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 32 |
| 948 | ID-L-501 | 100% CD's REV K | DETAILS-COLUMN | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 33 |
| 949 | ID-L-502 | 100% CD's REV K | DETAILS-MIRROR AND QUOIN | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 34 |
| 950 | ID-L-503 | REVISION O UPDATED DWGS | DETAILS-WALLS, BASE, FURNITURES, AND FIXTURES | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 35 |
| 951 | ID-L-504 | REVISION O UPDATED DWGS | DETAILS- GLASS DOORS AND PANELS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 36 |
| 952 | ID-L-505 | 100% CD's REV K | DETAILS- FOUNTAIN | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 10/11/2019 | | 2/3/2020 | | | | | | 37 |
| 953 | ID-L-506 | 100% CD's REV J | DETAILS-FLOOR PATTERNS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | | | | | | | 38 |
| 954 | ID-L-507 | REVISION O UPDATED DWGS | DETAILS- DOOR SCHEDULES AND DETAILS | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 39 |
| 955 | ID-L-508 | 100% CD's REV K | DETAILS-RECEPTION DESK | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | | | 40 |
| 956 | ID-L-700 | REVISION O UPDATED DWGS | SCHEDULES | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | 2/3/2020 | | | | 5/15/2020 | | 41 |
| 957 | ID-L-701 | 100% CD's REV J | SCHEDULES | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 10/11/2019 | | | | | | | | 42 |
| 958 | RMD INTERIOR DESIGN - VILLA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | [illegible] |
| 959 | ID-V-000 | REVISION O UPDATED DWGS | ID - VILLA - COVER SHEET | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 1/24/2019 | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 1 |
| 960 | ID-V-001 | REVISION O UPDATED DWGS | ID - VILLA - DRAWING LIST | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 1/24/2019 | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 2 |
| 961 | ID-V-100 | REVISION O UPDATED DWGS | 1ST FLOOR FLOOR PLAN (OVERALL PLAN) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 3 |
| 962 | ID-V-100A | REVISION O UPDATED DWGS | 1ST FLOOR FLOOR PLAN (PART A) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 4 |
| 963 | ID-V-100B | REVISION O UPDATED DWGS | 1ST FLOOR FLOOR PLAN (PART B) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 5 |
| 964 | ID-V-101 | REVISION O UPDATED DWGS | 2ND FLOOR FLOOR PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 6 |
| 965 | ID-V-102 | REVISION O UPDATED DWGS | 3RD FLOOR FLOOR PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 7 |
| 966 | ID-V-103 | REVISION O UPDATED DWGS | 4TH FLOOR FLOOR PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 8 |
| 967 | ID-V-110 | REVISION O UPDATED DWGS | 1ST FLOOR REFLECTED CEILING PLAN(OVERALL) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 6/4/2020 | | 9 |
| 968 | ID-V-110A | REVISION O UPDATED DWGS | 1ST FLOOR REFLECTED CEILING PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 6/4/2020 | | 10 |
| 969 | ID-V-110B | REVISION O UPDATED DWGS | 1ST FLOOR RCP (PART B) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 6/4/2020 | | 11 |
| 970 | ID-V-111 | REVISION O UPDATED DWGS | 2ND FLOOR LOBBY REFLECTED CEILING PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 12 |
| 971 | ID-V-112 | REVISION O UPDATED DWGS | 3RD FLOOR REFLECTED CEILING PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 13 |
| 972 | ID-V-113 | REVISION O UPDATED DWGS | 4TH FLOOR REFLECTED CEILING PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 14 |
| 973 | ID-V-120A | REVISION O UPDATED DWGS | 1ST FLOOR FURNITURE PLAN / MILLWORK(PART A) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 15 |
| 974 | ID-V-120B | REVISION O UPDATED DWGS | 1ST FLOOR FURNITURE PLAN / MILLWORK (PART B) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 16 |
| 975 | ID-V-121 | REVISION O UPDATED DWGS | 2ND FLOOR LOBBY FURNITURE PLAN / MILLWORK | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | 11/22/2019 | | | | | 5/15/2020 | | 17 |
| 976 | ID-V-122 | REVISION O UPDATED DWGS | 3RD FLOOR MEZZANINE FURNITURE PLAN / MILLWORK | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 18 |
| 977 | ID-V-123 | REVISION O UPDATED DWGS | 4TH FLOOR LOUNGE FURNITURE PLAN / MILLWORK | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 19 |
| 978 | ID-V-130A | REVISION O UPDATED DWGS | 1ST FLOOR FLOOR FINISH PLAN (PART A) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 20 |
| 979 | ID-V-130B | REVISION O UPDATED DWGS | 1ST FLOOR-FLOOR FINISH PLAN (PART B) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 21 |
| 980 | ID-V-131 | REVISION O UPDATED DWGS | 2ND FLOOR-FLOOR FINISH PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | | | | | 5/15/2020 | | 22 |
| 981 | ID-V-132 | REVISION O UPDATED DWGS | 3RD FLOOR-FLOOR FINISH PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 23 |
| 982 | ID-V-133 | REVISION O UPDATED DWGS | 4TH FLOOR FLOOR FINISH PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 24 |
| 983 | ID-V-140A | REVISION O UPDATED DWGS | 1ST FLOOR WALL FINISH PLAN (PART A) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 25 |
| 984 | ID-V-140B | REVISION O UPDATED DWGS | 1ST FLOOR WALL FINISH PLAN (PART B) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 26 |
| 985 | ID-V-141 | REVISION O UPDATED DWGS | 2ND FLOOR WALL FINISH PLAN | | | | | | | | | | | | | | | | 10/31/2019 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | | | | | 5/15/2020 | | 27 |
| 986 | ID-V-142 | REVISION O UPDATED DWGS | 3RD FLOOR WALL FINISH PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 28 |
| 987 | ID-V-143 | REVISION O UPDATED DWGS | 4TH FLOOR WALL FINISH PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 29 |
| 988 | ID-V-150A | REVISION O UPDATED DWGS | 1ST FLOOR POWER PLAN (PART A) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 30 |
| 989 | ID-V-150B | REVISION O UPDATED DWGS | 1ST FLOOR POWER PLAN (PART B) | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 31 |
| 990 | ID-V-151 | REVISION O UPDATED DWGS | 2ND FLOOR POWER PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | 11/22/2019 | | | | | 5/15/2020 | | 32 |
| 991 | ID-V-152 | REVISION O UPDATED DWGS | 3RD FLOOR POWER PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 33 |
| 992 | ID-V-153 | REVISION O UPDATED DWGS | 4TH FLOOR POWER PLAN | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 34 |
| 993 | ID-V-200 | REVISION O UPDATED DWGS | 1ST FLOOR GREAT ROOM & GRAND FOYER ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 35 |
| 994 | ID-V-201 | REVISION O UPDATED DWGS | 1ST FLOOR ICE SKATING FOYER/RINK ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 36 |
| 995 | ID-V-202 | REVISION O UPDATED DWGS | 1ST FLOOR ICE SKATIONG 3D ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | | | | | 5/15/2020 | | 37 |
| 996 | ID-V-203A | REVISION O UPDATED DWGS | 1ST FLOOR RESTROOM ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | | | | | 5/15/2020 | | 38 |
| 997 | ID-V-203B | REVISION O UPDATED DWGS | 1ST FLOOR RESTROOM ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | | | | | | 5/15/2020 | | 39 |
| 998 | ID-V-204.A | REVISION O UPDATED DWGS | 1ST FLOOR NORTH GALLERY ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 40 |
| 999 | ID-V-204.B | REVISION O UPDATED DWGS | 1ST FLOOR SOUTH GALLERY ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 41 |
| 1000 | ID-V-205 | REVISION O UPDATED DWGS | 1ST FLOOR BOWLING ALLEY ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 42 |
| 1001 | ID-V-206 | REVISION O UPDATED DWGS | 1ST FLOOR RACECAR SIM & TEEN ROOM ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 43 |
| 1002 | ID-V-207 | REVISION O UPDATED DWGS | 1ST FLOOR THEATER ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 6/4/2020 | | 44 |
| 1003 | ID-V-208 | REVISION O UPDATED DWGS | 1ST FLOOR BAR/BILLIARD ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | | | | | 5/15/2020 | | 45 |
| 1004 | ID-V-209 | REVISION O UPDATED DWGS | 1ST FLOOR CHILDREN/GOLF ROOM ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | | 46 |
| 1005 | ID-V-220 | REVISION O UPDATED DWGS | 2ND FLOOR NORTH GALLERY & SOUTH GALLERY | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | 11/22/2019 | | | | | 5/15/2020 | | 47 |
| 1006 | ID-V-221 | DELETED | VILLA ELEVATIONS 2ND FLOOR RESTROOM FOYER | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | | |
| 1007 | ID-V-222 | DELETED | VILLA ELEVATIONS 2ND FLOOR MEN RESTROOM | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | | |
| 1008 | ID-V-223 | DELETED | VILLA ELEVATIONS 2ND FLOOR WOMEN RESTROOM | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | | |
| 1009 | ID-V-230 | DELETED | | | | | | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | | |
| 1010 | ID-V-230A | REVISION O UPDATED DWGS | 3RD FLOOR GALLERY ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 48 |
| 1011 | ID-V-230B | REVISION O UPDATED DWGS | 3RD FLOOR GALLERY & FRAND FOYER ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 49 |
| 1012 | ID-V-231 | REVISION O UPDATED DWGS | 3RD FLOOR RESTROOM ELEVATIONS | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 50 |
| 1013 | ID-V-232 | DELETED | VILLA ELEVATION LEVEL-03 MEZZANINE RESIDENT CLUB | | | | 5/14/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | | |
| 1014 | ID-V-232A | REVISION O UPDATED DWGS | 3RD FLOOR RESIDENT CLUB & BAR ELEVATIONS | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | | 51 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| Row | Sheet No. | Version | Description | # of Sheets |
|---|---|---|---|---|
| 1015 | ID-V-232B | REVISION O UPDATED DWGS | 3RD FLOOR RESIDENT CLUB & BAR ELEVATIONS | 52 |
| 1016 | ID-V-232C | REVISION O UPDATED DWGS | 3RD FLOOR RESIDENTS BAR ENLARGED PLAN & ELEVATIONS | 53 |
| 1017 | ID-V-233 | REVISION O UPDATED DWGS | 3RD FLOOR ADMIN & WALL STREET ROOM ELEVATIONS | 54 |
| 1018 | ID-V-240 | REVISION O UPDATED DWGS | 4TH FLOOR CIGAR ROOM & GRAND FOYER ELEVATIONS | 55 |
| 1019 | ID-V-241 | DELETED | VILLA ELEVATION LEVEL-04 LOUNGE CIGAR & WINE ROOM | |
| 1020 | ID-V-242 | DELETED | VILLA ELEVATION LEVEL-04 RESTROOMS | |
| 1021 | ID-V-243 | DELETED | VILLA ELEVATION LEVEL-04 LOUNGE LOUNGE ROOM & BAR | |
| 1022 | ID-V-244 | DELETED | VILLA ELEVATION LEVEL-04 LOUNGE LOUNGE ROOM & BAR | |
| 1023 | ID-V-250 | REVISION O UPDATED DWGS | GRAND STAIRS ELEVATOR PLANS AND ELEVATIONS | 56 |
| 1024 | ID-V-251 | REVISION O UPDATED DWGS | GRAND FOYER ELEVATIONS | 57 |
| 1025 | ID-V-252 | REVISION O UPDATED DWGS | GRAND FOYER ELEVATIONS | 58 |
| 1026 | ID-V-300 | REVISION O UPDATED DWGS | GRAND STAIRS - VILLA | 59 |
| 1027 | ID-V-500 | REVISION O UPDATED DWGS | WALL BASE AND SADDLE DETAILS | 60 |
| 1028 | ID-V-501A | REVISION O UPDATED DWGS | DETAILS GREAT ROOM BILLIARD AREA N&S GALLERIES | 61 |
| 1029 | ID-V-502 | REVISION O UPDATED DWGS | DETAILS TEEN RM/GOLF SIMULATOR/RACE CAR SIMULATOR/CHILDRENS ROOM | 62 |
| 1030 | ID-V-503 | DELETED | DETAILS ICE RINK | |
| 1031 | ID-V-503A | REVISION O UPDATED DWGS | DETAILS ICE RINK | 63 |
| 1032 | ID-V-503B | REVISION O UPDATED DWGS | DETAILS ICE RINK | 64 |
| 1033 | ID-V-504 | DELETED | DETAILS THEATRE | |
| 1034 | ID-V-504A | REVISION O UPDATED DWGS | DETAILS THEATER | 65 |
| 1035 | ID-V-504B | REVISION O UPDATED DWGS | DETAILS THEATER | 66 |
| 1036 | ID-V-505 | DELETED | DETAILS BOWLING ALLEY | |
| 1037 | ID-V-505A | REVISION O UPDATED DWGS | DETAILS BOWLING ALLEY | 67 |
| 1038 | ID-V-505B | REVISION O UPDATED DWGS | DETAILS BOWLING ALLEY | 68 |
| 1039 | ID-V-506 | REVISION O UPDATED DWGS | DETAILS WALL STREET ROOM | 69 |
| 1040 | ID-V-507 | DELETED | DETAILS CIGAR ROOM | |
| 1041 | ID-V-507A | REVISION O UPDATED DWGS | DETAILS CIGAR ROOM | 70 |
| 1042 | ID-V-507B | REVISION O UPDATED DWGS | DETAILS CIGAR ROOM | 71 |
| 1043 | ID-V-508 | REVISION O UPDATED DWGS | DETAILS RESTROOMS | 72 |
| 1044 | ID-V-509 | REVISION O UPDATED DWGS | DETAILS 3RD FLOOR GALLERIES-ADMIN | 73 |
| 1045 | ID-V-510A | REVISION O UPDATED DWGS | DETAILS RESIDENTS CLUB | 74 |
| 1046 | ID-V-510B | REVISION O UPDATED DWGS | DETAILS RESIDENTS CLUB | 75 |
| 1047 | ID-V-510 | DELETED | DETAILS RESIDENTS CLUB | |
| 1048 | ID-V-511 | REVISION O UPDATED DWGS | DOOR SCHEDULE & DETAILS | 76 |
| 1049 | ID-V-600 | REVISION O UPDATED DWGS | MILLWORK DETAILS GREAT ROOM | 77 |
| 1050 | ID-V-600B | DELETED | | |
| 1051 | ID-V-601 | REVISION O UPDATED DWGS | MILLWORK DETAILS ICE SKATING FOYER&THEATERS&TEENS RM & RESTROOMS | 78 |
| 1052 | ID-V-602 | REVISION O UPDATED DWGS | MILLWORK DETAILS CHILDREN'S ROOM GOLF SIMULATOR | 79 |
| 1053 | ID-V-603 | REVISION O UPDATED DWGS | MILLWORK DETAILS BILLIARD BAR | 80 |
| 1054 | ID-V-604 | REVISION O UPDATED DWGS | MILLWORK DETAILS CIGAR ROOM | 81 |
| 1055 | ID-V-606B | DELETED | MILLWORK DETAILS RESIDENCE CLUB | |
| 1056 | ID-V-605 | REVISION O UPDATED DWGS | MILLWORK DETAILS 3RD FLOOR | 82 |
| 1057 | ID-V-606 | REVISION O UPDATED DWGS | MILLWORK DETAILS RESIDENCE CLUB | 83 |
| 1058 | ID-V-607 | DELETED | MILLWORK DETAILS WINE ROOM | |
| 1059 | ID-V-609 | DELETED | MILLWORK DETAILS LOUNG | |
| 1060 | ID-V-700 | REVISION O UPDATED DWGS | ROOM SCHEDULE | 84 |
| 1061 | ID-V-701 | REVISION O UPDATED DWGS | FINISH SCHEDULE | 85 |
| 1062 | ID-V-702 | REVISION O UPDATED DWGS | DOOR SCHEDULE | 86 |
| 1063 | ID-V-703 | REVISION O UPDATED DWGS | HARDWARE APPLIANCE PLUMBING AND ACCESSORIES SCHEDULES | 87 |
| 1064 | ID-V-704 | DELETED | | |
| 1065 | STA VILLA ID'S | | | 83 |
| 1066 | ID-STA-V0.000 | REVISION 4 UPDATED DWGS | COVER SHEET | 1 |
| 1067 | ID-STA V0.001 | REVISION 4 UPDATED DWGS | KEY SYMBOLS ABBREVIATIONS | 2 |
| 1068 | ID-STA V0.002 | REVISION 4 UPDATED DWGS | GENERAL NOTES & INTERIOR SPECIFICATIONS | 3 |
| 1069 | ID-STA V0.003 | REVISION 4 UPDATED DWGS | DRAWING INDEX | 4 |
| 1070 | ID-STA V2.100 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT FLOOR PLAN | 5 |
| 1071 | ID-STA V2.101 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT FLOOR FINISH PLAN | 6 |
| 1072 | ID-STA V2.102 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT POWER PLAN | 7 |
| 1073 | ID-STA V2.103 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT RCP | 8 |
| 1074 | ID-STA V2.104 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT FURNITURE PLAN | 9 |
| 1075 | ID-STA V2.200 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ELEVATIONS | 10 |
| 1076 | ID-STA V2.201 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ELEVATIONS | 11 |
| 1077 | ID-STA V2.202 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ELEVATIONS | 12 |
| 1078 | ID-STA V2.203 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ELEVATIONS | 13 |
| 1079 | ID-STA V2.204 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ELEVATIONS | 14 |
| 1080 | ID-STA V2.205 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ELEVATIONS | 15 |
| 1081 | ID-STA V2.206 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ELEVATIONS | 16 |
| 1082 | ID-STA V2.207 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ELEVATIONS | 17 |
| 1083 | ID-STA V2.208 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ELEVATIONS | 18 |
| 1084 | ID-STA V2.300 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ENLARGED PLANS & ELEVATIONS | 19 |
| 1085 | ID-STA V2.301 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ENLARGED PLANS & ELEVATIONS | 20 |
| 1086 | ID-STA V2.302 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ENLARGED PLANS & ELEVATIONS | 21 |
| 1087 | ID-STA V2.303 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ENLARGED PLANS & ELEVATIONS | 22 |
| 1088 | ID-STA V2.304 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ENLARGED PLANS & ELEVATIONS | 23 |
| 1089 | ID-STA V2.305 | REVISION 4 UPDATED DWGS | LEVEL 2 RESTAURANT ENLARGED PLANS & ELEVATIONS | 24 |
| 1090 | ID-STAV4.100 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE, FLOOR PLAN | 25 |
| 1091 | ID-STAV4.101 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNG FLOOR FINISH PLAN | 26 |
| 1092 | ID-STAV4.102 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE POWER PLAN | 27 |
| 1093 | ID-STAV4.103 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE RCP | 28 |
| 1094 | ID-STAV4.104 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE FURNITURE PLAN | 29 |
| 1095 | ID-STAV4.200 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE ELEVATIONS | 30 |
| 1096 | ID-STAV4.201 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE ELEVATIONS | 31 |
| 1097 | ID-STAV4.202 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE ELEVATIONS | 32 |
| 1098 | ID-STAV4.203 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE ELEVATIONS | 33 |
| 1099 | ID-STAV4.204 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE ELEVATIONS | 34 |
| 1100 | ID-STAV4.205 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE ELEVATIONS | 35 |
| 1101 | ID-STAV4.206 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE ELEVATIONS | 36 |
| 1102 | ID-STAV4.207 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE ELEVATIONS | 37 |
| 1103 | ID-STAV4.300 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE ENLARGED PLANS AND ELEVATIONS | 38 |
| 1104 | ID-STAV4.301 | REVISION 4 UPDATED DWGS | LEVEL 4 LOUNGE ENLARGED PLANS AND ELEVATIONS | 39 |
| 1105 | ID-STAV5.100 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB FLOOR PLAN | 40 |
| 1106 | ID-STAV5.101 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB FLOOR FINISH PLAN | 41 |
| 1107 | ID-STAV5.102 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB POWER PLAN | 42 |
| 1108 | ID-STAV5.103 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB RCP | 43 |
| 1109 | ID-STAV5.104 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB FURNITURE PLAN | 44 |
| 1110 | ID-STAV5.200 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB ENLARGED PLANS & ELEVATIONS | 45 |
| 1111 | ID-STAV5.201 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB ENLARGED PALANS AND ELEVATIONS | 46 |
| 1112 | ID-STAV5.202 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB ENALRGED PLANS AND ELEVATIONS | 47 |
| 1113 | ID-STAV5.203 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB ENLARGED PLANS AND ELEVATIONS | 48 |
| 1114 | ID-STAV5.204 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB ENLARGED PLANS AND ELEVATIONS | 49 |
| 1115 | ID-STAV5.205 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB ENLARGED PLANS AND ELEVATIONS | 50 |
| 1116 | ID-STAV5.206 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB ENLARGED PLANS AND ELEVATIONS | 51 |
| 1117 | ID-STAV5.207 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB ENLARGED PLANS AND ELEVATIONS | 52 |
| 1118 | ID-STAV5.208 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB ENLARGED PLANS AND ELEVATIONS | 53 |
| 1119 | ID-STAV5.209 | REVISION 4 UPDATED DWGS | LEVEL 5 HEALTH CLUB ENLARGED PLANS AND ELEVATIONS | 54 |
| 1120 | ID-STAV5.300 | REVISION 4 UPDATED DWGS | ENLARGED PLANS AND ELEVATIONS | 55 |
| 1121 | ID-STAV5.301 | REVISION 4 UPDATED DWGS | ENLARGED PLANS AND ELEVATIONS | 56 |
| 1122 | ID-STAV5.302 | REVISION 4 UPDATED DWGS | ENLARGED PLANS AND ELEVATIONS | 57 |
| 1123 | ID-STA V.400 | REVISION 4 UPDATED DWGS | DETAILS FLOOR | 58 |
| 1124 | ID-STAV.401 | REVISION 4 UPDATED DWGS | DETAILS FLOOR | 59 |
| 1125 | ID-STAV.402 | REVISION 4 UPDATED DWGS | DETAILS FLOOR | 60 |
| 1126 | ID-STA V.410 | REVISION 4 UPDATED DWGS | DETAILS WALLS | 61 |
| 1127 | ID-STAV.411 | REVISION 4 UPDATED DWGS | DETAILS WALLS | 62 |

| Row | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 |
|---|---|---|---|---|---|---|---|---|
| 1015 | | | | | | | | |
| 1016 | | | | | | | | |
| 1017 | | | | 5/14/2018 | | | | |
| 1018 | | | | 5/14/2018 | | | | |
| 1019 | | | | 5/14/2018 | | | | |
| 1020 | | | | 5/14/2018 | | | | |
| 1021 | | | | 5/14/2018 | | | | |
| 1022 | | | | 5/14/2018 | | | | |
| 1023 | | | | | | | | |
| 1024 | | | | | | | | |
| 1025 | | | | | | | | |
| 1026 | | | | 5/14/2018 | | | | |
| 1027 | | | | 5/14/2018 | | | | |
| 1028 | | | | | | | | |
| 1029 | | | | 5/14/2018 | | | | |
| 1030 | | | | 5/14/2018 | | | | |
| 1031 | | | | | | | | |
| 1032 | | | | | | | | |
| 1033 | | | | 5/14/2018 | | | | |
| 1034 | | | | | | | | |
| 1035 | | | | | | | | |
| 1036 | | | | 5/14/2018 | | | | |
| 1037 | | | | | | | | |
| 1038 | | | | | | | | |
| 1039 | | | | 5/14/2018 | | | | |
| 1040 | | | | 5/14/2018 | | | | |
| 1041 | | | | | | | | |
| 1042 | | | | | | | | |
| 1043 | | | | | | | | |
| 1044 | | | | 5/14/2018 | | | | |
| 1045 | | | | | | | | |
| 1046 | | | | | | | | |
| 1047 | | | | 5/14/2018 | | | | |
| 1048 | | | | 5/14/2018 | | | | |
| 1049 | | | | 5/14/2018 | | | | |
| 1050 | | | | | | | | |
| 1051 | | | | 5/14/2018 | | | | |
| 1052 | | | | 5/14/2018 | | | | |
| 1053 | | | | 5/14/2018 | | | | |
| 1054 | | | | 5/14/2018 | | | | |
| 1055 | | | | 5/14/2018 | | | | |
| 1056 | | | | | | | | |
| 1057 | | | | | | | | |
| 1058 | | | | 5/14/2018 | | | | |
| 1059 | | | | 5/14/2018 | | | | |
| 1060 | | | | 5/14/2018 | | | | |
| 1061 | | | | 5/14/2018 | | | | |
| 1062 | | | | | | | | |
| 1063 | | | | 5/14/2018 | | | | |
| 1064 | | | | 5/14/2018 | | | | |
| 1066 | | | | 2/14/2020 | 3/13/2020 | 3/20/2020 | 4/1/2020 | 5/15/2020 |
| 1067 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1068 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1069 | | | | 2/14/2020 | 3/13/2020 | 3/20/2020 | 4/1/2020 | 5/15/2020 |
| 1070 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1071 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1072 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1073 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1074 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1075 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1076 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1077 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1078 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1079 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1080 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1081 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1082 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1083 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1084 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1085 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1086 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1087 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1088 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1089 | | | | 2/14/2020 | | | 4/1/2020 | 5/15/2020 |
| 1090 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1091 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1092 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1093 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1094 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1095 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1096 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1097 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1098 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1099 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1100 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1101 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1102 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1103 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1104 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1105 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1106 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1107 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1108 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1109 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1110 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1111 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1112 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1113 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1114 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1115 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1116 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1117 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1118 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1119 | 11/15/2019 | | | | | 3/20/2020 | | 5/15/2020 |
| 1120 | | | | | | 3/20/2020 | | 5/15/2020 |
| 1121 | | | | | | 3/20/2020 | | 5/15/2020 |
| 1122 | | | | | | 3/20/2020 | | 5/15/2020 |
| 1123 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1124 | | | | | | 3/20/2020 | | 5/15/2020 |
| 1125 | | | | | 3/13/2020 | | | 5/15/2020 |
| 1126 | | | | 2/14/2020 | | | | 5/15/2020 |
| 1127 | | | | | | 3/20/2020 | | 5/15/2020 |

| Row | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1015 | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1016 | | | | | | | | | | | | | | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1017 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1018 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | | | | | 5/15/2020 | |
| 1019 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1020 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1021 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1022 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1023 | | | | | | | | | | | | | | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1024 | | | | | | | | | | | | | | | 11/13/2019 | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1025 | | | | | | | | | | | | | | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1026 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | | | | | 5/15/2020 | |
| 1027 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | 11/22/2019 | | | | | 5/15/2020 | |
| 1028 | | | | | | | | | | | | | 6/3/2019 | | 11/13/2019 | 12/6/2020 | 2/18/2020 | | | | 6/4/2020 | |
| 1029 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | 11/13/2019 | | | | | 5/15/2020 | |
| 1030 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1031 | | | | | | | | | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | |
| 1032 | | | | | | | | | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | |
| 1033 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1034 | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | | | | | 5/15/2020 | |
| 1035 | | | | | | | | | | | | | 6/3/2019 | | 11/13/2019 | | | | | | 5/15/2020 | |
| 1036 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1037 | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | 11/13/2019 | | | | | 5/15/2020 | |
| 1038 | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | |
| 1039 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | | | | | 5/15/2020 | |
| 1040 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1041 | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | | | | | 5/15/2020 | |
| 1042 | | | | | | | | | | | | | 6/3/2019 | | | 11/22/2019 | | | | | 5/15/2020 | |
| 1043 | | | | | | | | | | | | | 6/3/2019 | | 11/13/2019 | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1044 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1045 | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1046 | | | | | | | | | | | | | 6/3/2019 | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1047 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | 2/18/2020 | | | | | |
| 1048 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1049 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | 2/18/2020 | | | | 5/15/2020 | |
| 1050 | | | | | | | | | | | | | | | | | | | | | | |
| 1051 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | | | | | 5/15/2020 | |
| 1052 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | |
| 1053 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | | | | | 5/15/2020 | |
| 1054 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1055 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1056 | | | | | | | | | | | | | 6/3/2019 | | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1057 | | | | | | | | | | | | | | 7/25/2019 | | 11/22/2019 | 2/18/2020 | | | | 5/15/2020 | |
| 1058 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1059 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |
| 1060 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | |
| 1061 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | 7/25/2019 | 11/13/2019 | | 2/18/2020 | | | | 5/15/2020 | |
| 1062 | | | | | | | | | | | | | 6/3/2019 | | 11/13/2019 | 11/22/2019 | | | | | 5/15/2020 | |
| 1063 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | 11/13/2019 | 11/22/2019 | | | | | 5/15/2020 | |
| 1064 | | | | | | 7/20/2018 | | 10/31/2018 | | | | | 6/3/2019 | | | | | | | | | |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 1128 | ID-STAV.412 | REVISION 4 UPDATED DWGS | DETAILS WALLS | | | | | | 3/20/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 63 |
| 1129 | ID-STAV.413 | REVISION 4 UPDATED DWGS | DETAILS WALLS | | | | | 3/13/2020 | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 64 |
| 1130 | ID-STA V.420 | REVISION 4 UPDATED DWGS | DETAILS CEILING | | | | 2/14/2020 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 65 |
| 1131 | ID-STA V.421 | REVISION 4 UPDATED DWGS | DETAILS CEILING | | | | 2/14/2020 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 66 |
| 1132 | ID-STAV.422 | REVISION 4 UPDATED DWGS | DETAILS CEILING | | | | | | 3/20/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 67 |
| 1133 | ID-STAV.423 | REVISION 4 UPDATED DWGS | DETAILS CEILING | | | | | | 3/20/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 68 |
| 1134 | ID-STAV.424 | REVISION 4 UPDATED DWGS | DETAILS CEILING | | | | | 3/13/2020 | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 69 |
| 1135 | ID-STAV.425 | REVISION 4 UPDATED DWGS | DETAILS CEILING | | | | | 3/13/2020 | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 70 |
| 1136 | ID-STA V.430 | REVISION 4 UPDATED DWGS | DETAILS DOORS | | | | 2/14/2020 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 71 |
| 1137 | ID-STA V.431 | REVISION 4 UPDATED DWGS | DETAILS DOORS | | | | 2/14/2020 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 72 |
| 1138 | ID-STA V.432 | REVISION 4 UPDATED DWGS | DETAILS DOORS | | | | 2/14/2020 | | 3/20/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 73 |
| 1139 | ID-STAV.433 | REVISION 4 UPDATED DWGS | DETAILS DOORS | | | | | 3/13/2020 | 3/20/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 74 |
| 1140 | ID-STA V.440 | REVISION 4 UPDATED DWGS | DETAILS BATHROOM | | | | 2/14/2020 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 75 |
| 1141 | ID-STA V.450 | REVISION 4 UPDATED DWGS | DETAILS VENDORS | | | | 2/14/2020 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 76 |
| 1142 | ID-STA V.500 | REVISION 4 UPDATED DWGS | SCHEDULES FINISHES | | | | 2/14/2020 | 3/13/2020 | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 77 |
| 1143 | ID-STAV.501 | REVISION 4 UPDATED DWGS | SCHEDULES FINISHES | | | | | 3/13/2020 | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 78 |
| 1144 | ID-STAV.502 | REVISION 4 UPDATED DWGS | SCHEDULES FINISHES | | | | | 3/13/2020 | 3/20/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 79 |
| 1145 | ID-STAV.503 | REVISION 4 UPDATED DWGS | SCHEDULES FINISHES | | | | | 3/13/2020 | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 80 |
| 1146 | ID-STA V.510 | REVISION 4 UPDATED DWGS | SCHEDULES- PLUMBING FIXTURES EQUIPMENT AND APPLIANCES | | | | 2/14/2020 | 3/13/2020 | 3/20/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 81 |
| 1147 | ID-STA V.530 | REVISION 4 UPDATED DWGS | SCHEDULES DOORS AND HARDWARE | | | | 2/14/2020 | 3/13/2020 | 3/20/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 82 |
| 1148 | ID-STA V.531 | REVISION 4 UPDATED DWGS | SCHEDULES DOORS AND HARDWARE | | | | 2/14/2020 | 3/13/2020 | 3/20/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | | | | | 83 |
| 1149 | INTERIOR DESIGN -CABANAS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 8 |
| 1150 | ID-C-000 | REVISIION O UPDATED SET OF DWG'S | DRAWING LIST | | | | 6/3/2019 | | | | | | | | | | | | | | | | | | 7/25/2019 | | 3/3/2020 | | | | | 5/15/2020 | | 1 |
| 1151 | ID-C-100 | REVISIION O UPDATED SET OF DWG'S | TYPICAL CABANA & Cabana #4 FLOOR PLANS | | | | 6/3/2019 | | | | | | | | | | | | | | | | | | | | 3/3/2020 | | | | | 5/15/2020 | | 2 |
| 1152 | ID-C-200 | REVISIION O UPDATED SET OF DWG'S | TYPICAL CABANA & Cabana #4 INTERIOR ELEVATIONS | | | | 6/3/2019 | | | | | | | | | | | | | | | | | | | | 3/3/2020 | | | | | 5/15/2020 | | 3 |
| 1153 | ID-C-201 | REVISIION O UPDATED SET OF DWG'S | TYPICAL CABANA & CABANA #4 INTERIOR ELEVATIONS | | | | 6/3/2019 | | | | | | | | | | | | | | | | | | | | 3/3/2020 | | | | | 5/15/2020 | | 4 |
| 1154 | ID-C-500 | REVISIION O UPDATED SET OF DWG'S | CONSTRUCTION DETAILS | | | | 6/3/2019 | | | | | | | | | | | | | | | | | | | | 3/3/2020 | | | | | 5/15/2020 | | 5 |
| 1155 | ID-C-600 | REVISIION O UPDATED SET OF DWG'S | CABANA MILLWORK KITCHEN | | | | 6/3/2019 | | | | | | | | | | | | | | | | | | | | 3/3/2020 | | | | | 5/15/2020 | | 6 |
| 1156 | ID-C-601 | REVISIION O UPDATED SET OF DWG'S | CABANS MILLWORK | | | | | | | | | | | | | | | | | | | | | | | | 3/3/2020 | | | | | 5/15/2020 | | 7 |
| 1157 | ID-C-700 | REVISIION O UPDATED SET OF DWG'S | SCHEDULES | | | | 6/3/2019 | | | | | | | | | | | | | | | | | | 7/25/2019 | | 3/3/2020 | | | | | 5/15/2020 | | 8 |
| 1158 | INTERIOR DESIGN -ST & NT UNITS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 509 |
| 1159 | ID0.00 | REV 8 UPDATED SET OF DWG'S | COVER SHEET | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | 11/26/2019 | | 1/31/2020 | 4/9/2020 | 5/15/2020 | | | | | | | | | | | | | | | | | | | 1 |
| 1160 | ID0.01 | ID 100% CD Units 1 to 7 | KEY SYMBOLS& ABBREVIATIONS | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 1161 | ID0.02 | REV 2 UPDATED SET OF DWG'S | GENERAL NOTES & INTERIOR SPECIFICATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 3 |
| 1162 | ID0.03 | REV 8 UPDATED SET OF DWG'S | DRAWING INDEX (UNITS 1 to 9) | | | | | | 3/15/2019 | 5/31/2019 | 11/26/2019 | 12/13/2019 | 1/31/2020 | 4/9/2020 | 5/15/2020 | | | | | | | | | | | | | | | | | | | 4 |
| 1163 | ID0.04 | REV 8 UPDATED SET OF DWG'S | DRAWING INDEX (UNITS 10 to 15) | | | | | | 3/15/2019 | | 11/26/2019 | 12/13/2019 | 1/31/2020 | 4/9/2020 | 5/15/2020 | | | | | | | | | | | | | | | | | | | 5 |
| 1164 | ID0.05 | REV 8 UPDATED SET OF DWG'S | DRAWING INDEX | | | | | | | | | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 6 |
| 1165 | ID1.100 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, FLOOR PLAN | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 7 |
| 1166 | ID1.101 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, FLOOR FINISH PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 8 |
| 1167 | ID1.102 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, POWER PLAN | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 9 |
| 1168 | ID1.103 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, REFLECTED CEILING PLAN | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 10 |
| 1169 | ID1.104 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, FURNITURE PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 11 |
| 1170 | ID1.110 | ID 100% CD Units 1 to 7 | UNIT-1, UFFIZI, FLOOR PLAN, OPTION | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 12 |
| 1171 | ID1.111 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, FLOOR FINISH PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 13 |
| 1172 | ID1.112 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, POWER PLAN OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 14 |
| 1173 | ID1.113 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, REFLECTED CEILING PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 15 |
| 1174 | ID1.114 | ID 100% CD Units 1 to 7 | UNIT-1, UFFIZI, FURNITURE PLAN OPTION | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 16 |
| 1175 | ID1.120 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, FLOOR PLAN, OPTION2&3 | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 17 |
| 1176 | ID1.121 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, FLOOR FINISH PLAN, OPTION2&3 | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 18 |
| 1177 | ID1.122 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, POWER PLAN, OPTION2&3 | | | | | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 19 |
| 1178 | ID1.123 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, REFLECTED CEILING PLAN, OPTION2&3 | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 20 |
| 1179 | ID1.124 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, FURNITURE PLAN, OPTION2&3 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 21 |
| 1180 | ID1.200 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 22 |
| 1181 | ID1.201 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 23 |
| 1182 | ID1.202 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 24 |
| 1183 | ID1.203 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 25 |
| 1184 | ID1.204 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 26 |
| 1185 | ID1.205 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 27 |
| 1186 | ID1.206 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 28 |
| 1187 | ID1.207 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 29 |
| 1188 | ID1.208 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS OPTION2 | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 30 |
| 1189 | ID1.209 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS OPTION2 | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 31 |
| 1190 | ID1.210 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS OPTION3 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 32 |
| 1191 | ID1.211 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS OPTION3 | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 33 |
| 1192 | ID1.212 | REV 2 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS OPTION3 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 34 |
| 1193 | ID1.213 | REV 3 UPDATED SET OF DWG'S | UNIT-1, UFFIZI, ENLARGED PLANS& ELEVATIONS OPTION3 | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 35 |
| 1194 | ID1.214 | REV 2 UPDATED SET OF DWG'S | UNIT-1 UFFIZI KITCHEN COOKTOP OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 36 |
| 1195 | ID2.100 | REV 3 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, FLOOR PLAN | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 37 |
| 1196 | ID2.101 | REV 3 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, FLOOR FINISH PLAN | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 38 |
| 1197 | ID2.102 | REV 3 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, POWER PLAN | | | | | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 39 |
| 1198 | ID2.103 | REV 3 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, REFLECTED CEILING PLAN | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 40 |
| 1199 | ID2.104 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, FURNITURE PLAN | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 41 |
| 1200 | ID2.110 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, FLOOR PLAN, OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 42 |
| 1201 | ID2.111 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, FLOOR FINISH PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 43 |
| 1202 | ID2.112 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, POWER PLAN OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 44 |
| 1203 | ID2.113 | REV 3 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, REFLECTED CEILING PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 45 |
| 1204 | ID2.114 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, FURNITURE PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 46 |
| 1205 | ID2.200 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 47 |
| 1206 | ID2.201 | REV 3 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 48 |
| 1207 | ID2.202 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 49 |
| 1208 | ID2.203 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 50 |
| 1209 | ID2.204 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 51 |
| 1210 | ID2.205 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 52 |
| 1211 | ID2.206 | REV 2 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH, ENLARGED PLANS& ELEVATIONS OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 53 |
| 1212 | ID2.207 | REV 3 UPDATED SET OF DWG'S | UNIT-2, VECCHIO-NORTH KITCHEN COOKTOP OPTION | | | | | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 54 |
| 1213 | ID3.100 | REV 3 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, FLOOR PLAN | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 55 |
| 1214 | ID3.101 | REV 3 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, FLOOR FINISH PLAN | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 56 |
| 1215 | ID3.102 | REV 3 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, POWER PLAN | | | | | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 57 |
| 1216 | ID3.103 | REV 3 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, REFLECTED CEILING PLAN | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 58 |
| 1217 | ID3.104 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, FURNITURE PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 59 |
| 1218 | ID3.110 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, FLOOR PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 60 |
| 1219 | ID3.111 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, FLOOR FINISH PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 61 |
| 1220 | ID3.112 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, POWER PLAN OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 62 |
| 1221 | ID3.113 | REV 3 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, REFLECTED CEILING PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 63 |
| 1222 | ID3.114 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, FURNITURE PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 64 |
| 1223 | ID3.200 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 65 |
| 1224 | ID3.201 | REV 3 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 66 |
| 1225 | ID3.202 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 67 |
| 1226 | ID3.203 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 68 |
| 1227 | ID3.204 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 69 |
| 1228 | ID3.205 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 70 |
| 1229 | ID3.206 | REV 2 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, ENLARGED PLANS& ELEVATIONS OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 71 |
| 1230 | ID3.207 | REV 3 UPDATED SET OF DWG'S | UNIT-3, VECCHIO-SOUTH, KITCHEN COOKTOP OPTION | | | | | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 72 |
| 1231 | ID4.100 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, FLOOR PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 73 |
| 1232 | ID4.101 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, FLOOR FINISH PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 74 |
| 1233 | ID4.102 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, POWER PLAN | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 75 |
| 1234 | ID4.103 | REV 3 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, REFLECTED CEILING PLAN | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 76 |
| 1235 | ID4.104 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, FURNITURE PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 77 |
| 1236 | ID4.110 | REV 3 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, FLOOR PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 78 |
| 1237 | ID4.111 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, FLOOR FINISH PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 79 |
| 1238 | ID4.112 | REV 3 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, POWER PLAN OPTION | | | | | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 80 |
| 1239 | ID4.113 | REV 3 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, REFLECTED CEILING PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 81 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1240 | ID4.114 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, FURNITURE PLAN OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 82 |
| 1241 | ID4.200 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 83 |
| 1242 | ID4.201 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 84 |
| 1243 | ID4.202 | ID 100% CD Units 1 to 7 | UNIT-4, DONATELLO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 85 |
| 1244 | ID4.203 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 86 |
| 1245 | ID4.204 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 87 |
| 1246 | ID4.205 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 88 |
| 1247 | ID4.206 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 89 |
| 1248 | ID4.207 | REV 2 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 90 |
| 1249 | ID4.208 | REV 3 UPDATED SET OF DWG'S | UNIT-4, DONATELLO, ENLARGED PLANS& ELEVATIONS OPTION | | | | 3/2/2018 | | 3/15/2019 | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | 91 |
| 1250 | ID4.209 | REV 2 UPDATED SET OF DWG'S | UNIT-4,DONATELLO KITCHEN COOKTOP OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 92 |
| 1251 | ID5.100 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, FLOOR PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 93 |
| 1252 | ID5.101 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, FLOOR FINISH PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 94 |
| 1253 | ID5.102 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, POWER PLAN | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 95 |
| 1254 | ID5.103 | REV 2 CCD UPDATED SET OF DWG'S | UNIT-5, TOSCANA, REFLECTED CEILING PLAN | | | | 3/2/2018 | | 5/31/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 96 |
| 1255 | ID5.104 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, FURNITURE PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 97 |
| 1256 | ID5.105 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, FLOOR PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 98 |
| 1257 | ID5.106 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, FLOOR FINISH PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 99 |
| 1258 | ID5.107 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, POWER PLAN, OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 100 |
| 1259 | ID5.108 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, REFLECTED CEILING PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 101 |
| 1260 | ID5.109 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, FURNITURE PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 102 |
| 1261 | ID5.200 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 103 |
| 1262 | ID5.201 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 104 |
| 1263 | ID5.202 | ID 100% CD Units 1 to 7 | UNIT-5, TOSCANA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 105 |
| 1264 | ID5.203 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 106 |
| 1265 | ID5.204 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 107 |
| 1266 | ID5.205 | ID 100% CD Units 1 to 7 | UNIT-5, TOSCANA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 108 |
| 1267 | ID5.206 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 109 |
| 1268 | ID5.207 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 110 |
| 1269 | ID5.208 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA, ENLARGED PLANS& ELEVATIONS, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 111 |
| 1270 | ID5.209 | REV 2 UPDATED SET OF DWG'S | UNIT-5, TOSCANA KITCHEN COOKTOP OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 112 |
| 1271 | ID6.100 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, FLOOR PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 113 |
| 1272 | ID6.101 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, FLOOR FINISH PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 114 |
| 1273 | ID6.102 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, POWER PLAN | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 115 |
| 1274 | ID6.103 | REV 2 CCD 55 UPDATED SET OF DWG'S | UNIT-6, POSITANO, REFLECTED CEILING PLAN | | | | 3/2/2018 | | 12/5/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 116 |
| 1275 | ID6.104 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, FURNITURE PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 117 |
| 1276 | ID6.105 | ID 100% CD Units 1 to 7 | UNIT-6, POSITANO, FLOOR PLAN, OPTION | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 118 |
| 1277 | ID6.106 | ID 100% CD Units 1 to 7 | UNIT-6, POSITANO, FLOOR FINISH PLAN, OPTION | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 119 |
| 1278 | ID6.107 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, POWER PLAN, OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 120 |
| 1279 | ID6.108 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, REFLECTED CEILING PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 121 |
| 1280 | ID6.109 | ID 100% CD Units 1 to 7 | UNIT-6, POSITANO, FURNITURE PLAN, OPTION | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 122 |
| 1281 | ID6.200 | ID 100% CD Units 1 to 7 | UNIT-6, POSITANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 123 |
| 1282 | ID6.201 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 124 |
| 1283 | ID6.202 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 125 |
| 1284 | ID6.203 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 126 |
| 1285 | ID6.204 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 127 |
| 1286 | ID6.205 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 128 |
| 1287 | ID6.206 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 129 |
| 1288 | ID6.207 | REV 2 UPDATED SET OF DWG'S | UNIT-6, POSITANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 130 |
| 1289 | ID6.208 | ID 100% CD Units 1 to 7 | UNIT-6, POSITANO, ENLARGED PLANS& ELEVATIONS, OPTION | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 131 |
| 1290 | ID6.209 | REV 2 UPDATED SET OF DWG'S | UNIT-6 POSITANO KITCHEN COOKTOP OPTION & KITCHEN LVLS 14TH-16TH | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 132 |
| 1291 | ID7.100 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, FLOOR PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 133 |
| 1292 | ID7.101 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, FLOOR FINISH PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 134 |
| 1293 | ID7.102 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, POWER PLAN | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 135 |
| 1294 | ID7.103 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, REFLECTED CEILING PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 136 |
| 1295 | ID7.104 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, FURNITURE PLAN | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 137 |
| 1296 | ID7.105 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, FLOOR PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 138 |
| 1297 | ID7.106 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, FLOOR FINISH PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 139 |
| 1298 | ID7.107 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, POWER PLAN, OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 140 |
| 1299 | ID7.108 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, REFLECTED CEILING PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 141 |
| 1300 | ID7.109 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, FURNITURE PLAN, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 142 |
| 1301 | ID7.200 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 143 |
| 1302 | ID7.201 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 144 |
| 1303 | ID7.202 | ID 100% CD Units 1 to 7 | UNIT-7, MILANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 145 |
| 1304 | ID7.203 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 146 |
| 1305 | ID7.204 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 147 |
| 1306 | ID7.205 | ID 100% CD Units 1 to 7 | UNIT-7, MILANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 148 |
| 1307 | ID7.206 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 149 |
| 1308 | ID7.207 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 150 |
| 1309 | ID7.208 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 151 |
| 1310 | ID7.209 | REV 2 UPDATED SET OF DWG'S | UNIT-7, MILANO, ENLARGED PLANS& ELEVATIONS, OPTION | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 152 |
| 1311 | ID7.210 | REV 2 UPDATED SET OF DWG'S | UNIT-7 MILANO KITCHEN COOKTOP OPTION | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 153 |
| 1312 | ID8.100 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, FLOOR PLAN, LVL.1 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 154 |
| 1313 | ID8.100-1 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, FLOOR PLAN, LVL.2 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 155 |
| 1314 | ID8.101 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, FLOOR FINISH PLAN, LVL.1 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 156 |
| 1315 | ID8.101-1 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, FLOOR FINISH PLAN, LVL.2 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 157 |
| 1316 | ID8.102 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, POWER PLAN, LVL.1 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 158 |
| 1317 | ID8.102-1 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, POWER PLAN, LVL.2 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 159 |
| 1318 | ID8.103 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, REFLECTED CEILING PLAN, LVL.1 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 160 |
| 1319 | ID8.103-1 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, REFLECTED CEILING PLAN, LVL.2 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 161 |
| 1320 | ID8.104 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, FURNITURE PLAN, LVL.1 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 162 |
| 1321 | ID8.104-1 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, FURNITURE PLAN, LVL.2 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 163 |
| 1322 | ID8.105 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, POOL TERRACE | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 164 |
| 1323 | ID8.200 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 165 |
| 1324 | ID8.201 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS & ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 166 |
| 1325 | ID8.202 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 167 |
| 1326 | ID8.203 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS & ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 168 |
| 1327 | ID8.204 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS & ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 169 |
| 1328 | ID8.205 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 170 |
| 1329 | ID8.206 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS & ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 171 |
| 1330 | ID8.207 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 172 |
| 1331 | ID8.208 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 173 |
| 1332 | ID8.209 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 174 |
| 1333 | ID8.210 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 175 |
| 1334 | ID8.211 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS & ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 176 |
| 1335 | ID8.212 | REV 2 UPDATED SET OF DWG'S | UNIT-8, CASA DI SABBIA, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 177 |
| 1336 | ID9.100 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, FLOOR PLAN, LVL.1 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 178 |
| 1337 | ID9.100-1 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, FLOOR PLAN, LVL.2 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 179 |
| 1338 | ID9.101 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, FLOOR FINISH PLAN, LVL.1 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 180 |
| 1339 | ID9.101-1 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, FLOOR FINISH PLAN, LVL.2 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 181 |
| 1340 | ID9.102 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, POWER PLAN, LVL.1 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 182 |
| 1341 | ID9.102-1 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, POWER PLAN, LVL.2 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 183 |
| 1342 | ID9.103 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, REFLECTED CEILING PLAN, LVL.1 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 184 |
| 1343 | ID9.103-1 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, REFLECTED CEILING PLAN, LVL.2 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 185 |
| 1344 | ID9.104 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, FURNITURE PLAN, LVL.1 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 186 |
| 1345 | ID9.104-1 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, FURNITURE PLAN, LVL.2 | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 187 |
| 1346 | ID9.200 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 188 |
| 1347 | ID9.201 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 189 |
| 1348 | ID9.202 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 190 |
| 1349 | ID9.203 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 191 |
| 1350 | ID9.204 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 192 |
| 1351 | ID9.205 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 193 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | AK |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | # of Sheets |
| 1352 | ID9.206 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 194 |
| 1353 | ID9.207 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 195 |
| 1354 | ID9.208 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS & ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 196 |
| 1355 | ID9.209 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS & ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 197 |
| 1356 | ID9.210 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 198 |
| 1357 | ID9.211 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 199 |
| 1358 | ID9.212 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 200 |
| 1359 | ID9.213 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 201 |
| 1360 | ID9.214 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 202 |
| 1361 | ID9.215 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 203 |
| 1362 | ID9.216 | REV 2 UPDATED SET OF DWG'S | UNIT-9, CASA DI ORO, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 204 |
| 1363 | ID10.100 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI ESTE, FLOOR PLAN | | | | 3/2/2018 | | 3/15/2019 | 205 |
| 1364 | ID10.101 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI I ESTE, FLOOR FINISH PLAN | | | | 3/2/2018 | | 3/15/2019 | 206 |
| 1365 | ID10.102 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI ESTE, POWER PLAN | | | | | | 3/15/2019 | 207 |
| 1366 | ID10.103 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI ESTE, REFLECTED CEILING PLAN | | | | 3/2/2018 | | 3/15/2019 | 208 |
| 1367 | ID10.104 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI ESTE, FURNITURE PLAN | | | | 3/2/2018 | | 3/15/2019 | 209 |
| 1368 | ID10.200 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI I ESTE, ENLARGED PLANS & ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 210 |
| 1369 | ID10.201 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI ESTE, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 211 |
| 1370 | ID10.202 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI ESTE, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 212 |
| 1371 | ID10.203 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI ESTE, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 213 |
| 1372 | ID10.204 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI ESTE, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 214 |
| 1373 | ID10.205 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI ESTE, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 215 |
| 1374 | ID10.206 | REV 2 UPDATED SET OF DWG'S | UNIT-10, VILLA DI ESTE, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 216 |
| 1375 | ID11.100 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, FLOOR PLAN | | | | 3/2/2018 | | 3/15/2019 | 217 |
| 1376 | ID11.101 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, FLOOR FINISH PLAN | | | | 3/2/2018 | | 3/15/2019 | 218 |
| 1377 | ID11.102 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, POWER PLAN | | | | | | 3/15/2019 | 219 |
| 1378 | ID11.103 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, REFLECTED CEILING PLAN | | | | 3/2/2018 | | 3/15/2019 | 220 |
| 1379 | ID11.104 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, FURNITURE PLAN | | | | 3/2/2018 | | 3/15/2019 | 221 |
| 1380 | ID11.200 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 222 |
| 1381 | ID11.201 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 223 |
| 1382 | ID11.202 | ID 100% V2 Units 8 to 11 | UNIT-11, BOTTICELLI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | | 224 |
| 1383 | ID11.203 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 225 |
| 1384 | ID11.204 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 226 |
| 1385 | ID11.205 | ID 100%CD Units 8 to 11 | UNIT-11, BOTTICELLI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | | 227 |
| 1386 | ID11.206 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 228 |
| 1387 | ID11.207 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 229 |
| 1388 | ID11.208 | REV 2 UPDATED SET OF DWG'S | UNIT-11, BOTTICELLI, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 230 |
| 1389 | ID11.209 | REV 2 UPDATED SET OF DWG'S | UNIT -11, BOTICELLI ENLARGED PLANS & ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 231 |
| 1390 | ID11.210 | REV 2 UPDATED SET OF DWG'S | UNIT -11, BOTICELLI ENLARGED PLANS & ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | 232 |
| 1391 | ID12.100 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, FLOOR PLAN | | | | 3/2/2018 | | 3/15/2019 | 233 |
| 1392 | ID12.101 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, FLOOR FINISH PLAN | | | | 3/2/2018 | | 3/15/2019 | 234 |
| 1393 | ID12.102 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, POWER PLAN | | | | | | 3/15/2019 | 235 |
| 1394 | ID12.103 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, REFLECTED CEILING PLAN | | | | | | 3/15/2019 | 236 |
| 1395 | ID12.104 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, FURNITURE PLAN | | | | | | 3/15/2019 | 237 |
| 1396 | ID12.200 | ID 100%CD Units 8 to 11 | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | | 238 |
| 1397 | ID12.201 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 239 |
| 1398 | ID12.202 | ID 100%CD Units 8 to 11 | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | | 240 |
| 1399 | ID12.203 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 241 |
| 1400 | ID12.204 | ID 100%CD Units 8 to 11 | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | | 242 |
| 1401 | ID12.205 | ID 100%CD Units 8 to 11 | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | | 243 |
| 1402 | ID12.206 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 244 |
| 1403 | ID12.207 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 245 |
| 1404 | ID12.208 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 246 |
| 1405 | ID12.209 | ID 100%CD Units 8 to 11 | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | | 247 |
| 1406 | ID12.210 | ID 100%CD Units 8 to 11 | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | | 248 |
| 1407 | ID12.211 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 249 |
| 1408 | ID12.212 | ID 100%CD Units 8 to 11 | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | | 250 |
| 1409 | ID12.213 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 251 |
| 1410 | ID12.214 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 252 |
| 1411 | ID12.215 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 253 |
| 1412 | ID12.216 | REV 2 UPDATED SET OF DWG'S | UNIT-12, CASA DI SOGNI, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 254 |
| 1413 | ID13.100 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICCHEZZE, FLOOR PLAN | | | | | | 3/15/2019 | 255 |
| 1414 | ID13.101 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, FLOOR FINISH PLAN | | | | | | 3/15/2019 | 256 |
| 1415 | ID13.102 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, POWER PLAN | | | | | | 3/15/2019 | 257 |
| 1416 | ID13.103 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, REFLECTED CEILING PLAN | | | | | | 3/15/2019 | 258 |
| 1417 | ID13.104 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, FURNITURE PLAN | | | | | | 3/15/2019 | 259 |
| 1418 | ID13.200 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 260 |
| 1419 | ID13.201 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 261 |
| 1420 | ID13.202 | ID 100%CD Units 8 to 11 | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | | 262 |
| 1421 | ID13.203 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 263 |
| 1422 | ID13.204 | ID 100%CD Units 8 to 11 | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | | 264 |
| 1423 | ID13.205 | ID 100%CD Units 8 to 11 | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | | 265 |
| 1424 | ID13.206 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 266 |
| 1425 | ID13.207 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 267 |
| 1426 | ID13.208 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 268 |
| 1427 | ID13.209 | ID 100%CD Units 8 to 11 | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | | 269 |
| 1428 | ID13.210 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 270 |
| 1429 | ID13.211 | ID 100%CD Units 8 to 11 | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | | 271 |
| 1430 | ID13.212 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 272 |
| 1431 | ID13.213 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 273 |
| 1432 | ID13.214 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 274 |
| 1433 | ID13.215 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 275 |
| 1434 | ID13.216 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 276 |
| 1435 | ID13.217 | REV 2 UPDATED SET OF DWG'S | UNIT-13, CASA DI RICHEZZE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 277 |
| 1436 | ID14.100 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, FLOOR PLAN, LVL.1 | | | | | | 3/15/2019 | 278 |
| 1437 | ID14.101 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, FLOOR PLAN, LVL.2 | | | | | | 3/15/2019 | 279 |
| 1438 | ID14.102 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, FLOOR FINISH PLAN, LVL.1 | | | | | | 3/15/2019 | 280 |
| 1439 | ID14.103 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, FLOOR FINISH PLAN, LVL.2 | | | | | | 3/15/2019 | 281 |
| 1440 | ID14.104 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, POWER PLAN, LVL.1 | | | | | | 3/15/2019 | 282 |
| 1441 | ID14.105 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, POWER PLAN, LVL.2 | | | | | | 3/15/2019 | 283 |
| 1442 | ID14.106 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, REFLECTED CEILING PLAN, LVL.1 | | | | | | 3/15/2019 | 284 |
| 1443 | ID14.107 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, REFLECTED CEILING PLAN, LVL.2 | | | | | | 3/15/2019 | 285 |
| 1444 | ID14.108 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, FURNITURE PLAN, LVL.1 | | | | | | 3/15/2019 | 286 |
| 1445 | ID14.109 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, FURNITURE PLAN, LVL.2 | | | | | | 3/15/2019 | 287 |
| 1446 | ID14.200 | ID 100%CD Units 8 to 11 | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | | 288 |
| 1447 | ID14.201 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 289 |
| 1448 | ID14.202 | ID 100%CD Units 8 to 11 | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | | 290 |
| 1449 | ID14.203 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 291 |
| 1450 | ID14.204 | ID 100%CD Units 8 to 11 | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | | 292 |
| 1451 | ID14.205 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 293 |
| 1452 | ID14.206 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 294 |
| 1453 | ID14.207 | ID 100%CD Units 8 to 11 | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | | 295 |
| 1454 | ID14.208 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 296 |
| 1455 | ID14.209 | ID 100%CD Units 8 to 11 | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | | 297 |
| 1456 | ID14.210 | ID 100%CD Units 8 to 11 | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | | 298 |
| 1457 | ID14.211 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 299 |
| 1458 | ID14.212 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 300 |
| 1459 | ID14.213 | ID 100%CD Units 8 to 11 | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | | 301 |
| 1460 | ID14.214 | ID 100%CD Units 8 to 11 | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | | 302 |
| 1461 | ID14.215 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 303 |
| 1462 | ID14.216 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 304 |
| 1463 | ID14.217 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | 305 |

| L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 1464 | ID14.218 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 306 |
| 1465 | ID14.219 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI I OCEANA, ENLARGED PLANS & ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 307 |
| 1466 | ID14.220 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 308 |
| 1467 | ID14.221 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 309 |
| 1468 | ID14.222 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 310 |
| 1469 | ID14.223 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 311 |
| 1470 | ID14.224 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 312 |
| 1471 | ID14.225 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 313 |
| 1472 | ID14.226 | ID 100%CD Units 8 to 11 | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 314 |
| 1473 | ID14.227 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 315 |
| 1474 | ID14.228 | REV 2 UPDATED SET OF DWG'S | UNIT-14, CASA DI OCEANA, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 316 |
| 1475 | ID15.100 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, FLOOR PLAN, LVL.1 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 317 |
| 1476 | ID15.101 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, FLOOR PLAN, LVL.2 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 318 |
| 1477 | ID15.102 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, FLOOR FINISH PLAN, LVL.1 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 319 |
| 1478 | ID15.103 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, FLOOR FINISH PLAN, LVL.2 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 320 |
| 1479 | ID15.104 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, POWER PLAN, LVL.1 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 321 |
| 1480 | ID15.105 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, POWER PLAN, LVL.2 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 322 |
| 1481 | ID15.106 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, REFLECTED CEILING PLAN, LVL.1 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 323 |
| 1482 | ID15.107 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, REFLECTED CEILING PLAN, LVL.2 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 324 |
| 1483 | ID15.108 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, FURNITURE PLAN, LVL.1 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 325 |
| 1484 | ID15.109 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, FURNITURE PLAN, LVL.2 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 326 |
| 1485 | ID15.200 | ID 100%CD Units 8 to 11 | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 327 |
| 1486 | ID15.201 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 328 |
| 1487 | ID15.202 | ID 100%CD Units 8 to 11 | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 329 |
| 1488 | ID15.203 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 330 |
| 1489 | ID15.204 | ID 100%CD Units 8 to 11 | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 331 |
| 1490 | ID15.205 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 332 |
| 1491 | ID15.206 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 333 |
| 1492 | ID15.207 | ID 100%CD Units 8 to 11 | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 334 |
| 1493 | ID15.208 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 335 |
| 1494 | ID15.209 | ID 100%CD Units 8 to 11 | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 336 |
| 1495 | ID15.210 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 337 |
| 1496 | ID15.211 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 338 |
| 1497 | ID15.212 | ID 100%CD Units 8 to 11 | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 339 |
| 1498 | ID15.213 | ID 100%CD Units 8 to 11 | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 340 |
| 1499 | ID15.214 | ID 100%CD Units 8 to 11 | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 341 |
| 1500 | ID15.215 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 342 |
| 1501 | ID15.216 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 343 |
| 1502 | ID15.217 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 344 |
| 1503 | ID15.218 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 345 |
| 1504 | ID15.219 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 346 |
| 1505 | ID15.220 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 347 |
| 1506 | ID15.221 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 348 |
| 1507 | ID15.222 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 349 |
| 1508 | ID15.223 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 350 |
| 1509 | ID15.224 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI I MARE, ENLARGED PLANS & ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 351 |
| 1510 | ID15.225 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 352 |
| 1511 | ID15.226 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 353 |
| 1512 | ID15.227 | ID 100%CD Units 8 to 11 | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 354 |
| 1513 | ID15.228 | REV 2 UPDATED SET OF DWG'S | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 355 |
| 1514 | ID15.229 | ID 100%CD Units 8 to 11 | UNIT-15, CASA DI MARE, ENLARGED PLANS& ELEVATIONS | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 356 |
| 1515 | ID.300 | REV 2 UPDATED SET OF DWG'S | DETAILS- CEILING | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 357 |
| 1516 | ID.301 | REV 2 UPDATED SET OF DWG'S | DETAILS- CEILING | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 358 |
| 1517 | ID.302 | ID 100%CD Units 8 to 11 | DETAILS- CEILING | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 359 |
| 1518 | ID.303 | REV 8 UPDATED SET OF DWG'S | DETAILS- CEILING | | | | | | | | 11/26/2019 | | | 4/9/2020 | 5/15/2020 | | | | | | | | | | | | | | | | | | | 360 |
| 1519 | ID.304 | REV 7 UPDATED SET OF DWG'S | DETAILS-CEILING | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 361 |
| 1520 | ID.310 | REV 4 UPDATED SET OF DWG'S | DETAILS- TYPICAL MOUNTING HEIGHTS | | | | 3/2/2018 | | 3/15/2019 | | 11/26/2019 | | | | | | | | | | | | | | | | | | | | | | | 362 |
| 1521 | ID.310A | REV 8 UPDATED SET OF DWG'S | DETAILS- TYPICAL MOUNTING HEIGHTS | | | | | | | | 11/26/2019 | | | 4/9/2020 | 5/15/2020 | | | | | | | | | | | | | | | | | | | 363 |
| 1522 | ID.311 | REV 7 UPDATED SET OF DWG'S | DETAILS- INTERIOR FINISH | | | | 3/2/2018 | | 3/15/2019 | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 364 |
| 1523 | ID.312 | REV 4 UPDATED SET OF DWG'S | DETAILS- INTERIOR FINISH | | | | 3/2/2018 | | 3/15/2019 | | 11/26/2019 | | | | | | | | | | | | | | | | | | | | | | | 365 |
| 1524 | ID.313 | REV 4 UPDATED SET OF DWG'S | DETAILS- INTERIOR FINISH | | | | 3/2/2018 | | 3/15/2019 | | 11/26/2019 | | | | | | | | | | | | | | | | | | | | | | | 366 |
| 1525 | ID.314 | REV 2 UPDATED SET OF DWG'S | DETAILS- INTERIOR FINISH | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 367 |
| 1526 | ID.315 | REV 4 UPDATED SET OF DWG'S | DETAILS - INTERIOR FINISH | | | | | | | | 11/26/2019 | | | | | | | | | | | | | | | | | | | | | | | 368 |
| 1527 | ID.316 | REV 8 UPDATED SET OF DWG'S | DETAILS-INTERIOR FINISH | | | | | | | | 11/26/2019 | | | 4/9/2020 | 5/15/2020 | | | | | | | | | | | | | | | | | | | 369 |
| 1528 | ID.317 | REV 7 UPDATED SET OF DWG'S | DETAILS-INTERIOR FINISH | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 370 |
| 1529 | ID.320 | REV 7 UPDATED SET OF DWG'S | DETAILS- DOORS | | | | 3/2/2018 | | | | 11/26/2019 | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 371 |
| 1530 | ID.321 | ID 100% CD Units 1 to 7 | DETAILS- DOORS | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 372 |
| 1531 | ID.322 | ID 100%CD Units 8 to 11 | DETAILS- DOORS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 373 |
| 1532 | ID.323 | REV 7 UPDATED SET OF DWG'S | DETAILS- DOORS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 374 |
| 1533 | ID.324 | REV 8 UPDATED SET OF DWG'S | DETAILS-DOORS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 375 |
| 1534 | ID.325 | REV 7 UPDATED SET OF DWG'S | DETAILS-DOORS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 376 |
| 1535 | ID.326 | REV 7 UPDATED SET OF DWG'S | DETAILS-DOORS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 377 |
| 1536 | ID.330 | REV 8 UPDATED SET OF DWG'S | DETAILS- STAIRS | | | | 3/2/2018 | | | | | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 378 |
| 1537 | ID.331 | ID 100% CD outh Tower Units 12-15. | DETAILS- STAIRS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 379 |
| 1538 | ID.400 | REV 7 UPDATED SET OF DWG'S | SCHEDULES- DOORS | | | | 3/2/2018 | | 3/15/2019 | | 11/26/2019 | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 380 |
| 1539 | ID.401 | REV 2 UPDATED SET OF DWG'S | SCHEDULES- DOORS& HARDWARE | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 381 |
| 1540 | ID.402 | REV 2 UPDATED SET OF DWG'S | SCHEDULES- DOORS& HARDWARE | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 382 |
| 1541 | ID.403 | REV 2 UPDATED SET OF DWG'S | SCHEDULES- DOORS& HARDWARE | | | | 3/2/2018 | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 383 |
| 1542 | ID.404 | REV 8 UPDATED SET OF DWG'S | SCHEDULES- DOORS& HARDWARE | | | | 3/2/2018 | | 3/15/2019 | | 11/26/2019 | | | 4/9/2020 | 5/15/2020 | | | | | | | | | | | | | | | | | | | 384 |
| 1543 | ID.410 | REV 8 UPDATED SET OF DWG'S | SCHEDULES- PLUMBING1 OF2 | | | | 3/2/2018 | | 3/15/2019 | | 11/26/2019 | | | 4/9/2020 | 5/15/2020 | | | | | | | | | | | | | | | | | | | 385 |
| 1544 | ID.411 | REV 8 UPDATED SET OF DWG'S | SCHEDULES- PLUMBING2 OF2 | | | | 3/2/2018 | | 3/15/2019 | | 11/26/2019 | | | 4/9/2020 | 5/15/2020 | | | | | | | | | | | | | | | | | | | 386 |
| 1545 | ID.412 | REV 7 UPDATED SET OF DWG'S | SCHEDULES- MIRRORS | | | | 3/2/2018 | | 3/15/2019 | | 11/26/2019 | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 387 |
| 1546 | ID.413 | REV 2 UPDATED SET OF DWG'S | ST GUEST SUITE FINISH,FIXTURE, AND EQUIPMENT SCHEDULE | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 388 |
| 1547 | ID.414 | ID South Tower Units 12-15. | SCHEDULES- MIRRORS | | | | 3/2/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | | 389 |
| 1548 | ID.420 | REV 8 UPDATED SET OF DWG'S | SCHEDULES- EQUIPMENT | | | | 3/2/2018 | | 3/15/2019 | | 11/26/2019 | | | 4/9/2020 | 5/15/2020 | | | | | | | | | | | | | | | | | | | 390 |
| 1549 | ID.430 | REV 2 UPDATED SET OF DWG'S | SCHEDULES - FINISHES 1 OF 3 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 391 |
| 1550 | ID.431 | REV 2 UPDATED SET OF DWG'S | SCHEDULES - FINISHES 2 OF 3 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 392 |
| 1551 | ID.432 | REV 2 UPDATED SET OF DWG'S | SCHEDULES - FINISHES 3 OR 3 | | | | | | 3/15/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 393 |
| 1552 | ID.433 | REV 8 UPDATED SET OF DWG'S | SCHEDULES SCHEME 4 FINISHES | | | | | | | | 11/26/2019 | 12/13/2019 | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 394 |
| 1553 | IDN1.100 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI FLOOR PLAN | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 395 |
| 1554 | IDN1.101 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI FLOOR FINISH PLAN | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 396 |
| 1555 | IDN1.102 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI POWER PLAN | | | | | | | | 11/26/2019 | 12/13/2019 | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 397 |
| 1556 | IDN1.103 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI RCP | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 398 |
| 1557 | IDN1.104 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI FURNITURE PLAN | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 399 |
| 1558 | IDN1.110 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI FLOOR PLAN OPTION | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 400 |
| 1559 | IDN1.111 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI FLOOR FINISH PLAN OPTION | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 401 |
| 1560 | IDN1.112 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI POWER PLAN OPTION | | | | | | | | 11/26/2019 | 12/13/2019 | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 402 |
| 1561 | IDN1.113 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI RCP OPTION | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 403 |
| 1562 | IDN1.114 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI FURNITURE PLAN OPTION | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 404 |
| 1563 | IDN1.120 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI FLOOR PLAN MODIFIED | | | | | | | | | | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 405 |
| 1564 | IDN1.121 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI FLOOR FINISH PLAN MODIFIED | | | | | | | | | | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 406 |
| 1565 | IDN1.122 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI POWER PLAN MODIFIED | | | | | | | | | | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 407 |
| 1566 | IDN1.123 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI RCP MODIFIED | | | | | | | | | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 408 |
| 1567 | IDN1.124 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI FURNITURE PLAN MODIFIED | | | | | | | | | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 409 |
| 1568 | IDN1.130 | REV 7 UPDATED SET OF DWG'S | UNIT 1 AMALFI MODIFIED FLOOR PLAN 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 410 |
| 1569 | IDN1.131 | REV 7 UPDATED SET OF DWG'S | UNIT 1 AMALFI MODIFIED FLOOR FINISH PLAN FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 411 |
| 1570 | IDN1.132 | REV 7 UPDATED SET OF DWG'S | UNIT 1 AMALFI MODIFIED POWER PLAN FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 412 |
| 1571 | IDN1.133 | REV 7 UPDATED SET OF DWG'S | UNIT 1 AMALFI MODIFIED RCP FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 413 |
| 1572 | IDN1.134 | REV 7 UPDATED SET OF DWG'S | UNIT 1 AMALFI MODIFIED FURNITURE PLAN FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 414 |
| 1573 | IDN1.200 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 415 |
| 1574 | IDN1.201 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 416 |
| 1575 | IDN1.202 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 417 |

Case 1:22-cv-20715-KMW Document 1-6 Entered on FLSD Docket 03/09/2022 Page 133 of 1009

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020 | | | | | | | | | | | | | | | | Updated: | 7/7/2020 | | | | | | | | | | | | | | | | |
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 1576 | IDN1.203 | REV4 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | | | | | | | | | | | | | | | | | | | | 418 |
| 1577 | IDN1.204 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 419 |
| 1578 | IDN1.205 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 420 |
| 1579 | IDN1.206 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 421 |
| 1580 | IDN1.207 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 422 |
| 1581 | IDN1.208 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 423 |
| 1582 | IDN1.209 | REV 8 UPDATED SET OF DWG'S | UNIT 1 AMALFI CLOSED KITCHEN OPTION | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 424 |
| 1583 | IDN1.210 | REV 7 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS FLOORS 47-49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 425 |
| 1584 | IDN1.211 | REV 7 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 426 |
| 1585 | IDN1.212 | REV 7 UPDATED SET OF DWG'S | UNIT 1 AMALFI ENLARGED PLANS AND ELEVATIONS FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 427 |
| 1586 | IDN2.100 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO FLOOR PLAN | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 428 |
| 1587 | IDN2.101 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO FLOOR FINISH PLAN | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 429 |
| 1588 | IDN2.102 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO POWER PLAN | | | | | | | | 11/26/2019 | 12/13/2019 | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 430 |
| 1589 | IDN2.103 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO RCP | | | | | | | | 11/26/2019 | | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 431 |
| 1590 | IDN2.104 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO FUNITURE PLAN | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 432 |
| 1591 | IDN2.110 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO FLOOR PLAN OPTION | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 433 |
| 1592 | IDN2.111 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO FLOOR FINISH PLAN OPTION | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 434 |
| 1593 | IDN2.112 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO POWER PLAN OPTION | | | | | | | | 11/26/2019 | 12/13/2019 | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 435 |
| 1594 | IDN2.113 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO RCP OPTION | | | | | | | | 11/26/2019 | | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 436 |
| 1595 | IDN2.114 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO FURNITURE PLAN OPTION | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 437 |
| 1596 | IDN2.120 | REV 8 UPDATED SET OF DWG'S | UNIT 2 PARVELLO FLOOR PLAN MODIFIED | | | | | | | | | | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 438 |
| 1597 | IDN2.121 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO FLOOR FINISH PLAN MODIFIED | | | | | | | | | | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 439 |
| 1598 | IDN2.122 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO POWER PLAN MODIFIED | | | | | | | | | | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 440 |
| 1599 | IDN2.123 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO RCP MODIFIED | | | | | | | | | | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 441 |
| 1600 | IDN2.124 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO FURNITURE PLAN MODIFIED | | | | | | | | | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 442 |
| 1601 | IDN2.130 | REV 7 UPDATED SET OF DWG'S | UNIT 2 RAVELLO MODIFIED FLOOR PLAN FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 443 |
| 1602 | IDN2.131 | REV 7 UPDATED SET OF DWG'S | UNIT 2 RAVELLO MODIFIED FLOOR FINISH PLAN FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 444 |
| 1603 | IDN2.132 | REV 7 UPDATED SET OF DWG'S | UNIT 2 RAVELLO MODIFIED POWER PLAN FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 445 |
| 1604 | IDN2.133 | REV 7 UPDATED SET OF DWG'S | UNIT 2 RAVELLO MODIFIED RCP FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 446 |
| 1605 | IDN2.134 | REV 7 UPDATED SET OF DWG'S | UNIT 2 RAVELLO MODIFIED FURNITURE PLAN FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 447 |
| 1606 | IDN2.200 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 448 |
| 1607 | IDN2.201 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 449 |
| 1608 | IDN2.202 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 450 |
| 1609 | IDN2.203 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 451 |
| 1610 | IDN2.204 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 452 |
| 1611 | IDN2.205 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 453 |
| 1612 | IDN2.206 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 454 |
| 1613 | IDN2.207 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 455 |
| 1614 | IDN2.208 | REV 8 UPDATED SET OF DWG'S | UNIT 2 RAVELLO CLOSED KITCHEN OPTIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 456 |
| 1615 | IDN2.209 | REV 7 UPDATED SET OF DWG'S | UNIT 2 RAVELLO ENLARGED PLANS AND ELEVATIONS FLOORS 47-49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 457 |
| 1616 | IDN2.210 | REV 7 UPDATED SET OF DWG'S | UNIT 2 RAVELLO ENLARGED PLANS AND ELEVATIONS FLOOR 49 | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 458 |
| 1617 | IDN3.100 | REV 8 UPDATED SET OF DWG'S | UNIT 3 SAN REMO AND GUEST SUITE 14 & 15 FLOOR PLAN | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 459 |
| 1618 | IDN3.101 | REV 8 UPDATED SET OF DWG'S | UNIT 3 SAN REMO AND GUEST SUITE 14 & 15 FLOOR FINISH PLAN | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 460 |
| 1619 | IDN3.102 | REV 8 UPDATED SET OF DWG'S | UNIT 3 SAN REMO & GUEST SUITE 14&15 POWER PLAN | | | | | | | | 11/26/2019 | 12/13/2019 | 1/31/2020 | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 461 |
| 1620 | IDN3.103 | REV 8 UPDATED SET OF DWG'S | UNIT 3 SAN REMO AND GUEST SUITE 14 & 15 RCP | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 462 |
| 1621 | IDN3.104 | REV 8 UPDATED SET OF DWG'S | UNIT 3 SAN REMO AND GUEST SUITE 14&15 FURNITURE PLAN | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 463 |
| 1622 | IDN3.200 | REV 8 UPDATED SET OF DWG'S | UNIT 3 SAN REMO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 464 |
| 1623 | IDN3.201 | REV 8 UPDATED SET OF DWG'S | UNIT 3 SAN REMO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 465 |
| 1624 | IDN3.202 | REV 8 UPDATED SET OF DWG'S | UNIT 3 SAN REMO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 466 |
| 1625 | IDN3.203 | REV 8 UPDATED SET OF DWG'S | UNIT 3 SAN REMO ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 467 |
| 1626 | IDN3.204 | REV 8 UPDATED SET OF DWG'S | GS 14&15 GUEST SUITE 14 ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 468 |
| 1627 | IDN3.205 | REV 8 UPDATED SET OF DWG'S | GS 14&15 GUEST SUITE 14 ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 469 |
| 1628 | IDN3.206 | REV 8 UPDATED SET OF DWG'S | GS 14&15 GUEST SUITE 14 ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 470 |
| 1629 | IDN3.207 | REV 8 UPDATED SET OF DWG'S | GS 14&15 GUEST SUITE 14 ENLARGED PLANS AND ELEVATIONS | | | | | | | | 11/26/2019 | | | | 5/15/2020 | | | | | | | | | | | | | | | | | | | 471 |
| 1630 | IDN4.100 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA FLOOR PLAN | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 472 |
| 1631 | IDN4.101 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA FLOOR FINISH PLAN | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 473 |
| 1632 | IDN4.102 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DISPIAGGIA POWER PLAN | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 474 |
| 1633 | IDN4.103 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA RCP | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 475 |
| 1634 | IDN4.104 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA FURNITURE PLAN | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 476 |
| 1635 | IDN4.110 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA CLOSED KITCHEN OPTION FLOOR PLAN | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 477 |
| 1636 | IDN4.111 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA OPTION RCP AND FURNITURE PLAN | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 478 |
| 1637 | IDN4.200 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 479 |
| 1638 | IDN4.201 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 480 |
| 1639 | IDN4.202 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 481 |
| 1640 | IDN4.203 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 482 |
| 1641 | IDN4.204 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 483 |
| 1642 | IDN4.205 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 484 |
| 1643 | IDN4.206 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 485 |
| 1644 | IDN4.207 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 486 |
| 1645 | IDN4.208 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 487 |
| 1646 | IDN4.209 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 488 |
| 1647 | IDN4.210 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 489 |
| 1648 | IDN4.211 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 490 |
| 1649 | IDN4.212 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 491 |
| 1650 | IDN4.213 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 492 |
| 1651 | IDN4.214 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 493 |
| 1652 | IDN4.215 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 494 |
| 1653 | IDN4.216 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 495 |
| 1654 | IDN4.217 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 496 |
| 1655 | IDN4.218 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 497 |
| 1656 | IDN4.219 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 498 |
| 1657 | IDN4.220 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 499 |
| 1658 | IDN4.221 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 500 |
| 1659 | IDN4.222 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 501 |
| 1660 | IDN4.223 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA OPTION ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 502 |
| 1661 | IDN4.224 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA OPTION ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 503 |
| 1662 | IDN4.225 | REV 7 UPDATED SET OF DWG'S | UNIT 4 CASA DI SPIAGGIA OPTION ENLARGED PLANS AND ELEVATIONS | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 504 |
| 1663 | IDN5.100 | REV 7 UPDATED SET OF DWG'S | UNIT 5 CASA DI CIELO FLOOR PLAN | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 505 |
| 1664 | IDN5.101 | REV 7 UPDATED SET OF DWG'S | UNIT 5 CASA DI CIELO FLOOR FINISH PLAN | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 506 |
| 1665 | IDN5.102 | REV 7 UPDATED SET OF DWG'S | UNIT 5 CASA DI CIELO POWER PLAN | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 507 |
| 1666 | IDN5.103 | REV 7 UPDATED SET OF DWG'S | UNIT 5 CASA DI CIELO RCP | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 508 |
| 1667 | IDN5.104 | REV 7 UPDATED SET OF DWG'S | UNIT 5 CASA DI CIELO FUNITURE PLAN | | | | | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | 509 |
| 1668 | IRRIGATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 6 |
| 1669 | IR-1 | REVISION O-UPDATED SET OF DWGS | IRRIGATION PLAN: EAST | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 8/13/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 1 |
| 1670 | IR-2 | REVISION O-UPDATED SET OF DWGS | IRRIGATION PLAN: WEST | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 8/13/2019 | | | | | | | 5/15/2020 | | 2 |
| 1671 | IR-3 | REVISION O-UPDATED SET OF DWGS | IRRIGATION PLAN LEVEL 4 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 8/13/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 3 |
| 1672 | IR-4 | REVISION O-UPDATED SET OF DWGS | DRIP NOTES/DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 4 |
| 1673 | IR-5 | REVISION O-UPDATED SET OF DWGS | IRRIGATION DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 8/13/2019 | | | | | | | 5/15/2020 | | 5 |
| 1674 | IR-6 | REVISION O-UPDATED SET OF DWGS | IRRIGATION NOTES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 6 |
| 1675 | LANDSCAPE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 85 |
| 1676 | L.0-00 | REVISION O-UPDATED SET OF DWGS | Landscape Cover & Index | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 1 |
| 1677 | L.0-01 | REVISION L-UPDATED SET OF DWGS | General Notes | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 2 |
| 1678 | L.0-03 | REVISION I-UPDATED SET OF DWGS | Illustrative Site Plan | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 3 |
| 1679 | L.0-04 | REVISION I-UPDATED SET OF DWGS | Illustrative Elevation (Public Art) | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 4 |
| 1680 | L0-05 | REVISION I-UPDATED SET OF DWGS | MODEL IMAGES | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 5 |
| 1681 | L1.0-01 | REVISION I-UPDATED SET OF DWGS | Tree Disposition Notes | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 6 |
| 1682 | L1.1-01 | REVISION I-UPDATED SET OF DWGS | OVERALL TREE DISPOSITION PLAN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 7 |
| 1683 | L1.4-01 | REVISION I-UPDATED SET OF DWGS | TREE DISPOSITION SCHEDULE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 8 |
| 1684 | L2.0-01 | REVISION L-UPDATED SET OF DWGS | OVERALL HARDSCAPE NOTES | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 9 |
| 1685 | L2.1-00 | REVISION O-UPDATED SET OF DWGS | OVERALL HARDSCAPE PLAN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 10 |
| 1686 | L2.1-01 | REVISION L-UPDATED SET OF DWGS | HARDSCAPE PLAN- NE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 11 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
| 1687 | L2.1-02 | REVISION M-UPDATED SET OF DWGS | HARDSCAPE PLAN- SE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | | | 12 |
| 1688 | L2.1-03 | REVISION L-UPDATED SET OF DWGS | HARDSCAPE PLAN- NORTH TOWER | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 13 |
| 1689 | L2.1-04 | REVISION L-UPDATED SET OF DWGS | HARDSCAPE PLAN- SOUTH TOWER | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 14 |
| 1690 | L2.1-05 | REVISION O-UPDATED SET OF DWGS | HARDSCAPE PLAN- NW | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 15 |
| 1691 | L2.1-06 | REVISION O-UPDATED SET OF DWGS | HARDSCAPE PLAN- SW | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 16 |
| 1692 | L2.2-01 | REVISION L-UPDATED SET OF DWGS | HARDSCAPE ENLARGEMENT- NORTH BEACH ACCESS | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 17 |
| 1693 | L2.2-02 | REVISION L-UPDATED SET OF DWGS | HARDSCAPE ENLARGEMENT- SOUTH BEACH ACCESS | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 18 |
| 1694 | L2.3-01 | REVISION L-UPDATED SET OF DWGS | ELEVATION- COLLINS AVENUE WEST | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 19 |
| 1695 | L2.3-02 | REVISION I-UPDATED SET OF DWGS | ELEVATION- AMENITY DECK EAST | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 20 |
| 1696 | L2.3-03 | REVISION I-UPDATED SET OF DWGS | AMENITY DECK AQUATIC RIDES | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 21 |
| 1697 | L2.3-04 | REVISION I-UPDATED SET OF DWGS | AMENITY DECK FEATURE POOL | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 22 |
| 1698 | L2.3-05 | REVISION I-UPDATED SET OF DWGS | SPA POOL & WATERWALL | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 23 |
| 1699 | L2.3-06 | REVISION I-UPDATED SET OF DWGS | WF#1 COLLINS AVE FOUNTAIN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 24 |
| 1700 | L2.3-07 | REVISION I-UPDATED SET OF DWGS | WF#2A & 2B SIGNAGE FOUNTAIN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 25 |
| 1701 | L2.3-08 | REVISION O-UPDATED SET OF DWGS | WF#3A & 3B PORTECOCHERE FOUNTAIN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 26 |
| 1702 | L2.3-09 | REVISION O-UPDATED SET OF DWGS | WF#4 VILLA ARRIVAL | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 27 |
| 1703 | L2.3-10 | REVISION O-UPDATED SET OF DWGS | WF#5 CAPSTONE FOUNTAIN ELEV | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 28 |
| 1704 | L2.3-11 | REVISION O-UPDATED SET OF DWGS | WF#5 CAPSTONE FOUNTAIN SECT. | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 29 |
| 1705 | L2.3-12 | REVISION M-UPDATED SET OF DWGS | WF#6 DETAIL- AMENITY DECK SOUTH- CIRCULAR FOUNTAIN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 30 |
| 1706 | L2.3-13 | REVISION I-UPDATED SET OF DWGS | WF#7 AMENITY DECK CENTER FEATURE FOUNTAIN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 31 |
| 1707 | L2.3-14 | REVISION I-UPDATED SET OF DWGS | WF#8 NORTH AMENITY DECK | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 32 |
| 1708 | L2.3-15 | REVISION L-UPDATED SET OF DWGS | WF#9 AMENITY DECK SOUTH- LINEAR GARDEN FOUNTAIN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 33 |
| 1709 | L2.3-16 | REVISION I-UPDATED SET OF DWGS | HARDSCAPE DETAILS- FLATWORK | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 34 |
| 1710 | L2.3-17 | REVISION L-UPDATED SET OF DWGS | HARDSCAPE DETAILS- FLATWORK | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 35 |
| 1711 | L2.3-18 | REVISION L-UPDATED SET OF DWGS | HARDSCAPE DETAILS- FLATWORK | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 36 |
| 1712 | L2.3-20 | REVISION L-UPDATED SET OF DWGS | HARDSCAPE DETAILS-WALLS & COLUMNS | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 37 |
| 1713 | L2.3-21 | REVISION L-UPDATED SET OF DWGS | HARDSCAPE DETAILS- WALLS AND COLUMNS | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 38 |
| 1714 | L2.3-22 | REVISION I-UPDATED SET OF DWGS | HARDSCAPE DETAILS- WALLS AND COLUMNS | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 39 |
| 1715 | L2.3-23 | REVISION I-UPDATED SET OF DWGS | HARDSCAPE DETAILS- SIGNAGE WALLS | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 40 |
| 1716 | L2.3-24 | REVISION I-UPDATED SET OF DWGS | HARDSCAPE DETAILS-STAIR, RAILING, GATES | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 41 |
| 1717 | L2.3-25 | REVISION I-UPDATED SET OF DWGS | HARDSCAPE DETAILS- STAIRS, RAILINGS, GATES | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 42 |
| 1718 | L2.3-26 | REVISION I-UPDATED SET OF DWGS | HARDSCAPE DETAILS- STAIRS, RAILINGS, GATES | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 43 |
| 1719 | L2.3-27 | REVISION I-UPDATED SET OF DWGS | HS DETAILS: STAIR,RAILING,GATES | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 44 |
| 1720 | L2.3-28 | REVISION I-UPDATED SET OF DWGS | HARDSCAPE DETAILS- LANDSCAPE STRUCTURES | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 45 |
| 1721 | L2.3-29 | REVISION I-UPDATED SET OF DWGS | HS DETAILS: LANDSCAPE STRUCTURES | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 46 |
| 1722 | L2.3-30 | REVISION L-UPDATED SET OF DWGS | HS DETAILS: LANDSCAPE STRUCTURES | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 47 |
| 1723 | L2.3-31 | REVISION M-UPDATED SET OF DWGS | CITY STANDARDS BEACH ACCESS FURNISHINGS | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 48 |
| 1724 | L2.4-01 | | FINISH SCHEDULE | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | |
| 1725 | L2.4-01 A | REVISION L-UPDATED SET OF DWGS | FINISH SCHEDULE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 49 |
| 1726 | L2.4-01 B | REVISION I-UPDATED SET OF DWGS | FINISH SCHEDULE | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 50 |
| 1727 | L2.4-02 | REVISION I-UPDATED SET OF DWGS | FINISH SCHEDULE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 51 |
| 1728 | L3.0-01 | REVISION I-UPDATED SET OF DWGS | LANDSCAPE NOTES | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 52 |
| 1729 | L3.1-00 | REVISION O-UPDATED SET OF DWGS | OVERALL TREE PLAN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 53 |
| 1730 | L3.1-01 | REVISION L-UPDATED SET OF DWGS | TREE PLAN- NE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 54 |
| 1731 | L3.1-02 | REVISION L-UPDATED SET OF DWGS | TREE PLAN- NE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 55 |
| 1732 | L3.1-03 | REVISION L-UPDATED SET OF DWGS | TREE PLAN- NORTH TOWER | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 56 |
| 1733 | L3.1-04 | REVISION L-UPDATED SET OF DWGS | TREE PLAN- SOUTH TOWER | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 57 |
| 1734 | L3.1-05 | REVISION L-UPDATED SET OF DWGS | TREE PLAN- NW | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 58 |
| 1735 | L3.1-06 | REVISION L-UPDATED SET OF DWGS | TREE PLAN- SW | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 59 |
| 1736 | L4.1-00 | REVISION O-UPDATED SET OF DWGS | OVERALL SHRUB PLAN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 60 |
| 1737 | L4.1-01 | REVISION L-UPDATED SET OF DWGS | SHRUB PLAN- NE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 61 |
| 1738 | L4.1-02 | REVISION L-UPDATED SET OF DWGS | SHRUB PLAN- SE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 62 |
| 1739 | L4.1-03 | REVISION L-UPDATED SET OF DWGS | SHRUB PLAN- NORTH TOWER | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 63 |
| 1740 | L4.1-04 | REVISION L-UPDATED SET OF DWGS | SHRUB PLAN- SOUTH TOWER | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 64 |
| 1741 | L4.1-05 | REVISION O-UPDATED SET OF DWGS | SHRUB PLAN- NW | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 65 |
| 1742 | L4.1-06 | REVISION L-UPDATED SET OF DWGS | SHRUB PLAN- SW | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 66 |
| 1743 | L4.3-01 | REVISION I-UPDATED SET OF DWGS | LANDSCAPE DETAILS | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 67 |
| 1744 | L4.3-02 | REVISION I-UPDATED SET OF DWGS | LANDSCAPE DETAILS | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 68 |
| 1745 | L4.3-03 | REVISION I-UPDATED SET OF DWGS | LANDSCAPE DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 69 |
| 1746 | L4.4-01 | REVISION L-UPDATED SET OF DWGS | LANDSCAPE LEGEND AND PLANTING LIST | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 70 |
| 1747 | L6.0-00S | REVISION O-UPDATED SET OF DWGS | SEASONAL LIGHTING PLAN-(DELETED ) | | | | | | | | | | | | | | | | | | | | | | | | | | 11/29/2019 | | | | | |
| 1748 | L6.0-01 | REVISION I-UPDATED SET OF DWGS | LIGHTING NOTES | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 71 |
| 1749 | L6.1-00 S | REVISION O-UPDATED SET OF DWGS | SEASONAL LIGHTING PLAN | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 72 |
| 1750 | L6.1-00 | REVISION O-UPDATED SET OF DWGS | OVERALL LIGHTING PLAN | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 73 |
| 1751 | L6.1-01 S | REVISION O-UPDATED SET OF DWGS | SEASONAL LIGHTING PLAN NE | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 74 |
| 1752 | L6.1-01 | REVISION O-UPDATED SET OF DWGS | LIGHTING PLAN- NE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 75 |
| 1753 | L6.1-02 | REVISION O-UPDATED SET OF DWGS | LIGHTING PLAN- SE | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 76 |
| 1754 | L6.1-02S | REVISION O-UPDATED SET OF DWGS | SEASONAL LIGHTING PLAN-SE | | | | | | | | | | | | | | | | | | | | | | | | | | 11/29/2019 | | | 5/15/2020 | | 77 |
| 1755 | L6.1-03 S | REVISION O-UPDATED SET OF DWGS | SEASONAL LIGHTING PLAN NORTH TOWER | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 78 |
| 1756 | L6.1-03 | REVISION O-UPDATED SET OF DWGS | LIGHTING PLAN- NORTH TOWER | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 79 |
| 1757 | L6.1-04 S | REVISION O-UPDATED SET OF DWGS | SEASONAL LIGHTING PLAN SOUTH TOWER | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 80 |
| 1758 | L6.1-04 | REVISION O-UPDATED SET OF DWGS | LIGHTING PLAN- SOUTH TOWER | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 81 |
| 1759 | L6.1-05 S | REVISION O-UPDATED SET OF DWGS | SEASONAL LIGHTING PLAN NW | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 82 |
| 1760 | L6.1-05 | REVISION O-UPDATED SET OF DWGS | LIGHTING PLAN- NW | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 83 |
| 1761 | L6.1-06 S | REVISION O-UPDATED SET OF DWGS | SEASONAL LIGHTING PLAN SW | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 84 |
| 1762 | L6.1-06 | REVISION O-UPDATED SET OF DWGS | LIGHTING PLAN- SW | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 85 |
| 1763 | L6.3-01 | REVISION I-UPDATED SET OF DWGS | LIGHTING DETAILS (DELETED) | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | |
| 1764 | L6.3-02 | REVISION I-UPDATED SET OF DWGS | LIGHTING DETAILS (DELETED) | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | |
| 1765 | L6.3-03 | REVISION I-UPDATED SET OF DWGS | LIGHTING DETAILS (DELETED) | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | |
| 1766 | L6.4-01 | REVISION I-UPDATED SET OF DWGS | LIGHTING SCHEDULE (DELETED) | | | | 12/20/2017 | | 4/20/2018 | | | | | | | | 7/27/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | |
| 1767 | **LIGHTING CONTROL - LOBBIES AND VILLA** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **59** |
| 1768 | LC1.01 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM LEGEND AND SYMBOLS | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 1 |
| 1769 | LC2.01 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 2 |
| 1770 | LC2.02 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 3 |
| 1771 | LC2.03 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 4 |
| 1772 | LC2.04 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CLX-4HSW4 SWITCH MODULE | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 5 |
| 1773 | LC2.05 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CAEN BLOCK & PROCESSOR | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 6 |
| 1774 | LC2.06 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL DIN-HUB & PHAROS | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 7 |
| 1775 | LC2.07 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL GLS-ODT-C-CN OCC SENSOR | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 8 |
| 1776 | LC2.08 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL C2N-CBD-P KEYPAD | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 9 |
| 1777 | LC2.09 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL TSW-760 7" TOUCH PANEL | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 10 |
| 1778 | LC2.10 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL GLS-PLS-120/277 | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 11 |
| 1779 | LC6.01.1-V1 | REVISION O UPDATED SET OF DWGS | LIGHTING ZONING RCP VILLA LEVEL 1 AMENITITES | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 12 |
| 1780 | LC6.01.2-V1 | REVISION O UPDATED SET OF DWGS | LIGHTING ZONING BARRISOL VILLA LEVEL 1 AMENITIES | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 13 |
| 1781 | LC6.01-V2 | REVISION O UPDATED SET OF DWGS | Lighting Zoning - RCP Villa Level 2 - Restaurant | 1/13/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 14 |
| 1782 | LC6.01-V3 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS ZONING RCP VILLA LEVEL 3 ADMINISTRATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 15 |
| 1783 | LC6.01-V4 | REVISION O UPDATED SET OF DWGS | LIGHTING ZONING - RCP VILLA LEVEL 4 - RESIDENTS CLUB | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 16 |
| 1784 | LC6.01-V5 | REVISION O UPDATED SET OF DWGS | Lighting Zoning - RCP Villa Level 5-Res. Club | 1/13/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/10/2020 | 6/4/2020 | | 17 |
| 1785 | LC6.02-V1 | REVISION O UPDATED SET OF DWGS | LIGHTING ZONING FLOOR PLAN VILLA LEVEL 1 AMENITIES | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 18 |
| 1786 | LC6.02-V2 | REVISION O UPDATED SET OF DWGS | Lighting Zoning - Floor Plan Villa Level 2 - Restaurant | 1/13/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 19 |
| 1787 | LC6.02-V3 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS ZONING FLOOR PLAN VILLA LEVEL 3 ADMINISTRATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 20 |
| 1788 | LC6.02-V4 | REVISION O UPDATED SET OF DWGS | LIGHTING ZONING - FLOOR PLAN VILLA LEVEL 4 - RESIDENTS CLUB | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 21 |
| 1789 | LC6.02-V5 | REVISION O UPDATED SET OF DWGS | Lighting Zoning - Floor Plan Villa Level 5-Res. Club | 1/13/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/10/2020 | 6/4/2020 | | 22 |
| 1790 | LC6.03.1-V1 | REVISION O UPDATED SET OF DWGS | PANEL SCHEDULES VILLA LEVEL 1 AMENITITES NORMAL PANES | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 23 |
| 1791 | LC6.03.2-V1 | REVISION O UPDATED SET OF DWGS | PANEL SCHEDULES VILLA LEVEL 1 AMENITIES EMERGENCY PANEL | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 24 |
| 1792 | LC6.03-V2 | REVISION O UPDATED SET OF DWGS | PANEL SCHEDULES VILLA LEVEL 2 - RESTAURANT NORMAL PANEL | 1/13/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 25 |
| 1793 | LC6.03-V3 | REVISION O UPDATED SET OF DWGS | PANEL SCHEDULES VILLA LEVEL 3 ADMINISTRATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 26 |
| 1794 | LC6.03-V4 | REVISION O UPDATED SET OF DWGS | Panel Schedules Modules and Enclosures Villa Level 4 | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 27 |
| 1795 | LC6.03-V5 | REVISION O UPDATED SET OF DWGS | Panel Schedules Modules and Enclosures Villa Level 5-Res. Club | 1/13/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/10/2020 | 6/4/2020 | | 28 |
| 1796 | LC6.04-V1 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM DEVICES VILLA LEVEL 1 AMENITITES | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 29 |
| 1797 | LC6.04-V2 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM - DEVICES VILLA LEVEL 2 - RESTAURANT | 1/13/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 30 |
| 1798 | LC6.04-V3 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DEVICES VILLA LEVEL 3 ADMINISTRATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 31 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1799 | LC6.04-V4 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM - DEVICES VILLA LEVEL 4 - RESIDENTS CLUB | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 32 |
| 1800 | LC6.04-V5 | REVISION O UPDATED SET OF DWGS | Lighting Control System Villa Level 5-Res. Club Devices | 1/13/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/10/2020 | 6/4/2020 | | 33 |
| 1801 | LC6.05-V2 | REVISION O UPDATED SET OF DWGS | Shading Control System Villa Level 2 - Restaurant | 1/13/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 34 |
| 1802 | LC6.05-V3 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS THERMOSTATS VILLA LEVEL 3 ADMINISTRATION | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 35 |
| 1803 | LC6.05-V4 | REVISION O UPDATED SET OF DWGS | SHADING CONTROL SYSTEM VILLA LEVEL 4 - RESIDENTS CLUB | 1/13/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 36 |
| 1804 | LC6.05-V5 | REVISION O UPDATED SET OF DWGS | Shading Control System Reflected Ceiling Plan Villa Level 5-HEALTH CLUB | 1/13/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/10/2020 | 6/4/2020 | | 37 |
| 1805 | LC6.06-V1 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM THERMOSTAT VILLA LEVEL 1 AMENITITES | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 38 |
| 1806 | LC6.06-V2 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM THERMOSTATS VILLA LEVEL 2 RESTAURANT | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/28/2020 | 6/4/2020 | | 39 |
| 1807 | LC6.06-V4 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS THERMOSTATS VILLA LEVEL 4 RESIDENTS CLUB | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/24/2020 | 6/4/2020 | | 40 |
| 1808 | LC6.06-V5 | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS THERMOSTATS VILLA LEVEL 5 HEALTH CLUB | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/10/2020 | 6/4/2020 | | 41 |
| 1809 | LC7.01-V | REVISION O UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM VILLA LEVEL ONE LINE RISER | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 6/4/2020 | | 42 |
| 1810 | LC6.01-LN | REVISION N UPDATED SET OF DWGS | LIGHTING ZONING RCP LOBBY NORTH AND NORTH PORTE COCHERE | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 43 |
| 1811 | LC6.02-LN | REVISION N UPDATED SET OF DWGS | LIGHTING ZONING FLOOR PLAN LOBBY NORTH | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 44 |
| 1812 | LC6.03-LN | REVISION N UPDATED SET OF DWGS | LOBBY NORTH PANEL SCHEDULES | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 45 |
| 1813 | LC6.04-LN | REVISION N UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM DEVICES LOBBY NORTH | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 46 |
| 1814 | LC6.05-LN | REVISION N UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM SHADES LOBBY NORTH | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 47 |
| 1815 | LC6.06-LN | REVISION N UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM THERMOSTAT LOBBY NORTH | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 48 |
| 1816 | LC6.01-Lsa | REVISION N UPDATED SET OF DWGS | LIGHTING ZONING RCP LOBBY SOUTH AND SOUTH PORTE CHOCHERE | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 49 |
| 1817 | LC6.01-LSb | REVISION N UPDATED SET OF DWGS | LIGHTING ZONING RCP LOBBY SOUTH VIEW B | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 50 |
| 1818 | LC6.02-Lsa | REVISION N UPDATED SET OF DWGS | LIGHING ZONING FLOOR PLAN LOBBY SOUTH VIEW A | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 51 |
| 1819 | LC6.02LSb | REVISION N UPDATED SET OF DWGS | LIGHTING ZONING FLOOR PLAN LOBBY SOUTH VIEW B | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 52 |
| 1820 | LC6.03-LS | REVISION N UPDATED SET OF DWGS | LOBBY SOUTH PANEL SCHEDULES | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 53 |
| 1821 | LC6.04-Lsa | REVISION N UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM DEVICES LOGGY SOUTH VIEW A | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 54 |
| 1822 | LC6.04-LSb | REVISION N UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM DEVICES LOBBY SOUTH VIEW B | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 55 |
| 1823 | LC6.05-Lsa | REVISION N UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM SHADES LOBBY SOUTH VIEW A | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 56 |
| 1824 | LC6.05-LSb | REVISION N UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM SHADES LOBBY SOUTH VIEW B | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 57 |
| 1825 | LC6.06-Lsa | REVISION N UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM THERMOSTAT LOBBY SOUTH VIEW A | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 58 |
| 1826 | LC6.06-LSb | REVISION N UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM THERMOSTAT LOBBY SOUTH VIEW B | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/27/2020 | | | 59 |
| 1827 | LIGHTING CONTROL - SOUTH TOWER TYPICAL UNITs | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 135 |
| 1828 | LC1.01 | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM LEGEND AND SYMBOLS | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 1 |
| 1829 | LC2.06 | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 2 |
| 1830 | LC2.01 | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 3 |
| 1831 | LC2.02 | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 4 |
| 1832 | LC2.03 | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 5 |
| 1833 | LC2.04 | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CAEN BLOCK & PROCESSOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 6 |
| 1834 | LC2.05 | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL C2N-CBD-P KEYPAD | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 7 |
| 1835 | LC6.01.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 1 RCP UFFIZI UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 8 |
| 1836 | LC6.01.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 1 FLOOR PLAN UFFIZI UNIT | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 9 |
| 1837 | LC6.01.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 1 RCP UFFIZI UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 10 |
| 1838 | LC6.01.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 1 FLOOR PLAN UFFIZI UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 11 |
| 1839 | LC6.01.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 1 RCP UFFIZI UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 12 |
| 1840 | LC6.01.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 1 FLOOR PLAN UFFIZI UNIT (OPTION1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 13 |
| 1841 | LC6.01.2b | REV J UPDATED SET OF DWGS | SHADING CONROL SYSTEM UNIT 1 RCP UFFIZI UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 14 |
| 1842 | LC6.01.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 1 FLOOR PLAN UFFIZI UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 15 |
| 1843 | LC6.01.3 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 1 RCP UFFIZI UNIT (OPTION 2) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 16 |
| 1844 | LC6.01.3a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 1 FLOOR PLAN UFFIZI UNIT (OPTION 2) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 17 |
| 1845 | LC6.01.3b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 1 RCP UFFIZI UNIT (OPTION 2) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 18 |
| 1846 | LC6.01.3c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 1 FLOOR PLAN UFFIZI UNIT (OPTION 2) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 19 |
| 1847 | LC6.01.4 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 1 RCP CEILING PLAN UFFIZI UNIT (OPTION 3) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 20 |
| 1848 | LC6.01.4a | REV J UPDATED SET OF DWGS | LIGHTI8NG CONTROL SYSTEM UNIT 1 FLOOR PLAN UFFIZI UNIT (OPTION 3) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 21 |
| 1849 | LC6.01.4b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 1 RCP UFFIZI UNIT (OPTION 3) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 22 |
| 1850 | LC6.01.4c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 1 FLOOR PLAN UFFIZI UNIT (OPTION 3) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 23 |
| 1851 | LC6.02.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 2 RCP VECCHIO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 24 |
| 1852 | LC6.02.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 2 FLOOR PLAN VECCHIO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 25 |
| 1853 | LC6.02.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 2 RCP VECCHIO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 26 |
| 1854 | LC6.02.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 2 FLOOR PLAN VECCHIO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 27 |
| 1855 | LC6.02.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 2 RCP VECCHIO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 28 |
| 1856 | LC6.02.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 2 FLOOR PLAN VECCHIO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 29 |
| 1857 | LC6.02.2b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 2 RCP VECCHIO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 30 |
| 1858 | LC6.02.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 2 FLOOR PLAN VECCHIO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 31 |
| 1859 | LC6.03.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 3 RCP VECCHIO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 32 |
| 1860 | LC6.03.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 3 FLOOR PLAN VECCHIO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 33 |
| 1861 | LC6.03.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 3 RCP VECCHIO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 34 |
| 1862 | LC6.03.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 3 FLOOR PLAN VECCHIO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 35 |
| 1863 | LC6.03.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 3 RCP VECCHIO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 36 |
| 1864 | LC6.03.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 3 FLOOR PLAN VECCHIO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 37 |
| 1865 | LC6.03.2b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 3 RCP VECCHIO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 38 |
| 1866 | LC6.03.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 3 FLOOR PLAN VECCHIO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 39 |
| 1867 | LC6.04.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 4 RCP DONATELLO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 40 |
| 1868 | LC6.04.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 4 FLOOR PLAN DONATELLO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 41 |
| 1869 | LC6.04.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 4 RCP DONATELLO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 42 |
| 1870 | LC6.04.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 4 FLOOR PLAN DONATELLO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 43 |
| 1871 | LC6.04.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 4 RCP DONATELLO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 44 |
| 1872 | LC6.04.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 4 FLOOR PLAN DONATELLO UNIT (OPTION1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 45 |
| 1873 | LC6.04.2b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 4 RCP DONATELLO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 46 |
| 1874 | LC6.04.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 4 FLOOR PLAN DONATELLO UNIT (OPTION 1) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 47 |
| 1875 | LC6.05.1 | REV J UPDATED SET OF DWGS | MODULES AND ENCLOSURE UNIT 5 TOSCANA UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 48 |
| 1876 | LC6.05.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 5 FLOOR PLAN TOSCANA UNIT (TYIPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 49 |
| 1877 | LC6.05.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 5 RCP TOSCANA UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 50 |
| 1878 | LC6.05.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 5 FLOOR PLAN TOSCANA UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 51 |
| 1879 | LC6.05.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 5 RCP TOSCANA UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 52 |
| 1880 | LC6.05.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 5 FLOOR PLAN TOSCANA UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 53 |
| 1881 | LC6.05.2b | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 5 FLOOR PLAN TOSCANA UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 54 |
| 1882 | LC6.05.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 5 FLOOR PLAN TOSCANA UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 55 |
| 1883 | LC6.06.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 6 RCP POSITANO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 56 |
| 1884 | LC6.06.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 6 FLOOR PLAN POSITANO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 57 |
| 1885 | LC6.06.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 6 RCP POSITANO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 58 |
| 1886 | LC6.06.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 6 FLOOR PLAN POSITANO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 59 |
| 1887 | LC6.06.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 6 RCP POSITANO UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 60 |
| 1888 | LC6.06.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 6 FLOOR PLAN POSITANO UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 61 |
| 1889 | LC6.06.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 6 FLOOR PLAN POSITANO UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 62 |
| 1890 | LC6.06.2b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 6 RCP POSITANO UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 63 |
| 1891 | LC6.07.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 7 RCP MILANO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 64 |
| 1892 | LC6.07.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 7 FLOOR PLAN MILANO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 65 |
| 1893 | LC6.07.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 7 RCP MILANO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 66 |
| 1894 | LC6.07.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 7 FLOOR PLAN MILANO UNIT (TYPICAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 67 |
| 1895 | LC6.07.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 7 RCP MILANO UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 68 |
| 1896 | LC6.07.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 7 FLOOR PLAN MILANO UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 69 |
| 1897 | LC6.07.2b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 7 RCP MILANO UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 70 |
| 1898 | LC6.07.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 7 FLOOR PLAN MILANO UNIT (OPTIONAL) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 71 |
| 1899 | LC6.08.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 8 RCP CASA DI SABBIA 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 72 |
| 1900 | lc6.08.1A | REV J UPDATED SET OF DWGS | lighting control system unit 8 floor plan casa di sabbia 1st floor | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 73 |
| 1901 | LC6.08.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 8 RCP CASA DI SABBIA 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 74 |
| 1902 | LC6.08.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 8 FLOOR PLAN CASA DI SABBIA 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 75 |
| 1903 | LC6.08.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 8 RCP CASA DI SABBIA 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 76 |
| 1904 | LC6.08.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 8 FLOOR PLAN CASA DI SABBIA 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 77 |
| 1905 | LC6.08.2b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 8 RCP CASA DI SABBIA 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 78 |
| 1906 | LC6.08.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 8 FLOOR PLAN CASA DI SABBIA 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 79 |
| 1907 | LC6.09.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 9 RCP CASA DI ORO 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 80 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 1908 | LC6.09.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 9 FLOOR PLAN CASA DI ORO 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 81 |
| 1909 | LC6.09.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 9 RCP CASA DI ORO 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 82 |
| 1910 | LC6.09.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 9 FLOOR PLAN CASA DI ORO 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 83 |
| 1911 | LC6.09.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 9 RCP CASA DI ORO 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 84 |
| 1912 | LC6.09.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 9 FLOOR PLAN CASA DI ORO 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 85 |
| 1913 | LC6.09.2b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 9 RCP CASA DI ORO 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 86 |
| 1914 | LC6.09.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 9 FLOOR PLAN CASA DI ORO 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 87 |
| 1915 | LC6.10.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 501 RCP VILLA DI ESTE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 88 |
| 1916 | LC6.10.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 501 FLOOR PLAN VILLA DI ESTE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 89 |
| 1917 | LC6.10.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 501 RCP VILLA DI ESTE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 90 |
| 1918 | LC6.10.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 501 FLOOR PLAN VILLA DI ESTE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 91 |
| 1919 | LC6.10.2 | REV J UPDATED SET OF DWGS | MODULES AND ENCLOSURE UNIT 401 LIGHTING ZONING UNIT 401 LEVEL 4 RCP VILLA DI ESTE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 92 |
| 1920 | LC6.10.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM ONE LINE RISER AND LC SYSTEM FLOOR PLAN UNIT 401 VILLA DI ESTE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 93 |
| 1921 | LC6.10.2b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM ONE LINE RISER AND RCP UNIT 401 VILLA DI ESTE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 94 |
| 1922 | LC6.10.2c | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM ONE LINE RISER AND HVAC CONTROL SYSTEM UNIT 401 FLOOR PLAN VILLE DI ESTE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 95 |
| 1923 | LC6.11.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 404 RCP BOTICELLI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 96 |
| 1924 | LC6.11.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 404RCP BOTICELLI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 97 |
| 1925 | LC6.11.1B | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT404 RCP BOTICELLI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 98 |
| 1926 | LC6.11.1c | REV J UPDATED SET OF DWGS | HVAC CONTROLSYSTEM UNIT 404 FLOOR PLAN BOTICELLI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 99 |
| 1927 | LC6.11.2 | REV J UPDATED SET OF DWGS | LIGHTING ONING UNIT 504 RCP MODULES AND ENCLOSURE UMIT 504 BOTICELLI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 100 |
| 1928 | LC6.11.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM ONE LINE RISER AND FLOOR PLAN UNIT 504 BOTICELLI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 101 |
| 1929 | LC6.11.2b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM ONE LINE RISER AND RCP UNIT 504 BOTICELLI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 102 |
| 1930 | LC6.11.2c | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM ONE LINE RISER AND HVAC CONTROL SYSTEM UNIT 504 BOTICELLI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 103 |
| 1931 | LC6.12.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 12 RCP CASA DI SOGNI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 104 |
| 1932 | LC6.12.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 12 FLOOR PLAN CASA DI SOGNI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 105 |
| 1933 | LC6.12.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 12 FLOOR PLAN CASA DI SOGNI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 106 |
| 1934 | LC6.12.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 12 FLOOR PLAN CASA DI SOGNI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 107 |
| 1935 | LC6.12.2 | REV J UPDATED SET OF DWGS | SIGHTING SCHEDULE UNIT 12 CASA DI SOGNI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 108 |
| 1936 | LC6.12.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 12 ONE LINE RISER CASA DI SOGNI | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 109 |
| 1937 | LC6.13.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 13 RCP CASA DI RICCHEZZE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 110 |
| 1938 | LC6.13.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 13 FLOOR PLAN CASA DI RICCHEZZE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 111 |
| 1939 | LC6.13.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 13 FLOOR PLAN CASA DI RICCHEZZE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 112 |
| 1940 | LC6.13.1C | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 13 FLOOR PLAN CASA DI RICCHEZZE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 113 |
| 1941 | LC6.13.2 | REV J UPDATED SET OF DWGS | LIGHTING SCHEDULE UNIT 13 CASA DI RICCHEZZE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 114 |
| 1942 | LC6.13.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 13 ONE LINE RISER CASA DI RICCHEZZE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 115 |
| 1943 | LC6.14.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 14 FLOOR PLAN CASA DI OCEANA 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 116 |
| 1944 | LC6.14.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 14 RCP CASA DI OCEANA 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 117 |
| 1945 | LC6.14.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 14 RCP CASA DI OCEANA 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 118 |
| 1946 | LC6.14.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 14 FLOOR PLAN CASA DI OCEANA 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 119 |
| 1947 | LC6.14.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 14 RCP CASA DI OCEANA 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 120 |
| 1948 | LC6.14.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 14 FLOOR PLAN CASA DI OCEAN 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 121 |
| 1949 | LC6.14.2b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 14 FLOOR PLAN CASA DI OCEANA 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 122 |
| 1950 | LC6.14.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 14 FLOOR PLAN CASA DI OCEANA 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 123 |
| 1951 | LC6.14.3 | REV J UPDATED SET OF DWGS | LIGHTING SCHEDULE UNIT 14 CASA DI OCEANA 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 124 |
| 1952 | LC6.14.3a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 14 ONE LINE RISER CASA DI OCEANA | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 125 |
| 1953 | LC6.15.1 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 15 RCP CASA DI MARE 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 126 |
| 1954 | LC6.15.1a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 15 FLOOR PLAN CASA DI MARE 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 127 |
| 1955 | LC6.15.2a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 15 FLOOR PLAN CASA DI MARE 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 128 |
| 1956 | LC6.15.1b | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 15 FLOOR PLAN CASA DI MARE 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 129 |
| 1957 | LC6.15.1c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 15 FLOOR PLAN CASA DI MARE 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 130 |
| 1958 | LC6.15.2b | REV J UPDATED SET OF DWGS | SHADING CONTRIL SYSTEM UNIT 15 FLOOR PLAN CASA DI MARE 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 131 |
| 1959 | LC6.15.2c | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 15 FLOOR PLAN CASA DI MARE 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 132 |
| 1960 | LC6.15.2 | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 15 RCP CASA DI MARE 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 133 |
| 1961 | LC6.15.3 | REV J UPDATED SET OF DWGS | LIGHTING SCHEDULE UNIT 15 CASA DI MARE 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 134 |
| 1962 | LC6.15.3a | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 15 ONE LINE RISER CASA DI MARE | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 135 |
| 1963 | **LIGHTING CONTROL - SOUTH TOWER MODIFIED UNITs** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **23** |
| 1964 | LC1.01-M | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM LEGEND AND SYMBOLS | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 1 |
| 1965 | LC2.01-M | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 2 |
| 1966 | LC2.02-M | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 3 |
| 1967 | LC2.03-M | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 4 |
| 1968 | LC2.04-M | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL CAEN BLOCK & PROCESSOR | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 5 |
| 1969 | LC2.05-M | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEMS DETAIL C2N-CBD-P KEYPAD | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 6 |
| 1970 | LC2.06-M | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM PREWIRE DETAIL-XSPOT LOCATION | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 7 |
| 1971 | LC6.01.1-01M | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 1 RCP UFFIZI UNIT (MODIFIED UNIT) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 8 |
| 1972 | LC6.01.2-01M | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 1 FLOOR PLAN UFFIZI UNIT (MODIFIED UNIT) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 9 |
| 1973 | LC6.01.3-01M | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 1 RCP UFFIZI UNIT (MODIFIED UNIT) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 10 |
| 1974 | LC6.01.4-01M | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 1 FLOOR PLAN UFFIZI UNIT (MODIFIED UNIT) | | | | | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 11 |
| 1975 | LC6.02.1-02M | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 2 RCP VECCHIO UNIT (MODIFIED) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 12 |
| 1976 | LC6.02.2-02M | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 2 FLOOR PLAN VECCHIO UNIT (MODIFIED UNIT) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 13 |
| 1977 | LC6.02.3-02M | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 2 RCP VECCHIO UNIT (MODIFIED) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 14 |
| 1978 | LC6.02.4-02M | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 2 FLOOR PLAN VECCHIO UNIT (MODIFIED UNIT) | | | | | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 15 |
| 1979 | LC6.03.1-03M | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 3 RCP VECCHIO UNIT (MODIFIED) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 16 |
| 1980 | LC6.03.2-03M | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 3 FLOOR PLAN VECCHIO UNIT (MODIFIED UNIT) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 17 |
| 1981 | LC6.03.3-03M | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 3 RCP VECCHIO UNIT (MODIFIED UNIT) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 18 |
| 1982 | LC6.03.4-03M | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 3 FLOOR PLAN VECCHIO UNIT (MODIFIED UNIT) | | | | | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 19 |
| 1983 | LC6.04.1-04M | REV J UPDATED SET OF DWGS | LIGHTING ZONING UNIT 4 RCP DONATELLO UNIT (MODIFIED UNIT) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 20 |
| 1984 | LC6.04.2-04M | REV J UPDATED SET OF DWGS | LIGHTING CONTROL SYSTEM UNIT 4 FLOOR PLAN DONATELLO UNIT (MODIFIED UNIT) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 21 |
| 1985 | LC6.04.3-04M | REV J UPDATED SET OF DWGS | SHADING CONTROL SYSTEM UNIT 4 RCP DONATELLO UNIT (MODIFIED UNIT) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 22 |
| 1986 | LC6.04.4-04M | REV J UPDATED SET OF DWGS | HVAC CONTROL SYSTEM UNIT 4 FLOOR PLAN DONATELLO UNIT (MODIFIED UNIT) | | | | | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 23 |
| 1987 | **LIGHTING CONTROL - NORTH TOWER TYPICAL UNITS** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **43** |
| 1988 | LC1.01-NT | PERMIT SET | LIGHTING CONTROL SYSTEM LEGEND AND SYMBOLS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 1989 | LC2.01-NT | PERMIT SET | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 1990 | LC2.02-NT | PERMIT SET | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 3 |
| 1991 | LC2.03-NT | PERMIT SET | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4 |
| 1992 | LC2.04-NT | PERMIT SET | LIGHTING CONTROL SYSTMES DETAIL CAEN BLOCK AND PROCESSOR | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 5 |
| 1993 | LC2.05-NT | PERMIT SET | LIGHTING CONTROL SYSTEMS DETAIL C2N-CBD-P KEYPAD | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 6 |
| 1994 | LC2.06-NT | PERMIT SET | SHADING CONTROL SYSTEM PREWIRE DETAIL-XSPOT LOCATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 7 |
| 1995 | LC6.01.1a-NT | PERMIT SET | LIGHTING CONTROL SYSTEM UNIT 1 FLOOR PLAN AMALFI TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 8 |
| 1996 | LC6.01.1B-NT | PERMIT SET | SHADING CONTROL SYSTEM UNIT 1 RCP AMALFI TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 9 |
| 1997 | LC6.01.1c-NT | PERMIT SET | HVAC CONTROL SYSTEM UNIT 1 FLOOR PLAN AMALFI TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 10 |
| 1998 | LC6.01.1-NT | PERMIT SET | LIGHITING ZONING UNIT 1 RCP AMALFI TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 11 |
| 1999 | LC6.01.2a-NT | PERMIT SET | LIGHTING CONTROL SYSTEM UNIT 1 RCP AMALFI OPTION A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 12 |
| 2000 | LC6.01.2b-NT | PERMIT SET | SHADING CONTROL SYSTEM UNIT 1 RCP AMALFI OPTION A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 13 |
| 2001 | LC6.01.2c-NT | PERMIT SET | HVAC CONTROL SYSTEM UNIT 1 FLOOR PLAN AMALFI OPTION A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 14 |
| 2002 | LC6.01.2-NT | PERMIT SET | LIGHTING CONTROL SYSTEM RCP AMALFI OPTION A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 15 |
| 2003 | LC6.01.3a-NT | PERMIT SET | LIGHTING CONTROL SYSTEM UNIT 1 FLOOR PLAN AMALFI OPTION B,C,D&E | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 16 |
| 2004 | LC6.01.3b-NT | PERMIT SET | SHADING CONTROL SYSTEM UNIT 1 RCP AMALFI OPTION B,C,D&E | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 17 |
| 2005 | LC6.01.3c-NT | PERMIT SET | HVAC CONTROL SYSTEM UNIT FLOOR PLAN AMALFI OPTION B AND C | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 18 |
| 2006 | LC6.01.3-NT | PERMIT SET | LIGHTING CONTROL SYSTME RCP AMALFI OPTION B,C,D,E | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 19 |
| 2007 | LC6.02.1a-NT | PERMIT SET | LIGHTING CONTROL SYSTEM UNIT 2 FLOOR PLAN RAVELLO TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 20 |
| 2008 | LC6.02.1b-NT | PERMIT SET | SHADING CONTROL SYSTEM UNIT 2 RCP RAVELLO TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 21 |
| 2009 | LC6.02.1c-NT | PERMIT SET | HVAC CONTROL SYSTEM FLOOR PLAN RAVELLO TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 22 |
| 2010 | LC6.02.1-NT | PERMIT SET | LIGHTING ZONING UNIT 2 RCP RAVELLO TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 23 |
| 2011 | LC6.02.2a-NT | PERMIT SET | LIGHTING CONTROL SYSTEM UNIT 2 FLOOR PLAN RAVELLO OPTION A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 24 |
| 2012 | LC6.02.2b-NT | PERMIT SET | SHADING CONTROL SYSTEM UNIT 2 RCP RAVELLO OPTION A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 25 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | LC6.02.2c-NT | PERMIT SET | HVAC CONTROL SYSTEM UNIT 2 FLOOR PLAN RAVELLO OPTION A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 26 |
| 2014 | LC6.02.2-NT | PERMIT SET | LIGHTING ZONING UNIT 2 RCP RAVELLO OPTION A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 27 |
| 2015 | LC6.02.3a-NT | PERMIT SET | LIGHITN CONTROL SYSTEM UNIT 2 FLOOR PLAN RAVELLO OPTION B,C,D,E | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 28 |
| 2016 | LC6.02.3b-NT | PERMIT SET | SHADING CONTROL SYSTEM UNIT 2 RCP RAVELLO OPTION B,C,D,E | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 29 |
| 2017 | LC6.02.3c-NT | PERMIT SET | HVAC CONTROL SYSTEM UNIT 2 FLOOR PLAN RAVELLO OPTIONS B,C,D,E | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 30 |
| 2018 | LC6.02.3-NT | PERMIT SET | LIGHTING ZONING UNIT 2 RCP RAVELLO OPTION B,C,D,E | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 31 |
| 2019 | LC6.03.1a-NT | PERMIT SET | LIGHTING CONTROL SYSTEM UNIT 3 FLOOR PLAN SAN REMO TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 32 |
| 2020 | LC6.03.1b-NT | PERMIT SET | SHADING CONTROL SYSTEM UNIT 3 RCP SAN REMO TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 33 |
| 2021 | LC6.03.1c-NT | PERMIT SET | HVAC CONTROL SYSTEM UNIT 3 FLOOR PLAN SAN REMO TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 34 |
| 2022 | LC6.03.1-NT | PERMIT SET | LIGHTING ZONING UNIT 3 RCP SAN REMO TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 35 |
| 2023 | LC6.04.1a-NT | PERMIT SET | LIGHTING CONTROL SYSTEM FLOOR PLAN GUEST SUITE 14 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 36 |
| 2024 | LC6.04.1b-NT | PERMIT SET | SHADING CONTROL SYSTEM RCP GUEST SUITE 14 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 37 |
| 2025 | LC6.04.1c-NT | PERMIT SET | HVAC CONTROL SYSTEM FLOOR PLAN GUEST SUITE 14 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 38 |
| 2026 | LC6.04.1-NT | PERMIT SET | LIGHTING ZONING RCP GUEST SUITE 14 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 39 |
| 2027 | LC6.05.1a-NT | PERMIT SET | LIGHTING CONTROL SYSTEM FLOOR PLAN GUEST SUITE 15 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 40 |
| 2028 | LC6.05.1b-NT | PERMIT SET | SHADING CONTROL SYSTEM RCP GUEST SUITE 15 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 41 |
| 2029 | LC6.05.1c-NT | PERMIT SET | HVAC CONTROL SYSTEM FLOOR PLAN GUEST SUITE 15 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 42 |
| 2030 | LC6.05.1-NT | PERMIT SET | LIGHTING ZONING RCP GUEST SUITE 15 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 43 |
| 2031 | **LIGHTING CONTROL** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **15** |
| 2032 | LC1.01-NT-M | PERMIT SET | LIGHTING CONTROL SYSTEM LEGEND AND SYMBOLS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 2033 | LC2.01-NT-M | PERMIT SET | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 2034 | LC2.02-NT-M | PERMIT SET | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 3 |
| 2035 | LC2.03-NT-M | PERMIT SET | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4 |
| 2036 | LC2.04-NT-M | PERMIT SET | LIGHTING CONTROL SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 5 |
| 2037 | LC2.05-NT-M | PERMIT SET | LIGHTING CONTROL SYSTEMS DETAIL C2N-CBD-P KEYPAD | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 6 |
| 2038 | LC2.06-NT-M | PERMIT SET | SHADING CONTROL SYSTEM PREWIRE DETAIL-XSPOT LOCATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 7 |
| 2039 | LC6.01.1a-NT-M | PERMIT SET | LIGHTING CONTROL SYSTEM UNIT 1 RCP AMALFI MODIFIED | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 8 |
| 2040 | LC6.01.1b-NT-M | PERMIT SET | SHADING CONTROL SYSTEM UNIT 1 RCP AMALFI MODIFIED | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 9 |
| 2041 | LC6.01.1c-NT-M | PERMIT SET | HVAC CONTROL SYSTEM UNIT 1 FLOOR PLAN AMALFI MODIFIED | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 10 |
| 2042 | LC6.01.1-NT-M | PERMIT SET | LIGHTING CONTROL SYSTEM RCP AMALFI MODIFIED | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 11 |
| 2043 | LC6.01.2a-NT-M | PERMIT SET | LIGHTING CONTROL SYSTEM UNIT 2 FLOOR PLAN MODIFIED | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 12 |
| 2044 | LC6.01.2b-NT-M | PERMIT SET | SHADING CONTROL SYSTEM UNIT 2 RCP RAVELLO MODIFIED | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 13 |
| 2045 | LC6.01.2c-NT-M | PERMIT SET | HVAC CONTROL SYSTEM UNIT 2 FLOOR PLAN RAVELLO MODIFIED | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 14 |
| 2046 | LC6.01.2-NT-M | PERMIT SET | LIGHTING ZONING UNIT 2 RCP RAVELLO MODIFIED | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 15 |
| 2047 | **LIFE SAFETY** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **35** |
| 2048 | LS0.0 | REVISION L-UPDATED SET OF DWGS | LIFE SAFETY GENERAL NOTES & DIAGRAM FOR STAIR RE-ENTRY | | | | | | | | | | | | | | | | | | | | | | | | | | 11/29/2019 | | | | | 1 |
| 2049 | LS0.1 | PERMIT SET | FIRE EXTINGUISHER CABINET DETAILS & ACCESSIBILITY DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 2050 | LS1.0 | REVISION C-UPDATED SET OF DWGS | OVERALL GARAGE LIFE SAFETY PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 3 |
| 2051 | LS1.1 | REVISION O-UPDATED SET OF DWGS | ENCLOSED GARAGE LIFE SAFETY PLAN | | | | | | 9/28/2018 | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 4 |
| 2052 | LS1.2 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY- ARRIVAL DECK- LOBBY LEVEL PLAN/VILLA RESTAURANT LEVEL | | | | | | 9/28/2018 | | | | | | | | | | | 12/18/2018 | | | | | | | | | 11/29/2019 | 3/6/2020 | | 5/15/2020 | | 5 |
| 2053 | LS1.3 | PERMIT SET | LIFE SAFETY PLAN- SOUTH TOWER MEZZANINE/3RD LEVEL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 6 |
| 2054 | LS1.4 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER 4TH FLOOR | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 7 |
| 2055 | LS1.5 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 5 | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 8 |
| 2056 | LS1.6 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 6-12, 17-33 TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 9 |
| 2057 | LS1.7 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 6-12, 17-33 OPTIONAL | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 10 |
| 2058 | LS1.8 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 14, 15, 16 | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 11 |
| 2059 | LS1.9 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 34-36 TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 12 |
| 2060 | LS1.10 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 14-16, 34-46 OPTIONAL | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 13 |
| 2061 | LS1.11 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 47 | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 14 |
| 2062 | LS1.12 | REVISION L-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 48 | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | 11/29/2019 | | | | | 15 |
| 2063 | LS1.13 | REVISION L-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 49 | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | 11/29/2019 | | | | | 16 |
| 2064 | LS1.14 | PERMIT SET | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 50 MECHANICAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 17 |
| 2065 | LS1.15 | REVISION 1 UPDATED SET OF DWG | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 51 MECHANICAL FLOOR PLAN | | | | 12/20/2017 | 6/22/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 18 |
| 2066 | LS1.16 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER LEVEL 52 MAIN ROOF | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 19 |
| 2067 | LS1.17 | PERMIT SET | LIFE SAFETY PLAN- SOUTH TOWER OVERALL ROOF | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 20 |
| 2068 | LS1.18 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER VILLA MEZZANINE LEVEL 3 | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | [illegible] |
| 2069 | LS1.19 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER VILLA LOUNGE LEVEL 4 | | | | | | 9/28/2018 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 22 |
| 2070 | LS1.20 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- SOUTH TOWER HEALTH CLUB LEVEL 5 | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 23 |
| 2071 | LS1.21 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- NORTH TOWER MEZZANINE LEVEL 3 | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 24 |
| 2072 | LS1.22 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- NORTH TOWER LEVEL 4 | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 25 |
| 2073 | LS1.23 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- NORTH TOWER LEVEL 5 | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | 5/15/2020 | | 26 |
| 2074 | LS1.24 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- NORTH TOWER LEVEL 6-49 TYPICAL | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 27 |
| 2075 | LS1.25 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- NORTH TOWER LEVEL 17-33 OPTIONAL | | | | | | | | | | | | | | | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 28 |
| 2076 | LS1.26 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- NORTH TOWER LEVEL 50 TOWER SUITE | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 29 |
| 2077 | LS1.27 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- NORTH TOWER LEVEL 51 PENTHOUSE | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 30 |
| 2078 | LS1.28 | REVISION O-UPDATED SET OF DWGS | LIFE SAFETY PLAN- NORTH TOWER LEVEL 52 PENTHOUSE | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | 9/10/2019 | | | | | | 5/15/2020 | | 31 |
| 2079 | LS1.29 | REVISION 1 UPDATED SET OF DWG | LIFE SAFETY PLAN- NORTH TOWER LEVEL 53 MECHANICAL ROOF | | | | 12/20/2017 | 6/22/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 32 |
| 2080 | LS1.30 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- NORTH TOWER LEVEL 54 MECHANICAL ROOF | | | | | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 33 |
| 2081 | LS1.31 | REVISION D-UPDATED SET OF DWGS | LIFE SAFETY PLAN- NORTH TOWER LEVEL 55 MAIN ROOF | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 34 |
| 2082 | LS1.32 | PERMIT SET | LIFE SAFETY PLAN- NORTH TOWER OVERALL ROOF | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 35 |
| 2083 | **LOW VOLTAGE COMMON AREAS** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **122** |
| 2084 | AV-0.0 | DESIGN DEVELOPMENT | AUDIO VIDEO COVER SHEET | 2/14/2020 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 2085 | AV-0.01 | REVISION O-UPDATED SET OF DWGS | AUDIO VIDEO LEGENDS,GENERAL NOTES,SCHEDULES | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 1 |
| 2086 | AV-0.02 | REVISION O-UPDATED SET OF DWGS | AUDIO VIDEO LEGENDS,GENERAL NOTES,SCHEDULES | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 2 |
| 2087 | AV-1.01 | REVISION O-UPDATED SET OF DWGS | SPEAKER DETAIL 1 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 3 |
| 2088 | AV-1.02 | REVISION O-UPDATED SET OF DWGS | SPEAKER DETAIL 2 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 4 |
| 2089 | AV-1.03 | REVISION O-UPDATED SET OF DWGS | TOUCHPANEL AND KEYPAD DETAIL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 5 |
| 2090 | AV-2.01 | REVISION O-UPDATED SET OF DWGS | AUDIO VIDEO GARAGE LEVEL 1 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 6 |
| 2091 | AV-2.01A | PERMIT SET 100% CD'S | AV LEVEL 1 SOUTH POOL DECK SECTION A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 7 |
| 2092 | AV2.01B | PERMIT SET 100% CD'S | AV LEVEL 1 NORTH POOL DECK SECTION B | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 8 |
| 2093 | AV-2.01V | REVISION O-UPDATED SET OF DWGS | AV LEVEL 1 GARAGE LEVEL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 9 |
| 2094 | AV-2.02 | REVISION O-UPDATED SET OF DWGS | AV LEVEL 2 GARAGE | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 10 |
| 2095 | AV-2.02A | PERMIT SET 100% CD'S | AV LEVEL 2 LOBBY SEC A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 11 |
| 2096 | AV2.02B | PERMIT SET 100% CD'S | AV LEVEL 2 LOBBY SEC B | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 12 |
| 2097 | AV2.02C | PERMIT SET 100% CD'S | AV LEVEL 2 LOBBY SEC C | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 13 |
| 2098 | AV2.02D | PERMIT SET 100% CD'S | AV LEVEL 2 LOBBY SEC D | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 14 |
| 2099 | AV2.02V | REVISION O-UPDATED SET OF DWGS | AV LOBBY LEVEL 2 AMENITIES | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 15 |
| 2100 | AV-2.03 | REVISION O-UPDATED SET OF DWGS | AV MEZZANINE LEVEL SECTION ABCD | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 16 |
| 2101 | AV-2.03A | PERMIT SET 100% CD'S | AV LEVEL 3 SECTION A D | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 17 |
| 2102 | AV-2.03B | REVISION O-UPDATED SET OF DWGS | AV LEVEL 3 SECTION B C | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 18 |
| 2103 | AV-2.04 | REVISION O-UPDATED SET OF DWGS | AV LEVEL 4 VILLA LOUNGE | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 19 |
| 2104 | AV-2.04V | DESIGN DEVELOPMENT | AV PLAN VIEW LEVEL 2 VILLA | 12/20/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2105 | AV-2.05 | REVISION O-UPDATED SET OF DWGS | AUDIO VIDEO VILLA HEALTH LEVEL- LEVEL 5 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 20 |
| 2106 | AV-2.10 | DESIGN DEVELOPMENT | AUDIO VIDEO VILLA HEALTH LEVEL- LEVEL 5 | 12/20/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2107 | AV-3.01 | REVISION O-UPDATED SET OF DWGS | EMPLOYEE LOUNGE AV PLAN LEVEL 1 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 21 |
| 2108 | AV3.02 | REVISION O-UPDATED SET OF DWGS | ICE SKATING RINK AV PLAN LEVEL 1 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 22 |
| 2109 | AV3.03 | REVISION O-UPDATED SET OF DWGS | VILLA GREAT ROOM AV PLAN LEVEL 1 AMENITIES AREA | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 23 |
| 2110 | AV3.04 | REVISION O-UPDATED SET OF DWGS | BOWLING /NORTH /SOUTH/GALLERIES LEVEL 1 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 24 |
| 2111 | AV3.05 | REVISION O-UPDATED SET OF DWGS | CHILDRENS ROOM AV PLAN LEVEL 1 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 25 |
| 2112 | AV3.06 | REVISION O-UPDATED SET OF DWGS | TEEN ROOM AV PLAN LEVEL 1 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 26 |
| 2113 | AV3.07 | REVISION O-UPDATED SET OF DWGS | GOLF SIMULATOR ROOM AV PLAN LEVEL 1 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 27 |
| 2114 | AV3.08 | REVISION O-UPDATED SET OF DWGS | BILLIARDS ROOM AV AMENTITIES AREA | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 28 |
| 2115 | AV3..09 | REVISION O-UPDATED SET OF DWGS | THEATER AV PLAN AMMENETIES AREA | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 29 |
| 2116 | AV3.10 | REVISION O-UPDATED SET OF DWGS | F1 SIMULATOR GAME ROOM AV PLAN LEVEL 1 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 30 |
| 2117 | AV3.11 | REVISION O-UPDATED SET OF DWGS | REST ROOMS AV LEVEL 1 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 31 |
| 2118 | AV3.12 | REVISION O-UPDATED SET OF DWGS | POOL LOUNGE & RESTROOMS AV LEVEL 1 AMENITIES AREA | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 32 |
| 2119 | AV3.13A | PERMIT SET 100% CD'S | NORTH TOWER CABANAS AV PLAN LEVEL 1 AMENITIES AREA/POOL DECK | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 33 |
| 2120 | AV3.13B | PERMIT SET 100% CD'S | SOUTH TOWER CABANAS AV PLAN LEVEL 1 AMENITIES AREA/POOL DECK | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 34 |
| 2121 | AV3.13C | PERMIT SET 100% CD'S | SOUTH TOWER CABANAS AV PLAN LEVEL 1 AMENITIES AREA/POOL DECK | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 35 |
| 2122 | AV3.14A | PERMIT SET 100% CD'S | NORTH POOL DECK AV PLAN LEVEL 1 AMENITIES AREA/POOL DECK | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 36 |
| 2123 | AV3.14B | PERMIT SET 100% CD'S | SOUTH POOL DECK AV PLAN LEVEL 1 AMENITIES AREA/POOL DECK | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 37 |

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020 | | | | | | | | | | | | | | | | Updated: | 7/7/2020 | | | | | | | | | | | | | | | | |
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 2124 | AV3.15 | PERMIT SET 100% CD'S | ARRIVAL DECK LEVEL 2- LOBBY LEVEL | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 38 |
| 2125 | AV3.16 | REVISION O-UPDATED SET OF DWGS | VILLA- RESTARAUNT AREA LEVEL 2- LOBBY LEVEL | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 39 |
| 2126 | AV3.17 | PERMIT SET 100% CD'S | NORTH LOBBY LEVEL 2- LOBBY LEVEL | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 40 |
| 2127 | AV3.18 | PERMIT SET 100% CD'S | SOUTH LOBBY LEVEL 2- LOBBY LEVEL | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 41 |
| 2128 | AV3.19 | PERMIT SET 100% CD'S | NORTH POOL DECK LEVEL 2- LOBBY LEVEL | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 42 |
| 2129 | AV3.20 | PERMIT SET 100% CD'S | VILLAS MAIN POOL DECK LEVEL 2- LOBBY LEVEL | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 43 |
| 2130 | AV3.21 | PERMIT SET 100% CD'S | SOUTH POOL DECK LEVEL 2- LOBBY LEVEL | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 44 |
| 2131 | AV3.22 | REVISION O-UPDATED SET OF DWGS | NORTH LOBBY LEVEL 3 - MEZZANINE | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 45 |
| 2132 | AV3.23 | REVISION O-UPDATED SET OF DWGS | VILLA RESIDENT AMENITIES LEVEL 3 - MEZZANINE | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 46 |
| 2133 | AV3.24 | REVISION O-UPDATED SET OF DWGS | SOUTH LOBBY LEVEL 3 - MEZZANINE | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 47 |
| 2134 | AV3.25 | REVISION O-UPDATED SET OF DWGS | WALL STREET ROOM LEVEL 3 - MEZZANINE | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 48 |
| 2135 | AV3.26 | REVISION O-UPDATED SET OF DWGS | CONFERENCE ROOM LEVEL 3 - MEZZANINE | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 49 |
| 2136 | AV3.27 | REVISION O-UPDATED SET OF DWGS | RESTROOMS/CORRIDOR LEVEL 3 - MEZZANINE | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 50 |
| 2137 | AV3.28 | REVISION O-UPDATED SET OF DWGS | RESIDENTS CLUB LEVEL 3 - MEZZANINE | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 51 |
| 2138 | AV3.29 | REVISION O-UPDATED SET OF DWGS | RESIDENTS CLUB LEVEL 4 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 52 |
| 2139 | AV3.30 | REVISION O-UPDATED SET OF DWGS | PIANO LOUNGE LEVEL 4 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 53 |
| 2140 | AV3.31 | REVISION O-UPDATED SET OF DWGS | LOUNGE ROOM LEVEL 4 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 54 |
| 2141 | AV3.32 | REVISION O-UPDATED SET OF DWGS | BAR ROOM LEVEL 4 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 55 |
| 2142 | AV3.33 | REVISION O-UPDATED SET OF DWGS | CIGAR ROOM/RESTROOMS LEVEL 4 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 56 |
| 2143 | AV3.34 | REVISION O-UPDATED SET OF DWGS | FITNESS CENTER LEVEL 5 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 57 |
| 2144 | AV3.35 | REVISION O-UPDATED SET OF DWGS | SPA & WARM-UP AREA LEVEL 5 | 2/14/2020 | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 58 |
| 2145 | AV-4.02 | REVISION O-UPDATED SET OF DWGS | ICE RINK/FOYER ELEVATION LEVEL 1 AMENITIIES AREA | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 59 |
| 2146 | AV-4.03 | REVISION O-UPDATED SET OF DWGS | CIRCUS MAXIMUS GREAT ROOM ELEVATION LEVEL 1 AMENITIES AREA | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 60 |
| 2147 | AV-4.04 | REVISION O-UPDATED SET OF DWGS | BOWLING LOUNGE/ALLEY ELEVATION LEVEL 1 AMENITITES | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 61 |
| 2148 | AV-4.05 | REVISION O-UPDATED SET OF DWGS | CHILDRENS ROOM AND GOLF SIMULATOR ELEVATION LEVEL 1 AMENITITES AREA | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 62 |
| 2149 | AV-4.06 | REVISION O-UPDATED SET OF DWGS | TEEN ROOM ELEVATION LEVEL 1 AMENITITES AREA | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 63 |
| 2150 | AV-4.08 | REVISION O-UPDATED SET OF DWGS | BILLIARDS ROOM BAR ELEVATION LEVEL 1 AMENITITES AREA | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 64 |
| 2151 | AV-4.09 | REVISION O-UPDATED SET OF DWGS | THEATER ROOM ELEVATION LEVEL 1 AMENITITES AREA | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 65 |
| 2152 | AV-4.11N | PERMIT SET 100% CD'S | NORTH GALLERY ELEATION LEVEL 1 AMENITITES AREA | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 66 |
| 2153 | AV-4.11S | PERMIT SET 100% CD'S | SOUTH GARLLERY ELEVATION LEVEL 1 AMENITITES AREA | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 67 |
| 2154 | AV-4.28 | REVISION O-UPDATED SET OF DWGS | RESIDENTS CLUB LEVEL 3 & 4 | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 68 |
| 2155 | AV-5.01 | REVISION O-UPDATED SET OF DWGS | AUDIO VIDEO SYSTEMS AV RACK ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 69 |
| 2156 | AV-5.02 | REVISION O-UPDATED SET OF DWGS | AUDIO VIDEO SYSTEMS AV RACK ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 70 |
| 2157 | AV-5.03 | REVISION O-UPDATED SET OF DWGS | AUDIO VIDEO SYSTEMS AV RACK ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 71 |
| 2158 | AV-5.04 | REVISION O-UPDATED SET OF DWGS | AUDIO VIDEO SYSTEMS AV RACK ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 72 |
| 2159 | AV-5.05 | PERMIT SET 100% CD'S | AUDIO VIDEO SYSTEMS AV RACK ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 73 |
| 2160 | AV-5.06 | PERMIT SET 100% CD'S | AUDIO VIDEO SYSTEMS AV RACK ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 74 |
| 2161 | AV-5.07 | REVISION O-UPDATED SET OF DWGS | AUDIO VIDEO SYSTEMS AV RACK ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 75 |
| 2162 | AV-5.08 | REVISION O-UPDATED SET OF DWGS | AUDIO VIDEO SYSTEMS AV RACK ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 76 |
| 2163 | AV-6.01 | PERMIT SET 100% CD'S | AUDIO VISUAL NORTH TOWER RISER DIAGRAM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 77 |
| 2164 | AV-6.02A | REVISION O-UPDATED SET OF DWGS | AUDIO VISUAL VILLA RISER DIAGRAM VIEW A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 78 |
| 2165 | AV-6.02B | REVISION O-UPDATED SET OF DWGS | AUDIO VISUAL VILLA RISER DIAGRAM VIEW B | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 79 |
| 2166 | AV-6.03 | PERMIT SET 100% CD'S | AUDIO VISUAL SOUTH TOWER RISER DIAGRAM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 80 |
| 2167 | LV-1.01-C | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE LEGEND AND SYMBOLS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 81 |
| 2168 | LV-2.01 | REVISION N UPDATED SET OF DWGS | CCTV SCHEDULES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 82 |
| 2169 | LV-2.01-C | REVISION O-UPDATED SET OF DWGS | CCTV SCHEDULES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 82 |
| 2170 | LV-2.02 | REVISION N UPDATED SET OF DWGS | ACCESS CONTROL DOOR AND GATEWAY SCHEDULES | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 84 |
| 2171 | LV-2.02-C | REVISION O-UPDATED SET OF DWGS | ACCESS CONTROL SCHEDULES AND DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 83 |
| 2172 | LV2.03 | REVISION O-UPDATED SET OF DWGS | ACCESS CONTROL DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 84 |
| 2173 | LV-2.04 | REVISION O-UPDATED SET OF DWGS | ACCESS CONTROL DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 85 |
| 2174 | LV-2.05 | REVISION O-UPDATED SET OF DWGS | WIFI DETAILS AND SCHEDULES | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 86 |
| 2175 | LV-4.01 | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE ENLARGED SEC. RM. & WALL ELEVATION | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 87 |
| 2176 | LV-4.02 | REV 2 CCD 093 | LV SOUTH TOWER IDF RM AND ACCESS CONTROL PANEL DETAILS | | | | 12/20/2017 | | 4/7/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 88 |
| 2177 | LV-4.03 | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE ACCESS CONTROL PANEL DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 89 |
| 2178 | LV-5.01 | REV 2 CCD 093 | LOW VOLTAGE GARAGE BASEMENT FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 90 |
| 2179 | LV-5.02 | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE GARAGE LEVEL 1 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 91 |
| 2180 | LV-5.03 | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE POOL DECK LOBBY LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 92 |
| 2181 | LV-5.04 | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE MEZZANINE LEVEL 3 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 93 |
| 2182 | LV-5.05 | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE VILLA LOUNGE LEVEL 4 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 94 |
| 2183 | LV-5.06 | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE VILLA HEALTH LEVEL 5 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 95 |
| 2184 | LV-6.01A | REVISION N UPDATED SET OF DWGS | LOW VOLTAGE GARAGE GARAGE (VIEW A) BASEMENT FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 96 |
| 2185 | LV-6.01B | REVISION N UPDATED SET OF DWGS | LOW VOLTAGE GARAGE (VIEW B) BASEMENT FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 97 |
| 2186 | LV-6.01C | REVISION N UPDATED SET OF DWGS | LOW VOLTAGE GARAGE (VIEW C) BASEMENT FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 98 |
| 2187 | LV-6.02A | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE GARAGE (VIEW A) LEVEL 1 FLOOR PLAN | | | | 9/10/2019 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 99 |
| 2188 | LV-6.02B | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE GARAGE GARAGE (VIEW B) LEVEL 1 FLOOR PLAN | | | | 9/10/2019 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 100 |
| 2189 | LV-6.02C | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE GARAGE (VIEW C) LEVEL 1 FLOOR PLAN | | | | 9/10/2019 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 101 |
| 2190 | LV-6.02D | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE GARAGE (VIEW D) LEVEL 1 FLOOR PLAN | | | | 9/10/2019 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 102 |
| 2191 | LV-6.03A | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE ARRIVAL DECK (VIEW A) LOBBY LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 103 |
| 2192 | LV-6.03B | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE ARRIVAL DECK (VIEW B) LOBBY LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 104 |
| 2193 | LV-6.03C | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE ARRIVAL DECK (VIEW C) LOBBY LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 105 |
| 2194 | LV-6.03D | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE ARRIVAL DECK (VIEW D) LOBBY LEVEL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 106 |
| 2195 | LV-6.03V | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE LOBBY LEVEL 2 VILLA FLOOR PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 107 |
| 2196 | LV-6.04A | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE MEZZANINE (VIEW A) LEVEL 3 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 108 |
| 2197 | LV-6.04B | REVISION N UPDATED SET OF DWGS | LOW VOLTAGE MEZZANINE (VIEW B) LEVEL 3 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 109 |
| 2198 | LV-6.05A | REVISION O-UPDATED SET OF DWGS | LOW BOLTAGE-VILLA LOUNGE(VIEW A) LEVEL 4 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 110 |
| 2199 | LV-6.05B | REVISION N UPDATED SET OF DWGS | LOW VOLTAGE -VILLA LOUNGE (VIEW B) LEVEL 4 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 111 |
| 2200 | LV-6.06A | REVISION O-UPDATED SET OF DWGS | LOW VOLTAGE-VILLA HEALTH (VIEW A) LEVEL 5 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 112 |
| 2201 | LV-6.06B | REVISION N UPDATED SET OF DWGS | LOW VOLTAGE -VILLA HEALTH (VIEW B) LEVEL 5 FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 113 |
| 2202 | LV-7.01 | REVISION O-UPDATED SET OF DWGS | SECURITY RISER DIAGRAM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 114 |
| 2203 | LV-7.02 | REVISION O-UPDATED SET OF DWGS | VILLA/COMMON AREA TELECOM RISER DIAGRAM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 115 |
| 2204 | LV-7.03A | REVISION N UPDATED SET OF DWGS | TELECOM (UNIT DISTRIBUTION) RISER DIAGRAM A | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 116 |
| 2205 | LV-7.03B | REVISION N UPDATED SET OF DWGS | TELECOM (UNIT DISTRIBUTION) RISER DIAGRAM B | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 117 |
| 2206 | LV-7.04 | REVISION O-UPDATED SET OF DWGS | TELECOM UNIT DISTRIBUTION VILLA RISER DIAGRAM | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 118 |
| 2207 | LV-7.05A | REVISION N UPDATED SET OF DWGS | TELECOM UNIT DISTRIBUTION NORTH TOWER RISER DIAGRAM A | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 119 |
| 2208 | LV-7.05B | REVISION N UPDATED SET OF DWGS | TELECOM UNIT DISTRIBUTION NORTH TOWER RISER DIAGRAM B | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/7/2020 | | | 120 |
| 2209 | LV-8.01 | PERMIT SET 100% CD'S | LOW VOLTAGE FIRE PENETRATION DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 121 |
| 2210 | LV8.02 | PERMIT SET 100% CD'S | LOW VOLTAGE FIRE PENETRATION DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 122 |
| 2211 | **LOW VOLTAGE SOUTH TOWER TYPICAL UNITS** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **27** |
| 2212 | LV-1.01 | REV J UPDATED SET OF DWGS | SECURITY & AV LEGEND AND SYMBOLS | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 1 |
| 2213 | LV-2.01 | REV J UPDATED SET OF DWGS | SECURITY & AV DETAILS | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 2 |
| 2214 | LV-2.02 | REV J UPDATED SET OF DWGS | SECURITY & AV TYPICAL TV LIFT DETAILS | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 3 |
| 2215 | LV-3.01 | REV J UPDATED SET OF DWGS | UNITS 1-6 SERVICE ROOM LAYOUTS | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 4 |
| 2216 | LV3.02 | REV J UPDATED SET OF DWGS | UNITS 7-12 SERVICE ROOM LAYOUTS | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 5 |
| 2217 | LV3.03 | REV J UPDATED SET OF DWGS | UNITS 13-15 SERICE ROOM LAYOUTS | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 6 |
| 2218 | LV-6.01 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 1 FLOOR PLAN UFFIZI UNIT | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 7 |
| 2219 | LV-6.02 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 1 FLOOR PLAN UFFIZI UNIT (OPTION 3) | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 8 |
| 2220 | LV-6.03 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 2 FLOOR PLAN VECCHIO UNIT | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 9 |
| 2221 | LV-6.04 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 3 FLOOR PLAN VECCHIO UNIT | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 10 |
| 2222 | LV-6.05 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 4 FLOOR PLAN DONATELLO UNIT | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 11 |
| 2223 | LV-6.06 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 5 FLOOR PLAN TOSCANA UNIT | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 12 |
| 2224 | LV-6.07 | REV J UPDATED SET OF DWGS | SECURITY & av UNIT 6 FLOOR PLAN POSITANO | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 13 |
| 2225 | LV-6.08 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 7 FLOOR PLAN MILANO | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 14 |
| 2226 | LV-6.09 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 8 CASA DI SABBIA FLOOR PLANS | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 15 |
| 2227 | LV-6.10 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 9 CASA DI ORO 1ST FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 16 |
| 2228 | LV-6.11 | REV J UPDATED SET OF DWGS | SECURITY &AV UNIT 9 CASA DI ORO 2ND FLOOR | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 17 |
| 2229 | LV-6.12 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 10 VILLA DI ESTE FLOOR PLAN | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 18 |
| 2230 | lv-6.12.1 | REV J UPDATED SET OF DWGS | SECURITY & AV VILLA DI ESTE (UNIT 401) FLOOR PLAN | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 19 |
| 2231 | LV-6.13 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 11 BOTICELLI FLOOR PLAN | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 20 |
| 2232 | LV-6.13.1 | REV J UPDATED SET OF DWGS | SECURITY & AV BOTICELLI (UNIT 504) FLOOR PLAN | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 21 |
| 2233 | LV-6.14 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 12 CASA DI SOGNI FLOOR PLANS | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 22 |
| 2234 | LV-6.15 | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 13 CASA DI RICCHEZZI FLOOR PLANS | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 23 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2235 | LV-6.16A | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 14 (LEVEL 1) CASA DI OCEANA FLOOR PLAN | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 24 |
| 2236 | LV-6.16B | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 14 (LEVEL 2) CASA DI OCEANA FLOOR PLAN | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 25 |
| 2237 | LV-6.17A | REV J UPDATED SET OF DWGS | SECURITY & AV UNIT 15 (LEVEL 1) CASA DI MARE FLOOR PLAN | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 26 |
| 2238 | LV-6.17B | REV J UPDATED SET OF DWGS | SECURITY & av UNIT 15 (LEVEL 2) CASA DI MARE-FLOOR PLAN | | | | 12/20/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 27 |
| 2239 | LOW VOLTAGE SOUTH TOWER MODIFIED UNITS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 7 |
| 2240 | LV1.01-M | REV J UPDATED SET OF DWGS | SECURITY & AV LEGEND AND SYMBOLS | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 1 |
| 2241 | LV2.01-M | REV J UPDATED SET OF DWGS | SECURITY & AV DETAILS | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 2 |
| 2242 | LV2.02-M | REV J UPDATED SET OF DWGS | ENLOARGE UNIT SERVIE ROOM DETAILS | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 3 |
| 2243 | LV6.01-01M | REV J UPDATED SET OF DWGS | SECURITY & AV UFIZZI FLOOR PLAN (MODIFIED UNIT 1) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 4 |
| 2244 | LV6.02-02M | REV J UPDATED SET OF DWGS | SECURITY & AV VECCHIO 2 FLOOR PLAN (MODIFIED UNIT 2) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 5 |
| 2245 | LV6.03-03M | REV J UPDATED SET OF DWGS | SECURITY & AV VECCHIO 3 FLOOR PLAN (MODIFIED UNIT 3) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 6 |
| 2246 | LV6.04-04M | REV J UPDATED SET OF DWGS | SECURITY & AV DONATELLO FLOOR PLAN (MODIFIED UNIT 4) | | | | 6/24/2019 | | | | | | | | | | | | | | | | | | | 9/10/2019 | | | | | | | | 7 |
| 2247 | LOW VOLTAGE NORTH TOWER TYPICAL UNITS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 9 |
| 2248 | LV-1.01-NT | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV LEGEND AND SYMBOLS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 2249 | LV-2.01-NT | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 2250 | LV-2.02-NT | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV TYPICAL LIFT DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 3 |
| 2251 | LV-6.01.1-NT | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV UNIT 1 OPTION A AMALFI BEDROOM W/BATHROOM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4 |
| 2252 | LV-6.01-NT | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV UNIT 1 AMALFI TYPICAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 5 |
| 2253 | LV-6.02.1-NT | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV UNIT 2 OPTION A RAVELLO BEDROOM W/BATHROOM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 6 |
| 2254 | LV-6.02-NT | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV UNIT 2 RAVELLO TYPICAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 7 |
| 2255 | LV-6.03-NT | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV UNIT 3 SAN REMO TYPICAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 8 |
| 2256 | LV-6.04-NT | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV GUEST SUITES 14 AND 15 TYPICAL FLOOR PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 9 |
| 2257 | LOW VOLTAGE NORTH TOWER MODIFIED UNITS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5 |
| 2258 | LV-1.01-NT-M | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV LEGEND AND SYMBOLS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 2259 | LV-2.01-NT-M | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 2260 | LV-2.02-NT-M | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV TYPICAL TV LIFT DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 3 |
| 2261 | LV-6.01-NT-M | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV UNIT 1 MODIFIED AMALFI BEDROOM W/BATHROOM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 4 |
| 2262 | LV-6.02-NT-M | PERMIT SET 100% CD'S CCD 077 | SECURITY AND AV UNIT 2 MODIFIED RAVELLO BEDROOM WITH BATHROOM | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 5 |
| 2263 | MECHANICAL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 111 |
| 2264 | M1.00 | REVISION P UPDATED SET OF DWGS | INDEX AND SYMBOLS | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | 1/30/2019 | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 1/24/2020 | 3/20/2020 | 4/24/2020 | 6/4/2020 | 6/5/2020 | 1 |
| 2265 | M1.01 | REVISION B-UPDATED SET OF DWGS | GENERAL NOTES | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 2 |
| 2266 | M2.01 | REVISION D-UPDATED SET OF DWGS | BASEMENT LEVEL PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 3 |
| 2267 | M2.01A | REVISION C-UPDATED SET OF DWGS | BASEMENT LEVEL PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 4 |
| 2268 | M2.02 | REVISION D-UPDATED SET OF DWGS | BASEMENT LEVEL PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 5 |
| 2269 | M2.03 | REVISION O UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 6 |
| 2270 | M2.04 | REVISION O UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | 7/25/2019 | | | 10/18/2019 | 1/24/2020 | 3/20/2020 | | 5/15/2020 | | 7 |
| 2271 | M2.05 | REVISION K UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | 10/18/2019 | | | | | | 8 |
| 2272 | M2.06 | REVISION N UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | 9/10/2019 | | | 11/29/2019 | 3/6/2020 | 4/24/2020 | | | 9 |
| 2273 | M2.07 | REVISION L UPDATED SET OF DWGS | ARRIVAL DECK LOBBY PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | | 1/24/2020 | | | | | 10 |
| 2274 | M2.08 | REVISION C-UPDATED SET OF DWGS | ARRIVAL DECK LOBBY PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 11 |
| 2275 | M2.09 | REVISION I-UPDATED SET OF DWGS | ARRIVAL DECK LOBBY PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 12 |
| 2276 | M2.10 | REVISION D-UPDATED SET OF DWGS | ARRIVAL DECK LOBBY PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 13 |
| 2277 | M2.11 | REVISION M UPDATED SET OF DWGS | MEZZANINE LEVEL PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | | 1/24/2020 | 3/6/2020 | | | | 14 |
| 2278 | M2.12 | REVISION C-UPDATED SET OF DWGS | MEZZANINE LEVEL PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 15 |
| 2279 | M2.13 | REVISION F-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL4- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | | | | | | | | | | 16 |
| 2280 | M2.14 | REVISION I-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL5- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 17 |
| 2281 | M2.15 | REVISION F-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL6- 12& 17- 33- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | | | | | | | | | | 18 |
| 2282 | M2.16 | REVISION F-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL6- 12& 17- 33- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | | | | | | | | | | 19 |
| 2283 | M2.17 | REVISION F-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 14, 15,& 16- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 20 |
| 2284 | M2.18 | REVISION F-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 14- 16& 34- 46- OPTIONAL MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 21 |
| 2285 | M2.19 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 34- 46- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 22 |
| 2286 | M2.19A | REVISION L UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 46- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | 11/29/2019 | | | | | 23 |
| 2287 | M2.20 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 47- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 24 |
| 2288 | M2.21 | REVISION L UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 48- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | 11/29/2019 | | | | | 25 |
| 2289 | M2.22 | REVISION L UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 49- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | 11/29/2019 | | | | | 26 |
| 2290 | M2.23 | REVISION L UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 50- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | 11/29/2019 | | | | | 27 |
| 2291 | M2.24 | REVISION L UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 51- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | 12/18/2018 | | | | | | | | | 11/29/2019 | | | | | 28 |
| 2292 | M2.25 | REVISION A-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 52- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 29 |
| 2293 | M3.01 | REVISION M UPDATED SET OF DWGS | SOUTH TOWER- LOBBY LEVEL (LEVEL 2)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 30 |
| 2294 | M3.02 | REVISION M UPDATED SET OF DWGS | SOUTH TOWER- LOBBY LEVEL (LEVEL 2)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 31 |
| 2295 | M3.03 | REVISION K UPDATED SET OF DWGS | SOUTH TOWER- LOBBY LEVEL (LEVEL 2)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | 10/18/2019 | | | | | | 32 |
| 2296 | M3.04 | REVISION M UPDATED SET OF DWGS | SOUTH TOWER- MEZZANINE LEVEL (LEVEL 3)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 33 |
| 2297 | M3.05 | REVISION M UPDATED SET OF DWGS | SOUTH TOWER- MEZZANINE LEVEL (LEVEL 3)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 34 |
| 2298 | M3.06 | REVISION M UPDATED SET OF DWGS | SOUTH TOWER- MEZZANINE LEVEL (LEVEL 3)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 35 |
| 2299 | M3.07 | REVISION A-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 4TH& 5TH- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 36 |
| 2300 | M3.08 | REVISION F-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 4TH& 5TH- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | 3/1/2019 | | | | | | | | | | | | 37 |
| 2301 | M3.08A | REVISION F-UPDATED SET OF DWGS | SOUTH TOWER-4TH AND 5TH LEVEL MECHANICAL PLAN | | | | | | | | | | | | | | | | | | | 3/1/2019 | | | | | | | | | | | | 38 |
| 2302 | M3.09 | REVISION A-UPDATED SET OF DWGS | SOUTH TOWER- UNITS (LEVELS6- 12& 17- 33)- MECHANICAL PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 39 |
| 2303 | M3.10 | REVISION F-UPDATED SET OF DWGS | SOUTH TOWER- UNITS (LEVELS6- 12& 17- 33)- MECHANICAL PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | 3/1/2019 | | | | | | | | | | | | 40 |
| 2304 | M3.11 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- UNITS (LEVELS 14- 16& 34- 46)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 41 |
| 2305 | M3.12 | REVISION F-UPDATED SET OF DWGS | SOUTH TOWER- UNITS (LEVELS 14,15,16 MECHANICAL PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 42 |
| 2306 | M3.13 | REVISION A-UPDATED SET OF DWGS | SOUTH TOWER- UNITS (LEVELS 14- 16& 34- 46)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 43 |
| 2307 | M3.14 | REVISION L UPDATED SET OF DWGS | SOUTH TOWER- PENTHOUSE 4705 (LEVEL 47)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | 11/29/2019 | | | | | 44 |
| 2308 | M3.14A | REVISION M UPDATED SET OF DWGS | SOUTH TOWER LEVELS 46-47 MECHANICAL PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 45 |
| 2309 | M3.15 | REVISION M UPDATED SET OF DWGS | SOUTH TOWER- PENTHOUSE 4707 (LEVEL 47)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 46 |
| 2310 | M3.15A | REVISION M UPDATED SET OF DWGS | SOUTH TOWER LEVELS 46-47 MECHANICAL PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 47 |
| 2311 | M3.16 | REVISION A-UPDATED SET OF DWGS | SOUTH TOWER- PENTHOUSE 01 (LEVEL 48)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 48 |
| 2312 | M3.17 | REVISION A-UPDATED SET OF DWGS | SOUTH TOWER- PENTHOUSE 01 (LEVEL 49)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 49 |
| 2313 | M3.18 | REVISION L UPDATED SET OF DWGS | SOUTH TOWER- PENTHOUSE 02 (LEVEL 48)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | 11/29/2019 | | | | | 50 |
| 2314 | M3.19 | REVISION L UPDATED SET OF DWGS | SOUTH TOWER- PENTHOUSE 02 (LEVEL 49)- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | 11/29/2019 | | | | | 51 |
| 2315 | M3.20 | REVISION I-UPDATED SET OF DWGS | SOUTH TOWER- OPTIONAL PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | 7/25/2019 | | | | | | | | | 52 |
| 2316 | M3.20A | REVISION I-UPDATED SET OF DWGS | SOUTH TOWER MODIFED UNITS PLAN MECHANICAL FLOOR PLAN UFFIZI 01/VECCHIO UNIT 02 | | | | | | | | | | | | | | | | | | 1/30/2019 | | | | 7/25/2019 | | | | | | | | | 53 |
| 2317 | M3.21 | REVISION I-UPDATED SET OF DWGS | SOUTH TOWER- OPTIONAL UNITS PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | 1/31/2019 | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 54 |
| 2318 | M3.21A | REVISION I-UPDATED SET OF DWGS | SOUTH TOWER- OPTIONAL UNITS PLAN- MECHANICAL | | | | | | | | | | | | | | | | | | | 3/1/2019 | | | 7/25/2019 | | | | | | | | | 55 |
| 2319 | M3.22 | REVISION A-UPDATED SET OF DWGS | SOUTH TOWER- OPTIONAL PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 56 |
| 2320 | M3.23 | REVISION A-UPDATED SET OF DWGS | SOUTH TOWER- OPTIONAL PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 57 |
| 2321 | M3.24 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- OPTIONAL PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 58 |
| 2322 | M3.25 | REVISION A-UPDATED SET OF DWGS | SOUTH TOWER- OPTIONAL PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | | | | | | | | | | | | | | 59 |
| 2323 | M3.26 | REVISION O UPDATED SET OF DWGS | NORTH AND SOUTH CABANAS MECHANICAL PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | | | | 10/18/2019 | | | | 5/15/2020 | | 60 |
| 2324 | M3.26A | REVISION O UPDATED SET OF DWGS | GARAGE LEVEL1 NORTH& SOUTH CABANA- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | 7/25/2019 | | | 10/18/2019 | | | | 5/15/2020 | | 61 |
| 2325 | M3.27 | REVISION O UPDATED SET OF DWGS | VILLA - AMENITIES LEVEL1 PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | | | 6/4/2020 | | 62 |
| 2326 | M3.28 | REVISION O UPDATED SET OF DWGS | VILLA - AMENITIES LEVEL1 PARTIAL FLOOR PLAN- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | | 4/24/2020 | 6/4/2020 | | 63 |
| 2327 | M3.28A | REVISION O UPDATED SET OF DWGS | VILLA LEVEL 1 MECHANICAL ROOM | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | 1/24/2020 | | 4/24/2020 | 5/15/2020 | | 64 |
| 2328 | M3.29 | REVISION O UPDATED SET OF DWGS | VILLA LEVEL2 RESTAURANT- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | 1/24/2020 | 3/20/2020 | 4/24/2020 | 5/15/2020 | | 65 |
| 2329 | M3.30 | REVISION O UPDATED SET OF DWGS | VILLA LEVEL3 MEZZANINE- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | 3/6/2020 | 4/24/2020 | 5/15/2020 | | 66 |
| 2330 | M3.31 | REVISION O UPDATED SET OF DWGS | VILLA LEVEL4 LOUNGE- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | 4/7/2020 | 5/15/2020 | | 67 |
| 2331 | M3.32 | REVISION O UPDATED SET OF DWGS | VILLA LEVEL5 HEALTH CLUB- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | 4/10/2020 | 5/15/2020 | | 68 |
| 2332 | M3.33 | REVISION O UPDATED SET OF DWGS | VILLA ROOF LEVEL- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | 4/10/2020 | 5/15/2020 | | 69 |
| 2333 | M3.33A | REVISION N UPDATED SET OF DWGS | RESTAURANTS ICE MAKERS CW RISER | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/20/2020 | 4/24/2020 | | | 70 |
| 2334 | M3.34 | REVISION P UPDATED SET OF DWGS | NORTH TOWER 2ND LEVEL PARTIAL MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 71 |
| 2335 | M3.34A | REVISION M UPDATED SET OF DWGS | NORTH TOWER 2ND LEVEL PARTIAL MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 72 |
| 2336 | M3.35 | REVISION P UPDATED SET OF DWGS | NORTH TOWER 3RD LEVEL PARTIAL MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | | | 6/5/2020 | 73 |
| 2337 | M3.35A | REVISION M UPDATED SET OF DWGS | NORTH TOWER 3RD LEVEL PARTIAL MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | 9/10/2019 | | | | 3/6/2020 | | | | 74 |
| 2338 | M3.36 | REVISION P UPDATED SET OF DWGS | NORTH TOWER 4TH LEVEL MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 75 |
| 2339 | M3.37 | REVISION I-UPDATED SET OF DWGS | NORTH TOWER 5TH LEVEL MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 76 |
| 2340 | M3.38 | REVISION P UPDATED SET OF DWGS | NORTH TOWER 6TH THRU 49 LEVEL MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 77 |
| 2341 | M3.38C | REVISION P UPDATED SET OF DWGS | NORTH TOWER 6-46 LEVEL TYPICAL FLOOR PLAN MODIFIED MECHANICAL FLOOR PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | 11/29/2019 | | 4/17/2020 | | 6/5/2020 | 78 |
| 2342 | M3.39 | REVISION P UPDATED SET OF DWGS | NORTH TOWER 6TH THRU 49 LEVEL OPTIONAL MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 79 |
| 2343 | M3.39A | REVISION P UPDATED SET OF DWGS | NORTH TOWER LEVEL 4-46 OPTIONAL MECHANICAL PLAN | | | | | | | | | | | | | | | | | | | | | | | | | 10/18/2019 | | | | | 6/5/2020 | 80 |
| 2344 | M3.40 | REVISION B-UPDATED SET OF DWGS | NORTH TOWER LEVEL 50TH TOWER SUITE MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 81 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 2345 | M3.41 | REVISION M UPDATED SET OF DWGS | NORTH TOWER LEVEL 51ST PENTHOUSE MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 82 |
| 2346 | M3.42 | REVISION M UPDATED SET OF DWGS | NORTH TOWER LEVEL 52ND PENTHOUSE MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 83 |
| 2347 | M3.43 | REVISION M UPDATED SET OF DWGS | NORTH TOWER LEVEL 53RD MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | 3/6/2020 | | | | 84 |
| 2348 | M3.44 | REVISION B-UPDATED SET OF DWGS | NORTH TOWER LEVEL 54TH MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 85 |
| 2349 | M3.45 | PERMIT SET | NORTH TOWER LEVEL 55TH MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 86 |
| 2350 | M4.01 | REVISION L UPDATED SET OF DWGS | CHW RISERS SOUTH TOWER- MECHANICAL | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | | | | | 87 |
| 2351 | M4.02 | REVISION I-UPDATED SET OF DWGS | OA RISERS SOUTH TOWER - MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 88 |
| 2352 | M4.03 | REVISION F-UPDATED SET OF DWGS | STAIRS& ELEV. PRESSURIZATION RISERS SOUTH TOWER - MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | | | | | | | | | | 89 |
| 2353 | M4.04 | REVISION P UPDATED SET OF DWGS | CHW RISERS NORTH TOWER MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | | | 3/6/2020 | | | 6/5/2020 | 90 |
| 2354 | M4.05 | REVISIONJ-UPDATED SET OF DWGS | OA RISERS NORTH TOWER - MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | | | | 91 |
| 2355 | M4.06 | REVISION B-UPDATED SET OF DWGS | STAIRS& ELEV. PRESSURIZATION RISERS NORTH TOWER& VILLAGE- MECHANICAL | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 92 |
| 2356 | M4.07 | REVISION O UPDATED SET OF DWGS | CHILLED WATER FLOW DIAGRAM | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 93 |
| 2357 | M5.01 | REVISION C-UPDATED SET OF DWGS | MECHANICAL SCHEDULES | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 94 |
| 2358 | M5.02 | REVISION O UPDATED SET OF DWGS | MECHANICAL SCHEDULES | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | 5/15/2020 | | 95 |
| 2359 | M5.03 | REVISION L UPDATED SET OF DWGS | MECHANICAL SCHEDULES | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | 7/25/2019 | | | 10/18/2019 | 11/29/2019 | | | | | 96 |
| 2360 | M6.01 | REVISION C-UPDATED SET OF DWGS | MECHANICAL CONTROLS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 97 |
| 2361 | M6.02 | PERMIT SET | MECHANICAL CONTROLS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 98 |
| 2362 | M6.03 | PERMIT SET | MECHANICAL CONTROLS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 99 |
| 2363 | M6.04 | PERMIT SET | MECHANICAL CONTROLS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 100 |
| 2364 | M7.01 | REVISION J-UPDATED SET OF DWGS | SMOKE CONTROL NOTES | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | 9/10/2019 | | | | | | | | 101 |
| 2365 | M7.02 | REVISION D-UPDATED SET OF DWGS | SMOKE CONTROL PANEL SOUTH TOWER | | | | | | | | | | | | | | | | | 12/18/2019 | | | | | | | | | | | | | | 102 |
| 2366 | M7.03 | REVISION D-UPDATED SET OF DWGS | SMOKE CONTROL PANEL NORTH TOWER AND VILLA | | | | | | | | | | | | | | | | | 12/18/2019 | | | | | | | | | | | | | | 103 |
| 2367 | M8.01 | PERMIT SET | DETAILS MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 104 |
| 2368 | M8.02 | PERMIT SET | DETAILS MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 105 |
| 2369 | M8.03 | PERMIT SET | DETAILS MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 106 |
| 2370 | M8.04 | PERMIT SET | DETAILS MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 107 |
| 2371 | M8.05 | PERMIT SET | DETAILS MECHANICAL | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 108 |
| 2372 | M8.06 | REVISION B-UPDATED SET OF DWGS | MECHANICAL DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 109 |
| 2373 | M8.07 | REVISION B-UPDATED SET OF DWGS | MECHANICAL DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 110 |
| 2374 | M8.08 | REVISION B-UPDATED SET OF DWGS | MECHANICAL DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 111 |
| 2375 | **PLUMBING** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **117** |
| 2376 | P0.01 | REVISION P UPDATED SET OF DWGS | PLUMBING INDEX SHEET | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | 1/30/2019 | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 1/24/2020 | 3/6/2020 | 4/24/2020 | 5/15/2020 | 6/5/2020 | 1 |
| 2377 | P2.01 | REVISION N UPDATED SET OF DWGS | BASEMENT LEVEL PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | 9/10/2019 | | 10/18/2019 | 11/29/2019 | | 4/24/2020 | | | 2 |
| 2378 | P2.01A | REVISION K UPDATED SET OF DWGS | BASEMENT LEVEL PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | 10/18/2019 | | | | | | 3 |
| 2379 | P2.02 | REVISION N UPDATED SET OF DWGS | BASEMENT LEVEL PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | | 9/10/2019 | | 10/18/2019 | | | 4/24/2020 | | | 4 |
| 2380 | P2.03 | REVISION O UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL- PLUMBING PLAN (SLAB) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | 4/24/2020 | 5/15/2020 | | 5 |
| 2381 | P2.03A | REVISION P UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL- PLUMBING PLAN (CEILING) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | | | 5/15/2020 | 6/5/2020 | 6 |
| 2382 | P2.03B | REVISION C-UPDATED SET OF DWGS | INTERSTITIAL LEVEL | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 7 |
| 2383 | P2.04 | REVISION O UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL- PLUMBING PLAN (SLAB) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | 1/30/2019 | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | 4/24/2020 | 5/15/2020 | | 8 |
| 2384 | P2.04A | REVISION O UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL- PLUMBING PLAN (CEILING) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | 1/30/2019 | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 9 |
| 2385 | P2.04B | REVISION E-UPDATED SET OF DWGS | LOBBY LEVEL/ ARRIVAL DECK PARTIAL- PLUMBING PLAN | | | | | | | | | | | | | 4/20/2018 | | | | | 1/30/2019 | | | | | | | | | | | | | 10 |
| 2386 | P2.05 | REVISION N UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL- PLUMBING PLAN (SLAB) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | | 4/24/2020 | | | 11 |
| 2387 | P2.05A | REVISION N UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL- PLUMBING PLAN (CEILING) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/29/2019 | | 4/24/2020 | | | 12 |
| 2388 | P2.06 | REVISION N UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL- PLUMBING PLAN (SLAB) | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2008 | 12/18/2018 | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | 4/24/2020 | | | 13 |
| 2389 | P2.06A | REVISION N UPDATED SET OF DWGS | GARAGE LEVEL1 PARTIAL- PLUMBING PLAN (CEILING) | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | 1/30/2019 | | | | 7/25/2019 | 9/10/2019 | | | 11/29/2019 | | 4/24/2020 | | | 14 |
| 2390 | P2.07 | REVISION P UPDATED SET OF DWGS | LOBBY LEVEL/ ARRIVAL DECK PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | | | 6/5/2020 | 15 |
| 2391 | P2.08 | REVISION E-UPDATED SET OF DWGS | LOBBY LEVEL/ ARRIVAL DECK PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | 1/30/2019 | | | | | | | | | | | | | 16 |
| 2392 | P2.09 | REVISION I-UPDATED SET OF DWGS | LOBBY LEVEL/ ARRIVAL DECK PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 17 |
| 2393 | P2.10 | REVISION I-UPDATED SET OF DWGS | LOBBY LEVEL/ ARRIVAL DECK PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | 1/30/2019 | | | | 7/25/2019 | | | | | | | | | 18 |
| 2394 | P2.11 | REVISION C-UPDATED SET OF DWGS | MEZZANINE LEVEL PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2008 | | | | | | | | | | | | | | | 19 |
| 2395 | P2.12 | REVISION E-UPDATED SET OF DWGS | MEZZANINE LEVEL PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2019 | | | | | 1/30/2019 | | | | | | | | | | | | | 20 |
| 2396 | P2.13 | REVISION E-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL4- PLUMBING PLAN (CEILING) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | 1/30/2019 | | | | | | | | | | | | | 21 |
| 2397 | P2.13A | REVISION E-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL4- PLUMBING PLAN (SLAB) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | 1/30/2019 | | | | | | | | | | | | | 22 |
| 2398 | P2.14 | REVISION E-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL5- PLUMBING PLAN (CEILING) | | | | 12/20/2017 | | | | | | | | | 4/20/2019 | | | 10/31/2018 | | 1/30/2019 | | | | | | | | | | | | | 23 |
| 2399 | P2.14A | REVISION G-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL5- PLUMBING PLAN (SLAB) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | 1/30/2019 | | 5/1/2019 | | | | | | | | | | | 24 |
| 2400 | P2.15 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVELS6- 12& 17- 33 TYPICAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 25 |
| 2401 | P2.15A | REVISION E-UPDATED SET OF DWGS | SOUTH TOWER LEELS 6-12 AND 17-33 PLUMBING PLAN | | | | | | | | | | | | | | | | | | 1/30/2019 | | | | | | | | | | | | | 26 |
| 2402 | P2.16 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVELS6- 12& 17- 33 OPTIONAL TYPICAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 27 |
| 2403 | P2.17 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVELS 14& 15- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 28 |
| 2404 | P2.17A | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 16- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 29 |
| 2405 | P2.18 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVELS 35- 46 OPTIONAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 30 |
| 2406 | P2.18A | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 34 OPTIONAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 31 |
| 2407 | P2.18B | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVELS 16 OPTIONAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 32 |
| 2408 | P2.18C | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 14TH& 15TH OPTIONAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 33 |
| 2409 | P2.19 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVELS 35TH- 46TH TYPICAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 34 |
| 2410 | P2.19A | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 34- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 35 |
| 2411 | P2.19B | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 46- PLUMBING PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 36 |
| 2412 | P2.20 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 47- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | | | | 37 |
| 2413 | P2.21 | REVISION L UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 48- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | 11/29/2019 | | | | | 38 |
| 2414 | P2.22 | REVISION L UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 49- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | | | | 11/29/2019 | | | | | 39 |
| 2415 | P2.23 | REVISION B-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 50- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 40 |
| 2416 | P2.24 | REVISION B-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 51- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 41 |
| 2417 | P2.25 | REVISION B-UPDATED SET OF DWGS | SOUTH TOWER- LEVEL 52 MAIN ROOF- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 42 |
| 2418 | P2.26 | PERMIT SET | SOUTH TOWER- OVERALL ROOF- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 43 |
| 2419 | P3.00 | REVISION O UPDATED SET OF DWGS | ENLARGED KITCHENS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | 4/24/2020 | 5/15/2020 | | 44 |
| 2420 | P3.01 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER- UNIT 1 UFFIZI - OPTIONAL PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 45 |
| 2421 | P3.26 | REVISION O UPDATED SET OF DWGS | GARAGE LEVEL1 NORTH& SOUTH CABANA- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 46 |
| 2422 | P3.27 | REVISION O UPDATED SET OF DWGS | VILLA- AMENITIES LEVEL1 PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | | 4/24/2020 | 5/15/2020 | | 47 |
| 2423 | P3.28 | REVISION O UPDATED SET OF DWGS | VILLA- AMENITIES LEVEL1 PARTIAL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | | 4/24/2020 | 5/15/2020 | | 48 |
| 2424 | P3.29 | REVISION O UPDATED SET OF DWGS | VILLA LEVEL2- RESTAURANT- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | 3/6/2020 | 4/24/2020 | 5/15/2020 | | 49 |
| 2425 | P3.30 | REVISION O UPDATED SET OF DWGS | VILLA LEVEL3- MEZZANINE- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 1/24/2020 | 3/6/2020 | 4/17/2020 | 5/15/2020 | | 50 |
| 2426 | P3.31 | REVISION O UPDATED SET OF DWGS | VILLA LEVEL4- LOUNGE- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | 4/7/2020 | 5/15/2020 | | 51 |
| 2427 | P3.32 | REVISION O UPDATED SET OF DWGS | VILLA LEVEL5- HEALTH CLUB- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | | 4/10/2020 | 5/15/2020 | | 52 |
| 2428 | P3.33 | REVISION O UPDATED SET OF DWGS | VILLA ROOF LEVEL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | | | | | | | 4/10/2020 | 5/15/2020 | | 53 |
| 2429 | P3.34 | REVISION P UPDATED SET OF DWGS | ENLARGED 2ND LEVEL NORTH TOWER UNIT LOWER LEVEL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 54 |
| 2430 | P3.35 | REVISION P UPDATED SET OF DWGS | ENLARGED 3RD LEVEL NORTH TOWER UNIT UPPER LEVEL- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 55 |
| 2431 | P3.36 | REVISION P UPDATED SET OF DWGS | ENLARGED 4TH LEVEL NORTH TOWER- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 56 |
| 2432 | P3.37 | REVISION P UPDATED SET OF DWGS | ENLARGED 5H LEVEL NORTH TOWER- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 57 |
| 2433 | P3.38 | REVISION P UPDATED SET OF DWGS | ENLARGED 6TH- 49TH TYPICAL LEVEL NORTH TOWER- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 58 |
| 2434 | P3.38C | REVISION P UPDATED SET OF DWGS | NORTH TOWER 6-46 LEVEL TUPICAL FLOOR PLAN MODIFIED PLUMBING PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | 11/29/2019 | | | | 6/5/2020 | 59 |
| 2435 | P3.39 | REVISION P UPDATED SET OF DWGS | ENLARGED 4TH- 49TH OPTIONAL FLOOR NORTH TOWER- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | 6/5/2020 | 60 |
| 2436 | P3.39A | REVISION P UPDATED SET OF DWGS | ENLARGED OPTIONAL PLUMBING PLANS | | | | | | | | | | | | | | | | | | | | | | | | | 10/18/2019 | | | | | 6/5/2020 | 61 |
| 2437 | P3.40 | REVISION C-UPDATED SET OF DWGS | ENLARGED LEVEL 50 TOWER SUITE NORTH TOWER- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 62 |
| 2438 | P3.41 | REVISION M UPDATED SET OF DWGS | ENLARGED LEVEL 51 PH LOWER LEVEL NORTH TOWER- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 63 |
| 2439 | P3.42 | REVISION M UPDATED SET OF DWGS | ENLARGED LEVEL 52 PH UPPER LEVEL NORTH TOWER- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 64 |
| 2440 | P3.43 | REVISION C-UPDATED SET OF DWGS | ENLARGED LEVEL 53 NORTH TOWER MECHANICAL ROOF- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 65 |
| 2441 | P3.44 | PERMIT SET | ENLARGED LEVEL 54 NORTH TOWER MECHANICAL ROOF- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 66 |
| 2442 | P3.45 | PERMIT SET | ENLARGED LEVEL 55 NORTH TOWER MECHANICAL ROOF- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 67 |
| 2443 | P3.46 | PERMIT SET | ENLARGED LEVEL 56 NORTH TOWER MAIN ROOF- PLUMBING PLAN | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 68 |
| 2444 | P4.01 | REVISION N UPDATED SET OF DWGS | SANITARY COLLECTION ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | | | | 4/24/2020 | | | 69 |
| 2445 | P4.01A | REVISION O UPDATED SET OF DWGS | SANITARY COLLECTION ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | 1/30/2019 | 3/1/2019 | | | 7/25/2019 | | | | | | 4/17/2020 | 5/15/2020 | | 70 |
| 2446 | P4.01B | REVISION O UPDATED SET OF DWGS | SANITARY COLLECTION ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | 9/10/2019 | | | | | 4/24/2020 | 5/15/2020 | | 71 |
| 2447 | P4.02 | REVISION E UPDATED SET OF DWGS | SANITARY RISERS ISOMETRIC SOUTH TOWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | | | 1/30/2019 | | | | | | | | | | | | | 72 |
| 2448 | P4.03 | REVISION B-UPDATED SET OF DWGS | SANITARY COLLECTION ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 73 |
| 2449 | P4.04 | REVISION B-UPDATED SET OF DWGS | SANITARY RISERS ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 74 |
| 2450 | P4.05 | REVISION B-UPDATED SET OF DWGS | SANITARY RISERS ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 75 |
| 2451 | P4.06 | REVISION B-UPDATED SET OF DWGS | SANITARY RISERS ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 76 |
| 2452 | P4.07 | REVISION B-UPDATED SET OF DWGS | SANITARY RISERS ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 77 |
| 2453 | P4.08 | REVISION B-UPDATED SET OF DWGS | WATER DISTRIBUTION ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 78 |
| 2454 | P4.08A | REVISION B-UPDATED SET OF DWGS | SANITARY RISERS ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 79 |
| 2455 | P4.08B | REVISION B-UPDATED SET OF DWGS | SANITARY RISERS ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | | | | | | | | | | | | | 80 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2456 | P4.09 | REVISION B-UPDATED SET OF DWGS | WATER DISTRIBUTION ISOMETRIC | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 81 |
| 2457 | P4.10 | REVISION B-UPDATED SET OF DWGS | NORTH& SOUTH WATER RISERS (TYPICAL) | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 82 |
| 2458 | P4.11 | REVISION D-UPDATED SET OF DWGS | WATER UNITS ISOMETRIC | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 83 |
| 2459 | P4.12 | REVISION D-UPDATED SET OF DWGS | WATER UNITS ISOMETRIC | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | 12/18/2018 | | | | | | | | | | | | | | 84 |
| 2460 | P4.13 | REVISION C-UPDATED SET OF DWGS | WATER UNITS ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 85 |
| 2461 | P4.13A | REVISION E UPDATED SET OF DWGS | WATER UNITS ISOMETRIC SOUTH TOWER | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | 1/30/2019 | | | | | | | | | | | | | 86 |
| 2462 | P4.13B | REVISION C-UPDATED SET OF DWGS | WATER UNITS ISOMETRIC | | | | 12/20/2018 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 87 |
| 2463 | P4.14 | REVISION C-UPDATED SET OF DWGS | STORM DRAIN ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 88 |
| 2464 | P4.15 | REVISION C-UPDATED SET OF DWGS | STORM DRAIN ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 89 |
| 2465 | P4.15A | REVISION O UPDATED SET OF DWGS | CABANA WATER ISOMETRIC (NORTH) | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | 5/15/2020 | | 90 |
| 2466 | P4.15B | REVISION B-UPDATED SET OF DWGS | VILLA BUILDING WATER ISOMETRIC | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 91 |
| 2467 | P4.16 | REVISION I-UPDATED SET OF DWGS | STORM DRAIN ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | 12/18/2018 | 1/30/2019 | | | | 7/25/2019 | | | | | | | | | 92 |
| 2468 | P4.16A | REVISION F-UPDATED SET OF DWGS | POOL DECK STORM DRAIN ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | | | | 3/1/2019 | | | | | | | | | | | | 93 |
| 2469 | P4.16B | REVISION F-UPDATED SET OF DWGS | POOL DECK STORM DRAIN ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 94 |
| 2470 | P4.16C | REVISION L UPDATED SET OF DWGS | ARRIVAL DECK STORM DRAIN ISOMETRIC | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 7/20/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | 11/29/2019 | | | | | 95 |
| 2471 | P4.16D | REVISION N UPDATED SET OF DWGS | PLUMBING ISOMETRIC | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | 4/10/2020 | | | 96 |
| 2472 | P4.17 | REVISION F-UPDATED SET OF DWGS | STORM DRAIN COLLECTION ISOMETRIC NORTH SIDE PARKING AREA | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 97 |
| 2473 | P4.18 | REVISION L UPDATED SET OF DWGS | STORM DRAIN ISOMETRIC (PARKING DECK) | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | 11/29/2019 | | | | | 98 |
| 2474 | P4.19 | REVISION F-UPDATED SET OF DWGS | STORM DRAIN COLLECTION ISOMETRIC NORTH SIDE DECK | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | | | | | | | | | | | 99 |
| 2475 | P4.19A | REVISION D UPDATED SET OF DWGS | STORM DRAIN COLLECTION ISOMETRIC | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 100 |
| 2476 | P4.20 | REVISION E UPDATED SET OF DWGS | SOUTH TOWER GAS ISOMETRIC | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | 1/30/2019 | | | | | | | | | | | | | 101 |
| 2477 | P4.21 | REVISION C-UPDATED SET OF DWGS | GAS ISOMETRIC AND RISERS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 102 |
| 2478 | P4.22 | REVISION N UPDATED SET OF DWGS | GAS ISOMETRIC AND RISERS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | 4/17/2020 | | | 103 |
| 2479 | P4.23 | REVISION C-UPDATED SET OF DWGS | NORTH TOWER CONDENSATE ISOMETRIC | | | | 12/20/2018 | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 104 |
| 2480 | P4.24 | REVISION D-UPDATED SET OF DWGS | NORTH TOWER CONDENSATE ISOMETRIC | | | | | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | | | 105 |
| 2481 | P4.25 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER CONDENSATE DRAIN COLLECTION ISOMETRIC | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 106 |
| 2482 | P4.26 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER CONDENSATE RISER | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 107 |
| 2483 | P4.27 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER CONDENSATE RISER | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 108 |
| 2484 | P4.28 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER GARAGE/GARBAGE COLLECTION ISOMETRIC | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 109 |
| 2485 | P5.01 | REVISION F-UPDATED SET OF DWGS | PLUMBING DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | | | | | | | | | | | 110 |
| 2486 | P5.02 | REVISION N UPDATED SET OF DWGS | PLUMBING DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | 10/18/2019 | | | 4/24/2020 | | | 111 |
| 2487 | P5.03 | PERMIT SET | PLUMBING DETAILS& NOTES | | | | 12/20/2017 | | | | | | | | | | | | | | | | | | | | | | | | | | | 112 |
| 2488 | P5.04 | REVISION N UPDATED SET OF DWGS | PLUMBING DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | 4/24/2020 | | | 113 |
| 2489 | P5.05 | REVISION I-UPDATED SET OF DWGS | PLUMBING DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 114 |
| 2490 | P5.06 | REVISION B-UPDATED SET OF DWGS | PLUMBING DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 115 |
| 2491 | P5.07 | REVISION I-UPDATED SET OF DWGS | PLUMBING DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | | | | | 116 |
| 2492 | P5.08 | REVISION B-UPDATED SET OF DWGS | PLUMBING DETAILS | | | | 12/20/2017 | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | 117 |
| 2493 | **WATER DETECTION SYSTEM** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **9** |
| 2494 | H2O.1 | REVISION C-UPDATED SET OF DWGS | NORTH AND SOUTH TOWER LOBBY WATER DETECTION PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 1 |
| 2495 | H2O.2 | REVISION C-UPDATED SET OF DWGS | NORTH AND SOUTH TOWER MEZZANINE WATER DETECTION PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 2 |
| 2496 | H2O.3 | REVISION C-UPDATED SET OF DWGS | NORTH AND SOUTH TOWER LEVEL 4 WATER DETE3CTION PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 3 |
| 2497 | H2O.4 | REVISION C-UPDATED SET OF DWGS | NORTH AND SOUTH TOWER LEVEL 5 DETECTION PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 4 |
| 2498 | H2O.5 | REVISION C-UPDATED SET OF DWGS | NORTH AND SOUTH TOWER TYPICAL LEVEL WATER DETECTION PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 5 |
| 2499 | H2O.6 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER TYPICAL LEVEL 34-45 WATER DETECTION PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 6 |
| 2500 | H2O.7 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER LEVEL 46 WATER DETECTION PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 7 |
| 2501 | H2O.8 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER LEVEL 47 WATER DETECTION PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 8 |
| 2502 | H2O.9 | REVISION C-UPDATED SET OF DWGS | SOUTH TOWER LEVEL 49 WATER DETECTION PLAN | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 9 |
| 2503 | **LIGHTING LOBBIES** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **12** |
| 2504 | LT-001 | REVISION O-UPDATED SET OF DWGS | LOBBY LIGHTING COVER SHEET | | | | 4/11/2018 | | | | | | | | | | 7/20/2018 | | 10/31/2018 | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 1 |
| 2505 | LT-101 | REVISION O-UPDATED SET OF DWGS | SOUTH LOBBY LIGHTING PLAN | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 2 |
| 2506 | LT-102 | REVISION O-UPDATED SET OF DWGS | SOUTH LOBBY EXTENSION-LIGHTING PLAN | | | | | | | | | | | | | | | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 3 |
| 2507 | LT-103 | REVISION O-UPDATED SET OF DWGS | SOUTH LOBBY - PORTE COCHERE LIGHTING PLAN | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 4 |
| 2508 | LT-104 | REVISION O-UPDATED SET OF DWGS | NORTH LOBBY - PORTE COCHERE LIGHTING PLAN | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 5 |
| 2509 | LT-110 | REVISION O-UPDATED SET OF DWGS | NORTH LOBBY LIGHTING PLAN | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 6 |
| 2510 | LT-201 | REVISION O-UPDATED SET OF DWGS | SOUTH LOBBY LIGHTING RCP | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 7 |
| 2511 | LT-202 | REVISION O-UPDATED SET OF DWGS | SOUTH LOBBY EXTENSION- LIGHTING RCP | | | | | | | | | | | | | | | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 8 |
| 2512 | LT-L-202 | REVISION B (ID- VILLA & LOBBIES) | NORTH LOBBY LIGHTING RCP | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | |
| 2513 | LT-203 | REVISION O-UPDATED SET OF DWGS | SOUTH LOBBY PORTE COCHERE LIGHTING RCP | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 9 |
| 2514 | LT-204 | REVISION O-UPDATED SET OF DWGS | NORTH LOBBY PORTE COCHERE LIGHTING RCP | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 10 |
| 2515 | LT-210 | REVISION O-UPDATED SET OF DWGS | NORTH LOBBY LIGHTING RCP | | | | | | | | | | | | | | | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 11 |
| 2516 | LT-L-203 | REVISION B (ID- VILLA & LOBBIES) | SOUTH LOBBY - PORTE COCHERE LIGHTING RCP | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | |
| 2517 | LT-L-204 | REVISION B (ID- VILLA & LOBBIES) | NORTH LOBBY - PORTE COCHERE LIGHTING RCP | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | |
| 2518 | LT-L-401 | REVISION O-UPDATED SET OF DWGS | LOBBY LIGHTING LOAD SCHEDULE | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 3/18/2020 | | 5/15/2020 | | 12 |
| 2519 | **REVEAL/RMD LIGHTING VILLA** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **28** |
| 2520 | LT-011 | REVISION O-UPDATED SET OF DWGS | VILLA LIGHTING COVER SHEET | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 1 |
| 2521 | LT-111 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 - LIGHTING PLAN | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 2 |
| 2522 | LT-111A | REVISION O-UPDATED SET OF DWGS | ICE RINK ENLARGED PLAN | | | | | | | | | | | | | | | | | | | | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 3 |
| 2523 | LT-111B | DESIGN DEVELOPMENT | BOWLING ALLEY ENLARGED PLAN ( Deleted CCD 94.1) | | | | | | | | | | | | | | | | | | | | | 6/21/2019 | 7/25/2019 | | | | | | | | | 4 |
| 2524 | LT-112 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 2 - LIGHTING PLAN | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 4 |
| 2525 | LT-113 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 3 - LIGHTING PLAN | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 5 |
| 2526 | LT-114 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 4 - LIGHTING PLAN | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 6 |
| 2527 | LT-V-115 | REVISION B (ID- VILLA & LOBBIES) | VILLA LEVEL 5 - LIGHTING PLAN | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | |
| 2528 | LT-211 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 - LIGHTING RCP | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 7 |
| 2529 | LT-211A | REVISION O-UPDATED SET OF DWGS | ICE RINK ENLARGED RCP | | | | | | | | | | | | | | | | | | | | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 8 |
| 2530 | LT-211B | DESIGN DEVELOPMENT | BOWLING ALLEY ENLARGED RCP(DELETED CCD 94.1) | | | | | | | | | | | | | | | | | | | | | 6/21/2019 | 7/25/2019 | | | | | | | | | |
| 2531 | LT-212 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 2 - LIGHTING RCP | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 9 |
| 2532 | LT-213 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 3 - LIGHTING RCP | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 10 |
| 2533 | LT-214 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 4 - LIGHTING RCP | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 11 |
| 2534 | LT-214B | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 4 RESIDENT'S SOUNGE RCP DIMENSION PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | | 4/17/2020 | | 5/15/2020 | | 12 |
| 2535 | LT-215 | DESIGN DEVELOPMENT | VILLA LEVEL 5 LIGHTING RCP | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | |
| 2536 | LT-221 | DESIGN DEVELOPMENT | VILLA LEVEL 1 UPPER LIGHTING RCP (DELETED CCD 94.1) | | | | | | | | | | | | | | | | | | | | | 6/21/2019 | 7/25/2019 | | | | | | | | | 14 |
| 2537 | LT-311 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 GREAT ROOM GALLERY ELEVATIONS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 13 |
| 2538 | LT-312 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 GREAT ROOM ELEVATIONS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 14 |
| 2539 | LT-313 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 BOWLING ALLEY ELEVATIONS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 15 |
| 2540 | LT-314 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 GALLERY LIGHTING DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 16 |
| 2541 | LT-315 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 BOWLING ALLEY DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 17 |
| 2542 | LT-316 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 GREAT ROOM AND GALLERY LIGHTING DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 18 |
| 2543 | LT-317 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 ICE RINK ELEVATIONS AND DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 19 |
| 2544 | LT-318 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 CHILDRENS'S RM; GOLF SIM. LIGHTING DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 20 |
| 2545 | LT-319 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 TEEN ROOM LIGHTING DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 21 |
| 2546 | LT-321 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 1 RESTROOM LIGHTING DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 22 |
| 2547 | LT-322 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 3 RESIDENT'S LOUNGE ELEVATIONS AND DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 23 |
| 2548 | LT-323 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 3 RESIDENT'S LOUNGE DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 24 |
| 2549 | LT-324 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 3 WALL STREET ROOM LIGHTING DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 25 |
| 2550 | LT-325 | REV H 95% CD SET | VILLA LEVEL 4- LIGHTING DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | | | | | | | | | | |
| 2551 | LT-326 | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 4 CIGAR ROOM LIGHTING DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 26 |
| 2552 | LT-327 | REVISION O-UPDATED SET OF DWGS | VILLA STAIR LEVEL LIGHTING DETAILS | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 27 |
| 2553 | LT-411 | REVISION O-UPDATED SET OF DWGS | VILLA LIGHTING LOAD SCHEDULE | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | 4/17/2020 | | 5/15/2020 | | 28 |
| 2554 | LT-412 | DESIGN DEVELOPMENT | VILLA LIGHTING LOAD SCHEDULE DELETED CCD 94.1 | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | 7/25/2019 | | | | | | | | | 31 |
| 2555 | LT-413 | REV H 95% CD SET | VILLA LIGHTING LOAD SCHEDULE | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | | | | | | | | | | |
| 2556 | LT-414 | REVISION F UPDATED SET OF DWGS | VILLA LIGHTING LOAD SCHEDULE | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | | | | | | | | | | |
| 2557 | LT-415 | REVISION F UPDATED SET OF DWGS | VILLA LIGHTING LOAD SCHEDULE | | | | | | | | | | | | | | 7/20/2018 | | | | | 3/1/2019 | | 6/21/2019 | | | | | | | | | | |
| 2558 | LT-V-215 | REVISION B (ID- VILLA & LOBBIES) | VILLA LEVEL 5 - LIGHTING RCP | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | |
| 2559 | LT-V-401 | REVISION B (ID- VILLA & LOBBIES) | VILLA LIGHTING LOAD SCHEDULE | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | |
| 2560 | LT-V-402 | REVISION B (ID- VILLA & LOBBIES) | VILLA LIGHTING LOAD SCHEDULE | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | |
| 2561 | LT-V-403 | REVISION B (ID- VILLA & LOBBIES) | VILLA LIGHTING LOAD SCHEDULE | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | |
| 2562 | LT-V-404 | REVISION B (ID- VILLA & LOBBIES) | VILLA LIGHTING LOAD SCHEDULE | | | | | | | | | | | | | | 7/20/2018 | | | | | | | | | | | | | | | | | |

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020 | | | | | | | | | | | | | | | | Updated: | 7/7/2020 | | | | | | | | | | | | | | | | |
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 2563 | LUSIVE LIGHTING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 8 |
| 2564 | LUSIVE CUSTOM FIXTURE OPT 1 | DESIGN DEVELOPMENT | RESIDENTS CLUB SPEAKEASY | 6/5/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 2565 | LUSIVE DECORATIVE LIGHTING FIXTURE SCHEDULE 1 LOBBIES | DESIGN DEVELOPMENT | DECORATIVE LIGHTING FIXTURE SCHEDULE LOBBIES | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | | | | | | | | | | 2 |
| 2566 | LUSIVE EXTERIOR FIXTURE | DESIGN DEVELOPMENT | EXTERIOR FIXTURE | 7/17/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 3 |
| 2567 | LUSIVE DECORATIVE LIGHTING FIXTURE SCHEDULE 2 | DESIGN DEVELOPMENT | DECORATIVE LIGHTING FIXTURE SCHEDULE 2 | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | | | | | | | | | | 4 |
| 2568 | LUSIVE LT-01 | DESIGN DEVELOPMENT | NORTH LOBBY CHANDELIER 1 | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | 6/26/2019 | | | | | | | | | 5 |
| 2569 | LUSIVE LT-02 | DESIGN DEVELOPMENT | NORTH LOBBY CHANDELIER 2 | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | 6/26/2019 | | | | | | | | | 6 |
| 2570 | LUSIVE LT-03 | DESIGN DEVELOPMENT | FLOOR LAMP | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | 6/26/2019 | | | | | | | | | 7 |
| 2571 | LUSIVE LT-04 | DESIGN DEVELOPMENT | NORTH LOBBY CHANDELIER 3 | | | | | | | | | | | | | | | | | | | | | 6/3/2019 | 7/25/2019 | | | | | | | | | 8 |
| 2572 | REVEAL/STA VILLA LIGHTING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 27 |
| 2573 | LT-012A | REVISION O-UPDATED SET OF DWGS | VILLA LEVEL 2 STA LIGHTING COVER SHEET | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 1 |
| 2574 | LT-112A | 100% CD'S REV O | VILLA LEVEL 2 STA LIGHTING PLAN ENLARGED AND ROTATED | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 2 |
| 2575 | LT-112B | 100% CD'S REV O | VILLA LEVEL 2 TERRACE LIGHTING PLAN | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 3 |
| 2576 | LT212A | 100% CD'S REV O | VILLA LEVEL 2 STA LIGHTING RCP ENLARGED AND ROTATED | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 4 |
| 2577 | LT-212B | 100% CD'S REV O | VILLA LEVEL 2 TERRACE LIGHTING RCP | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 5 |
| 2578 | LT-341 | 100% CD'S REV O | VILLA LEVEL 2 STA RESTAURANT LIGHTING DETAILS | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 6 |
| 2579 | LT-342 | 100% CD'S REV O | VILLA LEVEL 2 STA RESTAURANT LIGHTING DETAILS | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 7 |
| 2580 | LT-343 | 100% CD'S REV O | VILLA LEVEL 2 STA RESTAURANT LIGHTING DETAILS | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 8 |
| 2581 | LT-344 | 100% CD'S REV O | VILLA LEVEL 2 STA RESTAURANT LIGHTING DETAILS | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 9 |
| 2582 | LT-345 | 100% CD'S REV O | VILLA LEVEL 2 STA RESTAURANT LIGHTING DETAILS | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 10 |
| 2583 | LT-346 | 100% CD'S REV O | VILLA LEVEL 2 STA RESTAURANT LIGHTING DETAILS | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 11 |
| 2584 | LT-412A | 100% CD'S REV O | VILLA LEVEL 2 STA LIGHTING LOAD SCHEDULE | | | | 3/30/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 12 |
| 2585 | LT-014A | 100% CD'S REV O | VILLA LEVEL 4 COVER SHEET | | | | 3/18/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 13 |
| 2586 | LT-114A | 100% CD'S REV O | VILLA LEVEL 4 STA LIGHTING PLAN ENLARGED | | | | 3/18/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 14 |
| 2587 | LT-214A | 100% CD'S REV O | VILLA LEVEL 4 STA LIGHTING RCP | | | | 3/18/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 15 |
| 2588 | LT-351A | 100% CD'S REV O | VILLA LEVEL 4 STA GALLERY AND RESTROOM LIGHTING DETAILS | | | | 3/18/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 16 |
| 2589 | LT-352A | 100% CD'S REV O | VILLA LEVEL 4 STA BAR LOUNGE LIGHTING DETAILS | | | | 3/18/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 17 |
| 2590 | LT-353A | 100% CD'S REV O | VILLA LEVEL 4 STA PIANO LOUNGE LIGHTING DETAILS | | | | 3/18/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 18 |
| 2591 | LT-414A | 100% CD'S REV O | VILLA LEVEL 4 STA LIGHTING LOAD SCHEDULE | | | | 3/18/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 19 |
| 2592 | LT-015A | 100% CD'S REV O | VILLA LEVEL 5 STA LIGHTING COVER SHEET | | | | 3/25/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 20 |
| 2593 | LT-115A | 100% CD'S REV O | VILLA LEVEL 5 STA LIGHTING PLAN ENLARGED AND ROTATED | | | | 3/25/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 21 |
| 2594 | LT-215A | 100% CD'S REV O | VILLA LEVEL 5 STA LIGHTING RCP ENLARGED AND ROTATED | | | | 3/25/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 22 |
| 2595 | LT-361A | 100% CD'S REV O | VILLA LEVEL 5 STA HEALTH CLUB LIGHTING DETAILS | | | | 3/25/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 23 |
| 2596 | LT-362A | 100% CD'S REV O | VILLA LEVEL 5 STA HEALTH CLUB LIGHTING DETAILS | | | | 3/25/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 24 |
| 2597 | LT363A | 100% CD'S REV O | VILLA LEVEL 5 STA HEALTH CLUB LIGHTING DETAILS | | | | 3/25/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 25 |
| 2598 | LT-364A | 100% CD'S REV O | VILLA LEVEL 5 STA HEALTH CLUB LIGHTING DETAILS | | | | 3/25/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 26 |
| 2599 | LT-415A | 100% CD'S REV O | VILLA LEVEL 5 STA LIGHTING LOAD SCHEDULE | | | | 3/25/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 27 |
| 2600 | REVEAL/RMD LIGHTING CABANAS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 3 |
| 2601 | LT-020 | 100% CD'S REV O | TYPICAL CABANA LIGHTING COVER SHEET | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 1 |
| 2602 | LT-121 | 100% CD'S REV O | TYPICAL CABANA LIGHTING PLAN, RCP, & DETAILS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 2 |
| 2603 | LT-421 | 100% CD'S REV O | TYICAL CABANA LIGHTING LOAD SCHEDULE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 3 |
| 2604 | LIGHTING UNITS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 37 |
| 2605 | RL-00 | CCD 88 | INDEX | | | | | 8/23/2018 | 11/27/2019 | 4/9/2019 | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 2606 | RL-01 | CCD 52 | NOTES | | | | 8/10/2017 | 8/23/2018 | 11/27/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 2 |
| 2607 | RL-02 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 1 "UFFIZI REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 3 |
| 2608 | RL-03 | REVISION 1 UPDATED SET OF DRAWINGS | UFFIZI UNIT 1 OPI | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 4 |
| 2609 | RL-04 | REVISION 1 UPDATED SET OF DRAWINGS | UFIZZI UNIT 1 OPT 2&3 | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 5 |
| 2610 | RL-05 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 2 "VECCHIO NORTH" REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 6 |
| 2611 | RL-06 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 2 "VECCHIO NORTH"/ REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 7 |
| 2612 | RL-07 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 3"VECCHIO SOUTH" REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 8 |
| 2613 | RL-08 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 3 "VECCHIO SOUTH". OPTION REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 9 |
| 2614 | RL-09 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 4' "DONATELLO" REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 10 |
| 2615 | RL-10 | REVISION 1 UPDATED SET OF DRAWINGS | DONATELLO UNIT 4 OPT | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 11 |
| 2616 | RL-11 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 5 "TOSCANA" REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 12 |
| 2617 | RL-12 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 5' "TOSCANA". OPTIC REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 13 |
| 2618 | RL-13 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 6r "POSITANO" REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 14 |
| 2619 | RL-14 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 6' "POSITANO". OPTIO REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 15 |
| 2620 | RL-15 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 7 "MILANO REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 16 |
| 2621 | RL-16 | REVISION 1 UPDATED SET OF DRAWINGS | UNIT- 7 "MILANO". OPTION REFLECTED CEILING PLAN | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 17 |
| 2622 | RL-17 | REVISION 1 UPDATED SET OF DRAWINGS | CASA DI SABBIA UNIT 8 IFL | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 18 |
| 2623 | RL-18 | REVISION 1 UPDATED SET OF DRAWINGS | CASA DI SABBIA UNIT 8 2FL | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 19 |
| 2624 | RL-19 | REVISION 1 UPDATED SET OF DRAWINGS | CASA DI ORO UNIT 9 IFL | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 20 |
| 2625 | RL-20 | REVISION 1 UPDATED SET OF DRAWINGS | CASA DI ORO UNIT 9 2FL | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 21 |
| 2626 | RL-21 | REVISION 1 UPDATED SET OF DRAWINGS | VILLA DI LST6 UNIT 10 | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 22 |
| 2627 | RL-22 | REVISION 1 UPDATED SET OF DRAWINGS | BOTTICLLLI UNIT 11 | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 23 |
| 2628 | RL-23 | REVISION 1 UPDATED SET OF DRAWINGS | CASA DI SOGNI - UNIT 12 | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 24 |
| 2629 | RL-24 | REVISION 1 UPDATED SET OF DRAWINGS | SPLCIALTY - UNIT 13 | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 25 |
| 2630 | RL-25 | REVISION 1 UPDATED SET OF DRAWINGS | CASA DI OCEANA - UNIT 14 1ST FL | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 26 |
| 2631 | RL-26 | REVISION 1 UPDATED SET OF DRAWINGS | CASA DI OCEANA - UNIT 14 2ND FL | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 27 |
| 2632 | RL-27 | REVISION 1 UPDATED SET OF DRAWINGS | CASA DI MARE - UNIT 15 1ST FL | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 28 |
| 2633 | RL-28 | REVISION 1 UPDATED SET OF DRAWINGS | CASA DI MARE - UNIT 15 2ND FL | | | | | 8/23/2018 | | | | | | | | | | | | | | | | | | | | | | | | | | 29 |
| 2634 | RL-29 | CCD 52 | AMALFI N1 | | | | | | 11/27/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 30 |
| 2635 | RL-30 | CCD 52 | AMALFI N1 OPT | | | | | | 11/27/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 31 |
| 2636 | RL-31 | CCD 52 | RAVELLO N2 | | | | | | 11/27/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 32 |
| 2637 | RL-32 | CCD 52 | RAVELLO N2 OPT | | | | | | 11/27/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 33 |
| 2638 | RL-33 | CCD 52 | SAN REMO N3 | | | | | | 11/27/2019 | | | | | | | | | | | | | | | | | | | | | | | | | 34 |
| 2639 | RL-34 | CCD 088 | CASA DI SPIAGGIA CASA DI CIELO N4 | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | | | | | 35 |
| 2640 | RL-35 | CCD 088 | CASA DI SPIAGGIA CASA DI CIELO N4 OPT | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | | | | | 36 |
| 2641 | RL-36 | CCD 088 | CASA DI SPIAGGIA CASA DI CIELO N5 | | | | | | | 4/9/2020 | | | | | | | | | | | | | | | | | | | | | | | | 37 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 2642 | STRUCTURE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 233 |
| 2643 | S0.00 | REVISION L UPDATED SET OF DWGS | GENERAL NOTES& DRAWING INDEX | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | | | | | 1 |
| 2644 | S0.00A | REVISION O UPDATED SET OF DWGS | DRAWING INDEX | | | | | | | | | | | | | | | | | | | | | | | | | | 11/28/2019 | 3/6/2020 | | 5/15/2020 | | 2 |
| 2645 | S0.01 | REVISION A-UPDATED SET OF DWGS | STANDARD DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | | | | | | | | | | | | | | | | | | 3 |
| 2646 | S0.02 | REVISION O UPDATED SET OF DWGS | STANDARD DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | 3/6/2020 | | 5/15/2020 | | 4 |
| 2647 | S0.03 | REVISION M UPDATED SET OF DWGS | STANDARD DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | | 7/25/2019 | | | | | 3/6/2020 | | | | 5 |
| 2648 | S0.04 | REVISION O UPDATED SET OF DWGS | STANDARD DETAILS | | | | 12/20/2017 | | | | | | | | | | 6/18/2018 | | | | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 6 |
| 2649 | S0.05 | REVISION I UPDATED SET OF DWGS | STANDARD DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | | | | | | | | | 7 |
| 2650 | S1.000 | REVISION K UPDATED SET OF DWGS | FOUNDATION/BASEMENT PARKING GARAGE- PARTIAL "1" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | | | | 8 |
| 2651 | S1.001 | REVISION K UPDATED SET OF DWGS | FOUNDATION/BASEMENT PARKING GARAGE- PARTIAL "2" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | 10/18/2019 | | | | | | 9 |
| 2652 | S1.002 | REVISION K UPDATED SET OF DWGS | FOUNDATION/BASEMENT PARKING GARAGE- PARTIAL "3" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | | | 9/10/2019 | | 10/18/2019 | | | | | | 10 |
| 2653 | S1.003 | REVISION K UPDATED SET OF DWGS | FOUNDATION/BASEMENT PARKING GARAGE- PARTIAL "1" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | | 12/18/2018 | | | 5/1/2019 | | | | | 10/18/2019 | | | | | | 11 |
| 2654 | S1.004 | REVISION K UPDATED SET OF DWGS | FOUNDATION/BASEMENT PARKING GARAGE- PARTIAL "2" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | | 12/18/2018 | | | 5/1/2019 | | | | | 10/18/2019 | | | | | | 12 |
| 2655 | S1.005 | REVISION K UPDATED SET OF DWGS | FOUNDATION/BASEMENT PARKING GARAGE- PARTIAL "3" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | | 12/18/2018 | | | | | | | | 10/18/2019 | | | | | | 13 |
| 2656 | S1.100 | REVISION O UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE- PARTIAL "1" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 14 |
| 2657 | S1.101 | REVISION O UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE- PARTIAL "4" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 15 |
| 2658 | S1.102 | REVISION O UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE- PARTIAL "1" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 16 |
| 2659 | S1.103 | REVISION O UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE- PARTIAL "4" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | | | | | 5/15/2020 | | 17 |
| 2660 | S1.104 | REVISION O UPDATED SET OF DWGS | GARAGE/ FOUNDATION- PARTIAL "2" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 18 |
| 2661 | S1.105 | REVISION O UPDATED SET OF DWGS | GARAGE/ FOUNDATION- PARTIAL "3" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | | 5/15/2020 | | 19 |
| 2662 | S1.106 | REVISION M UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE- PARTIAL "2" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | 10/18/2019 | | 3/6/2020 | | | | 20 |
| 2663 | S1.107 | REVISION M UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE- PARTIAL "3" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | 3/6/2020 | | | | 21 |
| 2664 | S1.108 | REVISION O UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE- PARTIAL "1" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | | | | 5/15/2020 | | 22 |
| 2665 | S1.109 | REVISION O UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE- PARTIAL "4" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | | | | | | | | | | | 5/15/2020 | | 23 |
| 2666 | S1.110 | REVISION O UPDATED SET OF DWGS | GARAGE/ FOUNDATION - PARTIAL "1" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | | 5/15/2020 | | 24 |
| 2667 | S1.111 | REVISION O UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE- PARTIAL "4" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | | 12/18/2018 | | | | | | | | | | | | 5/15/2020 | | 25 |
| 2668 | S1.112 | REVISION O UPDATED SET OF DWGS | LEVEL 1 GARAGE/FOUNDATION-PARTIAL 2 REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | | | 5/15/2020 | | 26 |
| 2669 | S1.113 | REVISION O UPDATED SET OF DWGS | LEVEL 1 GARAGE/FOUNDATION-PARTIAL 3 REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | | 12/18/2018 | | 3/1/2019 | | | | | | | | | | 5/15/2020 | | 27 |
| 2670 | S1.114 | REVISION G UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE PARTIAL 2 REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | | | | | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 28 |
| 2671 | S1.115 | REVISION G UPDATED SET OF DWGS | FOUNDATION PARKING GARAGE PARTIAL 3 FRAMING PLAN | | | | | | | | | | | | | | | | | | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 29 |
| 2672 | S1.116 | REVISION L UPDATED SET OF DWGS | GUARD HOUSE PARTIAL 3 FRAMING AND REINFORCING PLAN | | | | | | | | | | | | | | | | | | | 3/1/2019 | | | | | | | 11/26/2019 | | | | | 30 |
| 2673 | S1.200 | REVISION O UPDATED SET OF DWGS | INTERSTITIAL PARTIAL "1" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 31 |
| 2674 | S1.201 | REVISION O UPDATED SET OF DWGS | INTERSTITIAL PARTIAL "4" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | 3/6/2020 | | 5/15/2020 | | 32 |
| 2675 | S1.202 | REVISION O UPDATED SET OF DWGS | INTERSTITIAL PARTIAL "1" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | | | 9/10/2019 | | | | 3/6/2020 | | 5/15/2020 | | 33 |
| 2676 | S1.203 | REVISION O UPDATED SET OF DWGS | INTERSTITIAL PARTIAL "4" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | | | | | | | 3/6/2020 | | 5/15/2020 | | 34 |
| 2677 | S1.204 | REVISION M UPDATED SET OF DWGS | SLAB@ ELEV:+12'-10" PARTIAL "1"& "2" FRAMING/ REINFORCING PLAN | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | | | | | | | | | 9/10/2019 | | | 11/26/2019 | 3/6/2020 | | | | 35 |
| 2678 | S1.205 | REVISION G UPDATED SET OF DWGS | SLAB@ ELEV:+14'-8" PARTIAL 1 & 2 FRAMING/ REINFORCING PLAN | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 36 |
| 2679 | S1.300 | REVISION O UPDATED SET OF DWGS | LOBBY/DECK (2ND LEVEL) PARTIAL "1" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 37 |
| 2680 | S1.301 | REVISION O UPDATED SET OF DWGS | LOBBY/DECK (2ND LEVEL) PARTIAL "4" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 38 |
| 2681 | S1.302 | REVISION O UPDATED SET OF DWGS | LOBBY/DECK (2ND LEVEL) PARTIAL "1" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 39 |
| 2682 | S1.303 | REVISION O UPDATED SET OF DWGS | LOBBY/DECK (2ND LEVEL) PARTIAL "4" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 40 |
| 2683 | S1.304 | REVISION O UPDATED SET OF DWGS | LOBBY/DECK (2ND LEVEL) PARTIAL "2" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 41 |
| 2684 | S1.305 | REVISION O UPDATED SET OF DWGS | LOBBY/DECK (2ND LEVEL) PARTIAL "3" FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 7/20/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 42 |
| 2685 | S1.306 | REVISION O UPDATED SET OF DWGS | LOBBY/DECK (2ND LEVEL) PARTIAL "1" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 43 |
| 2686 | S1.307 | REVISION K UPDATED SET OF DWGS | LOBBY/DECK (2ND LEVEL) PARTIAL "4" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | 10/18/2019 | | | | | | 44 |
| 2687 | S1.308 | REVISION M UPDATED SET OF DWGS | LOBBY/DECK (2ND LEVEL) PARTIAL "2" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | | | | | | 3/6/2020 | | | | 45 |
| 2688 | S1.309 | REVISION M UPDATED SET OF DWGS | LOBBY/DECK (2ND LEVEL) PARTIAL "3" REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | | | | | 11/26/2019 | 3/6/2020 | | | | 46 |
| 2689 | S1.400 | REVISION O UPDATED SET OF DWGS | PARTIAL MEZZANINE (VILLA) 3RD LEVEL (NORTH TOWER) FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 47 |
| 2690 | S1.401 | REVISION L UPDATED SET OF DWGS | PARTIAL MEZZANINE (VILLA) 3RD LEVEL (SOUTH TOWER) FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | 11/26/2019 | | | | | 48 |
| 2691 | S1.402 | REVISION O UPDATED SET OF DWGS | PARTIAL MEZZANINE (VILLA) 3RD LEVEL (NORTH TOWER) REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | 6/13/2019 | | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 49 |
| 2692 | S1.403 | REVISION M UPDATED SET OF DWGS | PARTIAL MEZZANINE (VILLA) 3RD LEVEL (SOUTH TOWER) REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | | | | | | | 3/6/2020 | | | | 50 |
| 2693 | S1.500 | REVISION O UPDATED SET OF DWGS | PARTIAL LOUNGE (VILLA) 4TH LEVEL (NORTH TOWER) FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 51 |
| 2694 | S1.501 | REVISION M UPDATED SET OF DWGS | PARTIAL LOUNGE (VILLA) 4TH LEVEL (SOUTH TOWER) FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | | 11/26/2019 | 3/6/2020 | | | | 52 |
| 2695 | S1.502 | REVISION O UPDATED SET OF DWGS | PARTIAL LOUNGE (VILLA) 4TH LEVEL (NORTH TOWER) REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | 6/13/2019 | | 9/10/2019 | | | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 53 |
| 2696 | S1.503 | REVISION M UPDATED SET OF DWGS | PARTIAL LOUNGE (VILLA) 4TH LEVEL (SOUTH TOWER) REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | 3/6/2020 | | | | 54 |
| 2697 | S1.600 | REVISION O UPDATED SET OF DWGS | PARTIAL HEALTH CLUB (VILLA) 5TH LEVEL (NORTH TOWER) FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 55 |
| 2698 | S1.601 | REVISION J UPDATED SET OF DWGS | PARTIAL HEALTH CLUB (VILLA) 5TH LEVEL (SOUTH TOWER) FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | 9/10/2019 | | | | | | | | 56 |
| 2699 | S1.602 | REVISION O UPDATED SET OF DWGS | PARTIAL HEALTH CLUB (VILLA) 5TH LEVEL (NORTH TOWER) REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | | | 6/13/2019 | | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 57 |
| 2700 | S1.603 | REVISION G UPDATED SET OF DWGS | PARTIAL HEALTH CLUB (VILLA) 5TH LEVEL (SOUTH TOWER) REINFORCING PLAN | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 58 |
| 2701 | S1.700 | REVISION O UPDATED SET OF DWGS | ROOF LEVEL (VILLA)/ FRAMING& REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | | | 6/13/2019 | | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 59 |
| 2702 | S1.701 | REVISION O UPDATED SET OF DWGS | HIGH ROOF TRUSSES CONNECTIONS LAYOUT & DETAILS | | | | 12/20/2017 | | | | | | | | | | | | | | | 3/1/2019 | | 6/13/2019 | | | | | | | | 5/15/2020 | | 60 |
| 2703 | S1.800 | REVISION H UPDATED SET OF DWGS | SOUTH TOWER 14TH LEVEL FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | | | | | | | | | 61 |
| 2704 | S1.801 | REVISION G UPDATED SET OF DWGS | SOUTH TOWER 14TH LEVEL REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 62 |
| 2705 | S1.802 | REVISION J UPDATED SET OF DWGS | SOUTH TOWER 15TH & 16TH (TYP) LEVEL FRAMING PLAN | | | | | | | | | | | | | | | | | | | 3/1/2019 | 5/1/2019 | | | 9/10/2019 | | | | | | | | 63 |
| 2706 | S1.803 | REVISION G UPDATED SET OF DWGS | SOUTH TOWER 15TH & 16TH (TYP) LEVEL FRAMING PLAN | | | | | | | | | | | | | | | | | | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 64 |
| 2707 | S1.810 | REVISION G UPDATED SET OF DWGS | SOUTH TOWER 6TH THRU 11TH LEVEL FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 65 |
| 2708 | S1.811 | REVISION G UPDATED SET OF DWGS | SOUTH TOWER 6TH THRU 11TH LEVEL REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 66 |
| 2709 | S1.812 | REVISION H UPDATED SET OF DWGS | SOUTH TOWER 12TH LEVEL FRAMING PLAN | | | | | | | | | | | | | | | | | | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | | | | | | | | | 67 |
| 2710 | S1.813 | REVISION G UPDATED SET OF DWGS | SOUTH TOWER 12TH LEVEL REINFORCING PLAN | | | | | | | | | | | | | | | | | | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 68 |
| 2711 | S1.820 | REVISION M UPDATED SET OF DWGS | SOUTH TOWER 17TH THRU 33RD LEVEL FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | | | | | 3/6/2020 | | | | 69 |
| 2712 | S1.821 | REVISION H UPDATED SET OF DWGS | SOUTH TOWER 17TH THRU 33RD LEVEL REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | | | | | | | | | 70 |
| 2713 | S1.900 | REVISION H UPDATED SET OF DWGS | SOUTH TOWER 34TH LEVEL FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | | | | | | | | | 71 |
| 2714 | S1.901 | REVISION G UPDATED SET OF DWGS | SOUTH TOWER 34TH LEVEL REINFORCING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 72 |
| 2715 | S1.902 | REVISION K UPDATED SET OF DWGS | SOUTH TOWER 35TH THRU 45TH (TYP) LEVEL FRAMING PLAN | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | | | 10/18/2019 | | | | | | 73 |
| 2716 | S1.902A | REVISION H UPDATED SET OF DWGS | SOUTH TOWER 35TH THRU 45TH(TYP) LEVEL FRAMING PLAN(Deleted) | | | | | | | | | | | | | | | | | | | | 5/1/2019 | 6/13/2019 | 7/25/2019 | | | | | | | | | |
| 2717 | S1.902B | REVISION K UPDATED SET OF DWGS | SOUTH TOWER 42ND LEVEL FRAMING PLAN | | | | | | | | | | | | | | | | | | | | 5/1/2019 | 6/13/2019 | | | | 10/18/2019 | | | | | | 74 |
| 2718 | S1.903 | REVISION I UPDATED SET OF DWGS | SOUTH TOWER 35TH THRU 45TH (TYP.) LEVEL REINFORCING PLAN | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | | | | | | | 75 |
| 2719 | S1.903A | REVISION G UPDATED SET OF DWGS | SOUTH TOWER 35TH THRU 45TH(TYP) LEVEL REINFORCING PLAN(Deleted) | | | | | | | | | | | | | | | | | | | | 5/1/2019 | | 7/25/2019 | | | | | | | | | |
| 2720 | S1.903B | REVISION L UPDATED SET OF DWGS | SOUTH TOWER 42ND LEVEL REINFORCING PLAN | | | | | | | | | | | | | | | | | | | | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | 11/26/2019 | | | | | 76 |
| 2721 | S1.904 | REVISION L UPDATED SET OF DWGS | SOUTH TOWER 46TH LEVEL FRAMING PLAN | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | | 11/26/2019 | | | | | 77 |
| 2722 | S1.905 | REVISION K UPDATED SET OF DWGS | SOUTH TOWER 46TH LEVEL REINFORCING PLAN | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | | | | | | 78 |
| 2723 | S1.910 | REVISION M UPDATED SET OF DWGS | SOUTH TOWER 47TH LEVEL FRAMING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | | 11/26/2019 | 3/6/2020 | | | | 79 |
| 2724 | S1.911 | REVISION J UPDATED SET OF DWGS | 47TH LEVEL REINFORCING PLAN (SOUTH TOWER) | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | | | | | | | 80 |
| 2725 | S1.912 | REVISION M UPDATED SET OF DWGS | 48TH LEVEL FRAMING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | | | 81 |
| 2726 | S1.913 | REVISION M UPDATED SET OF DWGS | 48TH LEVEL REINFORCING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | | | 82 |
| 2727 | S1.914 | REVISION M UPDATED SET OF DWGS | 49TH LEVEL FRAMING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | 6/13/2019 | 7/25/2019 | 9/10/2019 | | | 11/26/2019 | 3/6/2020 | | | | 83 |
| 2728 | S1.915 | REVISION M UPDATED SET OF DWGS | 49TH LEVEL REINFORCING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | | 11/26/2019 | 3/6/2020 | | | | 84 |
| 2729 | S1.916 | REVISION M UPDATED SET OF DWGS | 50TH LEVEL FRAMING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | | 11/26/2019 | 3/6/2020 | | | | 85 |
| 2730 | S1.917 | REVISION M UPDATED SET OF DWGS | 50TH LEVEL REINFORCING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 86 |
| 2731 | S1.918 | REVISION O UPDATED SET OF DWGS | 51ST LEVEL FRAMING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | 5/1/2019 | | | | | | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 87 |
| 2732 | S1.919 | REVISION M UPDATED SET OF DWGS | 51ST LEVEL REINFORCING PLAN (SOUTH TOWER) | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | | | | | | 3/6/2020 | | | | 88 |
| 2733 | S1.920 | REVISION M UPDATED SET OF DWGS | 52ND LEVEL FRAMING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | | | 89 |
| 2734 | S1.921 | REVISION M UPDATED SET OF DWGS | 52ND LEVEL REINFORCING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | | | | 10/18/2019 | | 3/6/2020 | | | | 90 |
| 2735 | S1.922 | REVISION M UPDATED SET OF DWGS | 52ND & UP LEVEL FRAMING& REINFORCING PLAN (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | | | 91 |
| 2736 | S1.923 | REVISION O UPDATED SET OF DWGS | 6TH THRU 46TH (TYP.) LEVEL FRAMING/ REINF. PLAN (NORTH TOWER) | | | | | | | | | | | | | | 6/18/2018 | | | | | 3/1/2019 | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 92 |
| 2737 | S1.923A | REVISION M UPDATED SET OF DWGS | NORTH TOWER MODIFIED LEVEL FRAM/REINFO PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | 11/26/2019 | 3/6/2020 | | | | 93 |
| 2738 | S1.923B | REVISION M UPDATED SET OF DWGS | NORTH TOWER BUCK HOIST AND CRANE FRAMING REINFORCING PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 94 |
| 2739 | S1.923C | REVISION O UPDATED SET OF DWGS | NT NEW STAIR 21ST AND 37TH LVL FRAMING/REINFORCING PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 95 |
| 2740 | S1.923D | REVISION O UPDATED SET OF DWGS | NT PART PLAN 7TH,8TH,12TH,16TH LVL RAMING PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 96 |
| 2741 | S1.924 | REVISION O UPDATED SET OF DWGS | NORTH TOWER 47TH LEVEL FRAMING/ REINFORCING PLAN | | | | | | | | | | | | | | 6/18/2018 | | | | | | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 97 |
| 2742 | S1.924A | REVISION O UPDATED SET OF DWGS | NORTH TOWER 48TH LEVEL FRAMING/REINFORCEMENT PLAN | | | | | | | | | | | | | | | | | | | | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 98 |
| 2743 | S1.924B | REVISION O UPDATED SET OF DWGS | NORTH TOWER 49TH LEVEL FRAMING PLAN | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 99 |
| 2744 | S1.925 | REVISION O UPDATED SET OF DWGS | NORTH TOWER 50TH LEVEL FRAMING& REINFORCING PLAN | | | | | | | | | | | | | | 6/18/2018 | | | | | | | | 7/25/2019 | 9/10/2019 | | | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 100 |
| 2745 | S1.926 | REVISION O UPDATED SET OF DWGS | NORTH TOWER 51ST LEVEL FRAMING& REINFORCING PLAN | | | | | | | | | | | | | | 6/18/2018 | | | | | | | 6/13/2019 | 7/25/2019 | | | 10/18/2019 | 11/26/2019 | | | 5/15/2020 | | 101 |
| 2746 | S1.927 | REVISION L UPDATED SET OF DWGS | NORTH TOWER 52ND LEVEL FRAMING& REINFORCING PLAN | | | | | | | | | | | | | | 6/18/2018 | | | | | | | 6/13/2019 | 7/25/2019 | | | 10/18/2019 | 11/26/2019 | | | | | 102 |
| 2747 | S1.928 | REVISION O UPDATED SET OF DWGS | NORTH TOWER 53RD LEVEL FRAMING& REINFORCING PLAN | | | | | | | | | | | | | | 6/18/2018 | | | | | | | 6/13/2019 | 7/25/2019 | | | | | | | 5/15/2020 | | 103 |
| 2748 | S1.929 | REVISION O UPDATED SET OF DWGS | NORTH TOWER 54TH LEVEL FRAMING& REINFORCING PLAN | | | | | | | | | | | | | | 6/18/2018 | | | | | | | | | | | | | | | 5/15/2020 | | 104 |
| 2749 | S1.930 | REVISION O UPDATED SET OF DWGS | NORTH TOWER 55TH & 55 UP LEVEL FRAMING& REINFORCING PLAN | | | | | | | | | | | | | | 6/18/2018 | | | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 105 |
| 2750 | S1.931 | REVISION M UPDATED SET OF DWGS | NORTH TOWER 55TH LEVEL FRAMING AND REINFORCING PLAN | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | | | 106 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
| 2751 | S2.00 | REVISION O UPDATED SET OF DWGS | STANDARD PILE CAP DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | 5/1/2019 | | | | | | | 3/6/2020 | | 5/15/2020 | | 107 |
| 2752 | S2.00A | REVISION C-UPDATED SET OF DWGS | STANDARD PILE CAP DETAILS | | | | | | | | | | | | | | 6/18/2018 | | | | | | | | | | | | | | | | | |
| 2753 | S2.01 | REVISION O UPDATED SET OF DWGS | STANDARD PILE CAP DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | | | | | | | | | | | 5/15/2020 | | 108 |
| 2754 | S2.01A | REVISION O UPDATED SET OF DWGS | VILLA BUILDING/ SOUTH TOWER PILE CAP FRAMING DETAILS | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | | | | | | | | | | | 5/15/2020 | | 109 |
| 2755 | S2.01B | REVISION O UPDATED SET OF DWGS | VILLA BUILDING/ SOUTH TOWER PILE CAP FRAMING DETAILS | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | | | | | | | | 5/15/2020 | | 110 |
| 2756 | S2.02 | REVISION O UPDATED SET OF DWGS | STANDARD PILE CAP DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | | | | | | | | 5/15/2020 | | 111 |
| 2757 | S2.02A | REVISION O UPDATED SET OF DWGS | VILLA BUILDING/ SOUTH TOWER PILE CAP REINFORCING DETAILS | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | | | | | | | | 5/15/2020 | | 112 |
| 2758 | S2.02B | REVISION O UPDATED SET OF DWGS | VILLA BUILDING/ SOUTH TOWER PILE CAP REINFORCING DETAILS | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | | | | | | | | 5/15/2020 | | 113 |
| 2759 | S2.03 | REVISION B-UPDATED SET OF DWGS | STANDARD PILE CAP DETAILS (SOUTH TOWER) | | | | 12/20/2018 | | | | | | | | | 4/9/2018 | 6/18/2018 | | | | | | | | | | | | | | | | | 114 |
| 2760 | S2.04 | REVISION M UPDATED SET OF DWGS | STANDARD PILE CAP DETAILS (NORTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | | 12/18/2018 | | | 5/1/2019 | | 7/25/2019 | | | | | 3/6/2020 | | | | 115 |
| 2761 | S2.05 | REVISION M UPDATED SET OF DWGS | STANDARD PILE CAP DETAILS (NORTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | | 12/18/2018 | | | 5/1/2019 | | | | | | | 3/6/2020 | | | | 116 |
| 2762 | S2.06 | REVISION M UPDATED SET OF DWGS | STANDARD PILE CAP DETAILS (NORTH TOWER) | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | | | | | 5/1/2019 | | | | | | | 3/6/2020 | | | | 117 |
| 2763 | S3.00 | REVISION M UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | 11/26/2019 | 3/6/2020 | | | | 118 |
| 2764 | S3.01 | REVISION F UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 119 |
| 2765 | S3.02 | REVISION F UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 120 |
| 2766 | S3.03 | REVISION G UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 121 |
| 2767 | S3.04 | REVISION G UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 122 |
| 2768 | S3.05 | REVISION G UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 123 |
| 2769 | S3.06 | REVISION H UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | | 6/13/2019 | | | | | | | | | | 124 |
| 2770 | S3.07 | REVISION J UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | | 6/13/2019 | | 9/10/2019 | | | | | | | | 125 |
| 2771 | S3.08 | REVISION H UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | | 6/13/2019 | | | | | | | | | | 126 |
| 2772 | S3.09 | REVISION H UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | | 6/13/2019 | | | | | | | | | | 127 |
| 2773 | S3.10 | REVISION L UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | | | 10/18/2019 | 11/26/2019 | | | | | 128 |
| 2774 | S3.11 | REVISION M UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | | 6/13/2019 | | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | | | 129 |
| 2775 | S3.12 | REVISION L UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | | 6/13/2019 | | | | | 11/26/2019 | | | | | 130 |
| 2776 | S3.13 | REVISION L UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | | | | 11/26/2019 | | | | | 131 |
| 2777 | S3.14 | REVISION H UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | | | | | | | | | 132 |
| 2778 | S3.15 | REVISION C-UPDATED SET OF DWGS | SHEAR WALL DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | | | 10/31/2018 | | | | | | | | | | | | | | | 133 |
| 2779 | S3.16 | REVISION L UPDATED SET OF DWGS | SHEAR WALL DETAILS (NORTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | | 12/18/2018 | | | 5/1/2019 | | 7/25/2019 | | | | 11/26/2019 | | | | | 134 |
| 2780 | S3.17 | REVISION J UPDATED SET OF DWGS | SHEAR WALL DETAILS NORTH TOWER | | | | | | | | | | | | | | 6/18/2018 | | | | | | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | | | | | | | 135 |
| 2781 | S3.18 | REVISION L UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | 6/18/2018 | | | | | | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | 11/26/2019 | | | | | 136 |
| 2782 | S3.18A | REVISION I UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | 6/18/2018 | | | | | | 5/1/2019 | | 7/25/2019 | | | | | | | | | 137 |
| 2783 | S3.18B | REVISION L UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | 6/18/2018 | | | | | | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | | | | | 138 |
| 2784 | S3.18C | REVISION K UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | 6/18/2018 | | | | | | | | 7/25/2019 | | | 10/18/2019 | | | | | | 139 |
| 2785 | S3.18D | REVISION O UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | 6/18/2018 | | | | | | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 140 |
| 2786 | S3.18E | REVISION O UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | 10/18/2019 | | | | 5/15/2020 | | 141 |
| 2787 | S3.18E1 | REVISION O UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 142 |
| 2788 | S3.18F | REVISION O UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 143 |
| 2789 | S3.18G | REVISION O UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 144 |
| 2790 | S3.18H | REVISION O UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | 5/15/2020 | | 145 |
| 2791 | S3.18I | REVISION I UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 146 |
| 2792 | S3.18J | REVISION I UPDATED SET OF DWGS | NORTH TOWER SHEAR WALL DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 147 |
| 2793 | S3.19 | REVISION F UPDATED SET OF DWGS | VILLA SHEAR WALL DETAILS | | | | | | | | | | | | | 4/9/2018 | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 148 |
| 2794 | S3.20 | REVISION M UPDATED SET OF DWGS | VILLA SHEAR WALL DETAILS | | | | | | | | | | | | | 4/9/2018 | | | | | | 3/1/2019 | | | | | | | | 3/6/2020 | | | | 149 |
| 2795 | S3.21 | REVISION M UPDATED SET OF DWGS | VILLA SHEAR WALL DETAILS | | | | | | | | | | | | | 4/9/2018 | | | | | | 3/1/2019 | | | | | | | | 3/6/2020 | | | | 150 |
| 2796 | S4.00 | REVISION O UPDATED SET OF DWGS | COLUMN SCHEDULE& DETAILS(NORTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 151 |
| 2797 | S4.00A | REVISION O UPDATED SET OF DWGS | NT COLUMN SCHEDULE DETAILS | | | | | | | | | | | | | | | | | | | | 5/1/2019 | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | | | | 5/15/2020 | | 152 |
| 2798 | S4.01 | REVISION L UPDATED SET OF DWGS | COLUMN SCHEDULE& DETAILS(SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | | 11/26/2019 | | | | | 153 |
| 2799 | S4.02 | REVISION L UPDATED SET OF DWGS | COLUMN SCHEDULE& DETAILS(SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | | 11/26/2019 | | | | | 154 |
| 2800 | S4.03 | REVISION O UPDATED SET OF DWGS | COLUMN SCHEDULE& DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | | | 6/13/2019 | | | | | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 155 |
| 2801 | S4.04 | REVISION L UPDATED SET OF DWGS | PARKING COLUMN SCHEDULE AND DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | 9/10/2019 | | | 11/26/2019 | | | | | 156 |
| 2802 | S4.05 | REVISION L UPDATED SET OF DWGS | PARKING COLUMN SCHEDULE AND DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | | | | | 11/26/2019 | | | | | 157 |
| 2803 | S4.06 | REVISION M UPDATED SET OF DWGS | SOUTH TOWER BEAM SCHEDULE | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | | | 158 |
| 2804 | S4.06A | REVISION O UPDATED SET OF DWGS | WEST GARAGE NT&ST BEAM AND HEADER SCHEDULES | | | | | | | | | | | | | | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | | | 5/15/2020 | | 159 |
| 2805 | S4.06B | REVISION M UPDATED SET OF DWGS | SOUTH TOWER BEAM SCHEDULE | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 160 |
| 2806 | S4.07 | REVISION O UPDATED SET OF DWGS | BEAM SCHEDULE& DETAILS (VILLA) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | 6/13/2019 | | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 161 |
| 2807 | S4.08 | REVISION O UPDATED SET OF DWGS | BEAM SCHEDULE& DETAILS (VILLA) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | | 6/13/2019 | | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 162 |
| 2808 | S4.09 | REVISION O UPDATED SET OF DWGS | GRADE BEAM, WALL& CURB SCHEDULES | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | 6/13/2019 | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 163 |
| 2809 | S4.10 | REVISION O UPDATED SET OF DWGS | LINK BEAM SCHEDULE& DETAILS (NORTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/20/2018 | 6/18/2018 | | | | | | 5/1/2019 | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 164 |
| 2810 | S4.10A | REVISION I UPDATED SET OF DWGS | NORTH TOWER LINK BEAM SCHEDULE & DETAILS | | | | | | | | | | | | | | | | | | | | 5/1/2019 | | 7/25/2019 | | | | | | | | | 165 |
| 2811 | S4.11 | REVISION K UPDATED SET OF DWGS | LINK BEAM SCHEDULE& DETAILS (SOUTH TOWER) | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | | | 10/18/2019 | | | | | | 166 |
| 2812 | S4.12 | REVISION K UPDATED SET OF DWGS | SOUTH TOWER LINK BEAM SCHEDULE & DETAILS | | | | 12/20/2017 | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | | | 10/18/2019 | | | | | | 167 |
| 2813 | S5.00 | REVISION O UPDATED SET OF DWGS | SECTION DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | | | | | | 10/18/2019 | | | | 5/15/2020 | | 168 |
| 2814 | S5.00A | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | | | | | | | | 5/15/2020 | | 169 |
| 2815 | S5.00B | REVISION K UPDATED SET OF DWGS | SECTIONS SECTIONS SECTIONS SECTIONS SECTIONS SECTIONS | | | | 12/20/2017 | | | | | | | | | | 6/18/2018 | | 10/31/2018 | | | | | | | 9/10/2019 | | 10/18/2019 | | | | | | 170 |
| 2816 | S5.00C | REVISION M UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | 6/13/2019 | | 9/10/2019 | | | | 3/6/2020 | | | | 171 |
| 2817 | S5.00D | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | 5/15/2020 | | 172 |
| 2818 | S5.00E | REVISION F UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 173 |
| 2819 | S5.00 F | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | 3/1/2019 | | | | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 174 |
| 2820 | S5.01 | REVISION JUPDATED SET OF DWGS | SECTION DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | | | | | | | 175 |
| 2821 | S5.02 | REVISION L UPDATED SET OF DWGS | SECTION DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | | | 10/31/2018 | | | | 5/1/2019 | | | 9/10/2019 | | 10/18/2019 | 11/26/2019 | | | | | 176 |
| 2822 | S5.03 | REVISION O UPDATED SET OF DWGS | SECTION DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | | | | | | | | | | 9/10/2019 | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 177 |
| 2823 | S5.04 | REVISION L UPDATED SET OF DWGS | SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | 5/1/2019 | | 7/25/2019 | 9/10/2019 | | 10/18/2019 | 11/26/2019 | | | | | 178 |
| 2824 | S5.04A | REVISION L UPDATED SET OF DWGS | | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | 11/26/2019 | | | | | 179 |
| 2825 | S5.05 | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 180 |
| 2826 | S5.06 | REVISION M UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | | 5/1/2019 | | | | | | 11/26/2019 | 3/6/2020 | | | | 181 |
| 2827 | S5.07 | REVISION M UPDATED SET OF DWGS | SECTIONS | | | | 12/20/2017 | | | | | | | | | | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | | 5/1/2019 | | | | | | 11/26/2019 | 3/6/2020 | | | | 182 |
| 2828 | S5.08 | REVISION F UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 183 |
| 2829 | S5.09 | REVISION L UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | | 11/26/2019 | | | | | 184 |
| 2830 | S5.12 | REVISION M UPDATED SET OF DWGS | SOUTH TOWER ROOF SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | | | 3/6/2020 | | | | 185 |
| 2831 | S5.13 | REVISION M UPDATED SET OF DWGS | SECTION DETAILS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | | | | | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | | | 186 |
| 2832 | S5.14 | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | 7/25/2019 | | | | | | | 5/15/2020 | | 187 |
| 2833 | S5.14A | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | 6/18/2018 | 7/20/2018 | 10/31/2018 | | | 3/1/2019 | | | 7/25/2019 | | | | | 3/6/2020 | | 5/15/2020 | | 188 |
| 2834 | S5.14B | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | 7/20/2018 | 10/31/2018 | | | | | 6/13/2019 | 7/25/2019 | | | | | | | 5/15/2020 | | 189 |
| 2835 | S5.14C | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | 11/26/2019 | | | 5/15/2020 | | 190 |
| 2836 | S5.14D | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 191 |
| 2837 | S5.15 | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | 6/13/2019 | | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 192 |
| 2838 | S5.15A | REVISION F UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 193 |
| 2839 | S5.15B | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 194 |
| 2840 | S5.16 | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | 5/1/2019 | 6/13/2019 | | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 195 |
| 2841 | S5.16A | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | 7/20/2018 | | 12/18/2018 | | | 5/1/2019 | | | | | | | | | 5/15/2020 | | 196 |
| 2842 | S5.16B | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | 3/6/2020 | | 5/15/2020 | | 197 |
| 2843 | S5.17 | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | | 6/13/2019 | | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | 5/15/2020 | | 198 |
| 2844 | S5.18 | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | 6/13/2019 | | 9/10/2019 | | 10/18/2019 | 11/26/2019 | | | 5/15/2020 | | 199 |
| 2845 | S5.18A | REVISION C-UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | | | | | | 200 |
| 2846 | S5.18B | REVISION M UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | | | | | | | | | | 11/26/2019 | 3/6/2020 | | | | 201 |
| 2847 | S5.19 | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | | | 6/13/2019 | | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 202 |
| 2848 | S5.19A | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | | | 6/13/2019 | | | | 10/18/2019 | | 3/6/2020 | | 5/15/2020 | | 203 |
| 2849 | S5.20 | REVISION M UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | | 6/13/2019 | | | | | | 3/6/2020 | | | | 204 |
| 2850 | S5.21 | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | 3/1/2019 | | | 7/25/2019 | | | 10/18/2019 | | | | 5/15/2020 | | 205 |
| 2851 | S5.22 | REVISION G UPDATED SET OF DWGS | DETAILS | | | | | | | | | | | | | | | | | | | 3/1/2019 | 5/1/2019 | | | | | | | | | | | 206 |
| 2852 | S5.23 | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | | 5/1/2019 | | | | | | | | | 5/15/2020 | | 207 |
| 2853 | S5.24 | REVISION M UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | | | 6/13/2019 | | | | 10/18/2019 | 11/26/2019 | 3/6/2020 | | | | 208 |
| 2854 | S5.25 | REVISION M UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | 11/26/2019 | 3/6/2020 | | | | 209 |
| 2855 | S5.27 | REVISION O UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 5/15/2020 | | 210 |
| 2856 | S5.26 | REVISION M UPDATED SET OF DWGS | SECTIONS | | | | | | | | | | | | | | | | | | | | | | | | | | 11/26/2019 | 3/6/2020 | | | | 211 |
| 2857 | S6.00 | REVISION O UPDATED SET OF DWGS | STAIR SECTION | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | | | 10/31/2018 | 12/18/2018 | | | | 6/13/2019 | | | | | | | | 5/15/2020 | | 212 |
| 2858 | S6.01 | REVISION O UPDATED SET OF DWGS | VILLA STAIR SECTION | | | | 12/20/2017 | | | | | | | | | 4/9/2018 | | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | | 6/13/2019 | | | | 10/18/2019 | 11/26/2019 | | | 5/15/2020 | | 213 |
| 2859 | S6.01A | REVISION O UPDATED SET OF DWGS | VILLA STAIR SECTION | | | | | | | | | | | | | | | 7/20/2018 | | 12/18/2018 | | | | 6/13/2019 | | | | | 11/26/2019 | | | 5/15/2020 | | 214 |
| 2860 | S6.02 | REVISION K UPDATED SET OF DWGS | TOWER STAIR No.1 SECTIONS | | | | | | | | | | | | | 4/9/2018 | | | | | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | | | | | | 215 |
| 2861 | S6.03 | REVISION K UPDATED SET OF DWGS | TOWER STAIR No.1 SECTIONS | | | | | | | | | | | | | 4/9/2018 | | | | | | 3/1/2019 | 5/1/2019 | | 7/25/2019 | | | 10/18/2019 | | | | | | 216 |
| 2862 | S6.04 | REVISION K UPDATED SET OF DWGS | TOWER STAIR No.2 SECTIONS | | | | | | | | | | | | | 4/9/2018 | | | | | | | 5/1/2019 | | | | | 10/18/2019 | | | | | | 217 |

# ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 2863 | S6.05 | REVISION K UPDATED SET OF DWGS | TOWER STAIR No.2 SECTIONS | | | | | | | | | | | | | 4/9/2018 | | | | | | | 5/1/2019 | | | | | 10/18/2019 | | | | | | 218 |
| 2864 | S6.06 | REVISION F UPDATED SET OF DWGS | STAIR No1 SECTION | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 219 |
| 2865 | S6.06A | REVISION F UPDATED SET OF DWGS | STAIR NO. 3 SECTION | | | | | | | | | | | | | | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 220 |
| 2866 | S6.07 | REVISION F UPDATED SET OF DWGS | STAIR No2 SECTION | | | | | | | | | | | | | 4/9/2018 | | | 10/31/2018 | 12/18/2018 | | 3/1/2019 | | | | | | | | | | | | 221 |
| 2867 | S6.07A | REVISION F UPDATED SET OF DWGS | STAIR No.4 SECTIONS | | | | | | | | | | | | | | | | 10/31/2018 | | | 3/1/2019 | | | | | | | | | | | | 222 |
| 2868 | S6.08 | REVISION I UPDATED SET OF DWGS | STAIR SECTIONS | | | | | | | | | | | | | 4/9/2018 | 6/18/2018 | 7/20/2018 | 10/31/2018 | 12/18/2018 | | | | | 7/25/2019 | | | | | | | | | 223 |
| 2869 | S6.08A | REV D-NEW SHEET | Deck Stair No 5 Sections | | | | | | | | | | | | | | | | | 12/18/2018 | | | | | | | | | | | | | | 224 |
| 2870 | S6.09 | REVISION K UPDATED SET OF DWGS | STAIR No 5 SECTION | | | | | | | | | | | | | 4/9/2018 | | | 10/31/2018 | | | | | | | | | 10/18/2019 | | | | | | 225 |
| 2871 | S6.10 | REVISION K UPDATED SET OF DWGS | STAIR No 6 SECTION | | | | | | | | | | | | | 4/9/2018 | | | 10/31/2018 | | | | | | | | | 10/18/2019 | | | | | | 226 |
| 2872 | S7.00 | REVISION L-UPDATED SET OF DWGS | WIND PRESSURES | | | | | | | | | | | | | 4/9/2018 | | | | 12/18/2018 | | | | | | | | | 11/28/2019 | | | | | 227 |
| 2873 | S7.01 | REVISION L-UPDATED SET OF DWGS | WIND PRESSURES | | | | | | | | | | | | | 4/9/2018 | | | | 12/18/2018 | | | | | | | | | 11/28/2019 | | | | | 228 |
| 2874 | S7.02 | REVISION D-UPDATED SET OF DWGS | WIND PRESSURES | | | | | | | | | | | | | 4/9/2018 | | | | 12/18/2018 | | | | | | | | | | | | | | 229 |
| 2875 | S7.03 | REVISION D-UPDATED SET OF DWGS | WIND PRESSURES | | | | | | | | | | | | | 4/9/2018 | | | | 12/18/2018 | | | | | | | | | | | | | | 230 |
| 2876 | S7.04 | REVISION D-UPDATED SET OF DWGS | WIND PRESSURES | | | | | | | | | | | | | 4/9/2018 | | | | 12/18/2018 | | | | | | | | | | | | | | 231 |
| 2877 | S7.05 | REVISION D-UPDATED SET OF DWGS | WIND PRESSURES | | | | | | | | | | | | | 4/9/2018 | | | | 12/18/2018 | | | | | | | | | | | | | | 232 |
| 2878 | S7.06 | REVISION D-UPDATED SET OF DWGS | WIND PRESSURES | | | | | | | | | | | | | 4/9/2018 | | | | 12/18/2018 | | | | | | | | | | | | | | 233 |
| 2879 | **LEFT TURN LANE TO MANSIONS** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **8** |
| 2880 | 1 | DESIGN REVIEW REVISION 7 | MEDIAN AND DRIVEWAY LOCATION SKETCH WITHIN 300 FEET | 1/24/2012 | | | | | | | | | | 12/11/2018 | | | | | | | | | | | | | | | | | | | | 1 |
| 2881 | 2 | DESIGN REVIEW REVISION 7 | MEDIAN AND DREIVEWAY PLAN | 1/24/2012 | | | | | | | | | | 12/11/2018 | | | | | | | | | | | | | | | | | | | | 2 |
| 2882 | 3 | DESIGN REVIEW REVISION 7 | MEDIAN AND DRIVEWAY PAVEMENT MARKINGS AND SIGNAGE PLAN | 1/24/2012 | | | | | | | | | | 12/11/2018 | | | | | | | | | | | | | | | | | | | | 3 |
| 2883 | 4 | DESIGN REVIEW REVISION 7 | MEDIAN AND DRIVEWAY FIRELANE ROUTING EXHIBIT | 1/24/2012 | | | | | | | | | | 12/11/2018 | | | | | | | | | | | | | | | | | | | | 4 |
| 2884 | 5 | DESIGN REVIEW REVISION 7 | MEDIAN AND DRIVEWAY EXISTING & PROPOSED WB-65 ROUTING EXHIBIT | 1/24/2012 | | | | | | | | | | 12/11/2018 | | | | | | | | | | | | | | | | | | | | 5 |
| 2885 | 6 | DESIGN REVIEW REVISION 7 | MEDIAN AND DRIVEWAY WB 62 ROUTING EXHIBIT | 1/24/2012 | | | | | | | | | | 12/11/2018 | | | | | | | | | | | | | | | | | | | | 6 |
| 2886 | 7 | DESIGN REVIEW REVISION 7 | MEDIAN AND DRIVEWAY WB-40 ROUTING EXHIBIT | 1/24/2012 | | | | | | | | | | 12/11/2018 | | | | | | | | | | | | | | | | | | | | 7 |
| 2887 | 8 | DESIGN REVIEW REVISION 7 | MEDIAN AND DRIVEWAY DRIVEWAY LOCATION MOT PLAN | 1/24/2012 | | | | | | | | | | 12/11/2018 | | | | | | | | | | | | | | | | | | | | 8 |
| 2888 | **Food Service** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | **78** |
| 2889 | FS-0 | REVISION 2 UPDATED SET OF DRAWINGS | FOOD SERVICRE TITLE SHEET | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 1 |
| 2890 | FS-1.0 | REVISION 1 BID SET | LEVEL 1 EQUIPMENT OVERVIEW PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 2 |
| 2891 | FS-1.1 | REVISION 1 BID SET | LEVEL 1 EQUIPMENT PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 3 |
| 2892 | FS-1.2 | REVISION 2 UPDATED SET OF DRAWINGS | LEVEL 1 EQUIPMENT FLOOR PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 4 |
| 2893 | FS-2.0 | REVISION 1 BID SET | LEVEL 2 EQUIPMENT OVERVIEW PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 5 |
| 2894 | FS-2.1 | REVISION 2 UPDATED SET OF DRAWINGS | LEVEL 2 EQUIPMENT FLOOR PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 6 |
| 2895 | FS-3.1 | REVISION 1 BID SET | LEVEL 4 EQUIPMENT FLOOR PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 7 |
| 2896 | FS-4 | REVISION 2 UPDATED SET OF DRAWINGS | EQUIPMENT SCHEDULE | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 8 |
| 2897 | FS-4.1 | REVISION 2 UPDATED SET OF DRAWINGS | EQUIPMENT SCHEDULE | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 9 |
| 2898 | FS-P1.1 | REVISION 1 BID SET | LEVEL 1 PLUMBING ROUGH IN PLAN | 6/19/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 10 |
| 2899 | FS-P1.2 | REVISION 2 UPDATED SET OF DRAWINGS | LEVEL 1 PLUMBING ROUGH IN PLAN | 6/19/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 11 |
| 2900 | FS-P2.1 | REVISION 2 UPDATED SET OF DRAWINGS | LEVEL 2 PLUMBING ROUGH IN PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 12 |
| 2901 | FS-P3.1 | REVISION 1 BID SET | LEVEL 4 PLUMBING ROUGH IN PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 13 |
| 2902 | FS-P4 | REVISION 2 UPDATED SET OF DRAWINGS | PLUMBING ROUGH IN SCHEDULE | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 14 |
| 2903 | FS-P4.1 | REVISION 2 UPDATED SET OF DRAWINGS | PLUMBING ROUGH IN SCHEDULE | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 15 |
| 2904 | FS-E1.1 | REVISION 1 BID SET | LEVEL 1 ELECTRICAL ROUGH IN PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 16 |
| 2905 | FS-E1.2 | REVISION 2 UPDATED SET OF DRAWINGS | LEVEL 1 ELECTRICAL ROUGH IN PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 17 |
| 2906 | FS-E2.1 | REVISION 2 UPDATED SET OF DRAWINGS | LEV EL 2 ELECTRICAL ROUGH IN PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 18 |
| 2907 | FS-E3.1 | REVISION 1 BID SET | LEVEL 4 ELECTRICAL ROUGH IN PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 19 |
| 2908 | FS-E4 | REVISION 2 UPDATED SET OF DRAWINGS | ELECTRICAL ROUGH IN SCHEDULE | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 20 |
| 2909 | FS-E4.1 | REVISION 2 UPDATED SET OF DRAWINGS | ELECTRICAL ROUGH IN SCHEDULE | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 21 |
| 2910 | FS-E4.2 | REVISION 2 UPDATED SET OF DRAWINGS | ELECTRICAL ROUGH IN SCHEDULE | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 22 |
| 2911 | FS-SC1 | REVISION 1 BID SET | LEVEL 1 SPECIAL CONDITIONS PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 23 |
| 2912 | FS-SC1.1 | REVISION 1 BID SET | LEVEL 1 SPECIAL CONDITIONS PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 24 |
| 2913 | FS-SC1.2 | REVISION 1 BID SET | LEVEL 1 SPECIAL CONDITIONS PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 25 |
| 2914 | FS-SC1.3 | REVISION 1 BID SET | LEVEL 1 SPECIAL CONDITIONS PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 26 |
| 2915 | FS-SC2 | REVISION 2 UPDATED SET OF DRAWINGS | LEVEL 2 SPECIAL CONDITIONS PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 27 |
| 2916 | FS-SC2.1 | REVISION 2 UPDATED SET OF DRAWINGS | LEVEL 2 SPECIAL CONDITIONS PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 28 |
| 2917 | FS-SC3 | REVISION 1 BID SET | LEVEL 4 SPECIAL CONDITIONS PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 29 |
| 2918 | FS-SC3.1 | REVISION 1 BID SET | LEVEL 4 SPECIAL CONDITIONS PLAN | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 30 |
| 2919 | FS-M1 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 31 |
| 2920 | FS-M2 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 32 |
| 2921 | FS-M3 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 33 |
| 2922 | FS-M4 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 34 |
| 2923 | FS-M5 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 35 |
| 2924 | FS-M6 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 36 |
| 2925 | FS-M7 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 37 |
| 2926 | FS-M8 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 38 |
| 2927 | FS-M9 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 39 |
| 2928 | FS-M10 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 40 |
| 2929 | FS-M11 | REVISION 1 BID SET | HOOD VENTILATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 41 |
| 2930 | FS-M12 | REVISION 1 BID SET | FOOD SERVICE HOOD CONTROL DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 42 |
| 2931 | FS-M13 | REVISION 1 BID SET | FOOD SERVICE CORE ELECTRICAL DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 43 |
| 2932 | FS-BAR1 | REVISION 1 BID SET | BAR DIE WALL DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 44 |
| 2933 | FS-BAR2 | REVISION 1 BID SET | BAR DIE WALL DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 45 |
| 2934 | FS-BAR3 | REVISION 1 BID SET | BAR DIE WALL DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 46 |
| 2935 | FS-BAR4 | REVISION 1 BID SET | BAR DIE WALL DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 47 |
| 2936 | FS-BAR5 | REVISION 1 BID SET | BAR DIE WALL DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 48 |
| 2937 | FS-CB1 | REVISION 1 BID SET | COOKING BATTERY DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 49 |
| 2938 | FS-CB2 | REVISION 1 BID SET | COOKING BATTERY DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 50 |
| 2939 | FS-WIC1 | REVISION 1 BID SET | WALK IN COOLER DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 51 |
| 2940 | FS-WIC2 | REVISION 1 BID SET | WALK IN COOLER DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 52 |
| 2941 | FS-WIC3 | REVISION 1 BID SET | WALK IN COOLER DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 53 |
| 2942 | FS-WIC4 | REVISION 1 BID SET | WALK IN COOLER DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 54 |
| 2943 | FS-RS1 | REVISION 1 BID SET | RANGE SUITE DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 55 |
| 2944 | FS-FAB1 | REVISION 1 BID SET | STANDARD FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 56 |
| 2945 | FS-FAB2 | REVISION 1 BID SET | STANDARD FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 57 |
| 2946 | FS-FAB3 | REVISION 1 BID SET | STANDARD FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 58 |
| 2947 | FS-FAB4 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 59 |
| 2948 | FS-FAB5 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 60 |
| 2949 | FS-FAB6 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 61 |
| 2950 | FS-FAB7 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 62 |
| 2951 | FS-FAB8 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 63 |
| 2952 | FS-FAB9 | REVISION 2 UPDATED SET OF DRAWINGS | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 64 |
| 2953 | FS-FAB10 | REVISION 2 UPDATED SET OF DRAWINGS | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 65 |
| 2954 | FS-FAB11 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 66 |
| 2955 | FS-FAB12 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 67 |
| 2956 | FS-FAB13 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 68 |
| 2957 | FS-FAB14 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 69 |
| 2958 | FS-FAB15 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 70 |
| 2959 | FS-FAB16 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 71 |
| 2960 | FS-FAB17 | REVISION 1 BID SET | FABRICATION DETAILS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 72 |
| 2961 | FS-EL1 | REVISION 1 BID SET | EQUIPMENT ELEVATIONS | | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 73 |
| 2962 | FS-EL2 | REVISION 2 UPDATED SET OF DRAWINGS | EQUIPMENT ELEVATIONS | | 10/18/2019 | 11/7/2019 | | | 3/31/2020 | | | | | | | | | | | | | | | | | | | | | | | | | 74 |
| 2963 | FS-R1 | REVISION 1 BID SET | REMOTE REFRIGERATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 75 |
| 2964 | FS-R2 | REVISION 1 BID SET | REMOTE REFRIGERATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 76 |
| 2965 | FS-R3 | REVISION 1 BID SET | REMOTE REFRIGERATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 77 |
| 2966 | FS-R4 | REVISION 1 BID SET | REMOTE REFRIGERATION DETAILS | 6/12/2019 | 10/18/2019 | 11/7/2019 | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 78 |

1 ESTATES AT ACQUALINA CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

Updated: 7/7/2020

| | A | B | C | D | E | F | G | J | K | L | M | N | O | P | Q | R | S | U | V | W | X | Y | Z | AA | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Sheet No. | Version | Description | DESIGN DEV | Bid Set | BID SET REV 1 | Permit Set to CD | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV B | REV B.1 | Rev C | REV D | REV E | REV F | REV G | REV H | REV I | REV J | REV J | REV K | REV L | REV M | REV N | REV O | REV P | # of Sheets |
| 2967 | POOLs & WATER FEATURES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 165 |
| 2968 | XD116 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 1 |
| 2969 | XD117 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 2 |
| 2970 | XD118 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 3 |
| 2971 | XD119 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 4 |
| 2972 | XD120 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 5 |
| 2973 | XD121 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 6 |
| 2974 | XD122 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 7 |
| 2975 | XD123 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 8 |
| 2976 | XD100 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 9 |
| 2977 | XD101 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 10 |
| 2978 | XD102 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 11 |
| 2979 | XD103 | 100% CD's REV I | DETAILS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 12 |
| 2980 | XD104 | 100% CD's REV I | DETAILS | | | | 5/20/2018 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 13 |
| 2981 | XD105 | 100% CD's REV I | DETAILS | | | | 5/20/2018 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 14 |
| 2982 | XD106 | 100% CD's REV I | DETAILS | | | | 5/20/2018 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 15 |
| 2983 | XD107 | 100% CD's REV I | DETAILS | | | | 5/20/2018 | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 16 |
| 2984 | XD108 | 100% CD's REV I | DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 17 |
| 2985 | XD109 | 100% CD's REV I | DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 18 |
| 2986 | XD110 | 100% CD's REV I | DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 19 |
| 2987 | XD111 | 100% CD's REV I | DETAILS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 20 |
| 2988 | XD112 | 100% CD's REV 0 | DETAILS STRUCTURE | | | | | | | | | | | | | | | | | | | | | | 5/2/2018 | | | | | | | | | 21 |
| 2989 | XD113 | 100% CD's REV 0 | DETAILS STRUCTURE | | | | | | | | | | | | | | | | | | | | | | 5/20/2018 | | | | | | | | | 22 |
| 2990 | XD114 | 100% CD's REV 0 | DETAILS STRUCTURE | | | | | | | | | | | | | | | | | | | | | | 5/20/2018 | | | | | | | | | 23 |
| 2991 | XD115 | 100% CD's REV 0 | DETAILS STRUCTURE | | | | | | | | | | | | | | | | | | | | | | 5/20/2018 | | | | | | | | | 24 |
| 2992 | XF100 | 100% CD's REV I | SPA EQUIPMENT IDENTIFICATION DIMENSIONS& SECTIONS | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 25 |
| 2993 | XF101 | 100% CD's REV 0 | SPA PILE LAYOUT | | | | 5/20/2018 | | | | | | | | | | | | | | | | | | 5/20/2018 | | | | | | | | | 26 |
| 2994 | XF102 | 100% CD's REV I | SPA PIPING | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 27 |
| 2995 | XF200 | 100% CD's REV I | FAMILY POOL EQUIPMENT IDENTIFICATION | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 28 |
| 2996 | XF201 | 100% CD's REV I | FAMILY POOL DIMENSIONS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 29 |
| 2997 | XF202 | 100% CD's REV 0 | FAMILY POOL PILE LAYOUT | | | | 5/2/2018 | | | | | | | | | | | | | | | | | | 5/2/2018 | | | | | | | | | 30 |
| 2998 | XF203 | 100% CD's REV I | FAMILY POOL PIPING | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 31 |
| 2999 | XF230 | 100% CD's REV I | FAMILY POOL SECTIONS | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 32 |
| 3000 | XF300 | 100% CD's REV I | PRIMARY POOL EQUIPMENT IDENTIFICATION | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 33 |
| 3001 | XF301 | 100% CD's REV I | PRIMARY POOL DIMENSIONS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 34 |
| 3002 | XF302 | 100% CD's REV I | PRIMARY POOL PIPING | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 35 |
| 3003 | XF330 | 100% CD's REV I | PRIMARY POOL SECTIONS | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 36 |
| 3004 | XF400 | 100% CD's REV I | LAP POOL EQUIPMENT IDENTIFICATION | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 37 |
| 3005 | XF401 | 100% CD's REV I | LAP POOL DIMENSIONS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 38 |
| 3006 | XF402 | 100% CD's REV 0 | LAP POOL PILE LAYOUT | | | | 5/2/2018 | | | | | | | | | | | | | | | | | | 5/2/2018 | | | | | | | | | 39 |
| 3007 | XF403 | 100% CD's REV I | LAP POOL PIPING | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 40 |
| 3008 | XF430 | 100% CD's REV I | LAP POOL SECTIONS | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 41 |
| 3009 | XF500 | 100% CD's REV I | FLOWRIDER EQUIPMENT IDENTIFICATION& DIMENSIONS | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 42 |
| 3010 | XF501 | 100% CD's REV I | FLOWRIDER PIPING | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 43 |
| 3011 | XF530 | 100% CD's REV I | FLOWRIDER SECTIONS | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 44 |
| 3012 | XF700 | 100% CD's REV I | WATER FEATURE1- EQUIPMENT ID | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 45 |
| 3013 | XF701 | 100% CD's REV I | WATER FEATURE 1 FILTERED PIPING | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 46 |
| 3014 | XF702 | 100% CD's REV I | WATER FEATURE 1 DRAIN & SKIMMER PIPING | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 47 |
| 3015 | XF703 | 100% CD's REV I | WATER FEATURE 1 SUCTION & GRAVITY PIPING | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 48 |
| 3016 | XF730 | 100% CD's REV I | WATER FEATURE1- SECTIONS1&2 | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 49 |
| 3017 | XF731 | 100% CD's REV I | WATER FEATURE 1 ELEVATION | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 50 |
| 3018 | XF800 | 100% CD's REV I | WATER FEATURE 2A& 2B- TYP. EQUIPMENT ID& DIMENSIONS | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 51 |
| 3019 | XF801 | 100% CD's REV I | WATER FEATURE 2A& 2B- TYP. SUCTION, FILTER& FEATURE PIPING | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 52 |
| 3020 | XF830 | 100% CD's REV I | WATER FEATURE 2A & 2B TYP. SECTIONS | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 53 |
| 3021 | XF900 | 100% CD's REV I | WATER FEATURE 3A& 3B- TYP. EQUIPMENT ID& DIMENSIONS | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 54 |
| 3022 | XF901 | 100% CD's REV I | WATER FEATURE 3A& 3B- TYP. SUCTION, FILTER& FEATURE PIPING | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 55 |
| 3023 | XF930 | 100% CD's REV I | WATER FEATURES 3A & 3B TYP. SECTIONS | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 56 |
| 3024 | XF1000 | 100% CD's REV I | WATER FEATURE 4 EQUIPMENT ID & DIMSENSIONS | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 57 |
| 3025 | XF1001 | 100% CD's REV I | WATER FEATURE 4 SUCTION & FILTER PIPING | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 58 |
| 3026 | XF1002 | 100% CD's REV I | WATER FEATURE 4 FEATURE PIPING | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 59 |
| 3027 | XF1030 | 100% CD's REV I | WATER FEATURE 4 SECTIONS | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 60 |
| 3028 | XF1100 | 100% CD's REV I | WATER FEATURE 5A& 5B- TYP. EQUIPMENT ID& DIMENSIONS | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 61 |
| 3029 | XF1101 | 100% CD's REV I | WATER FEATURES5- TYP. SUCTION, FILTER& FEATURE PIPING | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 62 |
| 3030 | XF1130 | 100% CD's REV I | WATER FEATURES 5A & 5B TYP. SECTIONS | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 63 |
| 3031 | XF1200 | 100% CD's REV I | WATER FEATURE6- EQUIPMENT ID | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 64 |
| 3032 | XF1201 | 100% CD's REV I | WATER FEATURE6- SUCTION, FILTER& FEATURE PIPING | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 65 |
| 3033 | XF1300 | 100% CD's REV I | WATER FEATURE7- EQUIPMENT ID | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 66 |
| 3034 | XF1301 | 100% CD's REV I | WATER FEATURE 7 SUCTION AND FILTER PIPING | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 67 |
| 3035 | XF1302 | 100% CD's REV I | WATER FEATURE 7 FEATURE PIPING | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 68 |
| 3036 | XF1330 | 100% CD's REV I | WATER FEATURE 7 SECTIONS | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 69 |
| 3037 | XF1400 | 100% CD's REV I | WATER FEATURE 8 EQUIPMENT ID & DIMENSIONS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 70 |
| 3038 | XF1401 | 100% CD's REV I | WATER FEATURE 8 SUCTION FILTER AND FEATURE PIPING | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 71 |
| 3039 | XF1430 | 100% CD's REV I | WATER FEATURE 8 SECTION | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 72 |
| 3040 | XF1500 | 100% CD's REV I | WATER FEATURE 9 EQUIPMENT ID & DIMENSIONS | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 73 |
| 3041 | XF1501 | 100% CD's REV I | WATER FEATURE 9 SUCTION, FILTER & PIPING | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 74 |
| 3042 | XF1502 | 100% CD's REV I | WATER FEATURE 9 FEATURE PIPING | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 75 |
| 3043 | XG100 | 100% CD's REV I | COVER - POOLS | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 76 |
| 3044 | XG101 | 100% CD's REV I | PROJECT SUMMARY - POOLS | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 77 |
| 3045 | XG102 | 100% CD's REV I | GENERAL NOTES | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 78 |
| 3046 | XG103 | 100% CD's REV I | LEGENDS & INDEX - POOLS | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 79 |
| 3047 | XG200 | 100% CD's REV I | COVER - FOUNTAINS | | | | | | 9/29/2017 | | | | | | | | | | 7/13/2018 | | | | | | 7/25/2019 | | | | | | | | | 80 |
| 3048 | XG201 | 100% CD's REV I | GENERAL NOTES & LEGENDS - FOUNTAINS | | | | | | 9/29/2017 | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 81 |
| 3049 | XM100 | 100% CD's REV I | MECHANICAL ROOM 1 EQUIPMENT ID | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 82 |
| 3050 | XM101 | 100% CD's REV I | MECHANICAL ROOM 1 DIMENSIONS & HOUSEKEEPING PADS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 83 |
| 3051 | XM120 | 100% CD's REV I | MECHANICAL ROOM #1 PENETRATIONS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 84 |
| 3052 | XM121 | 100% CD's REV I | MECHANICAL ROOM #1 PENETRATIONS | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 85 |
| 3053 | XM140 | 100% CD's REV I | PRIMARY POOL PIPING DIAGRAM | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 86 |
| 3054 | XM141 | 100% CD's REV I | LAP POOL PIPING DIAGRAM | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 87 |
| 3055 | XM142 | 100% CD's REV I | FAMILY POOL PIPING DIAGRAM | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 88 |
| 3056 | XM143 | 100% CD's REV I | SPA PIPING DIAGRAM | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 89 |
| 3057 | XM160 | 100% CD's REV I | ASSEMBLIES | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 90 |
| 3058 | XM161 | 100% CD's REV I | ASSEMBLIES | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 91 |
| 3059 | XM162 | 100% CD's REV I | ASSEMBLIES | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 92 |
| 3060 | XM163 | 100% CD's REV I | ASSEMBLIES | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 93 |
| 3061 | XM200 | 100% CD's REV I | MECHANICAL ROOM | | | | 10/3/2016 | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 94 |
| 3062 | XM201 | 100% CD's REV I | MECHANICAL ROOM | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 95 |
| 3063 | XM220 | 100% CD's REV I | MECHANICAL ROOM | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 96 |
| 3064 | XM240 | 100% CD's REV I | FLOWRIDER PIPING DIAGRAM | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 97 |
| 3065 | XM260 | 100% CD's REV I | ASSEMBLIES | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 98 |
| 3066 | XM261 | 100% CD's REV I | ASSEMBLIES | | | | | | 6/20/2018 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 99 |
| 3067 | XM300 | 100% CD's REV I | MECHANICAL ROOM #1 EQUIPMENT ID | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 100 |
| 3068 | XM301 | 100% CD's REV I | MECHANICAL ROOM #1 DIMENSIONS & HOUSEKEEPING PADS | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 101 |
| 3069 | XM320 | 100% CD's REV I | MECHANICAL ROOM 1 PENETRATIONS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 102 |
| 3070 | XM340 | 100% CD's REV I | WF7 PIPING DIAGRAM | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 103 |
| 3071 | XM341 | 100% CD's REV I | WF7 PIPING DIAGRAM | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 104 |
| 3072 | XM400 | 100% CD's REV I | MECHANICAL ROOM #2 EQUIPMENT ID | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 105 |
| 3073 | XM401 | 100% CD's REV I | MECHANICAL ROOM #2 DIMENSIONS AND HOUSEKEEPING PADS | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 106 |
| 3074 | XM420 | 100% CD's REV I | MECHANICAL ROOM 2 PENETRATIONS | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 107 |
| 3075 | XM440 | 100% CD's REV I | WF8 PIPING DIAGRAM | | | | | | | | | | | | | | | | | | | | | | 7/25/2019 | | | | | | | | | 108 |
| 3076 | XM500 | 100% CD's REV I | MECHANICAL ROOM #3 EQUIPMENT ID | | | | | | 9/29/2017 | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 109 |
| 3077 | XM501 | 100% CD's REV I | MECHANICAL ROOM #3 DIMENSIONS AND HOUSEKEEPING PADS | | | | | | | | | | | | | | | | 7/31/2018 | | | | | | 7/25/2019 | | | | | | | | | 110 |

**ESTATES AT ACQUALINA** CURRENT DRAWINGS LOG TO REV P DATED 6/5/2020

| Sheet No. | Version | Description | DESIGN DEV | BID SET REV 1 | Bid Set | Permit Set by CO | REV 1 | REV 2 | REV 3 | REV 4 | REV 5 | REV 6 | REV 7 | REV 8 | REV A | REV 9 | REV B | REV B.1 | Rev C | REV D | REV E | REV X | REV Y | REV Z | REV 7 | REV G | REV O | REV H | REV I | REV J | REV K | REV L | REV M | REV N | REV V |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG UP TO CCD 108 UPDATED 07/07/2020**

| Sheet Name | VERSION | Description | DESIGN DEVELOPMENT | Permit Set | REV 1 | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| NT SF-CASA DI BARONA-COBA UNIT | | | | | | | | | 158 |
| WIMBERLY ID'S | | | | | | | | | 125 |
| ID0-0.1 | 100 % CD's CCD 092 | INDEX | | 4/15/2020 | | | | | 1 |
| ID0-0.2 | 100 % CD's CCD 092 | GENERAL NOTES | | 4/15/2020 | | | | | 2 |
| ID1-1.0 | 100 % CD's CCD 092 | GARAGE PLAN | | 4/15/2020 | | | | | 3 |
| ID1-2.0 | 100 % CD's CCD 092 | GARAGE PLAN ELEVATIONS | | 4/15/2020 | | | | | 4 |
| ID2-1.0 | 100 % CD's CCD 092 | LEVEL 02 FFE PLAN | | 4/15/2020 | | | | | 5 |
| ID2-2.0 | 100 % CD's CCD 092 | LEVEL 02 ARCHITECTURAL REFERENCE PLAN | | 4/15/2020 | | | | | 6 |
| ID2-3.0 | 100 % CD's CCD 092 | LEVEL 02 RCP | | 4/15/2020 | | | | | 7 |
| ID2-4.0 | 100 % CD's CCD 092 | LEVEL 02 ELECTRICAL AND MECHANICAL REFERENCE PLAN | | 4/15/2020 | | | | | 8 |
| ID2-5.0 | 100 % CD's CCD 092 | LEVEL 02 FLOOR COVERING PLAN | | 4/15/2020 | | | | | 9 |
| ID2-6.0 | 100 % CD's CCD 092 | LEVEL 02 WALL FINISH REFERENCE PLAN | | 4/15/2020 | | | | | 10 |
| ID2-6.1 | 100 % CD's CCD 092 | LEVEL 2 PLUMBING REFERENCE PLAN | | 4/15/2020 | | | | | 11 |
| ID2-6.2 | 100 % CD's CCD 092 | LEVEL 2 FLOOR OPENING REFERENCE PLAN | | 4/15/2020 | | | | | 12 |
| ID2-7.0 | 95% CD CCD 092 | LEVEL 2 SOUTH SECTION | | 4/1/2020 | | | | | 13 |
| ID2-7.1 | 95% CD CCD 092 | LEVEL 2 NORTH SECTION | | 4/1/2020 | | | | | 14 |
| ID2-7.2 | 95% CD CCD 092 | LEVEL 2 WEST SECTION | | 4/1/2020 | | | | | 15 |
| ID2-7.3 | 95% CD CCD 092 | LEVEL 2 DINING ROOM ELEVATION | | 4/1/2020 | | | | | 16 |
| ID2-7.4 | 95% CD CCD 092 | LEVEL 2 PLAYROOM ELEVATION | | 4/1/2020 | | | | | 17 |
| ID2-7.5 | 95% CD CCD 092 | LEVEL 2 ENTRY FOYER ELEVATION | | 4/1/2020 | | | | | 18 |
| ID2-7.6 | 95% CD CCD 092 | LEVEL 2 GRAND STAIR ELEVATION | | 4/1/2020 | | | | | 19 |
| ID2-7.7 | 95% CD CCD 092 | LEVEL 2 GALLERY ELEVATION | | 4/1/2020 | | | | | 20 |
| ID2-7.8 | 95% CD CCD 092 | LEVEL 2 GALLERY POWDER ROOM ELEVATION | | 4/1/2020 | | | | | 21 |
| ID2-7.9 | 95% CD CCD 092 | LEVEL 2 STORAGE ELEVATION | | 4/1/2020 | | | | | 22 |
| ID2-7.10 | 95% CD CCD 092 | LEVEL 2 GREAT ROOM ELEVATION | | 4/1/2020 | | | | | 23 |
| ID2-7.11 | 95% CD CCD 092 | LEVEL 2 SALON ELEVATION | | 4/1/2020 | | | | | 24 |
| ID2-7.12 | 95% CD CCD 092 | LEVEL 2 SALON POWDER ROOM ELEVATION | | 4/1/2020 | | | | | 25 |
| ID3-1.0 | 100 % CD's CCD 092 | LEVEL 3 FFE PLAN | | 4/15/2020 | | | | | 26 |
| ID3-2.0 | 100 % CD's CCD 092 | LEVEL 3 ARCHITECTURAL REFERENCE PLAN | | 4/15/2020 | | | | | 27 |
| ID3-3.0 | 100 % CD's CCD 092 | LEVEL 3 RCP | | 4/15/2020 | | | | | 28 |
| ID3-4.0 | 100 % CD's CCD 092 | LEVEL 3 ELECTRICAL AND MECHANICAL REFERENCE PLAN | | 4/15/2020 | | | | | 29 |
| ID3-5.0 | 100 % CD's CCD 092 | LEVEL 3 FLOOR COVERING PLAN | | 4/15/2020 | | | | | 30 |
| ID3-6.0 | 100 % CD's CCD 092 | LEVEL 3 WALL FINISH REFERENCE PLAN | | 4/15/2020 | | | | | 31 |
| ID3-6.1 | 100 % CD's CCD 092 | LEVEL 3 PLUMBING REFERENCE PLAN | | 4/15/2020 | | | | | 32 |
| ID3-6.2 | 100 % CD's CCD 092 | LEVEL 3 FLOOR OPENING REFERENCE PLAN | | 4/15/2020 | | | | | 33 |
| ID3-7.0 | 95% CD CCD 092 | LEVEL 3 SOUTH SECTION | | 4/1/2020 | | | | | 34 |
| ID3-7.1 | 95% CD CCD 092 | LEVEL 3 NORTH SECTION | | 4/1/2020 | | | | | 35 |
| ID3-7.2 | 95% CD CCD 092 | LEVEL 3 WEST SECTION | | 4/1/2020 | | | | | 36 |
| ID3-7.3 | 95% CD CCD 092 | LEVEL 3 STUDY ROOM ELEVATION | | 4/1/2020 | | | | | 37 |
| ID3-7.4 | 95% CD CCD 092 | LKEVEL 3 FAMILY ROOM ELEVATION | | 4/1/2020 | | | | | 38 |
| ID3-7.5 | 95% CD CCD 092 | LEVEL 3 FAMILY POWDER ROOM ELEVATION | | 4/1/2020 | | | | | 39 |
| ID3-7.6 | 95% CD CCD 092 | LEVEL 3 BEDROOM 4 ELEVATION | | 4/1/2020 | | | | | 40 |
| ID3-7.7 | 95% CD CCD 092 | LEVEL 3 EAST HALL ELEVATION | | 4/1/2020 | | | | | 41 |
| ID3-7.8 | 95% CD CCD 092 | LEVEL 3 BEDROOM 3 ELEVATION | | 4/1/2020 | | | | | 42 |
| ID3-7.9 | 95% CD CCD 092 | LEVEL 3 LAUNDRY ROOM ELEVATION | | 4/1/2020 | | | | | 43 |
| ID3-7.10 | 95% CD CCD 092 | LEVEL 3 NORTH HALL ELEVATION | | 4/1/2020 | | | | | 44 |
| ID3-7.11 | 95% CD CCD 092 | LEVEL 3 BEDROOM 2 ELEVATION | | 4/1/2020 | | | | | 45 |
| ID3-7.12 | 95% CD CCD 092 | LEVEL 3 WEST HALL ELEVATION | | 4/1/2020 | | | | | 46 |
| ID3-7.13 | 95% CD CCD 092 | LEVEL 3 BEDROOM 1 ELEVATION | | 4/1/2020 | | | | | 47 |
| ID3-7.14 | 95% CD CCD 092 | LEVEL 3 GRAND STAIR LANDING ELEVATION | | 4/1/2020 | | | | | 48 |
| ID4-1.0 | 100 % CD's CCD 092 | LEVEL 4 FFE PLAN | | 4/15/2020 | | | | | 49 |
| ID4-2.0 | 100 % CD's CCD 092 | LEVEL 4 ARCHITECTURAL REFERENCE PLAN | | 4/15/2020 | | | | | 50 |
| ID4-3.0 | 100 % CD's CCD 092 | LEVEL 4 RCP CEILING PLAN | | 4/15/2020 | | | | | 51 |
| ID4-4.0 | 100 % CD's CCD 092 | LEVEL 4 ELECTRICAL AND MECHANICAL REFERENCE PLAN | | 4/15/2020 | | | | | 52 |
| ID4-5.0 | 100 % CD's CCD 092 | LEVEL 4 FLOOR COVERING PLAN | | 4/15/2020 | | | | | 53 |
| ID4-6.0 | 100 % CD's CCD 092 | LEVEL 4 WALL FINISH REFERENCE PLAN | | 4/15/2020 | | | | | 54 |
| ID4-6.1 | 100 % CD's CCD 092 | LEVEL 4 PLUMBING REFERENCE PLAN | | 4/15/2020 | | | | | 55 |
| ID4-6.2 | 100 % CD's CCD 092 | LEVEL 4 FLOOR OPENING REFERENCE PLAN | | 4/15/2020 | | | | | 56 |
| ID4-7.0 | 95% CD CCD 092 | LEVEL 4 MASTER SUITE SECTION | | 4/1/2020 | | | | | 57 |
| ID4-7.1 | 95% CD CCD 092 | LEVEL 4 MASTER SUITE WEST SECTION | | 4/1/2020 | | | | | 58 |
| ID4-7.2 | 95% CD CCD 092 | LEVEL 4 GUEST SUITE NORTH SECTION | | 4/1/2020 | | | | | 59 |
| ID4-7.3 | 95% CD CCD 092 | LEVEL 4 MASTER PARLOR ELEVATION | | 4/1/2020 | | | | | 60 |
| ID4-7.4 | 95% CD CCD 092 | LEVEL 4 MASTER POWDER ROOM ELEVATION | | 4/1/2020 | | | | | 61 |
| ID4-7.5 | 95% CD CCD 092 | LEVEL 4 MASTER BEDROOM ELEVATION | | 4/1/2020 | | | | | 62 |
| ID4-7.6 | 95% CD CCD 092 | LEVEL 4 MASTER BATH HALLWAY ELEVATION | | 4/1/2020 | | | | | 63 |
| ID4-7.7 | 95% CD CCD 092 | LEVEL 4 SALON ROOM ELEVATION | | 4/1/2020 | | | | | 64 |
| ID4-7.8 | 95% CD CCD 092 | LEVEL 4 SALON ROOM EXTENSION ELEVATION | | 4/1/2020 | | | | | 65 |
| ID4-7.9 | 95% CD CCD 092 | LEVEL 4 GUEST ENTRY HALL ELEVATION | | 4/1/2020 | | | | | 66 |
| ID4-7.10 | 95% CD CCD 092 | LEVEL 4 GUEST BEDROOM 01 ELEVATION | | 4/1/2020 | | | | | 67 |
| ID4-7.11 | 95% CD CCD 092 | LEVEL 4 GUEST PARLOR ELEVATION | | 4/1/2020 | | | | | 68 |
| ID4-7.12 | 95% CD CCD 092 | LEVEL 4 GUEST LAUNDRY ELEVATION | | 4/1/2020 | | | | | 69 |
| ID4-7.13 | 95% CD CCD 092 | LEVEL 4 GUEST LAUNDRY EXTENSION ELEVATION | | 4/1/2020 | | | | | 70 |
| ID4-7.14 | 95% CD CCD 092 | LEVEL 4 GUEST BEDROOM 2 ELEVATION | | 4/1/2020 | | | | | 71 |
| ID5-1.0 | 95% CD CCD 092 | LEVEL 3 ENLARGED BATHROOM 1 PLANS | | 4/1/2020 | | | | | 72 |
| ID5-1.1 | 95% CD CCD 092 | LEVEL 3 ENLARGED BATHROOM 1 ELEVATIONS | | 4/1/2020 | | | | | 73 |
| ID5-2.0 | 95% CD CCD 092 | LEVEL 3 ENLARGED BATHROOM 2 PLANS | | 4/1/2020 | | | | | 74 |
| ID5-2.1 | 95% CD CCD 092 | LEVEL 3 ENLARGED BATHROOM 2 ELEVATIONS | | 4/1/2020 | | | | | 75 |
| ID5-3.0 | 95% CD CCD 092 | LEVEL 3 ENLARGED BATHROOM 3 PLANS | | 4/1/2020 | | | | | 76 |
| ID5-3.1 | 95% CD CCD 092 | LEVEL 3 ENLARGED BATHROOM 3 ELEVATIONS | | 4/1/2020 | | | | | 77 |
| ID5-4.0 | 95% CD CCD 092 | LEVEL 3 ENLARGED BATHROOM 4 PLANS | | 4/1/2020 | | | | | 78 |
| ID5-4.1 | 95% CD CCD 092 | LEVEL 3 ENLARGED BATHROOM 4 ELEVATIONS | | 4/1/2020 | | | | | 79 |

## ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG UP TO CCD 108 UPDATED 07/07/2020

| Sheet Name | VERSION | Description | DESIGN DEVELOPMENT | Permit Set | REV 1 | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| IDS-5.0 | 95% CD CCD 092 | LEVEL 4 ENLARGED HIS BATH PLANS | | 4/1/2020 | | | | | 80 |
| IDS-5.1 | 95% CD CCD 092 | LEVEL 4 ENLARGED HIS BATH ELEVATIONS | | 4/1/2020 | | | | | 81 |
| IDS-5.2 | 95% CD CCD 092 | LEVEL 4 ENLARGED HIS BATH ELEVATIONS | | 4/1/2020 | | | | | 82 |
| IDS-6.0 | 95% CD CCD 092 | LEVEL 4 ENLARGED HER BATH PLANS | | 4/1/2020 | | | | | 83 |
| IDS-6.1 | 95% CD CCD 092 | LEVEL 4 ENLARGED HER BATH ELEVATIONS | | 4/1/2020 | | | | | 84 |
| IDS-6.2 | 95% CD CCD 092 | LEVEL 4 ENLARGED HER BATH ELEVATIONS | | 4/1/2020 | | | | | 85 |
| IDS-7.0 | 95% CD CCD 092 | LEVEL 4 ENLARGED GUEST BATHROOM 1 PLANS | | 4/1/2020 | | | | | 86 |
| IDS-7.1 | 95% CD CCD 092 | LEVEL 4 ENLARGED GUEST BATHROOM 1 ELEVATIONS | | 4/1/2020 | | | | | 87 |
| IDS-8.0 | 95% CD CCD 092 | LEVEL 4 ENLARGED BATHROOM 2 PLANS | | 4/1/2020 | | | | | 88 |
| IDS-8.1 | 95% CD CCD 092 | LEVEL 4 ENLARGED GUEST BATHROOM 2 ELEVATIONS | | 4/1/2020 | | | | | 89 |
| ID8-1.0 | 95% CD CCD 092 | FLOOR DETAILS | | 4/1/2020 | | | | | 90 |
| ID8-1.1 | 95% CD CCD 092 | FLOOR DETAILS ENTRY FOYER | | 4/1/2020 | | | | | 91 |
| ID8-1.2 | 95% CD CCD 092 | FLOOR DETAILS GRAND STAIR | | 4/1/2020 | | | | | 92 |
| ID8-1.3 | 95% CD CCD 092 | FLOOR DETAILS GALLERY | | 4/1/2020 | | | | | 93 |
| ID8-1.4 | 95% CD CCD 092 | FLOOR DETAILS DINING ROOM | | 4/1/2020 | | | | | 94 |
| ID8-1.5 | 95% CD CCD 092 | FLOOR DETAILS STUDY ROOM | | 4/1/2020 | | | | | 95 |
| ID8-1.6 | 95% CD CCD 092 | FLOOR DETAILS W HALLAY MASTER HALLWAY | | 4/1/2020 | | | | | 96 |
| ID8-2.0 | 95% CD CCD 092 | CEILING DETAILS ENTRY FOYER | | 4/1/2020 | | | | | 97 |
| ID8-2.1 | 95% CD CCD 092 | CEILING DETAILS DINING ROOM | | 4/1/2020 | | | | | 98 |
| ID8-2.2 | 95% CD CCD 092 | CEILING DETAILS | | 4/1/2020 | | | | | 99 |
| ID8-2.3 | 95% CD CCD 092 | CEILING DETAILS | | 4/1/2020 | | | | | 100 |
| ID8-2.4 | 95% CD CCD 092 | CEILING DETAILS STUDY ROOM | | 4/1/2020 | | | | | 101 |
| ID8-2.5 | 95% CD CCD 092 | CEILING DETAILS | | 4/1/2020 | | | | | 102 |
| ID8-2.6 | 95% CD CCD 092 | CEILING DETAILS | | 4/1/2020 | | | | | 103 |
| ID8-2.7 | 95% CD CCD 092 | CEILING DETAILS | | 4/1/2020 | | | | | 104 |
| ID8-2.8 | 95% CD CCD 092 | CEILING DETAILS | | 4/1/2020 | | | | | 105 |
| ID8-3.0 | 95% CD CCD 092 | GRAND STAIR DETAILS | | 4/1/2020 | | | | | 106 |
| ID8-4.0 | 95% CD CCD 092 | SPIRAL STAIRS DETAILS | | 4/1/2020 | | | | | 107 |
| ID8-5.0 | 95% CD CCD 092 | TERRACE FIREPLANCE | | 4/1/2020 | | | | | 108 |
| ID8-6.0 | 95% CD CCD 092 | BATHROOM DETAILS | | 4/1/2020 | | | | | 109 |
| ID9-1.0 | 95% CD CCD 092 | TYPICAL WALL PANEL DETAILS | | 4/1/2020 | | | | | 110 |
| ID9-1.1 | 95% CD CCD 092 | TYPICAL WALL PANEL DETAILS | | 4/1/2020 | | | | | 111 |
| ID9-1.2 | 95% CD CCD 092 | TYPICAL WALL PANEL DETAILS | | 4/1/2020 | | | | | 112 |
| ID9-1.3 | 95% CD CCD 092 | TYPICAL WALL PANEL DETAILS | | 4/1/2020 | | | | | 113 |
| ID9-2.0 | 95% CD CCD 092 | TYPICAL CLOSETS AND SHELVING DETAILS | | 4/1/2020 | | | | | 114 |
| ID9-3.0 | 95% CD CCD 092 | LAUNDRY ROOM DETAILS | | 4/1/2020 | | | | | 115 |
| ID9-3.1 | 95% CD CCD 092 | LAUNDRY ROOM DETAILS | | 4/1/2020 | | | | | 116 |
| ID9-4.0 | 95% CD CCD 092 | MILLWORK DETAIL AT GARAGE | | 4/1/2020 | | | | | 117 |
| ID9-5.0 | 95% CD CCD 092 | MILLOWRK DETAIL AT DINING ROOM | | 4/1/2020 | | | | | 118 |
| ID9-6.0 | 95% CD CCD 092 | MILLWORK DETAIL AT STUDY ROOM | | 4/1/2020 | | | | | 119 |
| ID9-7.0 | 95% CD CCD 092 | MILLOWRK DETAIL AT EAST HALL | | 4/1/2020 | | | | | 120 |
| ID9-8.0 | 95% CD CCD 092 | MILLWORK DETAIL AT GUEST HALL | | 4/1/2020 | | | | | 121 |
| ID9-8.1 | 95% CD CCD 092 | MILLOWRK DETAIL GUEST HALL | | 4/1/2020 | | | | | 122 |
| ID10-1.0 | 95% CD CCD 092 | DOOR TYPES | | 4/1/2020 | | | | | 123 |
| ID10-1.1 | 95% CD CCD 092 | DOORS TYPES | | 4/1/2020 | | | | | 124 |
| ID10-1.2 | 95% CD CCD 092 | DOORS DETAILS | | 4/1/2020 | | | | | 125 |
| **WIMBERLY LIGHTING COBA** | | | | | | | | | 8 |
| LD5-1.1 | CCD 092 | COBA RESIDENCE GARAGE LIGHTING PLAN | | 4/15/2020 | | | | | 1 |
| LD5-1.2 | CCD 092 | COBA RESIDENCE GARAGE LIGHTING CONTROL PLAN | | 4/15/2020 | | | | | 2 |
| LD2-1.1 | CCD 092 | COBA RESIDENCE LEVEL 2 LIGHTING PLAN | | 4/15/2020 | | | | | 3 |
| LD2-1.2 | CCD 092 | COBA RESIDENCE LEVEL 2 LIGHTING PLAN | | 4/15/2020 | | | | | 4 |
| LD3-1.1 | CCD 092 | COBA RESIDENCE LEVEL 3 LIGHTING PLAN | | 4/15/2020 | | | | | 5 |
| LD3-1.2 | CCD 092 | COBA RESIDENCE LEVEL 3 LIGHTING PLAN | | 4/15/2020 | | | | | 6 |
| LD4-1.1 | CCD 092 | COBA RESIDENCE LEVEL 4 LIGHTING PLAN | | 4/15/2020 | | | | | 7 |
| LD4-1.2 | CCD 092 | COBA RESIDENCE LEVEL 4 LIGHTING PLAN | | 4/15/2020 | | | | | 8 |
| **AXIOM DESIGN LV'S COBA** | | | | | | | | | 25 |
| ELV-0.00 | CCD 092 | TITLE SHEET AND INDEX | 4/15/2020 | | | | | | 1 |
| ELV-2.00ECC | CCD 092 | GENERAL DEVICE PLAN ENTERTAINMENT COMM AND CONTROL GARAGE PLAN | 4/15/2020 | | | | | | 2 |
| ELV-2.00PCN | CCD 092 | GENERAL DEVICE PLAN POWER AND CONDUIT GARAGE PLAN | 4/15/2020 | | | | | | 3 |
| ELV-2.00S | CCD 092 | GENERAL DEVICE PLAN SECURITY GARAGE PALN | 4/15/2020 | | | | | | 4 |
| ELV-2.01ECC | CCD 092 | GENERAL DEVICE  PLAN ENTERTAINMENT COMM CONTROL GARAGE RCP | 4/15/2020 | | | | | | 5 |
| ELV-2.01PCN | CCD 092 | GENERAL DEVICE PLAN POWER AND CONDUIT GARAGE RCP | 4/15/2020 | | | | | | 6 |
| ELV-2.01S | CCD 092 | GENERAL DEVICE PLAN SECURITY GARAGE RCP | 4/15/2020 | | | | | | 7 |
| ELV-2.10ECC | CCD 092 | GENERAL DEVICE PLAN ENTERTAINMENT COMM. AND CONTROL LEVEL 2 PLAN | 4/15/2020 | | | | | | 8 |
| ELV-2.10PCN | CCD 092 | GENERAL DEVICE PLAN POWER AND CONDUIT LEVEL 2 PLAN | 4/15/2020 | | | | | | 9 |
| ELV-2.10S | CCD 092 | GENERAL DEVICE PLAN SECURITY LEVEL 2 PLAN | 4/15/2020 | | | | | | 10 |
| ELV-2.11ECC | CCD 092 | GENERAL DEVICE PLAN ENTERTAINMENT COMM AND CONTROL LEVEL 2 RCP | 4/15/2020 | | | | | | 11 |
| ELV-2.11PCN | CCD 092 | GENERAL DEVICE PLAN POWER AND CONDUIT LEVEL 2 RCP | 4/15/2020 | | | | | | 12 |
| ELV-2.11S | CCD 092 | GENERAL DEVICE PLAN SECURITY LEVEL 2 RCP | 4/15/2020 | | | | | | 13 |
| ELV-2.20ECC | CCD 092 | GENERAL DEVICE PLAN ENTERTAINMENT COMM AND CONTROL LEVEL 3 PLAN | 4/15/2020 | | | | | | 14 |
| ELV-2.20PCN | CCD 092 | GENERAL DEVICE PLAN POWER AND CONDUIT LEVEL 3 PLAN | 4/15/2020 | | | | | | 15 |
| ELV-2.20S | CCD 092 | GENERAL DEVICE PLAN SECURITY LEVEL 3 PLAN | 4/15/2020 | | | | | | 16 |
| ELV-2.21ECC | CCD 092 | GENERAL DEVICE PLAN ENTERTAINMENT COMM AND CONTROL LEVEL 3 RCP | 4/15/2020 | | | | | | 17 |
| ELV-2.21PCN | CCD 092 | GENERAL DEVICE PLAN POWER AND CONDUIT LEVEL 3 RCP | 4/15/2020 | | | | | | 18 |
| ELV-2.21S | CCD 092 | GENERAL DEVICE PLAN SECURITY LEVEL 3 RCP | 4/15/2020 | | | | | | 19 |
| ELV-2.30ECC | CCD 092 | GENERAL DEVICE PLAN ENTERTAINMENT COM AND CONTORL LEVEL 4 PLAN | 4/15/2020 | | | | | | 20 |
| EL-2.30PCN | CCD 092 | GENERAL DEVICE PLAN POWER AND CONDUIT LEVEL 4 | 4/15/2020 | | | | | | 21 |
| ELV-2.30S | CCD 092 | GENERAL DEVICE PLAN SECURITY LEVL 4 PLAN | 4/15/2020 | | | | | | 22 |
| ELV-2.31ECC | CCD 092 | GENERAL DEVICE PLAN ENTERTAINMENT COMM AND CONTROL LEVEL 4 RCP | 4/15/2020 | | | | | | 23 |
| ELV-2.31PCN | CCD 092 | GENERAL DEVICE PLAN POWER AND CONDUIT LEVEL 4 RCP | 4/15/2020 | | | | | | 24 |
| ELV-2.31S | CCD 092 | GENERAL DEVICE PLAN SECURITY LEVEL 4 RCP | 4/15/2020 | | | | | | 25 |

## ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG UP TO CCD 108 UPDATED 07/07/2020

| Sheet Name | VERSION | Description | DESIGN DEVELOPMENT | Permit Set | REV 1 | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **NORTH TOWER CU 701** | | | | | | | | | 8 |
| A0.0N-701 | CCD 081 | COVER SHEET | | 3/11/2020 | | | | | 1 |
| A2.13N-701 | CCD 081 | FLOOR PLAN | | 3/11/2020 | | | | | 2 |
| A5.13N-701 | CCD 081 | RCP | | 3/11/2020 | | | | | 3 |
| A6.3-701 | CCD 081 | DOOR AND FINISH SCHEDULES | | 3/11/2020 | | | | | 4 |
| M3.38C-701 | CCD 081 | MECHANICAL PLAN | | 3/11/2020 | | | | | 5 |
| E3.39-701 | CCD 081 | ELECTRICAL AND FIRE ALARM PLAN | | 3/11/2020 | | | | | 6 |
| P3.38C-701 | CCD 081 | PLUMBING PLAN | | 3/11/2020 | | | | | 7 |
| FP3.38-701 | CCD 081 | FIRE PROTECTION PLAN | | 3/11/2020 | | | | | 8 |
| **NORTH TOWER CU 801** | | | | | | | | | 8 |
| A0.0S-801 | CCD 071 | COVER SHEET | | 12/10/2019 | | | | | 1 |
| A2.5N-801 | CCD 071 | FLOOR PLAN | | 12/10/2019 | | | | | 2 |
| A5.5N-801 | CCD 071 | RCP | | 12/10/2019 | | | | | 3 |
| A6.3-801 | CCD 071 | DOOR AND FINISH SCHEDULES | | 12/10/2019 | | | | | 4 |
| M3.39-801 | CCD 071 | MECHANICAL PLAN | | 12/10/2019 | | | | | 5 |
| E3.38-801 | CCD 071 | ELECTRICAL AND FIRE ALARM PLAN | | 12/10/2019 | | | | | 6 |
| P3.38-801 | CCD 071 | PLUMBING PLAN | | 12/10/2019 | | | | | 7 |
| FP3.37-801 | CCD 071 | FIRE PROTECTION PLAN | | 12/10/2019 | | | | | 8 |
| | | | | | | | | | |
| **NORTH TOWER CU 1002** | | | | | | | | | 8 |
| A0.0N-1002 | CCD 098 | COVER SHEET | | 4/23/2020 | | | | | 1 |
| A2.13N-1002 | CCD 098 | FLOOR PLAN | | 4/23/2020 | | | | | 2 |
| A5.13N-1002 | CCD 098 | RCP | | 4/23/2020 | | | | | 3 |
| A6.3-1002 | CCD 098 | DOOR AND FINISH SCHEDULE | | 4/23/2020 | | | | | 4 |
| E3.38C-1002 | CCD 098 | ELECTRICAL PLAN | | 4/23/2020 | | | | | 5 |
| FP3.37C-1002 | CCD 098 | FIRE PROTECTION PLAN | | 4/23/2020 | | | | | 6 |
| M3.38C-1002 | CCD 098 | MECHANICAL PLAN | | 4/23/2020 | | | | | 7 |
| P3.38C-1002 | CCD 098 | PLUMBING PLAN | | 4/23/2020 | | | | | 8 |
| **NORTH TOWER CU 1101** | | | | | | | | | 8 |
| A0.0N-1101 | CCD 081 | COVER SHEET | | 3/16/2020 | | | | | 1 |
| A2.13N-1101 | CCD 081 | FLOOR PLAN | | 3/16/2020 | | | | | 2 |
| A5.13N-1101 | CCD 081 | RCP | | 3/16/2020 | | | | | 3 |
| A6.3-1101 | CCD 081 | DOOR AND FINISH SCHEDULES | | 3/16/2020 | | | | | 4 |
| M3.38C-1101 | CCD 081 | MECHANICAL PLAN | | 3/16/2020 | | | | | 5 |
| E3.38C-1101 | CCD 081 | ELECTRICAL AND FIRE ALARM PLAN | | 3/16/2020 | | | | | 6 |
| P3.38C-1101 | CCD 081 | PLUMBING PLAN | | 3/16/2020 | | | | | 7 |
| FP3.37C-1101 | CCD 081 | FIRE PROTECTION PLAN | | 3/16/2020 | | | | | 8 |
| **NORTH TOWER CU 1201** | | | | | | | | | 8 |
| A0.0S-1201 | CCD 079 | COVER SHEET | | 3/2/2020 | | | | | 1 |
| A2.13N-1201 | CCD 079 | FLOOR PLAN | | 3/2/2020 | | | | | 2 |
| A5.13N-1201 | CCD 079 | RCP | | 3/2/2020 | | | | | 3 |
| A6.3-1201 | CCD 079 | DOOR AND FINISH SCHEDULES | | 3/2/2020 | | | | | 4 |
| M3.38C-1201 | CCD 079 | MECHANICAL PLAN | | 3/2/2020 | | | | | 5 |
| E3.39-1201 | CCD 079 | ELECTRICAL AND FIRE ALARM PLAN | | 3/2/2020 | | | | | 6 |
| P3.38C-1201 | CCD 079 | PLUMBING PLAN | | 3/2/2020 | | | | | 7 |
| FP3.38-1201 | CCD 079 | FIRE PROTECTION PLAN | | 3/2/2020 | | | | | 8 |
| **NORTH TOWER CU 1402** | | | | | | | | | 8 |
| A0.0N-1402 | CCD 079 | COVER SHEET | | 3/5/2020 | | | | | 1 |
| A2.23N-1402 | CCD 079 | FLOOR PLAN | | 3/5/2020 | | | | | 2 |
| A5.13N-1402 | CCD 079 | RCP | | 3/5/2020 | | | | | 3 |
| A6.3-1402 | CCD 079 | DOOR AND FINISH SCHEDULES | | 3/5/2020 | | | | | 4 |
| M3.38C-1402 | CCD 079 | MECHANICAL PLAN | | 3/5/2020 | | | | | 5 |
| E3.38C-1402 | CCD 079 | ELECTRICAL AND FIRE ALARM PLAN | | 3/5/2020 | | | | | 6 |
| P3.38C-1402 | CCD 079 | PLUMBING PLAN | | 3/5/2020 | | | | | 7 |
| FP3.37C-1402 | CCD 079 | FIRE PROTECTION PLAN | | 3/5/2020 | | | | | 8 |
| **NORTH TOWER CU 1601** | | | | | | | | | 8 |
| A0.0N-1601 | CCD 079 | COVER SHEET | | 3/12/2020 | | | | | 1 |
| A2.13N-1601 | CCD 079 | FLOOR PLAN | | 3/12/2020 | | | | | 2 |
| A5.13N-1601 | CCD 079 | RCP | | 3/12/2020 | | | | | 3 |
| A6.3-1601 | CCD 079 | DOOR AND FINISH SCHEDULES | | 3/12/2020 | | | | | 4 |
| M3.38C-1601 | CCD 079 | MECHANICAL PLAN | | 3/12/2020 | | | | | 5 |
| E3.39-1601 | CCD 079 | ELECTRICAL AND FIRE ALARM PLAN | | 3/12/2020 | | | | | 6 |
| P3.38C-1601 | CCD 079 | PLUMBING PLAN | | 3/12/2020 | | | | | 7 |
| FP3.37C-1601 | CCD 079 | FIRE PROTECTION PLAN | | 3/12/2020 | | | | | 8 |

## ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG UP TO CCD 108 UPDATED 07/07/2020

| Sheet Name | VERSION | Description | DESIGN DEVELOPMENT | Permit Set | REV 1 | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **NORTH TOWER CU 1602** | | | | | | | | | 8 |
| A0.0N-1602 | CCD 091 | COVER SHEET | | 4/14/2020 | | | | | 1 |
| A2.13N-1602 | CCD 091 | FLOOR PLAN | | 4/14/2020 | | | | | 2 |
| A5.13N-1602 | CCD 091 | RCP | | 4/14/2020 | | | | | 3 |
| A6.3-1602 | CCD 091 | DOOR AND FINISH SCHEDULES | | 4/14/2020 | | | | | 4 |
| E3.39A-1602 | CCD 091 | ELECTRICAL AND FIRE ALARM PLAN | | 4/14/2020 | | | | | 5 |
| M3.38C-1602 | CCD 091 | MECHANICAL PLAN | | 4/14/2020 | | | | | 6 |
| P3.38C-1602 | CCD 091 | PLUMBING PLAN | | 4/14/2020 | | | | | 7 |
| FP3.37C-1602 | CCD 091 | FIRE PROTECTION PLAN | | 4/14/2020 | | | | | 8 |
| | | | | | | | | | |
| | | | | | | | | | |
| **NORTH TOWER CU 1802** | | | | | | | | | 8 |
| A0.0N-1802 | CCD 084 | COVER SHEET | | 3/26/2020 | | | | | 1 |
| A2.13N-1802 | CCD 084 | FLOOR PLAN | | 3/26/2020 | | | | | 2 |
| A5.13N-1802 | CCD 084 | RCP | | 3/26/2020 | | | | | 3 |
| A6.3-1802 | CCD 084 | DOOR AND FINISH SCHEDULES | | 3/26/2020 | | | | | 4 |
| M3.38C-1802 | CCD 084 | MECHANICAL PLAN | | 3/26/2020 | | | | | 5 |
| E3.38C-1802 | CCD 084 | ELECTRICAL PLAN | | 3/26/2020 | | | | | 6 |
| P3.38C-1802 | CCD 084 | PLUMBING PLAN | | 3/26/2020 | | | | | 7 |
| FP3.37C-1802 | CCD 084 | FIRE PROTECTION PLAN | | 3/26/2020 | | | | | 8 |
| | | | | | | | | | |
| | | | | | | | | | |
| **NORTH TOWER CU 2501** | | | | | | | | | 8 |
| A0.0N-2501 | CCD 104 | COVER SHEET | | 6/1/2020 | | | | | 1 |
| A2.13N-2501 | CCD 104 | FLOOR PLAN | | 6/1/2020 | | | | | 2 |
| A5.13N-2501 | CCD 104 | RCP | | 6/1/2020 | | | | | 3 |
| A6.3-2501 | CCD 104 | DOOR AND FINISH SCHEDULES | | 6/1/2020 | | | | | 4 |
| E3.8-2501 | CCD 104 | ELECTRICAL PLAN | | 6/1/2020 | | | | | 5 |
| FP3.37-2501 | CCD 104 | FIRE PROTECTION PLAN | | 6/1/2020 | | | | | 6 |
| M3.38-2501 | CCD 104 | MECHANICAL PLAN | | 6/1/2020 | | | | | 7 |
| P3.39-2501 | CCD 104 | PLUMBING PLAN | | 6/1/2020 | | | | | 8 |
| | | | | | | | | | |
| | | | | | | | | | |
| **NORTH TOWER CU 2601** | | | | | | | | | 8 |
| A0.0N-2601 | CCD 106 | COVER SHEET | | 6/8/2020 | | | | | 1 |
| A2.13N-2601 | CCD 106 | FLOOR PLAN | | 6/8/2020 | | | | | 2 |
| A5.13N-2601 | CCD 106 | RCP | | 6/8/2020 | | | | | 3 |
| A6.3-2601 | CCD 106 | DOOR AND FINISH SCHEDULES | | 6/8/2020 | | | | | 4 |
| M3.38C-2601 | CCD 106 | MECHANICAL PLAN | | 6/8/2020 | | | | | 5 |
| E3.38C-2601 | CCD 106 | ELECTRICAL PLAN | | 6/8/2020 | | | | | 6 |
| P3.39-2601 | CCD 106 | PLUMBING PLAN | | 6/8/2020 | | | | | 7 |
| FP3.37C-2601 | CCD 106 | FIRE PROTECTION PLAN | | 6/8/2020 | | | | | 8 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **NORTH TOWER CU 3201** | | | | | | | | | 8 |
| A0.0N-3201 | CCD 091 | COVER SHEET | | 3/20/2020 | | | | | 1 |
| A2.13N-3201 | CCD 091 | FLOOR PLAN | | 3/20/2020 | | | | | 2 |
| A5.13N-3201 | CCD 091 | RCP | | 3/20/2020 | | | | | 3 |
| A6.3-3201 | CCD 091 | DOOR AND FINISH SCHEDULES | | 3/20/2020 | | | | | 4 |
| M3.38C-3201 | CCD 091 | MECHANICAL PLAN | | 3/20/2020 | | | | | 5 |
| E3.38-3201 | CCD 091 | ELECTRICAL PLAN | | 3/20/2020 | | | | | 6 |
| P3.39-3201 | CCD 091 | PLUMBING PLAN | | 3/20/2020 | | | | | 7 |
| FP3.37-3201 | CCD 091 | FIRE PROTECTION PLAN | | 3/20/2020 | | | | | 8 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG UP TO CCD 108 UPDATED 07/07/2020**

| Sheet Name | VERSION | Description | DESIGN DEVELOPMENT | Permit Set | REV 1 | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

|  |  |  |  |  |  |  |  | total | 254 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**  UPDATED: 7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 601** | | | | | | | | | 18 |
| A0.05-601 | CCD 030 | COVER SHEET- CU 601 | 5/28/2019 | 8/23/2019 | | | | | 1 |
| A2.225-601 | CCD 019 | ST CU 601 FLOOR PLAN | 5/28/2019 | | | | | | 2 |
| A5.225-601 | CCD 030 | ST CU 601 RCP | 5/28/2019 | | | | | | 3 |
| A6.3-601 | CCD 019 | ST CU 601 DOOR AND FINISH SCHEDULES | 5/28/2019 | | | | | | 4 |
| STA COVER | CCD 030 | CU 601 COVER SHEET UFFIZI | 6/25/2019 | | | | | | 5 |
| ID.001 | CCD 030 | UNIT 601 UFFIZI INDEX KEY SYMBOLS | 6/25/2019 | | | | | | 6 |
| ID.100 | CCD 030 | UNIT 601 UFFIZI FLOOR PLAN | 6/25/2019 | | | | | | 7 |
| ID.101 | CCD 030 | UNIT 601 UFFIZI FLOOR FINISH PLAN | 6/25/2019 | | | | | | 8 |
| ID.200 | CCD 030 | UNIT 601 UFFIZI ENLARGED PLANS AND ELEVATIONS | 6/25/2019 | | | | | | 9 |
| LC6.01-601 | CCD 030 | LIGHTING ZONING CEILING PLAN UFFIZI UNIT 601 | 7/25/2019 | | | | | | 10 |
| LC6.02-601 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN UFFIZI UNIT 601 | 7/25/2019 | | | | | | 11 |
| LC6.03-601 | CCD 030 | SHADING CONTROL SYSTEM RCP UFFIZI UNIT 601 | 7/25/2019 | | | | | | 12 |
| LC6.04-601 | CCD 030 | HVAC CONTROL SYSTEM FLOOR PLAN UFFIZI UNIT 601 | 7/25/2019 | | | | | | 13 |
| LV6.01-601 | CCD 030 | SECURITY AND AV UNIT 601 FLOOR PLAN UFFIZI | 7/25/2019 | | | | | | 14 |
| M3.22-601 | CCD 019 | ST CU 601 MECHANICAL PLAN | 5/28/2019 | | | | | | 15 |
| E3.22-601 | CCD 019 | ST CU 601 ELECTRICAL PLAN | 5/28/2019 | | | | | | 16 |
| P2.16-601 | CCD 019 | ST CU 601 PLUMBING PLAN | 5/28/2019 | | | | | | 17 |
| FP3.22-601 | CCD 019 | ST CU 601 FIRE PROTECTION PLAN | 5/28/2019 | | | | | | 18 |
| **SOUTH TOWER UNIT 604** | | | | | | | | | 27 |
| A0.05-604 | CCD 046 | COVER SHEET CU 604 | 9/25/2019 | 11/8/2019 | | | | | 1 |
| A2.215-604 | CCD 40 | ST CU 604 FLOOR PLAN | 9/25/2019 | | | | | | 2 |
| A5.215-604 | CCD 40 | ST CU 604 RCP | 9/25/2019 | | | | | | 3 |
| A6.3-604 | CCD 40 | ST CU 604 DOOR AND FINISH SCHEDULES | 9/25/2019 | | | | | | 4 |
| STA COVER | CCD 046 | UNIT 604 COVER SHEET | 11/8/2019 | | | | | | 5 |
| ID.001 | CCD 046 | UNIT 604 DONATELLO INDEX KEY SYMBOLS | 11/8/2019 | | | | | | 6 |
| ID.100 | CCD 046 | UNIT 604 FLOOR PLAN | 11/8/2019 | | | | | | 7 |
| ID.101 | CCD 046 | UNIT 604 FLOOR FINISH POWER AND RCP | 11/8/2019 | | | | | | 8 |
| ID.200 | CCD 046 | UNIT 604 ENLARGED PLANS AND ELEVATIONS | 11/8/2019 | | | | | | 9 |
| LC1.01-604 | CCD 046 | LC LEGEND AND SYMBOLS | 12/20/2017 | | 1/10/2020 | | | | 10 |
| LC2.01-604 | CCD 046 | LC DETAIL CLS-2DIM8 DIMMER MODULE | 12/20/2017 | | 1/10/2020 | | | | 11 |
| LC2.02-604 | CCD 046 | LC DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | 1/10/2020 | | | | 12 |
| LC2.03-604 | CCD 046 | LC DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | 1/10/2020 | | | | 13 |
| LC2.04-604 | CCD 046 | LC DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | 1/10/2020 | | | | 14 |
| LC2.05-604 | CCD 046 | LC DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | 1/10/2020 | | | | 15 |
| LC2.06-604 | CCD 046 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | 1/10/2020 | | | | 16 |
| LC6.01-604 | CCD 046 | LIGHTING ZONING RCP UNIT 604 | 12/20/2017 | | 1/10/2020 | | | | 17 |
| LC6.02-604 | CCD 046 | LC FLOOR PLAN UNIT 604 | 12/20/2017 | | 1/10/2020 | | | | 18 |
| LC6.03-604 | CCD 046 | SHADING CONTROL SYSTEM RCP UNIT 604 | 12/20/2017 | | 1/10/2020 | | | | 19 |
| LC6.04-604 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN UNIT 604 | 12/20/2017 | | 1/10/2020 | | | | 20 |
| LV1.01-604 | CCD 046 | SECURITY AND AV LEGEND AND SYMBOLS | 12/20/2017 | 1/10/2020 | | | | | 21 |
| LV2.01-604 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | 1/10/2020 | | | | | 22 |
| LV6.01-604 | CCD 046 | SECURITY AND AV UNIT 604 FLOOR PLAN | 12/20/2017 | 1/10/2020 | | | | | 23 |
| M3.21A-604 | CCD 40 | ST CU 604 MECHANICAL PLAN | 9/25/2019 | | | | | | 24 |
| E3.21-604 | CCD 40 | ST CU 604 ELECTRICAL PLAN | 9/25/2019 | | | | | | 25 |
| P2.16-604 | CCD 40 | ST CU 604 PLUMBING PLAN | 9/25/2019 | | | | | | 26 |
| FP3.21A-604 | CCD 40 | ST CU 604 FIRE PROTECTION PLAN | 9/25/2019 | | | | | | 27 |
| **SOUTH TOWER  704** | | | | | | | | | 17 |
| A0.05-704 | CCD 030 | COVER SHEET | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.215-704 | CCD 005 | SOUTH TOWER CUSTOM UNIT 704 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.215-704 | CCD 030 | ST CU 704 RCP | 2/22/2019 | | | | | | 3 |
| STA COVER | CCD 030 | CUSTOM UNIT 704 DONATELLO COVER SHEET | 6/11/2019 | | | | | | 4 |
| ID.001 | CCD 030 | CU 704 DONATELLO INDEX KEY SYMBOLS | 6/11/2019 | | | | | | 5 |
| ID.100 | CCD 030 | UNIT 704 DONATELLO FLOOR PLAN | 6/11/2019 | | | | | | 6 |
| ID.101 | CCD 030 | UNIT 704 DONATELLO FLOOR FINISH PLAN | 6/11/2019 | | | | | | 7 |
| ID.200 | CCD 030 | UNIT 704 DONATELLO ENLARGED PLANS AND ELEVATIONS | 6/11/2019 | | | | | | 8 |
| LC6.01-704 | CCD 030 | MODULES AND ENCLOSURE DONATELLO UNIT 704 | | | 7/25/2019 | | | | 9 |
| LC6.02-704 | CCD 030 | LIGHTING CONTROL SYSTEM ONE LINE RISER DONATELLO UNIT 704 | | | 7/25/2019 | | | | 10 |
| LC6.03-704 | CCD 030 | SHADING CONTROL SYSTEM ONE LINE RISER DONATELLO UNIT 704 | | | 7/25/2019 | | | | 11 |
| LC6.04-704 | CCD 030 | HVAC CONTROL SYSTEM FLOOR PLAN DONATELLO UNIT 704 | | | 7/25/2019 | | | | 12 |
| LV6.01-704 | CCD 030 | SECURITY AND AV UNIT 704 FLOOR PLAN DONATELLO | | | 7/25/2019 | | | | 13 |
| M3.21-704 | CCD 005 | ST CU 704 MECHANICAL PLAN | 2/22/2019 | | | | | | 14 |
| E3.21-704 | CCD 005 | ST CU 704 ELECTRICAL PLAN | 2/22/2019 | | | | | | 15 |
| FP3.21-704 | CCD 005 | ST CU 704 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 16 |
| P2.16-704 | CCD 005 | ST CUSTOM UNIT 704 PLUMBING PLAN | 2/22/2019 | | | | | | 17 |
| **SOUTH TOWER UNIT 802** | | | | | | | | | 18 |
| A0.05-802 | CCD 030 | COVER SHEET CU 802 | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.205-802 | CCD 005 | ST CU 802 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.205-802 | CCD 005 | ST CU 802 RCP | 2/22/2019 | | | | | | 3 |
| A6.3-802 | CCD 005 | ST-CUSTOM UNIT 802 DOOR AND FINISH SCHEDULES | 2/22/2019 | | | | | | 4 |
| STA COVER | CCD 030 | CUSTOM UNIT 802 VECCHIO COVER SHEET | 6/11/2019 | | | | | | 5 |
| ID.001 | CCD 030 | CU 802 VECCHIO INDEX KEY SYMBOLS | 6/11/2019 | | | | | | 6 |
| ID.100 | CCD 030 | UNIT 802 VECCHIO FLOOR PLAN | 6/11/2019 | | | | | | 7 |
| ID.101 | CCD 030 | UNIT 802 VECCHIO FLOOR FINISH PLAN | 6/11/2019 | | | | | | 8 |
| ID.200 | CCD 030 | UNIT 802 VECCHIO ENLARGED PLANS AND ELEVATIONS | 6/11/2019 | | | | | | 9 |
| LC6.01-802 | CCD 030 | LIGHTING ZONISN RCP VECCHIO 2 UNIT 802 -MODULES AND ENCLOSURE VECCHIO 2 UNIT 802 | | | 7/25/2019 | | | | 10 |
| LC6.02-802 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN AND RISER VECCHIO 2 | | | 7/25/2019 | | | | 11 |
| LC6.03-802 | CCD 030 | SHADING CONTROL SYSTEM AND RISER CU 802 VECCHIO 2 | | | 7/25/2019 | | | | 12 |
| LC6.04-802 | CCD 030 | HVAC CONTROL SYSTEM PLAN AND LIGHTING CONTROL SYSTEM RISER VECCHIO 2 UNIT 802 | | | 7/25/2019 | | | | 13 |
| LV6.01-802 | CCD 030 | SECURITY AND AV UNIT 802 FLOOR PLAN VECCHIO 2 | | | 7/25/2019 | | | | 14 |
| M3.20-802 | CCD 005 | ST CU 802 MECHANICAL PLAN | 2/22/2019 | | | | | | 15 |
| E3.20-802 | CCD 005 | ST CU 802 ELECTRICAL PLAN | 2/22/2019 | | | | | | 16 |
| FP3.20-802 | CCD 005 | ST CU 802 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 17 |
| P2.15A-802 | CCD 005 | ST CU 802 PLUMBING PLAN | 2/22/2019 | | | | | | 18 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 803** | | | | | | | | | 26 |
| A0.05-803 | CCD 046 | COVER SHEET ST CU 803 | 7/10/2019 | 11/8/2019 | | | | | 1 |
| A2.215-803 | CCD 026 | ST CU 803 FLOOR PLAN | 7/10/2019 | | | | | | 2 |
| A5.215-803 | CCD 026 | ST CU 803 RCP | 7/10/2019 | | | | | | 3 |
| A6.3-803 | CCD 026 | ST CU 803 DOOR AND FINSH SCHEDULE | 7/10/2019 | | | | | | 4 |
| STA COVER | CCD 046 | | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 046 | UNIT 803 VECCHIO INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 046 | UNIT 803 FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| ID.200 | CCD 046 | UNIT 803 ENLARGED PLANS AND ELEVATIONS | 9/13/2019 | | | | | | 8 |
| LC.01-803 | CCD 046 | LC LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-803 | CCD 046 | LC DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-803 | CCD 046 | LIGHTING CONTROL DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-803 | CCD 046 | LC DETAIL CLX-2DIMFLVB DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-803 | CCD 046 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-803 | CCD 046 | LC DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-803 | CCD 046 | SHADING CONTROL SYSTEM PERWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-803 | CCD 046 | LIGHTING ZONING RCP UNIT 803 | 12/20/2017 | | | | | | 16 |
| LC6.02-803 | CCD 046 | LC FLOOR PLAN UNIT 803 | 12/20/2017 | | | | | | 17 |
| LC6.03-803 | CCD 046 | SHADING CONTROL SYSTME RCP UNIT 803 | 12/20/2017 | | | | | | 18 |
| LC6.04-803 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN UNIT 803 | 12/20/2017 | | | | | | 19 |
| LV1.01-803 | CCD 046 | SECURITY AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-803 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-803 | CCD 046 | SECURITY AND AV UNIT 803 FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| M3.21A-803 | CCD 026 | ST CU 803 MECHANICAL PLAN | 7/10/2019 | | | | | | 23 |
| E3.20A-803 | CCD 026 | ST CU 803 ELECTRICAL PLAN | 7/10/2019 | | | | | | 24 |
| P2.15A-803 | CCD 026 | ST CU 803 PLUMBING PLAN | 7/10/2019 | | | | | | 25 |
| FP3.21A-803 | CCD 026 | ST CU 803 FIRE PROTECTION PLAN | 7/10/2019 | | | | | | 26 |
| **SOUTH TOWER UNIT 804** | | | | | | | | | 17 |
| A0.05-804 | CCD 030 | COVER SHEET | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.215-804 | CCD 005 | SOUTH TOWER CUSTOM UNIT 804 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.215-804 | CCD 005 | ST CU 804 RCP | 2/22/2019 | | | | | | 3 |
| STA COVER | CCD 030 | CUSTOM UNIT 804 DONATELLO COVER SHEET | 6/11/2019 | | | | | | 4 |
| ID.001 | CCD 030 | UNIT 804 INDEX KEY SYMBOLS | 6/11/2019 | | | | | | 5 |
| ID.100 | CCD 030 | UNIT 804 DONATELLO FLOOR PLAN | 6/11/2019 | | | | | | 6 |
| ID.101 | CCD 030 | UNIT 804 DONATELLO FLOOR FINISH PLAN | 6/11/2019 | | | | | | 7 |
| ID.200 | CCD 030 | UNIT 804 DONATELLO ENLARGED PLANS AND ELEVATIONS | 6/11/2019 | | | | | | 8 |
| LC6.01-804 | CCD 030 | LIGHTING ZONING RCP AND MODULES AND ENCLOSURE DONATELLO UNIT 804 | | | 7/25/2019 | | | | 9 |
| LC6.02-804 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN AND RISER DONATELLO UNIT 804 | | | 7/25/2019 | | | | 10 |
| LC6.03-804 | CCD 030 | SHADING CONTROL SYSTEM ONE LINE RISER AND RCP DONATELLO UNIT 804 | | | 7/25/2019 | | | | 11 |
| LC6.04-804 | CCD 030 | LIGHTING CONTROL SYSTEM RISER AND HVAC CONTROL SYSTEM FLOOR PLAN DONATELLO UNIT 804 | | | 7/25/2019 | | | | 12 |
| LV6.01-804 | CCD 030 | SECURITY AND AV UNIT 804 FLOOR PLAN DONATELLO | | | 7/25/2019 | | | | 13 |
| M3.21-804 | CCD 005 | ST CU 804 MECHANICAL PLAN | 2/22/2019 | | | | | | 14 |
| E3.21-804 | CCD 005 | ST CU 804 ELECTRICAL PLAN | 2/22/2019 | | | | | | 15 |
| FP3.21-804 | CCD 005 | ST CU 804 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 16 |
| P2.16-804 | CCD 005 | ST CUSTOM UNIT 804 PLUMBING PLAN | 2/22/2019 | | | | | | 17 |
| **SOUTH TOWER UNIT 901** | | | | | | | | | 18 |
| A0.05-901 | CCD 005 | COVER SHEET CU 802 | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.205-901 | CCD 005 | SOUTH TOWER CUSTOM UNIT 901 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.205-901 | CCD 005 | ST CU 901 RCP | 2/22/2019 | | | | | | 3 |
| A6.3-901 | CCD 005 | ST-CUSTOM UNIT 901 DOOR AND FINISH SCHEDULES | 2/22/2019 | | | | | | 4 |
| STA COVER | CCD 030 | CUSTOM UNIT 901 UFFIZI COVER SHEET | 6/11/2019 | | | | | | 5 |
| ID.001 | CCD 030 | INDEX KEY SYMBOLS | 6/11/2019 | | | | | | 6 |
| ID.100 | CCD 030 | UNIT 901 UFFIZI FLOOR PLAN | 6/11/2019 | | | | | | 7 |
| ID.101 | CCD 030 | UNIT 901 UFFIZI FLOOR FINISH PLAN | 6/11/2019 | | | | | | 8 |
| ID.200 | CCD 030 | UNIT 901 UFFIZI ENLARGED PLANS AND ELEVATIONS | 6/11/2019 | | | | | | 9 |
| LC6.01-901 | CCD 030 | LIGHTING ZONING RCP& MODULES AND ENCLOSURE UFFIZI UNIT 901 | | | 7/25/2019 | | | | 10 |
| LC6.02-901 | CCD 030 | LIGHTING CONTROL SYSTEM RISER AND RCP UFFIZI UNIT 901 | | | 7/25/2019 | | | | 11 |
| LC6.03-901 | CCD 030 | SHADING CONTROL SYSTEM RISER AND RCP UFFIZI UNIT 901 | | | 7/25/2019 | | | | 12 |
| LC6.04-901 | CCD 030 | LIGHTING CONTROL SYSTEM RISER AND HVAC CONTROL FLOOR PLAN UFFIZI UNIT 901 | | | 7/25/2019 | | | | 13 |
| LV6.01-901 | CCD 030 | SECURITY AND AV UNIT 901 FLOOR PLAN UFFIZI | | | 7/25/2019 | | | | 14 |
| M3.20-901 | CCD 005 | ST CU 901 MECHANICAL PLAN | 2/22/2019 | | | | | | 15 |
| E3.20-901 | CCD 005 | ST CU 901 ELECTRICAL PLAN | 2/22/2019 | | | | | | 16 |
| FP3.20-901 | CCD 005 | ST CU 901 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 17 |
| P2.15A-901 | CCD 005 | ST CU 901 PLUMBING PLAN | 2/22/2019 | | | | | | 18 |
| **SOUTH TOWER UNIT 904** | | | | | | | | | 17 |
| A0.05-904 | CCD 030 | COVER SHEET | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.215-904 | CCD 005 | SOUTH TOWER CUSTOM UNIT 904 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.215-904 | CCD 005 | ST CU 904 RCP | 2/22/2019 | | | | | | 3 |
| STA COVER | CCD 030 | COVER SHEET CU 904 | 6/11/2019 | | | | | | 4 |
| ID.001 | CCD 030 | Index Key Symbols CU 904 | 6/11/2019 | | | | | | 5 |
| ID.100 | CCD 030 | UNIT 904 DONATELLO FLOOR PLAN | 6/11/2019 | | | | | | 6 |
| ID.101 | CCD 030 | UNIT 904 DONATELLO FLOOR FINISH PLAN | 6/11/2019 | | | | | | 7 |
| ID.200 | CCD 030 | UNIT 904 DONATELLO ENLARGED PLANS & ELEVATIONS | 6/11/2019 | | | | | | 8 |
| LC6.01-904 | CCD 030 | LIGHTING ZONING RCP DONATELLO UNIT 904 | | | 7/25/2019 | | | | 9 |
| LC6.02-904 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN DONATELLO UNIT904 | | | 7/25/2019 | | | | 10 |
| LC6.03-904 | CCD 030 | SHADING CONTROL SYSTEM RCP DONATELLO UNIT 904 | | | 7/25/2019 | | | | 11 |
| LC6.04-904 | CCD 030 | HVAC CONTROL SYSTEM FLOOR PLAN DONATELLO UNIT 904 | | | 7/25/2019 | | | | 12 |
| LV6.01-904 | CCD 030 | SECURITY &AV UNIT 904 FLOOR PLAN DONATELLO | | | 7/25/2019 | | | | 13 |
| M3.21-904 | CCD 005 | ST CU 904 MECHANICAL PLAN | 2/22/2019 | | | | | | 14 |
| E3.21-904 | CCD 005 | ST CU 904 ELECTRICAL PLAN | 2/22/2019 | | | | | | 15 |
| FP3.21-904 | CCD 005 | ST CU 904 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 16 |
| P2.16-904 | CCD 005 | ST CUSTOM UNIT 904 PLUMBING PLAN | 2/22/2019 | | | | | | 17 |
| **SOUTH TOWER UNIT 1001** | | | | | | | | | 18 |
| A0.05-1001 | CCD 030 | COVER SHEET CU 1001 | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.205-1001 | CCD 005 | SOUTH TOWER CUSTOM UNIT 1001 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.205-1001 | CCD 005 | ST CU 1001 RCP | 2/22/2019 | | | | | | 3 |
| A6.3-1001 | CCD 005 | ST-CUSTOM UNIT 1001 DOOR AND FINISH SCHEDULES | 2/22/2019 | | | | | | 4 |
| STA COVER | CCD 030 | COVER SHEET CU 1001 UFFIZI | 6/11/2019 | | | | | | 5 |
| ID.001 | CCD 030 | INDEX DEY SYMBOLS | 6/11/2019 | | | | | | 6 |
| ID.100 | CCD 030 | UNIT 1001 UFFIZI FLOOR PLAN | 6/11/2019 | | | | | | 7 |
| ID.101 | CCD 030 | UNIT 1001 UFFIZI FINISH FLOOR PLAN | 6/11/2019 | | | | | | 8 |
| ID.200 | CCD 030 | UNIT 1001 UFFIZI ENLARGED PLANS & ELEVATIONS | 6/11/2019 | | | | | | 9 |
| LC6.01-1001 | CCD 030 | LIGHTING ZONING RCP UFFIZI UNIT 1001 | | | 7/25/2019 | | | | 10 |
| LC6.02-1001 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN UFFIZI UNIT 1001 | | | 7/25/2019 | | | | 11 |
| LC6.03-1001 | CCD 030 | SHADING CONTROL SYSTEM RCP UFFIZI UNIT 1001 | | | 7/25/2019 | | | | 12 |
| LC6.04-1001 | CCD 030 | HVAC CONTROL SYSTEM FLOOR PLAN UFFIZI UNIT 1001 | | | 7/25/2019 | | | | 13 |
| LV6.01-1001 | CCD 030 | SECURITY & AV UNIT 1001 FLOOR PLAN UFFIZI | | | 7/25/2019 | | | | 14 |
| M3.22-1001 | CCD 005 | ST CU 1001 MECHANICAL PLAN | 2/22/2019 | | | | | | 15 |
| E3.22-1001 | CCD 005 | ST CU 1001 ELECTRICAL PLAN | 2/22/2019 | | | | | | 16 |
| FP3.22-1001 | CCD 005 | ST CU 1001 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 17 |
| P2.15A-1001 | CCD 005 | ST CU 1001 PLUMBING PLAN | 2/22/2019 | | | | | | 18 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**   UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 1101** | | | | | | | | | 18 |
| A0.05-1101 | CCD 030 | COVER SHEET | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.25S-1101 | CCD 008 | ST-CUSTOM UNITS 1101 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.25S-1101 | CCD 008 | ST-CUSTOM UNIT 1101 RCP | 2/22/2019 | | | | | | 3 |
| A6.3-1101 | CCD 008 | ST-CUSTOM UNIT 1101 DOOR AND FINISH SCHEDULE | 2/22/2019 | | | | | | 4 |
| STA COVER | CCD 030 | COVER SHEET CU 1101 UFFIZI | 6/25/2019 | | | | | | 5 |
| ID.001 | CCD 030 | UNIT 1101 UFFIZI INDEX KEY SYMBOLS | 6/25/2019 | | | | | | 6 |
| ID.100 | CCD 030 | UNIT 1101 UFFIZI FLOOR PLAN | 6/25/2019 | | | | | | 7 |
| ID.101 | CCD 030 | UNIT 1101 UFFIZI FLOOR FINISH PLAN | 6/25/2019 | | | | | | 8 |
| ID.102 | CCD 030 | UNIT 1101 UFFIZI RCP | 6/25/2019 | | | | | | 9 |
| LC6.01-1101 | CCD 030 | MODULES AND ENCLOSURE LIGHTING ZONING RCP UFFIZI 1101 | | | 7/25/2019 | | | | 10 |
| LC6.02-1101 | CCD 030 | LIGHTING CONTROL SYSTEM RISER AND FLOOR PLAN UFFIZI 1101 | | | 7/25/2019 | | | | 11 |
| LC6.03-1101 | CCD 030 | SHADING CONTROL RISER AND RCP UFFIZI UNIT 1101 | | | 7/25/2019 | | | | 12 |
| LC6.04-1101 | CCD 030 | HVAC CONTROL SYSTEM FLOOR PLAN AND LIGHTING CONTROL RISER UFFIZI 1101 | | | 7/25/2019 | | | | 13 |
| LV6.01-1101 | CCD 030 | SECURITY AND AV UNIT 1101 FLOOR PLAN UFFIZI | | | 7/25/2019 | | | | 14 |
| M3.20-1101 | CCD 008 | ST-CU 1101 MECHANICAL PLAN | 2/22/2019 | | | | | | 15 |
| E3.20-1101 | CCD 008 | ST-CU 1101 ELECTRICAL PLAN | 2/22/2019 | | | | | | 16 |
| FP3.20-1101 | CCD 008 | ST-CU 1101 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 17 |
| P2.15A | CCD 008 | ST-CU 1101 PLUMBING PLAN | 2/22/2019 | | | | | | 18 |
| **SOUTH TOWER UNIT 1102** | | | | | | | | | 18 |
| A0.05-1102 | CCD 030 | COVER SHEET CU 1102 | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.205-1102 | CCD 005 | SOUTH TOWER CUSTOM UNIT 1102 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.205-1102 | CCD 005 | ST CU 1102 RCP | 2/22/2019 | | | | | | 3 |
| A6.3-1102 | CCD 005 | ST-CUSTOM UNIT 1102 DOOR AND FINISH SCHEDULES | 2/22/2019 | | | | | | 4 |
| STA COVER | CCD 030 | COVER SHEET CU 1102 VECCHIO | 6/25/2019 | | | | | | 5 |
| ID.001 | CCD 030 | INDEX DEY SYMBOLS | 6/25/2019 | | | | | | 6 |
| ID.100 | CCD 030 | UNIT 1102 VECCHIO FLOOR PLAN | 6/25/2019 | | | | | | 7 |
| ID.101 | CCD 030 | UNIT 1102 VECCHIOFINISH FLOOR PLAN | 6/25/2019 | | | | | | 8 |
| ID.200 | CCD 030 | UNIT 1102 VECCHIOENLARGED PLANS & ELEVATIONS | 6/25/2019 | | | | | | 9 |
| LC6.01-1102 | CCD 030 | LIGHTING ZONING RCP VECCHIO UNIT 1102 | | | 7/25/2019 | | | | 10 |
| LC6.02-1102 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN VECCHIO 2 UNIT 1102 | | | 7/25/2019 | | | | 11 |
| LC6.03-1102 | CCD 030 | SHADING CONTROL SYSTEM RCP VECCHIO 2 UNIT 1102 | | | 7/25/2019 | | | | 12 |
| LC6.04-1102 | CCD 030 | HVAC CONTROL SYSTEM FLOOR PLAN VECCHIO 2 UNIT 1102 | | | 7/25/2019 | | | | 13 |
| LV6.01-1102 | CCD 030 | SECURITY & AV UNIT 1102 VECCHIO | | | 7/25/2019 | | | | 14 |
| M3.20-1102 | CCD 005 | ST CU 1102 MECHANICAL PLAN | 2/22/2019 | | | | | | 15 |
| E3.20-1102 | CCD 005 | ST CU 1102 ELECTRICAL PLAN | 2/22/2019 | | | | | | 16 |
| FP3.20-1102 | CCD 005 | ST CU 1102 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 17 |
| P2.15A-1102 | CCD 005 | ST CU 1102  PLUMBING PLAN | 2/22/2019 | | | | | | 18 |
| **SOUTH TOWER UNIT 1103** | | | | | | | | | 19 |
| A0.05-1103 | CCD 030 | COVER SHEET CU 1103 | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.215-1103 | CCD 010 | ST CU 1103 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.21S | CCD 010 | ST CU 1103 RCP | 2/22/2019 | | | | | | 3 |
| A6.3-1103 | CCD 010 | ST CU 1103 DOOR AND FINISH SCHEDULES | 2/22/2019 | | | | | | 4 |
| STA COVER | CCD 030 | UNIT 1103 CUSTOM VECCHIO COVER | 6/25/2019 | | | | | | 5 |
| ID.001 | CCD 030 | UNIT 1103 VECCHIO INDEX KEY SYMBOLS | 6/19/2019 | | | | | | 6 |
| ID.100 | CCD 030 | UNIT 1103 VECCHIO FLOOR PLAN | 6/19/2019 | | | | | | 7 |
| ID.101 | CCD 030 | UNIT 1103 VECCHIO FLOOR FINISH PLAN | 6/19/2019 | | | | | | 8 |
| ID.102 | CCD 030 | UNIT 1103 VECCHIO RCP | 6/19/2019 | | | | | | 9 |
| ID.200 | CCD 030 | UNIT 1103 VECCHIO ENLARGED PLANS AND ELEVATIONS | 6/19/2019 | | | | | | 10 |
| LC6.01-1103 | CCD 030 | LIGHTING ZONING RCP BECCHIO UNIT 1103 | | | 7/25/2019 | | | | 11 |
| LC6.02-1103 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN BECCHIO UNIT 1103 | 12/20/2017 | | 7/25/2019 | | | | 12 |
| LC6.03-1103 | CCD 030 | SHADING CONTROL SYSTEM RCP VECCCHIO UNIT 1103 | 12/20/2017 | | 7/25/2019 | | | | 13 |
| LC6.04-1103 | CCD 030 | HVAC CONTROL SYSTEM FLOOR PLAN VECCHIO UNIT 1103 | 12/20/2017 | | 7/25/2019 | | | | 14 |
| LV6.01-1103 | CCD 030 | SECURITY & AV UNIT 1103 FLOOR PLAN VECCHIO | 12/20/2017 | | 7/25/2019 | | | | 15 |
| M3.10-1103 | CCD 010 | ST CU 1103 MECHANICAL PLAN | 2/22/2019 | | | | | | 16 |
| E3.09-1103 | CCD 010 | ST CU 1103 ELECTRICAL PLAN | 2/22/2019 | | | | | | 17 |
| FP3.10-1103 | CCD 010 | ST CU 1103 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 18 |
| P2.15A-1103 | CCD 010 | ST CU 1103 PLUMBING PLAN | 2/22/2019 | | | | | | 19 |
| **SOUTH TOWER UNIT 1104** | | | | | | | | | 24 |
| A0.05-1104 | CCD 046 | COVER SHEET | 2/22/2019 | 7/25/2019 | | 11/8/2019 | | | 1 |
| A2.21s-1104 | CCD 032 | ST CU 1104 FLOOR PLAN | | 7/25/2019 | | 9/17/2019 | | | 2 |
| A5.21S-1104 | CCD 032 | ST- CUSTOM UNIT 1104 RCP | 2/22/2019 | 7/25/2019 | | 9/17/2019 | | | 3 |
| STA COVER | CCD 046 | COVER SHEET CU 1104 DONATELLO | 9/27/2019 | | | | | | 4 |
| ID.001 | CCD 046 | UNIT 1104 DONATELLO INDEX KEY SYMBOLS | 9/27/2019 | | | | | | 5 |
| ID.100 | CCD 046 | UNIT 1104 DONATELLO FLOOR PLAN | 9/27/2019 | | | | | | 6 |
| LC1.01-1104 | CCD 046 | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIM8 DIMMER MOD | 12/20/2017 | | | | | | 7 |
| LC2.02-1104 | CCD 046 | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMU8 DIMMER MOD | 12/20/2017 | | | | | | 8 |
| LC2.03-1104 | CCD 046 | LIGHTING CONTROL SYSTEM DETAIL CLX-2DIMFLV8 DIMMER MOD | 12/20/2017 | | | | | | 9 |
| LC2.04-1104 | CCD 046 | LIGHTING CONTROL SYSTEM DETAIL CAEN BLOCK & PROCESSOR | 12/20/2017 | | | | | | 10 |
| LC2.05-1104 | CCD 046 | LC SYSTEMS DETAIL C2N-CBC-P KEYPAD | 12/20/2017 | | | | | | 11 |
| LC2.06-1104 | CCD 046 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 12 |
| LC6.01-1104 | CCD 046 | LIGHTING ZONING RCP DONATELLO UNIT 1104 | 12/20/2017 | | | | | | 13 |
| LC6.02-1104 | CCD 046 | LIGHTING CONTROL SYSTEM RCP DONATELLO UNIT 1104 | 12/20/2017 | | | | | | 14 |
| LC6.03-1104 | CCD 046 | SHADING CONTROL SYSTEM RCP DONATELLO UNIT 1104 | 12/20/2017 | | | | | | 15 |
| LC6.04-1104 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LV1.01-1104 | CCD 046 | SECURITY AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 17 |
| LV2.01-1104 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 18 |
| LV6.01-1104 | CCD 046 | SECURIEY AND AV UNIT 1104 FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| M3.21-1104 | CCD 032 | ST-CU 1104 MECHANICAL PLAN | 2/22/2019 | 7/25/2019 | | 9/17/2019 | | | 20 |
| E3.21-1104 | CCD 032 | ST-CU 1104ELECTRICAL PLAN | 2/22/2019 | 7/25/2019 | | 9/17/2019 | | | 21 |
| FP3.21-1104 | CCD 032 | ST-CU 1104 FIRE PROTECTION PLAN | 2/22/2019 | 7/25/2019 | | 9/17/2019 | | | 22 |
| P2.15A-1104 | CCD 032 | ST-CU 1104 PLUMBING PLAN | 2/22/2019 | 7/25/2019 | | 9/17/2019 | | | 23 |
| **SOUTH TOWER UNIT 1202** | | | | | | | | | 19 |
| A0.05-1202 | CCD 030 | COVER SHEET CU 1202 | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.205-1202 | CCD 005 | SOUTH TOWER CUSTOM UNIT 1202 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.205-1202 | CCD 005 | ST CU 1202 RCP | 2/22/2019 | | | | | | 3 |
| A6.3-1202 | CCD 005 | ST-CUSTOM UNIT 1202 DOOR AND FINISH SCHEDULES | 2/22/2019 | | | | | | 4 |
| STA COVER | CCD 030 | COVER SHEET CU 1202 VECCHIO | 6/25/2019 | | | | | | 5 |
| ID.001 | CCD 030 | INDEX DEY SYMBOLS UNIT 1202 VECCHIO | 6/25/2019 | | | | | | 6 |
| ID.100 | CCD 030 | UNIT 1202 VECCHIO FLOOR PLAN | 6/25/2019 | | | | | | 7 |
| ID.101 | CCD 030 | UNIT 1202 VECCHIOFINISH FLOOR PLAN | 6/25/2019 | | | | | | 8 |
| ID.102 | CCD 030 | UNIT 1202 VECCHIO RCP | 6/25/2019 | | | | | | 9 |
| ID.200 | CCD 030 | UNIT 1202 VECCHIOENLARGED PLANS & ELEVATIONS | 6/25/2019 | | | | | | 10 |
| LC6.01-1202 | CCD 030 | LIGHTING ZONING RCP VECCHIO UNIT 1202 | | | 7/25/2019 | | | | 11 |
| LC6.02-1202 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN VECCHIO  UNIT 1202 | | | 7/25/2019 | | | | 12 |
| LC6.03-1202 | CCD 030 | SHADING CONTROL SYSTEM RCP VECCHIO  UNIT 1202 | | | 7/25/2019 | | | | 13 |
| LC6.04-1202 | CCD 030 | HVAC CONTROL SYSTEM FLOOR PLAN VECCHIO  UNIT 1202 | | | 7/25/2019 | | | | 14 |
| LV6.01-1202 | CCD 030 | SECURITY & AV UNIT 1202 VECCHIO | | | 7/25/2019 | | | | 15 |
| M3.20-1202 | CCD 005 | ST CU 1202 MECHANICAL PLAN | 2/22/2019 | | | | | | 16 |
| E3.20-1202 | CCD 005 | ST CU 1202 ELECTRICAL PLAN | 2/22/2019 | | | | | | 17 |
| FP3.20-1202 | CCD 005 | ST CU 1202 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 18 |
| P2.15A-1202 | CCD 005 | ST CU 1202  PLUMBING PLAN | 2/22/2019 | | | | | | 19 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**   UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 1203-04** | | | | | | | | | 35 |
| A0.05-1203-04 | CCD 056 | Cover Sheet -Custom Unit 1203-04 | 4/12/2019 | 8/23/2019 | | 11/14/2019 | | | 1 |
| A2.05-1203-04 | CCD 056 | SOUTH TOWER -CUSTOM UNIT 1203-04 FLOOR PLAN | 4/12/2019 | | | 11/14/2019 | | | 2 |
| A5.05-1203-04 | CCD 056 | SOUTH TOWER CUSTOM UNIT 1203-04 RCP | 4/12/2019 | | | 11/14/2019 | | | 3 |
| A6.05-1203-04 | CCD 056 | ST CUSTOM UNIT 1203-04 DOOR & FINISH SCHEDULE | 4/12/2019 | | | 11/14/2019 | | | 4 |
| A6.1S-1203-04 | CCD 011 | ST SLIDING DOORS, STOREFRONTS AND DOORS | 4/12/2019 | | | | | | 5 |
| LS1.05-1203-04 | CCD 011 | ST 12TH CU 1203-04 LIFE SAFETY PLAN | 4/12/2019 | | | | | | 6 |
| STA COVER | CCD 030 | Cover Sheet -Custom Unit 1203-04 | 7/12/2019 | | | | | | 7 |
| ID.001 | CCD 030 | CU 1203-04 INDEX KEY SYMBOLS | 7/12/2019 | | | | | | 8 |
| ID.100 | CCD 030 | CU 1203-04 FLOOR PLAN | 7/12/2019 | | | | | | 9 |
| ID.101 | CCD 030 | CU1203-04 FLOOR FINISH PLAN | 7/12/2019 | | | | | | 10 |
| ID.102 | CCD 030 | CU 1203-04 POWER PLAN | 7/12/2019 | | | | | | 11 |
| ID.103 | CCD 030 | CU 1203-04 RCP | 7/12/2019 | | | | | | 12 |
| ID.200 | CCD 030 | CU 1203-04 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 13 |
| ID.201 | CCD 030 | CU 1203-04 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 14 |
| ID.202 | CCD 030 | CU 1203-04 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 15 |
| ID.203 | CCD 030 | CU 1203-04 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 16 |
| ID.204 | CCD 030 | CU 1203-04 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 17 |
| ID.205 | CCD 030 | CU 1203-04 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 18 |
| ID.206 | CCD 030 | CU 1203-04 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 19 |
| ID.207 | CCD 030 | CU 1203-04 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 20 |
| ID.208 | CCD 030 | CU 1203-04 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 21 |
| ID.209 | CCD 030 | CU 1203-04 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 22 |
| ID.300 | CCD 030 | CU 1203-04 DOOR SCHEDULE | 7/12/2019 | | | | | | 23 |
| LC6.01-1203-04 | CCD 030 | LIGHTING CONTROL SYSTEM ZONING COMBINED UNIT 1203-04 | | | 7/25/2019 | 1/10/2020 | | | 24 |
| LC6.02-1203-04 | CCD 030 | LIGHTING CONTROL SYSTEM PANEL SCHEDULE COMBINED UNIT 1203-04 | | | 7/25/2019 | 1/10/2020 | | | 25 |
| LC6.03-1203-04 | CCD 030 | LIGHTING CONTROL SYSTEM DEVICES COMBINED UNIT 1203-04 | | | 7/25/2019 | 1/10/2020 | | | 26 |
| LC6.04-1203-04 | CCD 030 | LIGHTING CONTROL SYSTEM ONE LINE RISER COMBINED UNIT 1203-04 | | | 7/25/2019 | 1/10/2020 | | | 27 |
| LC6.05-1203-04 | CCD 030 | SHADING CONTROL SYSTEM RCP COMBINED UNIT 1203-04 | | | 7/25/2019 | 1/10/2020 | | | 28 |
| LC6.06-1203-04 | CCD 030 | HVAC CONTROL SYSTEM FLOOR PLAN COMBINED UNIT 1203-04 | | | 7/25/2019 | 1/10/2020 | | | 29 |
| LV6.01-1203-04 | CCD 030 | SECURITY AND AV UNIT 1203-04 FLOOR PLAN COMBINED | | | 7/25/2019 | | | | 30 |
| M3.21-1203-04 | CCD 056 | ST CU 1203-04 MECHANICAL PLAN | 4/12/2019 | | | 11/14/2019 | | | 31 |
| E3.21-1204 | CCD 011 | ST CU 1203-04 ELECTRICAL PLAN | 4/12/2019 | | | | | | 32 |
| E3.21A-1204 | CCD 011 | ST CU 1203-04 PARTIAL RISER AND SCHEDULES | 4/12/2019 | | | | | | 33 |
| P2.16-P-1204 | CCD 011 | ST CU 1203-04 PLUMBING PLAN | 4/12/2019 | | | | | | 34 |
| FP3.21A-1204 | CCD 011 | ST CU 1203-04 FIRE PROTECTION PLAN | 4/12/2019 | | | | | | 35 |
| **SOUTH TOWER UNIT 1405** | | | | | | | | | 24 |
| A0.05-1405 | CCD 030 | COVER SHEET | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.23S-1405 | CCD 008 | ST-CUSTOM UNITS 1405 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.23S-1405 | CCD 008 | ST- CUSTOM UNIT 1405 RCP | 2/22/2019 | 8/23/2019 | | | | | 3 |
| A6.3-1405 | CCD 008 | ST-CUSTOM UNIT 1405 DOOR AND FINISH SCHEDULE | 2/22/2019 | | | | | | 4 |
| A6.28S-1405 | CCD 008 | ST-SLIDING DOORS, STOREFRONTS AND DOORS SCHEDULE | 2/22/2019 | | | | | | 5 |
| STA COVER | CCD 030 | COVER SHEET CU 1405 TOSCANA | 6/25/2019 | | | | | | 6 |
| ID.001 | CCD 030 | UNIT 1405 TOSCANA INDEX KEY SYMBOLS | 6/25/2019 | | | | | | 7 |
| ID.100 | CCD 030 | UNIT 1405 TOSCANA FLOOR PLAN | 6/25/2019 | | | | | | 8 |
| ID.101 | CCD 030 | UNIT 1405 TOSCANA FLOOR FINISH PLAN | 6/25/2019 | | | | | | 9 |
| ID.102 | CCD 030 | UNIT 1405 TOSCANA POWER PLAN | 6/25/2019 | | | | | | 10 |
| ID.103 | CCD 030 | UNIT 1405 TOSCANA RCP | 6/25/2019 | | | | | | 11 |
| ID.200 | CCD 030 | UNIT 1405 TOSCANA ENLARGED PLANS & ELEVATIONS | 6/25/2019 | | | | | | 12 |
| ID.201 | CCD 030 | UNIT 1405 TOSCANA ENLARGED PLANS & ELEVATIONS | 6/25/2019 | | | | | | 13 |
| ID.202 | CCD 030 | UNIT 1405 TOSCANA ENALRGED PLANS AND ELEVATIONS | 6/25/2019 | | | | | | 14 |
| ID.300 | CCD 030 | UNIT 1405 TOSCANA DOOR SCHEDULE | 6/25/2019 | | | | | | 15 |
| LC6.01-1405 | CCD 030 | MODULES AND ENCLOSURE TOSCANA UNIT 14056 | | | 7/25/2019 | | | | 16 |
| LC6.02-1405 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN TOSCANA UNIT 1405 | | | 7/25/2019 | | | | 17 |
| LC6.03-1405 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN TOSCANA UNIT 1405 | | | 7/25/2019 | | | | 18 |
| LC6.04-1405 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN TOSCANA UNIT 1405 | | | 7/25/2019 | | | | 19 |
| LV6.01-1405 | CCD 030 | SECURITY AND AV 1405 FLOOR PLAN TOSCANA | | | 7/25/2019 | | | | 20 |
| M3.23-1405 | CCD 008 | SOUTH TOWER CU 1405 MECHANICAL PLAN | 2/22/2019 | | | | | | 21 |
| E3.23-1405 | CCD 008 | SOUTH TOWER CU 1405 ELECTRICAL PLAN | 2/22/2019 | | | | | | 22 |
| FP3.23 | CCD 008 | SOUTH TOWER CU 1405 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 23 |
| P2.18C-1405 | CCD 008 | SOUTH TOWER CU 1405 PLUMBING PLAN | 2/22/2019 | | | | | | 24 |
| **SOUTH TOWER UNIT 1407** | | | | | | | | | 17 |
| A0.05-1407 | CCD 030 | COVER SHEET | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.25S-1407 | CCD 005 | ST CU 1407 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.25S-1407 | CCD 005 | ST RCP UNIT 1407 | 2/22/2019 | | | | | | 3 |
| STA COVER | CCD 030 | COVER SHEET CU 1407 MILANO | 6/25/2019 | | | | | | 4 |
| ID.001 | CCD 030 | UNIT 1407 MILANO INDEX KEY SYMBOLS | 6/25/2019 | | | | | | 5 |
| ID.100 | CCD 030 | UNIT 1407 MILANO FLOOR PLAN | 6/25/2019 | | | | | | 6 |
| ID.101 | CCD 030 | UNIT 1407 MILANO FLOOR FINISH PLAN | 6/25/2019 | | | | | | 7 |
| ID.200 | CCD 030 | UNIT 1407 MILANO ENLARGED PLANS AND ELEVATIONS | 6/25/2019 | | | | | | 8 |
| LC6.01-1407 | CCD 030 | MODULES AND ENCLOSUR3E MILANO UNIT 1407 | | | 7/25/2019 | | | | 9 |
| LC6.02-1407 | CCD 030 | LIGHTING CONTROL SYSTEM ONE LINE RISER MILANO UNIT 1407 | | | 7/25/2019 | | | | 10 |
| LC6.03-1407 | CCD 030 | SHADING CONTROL SYSTEM ONE LINE RISER MILANO UNIT 1407 | | | 7/25/2019 | | | | 11 |
| LC6.04-1407 | CCD 030 | LIGHTING CONTROL SYSTEM ONE LINE RISER MILANO UNIT 1407 | | | 7/25/2019 | | | | 12 |
| LV6.01-1407 | CCD 030 | SECURITY AND AV UNIT 1407 FLOOR PLAN MILANO | | | 7/25/2019 | | | | 13 |
| M3.25-1407 | CCD 005 | ST CU 1407 MECHANICAL PLAN | 2/22/2019 | | | | | | 14 |
| E3.25-1407 | CCD 005 | ST CU 1407 ELECTRICAL PLAN | 2/22/2019 | | | | | | 15 |
| FP3.25-1407 | CCD 005 | ST CU 1407 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 16 |
| P2.18C-1407 | CCD 005 | SOUTH TOWER CU 1407 PLUMBING PLAN | 2/22/2019 | | | | | | 17 |
| **SOUTH TOWER UNIT 1505** | | | | | | | | | 18 |
| A0.05-1505 | CCD 030 | COVER SHEET | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.23S-1505 | CCD 005 | ST CU 1505 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.23S-1505 | CCD 005 | ST CU 1505 RCP | 2/22/2019 | | | | | | 3 |
| A6.3-1505 | CCD 005 | ST CU 1505 DOOR AND FINISH SCHEDULES | 2/22/2019 | | | | | | 4 |
| STA COVER | CCD 030 | COVER SHEET CU 1505 TOSCANA | 6/25/2019 | | | | | | 5 |
| ID.001 | CCD 030 | UNIT 1505 TOSCANA INDEX KEY SYMBOLS | 6/25/2019 | | | | | | 6 |
| ID.100 | CCD 030 | UNIT 1505 TOSCANA FLOOR PLAN | 6/25/2019 | | | | | | 7 |
| ID.101 | CCD 030 | UNIT 1505 TOSCANA FLOOR FINISH PLAN | 6/25/2019 | | | | | | 8 |
| ID.102 | CCD 030 | UNIT 1505 TOSCANA RCP | 6/25/2019 | | | | | | 9 |
| LC6.01-1505 | CCD 030 | MODULES AND ENCLOSURE TOSCANA UNIT 1505 | | | 7/25/2019 | | | | 10 |
| LC6.02-1505 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN TOSCANA UNIT 1505 | | | 7/25/2019 | | | | 11 |
| LC6.03-1505 | CCD 030 | LIGHTING CONTROL SYSTEM FLOOR PLAN TOSCANA UNIT 1505 | | | 7/25/2019 | | | | 12 |
| LC6.04-1505 | CCD 030 | HVAC CONTROL SYSTEM FLOOR PLAN TOSCANA UNIT 1505 | | | 7/25/2019 | | | | 13 |
| LV6.01-1505 | CCD 030 | SECURITY AND AV UNIT 1505 LOOR PLAN TOSCANA | | | 7/25/2019 | | | | 14 |
| M3.11-1505 | CCD 030 | ST CU 1505 MECHANICAL PLAN | 2/22/2019 | | | | | | 15 |
| E3.23-1505 | CCD 015 | ST CU 1505 ELECTRICAL PLAN | 2/22/2019 | 5/16/2019 | | | | | 16 |
| FP3.23-1505 | CCD 005 | ST CU 1505 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 17 |
| P2.17-1505 | CCD 005 | ST CU 1505 PLUMBING PLAN | 2/22/2019 | | | | | | 18 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED: 7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 1507** | | | | | | | | | 18 |
| A0.05-1507 | CCD 030 | COVER SHEET | 2/22/2019 | 8/23/2019 | | | | | 1 |
| A2.235-1507 | CCD 005 | ST CU 1507 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.255-1507 | CCD 005 | ST RCP UNIT 1507 | 2/22/2019 | | | | | | 3 |
| A6.3-1507 | CCD 005 | ST CU 1507 DOOR AND FINISH SCHEDULES | 2/22/2019 | | | | | | 4 |
| STA COVER | CCD 030 | COVER SHEET CU 1507 MILANO | 6/25/2019 | | | | | | 5 |
| ID.001 | CCD 030 | UNIT 1507 MILANO INDEX KEY SYMBOLS | 6/25/2019 | | | | | | 6 |
| ID.100 | CCD 030 | UNIT 1507 MILANO FLOOR PLAN | 6/25/2019 | | | | | | 7 |
| ID.101 | CCD 030 | UNIT 1507 MILANO FLOOR FINISH PLAN | 6/25/2019 | | | | | | 8 |
| ID.102 | CCD 030 | UNIT 1507 MILANO RCP | 6/25/2019 | | | | | | 9 |
| LC6.01-1507 | CCD 030 | MODULES AND ENCLOSUR3E MILANO UNIT 1507 | | 7/25/2019 | | | | | 10 |
| LC6.02-1507 | CCD 030 | LIGHTING CONTROL SYSTEM ONE LINE RISER MILANO UNIT 1507 | | 7/25/2019 | | | | | 11 |
| LC6.03-1507 | CCD 030 | SHADING CONTROL SYSTEM ONE LINE RISER MILANO UNIT 1507 | | 7/25/2019 | | | | | 12 |
| LC6.04-1507 | CCD 030 | LIGHTING CONTROL SYSTEM ONE LINE RISER MILANO UNIT 1507 | | 7/25/2019 | | | | | 13 |
| LV6.01-1507 | CCD 030 | SECURITY AND AV UNIT 1507 FLOOR PLAN MILANO | | 7/25/2019 | | | | | 14 |
| M3.25-1507 | CCD 005 | ST CU 1507 MECHANICAL PLAN | 2/22/2019 | | | | | | 15 |
| E3.25-1507 | CCD 005 | ST CU 1507 ELECTRICAL PLAN | 2/22/2019 | | | | | | 16 |
| FP3.25-1507 | CCD 005 | ST CU 1507 FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 17 |
| P2.18C-1507 | CCD 005 | ST CU 1507 PLUMBING PLAN | 2/22/2019 | | | | | | 18 |
| **SOUTH TOWER UNIT 1605** | | | | | | | | | 28 |
| A0.05-1605 | CCD 046 | COVER SHEET | 2/22/2019 | 11/8/2019 | | | | | 1 |
| A2.235-1605 | CCD 008 | SOUTH TOWER CUSTOM UNIT 1605 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.255-1605 | CCD 046 | SOUTH TOWER CU 1605 RCP | 2/22/2019 | 10/14/2019 | | | | | 3 |
| A6.3-1605 | CCD 008 | ST-CU UNIT 1605 DOOR AND FINISH SCHEDULES | 2/22/2019 | | | | | | 4 |
| STA COVER | CCD 046 | CU 1605 COVER SHEET | 7/12/2019 | | | | | | 5 |
| ID.001 | CCD 046 | UNIT 1605 TOSCANA INDEX KEY SYMBOLS | 7/12/2019 | | | | | | 6 |
| ID.100 | CCD 046 | UNIT 1605 FLOOR PLAN | 7/12/2019 | | | | | | 7 |
| ID.101 | CCD 046 | UNIT 1605 FLOOR FINISH PLAN | 7/12/2019 | | | | | | 8 |
| ID.102 | CCD 046 | UNIT 1605 RCP | 7/12/2019 | | | | | | 9 |
| ID.103 | CCD 046 | UNIT 1605 POWER PLAN | 7/12/2019 | | | | | | 10 |
| LC1.01-1605 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 11 |
| LC2.01-1605 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.02-1605 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 13 |
| LC2.03-1605 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 14 |
| LC2.04-1605 | CCD 046 | LC SYSTMES DETAIL C4EN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 15 |
| LC2.05-1605 | CCD 046 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 16 |
| LC2.06-1605 | CCD 046 | SHADING CONTROL SYSTEM PREWIRE DE3TAIL XSPOT LOCATION | 12/20/2017 | | | | | | 17 |
| LC6.01-1605 | CCD 046 | MODULES AND ENCLOSURE | 12/20/2017 | | | | | | 18 |
| LC6.02-1605 | CCD 046 | LC SYSTEM FLOOR PLAN AND ONE LINE RISER | 12/20/2017 | | | | | | 19 |
| LC6.03-1605 | CCD 046 | SHADING CONTROL SYSTEM ONE LINE RISER AND LC FLOOR PLAN | 12/20/2017 | | | | | | 20 |
| LC6.04-1605 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN AND LC ONE LINE RISER | 12/20/2017 | | | | | | 21 |
| LV1.01-1605 | CCD 046 | SECURITY AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 22 |
| LV2.01-1605 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 23 |
| LV6.01-1605 | CCD 046 | SECURITY AND AV UNIT 1605 FLOOR PLAN | 12/20/2017 | | | | | | 24 |
| E3.23-1605 | CCD 045 | ST-CU 1605 ELECTRICAL PLAN | 2/22/2019 | | | | | | 25 |
| FP3.23-1605 | CCD 045 | ST-CU 1605 FIRE PROTECTION PLAN | 2/22/2019 | 10/14/2019 | | | | | 26 |
| M3.23-1605 | CCD 045 | ST CU 1605-MECHANICAL PLAN | 2/22/2019 | 10/14/2019 | | | | | 27 |
| P2.18B-1605 | CCD 008 | ST CU 1605 PLUMBING PLAN | 2/22/2019 | | | | | | 28 |
| **SOUTH TOWER UNIT 1606** | | | | | | | | | 20 |
| A0.05-1606 | CCD 046 | COVER SHEET | 2/22/2019 | 11/8/2019 | | | | | 1 |
| A2.115-1606 | CCD 005 | ST CU 1606 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| STA COVER | CCD 046 | ST CU 1606 COVER SHEET | 7/12/2019 | | | | | | 3 |
| ID.001 | CCD 046 | UNIT 1606 POSITANO INDEX KEY SYMBOLS | 7/12/2019 | | | | | | 4 |
| ID.100 | CCD 046 | UNIT 1606 FLOOR PLAN | 7/12/2019 | | | | | | 5 |
| ID.200 | CCD 046 | UNILT 1606 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 6 |
| LC1.01-1606 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 7 |
| LC-2.01-1606 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 8 |
| LC2.02-1606 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.03-1606 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.04-1606 | CCD 046 | LC SYSTMES DETAIL C4EN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 11 |
| LC2.05-1606 | CCD 046 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 12 |
| LC2.06-1606 | CCD 046 | SHADING CONTROL SYSTEM PREWIRE DE3TAIL XSPOT LOCATION | 12/20/2017 | | | | | | 13 |
| LC6.01-1606 | CCD 046 | LIGHTING ZONING RCP -MODULES AND ENCLOSURE | 12/20/2017 | | | | | | 14 |
| LC6.02-1606 | CCD 046 | LC SYSTEM FLOOR PLAN AND ONE LINE RISER | 12/20/2017 | | | | | | 15 |
| LC6.04-1606 | CCD 046 | SHADING CONTROL SYSTEM ONE LINE RISER RCP | 12/20/2017 | | | | | | 16 |
| LC6.04-1606 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN AND LC ONE LINE RISER | 12/20/2017 | | | | | | 17 |
| LV1.01-1606 | CCD 046 | SECURITY AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 18 |
| LV2.01-1606 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 19 |
| LV6.01-1606 | CCD 046 | SECURITY AND AV UNIT 1606 FLOOR PLAN | 12/20/2017 | | | | | | 20 |
| **SOUTH TOWER UNIT 1607** | | | | | | | | | 29 |
| A0.05-1607 | CCD 046 | COVER SHEET | 2/22/2019 | 11/8/2019 | | | | | 1 |
| A2.25S | CCD 008 | ST CU 1607 FLOOR PLAN | 2/22/2019 | | | | | | 2 |
| A5.255-1607 | CCD 008 | ST RCP UNIT 1607 | 2/22/2019 | | | | | | 3 |
| A6.3-1607 | CCD 008 | ST CU UNIT 1607 DOOR AND FINISH SCHEDULES | 2/22/2019 | | | | | | 4 |
| M3.25-1607 | CCD 008 | ST CU 1607 MECHANICAL PLAN | 2/22/2019 | | | | | | 5 |
| E3.25-1607 | CCD 008 | ST CU 1607 ELECTRICAL PLAN | 2/22/2019 | | | | | | 6 |
| FP3.25-1607 | CCD 008 | ST CU 1607-FIRE PROTECTION PLAN | 2/22/2019 | | | | | | 7 |
| P2.18B-1607 | CCD 008 | ST CU 1607-PLUMBING PLAN | 2/22/2019 | | | | | | 8 |
| STA COVER | CCD 046 | Cover Sheet | 7/12/2019 | | | | | | 9 |
| ID.001 | CCD 046 | UNIT 1607 MILANO INDEX KEY SYMBOLS | 7/12/2019 | | | | | | 10 |
| ID.100 | CCD 046 | UNIT 1607 FLOOR PLAN | 7/12/2019 | | | | | | 11 |
| ID.101 | CCD 046 | UNIT 1607 FINISH FLOOR PLAN | 7/12/2019 | | | | | | 12 |
| ID.102 | CCD 046 | UNIT 1607 RCP | 7/12/2019 | | | | | | 13 |
| ID.200 | CCD 046 | UNIT 1607 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 14 |
| ID.201 | CCD 046 | UNIT 1607 ENLARGED PLANS AND ELEVATIONS | 7/12/2019 | | | | | | 15 |
| LC1.01-1607 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 16 |
| LC2.01-1607 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 17 |
| LC2.02-1607 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 18 |
| LC2.03-1607 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 19 |
| LC2.04-1607 | CCD 046 | LC SYSTMES DETAIL C4EN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 20 |
| LC2.05-1607 | CCD 046 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 21 |
| LC2.06-1607 | CCD 046 | SHADING CONTROL SYSTEM PREWIRE DE3TAIL XSPOT LOCATION | 12/20/2017 | | | | | | 22 |
| LC6.01-1607 | CCD 046 | LIGHTING ZONING RCP PLAN | 12/20/2017 | | | | | | 23 |
| LC6.02-1607 | CCD 046 | LC SYSTEM FLOOR PLAN AND ONE LINE RISER | 12/20/2017 | | | | | | 24 |
| LC6.03-1607 | CCD 046 | SHADING CONTROL SYSTEM RCP PLAN | 12/20/2017 | | | | | | 25 |
| LC6.04-1607 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 26 |
| LV1.01-1607 | CCD 046 | SECURITY AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 27 |
| LV2.01-1607 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 28 |
| LV6.01-1607 | CCD 046 | SECURITY AND AV UNIT 1607 FLOOR PLAN | 12/20/2017 | | | | | | 29 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**  UPDATED: 7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 1702** | | | | | | | | | 25 |
| A0.05-1702 | CCD 046 | COVER SHEET CUSTOM UNIT 1702 VECCHIO | 3/8/2019 | 11/8/2019 | | | | | 1 |
| A2.205-1702 | CCD 046 | ST-CU 1702 FLOOR PLAN | 3/8/2019 | | | | | | 2 |
| A5.215-1702 | CCD 010 | ST-CU 1702 RCP | 3/8/2019 | | | | | | 3 |
| A6.3-1702 | CCD 010 | ST-CU 1702 DOOR AND FINISH SCHEDULES | 3/8/2019 | | | | | | 4 |
| STA COVER | CCD 046 | ST CU 1702 ID COVER SHEET | 7/12/2019 | | | | | | 5 |
| ID.001 | CCD 046 | ST CU 1702 VECCHIO INDEX KEY SYMBOLS | 7/12/2019 | | | | | | 6 |
| ID.100 | CCD 046 | CU 1702 FLOOR PLAN | 7/12/2019 | | | | | | 7 |
| LC1.01-1702 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-1702 | CCD 046 | LC SYSTEM DETAIL CLX 2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-1702 | CCD 046 | LC SYSTME DETAIL CLX 2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-1702 | CCD 046 | LC SY STEM DTAIL CLX 2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-1702 | CCD 046 | LC SY STEM DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-1702 | CCD 046 | LC SYSTME DTAIL C2N CBD P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-1702 | CCD 046 | SHADIN CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-1702 | CCD 046 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |
| LC6.02-1702 | CCD 046 | LC SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-1702 | CCD 046 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LV1.01-1702 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-1702 | CCD 046 | SECURIT AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-1702 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-1702 | CCD 046 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| M3.21A-1702 | CCD 010 | SOUTH TOWER CU 1702 MECHANICAL PLAN | 3/8/2019 | | | | | | 22 |
| E3.20-1702 | CCD 010 | SOUTH TOWER CU 1702 ELECTRICAL PLAN | 3/8/2019 | | | | | | 23 |
| FP3.20-1702 | CCD 010 | SOUTH TOWER CU 1702 FIRE PROTECTION PLAN | 3/8/2019 | | | | | | 24 |
| P2.15A-1702 | CCD 010 | SOUTH TOWER CU 1702 PLUMBING PLAN | 3/8/2019 | | | | | | 25 |
| **SOUTH TOWER UNIT 1801** | | | | | | | | | 25 |
| A0.05-1801 | CCD 046 | COVER SHEET CUSTOM UNIT 1801 | 3/8/2019 | 11/8/2019 | | | | | 1 |
| A2.205-1801 | CCD 010 | ST-CU 1801 FLOOR PLAN | 3/8/2019 | 5/16/2019 | | | | | 2 |
| A5.205-1801 | CCD 015 | ST-CU 1801 RCP | 3/8/2019 | 5/16/2019 | | | | | 3 |
| A6.3-1802 | CCD 015 | ST CU 1801 DOOR AND FINISH SCHEDULES | 3/8/2019 | 5/16/2019 | | | | | 4 |
| STA COVER | CCD 046 | ST CU 1801 ID COVER SHEET | 8/23/2019 | | | | | | 5 |
| ID.001 | CCD 046 | UNIT 1801 UFFIZI INDEX KEY SYMBOLS | 8/23/2019 | | | | | | 6 |
| ID.100 | CCD 046 | UNIT 1801 UFFIZI FLOOR PLAN | 8/23/2019 | | | | | | 7 |
| LC1.01-1801 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-1801 | CCD 046 | LC SYSTEM DETAIL CLX 2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-1801 | CCD 046 | LC SYSTME DETAIL CLX 2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-1801 | CCD 046 | LC SY STEM DTAIL CLX 2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-1801 | CCD 046 | LC SY STEM DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-1801 | CCD 046 | LC SYSTME DTAIL C2N CBD P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-18010 | CCD 046 | SHADIN CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-1801 | CCD 046 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |
| LC6.02-1801 | CCD 046 | LC SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-1801 | CCD 046 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LC6.04-1801 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-1801 | CCD 046 | SECURIT AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-1801 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-1801 | CCD 046 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| M3.20-1801 | CCD 015 | SOUTH TOWER CU 1801 MECHANICAL PLAN | 3/8/2019 | 5/16/2019 | | | | | 22 |
| E3.20-1801 | CCD 015 | SOUTH TOWER CU 18012 ELECTRICAL PLAN | 3/8/2019 | 5/16/2019 | | | | | 23 |
| FP3.20-1801 | CCD 015 | SOUTH TOWER CU 1801 FIRE PROTECTION PLAN | 3/8/2019 | 5/16/2019 | | | | | 24 |
| P2.16-1801 | CCD 015 | SOUTH TOWER CU 1801 PLUMBING PLAN | 3/8/2019 | 5/16/2019 | | | | | 25 |
| **SOUTH TOWER UNIT 1803** | | | | | | | | | 25 |
| A0.05-1803 | CCD 046 | COVER SHEET ST UNIT 1803 | 3/8/2019 | 11/8/2019 | | | | | 1 |
| A2.215-1803 | CCD 010 | ST CU 1803 FLOOR PLAN | 3/8/2019 | | | | | | 2 |
| A5.215-1803 | CCD 010 | ST CU 1803 RCP | 3/8/2019 | | | | | | 3 |
| A6.3-1803 | CCD 010 | ST CU 1803 DOOR AND FINISH SCHEDULES | 3/8/2019 | | | | | | 4 |
| STA COVER | CCD 046 | ST CU 1803 ID COVER SHEET | 8/23/2019 | | | | | | 5 |
| ID.001 | CCD 046 | ST CU 1803 VECCHIO INDEX KEY SYMBOL | 8/23/2019 | | | | | | 6 |
| ID.100 | CCD 046 | CU 1803 FLOOR PLAN | 8/23/2019 | | | | | | 7 |
| LC1.01-1803 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-1803 | CCD 046 | LC SYSTEM DETAIL CLX 2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-1803 | CCD 046 | LC SYSTME DETAIL CLX 2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-1803 | CCD 046 | LC SY STEM DTAIL CLX 2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-1803 | CCD 046 | LC SY STEM DETAIL CAEN AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-1803 | CCD 046 | LC SYSTME DTAIL C2N CBD P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-1803 | CCD 046 | SHADIN CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-1803 | CCD 046 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |
| LC6.02-1803 | CCD 046 | LC SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-1803 | CCD 046 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LC6.04-1803 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-1803 | CCD 046 | SECURIT AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-1803 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-1803 | CCD 046 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| M3.21A-1803 | CCD 010 | ST CU 1803 MECHANICAL PLAN | 3/8/2019 | | | | | | 22 |
| E3.21-1803 | CCD 010 | ST CU 1803 ELECTRICAL PLAN | 3/8/2019 | | | | | | 23 |
| FP3.21-1803 | CCD 010 | SOUTH TOWER CU 1803 FIRE PROTECTION PLAN | 3/8/2019 | | | | | | 24 |
| P2.15A-1803 | CCD 010 | ST CU 1803 PLUMBING PLAN | 3/8/2019 | | | | | | 25 |
| **SOUTH TOWER UNIT 1804** | | | | | | | | | 29 |
| A0.05-1804 | CCD 046 | COVER SHEET CUSTOM UNIT 1804 | 3/8/2019 | 11/8/2019 | | | | | 1 |
| A2.215-1804 | CCD 045 | ST CU 1804 FLOOR PLAN | 3/8/2019 | 10/22/2019 | | | | | 2 |
| A5.215-1804 | CCD 045 | ST CU 1804 RCP | 3/8/2019 | 10/22/2019 | | | | | 3 |
| A6.3-1804 | CCD 010 | ST CU 1804 DOOR AND FINISH SCHEDULES | 3/8/2019 | | | | | | 4 |
| STA COVER | CCD 046 | ST CU 1804 DONATELLO COVER SHEET | 8/23/2019 | | | | | | 5 |
| ID.001 | CCD 046 | CU 1804 INDEX KEY SYMBOLS | 8/23/2019 | | | | | | 6 |
| ID.100 | CCD 046 | CU 1804 FLOOR PLAN | 8/23/2019 | | | | | | 7 |
| ID.101 | CCD 046 | CU 1804 FLOOR FINISH PLAN | 8/23/2019 | | | | | | 8 |
| ID.102 | CCD 046 | CU 1804 RCP | 8/23/2019 | | | | | | 9 |
| ID.200 | CCD 200 | CI 1804 ENLARGED PLANS AND ELEVATIONS | 8/23/2019 | | | | | | 10 |
| ID.201 | CCD 200 | CU 1804 ENLARGED PLANS AND ELEVATIONS | 8/23/2019 | | | | | | 11 |
| LC1.01-1804 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 12 |
| LC2.01-1804 | CCD 046 | LC SYSTEM DETAIL CLX 2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 13 |
| LC2.02-1804 | CCD 046 | LC SYSTME DETAIL CLX 2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 14 |
| LC2.03-1804 | CCD 046 | LC SY STEM DTAIL CLX 2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 15 |
| LC2.04-1804 | CCD 046 | LC SY STEM DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 16 |
| LC2.05-1804 | CCD 046 | LC SYSTME DTAIL C2N CBD P KEYPAD | 12/20/2017 | | | | | | 17 |
| LC2.06-1804 | CCD 046 | SHADIN CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 18 |
| LC6.01-1804 | CCD 046 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 19 |
| LC6.02-1804 | CCD 046 | LC SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 20 |
| LC6.03-1804 | CCD 046 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 21 |
| LC6.04-1804 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| LV1.01-1804 | CCD 046 | SECURIT AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 23 |
| LV2.01-1804 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 24 |
| LV6.01-1804 | CCD 046 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 25 |
| M3.10-1804 | CCD 045 | ST CU 1804 MECHANICAL PLAN | 3/8/2019 | 10/22/2019 | | | | | 26 |
| E3.10-1804 | CCD 045 | ST CU 1804 ELECTRICAL PLAN | 3/8/2019 | 10/22/2019 | | | | | 27 |
| FP3.10-1804 | CCD 045 | ST CU 1804 FIRE PROTECTION PLAN | 3/8/2019 | 10/22/2019 | | | | | 28 |
| P2.15-1804 | CCD 045 | ST CU 1804 PLUMBING PLAN | 3/8/2019 | 10/22/2019 | | | | | 29 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**          UPDATED:     7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 1904** | | | | | | | | | 30 |
| A0.05-1904 | CCD 046 | COVER SHEET | 3/8/2019 | 11/8/2019 | | | | | 1 |
| A2.215-1904 | CCD 011 | ST CU 1904 FLOOR PLAN DONATELLO | 3/8/2019 | | | | | | 2 |
| A5.215-1904 | CCD 011 | ST CU 1904 RCP | 3/8/2019 | | | | | | 3 |
| A6.3-1904 | CCD 011 | ST CU 1904 DOOR AND FINISH SCHEDULE | 3/8/2019 | | | | | | 4 |
| STA COVER | CCD 046 | CU 1904 COVER SHEET DONATELLO | 8/23/2019 | | | | | | 5 |
| ID.001 | CCD 046 | INDEX KEY SYMBOLS | 8/23/2019 | | | | | | 6 |
| ID.100 | CCD 046 | FLOOR PLAN | 8/23/2019 | | | | | | 7 |
| ID.101 | CCD 046 | FINISH FLOOR PLAN | 8/23/2019 | | | | | | 8 |
| ID.102 | CCD 046 | RCP | 8/23/2019 | | | | | | 9 |
| ID.103 | CCD 046 | POWER PLAN | 8/23/2019 | | | | | | 10 |
| ID.200 | CCD 046 | ENLARGED PLANS AND ELEVATIONS | 8/23/2019 | | | | | | 11 |
| ID.201 | CCD 046 | ENLARGED PLANS AND ELEVATIONS | 8/23/2019 | | | | | | 12 |
| LC1.01-1904 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 13 |
| LC2.01-1904 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 14 |
| LC2.02-1904 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 15 |
| LC2.03-1904 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 16 |
| LC2.04-1904 | CCD 046 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 17 |
| LC2.05-1904 | CCD 046 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 18 |
| LC2.06-1904 | CCD 046 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 19 |
| LC6.01-1904 | CCD 046 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 20 |
| LC6.02-1904 | CCD 046 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| LC6.03-1904 | CCD 046 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 22 |
| LC6.04-1904 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 23 |
| LV1.01-1904 | CCD 046 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 24 |
| LV2.01-1904 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 25 |
| LV6.01-1904 | CCD 046 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 26 |
| M3.21A-1904 | CCD 011 | ST CU 1904 MECHANICAL PLAN | 3/8/2019 | | | | | | 27 |
| E3.21-1904 | CCD 011 | ST CU 1904 ELECTRICAL PLAN | 3/8/2019 | | | | | | 28 |
| P2.15A-1904 | CCD 011 | ST CI 1904 PLUMBING PLAN | 3/8/2019 | | | | | | 29 |
| FP3.21-1904 | CCD 011 | ST CU 1904 FIRE PROTECTION PLAN | 3/8/2019 | | | | | | 30 |
| **SOUTH TOWER UNIT 2001** | | | | | | | | | 25 |
| A0.05-2001 | CCD 046 | COVER SHEET CU 2001 | 3/8/2019 | 11/8/2019 | | | | | 1 |
| A2.85-2001 | CCD 011 | ST CU 2001 FLOOR PLAN | 3/8/2019 | | | | | | 2 |
| A5.85-2001 | CCD 011 | ST CU 2001 RCP | 3/8/2019 | | | | | | 3 |
| A6.3-2001 | CCD 011 | ST CU 2001 DOOR AND FINISH SCHEDULE | 3/8/2019 | | | | | | 4 |
| STA COVER | CCD 046 | CU2001 COVER SHEET DONATELLO | 8/23/2019 | | | | | | 5 |
| ID.001 | CCD 046 | INDEX KEY SYMBOLS | 8/23/2019 | | | | | | 6 |
| ID1.00 | CCD 046 | FLOOR PLAN | 8/23/2019 | | | | | | 7 |
| LC1.01-2001 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-2001 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-2001 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-2001 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-2001 | CCD 046 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-2001 | CCD 046 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-2001 | CCD 046 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-2001 | CCD 046 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |
| LC6.02-2001 | CCD 046 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-2001 | CCD 046 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LC6.04-2001 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-2001 | CCD 046 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-2001 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-2001 | CCD 046 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| M3.09-2001 | CCD 011 | ST CU 2001 MECHANICAL PLAN | 3/8/2019 | | | | | | 22 |
| E3.09-2001 | CCD 011 | ST CU 2001 ELECTRICAL PLAN | 3/8/2019 | | | | | | 23 |
| P2.15-2001 | CCD 011 | ST CU 2001 PLUMBING PLAN | 3/8/2019 | | | | | | 24 |
| FP3.09-2001 | CCD 011 | ST CU 2001 FIRE PROTECTION PLAN | 3/8/2019 | | | | | | 25 |
| **SOUTH TOWER UNIT 2002** | | | | | | | | | 25 |
| A0.05-2002 | CCD 048 | COVER SHEET CU 2002 | 3/8/2019 | 11/8/2019 | | | | | 1 |
| A2.05-2002 | CCD 011 | ST-CU 2002 FLOOR PLAN | 3/8/2019 | 7/25/2019 | | | | | 2 |
| A5.205-2002 | CCD 011 | ST CU 2002 RCP | 3/8/2019 | 7/25/2019 | | | | | 3 |
| A6.3-2002 | CCD 011 | ST CU 2002 DOOR AND FINISH SCHEDULE | 3/8/2019 | 7/25/2019 | | | | | 4 |
| STA COVER | CCD 048 | CU2001 COVER SHEET DONATELLO | 11/11/2019 | | | | | | 5 |
| ID.001 | CCD 048 | INDEX KEY SYMBOLS | 11/11/2019 | | | | | | 6 |
| ID.100 | CCD 048 | FLOOR PLAN | 11/11/2019 | | | | | | 7 |
| LC1.01-2002 | CCD 048 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-2002 | CCD 048 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-2002 | CCD 048 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-2002 | CCD 048 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-2002 | CCD 048 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-2002 | CCD 048 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-2002 | CCD 048 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-2002 | CCD 048 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |
| LC6.02-2002 | CCD 048 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-2002 | CCD 048 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LC6.04-2002 | CCD 048 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-2002 | CCD 048 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-2002 | CCD 048 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-2002 | CCD 048 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| M3.20A-2002 | CCD 011 | ST CU 2002 MECHANICAL PLAN | 3/8/2019 | 7/25/2019 | | | | | 22 |
| E3.20-2002 | CCD 011 | ST CU 2002 ELECTRICAL PLAN | 3/8/2019 | 7/25/2019 | | | | | 23 |
| P2.15A-2002 | CCD 011 | ST CU 2002 PLUMBING PLAN | 3/8/2019 | 7/25/2019 | | | | | 24 |
| FP3.20-2002 | CCD 011 | ST CU 2002-FIRE PROTECTION PLAN | 3/8/2019 | 7/25/2019 | | | | | 25 |
| **SOUTH TOWER UNIT 2003** | | | | | | | | | 25 |
| A0.05-2003 | CCD 046 | COVER SHEET CU 2003 | 3/8/2019 | 11/8/2019 | | | | | 1 |
| A2.215-2003 | CCD 011 | ST CU 2003 FLOOR PLAN | 3/8/2019 | | | | | | 2 |
| A5.215-2003 | CCD 011 | ST CU 2003 RCP | 3/8/2019 | | | | | | 3 |
| A6.3-2003 | CCD 011 | ST CU 2003 DOOR AND FINISH SCHEDULES | 3/8/2019 | | | | | | 4 |
| STA COVER | CCD 046 | CU 2003 COVER SHEET DONATELLO | 8/23/2019 | | | | | | 5 |
| ID.001 | CCD 046 | INDEX KEY SYMBOLS | 8/23/2019 | | | | | | 6 |
| ID.100 | CCD 046 | FLOOR PLAN | 8/23/2019 | | | | | | 7 |
| LC1.01-2003 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-2003 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-2003 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-2003 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-2003 | CCD 046 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-2003 | CCD 046 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-2003 | CCD 046 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-2003 | CCD 046 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |
| LC6.02-2003 | CCD 046 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-2003 | CCD 046 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LC6.04-2003 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-2003 | CCD 046 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-2003 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-2003 | CCD 046 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| M3.21A-2003 | CCD 011 | ST CU 2003 MECHANICAL PLAN | 3/8/2019 | | | | | | 22 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**   UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| E3.21-2003 | CCD 011 | ST CU 2003 ELECTRICAL PLAN | 3/8/2019 | | | | | | 23 |
| P2.15A-2003 | CCD 011 | ST CU 2003 PLUMBING PLAN | 3/8/2019 | | | | | | 24 |
| FP3.21-2003 | CCD 011 | ST CI 2003 FIRE PROTECTION PLAN | 3/8/2019 | | | | | | 25 |

ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108  UPDATED:  7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 2004** | | | | | | | | | 24 |
| A0.05-2004 | CCD 046 | COVER SHEET CU 2004 | 3/8/2019 | 11/8/2019 | | | | | 1 |
| A2.215-2004 | CCD 011 | ST CU 2004 FLOOR PLAN | 3/8/2019 | | | | | | 2 |
| A5.215-2004 | CCD 011 | ST CU 2004 RCP | 3/8/2019 | | | | | | 3 |
| STA COVER | CCD 046 | CU 2004 COVER SHEET DONATELLO | 8/23/2019 | | | | | | 4 |
| ID.001 | CCD 046 | INDEX KEY SYMBOLS | 8/23/2019 | | | | | | 5 |
| ID.100 | CCD 046 | FLOOR PLAN | 8/23/2019 | | | | | | 6 |
| LC1.01-2004 | CCD 046 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 7 |
| LC2.01-2004 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 8 |
| LC2.02-2004 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.03-2004 | CCD 046 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.04-2004 | CCD 046 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 11 |
| LC2.05-2004 | CCD 046 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 12 |
| LC2.06-2004 | CCD 046 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 13 |
| LC6.01-2004 | CCD 046 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 14 |
| LC6.02-2004 | CCD 046 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 15 |
| LC6.03-2004 | CCD 046 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 16 |
| LC6.04-2004 | CCD 046 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LV1.01-2004 | CCD 046 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 18 |
| LV2.01-2004 | CCD 046 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 19 |
| LV6.01-2004 | CCD 046 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 20 |
| M3.21A-2004 | CCD 011 | ST CU 2004 MECHANICAL PLAN | 3/8/2019 | | | | | | 21 |
| E3.21-2004 | CCD 011 | ST CU 2004 MECHANICAL PLAN | 3/8/2019 | | | | | | 22 |
| P2.16-2004 | CCD 011 | ST CU 2004 PLUMBING PLAN | 3/8/2019 | | | | | | 23 |
| FP3.21-2004 | CCD 011 | ST CU 2004 FIRE PROTECTION PLAN | 3/8/2019 | | | | | | 24 |
| **SOUTH TOWER UNIT 2101** | | | | | | | | | 27 |
| A0.05-2101 | CCD 053 | COVER SHEET CU 2101 | 4/12/2019 | 11/27/2019 | | | | | 1 |
| A2.205-2101 | CCD 011 | ST CU 2101 FLOOR PLAN | 4/12/2019 | | | | | | 2 |
| A5.205-2101 | CCD 011 | ST CU 2101 RCP | 4/12/2019 | | | | | | 3 |
| A6.3-2101 | CCD 011 | ST CU 2101 DOOR AND FINISH SCHEDULES | 4/12/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| ID.101 | CCD 053 | RCP | 9/13/2019 | | | | | | 8 |
| ID.200 | CCD 053 | ENLARGED PLANS AND ELEVATIONS | 9/13/2019 | | | | | | 9 |
| LC1.01-2101 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 10 |
| LC2.01-2101 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.02-2101 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.03-2101 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 13 |
| LC2.04-2101 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 14 |
| LC2.05-2101 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 15 |
| LC2.06-2101 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 16 |
| LC6.01-2101 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 17 |
| LC6.02-2101 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LC6.03-2101 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 19 |
| LC6.04-2101 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 20 |
| LV1.01-2101 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 21 |
| LV2.01-2101 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 22 |
| LV6.01-2101 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 23 |
| M3.20A-2101 | CCD 011 | ST CU 2101 MECHANICAL PLAN | 4/12/2019 | | | | | | 24 |
| E3.20-2101 | CCD 011 | ST CU 2101 ELECTRICAL PLAN | 4/12/2019 | | | | | | 25 |
| P2.16-2101 | CCD 011 | ST CU 2101 PLUMBING PLAN | 4/12/2019 | | | | | | 26 |
| FP3.20-2101 | CCD 011 | ST CU 2101 FIRE PROTECTION PLAN | 4/12/2019 | | | | | | 27 |
| **SOUTH TOWER UNIT 2102** | | | | | | | | | 25 |
| A0.05-2102 | CCD 053 | COVER SHEET CU 2102 | 4/12/2019 | 11/27/2019 | | | | | 1 |
| A2.205-2102 | CCD 011 | ST CU 2102 FLOOR PLAN | 4/12/2019 | | | | | | 2 |
| A5.205-2102 | CCD 011 | ST CU 2102 RCP | 4/12/2019 | | | | | | 3 |
| A6.3-2102 | CCD 011 | ST CU 2102 DOOR AND FINISH SCHEDULE | 4/12/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| LC1.01-2102 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-2102 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-2102 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-2102 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-2102 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-2102 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-2102 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-2102 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |
| LC6.02-2102 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-2102 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LC6.04-2102 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-2102 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-2102 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-2102 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| M3.20A-2102 | CCD 011 | ST CU 2102 MECHANICAL PLAN | 4/12/2019 | | | | | | 22 |
| E3.20-2012 | CCD 011 | ST CU 2102 ELECTRICAL PLAN | 4/12/2019 | | | | | | 23 |
| P2.15A-2102 | CCD 011 | ST CU 2102 PLUMBING PLAN | 4/12/2019 | | | | | | 24 |
| FP3.20-2102 | CCD 011 | ST CU 2102 FIRE PROTECTION PLAN | 4/12/2019 | | | | | | 25 |
| **SOUTH TOWER UNIT 2104** | | | | | | | | | 26 |
| A0.05-2104 | CCD 053 | COVER SHEET CU 2104 | 4/12/2019 | 11/27/2019 | | | | | 1 |
| A2.215-2104 | CCD 011 | ST CU 2104 FLOOR PLAN | 4/12/2019 | | | | | | 2 |
| A5.21s-2104 | CCD 011 | ST CU 2104 RCP | 4/12/2019 | | | | | | 3 |
| A6.3-2104 | CCD 011 | ST CU 2104 DOOR AND FINISH SCHEDULES | 4/12/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| ID.200 | CCD 053 | ENLARGED PLANS AND ELEVATIONS | 9/13/2019 | | | | | | 8 |
| LC1.01-2104 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-2104 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-2104 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-2104 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-2104 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-2104 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-2104 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-2104 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-2104 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-2104 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-2104 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED: 7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| LV1.01-2104 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-2104 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-2104 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| M3.21A-2104 | CCD 011 | ST CU 2104 MECHANICAL PLAN | 4/12/2019 | | | | | | 23 |
| E3.21-2104 | CCD 011 | ST CU 2104 ELECTRICAL PLAN | 4/12/2019 | | | | | | 24 |
| P2.16-2104 | CCD 011 | ST CU 2104 PLUMBING PLAN | 4/12/2019 | | | | | | 25 |
| FP3.21A-2104 | CCD 011 | ST CU 2104 FIRE PROTECTION PLAN | 4/12/2019 | | | | | | 26 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 2304** | | | | | | | | | 23 |
| A0.05-2304 | CCD 053 | COVER SHEET CU 2304 | 4/12/2019 | 11/27/2019 | | | | | 1 |
| A2.95-2304 | CCD 011 | ST CU 2304 FLOOR PLAN | 4/12/2019 | | | | | | 2 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 3 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 4 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 5 |
| LC1.01-2304 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 6 |
| LC2.01-2304 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 7 |
| LC2.02-2304 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 8 |
| LC2.03-2304 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.04-2304 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 10 |
| LC2.05-2304 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 11 |
| LC2.06-2304 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 12 |
| LC6.01-2304 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 13 |
| LC6.02-2304 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 14 |
| LC6.03-2304 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 15 |
| LC6.04-2304 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LV1.01-2304 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 17 |
| LV2.01-2304 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 18 |
| LV6.01-2304 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| M3.10-2304 | CCD 011 | ST CU 2304 MECHANICAL PLAN | 4/12/2019 | | | | | | 20 |
| E3.10-2304 | CCD 011 | ST CU 2304 ELECTRICAL PLAN | 4/12/2019 | | | | | | 21 |
| P2.15-2304 | CCD 011 | ST CU 2304 ST CU 2304 PLUMBING PLAN | 4/12/2019 | | | | | | 22 |
| FP3.10-2304 | CCD 011 | ST CI 2304 FIRE PROTECTION PLAN | 4/12/2019 | | | | | | 23 |
| **SOUTH TOWER UNIT 2401** | | | | | | | | | 31 |
| A0.05-2401 | CCD 062 | COVER SHEET CU 2401 | 8/20/2019 | 11/27/2019 | | | | | 1 |
| A2.8S-2401 | CCD 054 | ST CU 2401 FLOOR PLAN | 8/20/2019 | 11/15/2019 | | | | | 2 |
| A5.8S-2401 | CCD 054 | ST CU 2401 RCP | 8/20/2019 | 11/15/2019 | | | | | 3 |
| A6.3-2401 | CCD 043 | ST CU 2401 DOOR AND FINISH SCHEDULE | 8/20/2019 | | | | | | 4 |
| STA COVER | CCD 062 | STA COVER SHEET | 12/23/2019 | | | | | | 5 |
| ID.001 | CCD 062 | INDEX KEY SYMBOLS | 12/23/2019 | | | | | | 6 |
| ID.100 | CCD 062 | FLOOR PLAN | 12/23/2019 | | | | | | 7 |
| ID.101 | CCD 062 | FINISH FLOOR PLAN | 12/23/2019 | | | | | | 8 |
| ID.102 | CCD 062 | POWER PLAN | 12/23/2019 | | | | | | 9 |
| ID.103 | CCD 062 | RCP | 12/23/2019 | | | | | | 10 |
| ID.200 | CCD 062 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 11 |
| ID.201 | CCD 062 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 12 |
| ID.202 | CCD 062 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 13 |
| LC1.01-2401 | CCD 062 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 14 |
| LC2.01-2401 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 12/20/2017 | | | | | | 15 |
| LC2.02-2401 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 16 |
| LC2.03-2401 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 17 |
| LC2.04-2401 | CCD 062 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 18 |
| LC2.05-2401 | CCD 062 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 19 |
| LC2.06-2401 | CCD 062 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 20 |
| LC6.01-2401 | CCD 062 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 21 |
| LC6.02-2401 | CCD 062 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| LC6.03-2401 | CCD 062 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 23 |
| LC6.04-2401 | CCD 062 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 24 |
| LV1.01-2401 | CCD 073 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | 2/28/2020 | | | | | 25 |
| LV2.01-2401 | CCD 073 | SECURITY AND AV DETAILS | 12/20/2017 | 2/28/2020 | | | | | 26 |
| LV6.01-2401 | CCD 073 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | 2/28/2020 | | | | | 27 |
| M3.20A-2401 | CCD 043 | ST CU 2401 MECHANICAL PLAN | 8/20/2019 | | | | | | 28 |
| E3.20-2401 | CCD 054 | ST CU 2401 ELECTRICAL PLAN | 8/20/2019 | 11/15/2019 | | | | | 29 |
| P2.15A-2401 | CCD 043 | ST CU 2401 PLUMBING PLAN | 8/20/2019 | | | | | | 30 |
| FP3.20A-2401 | CCD 043 | ST CU 2401 FIRE PROTECTION PLAN | 8/20/2019 | | | | | | 31 |
| **SOUTH TOWER UNIT 2501** | | | | | | | | | 26 |
| A0.05-2501 | CCD 053 | COVER SHEET CU 2501 | 4/12/2019 | 11/27/2019 | | | | | 1 |
| A2.20S-2501 | CCD 011 | ST CU 2501 FLOOR PLAN | 4/12/2019 | | | | | | 2 |
| A5.20S-2501 | CCD 011 | ST CU 2501 RCP | 4/12/2019 | | | | | | 3 |
| A6.3-2501 | CCD 011 | ST CU 2501 DOOR AND FINISH SCHEDULE | 4/12/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| ID.200 | CCD 053 | ENLARGED PLANS AND ELEVATIONS | 9/13/2019 | | | | | | 8 |
| LC1.01-2501 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-2501 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-2501 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-2501 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-2501 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-2501 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-2501 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-2501 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-2501 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-2501 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-2501 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-2304 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-2304 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-2304 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| M3.20A-2501 | CCD 011 | ST CU 2501 MECHANICAL PLAN | 4/12/2019 | | | | | | 23 |
| E3.20-2501 | CCD 011 | ST CI 2501 ELECTRICAL PLAN | 4/12/2019 | | | | | | 24 |
| P2.15A-2501 | CCD 011 | ST CU 2501 PLUMBING PLAN | 4/12/2019 | | | | | | 25 |
| FP3.20-2501 | CCD 011 | ST CU 2501 ST CU 2501 FIRE PROTECTION PLAN | 4/12/2019 | | | | | | 26 |
| **SOUTH TOWER UNIT 2502** | | | | | | | | | 25 |
| A0.05-2502 | CCD 053 | COVER SHEET CU 2502 | 4/12/2019 | 11/27/2019 | | | | | 1 |
| A2.20S-2502 | CCD 011 | ST CU 2502 FLOOR PLAN | 4/12/2019 | | | | | | 2 |
| A5.20S-2502 | CCD 011 | ST CU 2502 RCP | 4/12/2019 | | | | | | 3 |
| A6.3-2502 | CCD 011 | ST CU 2502 DOOR AND FINISH SCHEDULES | 4/12/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| LC1.01-2502 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-2502 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-2502 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-2502 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-2502 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-2502 | CCD 053 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-2502 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-2502 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| LC6.02-2502 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-2502 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LC6.04-2502 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-2502 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-2502 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-2502 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| M3.20-2502 | CCD 011 | ST CU 2502 MECHANICAL PLAN | 4/12/2019 | | | | | | 22 |
| E3.20-2502 | CCD 011 | ST CU 2502 ELECTRICAL PLAN | 4/12/2019 | | | | | | 23 |
| P2.15A-2502 | CCD 011 | ST CU 2502 PLUMBING PLAN | 4/12/2019 | | | | | | 24 |
| FP3.20-2502 | CCD 011 | ST CU 2502 ST CU 2501 FIRE PROTECTION PLAN | 4/12/2019 | | | | | | 25 |
| **SOUTH TOWER UNIT 2602** | | | | | | | | | 26 |
| A0.05-2602 | CCD 062 | COVER SHEET CU 2602 | 4/12/2019 | 11/27/2019 | | | | | 1 |
| A2.205-2602 | CCD 036 | ST CU 2602 FLOOR PLAN | 4/12/2019 | 5/16/2019 | | 7/25/2019 | 8/15/2019 | 9/20/2019 | 2 |
| A5.205-2602 | CCD 036 | ST CU 2602 RCP | 4/12/2019 | 5/16/2019 | | 7/25/2019 | 8/15/2019 | 9/20/2019 | 3 |
| A6.3-2602 | CCD 036 | ST CU 2602 DOOR AND FINISH SHCEDULES | 4/12/2019 | 5/16/2019 | | 7/25/2019 | 8/15/2019 | | 4 |
| STA COVER | CCD 062 | STA COVER SHEET | 12/23/2019 | | | | | | 5 |
| ID.001 | CCD 062 | INDEX KEY SYMBOLS | 12/23/2019 | | | | | | 6 |
| ID.100 | CCD 062 | FLOOR PLAN | 12/23/2019 | | | | | | 7 |
| ID.200 | CCD 062 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 8 |
| LC1.01-2602 | CCD 062 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-2602 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-2602 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-2602 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-2602 | CCD 062 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-2602 | CCD 062 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-2602 | CCD 062 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-2602 | CCD 062 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-2602 | CCD 062 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-2602 | CCD 062 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-2602 | CCD 062 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-2602 | CCD 062 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-2602 | CCD 062 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-2602 | CCD 062 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| M3.20A-2602 | CCD 036 | ST CU 2602 MECHANICAL PLAN | 4/12/2019 | 5/16/2019 | | 7/25/2019 | 8/15/2019 | 9/20/2019 | 23 |
| E3.20A-2602 | CCD 036 | ST CU 2602 ELECTRICAL PLAN | 4/12/2019 | 5/16/2019 | | 7/25/2019 | | 9/20/2019 | 24 |
| P2.15A-2602 | CCD 036 | ST CU 2602 PLUMBING PLAN | 4/12/2019 | 5/16/2019 | | 7/25/2019 | 8/15/2019 | 9/20/2019 | 25 |
| FP3.20-2602 | CCD 036 | ST CU 2602 FIRE PROTECTION PLAN | 4/12/2019 | 5/16/2019 | | 7/25/2019 | 8/15/2019 | 9/20/2019 | 26 |

## ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108

UPDATED:  7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 2603** | | | | | | | | | 26 |
| A0.05-2603 | CCD 053 | COVER SHEET CU 2603 | 4/25/2019 | 11/27/2019 | | | | | 1 |
| A2.215-2603 | CCD 12 | ST CU 2603 FLOOR PLAN | 4/25/2019 | | | | | | 2 |
| A5.215-2603 | CCD 12 | ST CU 2603 RCP | 4/25/2019 | | | | | | 3 |
| A6.3-2603 | CCD 12 | ST CU 2603 DOOR AND FINISH SCHEDULE | 4/25/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| ID.200 | CCD 053 | ENLARGED PLANS AND ELEVATIONS | 12/20/2017 | | | | | | 8 |
| LC1.01-2603 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-2603 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-2603 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-2603 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-2603 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-2603 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-2603 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-2603 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-2603 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-2603 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-2603 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-2603 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-2603 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-2603 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| E3.21-2603 | CCD 12 | ST CU 2603 ELECTRICAL PLAN | 4/25/2019 | | | | | | 23 |
| FP3.21-2603 | CCD 12 | ST CU 2603 FIRE PROTECTION PLAN | 4/25/2019 | | | | | | 24 |
| M3.21A-2603 | CCD 12 | ST CU 2603 MECHANICAL PLAN | 4/25/2019 | | | | | | 25 |
| P2.15A | CCD 12 | ST CU 2603 PLUMBING PLAN | 4/25/2019 | | | | | | 26 |
| **SOUTH TOWER UNIT 2702** | | | | | | | | | 26 |
| A0.05-2702 | CCD 053 | COVER SHEET CU 2702 | 4/25/2019 | 11/27/2019 | | | | | 1 |
| A2.205-2702 | CCD 12 | ST CU 2702 FLOOR PLAN | 4/25/2019 | | | | | | 2 |
| A5.205-2702 | CCD 12 | ST CU 2702 RCP | 4/25/2019 | | | | | | 3 |
| A6.3-2702 | CCD 12 | ST CU 2702 DOOR AND FINISH SCHEDULES | 4/25/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| ID.200 | CCD 053 | ENLARGED PLANS AND ELEVATIONS | 12/20/2017 | | | | | | 8 |
| LC1.01-2702 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-2702 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-2702 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-2702 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-2702 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-2702 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-2702 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-2702 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-2702 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-2702 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-2702 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-2702 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-2702 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-2702 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| E3.20-2702 | CCD 12 | ST CU 2702 ELECTRICAL PLAN | 4/25/2019 | | | | | | 23 |
| FP3.20-2702 | CCD 12 | ST CU 2702 FIRE PROTECTION PLAN | 4/25/2019 | | | | | | 24 |
| M3.20A-2702 | CCD 12 | ST CU 2702 MECHANICAL PLAN | 4/25/2019 | | | | | | 25 |
| P2.15A-2702 | CCD 12 | ST CU 2702 PLUMBING PLAN | 4/25/2019 | | | | | | 26 |
| **SOUTH TOWER UNIT 2703** | | | | | | | | | 26 |
| A0.05-2703 | CCD 053 | COVER SHEET CU 2703 | 4/25/2019 | 11/27/2019 | | | | | 1 |
| A2.21-2703 | CCD 12 | ST CU 2703 FLOOR PLAN | 4/25/2019 | | | | | | 2 |
| A5.215-2703 | CCD 12 | ST CU 2703 RCP | 4/25/2019 | | | | | | 3 |
| A6.3 | CCD 12 | ST CU 2703 DOOR AND FINISH SCHEDULE | 4/25/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| ID.200 | CCD 053 | ENLARGED PLANS AND ELEVATIONS | 12/20/2017 | | | | | | 8 |
| LC1.01-2703 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-2703 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-2703 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-2703 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-2703 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-2703 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-2703 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-2703 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-2703 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-2703 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-2703 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-2703 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-2703 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-2703 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| E3.20A-2703 | CCD 12 | ST CU 2703 MECHANICAL PLAN | 4/25/2019 | | | | | | 23 |
| FP3.21-2703 | CCD 12 | ST CU 2703 FIRE PROTECTION PLAN | 4/25/2019 | | | | | | 24 |
| M3.21A-2703 | CCD 12 | ST CU 2703 MECHANICAL PLAN | 4/25/2019 | | | | | | 25 |
| P2.15A-2703 | CCD 12 | ST CU 2703 PLUMBING PLAN | 4/25/2019 | | | | | | 26 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED: 7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 2704** | | | | | | | | | 26 |
| A0.05-2704 | CCD 053 | COVER SHEET CU 2704 | 4/25/2019 | 11/27/2019 | | | | | 1 |
| A2.215-2704 | CCD 12 | ST CU 2704 FLOOR PLAN | 4/25/2019 | | | | | | 2 |
| A5.215-2704 | CCD 12 | ST CU 2704 RCP | 4/25/2019 | | | | | | 3 |
| A6.3-2704 | CCD 12 | ST CU 2704 DOOR AND FINISH SCHEDULES | 4/25/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| ID.101 | CCD 053 | POWER PLAN | 12/20/2017 | | | | | | 8 |
| LC1.01-2704 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-2704 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-2704 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-2704 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-2704 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-2704 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-2704 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-2704 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-2704 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-2704 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-2704 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-2704 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-2704 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-2704 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| E3.21-2704 | CCD 12 | ST CU 2704 ELECTRICAL PLAN | 4/25/2019 | | | | | | 23 |
| FP3.21A-2704 | CCD 12 | ST CU 2704 FIRE PROTECTION PLAN | 4/25/2019 | | | | | | 24 |
| M3.21A-2704 | CCD 12 | ST CU 2704 MECHANICAL PLAN | 4/25/2019 | | | | | | 25 |
| P2.15A-2704 | CCD 12 | ST CU 2704 PLUMBING PLAN | 4/25/2019 | | | | | | 26 |
| **SOUTH TOWER UNIT 2801** | | | | | | | | | 25 |
| A0.05-2801 | CCD 053 | COVER SHEET CU 2801 | 4/25/2019 | 11/27/2019 | | | | | 1 |
| A2.225-2801 | CCD 12 | ST CU 2801 FLOOR PLAN | 4/25/2019 | | | | | | 2 |
| A5.225-2801 | CCD 12 | ST CU 2801 RCP | 4/25/2019 | | | | | | 3 |
| A6.3-2801 | CCD 12 | ST CU 2801 DOOR AND FINISH SCHEDULE | 4/25/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| LC1.01-2801 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-2801 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-2801 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-2801 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-2801 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-2801 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-2801 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-2801 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |
| LC6.02-2801 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-2801 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LC6.04-2801 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-2801 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-2801 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-2801 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| E3.22-2801 | CCD 12 | ST CU 2801 ELECTRICAL PLAN | 4/25/2019 | | | | | | 22 |
| FP3.22 | CCD 12 | ST CU 2801 FIRE PROTECTION PLAN | 4/25/2019 | | | | | | 23 |
| M3.22-2801 | CCD 12 | ST CU 2801 MECHANICAL PLAN | 4/25/2019 | | | | | | 24 |
| P2.16-2801 | CCD 12 | ST CU 2801 PLUMBING PLAN | 4/25/2019 | | | | | | 25 |
| **SOUTH TOWER UNIT 2803** | | | | | | | | | 26 |
| A0.05-2803 | CCD 053 | COVER SHEET CU 2803 | 4/25/2019 | 11/27/2019 | | | | | 1 |
| A2.215-2803 | CCD 12 | ST CU 2803 FLOOR PLAN | 4/25/2019 | | | | | | 2 |
| A5.215-2803 | CCD 12 | ST CU 2803 RCP | 4/25/2019 | | | | | | 3 |
| A6.35-2803 | CCD 12 | ST CU 2803 DOOR AND FINISH SCHEDULES | 4/25/2019 | | | | | | 4 |
| STA COVER | CCD 053 | STA COVER SHEET | 9/13/2019 | | | | | | 5 |
| ID.001 | CCD 053 | INDEX KEY SYMBOLS | 9/13/2019 | | | | | | 6 |
| ID.100 | CCD 053 | FLOOR PLAN | 9/13/2019 | | | | | | 7 |
| ID.200 | CCD 053 | ENLARGED PLANS AND ELEVATIONS | 9/13/2019 | | | | | | 8 |
| LC1.01-2803 | CCD 053 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-2803 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-2803 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-2803 | CCD 053 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-2803 | CCD 053 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-2803 | CCD 053 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-2803 | CCD 053 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-2803 | CCD 053 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-2803 | CCD 053 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-2803 | CCD 053 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-2803 | CCD 053 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-2803 | CCD 053 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-2803 | CCD 053 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-2801 | CCD 053 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| E3.20A-2803 | CCD 12 | ST CU 2803 ELECTRICAL PLAN | 4/25/2019 | | | | | | 23 |
| FP3.21-2803 | CCD 12 | ST CU 2803 FIRE PROTECTION PLAN | 4/25/2019 | | | | | | 24 |
| M3.21A-2803 | CCD 12 | ST CU 2803 MECHANICAL PLAN | 4/25/2019 | | | | | | 25 |
| P2.15A-2803 | CCD 12 | ST CU 2803 PLUMBING PLAN | 4/25/2019 | | | | | | 26 |
| **SOUTH TOWER UNIT 2804** | | | | | | | | | 26 |
| A0.05-2804 | CCD 062 | Cover Sheet ST CU 2804 | 6/17/2019 | 11/27/2019 | | | | | 1 |
| A2.9S-2804 | CCD 024 | ST CU 2804 FLOOR PLAN | 6/17/2019 | | | | | | 2 |
| A5.215-2804 | CCD024 | ST CU 2804 RCP | 6/17/2019 | | | | | | 3 |
| STA COVER | CCD 062 | COVER SHEET | 12/23/2019 | | | | | | 4 |
| ID.001 | CCD 062 | INDEX KEY SYMBOLS | 12/23/2019 | | | | | | 5 |
| ID.100 | CCD 062 | FLOOR PLAN | 12/23/2019 | | | | | | 6 |
| ID.200 | CCD 062 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 7 |
| LC1.01-2804 | CCD 062 | LC LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-2804 | CCD 062 | LC DETAIL CLS-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-2804 | CCD 062 | LC DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-2804 | CCD 062 | LC DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-2804 | CCD 062 | LC DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-2804 | CCD 062 | LC DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-2804 | CCD 062 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-2804 | CCD 062 | LIGHTING ZONING RCP UNIT 604 | 12/20/2017 | | | | | | 15 |
| LC6.02-2804 | CCD 062 | LC FLOOR PLAN UNIT 604 | 12/20/2017 | | | | | | 16 |
| LC6.03-2804 | CCD 062 | SHADING CONTROL SYSTEM RCP UNIT 604 | 12/20/2017 | | | | | | 17 |
| LC6.04-2804 | CCD 062 | HVAC CONTROL SYSTEM FLOOR PLAN UNIT 604 | 12/20/2017 | | | | | | 18 |
| LV1.01-2804 | CCD 062 | SECURITY AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-2804 | CCD 062 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-2804 | CCD 062 | SECURITY AND AV UNIT 604 FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| M3.10-2804 | CCD 024 | ST CU 2804 MECHANICAL PLAN | 6/17/2019 | | | | | | 22 |
| E3.10-2804 | CCD 024 | ST CU 2804 ELECTRICAL PLAN | 6/17/2019 | | | | | | 23 |
| P2.15-2804 | CCD 024 | ST CU 2804 PLUMBING PLAN | 6/17/2019 | | | | | | 24 |
| FP3.10-2804 | CCD 024 | ST CU 2804 FIRE PROTECTION PLAN | 6/17/2019 | | | | | | 25 |
| **SOUTH TOWER UNIT 2901** | | | | | | | | | 26 |
| A0.05-2901 | CCD 062 | COVER SHEET CU 2901 | 4/25/2019 | 1/22/2020 | | | | | 1 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED:    7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| A2.22S-2901 | CCD 12 | ST CU 2901 FLOOR PLAN | 4/25/2019 | | | | | | 2 |
| A5.22S-2901 | CCD 12 | ST CU 2901 RCP | 4/25/2019 | | | | | | 3 |
| A6.3-2901 | CCD 12 | ST CU 2901 DOOR AND FINISH SCHEDULES | 4/25/2019 | | | | | | 4 |
| STA COVER | CCD 062 | STA COVER SHEET | 9/27/2019 | | | | | | 5 |
| ID.001 | CCD 062 | INDEX KEY SYMBOLS | 9/27/2019 | | | | | | 6 |
| ID.100 | CCD 062 | FLOOR PLAN | 9/27/2019 | | | | | | 7 |
| ID.101 | CCD 062 | POWER AND RCP PLANS | 9/27/2019 | | | | | | 8 |
| ID.200 | CCD 062 | ENLARGED PLANS AND ELEVATIONS | 9/27/2019 | | | | | | 9 |
| LC1.01-2901 | CCD 062 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 10 |
| LC2.02-2901 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-2901 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-2901 | CCD 062 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-2901 | CCD 062 | SC SYSTEMS DETAIL CZN-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-2901. | CCD 062 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-2901 | CCD 062 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-2901 | CCD 062 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-2901 | CCD 062 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-2901 | CCD 062 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-2901 | CCD 062 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-2901 | CCD 062 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-2901 | CCD 062 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| E3.20-2901 | CCD 12 | ST CU 2901 ELECTRICAL PLAN | 4/25/2019 | | | | | | 23 |
| FP3.22-2901 | CCD 12 | ST CU 2901 FIRE PROTECTION PLAN | 4/25/2019 | | | | | | 24 |
| M3.22-2901 | CCD 12 | ST CU 2901 MECHANICAL PLAN | 4/25/2019 | | | | | | 25 |
| P2.15A-29 | CCD 12 | ST CU 2901 PLUMBING PLAN | 4/25/2019 | | | | | | 26 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**  UPDATED: 7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 3001** | | | | | | | | | **24** |
| A0.05-3001 | CCD 062 | COVER SHEET CU 3001 | 5/17/2019 | 1/22/2020 | | | | | 1 |
| A2.225-3001 | CCD 015 | ST CU 3001 FLOOR PLAN | 5/17/2019 | | | | | | 2 |
| A5.225-3001 | CCD 015 | ST CU 3001 RCP | 5/17/2019 | | | | | | 3 |
| STA COVER | CCD 062 | COVER SHEET | 9/27/2019 | | | | | | 4 |
| ID.001 | CCD 062 | INDEX KEY SYMBOLS | 9/27/2019 | | | | | | 5 |
| ID.100 | CCD 062 | FLOOR PLAN | 9/27/2019 | | | | | | 6 |
| LC1.01-3001 | CCD 062 | LC LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 7 |
| LC2.01-3001 | CCD 062 | LC DETAIL CLS-2DIMJB DIMMER MODULE | 12/20/2017 | | | | | | 8 |
| LC2.02-3001 | CCD 062 | LC DETAIL CLX-2DIMUJB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.03-3001 | CCD 062 | LC DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.04-3001 | CCD 062 | LC DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 11 |
| LC2.05-3001 | CCD 062 | LC DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 12 |
| LC2.06-3001 | CCD 062 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 13 |
| LC6.01-3001 | CCD 062 | LIGHTING ZONING RCP UNIT 604 | 12/20/2017 | | | | | | 14 |
| LC6.02-3001 | CCD 062 | LC FLOOR PLAN UNIT 604 | 12/20/2017 | | | | | | 15 |
| LC6.03-3001 | CCD 062 | SHADING CONTROL SYSTEM RCP UNIT 604 | 12/20/2017 | | | | | | 16 |
| LC6.04-3001 | CCD 062 | HVAC CONTROL SYSTEM FLOOR PLAN UNIT 604 | 12/20/2017 | | | | | | 17 |
| LV1.01-3001 | CCD 062 | SECURITY AND AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 18 |
| LV2.01-3001 | CCD 062 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 19 |
| LV6.01-3001 | CCD 062 | SECURITY AND AV UNIT 604 FLOOR PLAN | 12/20/2017 | | | | | | 20 |
| M3.20A-3001 | CCD 015 | ST CU 3001 MECHANICAL PLAN | 5/17/2019 | | | | | | 21 |
| E3.20-3001 | CCD 015 | ST CU 3001 ELECTRICAL PLAN | 5/17/2019 | | | | | | 22 |
| P2.16-3001 | CCD 015 | ST CU 3001 PLUMBING PLAN | 5/17/2019 | | | | | | 23 |
| FP3.20A-3001 | CCD 015 | ST CU 3001 FIRE PROTECTION PLAN | 5/17/2019 | | | | | | 24 |
| **SOUTH TOWER UNIT 3101** | | | | | | | | | **25** |
| A0.05-3101 | CCD 062 | COVER SHEET CU 3101 | 4/25/2019 | 1/22/2020 | | | | | 1 |
| A2.205-3101 | CCD 12 | ST CU 3101 FLOOR PLAN | 4/25/2019 | | | | | | 2 |
| A5.205-3101 | CCD 12 | ST CU 3101 RCP | 4/25/2019 | | | | | | 3 |
| A6.3-3101 | CCD 12 | ST CU 3101 DOOR AND FINISH SCHEDULES | 4/25/2019 | | | | | | 4 |
| STA COVER | CCD 062 | COVER SHEET | 9/27/2019 | | | | | | 5 |
| ID.001 | CCD 062 | INDEX KEY SYMBOLS | 9/27/2019 | | | | | | 6 |
| ID.100 | CCD 062 | FLOOR PLAN | 9/27/2019 | | | | | | 7 |
| LC1.01-3101 | CCD 062 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-3101 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-3101 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-3101 | CCD 062 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-3101 | CCD 062 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-3101 | CCD 062 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-3101 | CCD 062 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-3101 | CCD 062 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |
| LC6.02-3101 | CCD 062 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-3101 | CCD 062 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LC6.04-3101 | CCD 062 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-3101 | CCD 062 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-3101 | CCD 062 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-3101 | CCD 062 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| E3.20-3101 | CCD 12 | ST CU 3101 ELECTRICAL PLAN | 4/25/2019 | | | | | | 22 |
| FP2.20A-3101 | CCD 12 | ST CU 3101 FIRE PROTECTION PLAN | 4/25/2019 | | | | | | 23 |
| M3.20A-3101 | CCD 12 | ST CU 3101 MECHANICAL PLAN | 4/25/2019 | | | | | | 24 |
| P2.15A-3101 | CCD 12 | ST CU 3101 PLUMBING PLAN | 4/25/2019 | | | | | | 25 |
| **SOUTH TOWER UNIT 3201** | | | | | | | | | **26** |
| A0.05-3201 | CCD 068 | COVER SHEET-ST CU 3201 | 5/17/2019 | 2/7/2020 | | | | | 1 |
| A2.225-3201 | CCD 015 | ST CU 3201 FLOOR PLAN | 5/17/2019 | | | | | | 2 |
| A5.225-3201 | CCD 015 | ST CU 3201 RCP | 5/17/2019 | | | | | | 3 |
| A6.3-3201 | CCD 015 | ST CU 3201 DOOR AND FINISH SCHEDULES | 5/17/2019 | | | | | | 4 |
| M3.22-3201 | CCD 015 | ST CU 3201 MECHANICAL PLAN | 5/17/2019 | | | | | | 5 |
| E3.22-3201 | CCD 015 | ST CU 3201 ELECTRICAL PLAN | 5/17/2019 | | | | | | 6 |
| P2.15A-3201 | CCD 015 | ST CU 3201 PLUMBING PLAN | 5/17/2019 | | | | | | 7 |
| FP3.25A-3201 | CCD 015 | ST CU 3201 FIRE PROTECTION PLAN | 5/17/2019 | | | | | | 8 |
| LC1.01-3201 | CCD 068 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-3201 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-3201 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-3201 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-3201 | CCD 068 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-3201 | CCD 068 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-3201 | CCD 068 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-3201 | CCD 068 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-3201 | CCD 068 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-3201 | CCD 068 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-3201 | CCD 068 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-3201 | CCD 068 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-3201 | CCD 068 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-3201 | CCD 068 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| STA COVER | CCD 068 | COVER SHEET | 9/27/2019 | | | | | | 23 |
| ID.001 | CCD 068 | INDEX KEY SYMBOLS | 9/27/2019 | | | | | | 24 |
| ID.100 | CCD 068 | FLOOR PLAN | 9/27/2019 | | | | | | 25 |
| ID.200 | CCD 068 | ENLARGED PLANS AND ELEVATIONS | 9/27/2019 | | | | | | 26 |
| **SOUTH TOWER UNIT 3204** | | | | | | | | | **27** |
| A0.05-3204 | CCD 068 | COVER SHEET ST CU 3204 | 5/17/2019 | 2/7/2020 | | | | | 1 |
| A2.215-3204 | CCD 015 | ST CU 3204 FLOOR PLAN | 5/17/2019 | | | | | | 2 |
| A5.215-3204 | CCD 015 | ST CU 3204 RCP | 5/17/2019 | | | | | | 3 |
| A6.3-3204 | CCD 015 | ST CU 3204 DOOR AND FINISH SCHEDULES | 5/17/2019 | | | | | | 4 |
| M3.21A-3204 | CCD 015 | ST CU 3204 MECHANICAL PLAN | 5/17/2019 | | | | | | 5 |
| E3.21-3204 | CCD 015 | ST CU 3204 ELECTRICAL PLAN | 5/17/2019 | | | | | | 6 |
| P2.15A-3204 | CCD 015 | ST CU 3204 PLUMBING PLAN | 5/17/2019 | | | | | | 7 |
| FP3.21A-3204 | CCD 015 | ST CU 3204 FIRE PROTECTION PLAN | 5/17/2019 | | | | | | 8 |
| LC1.01-3204 | CCD 068 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-3204 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-3204 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-3204 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-3204 | CCD 068 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-3204 | CCD 068 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-3204 | CCD 068 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-3204 | CCD 068 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-3204 | CCD 068 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-3204 | CCD 068 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-3204 | CCD 068 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-3204 | CCD 068 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-3204 | CCD 068 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-3204 | CCD 068 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| STA COVER | CCD 068 | COVER SHEET | 9/27/2019 | | | | | | 23 |
| ID.001 | CCD 068 | INDEX KEY SYMBOLS | 9/27/2019 | | | | | | 24 |
| ID.100 | CCD 068 | FLOOR PLAN | 9/27/2019 | | | | | | 25 |
| ID.101 | CCD 068 | RCP | 9/27/2019 | | | | | | 26 |
| ID.200 | CCD 068 | ENLARGED PLANS AND ELEVATIONS | 9/27/2019 | | | | | | 27 |
| **SOUTH TOWER UNIT 3301** | | | | | | | | | **26** |
| A0.0S-3301 | CCD 068 | COVER SHEET ST CU 3301 | 5/17/2019 | 2/7/2020 | | | | | 1 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED:     7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| A2.205-3301 | CCD 015 | ST CU 3301 FLOOR PLAN | 5/17/2019 | | | | | | 2 |
| A5.205-3301 | CCD 045 | ST CU 3301 RCP | 5/17/2019 | 10/23/2019 | | | | | 3 |
| A6.3-3301 | CCD 015 | ST CU 3301 DOOR AND FINISH SCHEDULE | 5/17/2019 | | | | | | 4 |
| M3.20A-3301 | CCD 045 | ST CU 3301 MECHANICAL PLAN | 5/17/2019 | 10/23/2019 | | | | | 5 |
| E3.20-3301 | CCD 015 | ST CI 3301 ELECTRICAL PLAN | 5/17/2019 | | | | | | 6 |
| P2.16-3301 | CCD 015 | ST CU 3301 PLUMBING PLAN | 5/17/2019 | | | | | | 7 |
| FP3.20A-3301 | CCD 015 | ST CU 3301 FIRE PROTECTION PLAN | 5/17/2019 | | | | | | 8 |
| LC1.01-3301 | CCD 068 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-3301 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-3301 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-3301 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-3301 | CCD 068 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-3301 | CCD 068 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-3301 | CCD 068 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-3301 | CCD 068 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-3301 | CCD 068 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-3301 | CCD 068 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-3301 | CCD 068 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-3301 | CCD 068 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-3301 | CCD 068 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-3301 | CCD 068 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| STA COVER | CCD 068 | COVER SHEET | 10/18/2019 | | | | | | 23 |
| ID.001 | CCD 068 | INDEX KEY SYMBOLS | 10/18/2019 | | | | | | 24 |
| ID.100 | CCD 068 | FLOOR PLAN | 10/18/2019 | | | | | | 25 |
| ID.101 | CCD 068 | RCP | 10/18/2019 | | | | | | 26 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**   UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **SOUTH TOWER UNIT 3304** | | | | | | | | | 27 |
| A0.05-3304 | CCD 068 | COVER SHEET ST CU 3304 | 5/17/2019 | 2/7/2020 | | | | | 1 |
| A2.215-3304 | CCD 015 | ST CU 3304 FLOOR PLAN | 5/17/2019 | | | | | | 2 |
| A5.215-3304 | CCD 045 | ST CU 3304 RCP | 5/17/2019 | 10/23/2019 | | | | | 3 |
| A6.3-3304 | CCD 015 | ST CU 3304 DOOR AND FINISH SCHEDULE | 5/17/2019 | | | | | | 4 |
| M3.21A-3304 | CCD 045 | ST CU 3304 MECHANICAL PLAN | 5/17/2019 | 10/23/2019 | | | | | 5 |
| E3.21-3304 | CCD 015 | ST CU 3304 ELECTRICAL PLAN | 5/17/2019 | | | | | | 6 |
| P2.15A-3304 | CCD 015 | ST CU 3304 PLUMBING PLAN | 5/17/2019 | | | | | | 7 |
| FP3.21-3304 | CCD 015 | ST CU 3304 FIRE PROTECTION PLAN | 5/17/2019 | | | | | | 8 |
| LC1.01-3304 | CCD 068 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-3304 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-3304 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-3304 | CCD 068 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-3304 | CCD 068 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-3304 | CCD 068 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-3304 | CCD 068 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-3304 | CCD 068 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-3304 | CCD 068 | SIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-3304 | CCD 068 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-3304 | CCD 068 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-3304 | CCD 068 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-3304 | CCD 068 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-3304 | CCD 068 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| STA COVER | CCD 068 | COVER SHEET | 9/27/2019 | | | | | | 23 |
| ID.001 | CCD 068 | INDEX KEY SYMBOLS | 10/18/2019 | | | | | | 24 |
| ID.100 | CCD 068 | FLOOR PLAN | 10/18/2019 | | | | | | 25 |
| ID.101 | CCD 068 | RCP | 10/18/2019 | | | | | | 26 |
| ID.200 | CCD 068 | ENLARGED PLANS AND ELEVATIONS | 10/18/2019 | | | | | | 27 |
| **SOUTH TOWER UNIT 3405-06-07** | | | | | | | | | 65 |
| A0.05-3405-06-07 | CCD 068 | Cover Sheet | 7/25/2019 | 2/7/2020 | | | | | 1 |
| A2.05-3405-06-07 | CCD 068 | ST CU 3405-06-07 FLOOR PLAN | 7/25/2019 | 11/15/2019 | | | | | 2 |
| A5.05-3405-06-07 | CCD073 | ST CU 3405-06-07 RCP | 7/25/2019 | 11/15/2019 | | | | | 3 |
| A6.05-3405-06-07 | CCD 068 | ST CU 3405-06-07 DOOR AND FINISH SCHEDULES | 7/25/2019 | | | | | | 4 |
| A6.285-3405-06-07 | CCD 068 | ST 34TH LEVEL SLIDING DOORS STOREFRONTS AND DOORS | 7/25/2019 | | | | | | 5 |
| A8.105-3405-06-07 | CCD 068 | WALL TYPES | 7/25/2019 | | | | | | 6 |
| A8.115-3405-06-07 | CCD 068 | WALL TYPES | 7/25/2019 | | | | | | 7 |
| A8.125-3405-06-07 | CCD 068 | WALL TYPES AND DETAILS | 7/25/2019 | | | | | | 8 |
| LS1.05-3405-06-07 | CCD 068 | ST 34TH CU 3405-06-07 LIFE SAFETY PLAN | 7/25/2019 | | | | | | 9 |
| AV-0.01.U3405 | CCD 068 | AV LEGENDS AND GENERAL NOTES | 12/20/2017 | | | | | | 10 |
| AV-2.01.U3405 | CCD 068 | WHOLE AV FLOOR PLANS | 12/20/2017 | | | | | | 11 |
| AV2.02.U3405 | CCD 068 | 1ST HALF OF FLOOR PLAN | 12/20/2017 | | | | | | 12 |
| AV2.03.U3405 | CCD 068 | 2ND HALF OF FLOOR PLAN | 12/20/2017 | | | | | | 13 |
| LC1.01-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 14 |
| LC2.01-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 12/20/2017 | | | | | | 15 |
| LC2.02-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 16 |
| LC2.03-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 17 |
| LC2.04-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEMS DETAIL CAEN BLOCK & PROCESSOR | 12/20/2017 | | | | | | 18 |
| LC2.05-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 19 |
| LC2.06-3405-06-07 | CCD 068 | SHADING CONTROL SYSTEM PREWIRE DETAIL-XSPOT LOCATION | 12/20/2017 | | | | | | 20 |
| LC6.01-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEM ZONING COMBINED UNIT 3405-06-07 | 12/20/2017 | | | | | | 21 |
| LC6.02-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEM PANEL SCHEDULE -LCP 1-COMBINED UNIT 3405-06-07 | 12/20/2017 | | | | | | 22 |
| LC6.03-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEM PANEL SCHEDULE LCP 2 COMBINED UNIT 3405-06-07 | 12/20/2017 | | | | | | 23 |
| LC6.04-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEM PANEL SCHEDULE LCP-3 | 12/20/2017 | | | | | | 24 |
| LC6.05-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEM DEVICES FLOOR PLAN | 12/20/2017 | | | | | | 25 |
| LC6.06-3405-06-07 | CCD 068 | LIGHTING CONTROL SYSTEM ONE LINE RISER | 12/20/2017 | | | | | | 26 |
| LC6.08-3405-06-07 | CCD 068 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 27 |
| LC6.08-3405-06-07 | CCD 068 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 28 |
| M3.23-3405.6.7 | CCD 068 | ST CU 3405-06-07 MECHANICAL PLAN | 7/25/2019 | 11/15/2019 | | | | | 29 |
| E3.23-3405.6.7 | CCD 068 | ST CU 3405-06-07 ELECTRICAL PLAN | 7/25/2019 | 11/15/2019 | | | | | 30 |
| E3.23A-3405.06.07 | CCD 068 | ST CU 3405-06-07 ELECTRICAL PLAN | 7/25/2019 | 11/15/2019 | | | | | 31 |
| P2.19A-3405.6.7 | CCD 068 | ST CU 3405-06-07 PLUMBING PLAN | 7/25/2019 | 11/15/2019 | | | | | 32 |
| FP3.23-3405.6.7 | CCD 068 | ST CU 3405-06-07 FIRE PROTECTION PLAN | 7/25/2019 | 11/15/2019 | | | | | 33 |
| STA COVER | CCD 106 | ST CU 3405-06-07 COVER SHEET | 11/19/2009 | 6/18/2020 | | | | | 34 |
| ID.001-3405-06-07 | CCD 106 | CU 3405-06-07 INDEX KEY SYMBOLS ABBR. | 11/19/2019 | 6/18/2020 | | | | | 35 |
| ID.100-3405-06-07 | CCD 106 | CU 3405-06-07 FLOOR PLAN | 11/19/2019 | 6/18/2020 | | | | | 36 |
| ID.101-3405-06-07 | CCD 106 | FLOOR FINISH PLAN | 11/19/2019 | 6/18/2020 | | | | | 37 |
| ID.102-3405-06-07 | CCD 106 | POWER PLAN | 11/19/2019 | 6/18/2020 | | | | | 38 |
| ID.103-3405-06-07 | CCD 106 | RCP | 11/19/2019 | 6/18/2020 | | | | | 39 |
| ID.104-3405-06-07 | CCD 106 | FURNITURE PLAN | 11/19/2019 | 6/18/2020 | | | | | 40 |
| ID.200-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 41 |
| ID.201-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 42 |
| ID.202-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 43 |
| ID.203-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 44 |
| ID.204-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 45 |
| ID.207-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 46 |
| ID.207-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 47 |
| ID.208-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 48 |
| ID.209-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 49 |
| ID.210-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 50 |
| ID.211-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 51 |
| ID.212-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 52 |
| ID.213-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 53 |
| ID.214-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 54 |
| ID.215-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 55 |
| ID.216-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 56 |
| ID.217-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 57 |
| ID.218-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 58 |
| ID.219-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 59 |
| ID.220-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 60 |
| ID.221-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 61 |
| ID.222-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 62 |
| ID.223-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 63 |
| ID.224-3405-06-07 | CCD 106 | ENLARGED PLANS AND ELEVATIONS | 11/19/2019 | 6/18/2020 | | | | | 64 |
| ID.400-3405-06-07 | CCD 106 | SCHEDULES | 11/19/2019 | 6/18/2020 | | | | | 65 |
| **ST CU 3506** | | | | | | | | | 31 |
| A0.05-3506 | CCD 100 | COVER SHEET-CU 3506 | 5/28/2019 | 5/15/2020 | | | | | 1 |
| A2.115-3506 | CCD 104 | ST CU 3506 FLOOR PLAN | 5/28/2019 | 8/15/2019 | | 6/1/2020 | | | 2 |
| A5.115-3506 | CCD 104 | ST CU 3506 RCP | 5/28/2019 | 8/15/2019 | | 6/1/2020 | | | 3 |
| A6.3-3506 | CCD 104 | ST CU 3506 DOOR AND FINISH SCHEDULES | 5/28/2019 | 8/15/2019 | | 6/1/2020 | | | 4 |
| M3.12-3506 | CCD 104 | ST CU 3506 MECHANICAL PLAN | 5/28/2019 | 8/15/2019 | | 6/1/2020 | | | 5 |
| E3.12-3506 | CCD 104 | ST CU 3506 ELECTRICAL PLAN | 5/28/2019 | 3/13/2020 | | 6/1/2020 | | | 6 |
| P2.18-3506 | CCD 104 | ST CU 3506 PLUMBING PLAN | 5/28/2019 | 8/15/2019 | | 6/1/2020 | | | 7 |
| FP3.24-3506 | CCD 104 | ST CU 3506 FIRE PROTECTION PLAN | 5/28/2019 | 8/15/2019 | | 6/1/2020 | | | 8 |
| STA COVER | CCD 097.1 | STA COVER SHEET | 5/4/2020 | | | | | | 9 |
| ID.001 | CCD 097.1 | INDEX KEY SYMBOLS | 5/4/2020 | | | | | | 10 |
| ID.100 | CCD 097.1 | FLOOR PLAN | 5/4/2020 | | | | | | 11 |
| ID.101 | CCD 097.1 | FINISH FLOOR PLAN | 5/4/2020 | | | | | | 12 |
| ID.102 | CCD 097.1 | POWER PLAN | 5/4/2020 | | | | | | 13 |
| ID.103 | CCD 097.1 | RCP | 5/4/2020 | | | | | | 14 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| ID.200 | CCD 097.1 | ENLARGED PLANS AND ELEVATIONS | 5/4/2020 | | | | | | 15 |
| ID.201 | CCD 097.1 | ENLARGED PLANS AND ELEVATIONS | 5/4/2020 | | | | | | 16 |
| ID.202 | CCD 097.1 | ENLARGED PLANS AND ELEVATIONS | 5/4/2020 | | | | | | 17 |
| LC1.01-3506 | CCD 099 | LIGHTING CONTROL SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 18 |
| LC2.01-3506 | CCD 099 | LC SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 12/20/2017 | | | | | | 19 |
| LC2.02-3506 | CCD 099 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 20 |
| LC2.03-3506 | CCD 099 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 21 |
| LC2.04-3506 | CCD 099 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 22 |
| LC2.05-3506 | CCD 099 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 23 |
| LC2.06-3506 | CCD 099 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 24 |
| LC6.01-3506 | CCD 099 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 25 |
| LC6.02-3506 | CCD 099 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 26 |
| LC6.03-3506 | CCD 099 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 27 |
| LC6.04-3506 | CCD 099 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 28 |
| LV1.01-3506 | CCD 099 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 29 |
| LV2.01-3506 | CCD 099 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 30 |
| LV6.01-3506 | CCD 099 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 31 |
| **ST CU 3607** | | | | | | | | | 30 |
| A0.05-3607 | CCD 073 | COVER SHEET -CU 3607 | 5/28/2019 | 3/11/2020 | | | | | 1 |
| A2.125-3607 | CCD 019 | ST CU 3607 FLOOR PLAN | 5/28/2019 | | | | | | 2 |
| A5.125-3607 | CCD 019 | ST CU 3607 RCP | 5/28/2019 | | | | | | 3 |
| A6.3-3607 | CCD 019 | ST CU 3607 DOOR AND FINISH SCHEDULES | 5/28/2019 | | | | | | 4 |
| M3.25-3607 | CCD 019 | ST CU 3607 MECHANICAL PLAN | 5/28/2019 | | | | | | 5 |
| E3.25-3607 | CCD 019 | ST CU 3607 ST CU 3607 ELECTRICAL PLAN | 5/28/2019 | | | | | | 6 |
| P2.18-3607 | CCD 019 | ST CU 3607 PLUMBING PLAN | 5/28/2019 | | | | | | 7 |
| FP3.25-3607 | CCD 019 | ST CU 3607 FIRE PROTECTION PLAN | 5/28/2019 | | | | | | 8 |
| LC1.01-3607 | CCD 073 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-3607 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-3607 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-3607 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-3607 | CCD 073 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-3607 | CCD 073 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-3607 | CCD 073 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-3607 | CCD 073 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-3607 | CCD 073 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-3607 | CCD 073 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-3607 | CCD 073 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-3607 | CCD 073 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-3607 | CCD 073 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-3607 | CCD 073 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| STA COVER | CCD 073 | COVER SHEET | 11/8/2020 | | | | | | 23 |
| ID.001 | CCD 073 | INDEX KEY SYMBOLS | 11/8/2020 | | | | | | 24 |
| ID.100 | CCD 073 | FLOOR PLAN | 11/8/2020 | | | | | | 25 |
| ID.101 | CCD 073 | FINISH FLOOR PLAN | 11/8/2020 | | | | | | 26 |
| ID.102 | CCD 073 | POWER PLAN | 11/8/2020 | | | | | | 27 |
| ID.103 | CCD 073 | RCP | 11/8/2020 | | | | | | 28 |
| ID.200 | CCD 073 | ENLARGED PLANS AND ELEVATIONS | 11/8/2020 | | | | | | 29 |
| ID.201 | CCD 073 | ENLARGED PLANS AND ELEVATIONS | 11/8/2020 | | | | | | 30 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**   UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **ST CU 3707** | | | | | | | | | **20** |
| A0.05-3707 | CCD 073 | COVER SHEET ST CU 3707 | 6/17/2019 | 3/11/2020 | | | | | 1 |
| A2.125-3707 | CCD 024 | ST CU 3707 FLOOR PLAN | 6/17/2019 | | | | | | 2 |
| E3.13-3707 | CCD 024 | ST CU 3707 ELECTRICAL PLAN | 6/17/2019 | | | | | | 3 |
| LC1.01-3707 | CCD 073 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 4 |
| LC2.01-3707 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 5 |
| LC2.02-3707 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 6 |
| LC2.03-3707 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 7 |
| LC2.04-3707 | CCD 073 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 8 |
| LC2.05-3707 | CCD 073 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 9 |
| LC2.06-3707 | CCD 073 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 10 |
| LC6.01-3707 | CCD 073 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 11 |
| LC6.02-3707 | CCD 073 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 12 |
| LC6.03-3707 | CCD 073 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 13 |
| LC6.04-3707 | CCD 073 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 14 |
| LV1.01-3707 | CCD 073 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 15 |
| LV2.01-3707 | CCD 073 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 16 |
| LV6.01-3707 | CCD 073 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| STA COVER | CCD 073 | COVER SHEET | 11/8/2019 | | | | | | 18 |
| ID.001 | CCD 073 | INDEX KEY SYMBOLS | 11/8/2019 | | | | | | 19 |
| ID.100 | CCD 073 | FLOOR PLAN | 11/8/2019 | | | | | | 20 |
| **ST CU 3805** | | | | | | | | | **27** |
| A0.05-3805 | CCD 073 | COVER SHEET- CU 4705 | 5/28/2019 | 3/11/2020 | | | | | 1 |
| A2.105-3805 | CCD 019 | FLOOR PLAN | 5/28/2019 | | | | | | 2 |
| A5.105-3805 | CCD 019 | RCP | 5/28/2019 | | | | | | 3 |
| A6.3-3806 | CCD 019 | DOOR AND FINISH SHCEDULES | 5/28/2019 | | | | | | 4 |
| M3.23-3805 | CCD 019 | MECHANICAL PLAN | 5/28/2019 | | | | | | 5 |
| E3.23-3805 | CCD 019 | ELECTRICAL PLAN | 5/28/2019 | | | | | | 6 |
| P2.19-3805 | CCD 019 | PLUMBING PLAN | 5/28/2019 | | | | | | 7 |
| FP3.23-3805 | CCD 019 | FIRE PROTECTION PLAN | 5/28/2019 | | | | | | 8 |
| LC1.01-3805 | CCD 073 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-3805 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-3805 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-3805 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-3805 | CCD 073 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-3805 | CCD 073 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-3805 | CCD 073 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-3805 | CCD 073 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-3805 | CCD 073 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-3805 | CCD 073 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-3805 | CCD 073 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-3805 | CCD 073 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-3805 | CCD 073 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-3805 | CCD 073 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| STA COVER | CCD 073 | COVER SHEET | 11/8/2019 | | | | | | 23 |
| ID.001 | CCD 073 | INDEX KEY SYMBOLS | 11/8/2019 | | | | | | 24 |
| ID.100 | CCD 073 | FLOOR PLAN | 11/8/2019 | | | | | | 25 |
| ID.101 | CCD 073 | RCP | 11/8/2019 | | | | | | 26 |
| ID.200 | CCD 073 | ENLARGED PLANS AND ELEVATIONS | 11/8/2019 | | | | | | 27 |
| **ST CU 3806** | | | | | | | | | **25** |
| A0.05-3806 | CCD 073 | COVER SHEET - ST CU 3806 | 5/28/2019 | 3/11/2020 | | | | | 1 |
| A2.115-3806 | CCD 019 | ST CU 3806 FLOOR PLAN | 5/28/2019 | | | | | | 2 |
| A5.115-3806 | CCD 019 | ST CU 3806 RCP | 5/28/2019 | | | | | | 3 |
| M3.12-3806 | CCD 019 | ST CU 3806 MECHANICAL PLAN | 5/28/2019 | | | | | | 4 |
| E3.12-3806 | CCD 019 | ST CU 3806 ELECTRICAL PLAN | 5/28/2019 | | | | | | 5 |
| P2.19-3806 | CCD 019 | ST CU 3806 PLUMBING PLAN | 5/28/2019 | | | | | | 6 |
| FP3.12-3806 | CCD 019 | ST CU 3806 FIRE PROTECTION PLAN | 5/28/2019 | | | | | | 7 |
| LC1.01-3806 | CCD 073 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 8 |
| LC2.01-3806 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 9 |
| LC2.02-3806 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.03-3806 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.04-3806 | CCD 073 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 12 |
| LC2.05-3806 | CCD 073 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 13 |
| LC2.06-3806 | CCD 073 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 14 |
| LC6.01-3806 | CCD 073 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 15 |
| LC6.02-3806 | CCD 073 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 16 |
| LC6.03-3806 | CCD 073 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 17 |
| LC6.04-3806 | CCD 073 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 18 |
| LV1.01-3806 | CCD 073 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LV2.01-3806 | CCD 073 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 20 |
| LV6.01-3806 | CCD 073 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| STA COVER | CCD 073 | COVER SHEET | 11/8/2019 | | | | | | 22 |
| ID.001 | CCD 073 | INDEX KEY SYMBOLS | 11/8/2019 | | | | | | 23 |
| ID.100 | CCD 073 | FLOOR PLAN | 11/8/2019 | | | | | | 24 |
| ID.200 | CCD 073 | ENLARGED PLANS AND ELEVATIONS | 11/8/2019 | | | | | | 25 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**   UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **ST CU 3807** | | | | | | | | | **32** |
| A0.05-3807 | CCD 073 | COVER SHEET ST CU 3807 | 6/17/2019 | 7/25/2019 | | 3/11/2020 | | | 1 |
| A2.12S-3807 | CCD 032 | ST CU 3807 FLOOR PLAN | 6/17/2019 | 7/25/2019 | | | | | 2 |
| A5.12S-3807 | CCD 032 | ST CU 3807 RCP | 6/17/2019 | 7/25/2019 | | | | | 3 |
| A6.3-3807 | CCD 032 | ST CU 3807 DOOR AND FINISH SCHEDULES | 6/17/2019 | 7/25/2019 | | | | | 4 |
| A6.28S-3807 | CCD 024 | ST SLIDING DOORS STOREFRONTS AND DOORS-Deleted | 6/17/2019 | | | | | | |
| M3.25-3807 | CCD 032 | ST CU 3807 MECHANICAL PLAN | 6/17/2019 | 7/25/2019 | | | | | 5 |
| E3.25-3807 | CCD 032 | ST CU 3807 ELECTRICAL PLAN | 6/17/2019 | 7/25/2019 | | | | | 6 |
| P2.18-3807 | CCD 032 | ST CU 3807 PLUMBING PLAN | 6/17/2019 | 7/25/2019 | | | | | 7 |
| FP3.13-3807 | CCD 032 | ST CU 3807 FIRE PROTECTION PLAN | 6/17/2019 | 7/25/2019 | | | | | 8 |
| LC1.01-3807 | CCD 073 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 9 |
| LC2.01-3807 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMA DIMMER MODULE | 12/20/2017 | | | | | | 10 |
| LC2.02-3807 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 11 |
| LC2.03-3807 | CCD 073 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 12 |
| LC2.04-3807 | CCD 073 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 13 |
| LC2.05-3807 | CCD 073 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 14 |
| LC2.06-3807 | CCD 073 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 15 |
| LC6.01-3807 | CCD 073 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 16 |
| LC6.02-3807 | CCD 073 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 17 |
| LC6.03-3807 | CCD 073 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 18 |
| LC6.04-3807 | CCD 073 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 19 |
| LV1.01-3807 | CCD 073 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LV2.01-3807 | CCD 073 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 21 |
| LV6.01-3807 | CCD 073 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| STA COVER | CCD 073 | COVER SHEET | 11/8/2019 | | | | | | 23 |
| ID.001 | CCD 073 | INDEX KEY SYMBOLS | 11/8/2019 | | | | | | 24 |
| ID.100 | CCD 073 | FLOOR PLAN | 11/8/2019 | | | | | | 25 |
| ID.101 | CCD 073 | FINISH FLOOR PLAN | 11/8/2019 | | | | | | 26 |
| ID.102 | CCD 073 | POWER PLAN | 11/8/2019 | | | | | | 27 |
| ID.103 | CCD 073 | RCP | 11/8/2019 | | | | | | 28 |
| ID.200 | CCD 073 | ENLARGED PLANS AND ELEVATIONS | 11/8/2019 | | | | | | 29 |
| ID.201 | CCD 073 | ENLARGED PLANS AND ELEVATIONS | 11/8/2019 | | | | | | 30 |
| ID.202 | CCD 073 | ENLARGED PLANS AND ELEVATIONS | 11/8/2019 | | | | | | 31 |
| ID.203 | CCD 073 | ENLARGED PLANS AND ELEVATIONS | 11/8/2019 | | | | | | 32 |
| **ST CU 3905** | | | | | | | | | **29** |
| A0.05-3905 | CCD 103 | COVER SHEET | 3/18/2020 | 6/8/2020 | | | | | 1 |
| A2.10S-3905 | CCD 081 | FLOOR PLAN | 3/18/2020 | | | | | | 2 |
| A5.10S-3905 | CCD 081 | RCP | 3/18/2020 | | | | | | 3 |
| A6.3-3905 | CCD 081 | DOOR AND FINISH SCHEDULES | 3/18/2020 | | | | | | 4 |
| M3.23-3905 | CCD 081 | MECHANICAL PLAN | 3/18/2020 | | | | | | 5 |
| E3.23-3905 | CCD 081 | ELECTRICAL AND FIRE ALARM PLAN | 3/18/2020 | | | | | | 6 |
| P2.19-3905 | CCD 081 | PLUMBING PLAN | 3/18/2020 | | | | | | 7 |
| FP3.11-3905 | CCD 081 | FIRE PROTECTION PLAN | 3/18/2020 | | | | | | 8 |
| STA COVER | CCD 097 | COVER SHEET | 4/29/2020 | | | | | | 9 |
| ID.001 | CCD 097 | INDEX KEY SYMBOLS | 4/29/2020 | | | | | | 10 |
| ID.100 | CCD 097 | FLOOR PLAN | 4/29/2020 | | | | | | 11 |
| ID.101 | CCD 097 | FLOOR FINISH PLAN | 4/29/2020 | | | | | | 12 |
| ID.102 | CCD 097 | POWER PLAN | 4/29/2020 | | | | | | 13 |
| ID.103 | CCD 097 | RCP | 4/29/2020 | | | | | | 14 |
| ID.200 | CCD 097 | ENLARGED PLANS AND ELEVATIONS | 4/29/2020 | | | | | | 15 |
| LC1.01-3905 | CCD 103 | LC SYSTEM LEGEND AND SYMBOLS | 5/15/2020 | | | | | | 16 |
| LC2.01-3905 | CCD 103 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 5/15/2020 | | | | | | 17 |
| LC2.02-3905 | CCD 103 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 5/15/2020 | | | | | | 18 |
| LC2.03-3905 | CCD 103 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 5/15/2020 | | | | | | 19 |
| LC2.04-3905 | CCD 103 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 5/15/2020 | | | | | | 20 |
| LC2.05-3905 | CCD 103 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 5/15/2020 | | | | | | 21 |
| LC2.06-3905 | CCD 103 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 5/15/2020 | | | | | | 22 |
| LC6.01-3905 | CCD 103 | LIGHTING ZONING RCP | 5/15/2020 | | | | | | 23 |
| LC6.02-3905 | CCD 103 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 5/15/2020 | | | | | | 24 |
| LC6.03-3905 | CCD 103 | SHADING CONTROL SYSTEM RCP | 5/15/2020 | | | | | | 25 |
| LC6.04-3905 | CCD 103 | HVAC CONTROL SYSTEM FLOOR PLAN | 5/15/2020 | | | | | | 26 |
| LV1.01-3905 | CCD 103 | SECURITY & AV LEGEND AND SYMBOLS | 5/15/2020 | | | | | | 27 |
| LV2.01-3905 | CCD 103 | SECURITY AND AV DETAILS | 5/15/2020 | | | | | | 28 |
| LV6.01-3905 | CCD 103 | SECURITY AND AV FLOOR PLAN | 5/15/2020 | | | | | | 29 |
| **ST CU 3907** | | | | | | | | | **36** |
| A0.05-3907 | CCD 107 | COVER SHEET ST CU 3907 | 6/17/2019 | 4/17/2020 | | 6/23/2020 | | | 1 |
| A2.12S-3907 | CCD 024 | ST CU 3907 FLOOR PLAN | 6/17/2019 | | | | | | 2 |
| A5.25S-3907 | CCD 083 | ST CU 3907 RCP | 6/17/2019 | 3/24/2020 | | | | | 3 |
| A6.3-3907 | CCD 024 | ST CU 3907 DOOR AND FINISH SCHEDULES | 6/17/2019 | | | | | | 4 |
| M3.25-3907 | CCD 024 | ST CU 3907 MECHANICAL PLAN | 6/17/2019 | | | | | | 5 |
| E3.25-3907 | CCD 107 | ST CU 3907 ELECTRICAL PLAN | 6/17/2019 | 6/19/2020 | | | | | 6 |
| P2.18-3907 | CCD 024 | ST CU 3907 PLUMBING PLAN | 6/17/2019 | | | | | | 7 |
| FP3.25-3907 | CCD 024 | ST CU 3907 FIRE PROTECTION PLAN | 6/17/2019 | | | | | | 8 |
| STA COVER | CCD 083 | STA COVER SHEET | 3/13/2020 | | | | | | 9 |
| ID.001 | CCD 083 | INDEX KEY SYMBOLS | 3/13/2020 | | | | | | 10 |
| ID.100 | CCD 083 | FLOOR PLAN | 3/13/2020 | | | | | | 11 |
| ID.101 | CCD 083 | FINISH FLOOR PLAN | 3/13/2020 | | | | | | 12 |
| ID.102 | CCD 083 | POWER PLAN | 3/13/2020 | | | | | | 13 |
| ID.103 | CCD 083 | RCP | 3/13/2020 | | | | | | 14 |
| ID.200 | CCD 083 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 15 |
| ID.201 | CCD 083 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 16 |
| LC1.01-3907 | CCD 089 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 17 |
| LC2.01-3907 | CCD 089 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 18 |
| LC2.02-3907 | CCD 089 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 19 |
| LC2.03-3907 | CCD 089 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 20 |
| LC2.04-3907 | CCD 089 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 21 |
| LC2.05-3907 | CCD 089 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 22 |
| LC2.06-3907 | CCD 089 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 23 |
| LC6.01-3907 | CCD 089 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 24 |
| LC6.02-3907 | CCD 089 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 25 |
| LC6.03-3907 | CCD 089 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 26 |
| LC6.04-3907 | CCD 089 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 27 |
| LV1.01-3907 | CCD 089 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 28 |
| LV2.01-3907 | CCD 089 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 29 |
| LV6.01-3907 | CCD 089 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 30 |
| AV-0.01.U3907 | CCD 107 | AV LEGENDS & GENERAL NOTES | 6/19/2020 | | | | | | 31 |
| AV-2.01 U3907 | CCD 107 | AV FLOOR PLANS | 6/19/2020 | | | | | | 32 |
| AV-2.01 U3907 RCP | CCD 107 | AV RCP PLANS | 6/19/2020 | | | | | | 33 |
| AV-4.01.U3907 | CCD 107 | BEDROOM 4 ELEVATION | 6/19/2020 | | | | | | 34 |
| AV-4.02.U3907 | CCD 107 | DEN ELEVATION | 6/19/2020 | | | | | | 35 |
| AV-4.03.U3907 | CCD 107 | MASTER BEDROOM ELEVATION | 6/19/2020 | | | | | | 36 |
| **ST CU 4007** | | | | | | | | | **45** |
| A0.05-4007 | CCD 107 | COVER SHEET | 3/20/2020 | 6/8/2020 | | 6/24/2020 | | | 1 |
| A2.13S-4007 | CCD 083 | FLOOR PLAN | 3/20/2020 | | | | | | 2 |
| A5.14S-4007 | CCD 083 | RCP | 3/20/2020 | | | | | | 3 |
| A6.3-4007 | CCD 083 | DOOR AND FINISH SCHEDULES | 3/20/2020 | | | | | | 4 |
| A6.28S-4007 | CCD 083 | SLIDING DOORS, STOREFRONTS AND DOORS | 3/20/2020 | | | | | | 5 |
| M3.25-4007 | CCD 083 | MECHANICAL PLAN | 3/20/2020 | | | | | | 6 |
| E3.25-4007 | CCD 083 | ELECTRICAL AND FIRE ALARM PLAN | 3/20/2020 | | | | | | 7 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**   UPDATED: 7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| P2.18-4007 | CCD 083 | PLUMBING PLAN | 3/20/2020 | | | | | | 8 |
| FP3.13-4007 | CCD 083 | FIRE PROTECTION PLAN | 3/20/2020 | | | | | | 9 |
| STA COVER | CCD 097 | STA COVER SHEET | 4/30/2020 | | | | | | 10 |
| ID.001 | CCD 097 | INDEX KEY SYMBOLS | 4/30/2020 | | | | | | 11 |
| ID.100 | CCD 097 | FLOOR PLAN | 4/30/2020 | | | | | | 12 |
| ID.101 | CCD 097 | FINISH FLOOR PLAN | 4/30/2020 | | | | | | 13 |
| ID.102 | CCD 097 | POWER PLAN | 4/30/2020 | | | | | | 14 |
| ID.103 | CCD 097 | RCP | 4/30/2020 | | | | | | 15 |
| ID.104 | CCD 097 | FURNITURE PLAN | 4/30/2020 | | | | | | 16 |
| ID.200 | CCD 097 | ENLARGED PLANS AND ELEVATIONS | 4/30/2020 | | | | | | 17 |
| ID.201 | CCD 097 | ENLARGED PLANS AND ELEVATIONS | 4/30/2020 | | | | | | 18 |
| ID.202 | CCD 097 | ENLARGED PLANS AND ELEVATIONS | 4/30/2020 | | | | | | 19 |
| ID.203 | CCD 097 | ENLARGED PLANS AND ELEVATIONS | 4/30/2020 | | | | | | 20 |
| LC1.01-4007 | CCD 103 | LC SYSTEM LEGEND AND SYMBOLS | 5/18/2020 | | | | | | 21 |
| LC2.01-4007 | CCD 103 | LC SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 5/18/2020 | | | | | | 22 |
| LC2.02-4007 | CCD 103 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 5/18/2020 | | | | | | 23 |
| LC2.03-4007 | CCD 103 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 5/18/2020 | | | | | | 24 |
| LC2.04-4007 | CCD 103 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 5/18/2020 | | | | | | 25 |
| LC2.05-4007 | CCD 103 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 5/18/2020 | | | | | | 26 |
| LC2.06-4007 | CCD 103 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 5/18/2020 | | | | | | 27 |
| LC6.01-4007 | CCD 103 | LIGHTING ZONING RCP | 5/18/2020 | | | | | | 28 |
| LC6.02-4007 | CCD 103 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 5/18/2020 | | | | | | 29 |
| LC6.03-4007 | CCD 103 | SHADING CONTROL SYSTEM RCP | 5/18/2020 | | | | | | 30 |
| LC6.04-4007 | CCD 103 | HVAC CONTROL SYSTEM FLOOR PLAN | 5/18/2020 | | | | | | 31 |
| AV-0.01.U4007 | CCD 107 | AV LEGENDS & GENERAL NOTES | 6/17/2020 | | | | | | 32 |
| AV-2.01 U4007 | CCD 107 | AV FLOOR PLANS | 6/17/2020 | | | | | | 33 |
| AV-2.02 U4007 RCP | CCD 107 | AV RCP PLANS | 6/17/2020 | | | | | | 34 |
| AV-4.01.U4007 | CCD 107 | BEDROOM 4 ELEVATION | 6/17/2020 | | | | | | 35 |
| AV-4.02.U4007 | CCD 107 | BEDROOM 3 ELEVATION | 6/17/2020 | | | | | | 36 |
| AV-4.03.U4007 | CCD 107 | BEDROOM 3 ELEVATION | 6/17/2020 | | | | | | 37 |
| AV-4.04.U4007 | CCD 107 | BEDROOM 2 ELEVATION | 6/17/2020 | | | | | | 38 |
| AV-4.05.U4007 | CCD 107 | DEN ELEVATION | 6/17/2020 | | | | | | 39 |
| AV-4.06.U4007 | CCD 107 | BAR ELEVATION | 6/17/2020 | | | | | | 40 |
| AV-4.07.U4007 | CCD 107 | OFFICE ELEVATION | 6/17/2020 | | | | | | 41 |
| AV-4.08.U4007 | CCD 107 | MASTER BEDROOM ELEVATION | 6/17/2020 | | | | | | 42 |
| AV-4.09.U4007 | CCD 107 | MASTER BEDROOM ELEVATION | 6/17/2020 | | | | | | 43 |
| AV-4.10.U4007 | CCD 107 | GREAT ROOM SPEAKER ELEVATION | 6/17/2020 | | | | | | 44 |
| AV-4.11.U4007 | CCD 107 | BAR SPEAKER ELEVATION | 6/17/2020 | | | | | | 45 |
| **ST CU 4106** | | | | | | | | | **19** |
| A0.05-4106 | CCD 103 | COVER SHEET | 3/26/2020 | 6/8/2020 | | | | | 1 |
| A5.05-4106 | CCD 083 | RCP | 3/26/2020 | | | | | | 2 |
| STA COVER | CCD 097 | STA COVER SHEET | 4/29/2020 | | | | | | 3 |
| ID.001 | CCD 097 | INDEX KEY SYMBOLS | 4/29/2020 | | | | | | 4 |
| ID.100 | CCD 097 | RCP | 4/29/2020 | | | | | | 5 |
| LC1.01-4106 | CCD 103 | LC SYSTEM LEGEND AND SYMBOLS | 5/20/2020 | | | | | | 6 |
| LC2.01-4106 | CCD 103 | LC SYSTEMS DETAIL CLX-2DIM8 DIMMER MODULE | 5/20/2020 | | | | | | 7 |
| LC2.02-4106 | CCD 103 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 5/20/2020 | | | | | | 8 |
| LC2.03-4106 | CCD 103 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 5/20/2020 | | | | | | 9 |
| LC2.04-4106 | CCD 103 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 5/20/2020 | | | | | | 10 |
| LC2.05-4106 | CCD 103 | SC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 5/20/2020 | | | | | | 11 |
| LC2.06-4106 | CCD 103 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 5/20/2020 | | | | | | 12 |
| LC6.01-4106 | CCD 103 | LIGHTING ZONING RCP | 5/20/2020 | | | | | | 13 |
| LC6.02-4106 | CCD 103 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 5/20/2020 | | | | | | 14 |
| LC6.03-4106 | CCD 103 | SHADING CONTROL SYSTEM RCP | 5/20/2020 | | | | | | 15 |
| LC6.04-4106 | CCD 103 | HVAC CONTROL SYSTEM FLOOR PLAN | 5/20/2020 | | | | | | 16 |
| LV1.01-4106 | CCD 103 | SECURITY & AV LEGEND AND SYMBOLS | 5/15/2020 | | | | | | 17 |
| LV2.01-4106 | CCD 103 | SECURITY AND AV DETAILS | 5/15/2020 | | | | | | 18 |
| LV6.01-4106 | CCD 103 | SECURITY AND AV FLOOR PLAN | 5/15/2020 | | | | | | 19 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **ST CU 4205-06** | | | | | | | | | **49** |
| A0.05-4205-06 | CCD 100 | Cover Sheet | 8/12/2019 | 5/22/2020 | | | | | 1 |
| A2.105-4205-06 | CCD 033 | ST CU 4205-06 FLOOR PLAN | 8/12/2019 | | | | | | 2 |
| A5.105 | CCD 033 | ST CU 4205-06 RCP | 8/12/2019 | | | | | | 3 |
| A6.3-4205-06 | CCD 033 | ST CU 4205-06 DOOR AND FINISH SCHEDULE | 8/12/2019 | | | | | | 4 |
| A6.2B5-4205-06 | CCD 033 | ST CU 4205-06 SLIDING DOORS,WIND, and DOOR SCHEDULE | 8/12/2019 | | | | | | 5 |
| LS1.05-4205-06 | CCD 033 | ST 42ND CU 4205-06 LIFE SAFETY PLAN | 8/12/2019 | | | | | | 6 |
| M3.24-4205-06 | CCD 033 | ST CU 4205-06 MECHANICAL PLAN | 8/12/2019 | | | | | | 7 |
| E3.11-4205-06 | CCD 033 | ST CU 4205-06 ELECTRICAL PLAN | 8/12/2019 | | | | | | 8 |
| E3.11A-4205-06 | CCD 033 | ST CU 4205-06 ELECTYRICAL DETAILS | 8/12/2019 | | | | | | 9 |
| P2.19-4205-06 | CCD 033 | ST CU 4205-06 PLUMBING PLAN | 8/12/2019 | | | | | | 10 |
| FP3.13-4205-06 | CCD 033 | ST CU 4205-06 FIRE PROTECTION PLAN | 8/12/2019 | | | | | | 11 |
| STA COVER | CCD 099 | Cover Sheet | 12/23/2019 | | | | | | 12 |
| ID.001-4205-06 | CCD 099 | INDEX KEY SYMBOLS | 12/23/2019 | | | | | | 13 |
| ID.100-4205-06 | CCD 099 | FLOOR PLAN | 12/23/2019 | | | | | | 14 |
| ID.101-4205-06 | CCD 099 | FINISH FLOOR PLAN | 12/23/2019 | | | | | | 15 |
| ID.102-4205-06 | CCD 099 | POWER PLAN | 12/23/2019 | | | | | | 16 |
| ID.103-4205-06 | CCD 099 | RCP | 12/23/2019 | | | | | | 17 |
| ID.104-4205-06 | CCD 099 | FURNITURE PLAN | 12/23/2019 | | | | | | 18 |
| ID.200-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 19 |
| ID.201-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 20 |
| ID.202-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 21 |
| ID.203-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 22 |
| ID.204-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 23 |
| ID.205-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 24 |
| ID.206-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 25 |
| ID.207-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 26 |
| ID.208-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 27 |
| ID.209-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 28 |
| ID.210-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 29 |
| ID.211-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 30 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED: 7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| ID.212-4205-06 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 12/23/2019 | | | | | | 31 |
| ID.400-4205-06 | CCD 099 | SCHEDULES | 12/23/2019 | | | | | | 32 |
| LC1.01-4205-06 | CCD 100 | LC LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 33 |
| LC2.01-4205-06 | CCD 100 | LC DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 34 |
| LC2.02-4205-06 | CCD 100 | LC DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 35 |
| LC2.03-4205-06 | CCD 100 | LC DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 36 |
| LC2.04-4205-06 | CCD 100 | LC DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 37 |
| LC2.05-4205-06 | CCD 100 | LC DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 38 |
| LC2.06-4205-06 | CCD 100 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 39 |
| LC6.01-4205-06 | CCD 100 | LC ZONING RCP | 12/20/2017 | | | | | | 40 |
| LC6.02-4205-06 | CCD 100 | LC PANEL SCHEDULE LCP1 | 12/20/2017 | | | | | | 41 |
| LC6.03-4205-06 | CCD 100 | LC PANEL SCHEDULE LCP2 | 12/20/2017 | | | | | | 42 |
| LC6.04-4205-06 | CCD 100 | LC DEVICES FLOOR PLAN | 12/20/2017 | | | | | | 43 |
| LC6.05-4205-06 | CCD 100 | LC ONE LINE RISER | 12/20/2017 | | | | | | 44 |
| LC6.06-4205-06 | CCD 100 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 45 |
| LC6.07-4205-06 | CCD 100 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 46 |
| LV1.01-4205-06 | CCD 100 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 47 |
| LV2.01-4205-06 | CCD 100 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 48 |
| LV6.01-4205-06 | CCD 100 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 49 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**   UPDATED:  7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **ST CU 4207** | | | | | | | | | **29** |
| A0.05-4207 | CCD 089 | COVER SHEET ST CU 4207 | 6/17/2019 | 4/17/2020 | | | | | 1 |
| A2.125-4207 | CCD 024 | ST CU 4207 FLOOR PLAN | 6/17/2019 | | | | | | 2 |
| A5.255-4207 | CCD 083 | ST CU 4207 RCP | 6/17/2019 | 3/24/2020 | | | | | 3 |
| A6.3-4207 | CCD 024 | ST CU 4207. DOOR AND FINISH SCHEDULE | 6/17/2019 | | | | | | 4 |
| STA COVER | CCD 083 | COVER SHEET | 3/13/2020 | | | | | | 5 |
| ID.001 | CCD 083 | INDEX KEY SYMBOLS | 3/13/2020 | | | | | | 6 |
| ID.100 | CCD 083 | FLOOR PLAN | 3/13/2020 | | | | | | 7 |
| ID.101 | CCD 083 | FINISH FLOOR PLAN | 3/13/2020 | | | | | | 8 |
| ID.102 | CCD 083 | POWER PLAN | 3/13/2020 | | | | | | 9 |
| ID.103 | CCD 083 | RCP | 3/13/2020 | | | | | | 10 |
| ID.200 | CCD 083 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 11 |
| M3.25-4207 | CCD 024 | ST CU 4207 MECHANICAL PLAN | 6/17/2019 | | | | | | 12 |
| E3.25-4207 | CCD 024 | ST CU 4207 ELECTRICAL PLAN | 6/17/2019 | | | | | | 13 |
| P2.18-4207 | CCD 024 | ST CU 4207 PLUMBING PLAN | 6/17/2019 | | | | | | 14 |
| FP3.13-4207 | CCD 024 | ST CU 4207 FIRE PROTECTION PLAN | 6/17/2019 | | | | | | 15 |
| LC1.01-4207 | CCD 089 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 16 |
| LC2.01-4207 | CCD 089 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 17 |
| LC2.02-4207 | CCD 089 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 18 |
| LC2.03-4207 | CCD 089 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 19 |
| LC2.04-4207 | CCD 089 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 20 |
| LC2.05-4207 | CCD 089 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 21 |
| LC2.06-4207 | CCD 089 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 22 |
| LC6.01-4207 | CCD 089 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 23 |
| LC6.02-4207 | CCD 089 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 24 |
| LC6.03-4207 | CCD 089 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 25 |
| LC6.04-4207 | CCD 089 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 26 |
| LV1.01-4207 | CCD 089 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 27 |
| LV2.01-4207 | CCD 089 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 28 |
| LV6.01-4207 | CCD 089 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 29 |
| **ST CU 4307** | | | | | | | | | **8** |
| A0.05-4307 | CCD 104 | CU 4307 COVER SHEET | 11/15/2019 | 5/22/2020 | | | | | 1 |
| A2.125-4307 | CCD 104 | ST CU 4307 FLOOR PLAN | 11/15/2019 | 5/22/2020 | | | | | 2 |
| A5.125-4307 | CCD 104 | ST CU 4307 RCP | 11/15/2019 | 5/22/2020 | | | | | 3 |
| A6.3-4307 | CCD 104 | ST CU 4307 DOOR AND FINISH SCHEDULES | | 5/22/2020 | | | | | 4 |
| E3.13-4307 | CCD 104 | ST CU 4307 ELECTRICAL PLAN | 11/15/2019 | 5/22/2020 | | | | | 5 |
| M3.13-4307 | CCD 104 | MECHANICAL PLAN | 11/15/2019 | | | | | | 6 |
| FP3.13-4307 | CCD 104 | FIRE PROTECTION PLAN | 11/15/2019 | | | | | | 7 |
| P2.19-4307 | CCD 104 | PLUMBING PLAN | 11/15/2019 | | | | | | 8 |
| | | | | | | | | | |
| | | | | | | | | | |
| **ST CU 4406** | | | | | | | | | **26** |
| A0.05-4406 | CCD 100 | COVER SHEET ST CU 4407 | 6/17/2019 | | | 5/22/2020 | | | 1 |
| A2.115-4406 | CCD 024 | FLOOR PLAN | 6/17/2019 | 1/16/2020 | | | | | 2 |
| A5.115-4406 | CCD 024 | RCP | 6/17/2019 | | | | | | 3 |
| A6.3-4406 | CCD 100 | | | 1/16/2020 | | | | | 4 |
| M3.12-4406 | CCD 024 | MECHANICAL PLAN | 6/17/2019 | | | | | | 5 |
| E3.12-4406 | CCD 024 | ELECTRICAL PLAN | 6/17/2019 | | | | | | 6 |
| P2.19-4406 | CCD 024 | ST CU 4407 PLUMBING PLAN | 6/17/2019 | | | | | | 7 |
| FP3.12-4406 | CCD 024 | ST CU 4407 FIRE PROTECTION PLAN | 6/17/2019 | | | | | | 8 |
| STA COVER | CCD 099 | COVER SHEET | 1/17/2020 | | | | | | 9 |
| ID.001 | CCD 099 | INDEX KEY SYMBOLS | 1/17/2020 | | | | | | 10 |
| ID.100 | CCD 099 | FLOOR PLAN | 1/17/2020 | | | | | | 11 |
| ID.200 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 1/17/2020 | | | | | | 12 |
| LC1.01-4406 | CCD 100 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 13 |
| LC2.01-4406 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 14 |
| LC2.02-4406 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 15 |
| LC2.03-4406 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 16 |
| LC2.04-4406 | CCD 100 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 17 |
| LC2.05-4406 | CCD 100 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 18 |
| LC2.06-4406 | CCD 100 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 19 |
| LC6.01-4406 | CCD 100 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 20 |
| LC6.02-4406 | CCD 100 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| LC6.03-4406 | CCD 100 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 22 |
| LC6.04-4406 | CCD 100 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 23 |
| LV1.01-4406 | CCD 100 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 24 |
| LV2.01-4406 | CCD 100 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 25 |
| LV6.01-4406 | CCD 100 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 26 |
| **ST CU 4407** | | | | | | | | | **26** |
| A0.05-4407 | CCD 100 | COVER SHEET ST CU 4407 | 6/17/2019 | 5/22/2020 | | | | | 1 |
| A2.125-4407 | CCD 024 | ST CU 4407 FLOOR PLAN | 6/17/2019 | | | | | | 2 |
| A5.255-4407 | CCD 024 | ST CU 4407 RCP | 6/17/2019 | | | | | | 3 |
| A6.3-4407 | CCD 024 | ST CU 4407 DOOR AND FINISH SCHEDULES | 6/17/2019 | | | | | | 4 |
| M3.25-4407 | CCD 024 | ST CU 4407 MECHANICAL PLAN | 6/17/2019 | | | | | | 5 |
| E3.25-4407 | CCD 024 | ST CU 4407 ELECTRICAL PLAN | 6/17/2019 | | | | | | 6 |
| P2.18-4407 | CCD 024 | ST CU 4407 PLUMBING PLAN | 6/17/2019 | | | | | | 7 |
| FP3.25-4407 | CCD 024 | ST CU 4407 FIRE PROTECTION PLAN | 6/17/2019 | | | | | | 8 |
| STA COVER | CCD 099 | COVER SHEET | 1/17/2020 | | | | | | 9 |
| ID.001 | CCD 099 | INDEX KEY SYMBOLS | 1/17/2020 | | | | | | 10 |
| ID.100 | CCD 099 | FLOOR PLAN | 1/17/2020 | | | | | | 11 |
| ID.200 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 1/17/2020 | | | | | | 12 |
| LC1.01-4407 | CCD 100 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 13 |
| LC2.01-4407 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 14 |
| LC2.02-4407 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMU8 DIMMER MODULE | 12/20/2017 | | | | | | 15 |
| LC2.03-4407 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 16 |
| LC2.04-4407 | CCD 100 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 17 |
| LC2.05-4407 | CCD 100 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 18 |
| LC2.06-4407 | CCD 100 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 19 |
| LC6.01-4407 | CCD 100 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 20 |
| LC6.02-4407 | CCD 100 | LIGHTING CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 21 |
| LC6.03-4407 | CCD 100 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 22 |
| LC6.04-4407 | CCD 100 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 23 |
| LV1.01-4407 | CCD 100 | SECURITY & AV LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 24 |
| LV2.01-4407 | CCD 100 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 25 |
| LV6.01-4407 | CCD 100 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 26 |
| **ST CU 4507** | | | | | | | | | **8** |
| A0.05-4507 | CCD 106 | COVER SHEET | 6/4/2020 | | | | | | 1 |
| A2.125-4507 | CCD 106 | FLOOR PLAN | 6/4/2020 | | | | | | 2 |
| A5.125-4507 | CCD 106 | RCP | 6/4/2020 | | | | | | 3 |
| A6.3-4507 | CCD 106 | DOOR AND FINISH SCHEDULES | 6/4/2020 | | | | | | 4 |
| M3.25-4507 | CCD 106 | MECHANICAL PLAN | 6/4/2020 | | | | | | 5 |
| E3.25-4507 | CCD 106 | ELECTRICAL PLAN | 6/4/2020 | | | | | | 6 |
| P2.18-4507 | CCD 106 | PLUMBING PLAN | 6/4/2020 | | | | | | 7 |
| FP3.25-4507 | CCD 106 | FIRE PROTECTION PLAN | 6/4/2020 | | | | | | 8 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**   UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **ST CU 4605** | | | | | | | | | 28 |
| A0.05-4605 | CCD 100 | Cover Sheet | 12/5/2019 | 2/25/2020 | | 5/22/2020 | | | 1 |
| A2.135-4605 | CCD 058 | FLOOR PLAN | 12/5/2019 | | | | | | 2 |
| A5.13-4605 | CCD 058.3 | RCP | 12/5/2019 | | | | | | 3 |
| M3.14-4605 | CCD 058 | MECHANICAL PLAN | 12/5/2019 | | | | | | 4 |
| E3.14-4605 | CCD 058 | ELECTRICAL PLAN | 12/5/2019 | | | | | | 5 |
| P2.19B-4605 | CCD 058 | PLUMBING PLAN | 12/5/2019 | | | | | | 6 |
| FP3.13A-4605 | CCD 058 | FIRE PROTECTION PLAN | 12/5/2019 | | | | | | 7 |
| STA COVER | CCD 099 | Cover Sheet | 1/17/2020 | | | | | | 8 |
| ID.001 | CCD 099 | INDEX KEY SYMBOLS | 1/17/2020 | | | | | | 9 |
| ID.100 | CCD 099 | FLOOR PLAN | 1/17/2020 | | | | | | 10 |
| ID.101 | CCD 099 | RCP | 1/17/2020 | | | | | | 11 |
| ID.200 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 1/17/2020 | | | | | | 12 |
| LC1.01-4605 | CCD 100 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 13 |
| LC2.01-4605 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 14 |
| LC2.02-4605 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 15 |
| LC2.03-4605 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 16 |
| LC2.04-4605 | CCD 100 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 17 |
| LC2.05-4605 | CCD 100 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 18 |
| LC2.06-4605 | CCD 100 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 19 |
| LC6.01-4605 | CCD 100 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 20 |
| LC6.02-4605 | CCD 100 | LC PANEL SCHEDULE CASA DI SOGNI | 12/20/2017 | | | | | | 21 |
| LC6.03-4605 | CCD 100 | LC DEVICES FLOOR PLAN | 12/20/2017 | | | | | | 22 |
| LC6.04-4605 | CCD 100 | LC ONE LINE RISER | 12/20/2017 | | | | | | 23 |
| LC6.05-4605 | CCD 100 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 24 |
| LC6.06-4605 | CCD 100 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 25 |
| LV1.01-4605 | CCD 100 | SECURITY AND AV LEGEND AND SYBOLS | 12/20/2017 | | | | | | 26 |
| LV2.01-4605 | CCD 100 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 27 |
| LV6.01-4605 | CCD 100 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 28 |
| **ST CU 4705** | | | | | | | | | 35 |
| A0.05-4705 | CCD 100 | COVER SHEET | 5/28/2019 | 5/22/2020 | | | | | 1 |
| A2.135-4705 | CCD 019 | FLOOR PLAN | 5/28/2019 | | | | | | 2 |
| A5.145-4705 | CCD 019 | ST CU 4407 RCP | 5/28/2019 | | | | | | 3 |
| A6.3-4705 | CCD 019 | ST CU 4407 DOOR AND FINISH SCHEDULES | 5/28/2019 | | | | | | 4 |
| M3.14-4705 | CCD 019 | ST CU 4407 MECHANICAL PLAN | 5/28/2019 | | | | | | 5 |
| E3.14-4705 | CCD 019 | ST CU 4407 ELECTRICAL PLAN | 5/28/2019 | | | | | | 6 |
| P2.20-4705 | CCD 019 | ST CU 4407 PLUMBING PLAN | 5/28/2019 | | | | | | 7 |
| FP3.14-4705 | CCD 019 | ST CU 4407 FIRE PROTECTION PLAN | 5/28/2019 | | | | | | 8 |
| STA COVER | CCD 099 | COVER SHEET | 3/13/2020 | | | | | | 9 |
| ID.001 | CCD 099 | INDEX KEY SYMBOLS | 3/13/2020 | | | | | | 10 |
| ID.100 | CCD 099 | FLOOR PLAN | 3/13/2020 | | | | | | 11 |
| ID.101 | CCD 099 | FLOOR FINISH PLAN | 3/13/2020 | | | | | | 12 |
| ID.102 | CCD 099 | POWER PLAN | 3/13/2020 | | | | | | 13 |
| ID.103 | CCD 099 | RCP | 3/13/2020 | | | | | | 14 |
| ID.200 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 15 |
| ID.201 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 16 |
| ID.202 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 17 |
| ID.203 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 18 |
| ID.204 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 19 |
| LC1.01-4705 | CCD 100 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 20 |
| LC2.01-4705 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 21 |
| LC2.02-4705 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMUB DIMMER MODULE | 12/20/2017 | | | | | | 22 |
| LC2.03-4705 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 23 |
| LC2.04-4705 | CCD 100 | LC SYSTEMS DETAIL CAEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 24 |
| LC2.05-4705 | CCD 100 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 25 |
| LC2.06-4705 | CCD 100 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 26 |
| LC6.01-4705 | CCD 100 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 27 |
| LC6.02-4705 | CCD 100 | LC PANEL SCHEDULE CASA DI SOGNI | 12/20/2017 | | | | | | 28 |
| LC6.03-4705 | CCD 100 | LC DEVICES FLOOR PLAN | 12/20/2017 | | | | | | 29 |
| LC6.04-4705 | CCD 100 | LC ONE LINE RISER | 12/20/2017 | | | | | | 30 |
| LC6.05-4705 | CCD 100 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 31 |
| LC6.06-4705 | CCD 100 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 32 |
| LV1.01-4705 | CCD 100 | SECURITY AND AV LEGEND AND SYBOLS | 12/20/2017 | | | | | | 33 |
| LV2.01-4705 | CCD 100 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 34 |
| LV6.01-4705 | CCD 100 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 35 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**   UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| **ST CU 4707** | | | | | | | | | **34** |
| A0.05-4707 | CCD 100 | COVER SHEET- CU 4707 | 12/16/2019 | 5/22/2020 | | | | | 1 |
| A2.145-4707 | CCD 067 | ST CU 4707 FLOOR PLAN | 12/16/2019 | | | | | | 2 |
| A5.145-4707 | CCD 067 | ST CU 4707 RCP | 12/16/2019 | | | | | | 3 |
| A6.3-4707 | CCD 067 | ST CU 4707 DOOR AND FINISH SHCEDULES | 12/16/2019 | | | | | | 4 |
| M3.15A-4707 | CCD 067 | ST CU 4707 MECHANICAL PLAN | 12/16/2019 | | | | | | 5 |
| E3.15-4707 | CCD 067 | ST CU 4707 ELECTRICAL PLAN | 12/16/2019 | | | | | | 6 |
| P2.20-4707 | CCD 067 | ST CU 4707 PLUMBING PLAN | 12/16/2019 | | | | | | 7 |
| FP3.15-4707 | CCD 067 | ST CU 4707 FIRE PROTECTION PLAN | 12/16/2019 | | | | | | 8 |
| STA COVER | CCD 099 | COVER SHEET | 3/13/2020 | | | | | | 9 |
| ID.001 | CCD 099 | INDEX KEY SYMBOLS | 3/13/2020 | | | | | | 10 |
| ID.100 | CCD 099 | FLOOR PLAN | 3/13/2020 | | | | | | 11 |
| ID.101 | CCD 099 | FINISH FLOOR PLAN | 3/13/2020 | | | | | | 12 |
| ID.102 | CCD 099 | POWER PLAN | 3/13/2020 | | | | | | 13 |
| ID.103 | CCD 099 | RCP | 3/13/2020 | | | | | | 14 |
| ID.200 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 15 |
| ID.201 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 16 |
| ID.202 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 17 |
| ID.203 | CCD 099 | ENLARGED PLANS AND ELEVATIONS | 3/13/2020 | | | | | | 18 |
| LC1.01-4707 | CCD 100 | LC SYSTEM LEGEND AND SYMBOLS | 12/20/2017 | | | | | | 19 |
| LC2.01-4707 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMB DIMMER MODULE | 12/20/2017 | | | | | | 20 |
| LC2.02-4707 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMRU8 DIMMER MODULE | 12/20/2017 | | | | | | 21 |
| LC2.03-4707 | CCD 100 | LC SYSTEMS DETAIL CLX-2DIMFLV8 DIMMER MODULE | 12/20/2017 | | | | | | 22 |
| LC2.04-4707 | CCD 100 | LC SYSTEMS DETAIL C2N CBEN BLOCK AND PROCESSOR | 12/20/2017 | | | | | | 23 |
| LC2.05-4707 | CCD 100 | LC SYSTEMS DETAIL C2N-CBD-P KEYPAD | 12/20/2017 | | | | | | 24 |
| LC2.06-4707 | CCD 100 | SHADING CONTROL SYSTEM PREWIRE DETAIL XSPOT LOCATION | 12/20/2017 | | | | | | 25 |
| LC6.01-4707 | CCD 100 | LIGHTING ZONING RCP | 12/20/2017 | | | | | | 26 |
| LC6.02-4707 | CCD 100 | LC PANEL SCHEDULE CASA DI SOGNI | 12/20/2017 | | | | | | 27 |
| LC6.03-4707 | CCD 100 | LC DEVICES FLOOR PLAN | 12/20/2017 | | | | | | 28 |
| LC6.04-4707 | CCD 100 | LC ONE LINE RISER | 12/20/2017 | | | | | | 29 |
| LC6.05-4707 | CCD 100 | SHADING CONTROL SYSTEM RCP | 12/20/2017 | | | | | | 30 |
| LC6.06-4707 | CCD 100 | HVAC CONTROL SYSTEM FLOOR PLAN | 12/20/2017 | | | | | | 31 |
| LV1.01-4707 | CCD 100 | SECURITY AND AV LEGEND AND SYBOLS | 12/20/2017 | | | | | | 32 |
| LV2.01-4707 | CCD 100 | SECURITY AND AV DETAILS | 12/20/2017 | | | | | | 33 |
| LV6.01-4707 | CCD 100 | SECURITY AND AV FLOOR PLAN | 12/20/2017 | | | | | | 34 |
| **ST CU PH-02** | | | | | | | | | **311** |
| A0.05-PH-02 | CCD 058.2 | Cover Sheet | 12/20/2019 | 1/20/2020 | | | | | 1 |
| A2.175-PH-02 | CCD 108 | PH 02 LOWER LEVEL LEVEL 48 PLAN | 12/20/2019 | | | 5/15/2020 | 6/17/2020 | | 2 |
| A2.18S-PH-02 | CCD 108 | ST PH 02 UPPER LEVEL LVL 49 PLAN | 12/20/2019 | 1/20/2020 | | 5/15/2020 | 6/17/2020 | | 3 |
| A5.175-PH-02 | CCD 108 | ST PH 02 LOWER LEVEL 48 RCP | 12/20/2019 | | | 5/15/2020 | 6/17/2020 | | 4 |
| A5.18S-PH-02 | CCD 108 | ST PH 02 UPPER LEVEL 49 RCP | 12/20/2019 | | | 5/15/2020 | 6/17/2020 | | 5 |
| A6.3-PH-02 | CCD 108 | ST CU PH-02 DOOR AND FINISH SCHEDULE | 12/20/2019 | | | 5/15/2020 | 6/17/2020 | | 6 |
| A6.6-PH-02 | CCD 058 | DOORS ELEVATIONS AND DETAILS | 12/20/2019 | | | | | | 7 |
| A6.7-PH-02 | CCD 058 | DOOR DETAILS | 12/20/2019 | | | | | | 8 |
| A6.32S-PH-02 | CCD 058 | ST PH 02 SLIDING DOORS, STOREFRONTS AND DOORS | 12/20/2019 | | | | | | 9 |
| A6.33S-PH-02 | CCD 058 | ST PH 02 SLIDING DOORS, STOREFRONTS AND DOORS | 12/20/2019 | | | | | | 10 |
| A8.10-PH-02 | CCD 058 | WALL TYPES | 12/20/2019 | | | | | | 11 |
| A8.11-PH-02 | CCD 058 | WALL TYPES | 12/20/2019 | | | | | | 12 |
| LS1.12-PH-02 | CCD 058 | ST LEVEL 48 PH-02 LIFE SAFETY PLAN | 12/20/2019 | | | | | | 13 |
| LS1.13-PH-02 | CCD 058 | ST LEVEL 49 PH-02 LIFE SAFETY PLAN | 12/20/2019 | | | | | | 14 |
| M3.18PH-02 | CCD 108 | ST LEVEL 48 MECHANICAL PLAN | 10/28/2019 | | | 5/15/2020 | 6/17/2020 | | 15 |
| M3.19PH-02 | CCD 108 | ST LEVEL 49 MECHANICAL PLAN | 10/28/2019 | | | 5/15/2020 | 6/17/2020 | | 16 |
| E3.18-PH-02 | CCD 108 | ST LEVEL 48 ELECTRICAL PLAN | 10/28/2019 | | | 5/15/2020 | 6/17/2020 | | 17 |
| E3.19-PH-02 | CCD 108 | ST LEVEL 49 ELECTRICAL PLAN | 10/28/2019 | | | 5/15/2020 | 6/17/2020 | | 18 |
| P2.21-PH-02 | CCD 108 | ST LEVEL 48 PLUMBING PLAN | 10/28/2019 | | | 5/15/2020 | 6/17/2020 | | 19 |
| P2.22-PH-02 | CCD 108 | ST LEVEL 49 PLUMBING PLAN | 10/28/2019 | 1/16/2020 | | 5/15/2020 | 6/17/2020 | | 20 |
| FP3.18-PH-02 | CCD 108 | ST LEVEL 48 FIRE PROTECTION PLAN | 10/28/2019 | | | 5/15/2020 | 6/17/2020 | | 21 |
| FP3.19-PH-02 | CCD 108 | ST LEVEL 49 FIRE PROTECTION PLAN | 10/28/2019 | | | 5/15/2020 | 6/17/2020 | | 22 |
| A-2.0 | CCD 083 | 48TH FLOOR PLAN | 4/8/2020 | | | | | | 23 |
| A-2.1 | CCD 083 | 49TH FLOOR PLAN | 4/8/2020 | | | | | | 24 |
| I-2.0 | CCD 083 | 48TH FLOOR FINISH PLAN | 4/8/2020 | | | | | | 25 |
| I-2.1 | CCD 083 | 49TH FLOOR FINISH PLAN | 4/8/2020 | | | | | | 26 |
| A-6.0 | CCD 083 | 48TH FLOOR RCP | 4/8/2020 | | | | | | 27 |
| A-6.0a | CCD 083 | 48TH FLOOR RCP MECHANICAL AND SPRINKLER LOCATIONS | 4/8/2020 | | | | | | 28 |
| A-6.1 | CCD 083 | 49TH FLOOR RCP | 4/8/2020 | | | | | | 29 |
| A-6.1a | CCD 083 | 49TH FLOOR RCP MECHANICAL AND SPRINKLER LOCATIONS | 4/8/2020 | | | | | | 30 |
| A-6.2 | CCD 083 | CEILING DETAILS | 4/8/2020 | | | | | | 31 |
| A-6.3 | CCD 083 | LIGHTING SPECIFICATIONS | 4/8/2020 | | | | | | 32 |
| E-2.0 | CCD 083 | 48TH FLOOR ELECTRICAL | 4/8/2020 | | | | | | 33 |
| E-2.1 | CCD 083 | 49TH FLOOR ELECTRICAL | 4/8/2020 | | | | | | 34 |
| E-2.2 | CCD 083 | 48TH FLOOR LIGHTING ZONING | 4/8/2020 | | | | | | 35 |
| E-2.3 | CCD 083 | 49TH FLOOR LIGHTING ZONING | 4/8/2020 | | | | | | 36 |
| E-2.4 | CCD 083 | TYP. ELECTRICAL DETAILS | 4/8/2020 | | | | | | 37 |
| I-0.0 | CCD 083 | TITLE SHEET | 4/8/2020 | | | | | | 38 |
| I-0.1 | CCD 083 | TITLE SHEET | 4/8/2020 | | | | | | 39 |
| D-1.0 | CCD 083 | ENTRY DOOR ELEVATIONS | 4/8/2020 | | | | | | 40 |
| D-1.1 | CCD 083 | ENTRY DOOR DETAILS | 4/8/2020 | | | | | | 41 |
| D-1.2 | CCD 083 | INTERIOR DOOR ELEVATIONS | 4/8/2020 | | | | | | 42 |
| D-1.3 | CCD 083 | INTERIOR DOOR CASING DETAILS | 4/8/2020 | | | | | | 43 |
| D-1.4 | CCD 083 | CONCEALED DOOR DETAILS | 4/8/2020 | | | | | | 44 |
| D-1.5 | CCD 083 | INTERIOR DOOR ELEVATIONS | 4/8/2020 | | | | | | 45 |
| D-1.6 | CCD 083 | INTERIOR DOOR ELEVATIONS | 4/8/2020 | | | | | | 46 |
| D-1.7 | CCD 083 | GLAS ITALIA DOOR DETAILS | 4/8/2020 | | | | | | 47 |
| D-1.8 | CCD 083 | TYPICAL WALL PANEL DETAIL | 4/8/2020 | | | | | | 48 |
| D-1.9 | CCD 083 | TYPICAL WALL PANEL DETAIL | 4/8/2020 | | | | | | 49 |
| D-1.10 | CCD 083 | TYPICAL BATHROOM DETAILS | 4/8/2020 | | | | | | 50 |
| D-1.11 | CCD 083 | TYPICAL BATHROOM DETAILS | 4/8/2020 | | | | | | 51 |
| D-1.12 | CCD 083 | MASTER ENSUITE DETAILS | 4/8/2020 | | | | | | 52 |
| D-1.13 | CCD 083 | MAIN AND SECOND POWDER ROOM VANITY DETAILS | 4/8/2020 | | | | | | 53 |
| D-1.14 | CCD 083 | GUEST VANITY DETAILS | 4/8/2020 | | | | | | 54 |
| D-1.15 | CCD 083 | MASTER VANITY DETAILS MASTER DOOR JAMB DETAILS | 4/8/2020 | | | | | | 55 |
| I-E01.0 | CCD 083 | SUMMER KITCHEN PLAN | 4/8/2020 | | | | | | 56 |
| I-E01.1 | CCD 083 | SUMMER KITCHEN ELEVATION A,B,C | 4/8/2020 | | | | | | 57 |
| I-E01.2 | CCD 083 | SUMER KITCHEN ISLAND ELEVATIONS | 4/8/2020 | | | | | | 58 |
| I-G01.0 | CCD 083 | ELEVATOR LOBBY PLAN | 4/8/2020 | | | | | | 59 |
| I-G01.1 | CCD 083 | ELEVATOR LOBBY ELEVATION A&B | 4/8/2020 | | | | | | 60 |
| I-G01.2 | CCD 083 | ELEVATOR LOBBY ELEVATION C&D | 4/8/2020 | | | | | | 61 |
| I-G02.0 | CCD 083 | POWDER ROOM PLAN | 4/8/2020 | | | | | | 62 |
| I-G02.1 | CCD 083 | POWDER ROOM ELEVATION A,B | 4/8/2020 | | | | | | 63 |
| I-G02.2 | CCD 083 | POWDER ROOM ELEVATION C,C | 4/8/2020 | | | | | | 64 |
| I-G02.3 | CCD 083 | POWDER ROOM PLAN DETAILS | 4/8/2020 | | | | | | 65 |
| I-G03.0 | CCD 083 | A/C ROOM PLAN | 4/8/2020 | | | | | | 66 |
| I-G03.1 | CCD 083 | A/C ROOM ELEVATION A,B | 4/8/2020 | | | | | | 67 |
| I-G03.2 | CCD 083 | A/C ROOM ELEVATION C,D | 4/8/2020 | | | | | | 68 |
| I-G04.0 | CCD 083 | KITCHEN PLAN | 4/8/2020 | | | | | | 69 |
| I-G04.1 | CCD 083 | KITCHEN ELEVATION A | 4/8/2020 | | | | | | 70 |
| I-G04.2 | CCD 083 | KITCHEN ELEVATION B | 4/8/2020 | | | | | | 71 |
| I-G04.3 | CCD 083 | KITCHEN ELEVATION B OPEN CABINETS | 4/8/2020 | | | | | | 72 |
| I-G04.4 | CCD 083 | KITCHEN ELEVATION C | 4/8/2020 | | | | | | 73 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED: 7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| I-G04.5 | CCD 083 | KITCHEN ELEVATION D | 4/8/2020 | | | | | | 74 |
| I-G04.6 | CCD 083 | KITCHEN ISLAND ELEVATIONS | 4/8/2020 | | | | | | 75 |
| I-G05.0 | CCD 083 | GREAT ROOM PLAN | 4/8/2020 | | | | | | 76 |
| I-G05.1 | CCD 083 | GREAT ROOM ELEVATION A | 4/8/2020 | | | | | | 77 |
| I-G05.2 | CCD 083 | GREAT ROOM ELEVATION A Part 2 | 4/8/2020 | | | | | | 78 |
| I-G05.3 | CCD 083 | GREAT ROOM ELEVATION B | 4/8/2020 | | | | | | 79 |
| I-G05.4 | CCD 083 | GREAT ROOM ELEVATION C | 4/8/2020 | | | | | | 80 |
| I-G05.5 | CCD 083 | GREAT ROOM ELEVATION C PART 2 | 4/8/2020 | | | | | | 81 |
| I-G05.6 | CCD 083 | GREAT ROOM ELEVATION D | 4/8/2020 | | | | | | 82 |
| I-G05.7 | CCD 083 | GREAT ROOM ISLAND ELEVATIONS | 4/8/2020 | | | | | | 83 |
| I-G05.8 | CCD 083 | GLASSWARE CABINET | 4/8/2020 | | | | | | 84 |
| I-G05.9 | CCD 083 | FLOATING WINE STORAGE DETAILS | 4/8/2020 | | | | | | 85 |
| I-G06.0 | CCD 083 | STAIR GALLERY PLAN | 4/8/2020 | | | | | | 86 |
| I-G06.1 | CCD 083 | STAIR GALLERY ELEVATION A | 4/8/2020 | | | | | | 87 |
| I-G6.2 | CCD 083 | STAIR GALLERY ELEVATION B | 4/8/2020 | | | | | | 88 |
| I-G6.3 | CCD 083 | STAIR GALLERY ELEVATION B PART 2 | 4/8/2020 | | | | | | 89 |
| I-G06.4 | CCD 083 | STAIR GALLERY ELEVATION C | 4/8/2020 | | | | | | 90 |
| I-G06.5 | CCD 083 | STAIR GALLERY ELEVATION D | 4/8/2020 | | | | | | 91 |
| I-G06.6 | CCD 083 | STAIR GALLERY ELEVATION D PART 2 | 4/8/2020 | | | | | | 92 |
| I-G07.0 | CCD 083 | FAMILY ROOM PLAN | 4/8/2020 | | | | | | 93 |
| I-G07.1 | CCD 083 | FAMILY ROOM ELEVATION A | 4/8/2020 | | | | | | 94 |
| I-G07.2 | CCD 083 | FAMILY ROOM ELEVATION B | 4/8/2020 | | | | | | 95 |
| I-G07.3 | CCD 083 | FAMILY ROOM ELEVATION C | 4/8/2020 | | | | | | 96 |
| I-G07.4 | CCD 083 | FAMILY ROOM ELEVATION D | 4/8/2020 | | | | | | 97 |
| I-G07.5 | CCD 083 | FIREPLANCE SURROUND DETAILS | 4/8/2020 | | | | | | 98 |
| I-G07.6 | CCD 083 | FAMILY ROOM METAL SHELVING | 4/8/2020 | | | | | | 99 |
| I-G08.0 | CCD 083 | SIDE HALL PLAN | 4/8/2020 | | | | | | 100 |
| I-G08.1 | CCD 083 | SIDE HALL ELEVATION A,B | 4/8/2020 | | | | | | 101 |
| I-G08.2 | CCD 083 | SIDE HALL ELEVATION C,D | 4/8/2020 | | | | | | 102 |
| I-G09.0 | CCD 083 | POWDER ROOM 2 PLAN | 4/8/2020 | | | | | | 103 |
| I-G09.1 | CCD 083 | POWDER ROOM 2 ELEVATION A,B | 4/8/2020 | | | | | | 104 |
| I-G09.2 | CCD 083 | POWDER ROOM 2 ELEVATION C,D | 4/8/2020 | | | | | | 105 |
| I-G10.0 | CCD 083 | BEDROOM HALL PLAN | 4/8/2020 | | | | | | 106 |
| I-G10.1 | CCD 083 | BEDROOM HALL ELEVATION A | 4/8/2020 | | | | | | 107 |
| I-G10.2 | CCD 083 | BEDROOM HALL ELEVATION B | 4/8/2020 | | | | | | 108 |
| I-G10.3 | CCD 083 | BEDROOM HALL ELEVATION C | 4/8/2020 | | | | | | 109 |
| I-G10.4 | CCD 083 | BEDROOM HALL ELEVATION D | 4/8/2020 | | | | | | 110 |
| I-G11.0 | CCD 083 | BEDROOM 1 PLAN | 4/8/2020 | | | | | | 111 |
| I-G11.1 | CCD 083 | BEDROOM 1 ELEVATION A | 4/8/2020 | | | | | | 112 |
| I-G11.2 | CCD 083 | BEDROOM 1 ELEVATION B | 4/8/2020 | | | | | | 113 |
| I-G11.3 | CCD 083 | BEDROOM 1 ELEVATION C | 4/8/2020 | | | | | | 114 |
| I-G11.4 | CCD 083 | BEDROOM 1 ELEVATION D | 4/8/2020 | | | | | | 115 |
| I-G12.0 | CCD 083 | WIC 1 PLAN | 4/8/2020 | | | | | | 116 |
| I-G12.1 | CCD 083 | WIC 1 ELEVATION A | 4/8/2020 | | | | | | 117 |
| I-G12.2 | CCD 083 | WIC 1 ELEVATION C | 4/8/2020 | | | | | | 118 |
| I-G12.3 | CCD 083 | WIC 1 ELEVATION B,D | 4/8/2020 | | | | | | 119 |
| I-G12.4 | CCD 083 | WIC 1 ELEVATION E,F | 4/8/2020 | | | | | | 120 |
| 1-G12.5 | CCD 083 | WIC 1 ELEVATION G,H | 4/8/2020 | | | | | | 121 |
| I-G13.0 | CCD 083 | ENUITE 1 PLAN | 4/8/2020 | | | | | | 122 |
| I-G13.1 | CCD 083 | ENSUITE 1 ELEVATION A B | 4/8/2020 | | | | | | 123 |
| I-G13.2 | CCD 083 | E3NSUITE 1 ELEVATION C,D | 4/8/2020 | | | | | | 124 |
| I-G13.3 | CCD 083 | ENSUITE 1 ELEVATION E,F | 4/8/2020 | | | | | | 125 |
| I-G14.0 | CCD 083 | BEDROOM 2 PLAN | 4/8/2020 | | | | | | 126 |
| I-G14.1 | CCD 083 | BEDROOM 2 ELEVATION A | 4/8/2020 | | | | | | 127 |
| I-G14.2 | CCD 083 | BEDROOM 2 ELEVATION B | 4/8/2020 | | | | | | 128 |
| I-G14.3 | CCD 083 | BEDROOM 2 ELEVATION C | 4/8/2020 | | | | | | 129 |
| I-G14.4 | CCD 083 | BEDROOM 2 ELEVATION D | 4/8/2020 | | | | | | 130 |
| I-G15.0 | CCD 083 | WIC 2 PLAN | 4/8/2020 | | | | | | 131 |
| I-G15.1 | CCD 083 | WIC 2 ELEVATION A | 4/8/2020 | | | | | | 132 |
| I-G15.2 | CCD 083 | WIC 2 ELEVATION C | 4/8/2020 | | | | | | 133 |
| I-G15.3 | CCD 083 | WIC 2 ELEVATION B,D | 4/8/2020 | | | | | | 134 |
| I-G16.0 | CCD 083 | ENTRY 2 PLAN | 4/8/2020 | | | | | | 135 |
| I-G16.1 | CCD 083 | ENTRY 2 ELEVATION A,B | 4/8/2020 | | | | | | 136 |
| I-G16.2 | CCD 083 | ENTRY 2 ELEVATION C,D | 4/8/2020 | | | | | | 137 |
| I-G17.0 | CCD 083 | ENSUITE 2 PLAN | 4/8/2020 | | | | | | 138 |
| I-G17.1 | CCD 083 | ENSUITE 2 ELEVATION A,B | 4/8/2020 | | | | | | 139 |
| I-G17.2 | CCD 083 | ENSUITE 2 ELEVATION C,D | 4/8/2020 | | | | | | 140 |
| I-G17.3 | CCD 083 | ENSUITE 2 ELEVATION E,F | 4/8/2020 | | | | | | 141 |
| I-G18.0 | CCD 083 | LAUNDRY 1 PLAN | 4/8/2020 | | | | | | 142 |
| I-G18.1 | CCD 083 | LAUNDRY 1 ELEVATION A | 4/8/2020 | | | | | | 143 |
| I-G18.2 | CCD 083 | LAUNDRY 1 ELEVATION B | 4/8/2020 | | | | | | 144 |
| I-G18.3 | CCD 083 | LAUNDRY 1 ELEVATION C | 4/8/2020 | | | | | | 145 |
| I-G18.4 | CCD 083 | LAUNDRY 1 ELEVATION D | 4/8/2020 | | | | | | 146 |
| I-G19.0 | CCD 083 | ELEVATOR PLAN | 4/8/2020 | | | | | | 147 |
| I-G19.1 | CCD 083 | ELEVATOR ELEVATION A,B,C,D | 4/8/2020 | | | | | | 148 |
| I-G20.0 | CCD 083 | ELEVATOR FOYER PLAN | 4/8/2020 | | | | | | 149 |
| I-G20.1 | CCD 083 | FOYER ELEVATION A,B | 4/8/2020 | | | | | | 150 |
| I-G20.2 | CCD 083 | FOYER ELEVATION C&D | 4/8/2020 | | | | | | 151 |
| I-S01.0 | CCD 083 | MASTER BEDROOM PLAN | 4/8/2020 | | | | | | 152 |
| I-S01.1 | CCD 083 | MASTER BEDROOM ELEVATION A | 4/8/2020 | | | | | | 153 |
| I-S01.2 | CCD 083 | MASTER BEDROOM ELEVATION B | 4/8/2020 | | | | | | 154 |
| I-S01.3 | CCD 083 | MASTER BEDROOM ELEVATION C | 4/8/2020 | | | | | | 155 |
| I-S01.4 | CCD 083 | MASTER BEDROOM ELEVATION D | 4/8/2020 | | | | | | 156 |
| I-S01.5 | CCD 083 | MASTER BEDROOM HEADBOARD WALL SECTION | 4/8/2020 | | | | | | 157 |
| I-S02.0 | CCD 083 | HER DRESSING PLAN | 4/8/2020 | | | | | | 158 |
| I-S02.1 | CCD 083 | HER DRESSING ELEVATION A | 4/8/2020 | | | | | | 159 |
| I-S02.2 | CCD 083 | HER DRESSING ELEVATION B | 4/8/2020 | | | | | | 160 |
| I-S02.3 | CCD 083 | HER DRESSING ELEVATION C | 4/8/2020 | | | | | | 161 |
| I-S02.4 | CCD 083 | HER DRESSING ELEVATION D | 4/8/2020 | | | | | | 162 |
| I-S03.0 | CCD 083 | HER ENSUITE PLAN | 4/8/2020 | | | | | | 163 |
| I-S03.1 | CCD 083 | EHER ENSUITE ELEVATION A | 4/8/2020 | | | | | | 164 |
| I-S03.2 | CCD 083 | HER ENSUITE ELEVATION B | 4/8/2020 | | | | | | 165 |
| I-S03.3 | CCD 083 | HER ENSUITE ELEVATION C | 4/8/2020 | | | | | | 166 |
| I-S03.4 | CCD 083 | HER ENSUITE ELEVATION D | 4/8/2020 | | | | | | 167 |
| I-S04.1 | CCD 083 | HER WC ELEVATION A,B | 4/8/2020 | | | | | | 168 |
| I-S05.0 | CCD 083 | MASTER SHOWER PLAN | 4/8/2020 | | | | | | 169 |
| I-S05.1 | CCD 083 | MASTER SHOWER ELEVATION A,B | 4/8/2020 | | | | | | 170 |
| I-S05.2 | CCD 083 | MASTER SHOWER ELEVATION C,D | 4/8/2020 | | | | | | 171 |
| I-S06.0 | CCD 083 | HIS ENSUITE PLAN | 4/8/2020 | | | | | | 172 |
| I-S06.1 | CCD 083 | HIS ENSUITE ELEVATION A | 4/8/2020 | | | | | | 173 |
| I-S06.2 | CCD 083 | HIS ENSUITE ELEVATION B | 4/8/2020 | | | | | | 174 |
| I-S06.3 | CCD 083 | HIS ENSUITE ELEVATION C | 4/8/2020 | | | | | | 175 |
| I-S06.4 | CCD 083 | HIS ENSUITE ELEVATION D | 4/8/2020 | | | | | | 176 |
| I-S06.5 | CCD 083 | HIS ENSUITE ELEVATION E,F | 4/8/2020 | | | | | | 177 |
| I-S07.0 | CCD 083 | HIS DRESSING PLAN | 4/8/2020 | | | | | | 178 |
| I-S07.1 | CCD 083 | HIS DRESSING ELEVATION A,B | 4/8/2020 | | | | | | 179 |
| I-S07.2 | CCD 083 | HIS DRESSING ELEVATION C,D | 4/8/2020 | | | | | | 180 |
| I-S08.0 | CCD 083 | OFFICE PLAN | 4/8/2020 | | | | | | 181 |
| I-S08.1 | CCD 083 | OFFICE ELEVATION A | 4/8/2020 | | | | | | 182 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| I-S08.2 | CCD 083 | OFFICE ELEVATION B | 4/8/2020 | | | | | | 183 |
| I-S08.3 | CCD 083 | OFFICE ELEVATION C | 4/8/2020 | | | | | | 184 |
| I-S08.4 | CCD 083 | OFFICE ELEVATION D | 4/8/2020 | | | | | | 185 |
| I-S08.5 | CCD 083 | OFFICE WALL UNIT DETAILS | 4/8/2020 | | | | | | 186 |
| I-S09.0 | CCD 083 | MASTER HALL PLAN | 4/8/2020 | | | | | | 187 |
| I-S09.1 | CCD 083 | MASTER HALL ELEVATION A | 4/8/2020 | | | | | | 188 |
| I-S09.2 | CCD 083 | MASTER HALL ELEVATION B | 4/8/2020 | | | | | | 189 |
| I-S09.3 | CCD 083 | MASTER HALL ELEVATION C | 4/8/2020 | | | | | | 190 |
| I-S09.4 | CCD 083 | MASTER HALL ELEVATION D | 4/8/2020 | | | | | | 191 |
| I-S10.0 | CCD 083 | MASSAGE ROOM PLAN | 4/8/2020 | | | | | | 192 |
| I-S10.1 | CCD 083 | MASSAGE ROOM ELEVATION A,B | 4/8/2020 | | | | | | 193 |
| I-S10.2 | CCD 083 | MASSAGE ROOM ELEVATION C,D | 4/8/2020 | | | | | | 194 |
| I-S10.3 | CCD 083 | MASSAGE ROOM WALL SECTION | 4/8/2020 | | | | | | 195 |
| I-S11.0 | CCD 083 | SAUNA PLAN | 4/8/2020 | | | | | | 196 |
| I-S11.1 | CCD 083 | SAUNA ELEVATION A,B | 4/8/2020 | | | | | | 197 |
| I-S11.2 | CCD 083 | SAUNA ELEVATION C,D | 4/8/2020 | | | | | | 198 |
| I-S12.0 | CCD 083 | UPPER STAIR GALLERY PLAN | 4/8/2020 | | | | | | 199 |
| I-S12.1 | CCD 083 | UPPER STAIR GALLERY ELEVATION A | 4/8/2020 | | | | | | 200 |
| I-S12.2 | CCD 083 | UPPER STAIR GALLERY ELEVATION B | 4/8/2020 | | | | | | 201 |
| I-S12.3 | CCD 083 | UPPER STAIR GALLERY ELEVATION C | 4/8/2020 | | | | | | 202 |
| I-S12.4 | CCD 083 | UPPER STAIR GALLERY ELEVATION D | 4/8/2020 | | | | | | 203 |
| I-S13.0 | CCD 083 | MIDNIGHT BAR PLAN | 4/8/2020 | | | | | | 204 |
| I-S13.1 | CCD 083 | MIDNIGHT BAR ELEVATION A,B | 4/8/2020 | | | | | | 205 |
| I-S13.2 | CCD 083 | MIDNIGHT BAR ELEVATION C,D | 4/8/2020 | | | | | | 206 |
| I-S14.0 | CCD 083 | AV CLOSET PLAN | 4/8/2020 | | | | | | 207 |
| I-S14.1 | CCD 083 | AV CLOSET ELEVATION A,B | 4/8/2020 | | | | | | 208 |
| I-S14.2 | CCD 083 | AV CLOSET ELEVATION C,D | 4/8/2020 | | | | | | 209 |
| I-S15.0 | CCD 083 | UPPER HALL PLAN | 4/8/2020 | | | | | | 210 |
| I-S15.1 | CCD 083 | UPPER HALL ELEVATION A | 4/8/2020 | | | | | | 211 |
| I-S15.2 | CCD 083 | UPPER HALL ELEVATION B | 4/8/2020 | | | | | | 212 |
| I-S15.3 | CCD 083 | UPPER HALL ELEVATION C | 4/8/2020 | | | | | | 213 |
| I-S16.0 | CCD 083 | SIDE HALL PLAN | 4/8/2020 | | | | | | 214 |
| I-S16.1 | CCD 083 | SIDE HALL ELEVATION A,B | 4/8/2020 | | | | | | 215 |
| I-S16.2 | CCD 083 | SIDE HALL ELEVATION C,D | 4/8/2020 | | | | | | 216 |
| I-S17.0 | CCD 083 | BEDROOM 3 PLAN | 4/8/2020 | | | | | | 217 |
| I-S17.1 | CCD 083 | BEDROOM 3 ELEVATION A | 4/8/2020 | | | | | | 218 |
| I-S17.2 | CCD 083 | BEDROOM 3 ELEVATION B | 4/8/2020 | | | | | | 219 |
| I-S17.3 | CCD 083 | BEDROOM 3 ELEVATION C | 4/8/2020 | | | | | | 220 |
| I-S17.4 | CCD 083 | BEDROOM 3 ELEVATION D | 4/8/2020 | | | | | | 221 |
| I-S18.0 | CCD 083 | WIC 3 PLAN | 4/8/2020 | | | | | | 222 |
| I-S18.1 | CCD 083 | WIC 3 ELEVATION A | 4/8/2020 | | | | | | 223 |
| I-S18.2 | CCD 083 | WIC 3 ELEVATION C | 4/8/2020 | | | | | | 224 |
| I-S18.3 | CCD 083 | WIC 3 ELEVATION B,D | 4/8/2020 | | | | | | 225 |
| I-S18.4 | CCD 083 | WIC 3 ELEVATION E,F | 4/8/2020 | | | | | | 226 |
| I-S18.5 | CCD 083 | WIC 3 ELEVATION G,H | 4/8/2020 | | | | | | 227 |
| I-S19.0 | CCD 083 | ENSUITE 3 PLAN | 4/8/2020 | | | | | | 228 |
| I-S19.1 | CCD 083 | ENSUITE 3 ELEVATION A,B | 4/8/2020 | | | | | | 229 |
| I-S19.2 | CCD 083 | ENSUITE 3 ELEVATION C,D | 4/8/2020 | | | | | | 230 |
| I-S19.3 | CCD 083 | ENUITE 3 ELEVATION E,F | 4/8/2020 | | | | | | 231 |
| I-S20.0 | CCD 083 | BEDROOM 4 PLAN | 4/8/2020 | | | | | | 232 |
| I-S20.1 | CCD 083 | BEDROOM ELEVATION A | 4/8/2020 | | | | | | 233 |
| I-S20.2 | CCD 083 | BEDROOM 4 ELEVATION B | 4/8/2020 | | | | | | 234 |
| I-S20.3 | CCD 083 | BEDROOM 4 ELEVATION C | 4/8/2020 | | | | | | 235 |
| I-S20.4 | CCD 083 | BEDROOM 4 ELEVATION D | 4/8/2020 | | | | | | 236 |
| I-S21.0 | CCD 083 | WIC 4 PLAN | 4/8/2020 | | | | | | 237 |
| I-S21.1 | CCD 083 | WIC 4 ELEVATION A | 4/8/2020 | | | | | | 238 |
| I-S21.2 | CCD 083 | WIC 4 ELEVATION C | 4/8/2020 | | | | | | 239 |
| I-S21.3 | CCD 083 | WIC 4 ELEVATION B,D | 4/8/2020 | | | | | | 240 |
| I-S22.0 | CCD 083 | ENTRY 4 PLAN | 4/8/2020 | | | | | | 241 |
| I-S22.1 | CCD 083 | ENTRY 4 ELEVATION A,B | 4/8/2020 | | | | | | 242 |
| I-S22.2 | CCD 083 | ENTRY 4 ELEVATION C,D | 4/8/2020 | | | | | | 243 |
| I-S23.0 | CCD 083 | ENSUITE 4 PLAN | 4/8/2020 | | | | | | 244 |
| I-S23.1 | CCD 083 | ENSUITE 4 ELEVATION A,B | 4/8/2020 | | | | | | 245 |
| I-S23.2 | CCD 083 | ENSUITE 4 ELEVATION C,D | 4/8/2020 | | | | | | 246 |
| I-S23.3 | CCD 083 | ENSUITE 4 ELEVATION E,F | 4/8/2020 | | | | | | 247 |
| I-S23.4 | CCD 083 | ENUITE 4 ELEVATION G,H | 4/8/2020 | | | | | | 248 |
| I-S23.5 | CCD 083 | ENUITE 4 ELEVATION I,J | 4/8/2020 | | | | | | 249 |
| I-S23.6 | CCD 083 | ENSUITE 4 ELEVATION K,L | 4/8/2020 | | | | | | 250 |
| I-S24.0 | CCD 083 | LAUNDRY 2 PLAN | 4/8/2020 | | | | | | 251 |
| I-S24.1 | CCD 083 | LAUNDRY 2 ELEVATION A | 4/8/2020 | | | | | | 252 |
| I-S24.2 | CCD 083 | LAUNDRY 2 ELEVATION B | 4/8/2020 | | | | | | 253 |
| I-S24.3 | CCD 083 | LAUNDRY 2 ELEVATION C | 4/8/2020 | | | | | | 254 |
| I-S24.4 | CCD 083 | LAUNDRY 2 ELEVATION D | 4/8/2020 | | | | | | 255 |
| I-S24.5 | CCD 083 | LAUNDRY 2 ELEVATION C DOORS OPEN | 4/8/2020 | | | | | | 256 |
| I-S25.0 | CCD 083 | BEDROOM 5 PLAN | 4/8/2020 | | | | | | 257 |
| I-S25.1 | CCD 083 | BEDROOM 5 ELEVATION A | 4/8/2020 | | | | | | 258 |
| I-S25.2 | CCD 083 | BEDROOM 5 ELEVATION B | 4/8/2020 | | | | | | 259 |
| I-S25.3 | CCD 083 | BEDROOM 5 ELEVATION C | 4/8/2020 | | | | | | 260 |
| I-S25.4 | CCD 083 | BEDROOM 5 ELEATION D | 4/8/2020 | | | | | | 261 |
| I-S26.0 | CCD 083 | ENTRY 5 PLAN | 4/8/2020 | | | | | | 262 |
| I-S26.1 | CCD 083 | ENTRY 5 ELEVATION A,B | 4/8/2020 | | | | | | 263 |
| I-S26.2 | CCD 083 | ENTRY 5 ELEVATION C,D | 4/8/2020 | | | | | | 264 |
| I-S27.0 | CCD 083 | ENSUITE 5 PLAN | 4/8/2020 | | | | | | 265 |
| I-S27.1 | CCD 083 | ENSUITE 5 ELEVATION A,B | 4/8/2020 | | | | | | 266 |
| I-S27.2 | CCD 083 | ENSUITE 5 ELEVATION C,D | 4/8/2020 | | | | | | 267 |
| I-S27.3 | CCD 083 | ENSUITE 5 ELEVATION E,F | 4/8/2020 | | | | | | 268 |
| I-S27.4 | CCD 083 | ENSUITE 5 ELEVATION G,H | 4/8/2020 | | | | | | 269 |
| I-S28.0 | CCD 083 | WIC 5 PLAN | 4/8/2020 | | | | | | 270 |
| I-S28.1 | CCD 083 | WIC 5 ELEVATION A | 4/8/2020 | | | | | | 271 |
| I-S28.2 | CCD 083 | WIC 5 ELEVATION C | 4/8/2020 | | | | | | 272 |
| I-S30.0 | CCD 083 | ELEVATOR FOYER PLAN | 4/8/2020 | | | | | | 273 |
| I-S30.1 | CCD 083 | ELEVATOR FOYER ELEVATION A,B | 4/8/2020 | | | | | | 274 |
| I-S30.2 | CCD 083 | ELEVATOR FOYER ELEVATION C,D | 4/8/2020 | | | | | | 275 |
| DRAWING LIST PAGE 1/6 | CCD 083 | DRAWING LIST PAGE 1/6 | 4/8/2020 | | | | | | 276 |
| DRAWING LIST PAGE 2/6 | CCD 083 | DRAWING LIST PAGE 2/6 | 4/8/2020 | | | | | | 277 |
| DRAWING LIST PAGE 3/6 | CCD 083 | DRAWING LIST PAGE 3/6 | 4/8/2020 | | | | | | 278 |
| DRAWING LIST PAGE 4/6 | CCD 083 | DRAWING LIST PAGE 4/6 | 4/8/2020 | | | | | | 279 |
| DRAWING LIST PAGE 5/6 | CCD 083 | DRAWING LIST PAGE 5/6 | 4/8/2020 | | | | | | 280 |
| DRAWING LIST PAGE 6/6 | CCD 083 | DRAWING LIST PAGE 6/6 | 4/8/2020 | | | | | | 281 |
| SCHEDULE APPLIANCE 1/3 | CCD 083 | SCHEDULE APPLIANCE 1/3 | 4/8/2020 | | | | | | 282 |
| SCHEDULE APPLIANCE 2/3 | CCD 083 | SCHEDULE APPLIANCE 2/3 | 4/8/2020 | | | | | | 283 |
| SCHEDULE APPLIANCE 3/3 | CCD 083 | SCHEDULE APPLIANCE 3/3 | 4/8/2020 | | | | | | 284 |
| SCHEDULE DOOR 1/3 | CCD 083 | SCHEDULE DOOR 1/3 | 4/8/2020 | | | | | | 285 |
| SCHEDULE DOOR 2/3 | CCD 083 | SCHEDULE DOOR 2/3 | 4/8/2020 | | | | | | 286 |
| SCHEDULE DOOR 3/3 | CCD 083 | SCHEDULE DOOR 3/3 | 4/8/2020 | | | | | | 287 |
| SCHEDULE FINISH 1/10 | CCD 083 | SCHEDULE FINISH 1/10 | 4/8/2020 | | | | | | 288 |
| SCHEDULE FINISH 2/10 | CCD 083 | SCHEDULE FINISH 2/10 | 4/8/2020 | | | | | | 289 |
| SCHEDULE FINISH 3/10 | CCD 083 | SCHEDULE FINISH 3/10 | 4/8/2020 | | | | | | 290 |
| SCHEDULE FINISH 4/10 | CCD 083 | SCHEDULE FINISH 4/10 | 4/8/2020 | | | | | | 291 |

**ESTAES AT ACQUALINA CUSTOM UNITS DRAWING LOG TO CCD 108**

UPDATED:   7/7/2020

| Sheet Name | VERSION | Description | Permit Set | REV 1 | REV I | REV 2 | REV 3 | REV 4 | # of Sheets |
|---|---|---|---|---|---|---|---|---|---|
| SCHEDULE FINISH 5/10 | CCD 083 | SCHEDULE FINISH 5/10 | 4/8/2020 | | | | | | 292 |
| SCHEDULE FINISH 6/10 | CCD 083 | SCHEDULE FINISH 6/10 | 4/8/2020 | | | | | | 293 |
| SCHEDULE FINISH 7/10 | CCD 083 | SCHEDULE FINISH 7/10 | 4/8/2020 | | | | | | 294 |
| SCHEDULE FINISH 8/10 | CCD 083 | SCHEDULE FINISH 8/10 | 4/8/2020 | | | | | | 295 |
| SCHEDULE FINISH 9/10 | CCD 083 | SCHEDULE FINISH 9/10 | 4/8/2020 | | | | | | 296 |
| SCHEDULE FINISH 10/10 | CCD 083 | SCHEDULE FINISH 10/10 | 4/8/2020 | | | | | | 297 |
| SCHEDULE MILLWORK 1/5 | CCD 083 | SCHEDULE MILLWORK 1/5 | 4/8/2020 | | | | | | 298 |
| SCHEDULE MILLWORK 2/5 | CCD 083 | SCHEDULE MILLWORK 2/5 | 4/8/2020 | | | | | | 299 |
| SCHEDULE MILLWORK 3/5 | CCD 083 | SCHEDULE MILLWORK 3/5 | 4/8/2020 | | | | | | 300 |
| SCHEDULE MILLWORK 4/5 | CCD 083 | SCHEDULE MILLWORK 4/5 | 4/8/2020 | | | | | | 301 |
| SCHEDULE MILLWORK 5/5 | CCD 083 | SCHEDULE MILLWORK 5/5 | 4/8/2020 | | | | | | 302 |
| SCHEDULE PUMBING 1/9 | CCD 083 | SCHEDULE PUMBING 1/9 | 4/8/2020 | | | | | | 303 |
| SCHEDULE PUMBING 2/9 | CCD 083 | SCHEDULE PLUMBING 2/9 | 4/8/2020 | | | | | | 304 |
| SCHEDULE PLUMBING 3/9 | CCD 083 | SCHEDULE PLUMBING 3/9 | 4/8/2020 | | | | | | 305 |
| SCHEDULE PLUMBING 4/9 | CCD 083 | SCHEDULE PLUMBING 4/9 | 4/8/2020 | | | | | | 306 |
| SCHEDULE PLUMBING 5/9 | CCD 083 | SCHEDULE PLUMBING 5/9 | 4/8/2020 | | | | | | 307 |
| SCHEDULE PLUMBING 6/9 | CCD 083 | SCHEDULE PLUMBING 6/9 | 4/8/2020 | | | | | | 308 |
| SCHEDULE PLUMBING 7/9 | CCD 083 | SCHEDULE PLUMBING 7/9 | 4/8/2020 | | | | | | 309 |
| SCHEDULE PLUMBING 8/9 | CCD 083 | SCHEDULE PLUMBING 8/9 | 4/8/2020 | | | | | | 310 |
| SCHEDULE PLUMBING 9/9 | CCD 083 | SCHEDULE PLUMBING 9/9 | 4/8/2020 | | | | | | 311 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | Total | 2179 |

Exhibit "B"

LEGAL DESCRIPTION: Residential 777 Parcel

Residential 777 Parcel 1

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 310.62 feet; thence S 86°59'57" E for 195.94 feet to the Point of Beginning; thence continue S 86°59'18" E for 9.00 feet; thence S 03°00'42" W for 1.33 feet; thence S 86°59'18" E for 68.83 feet; thence S 03°00'42" W for 18.92 feet; thence N 86°59'18" W for 11.58 feet; thence S 03°00'42" W for 9.33 feet; thence N 86°59'18" W for 61.83 feet; thence N 03°00'42" E for 1.58 feet; thence N 86°59'18" W for 4.42 feet; thence N 03°00'42" E for 28.00 feet to the Point of Beginning.

AND

Residential 777 Parcel 1

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 405.12 feet; thence S 86°59'57" E for 196.59 feet to the Point of Beginning; thence S 86°59'18" E for 8.33 feet; thence N 03°00'42" E for 1.33 feet; thence S 86°59'18" E for 68.83 feet; thence N 03°00'42" E for 18.75 feet; thence N 86°59'18" W for 39.17 feet; thence N 03°00'42" E for 9.50 feet; thence N 86°59'18" W for 20.33 feet; thence S 03°00'42" W for 7.33 feet; thence N 86°59'18" W for 9.33 feet; thence N 03°00'42" E for 8.08 feet; thence S 86°59'18" W for 4.58 feet; thence S 03°00'42" W for 2.33 feet; thence N 86°59'18" W for 3.75 feet; thence S 03°00'42" W for 28.00 feet to the Point of Beginning.

The above described perimetrical boundarys being between elevation +3.5 to +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.

AND

Residential 777 Parcel 2

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 445.09 feet; thence S 86°59'57" E for 186.75 feet to the Point of Beginning; thence continue S 86°59'57" E for 6.00 feet; thence N 03°00'03" E for 3.00 feet; thence S 86°59'57" E for 90.92 feet; thence S 03°00'03" W for 6.83 feet; thence S 86°59'57" E for 40.08 feet; thence N 03°00'03" E for 118.00 feet; thence S 86°59'57" E for 4.33 feet; thence N 03°00'03" E for 9.67 feet; thence N 86°59'57" W for 20.98 feet to a point on a circular curve concave to the Soutwest, and whose radius point bears N85°23'02"E; thence Northwesterly along a 262.17 foot radius curve leading to the left through a central angle of 9°39'13" for an arc distance of 44.17 feet to a point of non-tangency; thence N 86°59'57" W for 17.26 feet; thence N 03°00'08" E for 22.50 feet; thence N 86°59'57" W for 87.21 feet; thence S 03°00'03" W for 21.58 feet; thence N 86°59'57" W for 9.12 feet; thence S 03°00'03" W for 20.58 feet; thence N 86°59'57" W for 7.58 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 0.83 feet; thence S 03°00'03" W for 8.58 feet; thence S 86°59'57" E for 0.83 feet; thence S 03°00'03" W for 10.67 feet; thence N 86°59'57" W for 0.83 feet; thence S 03°00'03" W for 8.58 feet; thence N 86°59'57" W for 0.83 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 6.58 feet; thence S 03°00'03" W for 34.00 feet; thence N 86°59'57" W for 5.25 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 1.50 feet; thence S 03°00'03" W for 27.83 feet; thence N 86°59'56" W for 1.50 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 6.25 feet; thence S 03°00'03" W for 20.58 feet; thence S 86°59'57" E for 2.75 feet; thence S 03°00'03" W for 10.33 feet  to the Point of Beginning.

The above described perimetrical boundary being above elevation +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.

Exhibit "C"

LEGAL DESCRIPTION:  COMMON AREA/AMENITIES PARCEL

Tract "Q", of AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, recorded in Plat Book 44, Page 42, of the Public Records of Miami-Dade County Florida.

LESS AND EXCEPT THE FOLLOWING DESCRIBED PARCELS:
(1) COMMERCIAL/RESTAURANT PARCEL, (2) RESIDENTIAL 888 PARCEL AND (3) RESIDENTIAL 777 PARCEL, BEING MORE PARTICUALLY DESCRIBED AS FOLLOWS:

 (1) COMMERCIAL/RESTAURANT PARCEL,

Commercial Parcel Restaurant 1

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 210.33 feet; thence S 86°59'57" E for 145.17 feet to the Point of Beginning; thence S 03°00'03" W for 36.50 feet; thence S 86°59'57" E for 44.50 feet; thence N 03°00'03" E for 9.17 feet; thence N 86°59'57" W for 1.17 feet; thence N 03°00'03" E for 27.33 feet; thence N 86°59'57" W for 43.33 feet to the Point of Beginning.

The above described perimetrical boundary being between elevation +3.5 to +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.

AND

Commercial Parcel Restaurant 2

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 259.84 feet; thence S 86°59'57" E for 145.17 feet to the Point of Beginning; thence S 03°00'03" W for 26.33 feet; thence S 86°59'57" E for 68.17 feet; thence N 03°00'03" E for 28.50 feet; thence N 86°59'57" W for 34.50 feet; thence N 03°00'03" E for 0.17 feet; thence N 86°59'57" W for 26.00 feet; thence S 03°00'03" W for 2.32 feet; thence N 87°05'58" W for 7.67 feet to the Point of Beginning.

The above described perimetrical boundary being between elevation +3.5 to +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.

AND

Commercial Parcel Restaurant 3

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 306.83 feet; thence S 86°59'57" E for 146.50 feet to the Point of Beginning; thence S 03°00'03" W for 21.06 feet; thence S 41°59'57" E for 14.53 feet; thence S 86°59'57" E for 28.22 feet; thence N 03°00'03" E for 9.67 feet; thence S 86°59'57" E for 1.67 feet; thence N 03°00'03" E for 21.67 feet; thence N 86°59'57" W for 40.17 feet to the Point of Beginning.

The above described perimetrical boundary being between elevation +3.5 to +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.

AND

Commercial Parcel Restaurant 4

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 185.50 feet; thence S 86°59'57" E for 189.51 feet to the Point of Beginning; thence S 03°00'03" W for 40.83 feet; thence S 86°59'57" E for 22.33 feet; thence S 03°00'03" W for 23.33 feet; thence S 86°59'57" E for 12.92 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 78.00 feet; thence N 03°00'03" E for 1.25 feet; thence S 86°59'57" E for 18.08 feet; thence N 03°00'03" E for 29.33 feet; thence S 86°59'57" E for 4.08 feet; thence S 03°00'06" W for 12.17 feet; thence S 86°59'57" E for 10.67 feet; thence N 03°00'04" E for 64.00 feet; thence N 86°59'57" W for 10.67 feet; thence S 03°00'03" W for 12.17 feet; thence N 86°59'57" W for 4.08 feet; thence N 03°00'03" E for 29.33 feet; thence N 86°59'57" W for 18.08 feet; thence N 03°00'03" E for 1.25 feet; thence N 86°59'57" W for 23.67 feet; thence S 03°00'03" W for 30.17 feet; thence N 86°59'57" W for 16.21 feet; thence N 03°00'03" E for 1.67 feet; thence N 86°59'57" W for 2.62 feet; thence N 03°00'03" E for 28.50 feet; thence N 86°59'57" W for 21.33 feet; thence S 03°00'03" W for 2.83 feet to a point on a circular curve concave to the Southwest and whose radius point bears S

38°16'41" W; thence Southeasterly and Southwesterly along a 9.80 foot radius curve leading to the right through a central angle of 60°44'32" for an arc distance of 10.39 feet to a non-tangent point on a circular curve concave to the Northwest and whose radius point bears N 76°27'21" W; thence Southwesterly along a 11.05 foot radius curve leading to the right through a central angle of 53°49'46" for an arc distance of 10.38 feet to a non-tangent point; thence S 03°00'03" W for 9.70 feet; thence
N 86°59'57" W for 14.75 feet; thence S 03°00'03" W for 0.67 feet; thence N 86°59'57" W for 11.67 feet; thence N 03°00'03" E for 0.17 feet; thence N 86°59'57" W for 21.00 feet to the Point of Beginning.

The above described perimetrical boundary being between elevation +21.8 to +30.3 feet, relative to the National Geodetic Vertical Datum of 1929.

 (2) RESIDENTIAL 888 PARCEL

Residential 888 Parcel 1

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 77.00 feet; thence S 86°59'57" E for 148.59 feet to the Point of Beginning; thence N 03°00'04" E for 38.00 feet; thence S 86°59'56" E for 33.08 feet; thence
N 03°00'04" E for 5.50 feet; thence S 86°59'56" E for 17.67 feet; thence S 03°00'04" W for 0.67 feet; thence
S 86°59'56" E for 37.50 feet; thence N 03°00'04" E for 4.58 feet; thence S 86°59'56" E for 24.33 feet; thence
S 03°00'04" W for 3.83 feet; thence S 86°59'56" E for 6.58 feet to a point hereinafter referred to as Point "A"; thence S 03°00'04" W for 27.83 feet; thence N 86°59'56" W for 2.17 feet; thence S 03°00'04" W for 30.00 feet; thence S 86°59'56" E for 0.88 feet; thence S 03°00'04" W for 30.50 feet; thence N 86°59'56" W for 7.04 feet; thence N 03°00'04" E for 33.50 feet; thence N 86°59'56" W for 20.33 feet; thence S 03°00'04" W for 39.42 feet; thence N 86°59'56" W for 22.00 feet; thence N 03°00'04" E for 26.42 feet; thence N 86°59'56" W for 21.00 feet; thence N 03°00'04" E for 17.00 feet; thence S 86°59'56" E for 11.17 feet; thence N 03°00'04" E for 9.67 feet; thence N 86°59'56" W for 26.25 feet; thence S 03°00'04" W for 2.42 feet; thence N 86°59'56" W for 32.42 feet to the Point of Beginning.

The above described perimetrical boundary being between elevation +3.5 to +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.

AND

Commence at aforesaid Point "A"; thence S 86°59'56" E for 6.00 feet to the Point of Beginning; thence continue S 86°59'56" E for 5.50 feet; thence N 03°00'04" E for 17.17 feet; thence S 86°59'56" E for 14.33 feet; thence N 03°00'04" E for 25.92 feet; thence S 86°59'56" E for 18.67 feet; thence S 03°00'04" W for 42.42 feet; thence N 86°59'56" W for 23.08 feet; thence S 03°00'04" W for 21.50 feet; thence N 86°59'56" W for 15.42 feet; thence N 03°00'04" E for 20.83 feet to the Point of Beginning.

The above described perimetrical boundary being between elevation +3.5 to +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.

AND

Residential 888 Parcel 2

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 152.50 feet; thence S 86°59'57" E for 201.51 feet to the Point of Beginning; thence N 03°00'03" E for 30.17 feet; thence N 86°59'57" W for 12.92 feet; thence N 03°00'03" E for 0.58 feet; thence N 86°59'57" W for 0.59 feet; thence N 03°00'03" E for 3.17 feet; thence S 86°59'57" E for 0.59 feet; thence N 03°00'03" E for 0.58 feet; thence S 86°59'57" E for 1.17 feet; thence N 03°00'03" E for 12.92 feet; thence N 86°59'57" W for 1.17 feet; thence N 03°00'03" E for 6.00 feet; thence N 86°59'57" W for 1.08 feet; thence N 03°00'03" E for 3.83 feet; thence N 86°59'57" W for 0.17 feet; thence N 03°00'03" E for 34.17 feet; thence S 86°59'57" E for 2.33 feet; thence N 03°00'03" E for 26.33 feet; thence S 86°59'57" E for 11.83 feet; thence N 03°00'03" E for 0.42 feet; thence S 86°59'57" E for 3.13 feet; thence N 03°00'03" E for 0.17 feet; thence S 86°59'57" E for 1.72 feet to a point of curvature; thence Northeasterly along a 47.29 foot radius curve leading to the left through a central angle of 17°49'06" for an arc distance of 14.71 feet to a point of reverse curvature; thence Northeasterly and Southeasterly along a 166.33 foot radius curve leading to the right through a central angle of 2°45'36" for an arc distance of 10.92 feet to a point of reverse curvature; thence Southeasterly along a 47.29 foot radius curve leading to the left through a central angle of 17°49'06" for an arc distance of 14.71 feet to a non-tangent point; thence N 03°00'03" E for 3.29 feet; thence S 86°59'57" E for 0.67 feet; thence N 03°00'08" E for 10.33 feet; thence S 86°59'57" E for 14.33 feet; thence N 03°00'03" E for 4.17 feet; thence S 86°59'57" E for 5.67 feet; thence N 03°00'03" E for 5.00 feet; thence S 86°59'57" E for 8.83 feet; thence S 03°00'03" W for 4.33 feet; thence S 86°59'57" E for 6.42 feet; thence S 03°00'03" W for 21.08 feet; thence S 86°59'57" E for 25.50 feet; thence S 03°00'03" W for 19.33 feet; thence N 86°59'57" W for 19.92 feet; thence S 03°00'03" W for 24.08 feet; thence N 86°59'57" W for 6.67 feet to a point on a circular curve concave to the Northwest and whose radius point bears N 87°09'48" W; thence Southwesterly along a 116.33 foot radius curve leading to the right through a central angle of 25°20'48" for an arc distance of 51.46 feet to a non-tangent

point; thence N 86°59'57" W for 4.82 feet; thence S 03°00'03" W for 18.92 feet; thence N 86°59'57" W for 29.29 feet; thence S 03°00'03" W for 7.83 feet; thence N 86°59'57" W for 58.96 feet; thence S 03°00'03" W for 1.67 feet; thence N 86°59'57" W for 6.12 feet; thence N 03°00'03" E for 1.67 feet; thence N 86°59'57" W for 1.67 feet to the Point of Beginning.

The above described perimetrical boundary being between elevation +21.8 to +30.3 feet, relative to the National Geodetic Vertical Datum of 1929.

AND

Residential 888 Parcel 3

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 122.28 feet; thence S 86°59'57" E for 188.66 feet to the Point of Beginning; thence S 87°04'31" E for 11.26 feet to a point of curvature; thence Southeasterly along a 68.67 foot radius curve leading to the right through a central angle of 16°23'29" for an arc distance of 19.65 feet to a point of reverse curvature; thence Southeasterly and Northeasterly along a 112.20 foot radius curve leading to the left through a central angle of 25°57'40" for an arc distance of 50.84 feet to a point of reverse curvature; thence Northeasterly and Southeasterly along a 158.56 foot radius curve leading to the right through a central angle of 9°34'411" for an arc distance of 26.48 feet to a non-tangent point; thence S 87°04'31" E for 5.88 feet to a point on a circular curve concave to the West and whose radius point bears N 61°41'08" W; thence Northeasterly and Northwesterly along a 117.00 foot radius curve leading to the left through a central angle of 48°43'08" for an arc distance of 99.49 feet to a non-tangent point; thence N 87°04'31" W for 9.61 feet to a point of curvature; thence Northwesterly along a 165.67 foot radius curve leading to the right through a central angle of 9°05'18" for an arc distance of 26.28 feet to a point of reverse curvature; thence Northwesterly and Southwesterly along a 107.83 foot radius curve leading to the left through a central angle of 25°15'36" for an arc distance of 47.54 feet to a point of reverse curvature; thence Southwesterly and Northwesterly along a 69.50 foot radius curve leading to the right through a central angle of 16°10'18" for an arc distance of 19.62 feet to a point of tangency; thence N 87°04'31" W for 12.73 feet; thence S 02°55'29" W for 18.75 feet; thence N 87°04'31" W for 4.58 feet; thence S 02°55'29" W for 4.00 feet; thence N 87°04'31" W for 1.17 feet; thence S 02°55'29" W for 18.00 feet; thence S 87°04'31" E for 1.17 feet; thence S 02°55'29" W for 4.00 feet; thence N 87°04'31" W for 1.17 feet; thence S 02°55'29" W for 18.00 feet; thence S 87°04'31" E for 1.17 feet; thence S 02°55'29" W for 4.00 feet; thence S 87°04'31" E for 4.58 feet; thence S 02°55'29" W for 22.58 feet to the Point of Beginning.

The above described perimetrical boundary being between elevation +30.3 to +643.0 feet, relative to the National Geodetic Vertical Datum of 1929.

(3) RESIDENTIAL 777 PARCEL

Residential 777 Parcel 1

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 310.62 feet; thence S 86°59'57" E for 195.94 feet to the Point of Beginning; thence continue S 86°59'18" E for 9.00 feet; thence S 03°00'42" W for 1.33 feet; thence S 86°59'18" E for 68.83 feet; thence S 03°00'42" W for 18.92 feet; thence N 86°59'18" W for 11.58 feet; thence S 03°00'42" W for 9.33 feet; thence N 86°59'18" W for 61.83 feet; thence N 03°00'42" E for 1.58 feet; thence
N 86°59'18" W for 4.42 feet; thence N 03°00'42" E for 28.00 feet to the Point of Beginning.

AND

Residential 777 Parcel 1

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 405.12 feet; thence S 86°59'57" E for 196.59 feet to the Point of Beginning; thence S 86°59'18" E for 8.33 feet; thence N 03°00'42" E for 1.33 feet; thence
S 86°59'18" E for 68.83 feet; thence N 03°00'42" E for 18.75 feet; thence N 86°59'18" W for 39.17 feet; thence N 03°00'42" E for 9.50 feet; thence N 86°59'18" W for 20.33 feet; thence S 03°00'42" W for 7.33 feet; thence
N 86°59'18" W for 9.33 feet; thence N 03°00'42" E for 8.08 feet; thence N 86°59'18" W for 4.58 feet; thence
S 03°00'42" W for 2.33 feet; thence N 86°59'18" W for 3.75 feet; thence S 03°00'42" W for 28.00 feet to the Point of Beginning.

The above described perimetrical boundarys being between elevation +3.5 to +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.

AND

Residential 777 Parcel 2

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 445.09 feet; thence S 86°59'57" E for 186.75 feet to the Point of Beginning; thence continue S 86°59'57" E for 6.00 feet; thence N 03°00'03" E for 3.00 feet; thence S 86°59'57" E for 90.92 feet; thence S 03°00'03" W for 6.83 feet; thence S 86°59'57" E for 40.08 feet; thence N 03°00'03" E for 118.00 feet; thence S 86°59'57" E for 4.33 feet; thence N 03°00'03" E for 9.67 feet; thence N 86°59'57" W for 20.98 feet to a point on a circular curve concave to the Southwest, and whose radius point bears N85°23'02"E; thence Northwesterly along a 262.17 foot radius curve leading to the left through a central angle of 9°39'13" for an arc distance of 44.17 feet to a point of non-tangency; thence N 86°59'57" W for 17.26 feet; thence N 03°00'08" E for 22.50 feet; thence N 86°59'57" W for 87.21 feet; thence S 03°00'03" W for 21.58 feet; thence N 86°59'57" W for 9.12 feet; thence S 03°00'03" W for 20.58 feet; thence N 86°59'57" W for 7.58 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 0.83 feet; thence S 03°00'03" W for 8.58 feet; thence S 86°59'57" E for 0.83 feet; thence S 03°00'03" W for 10.67 feet; thence N 86°59'57" W for 0.83 feet; thence S 03°00'03" W for 8.58 feet; thence N 86°59'57" W for 0.83 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 6.58 feet; thence S 03°00'03" W for 34.00 feet; thence N 86°59'57" W for 5.25 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 1.50 feet; thence S 03°00'03" W for 27.83 feet; thence N 86°59'56" W for 1.50 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 6.25 feet; thence S 03°00'03" W for 20.58 feet; thence S 86°59'57" E for 2.75 feet; thence S 03°00'03" W for 10.33 feet  to the Point of Beginning.

The above described perimetrical boundary being above elevation +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.

**"EXHIBIT D"**
**Estates at Acqualina**
**South Tower and Villa**

|  |  | South |  | Villa |
|---|---|---|---|---|
| GC | $ | 340,050 | $ | 4,555,903 |
| GR | $ | 3,895,328 | $ | 1,010,971 |
| Staff | $ | 4,817,477 |  |  |
| Transition | $ | 222,096 |  |  |
|  | $ | 9,274,951 | $ | 5,566,874 |

# Exhibit D

**general conditions**                                                    $340,050
**The Estates at Acqualina - South Tower**

| PROJECT STAFFING EXPENSES | | | | $170,000 |
|---|---|---|---|---|
| Regional Safety Director | 100,000,000.0 | % | 0.05% | $50,000 |
| Regional Scheduling Director | 100,000,000.0 | % | 0.05% | $50,000 |
| Regional BIM Director | 100,000,000.0 | % | 0.05% | $50,000 |
| Technology Allocation | 100,000,000.0 | % | 0.02% | $20,000 |
| Weekly Parking Fees | - | wks | $0 | By Owner |
| Recruiting Charges | - | lsum | $0 | $0 |
| Mileage | - | miles | $0.00 | $0 |
| Airfare | - | flights | $0 | $0 |
| Hotel | - | nights | $0 | $0 |
| Car Rental | - | days | $0 | $0 |
| House/Apartment Rental | - | mos | $0 | $0 |
| Moving/Relocation | - | wks | $0 | $0 |
| Tolls | - | wks | $0 | $0 |
| Food Allowance | - | wks | $0 | $0 |

| PROJECT TRAILERS | | | | $25,050 |
|---|---|---|---|---|
| **(64 x 24) Double-wide trailer** | | | | |
| Rent | 6 | mos | $1,125 | $6,750 |
| Delivery | - | lsum | $0 | $0 |
| Pick-up | 1 | lsum | $16,500 | $16,500 |
| Aluminum Steps | 6 | mos | $50 | $300 |
| Security System | 6 | mos | $50 | $300 |
| Utility Connections | - | lsum | $0 | $0 |
| Utility Consumption | 6 | mos | $200 | $1,200 |
| Skirting | - | lsum | $0 | $0 |
| ⊕ add trailers | | | | |

| TEMPORARY OFFICE RENTAL | In North Tower |
|---|---|

| SUFFOLK OFFICE FURNITURE & EQUIPMENT | In North Tower |
|---|---|

| INFORMATION TECHNOLOGY & SUPPORT | In North Tower |
|---|---|

| COMPUTER EQUIPMENT | In North Tower |
|---|---|

| PROCORE | | | | $100,000 |
|---|---|---|---|---|
| Procore Fee | $100mil | contract | 0.10% | $100,000 |

| BIM/AUTOCAD | | | | $40,000 |
|---|---|---|---|---|
| BIM 360 | $100mil | contract | 0.04% | $40,000 |

| BIM | In GR's |
|---|---|

| TEXTURA | In GR's |
|---|---|

| LEAN CONSULTING | In GR's |
|---|---|

# Exhibit D

 general conditions                                    $340,050

**The Estates at Acqualina - South Tower**

| COVID SAFETY | | | | In GR's |
|---|---|---|---|---|

| MISCELLANEOUS EXPENSES | | | | **$5,000** |
|---|---|---|---|---|
| Suffolk Project Sign | 1.0 | lsum | $5,000 | $5,000 |
| Marketing Photographs | - | lsum | $0 | $0 |
| Aerial Photos | - | mos | $0 | $0 |
| Client Entertainment | - | mos | $0 | $0 |
| Association Dues - TEXO | - | lsum | $0 | $0 |
| Groundbreaking Ceremony | - | lsum | $0 | $0 |
| Topping Off Ceremony | - | lsum | $0 | $0 |
| Team-Building Event | - | lsum | $0 | $0 |

**general requirements**                                   $3,895,328

The Estates at Acqualina - South Tower

| REPROGRAPHICS | | | | $41,300 |
|---|---|---|---|---|
| Pre-Construction | 1.0 | lsum | $0 | $0 |
| Construction | 1.0 | lsum | $25,000 | $25,000 |
| Turn-Over Manuals | 163.0 | lsum | $100 | $16,300 |

| PERMITS | | | | $0 |
|---|---|---|---|---|
| *Building Permit* | - | lsum | *ByOwner* | **ByOwner** |
| *Subcontractor Permits* | - | lsum | *ByOwner* | **ByOwner** |
| *Subcontractor Permit Application Fees* | - | lsum | *By Sub/Owner* | *y Sub/Owner* |
| *Permit Expediting* | - | lsum | *ByOwner* | **ByOwner** |
| *Parking Meter displacement fee (# of meters)* | - | Mos | *ByOwner* | **ByOwner** |
| *Right of Way Permits (sf of sidewalk/street)* | - | lsum | *ByOwner* | **ByOwner** |

| EXPLORATORY & SURVEYING SERVICES | | | | $50,000 |
|---|---|---|---|---|
| Exploratory Investigations - Work in Place | 1.0 | lsum | $50,000 | $50,000 |
| Surveying Services | - | day | $1,600 | $0 |
| Survey Crew - General Project & Back-check | 1.0 | sub | $0 | See Directs |
| Settlement Monitoring Level 30 & Above | - | lsum | ByOwner | ByOwner |
| Controls & Corners | 1.0 | sub | $0 | See Directs |
| Controls - Interiors / Elev Shafts | 1.0 | lsum | BySub | ByOwner |
| Survey Materials | 1.0 | lsum | BySub | ByOwner |
| Floor Survey -- Line & Grade | 1.0 | lsum | BySub | ByOwner |
| Final Survey for TCO | 1.0 | sub | $0 | See Directs |
| As-Built Drawings | 1.0 | sub | $0 | See Directs |

| CONSTRUCTION PARKING & TRANSPORTATION | | | | $72,800 |
|---|---|---|---|---|
| Off-Site Lot Monitoring - 1ea @ 48hrs/wk | 56.0 | weeks | $1,300 | $72,800 |
| Rental of Offsite Parking Lot | 1.0 | lsum | $0 | $0 |
| Remote Parking Lot - Install / Maintain / Remove | - | lsum | ByOwner | ByOwner |
| Remote Laydown - Install / Maintain / Remove | - | lsum | ByOwner | ByOwner |
| Shuttle Bus | - | Mos | ByOwner | ByOwner |
| Shuttle Bus Driver | - | Mos | ByOwner | ByOwner |
| Metered Parking Cost | - | lsum | ByOwner | ByOwner |

| CONSULTING SERVICES | | | | $136,476 |
|---|---|---|---|---|
| BIM Manager (2-Days/week) for Start-Up @ 40% | - | weeks | $1,632 | $0 |
| BIM Coordinator | 26.0 | weeks | $3,326 | $86,476 |
| Third Party Model Population | 1.0 | lsum | $15,000 | $15,000 |
| Procore Transfer / Data Entry | **1.0** | **Allow** | **$35,000** | **$35,000** |
| Partnering Session | - | lsum | $0 | See GCs |

| MISCELLANEOUS SUPPORT & EQUIPMENT | | | | $122,172 |
|---|---|---|---|---|
| Mock Ups (include removal) | - | subs | $0 | See Directs |
| **EQUIPMENT** | | | | $0 |
| Heavy Equipment | | subs | See Div 02 | See Directs |
| Fork Lift / Combination | 6.0 | mos | $9,129 | $54,774 |
| Fuel | 6.0 | mos | $541 | $3,248 |
| **CRANES** | | | | $0 |
| Mobile Crane | - | mos | BySub | See Directs |
| Extended Tower Crane | - | mos | BySub | See Directs |
| Crane insurance | - | mos | BySub | See Directs |
| Small Tools / Rental | 13.0 | mos | $2,500 | $32,500 |



**general requirements**                                    $3,895,328
**The Estates at Acqualina - South Tower**

| | | | | |
|---|---|---|---|---|
| Radios | 10.0 | ea | $750 | $7,500 |
| Off Hours Work Permit | - | days | $100 | See Directs |
| Punch List Materials | 161.0 | each | $150 | $24,150 |

| | | | | |
|---|---|---|---|---|
| **WATER CONSUMPTION** | | | | **$6,500** |
| Temp Water Consumption | 13.0 | mos | $500 | $6,500 |
| Temporary Water Service - S. Tower | | lsum | $0 | See Directs |
| Temporary Water Meter | | lsum | Incl Above | Included |
| Potable Water Consumption | | mos | Incl Above | Included |
| Water, Ice & Cups | | lsum | Incl Above | Included |
| Pool Fill | | each | Incl Above | Included |

| | | | | |
|---|---|---|---|---|
| **ELECTRICITY CONSUMPTION** | | | | **$272,500** |
| Temp. Electric Vault & Service | 1.0 | sub | $0 | See Directs |
| **TEMPORARY POWER** | | | | $0 |
| FPL Temporary | | lsum | ByOwner | ByOwner |
| Building Power Consumption - Temporary Power | 13.0 | mos | $2,500 | $32,500 |
| Electric Consumption - Permanent Power | 8.0 | **mos** | **$30,000** | **$240,000** |
| Tower Crane Consumption - 2 ea | | mos | Incl Above | Included |
| Hoist Consumption - 2 ea | | mos | Incl Above | Included |
| Start-up Power - S. Tower | | lsum | Incl Above | Included |

| | | | | |
|---|---|---|---|---|
| **TEMPORARY TOILETS** | | | | **$31,200** |
| Field Toilets (1 per 20 workers. 2x/week service) | 13.0 | Mos | $2,400 | $31,200 |
| Temporary Toilets in Building | - | Mos | $0 | $0 |
| Temp Bathroom Install | - | ea | NIC | N/A |
| Temp Bathroom Remove | - | ea | NIC | N/A |
| Temp Bathroom Cleaning | - | wks | NIC | N/A |
| Hand Sanitizer | - | ea | $0 | Included |
| Hand Wash Stations | - | ea | BySub | See Directs |
| Gel Pak | - | lsum | $0 | Included |
| Holding Tanks | - | lsum | $0 | Included |

| | | | | |
|---|---|---|---|---|
| **CONSTRUCTION MANAGEMENT PLAN** | | | | **$0** |
| **TEMPORARY ROADS & LAYDOWN** | | | | |
| Police Officer | | lsum | ByOwner | ByOwner |
| Security Guards - Tower / Roaming Start at Drywall | - | weeks | See Directs | See Directs |
| Final Photos | 1.0 | lsum | **See GCs** | See GCs |
| Aerial Photos | 14.0 | mos | **See GCs** | See GCs |
| MultiVista | 1.0 | lsum | ByOwner | ByOwner |
| Car/Boat Detailing | 1.0 | Allowance | See Directs | See Directs |
| Clean Adjacent Building | 1.0 | Allowance | See Directs | See Directs |
| Miscellaneous Permits | 1.0 | Allowance | See Directs | See Directs |
| Overtime Inspection Costs | 1.0 | Allowance | See Directs | See Directs |
| Access Point Turnstiles | | lsum | **NIC** | N/A |
| Hurricane Preparation | | Allowance | See Directs | See Directs |
| Parking Meter Fees | | | ByOwner | ByOwner |
| Off Hours Permit | - | Allowance | See Directs | See Directs |

| | | | | |
|---|---|---|---|---|
| **CONSTRUCTION FENCE** | | | | **$0** |
| Jersey Barriers | - | lf/month | See Site | See Site |
| Fence on top of Jersey Barriers | - | lf | See Site | See Site |



general requirements                                    $3,895,328

**The Estates at Acqualina - South Tower**

| | | | | |
|---|---|---|---|---|
| Chain Link Fence | - | lf | See Site | See Site |
| Windscreen/Scrim/Red Ribbon | - | lf | See Site | See Site |
| Water Barriers | - | lf | See Site | See Site |
| Gates | - | ea | See Site | See Site |
| Maintenance & Relocations | | wks | See Site | See Site |
| Fence Removal | - | lf | See Site | See Site |
| Laborer to Open & Close Gates | - | hrs | $0 | See Gatemen |

| SAFETY SUPPLIES & EQUIPMENT | | | | $59,300 |
|---|---|---|---|---|
| Temporary Signage / COVID Signs | 1.0 | lsum | $2,000 | $2,000 |
| First Aid Supplies | 13.0 | mos | $200 | $2,600 |
| COVID Employee Testing Agents | 26.0 | weeks | $1,500 | $39,000 |
| Safety Job Materials (Non-Trade Related) | 13.0 | lsum | $600 | $7,800 |
| Start-Up Kits | 1.0 | each | $3,500 | $3,500 |
| AED's | 1.0 | each | $1,200 | $1,200 |
| Safety Rails L & M - Single Height Panel | | lnft | BySub | See Directs |
| Safety Rails L & M - Double Height Panel | | lnft | BySub | See Directs |
| Safety Rails L & M - Stairs (9 Treads) | | each | BySub | See Directs |
| Safety Rails L & M - Elevator Gate | | each | BySub | See Directs |
| Maintain Safety Rails | | lsum | BySub | See Directs |
| FC Background Check System - Turnstile Rental (EA) | | mos | Excluded | Excluded |
| FC Background Check System - Handheld Scanner | | each | Excluded | Excluded |
| FC Background Check System - Scanner System | | mos | Excluded | Excluded |
| FC Background Check System - Badging System | | each | Excluded | Excluded |
| FC Background Check System - Badges | | each | Excluded | Excluded |
| FC Background Check System - Criminal Checks | | each | Excluded | Excluded |
| FC Background Check System - System Set-up | | each | Excluded | Excluded |
| FC Background Check System - Miscellaneous | | lsum | Excluded | Excluded |
| Safety Netting | | lsum | BySub | See Directs |
| Screen Exterior of Building | | lsum | BySub | See Directs |
| Temporary Fire Standpipe System | | Floors | BySub | See Directs |
| Temporary Fire Extinguishers | 16.0 | Floors | $200 | $3,200 |
| Sidewalk Protection - Collins Avenue | | lsum | Excluded | Excluded |
| Overhead Protection at Beach Access | | each | See Directs | See Directs |
| Security/Badging for workers | | each | Excluded | Excluded |
| Jessica Lundsford Act | | each | Excluded | Excluded |
| PERI System | | lsum | Excluded | Excluded |

| MISC LABOR & CLEANING | | | | $902,600 |
|---|---|---|---|---|
| Cleaning Supplies | 13.0 | mos | $500 | $6,500 |
| Rubbish Chute | - | floors | NIC | Excluded |
| HOUSEKEEPING | - | | | |
| Clean-up Structural Phase - Labor - Towers / Site | - | weeks | See Directs | See Directs |
| Clean-up Finishing Phase - Labor - Towers/Site | - | weeks | See Directs | See Directs |
| Final Cleaning Building | 1.0 | sub | $860,000 | **$860,000** |
| Final Clean Units | - | | Included | Included |
| Touch-up Units | - | | Included | Included |
| Pest Control | 13.0 | mos | $300 | $3,900 |
| Final Cleaning - Parking | - | sf | Included | See Villa |
| Final Clean - Exterior Windows | - | sf | Included | Included |
| Exterior Clean | - | sf | Included | See Villa |
| Rough Clean Units - (2 Times) | - | sf | Included | Included |
| Pre-Owner Inspection Clean | 161.0 | each | $200 | $32,200 |

## general requirements $3,895,328

### The Estates at Acqualina - South Tower

| TEMPORARY SAFETY & PROTECTION | | | | | | $0 |
|---|---|---|---|---|---|---|
| Temporary Stairs | | - | sub | | BySub | See Directs |
| Perimeter Fall Protection | | - | lsum | | $0 | $0 |
| Elevator Protection | | - | lsum | | $0 | $0 |
| Floor Protection | | - | lsum | | $0 | $0 |
| Door Protection | | - | lsum | | $0 | $0 |
| Window Protection | | - | lsum | | $0 | $0 |
| Temporary Wall Protection | | - | lsum | | $0 | $0 |
| Temp Protection of Furnished Items | | - | | BySub | | See Directs |
| Temp Protection - Public (NT/ST, Villa, Site) | | - | each | | See Directs | See Directs |
| Temp Protect of Elevator Cabs | | - | each | | BySub | See Directs |
| Additional Temp Protection of Completed Work- Units | | - | each | | BySub | See Directs |
| Temp Protect of Elevator Fronts | | - | stops | | See Directs | See Directs |
| Temp. Waterproofing @ slabs | | - | floors | | See Directs | See Directs |
| Temporary Storage | | - | mos | | $0 | $0 |
| Temporary Doors & Hardware | | - | each | | BySub | See Directs |

| DUMPSTERS | | | | | | $246,000 |
|---|---|---|---|---|---|---|
| Dumpsters | loads/wk | wks | 12.0 | mos | $20,500 | $246,000 |
| Overweight Pulls (10% of total # of loads) | | 1.0 | sub | Included | | Included |
| Trash Chute Screen Enclosure | | - | loads | Excluded | | Excluded |
| Bulk Trash Hauling | | - | loads | Incl Above | | Included |

| PERSONNEL & MATERIAL HOISTING | | | | | | $471,000 |
|---|---|---|---|---|---|---|
| Engineering | | - | each | | Included | Included |
| Transportation In | | - | lsum | | Included | Included |
| Transportation Out | | - | lsum | | Included | Included |
| Stainless Steel Anchors | | - | lsum | | Included | Included |
| Dismantle | | - | lsum | | Included | Included |
| Gin Pole Dismantle | | - | lsum | | Included | Included |
| Foundation Engineering | | - | each | | ByOwner | Included |
| Foundation | | | mos | | BySub | See Directs |
| Initial Installation | | | mos | Included | | Included |
| Gate Rental | | | mos | Included | | Included |
| Gate Installation | | | floors | Included | | Included |
| Insurance (Coastal)$400K Value(.90/$100-$3,600/H/Y | | | lsum | | N/A | See Insurance |
| Jumps | | | ea | Included | | Included |
| Post Jump Inspection | | | ea | Included | | Included |
| Rental - South Tower - N | | 1.0 | sub | | $735,500 | $735,500 |
| Rental - South Tower - S | | 1.0 | sub | | $735,500 | $735,500 |
| Credit for Expenditures through 7/27/2020 | | 1.0 | allow | -$1,000,000 | | -$1,000,000 |
| Overtime Equipment Hours | | | hrs | | Included | See Directs |
| Elevator Maintenance | | 13.0 | mos | | Included | See Directs |
| Elevator Repairs | | 1.0 | lsum | | $0 | See Directs |
| Cab Protection | | 1.0 | lsum | | $0 | See Directs |
| 90 Day Drop Test / Drop Test Weights | | 1.0 | lsum | Included | | Included |
| Drop Test Inspection | | 1.0 | lsum | Included | | Included |
| Ground Floor Fence / Enclosure / OH Protection | | - | ea | | BySub | Included |
| Loading Docks/Ramps/Overhead Prot. | | - | ea | | Included | Included |
| Plywood Partitions @ Gates | | - | ea | | Included | Included |
| Floor Safety Enclosures at Gates | | - | ea | Included | | Included |
| Remove Gates & Enclosures | | - | ea | Included | | Included |
| Power Transformer | | 13.0 | mos | Included | | Included |



general requirements                    $3,895,328

**The Estates at Acqualina - South Tower**

| | | | | |
|---|---|---|---|---|
| 3rd Party Certification | 1.0 | lsum | Included | Included |
| Initial Installation Inspection | 1.0 | lsum | Included | Included |
| Orientation / Repair / Maintenance | 1.0 | lsum | Included | Included |
| Service Calls | 1.0 | lsum | Included | Included |

| | | | | |
|---|---|---|---|---|
| **WEATHER CONDITIONS / TEMP ENVIRONMENTAL CONTROL** | | | | **$0** |
| Temporary Cooling | - | lsum | BySub | See Directs |
| Temporary De-Humidification | - | lsum | BySub | See Directs |
| Dewatering | - | lsum | BySub | See Directs |
| Fuel | - | wks | BySub | See Directs |

| | | | | |
|---|---|---|---|---|
| **TESTING & INSPECTIONS** | | | | **$0** |
| Concrete | - | ea | ByOwner | ByOwner |
| Steel | - | ea | ByOwner | ByOwner |
| Testing Lab Services | - | ea | ByOwner | ByOwner |
| Inspections - Overtime | - | ea | ByOwner | ByOwner |
| Threshold / Special Inspection | - | ea | ByOwner | ByOwner |
| Ground Penetrating Radar | - | ea | BySub | See Directs |

| | | | | |
|---|---|---|---|---|
| **LABOR ITEMS** | | | | **$1,483,480** |
| Miscellaneous Labor | 1.0 | lsum | $209,860 | $209,860 |
| Carpenters | 1.0 | lsum | $349,420 | $349,420 |
| Labor Foreman | 1.0 | lsum | $130,450 | $130,450 |
| Semi-Skilled Labor | 1.0 | lsum | $137,270 | $137,270 |
| Flagman | 1.0 | lsum | $99,890 | In Division 2 |
| KeyRunner | 1.0 | lsum | $103,620 | $103,620 |
| BuckHoist-Operators | 1.0 | lsum | $247,360 | $247,360 |
| Elevators-Operator | 1.0 | lsum | $305,500 | $305,500 |

Exhibit D

 staffing

## The Estates at Acqualina - South Tower

Sunny Isles, FL

| | | | | | | |
|---|---|---|---|---|---|---|
| **PreCon Start** | 11/5/2019 | **IT/wk** | $115.47 | **Estimating LIT** | 43.70% |
| **PreCon Finish** | 7/20/2020 | **Iphone/wk** | $0.00 | **Construction LIT** | 43.70% |
| **Contruction Start** | 7/20/2020 | **Gas/wk** | $0.00 | **Precon Raises** | 3.00% |
| **Construction Finish** | 8/13/2021 | | | **Construction Raises** | 3.00% |

| Job Title | Name | Start Month | Duration | Start Date | Finish Date | % |
|---|---|---|---|---|---|---|
| **Precon** | | | | | | |
| | | | | | | |
| **Construction** | | | | | | |
| VP Of Operations | Janus, Edward | 1 | 13 | 7/20/2020 | 8/20/2021 | 50% |
| Project Executive 2 | Frank, Andrew | 1 | 17 | 7/20/2020 | 12/20/2021 | 50% |
| Sr. Project Manager 2 | TBD - New Hire | 1 | 16 | 7/20/2020 | 11/20/2021 | 100% |
| Sr. Project Manager 1 - Cost Manager | Sarmiento, Olga L | 1 | 23 | 7/20/2020 | 6/20/2022 | 33% |
| Project Manager 2 - Interiors | Joslyn, Michael B. | 1 | 16 | 7/20/2020 | 11/20/2021 | 100% |
| Project Manager 1 - Unit Coordinator | TBD - New Hire | 1 | 13 | 7/20/2020 | 8/20/2021 | 100% |
| Asst Project Manager 2 - Interiors | Sandoval, Neris | 2 | 14 | 8/22/2020 | 10/22/2021 | 100% |
| Asst Project Manager 2 - Cost Control | TBD | 1 | 23 | 7/20/2020 | 6/20/2022 | 33% |
| Project Engineer - Interiors | Torres, Bryan C | 3 | 12 | 9/22/2020 | 9/22/2021 | 100% |
| Proj Admin | Wyant, Shani M | 1 | 23 | 7/20/2020 | 6/20/2022 | 50% |
| General Superintendent | Keller, Jeffrey | 1 | 17 | 7/20/2020 | 12/8/2021 | 100% |
| Sr. Superintendent 3 - Struct / Ext | Ellerman, Richard J (Rich) | 1 | 3 | 7/20/2020 | 10/20/2020 | 100% |
| Superintendent 2 - MEP | Palancar, Jorge Carlos | 1 | 16 | 7/20/2020 | 11/20/2021 | 100% |
| Superintendent 1 - Interiors | Montenegro, Francisco | 1 | 14 | 7/20/2020 | 9/20/2021 | 100% |
| Superintendent 1 - Interiors | Diaz, Eric | 1 | 18 | 7/20/2020 | 1/20/2022 | 100% |
| Asst Superintendent 1 - Punch | Marrero, Jonathan H | 1 | 19 | 7/20/2020 | 2/20/2022 | 100% |
| Asst Superintendent 1 - Interiors | Rosario, Christian J | 1 | 14 | 7/20/2020 | 9/20/2021 | 100% |
| Asst Superintendent 1 - Interiors | Ho Hung, Jhonny | 1 | 19 | 7/20/2020 | 2/20/2022 | 100% |
| Asst Superintendent 1 - Second Shift | TBD | 1 | 13 | 7/20/2020 | 8/20/2021 | 100% |
| Safety Manager 1 | TBD | 1 | 16 | 7/20/2020 | 11/8/2021 | 50% |
| Scheduler | Gutierrez,  Paola | 1 | 20 | 7/20/2020 | 3/8/2022 | 33% |
| Project Controller 1 | Ortega, Oscar | 1 | 23 | 7/20/2020 | 6/8/2022 | 33% |
| Project Accountant | Sanchez, Marisol | 1 | 20 | 7/20/2020 | 3/8/2022 | 33% |
| | | ***Avg Staff:*** | 29 | | | |

| | |
|---|---|
| **Total Staff:** | **$4,817,477** |

Note:  Highlighted Positions may work remotely at times

on-staff labor

**The Estates at Acqualina - South Tower**

*Note: The first crew member, in any given week, for Carpenters receives a Foreman rate by default.*

Exhibit D

| | | Starting $ | | | Starting $ | | | Starting $ | | | Starting $ | | | Starting $ | | | Starting $ | | | Starting $ | | | Starting $ | | |
| | | $24.00 | | | $40.00 | | | $29.00 | | | $40.00 | | | $11.00 | | | $24.00 | | | $24.00 | | | $24.00 | | | $24.00 | | |
| | | **Miscellaneous Labor** | | | **Carpenters** | | | **Labor Foreman** | | | **Semi-Skilled Labor** | | | **Flagman** | | | **KeyRunner** | | | **Bucket/Hoist-Operators** | | | **Elevators-Operator** | | |
| Index | Week | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | Rate | Total | Crew Size | Rate | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7/20/20 | 4.00 | 50% | 6,720.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | | | | | | |
| 2 | 7/27/20 | 4.00 | 50% | 6,720.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | | | | | | |
| 3 | 8/3/20 | 4.00 | 50% | 6,720.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | | | | | | |
| 4 | 8/10/20 | 4.00 | 50% | 6,720.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | | | | | | |
| 5 | 8/17/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 6 | 8/24/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 7 | 8/31/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 8 | 9/7/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 9 | 9/14/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 10 | 9/21/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 11 | 9/28/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 12 | 10/5/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 13 | 10/12/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 14 | 10/19/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 15 | 10/26/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 16 | 11/2/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 17 | 11/9/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 18 | 11/16/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 19 | 11/23/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 20 | 11/30/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 21 | 12/7/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 22 | 12/14/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 23 | 12/21/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 24 | 12/28/20 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,536.00 | 7,680.00 | | | |
| 25 | 1/4/21 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,534.00 | 7,680.00 | | | |
| 26 | 1/11/21 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,534.00 | 7,680.00 | | | |
| 27 | 1/18/21 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,534.00 | 7,680.00 | | | |
| 28 | 1/25/21 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,534.00 | 7,680.00 | | | |
| 29 | 2/1/21 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,534.00 | 7,680.00 | | | |
| 30 | 2/8/21 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,534.00 | 7,680.00 | | | |
| 31 | 2/15/21 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,534.00 | 7,680.00 | | | |
| 32 | 2/22/21 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,534.00 | 7,680.00 | | | |
| 33 | 3/1/21 | 2.00 | 50% | 3,360.00 | 2.00 | 50% | 5,940.00 | 1.00 | 50% | 2,060.00 | 1.00 | 50% | 2,170.00 | 1.00 | 50% | 1,680.00 | 1.00 | 50% | 1,710.00 | 5.00 | 1,534.00 | 7,680.00 | | | |
| 34 | 3/8/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | 5.00 | 1,600.00 | 8,000.00 | 8.00 | 1,375.00 | 11,000.00 |
| 35 | 3/15/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | 5.00 | 1,600.00 | 8,000.00 | 8.00 | 1,375.00 | 11,000.00 |
| 36 | 3/22/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | 5.00 | 1,600.00 | 8,000.00 | 8.00 | 1,375.00 | 11,000.00 |
| 37 | 3/29/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | 5.00 | 1,600.00 | 8,000.00 | 8.00 | 1,375.00 | 11,000.00 |
| 38 | 4/5/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | 5.00 | 1,600.00 | 8,000.00 | 8.00 | 1,375.00 | 11,000.00 |
| 39 | 4/12/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 40 | 4/19/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 41 | 4/26/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 42 | 5/3/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 43 | 5/10/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 44 | 5/17/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 45 | 5/24/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 46 | 5/31/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 47 | 6/7/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 48 | 6/14/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 49 | 6/21/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 50 | 6/28/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 51 | 7/5/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 52 | 7/12/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 53 | 7/19/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 54 | 7/26/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 55 | 8/2/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 56 | 8/9/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 57 | 8/16/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 58 | 8/23/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 59 | 8/30/21 | 2.00 | 50% | 3,500.00 | 2.00 | 50% | 6,080.00 | 1.00 | 50% | 2,130.00 | 1.00 | 50% | 2,240.00 | 1.00 | 50% | 1,750.00 | 1.00 | 50% | 1,780.00 | | | | 8.00 | 1,375.00 | 11,000.00 |
| 60 | 9/6/21 | | | | | | | | | | | | | | | | | | | | | | 2.00 | 1,375.00 | 2,750.00 |
| 61 | 9/13/21 | | | | | | | | | | | | | | | | | | | | | | 2.00 | 1,375.00 | 2,750.00 |
| 62 | 9/20/21 | | | | | | | | | | | | | | | | | | | | | | 2.00 | 1,375.00 | 2,750.00 |
| 63 | 9/27/21 | | | | | | | | | | | | | | | | | | | | | | 2.00 | 1,750.00 | 3,500.00 |
| 64 | 10/4/21 | | | | | | | | | | | | | | | | | | | | | | 2.00 | 1,750.00 | 3,500.00 |
| 65 | 10/11/21 | | | | | | | | | | | | | | | | | | | | | | 2.00 | 1,750.00 | 3,500.00 |
| 66 | 10/18/21 | | | | | | | | | | | | | | | | | | | | | | 2.00 | 1,750.00 | 3,500.00 |
| 67 | 10/25/21 | | | | | | | | | | | | | | | | | | | | | | | | |
| **Subtotals** | | | | 209,860.00 | | | 349,420.00 | | | 130,450.00 | | | 137,270.00 | | | 99,890.00 | | | 103,620.00 | | | 247,360.00 | | | 305,500.00 |
| **Foremen** | | | | 100,920.00 | | | 180,180.00 | | | | | | | | | | | | | | | | | | | |
| **TOTALS** | | | | 209,860.00 | | | 349,420.00 | | | 130,450.00 | | | 137,270.00 | | | 99,890.00 | | | 103,620.00 | | | 247,360.00 | | | 305,500.00 |



**Exhibit D**


staffing

# The Estates at Acqualina – Transition Team
Sunny Isles, FL

| | |
|---|---|
| **PreCon Start** | 11/12/2019 |
| **PreCon Finish** | 7/20/2020 |
| **Contruction Start** | 7/20/2020 |
| **Construction Finish** | 9/19/2020 |

| | |
|---|---|
| **IT/wk** | $115.47 |
| **Iphone/wk** | $0.00 |
| **Gas/wk** | $0.00 |

| | |
|---|---|
| **Estimating LIT** | 43.70% |
| **Construction LIT** | 43.70% |
| **Precon Raises** | 3.00% |
| **Construction Raises** | 3.00% |

| Job Title | Name | Start Month | Duration | Start Date | Finish Date | % |
|---|---|---|---|---|---|---|
| **Precon** | | | | | | |
| VP Of Preconstruction | Kennedy, Christopher T (Chris) | 1 | 2 | 7/20/2020 | 9/19/2020 | 50% |
| Chief Estimator | Ripley, Todd A | 1 | 2 | 7/20/2020 | 9/19/2020 | 50% |
| Estimating Manager | TBD | 1 | 2 | 7/20/2020 | 9/19/2020 | 100% |
| Estimating Manager | Newell, Darin L | 1 | 2 | 7/20/2020 | 9/19/2020 | 100% |
| Sr. Estimator 1 | Navarro, Guillermo A | 1 | 2 | 7/20/2020 | 9/19/2020 | 100% |
| | | | | | | |
| **Construction** | | | | | | |
| | *Avg Staff:* | - | | | | |
| | **Total Staff:** | | | | $222,096 | |

Note: Highlighted Positions may work remotely at times



**Exhibit D**

## general conditions

**The Estates at Acqualina - Villa, Garage, Site & Amenities**

$237,500

| PROJECT STAFFING EXPENSES | | | | $127,500 |
|---|---|---|---|---|
| Regional Safety Director | 75,000,000.0 | % | 0.05% | $37,500 |
| Regional Scheduling Director | 75,000,000.0 | % | 0.05% | $37,500 |
| Regional BIM Director | 75,000,000.0 | % | 0.05% | $37,500 |
| Technology Allocation | 75,000,000.0 | % | 0.02% | $15,000 |

| PROJECT TRAILERS | In South Tower |
|---|---|
| ⊕ add trailers | |

| TEMPORARY OFFICE RENTAL | In North Tower |
|---|---|

| SUFFOLK OFFICE FURNITURE & EQUIPMENT | In North Tower |
|---|---|

| INFORMATION TECHNOLOGY & SUPPORT | In North Tower |
|---|---|

| COMPUTER EQUIPMENT | In North Tower |
|---|---|

| PROCORE | | | | $75,000 |
|---|---|---|---|---|
| Procore Fee | $75mil | contract | 0.10% | $75,000 |

| BIM/AUTOCAD | | | | $30,000 |
|---|---|---|---|---|
| BIM 360 | $75mil | contract | 0.04% | $30,000 |

| BIM | In GR's |
|---|---|

| TEXTURA | In GR's |
|---|---|

| LEAN CONSULTING | In GR's |
|---|---|

| COVID SAFETY | In GR's |
|---|---|

| MISCELLANEOUS EXPENSES | | | | $5,000 |
|---|---|---|---|---|
| Suffolk Project Sign | 1.0 | lsum | $5,000 | $5,000 |
| Marketing Photographs | - | lsum | $0 | $0 |
| Aerial Photos | - | mos | $0 | $0 |
| Client Entertainment | - | mos | $0 | $0 |
| Association Dues - TEXO | - | lsum | $0 | $0 |
| Groundbreaking Ceremony | - | lsum | $0 | $0 |
| Topping Off Ceremony | - | lsum | $0 | $0 |
| Team-Building Event | - | lsum | $0 | $0 |

Exhibit D

 general requirements                                      $1,010,971

**The Estates at Acqualina - Villa, Garage, Site & Amenities**

| REPROGRAPHICS | | | | $10,000 |
|---|---|---|---|---|
| Pre-Construction | 1.0 | lsum | $0 | $0 |
| Construction | 1.0 | lsum | $10,000 | $10,000 |

| PERMITS | | | | $0 |
|---|---|---|---|---|
| *Building Permit* | - | lsum | ByOwner | ByOwner |
| *Subcontractor Permits* | - | lsum | ByOwner | ByOwner |
| *Subcontractor Permit Application Fees* | - | lsum | By Sub/Owner | By Sub/Owner |
| *Permit Expediting* | - | lsum | ByOwner | ByOwner |
| *Parking Meter displacement fee (# of meters)* | - | Mos | ByOwner | ByOwner |
| *Right of Way Permits (sf of sidewalk/street)* | - | lsum | ByOwner | ByOwner |

| EXPLORATORY & SURVEYING SERVICES | | | | $0 |
|---|---|---|---|---|
| Exploratory Investigations | 1.0 | lsum | $25,000 | See Towers |
| Surveying Services | - | day | $0 | See Directs |
| Survey Exist. Conditions | - | lsum | $0 | See Directs |
| Survey Crew - General Project & Back-check | 1.0 | lsum | BySub | See Directs |
| Controls - Interiors / Elev Shafts | 1.0 | lsum | BySub | See Directs |
| Control & Corners | 1.0 | lsum | BySub | See Directs |
| Survey Materials | 1.0 | lsum | BySub | See Directs |
| Floor Survey -- Line & Grade | 1.0 | lsum | BySub | See Directs |
| Final Survey for TCO | 1.0 | lsum | BySub | See Directs |
| As-Built Drawings | 1.0 | lsum | BySub | See Directs |
| Stake & Grade Piling layout | 1.0 | lsum | BySub | See Directs |

| CONSTRUCTION PARKING & TRANSPORTATION | | | | $20,800 |
|---|---|---|---|---|
| Rental of Offsite Parking Lot | 1.0 | lsum | ByOwner | ByOwner |
| Off-site Lot Monitoring - 1ea @ 48hrs/wk | 16.0 | weeks | $1,300 | $20,800 |
| Remote Parking Lot - Install / Maintain / Remove | - | lsum | ByOwner | By Owner |
| Remote Laydown - Install / Maintain / Remove | - | lsum | ByOwner | By Owner |
| Shuttle Bus | - | Mos | ByOwner | By Owner |
| Shuttle Bus Driver | - | Mos | ByOwner | By Owner |
| Metered Parking Cost | - | lsum | ByOwner | By Owner |

| TECHNOLOGY / VDC / BIM | | | | $15,000 |
|---|---|---|---|---|
| Procore Transfer / Data Entry | 1.0 | Allow | $15,000 | $15,000 |
| Partnering Session | - | mos | See GC's | See GCs |

| MISCELLANEOUS SUPPORT & EQUIPMENT | | | | $49,511 |
|---|---|---|---|---|
| Mock Ups (include removal) | - | lsum | BySub | See Directs |
| EQUIPMENT | | | | $0 |
| Heavy Equipment | | days | BySub | See Directs |
| Fork Lift / Combination | 3.0 | mos | $9,129 | $27,387 |
| Fuel | 3.0 | mos | $541 | $1,624 |
| CRANES | | | | $0 |
| Mobile Crane | - | mos | BySub | See Directs |
| Extended Tower Crane | - | mos | BySub | See Directs |
| Crane insurance | - | mos | BySub | See Directs |
| Small Tools / Rentals | 16.0 | mos | $1,000 | $16,000 |
| Radios | 6.0 | ea | $750 | $4,500 |
| Off Hours Work Permit | - | days | ByOwner | ByOwner |

 general requirements $1,010,971

**The Estates at Acqualina - Villa, Garage, Site & Amenities**

| WATER CONSUMPTION | | | | $6,400 |
|---|---|---|---|---|
| Water Consumption | 16.0 | mos | $400 | $6,400 |
| Temporary Water Service - Villas | 1.0 | sub | BySub | See Directs |
| Temporary Water Meter | 1.0 | sub | Incl Above | Included |
| Potable Water Consumption | | mos | Incl Above | Included |
| Potable Water Consumption - Soil Mix | | mos | BySub | See Directs |
| Water, Ice & Cups | | lsum | Incl Above | Included |
| Pool Fill | | each | Incl Above | Included |

| ELECTRICITY CONSUMPTION | | | | $48,000 |
|---|---|---|---|---|
| Temp. Electric Vault & Service | 1.0 | lsum | $0 | See Directs |
| **TEMPORARY POWER** | | | | $0 |
| FPL Temporary Service | - | lsum | ByOwner | ByOwner |
| Building Power Consumption - Temporary Power | 16.0 | mos | $500 | $8,000 |
| Electric Consumption - Permanent Power | 8.0 | mos | $5,000 | $40,000 |
| Tower Crane Consumption | 2.0 | each | Incl Above | Included |
| Hoist Consumption | 2.0 | each | Incl Above | Included |
| Start-up Power - Podium | 1.0 | lsum | Incl Above | Included |

| TEMPORARY TOILETS | | | | $8,000 |
|---|---|---|---|---|
| Field Toilets (1 per 20 workers. 2x/week service) | 16.0 | Mos | $500 | $8,000 |
| Temporary Toilets in Building | 1.0 | lsum | Incl Above | Included |
| Temp Bathroom Install | - | ea | Not Used | N/A |
| Temp Bathroom Remove | - | ea | Not Used | N/A |
| Temp Bathroom Cleaning | - | wks | Not Used | N/A |
| Hand Sanitizer | - | ea | Incl Above | Included |
| Hand Wash Stations | 1.0 | sub | BySub | See Directs |
| Gel Pak | - | ea | Incl Above | Included |
| Holding Tanks | - | ea | Incl Above | Included |

| CONSTRUCTION MANAGEMENT PLAN | | | | $1,500 |
|---|---|---|---|---|
| Sidewalk Bridge | - | lf | Not Used | N/A |
| Sidewalk Rental | - | lf | Not Used | N/A |
| Street Rental | - | lf | Not Used | N/A |
| Temporary Roads - Install / Maintain / Remove | 1.0 | sub | BySub | See Directs |
| Temporary Truck Wash-Install/Remove | 1.0 | sub | BySub | See Directs |
| Temporary Truck Wash - Operators | 1.0 | sub | BySub | See Directs |
| Traffic Maintenance & Street Cleaning | 1.0 | sub | BySub | See Directs |
| Traffic Control | 1.0 | sub | BySub | See Directs |
| Traffic Control - Barricades | 1.0 | sub | BySub | See Directs |
| Police Officer | - | lsum | ByOwner | ByOwner |
| Security Guards - Site | 1.0 | sub | See Directs | See Directs |
| Final Photos | 1.0 | lsum | $1,500 | $1,500 |
| Aerial Photos | - | lsum | See South | Tower |
| MultiVista | - | lsum | ByOwner | ByOwner |
| Car/Boat Detailing | 1.0 | Allowance | BySub | See Directs |
| Clean Adjacent Building | 1.0 | Allowance | BySub | See Directs |
| MOT Plan | 1.0 | Allowance | BySub | See Directs |
| Miscellaneous Permits | 1.0 | Allowance | BySub | See Directs |
| Overtime Inspection Costs | 1.0 | Allowance | BySub | See Directs |

 general requirements          $1,010,971

**The Estates at Acqualina - Villa, Garage, Site & Amenities**

| Access Point Turnstiles | | lsum | **NIC** | N/A |
|---|---|---|---|---|
| Hurricane Preparation | 1.0 | **Allowance** | BySub | See Directs |
| Parking Meter Fees | | mos | ByOwner | ByOwner |
| Off Hours Permit | 1.0 | **Allowance** | BySub | See Directs |

| **CONSTRUCTION FENCE** | | | | **$5,000** |
|---|---|---|---|---|
| Jersey Barriers | - | lf/month | $12 | $0 |
| Fence on top of Jersey Barriers | - | lf | $10 | $0 |
| Chain Link Fence | - | lf | $18 | $0 |
| Windscreen/Scrim/Red Ribbon | - | lf | $0 | $0 |
| Temp Fence  - Maintenance and Relocation | 1.0 | lsum | $5,000 | $5,000 |
| Gate Rental | 1.0 | sub | BySub | See Directs |
| Water-filled Jersey Barricades | 1.0 | sub | BySub | See Directs |
| Directional Signage | 1.0 | sub | BySub | See Directs |

| **SAFETY SUPPLIES & EQUIPMENT** | | | | **$54,470** |
|---|---|---|---|---|
| Temporary Signage / COVID Signs | 1.0 | lsum | $1,000 | $1,000 |
| Temporary Signage | 17.0 | lsum | $100 | $1,700 |
| COVID Employee Testing Agents | 26.0 | weeks | $1,500 | $38,970 |
| Safety Job Materials (Non-Trade Related) | 16.0 | mos | $600 | $9,600 |
| Start-Up Kits | 1.0 | each | $2,000 | $2,000 |
| AED's | 1.0 | each | $1,200 | $1,200 |
| Safety Rails L & M - Single Height Panel | 1.0 | sub | BySub | See Directs |
| Safety Rails L & M - Double Height Panel | 1.0 | sub | BySub | See Directs |
| Safety Rails L & M - Stairs (9 Treads) | 1.0 | sub | BySub | See Directs |
| Safety Rails L & M - Elevator Gate | 1.0 | sub | BySub | See Directs |
| Maintain Safety Rails | 1.0 | sub | BySub | See Directs |
| FC Background Check System - Turnstile Rental (EA) | - | mos | Excluded | Excluded |
| FC Background Check System - Handheld Scanner | - | each | Excluded | Excluded |
| FC Background Check System - Scanner System | - | mos | Excluded | Excluded |
| FC Background Check System - Badging System | - | each | Excluded | Excluded |
| FC Background Check System - Badges | - | each | Excluded | Excluded |
| FC Background Check System - Criminal Checks | - | each | Excluded | Excluded |
| FC Background Check System - System Set-up | - | each | Excluded | Excluded |
| FC Background Check System - Miscellaneous | - | lsum | Excluded | Excluded |
| Safety Netting | 1.0 | sub | BySub | See Directs |
| Screen Exterior of Building | 1.0 | sub | BySub | See Directs |
| Temporary Fire Standpipe System | 1.0 | sub | BySub | See Directs |
| Temporary Fire Extinguishers | 4.0 | Floors | $200 | Excluded |
| Sidewalk Protection - Collins Avenue | - | lsum | Excluded | Excluded |
| Overhead Protection at Beach Access | 1.0 | sub | See Directs | See Directs |
| Security/Badging for workers | - | lsum | Excluded | Excluded |
| Jessica Lundsford Act | - | lsum | Excluded | Excluded |
| PERI System | - | lsum | Excluded | Excluded |

| **MISC LABOR & CLEANING** | | | | **$14,900** |
|---|---|---|---|---|
| Cleaning Supplies | 15.0 | mos | $500 | $7,500 |
| Rubbish Chute | - | floors | Excluded | Excluded |
| Clean-up Structural Phase - Labor, Site | - | weeks | See Directs | See Directs |
| Clean-up Finishing Phase - Labor, Site | - | weeks | See Directs | See Directs |
| Pest Control | 16.0 | mos | $150 | $2,400 |
| Final Clean - Common Areas (Lobbies, Site, Parking, BOH, Villa) | 1.0 | lsum | e South Tower | See Directs |

## general requirements — $1,010,971

**The Estates at Acqualina - Villa, Garage, Site & Amenities**

| | | | | | |
|---|---|---|---|---|---|
| Final Clean - Exterior Windows | | 1.0 | lsum | Included | Included |
| Exterior Clean | | 1.0 | lsum | Included | Included |
| Pre-Owner Inspection | | 1.0 | lsum | $5,000 | $5,000 |
| **TEMPORARY SAFETY & PROTECTION** | | | | | **$0** |
| Temporary Stairs | | 1.0 | sub | BySub | See Directs |
| Perimeter Fall Protection | | - | lsum | See Directs | See Directs |
| Elevator Protection | | - | lsum | See Directs | See Directs |
| Floor Protection | | - | lsum | See Directs | See Directs |
| Door Protection | | - | lsum | See Directs | See Directs |
| Window Protection | | - | lsum | See Directs | See Directs |
| Temporary Wall Protection | | - | lsum | See Directs | See Directs |
| Temp Protection of Furnished Items | | - | lsum | BySub | See Directs |
| Temp Protection - Public (NT/ST, Villa, Site) | | - | each | See Directs | See Directs |
| Temp Protect of Elevator Cabs | | - | each | BySub | See Directs |
| Temp Protect of Elevator Fronts | | - | stops | BySub | See Directs |
| Temp. Waterproofing @ slabs | | - | floors | BySub | See Directs |
| Temporary Storage | | 1.0 | lsum | Included | Included |
| Temporary Doors & Hardware | | - | each | BySub | See Directs |
| **DUMPSTERS** | | | | | **$96,000** |
| Dumpsters | 1 loads/wk | wks | 16.0 | mos | $6,000 | $96,000 |
| Recycle Dumpster Premium | | 1.0 | lsum | $0 | Included |
| Post-Sort Services | | 1.0 | lsum | $0 | Included |
| Overweight Pulls (10% of total # of loads) | | 1.0 | lsum | $0 | Included |
| Trash Chute Screen Enclosure | | - | loads | Excluded | Excluded |
| Bulk Trash Hauling | | - | loads | Incl Above | Included |
| **PERSONNEL & MATERIAL HOISTING** | | | | | **$0** |
| **WEATHER CONDITIONS / TEMP ENVIRONMENTAL CONTROL** | | | | | **$0** |
| Temporary Cooling | | 1.0 | sub | BySub | See Directs |
| Temporary De-Humidification | | 1.0 | sub | BySub | See Directs |
| Dewatering | | 1.0 | sub | BySub | See Directs |
| Fuel | | 1.0 | sub | BySub | See Directs |
| **STAGING & SCAFFOLDING** | | | | | **$0** |
| **TESTING & INSPECTIONS** | | | | | **$0** |
| Concrete | | - | ea | ByOwner | ByOwner |
| Steel | | - | ea | ByOwner | ByOwner |
| Testing Lab Services | | - | ea | ByOwner | ByOwner |
| Inspections - Overtime | | - | ea | ByOwner | ByOwner |
| Threshold / Special Inspection | | - | ea | ByOwner | ByOwner |
| Ground Penetrating Radar | | - | ea | BySub | See Directs |
| **LABOR ITEMS** | | | | | **$681,390** |
| Miscellaneous Labor | | 1.0 | lsum | $125,930 | $125,930 |
| Carpenters | | 1.0 | lsum | $236,890 | $236,890 |
| Labor Foreman | | 1.0 | lsum | $147,490 | $147,490 |
| Semi-Skilled Labor | | 1.0 | lsum | $127,330 | $127,330 |
| Flagman | | 1.0 | lsum | $120,890 | In Division 2 |

 general requirements                    $1,010,971

**The Estates at Acqualina - Villa, Garage, Site & Amenities**

| | | | | |
|---|---|---|---|---|
| KeyRunner | 1.0 | lsum | NIC | Not Used |
| Hoist Operators | 1.0 | lsum | NIC | Not Used |
| Elevator Operators | 1.0 | lsum | $43,750 | $43,750 |

**Exhibit D**

# ⟁ staffing

## The Estates at Acqualina – Villa, Garage, Site & Amer
Sunny Isles, FL

| | |
|---|---|
| PreCon Start | 11/5/2019 |
| PreCon Finish | 7/20/2020 |
| Construction Start | 7/20/2020 |
| Construction Finish | 11/1/2021 |

| | |
|---|---|
| IT/wk | $115.47 |
| Iphone/wk | $0.00 |
| Gas/wk | $0.00 |

| | |
|---|---|
| Estimating LTT | 43.70% |
| Construction LTT | 43.70% |
| Precon Raises | 3.00% |
| Construction Raises | 3.00% |

| Job Title | Name | Start Month | Duration | Start Date | Finish Date | % |
|---|---|---|---|---|---|---|
| **Precon** | | | | | | |
| | | | | | | |
| **Construction** | | | | | | |
| Project Executive 2 | Masri, Iyad | 1 | 17 | 7/20/2020 | 12/20/2021 | 100% |
| Sr. Project Manager 1 | Sarmiento, Olga L | 1 | 23 | 7/20/2020 | 6/8/2022 | 33% |
| Project Manager 1 - Villas | Rivera, Jackeline | 1 | 19 | 7/20/2020 | 2/20/2022 | 100% |
| Asst Project Manager 2 - Hardscape | Mela, Davide | 6 | 12 | 12/8/2020 | 11/22/2021 | 100% |
| Asst Project Manager 2 - Cost Control | TBD | 1 | 23 | 7/20/2020 | 6/20/2022 | 33% |
| Asst Project Manager 1 - Villas | Attanasio, Nicolina | 1 | 17 | 7/20/2020 | 12/20/2021 | 100% |
| Proj Admin | Bellorini, Candy | 1 | 23 | 7/20/2020 | 6/8/2022 | 100% |
| Superintendent 3 - Lead | Rivas, Luis | 1 | 18 | 7/20/2020 | 1/20/2022 | 100% |
| Superintendent 2 - Specialties | Silverio, Anthony | 1 | 16 | 7/20/2020 | 11/20/2021 | 100% |
| Superintendent 2 - Villas | McMahon, Steve | 4 | 17 | 10/8/2020 | 2/22/2022 | 100% |
| Superintendent 2 - Villas | Klein, Joseph | 4 | 17 | 10/8/2020 | 2/22/2022 | 100% |
| Superintendent 1 - Hardscape | Sergentanis, Nicholas Emmanuel (Nick) | 1 | 18 | 7/20/2020 | 1/20/2022 | 100% |
| Superintendent 1 - Arrival Court | TBD | 1 | 16 | 7/20/2020 | 11/20/2021 | 100% |
| Asst Superintendent 1 - Specialties | Padilla, Belkis | 3 | 15 | 9/8/2020 | 11/22/2021 | 100% |
| Asst Superintendent 1 - Hardscapes | Johnson, Jamel | 9 | 9 | 3/8/2021 | 11/22/2021 | 100% |
| Safety Manager 1 | TBD | 1 | 16 | 7/20/2020 | 11/18/2021 | 50% |
| Scheduler | Gutierrez, Paola | 1 | 20 | 7/20/2020 | 3/8/2022 | 33% |
| Project Controller 1 | Ortega, Oscar | 1 | 23 | 7/20/2020 | 6/8/2022 | 33% |
| Project Accountant | Sanchez, Marisol | 1 | 20 | 7/20/2020 | 3/8/2022 | 33% |
| Estimator 2 | TBD | 1 | 5 | 7/20/2020 | 12/20/2020 | 100% |
| | **Avg Staff:** | | 23 | | | |

| | | |
|---|---|---|
| **Total Staff:** | 23 | **$4,318,403** |

Note: Highlighted Positions may work remotely at times

Exhibit D

on-staff labor

The Estates at Acqualina - Villa, Garage, Site & Amenities

Note: The first crew member, in any given week, for Carpenters receives a Foreman rate by default

| Index | Week | Miscellaneous Labor (Starting R: $24.00) | | | Carpenters (Starting R: $40.00) | | | Labor Foreman (Starting R: $29.00) | | | Semi-Skilled Labor (Starting R $31.00) | | | Flagman (Starting R: $24.00) | | | Elevator Operators (Starting $ 25.00) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | Rate | Total |
| 1 | 7/20/20 | 2.00 | 50% | $ 3,360.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 2 | 7/27/20 | 2.00 | 50% | $ 3,360.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 3 | 8/3/20 | 2.00 | 50% | $ 3,360.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 4 | 8/10/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 5 | 8/17/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 6 | 8/24/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 7 | 8/31/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 8 | 9/7/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 9 | 9/14/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 10 | 9/21/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 11 | 9/28/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 12 | 10/5/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 13 | 10/12/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 14 | 10/19/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 15 | 10/26/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 16 | 11/2/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 17 | 11/9/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 18 | 11/16/20 | 1.00 | 50% | $ 1,680.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 19 | 11/23/20 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | | | $ - | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 20 | 11/30/20 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | 1.00 | 50% | $ 2,170.00 | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 21 | 12/7/20 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | 1.00 | 50% | $ 2,170.00 | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 22 | 12/14/20 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | 1.00 | 50% | $ 2,170.00 | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 23 | 12/21/20 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | 1.00 | 50% | $ 2,170.00 | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 24 | 12/28/20 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,110.00 | 1.00 | 50% | $ 2,060.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,680.00 | | | $ - |
| 25 | 1/4/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 26 | 1/11/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 27 | 1/18/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 28 | 1/25/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 29 | 2/1/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 30 | 2/8/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 31 | 2/15/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 32 | 2/22/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 33 | 3/1/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 34 | 3/8/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 35 | 3/15/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 36 | 3/22/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 37 | 3/29/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 38 | 4/5/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 39 | 4/12/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 40 | 4/19/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 41 | 4/26/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 42 | 5/3/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 43 | 5/10/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 44 | 5/17/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 45 | 5/24/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 46 | 5/31/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |
| 47 | 6/7/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | | | $ - |

Exhibit D

| Index | Week | Miscellaneous Labor | | | Carpenters | | | Labor Foreman | | | Semi-Skilled Labor | | | Flagman | | | Elevator Operators | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | OT | Total | Crew Size | Rate | Total |
| 48 | 6/14/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 49 | 6/21/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 50 | 6/28/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 51 | 7/5/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 52 | 7/12/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 53 | 7/19/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 54 | 7/26/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 55 | 8/2/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 56 | 8/9/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 57 | 8/16/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 58 | 8/23/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 59 | 8/30/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 60 | 9/6/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 61 | 9/13/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 62 | 9/20/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 63 | 9/27/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 64 | 10/4/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 65 | 10/11/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 66 | 10/18/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 67 | 10/25/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 68 | 11/1/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 69 | 11/8/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 70 | 11/15/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 71 | 11/22/21 | 1.00 | 50% | $ 1,750.00 | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ 1,750.00 | 1.00 | $ 1,750.00 | $ 1,750.00 |
| 72 | 11/29/21 | 1.00 | 50% | $ - | 1.00 | 50% | $ 3,180.00 | 1.00 | 50% | $ 2,130.00 | 1.00 | 50% | $ 2,240.00 | 1.00 | 50% | $ - | 1.00 | $ 1,750.00 | $ - |
| 73 | 12/6/21 | | | $ - | 1.00 | 50% | $ 3,180.00 | | | $ - | 1.00 | 50% | $ 2,240.00 | | | $ - | | $ - | $ - |
| 74 | 12/13/21 | | | $ - | 1.00 | 50% | $ 3,180.00 | | | $ - | 1.00 | 50% | $ 2,240.00 | | | $ - | | $ - | $ - |
| 75 | 12/20/21 | | | $ - | 1.00 | 50% | $ 3,180.00 | | | $ - | 1.00 | 50% | $ 2,240.00 | | | $ - | | $ - | $ - |
| 76 | 12/27/21 | | | $ - | 1.00 | 50% | $ 3,180.00 | | | $ - | 1.00 | 50% | $ 2,240.00 | | | $ - | | $ - | $ - |
| 77 | 1/3/22 | | | $ - | | | $ - | | | $ - | | | $ - | | | $ - | | $ - | $ - |
| 78 | 1/10/22 | | | $ - | | | $ - | | | $ - | | | $ - | | | $ - | | $ - | $ - |
| 79 | 1/17/22 | | | $ - | | | $ - | | | $ - | | | $ - | | | $ - | | $ - | $ - |
| 80 | 1/24/22 | | | $ - | | | $ - | | | $ - | | | $ - | | | $ - | | $ - | $ - |
| **Subtotals** | | | | $ 125,930.00 | | | $ 236,890.00 | | | $ 147,490.00 | | | $ 127,330.00 | | | $ 120,890.00 | | | $ 43,750.00 |
| **Foreman** | | | | $ 125,090.00 | | | $ 233,250.00 | | | | | | | | | | | | |
| **TOTALS** | | | | $ 125,930.00 | | | $ 236,890.00 | | | $ 147,490.00 | | | $ 127,330.00 | | | $ 120,890.00 | | | $ 43,750.00 |

# Exhibit "E"



The Estates at Acqualina
17901 Collins Avenue South
Sunny Isles Beach, Florida 33160

Site Area Diagram

# Exhibit "F"

**Suffolk**

| Activity ID | Activity Name | Duration | Start | Finish |
|---|---|---|---|---|
| [SEACQ-0011.01-PR] ACQUALINA SCHEDULE | | | | |
| | **SOUTH TOWER** | 700 | 27-Jul-20 | 26-Jun-22 |
| | MILESTONES & SUMMARIES | 550 | 27-Jul-20 | 18-Dec-21 |
| | CONTRACT MILESTONES | 510 | 27-Jul-20 | 18-Dec-21 |
| | OWNER MILESTONES | | | |
| ST-HIT-PI0 | South Tower Start Date of 07/27/2020 | 0 | 27-Jul-20 | |
| ST-TCO10 | South Tower & LAP Pool TCO | 0 | | 05-Aug-21 |
| ST-FCO10 | South Tower & LAP Pool Substantial Completion | 0 | | 19-Sep-21 |
| ST-CO20 | South Tower & LAP Pool Final Completion / CO | 0 | | 18-Dec-21 |
| | SUFFOLK MILESTONES | 510 | 27-Jul-20 | 18-Dec-21 |
| | CONSTRUCTION | 410 | 27-Jul-20 | 15-Sep-21 |
| | LIFE SAFETY & STAIRS | 120 | 27-Jul-20 | 23-Nov-20 |
| | MEP/FP RISERS | 289 | 27-Jul-20 | 11-May-21 |
| | FACADE | 288 | 27-Jul-20 | 10-May-21 |
| | ROOF | 127 | 27-Jul-20 | 23-Nov-20 |
| | EQUIPMENT | 105 | 27-Jul-20 | 28-Dec-20 |
| | ELEVATORS | 195 | 27-Jul-20 | 28-Dec-20 |
| | INTERIOR BUILD OUT | 309 | 27-Jul-20 | 20-Jul-21 |
| | PUNCH LIST | 410 | 27-Jul-20 | 15-Sep-21 |
| | BUCKHOIST COMEBACK WORK | 98 | 19-Jul-21 | 26-Jul-21 |
| | FINAL SITE WORK | 215 | 27-Jul-20 | 27-Jul-21 |
| | COMMISSIONING & INSPECTION | 375 | 27-Jul-20 | 06-Aug-21 |
| | **VILLA, PODIUM & AMENITIES** | 591 | 27-Jul-20 | 09-Mar-22 |
| | MILESTONES & SUMMARIES | 591 | 27-Jul-20 | 09-Mar-22 |
| | CONTRACT MILESTONES | 591 | 27-Jul-20 | 09-Mar-22 |
| | OWNER MILESTONES | 591 | 27-Jul-20 | | |
| VA-HIT-PI | Villa, Beach Side Amenities, Guest Suite & Cabanas Start Date of 07/27/2020 | 0 | 27-Jul-20 | |
| VA-REST | Restaurant Turnover for Stocking & Training | 0 | | 27-Sep-21 |
| VA-TCO | Restaurant, Villa, Beach Side Amenities, Guest Suite & Cabanas TCO | 0 | | 25-Oct-21 |
| VA-CO10 | Restaurant, Villa, Beach Side Amenities, Guest Suite & Cabanas Substantial Completion | 0 | | 09-Dec-21 |
| VA-CO10 | Restaurant, Villa, Beach Side Amenities, Guest Suite & Cabanas Final Completion / CO | 0 | | 09-Mar-22 |
| | CONSTRUCTION | 565 | 27-Jul-20 | 11-Feb-22 |
| | STRUCTURE | 271 | 27-Jul-20 | 26-Jul-21 |
| | ARRIVAL DECK FINISHES | 310 | 24-Aug-20 | 25-Oct-21 |
| | SOUTH TOWER AMENITY DECK | 354 | 27-Jul-20 | 15-Jul-21 |
| | EXTERIOR ENCLOSURE | 227 | 27-Jul-20 | 16-Mar-21 |
| | VILLA | 490 | 27-Jul-20 | 25-Oct-21 |
| | VILLA AMENITY DECK | 362 | 27-Jul-20 | 25-Oct-21 |
| | NORTH TOWER AMENITY DECK | 334 | 15-Sep-21 | 11-Feb-22 |
| | COMMISSIONING & INSPECTION | 282 | 07-Jan-21 | 25-Oct-21 |
| | **NORTH TOWER** | 760 | 27-Jul-20 | 26-Jun-22 |
| | MILESTONES & SUMMARIES | 700 | 27-Jul-20 | 26-Jun-22 |
| | CONTRACT MILESTONES | 700 | 27-Jul-20 | 26-Jun-22 |
| | OWNER MILESTONES | 321 | 26-Feb-21 | 26-Jun-22 |
| NT-HIT-PI | North Tower Start Date of 07/27/2020 | 0 | 27-Jul-20 | |
| NT-TCO | North Tower TCO | 0 | | 11-Feb-22 |
| NT-CO | North Tower Substantial Completion | 0 | | 28-Mar-22 |
| NT-CO10 | North Tower Final Completion / CO | 0 | | 13-Jun-22 |
| | SUFFOLK MILESTONES | 321 | 26-Feb-21 | 13-Jun-22 |
| | CONSTRUCTION | 610 | 27-Jul-20 | 28-Mar-22 |
| | STRUCTURE | 287 | 01-Feb-21 | 24-Jan-22 |
| | LIFE SAFETY & STAIRS | 287 | 01-Feb-21 | 24-Jan-22 |
| | MEP/FP RISERS | 484 | 27-Jul-20 | 22-Nov-21 |
| | FACADE | 479 | 27-Jul-20 | 17-Nov-21 |
| | ROOF | 196 | 16-Mar-21 | 28-Jun-21 |
| | EQUIPMENT | 320 | 26-Feb-21 | 23-Nov-21 |
| | INTERIOR BUILD OUT | 339 | 05-Mar-21 | 28-Mar-22 |
| | PUNCH LIST | 104 | 24-Sep-21 | 05-Jan-22 |
| | FINAL SITE WORK | 131 | 25-Aug-21 | 24-Jan-22 |
| | COMMISSIONING & INSPECTION | 585 | 27-Jul-20 | 11-Feb-22 |

Legend:
- Remaining Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- ◆ Milestone

PROJECT ID:
ACQUALINA-11
DATA DATE: 16-JUL-20
PRINTED ON: 16-Jul-20
PAGE 1 OF 1

Suffolk Construction Co.
[SEACQ-0011.01-PR] ACQUALINA SCHEDULE

EXHIBIT F



**EXHIBIT "G"**

**Estates at Acqualina**

**Phases 1 and 2**

**17901 Collins Avenue, Sunny Isles Beach, FL 33132**

**ALLOWANCE LOG**

**July 14, 2020**

| Item # | DIV 01 MISCELLANEOUS | PH 1 (ST, VILLA, PODIUM) AMOUNT | PH 2 (NT) AMOUNT | COMMENTS |
|---|---|---|---|---|
| 01-050 | Extended Hours. Permits with City. | $ 50,000 | $ 50,000 | |
| 01-060 | Specialty Material & Fabrication Travel | $ 35,000 | $ 15,000 | |
| 01-070 | Dust & Noise Control (Car wash, street cleaning, damage to neighboring buildings) | $ 100,000 | $ 100,000 | |
| 01-470 | Temp. Completion Allowance for Phasing | $ 50,000 | $ 100,000 | |
| 01-547 | Building inspections/overtime | $ 31,500 | $ 13,500 | |
| | Procore data transfer | $ 50,000 | $ 35,000 | In GR's |
| | Hurricane preparation and remediation costs. | $ 100,000 | $ 200,000 | |
| | **DIV 02 SITEWORK** | | | |
| 02-050 | Heavy Equipment & Non-structure Cranes | $ 50,000 | $ 50,000 | |
| 02-100 | Tree Removal | $ 5,275 | N/A | |
| 02-112 | Survey (to fund survey changes to 04-5838-0300 & 04-5901-0300) | $ 119,000 | $ 51,000 | |
| 02-201 | Sitework / Civil Permit Allowance | $ 75,000 | N/A | In Subcontract |
| 02-202 | Temp. Roads Misc. Sitework | INC | INC | In Subcontract |
| 02-210 | Shotcrete DSM Walls (to fund changes to Unit Rate Subcontracts 04-5838-0110 & 04-5901-0101) | $ 30,000 | TBD | |
| 02-500 | Dewatering - Misc. (Less PCO 303 & 28(N)) | $ 91,539 | $ 16,154 | |
| 02-500 | Dewatering | $ 716,000 | $ 80,200 | In Subcontract |
| 02-500 | Transfer Dewatering Allowance to FL Civil through CCOs | $ 49,159 | $ 17,307 | In Subcontract |
| 02-500 | CCO #3 - Wellpoint Install & Rent | $ 25,604 | N/A | In Subcontract |
| 02-517 | Drainage Wells (Allowance for Temp, Cleaning, or other Well Services) | $ 118,500 | N/A | |
| 02-580 | Striping & Signage @ Parking Garage | $ 22,000 | IN PHASE 1 | |
| 02-610 | Site Amenities | $ 50,000 | N/A | |
| 02-616 | Monument Signage | IN 10-440 | IN 10-440 | |
| 02-700 | Landscape and irrigation in Villa planters | $ 50,000 | N/A | In Subcontract |
| 02-700 | Creeping vinary along existing Acqualina Resort podium wall | $ 15,000 | N/A | In Subcontract |
| 02-835 | Clean-up Structural Phase | IN 09-998 | IN 09-998 | |
| 02-840 | Traffic & Gate Men | $ 230,510 | $ 203,000 | |
| 02-900 | Termite & Pest Control (Outside of Building) (Under Structure by R&S) | $ 2,000 | $ 500 | |
| Item # | **DIV 03 CONCRETE WORK** | | | |
| 03-150 | R&S discount for Dec 2019 Funding | $ (12,255) | N/A | |
| 03-150 | Connecting bridge at Villa per R&S contract | $ 250,000 | N/A | In Subcontract |
| 03-211 | Rebar Material, Link Beams - Phase 1 through CCO #7 | $ 11,863,781 | N/A | In Subcontract |
| 03-211 | Rebar Material, Link Beams - Phase 2 through CCO #5 | N/A | $ 9,402,036 | In Subcontract |
| 03-305 | PT Repair Allowance (Primarily for post designed slab anchors) | $ 12,500 | 17,500 | |
| 03-935 | Core & Chipping / Repair Allowance (Common Elements or Undesigned Spaces) | $ 50,000 | $ 50,000 | |
| 03-805 | Specialty Shoring for Phasing & Logistics | $ 70,000 | $ 30,000 | |
| 03-830 | Crack Mitigation and/or Service | $ 70,000 | $ 30,000 | |
| 03-901 | Structural Trade Permit/Shop Drawing Fee | $ 35,000 | $ 15,000 | |
| 03-905 | O/H Prt. Beach Walk Alterations, & Misc. Protect - Misc. (for Misc. & Changes to Subcontracts 04-5838-0120 & 04-5901-0115) | $ 93,331 | $ 25,000 | |
| Item # | **DIV 05 METALS** | | | |
| 05-100 | MEP Bridge & Permit Allowance per RTA | $ 50,000 | $ 15,000 | In Subcontract |
| 05-100 | PCO #100 - CU 3204 (ROM) | $ 1,500 | N/A | |
| 05-100 | PCO #108 - CU 601 (ROM) | $ 1,500 | N/A | |
| 05-150 | Permit allowance per RTA | $ 10,000 | $ 5,000 | In Subcontract |
| 05-150 | 5/8" FRT CDX plywood sheathing at demo roofs | EXCLUDED | EXCLUDED | |
| 05-400 | Misc. Metals Not Shown or Purchased with George's Welding | $ 35,000 | $ 15,000 | |
| 05-400 | Decorative Metal Grilles at Ext. of Villa | $ 75,000 | N/A | |
| Item # | **DIV 06 CARPENTRY** | | | |
| 06-100 | Rough Carpentry | $ 100,000 | $ 100,000 | |
| 06-105 | North Tower Fireplace Millwork Surround - furnish and install | N/A | $ 500,000 | |
| 06-320 | Closet shelving in following units: Casa di Portofino, Spiaggia and Cielo per RTA | N/A | $ 200,000 | In Subcontract |
| 06-400 | Kitchen cabinet allowance - Portofino, Spiaggia and Cielo per RTA | N/A | $ 300,000 | In Subcontract |
| Item # | **DIV 07 THERMAL / MOISTURE PROTECTION** | | | |
| 07-100 | Allowance within Subcontract (Cetco repairs & Waterstop) | $ 100,000 | $ 56,200 | In Subcontract |
| 07-100 | CCO #4 - Ultraseal Allowance Reduction | $ (8,750) | N/A | |
| 07-100 | CCO #5 - Ultraseal Allowance Decrease | $ (6,500) | N/A | |
| 07-100 | PCO #18 / CE #5 CCD #3 Rev E (ROM) | $ 375 | N/A | |
| 07-100 | Below Grade Waterproofing - Misc. | $ 5,000 | $ 45,000 | |
| 07-105 | Above Grade Waterproofing Permit Allowance - Phase 1 | $ 25,000 | $ 10,000 | In Subcontract |
| 07-105 | Above Grade Waterproofing - Misc. | $ 25,000 | $ 10,000 | |
| 07-250 | Misc. Fire Caulking at Masonry | $ 59,500 | $ 25,000 | |
| 07-300 | Roofing Permit Allowance | $ 25,000 | $ 15,000 | In Subcontract |
| 07-500 | Finish Caulking (to trims and finishes TBD) | $ 105,000 | $ 45,000 | |
| 07-501 | Caulking Precast | $ 35,000 | $ 15,000 | |
| 07-990 | Addtl. Crane Roofing / Trusses | $ 85,000 | $ 85,000 | |

7/14/2020

| Item # | DIV 01 MISCELLANEOUS | PH 1 (ST, VILLA, PODIUM) AMOUNT | PH 2 (NT) AMOUNT | COMMENTS |
|---|---|---|---|---|
| **Item #** | **DIV 08 DOORS AND WINDOWS** | | | |
| 08-006 | Drs/Frames/Hrdwre (VAPS) - furnish and install | $ 600,000 | N/A | |
| 08-035 | Specialty Doors | $ 59,500 | $ 25,000 | |
| 08-045 | Ornamental lobby front doors | $ 300,000 | NIC | |
| 08-341 | Electrical Door Hardware | $ 40,000 | $ 10,000 | |
| 08-385 | Panic Hdw Allowance | $ 20,000 | $ 17,500 | In Subcontract |
| 08-385 | Glazing permit allowance per RTA | By Owner | By Owner | |
| 08-395 | Accordian Fold. Fire & Operable Partition Doors | $ 105,000 | $ 145,000 | |
| 08-841 | Skylight Permit Fee | $ 5,000 | N/A | |
| 08-850 | Standard Mirrors - Phase 2 | N/A | $ 463,094 | |
| 08-851 | Electric Mirrors - Phase 2 | N/A | $ 303,550 | |
| 08-905 | Access Panels for Unforeseen Conditions | $ 6,000 | $ 4,000 | |
| **Item #** | **DIV 09 FINISHES** | | | |
| 09-100 | Stucco Add for Precast VE | $ 50,000 | NIC | |
| 09-200 | PCO #108 CU 601 (ROM) | $ 1,000 | N/A | |
| 09-200 | Soft Close Pocket Door Comeback | $ 24,150 | NIC | |
| 09-205 | Drywall & Framing Villa Build-out | $ 200,000 | N/A | |
| 09-340 | Tile/Stone ST Penthouse, Cabanas, & 6 Guest Suites Allowances (bond for this Allow in base contract) | $ 1,467,393 | N/A | In Subcontract |
| 09-340 | Tile/Stone NT Penthouse, Cabanas, Single family unit & Suite(s) Allowances (bond for this Allow in base contract). Includes sales center. | N/A | $ 1,583,719 | In Subcontract |
| 09-605 | Allowance for expansion materia/caulking per RTA | In 07-500 | INC | Phase 2 Allowance Includes This |
| 09-605 | Wood Flooring Units - Phase 2 | N/A | $ 3,200,000 | |
| 09-900 | Stencil Allowance - Fire rated walls | $ 10,000 | $ 5,000 | In Subcontract |
| 09-900 | PCO #99 CU 3201 (ROM) | $ (105) | N/A | |
| 09-900 | PCO #110 CU 3607 (ROM) | $ 900 | N/A | |
| 09-900 | PCO #111 CU 3805 (ROM) | $ 409 | N/A | |
| 09-900 | PCO #294 CU 2102 Closets Added (ROM) | $ (720) | N/A | |
| 09-900 | Painting - Misc. | $ 12,000 | $ 8,000 | |
| 09-900 | Paint Add for Precast VE | $ 50,000 | NIC | |
| 09-900 | Secondary bead of caulk at exterior glazing per Glazing RTA | In 07-500 | In 07-500 | Allowance |
| 09-905 | Flr Underlayment & Leveling (Villa / Common Areas) | $ 75,000 | N/A | |
| 09-910 | Temporary Protection & Access (Villa / Common Areas) | $ 198,000 | $ 48,000 | |
| 09-998 | Clean-Up (Finishes Phase) | $ 346,500 | $ 300,000 | |
| 09-999 | Debris Netting - Misc. (to Fund Scope Not in 04-5838-0132 & 04-5901-0113 & / or changes to those Subcontracts) | $ 70,000 | $ 42,650 | |
| **Item #** | **DIV 10 SPECIALTIES** | | | |
| 10-440 | Temp & Perm Signage  including monumental signage/structure | $ 640,000 | $ 160,000 | |
| 10-450 | Awnings | $ 75,000 | $ 25,000 | |
| 10-550 | Mailboxes (material only) | $ 30,000 | $ 20,000 | |
| 10-805 | Fire Extinguishers - Upgrade & Design Completion | $ 24,202 | NIC | |
| 10-955 | Tenant Storage Lockers | $ 41,000 | $ 41,000 | |
| **Item #** | **DIV 11 EQUIPMENT** | | | |
| 11-100 | Appliances for TS (1) and phase (2) units per RTA | N/A | EXCLUDED | |
| 11-100 | Common area appliances per RTA | N/A | EXCLUDED | |
| 11-101 | Appliance Credit from Ferguson to A3 (ODP) | EXCLUDED | EXCLUDED | |
| 11-160 | Loading Dock Equipment | $ 10,000 | NIC | |
| 11-215 | Parking Access Control | $ 100,000 | NIC | |
| 11-216 | Plastic Delineators | $ 25,000 | NIC | |
| 11-905 | Vehicle Charging Stations (By Owner) | EXCLUDED | EXCLUDED | |
| **Item #** | **DIV 13 SPECIAL CONSTRUCTION** | | | |
| 13-460 | Summer Kitchens - Phase 2 | N/A | $ 458,000 | |
| 13-460 | Summer Kitchen Armor Guard or Other Protection | $ 38,000 | $ 23,250 | |
| 13-525 | Water Wall Allowance - Phase 1 | $ 30,000 | N/A | |
| 13-525 | Finish Premiums Pools or Spas @ Units | $ 160,000 | $ 160,000 | |
| 13-550 | Unit Saunas - Phase 2 | N/A | $ 675,000 | |
| 13-600 | Lobby Stone & Tile - Repair, Replacement & Maintenance Allowance | $ 70,000 | $ 30,000 | |
| 13-605 | Samples Procured by Others | $ 15,000 | NIC | |
| 13-610 | Lobby Interior Glazing Hardware Allowance | $ 2,500 | $ 2,000 | |
| 13-620 | Lobby Design Enhancements & Contingency | $ 175,000 | $ 75,000 | |
| 13-700 | Villa Stone & Tile | $ 2,005,000 | N/A | |
| 13-710 | Villa Floor Finishes | $ 700,000 | N/A | |
| 13-715 | Villa Millwork | $ 7,826,500 | N/A | |
| 13-720 | Villa Myrtha Spa negotiated with Owner | $ 550,000 | N/A | |
| 13-725 | Barrisol Backing Allowance | $ 75,000 | NIC | |
| 13-725 | Barrisol Penetration Allowance | $ 25,000 | NIC | |
| 13-745 | Villa Design Enhancements & Contingency | $ 1,625,535 | N/A | |
| 13-800 | Common Area Toilets Accessories | $ 150,000 | $ 10,000 | |
| 13-805 | Common Area Back of House Finishes | $ 250,000 | $ 75,000 | |
| 13-810 | Common Area Silver Leaf & Plaster Finishes | $ 1,045,000 | NIC | |
| 13-815 | Common Area Design Enhancements & Contingency | $ 200,000 | $ 50,000 | |
| 13-900 | Cabana Millwork & Finishes | $ 250,000 | NIC | |
| 13-905 | Connector Bridge | $ 300,000 | N/A | |
| 13-910 | Enclosed Terrace Options & Unit Enhancements | EXCLUDED | EXCLUDED | |
| **Item #** | **DIV 14 CONVEYING EQUIPMENT** | | | |
| 14-100 | Elevator Finish Allowance - Phase 1 | $ 375,000 | $ 150,000 | In Subcontract |

7/14/2020

| Item # | DIV 01 MISCELLANEOUS | PH 1 (ST, VILLA, PODIUM) AMOUNT | PH 2 (NT) AMOUNT | COMMENTS |
|---|---|---|---|---|
| Item # | DIV 15 MECHANICAL | | | |
| 15-400 | Plumbing & Mechanical Permit | $ 339,000 | $ 161,000 | In Subcontract |
| 15-400 | CCO #2 - Phase 1 Permit Fees Paid by Trump Group | $ (285,357) | N/A | |
| 15-400 | CCO #3 - Phase 1 Permit Fees Paid by Trump Group | $ (2,440) | N/A | |
| 15-410 | Common Area/Cabana Plumbing Fixtures | $ 255,000 | $ 45,000 | |
| 15-410 | Secondary Shower Drain Change (Infinity to Schluter) | IN CC #6 TO NAGELBUSH | NIC | |
| 15-600 | Temp A/C, Duct Cleaning, IAQ Allowance. Assume use of permanent A/C in units. | $ 32,200 | $ 20,200 | |
| 15-925 | Temp. Sanitary | $ 5,000 | $ 5,000 | |
| Item # | DIV 16 ELECTRICAL | | | |
| 16-001 | PCO #87 CU 2901 (ROM) | $ 3,518 | N/A | |
| 16-001 | PCO #97 CU 1801 (ROM) | $ 4,694 | N/A | |
| 16-001 | PCO #99 CU 3201 (ROM) | $ (236) | N/A | |
| 16-001 | PCO #214 CU 2002 Rev 1 (ROM) | $ 5,000 | N/A | |
| 16-001 | PCO #294 CU 2102 (ROM) | $ 4,335 | N/A | |
| 16-001 | Light fixture allowance per RTA | $ 3,616,245 | $ 1,068,755 | In Subcontract |
| 16-001 | Abandoning empty conduit on sleeves | $ 10,500 | $ 4,500 | In Subcontract |
| 16-001 | Light fixture premium allowance added via CCO | $ 732,437 | $ 270,899 | |
| 16-010 | Electrical Fixtures Premium Over PDI Subcontract | $ 300,000 | TBD | |
| 16-915 | Water Bug in-wall Allowance for Missing Scope (due to partial design). Devices by Owner | EXCLUDED | EXCLUDED | |
| Item # | DIV 99 OWNER AND EXCLUDED WORK | | | |
| 90-080 | Parking Misc. Costs | $ 3,500 | $ 1,500 | |
| | | | | |
| | END | | | |

Allowance Log

7/16/2020



# EXHIBIT "H"
# Estates at Acqualina

**South Tower, Villa, Beach Side Amenities, Guest Suites, Cabanas**

**17901 Collins Avenue, Sunny Isles Beach, FL 33132**

# QUALIFICATIONS & ASSUMPTIONS

**July 16, 2020**

| | DIV 01 GENERAL |
|---|---|
| 1 | Per Article 1.1.1.1 of the A201 Contract all scope and business term related qualifications delineated in all the RTA's (see Exhibit T) are included by reference in these qualifications and will have priority over 3rd through 7th priorities along with these Division 1 Qualifications. |
| 2 | The drawing log in the Contract (Exhibit A) is for reference only with respect to what is currently contracted with each subcontractor. Subcontractor and supplier contract values are as indicated on the RTA (Request to Award) packages that were prepared by Coastal and approved by Owner. The drawing set that each supplier and subcontractor is bound to is indicated in the RTA. The only changes to each RTA that are acknowledged and included in the GMP are itemized in the Schedule of Values (Exhibit U). Any subsequent drawing issuance, CCD's, RFI's or other change events that have occurred prior to the execution of this Contract will be reviewed by Contractor and processed as a change order to this contract for each subcontractor and supplier as allowed by the Contract. |
| 3 | COVID monitoring on the work force is included for a 6 month period. If monitoring is required for a different duration, the Contract will be adjusted to reflect actual durations at the unit rates included in General Requirements breakdown. |
| 4 | Contractor shall provide all required surveys for layout of the work performed under this Agreement, including Project Control and Utility As-Built (red-line) drawings.  Final As-Built (Mortgage) Surveys, Boundary Surveys, Easement Surveys and Design Surveys as may be required, shall be by Owner. |
| 5 | The costs of the following items **are not included** in this GMP. |
| | a. Cost or Resource Loaded schedule. |
| | b. Testing laboratory/technical agency fees (i.e. on-site inspections, threshold inspections, soils/materials testing, special inspectors, etc.). |
| | c. Furniture, fixtures and equipment (FF&E) unless specifically included in RTA's or Exhibit U. |
| | d. Exterior wall, roofing, waterproofing consultants (if required), excepting consultants due to deficient work. |
| | e. Police details. |
| | f. Any sidewalk or parking meter rental. |
| | g. 3rd Party Plan Review costs for permit revisions and permit related shop drawings outside of allowance for structural shop drawings. |
| | h. Permit Expeditor costs. |
| | i.  Smoke control consultant or field testing |
| | j. Any mock-ups beyond what is included in RTA's. |
| | k.  Multi-vista photo documentation other than identified in 2.1.8.2 of A102. |
| | l.  Parking lot rental including rental, shuttle buses, management, etc. Parking lot guards and cleanup are included. |
| 6 | Signalization by Owner. |
| 7 | We have included office space for threshold inspector and one Owner's representative. |
| 8 | If any testing performed by an Owner's consultant fails, the cost of retesting will be bourne by subcontractor responsible for test. |
| | |
| | **END** |



**EXHIBIT "I"**

**Billable Rates for Typical Positions**

*The weekly rates below include base salary, 43.7% labor burden (taxes, health insurance, 401K, etc.), bonus pool, company IT allocation, company car allowance, company gas card, and company cell phone and IT costs. Paid time off (vacations and holidays) is not included in labor burden and assumed to be billed to project.*

| STAFF DESCRIPTION | WEEKLY RATE* |
|---|---|
| **Main Office Support Staff:** | |
| Vice President of Operations / SBU Manager | $10,308.94/week |
| General Superintendent | $7,825.15/week |
| Safety Director | $6,281.78/week |
| Chief Estimator | $7,027.65/week |
| Senior Estimator | $5,552.64/week |
| Estimator | $3,463.46/week |
| Scheduler | $4,851.42/week |
| Scheduling Director | $6,215.19/week |
| | |
| **Project Management Staff:** | |
| Project Executive 1 | $6,017.84/week |
| Project Executive 2 | $6,519.41/week |
| Project Executive 3 | $7,389.90/week |
| Senior Project Manager 1 | $4,799.16/week |
| Senior Project Manager 2 | $5,292.44/week |
| Project Manager – Level 1 | $3,812.60/week |
| Project Manager – Level 2 | $4,363.91/week |
| Assistant Project Manager 1 | $2,627.76/week |
| Assistant Project Manager 2 | $3,004.97/week |
| MEP Project Manager | $4,363.91/week |
| Project Engineer | $2,148.99/week |
| Intern | $1,671.60/week |
| Project Administrator | $1,914.40/week |
| Project Controller | $3,684.40/week |
| Project Accountant | $2,320.63/week |
| | |
| **On-Site Field Staff:** | |
| Senior Superintendent – Level 1 | $5,437.52/week |
| Senior Superintendent – Level 2 | $5,997.12/week |
| Senior Superintendent – Level 3 | $6,374.33/week |
| Superintendent – Level 1 | $3,580.47/week |
| Superintendent – Level 2 | $4,131.78/week |
| Superintendent – Level 3 | $4,857.19/week |
| Assistant Superintendent 1 | $2,511.69/week |
| MEP Superintendent | $4,131.78/week |
| Field Engineers | $2,148.99/week |
| Safety Manager 1 | $3,406.37/week |
| Sr. Safety Manager | $4,131.78/week |

\* *The weekly rates are for calendar year 2020. Annual increases of 3% are included.*

**EXHIBIT "I1"**



**Liberty Construction Services**

General Labor & Carpentry  Florida - Billable Rates

| <u>LABOR CLASS</u> | <u>HOURLY RATES*</u><br>STRAIGHT |
|---|---|
| **From 1/1/2020 to 12/31/2020** | |
| Laborer | $25.00/hour |
| Laborer Foreman | $30.00/hour |
| Semi-Skilled | $32.00/hour |
| Carpenter | $42.00/hour |
| Carpenter Foreman | $46.00/hour |
| **From 1/1/2021 to 12/31/2021** | |
| Laborer | $26.00/hour |
| Laborer Foreman | $31.00/hour |
| Semi-Skilled | $33.00/hour |
| Carpenter | $43.00/hour |
| Carpenter Foreman | $47.00/hour |
| **From 1/1/2022 to 12/31/2022** | |
| Laborer | $27.00/hour |
| Laborer Foreman | $32.00/hour |
| Semi-Skilled | $34.00/hour |
| Carpenter | $44.00/hour |
| Carpenter Foreman | $48.00/hour |

*All work to be performed at the direction of Suffolk and billed on a T&M Basis at the rates listed above.*

*Construction Materials & Equipment Rentals are not included in these rates and if provided will be billed separately.*



# EXHIBIT J

SUBCONTRACT AGREEMENT BETWEEN
SUFFOLK CONSTRUCTION COMPANY INC. AND
"SUBCONTRACTOR NAME"
FOR THE PROJECT KNOWN AS
"PROJECT NAME, JOB #TBD"

DATE

RE:     PROJECT NAME
        JOB #TBD

Dear        :

Below please find the Subcontract Agreement for the above-referenced project, which includes all attached attachments, exhibits, and all documents incorporated by reference therein (collectively, the "Subcontract"). If you agree to all terms and conditions contained in the Subcontract, please execute this page where indicated within five days by doing the following:

- **Electronically sign your name by clicking on the yellow tab on this page, type your name and confirm your signature.**
- **As stated above, there is no need to print this document to sign your signature.**

Furthermore, please provide the required insurance certificates, safety manuals, and submittals to our office within seven (7) days of your receipt for further processing. Upon confirming your signature, the Subcontract will be automatically returned to Suffolk Construction Company, Inc. for execution. You will be notified via electronic mail when the Subcontract has been fully executed and is available for viewing. You can save the fully executed, PDF version of the Subcontract via the DocuSign website link that you receive in the confirmation email.

Insurance certificates should state the project name and job number to which they pertain, name Suffolk Construction Company, Inc., Owner Name, and any other required entities or people as additional insureds. Please return all certificates via email to: mschnelly@suffolk.com

☒ The Owner Contract is executed and the subcontractor is authorized to fully execute the scope of work contained within this subcontract upon its execution, or
☐ The Owner Contract is not fully executed as of this date. Subcontractor is not authorized to make financial expenditures against this subcontract until a subsequent Notice to Proceed is issued by Suffolk, or
☐ The Owner Contract is not fully executed as of this date. Prior to a subsequent Notice to Proceed being issued, expenditures against this subcontract are limited to a not to exceed value of $       for (insert scope of work).

By signing below you are acknowledging that you accept and understand the nature, terms, conditions and scope of the Subcontract and agree that the Subcontract contains the entire agreement between the parties. All prior or contemporaneous agreements, written or oral, between the parties regarding the subject matter hereof are superseded by the Subcontract. The Subcontract may not be modified except by a written document signed by an authorized representative of each party.

SUBCONTRACTOR NAME SUFFOLK CONSTRUCTION COMPANY, INC.
SUBCONTRACTOR NAME



# SUFFOLK CONSTRUCTION COMPANY, INC.
# SUBCONTRACT

THIS AGREEMENT, made as of the _____ day of _____, 20_____, by and between _____ of _____, ("Subcontractor") and Suffolk Construction Company, Inc., of 426 Clematis Street, West Palm Beach, FL 33401 (the "Contractor").

WHEREAS, the Contractor has undertaken the construction of **PROJECT NAME (JOB #TBD), PROJECT ADDRESS**, (the "Project") in accordance with the provisions of a construction contract (the "General Contract") between the Contractor and **OWNER NAME**, of **OWNER ADDRESS**, (the "Owner").

NOW, THEREFORE, in consideration of the agreements contained in this Subcontract, the Subcontractor and Contractor mutually agree as follows:

## DEFINITIONS

The following words and phrases shall have the meanings set forth opposite them:

**"Bonds are Required"** when the box next to "Yes" is marked:      Yes ☐ No ☐

**"Completion Date"** shall mean the date for Substantial Completion of Subcontractor's Work _____

**"State"** shall mean the state in which the Project is located.

**"Subcontract Sum"** shall mean _____ ($_____).

**"Work"** shall mean the work described in Article 1 and in Exhibit B for _____.

### INDEX TO SUBCONTRACT

|  |  |
|---|---|
| Article 1: | The Work |
| Article 2: | Time of Commencement and Substantial Completion |
| Article 3: | Subcontract Amount |
| Article 4: | Payment |
| Article 5: | Time |
| Article 6: | Extensions |
| Article 7: | Bonds |
| Article 8: | Subcontract Terms and Conditions |
| 8.1. | Scope of Work |
| 8.2. | Performance of Work |
| 8.3. | Dependence of Work |
| 8.4. | Statutory and Regulatory Compliance |
| 8.5. | Equal Opportunity Compliance/Nondiscrimination |
| 8.6. | Contractor's Rights and Remedies |
| 8.7. | Assignment |
| 8.8. | Indemnification |
| 8.9. | Insurance |
| 8.10 | Warranty |
| 8.11 | Mechanics Liens |

Long Form 3_26_19-Intr

| 8.12 | Claims |
| 8.13 | Changes |
| 8.14 | Cooperation |
| 8.15 | Records |
| 8.16 | Disputes |
| 8.17 | Miscellaneous (Including Discipline, Safety, Stored Materials, Clean up, Right of Offset, Maintenance of Equipment, Signage, Names in Event of Emergency, Effective Date, Confidentiality of Information, Jurisdiction, Waiver, Separability) |
| 8.18 | Protection of the Work |

| Article 9: | Final Agreement |

| Exhibit "A" | List of Contract Documents (may be omitted) |

| Exhibit "B" | The Work |

| Exhibit "M" | Form Payment and Performance Bonds [if Bonds are required] |

## ARTICLE 1.  THE WORK.

The Subcontractor agrees to furnish, provide and install all labor, supervision, materials, equipment, plant, supplies, tools, scaffolding, hoisting, transportation, layout (including engineering where necessary), unloading and handling, work and other services, and everything else required to perform and complete the Work required by the General Contract between the Contractor and the Owner as specified in the applicable sections of the specifications, together with all other related plans and Contract Documents (as defined in this Subcontract).  All of the foregoing is to be furnished and performed in accordance with the General Contract and the Contract Documents referred to in the General Contract, including the drawings, plans and specifications and addenda thereto prepared by the architect (the "Architect"), the General Conditions of the Contract for Construction and (if any) the Supplementary General Conditions and Special General Conditions and any Exhibits thereto, all of which are collectively referred to as the "Contract Documents".    Terms used in this Subcontract which are defined in the Contract Documents shall have the same meanings as designated in the Contract Documents.  The Subcontractor agrees to be bound to the Contractor with respect to the Work by all the terms of the Contract Documents, and further agrees to assume to the Contractor with respect to the Work, all obligations and responsibilities which the Contractor has assumed to the Owner with respect to the Work except to the extent that provisions in the Contract Documents are by their terms or by law applicable only to Contractor.  The Subcontractor shall require that all of its lower tier subcontractors and suppliers be bound unto Subcontractor in the same manner as Subcontractor is bound unto Contractor.

In the event of any conflict among the Contract Documents, the Documents shall be construed according to the following priorities:

| First Priority: | This Subcontract |
| Second Priority: | Exhibit "B" – The Work |
| Third Priority: | All other Exhibits to this Subcontract |
| Fourth Priority: | Change Order with later date having greater priority |
| Fifth Priority: | Owner/Contractor Agreement (with Exhibits) |
| Sixth Priority: | Drawings |
| Seventh Priority: | Specifications |
| Eighth Priority: | Supplementary General Conditions (If any) |
| Ninth Priority: | General Conditions |

## ARTICLE 2: TIME OF COMMENCEMENT AND SUBSTANTIAL COMPLETION.

Contractor shall give the Subcontractor a forty-eight (48) hour notice to proceed upon which Subcontractor shall man the project in accordance with Contractor's construction schedule (as it may be reasonably amended from time to time). Subject to authorized adjustments, the Work shall be substantially completed not later than the Completion Date.

**ARTICLE 3: SUBCONTRACT SUM.**

The Contractor agrees to pay the Subcontractor as full payment for all work, labor, materials, taxes, fees and all other matters to be performed or furnished by the Subcontractor under this Subcontract, the total price and sum of the Subcontract.

**ARTICLE 4: PAYMENT.**

Within ten (10) days after Contractor's receipt of good funds from Owner and provided Subcontractor's rate of progress and general performance are satisfactory, Contractor shall pay to Subcontractor ninety percent (90%) of the value of the Work properly performed during the previous month.  Receipt of progress and/or final payments by the Contractor from the Owner with respect to the Work shall be, in each instance, a condition precedent to the Subcontractor's rights to receive payment from Contractor.  Subcontractor agrees that in the event Contractor is required to post a Payment Bond pursuant to Chapter 713 or §255.05 of the Florida Statures, that payment to Subcontractor and/or to any subtrade of any of the Subcontractor shall be expressly contingent upon the prior payment by the Owner, and waives all claims against the Contractor's Bond to the extent that payment has not been received by Contractor from Owner.  The Subcontractor's applications for partial payments and final payment ("Requisitions") are to be submitted to the Contractor in the form set forth in one of the exhibits incorporated through Exhibit "A" and/or in the manner required by the Contractor, and shall specifically itemize all sales tax included in such application, where applicable.  Each Requisition must be supported by such data substantiating the Subcontractor's right to payment as the Contractor, Owner, Owner's Lender and/or Architect may require, including releases of lien from all sub-subcontractors, laborers and material men of the Subcontractor, confirming that they have been paid through the date of the requisition for which payment is being made to the Subcontractor.  The Contractor also reserves the right at its sole discretion to issue a joint check to the Subcontractor and any supplier or debtor of Subcontractor or to make direct payments to any supplier or debtor of Subcontractor, provided that upon issuance of the check, Subcontractor and said supplier or debtor shall issue a Release of Lien and Bond rights.

As a condition precedent to final payment, Contractor shall require the Subcontractor to provide evidence (including releases) that all payroll, materials, equipment, sub-subcontractors and suppliers have been paid in full for work on the Project.

Prior to submission of the first Requisition, the Subcontractor will deliver to the Contractor, for review and approval, a detailed breakdown of the Subcontract Amount showing a Schedule of Values for the various parts of the Work.  Once accepted, this Schedule of Values will be used as a basis for payment of the Subcontractor's monthly Requisition.  If the Owner agrees to pay for stored materials, Subcontractor may include stored materials in its Requisition  subject to the Owner's and Lender's approval and requirements, and providing adequate insurance coverage and transferring title to those materials free and clear of all liens.  Requisitions shall be submitted monthly on or before the 25th day of the month or on a schedule to be furnished to the Subcontractor by the Contractor.  Failure to submit any such Requisition on a timely basis may result in the postponement of payment under such Requisition until payment on the next Requisition is due.  The Subcontractor shall only be entitled to payment in the amount approved by the Contractor and the Architect or Owner with respect to said Requisitions.  The value of any materials, equipment and Work included in a Requisition for payment which is found unacceptable by the Contractor or the Architect may be deducted from that or any subsequent Requisition.

Retainage held on the Subcontractor shall be reduced at Substantial Completion as and when Owner releases retainage to Contractor.  Retainage shall be paid to Subcontractor less such amounts as the Architect or Contractor shall determine for all incomplete Work and unsettled claims as provided for in the Contract Documents.  Retainage shall be paid upon Contractor's receipt of such retainage from the Owner, with receipt of such retainage from Owner being a condition precedent to Contractor's obligation to pay retainage.

In addition to the foregoing requirements, final payment, constituting the entire unpaid balance of the Subcontract Amount, shall be due only when the Subcontractor shall execute and deliver to the Contractor a final release and lien waiver, in a form satisfactory to the Contractor, of all claims of the Subcontractor against the Owner and Contractor, an affidavit listing all sub-subcontractors, material men, and union benefits payments (where applicable) and certifying that there are no liens, claims or demands by sub-subcontractors, materialmen, laborers, other employees or third persons, and a certificate from the appropriate state and local taxing authority evidencing payment of all applicable taxes and provide all as-built drawings, maintenance manuals and warranties necessary or required in connection with the Work.  The Subcontractor's acceptance of final payment shall constitute full and final settlement of all obligations of the Owner and Contractor to the Subcontractor with respect to this Subcontract, except those claims which Subcontractor has specifically reserved in writing, with amounts of each such claim specified.  Failure to specify the amount of any claim so reserved shall constitute a waiver of such claim.

Long Form 3_26_19-Intr

**ARTICLE 5:  TIME.**

The Subcontractor agrees to perform the Work diligently and to provide a sufficient number of properly skilled and supervised workmen in accordance with the directions of the Contractor and in compliance with the project schedules of the Contractor.  It is specifically understood that time is of the essence for the performance of the Subcontractor's obligations under this Subcontract.  If at any time Subcontractor's actual progress is inadequate to meet the requirements of this Subcontract, Contractor may notify Subcontractor who shall then take such steps as may be necessary to improve its progress.  If within a reasonable period as determined by the Contractor, Subcontractor does not improve its performance to meet the currently approved progress schedule, Contractor may require an increase in Subcontractor's labor force, number of shifts, overtime operations, weekend work, all without additional cost to the Contractor.  Neither such notice, nor Contractor's failure to issue such notice shall relieve Subcontractor of its obligation to achieve the quality of Work and the rate of progress required by this Subcontract.  Project float provided for in the project schedule is for the exclusive use of the Contractor and Contractor may backcharge to the Subcontractor damages suffered by the Contractor caused by a delay of the Subcontractor in the performance of this Subcontract.

**ARTICLE 6:  EXTENSIONS.**

The Subcontractor agrees that it shall have no claim for money damages or additional compensation for delay no matter how caused, but for any delay or increase in the time required for performance of this Subcontract not due to the fault of the Subcontractor, the Subcontractor shall be entitled only to an extension of time for performance of its Work. Written notice of all claims for any extension of time shall be submitted to Contractor within ten (10) days of the date when Subcontractor knows (or should know) of the event which causes such delay, or such claim shall be considered waived by Subcontractor.

The Subcontractor shall be entitled to an extension of time for performing and completing the Subcontract Work upon the same terms and conditions that an extension of time is allowable under the Contract Documents.

**ARTICLE 7:  BONDS.**

If Bonds are Required (as determined from the first page of this Subcontract), the Subcontractor shall, prior to commencing work under the Subcontract, execute and deliver to the Contractor performance and payment bonds each in the penal sum equal to the Subcontract Amount and in the form attached hereto as Exhibit "M" and with sureties acceptable to the Contractor.  The Subcontractor's failure to furnish any required bonds within ten (10) days of the execution of this Subcontract shall be grounds for termination of this Subcontract, at the sole discretion of Contractor.

**ARTICLE 8:  SUBCONTRACT TERMS AND CONDITIONS.**

**8.1  Scope of Work**.  The intent of the Contract Documents is to include all items necessary for the proper execution of the Work.  The Contract Documents are complementary, and what is required by one shall be binding as if required by all.  Items omitted from the Contract Documents shall be included within the scope of the Work if they are required by applicable law, regulation, or code, if they are reasonably inferable from the intent of the Contract Documents, or if they are necessary to produce the intended results.

**8.2  Performance of Work**.  The Subcontractor agrees to perform, obtain, furnish and provide at its expense all work, labor, materials, tools and equipment necessary to complete the Work in a good and workmanlike manner, in accordance with the Contract Documents to the full satisfaction of the Architect, Contractor and Owner and in compliance with the directions and job schedule of the Contractor and in proper cooperation with the Contractor and other subcontractors so as not to delay or otherwise interfere with or obstruct their work.  The Subcontractor agrees to cleanup after the Subcontractor's Work, failure to do so expeditiously, after notification by the Contractor, said cleanup may be completed by Contractor, and charged to the Subcontract account by reducing the outstanding Subcontract balance an/or retainage.

The Subcontractor agrees to proceed at once to prepare all required shop drawings, samples, certificates and similar information which will meet with the approval of the Contractor and Architect, and to furnish said required submissions within two (2) weeks of the execution of this Subcontract or such other reasonable period of time as is specified in writing by the Contractor.  By submitting shop drawings and samples, the Subcontractor represents that the Subcontractor has determined and coordinated all field and shop measurements, field construction criteria, catalog

Long Form 3_26_19-Intr

numbers and similar data and that the Subcontractor has checked and coordinated each shop drawing and sample with the requirements of the Work and Contract Documents. The Subcontractor shall give the Contractor notice of, and opportunity to be present at, all inspections and testing with reference to the Work. The Subcontractor agrees that the Architect shall have the authority to reject Work which does not conform to the Contract Documents. The Subcontractor shall, within twenty-four (24) hours or such reasonable time as the Contractor allows, at its own cost and expense, repair or replace all Work or materials rejected by the Architect, Contractor, or Owner as defective or failing to conform to the Contract Documents, whether such defect is observed before or after Final Completion of the Work and whether or not fabricated, installed or completed.

**8.3   Dependence of Work.** If the Subcontractor determines that any previous work required to be performed under the Contract Documents, or any portion of work on which the Subcontractor's Work is dependent is not in accordance with the Contract Documents, the Subcontractor shall, prior to commencing that portion of the Work, promptly notify the Contractor in writing. Commencement of work in a particular area will be acknowledged as acceptance of the surfaces and conditions within that particular area and any further preparation or cleaning of the area after acceptance will be the Subcontractor's responsibility.

**8.4   Statutory and Regulatory Compliance**. The Subcontractor shall promptly notify the Contractor and Architect in writing of any variance between the Contract Documents and applicable laws, statutes, ordinances, regulations and building codes of the locality in which the Work is done, as well as any conflict among the Contract Documents which the Subcontractor discovers or should have discovered (based on the experience of experienced subcontractors performing the type of work described in Exhibit B) or by reasonable study of said Contract Documents. If the Subcontractor proceeds without instructions from the Contractor, the Subcontractor shall do so at its own risk. Any instruction to the Subcontractor shall be given in writing, and any claims of the Subcontractor derived from such instructions shall be governed by Paragraph 8.12.

If the Subcontractor performs any Work knowing it to be contrary to any applicable law, ordinance, rule, regulation or building code, the Subcontractor shall assume full responsibility for and shall bear all costs attributable to that Work. The Subcontractor shall defend, indemnify and hold harmless the Contractor and Owner for any loss or damage resulting from such violation.

The Subcontractor shall, at its own cost and expense, apply for and obtain all necessary licenses and permits and shall pay all fees and inspections necessary for the proper execution and completion of its Work. The Subcontractor shall pay all sales, consumer, use and all other applicable taxes for the Work or portions of the Work, and shall provide reasonable evidence of such payment.

**8.5   Equal Opportunity Compliance/Non-Discrimination**. During the performance of this Subcontract, the Subcontractor agrees as follows:

**8.5.1** The Subcontractor will not discriminate against any employee or applicant for employment because of race, creed, color, sex, sexual preference, national origin, ancestry, age, religion or liability for services in the armed forces of the United States. The Subcontractor will take affirmative action to ensure that applicants are employed and that employees are treated during their employment without regard to their race, religion, color, sex or national origin. Such action shall include, but not be limited to, employment, promotion, demotion or transfer, recruitment or recruitment advertising, lay-off or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship. The Subcontractor agrees to post in conspicuous places available to employees and applicants for employment notices to be provided by the Contractor setting forth the requirements of the Equal Opportunity Clause.

**8.5.2** The Subcontractor will, in all solicitations or advertisements for employees placed by or on behalf of the Subcontractor, state that all qualified applicants will receive consideration for employment without regard to race, religion, sex, sexual preference, national origin, ancestry, age, or liability for services in the armed forces of the United States.

**8.6   Contractor's Rights and Remedies**.

**8.6.1** The Contractor shall have the right, without invalidating this Agreement, to make changes in the Work to be performed under this Subcontract. Such changes may consist of (i) changes in the scope of the Work as such

Long Form 3_26_19-Intr

is defined in the Contract Documents; (ii) changes in the Work (including deletions of portions of the Work) ordered by the Contractor; or (iii) changes in the Work which occur as a result of the Subcontractor's default in the performance of its obligations under this Subcontract. Adjustment of the Subcontract Amount for the changes described in (i) and (ii) above shall be determined according to the manner set forth in the Contract Documents for reimbursement of Change Orders; adjustment of the Subcontract Amount for the changes described in (iii) shall be determined in the manner set forth in Paragraph 8.6.2.

**8.6.2** If the Subcontractor at any time defaults in any of its obligations under this Subcontract, neglects to carry out the Work in accordance with the Contract Documents, fails to supply a sufficient number of properly skilled workmen or materials of the proper quality or quantity, fails in any respect to prosecute the Work promptly or diligently, or fails to maintain the Contractor's job schedules the Contractor may, after twenty-four (24) hours' written notice to the Subcontractor (unless Subcontractor cures such default within said period or, if more time is required to complete the cure, commences such cure within said period and diligently and promptly completes such cure) and without prejudice to any other remedy he may have (i) provide any such labor and materials and deduct the cost thereof from any money due or thereafter becoming due to the Subcontractor or (ii) terminate the employment of the Subcontractor and enter upon the Project and take possession of all materials and equipment whatsoever thereon, including, without limitation, all materials stored on or off site, and employ any other person or persons to finish the Work and provide materials therefore. If the Contractor undertakes to correct such deficiencies provided in (i) of this Paragraph or to terminate this Subcontract as provided in (ii) of this Paragraph, the Subcontractor shall not be entitled to receive any further payments under this Subcontract until all work at the Project is completed.

In the event the Contractor undertakes to correct the Subcontractor's deficiencies pursuant to (i) above and not terminate this Subcontract, appropriate Change Order(s), under Paragraph 8.13, shall be issued, deducting from the payment then or thereafter due (a) all of the Contractor's direct and indirect costs of correcting such deficiencies or completing the Work and       (b) the cost to the Contractor of any delay made necessary by the Subcontractor's default, neglect, failure or termination; whereupon the Subcontract Amount shall be appropriately reduced by any of the above costs. If the cost of such remedial action shall exceed the unpaid balance of the Subcontract Amount, the Subcontractor shall promptly pay such difference to the Contractor. If the cost of completing the Work of this Subcontract exceeds the unpaid balance of the Subcontract Amount, the Subcontractor shall promptly pay such difference to the Contractor.

**8.6.3** Additionally, the Contractor shall have the right to terminate this Subcontract pursuant to the provisions of Paragraph 8.6.2 if the Subcontractor (i) shall file for bankruptcy protection or generally become involved in financial difficulties so that it is unable to pay its debts generally as they become due or (ii) shall suffer adverse changes in its financial position which substantially impede the Subcontractor's performance under this Subcontract

**8.6.4** In the event of a termination of the Work not caused by a default of the Subcontractor, including those caused by the failure or refusal of the Owner to approve the Subcontract or the failure of the Owner and Contractor to enter into a General Contract, the Subcontractor shall be compensated for the cost of the work completed prior to termination and to the amount for which the Contractor is first compensated by the Owner, but shall not be entitled to any overhead or profit on that portion of the Work which is not performed. Receipt of payment from Owner for such termination shall be a condition precedent to Subcontractor's right to receive payment hereunder. Any claims of the Subcontractor arising out of the Subcontractor's termination pursuant to this paragraph shall be governed by Paragraph 8.12.

**8.7** <u>**Assignment**</u>.

**8.7.1** Assignment by Contractor. The Contractor may assign its rights and obligations under this Subcontract to the Owner and/or Owner's lenders. The Contractor shall remain primarily liable under this Subcontract for the performance of all the Contractor's obligations set forth in this Subcontract until the time such assignment becomes effective, whereupon the Contractor shall be relieved of any and all of its obligations under this Subcontract, the Subcontractor agreeing to accept such assignee and the substitution of the Contractor, and shall look solely to the assignee for payment. It is agreed that in the event of such assignment the Subcontractor shall remain bound by the terms of this Subcontract.

Long Form 3_26_19-Intr

In the event of a termination of the General Contract between the Owner and the Contractor for any reason, this Subcontract may, at the sole option of the Owner or its lender providing construction financing, be assigned to the Owner or any lender providing construction financing or assigned to another contractor, and the Subcontractor shall continue to work as though this Subcontract was with the assignee. Said assignment shall become effective only upon written notice by the Owner or such lender that the Owner or such other contractor is assuming this Subcontract. The Subcontractor shall execute any instruments necessary to confirm such assignment. By executing this Subcontract, the Subcontractor confirms and assents to the aforementioned rights of assignment and assumption.

**8.7.2** Assignment by the Subcontractor. The Subcontractor acknowledges and agrees that neither this Subcontract nor the Work, nor any part of the Work, nor the Subcontractor's right to receive payment under this Subcontract shall be assigned nor sublet without the prior written consent of the Contractor, and any attempt to do so shall constitute an abandonment by the Subcontractor of this Subcontract and an additional cause for termination pursuant to Paragraph 8.6. Any such assignment shall be void, and the assignee shall acquire no rights in this Subcontract or to any payment due under this Subcontract. No sub-subcontract or assignment by the Subcontractor shall under any circumstances operate to relieve the Subcontractor of its obligations under this Subcontract.

**8.8   Indemnification**. To the fullest extent permitted by law, the Subcontractor hereby releases and shall  defend, indemnify and hold harmless the Contractor, Owner, Architect and their respective agents, officers, employees and partners (hereinafter collectively "Indemnitees") from and against all claims, damages, losses, expenses (including, but not limited  to reasonable attorneys' fees), liabilities, interest, judgments , whether arising before or after completion of the Work hereunder, which (i) are attributable to injury, sickness, disease, or death or to injury or to destruction or damage to  property, including loss of use therefrom and (ii) arising out of, in whole or in part, any default or negligent act or omission of the Subcontractor, its sub-subcontractor(s) or anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, and (iii) are caused, or claimed to be caused, by breach of Subcontractor of any representation, warranty, covenant, or performance obligation of this Subcontract. Such indemnification shall not include claims of, or damages resulting from, gross negligence, or willful, wanton or intentional misconduct of the Contractor or its officers, directors, agents or employees, or for statutory violation or punitive damages except and to the extent the statutory violation or punitive damages are caused by or result from the acts or omissions of the Subcontractor or any of the Subcontractor's contractors, subcontractors, sub-subcontractors, materialmen, or agents of any tier or their respective employees. The parties mutually acknowledge that the amount of indemnity provided for herein is equal to the limits of aggregate insurance provided by Subcontractor under this Agreement or $1 Million, whichever is greater, and that the requirements of §725.06, Fla. Stat. as modified by Chapter No. 2001-211 (SB-428) have been fulfilled and apply to this section. The aforesaid indemnification obligation shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor Workmen's Compensation, Disability Benefit Acts or other employee benefit acts. Subcontractor specifically waives any immunity provided against this indemnity by worker's compensation statute. The Subcontractor shall provide in the policy of comprehensive general liability insurance required by this Subcontract a contractual indemnity endorsement which insures Subcontractor's liability under the provisions of this Paragraph.

**8.9  Insurance**.

**8.9.1** The Subcontractor shall purchase and maintain such insurance as will protect itself from claims set forth below, which may arise out of, or result from its operations under this Subcontract, whether such operations be by itself, or by any sub-subcontractor, or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, including coverage for the following:

1) Claims under Worker's or Workmen's Compensation Disability Benefits, and other Employee Benefit Acts required by the state in which the project is located, whether or not Subcontractor utilizes leased employees, or labor services for its Work;

2) Claims for damages because of Bodily Injury, occupational sickness or disease, or death of its employees or other persons;

3)  Claims for damages, other than to the Work itself, because of injury to, or destruction of tangible property, including loss of use resulting there from;

4)    Claims for damages because of Bodily Injury, or death of any person, or property damage, arising out of the ownership, maintenance, or use of any motor vehicle; and

5)    COMPLETED OPERATIONS" Coverage which shall remain in effect for a minimum of eleven (11) years after actual possession by the owner, the date of the issuance of a certificate of occupancy, the date of abandonment of construction if not completed, or the date of completion of the contract or termination of the contract between the professional engineer, registered architect, or licensed contractor and his or her employer, whichever date is latest. (A Specific Endorsement may be required to all Subcontractor's Liability Insurance Policies, showing this extension of coverage).

6)    Claims which may arise out of or result from explosion, collapse or underground (XCU) operations.

**8.9.2 The Limits of Liability Shall Not be Less Than The Following:**

### GENERAL LIABILITY

| | |
|---|---|
| Bodily Injury & Property Damage | $1,000,000 per occurrence |
| General Aggregate | $1,000,000 per project |
| Products & Completed Operations | $1,000,000 annual aggregate |
| Automobile Liability | $1,000,000 Combined single limit |
| Employers Liability/ Worker's Compensation | $500,000 each accident or statutory limits $500,000 disease per employee or statutory limits $500,000 disease policy aggregate or statutory limits |
| Umbrella Liability | $3,000,000 per occurrence $3,000,000 per project aggregate |
| Professional Liability (if applicable) | $2,000,000 per claim $2,000,000 aggregate |
| Pollution Liability (if applicable) | $2,000,000 each occurrence $2,000,000 aggregate |

**8.9.4** The insurance required by Subparagraph 8.9.1 above shall include Contractual Liability Insurance Coverage, applicable to the Subcontractor's obligations under paragraph 8.8 of this Agreement. Such insurance shall include a Waiver of Subrogation in favor of Contractor, Owner, their subsidiaries, affiliates and any other entity required by the Contractor or the Owner. In the event an endorsement is required in order to obtain such Waiver of Subrogation, Subcontractor shall cause the policies to be so endorsed.

**8.9.5** Certificates of Insurance acceptable to the Contractor and/or the Owner, shall be filed with the Contractor within ten (10) days of the execution of this Subcontract, unless the Contractor otherwise directs the Subcontractor to provide such certificate in a shorter time period. These Certificates of Insurance shall contain a provision that coverage afforded under the applicable policies will not be canceled, altered, or amended, or not renewed, unless at least thirty (30) days prior written notice has been given the Contractor. This thirty (30) day notice requirement must also appear, by Endorsement, on all Subcontractor's policies. The Subcontractor, if requested, shall provide to Contractor copies of its complete insurance policies, certified if requested, which evidence coverages required by this Agreement. Insurance coverages must be provided in a format acceptable to Contractor by insurance companies licensed to do business in the State, and acceptable to the Contractor and/or the Owner.

Long Form 3_26_19-Intr

**8.9.6** The Subcontractor shall name the "Contractor, the Owner and/or any other interested parties as designated by the Owner", as Additional Insureds on a primary, non-contributing to any other insurance available to the additional insured whether such insurance is primary, excess/umbrella, self-insured or otherwise , on all Liability Policies of the Subcontractor, throughout the duration of the Project for claims arising out of the Work for ongoing and completed operations , and shall continue to so name those entities on those policies upon their renewal and throughout the statute of repose period and one (1) year.  The limits of liability stated above are minimum limits.  In the event Subcontractor has in force any insurance with coverages broader and/or limits higher than the minimum coverage amounts specified in this Subcontract, such broader coverages and higher limits shall insure and be available to all additional insureds; the coverages and limits provided to the Additional Insureds shall be no less than those provided to the Subcontractor as an insured under such policies; and this Subcontract shall be deemed to requite such broader coverages and higher limits.  Subcontractor's policies required herein shall contain no exclusions or limitations with respect to Subcontractor's scope of work and/or type of structure being constructed, including, without limitation, exclusions for condominium conversion, residential, lead, asbestos, EIFS or specified drywall, or the method of insuring the project including the implementation of a controlled insurance program (wrap up).

The Umbrella Liability insurance required by this Article, and any other insurance required by this Subcontract which is furnished via an excess/umbrella policy form, shall provide that (i) it covers any party as an additional insured who qualifies as such on the underlying insurance and follows form for such additional insured coverages, and (ii) the coverage afforded to such additional insured is primary and non-contributing to any of the other insurances available to the additional insureds whether such insurance is primary, excess/umbrella, self-insured, or otherwise.  Subcontractor shall provide reasonable evidence of completed operation coverage if required by Contractor as a condition precedent to final payment. The Liability Policies will provide defense and indemnity to the Additional Insureds for any and all claims arising out of the Subcontractor's work.

The Subcontractor shall provide professional liability insurance if the Work includes fire alarm design, mechanical work, plumbing work, fire sprinkler work or any professional service including design assist. Subcontractor must maintain policies written on a claims made basis for a minimum of ten (10) years after substantial completion of the Project and have a retroactive date prior to the effective date of this Subcontract. Subcontractor shall require same of all sub-tiers providing similar services.

The Subcontractor shall provide pollution liability insurance if the Work includes excavation, remediation, transporting or disposing of hazardous materials.  Contractor, the Owner and any other parties as designated by the Owner or the Contractor shall be named as additional insureds.  If hazardous waste is being hauled, Subcontractor shall ensure that the MCS 90 endorsement is included under the application automobile liability insurance.

The Subcontractor agrees to notify the Contractor of any substantial claims (paid or reserved) applied against the aggregate of any of the required insurance policies. The full aggregate general liability policy limits required above shall be available with respect to the Subcontractor's obligations hereunder, and the Subcontractor shall obtain a project specific aggregate limit endorsement confirming such coverage.

**8.9.7**  Property Insurance Coverage may be provided by the Owner, and may be limited to coverage for the Owner, Mortgagee and Contractor only, and limited to the perils of Fire, Lightning, Explosion (excluding Steam Boilers), Wind, Hail, Riot or Civil Commotion. Each Subcontractor shall be responsible for any deductible amount under the property insurance or any other insurance policy maintained by the Owner or Contractor arising out of a claim relating to or occurring in connection with the Subcontractor's negligence, breach or willful misconduct.

**8.9.8**   The Subcontractor, and/or sub-subcontractors and/or suppliers who supply materials for the work, shall be solely responsible for, and pay for the protection of and insuring the materials at all times, including while stored off premises and while the materials are in transit to the job site, until incorporated into the Work and transferred to and accepted by the Owner. If materials and equipment are to be paid for prior to incorporation into the Work and transfer to the Owner, the Subcontractor shall purchase and maintain insurance coverages on the property, in a format protecting the property, regardless of its location, for the "All Risk or Risks of Physical Loss" type perils, which are to include Weather damage, Theft, Vandalism, and

Malicious Mischief. Such insurance shall include a Waiver of Subrogation in favor of Contractor, Owner, their subsidiaries and affiliates. In the event an endorsement is required in order to obtain such Waiver of Subrogation, Subcontractor shall cause the policies to be so endorsed. Any Deductible Clause chosen shall be the sole responsibility of the Subcontractor, and shall be subject to the written approval of the Contractor and/or the Owner. This insurance shall be in a format acceptable to the Contractor and/or the Owner, and shall insure for the "Replacement Cost" of the materials with no Co-Insurance applicable.  The Contractor and/or the Owner, As Their Interest May Appear, shall be the "Loss Payee" on any such policy, if so requested. Evidence of coverage, acceptable to the Contractor and/or the Owner, shall be provided by the Subcontractor prior to payment being made by the Contractor and/or the Owner for the materials.

**8.9.9** At all times, and under all conditions, the Subcontractor is solely responsible for any and all of its equipment, tools, materials, and the like, which are not intended to be incorporated into the work, whether owned, leased, rented, borrowed, or otherwise.

**8.9.10**      In the event the Subcontractor fails to obtain and maintain the required insurance coverage, or to provide the policies and/or the certificates of such insurance, then Contractor, in addition to, and without limiting any other rights or remedies Contractor may have under this Subcontract or otherwise at law or in equity, may, but shall not be obligated to, take any and all actions Contractor reasonably deems necessary to obtain the necessary coverages on Subcontractor's behalf and backcharge all cost incurred to Subcontractor. This paragraph shall survive completion of the Work.

**8.9.11**      Subcontractor shall submit all deductibles and self-insured retention amounts under any of the policies that it is required to maintain in accordance with this Subcontract to Contractor for Contractor's approval prior to commencement of the Work.  Regardless of whether or not Contractor approves any such deductibles or self-insured retention amounts, Subcontractor shall be exclusively responsible for the payment of any and all such deductibles and self-insured retentions.

**8.9.12**      In the event that this Subcontractor will be covered by Contractor's subcontractor default insurance, Subcontractor shall provide all information deemed necessary to Contractor in its sole discretion at any time before, during and/or after the duration of the Project at intervals required by Contractor in it sole discretion for the purposes of pre-qualification, underwriting, enrollment and renewals.

**8.10  Warranty**.  The Subcontractor warrants to the Contractor, Architect and Owner that all materials and equipment furnished under this Subcontract shall be new unless otherwise specified in the Contract Documents, applicable state statutes,  and that all of the Work shall be of good quality, free from fault and other defects and in conformance with the Contract Documents.  All work not conforming to these requirements, including substitutions not properly approved, may be considered defective.  The Subcontractor shall execute a written guaranty and warranty applicable to all phases of the Work in accordance with this Subcontract and all other applicable provisions of the Contract Documents pertaining to warranties and guarantees.

Warranties shall commence as of the date of the Final Completion of all work at the Project and shall continue for a period of no less than one year unless a longer period is otherwise provided in the Contract Documents or unless the manufacturer provides a longer warranty. All guarantees shall be enforceable directly by the Owner if the Owner so elects.  The Subcontractor warrants and guarantees that title to all work, materials and equipment covered by a Requisition shall vest with the Contractor on or before the receipt of payment by the Subcontractor, free and clear of all liens, claims, security interests or encumbrances (hereinafter referred to as "liens"); and that no work, materials or equipment covered by a Requisition shall have been acquired by the Subcontractor or any other person performing the Work at the site or furnishing materials and equipment for the Project, subject to an agreement under which an interest therein or lien thereon is retained by the seller or otherwise imposed by the Subcontractor or such other person.

The Subcontractor further warrants that the materials and equipment furnished under this Subcontract shall not infringe any valid patent, copyright or trademark and that the Subcontractor shall indemnify and hold harmless the Contractor, Owner and Architect from and against any loss or damage, including attorneys' fees, which results directly or indirectly from any infringement, or any action or claim of infringement.

Subcontractor further warrants that it shall be responsible for all statutory warranties required of Contractor under Florida law, as applicable to Subcontractor's Work.

**8.11 <u>Construction Liens</u>**.  Subcontractor hereby agrees to defend, indemnify and hold harmless Contractor, Owner and any applicable sureties from and against any laborer's, materialmen's or other similar lien or bond claim filed or asserted by Subcontractor or any of its sub-subcontractors, materialmen or suppliers (of any tier) in connection with the Work. In the event that such lien or bond claim is filed, Subcontractor shall, upon forty-eight (48) hours' written notice, cause such lien or bond claim to be released and discharged, or file a bond to secure discharge of such lien or bond claim.  In the event that Subcontractor shall fail to do so, Contractor shall have the right to pay all sums necessary to obtain the release of such lien or claim and discharge or to file a bond in lieu of such lien (including reasonable attorneys' fees, bond or other premiums and costs).  Contractor shall have the right to deduct all amounts so incurred from this Subcontract Amount.

**8.12 <u>Claims</u>**.  The Subcontractor shall not make any claims for additional compensation for any work performed by the Subcontractor or for damages sustained  by the Subcontractor  by reason of any act or omission of the Contractor, Owner, or Architect during the performance of this Subcontract unless such work is done pursuant to, or such damages are sustained as a result of, a written order from the Contractor and such claim is made in the manner set forth in the Contract Documents.  Notice of all such claims (including disputes over the scope of work and requests for extensions of time) shall be given to the Contractor in writing within ten (10) business days (unless a shorter period is specified in the Contract Documents) after the occurrence of the event giving rise to such claim, or the claim shall be considered waived and abandoned by the Subcontractor.  In connection with any such claims, the Contractor agrees to allow the Subcontractor to use the Contractor's name in  procedures set up in the Contract Documents or as provided by law for the prosecution of such claims.  The Contractor further agrees, upon reasonable notice, to include any claims of the Subcontractor in any action brought by the Contractor against the Owner.  The Subcontractor agrees to become a party to and be bound by any legal and/or arbitration proceedings involving the Contractor, the Architect, or the Owner to the extent that such proceedings involve any of the rights or obligations of the Subcontractor.  The Subcontractor agrees to be bound by the results of any proceedings in the same manner that the Contractor is bound by such results under the Contract Documents.

The parties mutually, knowingly, and voluntarily acknowledge the waiver of a jury trial, and agree that any litigation will be decided by a Court of competent jurisdiction without a jury.

Contractor superintendents and other field personnel are not authorized to approve a change to this Subcontract or extra work under this Subcontract.  Contractor superintendents and field personnel can verify the amount of time and materials Subcontractor devotes to work, for which the Subcontractor claims it is entitled to extra compensation, but such verification shall not constitute agreement that the work in question is extra work entitling Subcontractor to additional compensation. The Contractor project manager is authorized to approve changes (increases or decreases) involving amounts up to $15,000.00; larger amounts require the approval of Contractor project executives, vice presidents, or the President.

In the event of a claim, dispute or any other matter in question arising out of or related to the provisions of this Paragraph 8.12, the Subcontract or the breach thereof, the Subcontractor shall carry on the Work and maintain the job progress schedule as directed by the Contractor during any proceedings to settle the dispute, unless otherwise directed by the Contractor in writing.  In no event shall delay in the resolution of any dispute excuse the prompt performance of the Work.  The Subcontractor understands that no officer, employee or other representative of the Owner or Contractor has authority to waive compliance with this provision, except for the President or a Vice President.

**8.13 <u>Changes</u>**.  All changes to this Subcontract and all changes in the scope of the Work, except those resulting from Subcontractor's default in the performance of its obligations under this Subcontract, shall be confirmed in a writing signed by the Contractor and Subcontractor after the ordering of such change, pursuant to Paragraph 8.6.1 by the Contractor.

**8.14 <u>Cooperation</u>**.  The Subcontractor agrees to procure materials and supplies from such sources and to perform all of its Work on the Project with labor and subcontractors that will work harmoniously with other elements of labor involved in the construction of the Project.

In the event any labor dispute or difficulty is created by or results from the operations of the Subcontractor in connection with the Work, and causes or results in a delay, interference or stoppage of any portion of the Work, or any portion of the work of Contractor or any other subcontractor, and such delay or interruption continues in the aggregate for two (2) or more business days, the Contractor may terminate this Subcontract pursuant to Paragraphs 8.6.2 and/or 8.6.3 of this Subcontract and the Contractor shall have all of the rights and remedies provided in this Subcontract or at law. The Subcontractor expressly agrees not to participate in or accede to any stoppage in the Work which may result from any labor dispute.

**8.15   Records**. With respect to all or any portion of the Work, including, but not limited to each Change Order (Paragraph 8.13) or claim for extra compensation, the Subcontractor shall keep separate and accurate records of accounts in a manner acceptable to the Contractor with respect to all of its costs directly allocable to the Work and shall, upon request by the Contractor, make such records, invoices and other information pertaining to the Work available for inspection by the Owner and Contractor or other designee for the limited purpose of verifying requests for payment when costs are the basis of such payment and for evaluating the reasonableness of proposed Subcontract price adjustments and claims. Such records shall be maintained in such a manner as to permit all costs incurred in connection with the performance of this Subcontract to be specifically identified.

To the extent required by law or the Contract Documents, payrolls and other records for all laborers and mechanics employed in the construction of the Project shall be maintained during the course of the Work and preserved for a period of three (3) years following Final Acceptance. Payroll records shall contain the name, address, social security number, hourly wage, daily and weekly number of hours work, gross wages earned, deductions made, actual wages paid and benefits, if any, paid. To the extent required by law or the Contract Documents the Subcontractor and all sub-subcontractors shall, on a weekly basis, provide copies of such payroll records to the Contractor. To the extent required by law or the Contract Documents, the Subcontractor and all sub-subcontractors shall provide the Contractor with monthly reports in a form and manner acceptable to the Contractor which shall set forth the total number of workmen employed on the Project, as well as the total number of minority and female workers and apprentices, and any other such records required by the Contract Documents, all such totals itemized by trade classifications.

**8.16   Disputes**. Any claim for an adjustment to the Subcontract Sum or Time of performance which cannot be resolved by negotiation shall be considered a dispute within the meaning of this section. For all claims in excess of $50,000.00, Subcontractor shall certify that the claim is made in good faith; that the supporting data is accurate and complete; and that the amount requested accurately reflects the adjustment for which Subcontractor believes that Contractor is responsible. Notwithstanding any provision contained in any Contract Documents requiring arbitration, Subcontractor agrees that any specific dispute under this Subcontract with a claim less than $50,000.00 shall be submitted to arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, upon Contractor's election. Each such dispute which is submitted to arbitration shall be heard before the American Arbitration Association in the State, which shall be West Palm Beach, Florida in the case of projects located in Florida or states served by the West Palm Beach office of the American Arbitration Association, unless the Contractor and Subcontractor agree on some other location. All disputes (single or aggregate) which exceed $50,000.00 or where injunctive relief is sought, shall be decided by a court of competent jurisdiction, trial by jury being expressly waived, unless the parties agree otherwise. Subcontractor agrees to pay all reasonable attorneys' fees and costs of litigation incurred by the Contractor in enforcement of the provisions of this Subcontract, or the collection of damages for Subcontractor's breach of same.

The Subcontractor agrees, upon Contractor's written demand, to become a party to and be bound by any arbitration , litigation or other proceeding involving the Contractor, the Architect or the Owner to the extent that such proceedings involve any of the rights or obligations of the Subcontractor under this Subcontract.

Contractor and Subcontractor agree that for all disputes under this Subcontract and the Payment Bond, responsible persons selected by each party will meet together and use good faith efforts (including exchange of all necessary documentation) to resolve the issue between them within fifteen (15) days of the written request of either party. The holding of at least one such "principal's meeting" shall be a condition precedent to mediation. In the event the dispute is not resolved by the principal's meeting, the Contractor and Subcontractor agree to attempt in good faith to resolve the dispute by non-binding mediation with a mediator mutually agreed to by Contractor and Subcontractor. Mediation shall be initiated by a written request from the Contractor or Subcontractor to the other specifying the dispute(s) to be mediated. Such mediation shall be a condition precedent to the commencement of litigation or arbitration, unless delay would irrevocably prejudice Contractor or Subcontractor in which event the litigation or arbitration, as the case may

be, may be commenced but shall be stayed pending mediation under this provision.  If the dispute has not been resolved pursuant to the mediation procedure within 30 days of the commencement of such procedure, which shall mean the first joint session with the mediator, the dispute shall be determined in accordance with the provisions of the first paragraph of this Paragraph 8.16.  The fees and expenses of the mediator shall be borne equally by the Contractor and Subcontractor.

The prevailing party in any dispute shall be entitled to recover its reasonable attorneys' fees, expert consultation fees and costs incurred in the course of such dispute from the date of a request for mediation through conclusion by trial or arbitration, including any appeals.

**8.17  Miscellaneous**.

    **8.17.1  Discipline**.  The Subcontractor shall at all times enforce strict discipline and good order among its employees and the employees of its sub-subcontractors and suppliers and shall not employ on the Work any unfit person or anyone not skilled in the task assigned to him or her.  The Subcontractor agrees to remove from the Work any worker or supervisor against whom Contractor, Owner or Architect has reasonable objection.

    **8.17.2  Safety**.  Provision of a safe and healthy work site for Subcontractor's employees (including the provision of all required training and/or appropriate personal protective equipment) is Subcontractor's sole responsibility.  The Subcontractor shall comply with all provisions of the regulations adopted thereunder, the State's Right to Know Law, OSHA regulations and Contractor's safety program (as applicable) all safety requirements of all applicable laws, ordinances, regulations, rules and orders of the locality in which the Work is done and shall hold the Contractor and Owner harmless from any and all fines, penalties, claims, damages, or losses resulting in a violation of the provisions of this Paragraph.  The Subcontractor agrees to insert this clause in each of its sub-subcontracts and enforce the same.

    **8.17.3  Off-Site Storage**.  The Subcontractor shall confine operations at the site to areas permitted by law, ordinance, permit and the Contract Documents, as such areas may be approved by the Contractor.  All applicable storage sites, both on and off site locations, shall be subject to inspection at any reasonable time by representatives of the Owner, Architect or Contractor.  The Subcontractor shall assume the risk of loss or damage to any materials, equipment, trailers or tools stored on-site, and the Contractor shall have no liability to the Subcontractor for the security of any property, tools, equipment, materials or work the Subcontractor stored on or off site.

    **8.17.4  Clean-up**.  The Subcontractor shall, at its own expense, keep the Project free from accumulation of waste materials or rubbish caused by its operation, and shall remove the same in accordance with the directives of the Contractor and in accordance with the cleaning requirements of the Contract Documents as it applies to its Work.  Subcontractor shall broom clean its work site regularly and as may be required by the Contractor. On a daily basis Subcontractor shall remove all its waste materials and rubbish from and about the Project to a centrally located dumpster provided by others (unless Exhibit B provides otherwise), as well as properly store all its tools, construction equipment, machinery and surplus materials.

    **8.17.5  Right of Offset.**  Any sum or sums chargeable to the Subcontractor under any provision of this Subcontract (except to the extent of personal injury or other damages covered by Subcontractor's insurance where Subcontractor's insurer acknowledges coverage and assumes all liability), may, at the election of the Contractor, be deducted from any payments otherwise due or to become due to the Subcontractor under this or any other subcontract between the Contractor (including any subsidiary or affiliate of Contractor, any entity which is at least fifty percent owned or controlled  by the owner of Contractor, or any joint venture in which Contractor or any of the foregoing is a venturer) and the Subcontractor with any remaining amounts due to Contractor to be paid by Subcontractor, or the Contractor may sue the Subcontractor and recover damages.

    **8.17.6  Maintenance of Equipment**.  The Subcontractor warrants and shall insure that all construction tools, equipment, temporary facilities and other items used by the Subcontractor in accomplishing the Work, whether purchased, rented or otherwise provided by or to the Subcontractor, are in a safe, sound and good condition and capable of performing the functions for which they are intended and are maintained in conformance with applicable laws, regulations, manufacturer's recommendations and good engineering practice.

**8.17.7** <u>Signage</u>.  The Subcontractor shall not, without the Contractor's and Owner's prior written consent, install or maintain any sign, trademark or advertisement or other identification symbol in or about the Project (including, but not limited to any tower cranes, manlifts, scaffolding or similar equipment).  The Contractor and Owner shall have the right, at the Subcontractor's expense and without notice to the Subcontractor, to remove any sign, trademark, advertisement or other identification symbol installed in violation of this Paragraph.

**8.17.8** <u>Names in Event of Emergency</u>.  The Subcontractor shall furnish the Contractor and the Architect in writing the names, addresses and telephone numbers of members of the Subcontractor's organization to be called in the event of an out-of-hours emergency at the Project site.

**8.17.9** <u>Effective Date</u>.  This Subcontract, and all terms and conditions hereunder (including, but not limited to indemnification and insurance obligations), shall take effect as of the date that Subcontractor performs any of the Work, whether on or off the Project site.

**8.17.10** <u>Confidentiality of Information</u>.  The Subcontractor shall keep all information relating to the Project and the Subcontractor's Work and all information supplied to the Subcontractor by the Contractor or Owner as confidential and proprietary information of the Contractor, Owner and Architect and shall not permit its release to other parties or make any public announcement or publicity releases without the Contractor's and Owner's written authorization.

**8.17.11** <u>Jurisdiction</u>.  The validity, interpretation and performance of this Contract shall be governed by the laws of the State in which the Project is located.

**8.17.12** <u>Waiver</u>.  No action or failure to act by the Owner, Architect, Contractor or Subcontractor shall constitute a waiver of any right or duty afforded any of them under the Contract Documents, nor shall any such action or failure to act constitute an approval of or acquiescence of any breach under this Subcontract expect as may be specifically agreed to in writing.

**8.17.13** <u>Separability</u>.  The duties and obligations imposed by the Contract Documents and this Subcontract and the rights and remedies available there under shall be in addition to and not in limitation of any duties, obligations, rights and remedies otherwise imposed or available by law.  Should any provision(s) of this Subcontract be invalid as a matter of law, such invalidity shall affect only such provision(s) and shall not invalidate or affect remaining provisions of this Subcontract.

**8.18** <u>Protection of the Work</u>.  It is understood and agreed that the work provided for in the Subcontract constitutes only a part of the work being performed on this Project for the Owner by the Contractor and other subcontractors.  The Subcontractor therefore agrees to perform the work called for in the Subcontract in such a manner that he will not injure or damage any other work performed by the Contractor or any other subcontractor, and the Subcontractor further agrees to furnish continuous and effective protection at all times for his own work-in-place and all materials stored for use under the Subcontract, and to bear and be solely liable for all loss and/or damage of any kind to or in connection with said work and materials at any time prior to the final completion and acceptance thereof, unless said loss or damage is caused by the sole negligence of the Contractor; and to pay or reimburse the Contractor on account of any damage or injury to the work or property of the Owner, the Contractor and other subcontractors caused by or arising from  the performance of its work as provided in the Subcontract, including the cost of replacing, repairing, refinishing or restoring any work damaged, removed or displaced in the course of correcting or repairing work or replacing materials hereunder which are rejected by the Owner, the Owner's Architect or Engineer or which are deemed to be at variance with the requirements of the Subcontract.

## ARTICLE 9:  FINAL AGREEMENT.

It is understood that this Subcontract, including all instruments incorporated into this Subcontract by reference, constitutes the full and complete agreement now existing between the parties.  All prior discussions, negotiations, proposals, quotes and/or agreements, verbal or written, are hereby merged into this Subcontract. The Contractor and Subcontractor have contributed to drafting this Subcontract and the terms and conditions of it shall not be construed against one party or the other.

Long Form 3_26_19-Intr

IN WITNESS WHEREOF, Contractor and Subcontractor, for themselves, their successors, executors, administrators and assigns have executed this Agreement the day and year first above written.

## Suffolk

# Estates at Acqualina,  South Tower
# Addendum No. 1 to the Subcontract Agreement

The Subcontract, by and between Suffolk Construction Company, Inc., a Massachusetts corporation ("Contractor") and                   a, _____corporation (the "Subcontractor"), governing the work to be performed at **Estates of Aqualina South Tower Project** located in Sunny Isles Beach, Florida  ("Project")  is hereby amended as follows:

<u>In Article:  8.9 Insurance</u> is modified as follows.

Insert at the beginning of Article 8.9.1 the following:

The Project is insured by an Owner Controlled Insurance Policy (OCIP) as set forth in the OCIP Manual, which is hereby made a part of the Subcontract.  The terms of this OCIP and OCIP Manual shall supersede the insurance requirements to the extent that it provides General Liability, Products/Completed Operations Coverage and Excess Liability.  To the extent of enrollment in the OCIP as required by the terms thereof, Subcontractor is relieved of the obligation to provide such coverage as it relates to the **<u>onsite activities and operations</u>**.  The Subcontractor shall maintain insurance for General Liability, Automobile Liability, Umbrella Coverage and Employers Liability/Workers' Compensation Insurance in accordance with the requirements of Article  8.9 to protect against losses that occur away from the Project site or that are otherwise not covered under the OCIP.  On or before the date of Project Completion, Subcontractor shall purchase and maintain the insurance required under 8.9 since OCIP COVERAGE WILL TERMINATE ON THE DATE OF FINAL COMPLETION, EXCEPT FOR THE PRODUCTS/COMPLETED OPERATIONS COVERAGE WHICH IS EXTENDED FOR 10 YEARS OR THE STATUTE OF REPOSE, WHICHEVER IS LESS.

Except as specifically modified hereby, the terms and provisions of the Subcontract by and between Contractor and Subcontractor shall remain in full force and effect. To the extent this Amendment conflicts with the terms of the Subcontract, this Amendment shall control.

Dated: _____, 20__

ACCEPTED AND AGREED:

**SUFFOLK CONSTRUCTION COMPANY, INC.**

By: _____

Print Name:_____

Title: _____

**SUBCONTRACTOR**

By: _____

Print Name:_____

Title: _____

___ Subcontractor Initials                                         ____ Suffolk Initials

# EXHIBIT J

**Coastal**

| CONTRACTOR PROJECT NUMBER & NAME: | (04-5838) / THE ESTATES AT ACQUALINA |
|---|---|

| | SUBCONTRACT DATE:<br>May 11, 2020 | REVISION NO:<br>- / - |
|---|---|---|

| CONTRACT NUMBER | COST CODE | DESCRIPTION | VALUE |
|---|---|---|---|
| **04-5838-0155** | **80-835** | **Construction Cleaning** | **$860,000.00** |

| CONTRACTOR | Coastal Construction of South Florida, Inc.<br>d/b/a Coastal Condominiums<br>5959 Blue Lagoon Drive, Suite 200<br>Miami, FL 33126 | ("Contractor") |
|---|---|---|
| | T: (305) 559-4900 | |
| AUTHORIZED SIGNATORY: | Bill Ford, Vice President<br>George P. Adornato, Sr. Vice President<br>Ken Fabel, Project Executive | |
| SUBCONTRACTOR: | All City Construction Services, LLC.<br>6960 NW 47th Place<br>Lauderhill, FL 33319 | ("Subcontractor") |
| | T: (954) 790-1661 | |
| AUTHORIZED SIGNATORY: | Gilad Goldenholz<br><br>President | |
| PROJECT: | The Estates at Acqualina<br>17901 Collins Avenue<br>Sunny Isles Beach, FL 33160 | ("Project") |
| OWNER: | A3 Development, LLC.<br>17780 Collins Avenue, 2nd Floor<br>Sunny Isles Beach, FL 33160 | ("Owner") |
| ARCHITECT / ENGINEER: | Cohen, Freedman, Encinosa & Associates<br>8085 NW 155th Street<br>Miami Lakes, FL 33013 | ("Architect") |
| PRIME CONTRACT DATE: | TBD | ("Contract") |
| COMBINED SUBCONTRACT VALUE: | $860,000.00    Eight Hundred Sixty Thousand and 00/100 Dollars | ("Price") |
| MONTHLY BILLING DATE: | 20th of each month | ("Monthly Billing Date") |
| RETAINED PERCENTAGE: | Ten Percent   (10%) | ("Retained Percentage") |
| CHANGE ORDER & OVERHEAD PROFIT: | Ten Percent   (10%) | ("Profit Percentage") |

PAYMENT AND PERFORMANCE BONDS:

Required ☐
Not Required ☒
Waived ☐
Waived with Joint Check Requirement ☐

(The above terms are incorporated by reference and are more fully explained below.)

DocuSign Envelope ID: 9DAB33FB-9159-417B-0550-3C239CAEF3C2
Case 1:22-cv-20715-KMW   Document 1-6   Entered on FLSD Docket 03/09/2022   Page 240 of 1009

EXHIBIT J

Contractor, and Subcontractor, with offices at the addresses shown above, agree for themselves, their successors and assigns as follows:

**TABLE OF CONTENTS**

Page

ARTICLE 1 WORK ................................................................................................................................. 3

ARTICLE 2 PRICE................................................................................................................................. 4

ARTICLE 3 PROGRESS PAYMENTS.................................................................................................. 4

ARTICLE 4 FINAL PAYMENT .............................................................................................................. 5

ARTICLE 5 PAYMENT CONDITIONS .................................................................................................. 5

ARTICLE 6 TIME .................................................................................................................................. 6

ARTICLE 7 EXTENSIONS OF TIME .................................................................................................... 7

ARTICLE 8 CHANGE ORDERS ........................................................................................................... 7

ARTICLE 9 NOTICES........................................................................................................................... 8

ARTICLE 10 BONDS............................................................................................................................ 8

ARTICLE 11 INSURANCE ................................................................................................................... 8

ARTICLE 12 INDEMNITY ..................................................................................................................... 9

ARTICLE 13 ASSIGNMENT ................................................................................................................ 9

ARTICLE 14 COMPLIANCE ............................................................................................................... 10

ARTICLE 15 SAFETY......................................................................................................................... 10

ARTICLE 16 CLEAN UP..................................................................................................................... 11

ARTICLE 17 TEMPORARY FACILITIES............................................................................................ 11

ARTICLE 18 QUALITY ....................................................................................................................... 11

ARTICLE 19 GUARANTEES AND WARRANTIES ............................................................................ 12

ARTICLE 20 SUBMITTALS ............................................................................................................... 12

ARTICLE 21 PERFORMANCE ........................................................................................................... 13

ARTICLE 22 LIENS ............................................................................................................................ 13

ARTICLE 23 PATENTS ...................................................................................................................... 14

ARTICLE 24 LABOR .......................................................................................................................... 14

ARTICLE 25 DAMAGE ....................................................................................................................... 14

ARTICLE 26 DEFAULT ...................................................................................................................... 14

ARTICLE 27 DISPUTES..................................................................................................................... 16

ARTICLE 28 EARLY TERMINATION ................................................................................................. 16

ARTICLE 29 SETOFF ........................................................................................................................ 16

ARTICLE 30 MISCELLANEOUS ........................................................................................................ 17

SCHEDULE 1 - CONTRACT DOCUMENTS ...................................................................................... 20

DocuSign Envelope ID: BDAB33FB-9159-417B-0550-8C239CAEE3C2

EXHIBIT J



# ARTICLE 1
## WORK

a.  The term "Work" means: (i) the furnishing and performance of all labor and materials by Subcontractor, at or for the benefit of the Project which is within the Scope of this Subcontract (as that term is defined in Exhibit A attached hereto) and the Contract Documents (as that term is defined in Schedule 1 attached hereto), or which can be reasonably inferred from the general scope of this Subcontract or the Contract Documents; (ii) unless specifically expressly excepted, the furnishing by Subcontractor of all labor, material, equipment, supplies, plant, tools, scaffolding, hoisting, temporary facilities, transportation, superintendence, inspections and temporary construction of every nature; (iii) that which is to be produced and supplied pursuant to this Subcontract; and (iv) the obligation of Subcontractor to visit the Project site, and to fully acquaint and familiarize itself with the site, surrounding and subsurface conditions and the character of the operations to be carried on at the site, and make such investigations as Subcontractor may deem fit or as may be prudent for Subcontractor to fully understand the facilities, physical conditions and restrictions attending the Work. All Work shall be completed strictly in accordance with the requirements of this Subcontract and the Contract Documents.

b.  The Contract Documents are available for examination by Subcontractor at all reasonable times at the office of Contractor. Subcontractor represents and agrees that it has carefully examined and understands the Contract Documents relevant to the Work; has adequately investigated the nature and conditions of the Project site and locality; has familiarized itself with conditions affecting the difficulty of the Work; and has entered into this Subcontract based on its own examination, investigation and evaluation and not in reliance upon any opinions or representations of Contractor.

c.  The Subcontract Sum includes the cost to perform all work necessary to provide a complete, useable, working facility for its portion of the Work, in accordance with the scope and intent of the Contract Documents and applicable Legal Requirements and all matters reasonably inferable therefrom. Subcontractor shall have the burden to demonstrate that there exists a "physical scope change" to the Project that could not have been discernable from Subcontractor's participation in pre-construction review and by thorough review of the Contract Documents. For removal of doubt, a "physical scope change" is defined as new work not shown by or inferable from the plans and specifications such as additional building area and does not include work inferable from work that is shown on the Contract Documents such as wire and conduit not shown on the plans connecting a switch and a light that are shown on the plans. Subcontractor acknowledges that the Contract Documents are not 100% complete nor have the Contract Documents been fully coordinated and, accordingly, Subcontractor agrees not to assert any request for an increase in Subcontract Price or Subcontract Time for issues related to lack of coordination or lack of completeness of the drawings.

d.  As a part of its obligation to provide and perform the Work, Subcontractor recognizes its responsibility to furnish a competent and adequate staff and use its best skill and attention for the proper administration, coordination, supervision and superintendence of the Work; (i) organize the procurement of all materials and equipment so that they will be available at the time they are needed for the Work; (ii) keep an adequate force of skilled workers on the job to complete the Work in strict accordance with all requirements of the Contract Documents; (iii) maintain throughout the duration of the Work a competent superintendent and any necessary assistants, all of whom shall be acceptable to Contractor and shall not be changed without the consent of Contractor; (iv) enforce discipline and order among Subcontractor's employees and not to employ at the Project any unfit person or anyone not skilled in the task assigned; (v) provide supervision by experts in all aspects of the application of the materials, equipment or system being fabricated and installed; and (vi) submit to Contractor the names, responsibilities and titles of the principal members of Subcontractor's staff.

e.  Subcontractor shall be bound to Contractor by the terms and conditions of the Contract Documents, as the same shall be applicable to the Work and this Subcontract, and hereby assumes toward Contractor all of the duties, obligations and responsibilities that Contractor has by the Contract Documents assumed toward the Owner. The Owner shall have the benefit of all rights, remedies, and redress against the Subcontractor that the Contractor, by the terms of this Subcontract, has against the Subcontractor. Subject only to the terms of Article 27, nothing herein shall be construed to be a binding agreement to arbitrate any dispute arising hereunder, notwithstanding any provision to the contrary contained in the Contract Documents.

f.  Subcontractor hereby irrevocably grants Contractor a license to use all shop drawings, designs, and deliverables provided by Subcontractor on the Project for Contractor's purposes on the Project. Such license extends, without limitation to all shop drawings, CAD drawings, submittals to governmental or quasi-governmental authorities, product approvals, fabrication processes and the like, which are in any way necessary or desirable for the performance of the Work ("Granted Licenses"). This Subcontract shall constitute conclusive evidence of the granting to Contractor of the Granted Licenses by Subcontractor.



## ARTICLE 2
### PRICE

a. Contractor shall pay to Subcontractor for the satisfactory performance and completion of the Work and performance of all the duties, obligations and responsibilities of Subcontractor under this Subcontract, the sum set forth above as the Price, subject only to additions and deductions as expressly provided in this Subcontract. To the extent that the Work is to be performed on a unit price basis, the Price shall be computed in accordance with the unit prices set forth in Exhibit A, based on actual quantities determined in accordance with the Contract Documents and this Subcontract. The Price and all unit prices shown in Exhibit A shall be deemed to include all costs of Subcontractor's performance of the Work as set forth in the Contract Documents, including, but not limited to, the costs of labor, supervision, services, materials, equipment, tools, scaffolds, hoisting, transportation, storage, insurance, taxes, and all overhead and profit.

b. Subcontractor acknowledges that the Subcontract Price is based upon the most current set of drawings and specifications and other Contract Documents, the knowledge that Subcontractor obtained during its pre-construction review, and the risks it has assumed pursuant to the Contract Documents. Subcontractor acknowledges that through its review of the drawings and specifications and the pre-construction review it has performed, and otherwise based on Subcontractor's general experience, Subcontractor fully understands and appreciates the scope, intent, jobsite conditions and coordination of the Work for this Project, and that Subcontractor has sufficient information and detail to agree upon the fixed price Subcontract Price with the Contractor.

## ARTICLE 3
### PROGRESS PAYMENTS

a. Within ten (10) days after the date of transmission of this Subcontract to Subcontractor, Subcontractor shall submit to Contractor for Contractor's approval a detailed schedule showing a proper cost breakdown (with a proper share of associated overhead and profit) of the Price according to the various line items, or parts, of the Work, for use only as a basis for verifying Subcontractor's applications for payment or supporting Contractor's applications for payments under the Contract Documents.

b. On or before each Monthly Billing Date, Subcontractor shall submit to Contractor, in such form and supported by such data (including bills of sale and applicable insurance) as Contractor may require, a progress payment application indicating the percentage completion of each portion of the Subcontractor's Work and showing the value of the Work installed ("Completed Work"), plus the value of the material and equipment for incorporation in the Work suitably stored and insured (to the satisfaction of Contractor and Architect) at the Project site or other approved location ("Stored Work"), as of such date if, and only if, the Contract Documents provide for payments to Contractor on that basis. Subcontractor shall also furnish to Contractor, with Subcontractor's first Application For Payment, a list of all companies, entities, and individuals supplying labor or materials for the performance of the Work ("Furnisher Information Schedule"). Such Furnisher Information Schedule shall be updated with every Application For Payment. Within seven (7) days after receiving a progress payment from Owner under the Contract Documents, Contractor shall make a progress payment to Subcontractor/equal to the value of the Completed Work and Stored Work as of the corresponding Monthly Billing Date, to the extent approved by Contractor and allowed and paid by Owner on account of the Work, and so long as all other conditions of payment are met under Article 5, below, and after deducting (a) all previous payments, (b) current retainage (meaning a reserve equal to the Retained Percentage times the allowed value of Completed Work and Stored Work, plus any additional reserve provided for herein) and (c) all charges or backcharges for services, materials, equipment, or other items furnished or otherwise chargeable to Subcontractor. To the fullest extent permitted by law, Contractor and its surety, if any, shall have no liability or responsibility for any amounts due or claimed to be due Subcontractor for any reason whatsoever except to the extent that Contractor has actually received funds from Owner specifically designated for disbursement to Subcontractor. Receipt of these funds by Contractor shall be an absolute condition precedent to Subcontractor's right to receive payment. In the event of any conflict between the Contract Documents and this provision, this provision shall govern. With regard to the foregoing, Subcontractor: (i) agrees that the Price shall be a non-recourse obligation; and (ii) waives Subcontractor's right to assert any claim, demand, right, or cause of action against Contractor for any portion of the Price (unless and to the extent that Contractor actually receives funds from the Owner attributable to the Work). In the event that any provision in this agreement shall conflict in any way with the requirements of the Contract Documents, this provision shall control to the exclusion of such conflicting provision.

c. Contractor shall review each Application for Payment together with such supporting documents as required under Article 5 of this Subcontract and as otherwise requested by Owner or Contractor. Contractor shall then approve, modify or reject, in whole or in part, such Application for Payment. Contractor reserves the right to advance the date of any payment (including final payment) due or to become due under this Subcontract if, in its sole judgment, it becomes desirable to do so. Subcontractor shall not be entitled to any payment until all documents and information required by this Subcontract to be furnished by Subcontractor have been supplied to Contractor, including, without limitation, schedule of values, schedule, and insurance certificates and policies. Acceptance of any progress payments by the Subcontractor shall constitute a release of the Contractor, Contractor's surety, if any, and Owner, except for any retainage, of and from all liability for all things done or not done or furnished or not furnished in connection with the Work, and for every act, omission, or neglect, if any, relating to or arising out of the Work or the Project, arising out of or incurred during the prior and current payment periods.

DocuSign Envelope ID: 5DAB33FB-9169-417B-0550-8C239CAEF3C2

EXHIBIT J



## ARTICLE 4
### FINAL PAYMENT

a.  A final payment, consisting of the unpaid balance of the Price, shall be made within thirty (30) days after the last of the following to occur: (a) satisfactory completion of the Work by Subcontractor, (b) unqualified acceptance thereof by the Architect and Owner, (c) full final payment by Owner to Contractor under the Contract Documents on account of the Work, (d) furnishing of evidence satisfactory to Contractor that there are no claims, obligations, or liens outstanding or unsatisfied for labor, services, materials, equipment, taxes, or other items performed, furnished or incurred in connection with the Work, (e) delivery of all guaranties, warranties, bonds, instruction manuals performance charts, diagrams, as-built drawings and similar items required of Subcontractor or its suppliers or subcontractors and (f) delivery of a general release, in a form satisfactory to Contractor, executed by Subcontractor running to and in favor of Contractor and Owner, and such other parties as Contractor may require. To the fullest extent permitted by law, Contractor and its surety, if any, shall have no liability or responsibility for any amounts due or claimed to be due Subcontractor for any reason whatsoever except to the extent that Contractor has actually received funds from Owner specifically designated for disbursement to Subcontractor. Receipt of these funds by Contractor shall be an absolute condition precedent to Subcontractor's right to receive payment. In the event of any conflict between the Contract Documents and this provision, this provision shall govern. With regard to the foregoing, Subcontractor: (i) agrees that the Price shall be a non-recourse obligation; and (ii) waives Subcontractor's right to assert any claim, demand, right, or cause of action against Contractor for any portion of the Price (unless and to the extent that Contractor actually receives funds from the Owner attributable to the Work). In the event that any provision in this agreement shall conflict in any way with the requirements of the Contract Documents, this provision shall control to the exclusion of such conflicting provision.

b.  Acceptance by Subcontractor of Final Payment shall constitute a release of Owner and Contractor (and its surety, if any) of and from all liability for all things done or not done or furnished or not furnished in connection with the Work, and for every act, omission, or neglect, if any, relating to or arising out of the Project. As a condition of Final Payment, Subcontractor shall also execute and deliver a general release to Contractor naming Owner and Contractor and such other parties as Contractor may require, and said general release to be in such form as Contractor may provide.

## ARTICLE 5
### PAYMENT CONDITIONS

a.  Subcontractor will receive the payments made by Contractor and Subcontractor and will hold such payments as a trust fund to be applied first to the payment of laborers, suppliers, subcontractors and others responsible for the Work for which such payments are made, including sufficient funds so that all taxes and insurance applicable thereto are also paid. Subcontractor shall first apply all progress payments received as trustee to satisfy all obligations Subcontractor has incurred due to the Work.

b.  Subcontractor, as a condition precedent to receiving any payments hereunder, shall execute the waiver and release forms attached hereto in Exhibit "L". Additionally, Subcontractor shall, as often as requested by Contractor, furnish such information, evidence and substantiation as Contractor may require with respect to the extent and value of current progress and the nature and extent of all obligations incurred by Subcontractor in connection with the Work and all payments made by Subcontractor on account thereof. Subcontractor shall also furnish the partial and final waivers and releases attached hereto as Exhibit "L-1" from each sub-tier and supplier to ensure that Subcontractor has paid all persons furnishing any labor, material, or services in furtherance of any Work furnished hereunder. The furnishing of such lien waivers and releases shall be a condition precedent to any payment hereunder. Moreover, no prior failure of Contractor to require such releases and waivers shall limit Contractor's right to require them subsequently.

c.  Contractor reserves the right to withhold, as an additional reserve and without limiting its other rights and remedies, an amount sufficient: (a) to defend, satisfy and discharge any asserted claim that Subcontractor (or anyone providing any of the Work hereunder) has failed to make payment for labor, services, materials, equipment, taxes, or other items or obligations furnished or incurred in connection with the Work or has caused damage to the Work or to any other work on the Project; (b) to complete the Work if it appears that funds remaining in the Subcontract, including retainage and exclusive of backcharges, are insufficient to complete the Work; (c) to reimburse Contractor for any backcharges incurred as a result of any act or omission by Subcontractor hereunder; (d) to protect Contractor from the possible consequences of any other breach or default by Subcontractor hereunder; or (e) to secure Contractor, or Contractor's affiliate, parent or subsidiary companies with respect to any breach or default by Subcontractor or its affiliates, parent company and subsidiaries under any other agreement.

d.  Payment hereunder shall not be evidence of the proper performance or progress of the Work, in whole or in part, and no payment shall be construed to be acceptance of defective, faulty or improper work or materials. Subcontractor shall remain responsible and liable for its performance being in strict compliance with this Subcontract and the Contract Documents. To the extent that payment is requested for any Work which requires the preparation of Contract Documents which are maintained on electronic media, no payment shall be due until delivery of the data for such construction documents in a format which is acceptable to Contractor. If the Subcontractor takes exception to any release, whether for a partial payment or final payment, the Subcontractor must return said payment with an affidavit by an officer listing each and every exception to the release and stating that no other claim exists.



e.  Subcontractor shall at all times cooperate, in the course of its performance of the Work and of the Contract Documents, with any lending entity or entities providing financing for the Project and shall agree in writing to all changes and modifications to the Contract Documents which are requested by such entity or entities that do not impose any substantial additional burdens on Subcontractor or materially reduce or limit Subcontractor's rights. Subcontractor shall supply such information and certifications as reasonably may be required from time to time by the aforesaid lending entity or entities in order that Owner can satisfy conditions to lender's obligations to make advances upon Owner's construction loan.

f.  As an additional condition precedent to any payment (including, but not limited to, final payment) under this Subcontract, Subcontractor shall provide to Contractor on electronic media copies of all drawings, shop drawings, CAD documentation and discs, and other documents prepared by Subcontractor, or prepared at Subcontractor's direction, in connection with the performance of the Work, whether or not submitted to Contractor or Owner in connection with the Work.

## ARTICLE 6
### TIME

a.  Time is of the essence. Therefore, Subcontractor shall be liable for all direct and consequential damages arising out of Subcontractor's breach of this Subcontract. Subcontractor shall: (a) submit to Contractor within ten (10) days of the date of transmission of this Subcontract to Subcontractor a detailed, proposed schedule for the Work for Contractor's use in preparing an overall progress schedule for the entire Work and its several parts under the Contract Documents; (b) begin the Work promptly upon Contractor's order to do so; (c) coordinate and perform the Work, and its several parts, diligently and promptly and in such order and sequence as Contractor may from time to time direct and as will assure its efficient and timely prosecution and will not delay completion of the entire Work and its several parts under the Contract Documents; and (d) furnish at all times sufficient, qualified and competent forces and supervision, and adequate, conforming and usable materials, equipment, plants, tools and other necessary things, to achieve progress according to Contractor's current progress schedule, including any specific schedule for Subcontractor's Work attached hereto as Schedule 2, and any revisions thereof by Contractor

b.  Without limiting the generality of the foregoing and in recognition of the completion dates contained herein and in the Contract Documents, Subcontractor shall: (a) submit, with its proposed schedule, information showing the time required to prepare and approve shop drawings, to fabricate and deliver materials and equipment, and to install the Work, (b) order (for manufacture or purchase and delivery) all materials required for performance of the Work as soon as possible in order to avoid delays caused by strikes, transportation or unavailability; (c) furnish Contractor within thirty (30) days a list of major materials and equipment required for the Work, showing the name(s), address(es) and telephone number(s) of the supplier(s) and the date(s) on which such material and equipment is expected to be delivered to the Project site; (d) furnish Contractor, upon issuance, a copy of each major purchase order and subcontract (with price information deleted); (e) cause a qualified home office supervisory representative (while Subcontractor has forces at the Project site and for two weeks prior thereto) to attend weekly progress meetings; and (f) notify Contractor immediately by telephone and confirm in writing within seventy-two (72) hours, if Subcontractor finds that any item cannot be delivered as required to maintain Contractor's progress schedule. Subcontractor also agrees to be bound by such modifications to the Project schedule as are discussed at the weekly job progress meetings and are contained in the minutes of those meetings unless written objection is delivered in writing by Subcontractor within seventy-two (72) hours of the occurrence of such meeting.

c.  The Work shall be performed during regular working hours except that, in the event of emergency or when necessary to perform the Work in accordance with the requirements of Article 6 of this Subcontract, Work shall be performed at Subcontractor's cost and expense (including Contractor's standby and other general conditions costs) on night shifts, overtime, Saturdays, Sundays, holidays and at other times, if permission to do so has been obtained in writing from Contractor. Without limiting the requirements of the preceding sentence, if the progress of the Work or of the Project has been delayed by any fault, neglect, act, or failure to act of Subcontractor or any of its subcontractors or suppliers, Subcontractor shall work such overtime, at Subcontractor's cost and expense as aforesaid, as Contractor shall deem necessary or desirable to make up for all time lost and to avoid delay in the completion of the Work or the Project. The failure by Contractor to direct Subcontractor to engage in such overtime work shall not relieve Subcontractor of the consequences of its delay.

d.  Contractor may direct acceleration of the Work in order that it may be performed in advance of the schedules, time requirements and Project requirements described in Article 6 hereof. If so directed, Subcontractor shall increase its staff or work overtime, or both. Subcontractor will not be entitled to additional compensation for work performed outside of regular working hours, except as authorized and accepted in writing by Contractor. Provided that Subcontractor is not in default under the Subcontract, and Contractor has issued the aforesaid authorization, there shall be added to the Price an actual out-of-pocket amount equal to: (i) additional wages actually paid, at rates which have been approved in advance in writing by Contractor; (ii) taxes imposed by law on such additional wages; and (iii) premiums for worker's compensation and liability insurance if required to be paid on such additional wages. Written authorization for overtime which exceeds $500.00 in any one week shall be invalid unless confirmed in advance in writing by Contractor's Project Manager, it being understood that Contractor's Superintendent shall not have authority to authorize such overtime which exceeds $500.00 in any one week.

DocuSign Envelope ID: 3DAB33FB-9159-417B-0550-8C239CAEF3C2

EXHIBIT J



## ARTICLE 7
### EXTENSIONS OF TIME

a.  If Subcontractor claims an extension in the completion time requirements by reason of a change in the Work, Subcontractor shall give Contractor written notice thereof within seventy-two (72) hours after Subcontractor's first knowledge of the occurrence of the conditions giving rise to such event. This written notice shall be given by Subcontractor before proceeding with the Work. No such request for an extension of time shall be valid unless written notice is given as required above. After delivering written notice of a perceived cause of delay, Subcontractor shall proceed to execute the Work, even though the time extension has not been agreed upon.

b.  Should Subcontractor be obstructed or delayed in the commencement, prosecution or completion of the Work without fault on its part, and by reason of causes which would entitle the Contractor to an extension of time under the Contract, then Subcontractor shall be entitled to an extension of time only to perform the Work which shall be equal to the extension of time to which the Contractor is entitled and granted by the Owner but no claim for extension of time on account of delay shall be allowed unless a claim in writing therefor is presented to Contractor with reasonable diligence but in any event not later than seventy-two (72) hours after the commencement of such claimed delay. The entitlement to an extension is absolutely conditioned upon Subcontractor's timely submission of the aforesaid written notice. Subcontractor expressly agrees not to make, and hereby waives, any claim for damages, including those resulting from increased labor or material costs, on account of any delay, obstruction or hindrance for any cause whatsoever, whether or not foreseeable and whether or not anticipated including, but not limited to, causes that would entitle the Subcontractor to an extension of time under the Contract, and agrees that the sole right and remedy therefor shall be an extension of time in accordance with the foregoing paragraph.

c.  Moreover, Subcontractor shall not be allowed an extension of time unless Subcontractor has established to Contractor's satisfaction that the delay claimed by Subcontractor is to a portion of the Work on the critical path of the Work schedule and that Subcontractor could not have reasonably anticipated the delay.

## ARTICLE 8
### CHANGE ORDERS

a.  Owner has reserved the right under the Contract Documents to require Contractor to make changes in the Work, including additions thereto and deletions therefrom. Additionally, Contractor reserves the right under this paragraph to require Subcontractor to make changes in the Work, including additions thereto and deletions therefrom. Without notice to any surety and without invalidating this Subcontract, Contractor may from time to time, by written order ("Change Order") to Subcontractor, make changes in the Work to the same extent and in the same manner as may be required of Contractor by Owner under the Contract Documents. Subcontractor shall thereupon perform the changed Work in accordance with the terms of this Subcontract and the Change Order. In the event that Subcontractor is obligated hereunder to provide a payment or a performance bond, or both, under this Subcontract, the penal sum of such bonds shall automatically be deemed to be increased by any increase in the Subcontract Price.

b.  Upon request of Contractor, and in time and manner sufficient to permit Contractor to comply with its obligations under the Contract Documents, Subcontractor shall submit a written proposal for any applicable Price and time adjustment attributable to the changed Work, detailed as Contractor or Owner may require, supported by and conforming to the requirements of the Contract Documents.

c.  Where a Change Order is issued pursuant to a change required by the Owner, the Price shall be adjusted by the net amount of any direct savings and direct cost plus Profit Percentage attributable to the Change Order, and the time for performance of the Work may be adjusted according to the Contract Documents, subject, however, in each case to the following limitations: (a) the Price and time adjustments hereunder shall be limited to the amount and extent of adjustments actually allowed Contractor under the Contract Documents (less, in the case of Price, any overhead, profit or similar markup allowed by Owner for Contractor's account); (b) where the Work affected by Change Order is the subject of unit prices under Exhibit A, the Price adjustment shall be limited to the amounts obtained by applying such unit prices to the actual increase or decrease in the quantity of units due to the change; and (c) the amount allowable for all overhead and profit shall be limited to the product obtained by multiplying the Profit Percentage by the net amount of Subcontractor's direct savings and direct cost.

d.  As used in this Subcontract, Subcontractor's direct savings and direct cost shall mean and be limited to the actual amount of the following: cost of materials, including sales tax and cost of delivery; cost of labor, including social security, old age and unemployment insurance, and fringe benefits required by agreement or custom; worker's compensation insurance; bond premiums if and to the extent actually increased; and actual rent not greater than the rent charged in the locale or reasonable value of Subcontractor-owned equipment and machinery. Contractor reserves the right to perform an audit of the any proposed calculation of a change order price or of direct savings and direct cost prior entering into or making payment of any changed work and may adjust the any payment should such audit finds any insufficient or conflicting back-up documentation or for any such item reflecting amounts not properly due under the terms of this Subcontract.



e. If the parties are able to agree upon the amount of the Price adjustment and the extent of any time adjustment, such adjustments shall be set forth in the Change Order, which shall be accepted by Subcontractor. If the parties are unable to agree upon such adjustments, Contractor may elect to issue the Change Order to Subcontractor directing such work to be performed by Subcontractor and any adjustments to Price or time shall be subject to ultimate determination in accordance with this Subcontract; and Subcontractor shall, nonetheless, proceed immediately with the changed Work. Subcontractor shall keep a detailed account of the direct savings and direct cost due to the changed Work separately from its other accounting records and shall make such records available to the Contractor at Contractor's request. Failure to keep adequate and separate cost records of the changed Work, and to furnish same to Contractor upon its request, shall constitute an acceptance on Subcontractor's part of the Contractor's determination of the direct savings and direct cost of such changed Work. In no event shall Subcontractor proceed with changed Work without a Change Order issued pursuant to this Article 8 and Contractor shall not be liable for any additional costs incurred or delays encountered in the performance of such changed Work without such a written Change Order.

## ARTICLE 9
### NOTICES

a. All written notices provided for in this Subcontract or in the Contract Documents shall be deemed given if delivered personally to the party, sent by regular mail to the party at its address shown on page one of this Subcontract and to the attention of the representative specified therein. Either party may from time to time, by written notice to the other as herein provided, designate a different address and/or representative to which notices to it should be sent.

## ARTICLE 10
### BONDS

a. If so indicated on page 1 hereof, Subcontractor, within ten (10) days of date of transmission of this Subcontract to Subcontractor, shall furnish (2) two performance, and labor and material payment bonds each for one hundred percent (100%) of the Price, said bonds to be on Contractor's standard bond forms (attached hereto as Exhibit J) and with sureties satisfactory to Contractor. The premiums on such bonds shall be paid by Subcontractor, or paid directly by Contractor to Subcontractor's surety and deducted from amounts due or to become due to Subcontractor, and are included in the Price. Subcontractor agrees to notify its surety or sureties of increases in the Price and to take such action as is required to have the penal amount of the bonds furnished pursuant to this paragraph increased correspondingly.

## ARTICLE 11
### INSURANCE

a. Before commencing the Work and until completion and final acceptance thereof by Owner, Subcontractor shall obtain and maintain, at its expense, at least the insurance coverage specified in Exhibit G and/or Exhibit G-2 attached hereto, all from companies and in form and substance acceptable to Contractor.

b. As a condition to any payment for the Work, Subcontractor shall furnish a certificate, satisfactory to Contractor, from each insurance company showing the required insurance to be in force and stating that the insurance will not be canceled or changed except upon at least thirty (30) days' written notice thereof to Contractor or as otherwise required by the Contract Documents. The certificate shall name Contractor, Owner and any other parties required by the Contract Documents as additional insureds under the policies required in Exhibit G and/or Exhibit G-2. The terms and conditions of insurance to be provided by Subcontractor are described in Exhibit G and/or Exhibit G-2. Neither Owner nor Contractor nor any other additional insureds, nor their agents, employees or assigns, shall be liable to Subcontractor or its agents, employees or assigns for any loss or damage covered by the insurance policies described in Exhibit G and/or Exhibit G-2. The failure of Subcontractor to obtain the insurance required therein prior to the commencement of the Work shall not be deemed a waiver of such requirements or of any rights or remedies that Owner or Contractor may have.

c. Subcontractor hereby acknowledges its obligation for any loss to its Work, including stored materials, paid for or not.

d. Subcontractor waives all rights against the Owner, Contractor, Architect and any separate contractors for damages caused by fire or other perils to the extent covered by property insurance applicable to the Work or Subcontractor's equipment, except such rights as Subcontractor may have to the proceeds of such insurance. Subcontractor shall require similar waivers from its subcontractors, suppliers, sub-subcontractors, agents and employees of any of them, by appropriate agreements, each in favor of the other parties enumerated herein.



## ARTICLE 12
### INDEMNITY

a.  To the full extent permitted by law, Subcontractor agrees to defend, indemnify and save harmless Contractor and Owner (and their respective officers, directors, shareholders, members, employees and agents), as well as any other parties which Contractor is required under the Contract Documents to defend, indemnify and hold harmless, and their agents, servants and employees, from and against any claim, cost, expense, or liability (including attorneys' fees, and including costs and attorneys' fees incurred in enforcing this indemnity at mediation, arbitration and all trial and appellate levels), attributable to bodily injury, sickness, disease, or death, or to damage to or destruction of property (including loss of use thereof), caused by, arising out of, resulting from, or occurring in connection with the performance of the Work by Subcontractor, its subcontractors and suppliers, or their agents, servants, or employees, whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder; provided, however, Subcontractor's duty hereunder shall not arise if such injury, sickness, disease, death, damage, or destruction is caused by the sole gross negligence of a party indemnified hereunder. Subcontractor's obligation hereunder shall not be limited by the provisions of any worker's compensation or similar act. Subcontractor hereby agrees that One Percent (1%) of the Price constitutes the separate consideration for Subcontractor's indemnity hereunder, the sufficiency of which is hereby acknowledged. Such amount shall be deemed paid out of the first application(s) for payment paid hereunder.

b.  Should Owner or any other person or entity assert a claim or institute a suit, action, or proceeding against Contractor involving the manner or sufficiency of the performance of the Work (including attorneys' fees), Subcontractor shall upon request of Contractor promptly assume the defense of such claim, suit, action or proceeding, with counsel satisfactory to Contractor at Subcontractor's expense. To the fullest extent permitted by law, Subcontractor shall indemnify and save harmless Contractor as well as anyone to be defended, indemnified and held harmless by Contractor and its or their agents, servants and employees, from and against any liability, loss, damage, or expense (including attorneys' fees, and including costs and attorneys' fees incurred in enforcing this indemnity at mediation, arbitration and all trial and appellate levels) arising out of or related to such claim, suit, action or proceeding. Nothing in Article 12 shall be construed to require any indemnification which would make Article 12 void or unenforceable or to eliminate or reduce any indemnification or rights which the Contractor or any other party indemnified hereunder have by law.

c.  Contractor and Subcontractor agree that the indemnification given herein shall be limited to the amount of the loss suffered by the respective indemnitee, but not to exceed an amount equal to the applicable policy limit under any insurance which Subcontractor is required to obtain and maintain under the terms of this Subcontract and the terms of other Contract Documents, including without limitation any excess or additional applicable policies plus the amount of this Subcontract, which amount is stipulated by the parties to bear a reasonable commercial relationship to the Contract Documents. This indemnification shall be deemed a part of the Project Specifications. To the extent indemnification is provided for by other portions of the Contract Documents, the consideration provided in connection therewith is intended as consideration for this provision as well and vice-versa. This indemnification obligation of the Subcontractor shall survive completion of the Project and termination of this Contract, but in no event beyond the applicable statute of limitations period.

## ARTICLE 13
### ASSIGNMENT

a.  Subcontractor shall not assign this Subcontract, or any monies due or to become due hereunder, or subcontract any substantial part of the Work, without the prior written consent of Contractor. No assignment by Subcontractor of any right hereunder shall be effective and any such attempt shall be null and void. No third party shall have any right to enforce any right of Subcontractor under this Subcontract. If Contractor gives written consent to an assignment of this Subcontract, in whole or in part, Subcontractor shall not be relieved of its duties and obligations hereunder and shall be and remain fully responsible and liable for the acts and omissions of its assignees. Nothing herein shall prevent Subcontractor from engaging subcontractors to perform a portion of the Work hereunder. However, Subcontractor shall be and remain as fully responsible for all persons directly or indirectly employed by such subcontractors as Subcontractor is for its own acts and omissions and those of its agents, servants and employees. Additionally, nothing herein shall prevent any guarantor or surety of Subcontractor from enforcing any right hereunder after acknowledgment of its obligation as guarantor or surety. Any attempted enforcement of such rights in the absence of an express acknowledgment shall constitute an admission by any guarantor or surety of its obligations under its agreement of guarantee or suretyship.

b.  Before any subcontractor or supplier is employed by Subcontractor, the name of such subcontractor or supplier shall be submitted in writing to Contractor, and no subcontractor or supplier shall be employed unless acceptable to Contractor. Each subcontractor and supplier shall be bound by all Contract Documents to the same extent and with the same effect as if the subcontractor or supplier were the Subcontractor. Subcontractor shall cause its subcontractors and suppliers to comply with the Contract Documents. Subcontractor shall be responsible for all of the acts, work, material and equipment of its subcontractors and suppliers and all persons either directly or indirectly employed by any of them.



c.  Subcontractor (and its successors and assigns) hereby assigns to Contractor all its interest in any subcontracts and purchase orders now existing or hereinafter entered into by Subcontractor for performance of any part of the Work which assignment will be effective upon acceptance by Contractor in writing and only as to those subcontracts and purchase orders which Contractor designates in writing. It is agreed and understood that Contractor may accept said assignment at any time during the course of construction prior to final completion. It is further agreed that all subcontracts and purchase orders shall provide that they are freely assignable by Subcontractor to Contractor and Contractor's assigns. Contractor may assign this Subcontract at any time without the consent of Subcontractor, or Subcontractor's payment and performance sureties or guarantors, if any.

## ARTICLE 14
### COMPLIANCE

a.  Subcontractor shall, at its own expense, obtain all necessary licenses and permits pertaining to the Work and comply with all statues, ordinances, rules, regulations and orders of any governmental or quasi-governmental authority having jurisdiction over the Work or the performance thereof, including, but not limited to, those relating to immigration status or United States Citizenship and Immigration Services (USCIS), Internal Revenue Service, or related to any safety, wages, discrimination and equal employment opportunity agencies and pay any fines or penalties imposed for any violations thereof ("Legal Requirements").  The Contractor may, at its sole discretion, require evidence of compliance with the Legal Requirements from the Subcontractor, its agents, servants and employees.  Subcontractor shall receive and respond to, and shall defend, indemnify and save harmless Contractor and Owner, as well as anyone to whom Contractor is obligated, and their agents, servants and employees from and against any loss, liability, or expense arising from any such violations and any citations, assessments, fines, or penalties resulting therefrom, including audits by the Owner or any agency which has or many have jurisdiction over the Project.  Without limiting the foregoing, Subcontractor will appear at hearings, proceedings and/or in court and contest to its substitution as a party defendant in respect of all summonses and claimed violations arising out of or relating to the Work.

b.  By executing this Subcontract, Subcontractor represents and warrants to Contractor that the Work, when completed, will comply fully with all applicable building and safety codes, regulations and construction requirements imposed or enforced by any governmental agencies and in existence on the date of execution of this Subcontract, without regard to any errors, omissions or deficiencies in the drawings and specifications; and Subcontractor shall furnish samples of all materials and component parts to be used as test specimens. Subcontractor shall furnish labor and facilities at the Project site as necessary in connection with testing and inspection services.

c.  Except as otherwise expressly specified in the Contract Documents or elsewhere in this Subcontract, Subcontractor shall pay for all laboratory services, tests, testing laboratories, agencies, professional engineers, engineering inspections and reports required by the Contract Documents, the Architect, or Contractor. Testing laboratories and professional engineers shall be subject to Contractor's prior written approval. Without limiting the provisions herein, the cost of testing laboratories, agencies, and/or engineers for the convenience of Subcontractor in its scheduling and performance of the Work, or related to remedial operations or possible deficiencies, shall be borne by Subcontractor.

d.  The observations of or participation by Owner, Architect, or Contractor in inspections or tests by persons other than Subcontractor shall not relieve Subcontractor from its obligations to perform the Work in accordance with the Contract Documents. Owner, Architect and Contractor, upon request, promptly shall have access to the Work, whether at the Project, in storage or in manufacture or preparation. Subcontractor shall provide proper and safe facilities for such access and for inspection at the Project site, at the place of storage or elsewhere. Subcontractor has given a license to exercise self-help. If the specifications or any legal requirements require any portion of the Work to be tested or reviewed, Subcontractor shall give Contractor timely written notice of such test or review.

e.  Subcontractor shall comply with and cooperate with other subcontractors, Contractor, Architect, and Owner in complying with legal requirements, including but not limited to OSHA requirements. Among other things, Subcontractor shall be responsible for performing corrective work within abatement periods, appealing from decisions or orders, requesting extensions on abatement periods, and furnishing such information or evidentiary material as may be necessary or as may be requested by Contractor to fully protect the rights and interests of Owner, Architect, and Contractor with respect to possible, threatened or pending proceedings or orders.

## ARTICLE 15
### SAFETY

a.  Subcontractor agrees that the prevention of accidents to workers engaged upon or in the vicinity of the Work is its responsibility, even if Contractor establishes a safety program for the entire Project. Subcontractor shall establish and implement safety measures, policies and standards conforming to those required or recommended by governmental or quasi-governmental authorities having jurisdiction and by Contractor and Owner, including, but not limited to, any requirements imposed by the Contract Documents. Subcontractor shall comply with the reasonable recommendations of insurance companies having an interest in the Project and shall stop any part of the Work that Contractor deems unsafe until corrective measures satisfactory to



Contractor have been taken. Contractor's failure to stop Subcontractor's unsafe practices shall not relieve Subcontractor of its responsibility therefor.

b. Subcontractor shall continuously protect the Work, other work, and the property of Contractor, Owner and others from damage, injury or loss arising in connection with the Subcontractor's performance of the Work. Neither Owner nor Contractor shall be responsible for any loss or damage to the Work or the property of Subcontractor, however caused, until after final acceptance thereof by Owner and final payment therefor. Likewise, neither Owner nor Contractor shall be responsible for loss of or damage (however caused) to materials, tools, equipment, appliances and other personal property of Subcontractor used in the performance of the Work. Subcontractor shall provide and maintain adequate protection against weather so as to protect the Work from injury or damage.

c. Subcontractor shall abide by and enforce the Contractor's Safety Manual and Contractor's instructions regarding signs, advertisements, fires, smoking, alcoholic beverages, and the possession of firearms by any person at the Project site. Subcontractor, as necessary for the Work, shall provide flagmen, erect proper barricades and other safeguards, and post danger signs and other warnings as warranted by hazardous and existing conditions. Subcontractor shall promptly report in writing to Contractor and Subcontractor's insurance carriers all accidents arising out of, or in connection with, the performance of the Work, whether on or off the Project site, which caused death, bodily injury or property damage, giving full details and statements of witnesses. In addition, if death or serious injuries or serious damages occur, the incident shall be reported to Contractor immediately by telephone or in person.

d. Subcontractor shall provide to Contractor a written site specific Safety and Health Program prior to the commencement of any Work on the Project. The Safety and Health Program shall address tasks to be performed on the Project with attendant risk analysis and have appropriate controls and safeguards to prevent injury and illness. Contractor will review the Safety and Health Program prior to the start of the work. Any questions, comments or inquiries by Contractor as to the adequacy of this program must be completely addressed by Subcontractor before Work is started. Subcontractor must have a Safety Orientation Program for all of its new Project workers. Documentation of this orientation is required for the Project. Weekly safety meeting with the workers of Subcontractor and its subcontractors of any tier are also required with evidence of the meeting results being supplied to Contractor.

e. Subcontractor must comply in full with all applicable environment, health and safety ("EH&S") local and national legislation, including all OSHA regulations. In circumstances where there is a conflict between local or national legislation and this Article 15, the higher (more protective) requirement shall prevail.

## ARTICLE 16
### CLEAN UP

a. Subcontractor shall, at its own expense: (a) keep the premises at all times free from waste materials, packaging and other debris accumulated in connection with the Work by collecting and removing such debris from the job site on a daily or other basis requested by Contractor; (b) at the completion of the Work in each area, sweep and otherwise make the Work and its immediate vicinity "broom-clean;" (c) remove all of its tools, equipment, scaffolds, temporary structures and surplus materials as directed by Contractor at the completion of the Work; and (d) at final inspection clean and prepare the Work for acceptance by Owner. Subcontractor agrees to provide all cleaning and cleanup required under the Contract Documents pertaining to the Work to the extent such requirements are in excess of those contained in this paragraph.

## ARTICLE 17
### TEMPORARY FACILITIES

a. Temporary facilities and services shall be provided in accordance with Exhibit "D" attached hereto.

## ARTICLE 18
### QUALITY

a. Subcontractor shall at all times provide first-quality, new materials (unless otherwise specified in the Contract Documents) and workmanship conforming to the Contract Documents requirements and be in accordance with the best standards of the construction industry where the Project is located. Subcontractor shall at all times provide proper facilities and an opportunity for the inspection of the Work by Contractor, Architect and Owner and their representatives. Subcontractor shall, within twenty-four (24) hours after receiving written notice from Owner, Contractor or Architect, proceed to take down and remove all portions of the Work which Contractor or Architect shall have condemned as unsound, improper, or in any way failing to conform to the Contract

<p style="text-align:center">EXHIBIT J</p>



Documents or this Subcontract and shall replace the same with proper and satisfactory Work and make good all work damaged or destroyed thereby. Contractor's failure to discover or notify Subcontractor of defective or nonconforming Work at the time the Work, or any portion thereof, is performed or completed shall not relieve Subcontractor of full responsibility for replacement of the defective or nonconforming Work and all damages resulting therefrom. If the Owner elects to accept defective or nonconforming Work, Contractor may require an appropriate adjustment in the Price to the extent required of Contractor.

b. Subcontractor shall use all necessary means to discover and to notify Contractor in writing of any defect in any part of the Project upon which the satisfactory performance of the Work may depend, and to allow a reasonable amount of time for remedying such defects. If Subcontractor should proceed with the Work, Subcontractor shall be considered to have accepted and be responsible for such condition unless Subcontractor shall have been directed by Contractor in writing to proceed over Subcontractor's written objection to Contractor.

<div style="text-align:center">

## ARTICLE 19
### GUARANTEES AND WARRANTIES
</div>

a. Subcontractor warrants and guarantees the Work to the full extent provided for in and required by the Contract Documents (including, without limitation, those warranties and guarantees required under Chapter 718, Florida Statutes, pertaining to condominiums). Without limiting the foregoing or any other liability or obligation with respect to the Work, Subcontractor shall, at its expense, make good any faulty, defective, or improper parts of the Work discovered within one (1) year from the date of Substantial Completion of the Work regarding the Project or within such longer period as may be provided in the Contract Documents or Legal Requirements (including without limitation, the three (3) year or longer warranties provided under Section 718.203, Florida Statutes). Subcontractor warrants that all materials furnished hereunder meet the requirements of the Contract Documents and warrants that they are both merchantable and fit for the purposes for which they are to be used under the Contract Documents. No Guarantee Period shall be construed to limit any warranty given by Subcontractor hereunder.

b. Performance of the aforementioned guarantee obligations shall be deemed to be a material component of Subcontractor's contractual obligation to perform the Work. This Subcontract shall not be considered completely performed until all guarantee obligations hereunder are fully satisfied. Performance bonds required of Subcontractor shall include the performance of guarantee obligations and warranty obligations and shall not contain clauses limiting the time to sue upon said bonds for breach of the guarantee or warranty.

<div style="text-align:center">

## ARTICLE 20
### SUBMITTALS
</div>

a. Subcontractor shall immediately prepare or obtain and promptly submit to Contractor shop and erection drawings, samples, product data, catalogue cuts, laboratory and inspection reports and engineering calculations, all as may be required by the Contract Documents or as may be necessary or appropriate to describe the details of the Work. Approval of drawings or other submittals by Contractor or Architect shall not relieve Subcontractor of its obligation to perform the Work in strict accordance with the Contract Documents or of its responsibility for the proper matching of the Work to contiguous work.

b. Subcontractor shall promptly submit all shop drawings and samples as to cause no delay in the Work or the progress of the Project. Subcontractor shall submit all shop drawings and samples through the Contractor to the Owner for the Architect's review. By submitting shop drawings and samples, Subcontractor represents and warrants that it has determined and verified all materials, field measurements, and field construction criteria pertaining thereto, has checked and coordinated this information with the Work and the Contract Documents, and that the Subcontractor shall fully guarantee and warrant the Work in accordance with this Subcontract and the Contract Documents. Any submission that, in Contractor's opinion, is incomplete, contains errors ,or has not been fully and properly checked may be returned unreviewed by Contractor for revision and resubmission.

c. In reviewing shop drawings, neither Contractor nor Architect shall be required to verify dimensions and field conditions. Architect will review shop drawings and samples only for conformance with the design concept of the Work and for general detailing of the proposed method of performance of the Work. Architect and Contractor's review shall not be construed as a complete check nor shall it relieve Subcontractor from its responsibility for any deficiency that may exist or from any departures or deviations from the requirements of the Contract Documents. Architect's or Contractor's review shall not relieve Subcontractor from responsibility for errors in shop drawings; responsibility for proper fitting of the Work, the necessity of furnishing any Work required by the Contract Documents which may not be indicated on shop drawings when reviewed; or the necessity of providing sufficient quantities of items.

EXHIBIT J



# ARTICLE 21
## PERFORMANCE

a.  The Work shall be performed and furnished under the direction and to the satisfaction of Architect and Contractor, but Subcontractor shall not thereby be relieved of its obligation to supervise the Work, using its best skill and attention, or its obligation to perform the Work as provided for herein. Subcontractor shall be bound by the interpretations and decisions of Architect and Owner to the same extent as Contractor may be bound thereby under the Contract Documents. No certificate issued or payment made to Subcontractor nor any partial or entire use or occupancy of the Project site shall be an acceptance of any Work not in accordance with this Subcontract or the Contract Documents or be deemed evidence of proper performance of the Work, either in whole or in part, or be construed as an acceptance of defective workmanship or improper materials.

b.  Subcontractor shall notify and obtain the approval of Contractor before the arrival of forces or delivery of materials and equipment to the Project site, before any substantial change in its forces, and before leaving the Project site for any reason.

c.  Subcontractor shall promptly and carefully check all Contract Documents and notify Contractor of any discrepancies or conflicts before performing any Work, and Subcontractor shall be responsible for any extra costs resulting from its failure to do so. Subcontractor shall cooperate with Contractor and other subcontractors in the preparation of coordination drawings where required by Contractor. Subcontractor shall take field measurements and verify field conditions and compare such field measurements and field conditions with the Contract Documents before activities are commenced. Errors, inconsistencies or omissions discovered are to be reported to Contractor at once. Any work done by Subcontractor with respect to any portion of the Work affected by such error, discrepancy, conflict, misunderstanding, or variance will be at Subcontractor's own risk and Subcontractor shall bear all costs and loss arising therefrom.

d.  Neither Architect nor Contractor nor Owner shall be responsible for: construction means, methods, techniques, sequences or procedures of Subcontractor; safety precautions and programs of Subcontractor; the acts or omissions of Subcontractor; or the failure of Subcontractor to carry out the work in accordance with the Contract Documents.

e.  The Subcontractor shall confine operations at the Project site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the Project site with materials and equipment. Subcontractor shall not perform any portion of the Work outside the areas of the Project site owned or controlled by Owner or designated as part of the Project site in the Contract Documents unless Subcontractor gives thirty (30) days advance written notice to Contractor, and Owner is able to obtain permission from the appropriate parties to proceed with the Work or to permit access pursuant to Owner's agreements with the owners and/or tenants of said areas. Any work permitted outside of the Project site owned by Owner shall be scheduled in a manner as to cause or occasion a minimum of inconvenience or disturbance to or interference with the normal operations of the Owner, abutters and the public. Subcontractor shall prosecute such operations expeditiously and restore the affected area and other areas needed for access to their original conditions immediately upon completion of such operations unless otherwise specified.

# ARTICLE 22
## LIENS

a.  To the extent not expressly prohibited by law, Subcontractor shall not suffer or permit any lien or other encumbrance to be filed or to remain of record as a claim against the building or the Project site or against any monies due or to become due for any Work performed or materials furnished by, to or on behalf of Subcontractor, or any of its subcontractors or suppliers; nor shall Subcontractor suffer or permit any such lien or encumbrance to be so filed because of any claim or demand against, or any action or non-action of, Subcontractor or any of its subcontractors or suppliers. Subcontractor shall defend, indemnify and save harmless Contractor, Contractor's sureties and Owner from any lien or claim of lien filed or maintained by any laborer, materialman, subcontractor, or other person or entity directly or indirectly acting for, through, or under Subcontractor, against the Project or any part thereof or any interest therein or against any monies due or to become due from Owner to Contractor or from Contractor to Subcontractor. Without limiting the foregoing, Subcontractor shall cause any such lien or claim of lien to be satisfied, removed, or discharged by bond, payment, or otherwise within such time as provided under the Contract Documents or ten (10) days from the date of receipt by Subcontractor of written notice from Contractor to Owner to remove the lien, whichever period is shorter. Anything herein contained to the contrary notwithstanding, Subcontractor hereby expressly subordinates all materialmen's and/or mechanic's liens it may have to the liens and security interests securing that certain loan from Owner's Lender to Owner in connection with the Project. Subcontractor agrees that a lien filed before there is any creditable evidence of possible non-payment by the Contractor or Owner will likely delay the processing of payments and, hence, the progress of the Project.

b.  Subcontractor agrees and covenants not to file a lien against the property on which the Project is located before payment is due under the Subcontract, unless, and only if, Subcontractor is within ten (10) days of losing its right to file a lien due to the expiration of the time allowed for filing under the law. Filing a lien before such date as permitted in the previous sentence shall be deemed a "Premature Lien." Subcontractor acknowledges that the damages for Subcontractor's breach of this provision are uncertain but that they are most accurately and reasonably quantified by the amount of double the attorneys' fee and double the lien bond

DocuSign Envelope ID: 8DAB33FB-9159-417B-0550-8C239CAEF3C2

EXHIBIT J



removal fees incurred by Contractor in the removal of any Premature Lien, together with any costs associated with any delays in the Project due to the failure or delay of payment due to the filing of a Premature Lien.

# ARTICLE 23
## PATENTS

a.   Subcontractor shall pay all royalties and license fees applicable to the Work. Subcontractor shall defend, indemnify and hold Owner, Architect and Contractor harmless of, from and against any and all suits, demands and claims for infringement of any patent rights except to the extent that Owner may have assumed responsibility therefor under the Contract Documents. The foregoing exception shall be inapplicable if Subcontractor had or should have had reason to believe the design, process, or product infringed upon a patent and failed to give written notification to Contractor of same.

# ARTICLE 24
## LABOR

a.   Subcontractor shall employ labor that is compatible with the labor of other subcontractors; shall take all steps necessary to avoid labor disputes; and shall be responsible for any delays and damages to Owner caused by such disputes. Subcontractor agrees that where the Work is stopped, delayed, or interfered with by strikes, slow-downs, or similar interruptions or disturbances (including cases where Subcontractor's employees are engaged in a work-stoppage solely as a result of a labor dispute involving Contractor or others and not in any manner involving Subcontractor), Contractor shall have the rights and remedies provided for in Article 26. Subcontractor shall maintain and exercise control over all employees engaged in the performance of the Work, and Subcontractor shall, to the extent permitted by law, remove or cause to be removed from the Project any employee whose presence is detrimental to the orderly prosecution of the Work. Subcontractor shall comply with all instructions by Contractor relating to the ingress and egress of its employees, materialmen and suppliers to the Project and shall take all necessary steps to restrain and enjoin any illegal picketing, demonstrating, violence, or similar activity against Subcontractor at the Project. Subcontractor agrees that if any provision of the Contract Documents conflicts with any agreement among members of a trade association, or with a union or labor council which regulates the work to be performed by a particular trade, Subcontractor shall reconcile such conflict without delay or damage to Owner or Contractor. Nothing herein shall be deemed to limit Contractor's rights under Article 26 hereof.

# ARTICLE 25
## DAMAGE

a.   Contractor shall not be liable or responsible for loss or damage to the equipment, tools, facilities, or other personal property owned, rented, or used by Subcontractor, or anyone employed by or through Subcontractor, in the performance of the Work; and Subcontractor shall maintain such insurance and take such protective action as Subcontractor deems desirable with respect to such property. Contractor shall not be liable or responsible for any loss or damage to the Work, and Subcontractor shall be responsible for the correction or restoration of any such loss or damage to the Work, or to the work of Contractor or any other subcontractor, resulting from the operations of Subcontractor, or its subcontractors, agents, servants, or employees hereunder. Subcontractor shall take all reasonable precautions to protect the Work from loss or damage prior to acceptance by Owner.

# ARTICLE 26
## DEFAULT

a.   Should Subcontractor at any time:

1.   fail to supply the labor, materials, equipment, supervision and other things required of it in sufficient quantities and of required quality to perform the Work with the skill, conformity, promptness and diligence required hereunder;

2.   cause interference, stoppage, or delay to the Project or any activity necessary to complete the Project;

3.   become insolvent;

4.   fails to properly and promptly make payment for all materials and services provided in the performance of the Work; or

5.   fail in the Contractor's opinion in the performance or observance of any of the covenants, conditions, or other terms of this Subcontract, then in any such event, each of which shall constitute a default hereunder by Subcontractor, Contractor shall, after giving Subcontractor written notice of default and forty-eight (48) hours within which to cure said default, have the right to exercise any one or more of the following remedies:

DocuSign Envelope ID: 8DAB33FB-9159-417B-9E50-8C239CAEF3C2

EXHIBIT J



i.   require that Subcontractor utilize, at its own expense, overtime labor (including Saturday and Sunday Work) and additional shifts as necessary to overcome the consequences of any delay attributable to Subcontractor's default;

ii.  attempt to remedy the default by whatever means Contractor may deem necessary or appropriate, including, but not limited to, correcting, furnishing, performing, or otherwise completing the Work, or any part thereof, by itself or through others (utilizing where appropriate any materials and equipment previously purchased for that purpose by Subcontractor) and deducting the cost thereof (plus an allowance for administrative burden equal to fifteen percent (15%) of such costs) from any monies due or to become due to Subcontractor hereunder;

iii. after giving Subcontractor an additional forty-eight (48) hours written notice (at any time following the expiration of the initial forty-eight (48) hours notice and curative period), terminate this Subcontract, without thereby waiving or releasing any rights or remedies against Subcontractor or its sureties, and by itself or through others take possession of the Work, and all materials, equipment, facilities, plants, tools, scaffolds and appliances of Subcontractor relating to the Work, for the purposes of completing the Work and securing to Contractor the payment of its costs (plus an allowance for administrative burden equal to fifteen percent (15%) of such costs) and other damages under the Subcontract and for the breach thereof, it being intended that Contractor shall, for the stated purposes, be the assignee of and have a security interest in the property described above to the extent located on the Project site (and Contractor may at any time file this Subcontract as a financing statement under applicable law); or

iv.  recover from Subcontractor all losses, damages, penalties and fines, whether actual or liquidated, direct or consequential (including without limitation any increase in Contractor's cost of insurance resulting from Subcontractor's failure to maintain insurance coverages required hereunder), and all reasonable attorneys' fees suffered or incurred by Contractor by reason of or as a result of Subcontractor's default.

b.  After completion of the Work by the exercise of any one or more of the above remedies and acceptance of the Work by Architect and full payment therefor by Owner, Contractor shall promptly pay Subcontractor the undisbursed balance of the Price, if any. If the cost of completion of the Work, plus the allowance for administrative burden, together with any other damages or losses sustained or incurred by Contractor, shall exceed the undisbursed balance of the Price, Subcontractor and its guarantors, surety, or sureties shall pay the difference within fifteen (15) days of written demand from Contractor.

c.  The foregoing remedies shall be considered separate and cumulative and shall be in addition to every other remedy given hereunder or under the Contract Documents, or now or hereafter existing at law or in equity. Subcontractor's guarantors, surety, or sureties agree to be bound to Contractor with respect to such remedies notwithstanding any provision of the bonds provided pursuant to Article 10 hereof.

d.  Except as limited by this Subcontract, Subcontractor shall have the rights and remedies available at law or in equity for a breach of this Subcontract by Contractor. Any default by Contractor shall be deemed waived unless Subcontractor shall have given Contractor written notice thereof within five (5) days after the occurrence of such default. Subcontractor shall be entitled to stop the Work or terminate this Subcontract only (a) on account of Contractor's failure to pay an amount to Subcontractor which is paid by Owner to Contractor under Subcontractor's Application for Payment that is approved in accordance with the Contract Documents and (b) where a good faith reason does not exist as to the withholding of such payments claimed by Subcontractor ("Contractor's Default"). Subcontractor shall not be entitled to stop the Work on account of a Contractor's Default unless such Contractor's Default shall have continued for more than ten (10) days after Contractor's receipt of written notice of such Contractor's Default from Subcontractor, specifying in detail the nature of the default and the steps necessary to cure the claimed default.

e.  Subcontractor shall not be entitled to terminate this Subcontract except for a Contractor's Default which shall have continued for at least an additional thirty (30) days after (a) Subcontractor shall have stopped Work in accordance with this paragraph and (b) Contractor shall have received thirty (30) days written notice of Subcontractor's intention to terminate this Subcontract. Article 26 represents the Subcontractor's sole right to stop the Work or terminate this Subcontract.

f.  Should any termination for default under Article 26 (iii) be determined to be invalid, improper or wrongful, such termination shall be deemed to have been a termination for convenience as provided in Article 28 below.

g.  Subcontractor shall not be entitled to receive any further payment until the Work shall be wholly completed to the satisfaction of Contractor and shall have been accepted by Contractor and Owner, at which time, if the unpaid balance, if any, of the Price at the time of Subcontractor's default shall exceed the costs and expenses incurred in completing the Work and curing Subcontractor's default, such excess shall be paid to Subcontractor; but if such costs and expenses shall exceed such unpaid balance, then Subcontractor shall pay the difference to Contractor. Such costs and expenses shall include not only the cost of completing the Work to the satisfaction of Contractor and Owner and of performing and furnishing all labor, services, materials, equipment and other items required therefor, but also all losses, damages, costs and expenses, whether direct or consequential, including, without limitation, attorney's and legal fees and disbursements, sustained, incurred or suffered or to be sustained, incurred or suffered by Owner or Contractor by reason of or resulting from any default of Subcontractor.

DocuSign Envelope ID: BDAB33FB-9159-417B-0550-8C239CAEF3C2

EXHIBIT J



## ARTICLE 27
### DISPUTES

a.  In the event of any dispute between Subcontractor and Contractor arising out of or relating to this Subcontract, or the breach thereof, which involves the correlative rights and duties of Owner, the dispute shall be decided in accordance with the Contract Documents, and Subcontractor, its suppliers, subcontractors and its guarantors, surety, or sureties, shall be bound to Contractor to the same extent that Contractor is bound to Owner by the terms of the Contract Documents and by any decisions or determination made under the Contract Documents by an authorized person, board, court, arbitration, or other tribunal. Subcontractor shall be afforded a reasonable opportunity to present information and testimony involving its rights. Subcontractor shall be solely responsible for the preparation of any information or testimony hereunder unless Contractor notifies Subcontractor in writing of its intention to provide attorneys and provide for the presentation of any case governed by this paragraph, in which case Subcontractor shall have the duty to cooperate with Contractor. Subcontractor acknowledges and agrees that Owner is an intended third party beneficiary for the purpose of enforcing all rights and obligations of Subcontractor hereunder, which may include seeking certain remedies in a court of competent jurisdiction.

b.  In the event of any dispute as to whether any item or portion of the Project Work is within the scope of the Work to be performed by Subcontractor or any dispute as to whether Subcontractor is entitled to an extra payment, Subcontractor shall continue to proceed diligently with the performance of the Work, this Subcontract, and any disputed Work, pending any resolution. The existence of a dispute shall not be grounds for any failure to perform by Subcontractor nor limit the right of Contractor to proceed to remedy any default by Subcontractor.

## ARTICLE 28
### EARLY TERMINATION

a.  If Owner terminates the Contract or stops the Work for a reason other than the sole default of Contractor, Contractor may terminate this Subcontract or stop the Work for the same reason, and Subcontractor's rights and remedies, including the basis for payment of any unpaid portion of the Price, shall be limited to the corresponding rights and remedies available to Contractor under the Contract Documents, and controlled by Article 26 above. Should this Subcontract be terminated for default, Subcontractor shall assign all purchase orders and subcontracts to Contractor if Contractor, in its sole and absolute discretion, requests such assignments. Subcontractor agrees to incorporate such provisions in its agreements with suppliers and subcontractors to effectuate this Article 28. Nothing herein shall create any duty on the part of Contractor to accept the assignment of any purchase order or subcontract hereunder.

b.  Further, in its sole discretion and without notice to any guarantors, surety, or sureties, Contractor may, at any time prior to final payment, terminate this Subcontract for its convenience upon the giving of written notice to Subcontractor. In no event shall Subcontractor be entitled to consequential damages or loss of profits on portions of the Work not yet performed. If terminated for convenience, Subcontractor shall be entitled to be paid all costs of all Work provided hereunder including reasonable and necessary costs of termination, as determined in accordance with the method set forth in Article 8 above, together with the Profit Percentage attributable to the costs so determined. Payment shall be made in accordance with and subject to the requirements of Article 4.

c.  Without limitation, the following obligations, among others, of Subcontractor shall survive the termination of the Subcontract whether pursuant to this Subcontract: warranties and guarantees of Work performed; indemnity; payment of taxes, damages, losses and expenses; certifications; delivery of manuals, data on electronic media and as-built drawings; correction of Work performed; removal of liens; and cooperation with the construction lender.

## ARTICLE 29
### SETOFF

a.  If Subcontractor is, or hereafter begins, performing any work for Contractor, or any affiliate or subsidiary of Contractor, other than the Work under the Subcontract and the unpaid balance of the Price becomes insufficient to complete such Work or compensate Contractor, or any affiliate or subsidiary of Contractor, for any damages or deficiencies by the Subcontractor in the performance of the other work, Subcontractor hereby consents and agrees to allow Contractor, in its sole discretion and judgment, to setoff any of Contractor's claims against any funds due, or which may become due, Subcontractor under any other agreement with Contractor, or any affiliate or subsidiary of Contractor, or any subcontract or agreement on any other project. No refusal or failure of Contractor, or any affiliate or subsidiary of Contractor, to exercise its rights hereunder shall constitute the basis of any right or claim against Contractor.

DocuSign Envelope ID: 9DAB33FB-9159-417B-0550-8C239CAEF3C2

EXHIBIT J



## ARTICLE 30
### MISCELLANEOUS

a.   All matters relating to the validity, performance, or interpretation of this Subcontract shall be governed by the law of the State in which the Project is located, applicable to the validity, performance, or interpretation, as the case may be, of the Contract Documents. In the event that any term, provision, or part of the Subcontract is held to be illegal, invalid or unenforceable, such term, provision, or part shall be deemed severed from the Subcontract and the remaining terms, provisions and parts shall remain unaffected thereby. Where the context requires, neuter terms used herein shall include the masculine and feminine, and singular terms shall include the plural, and vice versa.

b.   This Subcontract, including the documents incorporated herein by reference, embodies the entire agreement of the parties and supersedes all prior negotiations, agreements and understandings relating to the subject matter hereof. Subcontractor agrees that any claims against Contractor, irrespective of an alleged breach by Contractor of the Contract Documents, shall be based, nonetheless, upon this Subcontract and the Price, and shall in no event be based upon an asserted fair and reasonable value of the Work performed.

c.   This Subcontract may not be changed in any way except as herein provided or by a writing signed by a duly authorized officer or agent of each party. No requirement of this Subcontract may be waived except in writing signed by a duly authorized officer of the waiving party. This provision may not be waived orally by Contractor.

d.   Subject only to the final sentence in this section (d), in the event of suit by the Subcontractor or its surety or those with whom it deals on behalf of this Subcontract against the Contractor or its surety, then the venue of such suit shall be in the County in which the project is located and the Subcontractor hereby waives for itself, its surety or those with whom he deals on behalf of this agreement whatever rights it may have in the selection of venue.  Sub-Contractor and its surety do hereby further agree that the provisions concerning venue as contained herein shall be specifically binding upon them, notwithstanding the existence of any contrary venue provision which may be contained in any surety bond delivered to the Owner by Contractor or its surety.  In the event of a dispute in litigation or arbitration with the Owner in connection with this Project and in the event that Contractor elects to bring Subcontractor into such litigation or arbitration, in Contractor's sole and absolute discretion, the Subcontractor agrees that venue for such action shall be in the location in which the litigation or arbitration is pending with the Owner.

e.   The provisions of this Subcontract and the Contract Documents are intended to supplement and complement each other. If, however, any provision of this Subcontract irreconcilably conflicts with a provision of the Contract Documents, the provision imposing the greater duty on the Subcontractor shall govern.

f.   As to any claim which arises out of Subcontractor's performance which is also caused by the acts or omissions of any third party, Subcontractor's liability hereunder shall be joint and several.

g.   The failure of Owner or Contractor to insist upon performance or strict performance of any of the terms, covenants or conditions of this Subcontract or the Contract Documents shall not be deemed a waiver of any rights or remedies that Owner or Contractor may have; shall not be deemed to constitute an amendment of this Subcontract; and shall not be deemed a waiver of any subsequent breach or default by Contractor of any of the terms, covenants, or conditions of this Subcontract.

[Signature, Licensing Verification and Schedule 1 Follows]


## Coastal

**IN WITNESS WHEREOF**, the parties have duly executed this Subcontract as of:

| SUBCONTRACTOR: | GENERAL CONTRACTOR: |
|---|---|
| All City Construction Services, LLC. | Coastal Construction of South Florida, Inc.<br>d/b/a Coastal Condominiums |

By: _Gilad Goldenholz_       By: _ken Fabel_

Date: 5/11/2020           Date: 5/11/2020

Printed Name: Gilad Goldenholz     Printed Name & Title: <u>Ken Fabel, Project Executive</u>

Printed Title: President        Printed Name & Title: <u>Bill Ford, Vice President</u>

                                                   Printed Name & Title: <u>George P. Adornato, Sr. Vice President</u>

Subcontractor Check ONE:    ☐ Corporation    ☐ Partnership/Joint Venture    ☐ Individual

LICENSING: By executing this Subcontract, Subcontractor affirms that it holds the required contractor license(s) applicable to the Work as required by the state/county in which the Project is located and the required Occupational License/Business Tax Receipt to conduct business in the state/county in which Subcontractor conducts business.

**1. FEIN – Florida Department of State – Division of Corporations (http://www.sunbiz.org)**

     Florida Employer Identification No.: 64-0964355

(If no E.I. Number, enter business owner's Social Security No.) *Per IRS 3402(s), 31% of each payment is required to be withheld and remitted to the IRS if E.I. Number or Social Security Number is not provided. This withholding amount will be in addition to Subcontract retainage.

**2 DBPR - Department of Professional Business Regulations: (If none required, enter "N/A")**

     State of             <u>FLORIDA</u>

     License No(s).       <u>CGC1512637</u>

     License Classification(s): <u>Certified General Contractor</u>

     Expiration Date:      <u>08-31-2020</u>

**3. Certificate of Competency: (If none required, enter "N/A")**

     State of             <u>FLORIDA</u>

     County of          <u>N/A</u>

     License No(s).       <u>N/A</u>

     License Classification(s): <u>N/A</u>

     Expiration Date:      <u>N/A</u>

**4. Verification of Workers Compensation Insurance (REQUIRED)**

     Carrier:            Service American Indemnity Co.

     Policy#             RT20CWC0120025701

     Effective:           03-01-2020

EXHIBIT J

Coastal

| FOR CONTRACTOR'S USE: |

☒ License Verified          ☐ Not Required

☐ Maria Alvarez, Assistant Procurement Manager          _____          Date: _____

☒ Stephanie Perez, Procurement Administrator          _____          Date: 05-11-2020


Coastal

**SCHEDULE 1 - CONTRACT DOCUMENTS**

The Contract Documents referred to in Article I and elsewhere in this Subcontract consists of the Subcontract and the following:
The Contract Documents, sometimes referred to collectively as the "Subcontract," are listed below and shall constitute the Subcontract.

- This Subcontract with Schedule 1
- The Prime Contract

| | EXHIBIT | DESCRIPTION | TYPE | # PAGES | DATED | REV# |
|---|---|---|---|---|---|---|
| ☒ | A | Scope of Subcontractor's Work | SUB SPECIFIC | 10 | 05-11-2020 | n/a |
| ■ | ■ | ■■■■■■■■■ | | ■ | ■ | ■ |
| ☒ | B | Drawing Log (Through K) | | 27 | ------ | n/a |
| ☒ | C | Schedule | | 2 | 10-01-2018 | n/a |
| ☒ | D | General Jobsite Terms and Conditions | | 8 | 02-25-2019 | n/a |
| ■ | ■ | ■■■■■■■■■ | | ■ | ■ | ■ |
| ☒ | F-1 | Site Safety Plan | | 18 | 02-17-2017 | R7 |
| ■ | ■ | ■■■■■■■ | | ■ | ■ | ■ |
| ☒ | G | Insurance Requirements for OCIP | | 1 | 10-08-2018 | n/a |
| ■ | ■ | ■■■■■■■ | | ■ | ■ | ■ |
| ☒ | G-2 | OCIP Manual – Enrolled & Excluded Parties | | 26 | 07-16-2019 | n/a |
| ■ | ■ | ■■■■■■■■ | | ■ | ■ | ■ |
| ☒ | H | Hoisting / Crane Addendum | | 2 | 02-26-2019 | R4 |
| ■ | I | ■■■■■■ | ■■■ | ■ | ■ | ■ |
| ■ | I | ■■■■■■ | | ■ | ■ | ■ |
| ■ | ■ | ■■■■■■ | | ■ | | ■ |
| ■ | | ■■■■■■■■ | | ■ | | |
| ☒ | K-1 | Textura System Notification | | 3 | 03-16-2014 | n/a |
| ☒ | L | Subcontractor Lien Release | | 1 | -------- | n/a |
| ☒ | L-1 | Sub-tier / Supplier Release of Lien | | 2 | -------- | n/a |
| ■ | | ■■■■■■ | ■■■ | ■ | ■ | ■ |
| ☒ | N | Prime Contract Contingency | | 1 | 10-09-2018 | R1 |
| ■ | ■ | ■■■■■■ | | ■ | | ■ |
| ■ | ■ | ■■■■■■■■■ | | ■ | | ■ |
| ■ | ■ | ■■■■■■■■■ | | ■ | | ■ |
| ■ | ■ | ■■■■ | | ■ | | |
| ■ | ■ | ■■■ | | ■ | | |
| ☒ | U | Punch Out Procedures | | 2 | 01-26-2019 | n/a |
| ☒ | V | Warranty Requirements | | 1 | -------- | n/a |
| ■ | | ■■■■■■ | | ■ | ■ | ■ |

The Subcontractor is bound by the terms of all Contract Documents.

**The Estates at Acqualina**

**Exhibit K - Monthly GC & GR Draw Value (South Tower / Villa / Site)**

7/19/2020



|  | GC Cost | GR Cost |
|---|---|---|
| South Tower | $5,157,527 | $3,895,328 |
| Villa + Site | $4,555,903 | $1,010,971 |
| North Tower |  |  |
| Transition + Precon | $222,096 |  |
| **TOTALS** | **$9,935,526** | **$4,906,299** |
| **GRAND TOTAL GC + GR** | **$14,841,825.00** | |

| Month | Req # | Gross | Cumulative Gross | Percent Drawn | Cumulative Percent Drawn |
|---|---|---|---|---|---|
| Jul-20 | 1 | 747,498 | 747,498 | 5.0% | 5.0% |
| Aug-20 | 2 | 964,084 | 1,711,582 | 6.5% | 11.5% |
| Sep-20 | 3 | 1,207,990 | 2,919,572 | 8.1% | 19.7% |
| Oct-20 | 4 | 952,985 | 3,872,558 | 6.4% | 26.1% |
| Nov-20 | 5 | 911,591 | 4,784,149 | 6.1% | 32.2% |
| Dec-20 | 6 | 922,102 | 5,706,251 | 6.2% | 38.4% |
| Jan-21 | 7 | 904,167 | 6,610,418 | 6.1% | 44.5% |
| Feb-21 | 8 | 902,128 | 7,512,547 | 6.1% | 50.6% |
| Mar-21 | 9 | 891,943 | 8,404,490 | 6.0% | 56.6% |
| Apr-21 | 10 | 863,398 | 9,267,887 | 5.8% | 62.4% |
| May-21 | 11 | 851,827 | 10,119,714 | 5.7% | 68.2% |
| Jun-21 | 12 | 850,954 | 10,970,669 | 5.7% | 73.9% |
| Jul-21 | 13 | 805,165 | 11,775,833 | 5.4% | 79.3% |
| Aug-21 | 14 | 799,708 | 12,575,541 | 5.4% | 84.7% |
| Sep-21 | 15 | 712,329 | 13,287,870 | 4.8% | 89.5% |
| Oct-21 | 16 | 452,000 | 13,739,870 | 3.0% | 92.6% |
| Nov-21 | 17 | 389,843 | 14,129,713 | 2.6% | 95.2% |
| Dec-21 | 18 | 268,935 | 14,398,648 | 1.8% | 97.0% |
| Jan-22 | 19 | 170,722 | 14,569,370 | 1.2% | 98.2% |
| Feb-22 | 20 | 115,323 | 14,684,693 | 0.8% | 98.9% |
| Mar-22 | 21 | 54,287 | 14,738,981 | 0.4% | 99.3% |
| Apr-22 | 22 | 34,283 | 14,773,264 | 0.2% | 99.5% |
| May-22 | 23 | 34,283 | 14,807,547 | 0.2% | 99.8% |
| Jun-22 | 24 | 34,282 | 14,841,829 | 0.2% | 100.0% |
| | | | | | |
| | | | | | |
| | | | | | |
| Totals | | | | | |

Includes $250k Mobilization Billings in Month 1 (July 2020) and Month 3 (September 2020)

**Monthly GC & GR Draw Value**



**Cumulative GC & GR Billing**



Exhibit "L"

# Suffolk

## CONSENT OF CONTRACTOR

### Subject to Lender Approval

The undersigned contractor or contracting company ("Contractor") understands that there exists or is proposed a certain financing transaction between **A3 DEVELOPMENT LLC A3 RESTAURANT LLC** and **A3 AMENITIES LLC**, (collectively "Owner") and **BANK OZK** ("Lender") as evidenced by a variety of documents including that certain Construction Loan Agreement, by and between Lender, as lender, and Owner, as borrower, dated of even date herewith (as may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement").  By its execution hereof on this _____ day of _____, 2020, Contractor hereby CONSENTS TO AND ACKNOWLEDGES the assignment by Owner of all of the rights (but not obligations, except as expressly set forth hereunder) of Owner in or to any and all agreements, addendums, attachments, supplements, additions and amendments or change orders thereto (collectively, the "Construction Contracts") between Owner and Contractor pertaining to the construction of the improvements (or, as applicable, the renovation of the improvements) located or to be located upon that certain real property described on Exhibit A attached hereto and made a part hereof for all purposes (the "Land").  Contractor hereby agrees to be bound by such assignment.  Contractor further represents and warrants to and agrees with Lender as follows:

1.    Construction Contracts.  (a) The copies of the Construction Contracts attached hereto as Exhibit B are true, correct and complete in every respect and have not been changed or modified; (b) the Construction Contracts constitute the valid and binding obligation of Contractor, are enforceable in accordance with their terms and continue in full force and effect; (c) there have been no prior assignments of the Construction Contracts of which Contractor has notice or is aware; (d) all covenants, conditions and agreements of Contractor contained in the Construction Contracts have been performed as required therein except for those which are not due to be performed until after the date of this Consent of Contractor; and (e) to Contractor's knowledge, all covenants, conditions and agreements of Owner contained in the Construction Contracts have been performed as required therein except for those which are not due to be performed until after the date of this Consent of Contractor.

2.    Licensure and Compliance.  Contractor (or if Contractor is a corporation, partnership, limited liability company or any other business association, that the principals and all applicable employees and agents of Contractor) is duly licensed to perform, conduct and engage in such activities and business as are contemplated under the Construction Contracts or reasonably related thereto in the jurisdiction or jurisdictions where such activities, business or work is to be performed and in which the Land is located.  Contractor is familiar with the federal, state and local laws and ordinances relevant to the performance of the construction of improvements similar to those contemplated by the Construction Contracts.  Contractor shall be in compliance with Florida Statutes Chapter 713 at all times as it pertains to Contractor's scope of work.

# Suffolk

3.    <u>Default Situations</u>.

(a)    If Owner defaults under the Loan Agreement or Contractor defaults under the Construction Contracts beyond the expiration of any applicable notice and cure periods, and subject to Contractor's surety rights under any payment and performance bond, Lender may elect by a specific request in writing to (1) have Contractor continue or recommence performance under the Construction Contracts, in which case Contractor shall thereafter perform under the Construction Contracts pursuant to the remainder of this <u>Section 3(a)</u>, or (2) have Contractor stop work on the project and vacate the Land, in which case Contractor shall do so (i) immediately if pursuant to a Contractor default or (ii) within thirty (30) days of written notice by Lender if pursuant to an Owner default under the Loan Agreement.   If Lender elects by specific request in writing to have Contractor continue or recommence performance under the Construction Contracts, Contractor shall continue or recommence performance on Lender's behalf under the Construction Contracts in accordance with the terms thereof, <u>provided</u> <u>that</u>, Contractor shall be paid in accordance with the Construction Contracts for all work, labor and material thereafter performed or furnished on Lender's behalf if and as specifically requested by Lender following such notice.   Contractor will look solely to Owner for all sums owing under the Construction Contracts attributable to periods of time prior to the date Contractor begins to act on Lender's behalf and at Lender's specific request. Notwithstanding the foregoing, subject to <u>Section 5</u> hereof, nothing contained herein is intended to be (nor shall anything contained herein be construed to be) a waiver or release of Contractor's statutory lien rights under Florida law. Notwithstanding the foregoing, in the event Lender elects by specific request in writing to have Contractor continue or recommence performance pursuant to <u>clause (1)</u> above and there are outstanding amounts owing to Contractor under the Construction Contracts at the time Lender makes such election, Lender shall, upon request by Contractor, pay such amounts owing to Contractor to the extent all of the following conditions apply: (i) Lender shall have not already made an Advance (as defined in the Loan Agreement) or disbursement to Owner in respect of such amounts, (ii) such amounts are in the Budget (as defined in the Loan Agreement) and would otherwise be available for Advance to Owner, (iii) the work performed was contained within the approved Plans (as defined in the Loan Agreement), and (iv) Loan proceeds are actually available for an Advance.  Lender shall not be liable for any damages Contractor may be entitled to recover from Owner or for any change orders made by Contractor and not approved by Lender pursuant to the Loan Agreement, except as authorized in <u>Section 4</u> hereof. "<u>Lender</u>" as used in this <u>Section 3(a)</u> includes Lender's successors or assigns, any receiver in possession of the Land, any purchaser upon foreclosure of Lender's security, or any corporation or other nominee formed by or on Lender's behalf (collectively "<u>Lender's Successors</u>").

(b)    If Owner defaults in making any payment or in performing any other obligation under the Construction Contracts, Contractor shall promptly give Lender written notice thereof, specifying the default and the steps necessary to cure same. Contractor will not exercise any remedy available under the Construction Contracts, at law, or in equity, arising from such default by Owner until Lender shall have had the

Suffolk

same opportunity to cure such default to which Owner is entitled, but not more than (i) fifteen (15) days in the case of a payment default or (ii) thirty (30) days in the case of a default for other than payment, if Lender so elects to cure such default, or such longer period of time as may be necessary to obtain possession of, or title to, the Land, provided that such additional time period shall not exceed one hundred twenty (120) days, and provided further that Lender shall have no obligation to cure any Owner default.  Any curative act done by Lender shall be as effective as if done by Owner, as the case may be.

4.    <u>Change Orders; Amendment; Termination</u>.  Contractor shall not perform work pursuant to any change order without Owner first securing Lender's written consent to such change order unless: (a) Owner has certified to Contractor that Lender's consent is not required for such change order; and (b) the cost of or reduction resulting from any single change or modification does not exceed _____ Dollars ($_____) and does not exceed _____ Dollars ($_____) in the aggregate with all prior change orders.  In any such case, Owner shall promptly provide Lender or its construction consultant with a copy of such change order or other modification.  Lender's consent shall not constitute any assumption by Lender of any obligations under the Construction Contracts.  In addition, Contractor will not amend, modify, or terminate the Construction Contracts without obtaining the prior written consent of Lender, <u>provided that</u>, Contractor may terminate the Construction Contracts because of a default by Owner thereunder to the extent (i) Contractor has such right in the Construction Contracts, and (ii) Contractor has first complied with its obligations under <u>Section 3(b)</u> above.

5.    <u>Subordination of Rights and Liens</u>.  Contractor hereby expressly subordinates all contractual, constitutional and statutory mechanics' and materialmen's liens (whether choate or inchoate) to which Contractor may be or become entitled, if any, to all liens and security interests securing the loan contemplated by the Loan Agreement and shall require all subcontracts made by Contractor to contain a provision subordinating the subcontractors' mechanics' and materialmen's liens to the liens and security interests securing the loan contemplated by the Loan Agreement.  Contractor acknowledges and agrees that, subject to Lender's (or Lender's Successors') election made pursuant to <u>Section 3(a)</u> above, foreclosure or conveyance in lieu of foreclosure of the liens and security interests securing the loan contemplated by the Loan Agreement shall be fully and automatically effective to cut off, terminate, and extinguish all of Contractor's liens and claims of any kind against the Land and any improvements thereto, if any exist; notwithstanding, Contractor shall be entitled to any residual or excess value of the Project after financial satisfaction of the Loan Agreement to the extent Contractor is entitled pursuant to the terms of the Construction Contracts.

6.    <u>Assignment of Rights as to Subcontracts</u>.  Contractor hereby grants, pledges, transfers, sets over and assigns all of its right, title and interest in and to any agreement or contract with any subcontractor, mechanic or materialman, which assignment shall automatically become a present, unconditional assignment, at Lender's option, in the event Lender should undertake the election specified in <u>Section 3(a)(2)</u> hereinabove; <u>provided</u>, <u>however</u>, Lender shall expressly not bear any liability or responsibility for the payment of any such subcontractor, mechanic or materialman or other sum as may be owing pursuant to any such agreements or

# Suffolk

contracts for the period of time prior to Lender undertaking the election specified in Section 3(a)(2) herein, provided, however, Contractor does not waive or relinquish its claim of lien rights against the Property for all sums due to Contractor for the period of time prior to Lender undertaking the election specified in Section 3(a)(2).

7.      Permits and Compliance.  Any and all approvals, permits or licenses (including, without limitation, a building permit) for the clearing and grading of the Land, the preparation of the surface and subsurface of the Land, and the construction of the improvements contemplated by the Construction Contracts, have been or will timely, and shall continue to be applied for and received pursuant to the Construction Contracts, in accordance with all applicable laws. Contractor, in its capacity as licensed general contractor and not a design professional, has no actual knowledge that the improvements contemplated by the Construction Contracts, if constructed in accordance therewith, will fail to comply with any applicable laws, statutes, ordinances, codes, rules, regulations, decrees or orders.

8.      Submissions to Lender.

(a)      Intentionally left blank.

(b)      Contractor shall provide Lender promptly in each case with (a) any information Contractor may have regarding defects in workmanship or materials incorporated into or provided for the project which come to Contractor's attention that remain uncorrected, (b) Contractor's estimate(s) of the stage(s) of completion of the project following Lender's reasonable request, (c) any known material deviations or variations in construction of the project (other than pursuant to change orders allowed pursuant to Section 4 hereof), and (d) any information Contractor may have regarding any defaults by Owner or any contractor or subcontractor under any construction contracts.

(c)      Upon substantial completion of construction of the improvements pursuant to the Construction Contracts, Contractor shall notify Lender and Owner of same.  After substantial completion of construction of such improvements, Contractor, upon written request by Lender, agrees to furnish to Lender any certificate of substantial completion or similar certificate as may be available and customarily issued by the applicable local authority and fully executed lien waivers from Contractor and its subcontractors, suppliers, mechanics and materialmen, in form and substance required by the Construction Contracts, in accordance with the law of the state in which the Land is located, and as Lender may reasonably request, provided that payment is received by Contractor pertaining to the lien waiver requested.

(d)      Upon Lender's request, Contractor shall promptly provide a list of each pending or proposed subcontract with any subcontractor or supplier entered into relative to the project contemplated by the Construction Contracts.  Upon Lender's request, but prior to the execution of the Contracts between Owner and Contractor, Lender shall either (i) approve of Contractor's standard subcontract subordination and consent to assignment

Suffolk

language or (ii) provide Contractor with proposed language to be included by Contractor in its agreements with subcontractors and suppliers that shall require a subordination of lien and consent to assignment in a form acceptable to Lender in its sole and absolute discretion to be executed by any such subcontractor specified by Lender prior to Contractor entering into any written agreement with any such subcontractor.

9.     Retainage.  Contractor hereby acknowledges and agrees that (i) Lender may retain in its possession a certain amount of funds from any Advance Lender makes to Owner under the Loan Agreement, (ii) Contractor shall not at any time have any claim to or lien upon such funds (whether statutory or otherwise) unless permitted under applicable law, and (iii) Lender, by virtue of its retaining such funds, shall not be deemed to be the agent, trustee or receiver of Owner.

10.     No Filings.   As of the date hereof, no affidavit or other evidence of oral agreement for the construction of any improvements, performance of labor, furnishing of materials or providing of specially-fabricated materials in connection with such construction, as contemplated by the Construction Contracts, has been filed by or on behalf of Contractor or, to the knowledge of Contractor, by any subcontractor for such construction, performance or furnishing, in the real property records or similar records where the Land is located. Furthermore, Contractor shall not cause any such filing or recordation to occur in the future.

11.     Insurance.   Contractor hereby acknowledges and agrees that Lender shall be named as an additional insured on all Contractor insurance policies, excluding Workers Compensation, that in any way relate to the Land or Contractor's work thereon (the "Insurance Policies"); (ii) Lender shall be provided at least 30 days' notice of cancellation of the Insurance Policies; (iii) the Insurance Policies shall contain a waiver of subrogation in favor of Lender; (iv) any Insurance Policy related solely to construction operations liability shall include a Completed Operations Extension for the term of construction plus the applicable statute of repose; (v) if Payment and Performance Bonds and/or Subcontractor Default Insurance is secured, Contractor shall include Lender under a Dual Obligee Endorsement and/or a Financial or Secondary Interest Endorsement as applicable; and (vi) to the fullest extent permitted by law Contractor shall indemnify and hold Lender harmless from and against any claims, damages, losses and expenses arising out of or resulting from the performance of Contractor's work at the Property to the same extent that Owner is entitled pursuant to the Construction Contracts only in the event that Lender undertakes the completion of the Work on behalf of the Owner. Additionally, Contractor hereby acknowledges and agrees that notwithstanding anything to the contrary set forth in the Construction Contracts, (x) any proceeds collected from the builders risk insurance policy shall be applied in the manner set forth in the Loan Agreement; provided, however, that nothing in the Loan Agreement shall prejudice Contractor's rights as an additional insured under the builders risk insurance policy, (y) any settlement of an insured loss which is entitled to be conducted by Borrower under the Loan Agreement may be conducted in accordance with those sections of the Construction Contracts that address adjustment of claims, and (z) any settlement of an insured loss which requires the consent of Lender under the Loan Agreement shall be conducted in accordance with the Loan Agreement.

# Suffolk

12.     Notices.  Any notice for purposes of this Consent of Contractor shall be given in writing and shall be addressed or delivered to the respective addresses set forth below, or to such other address as may have been previously designated by the intended recipient by notice given in accordance with this Section.  If sent by prepaid, registered or certified mail (return receipt requested), the notice shall be deemed effective when the receipt is signed or when the attempted initial delivery is refused or cannot be made because of a change of address of which the sending party has not been notified; if transmitted by facsimile or personal delivery, the notice shall be effective when received; and if transmitted by a national overnight delivery service (e.g., FedEx, UPS, etc.), such notice shall be deemed effectively provided upon either actual receipt by the recipient or by written confirmation of effective delivery to the address indicated below by the nationwide delivery service.  Until changed by notice given in accordance with this Section, the initial respective addresses for notices are the following:

|            |            |
|------------|------------|
| To Lender: | Bank OZK |
|            | 8300 Douglas Avenue |
|            | Suite 900 |
|            | Dallas, Texas 75225 |
|            | Attn: _____ |
| To Contractor: | Suffolk Construction Company, Inc. |
|            | One Biscayne Tower, Suite 2700 |
|            | 2 South Biscayne Boulevard |
|            | Miami, Florida 33131 |
|            | Attention: Peter J. Tuffo, President-SE |
| With a copies to: | Suffolk Construction Company, Inc. |
|            | Legal Department |
|            | 426 Clematis Street |
|            | West Palm Beach, Florida 33401 |
|            | Attention: Juan Diaz, General Counsel-SE |

13.     Miscellaneous.

(a)     Nothing herein shall be construed to confer any present benefits on Contractor or to create any contractual arrangement between Contractor and Lender or to impose upon Lender any duty to see to the application of the proceeds of the loan contemplated by the Loan Agreement.  Contractor acknowledges that Lender is obligated under the Loan Agreement only to Owner and to no other person or entity.  Contractor is executing this Consent of Contractor to induce Lender to advance funds under the Loan Agreement, and Contractor understands that Lender would not do so but for Contractor's execution and delivery of this Consent of Contractor.

(b)     This Consent of Contractor shall bind and benefit Contractor, Lender and their respective heirs, legal representatives and assigns, including Lender's Successors.

SuFFolk

(c)     The provisions of this Consent of Contractor cannot be waived, modified or amended unless such waiver, modification or amendment is in writing and is executed on behalf of each of Lender and Contractor.

(d)     None of the Construction Contracts, nor any memorandum or affidavit thereof, has been recorded by or on behalf of Contractor in the county where the Land is located or in any other county and Contractor shall not cause any such filing or recordation to occur.

**[SIGNATURE PAGE FOLLOWS]**

EXECUTED to be effective as of the date first written above.

**<u>CONTRACTOR</u>:**

SUFFOLK CONSTRUCTION COMPANY, INC.,
a Massachusetts corporation

By:_____
    Name: _____
    Title: _____

**EXHIBIT A**

**<u>Legal Description</u>**

**EXHIBIT B**

**<u>Construction Contracts</u>**

[Copies of the Construction Contracts immediately follow this cover page.]

Exhibit "A"

LEGAL DESCRIPTION: Residential 777 Parcel

Residential 777 Parcel 1

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 310.62 feet; thence S 86°59'57" E for 195.94 feet to the Point of Beginning; thence continue S 86°59'18" E for 9.00 feet; thence S 03°00'42" W for 1.33 feet; thence S 86°59'18" E for 68.83 feet; thence S 03°00'42" W for 18.92 feet; thence N 86°59'18" W for 11.58 feet; thence S 03°00'42" W for 9.33 feet; thence N 86°59'18" W for 61.83 feet; thence N 03°00'42" E for 1.58 feet; thence N 86°59'18" W for 4.42 feet; thence N 03°00'42" E for 28.00 feet to the Point of Beginning.

AND

Residential 777 Parcel 1

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 405.12 feet; thence S 86°59'57" E for 196.59 feet to the Point of Beginning; thence S 86°59'18" E for 8.33 feet; thence N 03°00'42" E for 1.33 feet; thence S 86°59'18" E for 68.83 feet; thence N 03°00'42" E for 18.75 feet; thence N 86°59'18" W for 39.17 feet; thence N 03°00'42" E for 9.50 feet; thence N 86°59'18" W for 20.33 feet; thence S 03°00'42" W for 7.33 feet; thence N 86°59'18" W for 9.33 feet; thence N 03°00'42" E for 8.08 feet; thence N 86°59'18" W for 4.58 feet; thence S 03°00'42" W for 2.33 feet; thence N 86°59'18" W for 3.75 feet; thence S 03°00'42" W for 28.00 feet to the Point of Beginning.

The above described perimetrical boundarys being between elevation +3.5 to +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.

AND

Residential 777 Parcel 2

A portion of Tract Q, AMENDED PLAT OF NORTH BISCAYNE BEACH, according to the plat thereof, as recorded in Plat Book 44 at Page 42 of the Public Records of Miami-Dade County, Florida and being more particularly described as follows:

Commence at the Northwest corner of said Tract Q; thence S 03°00'03" W along the West line of said Tract Q, also being the East right of way line of Collins Avenue for 445.09 feet; thence S 86°59'57" E for 186.75 feet to the Point of Beginning; thence continue S 86°59'57" E for 6.00 feet; thence N 03°00'03" E for 3.00 feet; thence S 86°59'57" E for 90.92 feet; thence S 03°00'03" W for 6.83 feet; thence S 86°59'57" E for 40.08 feet; thence N 03°00'03" E for 118.00 feet; thence S 86°59'57" E for 4.33 feet; thence N 03°00'03" E for 9.67 feet; thence N 86°59'57" W for 20.98 feet to a point on a circular curve concave to the Soutwest, and whose radius point bears N85°23'02"E; thence Northwesterly along a 262.17 foot radius curve leading to the left through a central angle of 9°39'13" for an arc distance of 44.17 feet to a point of non-tangency; thence N 86°59'57" W for 17.26 feet; thence N 03°00'08" E for 22.50 feet; thence N 86°59'57" W for 87.21 feet; thence S 03°00'03" W for 21.58 feet; thence N 86°59'57" W for 9.12 feet; thence S 03°00'03" W for 20.58 feet; thence N 86°59'57" W for 7.58 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 0.83 feet; thence S 03°00'03" W for 8.58 feet; thence S 86°59'57" E for 0.83 feet; thence S 03°00'03" W for 10.67 feet; thence N 86°59'57" W for 0.83 feet; thence S 03°00'03" W for 8.58 feet; thence N 86°59'57" W for 0.83 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 6.58 feet; thence S 03°00'03" W for 34.00 feet; thence N 86°59'57" W for 5.25 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 1.50 feet; thence S 03°00'03" W for 27.83 feet; thence N 86°59'56" W for 1.50 feet; thence S 03°00'03" W for 6.67 feet; thence S 86°59'57" E for 6.25 feet; thence S 03°00'03" W for 20.58 feet; thence S 86°59'57" E for 2.75 feet; thence S 03°00'03" W for 10.33 feet  to the Point of Beginning.

The above described perimetrical boundary being above elevation +21.8 feet, relative to the National Geodetic Vertical Datum of 1929.



EXHIBIT "M"


All unit pricing included in Subcontractor Agreements are valid for processing changes in the work. Changes will be calculated on net increase from Base Contract plus Contractor mark-ups allowed by contract.

# EXHIBIT N

# *THE ESTATES AT ACQUALINA*

## *SUFFOLK CONSTRUCTION COMPANY*

### *HURRICANE PREPAREDNESS PROCEDURES*

**PURPOSE:**

To establish a procedure to be followed when severe weather is forecast in the vicinity of the construction site.

**ALL PROJECTS WILL INCORPORATE THIS SEVERE WEATHER PROCEDURE WITH THEIR PROJECT POLICIES AND PROCEDURES.**

**PROCEDURE:**

I.    Notification:

    A.    In the event of a severe weather advisory issued by the U.S. Weather Bureau at night, during the weekend or on a holiday, the Project Manager/Superintendent will notify designated Suffolk Personnel and each subcontractor of the advisory.

    B.    Each Project Manager will maintain an up-to-date list of personnel required to secure the jobsite in the event of a severe weather advisory.

    C.    The number of persons to be called to the project shall be left up to the discretion of the Project Manager/Superintendent.

II.   Execution:

    A.    All loose or easily blown-about material and equipment shall be secured such as wind screen on fences, etc.

    B.    Excavations will be checked for proper run-off/soil stability.

    C.    Crane booms will be lowered when winds reach 50 miles per hour.

    D.    All work on elevated areas will be secured as required to fulfill the requirements of this procedure. Workmen to be evacuated as necessary.

    E.    All electrical power shall be de-energized to power company source.

    F.    Portable fuel tanks and all portable equipment will be secured or removed.

    G.    Glass in place will be covered and taped when winds are expected to exceed 50 miles per hour.

    H.    Secure the following items on the job or have readily available:

1

# EXHIBIT N

- Portable generators, pumps, mops, buckets, vacuums, rags, and other tools required for clean-up.

I.    Verify jobsite trailer is properly secured and tied down.

J.    Ensure all critical paperwork, contract documents, and computers are moved to a safe location or to the main office.

K.    Each jobsite shall be equipped with an air horn device to warn workmen of a weather related emergency. This horn may also be used in case of a project fire. Workmen should be instructed as to where to report when they hear the warning.

L.    The superintendent shall post his name and pager number in the trailer window so that emergency response personnel will have a point of contact for the jobsite.

M.    Chain link fencing should be placed over all open dumpsters and secured.

N.    Roofing materials and sheathing should be properly secured or removed from the roof.

O.    Weather advisories will be monitored for severity of incoming storms.  Suffolk will make sure not to erect falsework / formwork if the concrete elements cannot be safely placed and cured prior to any evacuation timeframes.

P.    This plan will be amended with specific protocols for cranes and hoists when the engineering information is available.

NOTE: *Due to the speed in which severe weather can move through the area, jobsite personnel should take continuous steps to keep the project safe from blowing debris.*

| NATIONAL HURRICANE CENTER SEVERITY SCALE | | |
|---|---|---|
| CATEGORY | WIND SPEED | STORM SURGE |
| 1 (Least Severe) | 74 – 95    MPH | 4 – 5    Feet |
| 2 | 95 – 100  MPH | 6 – 8    Feet |
| 3 | 111 – 130 MPH | 9 – 12   Feet |
| 4 | 131 – 150 MPH | 13 – 18  Feet |
| 5 | Over 150 MPH | Over 18 Feet |

## HURRICANE CONDITIONS

CONDITION IV:    **72 HOURS PRIOR** TO THE ARRIVAL OF FORECASTED 50 KNOT WINDS
- Make all necessary notifications to personnel and subcontractors.
- Stay informed of the hurricane's position/intensity and expected landfall.

CONDITION III:    **48 HOURS PRIOR** TO THE ARRIVAL OF FORECASTED 50 KNOT WINDS
- Verify all the "execution" procedures have been implemented.
- Verify all subcontractors have secured and weather-proofed their areas of responsibility.

2

# EXHIBIT N

CONDITION II:  **24 HOURS PRIOR** TO THE ARRIVAL OF FORECASTED 50 KNOT WINDS
- Execution steps A-N have been completed at the project.
- Take precautions for personal safety.

CONDITION I:  **FINAL HURRICANE WARNING (12 HOURS PRIOR)**

POST EMERGENCY:  Contact SBU Manager/Project Executive with specifics of damage and outline a "cleanup" plan.

3



**Exhibit O**
**GENERAL CONTRACTOR WARRANTY**

Suffolk Construction Co., Inc. ("Contractor") and its successors and assigns, hereby warrants and represents to _____ ("Owner") the following with respect to the _____ _____, located at _____(the "Project"):

1. All labor, materials and equipment furnished under that certain Standard Form of Agreement between Owner and Contractor AIA Document A102-2017 and the General Conditions of the Contract for Construction AIA Document A201-2017 dated _July___17,____2020_(hereinafter collectively referred to as the "Contract"), are of good quality and new unless otherwise permitted in the Contract Documents;

2. All labor performed, materials furnished and/or services and all other components of the Work provided pursuant to the Contract (hereinafter collectively referred to as "Work") at the Project is free from defects and conforms to the standards and requirements of the Contract Documents specifically including but not limited to Paragraph 3.5 and Subparagraphs 3.5.1 through 3.5.16 inclusive of the General Conditions of the Contract for Construction ("General Conditions" unless otherwise referenced ) which are incorporated by reference herein.  This Warranty shall be in effect from the date of Substantial Completion, and shall extend for the period set forth in the Agreement   (the "Warranty Period") from the date of Substantial Completion, which is established as of _____{insert date}.

3. Contractor hereby assigns to Owner any and all subcontractor, supplier, manufacturer and dealer warranties and guarantees on labor, material and equipment; but such assignment shall not relieve the Contractor of its warranty obligations hereunder or pursuant to the Contract. In addition, this Warranty shall not be compromised by the issuance of any warranties and/or guarantees, from manufacturers, subcontractors, sub-subcontractors, materialmen, dealers and others with respect to the Project.

4. Contractor acknowledges its statutory warranty obligations pursuant to Section 718.203(2) of the Florida Statutes, as to implied warranties of fitness for the roof and structural components, mechanical and plumbing components and the electrical components serving the buildings or improvements associated with the Work that extend in favor of the Owner as Developer and to ultimate purchasers of condominium units at the Project.

5. During the Warranty Period, upon written notice from the Owner, Contractor, at its cost, shall investigate a claim of defective or incomplete Work, and shall repair or replace such valid Warranty Work, as required by the Agreement  , with due consideration being given for surrounding finishes and the convenience of occupants at the Project. In case of emergencies, the twenty- four (24) hour provisions of Subparagraph 3.5.11 of the General Conditions shall govern.

6. In order to obtain performance of any obligation under this Warranty, the Owner  shall notify Contractor as required by the Agreement, at the election of Owner, at the following address:



**Exhibit O**

**As to Contractor:**           Tim Havill
                                Suffolk Construction Company, Inc
                                426 Clematis Street
                                West Palm Beach, Florida 33401


**As to Architect:**

**With Copies To:**

                                -and-


                                Juan Diaz General Counsel, SE Region
                                Suffolk Construction Company, Inc.
                                426 Clematis Street
                                West Palm Beach, Florida 33401

7.      This Warranty provides the Owner with specific legal rights which are in addition to other rights the Owner may have pursuant to Florida law. This Warranty applies only to the Owner and excludes coverage to ultimate purchasers of condominium units or a condominium association for which the statutory implied warranties pursuant to Section 718.203 (2), Florida Statutes shall be the only available remedies.

8.      This Warranty is not transferable or assignable to any third party, without Contractor's prior written consent.

9.      In the event that any one or more provisions of this Warranty shall be determined to be in violation of applicable law, such determination shall not affect the validity or enforceability of the remaining provisions, all of which shall remain in full force and effect.


**EXECUTED THIS _____DAY OF _____, 20 ____.**

**SUFFOLK CONSTRUCTION COMPANY., INC.**


_____

By:
Title:

Exhibit "P"

A3 Development, LLC; A3 North Development, LLC

The Estates at Acqualina Project

Sunny Isles Beach, Florida

# Owner Controlled Insurance Program OCIP Manual

Version 2 –  July, 2019



# Table of Contents

**Section 1 : Overview** ......................................................................................................................**3**

    *What is an OCIP?*.......................................................................................................................*3*

    *How to Bid?* ..............................................................................................................................*3*

    *What is Required to start work?* .................................................................................................*4*

    *What is the purpose of this manual?* ..........................................................................................*4*

**Section 2 : Program Directory** ........................................................................................................**5**

**Section 3 : Definitions** ...................................................................................................................**6**

**Section 4 : Owner Provided Coverages** ..........................................................................................**8**

**Section 5 : Contractor and Subcontractor Required Coverage** .......................................................**11**

**Section 6 : OCIP Requirements** ....................................................................................................**12**

    *Enrollment / Reporting Requirements:* ......................................................................................*12*

    *Contractor's and Subcontractor's Responsibilities* ...................................................................*15*

**Section 7 : Insurance Claim Procedures** .......................................................................................**16**

**Section 8 : OCIP Forms** ................................................................................................................**17**

# Section 1: Overview

Owner has elected to implement an Owner Controlled Insurance Program (OCIP) for Enrolled Parties providing direct labor at the Project Site.   The Owner agrees to pay all premiums and deductibles for coverages provided by the OCIP.

The insurance coverage provided by the OCIP, as well as your rights and responsibilities under the program, is outlined in this OCIP Manual (the "Manual") and is as much a part of your Contract as the actual work specifications.  All terms and conditions of this Manual are incorporated by reference into your Contract and you are required to bind all your lower-tiered Subcontractors to the terms, conditions and requirements of this Manual.

## What is an OCIP?

An Owner Controlled Insurance Program (OCIP) is a coordinated insurance and claims management program that provides specific coverages for the Owner and Enrolled Parties while performing work at the Project site.

The features of an Owner Controlled Insurance Program include:

- Uniform insurance protection and dedicated limits;
- Extended completed operations coverage;
- Centralized safety, loss prevention and claims management; and
- Reduction of potential litigation between Contractors and Subcontractors.

 **PARTICIPATION IS MANDATORY, except for Excluded Subcontractors, as defined herein, BUT ACCEPTANCE AND ENROLLMENT IS NOT AUTOMATIC. Eligible Parties must follow enrollment procedures as described in Section 6.**

## How to Bid?

In consideration of the on-site Commercial General Liability and Excess Liability provided by the Owner's OCIP, an Eligible Contractor will submit its bid/price proposal including these insurance costs. Each Eligible Contractor warrants that all insurance premium costs for the General Liability and Umbrella/Excess Liability Work performed at the Project Site have been correctly identified by completion of the OCIP Insurance Cost Calculation Form 3 included in this manual.  The Calculation Form must be submitted to the OCIP Administrator along with copies of the declaration and rating pages from the Eligible Contractor's General Liability and Umbrella/Excess policies in effect at the time of contract award. Once the identified cost for insurance coverages is verified and approved by the OCIP Administrator, a deductive change order shall be issued to deduct this cost.

The Eligible Contractor represents the accuracy of the information used to calculate the OCIP Insurance Cost and agrees that the Owner, the Owner's representative or insurer may audit the Enrolled Contractor's records and insurance agreements at any time to confirm the accuracy of the information.

All subsequent change orders issued to an Enrolled Contractor shall be net of insurance cost for coverages provided under the OCIP.

## What is Required to start work?

Contractors and Subcontractors shall NOT commence work on the Project Site until:

a) <u>If Eligible Parties:</u>
   - Having complied with enrollment requirements and received a Certificate of Insurance issued by the OCIP Administrator confirming they are Enrolled.

b) <u>If Excluded Parties:</u>
   - Having provided Certificate(s) of Insurance to the OCIP Administrator which evidence all required insurance coverages.

**NOTE: Contractors and Subcontractors must enroll for each Contract awarded.**

## What is the purpose of this manual?

**This manual, which is part of your contract documents, details OCIP procedures, provides an overview of OCIP coverages and Contractor and Subcontractor insurance requirements.**



**NOTE:  This Manual does not, and is not intended to, provide coverage interpretations or complete information about coverages.  The terms and conditions of the insurance policies will govern how coverage is applied.  If any conflict occurs between the OCIP Manual and Contract documents, the Contract documents will govern.**

The OCIP Manual may only be updated during the course of the Project by the Owner and distributed by the OCIP Administrator and is subject to review and final approval by the Owner. Any revised versions shall replace and supersede any previous versions.

# Section 2: Program Directory

| **Owner – A3 Development, LLC; A3 North Development, LLC** | |
|---|---|
| Ben Bryant | 17780 Collins Ave., 2nd Fl., Sunny Isles Beach, Florida 33160<br>Phone: (954) 638-1001<br>Email: benb@trumpgroup.com |

| **General Contractor – Coastal Construction of South Florida dba Coastal Condominiums** | |
|---|---|
| Ken Fabel<br>Project Executive | 18975 Collins Ave., Sunny Isles Beach, FL 33160<br>Phone: (786) 707-3554<br>Email: kfabel@coastalconstruction.com |
| Jamie Corbett<br>Project Manager | 5959 Blue Lagoon Drive, Suite 200, Miami, FL 33126<br>Phone: (617) 594-5466<br>Email: jcorbett@coastalconstruction.com |
| Brandon Moore<br>Sr. Project Manager | 17901 Collins Ave., Sunny Isles Beach, FL 33160<br>Phone: (786) 910-0307<br>Email: bmoore@coastalconstruction.com |
| Michael Naranjo<br>Safety Coordinator | 5959 Blue Lagoon Drive, Suite 200, Miami, FL 33126<br>Phone: (305) 323-0927<br>Email: mnaranjo@coastalconstruction.com |
| Nicole Tellez<br>Executive Assistant | 17901 Collins Ave., Sunny Isles Beach, FL 33160<br>Phone: (786) 766-7769<br>Email: ntellez@coastalconstruction.com |

| **Willis Towers Watson - OCIP Administration** | |
|---|---|
| **OCIP Administrator**<br><br>Dawn Osborn-Straughan | 300 Colonial Center Parkway, Suite 120<br>Lake Mary, FL 32746<br>Phone: (407) 562-2470<br>Email: dawn.osborn@willistowerswatson.com |
| **OCIP Administration Manager**<br><br>Shawn Leonard | 300 Colonial Center Parkway, Suite 120<br>Lake Mary, FL 32746<br>Phone: (407) 833-4279<br>Email: shawn.leonard@willistowerswatson.com |
| **OCIP Account Executive**<br><br>Steven J. Anderson | 1645 Palm Beach Lakes Blvd., Suite 1200<br>West Palm Beach, FL 33401<br>Phone: (954) 646-7247<br>Email: steven.anderson@willistowerswatson.com |

| **Willis Towers Watson - Claims Reporting Contact** | |
|---|---|
| Dorty Rivero-Stunson | 1450 Brickell Ave, Suite 1600<br>Miami, FL 33131<br>Phone: (305) 421-6225<br>Cell: (305) 250-8032<br>Email: dorty.stunson@willistowerswatson.com |

# Section 3: Definitions

| | |
|---|---|
| **Bid Gross Program/ Insurance Deduct** | In consideration of the on-site Commercial General Liability and Excess Liability provided by the Owner's OCIP, an Eligible Contractor will submit its bid/price proposal including these insurance costs. Each Eligible Contractor warrants that all insurance premium costs for the General Liability and Umbrella/Excess Liability Work performed at the Project Site have been correctly identified by completion of the OCIP Insurance Cost Calculation Form 3 included in this manual.  The Calculation Form must be submitted to the OCIP Administrator along with copies of the declaration and rating pages from the Eligible Contractor's General Liability and Umbrella/Excess policies in effect at the time of contract award. Once the identified cost for insurance coverages is verified and approved by the OCIP Administrator, a deductive change order shall be issued to deduct this cost. <br><br> The Eligible Contractor represents the accuracy of the information used to calculate the OCIP Insurance Cost and agrees that the Owner, the Owner's representative or insurer may audit the Enrolled Contractor's records and insurance agreements at any time to confirm the accuracy of the information. <br><br> All subsequent change orders issued to an Enrolled Contractor shall be net of insurance cost for coverages provided under the OCIP |
| **Contract** | As respects the OCIP, the Contract or Agreement by and between the Owner and the Contractor (the Contract) or between the Contractor and their Subcontractors; or between the Subcontractors and their lower tiered Subcontractors. |
| **Contractor** | Coastal Construction – The entity with which Owner has contracted for performance of the work. |
| **Owner Controlled Insurance Program (OCIP)** | A coordinated insurance and claim management program, under which Commercial General Liability and Excess Liability are procured or provided on a project basis for all Enrolled Parties while performing operations at the Project Site. |
| **Eligible Parties** | Contractors and Subcontractors of all tiers performing labor or services at the project site are eligible to be enrolled in the OCIP.  Suppliers that perform or subcontract installation, temporary labor services, employee leasing companies providing direct labor, joint ventures and all joint ventures partners are considered Eligible Parties.  The Owner may, at its discretion, include a Contractor or Subcontractor who otherwise, by definition, would be an Excluded Party. |
| **Enrolled Parties** | Eligible Parties of any tier who have been awarded work, who have submitted all necessary enrollment forms, have met all enrollment requirements and have been issued a Certificate of Insurance by the OCIP Administrator. |
| **Excluded Parties** | Contractors, Subcontractors or companies excluded from the OCIP: <br> • Contractors and any Subcontractors of any tier that do not perform any actual labor on the Project Site; <br> • Architects, surveyors, engineers, and soil testing engineers, and their consultants; <br> • Hazardous materials remediation, removal and/or transport companies and their consultants; <br> • Vendors, suppliers, fabricators, material dealers, truckers, haulers, drivers and others who merely transport, pick up, deliver, or carry materials, personnel, parts or |

|  | equipment, or any other items or persons to or from the Project Site; <br> • Any party performing structural demolition and/or blasting operations; <br> • Contractors or Subcontractors whose sole scope of work includes Exterior Insulation and Finish Systems; <br> • Any other parties whom the Owner elects, in its sole discretion, to exclude from the OCIP, even if otherwise eligible. |
|---|---|
| **Owner** | A3 Development, LLC; A3 North Development, LLC <br><br> The entity(ies) that determines which insurance coverages will be included, procures the policies and controls the insurance program. |
| **Project or Project Site** | The Estates at Acqualina <br> 17901 Collins Avenue, Sunny Isles Beach, FL 33160 <br><br> 1) St. Mary Magdelen Catholic Church (Church parking lot/ trailer compound) <br> 17775 North Bay Road, Sunny Isles Beach, FL 33160 <br><br> 2) Marian Towers (Haulover Beach parking lot) <br> 17505 North Bay Road, Sunny Isles Beach, FL 33160 <br><br> 3) Walgreens Parking Lot (Lot behind Walgreens) <br> 17534 Collins Ave., Sunny Isles Beach, FL 33160 <br><br> 4) Golden Strand Parking Lot (Golden Strand offsite lot) <br> 17925 Collins Ave., Sunny Isles Beach, FL 33160 <br><br> The Project Site as defined in the contract documents, appropriate to each project and any scheduled offsite location or structure within 1,000 feet of the designated project if dedicated to the Project and approved by the Owner (Including, but not limited to, lay down areas, parking lots, trailers, mock up and staging areas, model units, jobsite offices and any operations necessary and incidental to the designated project). It is agreed that the policy applies to all operations conducted at, by, or from project site within 1,000 feet of the designated project, including operations necessary and/or incidental thereto, designated as approved project locations by the Owner. As Per Written Contract. |
| **Subcontractor** | As respects the OCIP, "Subcontractor" includes any entity with which a Contractor or Subcontractor has contracted for performance of work at the Project Site. |

# Section 4: Owner Provided Coverages

**OCIP Insurance Coverage**

This section provides a brief description of the coverages provided under the OCIP. **The Contractor and Subcontractors shall refer to the actual policies for details concerning coverages, exclusions and limitations.**   Policies are available for review upon request and approval for release by the Owner.

The Owner has procured, and will maintain the insurance coverages described below for Enrolled Parties.  The Owner intends to maintain coverages until the expiration of the policy or until substantial completion of the Work, whichever occurs first, however in no event beyond Program Expiration Date.  Coverage is primary and non-contributory with respect to any other insurance carried by the Enrolled Parties.

While the OCIP provides uniform coverages and reasonable limits for work performed at the Project Site, the OCIP is not intended to meet all the insurance needs of the Enrolled Parties.  Contractor and Subcontractor shall discuss the OCIP with its insurance agent or consultant to assure that proper coverages are maintained. Contractor and Subcontractor shall notify its agent that the work performed on-site will be insured under the OCIP.   This notification is to inform the Enrolled Parties standard insurance company(ies) that the insurance coverages provided under the OCIP are primary on the Project Site.

**<u>Commercial General Liability:</u>** (Coverage for off-site operations is <u>excluded unless locations are scheduled & approved by the Owner and OCIP insurance carriers</u>).

Insurance Carrier – Endurance American Specialty Insurance Company

|  | **Limits of Liability <br> Shared by All Insureds** |
|---|---|
| Each Occurrence Limit | $5,000,000 |
| General Aggregate Limit | $5,000,000 |
| Products/Completed Operations Aggregate (Term Limit) | $5,000,000 |
| Personal and Advertising Injury Limit – any one person or organization | $2,000,000 |
| Damage to Premises Rented to You | $  50,000 |
| Medical Pay Limit | Excluded |

- The General Aggregate Limit will reinstate one time during the policy period at 30 month interval. The Products/Completed Operations Aggregate including the extension period will not reinstate.
- Policy provides Completed Operations Extension coverage for the applicable statute of repose provided by the controlling law of the jurisdiction where the project is located per policy terms and conditions.
- The OCIP Coverage is subject to a deductible of $50,000 per occurrence, which cost shall be borne initially by the Owner.  At Owner's discretion, Contractor shall be required to reimburse Owner a sum of up to $25,000 for each occurrence, including court costs, claims adjustment expenses, attorney's fees and costs of defense for bodily injury or property damage, to the extent such losses payable under the OCIP Commercial General Liability Policy are attributable to Contractor's Work, acts or omissions, or the Work, acts or omissions of any of Contractor's Subcontractors, or any other entity or party for whom Contractor may be contractually or legally responsible ("General Liability Obligation").  The General Liability Obligation shall remain uninsured by Contractor and will not be covered by the OCIP Coverages.  If a loss arises out of, or is the responsibility of one or more Subcontractors, Contractor may seek recovery from the Subcontractor(s) for the deductible amount paid by Contractor in accordance with the terms of their Subcontract Agreement.
- Repair Work Coverage Extension: Limited Coverage – Repair Work (10 Years).

- This insurance is primary for occurrences at the Project Site (as defined in the CGL insurance policy)
- The General Aggregate Limit is not shared with other projects.
- The Products/Completed Operations Aggregate Limit is not shared with other projects.
- Defense costs are outside policy limits.
- Waiver of Subrogation is included.
- Limits shared by all insureds.

*A single Commercial General Liability policy will be issued and will include all Enrolled Parties as Named Insureds and is available for review upon request to the OCIP Administrator.*

**Excess Liability:**  (Coverage for off-site operations is <u>excluded unless locations are scheduled & approved by the Owner and OCIP insurance carriers.</u>)

Lead Insurance Carrier – Navigators Specialty Insurance Company

|  | Limits of Liability<br>Shared by All Insureds |
|---|---|
| Each Occurrence | $170,000,000 |
| General Aggregate | $170,000,000 |
| Products & Completed Operations Aggregate | $170,000,000 |

- The General Aggregate Limit is not shared with other projects.
- Products & Completed Operations Aggregate Limit is not shared with other projects.
- Excess of primary OCIP Commercial General Liability policy subject to policy terms and conditions.
- Limits shared by all insureds.

## Evidence of Coverage

Certificates of Insurance will be issued to each Enrolled Parties by the OCIP Administrator evidencing the OCIP coverage described above.  Contractor and Subcontractor agree to be bound by the terms and conditions of the OCIP policies.

## Contract Termination

Enrolled Parties with more than one contract will maintain coverage under the Owner's OCIP until the last contract is terminated.

If, subsequent to work completion and close-out, an Enrolled Parties returns to the Project Site to perform warranty or repair work, the OCIP shall include coverage for all exposures related to the work, subject to statute of repose and policy terms and conditions.

## OCIP Termination / Modification

The Owner reserves the right to terminate or modify the OCIP or any portion thereof.  The Owner will provide thirty (30) advance written notice of termination or material modification to Enrolled Parties covered by the OCIP. In such event, Enrolled Parties will be required to immediately acquire replacement insurance coverage, equivalent to what is currently required for Offsite and Excluded Parties. Written evidence of such insurance will be provided to the Owner or OCIP Administrator prior to the effective date of the termination or modification of the OCIP coverages.  The cost of the replacement insurance shall be at Owner's expense, but only to the extent of the reasonable insurance prices available on the market at the time of replacement.

**<u>Waiver of Subrogation and Rights of Recovery</u>**:

Except for the amount of the General Liability Obligations or deductibles as described elsewhere, Enrolled Parties, each on their own behalf, whether by way of subrogation or otherwise, hereby waive any and all subrogation or other rights of recovery of any kind which they may now, or hereafter have, against the Owner, each other and their parent, related and affiliated companies, the successors and assigns of each other, in connection with the performance of the work and to the extent claims, loss or damages are covered under the OCIP.  Each Contractor and Subcontractor shall require Subcontractor(s) to similarly waive their rights of subrogation and recovery in each of their respective construction contracts with respect to their work.

# Section 5: Contractor and Subcontractor Required Coverage

All Contractors and Subcontractors, whether Enrolled or Excluded, are required to maintain for the duration of their contract with the Owner, the coverages as required by "Exhibit K – Insurance" of the Contract between the Owner and Contractor.  The limits shown in the contract are minimum limits and are not intended to limit the Contractors' or Subcontractors' liability.

Contractors and Subcontractors are required to provide a certificate of insurance evidencing the required coverages and limits prior to coming on the project site. Certificates of insurance should include confirmation of compliance with additional insured and waiver of subrogation requirements from the Contract for the following entities:

- **A3 Development, LLC**
  **17780 Collins Avenue, 2nd Floor**
  **Sunny Isles Beach, FL 33160**

- **A3 North Development, LLC**
  **17780 Collins Avenue, 2nd Floor**
  **Sunny Isles Beach, FL 33160**

- **Bank OZK ISAOA / ATIMA**
  **625 Court Street**
  **Clearwater, FL 33756**

- **Coastal Construction of South Florida dba Coastal Condominiums**
  **5959 Blue Lagoon Drive, Suite 200**
  **Miami, FL 33126**

- **And others as required during or after the term of construction**

**<u>Certificates of Insurance</u>**

All Contractors and Subcontractors shall maintain the required insurance without interruption from the date of commencement of work throughout the warranty period.  The Owner reserves the right to request certificates of insurance, copies of policies or specific endorsements from any Contractor or Subcontractor.  Failure of any Contractor, Subcontractor or other party to provide such certificates of insurance will not be relief from the responsibility to carry and maintain such insurance.

**<u>No Release</u>**

The Owner's procurement and provision of the OCIP shall in no way relieve the Contractor or Subcontractor of any responsibility or liability under this contract, any applicable law, statute, regulation or order, except the responsibility of securing the OCIP coverages if, and commencing when, the Contractor or Subcontractor becomes Enrolled Parties.

# Section 6: OCIP Requirements

**Enrollment / Reporting Requirements:**

**What Forms & Reports are Required?**

Complete the following forms within the time frames specified below:

- Notice of Contract Award Form 1 – within five (5) business days of contract award to Contractor or Subcontractor or when Contractor awards work to Subcontractors of all tiers or the OCIP Administrator's request.

- Insurance Information Form 2 – Prior to starting work onsite or within five (5) business days of contract award or OCIP Administrator's request.

- OCIP Insurance Cost Calculation Form 3 – Prior to starting work onsite or within five (5) business days of contract award or OCIP Administrator's request. Attach copies of your company's General Liability & Umbrella/Excess Liability Policy Declaration & Rate Pages.

- Compliant Certificate of Insurance & Required Endorsements – Prior to starting work onsite or within five (5) business days of contract award or OCIP Administrator's request.

- Notice of Completion Form 4 – Upon completion

Failure to provide the required enrollment documents and/or other reporting forms may cause delayed progress payments.

**How do I complete the forms & submit reports?**

**NOTICE OF CONTRACT AWARD FORM 1:**

- When Enrolled Parties award a subcontract, the awarding Contractor or Subcontractor shall complete the Notice of Contract Award Form 1 for each Subcontractor and immediately forward it to the OCIP Administrator.

- The awarding Contractor or Subcontractor shall ensure that their Subcontractors immediately complete and forward the remainder of the enrollment forms and required documentation to the OCIP Administrator.

**OCIP ENROLLMENT PACKET:**

The OCIP enrollment packet consists of the following:

- Insurance Information Form 2
- Insurance Cost Calculation Form 3
- General Liability & Umbrella/Excess Liability Policy Declaration & Rate Pages
- Compliant Certificate of Insurance & Required Endorsements

Enrollment into the OCIP program is mandatory but **NOT** automatic.  Access to the project site will not be granted until enrollment is completed.  Unenrolled/Excluded Parties do not have any insurance coverage under the OCIP.

- Eligible Parties working at the Project Site shall complete the enrollment packet.  Contractors and Subcontractors shall contact their insurance agent for assistance in completing these documents.

- If a Contractor or Subcontractor is awarded more than one contract on the project, the Contractor or Subcontractor is required to complete a separate enrollment packet for each contract.

## PRICING OF OCIP INSURANCE COSTS

Eligible Contractors should prepare their proposal using standard pricing for the scope of work outlined and provide a price reduction for the cost of insurance not incurred due to participation in the OCIP for on-site work. The insurance should be based on the OCIP on-site work that will be performed as outlined below.

The Eligible Contractor is required to complete the OCIP enrollment packet and submit this information to the OCIP Administrator. Failure to provide the required information may delay an award of work.

Contractors and Subcontractors through completion of the Award and enrollment packet have warranted and agreed that insurance costs relating to OCIP coverage provided have been included in its bid and correctly identified.  Contractors' or Subcontractors' calculations noted in the OCIP Insurance Cost Calculation Form 3 have been and shall be based upon rates in force at the time of the contract bid and are not subject to change during the contract period.

- Identify all applicable insurance costs associated with their work at the Project Site for coverages provided under the OCIP and cooperate with the OCIP Administrator to verify the insurance cost;

  - General Liability – amount based on risk financing technique employed for such exposures considering deductible or self-insured retention based on each Enrolled Contractor's policy at the time of Bid.  If no deductibles or self-insured retentions exist, then first dollar costs shall be provided. (If premiums are on a flat-basis, Contractors and Subcontractors shall be expected to provide applicable underlying General Liability exposures to substantiate a cost allocation for this Project)

  - Umbrella/Excess Liability - first dollar regardless of the risk financing technique employed for such exposures, including, but not limited to, insurance premiums, expected losses with any retention or deductible amount, loss handling expenses and administrative expenses.  (If premiums are on a flat-basis, Contractors and Subcontractors shall be expected to provide Umbrella/Excess premium and the applicable underlying General Liability exposures to substantiate a cost allocation for this Project.  If this information is not provided, the OCIP Administrator will calculate based on a percentage of the General Liability premium).

- Calculation of Insurance Cost.   In calculating insurance costs, each Enrolled Party shall use the General Liability and Umbrella/Excess Liability limits as described in the Contractor Required Insurance section as if they were required to provide the coverages and limits of liability for onsite work.  If the insured party carries a deductible or self-insured retention under any of its policies, then the following may be requested by Owner's representative or OCIP Administrator:

- Rating pages from the Deductible Agreement showing the Deductible and Loss rates or a letter from your insurance carrier evidencing the deductible rate and loss content rate; OR

- Minimum of five (5) years of loss history for all entities that retain losses.  Paid, outstanding and total incurred losses must be evidenced by policy period.  AND

  Minimum of five (5) years of payroll or revenue/receipts history for all entities.

- Any Contractor or Subcontractor, whose policies are written on a large deductible basis and/or those utilizing corporate allocations should contact the OCIP Administrator for additional instructions. Contractors and Subcontractors shall cooperate in providing all documentation necessary to verify their insurance costs.

- Contractors and Subcontractors shall accurately estimate all on-site, unburdened payroll and/or receipts.

- If an Enrolled Contractor or Subcontractor will be subcontracting work and has not yet identified all of its Subcontractor(s) or does not have the insurance costs for its Subcontractor(s), that Enrolled Contractor or Subcontractor may be subject to an estimated percentage of the subcontracted value for its Subcontractor's insurance costs until Subcontractor information and documentation can be provided.

- If a Contractor or Subcontractor is awarded more than one contract on the project, the Contractor or Subcontractor is required to complete a separate enrollment packet for every contract.

- If no or insufficient information is submitted to allow verification of the applicable insurance cost, then Owner's representative or the OCIP Administrator may independently calculate an appropriate insurance cost.

- After contract approval, the Owner will execute a deductive change order reducing the total bid by an amount equal to the cost of insurance identified and accepted for OCIP insurance credit.

The Owner's representative or insurer may audit the Enrolled Contractor's records and insurance agreements, at any time, to confirm the accuracy of the insurance cost information. At Owner's discretion, any variances may result in an adjustment to the final contract cost.

## CHANGE ORDERS

All change orders are to be negotiated net of insurance costs for coverages provided under the OCIP, unless otherwise directed by the OCIP Administrator or Owner.

## PREMIUM AUDIT

The Contractor and its Subcontractors of all tiers for whom insurance is provided by the OCIP are required to maintain records of Project Site payroll and/or receipts. These records will serve two purposes:

(a) Provide the information needed to determine the insurance premium to be paid by Owner for the Work performed at the Project Site.

(b) Serve the same purpose for the Contractor's and Subcontractor's regular insurance company in deleting such payroll and/or receipts when making its audit for earned premium under the Contractor's and Subcontractor's ongoing insurance program.

Records must be maintained by class of work to show the actual amount earned as well as by separate location numbers, if applicable.

## NOTICE OF COMPLETION - CLOSEOUT PROCESS

- When an Enrolled Contractor or Subcontractor makes a Request for Final Payment, the OCIP Administrator shall be notified and the Notice of Completion Form shall be completed and submitted to the OCIP Administrator.

- The Owner's representative or insurer may audit the Enrolled Contractor's records and insurance agreements to confirm the accuracy of the insurance cost information. At Owner's discretion, any variances may result in an adjustment to the final contract cost.

## Contractor and Subcontractor's Responsibilities:

All Contractors and Subcontractors are required to reasonably cooperate with the Owner, the OCIP Administrator, and the OCIP insurance carrier(s) in all aspects of the OCIP operation and administration. Contractor and Subcontractor responsibilities include:

- Incorporating OCIP contract provisions and requirements in all subcontracts;

- Including the OCIP Manual by reference into the successful bidders' Contract; and providing each Subcontractor with a copy of the OCIP Manual;

- Enforcing enrollment of all Subcontractors, except for those identified as Excluded Parties, as participation by Eligible Parties is mandatory;

- Notifying the OCIP Administrator of all subcontracts awarded by completing the Notice of Contract Award Form 1;

- Assisting in timely securing the required enrollment and/or premium information from their Subcontractors;

- Complying with insurance requirements and Section 7, Insurance Claims Procedures;

- Attending all meetings regarding OCIP administration or claims issues, as required;

- Assuring that all Subcontractor(s) of all tiers are enrolled;

- In consideration of Owner's provision of OCIP coverage, Enrolled Parties agree to:

  o Include and identify all applicable insurance costs associated with their work at the Project Site for coverages provided under the OCIP and cooperate with the OCIP Administrator to verify and audit the insurance cost;

  o Ensure that Eligible Parties include and identify the cost of OCIP coverages from their respective bids;

  o Assignment of Return Premiums:  The Owner shall be responsible for payment of all premiums associated with the OCIP and will be the sole recipient of any dividend(s), rebate(s), and/or return premium(s) generated by the OCIP. Contractors and Subcontractors agree to evidence such assignment by executing and delivering the Enrollment Forms.  Contractors and Subcontractors further agree to require each lower tier Subcontractor to execute the assignment on the Enrollment Form, for the benefit of the Owner;

  o Enrolled Parties shall provide, and require all of its Enrolled Subcontractors of all tiers to provide, within five (5) business days of Owner's or the OCIP Administrator's request, all documents or information as requested.  Such information may include, but is not limited to certified copies of insurance policies and endorsements, declaration pages of the policies, certificates of insurance, or such other information as Owner, the OCIP Administrator, or OCIP Insurers may reasonably request in the administration of the OCIP.

  o If any Subcontractor leases one or more employees through the use of a payroll, employee management or other company, the Subcontractor must procure workers compensation insurance written on a "If Any" policy form and will be in addition to the workers compensation coverage provided to the leased employees by the payroll, employee management or other company. The insurance shall include an endorsement providing coverage for Alternate Employer/Leased Employee liability.

# Section 7  Insurance Claim Procedures

This section explains the processes to be followed in the event of accidents or incidents that may result in claims covered by the OCIP insurance policies.

## Claims Reporting

All General Liability claims, including incidents, accidents and unusual circumstances which may reasonably be expected to develop into claims against OCIP policies, must be reported by Contractors and/or Subcontractors as soon as possible. All accidents and incidents must be reported no later than the close of business on the date of the occurrence. Reports must be made by fax or email to the contacts listed below. The report may also be done initially via telephone, but must also be faxed or emailed.

Following any accident or incident, basic scene investigation should be undertaken by any involved Contractor or Subcontractor's safety representative to establish the facts of the accident and to assist in the OCIP carrier's claims adjudication process.

- Determine what happened and write it down.
- Take photographs and/or measurements, as applicable.
- Identify all involved parties, including witnesses, and obtain contact information.
- Record date(s), time(s) and weather conditions.
- Preserve and protect physical evidence
- Maintain complete confidentiality.
- Cooperate fully with the OCIP Carrier's adjuster.

**Report General Liability claims to:**
Endurance U.S. Insurance - Claims
750 Third Avenue, 18th Floor
New York, NY 10017

Email: eclaims@enhinsurance.com

**Send Copies of all Claims to:**

**Claims Reporting Contact:**
Willis Towers Watson
Dorty Rivero-Stunson
1450 Brickell Ave, Suite 1600, Miami, FL 33131
Phone: (305) 421-6225 or (305)  250-8032
Email: dorty.stunson@willistowerswatson.com

**Owner:**
A3 Development LLC, A3 North Development, LLC
Ben Bryant
17780 Collins Avenue, 2nd Floor
Sunny Isles Beach, FL 33160
(954) 638-1001
benb@trumpgroup.com

**General Contractor:**
Jamie Corbett
Coastal Construction
5959 Blue Lagoon Drive, Suite 200
Miami, FL 33126
(617) 594-5466
jcorbett@coastalconstruction.com

**Awarding Contractor:**
Will vary by claim.  Please contact your awarding
contractor to identify the appropriate personnel
to copy on claims.

# Section 8: OCIP Forms

- Notice of Contract Award Form 1

- Insurance Information Form 2

- OCIP Insurance Cost Calculation Form 3

- Certificate of Insurance

  o   Enrolled Subcontractors

  o   Excluded Subcontractors

- Notice of Completion Form 4

**ALL OCIP FORMS ARE AVAILABLE FROM THE OCIP ADMINISTRATOR.**

## ESTATES AT ACQUALINA
## NOTICE OF CONTRACT AWARD

| FORM 1 |
|---|

**Date:**

**This is to inform that we** _____ **(Hiring Contractor)**

**have awarded a contract to the following Subcontractor:**

---

**Subcontractor Information:**

    **Subcontractor:** _____

    **Contact  Name:** _____

    **Address:** _____

    **City,  State  Zip:** _____

    **Phone No:** _____

    **Fax No:** _____

    **Email Address:** _____

---

**Contract Information:**

    **Phase No:** _____

        (If Applicable)

    **Work Description:**

    **Date of Contract:** _____

    **Est. Contract Value:** _____

    **Est. Start Date:** _____

    **Est. Completion Date:** _____

    **Professional Liability Required:** ☐ Yes    **Limit $**

    **Pollution Liability Required:** ☐ Yes    **Limit $**

---

**Note: A Notice of Contract Award must be completed for each of your subcontractors.**

**Signed By:** _____    **Title:** _____    **Date:** _____

**PLEASE SUBMIT TO:  Dawn Osborn-Straughan,** OCIP Administrator

Email: dawn.osborn@willistowerswatson.com

## ESTATES AT ACQUALINA
## INSURANCE INFORMATION

| FORM 2 |
| --- |

Date: _____

---

Your Company  Name: _____

Your Awarding Contractor: _____

Your Contract Amount: _____

Estimated Payroll: _____

**\*Submit copy of General Liability and Excess Liability Declaration & Rate pages**

---

Use of Subcontractors

Do you intend to subcontract any of                          Yes                                  No
Your work?

                                                    % Self-
If yes, advise percentages:                    Performed  _____        % Subcontracted  _____

If yes, list anticipated Subcontractors:        _____
                                                _____
                                                _____

Note: Form 1 must be completed for each Subcontractor by the awarding entity.

---

Use of Employee Leasing Companies

Will you use a Leasing Company?                     Yes                              No

If yes, Leasing Company Name: _____

Contact Name: _____

Telephone No: _____

---

It is the Enrolled Contractor's and Subcontractor's responsibility to notify its own insurance carrier that onsite this project will be covered by a General Liability OCIP program.

In consideration of Owner paying the OCIP premiums, the undersigned hereby assigns all return premiums, premium refunds, dividends, and any other monies due or to become due in connection with such insurance to Owner.

Signed By: _____    Title: _____    Date: _____

**ATTACH CERTIFICATE OF INSURANCE**
**PLEASE SUBMIT TO:  Dawn Osborn-Straughan , OCIP Administrator**
Email: dawn.osborn@willistowerswatson.com

# ESTATES AT ACQUALINA

## OCIP INSURANCE COST CALCULATION

| FORM 3 |

| | |
|---|---|
| Date: _____ | Hiring Contractor: _____ |
| Your Company's Name: _____ | Work Description: _____ |
| Contact/Title: _____ | Contract Value: _____ |
| Address: _____ | |
| Telephone No.: _____ | Est. Start Date: _____ |
| Fax No.: _____ | Est. Completion Date: _____ |
| Email Address: _____ | Agent's Name/Contact: _____ |
| GL Policy Period: _____ | Agent's Phone No.: _____ |
| UM Policy Period: _____ | Agent's Email Address: _____ |

| A. General Liability – Jobsite Payroll / Receipts Only | | | | | |
|---|---|---|---|---|---|
| G.L. Classification | G.L. Code | G.L. Rate/ $1,000 | Estimated Payroll / Receipts* | Premium ** | |
| 1. | | | | $            - | |
| 2. | | | | $            - | |
| 3. | | | | $            - | |
| 4. | | | | $            - | |
| B. General Liability Subtotal | | $            - | | $            - | (B) |
| C. Umbrella Excess Cost | | | | $            - | (C) |
| D. Subtotal (B+C) | | | | $            - | (D) |
| E. Profit & Overhead – Percentage per Bid times Subtotal – (i.e.; 10% X D) | | | | | (E) |
| F. Total Insurance Cost (D + E) | | | | $            - | (F) |

The Owner, or their Agent, is granted permission by Eligible Parties and Enrolled Contractors to inspect the insurance and payroll records used in determining the above credit. Once the identified cost for insurance coverages is verified and approved by the OCIP Administrator, a deductive change order shall be issued to deduct this cost. Any and all returns of premiums, dividends, discounts or other adjustments to any OCIP policy is assigned, transferred and set over absolutely to Owner. This assignment is valid for insurance policies whose premiums have been paid by the Owner on behalf of such Contractors.

This agreement shall be effective when signed below or in counterpart, and photocopy, facsimile, electronic or other copies shall have the same effect for all purposes as an ink-signed original.

Signature: _____   Title: _____   Date: _____

**PLEASE SUBMIT TO: Willis Towers Watson – Dawn Osborn-Straughan**

**Phone: 407-562-2470 ; Email Address: dawn.osborn@willistowerswatson.com**

**SAMPLE CERTIFICATE – SUBCONTRACTORS**

| ACORD™ | # CERTIFICATE OF LIABILITY INSURANCE | DATE (MM/DD/YYY) |
|---|---|---|

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| | PHONE (A/C, No. Ext): | FAX (A/C, No): |
| | E-MAIL ADDRESS: | |
| | INSURER(S) AFFORDING COVERAGE | NAIC# |
| INSURED | INSURER A : | |
| | INSURER B : | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN. THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYY) | POLICY EXP (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| x | GENERAL LIABILITY | X | X | Policy Number | Effective Date | Exp Date | EACH OCCURRENCE | $1,000,000 |
| | COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGES TO RENTED PREMISES(Ea occurrence) | $ 50,000 |
| | CLAIMS-MADE [X] OCCUR | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | POLICY [X] PRO-JECT LOC | | | | | | PRODUCTS-COMP/OP AGG | $2,000,000 |
| x | AUTOMOBILE LIABILITY | X | X | Policy Number | Effective Date | Exp Date | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY(Per person) | $ |
| | ALL OWNED AUTOS / SCHEDULED AUTOS | | | | | | BODILY INJURY(Per accident) | $ |
| x | HIRED AUTOS [X] NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | If Hauling Hazardous Materials | $5,000,000 |
| X | UMBRELLA LIAB [x] OCCUR | X | X | Policy Number | Effective Date | Exp Date | EACH OCCURRENCE * | $3,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE * | $3,000,000 |
| | DED RETENTION $ | | | | | | *UNLESS OTHERWISE SPECIFIED IN YOUR CONTRACT | |
| | WORKERS COMPENSATION AND EMPLOYERS ' LIABILITY Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [ ] (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | X | Policy Number | Effective Date | Exp Date | [X] WC STATU-TORY LIMITS / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | E.L. DISEASE – EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE – POLICY LIMIT | $1,000,000 |
| | Pollution Liability | | | Policy Number | Effective Date | Exp Date | $5,000,000 per occ/agg | |
| | Professional Liability | | | Policy Number | Effective Date | Exp Date | $5,000,000 per claim | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

*Project Name/Location: The Estates at Acqualina Development Project / 17901 Collins Avenue, Sunny Isles Beach, FL 33160.*
*See attachment for additional required wording.*

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| **A3 Development, LLC, A3 North Development, LLC** c/o Willis Towers Watson 300 Colonial Center Pkwy, Suite 120, Lake Mary, FL 32746 Email: dawn.osborn@willistowerswatson.com | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

**PLEASE SUBMIT TO: Dawn Osborn-Straughan,** OCIP Administrator
Email: dawn.osborn@willistowerswatson.com

**SAMPLE CERTIFICATE – GENERAL CONTRACTOR**

# CERTIFICATE OF LIABILITY INSURANCE

ACORD

DATE (MM/DD/YYY)

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| | PHONE (A/C, No. Ext): | FAX (A/C, No): |
| | E-MAIL ADDRESS: | |
| | INSURER(S) AFFORDING COVERAGE | NAIC# |
| INSURED | INSURER A : | |
| | INSURER B : | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

COVERAGES                 CERTIFICATE NUMBER:                 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN.  THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES.  LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYY) | POLICY EXP (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | GENERAL LIABILITY | X | X | Policy Number | Effective Date | Exp Date | EACH OCCURRENCE | $1,000,000 |
| x | COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGES TO RENTED PREMISES(Ea occurrence) | $  50,000 |
| | CLAIMS-MADE   X   OCCUR | | | | | | MED EXP (Any one person) | $  10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | POLICY   X   PRO-JECT   LOC | | | | | | PRODUCTS-COMP/OP AGG | $2,000,000 |
| | AUTOMOBILE LIABILITY | X | X | Policy Number | Effective Date | Exp Date | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| x | ANY AUTO | | | | | | BODILY INJURY(Per person) | $ |
| | ALL OWNED AUTOS   SCHEDULED AUTOS | | | | | | BODILY INJURY(Per accident) | $ |
| x | HIRED AUTOS   X   NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | If Hauling Hazardous Materials | $5,000,000 |
| X | UMBRELLA LIAB   x   OCCUR | X | X | Policy Number | Effective Date | Exp Date | EACH OCCURRENCE * | $5,000,000 |
| | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE * | $5,000,000 |
| | DED   RETENTION $ | | | | | | *UNLESS OTHERWISE SPECIFIED IN YOUR CONTRACT | |
| | WORKERS COMPENSATION AND EMPLOYERS ' LIABILITY   Y/N | N/A | X | Policy Number | Effective Date | Exp Date | X   WC STATU-TORY LIMITS   OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE – EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE – POLICY LIMIT | $1,000,000 |
| | Pollution Liability | | | Policy Number | Effective Date | Exp Date | $5,000,000 per occ/agg | |
| | Professional Liability | | | Policy Number | Effective Date | Exp Date | $5,000,000 per claim | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

*Project Name/Location: The Estates at Acqualina Development Project / 17901 Collins Avenue, Sunny Isles Beach, FL 33160.*

*See attachment for additional required wording.*

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| **A3 Development, LLC, A3 North Development, LLC** c/o Willis Towers Watson 300 Colonial Center Pkwy, Suite 120, Lake Mary, FL 32746 Email: dawn.osborn@willistowerswatson.com | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

**PLEASE SUBMIT TO:  Dawn Osborn-Straughan,** OCIP Administrator

Email: dawn.osborn@willistowerswatson.com

**DESCRIPTIONS OF OPERATIONS (Continued).**
**All policy endorsements and forms must be attached to the certificate.**

A3 Development LLC, A3 North Development, LLC, Bank OZK (Lender / Mortgagee), and Coastal Construction of South Florida dba Coastal Condominiums are named as Additional Insureds on General Liability coverage only as their interest may appear when required by written contract (per form CG2010 11/85, or its equivalent CG2010 10/01 and CG2037 10/01). The Additional Insured form must include coverage for Completed Operations.

General Liability, Auto Liability, and Umbrella / Excess Liability must be primary and non-contributory to any other insurance available to the Additional Insureds named above when required by written contract.

Umbrella Liability extends to underlying General Liability, Auto Liability, and Workers Compensation coverages.

Waiver of subrogation is provided under the Workers Compensation, General Liability, and Auto Liability coverages in favor of all Additional Insureds when required by written contract.

**The policies herein contain no exclusions and / or limitations for residential construction including condominiums.**

Thirty (30) days' notice of cancellation for any reason other than non-payment of premiums is provided, when required by written contract.

**Estates at Acqualina**

# FORM 4

## NOTICE OF COMPLETION

Date: _____

From: _____
(Awarding Contractor)

Contact Name: _____

Address: _____

City, State, Zip _____

Telephone No: _____

Email Address: _____

Please be advised that the following Enrolled Contractor is scheduled to complete work.

| Contractor: | | | |
|---|---|---|---|
| Contact/Title: | | | |
| Address: | | | |
| Work Description: | | Final Contract Price: | |
| Telephone No: | | Final Contract Value: | |
| Email Address: | | Final Payroll Amount: | |
| Actual Start Date: | | Completion Date: | |
| | | Date: | |

Name of subcontractors, if any, which are included in this work: _____

Is this the only contract for this contractor at this project?  Yes _____ No _____
If no, please list: _____

Signed By: _____  Title: _____

**PLEASE SUBMIT TO: Dawn Osborn-Straughan,** OCIP Administrator
Email: dawn.osborn@willistowerswatson.com

## OCIP ACCIDENT / INCCIDENT REPORT

| PROJECT NAME / DESCRIPTION: | Estates at Acqualina | PROJECT / CONTRACT # : | |
|---|---|---|---|
| COMPANY NAME : | | | |
| NAME OF PERSON REPORTING | | PHONE# : | FAX# : | EMAIL : |

| ACCIDENT / INCIDENT INFORMATION | | | | | |
|---|---|---|---|---|---|
| DATE OF ACCIDENT / INCIDENT: | | TIME OF ACCIDENT/INCIDENT : | | ☐ AM ☐ PM | DATE NOTIFIED : | |
| ADDRESS OR LOCATION WHERE ACCIDENT / INCIDENT OCCURRED (BE SPECIFIC) | | | | | |
| WERE THE POLICE CONTACTED? | ☐ YES ☐ NO | REPORT NUMBER : | | | |

**BRIEF DESCRIPTION OF ACCIDENT / INCIDENT** (Use a separate sheet and diagram if necessary)

| CLAIMANT INFORMATION | | | | | |
|---|---|---|---|---|---|
| CLAIMANT NAME : | | HOME PHONE# : | | WORK PHONE# : | | EMAIL : | |
| ADDRESS : | | | | | |
| INJURED PARTY IS : | ☐ MALE   ☐ FEMALE | | | | |

| INJURY INFORMATION | |
|---|---|
| WERE ANY INJURIES INCURRED? | ☐ YES ☐ NO |

IF INJURY OCCURRED, GIVE BRIEF DESCRIPTION:

WHAT INITIAL TREATMENT DID THE CLAIMANT RECEIVE? (FIRST AID, EMERGENCY, ETC)

| WITNESS INFORMATION | | | | | |
|---|---|---|---|---|---|
| WITNESS NAME : | | HOME PHONE# : | | WORK PHONE# : | | EMAIL : | |
| ADDRESS : | | | | | |
| WITNESS NAME : | | HOME PHONE# : | | WORK PHONE# : | | EMAIL : | |
| ADDRESS : | | | | | |

**Willis Towers Watson** IıIıI

Willis Towers Watson Confidential

| WITNESS NAME : | | HOME PHONE# : | | WORK PHONE# : | | EMAIL : | |
|---|---|---|---|---|---|---|---|
| ADDRESS : | | | | | | | |

**ADDITIONAL COMMENTS**

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

**DIAGRAM (SHOW NORTH / SOUTH) :**

|  |
|---|
|  |

**PERSON COMPLETING REPORT**

| NAME : | | TITLE : | | | DATE : | |
|---|---|---|---|---|---|---|
| SIGNATURE : | | | | | | |

**PROJECT MANAGER**

| NAME : | | TITLE : | | | DATE : | |
|---|---|---|---|---|---|---|
| ADDRESS : | | PHONE # : | | FAX# : | | EMAIL : | |
| SIGNATURE : | | | | | | | |

Willis Towers Watson Confidential

Willis Towers Watson

Exhibit P1

**ENDORSEMENT #010**

**This endorsement, effective 12:01 A.M.,** 12/31/2019
**Forms a part of Policy No.:** 043820532
**Issued to:**  A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:**  NEW HAMPSHIRE INSURANCE COMPANY

## POLICY CHANGES ENDORSEMENT

Endorsement #009, Policy Changes Endorsement is deleted in its entirety and replaced by the following:

The following item(s):

| | | |
|---|---|---|
| ☐ Insured's Name | ☐ | Insured's Mailing Address |
| ☐ Policy Number | ☐ | Company |
| ☒ Effective/Expiration Date | ☐ | Insured's Legal Status/Business of Insured |
| ☐ Payment Plan | ☐ | Premium Determination |
| ☐ Additional Interested Parties | ☐ | Coverage Forms and Endorsements |
| ☒ Limits/Exposures | ☐ | Deductibles/Waiting Periods |
| ☒ Covered Property/Location Description | ☐ | Additional Location(s) |
| ☐ Underlying Insurance | ☐ | Special Terms and Conditions |

is (are) changed to read **{See Additional Page(s)}:**

The above amendments result in a change in the premium as follows:

| | | | | | |
|---|---|---|---|---|---|
| ☐ | **NO CHANGES** | ☒ | **ADDITIONAL PREMIUM**  $245,729 | ☐ | **RETURN PREMIUM**  $ |

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.          **Page 1 of 2**

## POLICY CHANGES ENDORSEMENT DESCRIPTION

1.  **Item 4.A. Policy Period** of the Declarations is amended to include the following:

    A.  Inception Date:   14 December 2018   Expiration Date: 01 April 2022
        (12:01 a.m., Standard Time at the **insured project** location.  The Expiration Date may vary in accordance with Item **4.B.**) (hereinafter, the **Original Policy Period**)

2.  **Item 5. Insured Project** of the Declarations is amended to include the following:

    **Description**: Addition of the entirety of the North Tower/Phase 2 of the project, inclusive of the west parking garage

3.  **Item 8. Deposit Premium** of the Declarations is deleted in its entirety and replaced by the following:

| Phase 1 Coverage | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| **Total Project Value (South Tower)** | 2.5479 years | $373,500,000 | $Various | $1,648,911 |
| **Total Project Value (Villa and Site)** | 3.0493 years | $60,000,000 | $Various | $412,300 |
| **Existing Property** | 3.0493 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| **Contractors Equipment** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Delay In Completion** | 3.0493 years | $44,022,420 | $Various | $343,015 |
| **Hot Testing** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Terrorism** | 3.0493 years | $477,522,420 | $0.0375 of the non-NatCat premium | $26,271 |
| **LEG 3** | 3.0493 years | $477,522,420 | $0.10 of the non-NatCat premium | $70,055 |
| | **Total Deposit Premium:** | | | $2,500,552 |

| Phase 2 Coverage* | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| **Total Project Value (North Tower + West Garage, less credits noted below)** | 2.5521 years | $169,158,811 | $Various | $642,607 |
| **Existing Property** | 2.5521 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| **Contractors Equipment** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Delay In Completion** | 2.5521 years | $48,457,160 | $Various | $36,795 |
| **Hot Testing** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Terrorism** | 2.5521 years | $217,615,971 | $0.0375 of the non-NatCat premium | $6,186 |
| **LEG 3** | 2.5521 years | $217,615,971 | $0.10 of the non-NatCat premium | $16,496 |
| | **Total Additional Deposit Premium*:** | | | $702,083 |

*Phase 2 Additional Deposit Premium calculation is based on:*
*(1) $207,300,000 (Phase 2) plus $7,000,000 (West Garage) minus $45,141,189 ($20,141,189 savings and $25,000,000 included within Phase 1 Total Project Value) for the project term, 12/31/19 to 4/1/22; and*
*(2) Delay in Completion, Terrorism & LEG 3 premiums are the difference between Phase 1 & Phase 2*
*(3) Delay in Completion Limit for Phase 2 is the values of Phase 1 with the increase of $4,434,740.  Total Delay in Completion Limit for the policy is $48,457,160, as noted on the De-*

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

*lay in Completion Endorsement.*

Policy Extension Calculations (180 days per phase/per TCO):

- North Tower - to extend to October 1, 2022
    – April 1 to May 31: $15,008 per month
    – during wind season (June to Nov): $59,997 per month
    – Full delay value assumed ($48,457,160)

For Audit & Extensions the Annual rates are:

- South Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- Villa: .115 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- North Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- 150% for delay; 3.75% for terrorism (3% base rate * 25% surcharge to remove sunset clause); 10% for LEG 3. Terrorism & LEG 3 premiums are calculated based on the non-Cat premium.

4. **Item 9. Policy Limit** of the Declarations is deleted in its entirety and replaced with the following:

   **Item 9. Policy Limit:** $651,115,971  The **quota share percentage** (shown in Item **13.** of the Declarations) of the **Policy Limit** is the Company's maximum liability in any one **occurrence** as a result of all covered loss or damage regardless of the number of coverages or **covered causes of loss** under this Policy.

5. **Subsection (1)** and **(4)** of Subsection **10.A. Sublimits Applicable to Specified Covered Causes of Loss** of the Declarations are deleted in their entirety and replaced with the following:

   **1. Earth Movement:**  $651,115,971 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $651,115,971, for all covered loss or damage arising out of **earth movement**

   **4. Terrorism:**  $651,115,971 for all covered loss or damage arising out of **terrorism**

6. Subsection **10.B. Sublimits of Liability** of the Declarations is amended as follows:

   **Physical Damage Sublimit of Liability**  $602,658,811 applicable to physical damage to **covered property** at the **insured project**

7. **Endorsement #001, Delay in Completion Endorsement** is deleted in its entirety and replaced with the following:

   ### DELAY IN COMPLETION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

I. **Named Insured and Address:**
   A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
   17901 COLLINS AVENUE SOUTH
   SUNNY ISLES BEACH FL 33160

   All coverage under this Delay in Completion Endorsement shall only be provided to the Named Insured shown above (hereinafter, the **Named Insured** for purposes of this endorsement only).  No coverage shall be provided under this endorsement to any other person or entity.

**II.** The coverage provided under this Delay in Completion Endorsement is applicable to the entire **insured project** unless otherwise described below:

Not Applicable

**III. Period of Indemnity**: 540 Calendar Days

**IV. Anticipated Date of Completion:** South Tower – 07/01/2021
Villa – 12/31/2021
North Tower – 04/01/2022

**V. Deductible Period:**

| | **Deductible Period** (per **occurrence** unless otherwise stated below) |
|---|---|
| **Standard Deductible** | 30 Calendar Days<br>☒ per **occurrence** or<br>☐ in the Aggregate, no other **Deductible Periods** apply |
| **Earth Movement, Flood** or **Named Storm** | 30 Calendar Days |
| **Cyber Loss** | 30 Calendar Days |
| **Ingress & Egress** | 30 Calendar Days |
| **Order of Civil or Military Authority** | 30 Calendar Days |
| **Service Interruption** | 30 Calendar Days |
| **Hot Testing** | 30 Calendar Days |
| **LEG 3** | 30 Calendar Days |

If two or more deductible amounts provided above apply to a single **occurrence**, the total to be deducted shall be the largest applicable deductible.  The above deductibles are in addition to any applicable deductibles on the Declarations of this Policy.  If the Standard Deductible applies on a per **occurrence** basis, then such deductible shall apply unless a more specific deductible applies.

**VI. Limits of Liability Applicable to this Endorsement**

The following are subject to and not in addition to the **Policy Limit** and all sublimits of liability shown in Item **10.A.** of the Declarations.  The sublimits of liability stated in this endorsement are per **occurrence** unless otherwise stated.

*If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage, then no coverage is provided for that coverage, whether under the Insuring Agreement or any Additional Coverage.  If the words, NOT APPLICABLE are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

    **A.**  Aggregate Sublimit of liability for all coverage under this endorsement    $48,457,160

The following sublimits of liability **VI.B.** through **VI.I.** are subject to **VI.A.** above:

    **B.**  Loss of **Rental Income**    $Not Covered

    **C.**  Loss of **Gross Earnings**    $Not Covered

| | | |
|---|---|---|
| **D.** | **Cyber Loss** | See Item **10.B.7.** of the Declarations |
| **E.** | Ingress & Egress | 15 Calendar Days, subject to maximum of $2,500,000 |
| **F.** | Order of Civil or Military Authority | 15 Calendar Days, subject to maximum of $1,000,000 |
| **G.** | Service Interruption | 15 Calendar Days, subject to maximum of $1,000,000 |
| **H.** | Other: Not Covered | $Not Covered |
| **I.** | **Soft Costs/Additional Expenses** | $48,457,160 |

The following sublimits of liability are subject to **VI.I.** above.

| | | |
|---|---|---|
| **1.** | Interim interest expense | $Included |
| **2.** | Realty taxes/Ground rents | $Included |
| **3.** | Leasing/Commission expense | $Included |
| **4.** | Insurance premiums | $Included |
| **5.** | Advertising and marketing expense | $Included |
| **6.** | Legal and accounting fees | $Included |
| **7.** | License and permit fees | $Included |
| **8.** | Project management fees | $Included |
| **9.** | Other:  Construction Supervision | $Included |
| **10.** | Other: Real Estate Taxes | $Included |
| **11.** | Other: Loan Fees and Interest | $Included |
| **12.** | Other: Sales Deposit & Bond Interest | $Included |
| **13.** | Other: Project G & A | $Included |
| **14.** | Other: Soft Cost Contingency | $Included |

No coverage or Additional Coverage shall be provided unless the **delay(s)** exceeds the **anticipated date of completion** and then such coverage shall only be provided for the **delay(s)** that is/are in excess of such **anticipated date of completion**, subject to the applicable **deductible period.**  All covered losses and expenses are subject to the applicable **Policy Limit**, sublimits of liability, **period of indemnity** or calendar days as stated in the above Schedule.

**A. INSURING AGREEMENT**

  **1.** Subject to all terms and conditions of this Policy, in the event of:

  **a.** Direct physical loss of or damage to **covered property, landscaping materials** or **plans and draw-**

ings by a **covered cause of loss**, or

    **b.**  Corruption, erasure or alteration of:

        **i.**  **Electronic data** in the **building or other systems**, due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss**,

        **ii.**  **Plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code**, or

    **c.**  **Building or other systems** that are rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems**

(hereinafter, collectively Subsections **1.b.** and **1.c.** are referred to as **cyber loss**), the Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** sustained during the **period of indemnity** as a result of **delay** in completion of the **insured project**, on an actual loss sustained basis.

**2.**  The Company shall also indemnify the **Named Insured** for reasonable expenses, over and above normal operating expenses, during the **period of indemnity**, that are necessarily incurred for the purpose of reducing any loss covered under this endorsement, but in no event shall the Company be liable for an amount greater than that for which the Company would have been liable had there been no covered **delay**.

## B.  ADDITIONAL COVERAGES

**1.**  **Ingress & Egress**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if ingress to or egress from the **insured project** is prohibited as a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy, provided that such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the prohibition of ingress or egress to the **insured project** for the lesser of:

    **a.**  The number of calendar days shown for Ingress & Egress in the above Schedule, or

    **b.**  Until the ingress or egress is no longer prohibited,

subject to the Ingress & Egress sublimit of liability shown in the above Schedule.

**2.**  **Order of Civil or Military Authority**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if an order of civil or military authority prohibits access to the **insured project**, provided that: (1) such order is a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy and (2) such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with such order that prohibits access to the **insured project** for the lesser of:

a.  The number of calendar days shown for Order of Civil or Military Authority in the above Schedule, or

b.  Until access to the **insured project** is no longer prohibited,

subject to the Order of Civil or Military Authority sublimit of liability shown in the above Schedule.

3.  **Service Interruption**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** resulting from the interruption of incoming electricity, steam, gas, fuel or water caused by direct physical loss or damage by a **covered cause of loss** to a service provider's transmission and distribution lines and related plants, substations and equipment located outside of the **insured project**. Notwithstanding the foregoing, the Company will not pay for any interruption intentionally caused by any **Insured** or any service provider.

If a service provider's transmission and distribution lines and related plants, substations and equipment that sustain loss or damage are part of the **insured project** and included in the **total project value**, the Service Interruption sublimit of liability shown in the above Schedule shall not apply, nevertheless the Aggregate Sublimit of Liability for all coverage under this endorsement shown in **VI.A.** above shall apply.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the interruption of incoming electricity, steam, gas, fuel, or water to the **insured project** for the lesser of:

a.  The number of calendar days shown for Service Interruption in the above Schedule, or

b.  Until such incoming utilities are restored,

subject to the Service Interruption sublimit of liability shown in the above Schedule.

C.  **ADDITIONAL EXCLUSIONS AND LIMITATIONS**

In addition to all other exclusions of this Policy, the Company will not be liable under this endorsement for any loss or increase in **delay** caused by, resulting from or arising out of any of the following:

1.  The enforcement of any law, ordinance, governmental directive or standard regulating removal, repair, construction or reconstruction of any property;

2.  Changes made in the design, plans, specifications or other contract documents in order to effect the repair or replacement of any property;

3.  Non-availability of funds;

4.  Import, export or customs restrictions and/or regulations;

5.  The breach, suspension, lapse or cancellation of or the failure to obtain, maintain or extend any permit, lease, license, contract or purchase orders;

6.  The interference by strikers or other persons directly or indirectly with the completion of the **insured**

**project**, including the transportation of property, the construction, rebuilding, repairing or replacing of any property or the occupancy or use of the premises where the **insured project** is located;

7. The failure to use due diligence and dispatch in restoring any property to the condition existing prior to the loss or damage;

8. Any deviation in the **construction schedule** or a revised **construction schedule** except for a deviation that is the result of covered loss or damage;

9. Any disruption in the normal movement of **covered property** unless such **covered property** is damaged by a **covered cause of loss** during **inland transit**;

10. Re-erection of any tower or pole crane(s), unless such tower or pole crane is specifically covered under Schedule A of the Contractors' Equipment Endorsement. or

11. Loss or damage to that part of the **insured project** which at the time of loss or damage has been put to its intended use or has become operational.

## D. ADDITIONAL LOSS ADJUSTMENT CONDITIONS

In addition to the conditions set forth in the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section of this Policy, the following additional conditions apply to this endorsement:

1. Upon written notification of any loss or damage under the terms and conditions of this Policy, the **Insured** shall provide the Company with all applicable **construction schedules** as requested by the Company.

2. Upon request by the Company, the **Insured** shall make available all other records and information relevant to the determination of any claim for loss, damage and/or expenses or any audit under this endorsement.

3. In the event of payment under this endorsement, the Company may conduct an audit of the **Named Insured's** records for a reasonable period of time, to be determined by the Company, (typically 12 months) after actual commencement of operations to determine the loss under this endorsement, as well as any expenses incurred by the **Named Insured** related to reducing such loss.  Due consideration shall be given to seasonal patterns, trends, variations or special circumstances which would have affected the business had the **delay** not occurred, so that the amount adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the **delay**, would have been realized.  Any amount saved with respect to labor costs, charges and expenses that have ceased or reduced during the **period of indemnity** and liquidated damages the **Named Insured** is entitled to receive from others, whether collectible or not, shall be deducted from the loss during the **period of indemnity**.

   In the event the amount of loss determined by the audit is less than or exceeds the sum paid by the Company for loss covered under this endorsement during the **period of indemnity**, the difference between the two amounts shall be paid by the Company or to the Company by the **Named Insured**, whichever is applicable.

## E. ADDITIONAL GENERAL CONDITIONS

In addition to the conditions set forth in the GENERAL CONDITIONS Section of this Policy, the following additional conditions apply to this endorsement:

1. In the event loss, damage or other circumstances require that the project completion date shown on any critical path, time line, bar chart or other scheduling vehicle is revised to extend such completion date, the **Insured** shall establish a revised **construction schedule** and furnish the same to the Company.  The new date established in such revised **construction schedule** shall become the **anticipated**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

**date of completion**.  The Company shall have the right to change the **anticipated date of completion**, even if the **Insured** has failed to provide such revised **construction schedule**.

There shall be no amendment to the **anticipated date of completion** in the event any critical path, time line, bar chart or other scheduling vehicle is revised to compress or accelerate the **construction schedule**, without the written notice to the Company and endorsement by the Company hereto.

2.  The **Insured** shall take and allow all reasonable measures to minimize the extent of any interference with the **construction schedule** so as to avoid or diminish any potential **delay**.  The **Insured** shall begin normal operations as soon as practicable.

## F.  ADDITIONAL DEFINITIONS

The definitions of this Policy apply to this endorsement.  However, the following additional definitions apply to this endorsement and supersede any similar definitions of this Policy to the contrary.

1.  **Anticipated date of completion** means: (1) the date as shown in the above Schedule as the Anticipated Date of Completion or (2) the revised **anticipated date of completion** in accordance with the Subsection **E.1.** of the Additional General Conditions Subsection of this endorsement.  For calculation of loss under this endorsement, the Company shall use the applicable **anticipated date of completion** at the time of the loss or damage.

2.  **Construction schedule** means the schedule utilized in the construction management program through software that shows the construction operations, the times for starting and completion of operations, the period of the operations, the interrelationships between the operations and the critical path that identifies the critical operations.

3.  **Deductible period** means the applicable number of calendar days shown in Item **V.** of the above Schedule beginning with the **anticipated date of completion**.  Losses are only payable in excess of the applicable **deductible period**.

4.  **Delay** means the period of time between the **anticipated date of completion** and the actual date on which occupancy or commercial service can commence with respect to the entire **insured project** or the **insured project** as described in Item **II.** of the Schedule, whichever is applicable, with the exercise of due diligence and dispatch.

5.  **Gross earnings** means gross revenues from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

6.  **Insured project** means the entire **insured project** or the part of the **insured project** as identified in Item **II.** of the above Schedule.  The words, **insured project**, also include the definition in the Completed Value Builders Risk Policy.

7.  **Period of indemnity** means the number of calendar days for which coverage is provided under this endorsement, regardless of the number of **occurrences**, not to exceed the number of days shown in Item **III.** of the above Schedule.  For each **occurrence**, such calendar days or remaining calendar days shall commence upon the expiration of the applicable **deductible period**.  The **period of indemnity** shall not be limited by the end of the **policy period**.

8.  **Rental income** means revenues from rentals and leases from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

9.  **Soft costs/additional expenses** means such expenses as shown in Item **VI.I.1.** through **VI.I.9.** of the

above Schedule, inclusive, in relation to the **insured project**.

8. **Endorsement #002, Extension for Repairing or Replacing Defective Covered Property ("LEG3") Endorsement** is deleted in its entirety and replaced with the following:

## EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

Sublimits of Liability and Deductibles (per **occurrence**):

**A.** The following sublimit of liability is added to Item **10.B.** of the Declarations:

    Sublimit for repairing or replacing faulty or defective **covered property**    $602,658,811

**B.** The following deductible is added to Item **11.** of Declarations:

    Deductible applicable to repairing or replacing faulty or defective **covered property**    $100,000

The above deductible shall apply in addition to the applicable deductible(s) in Item **11.A.** through **11.G.**, inclusive, as shown on the Declarations.

**C.** The following sublimit of liability is added as Item **VI.J.** to the Delay In Completion Endorsement:

    Provided that Delay In Completion coverage is provided under this Policy, the Sublimit for Delay in Completion resulting from repair or replacement of faulty or defective **covered property**    $48,457,160

The **Deductible Period** shown in the Delay in Completion Endorsement applies to the above coverage in this Subsection **C.**

Additional Premium: $86,551
_____

In consideration of the Additional Premium shown in the above Schedule, Exclusion **B.10.** of the PERILS EXCLUDED Section is deleted in its entirety and replaced with the following:

**10. a.** Faulty workmanship, material, construction or installation from any cause; or

    **b.** Any fault, defect, error, deficiency or omission in any design, plans, or specifications,

all unless direct physical loss or damage not otherwise excluded by this Policy ensues. If direct physical loss or damage not otherwise excluded by this Policy ensues, then the Company shall pay for the following only:

    **a.** Such ensuing direct physical loss or damage to **covered property**, and/or

    **b.** Subject to the sublimit(s) of liability shown in the above Schedule, repairing or replacing (whichever is less) with like kind and quality at the time and place of the loss the damaged part of the faulty or defective **covered property**.

However, in no event shall the Company pay any loss, cost, damage or expense to: (1) improve

the original workmanship, materials, construction, installation, design, plans or specifications or (2) redesign any design, plans or specifications.

No portion of the **covered property** shall be regarded as damaged solely by virtue of the existence of: (1) any faulty workmanship, material, construction or installation, or (2) any fault, defect, error, deficiency or omission in any design, plans, or specifications.

NOTICE:  THIS ENDORSEMENT IS BASED UPON LEG 3 PROVISIONS, BUT MAY DIFFER FROM SUCH CURRENT OR PRIOR LEG 3 PROVISIONS.


All other terms and conditions of the Policy remain the same.

_____
Authorized Representative

# General Security Indemnity Company of Arizona
**(THE "COMPANY")**

| | |
|---|---|
| **HOME OFFICES** | **ADMINISTRATIVE OFFICES** |
| 2338  W. ROYAL PALM ROAD, | One Seaport Plaza |
| SUITE J | 199 Water Street, 21st Floor |
| Phoenix, AZ 85021 | New York, New York 10038-3526 |
| | Telephone No: +(1) 212-480-1900 |
| | U.S. Toll-Free (outside NY) 800-326-3299 |

This Endorsement, effective 12:01 am 12/31/2019

Forms part of Policy Number: FA0037954-2018-1

Issued to: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP

**By: GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA**

### Endorsement No.10

Endorsement #9, Policy Changes Endorsement is deleted in its entirety and replaced by the following:

It is hereby understood and agreed changes have been made per AIG's endorsement attached for a SCOR additional premium of $35,104 ($34,735 – All Risk; $369 – TRIA).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*Matthew Thinnes*

Matthew Thinnes
SCOR | P&C | Specialty Insurance
Vice President | North America Head of Construction
One Seaport Plaza | 199 Water Street | New York, NY 10038 | USA
Office: (212) 884-9053 | Mobile: (646) 285-4899 | Email: mthinnes@scor.com

ENDORSEMENT #010

**This endorsement, effective 12:01 A.M.,** 12/31/2019
**Forms a part of Policy No.:** 043820532
**Issued to:**   A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:**   NEW HAMPSHIRE INSURANCE COMPANY

## POLICY CHANGES ENDORSEMENT

Endorsement #009, Policy Changes Endorsement is deleted in its entirety and replaced by the following:

The following item(s):

| | | |
|---|---|---|
| ☐ Insured's Name | | ☐ Insured's Mailing Address |
| ☐ Policy Number | | ☐ Company |
| ☒ Effective/Expiration Date | | ☐ Insured's Legal Status/Business of Insured |
| ☐ Payment Plan | | ☐ Premium Determination |
| ☐ Additional Interested Parties | | ☐ Coverage Forms and Endorsements |
| ☒ Limits/Exposures | | ☐ Deductibles/Waiting Periods |
| ☒ Covered Property/Location Description | | ☐ Additional Location(s) |
| ☐ Underlying Insurance | | ☐ Special Terms and Conditions |

is (are) changed to read **{See Additional Page(s)}:**

The above amendments result in a change in the premium as follows:

| ☐ | **NO CHANGES** | ☒ | **ADDITIONAL PREMIUM** | ☐ | **RETURN PREMIUM** |
|---|---|---|---|---|---|
| | | | $245,729 | | $ |

| **POLICY CHANGES ENDORSEMENT DESCRIPTION** |
| --- |

1. **Item 4.A. Policy Period** of the Declarations is amended to include the following:

   **A.** Inception Date:   14 December 2018   Expiration Date:01 April 2022
   (12:01 a.m., Standard Time at the **insured project** location.  The Expiration Date may vary in accordance with Item **4.B.**) (hereinafter, the **Original Policy Period**)

2. **Item 5. Insured Project** of the Declarations is amended to include the following:

   **Description**: Addition of the entirety of the North Tower/Phase 2 of the project, inclusive of the west parking garage

3. **Item 8. Deposit Premium** of the Declarations is deleted in its entirety and replaced by the following:

| Phase 1 Coverage | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
| --- | --- | --- | --- | --- |
| **Total Project Value (South Tower)** | 2.5479 years | $373,500,000 | $Various | $1,648,911 |
| **Total Project Value (Villa and Site)** | 3.0493 years | $60,000,000 | $Various | $412,300 |
| **Existing Property** | 3.0493 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| **Contractors Equipment** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Delay In Completion** | 3.0493 years | $44,022,420 | $Various | $343,015 |
| **Hot Testing** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Terrorism** | 3.0493 years | $477,522,420 | $0.0375 of the non-NatCat premium | $26,271 |
| **LEG 3** | 3.0493 years | $477,522,420 | $0.10 of the non-NatCat premium | $70,055 |
| | **Total Deposit Premium:** | | | $2,500,552 |

| Phase 2 Coverage* | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
| --- | --- | --- | --- | --- |
| **Total Project Value (North Tower + West Garage, less credits noted below)** | 2.5521 years | $169,158,811 | $Various | $642,607 |
| **Existing Property** | 2.5521 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| **Contractors Equipment** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Delay In Completion** | 2.5521 years | $48,457,160 | $Various | $36,795 |
| **Hot Testing** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Terrorism** | 2.5521 years | $217,615,971 | $0.0375 of the non-NatCat premium | $6,186 |
| **LEG 3** | 2.5521 years | $217,615,971 | $0.10 of the non-NatCat premium | $16,496 |
| | **Total Additional Deposit Premium*:** | | | $702,083 |

*Phase 2 Additional Deposit Premium calculation is based on:*
   *(1) $207,300,000 (Phase 2) plus $7,000,000 (West Garage) minus $45,141,189 ($20,141,189 savings and $25,000,000 included within Phase 1 Total Project Value) for the project term, 12/31/19 to 4/1/22; and*
   *(2) Delay in Completion, Terrorism & LEG 3 premiums are the difference between Phase 1 & Phase 2*
   *(3) Delay in Completion Limit for Phase 2 is the values of Phase 1 with the increase of $4,434,740.  Total Delay in Completion Limit for the policy is $48,457,160, as noted on the De-*

*lay in Completion Endorsement.*

Policy Extension Calculations (180 days per phase/per TCO):

- North Tower - to extend to October 1, 2022
  - April 1 to May 31: $15,008 per month
  - during wind season (June to Nov): $59,997 per month
  - Full delay value assumed ($48,457,160)

For Audit & Extensions the Annual rates are:

- South Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- Villa: .115 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- North Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- 150% for delay; 3.75% for terrorism (3% base rate * 25% surcharge to remove sunset clause); 10% for LEG 3. Terrorism & LEG 3 premiums are calculated based on the non-Cat premium.

4. **Item 9. Policy Limit** of the Declarations is deleted in its entirety and replaced with the following:

   **Item 9. Policy Limit:** $651,115,971  The **quota share percentage** (shown in Item **13.** of the Declarations) of the **Policy Limit** is the Company's maximum liability in any one **occurrence** as a result of all covered loss or damage regardless of the number of coverages or **covered causes of loss** under this Policy.

5. Subsection **(1)** and **(4)** of Subsection **10.A. Sublimits Applicable to Specified Covered Causes of Loss** of the Declarations are deleted in their entirety and replaced with the following:

   **1. Earth Movement:**  $651,115,971 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $651,115,971, for all covered loss or damage arising out of **earth movement**

   **4. Terrorism:**  $651,115,971 for all covered loss or damage arising out of **terrorism**

6. Subsection **10.B. Sublimits of Liability** of the Declarations is amended as follows:

   **Physical Damage Sublimit of Liability**  $602,658,811 applicable to physical damage to **covered property** at the **insured project**

7. **Endorsement #001, Delay in Completion Endorsement** is deleted in its entirety and replaced with the following:

## DELAY IN COMPLETION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

I. **Named Insured and Address:**
   A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
   17901 COLLINS AVENUE SOUTH
   SUNNY ISLES BEACH FL 33160

   All coverage under this Delay in Completion Endorsement shall only be provided to the Named Insured shown above (hereinafter, the **Named Insured** for purposes of this endorsement only).  No coverage shall be provided under this endorsement to any other person or entity.

**II.** The coverage provided under this Delay in Completion Endorsement is applicable to the entire **insured project** unless otherwise described below:

Not Applicable

**III. Period of Indemnity**:      540 Calendar Days

**IV. Anticipated Date of Completion:**    South Tower – 07/01/2021
Villa – 12/31/2021
North Tower – 04/01/2022

**V. Deductible Period:**

|  | **Deductible Period** (per **occurrence** unless otherwise stated below) |
|---|---|
| **Standard Deductible** | 30 Calendar Days<br>☒per **occurrence** or<br>☐ in the Aggregate, no other **Deductible Periods** apply |
| **Earth Movement, Flood** or **Named Storm** | 30 Calendar Days |
| **Cyber Loss** | 30 Calendar Days |
| **Ingress & Egress** | 30 Calendar Days |
| **Order of Civil or Military Authority** | 30 Calendar Days |
| **Service Interruption** | 30 Calendar Days |
| **Hot Testing** | 30 Calendar Days |
| **LEG 3** | 30 Calendar Days |

If two or more deductible amounts provided above apply to a single **occurrence**, the total to be deducted shall be the largest applicable deductible.  The above deductibles are in addition to any applicable deductibles on the Declarations of this Policy.  If the Standard Deductible applies on a per **occurrence** basis, then such deductible shall apply unless a more specific deductible applies.

**VI. Limits of Liability Applicable to this Endorsement**

The following are subject to and not in addition to the **Policy Limit** and all sublimits of liability shown in Item **10.A.** of the Declarations.  The sublimits of liability stated in this endorsement are per **occurrence** unless otherwise stated.

*If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage, then no coverage is provided for that coverage, whether under the Insuring Agreement or any Additional Coverage.  If the words, NOT APPLICABLE are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

     **A.**    Aggregate Sublimit of liability for all coverage under this endorsement      $48,457,160

The following sublimits of liability **VI.B.** through **VI.I.** are subject to **VI.A.** above:

     **B.**    Loss of **Rental Income**      $Not Covered

     **C.**    Loss of **Gross Earnings**      $Not Covered

| | | |
|---|---|---|
| **D.** | **Cyber Loss** | See Item **10.B.7.** of the Declarations |
| **E.** | Ingress & Egress | 15 Calendar Days, subject to maximum of $2,500,000 |
| **F.** | Order of Civil or Military Authority | 15 Calendar Days, subject to maximum of $1,000,000 |
| **G.** | Service Interruption | 15 Calendar Days, subject to maximum of $1,000,000 |
| **H.** | Other: Not Covered | $Not Covered |
| **I.** | **Soft Costs/Additional Expenses** | $48,457,160 |

The following sublimits of liability are subject to **VI.I.** above.

| | | |
|---|---|---|
| **1.** | Interim interest expense | $Included |
| **2.** | Realty taxes/Ground rents | $Included |
| **3.** | Leasing/Commission expense | $Included |
| **4.** | Insurance premiums | $Included |
| **5.** | Advertising and marketing expense | $Included |
| **6.** | Legal and accounting fees | $Included |
| **7.** | License and permit fees | $Included |
| **8.** | Project management fees | $Included |
| **9.** | Other:  Construction Supervision | $Included |
| **10.** | Other: Real Estate Taxes | $Included |
| **11.** | Other: Loan Fees and Interest | $Included |
| **12.** | Other: Sales Deposit & Bond Interest | $Included |
| **13.** | Other: Project G & A | $Included |
| **14.** | Other: Soft Cost Contingency | $Included |

_____

No coverage or Additional Coverage shall be provided unless the **delay(s)** exceeds the **anticipated date of completion** and then such coverage shall only be provided for the **delay(s)** that is/are in excess of such **anticipated date of completion**, subject to the applicable **deductible period.**  All covered losses and expenses are subject to the applicable **Policy Limit**, sublimits of liability, **period of indemnity** or calendar days as stated in the above Schedule.

**A. INSURING AGREEMENT**

1. Subject to all terms and conditions of this Policy, in the event of:

   a. Direct physical loss of or damage to **covered property, landscaping materials** or **plans and draw-**

**ings** by a **covered cause of loss**, or

   b.   Corruption, erasure or alteration of:

      i.   **Electronic data** in the **building or other systems**, due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss**,

      ii.   **Plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code**, or

   c.   **Building or other systems** that are rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems**

(hereinafter, collectively Subsections **1.b.** and **1.c.** are referred to as **cyber loss**), the Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** sustained during the **period of indemnity** as a result of **delay** in completion of the **insured project**, on an actual loss sustained basis.

   2.   The Company shall also indemnify the **Named Insured** for reasonable expenses, over and above normal operating expenses, during the **period of indemnity**, that are necessarily incurred for the purpose of reducing any loss covered under this endorsement, but in no event shall the Company be liable for an amount greater than that for which the Company would have been liable had there been no covered **delay**.

## B.  ADDITIONAL COVERAGES

   1.  **Ingress & Egress**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if ingress to or egress from the **insured project** is prohibited as a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy, provided that such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the prohibition of ingress or egress to the **insured project** for the lesser of:

   a.   The number of calendar days shown for Ingress & Egress in the above Schedule, or

   b.   Until the ingress or egress is no longer prohibited,

subject to the Ingress & Egress sublimit of liability shown in the above Schedule.

   2.  **Order of Civil or Military Authority**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if an order of civil or military authority prohibits access to the **insured project**, provided that: (1) such order is a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy and (2) such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

The Company shall only provide coverage for **delay** associated with such order that prohibits access to the **insured project** for the lesser of:

**a.** The number of calendar days shown for Order of Civil or Military Authority in the above Schedule, or

**b.** Until access to the **insured project** is no longer prohibited,

subject to the Order of Civil or Military Authority sublimit of liability shown in the above Schedule.

**3. Service Interruption**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** resulting from the interruption of incoming electricity, steam, gas, fuel or water caused by direct physical loss or damage by a **covered cause of loss** to a service provider's transmission and distribution lines and related plants, substations and equipment located outside of the **insured project**. Notwithstanding the foregoing, the Company will not pay for any interruption intentionally caused by any **Insured** or any service provider.

If a service provider's transmission and distribution lines and related plants, substations and equipment that sustain loss or damage are part of the **insured project** and included in the **total project value**, the Service Interruption sublimit of liability shown in the above Schedule shall not apply, nevertheless the Aggregate Sublimit of Liability for all coverage under this endorsement shown in **VI.A.** above shall apply.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the interruption of incoming electricity, steam, gas, fuel, or water to the **insured project** for the lesser of:

**a.** The number of calendar days shown for Service Interruption in the above Schedule, or

**b.** Until such incoming utilities are restored,

subject to the Service Interruption sublimit of liability shown in the above Schedule.

**C. ADDITIONAL EXCLUSIONS AND LIMITATIONS**

In addition to all other exclusions of this Policy, the Company will not be liable under this endorsement for any loss or increase in **delay** caused by, resulting from or arising out of any of the following:

**1.** The enforcement of any law, ordinance, governmental directive or standard regulating removal, repair, construction or reconstruction of any property;

**2.** Changes made in the design, plans, specifications or other contract documents in order to effect the repair or replacement of any property;

**3.** Non-availability of funds;

**4.** Import, export or customs restrictions and/or regulations;

**5.** The breach, suspension, lapse or cancellation of or the failure to obtain, maintain or extend any permit, lease, license, contract or purchase orders;

**6.** The interference by strikers or other persons directly or indirectly with the completion of the **insured**

**project**, including the transportation of property, the construction, rebuilding, repairing or replacing of any property or the occupancy or use of the premises where the **insured project** is located;

7. The failure to use due diligence and dispatch in restoring any property to the condition existing prior to the loss or damage;

8. Any deviation in the **construction schedule** or a revised **construction schedule** except for a deviation that is the result of covered loss or damage;

9. Any disruption in the normal movement of **covered property** unless such **covered property** is damaged by a **covered cause of loss** during **inland transit**;

10. Re-erection of any tower or pole crane(s), unless such tower or pole crane is specifically covered under Schedule A of the Contractors' Equipment Endorsement. or

11. Loss or damage to that part of the **insured project** which at the time of loss or damage has been put to its intended use or has become operational.

## D.  ADDITIONAL LOSS ADJUSTMENT CONDITIONS

In addition to the conditions set forth in the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section of this Policy, the following additional conditions apply to this endorsement:

1. Upon written notification of any loss or damage under the terms and conditions of this Policy, the **Insured** shall provide the Company with all applicable **construction schedules** as requested by the Company.

2. Upon request by the Company, the **Insured** shall make available all other records and information relevant to the determination of any claim for loss, damage and/or expenses or any audit under this endorsement.

3. In the event of payment under this endorsement, the Company may conduct an audit of the **Named Insured's** records for a reasonable period of time, to be determined by the Company, (typically 12 months) after actual commencement of operations to determine the loss under this endorsement, as well as any expenses incurred by the **Named Insured** related to reducing such loss.  Due consideration shall be given to seasonal patterns, trends, variations or special circumstances which would have affected the business had the **delay** not occurred, so that the amount adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the **delay**, would have been realized.  Any amount saved with respect to labor costs, charges and expenses that have ceased or reduced during the **period of indemnity** and liquidated damages the **Named Insured** is entitled to receive from others, whether collectible or not, shall be deducted from the loss during the **period of indemnity**.

   In the event the amount of loss determined by the audit is less than or exceeds the sum paid by the Company for loss covered under this endorsement during the **period of indemnity**, the difference between the two amounts shall be paid by the Company or to the Company by the **Named Insured**, whichever is applicable.

## E.  ADDITIONAL GENERAL CONDITIONS

In addition to the conditions set forth in the GENERAL CONDITIONS Section of this Policy, the following additional conditions apply to this endorsement:

1. In the event loss, damage or other circumstances require that the project completion date shown on any critical path, time line, bar chart or other scheduling vehicle is revised to extend such completion date, the **Insured** shall establish a revised **construction schedule** and furnish the same to the Company.  The new date established in such revised **construction schedule** shall become the **anticipated**

**date of completion**. The Company shall have the right to change the **anticipated date of completion**, even if the **Insured** has failed to provide such revised **construction schedule**.

There shall be no amendment to the **anticipated date of completion** in the event any critical path, time line, bar chart or other scheduling vehicle is revised to compress or accelerate the **construction schedule**, without the written notice to the Company and endorsement by the Company hereto.

2. The **Insured** shall take and allow all reasonable measures to minimize the extent of any interference with the **construction schedule** so as to avoid or diminish any potential **delay**. The **Insured** shall begin normal operations as soon as practicable.

## F.  ADDITIONAL DEFINITIONS

The definitions of this Policy apply to this endorsement. However, the following additional definitions apply to this endorsement and supersede any similar definitions of this Policy to the contrary.

1. **Anticipated date of completion** means: (1) the date as shown in the above Schedule as the Anticipated Date of Completion or (2) the revised **anticipated date of completion** in accordance with the Subsection **E.1.** of the Additional General Conditions Subsection of this endorsement. For calculation of loss under this endorsement, the Company shall use the applicable **anticipated date of completion** at the time of the loss or damage.

2. **Construction schedule** means the schedule utilized in the construction management program through software that shows the construction operations, the times for starting and completion of operations, the period of the operations, the interrelationships between the operations and the critical path that identifies the critical operations.

3. **Deductible period** means the applicable number of calendar days shown in Item **V.** of the above Schedule beginning with the **anticipated date of completion**. Losses are only payable in excess of the applicable **deductible period**.

4. **Delay** means the period of time between the **anticipated date of completion** and the actual date on which occupancy or commercial service can commence with respect to the entire **insured project** or the **insured project** as described in Item **II.** of the Schedule, whichever is applicable, with the exercise of due diligence and dispatch.

5. **Gross earnings** means gross revenues from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

6. **Insured project** means the entire **insured project** or the part of the **insured project** as identified in Item **II.** of the above Schedule. The words, **insured project**, also include the definition in the Completed Value Builders Risk Policy.

7. **Period of indemnity** means the number of calendar days for which coverage is provided under this endorsement, regardless of the number of **occurrences**, not to exceed the number of days shown in Item **III.** of the above Schedule. For each **occurrence**, such calendar days or remaining calendar days shall commence upon the expiration of the applicable **deductible period**. The **period of indemnity** shall not be limited by the end of the **policy period**.

8. **Rental income** means revenues from rentals and leases from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

9. **Soft costs/additional expenses** means such expenses as shown in Item **VI.I.1.** through **VI.I.9.** of the

above Schedule, inclusive, in relation to the **insured project**.

8.   **Endorsement #002, Extension for Repairing or Replacing Defective Covered Property ("LEG3") Endorsement** is deleted in its entirety and replaced with the following:

## EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

**SCHEDULE**

Sublimits of Liability and Deductibles (per **occurrence**):

**A.** The following sublimit of liability is added to Item **10.B.** of the Declarations:

   Sublimit for repairing or replacing faulty or defective **covered property**     $602,658,811

**B.** The following deductible is added to Item **11.** of Declarations:

   Deductible applicable to repairing or replacing faulty or defective **covered property**     $100,000

   The above deductible shall apply in addition to the applicable deductible(s) in Item **11.A.** through **11.G.**, inclusive, as shown on the Declarations.

**C.** The following sublimit of liability is added as Item **VI.J.** to the Delay In Completion Endorsement:

   Provided that Delay In Completion coverage is provided under this Policy, the Sublimit for Delay in Completion resulting from repair or replacement of faulty or defective **covered property**     $48,457,160

   The **Deductible Period** shown in the Delay in Completion Endorsement applies to the above coverage in this Subsection **C.**

Additional Premium: $86,551
_____

In consideration of the Additional Premium shown in the above Schedule, Exclusion **B.10.** of the PERILS EXCLUDED Section is deleted in its entirety and replaced with the following:

**10. a.**   Faulty workmanship, material, construction or installation from any cause; or

   **b.**   Any fault, defect, error, deficiency or omission in any design, plans, or specifications,

   all unless direct physical loss or damage not otherwise excluded by this Policy ensues.  If direct physical loss or damage not otherwise excluded by this Policy ensues, then the Company shall pay for the following only:

   **a.**   Such ensuing direct physical loss or damage to **covered property**, and/or

   **b.**   Subject to the sublimit(s) of liability shown in the above Schedule, repairing or replacing (whichever is less) with like kind and quality at the time and place of the loss the damaged part of the faulty or defective **covered property**.

   However, in no event shall the Company pay any loss, cost, damage or expense to: (1) improve

the original workmanship, materials, construction, installation, design, plans or specifications or (2) redesign any design, plans or specifications.

No portion of the **covered property** shall be regarded as damaged solely by virtue of the existence of: (1) any faulty workmanship, material, construction or installation, or (2) any fault, defect, error, deficiency or omission in any design, plans, or specifications.

NOTICE:   THIS ENDORSEMENT IS BASED UPON LEG 3 PROVISIONS, BUT MAY DIFFER FROM SUCH CURRENT OR PRIOR LEG 3 PROVISIONS.

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative

Allianz Global Corporate & Specialty®

# Insurance policy

**Commercial Lines Policy**





## Allianz Global Risks US Insurance Company
## 225 West Washington Street, Suite 1800, Chicago, IL 60606-3484

**THIS POLICY CONSISTS OF:**
- **DECLARATIONS**
- **ONE OR MORE COVERAGE PARTS.**

**A COVERAGE PART CONSISTS OF:**
- **ONE OR MORE COVERAGE FORMS**
- **APPLICABLE FORMS AND ENDORSEMENTS**

**In Witness Whereof**, we have caused this policy to be executed and attested, and if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Secretary

President and Chief Executive Officer

# Allianz Global Risks US Insurance Company

(A Stock Company)
225 West Washington Street, Suite 1800
Chicago, IL 60606-3484

## COMMON POLICY DECLARATIONS

Policy No.:  **USE00054118**              Policy Period:    From:  **December 14, 2018**
                                                           To:    **December 31, 2021**

| First Named Insured: | Producer: |
|---|---|
| **A3 Development, LLC LPLA Partners, LP, The Trump Group** | **Willis Insurance Services of Georgia, Inc.** |
| **17901 Collins Avenue South** | **Concourse Corporate Center Five, 18th Floor Atlanta, GA 30328** |
| Sunny Isles Beach, FL 33160 | United States |
| United States | |

| | |
|---|---|
| Builders Risk – Property Damage | $532,816.50 |
| Builders Risk – Delayed Opening | $85,753.75 |
| Certified Terrorism | $6,567.75 |
| **TOTAL AMOUNT PAYABLE BY THE INSURED** | **$625,138.00** |

**Allianz Global Risks US Insurance Company**

**FORMS AND ENDORSEMENT LIST**

**NAMED INSURED:**   A3 Development, LLC
**POLICY NUMBER:**   USE00054118
**EFFECTIVE DATE:**   12/14/2018

**The following policy forms and endorsements have been attached to and made a part of the policy at inception.**

| FORM NAME | FORM NUMBER | EDITION DATE |
|---|---|---|
| Policyholder Notice - All States | AGR-IL 8001 (07-14) | 07/2014 |
| Policyholder Notice - OFAC | AGR-IL 8003 (01-05) | 01/2005 |
| A3 DEVELOPMENT, LLC COMPLETED VALUE BUILDERS RISK POLICY FORM | No Form No Assigned | 12/2018 |
| Participation Endorsement | AGR-CP 1012 (06-08) | 06/2008 |
| Sanction Limitation and Exclusion | AGR-CP 5126 (10-14) | 10/2014 |
| Terrorism Endorsement: Certified Act of Terrorism | AGRT-CM 5T38 (01-15) | 01/2015 |

**AGR-DS 1002 (11-03)**



# POLICYHOLDER NOTICE - ALL STATES

Allianz Global Risks US Insurance Company
24 Hour Emergency Claims Service

**TO OBTAIN INFORMATION, FILE A CLAIM OR TO MAKE A COMPLAINT:**

You may call Allianz Global Risks US Insurance Company's toll free number at:

**Phone:**     **1 (800) 558 1606 [or 1 (314) 513 1353 from outside the United States]**
**Fax:**        **1 (888) 323 6450 [or 1 (314) 513 1345 from outside the United States]**

**To report a claim via e-mail:**     **NewLoss@agcs.allianz.com**

You may also write to:

Allianz Global Corporate & Specialty
Attn: FNOL Claims Unit
One Progress Point Parkway
3rd Floor
O'Fallon, MO 63368

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part or condition of the attached document.

**AGR-IL 8001 (07-14)**                                                      **Page 1 of 1**

**Allianz ⑪**

# POLICYHOLDER NOTICE - OFAC

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- o   Foreign agents;
- o   Front organizations;
- o   Terrorists;
- o   Terrorist organizations; and
- o   Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



Energy and Engineered Risk Division

## <u>IMPORTANT NOTICE</u> – TO BE KEPT WITH POLICY

## <u>WHAT TO DO WHEN A LOSS OCCURS</u>

Report as soon as practicable, every incident, loss or damage which may become a claim to:

Mr. John E. Roberts
Energy and Engineered Risk Division / Property Claims
2929 Allen Parkway, Suite 1100
Houston, TX 77019
Tel: (713) 342-7376
E-Mail: Report **<u>must</u>** be sent to **<u>both</u>**:  <u>JohnE.Roberts@aig.com</u> and <u>NewLoss-USproperty&energy@aig.com</u>

1. Energy and Engineered Risk Claims **<u>CANNOT</u>** be processed through any other facility and must be reported as indicated.

2. Adjuster can **<u>ONLY</u>** be assigned by the Energy and Engineered Risk Division.

Ed. 5-18

 Construction Performance®

## NEW HAMPSHIRE INSURANCE COMPANY
### (A CAPITAL STOCK COMPANY)
### 175 Water Street, New York, New York 10038

### COMPLETED VALUE BUILDERS RISK POLICY
### QUOTA SHARE DECLARATIONS

Policy Number:  **043820532**

**Item 1.  Named Insured and Address:**

A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
17901 COLLINS AVENUE SOUTH
SUNNY ISLES BEACH FL 33160

**Item 2.  Additional Insureds:**

**Additional insured(s)** means all **project owner(s)** and contractors and subcontractors of every tier at the **insured project** location and any other individual or entity, but only to the extent required by the **contract document(s)** or subcontract document(s) with respect to the **insured project** and then only as their respective interests may appear.  Notwithstanding the foregoing sentence, architects, engineers, manufacturers and suppliers shall only be **additional insureds** with respect to their activities at the **insured project** location.

**Item 3.  Mortgagees and Loss Payees:**  Per Certificates of Insurance on file with the Company or any endorsement attached to and forming a part of this Policy.

**Item 4.  Policy Period:**

**A.**  Inception Date:    14 DECEMBER 2018  Expiration Date:  31 DECEMBER 2021 (12:01 a.m., Standard Time at the **insured project** location.  The Expiration Date may vary in accordance with Item **4.B.**) (hereinafter, the **Original Policy Period**)

**B.**  The Expiration Date shall be the earliest of the following:

**1.**  The date of formal acceptance of the entire **insured project** by the **project owner(s)**;

**2.**  The date or expiry of the **Named Insured's** interest in the **insured project**;

**3.**  The effective date of cancellation of this Policy, or

**4.**  The expiration date as set forth in Item **4.A.**

**C.  Extension of the Policy Period**
Provided that coverage has not ended in accordance with Items **4.B.1.** through **4.B.4.**, this Policy will be automatically extended once for up to 180 days per phase / per TCO (see page 7) for a pro rata additional premium upon notification by the **Named Insured** to the Company.  The **Named Insured** may request an additional extension of this Policy subject to the Company's written approval and terms and conditions to be agreed upon.

**Item 5.  Insured Project:**

| Location | 17901 Collins Avenue South<br>Sunny Isles Beach, FL 33160 |
|---|---|
| Description | Ground up construction of a 51 story 154 unit condominium tower (phase I) including a shared foundation which will include the podium for Phase II (a separate tower 91 unit Tower which will be built after completion of Phase I). The site, at 17901 Collins Avenue, has more than 500 feet of oceanfront. It's north of the Mansions at Acqualina, completed in 2015, and Acqualina Resort & Spa, completed in 2006.<br><br>The Estates will feature a lobby designed by Chanel and Fendi creative director Karl Lagerfeld and Villa Acqualina, a 50,000-square-foot building with a slate of amenities that will include a spa and fitness center, restaurant and Circus Maximus, an ice skating rink, bowling lanes and a movie theater, as well as a Wall Street Trader's Club room. The property will also feature landscaped gardens, multiple infinity pools, a FlowRider for surfers, a basketball court, bocce court, dog park, soccer field and a beachfront restaurant.<br><br>First five stories / associated work of the North Tower.<br><br>South Tower will be completed on 07/01/2021 and will roll onto a permanent property policy at that time. Villa construction to continue to 12/31/2021. |
| Project Owner(s) | A3 Development LLC, LPLA Partners, LP, The Trump Group |

**Item 6. Coverage Territory:**

United States, its territories and possessions and Puerto Rico, including their respective coastal waters.  If any coverage is provided on a worldwide basis, such worldwide coverage shall not include any jurisdiction prohibited or restricted under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.  Losses are only covered within the **coverage territory**.

**Item 7.  Premium:**

**A. Total Deposit Premium:**      $2,500,552 (See Item **8.** below for the calculation)

    **AIG's 35% Share:**        $875,193

**B. Terrorism Premium:**        $26,271 (included within the Total Deposit Premium)

**C. Surcharges:  (If Applicable)**    $866

**D. Engineering Fees: (If Applicable. Not included as part of the premium)**

$25,000 (includes 1 Site Visit per year and 1 Market Report to be released close to the end date of the project).

**Item 8. Deposit Premiums:**

| Coverage | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| Total Project Value (South Tower) | 2.5479 years | $373,500,000 | $Various | $1,648,911 |
| Total Project Value | 3.0493 years | $60,000,000 | $Various | $412,300 |

©American International Group, Inc.<br>All Rights Reserved.

| (Villa and Site) | | | | |
|---|---|---|---|---|
| Existing Property | 3.0493 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Delay In Completion | 3.0493 years | $44,022,420 | $Various | $343,015 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 3.0493 years | $477,522,420 | $0.0375 of the non-NatCat premium | $26,271 |
| LEG 3 | 3.0493 years | $477,522,420 | $0.10 of the non-NatCat premium | $70,055 |
| | Total Deposit Premium: | | | $2,500,552 |

**Item 9. Policy Limit:** $477,522,420   The **quota share percentage** (shown in Item **13.** of the Declarations) of the **Policy Limit** is the Company's maximum liability in any one **occurrence** as a result of all covered loss or damage regardless of the number of coverages or **covered causes of loss** under this Policy.

**Item 10. Sublimits of Liability:**  The sublimits of liability stated in this Policy are part of and not in addition to the **Policy Limit** and any sublimits of liability shown in Item **10.A.** below.  The **quota share percentage** (shown in Item **13.** of the Declarations) of the sublimits of liability are: (1) the maximum amount the Company will pay for all covered loss or damage arising out of the specific perils or coverages and/or (2) the maximum number of days for which the Company will pay for all covered loss or damage for a specific coverage, regardless of the number of coverages or **covered causes of loss** under this Policy.   The sublimits of liability stated in this Policy are per **occurrence** unless otherwise indicated.

Regardless of the number of **occurrences**: (1) any Term Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss** that is applicable to the entire **policy period** regardless of the length of the **policy period**, and (2) any Annual Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss** that is applicable to each annual period with respect to the **policy period.**

If any Annual Aggregate applies and the **policy period** is longer than one year, at the end of each twelve (12) month period (hereinafter, the **annual anniversary date**), such Annual Aggregate shown below shall be reinstated in full, but only with respect to an **occurrence** which first commences on or after 12:01 a.m., Standard Time at the **insured project** location on such **annual anniversary date**.  If the final period is less than twelve (12) months, then such Annual Aggregate shall be reinstated in full for that final period.

*If the words NOT COVERED are shown instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage or* **Covered Cause of Loss***, then no coverage is provided for that coverage or* **Covered Cause of Loss***.  If the words, NOT APPLICABLE (or N/A) are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

  **A.  Sublimits Applicable to Specified Covered Causes of Loss** – Each of these sublimits is part of and not in addition to the **Policy Limit:**

    **1.  Earth Movement:** $477,522,420 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $477,522,420, for all covered loss or damage arising out of **earth movement.**

    **2.  Flood:** $100,000,000 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $100,000,000, for all covered loss or damage arising out of **flood.**

**3. Named Storm:** $150,000,000 per **occurrence**, for all covered loss or damage arising out of **named storm.**

For the purpose of the above sublimits of liability, **named storm** includes, but is not limited to, loss or damage from wind, hail, lightning, tornado, rain or water (whether driven by wind or not), **flood**, or any wind driven objects or debris.

In the event that loss or damage by **flood** occurs concurrently or in any sequence with a **named storm**, regardless of whether any flood sublimit or remaining aggregate flood sublimit shown in Item **10.A.2.** (hereinafter, the **applicable flood sublimit**) is greater or less than the applicable Named Storm sublimit, the maximum amount the Company will pay per **occurrence** for all such covered loss or damage by **flood** shall be the **applicable flood sublimit**, subject always to the maximum applicable Named Storm sublimit. However, if **flood** is not covered, the maximum amount the Company will pay per **occurrence** for all such covered loss or damage arising out of **named storm** shall exclude loss or damage by **flood.**

**4. Terrorism:** $477,522,420 for all covered loss or damage arising out of **terrorism.**

**B. Sublimits of Liability**

Each of the following sublimits is part of, and not in addition to the **Policy Limit** and any other sublimits shown in Item **10.A.** of the Declarations:

| | | |
|---|---|---|
| **Physical Damage Sublimit of Liability** | | $433,500,000 applicable to physical damage to **covered property** at the **insured project** |
| **1.** | Inland Transit | $50,000,000 |
| **2.** | Offsite Temporary Storage | $50,000,000 any one location |
| **3.** | Arson, Theft or Vandalism and Malicious Mischief Reward | $100,000 |
| **4.** | Claims Preparation Costs | $2,500,000 |
| **5.** | Crane Re-Erection Expenses | $1,000,000 |
| **6.** | Crisis Management | 30 days, subject to a maximum Term Aggregate of $2,500,000 |
| **7.** | Cyber Coverage | $Not Covered  Term Aggregate |
| | The following sublimits of liability **7.a.** through **7.d.**, inclusive, are subject to the Cyber Coverage sublimit of liability shown above: | |
| | **a.** Electronic Data | $Not Covered  Term Aggregate |
| | **b.** Building or Other Systems | $Not Covered  Term Aggregate |
| | **c.** Plans and Drawings | $Not Covered  Term Aggregate |
| | **d.** Cyber Extra Expense | $Not Covered  Term Aggregate |
| **8.** | Debris Removal | $50,000,000 or 25% of direct physical loss or damage to all **insured property**, whichever is less |
| **9.** | Demolition and Increased Cost of Construction | |
| | Demolition Coverage A: | $INCLUDED |
| | Demolition Coverage B: | $25,000,000 |
| | Demolition Coverage C: | $25,000,000 |
| **10.** | Expediting Expense and Extra Expense | $25,000,000 |
| **11.** | Owner's Extra Expense | NOT APPLICABLE |
| | The following expenses **11.a.** through **11.d.**, inclusive, are subject to the Owner's Extra Expense sublimit of liability shown above: | |
| | **a.** Advertising and Marketing Expenses | NOT APPLICABLE |

©American International Group, Inc. All Rights Reserved.

|     |                                                        |                                                                           |
| --- | ------------------------------------------------------ | ------------------------------------------------------------------------- |
| **b.**  | Legal and Accounting Fees                          | NOT APPLICABLE                                                            |
| **c.**  | License and Permit Fees                            | NOT APPLICABLE                                                            |
| **d.**  | Project Management Fees                            | NOT APPLICABLE                                                            |
| **12.** | Fine Arts                                          | $1,250,000                                                               |
| **13.** | Fire Brigade, Extinguishing Expenses and Police Charges | $5,000,000                                                         |
| **14.** | Fungus, Mold or Spore                              | $5,000,000                                                               |
| **15.** | Maximum Hot Testing Period                         | NOT APPLICABLE                                                            |
| **16.** | Landscaping Materials                              | $50,000 any one item, subject to a maximum of $2,500,000 per **occurrence** |
| **17.** | Logistics Extra Costs                              | $NOT COVERED                                                             |
| **18.** | Plans and Drawings                                 | $5,000,000                                                               |
| **19.** | Pollution and Contamination Coverage              | $2,500,000 Term Aggregate                                                |
| **20.** | Preservation of Property                          | $2,500,000                                                               |
| **21.** | Professional Design Fees                          | $10,000,000                                                              |

**Item 11. Deductibles:**  The deductibles shown below apply per **occurrence** unless otherwise stated.

**A. Policy Deductible**   $50,000   Applicable to all covered loss or damage unless otherwise stated below or in this Policy.

**B. Earth Movement**

$50,000

**C. Flood**

$500,000

**D. Named Storm**

3% of **total project value** at risk at the time of the loss or damage, subject to a minimum of $250,000 for any one **occurrence** and a maximum of $7,500,000 for any one **occurrence**, for all loss or damage arising out of **named storm**.

**E. Water Damage:**

$100,000

**F. Hot Testing:**

$NOT APPLICABLE

**G. Additional Deductibles**

**LEG 3:** $100,000

**Special Deductible for Owner's Extra Expense:**        $NOT APPLICABLE

In each case of loss or damage covered by this Policy, the Company shall not be liable unless the **Insured** sustains covered loss or damage in a single **occurrence** greater than any applicable deductible described in this Policy and then only for the amount in excess of such deductible.  As used above, "at risk" includes all **covered property** at the location (including **inland transit**) where the loss occurs, whether such **covered property** sustains damage or not.

If an amount is not shown (or if NOT APPLICABLE or N/A is shown) for any deductible, then that deductible shall not apply.  Also, if an amount is not shown (or if NOT APPLICABLE or N/A is shown) with respect to a part of a deductible, then such part shall not apply, but the rest of the deductible shall apply.

If two or more deductible amounts provided in this Policy apply to a single **occurrence**, the total to be deducted shall not exceed the largest deductible applicable unless otherwise stated in this Policy.  If a Delay in Completion Coverage Endorsement is attached to and made a part of this Policy, then the specified **deductible period** stated in such endorsement shall be applied in addition to the applicable deductible shown in Item **11.A.** through **11.G.** above, inclusive.  The Special Deductible for **owner's extra expense** shall apply in addition to the applicable deductible shown in Item **11.A.** through **11.G.** above, inclusive.

**Item 12. Margin Clause:**

If there is any increase in the **total project value**, the **Policy Limit** and the Physical Damage Sublimit of Liability shall be automatically increased by the same percentage of such increase in the **total project value**, subject to a maximum increase of 10% regardless of the number of increases in the **total project value**.  If the cumulative increases in the **total project value** exceed the maximum percentage set forth above, then the **Named Insured** shall report such changes in writing to the Company.

This provision does not apply to any other sublimits of liability, including any other sublimit of liability shown in Item **10.A.** or Item **10.B.** and/or sublimits of liability for any coverage added by endorsement.

**Item 13. Quota Share Participation:**

35% is the Company's participation for all coverage provided under this Policy and is the percentage of the **Policy Limit** and sublimits of liability under this Policy that the Company shall pay in excess of the total applicable deductible(s) (herein, the percentage is referred to as the **quota share percentage**).

The Company's liability under this Policy shall not be increased, for any reason, including: (1) the receivership, bankruptcy, insolvency, liquidation, or dissolution of any other **participating insurer**; (2) the denial or reservation of rights with respect to any claim by any other **participating insurer**; (3) the cancellation, non-renewal, or other termination of any policy issued by any other **participating insurer**; or (4) the inability, refusal, or failure, for any reason, of any other **participating insurer** to fulfill its duties or obligations under any policy or program.  The Company's liability is several, but not joint, under this program.

**Participating insurer** shall mean any insurer or other entity including, a captive or entity under a self-insured program, that shares in the liabilities under any policy or program related to the coverage provided under this Policy.

**Item 14. Special Terms and Conditions:**

TPA: Mike Kaemph at York (Chicago)

Producer:  Willis of Florida, Inc.
Address:   1450 Brickell Ave, ste 1450
           Miami, FL 33131

**PHASE 2 OPTION (Rate guaranteed for 24 months from binding date of this policy; final premium for Phase 2 determined based on policy period and estimated value at time of binding):** The Additional Premium to include Phase 2 (12/01/19 to 07/01/22) would be as follows:

| Coverage | Original Policy Period | Estimated Value at Inception Date | Deposit Premium |
|---|---|---|---|
| Total Project Value (North Tower + West Garage, less credits noted below) | 2.5836 years | $169,158,811 | $713,189 |
| Existing Property | 2.5836 years | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable |
| Delay In Completion | 2.5836 years | $48,457,160 | $51,094 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 2.5836 years | $217,615,971 | $7,307 |
| LEG 3 | 2.5836 years | $217,615,971 | $19,486 |
| | | Total Additional Deposit Premium*: | $803,306 |
| | | AIG's 35% share Additional Deposit Premium: | $281,157 |

*Phase 2 Additional Deposit Premium calculation is based on:*

> *(1) $207,300,000 (Phase 2) plus $7,000,000 (West Garage) minus $45,141,189 ($20,141,189 savings and $25,000,000 included within Phase 1 Total Project Value) for the project term, 12/1/19 to 7/1/22; and*
>
> *(2) Delay in Completion, Terrorism & LEG 3 premiums are the difference between Phase 1 & Phase 2*

*PAYMENT TERMS: If the insured elects to bind Phase 2, the Additional Premium will be billed at the time AIG is provided with the order to bind. Premium will then be due per the policy payment terms.*

Policy Extension Calculations (180 days per phase/per TCO):

- South Tower – to extend to December 31, 2021
  - during wind season (Jul to Nov): $92,659 per month
  - December (outside wind season): $23,950
  - No delay factored in here
- Villa – to extend to June 30, 2022
  - outside wind season (Jan to May): $10,141 per month
  - June (wind season): $33,414
  - Full delay value assumed here as per your request ($44,022,420)
- North Tower - to extend to December 31, 2022
  - during wind season (July to Nov): $59,997 per month
  - December (outside wind season): $15,508
  - Full delay value assumed here as per your request ($48,457,160)

For Audit & Extensions the Annual rates are:

- South Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- Villa: .115 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- North Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- 150% for delay; 3.75% for terrorism (3% base rate * 25% surcharge to remove sunset clause); 10% for LEG 3. Terrorism & LEG 3 premiums are calculated based on the non-Cat premium.

| 125689 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 7 of 8 |
|---|---|---|

**IN WITNESS WHEREOF**, the Company has caused this Policy to be signed on the Declarations by the President and Secretary of the Company and its duly authorized representative.

_____
President

_____
Secretary

This Policy shall not be valid unless signed at the time of issuance by the Company's authorized representative.

_____
Authorized Representative

## FLORIDA ADDENDUM TO THE DECLARATIONS

If you have questions about your insurance policy, or questions about claims relating to your insurance policy, please contact your insurer at the following:

**AIG**
**175 Water Street**
**New York, NY 10038**
**(212) 458-5000**

74825 (01/13)

# FORMS SCHEDULE

Named Insured: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP

Policy No: 043820532                                  Effective Date: 12/14/2018

| Form Number | Edition Date | Endorsement Number | Title |
| --- | --- | --- | --- |
| 125689 | 05/17 | | **COMPLETED VALUE BUILDERS RISK POLICY QUOTA SHARE DECLARATIONS** |
| 125687 | 05/17 | | **COMPLETED VALUE BUILDERS RISK POLICY** |
| 125696 | 05/17 | 001 | **DELAY IN COMPLETION ENDORSEMENT** |
| 125699 | 10/17 | 002 | **EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT** |
| 125700 | 05/17 | 003 | **LENDER LOSS PAYEE OR LOSS PAYEE ENDORSEMENT** |
| 125703 | 05/17 | 004 | **PILING, SHEET PILING & CAISSON LIMITATION ENDORSEMENT** |
| 125705 | 05/17 | 005 | **POLICY CHANGES ENDORSEMENT** |
| 76105 | 06/15 | 006 | **FLORIDA CANCELLATION/NONRENEWAL ENDORSEMENT** |
| 125719 | 05/17 | | **FLORIDA STATE AMENDATORY ENDORSEMENT** |

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG).  The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.  You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

## <u>FLORIDA NOTICE OF LOSS CONTROL SERVICES</u>

Pursuant to Florida Administrative Code ("FAC") 690-166.040, we would like to inform you of the risk management programs that we have developed and that are available to you.

For your consideration, we offer the services of AIG PC Global Services, Inc.  With more than 25 years experience and expertise in assisting with the prevention and mitigation of losses, AIG PC Global Services, Inc. can help address a range of problems related to loss control in various lines of business. Certain risk management programs are available to you, free of charge, as part of your commercial insurance coverage; contact your insurance broker for more details on these plans. Other, more substantive risk management programs can be purchased which include, but are not limited to the following services: surveys/analysis for identifying exposures related to your specific operations, safety management training and counseling for your staff, adoption of relevant testing strategies, and evaluations of current loss control practices.

Upon your written request, we could provide you with specific guidelines for risk management programs as established by FAC 690-166.040. Such guidelines would provide instructions and offer basic criteria to assist you in creating your own risk management plan. Should you request such guidelines and, subsequently, wish to further explore the purchase of a risk management plan, developed by AIG PC Global Services, Inc., which is specific to your company's needs, we would be willing to discuss with you both the availability of such a plan, and if available, its specific content and cost.

Again, we welcome all inquiries regarding the services of AIG PC Global Services, Inc.



Construction Performance®

## NEW HAMPSHIRE INSURANCE COMPANY
### (A CAPITAL STOCK COMPANY)
**175 Water Street, New York, New York 10038**

### COMPLETED VALUE BUILDERS RISK POLICY

Various provisions in this Policy restrict coverage.  Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the word **Insured(s)** means the **Named Insured** and the **additional insured(s)**. The word "Company" means the insurance company shown in the header above.  The word "Policy" means this Completed Value Builders Risk Policy including, the Declarations, all endorsements and Schedules.

Other defined words and phrases that appear in boldface type have special meaning.  Refer to: (1) the DEFINITIONS Section, (2) the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section and (3) elsewhere in this Policy.  If such ordinarily boldfaced words and phrases are not bolded then such words and phrases shall include, but not be limited to, the specific meaning set forth in this Policy.

### SECTION I – INSURING AGREEMENT AND COVERED PROPERTY

**A.  INSURING AGREEMENT**

Subject to the terms and conditions of this Policy, the Company will pay for all risks of direct physical loss or damage by a **covered cause of loss** to **covered property** at the **insured project**, while in offsite temporary storage or during **inland transit** (both as provided in the Additional Coverages), all within the **coverage territory** and occurring during the term of this Policy.

**B.  COVERED PROPERTY**

The Company insures the following property for which the **Insured** is contractually responsible, the value of which has been included in the **total project value**:

**1.** Permanent works - All materials, supplies, equipment, machinery, and other property of a similar nature all when used or to be used in or incidental to the demolition of existing structures, site preparation, fabrication or assembly, installation or erection or the construction of or alteration, renovation, rehabilitation of the **insured project** (hereinafter, **permanent works**);

**2.** Temporary works - All scaffolding, form work, fences, shoring, hoarding, falsework and temporary buildings, construction trailer(s) including such trailers' contents (except **plans and drawings**), all incidental to the **insured project** (hereinafter, **temporary works**); and

**3.** Property of others – Property of others for which the **Insured** is legally liable (hereinafter, **property of others**);

while at the location of the **insured project**, in transit as set forth in the INLAND TRANSIT Additional Coverage, or at offsite temporary storage as set forth in OFFSITE TEMPORARY STORAGE Additional Coverage.

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 1 of 25 |
|---|---|---|

**C. SPECIFIED COVERED CAUSES OF LOSS**

Subject to the terms and conditions of this Policy, **covered causes of loss** include the following specified **covered causes of loss**:

1. **Earth movement**, which means any natural or manmade:

   a. Earthquake, including any earth sinking, rising or shifting related to such event;

   b. Landslide, including any earth sinking, rising or shifting related to such event;

   c. Mine subsidence, meaning subsidence of a manmade mine, whether or not mining activity has ceased;

   d. Earth sinking, rising or shifting, including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of **covered property**, unless otherwise excluded by this Policy;

   e. Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, sinkhole collapse, or subsidence, unless otherwise excluded by this Policy; or

   f. Tsunami arising out of any of the above.

2. **Flood**, which means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike or other surface containment structure, storm surge, storm tide, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.  A tsunami shall not be considered a **flood**.

3. **Water damage** means all loss or damage caused by:

   a. Water, other than water from a **flood** or **named storm**, that enters into a building or structure through an opening;

   b. Discharge or leakage of water or steam from a plumbing, heating, air conditioning or other system or appliance;

   c. Discharge or leakage from a sprinkler system, other than discharge due to a fire, explosion or **earth movement**; or

   d. Water, other than water from a **flood** or **named storm**, that backs-up into the **insured project** (or **existing property**, if endorsed onto this Policy) from sewers, drains, sumps, and/or pumps.

4. **Named storm**, which means a storm that, at any time, has been declared by the United States National Weather Service or another meteorological authority to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm.

If **earth movement**, **flood** or **named storm** is not covered, then any cause or event occurring concurrently or in any sequence with such peril(s) is also not covered, except for direct physical loss or damage to **covered property** caused by fire, sprinkler leakage or explosion following **earth movement**, **flood** or **named storm**, whichever is applicable.

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 2 of 25 |
| --- | --- | --- |

Direct physical loss or damage to **covered property** caused by fire, sprinkler leakage or explosion shall not be considered loss or damage by **earth movement**, **flood** or **named storm**, whichever is applicable, within the terms and conditions of this Policy.

5. **Terrorism**, which means the use or threatened use of force or violence against a person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

   a. A government;

   b. The civilian population of a country, state or community; or

   c. Disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002, and any revisions or amendments thereto (the "Act") is in effect, **terrorism** includes a certified act of terrorism defined by Section 102. Definitions of the Act.

Whether or not **terrorism** is covered under this Policy, the Company does not cover loss or damage caused directly or indirectly by **biological and/or chemical terrorism** or **nuclear terrorism** whether controlled or uncontrolled, proximate or remote, sudden or over any length of time, or which is contributed to or aggravated by any other cause or event. Such **biological and/or chemical terrorism** or **nuclear terrorism** is excluded regardless of any other cause or event occurring concurrently or in any sequence with such **biological and/or chemical terrorism** or **nuclear terrorism**. **Biological and/or chemical terrorism** means the dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances in an act(s) of **terrorism**. **Nuclear terrorism** means an act(s) of **terrorism** involving or resulting in nuclear reaction or nuclear radiation or radioactive contamination.

If **terrorism** is covered under this Policy, then a corresponding premium will be shown in Item **7.B.** of the Declarations.

If **terrorism** is not covered then any cause or event occurring concurrently or in any sequence with such **terrorism** is also not covered, including any action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except for direct physical loss or damage to **covered property** caused by fire following **terrorism**. With respect to this exception for fire following **terrorism**, no coverage is provided for: (1) fire following **biological or chemical terrorism** or **nuclear terrorism**, (2) any Additional Coverage, except debris removal under the DEBRIS REMOVAL Additional Coverage, or (3) delay in completion loss. Notwithstanding any other valuation provision of this Policy to the contrary, the Company shall only pay the actual cash value of the **covered property** at the time and place of the loss caused directly by the ensuing fire.

## SECTION II – ADDITIONAL COVERAGES

Subject to the terms and conditions of this Policy, all loss, damage, expenses and/or other payments for the following Additional Coverages and any Additional Coverage(s) added to this Section by endorsement or through the Special Terms and Conditions is subject to the sublimits of liability as shown in Item **10.B.** of the Declarations and sublimits shown elsewhere in this Policy.

1. **INLAND TRANSIT**

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **covered property** during **inland transit**.

The **Insured** agrees to keep records of all shipments insured hereunder and make them available to the Company upon request.  Failure to keep such records may result in the Company not paying for such **covered property** during **inland transit**.

This Additional Coverage shall be void if the **Insured** enters into any agreement with carriers, releasing them from their common law or statutory liability or agreeing that this insurance shall in any way inure to the benefit of such carriers; however, the **Insured** may, without prejudice to this Additional Coverage, accept bills of lading, receipts, or contracts of transportation as are ordinarily issued by carriers containing a limitation as to the value of **covered property**.

As used herein, **inland transit** means the transit of **covered property** from the commencement of loading at the original point of shipment anywhere within the **coverage territory** or Canada until completion of unloading: at the location of the **insured project** or at a temporary offsite location, including shipments on inland or coastal waters, but excluding ocean marine shipments.

2. **OFFSITE TEMPORARY STORAGE**

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **covered property** while such property is at offsite temporary storage, anywhere within the **coverage territory**.  There is no coverage for such **covered property** while: (1) in the course of manufacturing or processing, (2) at a manufacturer's or supplier's site or warehouse, unless the **Insured** is legally liable for such **covered property**, or (3) in transit.

3. **ARSON, THEFT OR VANDALISM AND MALICIOUS MISCHIEF REWARD**

The Company covers the reasonable payment of any reward offered by the **Named Insured** or on the **Named Insured's** behalf for information that leads to conviction of the perpetrator(s) of arson, theft or **vandalism and malicious mischief** to **covered property**.

Regardless of the number of informants, the Company's maximum liability for any one **occurrence** of arson, theft and/or **vandalism and malicious mischief** is the Arson, Theft or Vandalism and Malicious Mischief Reward sublimit of liability shown in Item **10.B.** of the Declarations.

4. **CLAIMS PREPARATION COSTS**

The Company will pay reasonable and necessary expenses incurred by the **Named Insured** for its:

**a.**   Accountants, architects, auditors, engineers, or other professionals;

**b.**   Employees; or

**c.**   Insurance agent's or broker's subsidiaries, related or associated entities;

to prepare and certify particulars or details of the **Named Insured's** claim required by the Company resulting from a covered loss under this Policy for which the Company has accepted liability.

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 4 of 25 |

The Company will not pay for expenses incurred by the **Named Insured** to utilize the services of property managers, attorneys, public adjusters, or any of its subsidiaries, related or associated entities or insurance agents or brokers.  The Company will not pay any fees or costs for consultation on coverage or negotiation of claims.

**5.  CRANE RE-ERECTION EXPENSES**

The Company will pay reasonable and necessary expenses incurred by the **Named Insured** to re-erect a tower or pole crane that sustains direct physical loss or damage by a **covered cause of loss**.  However, the Company shall not cover any loss or damage to the tower or pole crane itself.

**6.  CRISIS MANAGEMENT**

The Company shall indemnify the **Named Insured** for the reasonable and necessary costs over and above the total costs that normally would have been incurred to continue the scheduled progress of the **insured project** if an order of civil or military authority limits, restricts or prohibits partial or total access to the **insured project**, provided that such order is a direct result of a violent crime, suicide, attempted suicide, death (not including, disease or sickness resulting in death) or armed robbery at such **insured project**.

Coverage begins on the date and time that the order of civil or military authority limits, restricts or prohibits partial or total access to the **insured project** and ends when access to the **insured project** is no longer limited, restricted or prohibited, but in no event for more than the number of days shown in Item **10.B.** of the Declarations under Crisis Management.

The **Named Insured** must report any loss under this Additional Coverage within 30 days after the effective date of such order of the civil or military authority.

**7.  CYBER COVERAGE**

**a.**  Electronic Data

The Company will pay for corruption, erasure or alteration of **electronic data** in the **building or other systems** that are incorporated into the **insured project** due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss**.

The Company will not pay for any loss under this Additional Coverage for which coverage is provided under the Building or Other Systems Additional Coverage or would be provided under such Additional Coverage but for the exhaustion of the Building or Other Systems sublimit of liability shown in Item **10.B.** of the Declarations.

**b.**  Building or Other Systems

The Company will pay for the **building or other systems** that are incorporated into the **insured project** rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems**.

**c.**  Plans and Drawings

The Company will pay for corruption, erasure or alteration of **plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code**.

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 5 of 25 |
|---|---|---|

**d.** Cyber Extra Expense

If coverage is provided under Subsections **7.a.**, **7.b.** or **7.c.** above, the Company will also pay the reasonable and necessary costs, over and above normal operating costs, incurred by the **Named Insured** limited to the following and such costs shall not be considered extra expense under any other Additional Coverage:

**i.** Conducting an investigation (including a forensic investigation) to determine the cause and scope of the introduction of such **malicious code**; and

**ii.** Hiring an expert to consult with the **Named Insured** on: (1) the protection of such **electronic data** and (2) the eradication of such **malicious code**.

**e.** Additional Exclusions

The following additional exclusions apply to all Additional Coverages set forth in the CYBER COVERAGE Additional Coverage:

**i.** The Company will not pay any loss, damage, cost or expense arising out of a breach in confidentiality or privacy of, or release of, any **electronic data** for any reason.

**ii.** The Company does not cover theft of any **electronic data** unless there has been corruption, erasure or alteration of **electronic data** and then the Company shall only pay the covered loss that is related to the corruption, erasure or alteration of **electronic data**.

**iii.** The Company will not pay any extortion payments or public relations expenses.

**iv.** The Company will not pay any loss, damage, cost or expense arising out of **malicious code**, otherwise excluded under this Policy.

The maximum amount the Company will pay for all loss or damage (including corruption, erasure or alteration) under any single Additional Coverage under this CYBER COVERAGE Additional Coverage is the corresponding sublimit of liability for such single Additional Coverage as shown in Item **10.B.** of the Declarations, regardless of any other applicable coverages or Additional Coverages.

For the purposes of the CYBER COVERAGE Additional Coverage, Subsection **7.a.**, **7.b.**, **7.c.**, and **7.d.** shall each be treated as a separate Additional Coverage.

**8. DEBRIS REMOVAL**

If **covered property** at the **insured project** sustains direct physical loss or damage by a **covered cause of loss** during the **policy period**, the Company will pay the reasonable and necessary expenses to:

**a.** Remove debris of **covered property** remaining from the **insured project**; and

**b.** Remove debris of uninsured property from the **insured project**.

The Company will not pay the expense to extract **pollutants or contaminants** from land, water and/or debris, or to remove, restore, or replace contaminated or polluted land or water. In addition, the Company will not cover the cost to remove or transport any property or debris to a site for storage or decontamination required because the property or debris is affected by **pollutants or contaminants**, whether or not such removal, transport or decontamination is required by law, ordinance or regulation nor will the Company cover the cost to remove, transport or decontaminate any property or debris damaged by **fungus, mold or spore**.

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 6 of 25 |
| --- | --- | --- |

**9.   DEMOLITION AND INCREASED COST OF CONSTRUCTION**

In the event of direct physical loss or damage by a **covered cause of loss** to **covered property** that results in the enforcement of any law, ordinance, governmental directive or standard (hereinafter, **law or ordinance**) in effect at the time of loss or damage regulating the repair or rebuilding of the damaged portion(s) of the **covered property**, the Company will pay:

**a.**   Demolition Coverage A:  In accordance with the VALUATION Section, the cost to replace the undamaged portion of the damaged **covered property** as a consequence of the enforcement of a **law or ordinance** that requires demolition of the undamaged portion of the damaged **covered property**;

**b.**   Demolition Coverage B:  For the cost to demolish and clear the site of the undamaged portion of the damaged **covered property**, as a consequence of the enforcement of a **law or ordinance** that requires demolition of the undamaged portion or the damaged **covered property**; and

**c.**   Demolition Coverage C:  For the increased cost of repairing or rebuilding the damaged and undamaged portion of the **covered property**, limited to the cost that would have been incurred in order to comply with the minimum requirements of such **law or ordinance** regulating the repair or rebuilding of the damaged **covered property**.

The Company shall not be liable for any loss under this provision, unless and until the damaged or destroyed **covered property** is actually repaired or rebuilt on the same premises with exercise of due diligence and dispatch and in no event, unless repair or rebuilding is completed within two (2) years after the destruction or damage of such **covered property** or within such further time as the Company may allow in writing during the two (2) year period.

The Company shall not be liable for any cost set forth above:

**a.**   Necessitated by the enforcement of any **law or ordinance** regulating any form of **pollutant or contaminant**; or

**b.**   Incurred due to any **law or ordinance** with which the **Insured** was legally obligated to comply with prior to the time of the direct physical loss or damage.

**10. EXPEDITING EXPENSE AND EXTRA EXPENSE**

The Company will pay reasonable and necessary:

**a.**   Expediting expenses to make temporary repairs and to expedite the permanent repair or replacement of **covered property**, that sustains direct physical loss or damage due to a **covered cause of loss**, including additional wages for overtime, night work, and work on public holidays and the extra costs of express and air freight and extra costs of rental equipment; and

**b.**   **Extra expense** which is incurred by the **Insured** for the purpose of continuing as nearly as practicable the scheduled progress of undamaged work, but only when such scheduled progress is impaired by direct physical loss or damage by a **covered cause of loss** to the **covered property**.

In order to receive payment under this provision, the **Insured** must exercise due diligence and dispatch to maintain the scheduled progress of the undamaged work.

Notwithstanding the foregoing, the Company will not pay expenses incurred:

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 7 of 25 |
|---|---|---|

    a.  To comply with any **law or ordinance** which regulates removal, repair, demolition, construction or re-construction of the **covered property**;

    b.  To overcome delays in the scheduled progress of the work which existed at the time of the loss;

    c.  For alterations, additions, improvements or other changes in materials, designs, plans, specifications or the means and methods of construction; or

    d.  As **owner's extra expense**.

## 11. OWNER'S EXTRA EXPENSE

The Company will pay reasonable and necessary **owner's extra expense** incurred by the **project owner(s)**, prior to the Expiration Date as described in Item **4**. of the Declarations, due to direct physical loss or damage by a **covered cause of loss** to **covered property**.

Notwithstanding the foregoing, the Company will not pay expenses incurred:

    a.  To comply with any **law or ordinance** which regulates removal, repair, demolition, construction or re-construction of the **covered property**;

    b.  To overcome delays in the scheduled progress of the work which existed at the time of the loss;

    c.  For alterations, additions, improvements or other changes in materials, designs, plans, specifications or the means and methods of construction; or

    d.  As **extra expense** or expediting expenses as set forth under the EXPEDITING EXPENSE AND EXTRA EXPENSE Additional Coverage.

## 12. FINE ARTS

The Company will pay for direct physical loss or damage by a **covered cause of loss** to the **Insured's fine arts** at the **insured project** for which the value has been included in the **total project value**. However, the Company will not pay for loss or damage as a result of restoring, repairing or retouching processes.

## 13. FIRE BRIGADE, EXTINGUISHING EXPENSES AND POLICE CHARGES

The Company will pay the following expenses resulting from a **covered cause of loss** to **covered property** incurred by the **Insured**:

    a.  Fire brigade charges and extinguishing expenses;

    b.  Loss and disposal of fire extinguishing materials expended; and

    c.  Police charges to investigate a covered loss.

## 14. FUNGUS, MOLD OR SPORE

The Company will pay for direct physical loss or damage to **covered property** caused by or resulting from **fungus, mold or spore**, when such **fungus, mold or spore** arises out of a **covered cause of loss** that commences during the **policy period**. This coverage includes reasonable and necessary cost or expense with respect to the **insured project** to:

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 8 of 25 |
|---|---|---|

a.  Clean-up, remove, contain, treat, detoxify or neutralize **fungus, mold or spore**;

b.  Test the indoor air quality for **fungus, mold or spore**;

c.  Test the surfaces and materials for **fungus, mold or spore**;

d.  Develop and implement a remediation plan for **fungus, mold or spore**; and

e.  Remove debris that has been contaminated with **fungus, mold or spore**.

## 15. HOT TESTING

The Company will pay for direct physical loss or damage to **covered property** at the **insured project** due to a **covered cause of loss** arising out of **hot testing** during the **hot testing period**.

The **hot testing period** means the period of time that:

a.  Begins with the introduction into each system of: (1) feedstock or other raw materials or (2) fuel supply, and

b.  Ends on the earliest of the following:

   i.   The Expiration Date or earlier termination date of the Policy;

   ii.  The date of formal acceptance of the **insured project** or any part of the **insured project** undergoing **hot testing** by the **project owner(s)**; or

   iii. The date after the total number days of **hot testing**, whether or not consecutive, as shown in Item **10.B.** of the Declarations (referred to as the Maximum Hot Testing Period), after the commencement of **hot testing**.

**Hot testing** means testing of equipment or machinery through the introduction into a system of: (1) feedstock or other raw materials or (2) fuel supply. **Hot testing** does not mean testing of building systems including, but not limited to, electrical, mechanical, hydraulic, hydrostatic and pneumatic testing which shall be deemed to be cold testing.

## 16. LANDSCAPING MATERIALS

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **landscaping materials** at the **insured project**, except for loss or damage to **landscaping materials** from infestation, disease, freeze, drought, lack of moisture, hail, weight of ice or snow or any damage caused by insects, vermin, rodents or animals.

As used herein, **landscaping materials** means trees, plants, shrubs, grass and lawns (including fairways, greens and tees) for which the **Insured** is contractually responsible and the value of which has been included in the **total project value**.

For the purpose of applying the sublimit of liability, "one item" shall mean: (1) any one tree, plant, shrub, green or tee, or (2) each separate area of a fairway or grass, bounded by rough vegetation, water, dirt, concrete or paved surfaces on all sides.

## 17. LOGISTICS EXTRA COSTS

The Company will pay the reasonable and necessary extra cost incurred by the **Insured** to temporarily continue, as nearly normal as practicable, the movement of **covered property** directly between the location of the **Insured's** direct supplier and the **insured project**, provided

that the normal movement of such **covered property** is disrupted as a result of direct physical loss or damage by a **covered cause of loss** to bridges, roadways, tunnels, docks, piers, wharves runways, taxiways, tarmacs, terminals, and/or railways (hereinafter, **infrastructure**) located in the **coverage territory**.

Coverage begins:

**a.**   48 hours after such disruption; or

**b.**   In the case of disruption caused by **earth movement**, **flood** or **windstorm or hail**, 168 hours after such disruption;

and ends when, with exercise of due diligence and dispatch, the normal movement of the **covered property** could be resumed (hereinafter, the **waiting period deductible**).  Any **waiting period deductible** shall apply in addition to any other deductible(s) applicable to the **covered cause of loss** that resulted in damage to the **infrastructure**.  Such other deductible(s) shall be subject to a minimum deductible of the Policy Deductible.

The following additional exclusions apply to this Additional Coverage.  The Company will not pay for:

**a.**   Any loss resulting from disruption of electricity, gas, fuel, water, steam, sewerage, refrigeration, cloud computing service, or any data, voice or video service;

**b.**   Any costs that would have been incurred during the same period had there been no disruption of normal movement of goods or materials;

**c.**   Any costs for the repair or replacement of property that has been damaged or destroyed; or

**d.**   Any costs recoverable elsewhere under this Policy.

## 18. PLANS AND DRAWINGS

The Company will pay for direct physical loss of or damage by a **covered cause of loss** to **plans and drawings**.

## 19. POLLUTION AND CONTAMINATION COVERAGE

The Company will pay the reasonable and necessary expenses incurred by the **Insured** to:

**a.**   Remove, extract, dispose of, or clean-up the actual presence of **pollutants or contaminants** from land or water at the **insured project**;

**b.**   Remove and transport property or debris at the **insured project** that is affected by **pollutants or contaminants** to a site for storage or decontamination; and

**c.**   Test for **pollutants or contaminants** during the extraction of **pollutants or contaminants** from land or water at the **insured project**;

but only if the **pollutants or contaminants** originate at the **insured project** due to direct physical loss or damage by a **covered cause of loss** during the **policy period**.  There will be no coverage unless such expenses are reported to the Company within 180 days after the date of such direct physical loss or damage.

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 10 of 25 |
| --- | --- | --- |

**20. PRESERVATION OF PROPERTY**

The Company will pay for:

**a.** Reasonable and necessary costs, over and above normal operating costs, incurred by the **Insured** for actions to temporarily protect or preserve **covered property**, and

**b.** Direct physical loss or damage by a **covered cause of loss** to **covered property** removed from the **insured project**,

provided that such actions or removal is necessary due to imminent direct physical loss or damage by a **covered cause of loss** to **covered property**. If **covered property** is removed to and located at offsite temporary storage in accordance with this provision, then the OFFSITE TEMPORARY STORAGE Additional Coverage shall apply.

**21. PROFESSIONAL DESIGN FEES**

In the event of direct physical loss or damage by a **covered cause of loss** to the **insured project**, the Company will pay the reasonable and necessary expenses incurred by the **Insured** for architects, engineers or other design professionals to redesign the damaged portion of the **insured project** in accordance with the design as set forth in the **contract documents** on the date of loss.

<div align="center">

**SECTION III – VALUATION**

</div>

Unless otherwise provided in this Policy, the basis of adjustment of a claim shall be as follows, at the time and place of the loss:

**A.** <u>Permanent Works</u> – The cost to repair or replace (whichever is less) the **permanent works** that sustained loss or damage at the time and place of the loss with material of like kind and quality, less betterment, and including contractor's reasonable profit and overhead in the same proportion as that included in the **contract documents** to the extent declared as part of the **total project value**. If the **permanent works** are not repaired or replaced within 2 years after the date of loss, then the Company shall pay the actual cash value of such **permanent works** at the time and place of the loss.

**B.** <u>Temporary Works</u> – With respect to **temporary works** that sustain loss or damage, the lesser of: (1) the cost to repair or replace (whichever is less) the **temporary works** at the time and place of loss with materials of like kind and quality, but if not repaired or replaced within 2 years after the date of loss, the recovery will not exceed actual cash value or (2) the value that the **Insured** is legally required to pay for the **temporary works** as set forth in the lessor's contract.

**C.** <u>Property of others</u> – The lesser of: (1) the cost to repair or replace (whichever is less) the **property of others** that sustained loss or damage at the time and place of loss with material of like kind and quality, less betterment and/or charges incurred by the contractor prior to the loss and related to such property or (2) the property owner's cost.

**D.** <u>Property in Inland Transit</u> – The invoice cost of property in **inland transit** plus accrued shipping charges less the shipper's liability, if any.

**E.** <u>Plans and Drawings</u> – If replaced, the cost to reproduce the **plans and drawings** (in physical or **electronic data** format) from duplicates, or if no duplicates are available, then the cost to research, gather and/or assemble the information to recreate such **plans and drawings**. If not replaced, the value of the blank material.

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 11 of 25 |
|---|---|---|

**F.** **Landscaping Materials** – (1) The cost to replace **landscaping materials** with property of like kind and quality, and (2) the labor necessary to replace such property.

**G.** **Fine Arts** – The least of the following: (1) the cost to repair or replace the **fine arts**; (2) the appraised value at the time of the loss had no loss or damage occurred or (3) the agreed value, if any, on file with the Company.

**H.** **Electronic Data** – The cost of reproducing **electronic data** from duplicates to the condition that existed prior to the time of the loss, or if no duplicates exist, then the cost to research, gather and/or assemble the **electronic data**. If the **electronic data** is not replaced, then the value of the blank media.

## SECTION IV – PROPERTY NOT COVERED

Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company does not insure the following property:

**A.** Land and land values and the value of cut, fill and backfill materials existing at the location of the **insured project** prior to project commencement; however, to the extent identified in the **contract documents** and included in the **total project value**, fill and backfill materials purchased for use in the completion of the **insured project** are covered. Labor and material charges incurred to excavate land and to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured, are covered to the extent such charges are identified in the **contract documents** and included in the **total project value**;

**B.** **(i)** Contractors' tools, machinery, plant and equipment, including spare parts and accessories, whether owned, loaned, hired or leased, and

**(ii)** Property of a similar nature not intended to be a permanent part of the completed **insured project**,

regardless of ownership, unless specifically provided by endorsement and then only to the extent provided therein;

**C.** Vehicles or equipment licensed for highway use, aircraft including drones or watercraft, except with respect to drones only, if such drones are owned and used by the **Insured** as part of the operations at the **insured project**;

**D.** Railcars and locomotives;

**E.** Water, except water that is contained within any enclosed tank, piping system, or **processing water**;

**F.** Standing timber, growing crops or animals;

**G.** Trees, plants, shrubs, grass or lawns (including fairways, greens or tees) that already exist at the **insured project**;

**H.** **Landscaping materials**;

**I.** **Plans and drawings**;

**J.** Accounts, bills, stamps, deeds, evidence of debt, checks, bonds, notes, **money**, **fine arts**, precious metals or precious stones or other property of a similar nature;

**K. Existing property** at the location of the **insured project**, unless specifically provided by endorsement and then only to the extent provided therein;

**L. Used machinery and equipment** while undergoing any form of testing, commissioning or startup, unless specifically provided by endorsement and then only to the extent provided therein;

**M.** Transmission, distribution or communication lines, except to the extent identified in the **contract documents**;

**N.** Property not at an **insured project** unless covered under the INLAND TRANSIT Additional Coverage, OFFSITE TEMPORARY STORAGE Additional Coverage or by endorsement; or

**O. Electronic data**.

<p align="center">**SECTION V – PERILS EXCLUDED**</p>

**A.** Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company does not insure for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage.  The following exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:

   **1.** Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or contributed to or aggravated by a **covered cause of loss**.  However, if fire or sprinkler leakage not otherwise excluded ensues, the Company shall be liable for direct physical loss or damage by such ensuing fire or sprinkler leakage, but not including any loss or damage due to nuclear reaction, nuclear radiation, or radioactive contamination;

   **2. a.** War, hostile or warlike action in time of peace or war, whether or not declared, including action in hindering, combating, or defending against an actual, impending, or expected attack:

   **i.** By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces; or

   **ii.** By military, naval, or air forces; or

   **iii.** By an agent of any such government, power, authority, or force;

   **b.** Any weapon employing atomic fission, fusion or radioactive force, or any weapon that disperses radioactive material or a directed-energy or electromagnetic weapon, whether in time of peace or war, whether or not its discharge was accidental; or

   **c.** Insurrection, rebellion, revolution, civil war, usurped power, seizure or destruction or any action taken by governmental authority in hindering, combating, or defending against such event;

   Including any consequence of Subsection **a.**, **b.**, or **c.** above;

   **3.** The actual, alleged or threatened release, discharge, escape or dispersal of **pollutants or contaminants**, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any **covered cause of loss** under this Policy.

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 13 of 25 |

However, this exclusion shall not apply to direct physical loss or damage to **covered property** from **pollutants or contaminants** caused by a **covered cause of loss** at the **insured project**, including the cost to clean-up **pollutants or contaminants** from **covered property** at the **insured project** resulting from such loss or damage.  No coverage is provided for testing or monitoring for **pollutants or contaminants**.  For the purpose of the exception to this exclusion only, **pollutants or contaminants** do not include radioactive contaminants;

4. Dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances by any cause whatsoever;

5. Asbestos, dioxins or polychlorinated biphenols (hereinafter, **material(s)**) including:

   a. **Material(s)** removal;

   b. Demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating **material(s)**;

   c. Any governmental order or direction declaring that any **material** which is present in or part of or utilized on any portion of the **insured project** must be removed or modified;

6. a. Any functioning or malfunctioning or lack of the internet or similar facility, or of any intranet or private network, computer system, computer or computing device or similar facility;

   b. Any corruption, destruction, distortion, erasure or other loss or damage to data, coding, program, or software;

   c. Loss of use or functionality whether partial or entire of data, coding, program, software, any computer or computer system or other device and any ensuing liability or failure of the **Insured** to conduct business;

   all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage at the **insured project**;

7. Error or omission in machine programming or instructions of **electronic data**, including, loss attributable to program design constraints, networking compatibility and original business software; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage at the **insured project**;

8. Lack of incoming electricity, fuel, water, gas, steam, refrigeration, or outgoing sewerage, or incoming or outgoing data, voice or video service; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage, but only if: (1) such ensuing loss or damage is caused by a lack of incoming electricity, fuel, water, gas, steam or refrigeration from an offsite service provider and (2) such ensuing loss or damage is to equipment or machinery that is part of the **permanent works** of the **insured project** and is not operational at the time of the loss. This exception does not apply to **hot testing**.

9. Any loss or damage arising out of **hot testing**;

10. Infidelity, dishonesty or fraudulent activity of any **Insured** or any of the **Insured's** proprietors, partners, officers, directors, trustees, employees or others with whom the property is entrusted (other than a carrier for hire).   However, a willful act of destruction by the

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 14 of 25 |
|---|---|---|

**Insured's** employee without the knowledge of any of the **Insured's** proprietors, partners, officers, directors or trustees is covered;

11. Any act that: (1) causes corruption, erasure or deletion of **electronic data**, including the rendering of any equipment or machinery useless, or (2) prevents access to or use of computer hardware, software or other components thereof; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage.

12. **Fungus, mold or spore**; or any spores or toxins created or produced by or emanating from such **fungus, mold or spore**; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage;

13. Confiscation, seizure, appropriation, expropriation, nationalization, requisition for use or title, or willful destruction by any government, sovereign power, civil authority or military authority (de jure or de facto); or

14. Loss or damage arising out of any **covered cause of loss** or Additional Coverages for which the words NOT COVERED or for which an amount or number of days is not shown in Item **10.** of the Declarations.

B. Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company will not pay for loss or damage caused by or attributable to any of the following:

1. Indirect, remote or consequential loss or damage;

2. Delay, loss of market or loss of use;

3. Delay in completion of the **insured project**, unless specifically provided by endorsement and then only to the extent provided therein;

4. Any business interruption loss, **extra expense**, **owner's extra expense**, expediting expenses, expenses to reduce loss, loss of rental income and other economic losses;

5. Liquidated damages, performance penalties, penalties for non-completion, late completion or non-compliance with contract conditions;

6. Loss, damage, costs, expenses, fines or penalties incurred or sustained by or imposed on the **Insured** at the order of any government agency, court or other authority arising from any cause whatsoever;

7. Loss, damage, or expense covered under any written or implied guarantee or warranty by any contractor, manufacturer or supplier, whether or not such contractor, manufacturer or supplier is an **Insured**, but only to the extent such loss, damage, or expense should have been recovered under such written or implied guarantee or warranty;

8. Unexplained or mysterious disappearance, loss or shortage disclosed on taking inventory;

9. Normal: subsidence, heave, settling, cracking, expansion, contraction or shrinkage of walls, floors, ceilings, buildings, foundations, patios, walkways, driveways or pavements, all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage;

**10. a.** Faulty workmanship, material, construction or installation from any cause; or

**b.** Any fault, defect, error, deficiency or omission in any design, plans, or specifications;

all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage; or

**11.** Wear and tear, erosion, inherent vice, latent defect, corrosion, rust, wet or dry rot, evaporation, shrinkage, or change in color, flavor, texture or finish, extremes or changes of temperature damage, or changes in relative humidity damage, all whether atmospheric or not or gradual deterioration, all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage.

### SECTION VI – CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT

**A. ABANDONMENT**

There can be no abandonment of any property to the Company.

**B. ADJUSTMENT OF LOSSES**

Loss or damage will be adjusted with the **Named Insured** and shall be payable as directed in writing by the **Named Insured** subject to: mortgagee; lender; or similar interests; as their interests may appear as shown on the Certificates of Insurance or any endorsement attached to and forming a part of the Policy.  The effective date of any interests will be the issue date of the Certificate of Insurance unless a later date is specified on the Certificate of Insurance.

Notwithstanding the foregoing, if the Company is prohibited from adjusting and making payment in accordance with the preceding paragraph, the Company will adjust and make payment to the **Named Insured**.

**C. APPRAISAL**

If the **Named Insured** and the Company disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss.  In such event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire.  If the appraisers cannot agree on an umpire, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the replacement cost and actual cash value of the property and amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding.  Each party will:

**1.** Pay its chosen appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, it is without prejudice to the Company's rights under the terms and conditions of this Policy and the Company's right to deny the claim in whole or in part.

**D. PARTIAL PAYMENT OF LOSS**

In the event the amount of loss or damage for which the Company is liable is determined by the Company to be in excess of the applicable deductible, the Company may advance partial payment(s) with respect to any claim, subject to all other terms and conditions of this Policy.

**E.   REQUIREMENTS IN CASE OF LOSS OR DAMAGE**

In case of loss or damage, the **Insured** shall:

1.  Give written notice of any loss or damage to the Company as soon as practicable after the date of such loss or damage;

2.  Promptly contact the applicable authority having jurisdiction in the event a law has been broken, and promptly file a written report with such authority;

3.  Protect the property from further loss or damage;

4.  Separate the damaged and undamaged property;

5.  Maintain such property in the best possible order;

6.  Furnish a complete inventory of the lost, destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed;

7.  Allow the Company to examine and audit the **Insured's** books and records at any reasonable time for the purpose of investigating or verifying any claim;

8.  Furnish all other documents or insurance policies that the Company may reasonably require;

9.  Allow the Company to access and inspect any damaged or undamaged property;

10. Submit to examination under oath at such times as the Company reasonably may require concerning any matter relating to this insurance or any claim;

11. Cooperate with the Company in all aspects of any claim and provide the Company with any additional information that the Company requires; and

12. Provide the Company with a proof of loss, signed and sworn to by the **Named Insured** as soon as practicable, but in no event more than 90 days after a loss, stating the **Insured's** knowledge and belief as to the following:

    a.  The time and origin of the loss;

    b.  The **Insured's** interest and the interest of all others in the property;

    c.  The value of each item thereof determined in accordance with the VALUATION Section and the amount of loss thereto and all encumbrances thereon;

    d.  All other contracts of insurance, whether collectible or not, covering any of the **covered property**; and

    e.  Any changes in the title, use, occupancy, location, possession or exposures of the **covered property** subsequent to the issuance of this Policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss, whether or not it then stood on leased ground.

**F.   SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable shall be payable within 30 days after proof of loss, as herein required, is received and agreed to by the Company or the amount of

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 17 of 25 |
|---|---|---|

loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

The Company shall have the option to take all or any part of the property at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing the **Named Insured** with notice of the Company's intention to do so within 60 days after the Company's receipt of the proof of loss herein required.

**G. SUBROGATION**

The Company may require from the **Insured** an assignment of all rights of recovery against any party for loss to the extent that payment is made by the Company.  However, the **Insured** has the right to waive subrogation, provided such waiver is entered into by the **Insured** in writing prior to the loss.   The **Insured** will do nothing after a loss to prejudice such rights of subrogation.

Notwithstanding the foregoing, it is a condition of this Policy that the Company shall be subrogated to all the **Insured's** rights of recovery against:

**1.** Any architect or engineer, whether named as an **Insured** or not, for any loss or damage arising out of the performance of professional services in their capacity as such and caused by an error, omission, deficiency or act of the architect or engineer, by any person employed by them or by any others for whose acts they are legally liable; and

**2.** Any manufacturer or supplier of machinery, equipment or other property, whether named as an **Insured** or not, for the cost of making good any loss or damage regardless of any guarantee or warranty, whether express or implied.

Any recovery by the Company as a result of subrogation proceedings arising out of an **occurrence**, after expenses, including the Company's legal fees, incurred in such subrogation proceedings are deducted, shall accrue to the **Insured** in the proportion that the deductible amount and/or any provable uninsured loss amount bears to the entire provable loss amount.

The **Insured** will cooperate with the Company and, upon the Company's request and expense will:

**1.** Attend hearings and trials;

**2.** Assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and conducting suits.

**H. SUIT AGAINST COMPANY**

No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless the same be commenced within 24 months immediately after the date of the loss, provided however, that if under the laws of the applicable jurisdiction such time limitation is unenforceable, then the period within which such action or proceeding must be commenced shall be the shortest period of time permitted by the laws of such jurisdiction.

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 18 of 25 |
|---|---|---|

## SECTION VII – GENERAL CONDITIONS

### A. ASSIGNMENT

The **Insured** may not assign this Policy without the Company's prior written consent.

### B. CANCELLATION

This Policy may be cancelled by the **Named Insured** at any time by surrendering this Policy to the Company or by mailing or delivering to the Company written notice stating when thereafter such cancellation shall take effect.  The Company may cancel this Policy by giving the **Named Insured** written notice stating when, not less than 90 days thereafter, or 10 days thereafter for nonpayment of premium, such cancellation shall be effective.

The Company shall pay return premium to the **Named Insured** on a pro-rata basis if the Company cancels and on a short rate basis (meaning 90% of the unearned premium) if the **Named Insured** cancels.

Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If any specific state amendatory endorsement provides less than 90 days notice of cancellation for reasons other than nonpayment of premium, where permitted by law, the Company shall provide the 90 days notice set forth herein.

### C. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Policy is voidable by the Company if any **Insured**, whether before or after a loss, has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or has committed any act of fraud, attempted fraud or false swearing concerning any matter relating to this insurance or the subject thereof.

### D. CONFORMANCE TO STATUTE

Any provisions of this Policy which are in conflict with statutes applicable to this Policy are understood, declared and acknowledged by the Company to be amended to conform to such statutes.

### E. ECONOMIC AND TRADE SANCTIONS

The Company shall not be deemed to provide cover and the Company shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose this Company, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.

### F. ERRORS OR OMISSIONS

No unintentional errors or omissions in any information required to be reported to the Company will prejudice the **Insured's** rights of recovery, but the **Insured** shall report the correct information to the Company as soon as practicable when discovered and the **Insured** shall pay any additional premium when due.

**G.  GOVERNING LAW**

Any interpretation of this Policy or issue relating to its construction, validity or operation shall be determined by the laws of the United States or of any applicable state in the United States. The parties will submit to the exclusive jurisdiction of the applicable court within the United States.

**H.  INCREASE IN HAZARD**

If the circumstances in which this insurance was entered into shall be altered or if the risk shall be materially increased, the **Insured** shall as soon as possible give notice in writing to the Company. In the event there is a material increase in the risk, the Company reserves the right to change the terms or conditions of this Policy or cancel this Policy (if allowable by law).

**I.  INSPECTION**

The Company shall be permitted, but not obligated, to inspect **covered property** at all reasonable times during the **policy period**.  Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute any undertaking by the Company, on behalf of or for the benefit of the **Insured** or others, to determine or warrant that such **covered property** is safe or healthful or that such **covered property** complies with any law, rule, regulation, code, engineering or industry standard.

**J.  LIBERALIZATION**

If the Company adopts a standard revision to the Company's Completed Value Builders Risk Construction Performance Policy that would broaden the coverage under this Policy within 45 days prior to the inception date of this Policy or during the **policy period** of this Policy and if no additional premium is required for such revision, then the broadened coverage will immediately apply to this Policy.

**K.  NAMED INSURED**

If this Policy insures more than one person or organization, the **Named Insured** is authorized to act on behalf of all other **Insureds** with respect to such **Insureds'** rights, obligations, and duties under this Policy including, but not limited to, the giving and receiving of notices under this Policy.  Payment of loss or return premium under this Policy to the **Named Insured** shall satisfy the Company's obligations with respect to all **Insureds** under this Policy.

**L.  NO BENEFIT TO BAILEE**

No person or organization, other than the **Insured**, having custody of **covered property** will benefit from this insurance.

**M.  OTHER INSURANCE**

1.  An **Insured** may have other insurance.  If such **Insured** does have other insurance, the Company will pay its share of the covered loss or damage.  Subject to the exceptions as set forth in **2.** below, the Company's share is the proportion that the applicable limit/sublimit of liability under this Policy bears to the limits/sublimits of liability of all insurance covering the loss or damage.

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | **Page 20 of 25** |
| --- | --- | --- |

2. If there is other insurance as described below, the Company will pay under this Policy only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether the **Insured** can collect on it or not:

   a. The property covered under this Policy is also covered under another policy, in which such property is more specifically described; or

   b. The other insurance covers the **Insured's** interest or the interest of others in property which the **Insured** does not own.

## N. PAIR AND SET

In the event of loss or damage to any part of **covered property** consisting, when complete for use, of several parts, the Company will only be liable for the value of the part lost or damaged.

## O. PREMIUM ADJUSTMENT

1. **During the Term of the Policy:**

   a. At the time of any extension of this Policy or if the scope or value of the **insured project** changes beyond the percentage set forth in the Margin Clause shown on the Declarations, the **Named Insured** shall report in writing to the Company the **adjusted total project value** as of the date of such extension or change order.

   b. The adjusted premium shall be calculated by applying the rates as shown in Item **8.** of Declarations used for the purpose of computing the Deposit Premiums to the amended term of coverage and the **adjusted total project value**.

   c. If the adjusted premium so calculated differs from the Total Deposit Premium shown in Item **8.** of the Declarations (or the previous revision of the Total Deposit Premium), such difference shall be due and payable to the Company or the **Named Insured**, whichever is applicable.

2. **Upon Expiration or Cancellation of the Policy:**

   a. At the time of expiration or cancellation of this Policy, the **Named Insured** shall report in writing to the Company the **adjusted total project value** as of the Expiration Date or the effective date of cancellation.

   b. The final earned premium for this Policy shall be calculated by applying the rates as shown in Item **8.** of Declarations used for the purpose of computing the Deposit Premiums to the actual term of coverage and the **adjusted total project value**.

   c. If the premium so calculated differs from the Total Deposit Premium shown in Item **8.** of the Declarations (or the previous revision of the Total Deposit Premium), such difference shall be due and payable to the **Named Insured** or the Company, whichever is applicable.

## P. PRESERVATION OF PROPERTY

In case of imminent loss or damage, the **Insured** must make reasonable efforts to protect property from such loss or damage.

## Q. RECOVERY FROM OTHER PARTIES

No loss or damage in whole or in part shall be paid hereunder to the extent the **Insured** has collected such loss or damage from others.

**R.  SALVAGE AND RECOVERIES**

All salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this Policy, shall reduce the loss accordingly.

**S.  TITLES**

The titles in this Policy are solely for reference and shall not in any way affect the provisions to which they relate.

## SECTION VIII − DEFINITIONS

1. **Additional Insured(s)** means those **Insureds** shown in Item **2.** of the Declarations.

2. **Adjusted total project value** means the **total project value** that may be adjusted during the **insured project** or if previously adjusted, any adjustments to the revised **total project value**.

3. **Building or other system(s)** means:

    **a.**  Equipment and machinery; and/or

    **b.**  Manufacturing or structural system(s), such as a HVAC, instrumentation, electrical, mechanical or control system(s);

    that are incorporated into the **insured project**.

4. **Collapse** means an abrupt falling down or caving in of a building or structure or any part of a building or structure.

5. **Contract documents** means the contract(s) or agreement(s), as may be amended, on file with the **Insured** for the **insured project**.

6. **Coverage territory** means the coverage territory as shown in Item **6.** of the Declarations.

7. **Covered cause(s) of loss** means a peril or other type of loss, not otherwise excluded under this Policy.

8. **Covered property** means property as described in the COVERED PROPERTY Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section which is not otherwise excluded under the PROPERTY NOT COVERED Section, for which the **Insured** is contractually responsible and the value of which has been included in the **total project value**.

9. **Electronic data** means data, messages, information, coding, programs, instructions or software in a form suitable for communications, storage, or processing by electronic, electromechanical, electromagnetic data processing or electronically controlled production equipment.  **Electronic data** does not include electronic storage media.

10. **Existing property** means existing buildings and/or permanent structures, including equipment and apparatus used to maintain or service the buildings or structures, that existed prior to the inception date of this Policy and is located at the **insured project.  Existing property** does not include personal property, any property located outside of the existing buildings and/or permanent structures, and/or any underground utilities of any kind or description.

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | **Page 22 of 25** |
|---|---|---|

11. **Extra expense** means the excess costs over and above the total costs that would normally have been incurred to continue the scheduled progress of the undamaged work in the absence of such loss or damage, including:

   **a.** Labor, supervision, management and administration costs;

   **b.** Equipment rental, temporary use of property;

   **c.** Emergency expenses, additional security; and

   **d.** Demobilization and remobilization of equipment and facilities;

   all when necessarily incurred to reduce time delays in the contract schedule.

12. **Fine arts** means paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; porcelains; and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft and **money**.

13. **Fungus, mold or spore** means:

   **a.** **Fungus** including, but not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including **mold**, yeast, rusts, mildews, smuts and mushrooms;

   **b.** **Mold** including, but not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and **fungi** that produce **mold**; and/or

   **c.** **Spore** including, but not limited to, any dormant or reproductive body produced by or arising or emanating out of any **fungus**, **mold**, mildew, plants, organisms or microorganisms.

14. **Insured(s)** means the **Named Insured(s)** and the **Additional Insured(s)**.

15. **Insured project** means the construction project as described in Item **5.** of the Declarations, for which values have been reported and are included in the **total project value**.

16. **Malicious code** means any unauthorized code designed to cause corruption, erasure or alteration of **electronic data.**

17. **Money** means:

   **a.** Currency, coins, bank notes, bullion, traveler checks, registered checks, money orders; and

   **b.** Negotiable and non negotiable instruments or contracts representing money including: tokens, tickets, revenue stamps and other stamps (whether represented by actual stamps or unused value in a meter), and evidence of debt issued in connection with credit card or charge cards that are issued to the **Insured**.

18. **Named Insured** means the Named Insured(s) shown in Item **1.** of the Declarations.

19. **Occurrence** means any one accident, loss, disaster, casualty, incident or series of accidents, losses, disasters, casualties or incidents, including all resultant or concomitant insured losses, not otherwise excluded by this Policy and with respect to:

   **a.** **Terrorism** (to the extent **terrorism** is covered), arises out of the same or related purpose or cause; or

| 125687 (5/17) | ©**American International Group, Inc.** **All Rights Reserved.** | **Page 23 of 25** |
|---|---|---|

**b.** Covered perils other than **terrorism**, arises out of a single event or originating cause.

The **occurrence** must occur during the **policy period**.

When the term applies to loss or losses from the perils of **windstorm or hail**, **named storm**, **riot, strike or civil commotion**, **vandalism and malicious mischief**, **earth movement**, **flood** or **terrorism**, to the extent any such peril(s) are covered, all losses arising from such peril(s) occurring during a continuous period of 72 hours shall be deemed to be a single **occurrence**. The **Named Insured** may elect the moment at which the 72 hour period shall be deemed to have commenced, which shall not be earlier than the time when the first loss occurs to the **covered property**, but no two such 72 hour periods shall overlap.

If the **occurrence** commences during this **policy period**, then the Company shall treat the entire **occurrence** as occurring during this **policy period**.

20. **Owner's extra expense** means the following expenses:

   **a.** Advertising and marketing expense;

   **b.** Legal and accounting fees;

   **c.** License and permit fees; and

   **d.** Project management fees.

21. **Plans and drawings** means plans, blueprints, drawings, renderings, specifications or other contract documents and models (whether in physical or **electronic data** format) for the **insured project** stored anywhere in the world. Such **plans and drawings** do not include machine programing instructions including, Building Information Modelling ("BIM").

22. **Policy Limit** means the limit of liability shown in Item **9.** of the Declarations.

23. **Policy period** means the policy period as described in Item **4.A.** and Item **4.B.** of the Declarations.

24. **Pollutants or contaminants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances. Waste includes materials to be recycled, reconditioned or reclaimed. **Pollutants or contaminants** do not include **fungus, mold or spore**.

25. **Processing water** means water used directly in the **Insured's** business process that is contained within any enclosed tank, piping system or any other processing equipment.

26. **Project owner(s)** means the project owner(s) shown in Item **5.** of the Declarations.

27. **Riot, strike or civil commotion** means riot or civil commotion including, but not limited to:

   **a.** Acts of striking employees while occupying an **insured project**; and

   **b.** Pilferage or looting occurring at the time and place of a riot or civil commotion.

28. **Total project value** means the total value of **permanent works** (including **landscaping materials**), **temporary works** and **property of others**; plus labor costs that will be expended to construct the

**insured project**; plus site general conditions, construction management fees, and contractor's profit and overhead as stated in the **contract documents** as the "total project value", "total contract value", or other similar description.

29. **Used machinery and equipment** means any mechanical or electrical machine or equipment, including a pressure or non-pressure vessel, which has been previously installed or refurbished or is no longer under a manufacturer's warranty.

30. **Vandalism and malicious mischief** means willful and malicious damage to, or destruction of, **covered property**.

31. **Windstorm or hail** means the direct action of wind or the direct action of hail, whether accompanied by wind or not.  However, **windstorm or hail** does not mean:

    **a.**  Loss or damage caused by or resulting from frost or cold weather, ice (other than hail), snow or sleet, whether driven by wind or not;

    **b.**  Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters; or

    **c.**  Loss or damage caused when weight of snow, rainwater, ice or sleet is a contributing factor to the fall or **collapse** of a building or structure or any part thereof.

**ENDORSEMENT #001**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## DELAY IN COMPLETION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

**SCHEDULE**

I. **Named Insured and Address:**
   A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
   17901 COLLINS AVENUE SOUTH
   SUNNY ISLES BEACH FL 33160

   All coverage under this Delay in Completion Endorsement shall only be provided to the Named Insured shown above (hereinafter, the **Named Insured** for purposes of this endorsement only).  No coverage shall be provided under this endorsement to any other person or entity.

II. The coverage provided under this Delay in Completion Endorsement is applicable to the entire **insured project** unless otherwise described below:

   Not Applicable

III. **Period of Indemnity**:           540 Calendar Days
IV. **Anticipated Date of Completion:**   South Tower - 07/01/2021
                                          Villa - 12/31/2021

V. **Deductible Period:**

|  | **Deductible Period** (per **occurrence** unless otherwise stated below) |
|---|---|
| **Standard Deductible** | 30 Calendar Days<br>☒ per **occurrence** or<br>☐ in the Aggregate, no other **Deductible Periods** apply |
| **Earth Movement, Flood** or **Named Storm** | 30 Calendar Days |
| **Cyber Loss** | 30 Calendar Days |
| **Ingress & Egress** | 30 Calendar Days |
| **Order of Civil or Military Authority** | 30 Calendar Days |
| **Service Interruption** | 30 Calendar Days |
| **Hot Testing** | Not Applicable |
| **LEG 3** | 30 Calendar Days |

If two or more deductible amounts provided above apply to a single **occurrence**, the total to be deducted shall be the largest applicable deductible.  The above deductibles are in addition to any applicable deductibles on the Declarations of this Policy.  If the Standard Deductible applies on a per **occurrence** basis, then such deductible shall apply unless a more specific deductible applies.

**VI. Limits of Liability Applicable to this Endorsement**

The following are subject to and not in addition to the **Policy Limit** and all sublimits of liability shown in Item **10.A.** of the Declarations.  The sublimits of liability stated in this endorsement are per **occurrence** unless otherwise stated.

*If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage, then no coverage is provided for that coverage, whether under the Insuring Agreement or any Additional Coverage.  If the words, NOT APPLICABLE are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

| | | |
|---|---|---|
| **A.** | Aggregate Sublimit of liability for all coverage under this endorsement | $44,022,420 |

The following sublimits of liability **VI.B.** through **VI.I.** are subject to **VI.A.** above:

| | | |
|---|---|---|
| **B.** | Loss of **Rental Income** | $NOT COVERED |
| **C.** | Loss of **Gross Earnings** | $NOT COVERED |
| **D.** | **Cyber Loss** | See Item **10.B.7.** of the Declarations |
| **E.** | Ingress & Egress | 15 Calendar Days, subject to maximum of $2,500,000 |
| **F.** | Order of Civil or Military Authority | 15 Calendar Days, subject to maximum of $1,000,000 |
| **G.** | Service Interruption | 15 Calendar Days, subject to maximum of $1,000,000 |
| **H.** | Other:  NOT COVERED | $NOT COVERED |
| **I.** | **Soft Costs/Additional Expenses** | $44,022,420 |

The following sublimits of liability are subject to **VI.I.** above.

| | | |
|---|---|---|
| **1.** | Interim interest expense | $INCLUDED |
| **2.** | Realty taxes/Ground rents | $INCLUDED |
| **3.** | Leasing/Commission expense | $INCLUDED |
| **4.** | Insurance premiums | $INCLUDED |
| **5.** | Advertising and marketing expense | $INCLUDED |
| **6.** | Legal and accounting fees | $INCLUDED |
| **7.** | License and permit fees | $INCLUDED |
| **8.** | Project management fees | $INCLUDED |
| **9.** | Other: Construction Supervision | $INCLUDED |

 ©**American International Group, Inc.**
**All Rights Reserved.**

| | | |
|---|---|---|
| **10.** | Other: Real State Taxes | $INCLUDED |
| **11.** | Other: Loan Fees and Interest | $INCLUDED |
| **12.** | Other: Sales Deposit & Bond Interest | $INCLUDED |
| **13.** | Other: Project G & A | $INCLUDED |
| **14.** | Other: Soft Cost Contingency | $INCLUDED |

_____

No coverage or Additional Coverage shall be provided unless the **delay(s)** exceeds the **anticipated date of completion** and then such coverage shall only be provided for the **delay(s)** that is/are in excess of such **anticipated date of completion**, subject to the applicable **deductible period.** All covered losses and expenses are subject to the applicable **Policy Limit**, sublimits of liability, **period of indemnity** or calendar days as stated in the above Schedule.

## A.  INSURING AGREEMENT

**1.**  Subject to all terms and conditions of this Policy, in the event of:

**a.**  Direct physical loss of or damage to **covered property, landscaping materials** or **plans and drawings** by a **covered cause of loss**, or

**b.**  Corruption, erasure or alteration of:

**i.**  **Electronic data** in the **building or other systems**, due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss**,

**ii.**  **Plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code**, or

**c.**  **Building or other systems** that are rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems**

(hereinafter, collectively Subsections **1.b.** and **1.c.** are referred to as **cyber loss**), the Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** sustained during the **period of indemnity** as a result of **delay** in completion of the **insured project**, on an actual loss sustained basis.

**2.**  The Company shall also indemnify the **Named Insured** for reasonable expenses, over and above normal operating expenses, during the **period of indemnity**, that are necessarily incurred for the purpose of reducing any loss covered under this endorsement, but in no event shall the Company be liable for an amount greater than that for which the Company would have been liable had there been no covered **delay**.

## B.  ADDITIONAL COVERAGES

**1.  Ingress & Egress**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if ingress to or egress from the **insured project** is prohibited as a result of direct

 ©**American International Group, Inc.** **All Rights Reserved.**

physical loss or damage by a **covered cause of loss** to property not insured under this Policy, provided that such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the prohibition of ingress or egress to the **insured project** for the lesser of:

**a.** The number of calendar days shown for Ingress & Egress in the above Schedule, or

**b.** Until the ingress or egress is no longer prohibited,

subject to the Ingress & Egress sublimit of liability shown in the above Schedule.

**2.  Order of Civil or Military Authority**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if an order of civil or military authority prohibits access to the **insured project**, provided that: (1) such order is a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy and (2) such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with such order that prohibits access to the **insured project** for the lesser of:

**a.** The number of calendar days shown for Order of Civil or Military Authority in the above Schedule, or

**b.** Until access to the **insured project** is no longer prohibited,

subject to the Order of Civil or Military Authority sublimit of liability shown in the above Schedule.

**3.  Service Interruption**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** resulting from the interruption of incoming electricity, steam, gas, fuel or water caused by direct physical loss or damage by a **covered cause of loss** to a service provider's transmission and distribution lines and related plants, substations and equipment located outside of the **insured project**. Notwithstanding the foregoing, the Company will not pay for any interruption intentionally caused by any **Insured** or any service provider.

If a service provider's transmission and distribution lines and related plants, substations and equipment that sustain loss or damage are part of the **insured project** and included in the **total project value**, the Service Interruption sublimit of liability shown in the above Schedule shall not apply, nevertheless the Aggregate Sublimit of Liability for all coverage under this endorsement shown in **VI.A.** above shall apply.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

©American International Group, Inc.
All Rights Reserved.

The Company shall only provide coverage for **delay** associated with the interruption of incoming electricity, steam, gas, fuel, or water to the **insured project** for the lesser of:

**a.** The number of calendar days shown for Service Interruption in the above Schedule, or

**b.** Until such incoming utilities are restored,

subject to the Service Interruption sublimit of liability shown in the above Schedule.

## C.  ADDITIONAL EXCLUSIONS AND LIMITATIONS

In addition to all other exclusions of this Policy, the Company will not be liable under this endorsement for any loss or increase in **delay** caused by, resulting from or arising out of any of the following:

**1.** The enforcement of any law, ordinance, governmental directive or standard regulating removal, repair, construction or reconstruction of any property;

**2.** Changes made in the design, plans, specifications or other contract documents in order to effect the repair or replacement of any property;

**3.** Non-availability of funds;

**4.** Import, export or customs restrictions and/or regulations;

**5.** The breach, suspension, lapse or cancellation of or the failure to obtain, maintain or extend any permit, lease, license, contract or purchase orders;

**6.** The interference by strikers or other persons directly or indirectly with the completion of the **insured project**, including the transportation of property, the construction, rebuilding, repairing or replacing of any property or the occupancy or use of the premises where the **insured project** is located;

**7.** The failure to use due diligence and dispatch in restoring any property to the condition existing prior to the loss or damage;

**8.** Any deviation in the **construction schedule** or a revised **construction schedule** except for a deviation that is the result of covered loss or damage;

**9.** Any disruption in the normal movement of **covered property** unless such **covered property** is damaged by a **covered cause of loss** during **inland transit**;

**10.** Re-erection of any tower or pole crane(s), unless such tower or pole crane is specifically covered under Schedule A of the Contractors' Equipment Endorsement. or

**11.** Loss or damage to that part of the **insured project** which at the time of loss or damage has been put to its intended use or has become operational.

## D.  ADDITIONAL LOSS ADJUSTMENT CONDITIONS

In addition to the conditions set forth in the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section of this Policy, the following additional conditions apply to this endorsement:

1. Upon written notification of any loss or damage under the terms and conditions of this Policy, the **Insured** shall provide the Company with all applicable **construction schedules** as requested by the Company.

2. Upon request by the Company, the **Insured** shall make available all other records and information relevant to the determination of any claim for loss, damage and/or expenses or any audit under this endorsement.

3. In the event of payment under this endorsement, the Company may conduct an audit of the **Named Insured's** records for a reasonable period of time, to be determined by the Company, (typically 12 months) after actual commencement of operations to determine the loss under this endorsement, as well as any expenses incurred by the **Named Insured** related to reducing such loss.  Due consideration shall be given to seasonal patterns, trends, variations or special circumstances which would have affected the business had the **delay** not occurred, so that the amount adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the **delay**, would have been realized.  Any amount saved with respect to labor costs, charges and expenses that have ceased or reduced during the **period of indemnity** and liquidated damages the **Named Insured** is entitled to receive from others, whether collectible or not, shall be deducted from the loss during the **period of indemnity**.

   In the event the amount of loss determined by the audit is less than or exceeds the sum paid by the Company for loss covered under this endorsement during the **period of indemnity**, the difference between the two amounts shall be paid by the Company or to the Company by the **Named Insured**, whichever is applicable.

## E.   ADDITIONAL GENERAL CONDITIONS

In addition to the conditions set forth in the GENERAL CONDITIONS Section of this Policy, the following additional conditions apply to this endorsement:

1. In the event loss, damage or other circumstances require that the project completion date shown on any critical path, time line, bar chart or other scheduling vehicle is revised to extend such completion date, the **Insured** shall establish a revised **construction schedule** and furnish the same to the Company.  The new date established in such revised **construction schedule** shall become the **anticipated date of completion**.  The Company shall have the right to change the **anticipated date of completion**, even if the **Insured** has failed to provide such revised **construction schedule**.

   There shall be no amendment to the **anticipated date of completion** in the event any critical path, time line, bar chart or other scheduling vehicle is revised to compress or accelerate the **construction schedule**, without the written notice to the Company and endorsement by the Company hereto.

2. The **Insured** shall take and allow all reasonable measures to minimize the extent of any interference with the **construction schedule** so as to avoid or diminish any potential **delay**. The **Insured** shall begin normal operations as soon as practicable.

## F.   ADDITIONAL DEFINITIONS

The definitions of this Policy apply to this endorsement.  However, the following additional definitions apply to this endorsement and supersede any similar definitions of this Policy to the contrary.

1. **Anticipated date of completion** means: (1) the date as shown in the above Schedule as the Anticipated Date of Completion or (2) the revised **anticipated date of completion** in

©American International Group, Inc.
All Rights Reserved.

accordance with the Subsection **E.1.** of the Additional General Conditions Subsection of this endorsement.  For calculation of loss under this endorsement, the Company shall use the applicable **anticipated date of completion** at the time of the loss or damage.

2. **Construction schedule** means the schedule utilized in the construction management program through software that shows the construction operations, the times for starting and completion of operations, the period of the operations, the interrelationships between the operations and the critical path that identifies the critical operations.

3. **Deductible period** means the applicable number of calendar days shown in Item **V.** of the above Schedule beginning with the **anticipated date of completion**.  Losses are only payable in excess of the applicable **deductible period**.

4. **Delay** means the period of time between the **anticipated date of completion** and the actual date on which occupancy or commercial service can commence with respect to the entire **insured project** or the **insured project** as described in Item **II.** of the Schedule, whichever is applicable, with the exercise of due diligence and dispatch.

5. **Gross earnings** means gross revenues from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

6. **Insured project** means the entire **insured project** or the part of the **insured project** as identified in Item **II.** of the above Schedule.  The words, **insured project**, also include the definition in the Completed Value Builders Risk Policy.

7. **Period of indemnity** means the number of calendar days for which coverage is provided under this endorsement, regardless of the number of **occurrences**, not to exceed the number of days shown in Item **III.** of the above Schedule.  For each **occurrence**, such calendar days or remaining calendar days shall commence upon the expiration of the applicable **deductible period**.  The **period of indemnity** shall not be limited by the end of the **policy period**.

8. **Rental income** means revenues from rentals and leases from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

9. **Soft costs/additional expenses** means such expenses as shown in Item **VI.I.1.** through **VI.I.9.** of the above Schedule, inclusive, in relation to the **insured project**.

All other terms and conditions of the Policy remain the same.

  ©American International Group, Inc.
All Rights Reserved.

**ENDORSEMENT #002**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

**SCHEDULE**

Sublimits of Liability and Deductibles (per **occurrence**):

**A.** The following sublimit of liability is added to Item **10.B.** of the Declarations:

Sublimit for repairing or replacing faulty or defective **covered property**          $433,500,000

**B.** The following deductible is added to Item **11.** of Declarations:

Deductible applicable to repairing or replacing faulty or defective          $100,000
**covered property**

The above deductible shall apply in addition to the applicable deductible(s) in Item **11.A.** through **11.G.**, inclusive, as shown on the Declarations.

**C.** The following sublimit of liability is added as Item **VI.J.** to the Delay In Completion Endorsement:

Provided that Delay In Completion coverage is provided under this          $44,022,420
Policy, the Sublimit for Delay in Completion resulting from repair or
replacement of faulty or defective **covered property**

The **Deductible Period** shown in the Delay in Completion Endorsement applies to the above coverage in this Subsection **C.**

Additional Premium:     $70,055

_____

In consideration of the Additional Premium shown in the above Schedule, Exclusion **B.10.** of the PERILS EXCLUDED Section is deleted in its entirety and replaced with the following:

**10. a.** Faulty workmanship, material, construction or installation from any cause; or

**b.** Any fault, defect, error, deficiency or omission in any design, plans, or specifications,

all unless direct physical loss or damage not otherwise excluded by this Policy ensues.  If direct physical loss or damage not otherwise excluded by this Policy ensues, then the Company shall pay for the following only:

**a.** Such ensuing direct physical loss or damage to **covered property**, and/or

**b.** Subject to the sublimit(s) of liability shown in the above Schedule, repairing or replacing (whichever is less) with like kind and quality at the time and place of the loss the damaged part of the faulty or defective **covered property**.

| 125699 (10/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 1 of 2 |
|---|---|---|

However, in no event shall the Company pay any loss, cost, damage or expense to: (1) improve the original workmanship, materials, construction, installation, design, plans or specifications or (2) redesign any design, plans or specifications.

No portion of the **covered property** shall be regarded as damaged solely by virtue of the existence of: (1) any faulty workmanship, material, construction or installation, or (2) any fault, defect, error, deficiency or omission in any design, plans, or specifications.

NOTICE:  THIS ENDORSEMENT IS BASED UPON LEG 3 PROVISIONS, BUT MAY DIFFER FROM SUCH CURRENT OR PRIOR LEG 3 PROVISIONS.

All other terms and conditions of the Policy remain the same.

**ENDORSEMENT #003**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## LENDER LOSS PAYEE OR LOSS PAYEE ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

**Lender Loss Payee or Loss Payee:**
Bank OZK, its successors and assigns, as their interests may appear
625 Court Street
Clearwater, FL 33756

_____

1.  Subject to the terms and conditions of this Policy, the Company will not pay any Lender Loss Payee or Loss Payee more than its financial interest in: (1) **covered property** which is part of the **insured project** or (2) **existing property** (but only if coverage for **existing property** is provided by endorsement) (hereinafter, (1) and (2) are collectively referred to as **covered property**).

2.  Any Lender Loss Payee or Loss Payee shown in the above Schedule is a creditor, including a Lender Loss Payee or trustee, whose interest in the **covered property** is established by such written instruments as:

    a.  Warehouse receipts;

    b.  A contract for deed;

    c.  Bills of lading;

    d.  Financing statements;

    e.  **Contract documents**; or

    f.  Mortgages, deeds of trust, or security agreements.

3.  For **covered property** for which both the **Insured** and a Lender Loss Payee or Loss Payee have an insurable interest:

    a.  The Company will pay for covered loss or damage to each Lender Loss Payee or Loss Payee in their order of precedence, as interests may appear.

    b.  The Lender Loss Payee or Loss Payee has the right to receive loss payment even if the Lender Loss Payee or Loss Payee has started foreclosure or similar action on the **covered property**.

    c.  If the Company denies the **Insured's** claim because of the **Insured's** acts or because the **Insured** has failed to comply with the terms of this Policy, the Lender Loss Payee or Loss Payee shall still have the right to receive loss payment, if the Lender Loss Payee or Loss Payee:

**125700 (5/17)**       Includes copyrighted information of the Insurance Services Offices,       **Page 1 of 2**
Inc., with its permission.  All rights reserved.

**(1)** Pays any premium due under this Policy at the Company's request if the **Named Insured** has failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from the Company of the **Insured's** failure to do so; and

**(3)** Has notified the Company of any change in ownership, occupancy or substantial change in risk known to the Lender Loss Payee or Loss Payee.

All of the terms of this Policy will then apply directly to the Lender Loss Payee or Loss Payee.

**d.** If the Company pays the Lender Loss Payee or Loss Payee for any loss or damage and denies payment to the **Insured** because of the **Insured's** acts or because the **Insured** has failed to comply with the terms of this Policy:

**(1)** The Lender Loss Payee's or Loss Payee's rights will be transferred to the Company to the extent of the amount of the Company's payment; and

**(2)** The Lender Loss Payee or Loss Payee's rights to recover the remaining amount of the Lender Loss Payee or Loss Payee's claim will not be impaired.

At the Company's option, the Company may pay to the Lender Loss Payee or Loss Payee the whole principal on the debt plus any accrued interest.  In this event, the **Insured** will pay the **Insured's** remaining debt to the Company.

**e.** If the Company cancels this Policy, the Company will give written notice to the Lender Loss Payee or Loss Payee at least:

**(1)** 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if the Company cancels for any other reason.

All other terms and conditions of the Policy remain the same.

**ENDORSEMENT #004**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## PILING, SHEET PILING & CAISSON LIMITATION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

In addition to all other exclusions of the Policy, the Company shall not pay any costs or expenses for:

1. Replacing, repairing, realigning or rectifying casings, piles, sheet piles or caissons which are misplaced, misaligned, jammed, abandoned or damaged during installation, extraction or construction;

2. Replacing, repairing, realigning or rectifying casings, piles, sheet piles or caissons which have become obstructed by: (a) jammed or damaged piling equipment or (b) jammed or damaged casings;

3. Rectifying defective, disconnected or declutched piling, sheet piles or caissons;

4. Rectifying any leakage of any kind or infiltration of any material;

5. Filling voids or replacing lost bentonite;

6. Replacing, repairing, realigning or rectifying profiles and dimensions; or

7. Failure to reach design load bearing capacity or to pass any load bearing test.  No coverage is provided for any loss or damage as a result of any load bearing test, notwithstanding any other provision of this endorsement to the contrary.

However, this endorsement shall not apply:

1. When any of the foregoing are the result of direct physical loss of or damage to other **covered property**, not otherwise excluded by this Policy; or

2. To direct physical loss of or damage to other **covered property** which results from any of the foregoing.

All other terms and conditions of the Policy remain the same.

| | | |
|---|---|---|
| **125703 (5/17)** | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 1 of 1 |

ENDORSEMENT #005

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## POLICY CHANGES ENDORSEMENT

The following item(s):

| | |
|---|---|
| ☐ Insured's Name | ☐ Insured's Mailing Address |
| ☐ Policy Number | ☐ Company |
| ☐ Effective/Expiration Date | ☐ Insured's Legal Status/Business of Insured |
| ☐ Payment Plan | ☐ Premium Determination |
| ☐ Additional Interested Parties | ☐ Coverage Forms and Endorsements |
| ☐ Limits/Exposures | ☐ Deductibles/Waiting Periods |
| ☐ Covered Property/Location Description | ☐ Additional Location(s) |
| ☐ Underlying Insurance | ☒ Special Terms and Conditions |

is (are) changed to read **{See Additional Page(s)}:**

The above amendments result in a change in the premium as follows:

| ☒ | **NO CHANGES** | ☐ | **ADDITIONAL PREMIUM** | **RETURN PREMIUM** |
|---|---|---|---|---|
| | | | $ | $ |

| POLICY CHANGES ENDORSEMENT DESCRIPTION |
|---|

**FLOOD AND NAMED STORM AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided by the Policy:

I. Subsection 2. of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and is replaced with the following:

2. Flood, which means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water (other than storm surge or storm tide), overflow or rupture of a dam, levy, dike or other surface containment structure, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not. A tsunami shall not be considered a flood.

II. Subsection 4. of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and is replaced with the following:

4. Named storm, which means:

a A storm that, at any time, has been declared by the United States National Weather Service or another meteorological authority to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm; and

b. Storm surge and storm tide, or the spray therefrom, all whether: (1) driven by wind or not or (2) related to a storm described in Subsection 4.a. above or not.

**ENDORSEMENT #006**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## FLORIDA CANCELLATION/NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy, and 2) "you", "your", "named Insured" and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

It is hereby agreed and understood that the cancellation provision of this policy is to be deleted in its entirety and to be replaced with the following:

A.    The Insured shown in the Declarations may cancel this policy by mailing or delivering to the Insurer advance written notice of cancellation.

B.1.    Cancellation for Policies in Effect Ninety (90) Days or Less

If this policy has been in effect ninety (90) days or less the Insurer may cancel this policy by mailing or delivering to the Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

(a)    Ten (10) days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or

(b)    Twenty (20) days before the effective date of cancellation if the Insurer cancels for any other reason, except the Insurer may cancel immediately if there has been:

1.    A material misstatement or misrepresentation; or
2.    A failure to comply with underwriting requirements established by the Insurer.

B.2.    Cancellation for Policies in Effect for More Than Ninety (90) Days

If this policy has been in effect for more than ninety (90) days the Insurer may cancel this policy only for one or more of the following reasons:

(a)    Nonpayment of premium;

(b)    The policy was obtained by a material misstatement;

(c)    There has been a failure to comply with underwriting requirements established by us within ninety (90) days of the date of effectuation of coverage;

(d)    There has been a substantial change in the risk covered by the policy; or

(e)    The cancellation is for all insureds under such policies for a given class of insureds.

If the Insurer cancels this policy for any of these reasons, the Insurer will mail or deliver to the Named Insured written notice of cancellation, accompanied by the reasons for the cancellation at least:

1.    Ten (10) days before the effective date of cancellation if cancellation is for the reason stated in B.2.(a) above; or

2.      Forty-five (45) days before the effective date of cancellation if cancellation is for the reasons stated in B.2.(b), (c), (d) or (e) above.

3.      One hundred twenty days (120) before the effective date of cancellation of a commercial residential property insurance policy if cancellation is for the reasons stated in B.2.(b),(c),(d) or (e) above.

B.3.    If this policy is cancelled, the Insurer will send the Named Insured any premium refund due. If the Insurer cancels, the refund will be pro rata. If the Named Insured cancels, the refund may be less than pro rata, however, such refund will not be less than 90% of the pro rata unearned premium. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect.

It is hereby understood that the Non-renewal provision of this policy is deleted and replaced with the following:

C.1.    Non-Renewal

(a)     If the Insurer decides not to renew this policy the Insurer will mail or deliver to the Insured written notice of nonrenewal, accompanied by the reason for nonrenewal, at least forty-five (45) days prior to the expiration of this policy.   Written notice of nonrenewal will be provided at least one hundred twenty (120) days prior to the expiration of a commercial residential property insurance policy.

(b)     Any notice of nonrenewal will be mailed or delivered to the Insured's last mailing address known to the Insurer.   If notice is mailed, proof of mailing will be sufficient proof of notice.

C.2.    Renewal

The Insurer shall give the named insured at least forty-five (45) days advance written notice of the renewal premium.

**ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN THE SAME.**

# FLORIDA STATE AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided by the Policy.

The following changes apply only to locations covered by the Policy that are in the State of Florida.

**A.** The SETTLEMENT OF CLAIMS Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section is deleted in its entirety and replaced by the following:

**SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable shall be payable:

**1.** Within 20 days after proof of loss, as herein required, is received and agreed to by the Company; or

**2.** Within 30 days after the Company receives the proof of loss and:

   **a.** There is an entry of a final judgment; or

   **b.** The amount of loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

**3.** Within 60 days of receiving notice of claim, unless the Company denies the claim during that time or factors beyond the Company's control reasonably prevent such payment. If a portion of the claim is denied, then the 60-day time period for payment of claim relates to the portion of the claim that is not denied.

   Subsection **3**. applies only to the following:

   **a.** A claim under a Policy covering residential property, if such property is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy; or

   **b.** A claim for building coverage, if such property is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, if the structure is 10,000 square feet or less and the Policy covers only locations in Florida.

   The Company shall have the option to take all, or any part of the structure at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing the **Named Insured** with notice of the Company's intention to do so within 60 days after the Company's receipt of the proof of loss herein required.

**B.** The SUIT AGAINST COMPANY Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section is deleted in its entirety and replaced by the following:

**SUIT AGAINST COMPANY**

No one may bring a legal action against the Company under this Policy unless:

**1.** There has been full compliance with all of the terms of this Policy; and

**2.** Legal action against the Company involving direct physical loss or damage to property must be brought within 5 years from the date the loss occurs.

   Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

**C.** If a building is covered as **existing property** under Damage to Existing Property Endorsement, attached to and forming part of this Policy, then with respect to such a building, Subsection **e.** of Subsection **1.** Earth movement of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY  Section is deleted in its entirety and replaced with the following :

    **e.** Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, and subsidence.

**D.** If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then with respect to such a building, Subsection  **1.**  Earth movement of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is amended to include**:**

    **Earth movement** does not include **sinkhole loss** or **catastrophic ground cover collapse.**

**E.  SINKHOLE LOSS AND CATASTROPHIC GROUND COVER COLLAPSE**

If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then the following provisions are added to the Policy as SPECIFIED COVERED CAUSES OF LOSS with respect to such a building:

**1. Sinkhole loss,** meaning loss or damage to a building when **structural damage** to the covered building, including the foundation, is caused by settlement or systematic weakening of the earth supporting the building, only if the settlement or systematic weakening results from contemporaneous movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

    **a.** Coverage for **sinkhole loss** includes stabilization of the building (including land stabilization) and repair to the foundation, provided such work is in accordance with the requirements of Florida Insurance Law and in accordance with the recommendation of a professional engineer and with notice to the **Named Insured**. The professional engineer must be selected or approved by the Company. However, until the **Named Insured** or **project owner(s)**, whichever is applicable, enters into a contract for performance of building stabilization or foundation repair in accordance with the recommendations of the professional engineer as set forth in a report from the Company:

        **(1)** The Company will not pay for underpinning or grouting or any other repair technique performed below the existing foundation of the building; and

        **(2)** The Company's payment for **sinkhole loss** to the covered building will be limited to the actual cash value of the loss to such property.

    The **Named Insured** or **project owner(s)**, whichever is applicable, must enter into a contract for the performance of building stabilization and/or foundation repair in accordance with the aforementioned recommendations, within 90 days after the Company notifies the **Named Insured** that there is coverage for the **sinkhole loss**. After the **Named Insured** or **project owner(s)**, whichever is applicable, has entered into such contract, the Company will pay the amounts necessary to begin and perform such repairs as the work is performed and the expenses are incurred.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

However, if the professional engineer determines, prior to the **Named Insured** or **project owner(s)**, whichever is applicable, entering into the aforementioned contract or prior to the start of repair work, that the repairs will exceed the applicable **Policy Limit**, the Company must either complete the recommended repairs or pay that **Policy Limit** upon such determination. If the aforementioned determination is made during the course of repair work and the Company has begun making payments for the work performed, the Company must either complete the recommended repairs or pay only the remaining portion of the applicable **Policy Limit** upon such determination. The most the Company will pay for the total of all **sinkhole loss**, including building and land stabilization and foundation repair, is the applicable **Policy Limit** on the affected building.

The stabilization and all other repairs to the covered building must be completed within 12 months after entering into the contract for the performance of these repairs, unless:

**(1)** There is a mutual agreement between the **Named Insured** and the Company;

**(2)** The claim is involved with the neutral evaluation process;

**(3)** The claim is in litigation; or

**(4)** The claim is under appraisal or mediation.

**b.** **Sinkhole loss** does not include:

**(1)** Sinking or collapse of land into man-made underground cavities; or

**(2)** **Earth movement**.

**c.** With respect to a claim for alleged **sinkhole loss**, the following provision is added:

Following receipt by the Company of a report from a professional engineer or professional geologist on the cause of loss and recommendations for land stabilization and repair of property, or if the Company denies the **Insured's** claim, the Company will notify the **Named Insured** or **project owner(s)**, whichever is applicable, of its right to participate in a neutral evaluation program administered by the Florida Department of Financial Services (hereinafter referred to as the "Department"). For alleged **sinkhole loss** to commercial residential or farm residential properties, this program applies instead of any mediation procedure set forth elsewhere in this Policy, but does not invalidate the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

The **Named Insured** or **project owner(s)**, whichever is applicable, or the Company, may file a request with the Department for neutral evaluation; the other party must comply with such request. The Company will pay reasonable costs associated with the neutral evaluation, regardless of which party makes the request. But if a party chooses to hire a court reporter or stenographer to contemporaneously record and document the neutral evaluation, that party must bear the costs of those services. The neutral evaluator will be selected from a list maintained by the Department. The recommendation of the neutral evaluator will not be binding on the **Named Insured** or **project owner(s)**, whichever is applicable, or the Company.

Participation in the neutral evaluation program does not change the **Named Insured's** or **project owner(s)'**, whichever is applicable, right to file suit against the Company in accordance with the SUIT AGAINST COMPANY Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section in this Policy, except that the time for filing suit is extended for a period of 60 days following the conclusion of the neutral evaluation process or five (5) years, whichever is later.

d.   Coverage for **sinkhole loss** under this endorsement does not increase the **Policy Limit**. Even if the loss or damage qualifies under, or includes, **catastrophic ground cover collapse** (addressed elsewhere in this endorsement) and **sinkhole loss**, only one **Policy Limit** will apply to such loss or damage.

e.   The following provision is added to the REQUIREMENTS IN CASE OF LOSS OR DAMAGE Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section:

A claim for **sinkhole loss**, including but not limited to initial, supplemental and reopened claims is barred unless notice of claim is provided to the Company in accordance with the terms of this Policy within two (2) years after the **Insured** knew or reasonably should have known about the **sinkhole loss**.

f.   If the Company denies the **Insured's** claim for **sinkhole loss** without performing testing under section 627.7072, Florida Statutes, the **Named Insured** or **project owner(s)**, whichever is applicable, may demand testing by communicating such demand to the Company in writing within 60 days after the **Named Insured** receives our denial of the claim. The **Named Insured** or **project owner(s)**, whichever is applicable, is responsible for 50% of the testing costs, or $2,500, whichever is less. If the Company's professional engineer or geologist provides written certification, pursuant to section 627.7073, that there is **sinkhole loss**, the Company will reimburse the **Named Insured** or **project owner(s)**, whichever is applicable, for the testing costs.

g.   The **Insured** may not accept a rebate from any person performing repairs for **sinkhole loss** covered under this endorsement. If the **Insured** receives a rebate, coverage under this endorsement is void and the **Insured** must refund the amount of the rebate to the Company.

h.   If the Company denies the **Insured's** claim for **sinkhole loss** upon receipt of written certification from a professional engineer or geologist, pursuant to section 627.7073, that there is no **sinkhole loss** or that the cause of the damage was not sinkhole activity, and if the sinkhole claim was submitted without good faith grounds for submitting such claim, the **Named Insured** or **project owner(s)**, whichever is applicable, shall reimburse the Company for 50% of the actual costs of the analyses and services provided under sections 627.7072 and 627.7073, or $2,500, whichever is less. The **Named Insured** or **project owner(s)**, whichever is applicable, is not required to pay such reimbursement unless it requested the analysis and services and the Company, before ordering the analysis, informed the **Named Insured** or **project owner(s)**, whichever is applicable, in writing of the potential for reimbursement and gave the **Named Insured** or **project owner(s)**, whichever is applicable, the opportunity to withdraw the claim.

i.   As a precondition to accepting payment for **sinkhole loss**, the **Named Insured** or **project owner(s)**, whichever is applicable, must file with the county clerk of court, a copy of any sinkhole report regarding the property which was prepared on behalf or at the **Named Insured** or **project owner(s)**, whichever is applicable, request. The **Named Insured** or **project owner(s)**, whichever is applicable, will bear the cost of filing and recording the sinkhole report.

2.   **Catastrophic Ground Cover Collapse**

The Company will pay for direct physical loss or damage to a covered building caused by or resulting from **catastrophic ground cover collapse**, meaning geological activity that results in all of the following:

a.   The abrupt collapse of the ground cover;

b.    A depression in the ground cover clearly visible to the naked eye;

c.   **Structural damage** to the building, including the foundation; and

          Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

d.  The insured structure being condemned and ordered to be vacated by the governmental agency authorized by law to issue such an order for that structure.

However, damage consisting merely of the settling or cracking of a foundation, structure or building does not constitute loss or damage resulting from a **catastrophic ground cover collapse**.

Coverage for **catastrophic ground cover collapse** does not increase the **Policy Limit**. Regardless of whether loss or damage attributable to **catastrophic ground cover collapse** also qualifies as **sinkhole loss** or **earth movement** (if either or both of those causes of loss are covered under this Policy), only one **Policy Limit** will apply to such loss or damage.

3.  For the purposes of **Sinkhole Loss** and **Catastrophic Ground Cover Collapse** coverages only, the following definitions are added to the Policy:

a.  **Structural damage** means a building, regardless of the date of its construction, has experienced the following:

(1)  Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement related damage to the interior such that the interior building structure or members become unfit for service or represent a safety hazard as defined within the Florida Building Code;

(2)  Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement related damage to the **primary structural members** or **primary structural systems** and that prevents those members or systems from supporting the loads and forces they were designed to support to the extent that stresses in those **primary structural members** or **primary structural systems** exceed one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location;

(3)  Damage that results in listing, leaning, or buckling of the exterior load bearing walls or other vertical **primary structural members** to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

(4)  Damage that results in the building, or any portion of the building containing **primary structural members** or **primary structural systems**, being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

(5)  Damage occurring on or after October 15, 2005, that qualifies as substantial structural damage as defined in the Florida Building Code.

b.  **Primary structural member** means a structural element designed to provide support and stability for the vertical or lateral loads of the overall structure.

c.  **Primary structural system** means an assemblage of **primary structural members**.

All other terms and conditions of the Policy remain the same.

ENDORSEMENT #007

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## CLAIMS COOPERATION ENDORSEMENT

This endorsement modifies insurance provided by this Policy:

The following is added to the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section:

For the purpose of this endorsement:

1. **Assigned adjuster** means the Assigned Adjuster as shown in the Schedule below.

2. **Policy** means the Policy issued by the Lead Insurer set forth in the Schedule below.

3. **Program** means all policies issued by the **quota share insurers** participating in the coverage for this **insured project**.

4. **Quota share insurers** means the quota share insurers specifically listed in the Schedule below.

### SCHEDULE

| Quota Share Insurers | Quota Share Participation | Insurer Type | Signature |
|---|---|---|---|
| New Hampshire Insurance Company (AIG) | 35% | Lead Insurer | *[signature]* |
| Allianz Global Risks US Insurance Company | 25% | **Participating insurer** | *[signature]* |
| Starr Indemnity and Liability Company | 25% | **Participating insurer** | |
| Liberty Mutual Insurance Company | 10% | **Participating insurer** | |
| General Security Indemnity Company of Arizona | 5% | **Participating insurer** | |

The **quota share insurers** may be changed by written endorsement attached to and forming a part of this **policy**. The rights and obligations contained herein shall only apply to the **quota share insurers**.

**Assigned Adjuster:**
Mike Kaemph at York (Chicago)

_____

With respect to any loss or damage that may give rise to a claim under this **program**, the following terms and conditions shall apply:

1. The **quota share insurers** agree to use the **assigned adjuster** for the adjustment of all claims reported under this **program**. This assignment may be changed by mutual consent of the **Named Insured** and the **quota share insurers.**

2. The **assigned adjuster** shall report to the **quota share insurers** and coordinate all activities involving any claim reported under the **program**, including communicating with the **quota share insurers**, in

accordance with the terms and conditions set forth in this **policy**. Notwithstanding the foregoing, the **quota share insurers** shall be the sole determiners of whether coverage is provided for each of their respective policies.

3.  The **Named Insured** or Producer as shown in the Declarations shall notify the Lead Insurer and the **assigned adjuster** of such loss or damage that may give rise to a claim under this **program** and in turn, the **assigned adjuster** shall notify the **quota share insurers** of the same as soon as practicable, but in no event later than 48 hours after receiving such notice.

4.  The **assigned adjuster** may retain third parties with respect to the handling of the loss adjustment, including accountants, consultants, engineers and other experts as necessary and such third parties shall also report to the **quota share insurers**.

5.  The other **quota share insurers** shall have the right, if they so choose, to attend all meetings relating to the investigation, negotiation, adjustment or settlement of the claim, and shall be entitled to receive all information or claim related documentation from the **assigned adjuster** to the same extent that the Lead Insurer obtains such information or participates in such meetings.

6.  The Lead Insurer shall cooperate with the other **quota share insurers** with respect to all investigations, negotiations, adjustments and settlements in connection with any such claim.

7.  All fees, expenses and other costs incurred in connection with any adjustment shall be shared among all **quota share insurers** in accordance with their respective Quota Share Participation as shown in the above Schedule.

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative



| Policy No.: | USE00054118 | Endorsement No. |
|---|---|---|
| Effective Date: | December 14, 2018 | AZ1 |

## PARTICIPATION ENDORSEMENT

A. **Company's Limit of Liability**

Notwithstanding what is stated in the policy to which this endorsement is attached, the Company is not liable for more than its proportionate share, as specified below, of the Program Limit or of the Program Layer Limits that make up the Program Limit for all loss or damage arising out of one occurrence regardless of the number of locations or coverages involved in the occurrence:

| Company's Limit Of Liability | | Program Limit or Program Layer Limits | | Attachment Point |
|---|---|---|---|---|
| $119,380,605 | (being 25%) part of | $477,522,420 | excess of | Policy Deductible |

The Company is not liable for more than the same proportionate share specified above of any Sublimits which are part of the Program Limit or are part of any Program Layer Limits that make up the Program Limit.

In the event an occurrence results in liability being payable under more than one policy issued to the Insured by the Company, or its subsidiaries, affiliates, or cooperation partners, the maximum amount payable in the aggregate under all such policies will be the Company's Limit Of Liability specified herein regardless of the number of locations or coverages involved.

B. **Program Limits Of Liability**

1. **Program Limit**

   **$477,522,420** per occurrence.

2. **Sublimits**

   The following provisions apply to any sublimits specified in the policy to which this endorsement is attached:

   a. Sublimits are part of and not in addition to the Program Limit. Sublimits do not increase the Program Limit or any other sublimits.

   b. Sublimits apply in the aggregate per occurrence to all locations and for all coverages involved, including Time Element.

   c. When a sublimit is noted as an Annual Aggregate, such sublimit applies in the aggregate to all losses occurring during the policy period. If the policy period is greater than twelve (12) months, then the sublimit applies in the aggregate to all losses occurring during each twelve (12) month period, beginning on the Effective Date specified above, and each subsequent anniversary date.

   d. If more than one sublimit is involved in an occurrence, the sublimit specified for the peril involved is the maximum sublimit applicable to such occurrence.

   e. If a sublimit is specified for a location or property, such sublimit is the maximum amount payable under this policy for all loss or damage, including Time Element loss, at all locations resulting from physical loss or damage not otherwise excluded by this policy at such location or to such property.

   f. No sublimit applies if the corresponding sublimit is specified as **Included**. No coverage is provided by this policy if the corresponding sublimit is specified as **Not Insured**.



**Policy No. USE00054118  Endorsement No. AZ1**
**PARTICIPATION ENDORSEMENT**

C.      **Definitions**

1.      The term "Company", wherever it appears in the policy, means the **Allianz Global Risks US Insurance Company** with mailing address at 225 West Washington Street, Suite 1800, Chicago, IL 60606-3484.

2.      Where the terms "policy", "occurrence", "location", "locations" and "Time Element" in this endorsement are defined in the policy to which this endorsement is attached, such terms herein assume those same definitions.

All other terms and conditions remain unchanged.



**Policy No.:**          **USE00054118**                                    **Endorsement No.**
**Effective Date:**      **December 14, 2018**                              **AZ2**

## SANCTION LIMITATION AND EXCLUSION CLAUSE (LMA 3100)

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.



Allianz (ⅲ)
Global Risks

**Policy Number:**   USE00054118                                      **Endorsement Number**
**Effective Date:**   **December 14, 2018**                                  **AZ3**

## TERRORISM ENDORSEMENT: CERTIFIED ACT OF TERRORISM

This Endorsement modifies insurance provided under the following:

A3 DEVELOPMENT, LLC COMPLETED VALUE BUILDERS RISK POLICY FORM

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**This Endorsement contains words or phrases that have specific Definitions. Refer to Items A. and B. below for details of these Definitions.**

**The following applies if the box is checked:**

☒   In consideration of the premium charged, and subject to the terms, exclusions, limits and conditions of the Policy to which this Endorsement is attached, this Policy insures against direct physical loss or direct physical damage caused directly or indirectly by or resulting from a Certified Act of Terrorism.

☐   In consideration of the premium charged, and subject to the terms, exclusions, limits and conditions of the Policy to which this Endorsement is attached, this Policy insures against direct physical loss or direct physical damage caused directly or indirectly by or resulting from a Certified Act of Terrorism.

The word "Addendum "is hereby substituted for the word "Endorsement" wherever it appears in this form.

☐   In consideration of the premium charged, and subject to the terms, exclusions, limits and conditions of the Project Declaration Endorsement and to the Master Policy to which this Endorsement is attached, this Project Declaration Endorsement insures against direct physical loss or direct physical damage caused directly or indirectly by or resulting from a Certified Act of Terrorism.

The words "Project Declaration Endorsement" are hereby substituted for the word "Policy" wherever it appears in this form.

Notwithstanding anything contained elsewhere in this Policy or any of its Endorsements, any exclusion or limitation of terrorism is hereby amended to the effect that such exclusion or limitation does not apply to a Certified Act of Terrorism as defined herein.

**A.    Definitions**

The following definitions are added with respect to the provisions of this Endorsement to the Policy:

1.    The Act

The Act means the federal Terrorism Risk Insurance Act of 2002 as amended by the Terrorism Risk Insurance Program Reauthorization Act of 2015.

2.    Certified Act of Terrorism

Certified Act of Terrorism means an act that is certified by the Secretary of the Treasury in accordance with the provisions of the federal Terrorism Risk Insurance Act, as amended, to be an act of terrorism pursuant to The Act. The criteria contained in The Act for a Certified Act of Terrorism include the following:

a.    The act resulted in aggregate property and casualty insurance losses in excess of $5,000,000; and



b.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.   Amendment**

For purposes of this Endorsement only, any definition of Occurrence stated in the Policy to which this Endorsement is attached, is amended as follows:

Occurrence

The term Occurrence as applied to a Certified Act of Terrorism shall mean any one loss, disaster, or casualty, or series of losses, disasters or casualties attributable directly or indirectly to one cause or to one series of similar causes. All such losses will be added together and the total amount of such losses will be treated as one Occurrence. It shall be defined as the sum total of all losses arising out of or caused by a Certified Act of Terrorism during any period of 72 consecutive hours. When filing proof of loss, the Insured shall have the right to elect the moment at which the 72 hour period shall be deemed to have commenced provided always that no elected period of 72 hours shall commence earlier than when the first loss to the Insured Property or interests occurs. However, the Company shall not be liable hereunder for any loss or damage:

1.   occurring before this Policy becomes effective; or

2.   arising from an Occurrence which is in progress at the time this Policy becomes effective, even if such loss or damage occurs after this Policy becomes effective; or

3.   occurring after the Expiration Date of this Policy, except loss or damage arising from an Occurrence in progress at the time this Policy expires.

**C.   Application of Other Exclusions**

All other limitations and exclusions as provided elsewhere in this Policy are in full force and effect.

**D.   Disclosure**

The following disclosure is added to the Policy:

COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER FORMULA ESTABLISHED BY FEDERAL LAW.   HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS EXCLUSION FOR NUCLEAR EVENTS.   UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES EIGHTY-FIVE PERCENT (85%) THROUGH 2015, 84% BEGINNING ON JANUARY 1, 2016, 83% BEGINNING ON JANUARY 1, 2017, 82% BEGINNING ON JANUARY 1, 2018, 81% ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020 OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE COMPANY PROVIDING THE COVERAGE.   THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, COVERAGE UNDER THIS POLICY MAY BE REDUCED.



E.   **Sublimit**

Irrespective of the number of locations involved, the Company shall not be liable under this Endorsement for more than the following sublimit for all loss or damage covered by this Policy caused directly or indirectly by or resulting from a Certified Act of Terrorism during any one Occurrence, including any loss or damage covered by this Policy or its Endorsements (by fire or otherwise) which ensues from a Certified Act of Terrorism. This limitation applies even if another peril not otherwise excluded contributes concurrently or in any sequence to the loss or damage. Notwithstanding anything to the contrary in the Policy including its Endorsements to which this Endorsement is attached, this sublimit is reflective of the Company's share and may not represent the100% program sublimit.

Sublimit:

$119,380,605 (being 25%) part of $477,522,420 per Occurrence in Excess of Deductibles

The sublimit is part of and not in addition to the Policy Limit. The sublimit does not increase the Policy Limit or any other sublimit.  If the sublimit above is noted as an annual aggregate, such sublimit applies in the aggregate to all losses occurring during the policy period.  If the policy period is greater than twelve (12) months, then the sublimit applies in the aggregate to all losses occurring during each twelve (12) month period, beginning on the policy inception date, and each subsequent anniversary date

.F.   **Exception Covering Certain Fire Losses**

The following exception to the sublimit in Paragraph **E**. applies if the location of the Insured's Covered Property or Property Insured is within a jurisdiction that has a Standard Fire Policy law.

If a Certified Act of Terrorism results in fire, then the Company will pay for the loss or damage caused by that fire up to the Company's share of the program limit. Such coverage for fire applies only to direct loss or damage by fire to Covered Property or Property Insured. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage, or to the Legal Liability coverage, or the Leasehold Interest coverage, or the Net Leasehold coverage.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act, as amended, exceed $100 billion in a calendar year and the Company has met the deductible under the Terrorism Risk Insurance Act, as amended, then the Company shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

G.   **Premium**

The following is included in the premium referenced on the COMMON POLICY DECLARATIONS of this Policy:

| Coverage | Premium |
| --- | --- |
| Certified Act of Terrorism Coverage | 6,567.75 |

Where the terms "Policy" or "Company" in this Endorsement are defined in the Policy to which this Endorsement is attached, those terms herein assume those same definition(s).

**All other terms and conditions remain unchanged.**

SCOR

# General Security Indemnity Company of Arizona
### (THE "COMPANY")

| | |
|---|---|
| **HOME OFFICES**<br>2338  W. ROYAL PALM ROAD,<br>SUITE J<br>Phoenix, AZ 85021 | **ADMINISTRATIVE OFFICES**<br>One Seaport Plaza<br>199 Water Street, 21ˢᵗ Floor<br>New York, New York 10038-3526<br>Telephone No: +(1) 212-480-1900<br>U.S. Toll-Free (outside NY) 800-326-3299 |

## *PROPERTY DECLARATIONS*

**NOTICES**

1) <u>Duty to Defend or Investigate</u>:  The Company shall have no duty to defend or investigate any claim or suit unless and until all limits of all underlying insurance policies have been exhausted by payment of judgments, claims or settlements.

2) <u>Duty to Pay Claims</u>: If any underlying insurance policy has no duty to pay a claim for injury or damage for a reason other than exhaustion of an aggregate limit of insurance, then Company shall have no obligation to make any payment under this policy.

3) Coverage is excluded in any country and for any transaction where such coverage is unlawful as determined by the Government of the United States of America or its agencies.

4) Assignment of the Policy shall not be valid except with the written consent of the Company.

POLICY NUMBER:  **FA0037954-2018-1**               RENEWAL OF POLICY NUMBER: N/A

ITEM 1          <u>NAMES AND ADDRESSES</u>

Insured's Name:                    A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP

Insured's Address:          Street:17901 COLLINS AVENUE SOUTH

                      City, State, Zip:SUNNY ISLES BEACH, FL 33160

                      Country:U.S.A.

Broker's Name:              WILLIS INSURANCE SERVICES OF GEORGIA, INC.

Broker's Address:          Street:5 CONCOURSE PARKWAY, 18ᵀᴴ FLOOR

                      City, State, Zip:ATLANTA, GA 30328

                      Country:U.S.A.

ITEM 2          <u>POLICY PERIOD</u>  From DEC 14ᵀᴴ, 2018  To DEC 31ˢᵀ, 2021  at 12:01 AM standard time at the address of the Insured



By: _MAT_

Date: **04/10/2019**

Pages 1-68

**SCOR**

# General Security Indemnity Company of Arizona
## (THE "COMPANY")

| HOME OFFICES | ADMINISTRATIVE OFFICES |
|---|---|
| 2338  W. ROYAL PALM ROAD,<br>SUITE J<br>Phoenix, AZ 85021 | One Seaport Plaza<br>199 Water Street, 21st Floor<br>New York, New York 10038-3526<br>Telephone No: +(1) 212-480-1900<br>U.S. Toll-Free (outside NY) 800-326-3299 |

| ITEM 3 | COVERAGES |
|---|---|

| COVERAGES | LIMIT OF INSURANCE | PREMIUM FOR COVERAGE PROVIDED BY COMPANY |
|---|---|---|
| See Reference Number : **FA0037954-2018-1** | US$ 23,876,121 being 5% of US$ 477,522,420 of ☒ each and every occurrence<br><br>Deductibles, attachment points and sublimits as per attached Reference Number: **FA0037954-2018-1** | See Reference Number : **FA0037954-2018-1** |

Conformity to Statute.  Any provision or stipulation of the Policy which is in conflict with the statutes of the state(s) wherein the property covered hereunder is located is hereby amended to conform to such statutes. The Policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of the Policy, together with such other provisions, stipulations and agreements as may be added hereto, as provided in the Policy.

ITEM 4    PREMIUM FOR COVERAGE PROVIDED BY COMPANY

| | |
|---|---|
| Coverage | **US$ 123,714.00** |
| TRIA | **US$    1,314.00** |
| Total | **US$ 125,028.00** |

TEM 5    CLAIMS NOTIFICATION

Any notification under this policy should be made to the following:

CLAIMS DEPARTMENT
GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA
ONE SEAPORT PLAZA
199 WATER STREET, SUITE 2100
NEW YORK, NEW YORK 10038-3526 – USA
SBSAmericasClaims@Scor.com
Chicago-Claims@Scor.com

IN WITNESS WHEREOF, General Security Indemnity Company of Arizona has caused the Policy to be executed by its duly authorized representative:

Signed at:        New York, NY                              Date:     April 10th, 2019

Signature:     *Matthew Thinnes*          Print Name & Title: Matthew Thinnes

SCOR Reinsurance Company | Vice President Construction | Americas
One Seaport Plaza | 199 Water Street | New York, NY 10038 | USA
Office: (212) 884-9053 | Mobile: (646) 285-4899 | Email: mthinnes@scor.com

SCOR

# General Security Indemnity Company of Arizona
**(THE "COMPANY")**

| | |
|---|---|
| **HOME OFFICES** | **ADMINISTRATIVE OFFICES** |
| 2338  W. ROYAL PALM ROAD, | One Seaport Plaza |
| SUITE J | 199 Water Street, 21st Floor |
| Phoenix, AZ 85021 | New York, New York 10038-3526 |
| | Telephone No: +(1) 212-480-1900 |
| | U.S. Toll-Free (outside NY) 800-326-3299 |

> **Please be advised that this Policy will be issued through a surplus lines insurer on whose behalf we are authorized to act. Compliance with applicable laws and payment of taxes is the responsibility of the Insured, the insurance agent or insurance broker.**

# General Security Indemnity Company of Arizona
**(THE "COMPANY")**

| HOME OFFICES | ADMINISTRATIVE OFFICES |
|---|---|
| 2338  W. ROYAL PALM ROAD,<br>SUITE J<br>Phoenix, AZ 85021 | One Seaport Plaza<br>199 Water Street, 21st Floor<br>New York, New York 10038-3526<br>Telephone No: +(1) 212-480-1900<br>U.S. Toll-Free (outside NY) 800-326-3299 |

## POLICYHOLDER NOTICE
## TERRORISM RISK INSURANCE ACT

This Notice addresses requirements of the Terrorism Risk Insurance Act of 2002, and any amendments or extensions thereto, including the Terrorism Risk Insurance Program Reauthorization Act of 2015 (hereinafter "Act").

**Definitions**

"Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States: to be an act of terrorism; to be an act that is violent or dangerous to human life, property  or infrastructure; to have resulted in damage within the United States, or outside of the United States in the case of United States missions or certain air carriers or vessels; to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Insured terrorism loss" means any loss resulting from an "act of terrorism" (including an act of war, in the case of workers compensation) that is covered by primary or excess or umbrella property and casualty insurance issued by an insurer if the loss occurs in the United States or at United States missions or to certain air carriers or vessels.

"Insurer deductible" means the amount established in the Act that must be paid by the insurer issuing your policy before the federal government can pay its share of the compensation for insured terrorism losses.

**Notice of Federal Share of Losses, Premium Charge, and potential reduction in coverage under your Policy**

YOU SHOULD KNOW THAT COVERAGE WHICH MAY BE PROVIDED BY THIS POLICY FOR INSURED TERRORISM LOSSES IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR, BIOLOGICAL OR CHEMICAL EVENTS. UNDER THIS FORMULA, THE UNITED STATES PAYS 85% OF INSURED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE

# General Security Indemnity Company of Arizona
## (THE "COMPANY")

| **HOME OFFICES** | **ADMINISTRATIVE OFFICES** |
|---|---|
| 2338  W. ROYAL PALM ROAD, | One Seaport Plaza |
| SUITE J | 199 Water Street, 21st Floor |
| Phoenix, AZ 85021 | New York, New York 10038-3526 |
| | Telephone No: +(1) 212-480-1900 |
| | U.S. Toll-Free (outside NY) 800-326-3299 |

COMPANY PROVIDING THE COVERAGE THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020. YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100

BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

If you elected to purchase coverage for insured terrorism losses, the premium charge for this coverage is shown in the Declarations or an extension to the Declarations.

If you rejected this offer of coverage, coverage for statutorily mandated fire coverage resulting from such acts, if applicable to your coverage, is provided at no additional premium charge

# General Security Indemnity Company of Arizona
## (THE "COMPANY")

| | |
|---|---|
| **HOME OFFICES** | **ADMINISTRATIVE OFFICES** |
| 2338  W. ROYAL PALM ROAD, | One Seaport Plaza |
| SUITE J | 199 Water Street, 21st Floor |
| Phoenix, AZ 85021 | New York, New York 10038-3526 |
| | Telephone No: +(1) 212-480-1900 |
| | U.S. Toll-Free (outside NY) 800-326-3299 |

## Maximum Cap on Coverage of Certified Acts of Terrorism Exclusion of Punitive and Exemplary Damages

**1. Definitions**

"We, "us," "our" and "insurer" means General Security Indemnity Company of Arizona. "You" means the insured listed in the Declarations to this policy.

**2. Maximum Cap On Coverage of Certified Acts of Terrorism**

"Certified act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism according to the U.S. federal Terrorism Risk Insurance Act ("TRIA"). The criteria contained in TRIA for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, that are attributable to all types of insurance that is subject to the TRIA; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses that are attributable to certified acts of terrorism exceed $100 billion in a Calendar Year (January 1 through December 31), and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that is greater than $100 billion. In such case, insured losses up to that amount are subject to being allocated on a pro rata basis in accordance with the requirements of the Act and procedures established by the Secretary of the Treasury.

**3. Exclusion of Punitive and Exemplary Damages**

This policy does not cover claims for punitive and exemplary damages that are caused by, exacerbated by or which arise, directly or indirectly, out of a "certified act of terrorism."

**4. No Coverage Implied**

The terms and conditions of this policy shall always apply, and the limitations of any terrorism exclusion or exceptions to such terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, shall not serve to create coverage for any loss which would otherwise be excluded under this policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

# General Security Indemnity Company of Arizona
## (THE "COMPANY")

| **HOME OFFICES** | **ADMINISTRATIVE OFFICES** |
|---|---|
| 2338  W. ROYAL PALM ROAD, | One Seaport Plaza |
| SUITE J | 199 Water Street, 21st Floor |
| Phoenix, AZ 85021 | New York, New York 10038-3526 |
| | Telephone No: +(1) 212-480-1900 |
| | U.S. Toll-Free (outside NY) 800-326-3299 |

### SANCTION LIMITATION AND EXCLUSION CLAUSE (LMA 3100)

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

All other terms and conditions remain unchanged.

# General Security Indemnity Company of Arizona
## (THE "COMPANY")

| | |
|---|---|
| **HOME OFFICES** | **ADMINISTRATIVE OFFICES** |
| 2338  W. ROYAL PALM ROAD, | One Seaport Plaza |
| SUITE J | 199 Water Street, 21st Floor |
| Phoenix, AZ 85021 | New York, New York 10038-3526 |
| | Telephone No: +(1) 212-480-1900 |
| | U.S. Toll-Free (outside NY) 800-326-3299 |

## INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL, BIO-CHEMICAL AND ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith

1.    In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from

   1.1    ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

   1.2    the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

   1.3    any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

   1.4    the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter.  The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes

   1.5    any chemical, biological, bio-chemical, or electromagnetic weapon.

CL 370

 Construction Performance®

## NEW HAMPSHIRE INSURANCE COMPANY
### (A CAPITAL STOCK COMPANY)
**175 Water Street, New York, New York 10038**

### COMPLETED VALUE BUILDERS RISK POLICY
### QUOTA SHARE DECLARATIONS

Policy Number: **043820532**

**Item 1. Named Insured and Address:**

A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
17901 COLLINS AVENUE SOUTH
SUNNY ISLES BEACH FL 33160

**Item 2. Additional Insureds:**

**Additional insured(s)** means all **project owner(s)** and contractors and subcontractors of every tier at the **insured project** location and any other individual or entity, but only to the extent required by the **contract document(s)** or subcontract document(s) with respect to the **insured project** and then only as their respective interests may appear.  Notwithstanding the foregoing sentence, architects, engineers, manufacturers and suppliers shall only be **additional insureds** with respect to their activities at the **insured project** location.

**Item 3. Mortgagees and Loss Payees:**  Per Certificates of Insurance on file with the Company or any endorsement attached to and forming a part of this Policy.

**Item 4. Policy Period:**

**A.** Inception Date:   14 DECEMBER 2018  Expiration Date:  31 DECEMBER 2021
(12:01 a.m., Standard Time at the **insured project** location.  The Expiration Date may vary in accordance with Item **4.B.**) (hereinafter, the **Original Policy Period**)

**B.** The Expiration Date shall be the earliest of the following:

**1.** The date of formal acceptance of the entire **insured project** by the **project owner(s)**;

**2.** The date or expiry of the **Named Insured's** interest in the **insured project**;

**3.** The effective date of cancellation of this Policy, or

**4.** The expiration date as set forth in Item **4.A.**

**C. Extension of the Policy Period**
Provided that coverage has not ended in accordance with Items **4.B.1.** through **4.B.4.**, this Policy will be automatically extended once for up to 180 days per phase / per TCO (see page 7) for a pro rata additional premium upon notification by the **Named Insured** to the Company.  The **Named Insured** may request an additional extension of this Policy subject to the Company's written approval and terms and conditions to be agreed upon.

**Item 5.  Insured Project:**

| Location | 17901 Collins Avenue South<br>Sunny Isles Beach, FL 33160 |
|---|---|
| Description | Ground up construction of a 51 story 154 unit condominium tower (phase I) including a shared foundation which will include the podium for Phase II (a separate tower 91 unit Tower which will be built after completion of Phase I). The site, at 17901 Collins Avenue, has more than 500 feet of oceanfront. It's north of the Mansions at Acqualina, completed in 2015, and Acqualina Resort & Spa, completed in 2006.<br><br>The Estates will feature a lobby designed by Chanel and Fendi creative director Karl Lagerfeld and Villa Acqualina, a 50,000-square-foot building with a slate of amenities that will include a spa and fitness center, restaurant and Circus Maximus, an ice skating rink, bowling lanes and a movie theater, as well as a Wall Street Trader's Club room. The property will also feature landscaped gardens, multiple infinity pools, a FlowRider for surfers, a basketball court, bocce court, dog park, soccer field and a beachfront restaurant.<br><br>First five stories / associated work of the North Tower.<br><br>South Tower will be completed on 07/01/2021 and will roll onto a permanent property policy at that time. Villa construction to continue to 12/31/2021. |
| Project Owner(s) | A3 Development LLC, LPLA Partners, LP, The Trump Group |

**Item 6. Coverage Territory:**

United States, its territories and possessions and Puerto Rico, including their respective coastal waters.  If any coverage is provided on a worldwide basis, such worldwide coverage shall not include any jurisdiction prohibited or restricted under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.  Losses are only covered within the **coverage territory**.

**Item 7.  Premium:**

    **A.  Total Deposit Premium:**    $2,500,552 (See Item **8.** below for the calculation)

        **AIG's 35% Share:**    $875,193

    **B.  Terrorism Premium:**    $26,271 (included within the Total Deposit Premium)

    **C.  Surcharges:  (If Applicable)**    $866

    **D.  Engineering Fees: (If Applicable. Not included as part of the premium)**

    $25,000 (includes 1 Site Visit per year and 1 Market Report to be released close to the end date of the project).

**Item 8. Deposit Premiums:**

| Coverage | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| Total Project Value (South Tower) | 2.5479 years | $373,500,000 | $Various | $1,648,911 |
| Total Project Value | 3.0493 years | $60,000,000 | $Various | $412,300 |

©American International Group, Inc.<br>All Rights Reserved.

| (Villa and Site) | | | | |
|---|---|---|---|---|
| Existing Property | 3.0493 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Delay In Completion | 3.0493 years | $44,022,420 | $Various | $343,015 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 3.0493 years | $477,522,420 | $0.0375 of the non-NatCat premium | $26,271 |
| LEG 3 | 3.0493 years | $477,522,420 | $0.10 of the non-NatCat premium | $70,055 |
| | Total Deposit Premium: | | | $2,500,552 |

**Item 9. Policy Limit:**  $477,522,420   The **quota share percentage** (shown in Item **13.** of the Declarations) of the **Policy Limit** is the Company's maximum liability in any one **occurrence** as a result of all covered loss or damage regardless of the number of coverages or **covered causes of loss** under this Policy.

**Item 10. Sublimits of Liability:**  The sublimits of liability stated in this Policy are part of and not in addition to the **Policy Limit** and any sublimits of liability shown in Item **10.A.** below.  The **quota share percentage** (shown in Item **13.** of the Declarations) of the sublimits of liability are: (1) the maximum amount the Company will pay for all covered loss or damage arising out of the specific perils or coverages and/or (2) the maximum number of days for which the Company will pay for all covered loss or damage for a specific coverage, regardless of the number of coverages or **covered causes of loss** under this Policy.   The sublimits of liability stated in this Policy are per **occurrence** unless otherwise indicated.

Regardless of the number of **occurrences**: (1) any Term Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss** that is applicable to the entire **policy period** regardless of the length of the **policy period**, and (2) any Annual Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss** that is applicable to each annual period with respect to the **policy period.**

If any Annual Aggregate applies and the **policy period** is longer than one year, at the end of each twelve (12) month period (hereinafter, the **annual anniversary date**), such Annual Aggregate shown below shall be reinstated in full, but only with respect to an **occurrence** which first commences on or after 12:01 a.m., Standard Time at the **insured project** location on such **annual anniversary date**.  If the final period is less than twelve (12) months, then such Annual Aggregate shall be reinstated in full for that final period.

*If the words NOT COVERED are shown instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage or **Covered Cause of Loss,** then no coverage is provided for that coverage or **Covered Cause of Loss.  If the words, NOT APPLICABLE (or N/A) are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.***

**A. Sublimits Applicable to Specified Covered Causes of Loss** – Each of these sublimits is part of and not in addition to the **Policy Limit:**

1. **Earth Movement:**  $477,522,420 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $477,522,420, for all covered loss or damage arising out of **earth movement.**

2. **Flood:**  $100,000,000 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $100,000,000, for all covered loss or damage arising out of **flood.**

©American International Group, Inc.
All Rights Reserved.

**3. Named Storm:** $150,000,000 per **occurrence**, for all covered loss or damage arising out of **named storm.**

For the purpose of the above sublimits of liability, **named storm** includes, but is not limited to, loss or damage from wind, hail, lightning, tornado, rain or water (whether driven by wind or not), **flood**, or any wind driven objects or debris.

In the event that loss or damage by **flood** occurs concurrently or in any sequence with a **named storm**, regardless of whether any flood sublimit or remaining aggregate flood sublimit shown in Item **10.A.2.** (hereinafter, the **applicable flood sublimit**) is greater or less than the applicable Named Storm sublimit, the maximum amount the Company will pay per **occurrence** for all such covered loss or damage by **flood** shall be the **applicable flood sublimit**, subject always to the maximum applicable Named Storm sublimit.  However, if **flood** is not covered, the maximum amount the Company will pay per **occurrence** for all such covered loss or damage arising out of **named storm** shall exclude loss or damage by **flood**.

**4. Terrorism:** $477,522,420 for all covered loss or damage arising out of **terrorism.**

**B. Sublimits of Liability**

Each of the following sublimits is part of, and not in addition to the **Policy Limit** and any other sublimits shown in Item **10.A.** of the Declarations:

| **Physical Damage Sublimit of Liability** | $433,500,000 applicable to physical damage to **covered property** at the **insured project** |
|---|---|
| **1.** Inland Transit | $50,000,000 |
| **2.** Offsite Temporary Storage | $50,000,000 any one location |
| **3.** Arson, Theft or Vandalism and Malicious Mischief Reward | $100,000 |
| **4.** Claims Preparation Costs | $2,500,000 |
| **5.** Crane Re-Erection Expenses | $1,000,000 |
| **6.** Crisis Management | 30 days, subject to a maximum Term Aggregate of $2,500,000 |
| **7.** Cyber Coverage | $Not Covered  Term Aggregate |
| The following sublimits of liability **7.a.** through **7.d.**, inclusive, are subject to the Cyber Coverage sublimit of liability shown above: | |
|   **a.** Electronic Data | $Not Covered  Term Aggregate |
|   **b.** Building or Other Systems | $Not Covered  Term Aggregate |
|   **c.** Plans and Drawings | $Not Covered  Term Aggregate |
|   **d.** Cyber Extra Expense | $Not Covered  Term Aggregate |
| **8.** Debris Removal | $50,000,000 or 25% of direct physical loss or damage to all **insured property**, whichever is less |
| **9.** Demolition and Increased Cost of Construction | |
|   Demolition Coverage A: | $INCLUDED |
|   Demolition Coverage B: | $25,000,000 |
|   Demolition Coverage C: | $25,000,000 |
| **10.** Expediting Expense and Extra Expense | $25,000,000 |
| **11.** Owner's Extra Expense | NOT APPLICABLE |
| The following expenses **11.a.** through **11.d.**, inclusive, are subject to the Owner's Extra Expense sublimit of liability shown above: | |
|   **a.** Advertising and Marketing Expenses | NOT APPLICABLE |

|  |  |  |
|---|---|---|
| **b.** | Legal and Accounting Fees | NOT APPLICABLE |
| **c.** | License and Permit Fees | NOT APPLICABLE |
| **d.** | Project Management Fees | NOT APPLICABLE |
| **12.** | Fine Arts | $1,250,000 |
| **13.** | Fire Brigade, Extinguishing Expenses and Police Charges | $5,000,000 |
| **14.** | Fungus, Mold or Spore | $5,000,000 |
| **15.** | Maximum Hot Testing Period | NOT APPLICABLE |
| **16.** | Landscaping Materials | $50,000 any one item, subject to a maximum of $2,500,000 per **occurrence** |
| **17.** | Logistics Extra Costs | $NOT COVERED |
| **18.** | Plans and Drawings | $5,000,000 |
| **19.** | Pollution and Contamination Coverage | $2,500,000 Term Aggregate |
| **20.** | Preservation of Property | $2,500,000 |
| **21.** | Professional Design Fees | $10,000,000 |

**Item 11. Deductibles:**  The deductibles shown below apply per **occurrence** unless otherwise stated.

**A. Policy Deductible**   $50,000   Applicable to all covered loss or damage unless otherwise stated below or in this Policy.

**B. Earth Movement**

$50,000

**C. Flood**

$500,000

**D. Named Storm**

3% of **total project value** at risk at the time of the loss or damage, subject to a minimum of $250,000 for any one **occurrence** and a maximum of $7,500,000 for any one **occurrence**, for all loss or damage arising out of **named storm**.

**E. Water Damage:**

$100,000

**F. Hot Testing:**

$NOT APPLICABLE

**G. Additional Deductibles**

**LEG 3:** $100,000

**Special Deductible for Owner's Extra Expense:**        $NOT APPLICABLE

In each case of loss or damage covered by this Policy, the Company shall not be liable unless the **Insured** sustains covered loss or damage in a single **occurrence** greater than any applicable deductible described in this Policy and then only for the amount in excess of such deductible.  As used above, "at risk" includes all **covered property** at the location (including **inland transit**) where the loss occurs, whether such **covered property** sustains damage or not.

If an amount is not shown (or if NOT APPLICABLE or N/A is shown) for any deductible, then that deductible shall not apply.  Also, if an amount is not shown (or if NOT APPLICABLE or N/A is shown) with respect to a part of a deductible, then such part shall not apply, but the rest of the deductible shall apply.

©American International Group, Inc.
All Rights Reserved.

If two or more deductible amounts provided in this Policy apply to a single **occurrence**, the total to be deducted shall not exceed the largest deductible applicable unless otherwise stated in this Policy.  If a Delay in Completion Coverage Endorsement is attached to and made a part of this Policy, then the specified **deductible period** stated in such endorsement shall be applied in addition to the applicable deductible shown in Item **11.A.** through **11.G.** above, inclusive.  The Special Deductible for **owner's extra expense** shall apply in addition to the applicable deductible shown in Item **11.A.** through **11.G.** above, inclusive.

**Item 12. Margin Clause:**

If there is any increase in the **total project value**, the **Policy Limit** and the Physical Damage Sublimit of Liability shall be automatically increased by the same percentage of such increase in the **total project value**, subject to a maximum increase of 10% regardless of the number of increases in the **total project value**.  If the cumulative increases in the **total project value** exceed the maximum percentage set forth above, then the **Named Insured** shall report such changes in writing to the Company.

This provision does not apply to any other sublimits of liability, including any other sublimit of liability shown in Item **10.A.** or Item **10.B.** and/or sublimits of liability for any coverage added by endorsement.

**Item 13. Quota Share Participation:**

35% is the Company's participation for all coverage provided under this Policy and is the percentage of the **Policy Limit** and sublimits of liability under this Policy that the Company shall pay in excess of the total applicable deductible(s) (herein, the percentage is referred to as the **quota share percentage**).

The Company's liability under this Policy shall not be increased, for any reason, including: (1) the receivership, bankruptcy, insolvency, liquidation, or dissolution of any other **participating insurer**; (2) the denial or reservation of rights with respect to any claim by any other **participating insurer**; (3) the cancellation, non-renewal, or other termination of any policy issued by any other **participating insurer**; or (4) the inability, refusal, or failure, for any reason, of any other **participating insurer** to fulfill its duties or obligations under any policy or program.  The Company's liability is several, but not joint, under this program.

**Participating insurer** shall mean any insurer or other entity including, a captive or entity under a self-insured program, that shares in the liabilities under any policy or program related to the coverage provided under this Policy.

**Item 14. Special Terms and Conditions:**

TPA: Mike Kaemph at York (Chicago)

Producer:   Willis of Florida, Inc.
Address:    1450 Brickell Ave, ste 1450
            Miami, FL 33131

| 125689 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 6 of 8 |

**PHASE 2 OPTION (Rate guaranteed for 24 months from binding date of this policy; final premium for Phase 2 determined based on policy period and estimated value at time of binding):**   The Additional Premium to include Phase 2 (12/01/19 to 07/01/22) would be as follows:

| Coverage | Original Policy Period | Estimated Value at Inception Date | Deposit Premium |
|---|---|---|---|
| Total Project Value (North Tower + West Garage, less credits noted below) | 2.5836 years | $169,158,811 | $713,189 |
| Existing Property | 2.5836  years | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable |
| Delay In Completion | 2.5836  years | $48,457,160 | $51,094 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 2.5836  years | $217,615,971 | $7,307 |
| LEG 3 | 2.5836  years | $217,615,971 | $19,486 |
| | Total Additional Deposit Premium*: | | $803,306 |
| | AIG's 35% share Additional Deposit Premium: | | $281,157 |

*Phase 2 Additional Deposit Premium calculation is based on:*

> *(1) $207,300,000 (Phase 2) plus $7,000,000 (West Garage) minus $45,141,189 ($20,141,189 savings and $25,000,000 included within Phase 1 Total Project Value) for the project term, 12/1/19 to 7/1/22; and*

> *(2) Delay in Completion, Terrorism & LEG 3 premiums are the difference between Phase 1 & Phase 2*

*PAYMENT TERMS:  If the insured elects to bind Phase 2, the Additional Premium will be billed at the time AIG is provided with the order to bind.  Premium will then be due per the policy payment terms.*

Policy Extension Calculations (180 days per phase/per TCO):

- South Tower – to extend to December 31, 2021
    – during wind season (Jul to Nov): $92,659 per month
    – December (outside wind season): $23,950
    – No delay factored in here
- Villa – to extend to June 30, 2022
    – outside wind season (Jan to May): $10,141 per month
    – June (wind season): $33,414
    – Full delay value assumed here as per your request ($44,022,420)
- North Tower - to extend to December 31, 2022
    – during wind season (July to Nov): $59,997 per month
    – December (outside wind season): $15,508
    – Full delay value assumed here as per your request ($48,457,160)

For Audit & Extensions the Annual rates are:

- South Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- Villa: .115 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- North Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- 150% for delay; 3.75% for terrorism (3% base rate * 25% surcharge to remove sunset clause); 10% for LEG 3. Terrorism & LEG 3 premiums are calculated based on the non-Cat premium.

| 125689 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 7 of 8 |
|---|---|---|

**IN WITNESS WHEREOF**, the Company has caused this Policy to be signed on the Declarations by the President and Secretary of the Company and its duly authorized representative.

_____          _____
President                                                              Secretary

This Policy shall not be valid unless signed at the time of issuance by the Company's authorized representative.

_____
Authorized Representative

_____     _____     _____
Countersignature (if applicable)          Date                              Countersigned At

| 125689 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 8 of 8 |
|---|---|---|

## FLORIDA ADDENDUM TO THE DECLARATIONS

If you have questions about your insurance policy, or questions about claims relating to your insurance policy, please contact your insurer at the following:

**AIG**
**175 Water Street**
**New York, NY 10038**
**(212) 458-5000**

74825 (01/13)

## FORMS SCHEDULE

Named Insured: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP

Policy No: 043820532                                    Effective Date: 12/14/2018

| Form Number | Edition Date | Endorsement Number | Title |
| --- | --- | --- | --- |
| 125689 | 05/17 | | **COMPLETED VALUE BUILDERS RISK POLICY QUOTA SHARE DECLARATIONS** |
| 125687 | 05/17 | | **COMPLETED VALUE BUILDERS RISK POLICY** |
| 125696 | 05/17 | 001 | **DELAY IN COMPLETION ENDORSEMENT** |
| 125699 | 10/17 | 002 | **EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT** |
| 125700 | 05/17 | 003 | **LENDER LOSS PAYEE OR LOSS PAYEE ENDORSEMENT** |
| 125703 | 05/17 | 004 | **PILING, SHEET PILING & CAISSON LIMITATION ENDORSEMENT** |
| 125705 | 05/17 | 005 | **POLICY CHANGES ENDORSEMENT** |
| 76105 | 06/15 | 006 | **FLORIDA CANCELLATION/NONRENEWAL ENDORSEMENT** |
| 125719 | 05/17 | | **FLORIDA STATE AMENDATORY ENDORSEMENT** |

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG).  The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.  You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)

## <u>FLORIDA NOTICE OF LOSS CONTROL SERVICES</u>

Pursuant to Florida Administrative Code ("FAC") 690-166.040, we would like to inform you of the risk management programs that we have developed and that are available to you.

For your consideration, we offer the services of AIG PC Global Services, Inc.  With more than 25 years experience and expertise in assisting with the prevention and mitigation of losses, AIG PC Global Services, Inc. can help address a range of problems related to loss control in various lines of business. Certain risk management programs are available to you, free of charge, as part of your commercial insurance coverage; contact your insurance broker for more details on these plans. Other, more substantive risk management programs can be purchased which include, but are not limited to the following services: surveys/analysis for identifying exposures related to your specific operations, safety management training and counseling for your staff, adoption of relevant testing strategies, and evaluations of current loss control practices.

Upon your written request, we could provide you with specific guidelines for risk management programs as established by FAC 690-166.040. Such guidelines would provide instructions and offer basic criteria to assist you in creating your own risk management plan. Should you request such guidelines and, subsequently, wish to further explore the purchase of a risk management plan, developed by AIG PC Global Services, Inc., which is specific to your company's needs, we would be willing to discuss with you both the availability of such a plan, and if available, its specific content and cost.

Again, we welcome all inquiries regarding the services of AIG PC Global Services, Inc.

                                        Construction Performance®

# NEW HAMPSHIRE INSURANCE COMPANY
### (A CAPITAL STOCK COMPANY)
**175 Water Street, New York, New York 10038**

### COMPLETED VALUE BUILDERS RISK POLICY

Various provisions in this Policy restrict coverage.  Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the word **Insured(s)** means the **Named Insured** and the **additional insured(s)**. The word "Company" means the insurance company shown in the header above.  The word "Policy" means this Completed Value Builders Risk Policy including, the Declarations, all endorsements and Schedules.

Other defined words and phrases that appear in boldface type have special meaning.  Refer to: (1) the DEFINITIONS Section, (2) the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section and (3) elsewhere in this Policy.  If such ordinarily boldfaced words and phrases are not bolded then such words and phrases shall include, but not be limited to, the specific meaning set forth in this Policy.

## SECTION I – INSURING AGREEMENT AND COVERED PROPERTY

**A. INSURING AGREEMENT**

Subject to the terms and conditions of this Policy, the Company will pay for all risks of direct physical loss or damage by a **covered cause of loss** to **covered property** at the **insured project**, while in offsite temporary storage or during **inland transit** (both as provided in the Additional Coverages), all within the **coverage territory** and occurring during the term of this Policy.

**B. COVERED PROPERTY**

The Company insures the following property for which the **Insured** is contractually responsible, the value of which has been included in the **total project value**:

**1.** Permanent works - All materials, supplies, equipment, machinery, and other property of a similar nature all when used or to be used in or incidental to the demolition of existing structures, site preparation, fabrication or assembly, installation or erection or the construction of or alteration, renovation, rehabilitation of the **insured project** (hereinafter, **permanent works**);

**2.** Temporary works - All scaffolding, form work, fences, shoring, hoarding, falsework and temporary buildings, construction trailer(s) including such trailers' contents (except **plans and drawings**), all incidental to the **insured project** (hereinafter, **temporary works**); and

**3.** Property of others – Property of others for which the **Insured** is legally liable (hereinafter, **property of others**);

while at the location of the **insured project**, in transit as set forth in the INLAND TRANSIT Additional Coverage, or at offsite temporary storage as set forth in OFFSITE TEMPORARY STORAGE Additional Coverage.

**C. SPECIFIED COVERED CAUSES OF LOSS**

Subject to the terms and conditions of this Policy, **covered causes of loss** include the following specified **covered causes of loss**:

1. **Earth movement**, which means any natural or manmade:

   a. Earthquake, including any earth sinking, rising or shifting related to such event;

   b. Landslide, including any earth sinking, rising or shifting related to such event;

   c. Mine subsidence, meaning subsidence of a manmade mine, whether or not mining activity has ceased;

   d. Earth sinking, rising or shifting, including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of **covered property**, unless otherwise excluded by this Policy;

   e. Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, sinkhole collapse, or subsidence, unless otherwise excluded by this Policy; or

   f. Tsunami arising out of any of the above.

2. **Flood**, which means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike or other surface containment structure, storm surge, storm tide, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.  A tsunami shall not be considered a **flood**.

3. **Water damage** means all loss or damage caused by:

   a. Water, other than water from a **flood** or **named storm**, that enters into a building or structure through an opening;

   b. Discharge or leakage of water or steam from a plumbing, heating, air conditioning or other system or appliance;

   c. Discharge or leakage from a sprinkler system, other than discharge due to a fire, explosion or **earth movement**; or

   d. Water, other than water from a **flood** or **named storm**, that backs-up into the **insured project** (or **existing property**, if endorsed onto this Policy) from sewers, drains, sumps, and/or pumps.

4. **Named storm**, which means a storm that, at any time, has been declared by the United States National Weather Service or another meteorological authority to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm.

If **earth movement**, **flood** or **named storm** is not covered, then any cause or event occurring concurrently or in any sequence with such peril(s) is also not covered, except for direct physical loss or damage to **covered property** caused by fire, sprinkler leakage or explosion following **earth movement**, **flood** or **named storm**, whichever is applicable.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 2 of 25 |
| --- | --- | --- |

Direct physical loss or damage to **covered property** caused by fire, sprinkler leakage or explosion shall not be considered loss or damage by **earth movement**, **flood** or **named storm**, whichever is applicable, within the terms and conditions of this Policy.

5. **Terrorism**, which means the use or threatened use of force or violence against a person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

   a. A government;

   b. The civilian population of a country, state or community; or

   c. Disrupt the economy of a country, state or community.

   So long as the Terrorism Risk Insurance Act of 2002, and any revisions or amendments thereto (the "Act") is in effect, **terrorism** includes a certified act of terrorism defined by Section 102. Definitions of the Act.

   Whether or not **terrorism** is covered under this Policy, the Company does not cover loss or damage caused directly or indirectly by **biological and/or chemical terrorism** or **nuclear terrorism** whether controlled or uncontrolled, proximate or remote, sudden or over any length of time, or which is contributed to or aggravated by any other cause or event. Such **biological and/or chemical terrorism** or **nuclear terrorism** is excluded regardless of any other cause or event occurring concurrently or in any sequence with such **biological and/or chemical terrorism** or **nuclear terrorism**. **Biological and/or chemical terrorism** means the dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances in an act(s) of **terrorism**. **Nuclear terrorism** means an act(s) of **terrorism** involving or resulting in nuclear reaction or nuclear radiation or radioactive contamination.

   If **terrorism** is covered under this Policy, then a corresponding premium will be shown in Item **7.B.** of the Declarations.

   If **terrorism** is not covered then any cause or event occurring concurrently or in any sequence with such **terrorism** is also not covered, including any action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except for direct physical loss or damage to **covered property** caused by fire following **terrorism**. With respect to this exception for fire following **terrorism**, no coverage is provided for: (1) fire following **biological or chemical terrorism** or **nuclear terrorism**, (2) any Additional Coverage, except debris removal under the DEBRIS REMOVAL Additional Coverage, or (3) delay in completion loss. Notwithstanding any other valuation provision of this Policy to the contrary, the Company shall only pay the actual cash value of the **covered property** at the time and place of the loss caused directly by the ensuing fire.

### SECTION II – ADDITIONAL COVERAGES

Subject to the terms and conditions of this Policy, all loss, damage, expenses and/or other payments for the following Additional Coverages and any Additional Coverage(s) added to this Section by endorsement or through the Special Terms and Conditions is subject to the sublimits of liability as shown in Item **10.B.** of the Declarations and sublimits shown elsewhere in this Policy.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 3 of 25 |
|---|---|---|

1. **INLAND TRANSIT**

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **covered property** during **inland transit**.

The **Insured** agrees to keep records of all shipments insured hereunder and make them available to the Company upon request.  Failure to keep such records may result in the Company not paying for such **covered property** during **inland transit**.

This Additional Coverage shall be void if the **Insured** enters into any agreement with carriers, releasing them from their common law or statutory liability or agreeing that this insurance shall in any way inure to the benefit of such carriers; however, the **Insured** may, without prejudice to this Additional Coverage, accept bills of lading, receipts, or contracts of transportation as are ordinarily issued by carriers containing a limitation as to the value of **covered property**.

As used herein, **inland transit** means the transit of **covered property** from the commencement of loading at the original point of shipment anywhere within the **coverage territory** or Canada until completion of unloading: at the location of the **insured project** or at a temporary offsite location, including shipments on inland or coastal waters, but excluding ocean marine shipments.

2. **OFFSITE TEMPORARY STORAGE**

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **covered property** while such property is at offsite temporary storage, anywhere within the **coverage territory**.  There is no coverage for such **covered property** while: (1) in the course of manufacturing or processing, (2) at a manufacturer's or supplier's site or warehouse, unless the **Insured** is legally liable for such **covered property**, or (3) in transit.

3. **ARSON, THEFT OR VANDALISM AND MALICIOUS MISCHIEF REWARD**

The Company covers the reasonable payment of any reward offered by the **Named Insured** or on the **Named Insured's** behalf for information that leads to conviction of the perpetrator(s) of arson, theft or **vandalism and malicious mischief** to **covered property**.

Regardless of the number of informants, the Company's maximum liability for any one **occurrence** of arson, theft and/or **vandalism and malicious mischief** is the Arson, Theft or Vandalism and Malicious Mischief Reward sublimit of liability shown in Item **10.B.** of the Declarations.

4. **CLAIMS PREPARATION COSTS**

The Company will pay reasonable and necessary expenses incurred by the **Named Insured** for its:

**a.** Accountants, architects, auditors, engineers, or other professionals;

**b.** Employees; or

**c.** Insurance agent's or broker's subsidiaries, related or associated entities;

to prepare and certify particulars or details of the **Named Insured's** claim required by the Company resulting from a covered loss under this Policy for which the Company has accepted liability.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 4 of 25 |

The Company will not pay for expenses incurred by the **Named Insured** to utilize the services of property managers, attorneys, public adjusters, or any of its subsidiaries, related or associated entities or insurance agents or brokers.  The Company will not pay any fees or costs for consultation on coverage or negotiation of claims.

**5.  CRANE RE-ERECTION EXPENSES**

The Company will pay reasonable and necessary expenses incurred by the **Named Insured** to re-erect a tower or pole crane that sustains direct physical loss or damage by a **covered cause of loss**.  However, the Company shall not cover any loss or damage to the tower or pole crane itself.

**6.  CRISIS MANAGEMENT**

The Company shall indemnify the **Named Insured** for the reasonable and necessary costs over and above the total costs that normally would have been incurred to continue the scheduled progress of the **insured project** if an order of civil or military authority limits, restricts or prohibits partial or total access to the **insured project**, provided that such order is a direct result of a violent crime, suicide, attempted suicide, death (not including, disease or sickness resulting in death) or armed robbery at such **insured project**.

Coverage begins on the date and time that the order of civil or military authority limits, restricts or prohibits partial or total access to the **insured project** and ends when access to the **insured project** is no longer limited, restricted or prohibited, but in no event for more than the number of days shown in Item **10.B.** of the Declarations under Crisis Management.

The **Named Insured** must report any loss under this Additional Coverage within 30 days after the effective date of such order of the civil or military authority.

**7.  CYBER COVERAGE**

    **a.**  Electronic Data

    The Company will pay for corruption, erasure or alteration of **electronic data** in the **building or other systems** that are incorporated into the **insured project** due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss**.

    The Company will not pay for any loss under this Additional Coverage for which coverage is provided under the Building or Other Systems Additional Coverage or would be provided under such Additional Coverage but for the exhaustion of the Building or Other Systems sublimit of liability shown in Item **10.B.** of the Declarations.

    **b.**  Building or Other Systems

    The Company will pay for the **building or other systems** that are incorporated into the **insured project** rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems**.

    **c.**  Plans and Drawings

    The Company will pay for corruption, erasure or alteration of **plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code**.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 5 of 25 |
|---|---|---|

**d.** Cyber Extra Expense

If coverage is provided under Subsections **7.a.**, **7.b.** or **7.c.** above, the Company will also pay the reasonable and necessary costs, over and above normal operating costs, incurred by the **Named Insured** limited to the following and such costs shall not be considered extra expense under any other Additional Coverage:

**i.** Conducting an investigation (including a forensic investigation) to determine the cause and scope of the introduction of such **malicious code**; and

**ii.** Hiring an expert to consult with the **Named Insured** on: (1) the protection of such **electronic data** and (2) the eradication of such **malicious code**.

**e.** Additional Exclusions

The following additional exclusions apply to all Additional Coverages set forth in the CYBER COVERAGE Additional Coverage:

**i.** The Company will not pay any loss, damage, cost or expense arising out of a breach in confidentiality or privacy of, or release of, any **electronic data** for any reason.

**ii.** The Company does not cover theft of any **electronic data** unless there has been corruption, erasure or alteration of **electronic data** and then the Company shall only pay the covered loss that is related to the corruption, erasure or alteration of **electronic data**.

**iii.** The Company will not pay any extortion payments or public relations expenses.

**iv.** The Company will not pay any loss, damage, cost or expense arising out of **malicious code**, otherwise excluded under this Policy.

The maximum amount the Company will pay for all loss or damage (including corruption, erasure or alteration) under any single Additional Coverage under this CYBER COVERAGE Additional Coverage is the corresponding sublimit of liability for such single Additional Coverage as shown in Item **10.B.** of the Declarations, regardless of any other applicable coverages or Additional Coverages.

For the purposes of the CYBER COVERAGE Additional Coverage, Subsection **7.a.**, **7.b.**, **7.c.**, and **7.d.** shall each be treated as a separate Additional Coverage.

**8. DEBRIS REMOVAL**

If **covered property** at the **insured project** sustains direct physical loss or damage by a **covered cause of loss** during the **policy period**, the Company will pay the reasonable and necessary expenses to:

**a.** Remove debris of **covered property** remaining from the **insured project**; and

**b.** Remove debris of uninsured property from the **insured project**.

The Company will not pay the expense to extract **pollutants or contaminants** from land, water and/or debris, or to remove, restore, or replace contaminated or polluted land or water. In addition, the Company will not cover the cost to remove or transport any property or debris to a site for storage or decontamination required because the property or debris is affected by **pollutants or contaminants**, whether or not such removal, transport or decontamination is required by law, ordinance or regulation nor will the Company cover the cost to remove, transport or decontaminate any property or debris damaged by **fungus, mold or spore**.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 6 of 25 |

**9.  DEMOLITION AND INCREASED COST OF CONSTRUCTION**

In the event of direct physical loss or damage by a **covered cause of loss** to **covered property** that results in the enforcement of any law, ordinance, governmental directive or standard (hereinafter, **law or ordinance**) in effect at the time of loss or damage regulating the repair or rebuilding of the damaged portion(s) of the **covered property**, the Company will pay:

**a.**   Demolition Coverage A:  In accordance with the VALUATION Section, the cost to replace the undamaged portion of the damaged **covered property** as a consequence of the enforcement of a **law or ordinance** that requires demolition of the undamaged portion of the damaged **covered property**;

**b.**   Demolition Coverage B:  For the cost to demolish and clear the site of the undamaged portion of the damaged **covered property**, as a consequence of the enforcement of a **law or ordinance** that requires demolition of the undamaged portion or the damaged **covered property**; and

**c.**   Demolition Coverage C:  For the increased cost of repairing or rebuilding the damaged and undamaged portion of the **covered property**, limited to the cost that would have been incurred in order to comply with the minimum requirements of such **law or ordinance** regulating the repair or rebuilding of the damaged **covered property**.

The Company shall not be liable for any loss under this provision, unless and until the damaged or destroyed **covered property** is actually repaired or rebuilt on the same premises with exercise of due diligence and dispatch and in no event, unless repair or rebuilding is completed within two (2) years after the destruction or damage of such **covered property** or within such further time as the Company may allow in writing during the two (2) year period.

The Company shall not be liable for any cost set forth above:

**a.**   Necessitated by the enforcement of any **law or ordinance** regulating any form of **pollutant or contaminant**; or

**b.**   Incurred due to any **law or ordinance** with which the **Insured** was legally obligated to comply with prior to the time of the direct physical loss or damage.

**10. EXPEDITING EXPENSE AND EXTRA EXPENSE**

The Company will pay reasonable and necessary:

**a.**   Expediting expenses to make temporary repairs and to expedite the permanent repair or replacement of **covered property**, that sustains direct physical loss or damage due to a **covered cause of loss**, including additional wages for overtime, night work, and work on public holidays and the extra costs of express and air freight and extra costs of rental equipment; and

**b.**   **Extra expense** which is incurred by the **Insured** for the purpose of continuing as nearly as practicable the scheduled progress of undamaged work, but only when such scheduled progress is impaired by direct physical loss or damage by a **covered cause of loss** to the **covered property**.

In order to receive payment under this provision, the **Insured** must exercise due diligence and dispatch to maintain the scheduled progress of the undamaged work.

Notwithstanding the foregoing, the Company will not pay expenses incurred:

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 7 of 25 |
| --- | --- | --- |

   a.  To comply with any **law or ordinance** which regulates removal, repair, demolition, construction or re-construction of the **covered property**;

   b.  To overcome delays in the scheduled progress of the work which existed at the time of the loss;

   c.  For alterations, additions, improvements or other changes in materials, designs, plans, specifications or the means and methods of construction; or

   d.  As **owner's extra expense**.

## 11. OWNER'S EXTRA EXPENSE

The Company will pay reasonable and necessary **owner's extra expense** incurred by the **project owner(s)**, prior to the Expiration Date as described in Item **4.** of the Declarations, due to direct physical loss or damage by a **covered cause of loss** to **covered property**.

Notwithstanding the foregoing, the Company will not pay expenses incurred:

   a.  To comply with any **law or ordinance** which regulates removal, repair, demolition, construction or re-construction of the **covered property**;

   b.  To overcome delays in the scheduled progress of the work which existed at the time of the loss;

   c.  For alterations, additions, improvements or other changes in materials, designs, plans, specifications or the means and methods of construction; or

   d.  As **extra expense** or expediting expenses as set forth under the EXPEDITING EXPENSE AND EXTRA EXPENSE Additional Coverage.

## 12. FINE ARTS

The Company will pay for direct physical loss or damage by a **covered cause of loss** to the **Insured's fine arts** at the **insured project** for which the value has been included in the **total project value**. However, the Company will not pay for loss or damage as a result of restoring, repairing or retouching processes.

## 13. FIRE BRIGADE, EXTINGUISHING EXPENSES AND POLICE CHARGES

The Company will pay the following expenses resulting from a **covered cause of loss** to **covered property** incurred by the **Insured**:

   a.  Fire brigade charges and extinguishing expenses;

   b.  Loss and disposal of fire extinguishing materials expended; and

   c.  Police charges to investigate a covered loss.

## 14. FUNGUS, MOLD OR SPORE

The Company will pay for direct physical loss or damage to **covered property** caused by or resulting from **fungus, mold or spore**, when such **fungus, mold or spore** arises out of a **covered cause of loss** that commences during the **policy period**. This coverage includes reasonable and necessary cost or expense with respect to the **insured project** to:

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 8 of 25 |
|---|---|---|

a.   Clean-up, remove, contain, treat, detoxify or neutralize **fungus, mold or spore**;

b.   Test the indoor air quality for **fungus, mold or spore**;

c.   Test the surfaces and materials for **fungus, mold or spore**;

d.   Develop and implement a remediation plan for **fungus, mold or spore**; and

e.   Remove debris that has been contaminated with **fungus, mold or spore**.

## 15. HOT TESTING

The Company will pay for direct physical loss or damage to **covered property** at the **insured project** due to a **covered cause of loss** arising out of **hot testing** during the **hot testing period**.

The **hot testing period** means the period of time that:

a.   Begins with the introduction into each system of: (1) feedstock or other raw materials or (2) fuel supply, and

b.   Ends on the earliest of the following:

  i.   The Expiration Date or earlier termination date of the Policy;

  ii.   The date of formal acceptance of the **insured project** or any part of the **insured project** undergoing **hot testing** by the **project owner(s)**; or

  iii.   The date after the total number days of **hot testing**, whether or not consecutive, as shown in Item **10.B.** of the Declarations (referred to as the Maximum Hot Testing Period), after the commencement of **hot testing**.

**Hot testing** means testing of equipment or machinery through the introduction into a system of: (1) feedstock or other raw materials or (2) fuel supply.  **Hot testing** does not mean testing of building systems including, but not limited to, electrical, mechanical, hydraulic, hydrostatic and pneumatic testing which shall be deemed to be cold testing.

## 16. LANDSCAPING MATERIALS

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **landscaping materials** at the **insured project**, except for loss or damage to **landscaping materials** from infestation, disease, freeze, drought, lack of moisture, hail, weight of ice or snow or any damage caused by insects, vermin, rodents or animals.

As used herein, **landscaping materials** means trees, plants, shrubs, grass and lawns (including fairways, greens and tees) for which the **Insured** is contractually responsible and the value of which has been included in the **total project value**.

For the purpose of applying the sublimit of liability, "one item" shall mean: (1) any one tree, plant, shrub, green or tee, or (2) each separate area of a fairway or grass, bounded by rough vegetation, water, dirt, concrete or paved surfaces on all sides.

## 17. LOGISTICS EXTRA COSTS

The Company will pay the reasonable and necessary extra cost incurred by the **Insured** to temporarily continue, as nearly normal as practicable, the movement of **covered property** directly between the location of the **Insured's** direct supplier and the **insured project**, provided

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 9 of 25 |
|---|---|---|

that the normal movement of such **covered property** is disrupted as a result of direct physical loss or damage by a **covered cause of loss** to bridges, roadways, tunnels, docks, piers, wharves runways, taxiways, tarmacs, terminals, and/or railways (hereinafter, **infrastructure**) located in the **coverage territory**.

Coverage begins:

**a.** 48 hours after such disruption; or

**b.** In the case of disruption caused by **earth movement**, **flood** or **windstorm or hail**, 168 hours after such disruption;

and ends when, with exercise of due diligence and dispatch, the normal movement of the **covered property** could be resumed (hereinafter, the **waiting period deductible**). Any **waiting period deductible** shall apply in addition to any other deductible(s) applicable to the **covered cause of loss** that resulted in damage to the **infrastructure**. Such other deductible(s) shall be subject to a minimum deductible of the Policy Deductible.

The following additional exclusions apply to this Additional Coverage. The Company will not pay for:

**a.** Any loss resulting from disruption of electricity, gas, fuel, water, steam, sewerage, refrigeration, cloud computing service, or any data, voice or video service;

**b.** Any costs that would have been incurred during the same period had there been no disruption of normal movement of goods or materials;

**c.** Any costs for the repair or replacement of property that has been damaged or destroyed; or

**d.** Any costs recoverable elsewhere under this Policy.

## 18. PLANS AND DRAWINGS

The Company will pay for direct physical loss of or damage by a **covered cause of loss** to **plans and drawings**.

## 19. POLLUTION AND CONTAMINATION COVERAGE

The Company will pay the reasonable and necessary expenses incurred by the **Insured** to:

**a.** Remove, extract, dispose of, or clean-up the actual presence of **pollutants or contaminants** from land or water at the **insured project**;

**b.** Remove and transport property or debris at the **insured project** that is affected by **pollutants or contaminants** to a site for storage or decontamination; and

**c.** Test for **pollutants or contaminants** during the extraction of **pollutants or contaminants** from land or water at the **insured project**;

but only if the **pollutants or contaminants** originate at the **insured project** due to direct physical loss or damage by a **covered cause of loss** during the **policy period**. There will be no coverage unless such expenses are reported to the Company within 180 days after the date of such direct physical loss or damage.

**20. PRESERVATION OF PROPERTY**

The Company will pay for:

**a.** Reasonable and necessary costs, over and above normal operating costs, incurred by the **Insured** for actions to temporarily protect or preserve **covered property**, and

**b.** Direct physical loss or damage by a **covered cause of loss** to **covered property** removed from the **insured project**,

provided that such actions or removal is necessary due to imminent direct physical loss or damage by a **covered cause of loss** to **covered property**. If **covered property** is removed to and located at offsite temporary storage in accordance with this provision, then the OFFSITE TEMPORARY STORAGE Additional Coverage shall apply.

**21. PROFESSIONAL DESIGN FEES**

In the event of direct physical loss or damage by a **covered cause of loss** to the **insured project**, the Company will pay the reasonable and necessary expenses incurred by the **Insured** for architects, engineers or other design professionals to redesign the damaged portion of the **insured project** in accordance with the design as set forth in the **contract documents** on the date of loss.

<div align="center">

**SECTION III − VALUATION**

</div>

Unless otherwise provided in this Policy, the basis of adjustment of a claim shall be as follows, at the time and place of the loss:

**A.** <u>Permanent Works</u> − The cost to repair or replace (whichever is less) the **permanent works** that sustained loss or damage at the time and place of the loss with material of like kind and quality, less betterment, and including contractor's reasonable profit and overhead in the same proportion as that included in the **contract documents** to the extent declared as part of the **total project value**. If the **permanent works** are not repaired or replaced within 2 years after the date of loss, then the Company shall pay the actual cash value of such **permanent works** at the time and place of the loss.

**B.** <u>Temporary Works</u> − With respect to **temporary works** that sustain loss or damage, the lesser of: (1) the cost to repair or replace (whichever is less) the **temporary works** at the time and place of loss with materials of like kind and quality, but if not repaired or replaced within 2 years after the date of loss, the recovery will not exceed actual cash value or (2) the value that the **Insured** is legally required to pay for the **temporary works** as set forth in the lessor's contract.

**C.** <u>Property of others</u> − The lesser of: (1) the cost to repair or replace (whichever is less) the **property of others** that sustained loss or damage at the time and place of loss with material of like kind and quality, less betterment and/or charges incurred by the contractor prior to the loss and related to such property or (2) the property owner's cost.

**D.** <u>Property in Inland Transit</u> − The invoice cost of property in **inland transit** plus accrued shipping charges less the shipper's liability, if any.

**E.** <u>Plans and Drawings</u> − If replaced, the cost to reproduce the **plans and drawings** (in physical or **electronic data** format) from duplicates, or if no duplicates are available, then the cost to research, gather and/or assemble the information to recreate such **plans and drawings**. If not replaced, the value of the blank material.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 11 of 25 |
|---|---|---|

**F.** **Landscaping Materials** – (1) The cost to replace **landscaping materials** with property of like kind and quality, and (2) the labor necessary to replace such property.

**G.** **Fine Arts** – The least of the following: (1) the cost to repair or replace the **fine arts**; (2) the appraised value at the time of the loss had no loss or damage occurred or (3) the agreed value, if any, on file with the Company.

**H.** **Electronic Data** – The cost of reproducing **electronic data** from duplicates to the condition that existed prior to the time of the loss, or if no duplicates exist, then the cost to research, gather and/or assemble the **electronic data**. If **electronic data** is not replaced, then the value of the blank media.

<div align="center">

**SECTION IV – PROPERTY NOT COVERED**

</div>

Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company does not insure the following property:

**A.** Land and land values and the value of cut, fill and backfill materials existing at the location of the **insured project** prior to project commencement; however, to the extent identified in the **contract documents** and included in the **total project value**, fill and backfill materials purchased for use in the completion of the **insured project** are covered. Labor and material charges incurred to excavate land and to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured, are covered to the extent such charges are identified in the **contract documents** and included in the **total project value**;

**B.** **(i)** Contractors' tools, machinery, plant and equipment, including spare parts and accessories, whether owned, loaned, hired or leased, and

**(ii)** Property of a similar nature not intended to be a permanent part of the completed **insured project**,

regardless of ownership, unless specifically provided by endorsement and then only to the extent provided therein;

**C.** Vehicles or equipment licensed for highway use, aircraft including drones or watercraft, except with respect to drones only, if such drones are owned and used by the **Insured** as part of the operations at the **insured project**;

**D.** Railcars and locomotives;

**E.** Water, except water that is contained within any enclosed tank, piping system, or **processing water**;

**F.** Standing timber, growing crops or animals;

**G.** Trees, plants, shrubs, grass or lawns (including fairways, greens or tees) that already exist at the **insured project**;

**H.** **Landscaping materials**;

**I.** **Plans and drawings**;

**J.** Accounts, bills, stamps, deeds, evidence of debt, checks, bonds, notes, **money**, **fine arts**, precious metals or precious stones or other property of a similar nature;

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 12 of 25 |
|---|---|---|

**K.** **Existing property** at the location of the **insured project**, unless specifically provided by endorsement and then only to the extent provided therein;

**L.** **Used machinery and equipment** while undergoing any form of testing, commissioning or startup, unless specifically provided by endorsement and then only to the extent provided therein;

**M.** Transmission, distribution or communication lines, except to the extent identified in the **contract documents**;

**N.** Property not at an **insured project** unless covered under the INLAND TRANSIT Additional Coverage, OFFSITE TEMPORARY STORAGE Additional Coverage or by endorsement; or

**O.** **Electronic data**.

<div align="center">

**SECTION V – PERILS EXCLUDED**

</div>

**A.** Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company does not insure for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage.  The following exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:

1. Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or contributed to or aggravated by a **covered cause of loss**.  However, if fire or sprinkler leakage not otherwise excluded ensues, the Company shall be liable for direct physical loss or damage by such ensuing fire or sprinkler leakage, but not including any loss or damage due to nuclear reaction, nuclear radiation, or radioactive contamination;

2. **a.** War, hostile or warlike action in time of peace or war, whether or not declared, including action in hindering, combating, or defending against an actual, impending, or expected attack:

   **i.** By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces; or

   **ii.** By military, naval, or air forces; or

   **iii.** By an agent of any such government, power, authority, or force;

   **b.** Any weapon employing atomic fission, fusion or radioactive force, or any weapon that disperses radioactive material or a directed-energy or electromagnetic weapon, whether in time of peace or war, whether or not its discharge was accidental; or

   **c.** Insurrection, rebellion, revolution, civil war, usurped power, seizure or destruction or any action taken by governmental authority in hindering, combating, or defending against such event;

   Including any consequence of Subsection **a.**, **b.**, or **c.** above;

3. The actual, alleged or threatened release, discharge, escape or dispersal of **pollutants or contaminants**, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any **covered cause of loss** under this Policy.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 13 of 25 |
|---|---|---|

However, this exclusion shall not apply to direct physical loss or damage to **covered property** from **pollutants or contaminants** caused by a **covered cause of loss** at the **insured project**, including the cost to clean-up **pollutants or contaminants** from **covered property** at the **insured project** resulting from such loss or damage.  No coverage is provided for testing or monitoring for **pollutants or contaminants.**  For the purpose of the exception to this exclusion only, **pollutants or contaminants** do not include radioactive contaminants;

4.  Dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances by any cause whatsoever;

5.  Asbestos, dioxins or polychlorinated biphenols (hereinafter, **material(s)**) including:

    a.  **Material(s)** removal;

    b.  Demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating **material(s)**;

    c.  Any governmental order or direction declaring that any **material** which is present in or part of or utilized on any portion of the **insured project** must be removed or modified;

6.  a.  Any functioning or malfunctioning or lack of the internet or similar facility, or of any intranet or private network, computer system, computer or computing device or similar facility;

    b.  Any corruption, destruction, distortion, erasure or other loss or damage to data, coding, program, or software;

    c.  Loss of use or functionality whether partial or entire of data, coding, program, software, any computer or computer system or other device and any ensuing liability or failure of the **Insured** to conduct business;

all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage at the **insured project**;

7.  Error or omission in machine programming or instructions of **electronic data**, including, loss attributable to program design constraints, networking compatibility and original business software; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage at the **insured project**;

8.  Lack of incoming electricity, fuel, water, gas, steam, refrigeration, or outgoing sewerage, or incoming or outgoing data, voice or video service; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage, but only if: (1) such ensuing loss or damage is caused by a lack of incoming electricity, fuel, water, gas, steam or refrigeration from an offsite service provider and (2) such ensuing loss or damage is to equipment or machinery that is part of the **permanent works** of the **insured project** and is not operational at the time of the loss. This exception does not apply to **hot testing**.

9.  Any loss or damage arising out of **hot testing**;

10.  Infidelity, dishonesty or fraudulent activity of any **Insured** or any of the **Insured's** proprietors, partners, officers, directors, trustees, employees or others with whom the property is entrusted (other than a carrier for hire).  However, a willful act of destruction by the

**Insured's** employee without the knowledge of any of the **Insured's** proprietors, partners, officers, directors or trustees is covered;

11. Any act that: (1) causes corruption, erasure or deletion of **electronic data**, including the rendering of any equipment or machinery useless, or (2) prevents access to or use of computer hardware, software or other components thereof; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage.

12. **Fungus, mold or spore**; or any spores or toxins created or produced by or emanating from such **fungus, mold or spore**; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage;

13. Confiscation, seizure, appropriation, expropriation, nationalization, requisition for use or title, or willful destruction by any government, sovereign power, civil authority or military authority (de jure or de facto); or

14. Loss or damage arising out of any **covered cause of loss** or Additional Coverages for which the words NOT COVERED or for which an amount or number of days is not shown in Item **10.** of the Declarations.

B. Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company will not pay for loss or damage caused by or attributable to any of the following:

1. Indirect, remote or consequential loss or damage;

2. Delay, loss of market or loss of use;

3. Delay in completion of the **insured project**, unless specifically provided by endorsement and then only to the extent provided therein;

4. Any business interruption loss, **extra expense**, **owner's extra expense**, expediting expenses, expenses to reduce loss, loss of rental income and other economic losses;

5. Liquidated damages, performance penalties, penalties for non-completion, late completion or non-compliance with contract conditions;

6. Loss, damage, costs, expenses, fines or penalties incurred or sustained by or imposed on the **Insured** at the order of any government agency, court or other authority arising from any cause whatsoever;

7. Loss, damage, or expense covered under any written or implied guarantee or warranty by any contractor, manufacturer or supplier, whether or not such contractor, manufacturer or supplier is an **Insured**, but only to the extent such loss, damage, or expense should have been recovered under such written or implied guarantee or warranty;

8. Unexplained or mysterious disappearance, loss or shortage disclosed on taking inventory;

9. Normal: subsidence, heave, settling, cracking, expansion, contraction or shrinkage of walls, floors, ceilings, buildings, foundations, patios, walkways, driveways or pavements, all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage;

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 15 of 25 |
| --- | --- | --- |

**10. a.**   Faulty workmanship, material, construction or installation from any cause; or

   **b.**   Any fault, defect, error, deficiency or omission in any design, plans, or specifications;

   all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage; or

**11.**   Wear and tear, erosion, inherent vice, latent defect, corrosion, rust, wet or dry rot, evaporation, shrinkage, or change in color, flavor, texture or finish, extremes or changes of temperature damage, or changes in relative humidity damage, all whether atmospheric or not or gradual deterioration, all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage.

### SECTION VI − CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT

**A.   ABANDONMENT**

There can be no abandonment of any property to the Company.

**B.   ADJUSTMENT OF LOSSES**

Loss or damage will be adjusted with the **Named Insured** and shall be payable as directed in writing by the **Named Insured** subject to: mortgagee; lender; or similar interests; as their interests may appear as shown on the Certificates of Insurance or any endorsement attached to and forming a part of the Policy. The effective date of any interests will be the issue date of the Certificate of Insurance unless a later date is specified on the Certificate of Insurance.

Notwithstanding the foregoing, if the Company is prohibited from adjusting and making payment in accordance with the preceding paragraph, the Company will adjust and make payment to the **Named Insured**.

**C.   APPRAISAL**

If the **Named Insured** and the Company disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss.  In such event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire.  If the appraisers cannot agree on an umpire, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the replacement cost and actual cash value of the property and amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding.  Each party will:

**1.**   Pay its chosen appraiser; and

**2.**   Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, it is without prejudice to the Company's rights under the terms and conditions of this Policy and the Company's right to deny the claim in whole or in part.

**D.   PARTIAL PAYMENT OF LOSS**

In the event the amount of loss or damage for which the Company is liable is determined by the Company to be in excess of the applicable deductible, the Company may advance partial payment(s) with respect to any claim, subject to all other terms and conditions of this Policy.

**E. REQUIREMENTS IN CASE OF LOSS OR DAMAGE**

In case of loss or damage, the **Insured** shall:

1. Give written notice of any loss or damage to the Company as soon as practicable after the date of such loss or damage;

2. Promptly contact the applicable authority having jurisdiction in the event a law has been broken, and promptly file a written report with such authority;

3. Protect the property from further loss or damage;

4. Separate the damaged and undamaged property;

5. Maintain such property in the best possible order;

6. Furnish a complete inventory of the lost, destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed;

7. Allow the Company to examine and audit the **Insured's** books and records at any reasonable time for the purpose of investigating or verifying any claim;

8. Furnish all other documents or insurance policies that the Company may reasonably require;

9. Allow the Company to access and inspect any damaged or undamaged property;

10. Submit to examination under oath at such times as the Company reasonably may require concerning any matter relating to this insurance or any claim;

11. Cooperate with the Company in all aspects of any claim and provide the Company with any additional information that the Company requires; and

12. Provide the Company with a proof of loss, signed and sworn to by the **Named Insured** as soon as practicable, but in no event more than 90 days after a loss, stating the **Insured's** knowledge and belief as to the following:

    a. The time and origin of the loss;

    b. The **Insured's** interest and the interest of all others in the property;

    c. The value of each item thereof determined in accordance with the VALUATION Section and the amount of loss thereto and all encumbrances thereon;

    d. All other contracts of insurance, whether collectible or not, covering any of the **covered property**; and

    e. Any changes in the title, use, occupancy, location, possession or exposures of the **covered property** subsequent to the issuance of this Policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss, whether or not it then stood on leased ground.

**F. SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable shall be payable within 30 days after proof of loss, as herein required, is received and agreed to by the Company or the amount of

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 17 of 25 |
|---|---|---|

loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

The Company shall have the option to take all or any part of the property at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing the **Named Insured** with notice of the Company's intention to do so within 60 days after the Company's receipt of the proof of loss herein required.

## G. SUBROGATION

The Company may require from the **Insured** an assignment of all rights of recovery against any party for loss to the extent that payment is made by the Company.  However, the **Insured** has the right to waive subrogation, provided such waiver is entered into by the **Insured** in writing prior to the loss.   The **Insured** will do nothing after a loss to prejudice such rights of subrogation.

Notwithstanding the foregoing, it is a condition of this Policy that the Company shall be subrogated to all the **Insured's** rights of recovery against:

1. Any architect or engineer, whether named as an **Insured** or not, for any loss or damage arising out of the performance of professional services in their capacity as such and caused by an error, omission, deficiency or act of the architect or engineer, by any person employed by them or by any others for whose acts they are legally liable; and

2. Any manufacturer or supplier of machinery, equipment or other property, whether named as an **Insured** or not, for the cost of making good any loss or damage regardless of any guarantee or warranty, whether express or implied.

Any recovery by the Company as a result of subrogation proceedings arising out of an **occurrence**, after expenses, including the Company's legal fees, incurred in such subrogation proceedings are deducted, shall accrue to the **Insured** in the proportion that the deductible amount and/or any provable uninsured loss amount bears to the entire provable loss amount.

The **Insured** will cooperate with the Company and, upon the Company's request and expense will:

1. Attend hearings and trials;

2. Assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and conducting suits.

## H.  SUIT AGAINST COMPANY

No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless the same be commenced within 24 months immediately after the date of the loss, provided however, that if under the laws of the applicable jurisdiction such time limitation is unenforceable, then the period within which such action or proceeding must be commenced shall be the shortest period of time permitted by the laws of such jurisdiction.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 18 of 25 |
|---|---|---|

## SECTION VII – GENERAL CONDITIONS

### A.  ASSIGNMENT

The **Insured** may not assign this Policy without the Company's prior written consent.

### B.  CANCELLATION

This Policy may be cancelled by the **Named Insured** at any time by surrendering this Policy to the Company or by mailing or delivering to the Company written notice stating when thereafter such cancellation shall take effect.  The Company may cancel this Policy by giving the **Named Insured** written notice stating when, not less than 90 days thereafter, or 10 days thereafter for nonpayment of premium, such cancellation shall be effective.

The Company shall pay return premium to the **Named Insured** on a pro-rata basis if the Company cancels and on a short rate basis (meaning 90% of the unearned premium) if the **Named Insured** cancels.

Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If any specific state amendatory endorsement provides less than 90 days notice of cancellation for reasons other than nonpayment of premium, where permitted by law, the Company shall provide the 90 days notice set forth herein.

### C.  CONCEALMENT, MISREPRESENTATION OR FRAUD

This Policy is voidable by the Company if any **Insured**, whether before or after a loss, has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or has committed any act of fraud, attempted fraud or false swearing concerning any matter relating to this insurance or the subject thereof.

### D.  CONFORMANCE TO STATUTE

Any provisions of this Policy which are in conflict with statutes applicable to this Policy are understood, declared and acknowledged by the Company to be amended to conform to such statutes.

### E.  ECONOMIC AND TRADE SANCTIONS

The Company shall not be deemed to provide cover and the Company shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose this Company, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.

### F.  ERRORS OR OMISSIONS

No unintentional errors or omissions in any information required to be reported to the Company will prejudice the **Insured's** rights of recovery, but the **Insured** shall report the correct information to the Company as soon as practicable when discovered and the **Insured** shall pay any additional premium when due.

**G.  GOVERNING LAW**

Any interpretation of this Policy or issue relating to its construction, validity or operation shall be determined by the laws of the United States or of any applicable state in the United States. The parties will submit to the exclusive jurisdiction of the applicable court within the United States.

**H.  INCREASE IN HAZARD**

If the circumstances in which this insurance was entered into shall be altered or if the risk shall be materially increased, the **Insured** shall as soon as possible give notice in writing to the Company. In the event there is a material increase in the risk, the Company reserves the right to change the terms or conditions of this Policy or cancel this Policy (if allowable by law).

**I.  INSPECTION**

The Company shall be permitted, but not obligated, to inspect **covered property** at all reasonable times during the **policy period**.  Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute any undertaking by the Company, on behalf of or for the benefit of the **Insured** or others, to determine or warrant that such **covered property** is safe or healthful or that such **covered property** complies with any law, rule, regulation, code, engineering or industry standard.

**J.  LIBERALIZATION**

If the Company adopts a standard revision to the Company's Completed Value Builders Risk Construction Performance Policy that would broaden the coverage under this Policy within 45 days prior to the inception date of this Policy or during the **policy period** of this Policy and if no additional premium is required for such revision, then the broadened coverage will immediately apply to this Policy.

**K.  NAMED INSURED**

If this Policy insures more than one person or organization, the **Named Insured** is authorized to act on behalf of all other **Insureds** with respect to such **Insureds'** rights, obligations, and duties under this Policy including, but not limited to, the giving and receiving of notices under this Policy.  Payment of loss or return premium under this Policy to the **Named Insured** shall satisfy the Company's obligations with respect to all **Insureds** under this Policy.

**L.  NO BENEFIT TO BAILEE**

No person or organization, other than the **Insured**, having custody of **covered property** will benefit from this insurance.

**M.  OTHER INSURANCE**

**1.**  An **Insured** may have other insurance.  If such **Insured** does have other insurance, the Company will pay its share of the covered loss or damage.  Subject to the exceptions as set forth in **2.** below, the Company's share is the proportion that the applicable limit/sublimit of liability under this Policy bears to the limits/sublimits of liability of all insurance covering the loss or damage.

| 125687 (5/17) | ©American International Group, Inc. <br> All Rights Reserved. | Page 20 of 25 |
| --- | --- | --- |

   **2.** If there is other insurance as described below, the Company will pay under this Policy only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether the **Insured** can collect on it or not:

   **a.** The property covered under this Policy is also covered under another policy, in which such property is more specifically described; or

   **b.** The other insurance covers the **Insured's** interest or the interest of others in property which the **Insured** does not own.

## N.  PAIR AND SET

In the event of loss or damage to any part of **covered property** consisting, when complete for use, of several parts, the Company will only be liable for the value of the part lost or damaged.

## O.  PREMIUM ADJUSTMENT

   **1.  During the Term of the Policy:**

   **a.** At the time of any extension of this Policy or if the scope or value of the **insured project** changes beyond the percentage set forth in the Margin Clause shown on the Declarations, the **Named Insured** shall report in writing to the Company the **adjusted total project value** as of the date of such extension or change order.

   **b.** The adjusted premium shall be calculated by applying the rates as shown in Item **8.** of Declarations used for the purpose of computing the Deposit Premiums to the amended term of coverage and the **adjusted total project value.**

   **c.** If the adjusted premium so calculated differs from the Total Deposit Premium shown in Item **8.** of the Declarations (or the previous revision of the Total Deposit Premium), such difference shall be due and payable to the Company or the **Named Insured**, whichever is applicable.

   **2.  Upon Expiration or Cancellation of the Policy:**

   **a.** At the time of expiration or cancellation of this Policy, the **Named Insured** shall report in writing to the Company the **adjusted total project value** as of the Expiration Date or the effective date of cancellation.

   **b.** The final earned premium for this Policy shall be calculated by applying the rates as shown in Item **8.** of Declarations used for the purpose of computing the Deposit Premiums to the actual term of coverage and the **adjusted total project value.**

   **c.** If the premium so calculated differs from the Total Deposit Premium shown in Item **8.** of the Declarations (or the previous revision of the Total Deposit Premium), such difference shall be due and payable to the **Named Insured** or the Company, whichever is applicable.

## P.  PRESERVATION OF PROPERTY

In case of imminent loss or damage, the **Insured** must make reasonable efforts to protect property from such loss or damage.

## Q.  RECOVERY FROM OTHER PARTIES

No loss or damage in whole or in part shall be paid hereunder to the extent the **Insured** has collected such loss or damage from others.

**R.  SALVAGE AND RECOVERIES**

All salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this Policy, shall reduce the loss accordingly.

**S.  TITLES**

The titles in this Policy are solely for reference and shall not in any way affect the provisions to which they relate.

## SECTION VIII – DEFINITIONS

1.  **Additional Insured(s)** means those **Insureds** shown in Item **2.** of the Declarations.

2.  **Adjusted total project value** means the **total project value** that may be adjusted during the **insured project** or if previously adjusted, any adjustments to the revised **total project value**.

3.  **Building or other system(s)** means:

    **a.**  Equipment and machinery; and/or

    **b.**  Manufacturing or structural system(s), such as a HVAC, instrumentation, electrical, mechanical or control system(s);

    that are incorporated into the **insured project**.

4.  **Collapse** means an abrupt falling down or caving in of a building or structure or any part of a building or structure.

5.  **Contract documents** means the contract(s) or agreement(s), as may be amended, on file with the **Insured** for the **insured project**.

6.  **Coverage territory** means the coverage territory as shown in Item **6.** of the Declarations.

7.  **Covered cause(s) of loss** means a peril or other type of loss, not otherwise excluded under this Policy.

8.  **Covered property** means property as described in the COVERED PROPERTY Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section which is not otherwise excluded under the PROPERTY NOT COVERED Section, for which the **Insured** is contractually responsible and the value of which has been included in the **total project value**.

9.  **Electronic data** means data, messages, information, coding, programs, instructions or software in a form suitable for communications, storage, or processing by electronic, electromechanical, electromagnetic data processing or electronically controlled production equipment.  **Electronic data** does not include electronic storage media.

10. **Existing property** means existing buildings and/or permanent structures, including equipment and apparatus used to maintain or service the buildings or structures, that existed prior to the inception date of this Policy and is located at the **insured project.  Existing property** does not include personal property, any property located outside of the existing buildings and/or permanent structures, and/or any underground utilities of any kind or description.

11. **Extra expense** means the excess costs over and above the total costs that would normally have been incurred to continue the scheduled progress of the undamaged work in the absence of such loss or damage, including:

    **a.** Labor, supervision, management and administration costs;

    **b.** Equipment rental, temporary use of property;

    **c.** Emergency expenses, additional security; and

    **d.** Demobilization and remobilization of equipment and facilities;

all when necessarily incurred to reduce time delays in the contract schedule.

12. **Fine arts** means paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; porcelains; and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft and **money**.

13. **Fungus, mold or spore** means:

    **a.** **Fungus** including, but not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including **mold**, yeast, rusts, mildews, smuts and mushrooms;

    **b.** **Mold** including, but not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and **fungi** that produce **mold**; and/or

    **c.** **Spore** including, but not limited to, any dormant or reproductive body produced by or arising or emanating out of any **fungus**, **mold**, mildew, plants, organisms or microorganisms.

14. **Insured(s)** means the **Named Insured(s)** and the **Additional Insured(s)**.

15. **Insured project** means the construction project as described in Item **5.** of the Declarations, for which values have been reported and are included in the **total project value**.

16. **Malicious code** means any unauthorized code designed to cause corruption, erasure or alteration of **electronic data.**

17. **Money** means:

    **a.** Currency, coins, bank notes, bullion, traveler checks, registered checks, money orders; and

    **b.** Negotiable and non negotiable instruments or contracts representing money including: tokens, tickets, revenue stamps and other stamps (whether represented by actual stamps or unused value in a meter), and evidence of debt issued in connection with credit card or charge cards that are issued to the **Insured**.

18. **Named Insured** means the Named Insured(s) shown in Item **1.** of the Declarations.

19. **Occurrence** means any one accident, loss, disaster, casualty, incident or series of accidents, losses, disasters, casualties or incidents, including all resultant or concomitant insured losses, not otherwise excluded by this Policy and with respect to:

    **a.** **Terrorism** (to the extent **terrorism** is covered), arises out of the same or related purpose or cause; or

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 23 of 25 |
|---|---|---|

**b.** Covered perils other than **terrorism**, arises out of a single event or originating cause.

The **occurrence** must occur during the **policy period**.

When the term applies to loss or losses from the perils of **windstorm or hail**, **named storm**, **riot, strike or civil commotion**, **vandalism and malicious mischief**, **earth movement**, **flood** or **terrorism,** to the extent any such peril(s) are covered, all losses arising from such peril(s) occurring during a continuous period of 72 hours shall be deemed to be a single **occurrence**. The **Named Insured** may elect the moment at which the 72 hour period shall be deemed to have commenced, which shall not be earlier than the time when the first loss occurs to the **covered property**, but no two such 72 hour periods shall overlap.

If the **occurrence** commences during this **policy period**, then the Company shall treat the entire **occurrence** as occurring during this **policy period**.

20. **Owner's extra expense** means the following expenses:

    **a.** Advertising and marketing expense;

    **b.** Legal and accounting fees;

    **c.** License and permit fees; and

    **d.** Project management fees.

21. **Plans and drawings** means plans, blueprints, drawings, renderings, specifications or other contract documents and models (whether in physical or **electronic data** format) for the **insured project** stored anywhere in the world. Such **plans and drawings** do not include machine programing instructions including, Building Information Modelling ("BIM").

22. **Policy Limit** means the limit of liability shown in Item **9.** of the Declarations.

23. **Policy period** means the policy period as described in Item **4.A.** and Item **4.B.** of the Declarations.

24. **Pollutants or contaminants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances. Waste includes materials to be recycled, reconditioned or reclaimed. **Pollutants or contaminants** do not include **fungus, mold or spore**.

25. **Processing water** means water used directly in the **Insured's** business process that is contained within any enclosed tank, piping system or any other processing equipment.

26. **Project owner(s)** means the project owner(s) shown in Item **5.** of the Declarations.

27. **Riot, strike or civil commotion** means riot or civil commotion including, but not limited to:

    **a.** Acts of striking employees while occupying an **insured project**; and

    **b.** Pilferage or looting occurring at the time and place of a riot or civil commotion.

28. **Total project value** means the total value of **permanent works** (including **landscaping materials**), **temporary works** and **property of others**; plus labor costs that will be expended to construct the

**insured project**; plus site general conditions, construction management fees, and contractor's profit and overhead as stated in the **contract documents** as the "total project value", "total contract value", or other similar description.

29. **Used machinery and equipment** means any mechanical or electrical machine or equipment, including a pressure or non-pressure vessel, which has been previously installed or refurbished or is no longer under a manufacturer's warranty.

30. **Vandalism and malicious mischief** means willful and malicious damage to, or destruction of, **covered property**.

31. **Windstorm or hail** means the direct action of wind or the direct action of hail, whether accompanied by wind or not.  However, **windstorm or hail** does not mean:

    a.  Loss or damage caused by or resulting from frost or cold weather, ice (other than hail), snow or sleet, whether driven by wind or not;

    b.  Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters; or

    c.  Loss or damage caused when weight of snow, rainwater, ice or sleet is a contributing factor to the fall or **collapse** of a building or structure or any part thereof.

**ENDORSEMENT #001**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## DELAY IN COMPLETION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

**SCHEDULE**

I.   **Named Insured and Address:**
A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
17901 COLLINS AVENUE SOUTH
SUNNY ISLES BEACH FL 33160

All coverage under this Delay in Completion Endorsement shall only be provided to the Named Insured shown above (hereinafter, the **Named Insured** for purposes of this endorsement only).  No coverage shall be provided under this endorsement to any other person or entity.

II.   The coverage provided under this Delay in Completion Endorsement is applicable to the entire **insured project** unless otherwise described below:

Not Applicable

III.   **Period of Indemnity**:          540 Calendar Days
IV.   **Anticipated Date of Completion:**   South Tower - 07/01/2021
                                            Villa - 12/31/2021

V.   **Deductible Period:**

|  | **Deductible Period** (per **occurrence** unless otherwise stated below) |
|---|---|
| **Standard Deductible** | 30 Calendar Days<br>☒ per **occurrence** or<br>☐ in the Aggregate, no other **Deductible Periods** apply |
| **Earth Movement, Flood** or **Named Storm** | 30 Calendar Days |
| **Cyber Loss** | 30 Calendar Days |
| **Ingress & Egress** | 30 Calendar Days |
| **Order of Civil or Military Authority** | 30 Calendar Days |
| **Service Interruption** | 30 Calendar Days |
| **Hot Testing** | Not Applicable |
| **LEG 3** | 30 Calendar Days |

If two or more deductible amounts provided above apply to a single **occurrence**, the total to be deducted shall be the largest applicable deductible.  The above deductibles are in addition to any applicable deductibles on the Declarations of this Policy.  If the Standard Deductible applies on a per **occurrence** basis, then such deductible shall apply unless a more specific deductible applies.

**VI. Limits of Liability Applicable to this Endorsement**

The following are subject to and not in addition to the **Policy Limit** and all sublimits of liability shown in Item **10.A.** of the Declarations.  The sublimits of liability stated in this endorsement are per **occurrence** unless otherwise stated.

*If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage, then no coverage is provided for that coverage, whether under the Insuring Agreement or any Additional Coverage.  If the words, NOT APPLICABLE are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

| | | |
|---|---|---|
| **A.** | Aggregate Sublimit of liability for all coverage under this endorsement | $44,022,420 |

The following sublimits of liability **VI.B.** through **VI.I.** are subject to **VI.A.** above:

| | | |
|---|---|---|
| **B.** | Loss of **Rental Income** | $NOT COVERED |
| **C.** | Loss of **Gross Earnings** | $NOT COVERED |
| **D.** | **Cyber Loss** | See Item **10.B.7.** of the Declarations |
| **E.** | Ingress & Egress | 15 Calendar Days, subject to maximum of $2,500,000 |
| **F.** | Order of Civil or Military Authority | 15 Calendar Days, subject to maximum of $1,000,000 |
| **G.** | Service Interruption | 15 Calendar Days, subject to maximum of $1,000,000 |
| **H.** | Other:  NOT COVERED | $NOT COVERED |
| **I.** | **Soft Costs/Additional Expenses** | $44,022,420 |

The following sublimits of liability are subject to **VI.I.** above.

| | | |
|---|---|---|
| **1.** | Interim interest expense | $INCLUDED |
| **2.** | Realty taxes/Ground rents | $INCLUDED |
| **3.** | Leasing/Commission expense | $INCLUDED |
| **4.** | Insurance premiums | $INCLUDED |
| **5.** | Advertising and marketing expense | $INCLUDED |
| **6.** | Legal and accounting fees | $INCLUDED |
| **7.** | License and permit fees | $INCLUDED |
| **8.** | Project management fees | $INCLUDED |
| **9.** | Other: Construction Supervision | $INCLUDED |

 ©**American International Group, Inc.**
**All Rights Reserved.**

| | | |
|---|---|---|
| **10.** | Other: Real State Taxes | $INCLUDED |
| **11.** | Other: Loan Fees and Interest | $INCLUDED |
| **12.** | Other: Sales Deposit & Bond Interest | $INCLUDED |
| **13.** | Other: Project G & A | $INCLUDED |
| **14.** | Other: Soft Cost Contingency | $INCLUDED |

No coverage or Additional Coverage shall be provided unless the **delay(s)** exceeds the **anticipated date of completion** and then such coverage shall only be provided for the **delay(s)** that is/are in excess of such **anticipated date of completion**, subject to the applicable **deductible period.** All covered losses and expenses are subject to the applicable **Policy Limit**, sublimits of liability, **period of indemnity** or calendar days as stated in the above Schedule.

## A.  INSURING AGREEMENT

1. Subject to all terms and conditions of this Policy, in the event of:

    a. Direct physical loss of or damage to **covered property, landscaping materials** or **plans and drawings** by a **covered cause of loss**, or

    b. Corruption, erasure or alteration of:

        i. **Electronic data** in the **building or other systems**, due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss**,

        ii. **Plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code**, or

    c. **Building or other systems** that are rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems**

    (hereinafter, collectively Subsections **1.b.** and **1.c.** are referred to as **cyber loss**), the Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** sustained during the **period of indemnity** as a result of **delay** in completion of the **insured project**, on an actual loss sustained basis.

2. The Company shall also indemnify the **Named Insured** for reasonable expenses, over and above normal operating expenses, during the **period of indemnity**, that are necessarily incurred for the purpose of reducing any loss covered under this endorsement, but in no event shall the Company be liable for an amount greater than that for which the Company would have been liable had there been no covered **delay**.

## B.  ADDITIONAL COVERAGES

1. **Ingress & Egress**

    The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if ingress to or egress from the **insured project** is prohibited as a result of direct

physical loss or damage by a **covered cause of loss** to property not insured under this Policy, provided that such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the prohibition of ingress or egress to the **insured project** for the lesser of:

**a.**   The number of calendar days shown for Ingress & Egress in the above Schedule, or

**b.**   Until the ingress or egress is no longer prohibited,

subject to the Ingress & Egress sublimit of liability shown in the above Schedule.

**2.   Order of Civil or Military Authority**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if an order of civil or military authority prohibits access to the **insured project**, provided that: (1) such order is a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy and (2) such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with such order that prohibits access to the **insured project** for the lesser of:

**a.**   The number of calendar days shown for Order of Civil or Military Authority in the above Schedule, or

**b.**   Until access to the **insured project** is no longer prohibited,

subject to the Order of Civil or Military Authority sublimit of liability shown in the above Schedule.

**3.   Service Interruption**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** resulting from the interruption of incoming electricity, steam, gas, fuel or water caused by direct physical loss or damage by a **covered cause of loss** to a service provider's transmission and distribution lines and related plants, substations and equipment located outside of the **insured project**.  Notwithstanding the foregoing, the Company will not pay for any interruption intentionally caused by any **Insured** or any service provider.

If a service provider's transmission and distribution lines and related plants, substations and equipment that sustain loss or damage are part of the **insured project** and included in the **total project value**, the Service Interruption sublimit of liability shown in the above Schedule shall not apply, nevertheless the Aggregate Sublimit of Liability for all coverage under this endorsement shown in **VI.A.** above shall apply.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

©American International Group, Inc.
All Rights Reserved.

The Company shall only provide coverage for **delay** associated with the interruption of incoming electricity, steam, gas, fuel, or water to the **insured project** for the lesser of:

**a.** The number of calendar days shown for Service Interruption in the above Schedule, or

**b.** Until such incoming utilities are restored,

subject to the Service Interruption sublimit of liability shown in the above Schedule.

## C.  ADDITIONAL EXCLUSIONS AND LIMITATIONS

In addition to all other exclusions of this Policy, the Company will not be liable under this endorsement for any loss or increase in **delay** caused by, resulting from or arising out of any of the following:

**1.** The enforcement of any law, ordinance, governmental directive or standard regulating removal, repair, construction or reconstruction of any property;

**2.** Changes made in the design, plans, specifications or other contract documents in order to effect the repair or replacement of any property;

**3.** Non-availability of funds;

**4.** Import, export or customs restrictions and/or regulations;

**5.** The breach, suspension, lapse or cancellation of or the failure to obtain, maintain or extend any permit, lease, license, contract or purchase orders;

**6.** The interference by strikers or other persons directly or indirectly with the completion of the **insured project**, including the transportation of property, the construction, rebuilding, repairing or replacing of any property or the occupancy or use of the premises where the **insured project** is located;

**7.** The failure to use due diligence and dispatch in restoring any property to the condition existing prior to the loss or damage;

**8.** Any deviation in the **construction schedule** or a revised **construction schedule** except for a deviation that is the result of covered loss or damage;

**9.** Any disruption in the normal movement of **covered property** unless such **covered property** is damaged by a **covered cause of loss** during **inland transit**;

**10.** Re-erection of any tower or pole crane(s), unless such tower or pole crane is specifically covered under Schedule A of the Contractors' Equipment Endorsement. or

**11.** Loss or damage to that part of the **insured project** which at the time of loss or damage has been put to its intended use or has become operational.

## D.  ADDITIONAL LOSS ADJUSTMENT CONDITIONS

In addition to the conditions set forth in the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section of this Policy, the following additional conditions apply to this endorsement:

©American International Group, Inc.
All Rights Reserved.

1. Upon written notification of any loss or damage under the terms and conditions of this Policy, the **Insured** shall provide the Company with all applicable **construction schedules** as requested by the Company.

2. Upon request by the Company, the **Insured** shall make available all other records and information relevant to the determination of any claim for loss, damage and/or expenses or any audit under this endorsement.

3. In the event of payment under this endorsement, the Company may conduct an audit of the **Named Insured's** records for a reasonable period of time, to be determined by the Company, (typically 12 months) after actual commencement of operations to determine the loss under this endorsement, as well as any expenses incurred by the **Named Insured** related to reducing such loss. Due consideration shall be given to seasonal patterns, trends, variations or special circumstances which would have affected the business had the **delay** not occurred, so that the amount adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the **delay**, would have been realized. Any amount saved with respect to labor costs, charges and expenses that have ceased or reduced during the **period of indemnity** and liquidated damages the **Named Insured** is entitled to receive from others, whether collectible or not, shall be deducted from the loss during the **period of indemnity**.

In the event the amount of loss determined by the audit is less than or exceeds the sum paid by the Company for loss covered under this endorsement during the **period of indemnity**, the difference between the two amounts shall be paid by the Company or to the Company by the **Named Insured**, whichever is applicable.

## E.  ADDITIONAL GENERAL CONDITIONS

In addition to the conditions set forth in the GENERAL CONDITIONS Section of this Policy, the following additional conditions apply to this endorsement:

1. In the event loss, damage or other circumstances require that the project completion date shown on any critical path, time line, bar chart or other scheduling vehicle is revised to extend such completion date, the **Insured** shall establish a revised **construction schedule** and furnish the same to the Company. The new date established in such revised **construction schedule** shall become the **anticipated date of completion**. The Company shall have the right to change the **anticipated date of completion**, even if the **Insured** has failed to provide such revised **construction schedule**.

There shall be no amendment to the **anticipated date of completion** in the event any critical path, time line, bar chart or other scheduling vehicle is revised to compress or accelerate the **construction schedule**, without the written notice to the Company and endorsement by the Company hereto.

2. The **Insured** shall take and allow all reasonable measures to minimize the extent of any interference with the **construction schedule** so as to avoid or diminish any potential **delay**. The **Insured** shall begin normal operations as soon as practicable.

## F.  ADDITIONAL DEFINITIONS

The definitions of this Policy apply to this endorsement. However, the following additional definitions apply to this endorsement and supersede any similar definitions of this Policy to the contrary.

1. **Anticipated date of completion** means: (1) the date as shown in the above Schedule as the Anticipated Date of Completion or (2) the revised **anticipated date of completion** in

accordance with the Subsection **E.1.** of the Additional General Conditions Subsection of this endorsement.  For calculation of loss under this endorsement, the Company shall use the applicable **anticipated date of completion** at the time of the loss or damage.

2. **Construction schedule** means the schedule utilized in the construction management program through software that shows the construction operations, the times for starting and completion of operations, the period of the operations, the interrelationships between the operations and the critical path that identifies the critical operations.

3. **Deductible period** means the applicable number of calendar days shown in Item **V.** of the above Schedule beginning with the **anticipated date of completion**.  Losses are only payable in excess of the applicable **deductible period**.

4. **Delay** means the period of time between the **anticipated date of completion** and the actual date on which occupancy or commercial service can commence with respect to the entire **insured project** or the **insured project** as described in Item **II.** of the Schedule, whichever is applicable, with the exercise of due diligence and dispatch.

5. **Gross earnings** means gross revenues from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

6. **Insured project** means the entire **insured project** or the part of the **insured project** as identified in Item **II.** of the above Schedule.  The words, **insured project**, also include the definition in the Completed Value Builders Risk Policy.

7. **Period of indemnity** means the number of calendar days for which coverage is provided under this endorsement, regardless of the number of **occurrences**, not to exceed the number of days shown in Item **III.** of the above Schedule.  For each **occurrence**, such calendar days or remaining calendar days shall commence upon the expiration of the applicable **deductible period**.  The **period of indemnity** shall not be limited by the end of the **policy period**.

8. **Rental income** means revenues from rentals and leases from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

9. **Soft costs/additional expenses** means such expenses as shown in Item **VI.I.1.** through **VI.I.9.** of the above Schedule, inclusive, in relation to the **insured project**.

All other terms and conditions of the Policy remain the same.

**ENDORSEMENT #002**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

**SCHEDULE**

Sublimits of Liability and Deductibles (per **occurrence**):

**A.** The following sublimit of liability is added to Item **10.B.** of the Declarations:

Sublimit for repairing or replacing faulty or defective **covered property**  $433,500,000

**B.** The following deductible is added to Item **11.** of Declarations:

Deductible applicable to repairing or replacing faulty or defective **covered property**  $100,000

The above deductible shall apply in addition to the applicable deductible(s) in Item **11.A.** through **11.G.**, inclusive, as shown on the Declarations.

**C.** The following sublimit of liability is added as Item **VI.J.** to the Delay In Completion Endorsement:

Provided that Delay In Completion coverage is provided under this Policy, the Sublimit for Delay in Completion resulting from repair or replacement of faulty or defective **covered property**  $44,022,420

The **Deductible Period** shown in the Delay in Completion Endorsement applies to the above coverage in this Subsection **C.**

Additional Premium:   $70,055

_____

In consideration of the Additional Premium shown in the above Schedule, Exclusion **B.10.** of the PERILS EXCLUDED Section is deleted in its entirety and replaced with the following:

**10. a.**  Faulty workmanship, material, construction or installation from any cause; or

**b.**  Any fault, defect, error, deficiency or omission in any design, plans, or specifications,

all unless direct physical loss or damage not otherwise excluded by this Policy ensues.  If direct physical loss or damage not otherwise excluded by this Policy ensues, then the Company shall pay for the following only:

**a.**  Such ensuing direct physical loss or damage to **covered property**, and/or

**b.**  Subject to the sublimit(s) of liability shown in the above Schedule, repairing or replacing (whichever is less) with like kind and quality at the time and place of the loss the damaged part of the faulty or defective **covered property**.

| 125699 (10/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 1 of 2 |

However, in no event shall the Company pay any loss, cost, damage or expense to: (1) improve the original workmanship, materials, construction, installation, design, plans or specifications or (2) redesign any design, plans or specifications.

No portion of the **covered property** shall be regarded as damaged solely by virtue of the existence of: (1) any faulty workmanship, material, construction or installation, or (2) any fault, defect, error, deficiency or omission in any design, plans, or specifications.

NOTICE:  THIS ENDORSEMENT IS BASED UPON LEG 3 PROVISIONS, BUT MAY DIFFER FROM SUCH CURRENT OR PRIOR LEG 3 PROVISIONS.

All other terms and conditions of the Policy remain the same.

ENDORSEMENT #003

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## LENDER LOSS PAYEE OR LOSS PAYEE ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

**Lender Loss Payee or Loss Payee:**
Bank OZK, its successors and assigns, as their interests may appear
625 Court Street
Clearwater, FL 33756

_____

1.  Subject to the terms and conditions of this Policy, the Company will not pay any Lender Loss Payee or Loss Payee more than its financial interest in: (1) **covered property** which is part of the **insured project** or (2) **existing property** (but only if coverage for **existing property** is provided by endorsement) (hereinafter, (1) and (2) are collectively referred to as **covered property**).

2.  Any Lender Loss Payee or Loss Payee shown in the above Schedule is a creditor, including a Lender Loss Payee or trustee, whose interest in the **covered property** is established by such written instruments as:

    a.  Warehouse receipts;

    b.  A contract for deed;

    c.  Bills of lading;

    d.  Financing statements;

    e.  **Contract documents**; or

    f.  Mortgages, deeds of trust, or security agreements.

3.  For **covered property** for which both the **Insured** and a Lender Loss Payee or Loss Payee have an insurable interest:

    a.  The Company will pay for covered loss or damage to each Lender Loss Payee or Loss Payee in their order of precedence, as interests may appear.

    b.  The Lender Loss Payee or Loss Payee has the right to receive loss payment even if the Lender Loss Payee or Loss Payee has started foreclosure or similar action on the **covered property**.

    c.  If the Company denies the **Insured's** claim because of the **Insured's** acts or because the **Insured** has failed to comply with the terms of this Policy, the Lender Loss Payee or Loss Payee shall still have the right to receive loss payment, if the Lender Loss Payee or Loss Payee:

**(1)** Pays any premium due under this Policy at the Company's request if the **Named Insured** has failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from the Company of the **Insured's** failure to do so; and

**(3)** Has notified the Company of any change in ownership, occupancy or substantial change in risk known to the Lender Loss Payee or Loss Payee.

All of the terms of this Policy will then apply directly to the Lender Loss Payee or Loss Payee.

**d.** If the Company pays the Lender Loss Payee or Loss Payee for any loss or damage and denies payment to the **Insured** because of the **Insured's** acts or because the **Insured** has failed to comply with the terms of this Policy:

**(1)** The Lender Loss Payee's or Loss Payee's rights will be transferred to the Company to the extent of the amount of the Company's payment; and

**(2)** The Lender Loss Payee or Loss Payee's rights to recover the remaining amount of the Lender Loss Payee or Loss Payee's claim will not be impaired.

At the Company's option, the Company may pay to the Lender Loss Payee or Loss Payee the whole principal on the debt plus any accrued interest.  In this event, the **Insured** will pay the **Insured's** remaining debt to the Company.

**e.** If the Company cancels this Policy, the Company will give written notice to the Lender Loss Payee or Loss Payee at least:

**(1)** 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if the Company cancels for any other reason.

All other terms and conditions of the Policy remain the same.

ENDORSEMENT #004

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## PILING, SHEET PILING & CAISSON LIMITATION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

In addition to all other exclusions of the Policy, the Company shall not pay any costs or expenses for:

1.  Replacing, repairing, realigning or rectifying casings, piles, sheet piles or caissons which are misplaced, misaligned, jammed, abandoned or damaged during installation, extraction or construction;

2.  Replacing, repairing, realigning or rectifying casings, piles, sheet piles or caissons which have become obstructed by: (a) jammed or damaged piling equipment or (b) jammed or damaged casings;

3.  Rectifying defective, disconnected or declutched piling, sheet piles or caissons;

4.  Rectifying any leakage of any kind or infiltration of any material;

5.  Filling voids or replacing lost bentonite;

6.  Replacing, repairing, realigning or rectifying profiles and dimensions; or

7.  Failure to reach design load bearing capacity or to pass any load bearing test.  No coverage is provided for any loss or damage as a result of any load bearing test, notwithstanding any other provision of this endorsement to the contrary.

However, this endorsement shall not apply:

1.  When any of the foregoing are the result of direct physical loss of or damage to other **covered property**, not otherwise excluded by this Policy; or

2.  To direct physical loss of or damage to other **covered property** which results from any of the foregoing.

All other terms and conditions of the Policy remain the same.

| 125703 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 1 of 1 |
|---|---|---|

**ENDORSEMENT #005**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## POLICY CHANGES ENDORSEMENT

The following item(s):

| | | | |
|---|---|---|---|
| ☐ | Insured's Name | ☐ | Insured's Mailing Address |
| ☐ | Policy Number | ☐ | Company |
| ☐ | Effective/Expiration Date | ☐ | Insured's Legal Status/Business of Insured |
| ☐ | Payment Plan | ☐ | Premium Determination |
| ☐ | Additional Interested Parties | ☐ | Coverage Forms and Endorsements |
| ☐ | Limits/Exposures | ☐ | Deductibles/Waiting Periods |
| ☐ | Covered Property/Location Description | ☐ | Additional Location(s) |
| ☐ | Underlying Insurance | ☒ | Special Terms and Conditions |

is (are) changed to read **{See Additional Page(s)}:**

The above amendments result in a change in the premium as follows:

| ☒ | **NO CHANGES** | ☐ | **ADDITIONAL PREMIUM** | **RETURN PREMIUM** |
|---|---|---|---|---|
| | | | $ | $ |

**POLICY CHANGES ENDORSEMENT DESCRIPTION**

**FLOOD AND NAMED STORM AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided by the Policy:

I. Subsection 2. of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and is replaced with the following:

2. Flood, which means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water (other than storm surge or storm tide), overflow or rupture of a dam, levy, dike or other surface containment structure, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.  A tsunami shall not be considered a flood.

II. Subsection 4. of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and is replaced with the following:

4. Named storm, which means:

a A storm that, at any time, has been declared by the United States National Weather Service or another meteorological authority to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm; and

b. Storm surge and storm tide, or the spray therefrom, all whether: (1) driven by wind or not or (2) related to a storm described in Subsection 4.a. above or not.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

ENDORSEMENT #006

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## FLORIDA CANCELLATION/NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy, and 2) "you", "your", "named Insured" and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

It is hereby agreed and understood that the cancellation provision of this policy is to be deleted in its entirety and to be replaced with the following:

A.      The Insured shown in the Declarations may cancel this policy by mailing or delivering to the Insurer advance written notice of cancellation.

B.1.    Cancellation for Policies in Effect Ninety (90) Days or Less

If this policy has been in effect ninety (90) days or less the Insurer may cancel this policy by mailing or delivering to the Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

(a)     Ten (10) days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or

(b)     Twenty (20) days before the effective date of cancellation if the Insurer cancels for any other reason, except the Insurer may cancel immediately if there has been:

1.      A material misstatement or misrepresentation; or
2.      A failure to comply with underwriting requirements established by the Insurer.

B.2.    Cancellation for Policies in Effect for More Than Ninety (90) Days

If this policy has been in effect for more than ninety (90) days the Insurer may cancel this policy only for one or more of the following reasons:

(a)     Nonpayment of premium;

(b)     The policy was obtained by a material misstatement;

(c)     There has been a failure to comply with underwriting requirements established by us within ninety (90) days of the date of effectuation of coverage;

(d)     There has been a substantial change in the risk covered by the policy; or

(e)     The cancellation is for all insureds under such policies for a given class of insureds.

If the Insurer cancels this policy for any of these reasons, the Insurer will mail or deliver to the Named Insured written notice of cancellation, accompanied by the reasons for the cancellation at least:

1.      Ten (10) days before the effective date of cancellation if cancellation is for the reason stated in B.2.(a) above; or

2.  Forty-five (45) days before the effective date of cancellation if cancellation is for the reasons stated in B.2.(b), (c), (d) or (e) above.

3.  One hundred twenty days (120) before the effective date of cancellation of a commercial residential property insurance policy if cancellation is for the reasons stated in B.2.(b),(c),(d) or (e) above.

B.3.  If this policy is cancelled, the Insurer will send the Named Insured any premium refund due. If the Insurer cancels, the refund will be pro rata. If the Named Insured cancels, the refund may be less than pro rata, however, such refund will not be less than 90% of the pro rata unearned premium. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect.

It is hereby understood that the Non-renewal provision of this policy is deleted and replaced with the following:

C.1.  Non-Renewal

(a)  If the Insurer decides not to renew this policy the Insurer will mail or deliver to the Insured written notice of nonrenewal, accompanied by the reason for nonrenewal, at least forty-five (45) days prior to the expiration of this policy.  Written notice of nonrenewal will be provided at least one hundred twenty (120) days prior to the expiration of a commercial residential property insurance policy.

(b)  Any notice of nonrenewal will be mailed or delivered to the Insured's last mailing address known to the Insurer.  If notice is mailed, proof of mailing will be sufficient proof of notice.

C.2.  Renewal

The Insurer shall give the named insured at least forty-five (45) days advance written notice of the renewal premium.

**ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN THE SAME.**

## FLORIDA STATE AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided by the Policy.

The following changes apply only to locations covered by the Policy that are in the State of Florida.

**A.** The SETTLEMENT OF CLAIMS Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section is deleted in its entirety and replaced by the following:

**SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable shall be payable:

**1.** Within 20 days after proof of loss, as herein required, is received and agreed to by the Company; or

**2.** Within 30 days after the Company receives the proof of loss and:

**a.** There is an entry of a final judgment; or

**b.** The amount of loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

**3.** Within 60 days of receiving notice of claim, unless the Company denies the claim during that time or factors beyond the Company's control reasonably prevent such payment. If a portion of the claim is denied, then the 60-day time period for payment of claim relates to the portion of the claim that is not denied.

Subsection **3**. applies only to the following:

**a.** A claim under a Policy covering residential property, if such property is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy; or

**b.** A claim for building coverage, if such property is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, if the structure is 10,000 square feet or less and the Policy covers only locations in Florida.

The Company shall have the option to take all, or any part of the structure at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing the **Named Insured** with notice of the Company's intention to do so within 60 days after the Company's receipt of the proof of loss herein required.

**B.** The SUIT AGAINST COMPANY Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section is deleted in its entirety and replaced by the following:

**SUIT AGAINST COMPANY**

No one may bring a legal action against the Company under this Policy unless:

**1.** There has been full compliance with all of the terms of this Policy; and

**2.** Legal action against the Company involving direct physical loss or damage to property must be brought within 5 years from the date the loss occurs.

**C.** If a building is covered as **existing property** under Damage to Existing Property Endorsement, attached to and forming part of this Policy, then with respect to such a building, Subsection **e.** of Subsection **1.** Earth movement of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY  Section is deleted in its entirety and replaced with the following :

    **e.** Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, and subsidence.

**D.** If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then with respect to such a building, Subsection  **1.**  Earth movement of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is amended to include**:**

    **Earth movement** does not include **sinkhole loss** or **catastrophic ground cover collapse.**

**E. SINKHOLE LOSS AND CATASTROPHIC GROUND COVER COLLAPSE**

If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then the following provisions are added to the Policy as SPECIFIED COVERED CAUSES OF LOSS with respect to such a building:

**1.** **Sinkhole loss,** meaning loss or damage to a building when **structural damage** to the covered building, including the foundation, is caused by settlement or systematic weakening of the earth supporting the building, only if the settlement or systematic weakening results from contemporaneous movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

    **a.** Coverage for **sinkhole loss** includes stabilization of the building (including land stabilization) and repair to the foundation, provided such work is in accordance with the requirements of Florida Insurance Law and in accordance with the recommendation of a professional engineer and with notice to the **Named Insured**. The professional engineer must be selected or approved by the Company. However, until the **Named Insured** or **project owner(s)**, whichever is applicable, enters into a contract for performance of building stabilization or foundation repair in accordance with the recommendations of the professional engineer as set forth in a report from the Company:

        **(1)** The Company will not pay for underpinning or grouting or any other repair technique performed below the existing foundation of the building; and

        **(2)** The Company's payment for **sinkhole loss** to the covered building will be limited to the actual cash value of the loss to such property.

    The **Named Insured** or **project owner(s)**, whichever is applicable, must enter into a contract for the performance of building stabilization and/or foundation repair in accordance with the aforementioned recommendations, within 90 days after the Company notifies the **Named Insured** that there is coverage for the **sinkhole loss**. After the **Named Insured** or **project owner(s)**, whichever is applicable, has entered into such contract, the Company will pay the amounts necessary to begin and perform such repairs as the work is performed and the expenses are incurred.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

However, if the professional engineer determines, prior to the **Named Insured** or **project owner(s)**, whichever is applicable, entering into the aforementioned contract or prior to the start of repair work, that the repairs will exceed the applicable **Policy Limit**, the Company must either complete the recommended repairs or pay that **Policy Limit** upon such determination. If the aforementioned determination is made during the course of repair work and the Company has begun making payments for the work performed, the Company must either complete the recommended repairs or pay only the remaining portion of the applicable **Policy Limit** upon such determination. The most the Company will pay for the total of all **sinkhole loss**, including building and land stabilization and foundation repair, is the applicable **Policy Limit** on the affected building.

The stabilization and all other repairs to the covered building must be completed within 12 months after entering into the contract for the performance of these repairs, unless:

**(1)** There is a mutual agreement between the **Named Insured** and the Company;

**(2)** The claim is involved with the neutral evaluation process;

**(3)** The claim is in litigation; or

**(4)** The claim is under appraisal or mediation.

b.   **Sinkhole loss** does not include:

**(1)** Sinking or collapse of land into man-made underground cavities; or

**(2)** **Earth movement**.

c.   With respect to a claim for alleged **sinkhole loss**, the following provision is added:

Following receipt by the Company of a report from a professional engineer or professional geologist on the cause of loss and recommendations for land stabilization and repair of property, or if the Company denies the **Insured's** claim, the Company will notify the **Named Insured** or **project owner(s)**, whichever is applicable, of its right to participate in a neutral evaluation program administered by the Florida Department of Financial Services (hereinafter referred to as the "Department"). For alleged **sinkhole loss** to commercial residential or farm residential properties, this program applies instead of any mediation procedure set forth elsewhere in this Policy, but does not invalidate the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

The **Named Insured** or **project owner(s)**, whichever is applicable, or the Company, may file a request with the Department for neutral evaluation; the other party must comply with such request. The Company will pay reasonable costs associated with the neutral evaluation, regardless of which party makes the request. But if a party chooses to hire a court reporter or stenographer to contemporaneously record and document the neutral evaluation, that party must bear the costs of those services. The neutral evaluator will be selected from a list maintained by the Department. The recommendation of the neutral evaluator will not be binding on the **Named Insured** or **project owner(s)**, whichever is applicable, or the Company.

Participation in the neutral evaluation program does not change the **Named Insured's** or **project owner(s)'**, whichever is applicable, right to file suit against the Company in accordance with the SUIT AGAINST COMPANY Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section in this Policy, except that the time for filing suit is extended for a period of 60 days following the conclusion of the neutral evaluation process or five (5) years, whichever is later.

d. Coverage for **sinkhole loss** under this endorsement does not increase the **Policy Limit**. Even if the loss or damage qualifies under, or includes, **catastrophic ground cover collapse** (addressed elsewhere in this endorsement) and **sinkhole loss**, only one **Policy Limit** will apply to such loss or damage.

e. The following provision is added to the REQUIREMENTS IN CASE OF LOSS OR DAMAGE Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section:

A claim for **sinkhole loss**, including but not limited to initial, supplemental and reopened claims is barred unless notice of claim is provided to the Company in accordance with the terms of this Policy within two (2) years after the **Insured** knew or reasonably should have known about the **sinkhole loss**.

f. If the Company denies the **Insured's** claim for **sinkhole loss** without performing testing under section 627.7072, Florida Statutes, the **Named Insured** or **project owner(s)**, whichever is applicable, may demand testing by communicating such demand to the Company in writing within 60 days after the **Named Insured** receives our denial of the claim. The **Named Insured** or **project owner(s)**, whichever is applicable, is responsible for 50% of the testing costs, or $2,500, whichever is less. If the Company's professional engineer or geologist provides written certification, pursuant to section 627.7073, that there is **sinkhole loss**, the Company will reimburse the **Named Insured** or **project owner(s)**, whichever is applicable, for the testing costs.

g. The **Insured** may not accept a rebate from any person performing repairs for **sinkhole loss** covered under this endorsement. If the **Insured** receives a rebate, coverage under this endorsement is void and the **Insured** must refund the amount of the rebate to the Company.

h. If the Company denies the **Insured's** claim for **sinkhole loss** upon receipt of written certification from a professional engineer or geologist, pursuant to section 627.7073, that there is no **sinkhole loss** or that the cause of the damage was not sinkhole activity, and if the sinkhole claim was submitted without good faith grounds for submitting such claim, the **Named Insured** or **project owner(s)**, whichever is applicable, shall reimburse the Company for 50% of the actual costs of the analyses and services provided under sections 627.7072 and 627.7073, or $2,500, whichever is less. The **Named Insured** or **project owner(s)**, whichever is applicable, is not required to pay such reimbursement unless it requested the analysis and services and the Company, before ordering the analysis, informed the **Named Insured** or **project owner(s)**, whichever is applicable, in writing of the potential for reimbursement and gave the **Named Insured** or **project owner(s)**, whichever is applicable, the opportunity to withdraw the claim.

i. As a precondition to accepting payment for **sinkhole loss**, the **Named Insured** or **project owner(s)**, whichever is applicable, must file with the county clerk of court, a copy of any sinkhole report regarding the property which was prepared on behalf or at the **Named Insured** or **project owner(s)**, whichever is applicable, request. The **Named Insured** or **project owner(s)**, whichever is applicable, will bear the cost of filing and recording the sinkhole report.

2. **Catastrophic Ground Cover Collapse**

The Company will pay for direct physical loss or damage to a covered building caused by or resulting from **catastrophic ground cover collapse**, meaning geological activity that results in all of the following:

a. The abrupt collapse of the ground cover;

b. A depression in the ground cover clearly visible to the naked eye;

c. **Structural damage** to the building, including the foundation; and

    **d.**  The insured structure being condemned and ordered to be vacated by the governmental agency authorized by law to issue such an order for that structure.

However, damage consisting merely of the settling or cracking of a foundation, structure or building does not constitute loss or damage resulting from a **catastrophic ground cover collapse**.

Coverage for **catastrophic ground cover collapse** does not increase the **Policy Limit**. Regardless of whether loss or damage attributable to **catastrophic ground cover collapse** also qualifies as **sinkhole loss** or **earth movement** (if either or both of those causes of loss are covered under this Policy), only one **Policy Limit** will apply to such loss or damage.

**3.**  For the purposes of **Sinkhole Loss** and **Catastrophic Ground Cover Collapse** coverages only, the following definitions are added to the Policy:

    **a.**  **Structural damage** means a building, regardless of the date of its construction, has experienced the following:

      **(1)**  Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement related damage to the interior such that the interior building structure or members become unfit for service or represent a safety hazard as defined within the Florida Building Code;

      **(2)**  Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement related damage to the **primary structural members** or **primary structural systems** and that prevents those members or systems from supporting the loads and forces they were designed to support to the extent that stresses in those **primary structural members** or **primary structural systems** exceed one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location;

      **(3)** Damage that results in listing, leaning, or buckling of the exterior load bearing walls or other vertical **primary structural members** to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

      **(4)** Damage that results in the building, or any portion of the building containing **primary structural members** or **primary structural systems**, being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

      **(5)** Damage occurring on or after October 15, 2005, that qualifies as substantial structural damage as defined in the Florida Building Code.

    **b.**  **Primary structural member** means a structural element designed to provide support and stability for the vertical or lateral loads of the overall structure.

    **c.**  **Primary structural system** means an assemblage of **primary structural members**.

All other terms and conditions of the Policy remain the same.

**ENDORSEMENT #007**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

# CLAIMS COOPERATION ENDORSEMENT

This endorsement modifies insurance provided by this Policy:

The following is added to the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section:

For the purpose of this endorsement:

1. **Assigned adjuster** means the Assigned Adjuster as shown in the Schedule below.

2. **Policy** means the Policy issued by the Lead Insurer set forth in the Schedule below.

3. **Program** means all policies issued by the **quota share insurers** participating in the coverage for this **insured project**.

4. **Quota share insurers** means the quota share insurers specifically listed in the Schedule below.

### SCHEDULE

| Quota Share Insurers | Quota Share Participation | Insurer Type | Signature |
|---|---|---|---|
| New Hampshire Insurance Company (AIG) | 35% | Lead Insurer | *[signature]* |
| Allianz Global Risks US Insurance Company | 25% | **Participating insurer** | |
| Starr Indemnity and Liability Company | 25% | **Participating insurer** | |
| Liberty Mutual Insurance Company | 10% | **Participating insurer** | |
| General Security Indemnity Company of Arizona | 5% | **Participating insurer** | *[signature]* |

The **quota share insurers** may be changed by written endorsement attached to and forming a part of this **policy**. The rights and obligations contained herein shall only apply to the **quota share insurers**.

**Assigned Adjuster:**
Mike Kaemph at York (Chicago)
_____

With respect to any loss or damage that may give rise to a claim under this **program**, the following terms and conditions shall apply:

1. The **quota share insurers** agree to use the **assigned adjuster** for the adjustment of all claims reported under this **program**. This assignment may be changed by mutual consent of the **Named Insured** and the **quota share insurers.**

2. The **assigned adjuster** shall report to the **quota share insurers** and coordinate all activities involving any claim reported under the **program**, including communicating with the **quota share insurers**, in

accordance with the terms and conditions set forth in this **policy**. Notwithstanding the foregoing, the **quota share insurers** shall be the sole determiners of whether coverage is provided for each of their respective policies.

3. The **Named Insured** or Producer as shown in the Declarations shall notify the Lead Insurer and the **assigned adjuster** of such loss or damage that may give rise to a claim under this **program** and in turn, the **assigned adjuster** shall notify the **quota share insurers** of the same as soon as practicable, but in no event later than 48 hours after receiving such notice.

4. The **assigned adjuster** may retain third parties with respect to the handling of the loss adjustment, including accountants, consultants, engineers and other experts as necessary and such third parties shall also report to the **quota share insurers**.

5. The other **quota share insurers** shall have the right, if they so choose, to attend all meetings relating to the investigation, negotiation, adjustment or settlement of the claim, and shall be entitled to receive all information or claim related documentation from the **assigned adjuster** to the same extent that the Lead Insurer obtains such information or participates in such meetings.

6. The Lead Insurer shall cooperate with the other **quota share insurers** with respect to all investigations, negotiations, adjustments and settlements in connection with any such claim.

7. All fees, expenses and other costs incurred in connection with any adjustment shall be shared among all **quota share insurers** in accordance with their respective Quota Share Participation as shown in the above Schedule.

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative



| | ©**American International Group, Inc.** **All Rights Reserved.** | Page 2 of 2 |



## COMPLETED VALUE BUILDER'S RISK POLICY

Security as

# LIBERTY MUTUAL INSURANCE COMPANY

(A Massachusetts Stock Insurance Company, hereinafter the "Insurer")

175 Berkley Street, Boston MA 02116

Toll-free number: 1-800-677-9163

| | | | |
|---|---|---|---|
| Named Insured: | A3 Development LLC, LPLA Partners, LP, The Trump Group | Producer: | Willis of Florida, Inc. |
| Mailing Address: | 17901 Collins Avenue South Sunny Isles Beach FL 33160 | Address: | Willis Towers Watson 1450 Brickell Ave., Ste. 1450 Miami, FL 33131 |
| Policy Number: | 4NABQE6J001 | Commission: | 10% |
| Project: | 17901 Collins Avenue South | | |

## POLICY DECLARATIONS

In return for the payment of the deposit premium, and subject to all the terms of this policy, the Insurer agrees with the Named Insured to provide the insurance as stated in this policy.

This Policy covers for a 10% (percent) interest in this insurance and the Insurer shall not be liable for more than 10% (percent) interest of the Limit(s) of Liability, Sublimit(s) of Liability, Annual Aggregate Limit(s) of Liability and/or Term Aggregate Limit(s) of Liability stated in this Policy or any endorsements attached thereto.

| | |
|---|---|
| Deposit Premium (excluding Other Premium/Charges): | $213,127 |

Other Premium/Charges:

| | |
|---|---|
| 1. Delay in Start Up Endorsement Premium (if attached to this policy): | $34,302 |
| 2. Terrorism Risk Insurance Program Reauthorization Act of 2007 (TRIA) Deposit Premium: | $2,627 |
| 3. Deposit State or Municipal Taxes, Surcharges and Other Miscellaneous Charges: (see State or Municipal Taxes, Surcharges and Other Miscellaneous Charges Summary) | Not Applicable |
| Total Deposit Premium and Other Premium/Charges: | $250,050 |
| Liberty Mutual Insurance Corporation Total Deposit Premium and Other Premium/Charges: | $250,050 |



**COMPLETED VALUE BUILDER'S RISK POLICY**

Forms & Endorsements Attached At Issue:

Manuscript AIG Leading Policy 043820532 pages 1-25 and Endorsements 1-6
TRIA-N004-0315 Disclosure Endorsement No 7
TRIA-E002-0315 Cap on Losses Endorsement No 8
U.S. Trade Sanctions (OFAC) Endorsement No 9
Notice of Membership in Liberty Mutual Holding Company Inc.
Liberty Insurance Underwriters Notification of Claims

By: _____
   Authorized Company Representative or Countersignature (as required)

**In witness whereof, the company has caused this policy to be signed by its President and its Secretary at Boston, Massachusetts, and countersigned by a duly authorized representative of the company.**

PRESIDENT
David H. Long

VICE PRESIDENT and SECRETARY
Mark C. Touhey

**Important Notice to Our Insureds/Brokers/Agents**

## NOTIFICATION OF CLAIMS

**Upon knowledge of any occurrence likely to give rise to a claim hereunder, "you" must give immediate notice to:**

**Marc Giovannetti**
**Senior Claims Manager**
**Liberty International Underwriters**
**US Energy & Construction Claims**
**55 Water Street, 23rd Floor**
**New York, NY  10041**

**Direct Line:  212-208-4231**

**Email:  FirstPartyClaims@LibertyIU.com**



Energy and Engineered Risk Division

## <u>IMPORTANT NOTICE</u> – TO BE KEPT WITH POLICY

## <u>WHAT TO DO WHEN A LOSS OCCURS</u>

Report as soon as practicable, every incident, loss or damage which may become a claim to:

Mr. John E. Roberts
Energy and Engineered Risk Division / Property Claims
2929 Allen Parkway, Suite 1100
Houston, TX 77019
Tel: (713) 342-7376
E-Mail: Report **must** be sent to **both**:  JohnE.Roberts@aig.com and
NewLoss-USproperty&energy@aig.com

1. Energy and Engineered Risk Claims **CANNOT** be processed through any other facility and must be reported as indicated.

2. Adjuster can **ONLY** be assigned by the Energy and Engineered Risk Division.

Ed. 5-18



Construction Performance®

### NEW HAMPSHIRE INSURANCE COMPANY
**(A CAPITAL STOCK COMPANY)**
**175 Water Street, New York, New York 10038**

#### COMPLETED VALUE BUILDERS RISK POLICY
#### QUOTA SHARE DECLARATIONS

Policy Number:  **043820532**

**Item 1. Named Insured and Address:**

A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
17901 COLLINS AVENUE SOUTH
SUNNY ISLES BEACH FL 33160

**Item 2. Additional Insureds:**

**Additional insured(s)** means all **project owner(s)** and contractors and subcontractors of every tier at the **insured project** location and any other individual or entity, but only to the extent required by the **contract document(s)** or subcontract document(s) with respect to the **insured project** and then only as their respective interests may appear.  Notwithstanding the foregoing sentence, architects, engineers, manufacturers and suppliers shall only be **additional insureds** with respect to their activities at the **insured project** location.

**Item 3. Mortgagees and Loss Payees:**  Per Certificates of Insurance on file with the Company or any endorsement attached to and forming a part of this Policy.

**Item 4. Policy Period:**

**A.** Inception Date:     14 DECEMBER 2018  Expiration Date:  31 DECEMBER 2021
(12:01 a.m., Standard Time at the **insured project** location.  The Expiration Date may vary in accordance with Item **4.B.**) (hereinafter, the **Original Policy Period**)

**B.** The Expiration Date shall be the earliest of the following:

**1.** The date of formal acceptance of the entire **insured project** by the **project owner(s);**

**2.** The date or expiry of the **Named Insured's** interest in the **insured project;**

**3.** The effective date of cancellation of this Policy, or

**4.** The expiration date as set forth in Item **4.A.**

**C. Extension of the Policy Period**

Provided that coverage has not ended in accordance with Items **4.B.1.** through **4.B.4.**, this Policy will be automatically extended once for up to 180 days per phase / per TCO (see page 7) for a pro rata additional premium upon notification by the **Named Insured** to the Company.  The **Named Insured** may request an additional extension of this Policy subject to the Company's written approval and terms and conditions to be agreed upon.

| 125689 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 1 of 8 |
|---|---|---|

**Item 5.  Insured Project:**

| Location | 17901 Collins Avenue South<br>Sunny Isles Beach, FL 33160 |
|---|---|
| Description | Ground up construction of a 51 story 154 unit condominium tower (phase I) including a shared foundation which will include the podium for Phase II (a separate tower 91 unit Tower which will be built after completion of Phase I). The site, at 17901 Collins Avenue, has more than 500 feet of oceanfront. It's north of the Mansions at Acqualina, completed in 2015, and Acqualina Resort & Spa, completed in 2006.<br><br>The Estates will feature a lobby designed by Chanel and Fendi creative director Karl Lagerfeld and Villa Acqualina, a 50,000-square-foot building with a slate of amenities that will include a spa and fitness center, restaurant and Circus Maximus, an ice skating rink, bowling lanes and a movie theater, as well as a Wall Street Trader's Club room. The property will also feature landscaped gardens, multiple infinity pools, a FlowRider for surfers, a basketball court, bocce court, dog park, soccer field and a beachfront restaurant.<br><br>First five stories / associated work of the North Tower.<br><br>South Tower will be completed on 07/01/2021 and will roll onto a permanent property policy at that time. Villa construction to continue to 12/31/2021. |
| Project Owner(s) | A3 Development LLC, LPLA Partners, LP, The Trump Group |

**Item 6. Coverage Territory:**

United States, its territories and possessions and Puerto Rico, including their respective coastal waters.  If any coverage is provided on a worldwide basis, such worldwide coverage shall not include any jurisdiction prohibited or restricted under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.  Losses are only covered within the **coverage territory**.

**Item 7.  Premium:**

    **A.  Total Deposit Premium:**      $2,500,552 (See Item **8.** below for the calculation)

        **AIG's 35% Share:**         $875,193

    **B.  Terrorism Premium:**        $26,271 (included within the Total Deposit Premium)

    **C.  Surcharges:  (If Applicable)**    $866

    **D.  Engineering Fees: (If Applicable. Not included as part of the premium)**

        $25,000 (includes 1 Site Visit per year and 1 Market Report to be released close to the end date of the project).

**Item 8.  Deposit Premiums:**

| Coverage | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| Total Project Value (South Tower) | 2.5479 years | $373,500,000 | $Various | $1,648,911 |
| Total Project Value | 3.0493 years | $60,000,000 | $Various | $412,300 |

| (Villa and Site) | | | | |
|---|---|---|---|---|
| Existing Property | 3.0493 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Delay In Completion | 3.0493 years | $44,022,420 | $Various | $343,015 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 3.0493 years | $477,522,420 | $0.0375 of the non-NatCat premium | $26,271 |
| LEG 3 | 3.0493 years | $477,522,420 | $0.10 of the non-NatCat premium | $70,055 |
| | Total Deposit Premium: | | | $2,500,552 |

**Item 9. Policy Limit:**   $477,522,420   The **quota share percentage** (shown in Item **13.** of the Declarations) of the **Policy Limit** is the Company's maximum liability in any one **occurrence** as a result of all covered loss or damage regardless of the number of coverages or **covered causes of loss** under this Policy.

**Item 10. Sublimits of Liability:**   The sublimits of liability stated in this Policy are part of and not in addition to the **Policy Limit** and any sublimits of liability shown in Item **10.A.** below.  The **quota share percentage** (shown in Item **13.** of the Declarations) of the sublimits of liability are: (1) the maximum amount the Company will pay for all covered loss or damage arising out of the specific perils or coverages and/or (2) the maximum number of days for which the Company will pay for all covered loss or damage for a specific coverage, regardless of the number of coverages or **covered causes of loss** under this Policy.  The sublimits of liability stated in this Policy are per **occurrence** unless otherwise indicated.

Regardless of the number of **occurrences**: (1) any Term Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss** that is applicable to the entire **policy period** regardless of the length of the **policy period**, and (2) any Annual Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss** that is applicable to each annual period with respect to the **policy period**.

If any Annual Aggregate applies and the **policy period** is longer than one year, at the end of each twelve (12) month period (hereinafter, the **annual anniversary date**), such Annual Aggregate shown below shall be reinstated in full, but only with respect to an **occurrence** which first commences on or after 12:01 a.m., Standard Time at the **insured project** location on such **annual anniversary date**.  If the final period is less than twelve (12) months, then such Annual Aggregate shall be reinstated in full for that final period.

*If the words NOT COVERED are shown instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage or **Covered Cause of Loss**, then no coverage is provided for that coverage or **Covered Cause of Loss**.  If the words, NOT APPLICABLE (or N/A) are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

A. **Sublimits Applicable to Specified Covered Causes of Loss** – Each of these sublimits is part of and not in addition to the **Policy Limit**:

1. **Earth Movement:**  $477,522,420 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $477,522,420, for all covered loss or damage arising out of **earth movement**.

2. **Flood:**  $100,000,000 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $100,000,000, for all covered loss or damage arising out of **flood**.

3. **Named Storm:** $150,000,000 per **occurrence**, for all covered loss or damage arising out of **named storm.**

For the purpose of the above sublimits of liability, **named storm** includes, but is not limited to, loss or damage from wind, hail, lightning, tornado, rain or water (whether driven by wind or not), **flood**, or any wind driven objects or debris.

In the event that loss or damage by **flood** occurs concurrently or in any sequence with a **named storm**, regardless of whether any flood sublimit or remaining aggregate flood sublimit shown in Item **10.A.2.** (hereinafter, the **applicable flood sublimit**) is greater or less than the applicable Named Storm sublimit, the maximum amount the Company will pay per **occurrence** for all such covered loss or damage by **flood** shall be the **applicable flood sublimit**, subject always to the maximum applicable Named Storm sublimit. However, if **flood** is not covered, the maximum amount the Company will pay per **occurrence** for all such covered loss or damage arising out of **named storm** shall exclude loss or damage by **flood.**

4. **Terrorism:** $477,522,420 for all covered loss or damage arising out of **terrorism.**

**B. Sublimits of Liability**

Each of the following sublimits is part of, and not in addition to the **Policy Limit** and any other sublimits shown in Item **10.A.** of the Declarations:

| | | |
|---|---|---|
| **Physical Damage Sublimit of Liability** | | $433,500,000 applicable to physical damage to **covered property** at the **insured project** |
| 1. | Inland Transit | $50,000,000 |
| 2. | Offsite Temporary Storage | $50,000,000 any one location |
| 3. | Arson, Theft or Vandalism and Malicious Mischief Reward | $100,000 |
| 4. | Claims Preparation Costs | $2,500,000 |
| 5. | Crane Re-Erection Expenses | $1,000,000 |
| 6. | Crisis Management | 30 days, subject to a maximum Term Aggregate of $2,500,000 |
| 7. | Cyber Coverage | $Not Covered  Term Aggregate |
| | The following sublimits of liability **7.a.** through **7.d.**, inclusive, are subject to the Cyber Coverage sublimit of liability shown above: | |
| | a. Electronic Data | $Not Covered  Term Aggregate |
| | b. Building or Other Systems | $Not Covered  Term Aggregate |
| | c. Plans and Drawings | $Not Covered  Term Aggregate |
| | d. Cyber Extra Expense | $Not Covered  Term Aggregate |
| 8. | Debris Removal | $50,000,000 or 25% of direct physical loss or damage to all **insured property,** whichever is less |
| 9. | Demolition and Increased Cost of Construction | |
| | Demolition Coverage A: | $INCLUDED |
| | Demolition Coverage B: | $25,000,000 |
| | Demolition Coverage C: | $25,000,000 |
| 10. | Expediting Expense and Extra Expense | $25,000,000 |
| 11. | Owner's Extra Expense | NOT APPLICABLE |
| | The following expenses **11.a.** through **11.d.**, inclusive, are subject to the Owner's Extra Expense sublimit of liability shown above: | |
| | a. Advertising and Marketing Expenses | NOT APPLICABLE |

| 125689 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 4 of 8 |
|---|---|---|

|     |                                              |                                                                                  |
|-----|----------------------------------------------|----------------------------------------------------------------------------------|
| b.  | Legal and Accounting Fees                    | NOT APPLICABLE                                                                   |
| c.  | License and Permit Fees                      | NOT APPLICABLE                                                                   |
| d.  | Project Management Fees                       | NOT APPLICABLE                                                                   |
| 12. | Fine Arts                                    | $1,250,000                                                                       |
| 13. | Fire Brigade, Extinguishing Expenses and Police Charges | $5,000,000                                                            |
| 14. | Fungus, Mold or Spore                        | $5,000,000                                                                       |
| 15. | Maximum Hot Testing Period                   | NOT APPLICABLE                                                                   |
| 16. | Landscaping Materials                        | $50,000 any one item, subject to a maximum of $2,500,000 per **occurrence**      |
| 17. | Logistics Extra Costs                        | $NOT COVERED                                                                     |
| 18. | Plans and Drawings                           | $5,000,000                                                                       |
| 19. | Pollution and Contamination Coverage         | $2,500,000 Term Aggregate                                                        |
| 20. | Preservation of Property                     | $2,500,000                                                                       |
| 21. | Professional Design Fees                     | $10,000,000                                                                      |

**Item 11. Deductibles:**  The deductibles shown below apply per **occurrence** unless otherwise stated.

**A. Policy Deductible**   $50,000   Applicable to all covered loss or damage unless otherwise stated below or in this Policy.

**B. Earth Movement**

$50,000

**C. Flood**

$500,000

**D. Named Storm**

3% of **total project value** at risk at the time of the loss or damage, subject to a minimum of $250,000 for any one **occurrence** and a maximum of $7,500,000 for any one **occurrence**, for all loss or damage arising out of **named storm**.

**E. Water Damage:**

$100,000

**F. Hot Testing:**

$NOT APPLICABLE

**G. Additional Deductibles**

**LEG 3:** $100,000

**Special Deductible for Owner's Extra Expense:**        $NOT APPLICABLE

In each case of loss or damage covered by this Policy, the Company shall not be liable unless the **Insured** sustains covered loss or damage in a single **occurrence** greater than any applicable deductible described in this Policy and then only for the amount in excess of such deductible.  As used above, "at risk" includes all **covered property** at the location (including **inland transit**) where the loss occurs, whether such **covered property** sustains damage or not.

If an amount is not shown (or if NOT APPLICABLE or N/A is shown) for any deductible, then that deductible shall not apply.  Also, if an amount is not shown (or if NOT APPLICABLE or N/A is shown) with respect to a part of a deductible, then such part shall not apply, but the rest of the deductible shall apply.

If two or more deductible amounts provided in this Policy apply to a single **occurrence**, the total to be deducted shall not exceed the largest deductible applicable unless otherwise stated in this Policy.  If a Delay in Completion Coverage Endorsement is attached to and made a part of this Policy, then the specified **deductible period** stated in such endorsement shall be applied in addition to the applicable deductible shown in Item **11.A.** through **11.G.** above, inclusive.  The Special Deductible for **owner's extra expense** shall apply in addition to the applicable deductible shown in Item **11.A.** through **11.G.** above, inclusive.

**Item 12. Margin Clause:**

If there is any increase in the **total project value**, the **Policy Limit** and the Physical Damage Sublimit of Liability shall be automatically increased by the same percentage of such increase in the **total project value**, subject to a maximum increase of 10% regardless of the number of increases in the **total project value**.  If the cumulative increases in the **total project value** exceed the maximum percentage set forth above, then the **Named Insured** shall report such changes in writing to the Company.

This provision does not apply to any other sublimits of liability, including any other sublimit of liability shown in Item **10.A.** or Item **10.B.** and/or sublimits of liability for any coverage added by endorsement.

**Item 13. Quota Share Participation:**

35% is the Company's participation for all coverage provided under this Policy and is the percentage of the **Policy Limit** and sublimits of liability under this Policy that the Company shall pay in excess of the total applicable deductible(s) (herein, the percentage is referred to as the **quota share percentage).**

The Company's liability under this Policy shall not be increased, for any reason, including: (1) the receivership, bankruptcy, insolvency, liquidation, or dissolution of any other **participating insurer;** (2) the denial or reservation of rights with respect to any claim by any other **participating insurer;** (3) the cancellation, non-renewal, or other termination of any policy issued by any other **participating insurer;** or (4) the inability, refusal, or failure, for any reason, of any other **participating insurer** to fulfill its duties or obligations under any policy or program.  The Company's liability is several, but not joint, under this program.

**Participating insurer** shall mean any insurer or other entity including, a captive or entity under a self-insured program, that shares in the liabilities under any policy or program related to the coverage provided under this Policy.

**Item 14. Special Terms and Conditions:**

TPA: Mike Kaemph at York (Chicago)

Producer:   Willis of Florida, Inc.
Address:    1450 Brickell Ave, ste 1450
            Miami, FL 33131

**PHASE 2 OPTION (Rate guaranteed for 24 months from binding date of this policy; final premium for Phase 2 determined based on policy period and estimated value at time of binding):** The Additional Premium to include Phase 2 (12/01/19 to 07/01/22) would be as follows:

| Coverage | Original Policy Period | Estimated Value at Inception Date | Deposit Premium |
|---|---|---|---|
| Total Project Value (North Tower + West Garage, less credits noted below) | 2.5836 years | $169,158,811 | $713,189 |
| Existing Property | 2.5836 years | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable |
| Delay In Completion | 2.5836 years | $48,457,160 | $51,094 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 2.5836 years | $217,615,971 | $7,307 |
| LEG 3 | 2.5836 years | $217,615,971 | $19,486 |
| | Total Additional Deposit Premium*: | | $803,306 |
| | AIG's 35% share Additional Deposit Premium: | | $281,157 |

*Phase 2 Additional Deposit Premium calculation is based on:*

(1) $207,300,000 (Phase 2) plus $7,000,000 (West Garage) minus $45,141,189 ($20,141,189 savings and $25,000,000 included within Phase 1 Total Project Value) for the project term, 12/1/19 to 7/1/22; and

(2) Delay in Completion, Terrorism & LEG 3 premiums are the difference between Phase 1 & Phase 2

*PAYMENT TERMS: If the insured elects to bind Phase 2, the Additional Premium will be billed at the time AIG is provided with the order to bind. Premium will then be due per the policy payment terms.*

Policy Extension Calculations (180 days per phase/per TCO):

- South Tower – to extend to December 31, 2021
    - during wind season (Jul to Nov): $92,659 per month
    - December (outside wind season): $23,950
    - No delay factored in here
- Villa – to extend to June 30, 2022
    - outside wind season (Jan to May): $10,141 per month
    - June (wind season): $33,414
    - Full delay value assumed here as per your request ($44,022,420)
- North Tower - to extend to December 31, 2022
    - during wind season (July to Nov): $59,997 per month
    - December (outside wind season): $15,508
    - Full delay value assumed here as per your request ($48,457,160)

For Audit & Extensions the Annual rates are:

- South Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- Villa: .115 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- North Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- 150% for delay; 3.75% for terrorism (3% base rate * 25% surcharge to remove sunset clause); 10% for LEG 3. Terrorism & LEG 3 premiums are calculated based on the non-Cat premium.

**IN WITNESS WHEREOF**, the Company has caused this Policy to be signed on the Declarations by the President and Secretary of the Company and its duly authorized representative.

President                                                              Secretary

This Policy shall not be valid unless signed at the time of issuance by the Company's authorized representative.

Authorized Representative

Countersignature (if applicable)          Date                    Countersigned At

| 125689 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 8 of 8 |

## FLORIDA ADDENDUM TO THE DECLARATIONS

If you have questions about your insurance policy, or questions about claims relating to your insurance policy, please contact your insurer at the following:

**AIG**
**175 Water Street**
**New York, NY 10038**
**(212) 458-5000**

74825 (01/13)

# FORMS SCHEDULE

Named Insured: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP

Policy No: 043820532                                    Effective Date: 12/14/2018

| Form Number | Edition Date | Endorsement Number | Title |
|---|---|---|---|
| 125689 | 05/17 | | COMPLETED VALUE BUILDERS RISK POLICY QUOTA SHARE DECLARATIONS |
| 125687 | 05/17 | | COMPLETED VALUE BUILDERS RISK POLICY |
| 125696 | 05/17 | 001 | DELAY IN COMPLETION ENDORSEMENT |
| 125699 | 10/17 | 002 | EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT |
| 125700 | 05/17 | 003 | LENDER LOSS PAYEE OR LOSS PAYEE ENDORSEMENT |
| 125703 | 05/17 | 004 | PILING, SHEET PILING & CAISSON LIMITATION ENDORSEMENT |
| 125705 | 05/17 | 005 | POLICY CHANGES ENDORSEMENT |
| 76105 | 06/15 | 006 | FLORIDA CANCELLATION/NONRENEWAL ENDORSEMENT |
| 125719 | 05/17 | | FLORIDA STATE AMENDATORY ENDORSEMENT |

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)

## FLORIDA NOTICE OF LOSS CONTROL SERVICES

Pursuant to Florida Administrative Code ("FAC") 690-166.040, we would like to inform you of the risk management programs that we have developed and that are available to you.

For your consideration, we offer the services of AIG PC Global Services, Inc.  With more than 25 years experience and expertise in assisting with the prevention and mitigation of losses, AIG PC Global Services, Inc. can help address a range of problems related to loss control in various lines of business. Certain risk management programs are available to you, free of charge, as part of your commercial insurance coverage; contact your insurance broker for more details on these plans. Other, more substantive risk management programs can be purchased which include, but are not limited to the following services: surveys/analysis for identifying exposures related to your specific operations, safety management training and counseling for your staff, adoption of relevant testing strategies, and evaluations of current loss control practices.

Upon your written request, we could provide you with specific guidelines for risk management programs as established by FAC 690-166.040. Such guidelines would provide instructions and offer basic criteria to assist you in creating your own risk management plan. Should you request such guidelines and, subsequently, wish to further explore the purchase of a risk management plan, developed by AIG PC Global Services, Inc., which is specific to your company's needs, we would be willing to discuss with you both the availability of such a plan, and if available, its specific content and cost.

Again, we welcome all inquiries regarding the services of AIG PC Global Services, Inc.



Construction Performance®

## NEW HAMPSHIRE INSURANCE COMPANY
### (A CAPITAL STOCK COMPANY)
### 175 Water Street, New York, New York 10038

### COMPLETED VALUE BUILDERS RISK POLICY

Various provisions in this Policy restrict coverage.  Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the word **Insured(s)** means the **Named Insured** and the **additional insured(s)**. The word "Company" means the insurance company shown in the header above.  The word "Policy" means this Completed Value Builders Risk Policy including, the Declarations, all endorsements and Schedules.

Other defined words and phrases that appear in boldface type have special meaning.  Refer to: (1) the DEFINITIONS Section, (2) the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section and (3) elsewhere in this Policy.  If such ordinarily boldfaced words and phrases are not bolded then such words and phrases shall include, but not be limited to, the specific meaning set forth in this Policy.

### SECTION I – INSURING AGREEMENT AND COVERED PROPERTY

**A. INSURING AGREEMENT**

Subject to the terms and conditions of this Policy, the Company will pay for all risks of direct physical loss or damage by a **covered cause of loss** to **covered property** at the **insured project**, while in offsite temporary storage or during **inland transit** (both as provided in the Additional Coverages), all within the **coverage territory** and occurring during the term of this Policy.

**B. COVERED PROPERTY**

The Company insures the following property for which the **Insured** is contractually responsible, the value of which has been included in the **total project value**:

1. Permanent works - All materials, supplies, equipment, machinery, and other property of a similar nature all when used or to be used in or incidental to the demolition of existing structures, site preparation, fabrication or assembly, installation or erection or the construction of or alteration, renovation, rehabilitation of the **insured project** (hereinafter, **permanent works**);

2. Temporary works - All scaffolding, form work, fences, shoring, hoarding, falsework and temporary buildings, construction trailer(s) including such trailers' contents (except **plans and drawings**), all incidental to the **insured project** (hereinafter, **temporary works**); and

3. Property of others – Property of others for which the **Insured** is legally liable (hereinafter, **property of others**);

while at the location of the **insured project**, in transit as set forth in the INLAND TRANSIT Additional Coverage, or at offsite temporary storage as set forth in OFFSITE TEMPORARY STORAGE Additional Coverage.

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 1 of 25 |
|---|---|---|

C. **SPECIFIED COVERED CAUSES OF LOSS**

Subject to the terms and conditions of this Policy, **covered causes of loss** include the following specified **covered causes of loss**:

1. **Earth movement**, which means any natural or manmade:

   a. Earthquake, including any earth sinking, rising or shifting related to such event;

   b. Landslide, including any earth sinking, rising or shifting related to such event;

   c. Mine subsidence, meaning subsidence of a manmade mine, whether or not mining activity has ceased;

   d. Earth sinking, rising or shifting, including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of **covered property**, unless otherwise excluded by this Policy;

   e. Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, sinkhole collapse, or subsidence, unless otherwise excluded by this Policy; or

   f. Tsunami arising out of any of the above.

2. **Flood**, which means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike or other surface containment structure, storm surge, storm tide, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.  A tsunami shall not be considered a **flood**.

3. **Water damage** means all loss or damage caused by:

   a. Water, other than water from a **flood** or **named storm**, that enters into a building or structure through an opening;

   b. Discharge or leakage of water or steam from a plumbing, heating, air conditioning or other system or appliance;

   c. Discharge or leakage from a sprinkler system, other than discharge due to a fire, explosion or **earth movement**; or

   d. Water, other than water from a **flood** or **named storm**, that backs-up into the **insured project** (or **existing property**, if endorsed onto this Policy) from sewers, drains, sumps, and/or pumps.

4. **Named storm**, which means a storm that, at any time, has been declared by the United States National Weather Service or another meteorological authority to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm.

If **earth movement, flood** or **named storm** is not covered, then any cause or event occurring concurrently or in any sequence with such peril(s) is also not covered, except for direct physical loss or damage to **covered property** caused by fire, sprinkler leakage or explosion following **earth movement, flood** or **named storm**, whichever is applicable.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 2 of 25 |
|---|---|---|

Direct physical loss or damage to **covered property** caused by fire, sprinkler leakage or explosion shall not be considered loss or damage by **earth movement**, **flood** or **named storm**, whichever is applicable, within the terms and conditions of this Policy.

5. **Terrorism**, which means the use or threatened use of force or violence against a person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

   a. A government;

   b. The civilian population of a country, state or community; or

   c. Disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002, and any revisions or amendments thereto (the "Act") is in effect, **terrorism** includes a certified act of terrorism defined by Section 102. Definitions of the Act.

Whether or not **terrorism** is covered under this Policy, the Company does not cover loss or damage caused directly or indirectly by **biological and/or chemical terrorism** or **nuclear terrorism** whether controlled or uncontrolled, proximate or remote, sudden or over any length of time, or which is contributed to or aggravated by any other cause or event. Such **biological and/or chemical terrorism** or **nuclear terrorism** is excluded regardless of any other cause or event occurring concurrently or in any sequence with such **biological and/or chemical terrorism** or **nuclear terrorism**. **Biological and/or chemical terrorism** means the dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances in an act(s) of **terrorism**. **Nuclear terrorism** means an act(s) of **terrorism** involving or resulting in nuclear reaction or nuclear radiation or radioactive contamination.

If **terrorism** is covered under this Policy, then a corresponding premium **will** be shown in Item **7.B.** of the Declarations.

If **terrorism** is not covered then any cause or event occurring concurrently or in any sequence with such **terrorism** is also not covered, including any action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except for direct physical loss or damage to **covered property** caused by fire following **terrorism**. With respect to this exception for fire following **terrorism**, no coverage is provided for: (1) fire following **biological or chemical terrorism** or **nuclear terrorism**, (2) any Additional Coverage, except debris removal under the DEBRIS REMOVAL Additional Coverage, or (3) delay in completion loss. Notwithstanding any other valuation provision of this Policy to the contrary, the Company shall only pay the actual cash value of the **covered property** at the time and place of the loss caused directly by the ensuing fire.

## SECTION II – ADDITIONAL COVERAGES

Subject to the terms and conditions of this Policy, all loss, damage, expenses and/or other payments for the following Additional Coverages and any Additional Coverage(s) added to this Section by endorsement or through the Special Terms and Conditions is subject to the sublimits of liability as shown in Item **10.B.** of the Declarations and sublimits shown elsewhere in this Policy.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 3 of 25 |

1. **INLAND TRANSIT**

   The Company will pay for direct physical loss or damage by a **covered cause of loss** to **covered property** during **inland transit**.

   The **Insured** agrees to keep records of all shipments insured hereunder and make them available to the Company upon request.  Failure to keep such records may result in the Company not paying for such **covered property** during **inland transit**.

   This Additional Coverage shall be void if the **Insured** enters into any agreement with carriers, releasing them from their common law or statutory liability or agreeing that this insurance shall in any way inure to the benefit of such carriers; however, the **Insured** may, without prejudice to this Additional Coverage, accept bills of lading, receipts, or contracts of transportation as are ordinarily issued by carriers containing a limitation as to the value of **covered property**.

   As used herein, **inland transit** means the transit of **covered property** from the commencement of loading at the original point of shipment anywhere within the **coverage territory** or Canada until completion of unloading: at the location of the **insured project** or at a temporary offsite location, including shipments on inland or coastal waters, but excluding ocean marine shipments.

2. **OFFSITE TEMPORARY STORAGE**

   The Company will pay for direct physical loss or damage by a **covered cause of loss** to **covered property** while such property is at offsite temporary storage, anywhere within the **coverage territory**.  There is no coverage for such **covered property** while: (1) in the course of manufacturing or processing, (2) at a manufacturer's or supplier's site or warehouse, unless the **Insured** is legally liable for such **covered property**, or (3) in transit.

3. **ARSON, THEFT OR VANDALISM AND MALICIOUS MISCHIEF REWARD**

   The Company covers the reasonable payment of any reward offered by the **Named Insured** or on the **Named Insured's** behalf for information that leads to conviction of the perpetrator(s) of arson, theft or **vandalism and malicious mischief** to **covered property**.

   Regardless of the number of informants, the Company's maximum liability for any one **occurrence** of arson, theft and/or **vandalism and malicious mischief** is the Arson, Theft or Vandalism and Malicious Mischief Reward sublimit of liability shown in Item **10.B.** of the Declarations.

4. **CLAIMS PREPARATION COSTS**

   The Company **will** pay reasonable and necessary expenses incurred by the **Named Insured** for its:

   a.  Accountants, architects, auditors, engineers, or other professionals;

   b.  Employees; or

   c.  Insurance agent's or broker's subsidiaries, related or associated entities;

   to prepare and certify particulars or details of the **Named Insured's** claim required by the Company resulting from a covered loss under this Policy for which the Company has accepted liability.

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 4 of 25 |
|---|---|---|

The Company will not pay for expenses incurred by the **Named Insured** to utilize the services of property managers, attorneys, public adjusters, or any of its subsidiaries, related or associated entities or insurance agents or brokers.   The Company will not pay any fees or costs for consultation on coverage or negotiation of claims.

5.  **CRANE RE-ERECTION EXPENSES**

The Company will pay reasonable and necessary expenses incurred by the **Named Insured** to re-erect a tower or pole crane that sustains direct physical loss or damage by a **covered cause of loss**.  However, the Company shall not cover any loss or damage to the tower or pole crane itself.

6.  **CRISIS MANAGEMENT**

The Company shall indemnify the **Named Insured** for the reasonable and necessary costs over and above the total costs that normally would have been incurred to continue the scheduled progress of the **insured project** if an order of civil or military authority limits, restricts or prohibits partial or total access to the **insured project**, provided that such order is a direct result of a violent crime, suicide, attempted suicide, death (not including, disease or sickness resulting in death) or armed robbery at such **insured project**.

Coverage begins on the date and time that the order of civil or military authority limits, restricts or prohibits partial or total access to the **insured project** and ends when access to the **insured project** is no longer limited, restricted or prohibited, but in no event for more than the number of days shown in Item **10.B.** of the Declarations under Crisis Management.

The **Named Insured** must report any loss under this Additional Coverage within 30 days after the effective date of such order of the civil or military authority.

7.  **CYBER COVERAGE**

a.  Electronic Data

The Company will pay for corruption, erasure or alteration of **electronic data** in the **building or other systems** that are incorporated into the **insured project** due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss.**

The Company will not pay for any loss under this Additional Coverage for which coverage is provided under the Building or Other Systems Additional Coverage or would be provided under such Additional Coverage but for the exhaustion of the Building or Other Systems sublimit of liability shown in Item **10.B.** of the Declarations.

b.  Building or Other Systems

The Company will pay for the **building or other systems** that are incorporated into the **insured project** rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems.**

c.  Plans and Drawings

The Company will pay for corruption, erasure or alteration of **plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code.**

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 5 of 25 |
|---|---|---|

   **d.**  Cyber Extra Expense

If coverage is provided under Subsections **7.a.**, **7.b.** or **7.c.** above, the Company will also pay the reasonable and necessary costs, over and above normal operating costs, incurred by the **Named Insured** limited to the following and such costs shall not be considered extra expense under any other Additional Coverage:

   **i.**  Conducting an investigation (including a forensic investigation) to determine the cause and scope of the introduction of such **malicious code**; and

   **ii.**  Hiring an expert to consult with the **Named Insured** on: (1) the protection of such **electronic data** and (2) the eradication of such **malicious code**.

   **e.**  Additional Exclusions

The following additional exclusions apply to all Additional Coverages set forth in the CYBER COVERAGE Additional Coverage:

   **i.**  The Company will not pay any loss, damage, cost or expense arising out of a breach in confidentiality or privacy of, or release of, any **electronic data** for any reason.

   **ii.**  The Company does not cover theft of any **electronic data** unless there has been corruption, erasure or alteration of **electronic data** and then the Company shall only pay the covered loss that is related to the corruption, erasure or alteration of **electronic data**.

   **iii.**  The Company will not pay any extortion payments or public relations expenses.

   **iv.**  The Company will not pay any loss, damage, cost or expense arising out of **malicious code**, otherwise excluded under this Policy.

The maximum amount the Company will pay for all loss or damage (including corruption, erasure or alteration) under any single Additional Coverage under this CYBER COVERAGE Additional Coverage is the corresponding sublimit of liability for such single Additional Coverage as shown in Item **10.B.** of the Declarations, regardless of any other applicable coverages or Additional Coverages.

For the purposes of the CYBER COVERAGE Additional Coverage, Subsection **7.a.**, **7.b.**, **7.c.**, and **7.d.** shall each be treated as a separate Additional Coverage.

**8.**  **DEBRIS REMOVAL**

If **covered property** at the **insured project** sustains direct physical loss or damage by a **covered cause of loss** during the **policy period**, the Company will pay the reasonable and necessary expenses to:

   **a.**  Remove debris of **covered property** remaining from the **insured project**; and

   **b.**  Remove debris of uninsured property from the **insured project**.

The Company will not pay the expense to extract **pollutants or contaminants** from land, water and/or debris, or to remove, restore, or replace contaminated or polluted land or water. In addition, the Company will not cover the cost to remove or transport any property or debris to a site for storage or decontamination required because the property or debris is affected by **pollutants or contaminants,** whether or not such removal, transport or decontamination is required by law, ordinance or regulation nor will the Company cover the cost to remove, transport or decontaminate any property or debris damaged by **fungus, mold or spore.**

**9.  DEMOLITION AND INCREASED COST OF CONSTRUCTION**

In the event of direct physical loss or damage by a **covered cause of loss** to **covered property** that results in the enforcement of any law, ordinance, governmental directive or standard (hereinafter, **law or ordinance**) in effect at the time of loss or damage regulating the repair or rebuilding of the damaged portion(s) of the **covered property**, the Company will pay:

a.  Demolition Coverage A:  In accordance with the VALUATION Section, the cost to replace the undamaged portion of the damaged **covered property** as a consequence of the enforcement of a **law or ordinance** that requires demolition of the undamaged portion of the damaged **covered property**;

b.  Demolition Coverage B:  For the cost to demolish and clear the site of the undamaged portion of the damaged **covered property**, as a consequence of the enforcement of a **law or ordinance** that requires demolition of the undamaged portion or the damaged **covered property**; and

c.  Demolition Coverage C:  For the increased cost of repairing or rebuilding the damaged and undamaged portion of the **covered property**, limited to the cost that would have been incurred in order to comply with the minimum requirements of such **law or ordinance** regulating the repair or rebuilding of the damaged **covered property**.

The Company shall not be liable for any loss under this provision, unless and until the damaged or destroyed **covered property** is actually repaired or rebuilt on the same premises with exercise of due diligence and dispatch and in no event, unless repair or rebuilding is completed within two (2) years after the destruction or damage of such **covered property** or within such further time as the Company may allow in writing during the two (2) year period.

The Company shall not be liable for any cost set forth above:

a.  Necessitated by the enforcement of any **law or ordinance** regulating any form of **pollutant or contaminant**; or

b.  Incurred due to any **law or ordinance** with which the **Insured** was legally obligated to comply with prior to the time of the direct physical loss or damage.

**10. EXPEDITING EXPENSE AND EXTRA EXPENSE**

The Company will pay reasonable and necessary:

a.  Expediting expenses to make temporary repairs and to expedite the permanent repair or replacement of **covered property**, that sustains direct physical loss or damage due to a **covered cause of loss**, including additional wages for overtime, night work, and work on public holidays and the extra costs of express and air freight and extra costs of rental equipment; and

b.  **Extra expense** which is incurred by the **Insured** for the purpose of continuing as nearly as practicable the scheduled progress of undamaged work, but only when such scheduled progress is impaired by direct physical loss or damage by a **covered cause of loss** to the **covered property**.

In order to receive payment under this provision, the **Insured** must exercise due diligence and dispatch to maintain the scheduled progress of the undamaged work.

Notwithstanding the foregoing, the Company will not pay expenses incurred:

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 7 of 25 |
|---|---|---|

a.  To comply with any **law or ordinance** which regulates removal, repair, demolition, construction or re-construction of the **covered property**;

b.  To overcome delays in the scheduled progress of the work which existed at the time of the loss;

c.  For alterations, additions, improvements or other changes in materials, designs, plans, specifications or the means and methods of construction; or

d.  As **owner's extra expense**.

## 11. OWNER'S EXTRA EXPENSE

The Company will pay reasonable and necessary **owner's extra expense** incurred by the **project owner(s)**, prior to the Expiration Date as described in Item **4.** of the Declarations, due to direct physical loss or damage by a **covered cause of loss** to **covered property**.

Notwithstanding the foregoing, the Company will not pay expenses incurred:

a.  To comply with any **law or ordinance** which regulates removal, repair, demolition, construction or re-construction of the **covered property**;

b.  To overcome delays in the scheduled progress of the work which existed at the time of the loss;

c.  For alterations, additions, improvements or other changes in materials, designs, plans, specifications or the means and methods of construction; or

d.  As **extra expense** or expediting expenses as set forth under the EXPEDITING EXPENSE AND EXTRA EXPENSE Additional Coverage.

## 12. FINE ARTS

The Company will pay for direct physical loss or damage by a **covered cause of loss** to the **Insured's fine arts** at the **insured project** for which the value has been included in the **total project value**. However, the Company will not pay for loss or damage as a result of restoring, repairing or retouching processes.

## 13. FIRE BRIGADE, EXTINGUISHING EXPENSES AND POLICE CHARGES

The Company will pay the following expenses resulting from a **covered cause of loss** to **covered property** incurred by the **Insured**:

a.  Fire brigade charges and extinguishing expenses;

b.  Loss and disposal of fire extinguishing materials expended; and

c.  Police charges to investigate a covered loss.

## 14. FUNGUS, MOLD OR SPORE

The Company will pay for direct physical loss or damage to **covered property** caused by or resulting from **fungus, mold or spore**, when such **fungus, mold or spore** arises out of a **covered cause of loss** that commences during the **policy period**. This coverage includes reasonable and necessary cost or expense with respect to the **insured project** to:

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 8 of 25 |
|---|---|---|

a. Clean-up, remove, contain, treat, detoxify or neutralize **fungus, mold or spore;**

b. Test the indoor air quality for **fungus, mold or spore;**

c. Test the surfaces and materials for **fungus, mold or spore;**

d. Develop and implement a remediation plan for **fungus, mold or spore;** and

e. Remove debris that has been contaminated with **fungus, mold or spore**.

### 15. HOT TESTING

The Company **will** pay **for** direct physical loss or damage to **covered property** at the **insured project** due to a **covered cause of loss** arising out of **hot testing** during the **hot testing period**.

The **hot testing period** means the period of time that:

a. Begins with the introduction into each system of: (1) feedstock or other raw materials or (2) fuel supply, and

b. Ends on the earliest of the following:

    i. The Expiration Date or earlier termination date of the Policy;

    ii. The date of formal acceptance of the **insured project** or any part of the **insured project** undergoing **hot testing** by the **project owner(s)**; or

    iii. The date after the total number days of **hot testing**, whether or not consecutive, as shown in Item **10.B.** of the Declarations (referred to as the Maximum Hot Testing Period), after the commencement of **hot testing**.

**Hot testing** means testing of equipment or machinery through the introduction into a system of: (1) feedstock or other raw materials or (2) fuel supply. **Hot testing** does not mean testing of building systems including, but not limited to, electrical, mechanical, hydraulic, hydrostatic and pneumatic testing which shall be deemed to be cold testing.

### 16. LANDSCAPING MATERIALS

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **landscaping materials** at the **insured project**, except for loss or damage to **landscaping materials** from infestation, disease, freeze, drought, lack of moisture, hail, weight of ice or snow or any damage caused by insects, vermin, rodents or animals.

As used herein, **landscaping materials** means trees, plants, shrubs, grass and lawns (including fairways, greens and tees) for which the **Insured** is contractually responsible and the value of which has been included in the **total project value**.

For the purpose of applying the sublimit of liability, "one item" shall mean: (1) any one tree, plant, shrub, green or tee, or (2) each separate area of a fairway or grass, bounded by rough vegetation, water, dirt, concrete or paved surfaces on all sides.

### 17. LOGISTICS EXTRA COSTS

The Company will pay the reasonable and necessary extra cost incurred by the **Insured** to temporarily continue, as nearly normal as practicable, the movement of **covered property** directly between the location of the **Insured's** direct supplier and the **insured project**, provided

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 9 of 25 |
|---|---|---|

that the normal movement of such **covered property** is disrupted as a result of direct physical loss or damage by a **covered cause of loss** to bridges, roadways, tunnels, docks, piers, wharves runways, taxiways, tarmacs, terminals, and/or railways (hereinafter, **infrastructure**) located in the **coverage territory**.

Coverage begins:

**a.** 48 hours after such disruption; or

**b.** In the case of disruption caused by **earth movement**, **flood** or **windstorm or hail**, 168 hours after such disruption;

and ends when, with exercise of due diligence and dispatch, the normal movement of **the covered property** could be resumed (hereinafter, the **waiting period deductible**). Any **waiting period deductible** shall apply in addition to any other deductible(s) applicable to the **covered cause of loss** that resulted in damage to the **infrastructure**. Such other deductible(s) shall be subject to a minimum deductible of the Policy Deductible.

The following additional exclusions apply to this Additional Coverage. The Company **will not pay** for:

**a.** Any loss resulting from disruption of electricity, gas, fuel, water, steam, sewerage, refrigeration, cloud computing service, or any data, voice or video service;

**b.** Any costs that would have been incurred during the same period had there been no disruption of normal movement of goods or materials;

**c.** Any costs for the repair or replacement of property that has been damaged or destroyed; or

**d.** Any costs recoverable elsewhere under this Policy.

## 18. PLANS AND DRAWINGS

The Company will pay for direct physical loss of or damage **by a covered cause of loss** to **plans and drawings**.

## 19. POLLUTION AND CONTAMINATION COVERAGE

The Company will pay the reasonable and necessary expenses incurred by the **Insured to:**

**a.** Remove, extract, dispose of, or clean-up the actual presence of **pollutants or contaminants** from land or water at the **insured project**;

**b.** Remove and transport property or debris at the **insured project** that is affected by **pollutants or contaminants** to a site for storage or decontamination; and

**c.** Test for **pollutants or contaminants** during the extraction of **pollutants or contaminants** from land or water at the **insured project**;

but only if the **pollutants or contaminants** originate at the **insured project** due to direct physical loss or damage by a **covered cause of loss** during the **policy period**. There will be no coverage unless such expenses are reported to the Company within 180 days after the date of such direct physical loss or damage.

**20. PRESERVATION OF PROPERTY**

The Company will pay for:

a. Reasonable and necessary costs, over and above normal operating costs, incurred by the **Insured** for actions to temporarily protect or preserve **covered property**, and

b. Direct physical loss or damage by a **covered cause of loss** to **covered property** removed from the **insured project**,

provided that such actions or removal is necessary due to imminent direct physical loss or damage by a **covered cause of loss** to **covered property**. If **covered property** is removed to and located at offsite temporary storage in accordance with this provision, then the OFFSITE TEMPORARY STORAGE Additional Coverage shall apply.

**21. PROFESSIONAL DESIGN FEES**

In the event of direct physical loss or damage by a **covered cause of loss** to the **insured project**, the Company will pay the reasonable and necessary expenses incurred by the **Insured** for architects, engineers or other design professionals to redesign the damaged portion of the **insured project** in accordance with the design as set forth in the **contract documents** on the date of loss.

<div align="center">

**SECTION III – VALUATION**

</div>

Unless otherwise provided in this Policy, the basis of adjustment of a claim shall be as follows, at the time and place of the loss:

A. <u>Permanent Works</u> – The cost to repair or replace (whichever is less) the **permanent works** that sustained loss or damage at the time and place of the loss with material of like kind and quality, less betterment, and including contractor's reasonable profit and overhead in the same proportion as that included in the **contract documents** to the extent declared as part of the **total project value**. If the **permanent works** are not repaired or replaced within 2 years after the date of loss, then the Company shall pay the actual cash value of such **permanent works** at the time and place of the loss.

B. <u>Temporary Works</u> – With respect to **temporary works** that sustain loss or damage, the lesser of: (1) the cost to repair or replace (whichever is less) the **temporary works** at the time and place of loss with materials of like kind and quality, but if not repaired or replaced within 2 years after the date of loss, the recovery will not exceed actual cash value or (2) the value that **the Insured** is legally required to pay for the **temporary works** as set forth in the lessor's contract.

C. <u>Property of others</u> – The lesser of: (1) the cost to repair or replace (whichever is less) the **property of others** that sustained loss or damage at the time and place of loss with material of like kind and quality, less betterment and/or charges incurred by the contractor prior to the loss and related to such property or (2) the property owner's cost.

D. <u>Property in Inland Transit</u> – The invoice cost of property in **inland transit** plus accrued shipping charges less the shipper's liability, if any.

E. <u>Plans and Drawings</u> – If replaced, the cost to reproduce the **plans and drawings** (in physical or **electronic data** format) from duplicates, or if no duplicates are available, then the cost to research, gather and/or assemble the information to recreate such **plans and drawings**. If not replaced, the value of the blank material.

| | | |
|---|---|---|
| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 11 of 25 |

F. **Landscaping Materials** – (1) The cost to replace **landscaping materials** with property of like kind and quality, and (2) the labor necessary to replace such property.

G. **Fine Arts** – The least of the following: (1) the cost to repair or replace the **fine arts**; (2) the appraised value at the time of the loss had no loss or damage occurred or (3) the agreed value, if any, on file with the Company.

H. **Electronic Data** – The cost of reproducing **electronic data** from duplicates to the condition that existed prior to the time of the loss, or if no duplicates exist, then the cost to research, gather and/or assemble the **electronic data**.  If the **electronic data** is not replaced, then the value of the blank media.

## SECTION IV – PROPERTY NOT COVERED

Except as otherwise provided under the Additional Coverages (and in such event, **only** to the extent provided therein), the Company does not insure the following property:

A. Land and land values and the value of cut, fill and backfill materials existing at the location of the **insured project** prior to project commencement; however, to the extent identified in the **contract documents** and included in the **total project value**, fill and backfill materials purchased for use in the completion of the **insured project** are covered.  Labor and material charges incurred to excavate land and to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured, are covered to the extent such charges are identified in the **contract documents** and included in the **total project value;**

B. **(i)** Contractors' tools, machinery, plant and equipment, including spare parts and accessories, whether owned, loaned, hired or leased, and

   **(ii)** Property of a similar nature not intended to be a permanent part of the completed **insured project,**

   regardless of ownership, unless specifically provided by endorsement and then **only** to the extent provided therein;

C. Vehicles or equipment licensed for highway use, aircraft including drones or watercraft, except with respect to drones only, if such drones are owned and used by the **Insured** as part of the operations at the **insured project;**

D. Railcars and locomotives;

E. Water, except water that is contained within any enclosed tank, piping system, or **processing water;**

F. Standing timber, growing crops or animals;

G. Trees, plants, shrubs, grass or lawns (including fairways, greens or tees) that already exist at the **insured project;**

H. **Landscaping materials;**

I. **Plans and drawings;**

J. Accounts, bills, stamps, deeds, evidence of debt, checks, bonds, notes, **money, fine arts,** precious metals or precious stones or other property of a similar nature;

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 12 of 25 |
|---|---|---|

K. **Existing property** at the location of the **insured project**, unless specifically provided by endorsement and then only to the extent provided therein;

L. **Used machinery and equipment** while undergoing any form of testing, commissioning or startup, unless specifically provided by endorsement and then only to the extent provided therein;

M. Transmission, distribution or communication lines, except to the extent identified in the **contract documents**;

N. Property not at an **insured project** unless covered under the INLAND TRANSIT Additional Coverage, OFFSITE TEMPORARY STORAGE Additional Coverage or by endorsement; or

O. **Electronic data**.

## SECTION V – PERILS EXCLUDED

A. Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company does not insure for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage. The following exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:

1. Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or contributed to or aggravated by a **covered cause of loss**. However, if fire or sprinkler leakage not otherwise excluded ensues, the Company shall be liable for direct physical loss or damage by such ensuing fire or sprinkler leakage, but not including any loss or damage due to nuclear reaction, nuclear radiation, or radioactive contamination;

2. a. War, hostile or warlike action in time of peace or war, whether or not declared, including action in hindering, combating, or defending against an actual, impending, or expected attack:

   i. By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces; or

   ii. By military, naval, or air forces; or

   iii. By an agent of any such government, power, authority, or force;

   b. Any weapon employing atomic fission, fusion or radioactive force, or any weapon that disperses radioactive material or a directed-energy or electromagnetic weapon, whether in time of peace or war, whether or not its discharge was accidental; or

   c. Insurrection, rebellion, revolution, civil war, usurped power, seizure or destruction or any action taken by governmental authority in hindering, combating, or defending against such event;

   Including any consequence of Subsection **a., b.,** or **c.** above;

3. The actual, alleged or threatened release, discharge, escape or dispersal of **pollutants or contaminants**, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated **by any covered cause of loss** under this Policy.

However, this exclusion shall not apply to direct physical loss or damage to **covered property** from **pollutants or contaminants** caused by a **covered cause of loss** at the **insured project**, including the cost to clean-up **pollutants or contaminants** from **covered property** at the **insured project** resulting from such loss or damage.  No coverage is provided for testing or monitoring for **pollutants or contaminants**.  For the purpose of the exception to this exclusion only, **pollutants or contaminants** do not include radioactive contaminants;

4. Dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances by any cause whatsoever;

5. Asbestos, dioxins or polychlorinated biphenols (hereinafter, **material(s)**) including:

   a. **Material(s)** removal;

   b. Demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating **material(s)**;

   c. Any governmental order or direction declaring that any **material** which is present in or part of or utilized on any portion of the **insured project** must be removed or modified;

6. a. Any functioning or malfunctioning or lack of the **internet** or similar facility, or of any intranet or private network, computer system, computer or computing device or similar facility;

   b. Any corruption, destruction, distortion, erasure or other loss or damage to data, coding, program, or software;

   c. Loss of use or functionality whether partial or entire of data, coding, program, software, any computer or computer system or other device and any ensuing liability or failure of the **Insured** to conduct business;

   all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage at the **insured project**;

7. Error or omission in machine programming or instructions of **electronic data**, including, loss attributable to program design constraints, networking compatibility and original business software; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage at the **insured project**;

8. Lack of incoming electricity, fuel, water, gas, steam, refrigeration, or outgoing sewerage, or incoming or outgoing data, voice or video service; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage, but only if: (1) such ensuing loss or damage is caused by a lack of incoming electricity, fuel, water, gas, steam or refrigeration from an offsite service provider and (2) such ensuing loss or damage is to equipment or machinery that is part of the **permanent works** of the **insured project** and is not operational at the time of the loss. This exception does not apply to **hot testing**;

9. Any loss or damage arising out of **hot testing**;

10. Infidelity, dishonesty or fraudulent activity of any **Insured** or any of the **Insured's** proprietors, partners, officers, directors, trustees, employees or others with whom the property is entrusted (other than a carrier for hire).  However, a willful act of destruction by the

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 14 of 25 |
|---|---|---|

**Insured's** employee without the knowledge of any of the **Insured's** proprietors, partners, officers, directors or trustees is covered;

11. Any act that: (1) causes corruption, erasure or deletion of **electronic data**, including the rendering of any equipment or machinery useless, or (2) prevents access to or use of computer hardware, software or other components thereof; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage.

12. **Fungus, mold or spore**; or any spores or toxins created or produced by or emanating from such **fungus, mold or spore**; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage;

13. Confiscation, seizure, appropriation, expropriation, nationalization, requisition for use or title, or willful destruction by any government, sovereign power, civil authority or military authority (de jure or de facto); or

14. Loss or damage arising out of any **covered cause of loss** or Additional Coverages for which the words NOT COVERED or for which an amount or number of days is not shown in Item **10.** of the Declarations.

B. Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company will not pay for loss or damage caused by or attributable to any of the following:

1. Indirect, remote or consequential loss or damage;

2. Delay, loss of market or loss of use;

3. Delay in completion of the **insured project**, unless specifically provided by endorsement and then only to the extent provided therein;

4. Any business interruption loss, **extra expense, owner's extra expense**, expediting expenses, expenses to reduce loss, loss of rental income and other economic losses;

5. Liquidated damages, performance penalties, penalties for non-completion, late completion or non-compliance with contract conditions;

6. Loss, damage, costs, expenses, fines or penalties incurred or sustained by or imposed on the **Insured** at the order of any government agency, court or other authority arising from any cause whatsoever;

7. Loss, damage, or expense covered under any written or implied guarantee or warranty by any contractor, manufacturer or supplier, whether or not such contractor, manufacturer or supplier is an **Insured**, but only to the extent such loss, damage, or expense should have been recovered under such written or implied guarantee or warranty;

8. Unexplained or mysterious disappearance, loss or shortage disclosed on taking inventory;

9. Normal: subsidence, heave, settling, cracking, expansion, contraction or shrinkage of walls, floors, ceilings, buildings, foundations, patios, walkways, driveways or pavements, all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage;

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 15 of 25 |
|---|---|---|

10. a.  Faulty workmanship, material, construction or installation from any cause; or

b.  Any fault, defect, error, deficiency or omission in any design, plans, or specifications;

all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage; or

11. Wear and tear, erosion, inherent vice, latent defect, corrosion, rust, wet or dry rot, evaporation, shrinkage, or change in color, flavor, texture or finish, extremes or changes of temperature damage, or changes in relative humidity damage, all whether atmospheric or not or gradual deterioration, all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage.

### SECTION VI – CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT

## A.  ABANDONMENT

There can be no abandonment of any property to the Company.

## B.  ADJUSTMENT OF LOSSES

Loss or damage will be adjusted with the **Named Insured** and shall be payable as directed in writing by the **Named Insured** subject to: mortgagee; lender; or similar interests; as their interests may appear as shown on the Certificates of Insurance or any endorsement attached to and forming a part of the Policy.  The effective date of any interests will be the issue date of the Certificate of Insurance unless a later date is specified on the Certificate of Insurance.

Notwithstanding the foregoing, if the Company is prohibited from adjusting and making payment in accordance with the preceding paragraph, the Company will adjust and make payment to the **Named Insured**.

## C.  APPRAISAL

If the **Named Insured** and the Company disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss.  In such event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire.  If the appraisers cannot agree on an umpire, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the replacement cost and actual cash value of the property and amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding.  Each party will:

1.  Pay its chosen appraiser; and

2.  Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, it is without prejudice to the Company's rights under the terms and conditions of this Policy and the Company's right to deny the claim in whole or in part.

## D.  PARTIAL PAYMENT OF LOSS

In the event the amount of loss or damage for which the Company is liable is determined by the Company to be in excess of the applicable deductible, the Company may advance partial payment(s) with respect to any claim, subject to all other terms and conditions of this Policy.

E. **REQUIREMENTS IN CASE OF LOSS OR DAMAGE**

In case of loss or damage, the **Insured** shall:

1. Give written notice of any loss or damage to the Company as soon as practicable after the date of such loss or damage;

2. Promptly contact the applicable authority having jurisdiction in the event a law has been broken, and promptly file a written report with such authority;

3. Protect the property from further loss or damage;

4. Separate the damaged and undamaged property;

5. Maintain such property in the best possible order;

6. Furnish a complete inventory of the lost, destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed;

7. Allow the Company to examine and audit the **Insured's** books and records at any reasonable time for the purpose of investigating or verifying any claim;

8. Furnish all other documents or insurance policies that the Company may reasonably require;

9. Allow the Company to access and inspect any damaged or undamaged property;

10. Submit to examination under oath at such times as the Company reasonably may require concerning any matter relating to this insurance or any claim;

11. Cooperate with the Company in all aspects of any claim and provide the Company with any additional information that the Company requires; and

12. Provide the Company with a proof of loss, signed and sworn to by the **Named Insured** as soon as practicable, but in no event more than 90 days after a loss, stating the **Insured's** knowledge and belief as to the following:

    a. The time and origin of the loss;

    b. The **Insured's** interest and the interest of all others in the property;

    c. The value of each item thereof determined in accordance with the VALUATION Section and the amount of loss thereto and all encumbrances thereon;

    d. All other contracts of insurance, whether collectible or not, covering any of the **covered property**; and

    e. Any changes in the title, use, occupancy, location, possession or exposures of the **covered property** subsequent to the issuance of this Policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss, whether or not it then stood on leased ground.

F. **SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable shall be payable within 30 days after proof of loss, as herein required, is received and agreed to by the Company or the amount of

| 125687 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 17 of 25 |
|---|---|---|

loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

The Company shall have the option to take all or any part of the property at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing the **Named Insured** with notice of the Company's intention to do so within 60 days after the Company's receipt of the proof of loss herein required.

## G. SUBROGATION

The Company may require from the **Insured** an assignment of all rights of recovery against any party for loss to the extent that payment is made by the Company. However, the **Insured** has the right to waive subrogation, provided such waiver is entered into by the **Insured** in writing prior to the loss. The **Insured** will do nothing after a loss to prejudice such rights of subrogation.

Notwithstanding the foregoing, it is a condition of this Policy that the Company shall be subrogated to all the **Insured's** rights of recovery against:

1. Any architect or engineer, whether named as an **Insured** or not, for any loss or damage arising out of the performance of professional services in their capacity as such and caused by an error, omission, deficiency or act of the architect or engineer, by any person employed by them or by any others for whose acts they are legally liable; and

2. Any manufacturer or supplier of machinery, equipment or other property, whether named as an **Insured** or not, for the cost of making good any loss or damage regardless of any guarantee or warranty, whether express or implied.

Any recovery by the Company as a result of subrogation proceedings arising out of an **occurrence**, after expenses, including the Company's legal fees, incurred in such subrogation proceedings are deducted, shall accrue to the **Insured** in the proportion that the deductible amount and/or any provable uninsured loss amount bears to the entire provable loss amount.

The **Insured** will cooperate with the Company and, upon the Company's request and expense will:

1. Attend hearings and trials;

2. Assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and conducting suits.

## H. SUIT AGAINST COMPANY

No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless the same be commenced within 24 months immediately after the date of the loss, provided however, that if under the laws of the applicable jurisdiction such time limitation is unenforceable, then the period within which such action or proceeding must be commenced shall be the shortest period of time permitted by the laws of such jurisdiction.

## SECTION VII – GENERAL CONDITIONS

**A.  ASSIGNMENT**

The **Insured** may not assign this Policy without the Company's prior written consent.

**B.  CANCELLATION**

This Policy may be cancelled by the **Named Insured** at any time by surrendering this Policy to the Company or by mailing or delivering to the Company written notice stating when thereafter such cancellation shall take effect.   The Company may cancel this Policy by giving the **Named Insured** written notice stating when, not less than 90 days thereafter, or 10 days thereafter for nonpayment of premium, such cancellation shall be effective.

The Company shall pay return premium to the **Named Insured** on a pro-rata basis if the Company cancels and on a short rate basis (meaning 90% of the unearned premium) if the **Named Insured** cancels.

Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If any specific state amendatory endorsement provides less than 90 days notice of cancellation for reasons other than nonpayment of premium, where permitted by law, the Company shall provide the 90 days notice set forth herein.

**C.  CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Policy is voidable by the Company if any **Insured**, whether before or after a loss, has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or has committed any act of fraud, attempted fraud or false swearing concerning any matter relating to this insurance or the subject thereof.

**D.  CONFORMANCE TO STATUTE**

Any provisions of this Policy which are in conflict with statutes applicable to this Policy are understood, declared and acknowledged by the Company to be amended to conform to such statutes.

**E.  ECONOMIC AND TRADE SANCTIONS**

The Company shall not be deemed to provide cover and the Company shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose this Company, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.

**F.  ERRORS OR OMISSIONS**

No unintentional errors or omissions in any information required to be reported to the Company will prejudice the **Insured's** rights of recovery, but the **Insured** shall report the correct information to the Company as soon as practicable when discovered and the **Insured** shall pay any additional premium when due.

**G. GOVERNING LAW**

Any interpretation of this Policy or issue relating to its construction, validity or operation shall be determined by the laws of the United States or of any applicable state in the United States. The parties will submit to the exclusive jurisdiction of the applicable court within the United States.

**H. INCREASE IN HAZARD**

If the circumstances in which this insurance was entered into shall be altered or if the risk shall be materially increased, the **Insured** shall as soon as possible give notice in writing to the Company. In the event there is a material increase in the risk, the Company reserves the right to change the terms or conditions of this Policy or cancel this Policy (if allowable by law).

**I. INSPECTION**

The Company shall be permitted, but not obligated, to inspect **covered property** at all reasonable times during the **policy period**. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute any undertaking by the Company, on behalf of or for the benefit of the **Insured** or others, to determine or warrant that such **covered property** is safe or healthful or that such **covered property** complies with any law, rule, regulation, code, engineering or industry standard.

**J. LIBERALIZATION**

If the Company adopts a standard revision to the Company's Completed Value Builders Risk Construction Performance Policy that would broaden the coverage under this Policy within 45 days prior to the inception date of this Policy or during the **policy period** of this Policy and if no additional premium is required for such revision, then the broadened coverage will immediately apply to this Policy.

**K. NAMED INSURED**

If this Policy insures more than one person or organization, the **Named Insured** is authorized to act on behalf of all other **Insureds** with respect to such **Insureds'** rights, obligations, and duties under this Policy including, but not limited to, the giving and receiving of notices under this Policy. Payment of loss or return premium under this Policy to the **Named Insured** shall satisfy the Company's obligations with respect to all **Insureds** under this Policy.

**L. NO BENEFIT TO BAILEE**

No person or organization, other than the **Insured**, having custody of **covered property** will benefit from this insurance.

**M. OTHER INSURANCE**

1. An **Insured** may have other insurance. If such **Insured** does have other insurance, the Company will pay its share of the covered loss or damage. Subject to the exceptions as set forth in **2.** below, the Company's share is the proportion that the applicable limit/sublimit of liability under this Policy bears to the limits/sublimits of liability of all insurance covering the loss or damage.

    **2.** If there is other insurance as described below, the Company **will** pay under this Policy only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether the **Insured** can collect on it or not:

        **a.** The property covered under this Policy is also covered under another policy, in which such property is more specifically described; or

        **b.** The other insurance covers the **Insured's** interest or the interest of others in property which the **Insured** does not own.

## N. PAIR AND SET

In the event of loss or damage to any part of **covered property** consisting, when complete for use, of several parts, the Company will only be liable for the value of the part lost or damaged.

## O. PREMIUM ADJUSTMENT

    **1. During the Term of the Policy:**

        **a.** At the time of any extension of this Policy or if the scope or value of the **insured project** changes beyond the percentage set forth in the Margin Clause shown on the Declarations, the **Named Insured** shall report in writing to the Company the **adjusted total project value** as of the date of such extension or change order.

        **b.** The adjusted premium shall be calculated by applying the rates as shown in Item **8.** of Declarations used for the purpose of computing the Deposit Premiums to the amended term of coverage and the **adjusted total project value.**

        **c.** If the adjusted premium so calculated differs from the Total Deposit Premium shown in Item **8.** of the Declarations (or the previous revision of the Total Deposit Premium), such difference shall be due and payable to the Company or the **Named Insured,** whichever is applicable.

    **2. Upon Expiration or Cancellation of the Policy:**

        **a.** At the time of expiration or cancellation of this Policy, the **Named Insured** shall report in writing to the Company the **adjusted total project value** as of the Expiration Date or the effective date of cancellation.

        **b.** The final earned premium for this Policy shall be calculated by applying the rates as shown in Item **8.** of Declarations used for the purpose of computing the Deposit Premiums to the actual term of coverage and the **adjusted total project value.**

        **c.** If the premium so calculated differs from the Total Deposit Premium shown in Item **8.** of the Declarations (or the previous revision of the Total Deposit Premium), such difference shall be due and payable to the **Named Insured** or the Company, whichever is applicable.

## P. PRESERVATION OF PROPERTY

In case of imminent loss or damage, the **Insured** must make reasonable efforts to protect property from such loss or damage.

## Q. RECOVERY FROM OTHER PARTIES

No loss or damage in whole or in part shall be paid hereunder to the extent the **Insured** has collected such loss or damage from others.

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 21 of 25 |
|---|---|---|

**R.  SALVAGE AND RECOVERIES**

All salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this Policy, shall reduce the loss accordingly.

**S.  TITLES**

The titles in this Policy are solely for reference and shall not in any way affect the provisions to which they relate.

## SECTION VIII – DEFINITIONS

1.  **Additional Insured(s)** means those **Insureds** shown in Item **2.** of the Declarations.

2.  **Adjusted total project value** means the **total project value** that may be adjusted during the **insured project** or if previously adjusted, any adjustments to the revised **total project value.**

3.  **Building or other system(s)** means:

    a.  Equipment and machinery; and/or

    b.  Manufacturing or structural system(s), such as a HVAC, instrumentation, electrical, mechanical or control system(s);

    that are incorporated into the **insured project.**

4.  **Collapse** means an abrupt falling down or caving in of a building or structure or any part of a building or structure.

5.  **Contract documents** means the contract(s) or agreement(s), as may be amended, on file with the **Insured** for the **insured project.**

6.  **Coverage territory** means the coverage territory as shown in Item **6.** of the Declarations.

7.  **Covered cause(s) of loss** means a peril or other type of loss, not otherwise excluded under this Policy.

8.  **Covered property** means property as described in the COVERED PROPERTY Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section which is not otherwise excluded under the PROPERTY NOT COVERED Section, for which the **Insured** is contractually responsible and the value of which has been included in the **total project value.**

9.  **Electronic data** means data, messages, information, coding, programs, instructions or software in a form suitable for communications, storage, or processing by electronic, electromechanical, electromagnetic data processing or electronically controlled production equipment.  **Electronic data** does not include electronic storage media.

10. **Existing property** means existing buildings and/or permanent structures, including equipment and apparatus used to maintain or service the buildings or structures, that existed prior to the inception date of this Policy and is located at the **insured project.  Existing property** does not include personal property, any property located outside of the existing buildings and/or permanent structures, and/or any underground utilities of any kind or description.

11. **Extra expense** means the excess costs over and above the total costs that would normally have been incurred to continue the scheduled progress of the undamaged work in the absence of such loss or damage, including:

    a.  Labor, supervision, management and administration costs;

    b.  Equipment rental, temporary use of property;

    c.  Emergency expenses, additional security; and

    d.  Demobilization and remobilization of equipment and facilities;

all when necessarily incurred to reduce time delays in the contract schedule.

12. **Fine arts** means paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; porcelains; and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft and **money**.

13. **Fungus, mold or spore** means:

    a.  **Fungus** including, but not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including **mold**, yeast, rusts, mildews, smuts and mushrooms;

    b.  **Mold** including, but not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and **fungi** that produce **mold**; and/or

    c.  **Spore** including, but not limited to, any dormant or reproductive body produced by or arising or emanating out of any **fungus**, **mold**, mildew, plants, organisms or microorganisms.

14. **Insured(s)** means the **Named Insured(s)** and the **Additional Insured(s)**.

15. **Insured project** means the construction project as described in Item 5. of the Declarations, for which values have been reported and are included in the **total project value**.

16. **Malicious code** means any unauthorized code designed to cause corruption, erasure or alteration of **electronic data**.

17. **Money** means:

    a.  Currency, coins, bank notes, bullion, traveler checks, registered checks, money orders; and

    b.  Negotiable and non negotiable instruments or contracts representing money including: tokens, tickets, revenue stamps and other stamps (whether represented by actual stamps or unused value in a meter), and evidence of debt issued in connection with credit card or charge cards that are issued to the **Insured**.

18. **Named Insured** means the Named Insured(s) shown in Item 1. of the Declarations.

19. **Occurrence** means any one accident, loss, disaster, casualty, incident or series of accidents, losses, disasters, casualties or incidents, including all resultant or concomitant insured losses, not otherwise excluded by this Policy and with respect to:

    a.  **Terrorism** (to the extent **terrorism** is covered), arises out of the same or related purpose or cause; or

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 23 of 25 |
|---|---|---|

**b.** Covered perils other than **terrorism**, arises out of a single event or originating cause.

The **occurrence** must occur during the **policy period**.

When the term applies to loss or losses from the perils of **windstorm or hail, named storm, riot, strike or civil commotion, vandalism and malicious mischief, earth movement, flood** or **terrorism**, to the extent any such peril(s) are covered, all losses arising from such peril(s) occurring during a continuous period of 72 hours shall be deemed to be a single **occurrence. The Named Insured** may elect the moment at which the 72 hour period shall be deemed to have commenced, which shall not be earlier than the time when the first loss occurs to the **covered property**, but no two such 72 hour periods shall overlap.

If the **occurrence** commences during this **policy period**, then the Company shall treat the entire **occurrence** as occurring during this **policy period**.

20. **Owner's extra expense** means the following expenses:

 a. Advertising and marketing expense;

 b. Legal and accounting fees;

 c. License and permit fees; and

 d. Project management fees.

21. **Plans and drawings** means plans, blueprints, drawings, renderings, specifications or other contract documents and models (whether in physical or **electronic data** format) for the **insured project** stored anywhere in the world.  Such **plans and drawings** do not include machine programing instructions including, Building Information Modelling ("BIM").

22. **Policy Limit** means the limit of liability shown in Item **9.** of the Declarations.

23. **Policy period** means the policy period as described in Item **4.A.** and Item **4.B.** of the Declarations.

24. **Pollutants or contaminants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances. Waste includes materials to be recycled, reconditioned or reclaimed.  **Pollutants or contaminants** do not include **fungus, mold or spore.**

25. **Processing water** means water used directly in the **Insured's** business process that is contained within any enclosed tank, piping system or any other processing equipment.

26. **Project owner(s)** means the project owner(s) shown in Item **5.** of the Declarations.

27. **Riot, strike or civil commotion** means riot or civil commotion including, but not limited to:

 a. Acts of striking employees while occupying an **insured project;** and

 b. Pilferage or looting occurring at the time and place of a riot or civil commotion.

28. **Total project value** means the total value of **permanent works** (including **landscaping materials), temporary works** and **property of others**; plus labor costs that will be expended to construct the

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 24 of 25 |

insured project; plus site general conditions, construction management fees, and contractor's profit and overhead as stated in the **contract documents** as the "total project value", "total contract value", or other similar description.

29. **Used machinery and equipment** means any mechanical or electrical machine or equipment, including a pressure or non-pressure vessel, which has been previously installed or refurbished or is no longer under a manufacturer's warranty.

30. **Vandalism and malicious mischief** means willful and malicious damage to, or destruction of, **covered property**.

31. **Windstorm or hail** means the direct action of wind or the direct action of hail, whether accompanied by wind or not.  However, **windstorm or hail** does not mean:

   a. Loss or damage caused by or resulting from frost or cold weather, ice (other than hail), snow or sleet, whether driven by wind or not;

   b. Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters; or

   c. Loss or damage caused when weight of snow, rainwater, ice or sleet is a contributing factor to the fall or **collapse** of a building or structure or any part thereof.

ENDORSEMENT #001

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## DELAY IN COMPLETION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

I.  **Named Insured and Address:**
    A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
    17901 COLLINS AVENUE SOUTH
    SUNNY ISLES BEACH FL 33160

    All coverage under this Delay in Completion Endorsement shall only be provided to the Named Insured shown above (hereinafter, the **Named Insured** for purposes of this endorsement only). No coverage shall be provided under this endorsement to any other person or entity.

II. The coverage provided under this Delay in Completion Endorsement is applicable to the entire **insured project** unless otherwise described below:

    Not Applicable

III. **Period of Indemnity:**           540 Calendar Days
IV.  **Anticipated Date of Completion:** South Tower - 07/01/2021
                                         Villa - 12/31/2021

V. **Deductible Period:**

|  | Deductible Period (per occurrence unless otherwise stated below) |
|---|---|
| **Standard Deductible** | 30 Calendar Days<br>☒ per **occurrence** or<br>☐ in the Aggregate, no other **Deductible Periods** apply |
| **Earth Movement, Flood or Named Storm** | 30 Calendar Days |
| **Cyber Loss** | 30 Calendar Days |
| **Ingress & Egress** | 30 Calendar Days |
| **Order of Civil or Military Authority** | 30 Calendar Days |
| **Service Interruption** | 30 Calendar Days |
| **Hot Testing** | Not Applicable |
| **LEG 3** | 30 Calendar Days |

If two or more deductible amounts provided above apply to a single **occurrence**, the total to be deducted shall be the largest applicable deductible. The above deductibles are in addition to any applicable deductibles on the Declarations of this Policy. If the Standard Deductible applies on a per **occurrence** basis, then such deductible shall apply unless a more specific deductible applies.

**VI. Limits of Liability Applicable to this Endorsement**

The following are subject to and not in addition to the **Policy Limit** and all sublimits of liability shown in **Item 10.A.** of the Declarations.  The sublimits of liability stated in this endorsement are per **occurrence** unless otherwise stated.

*If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage, then no coverage is provided for that coverage, whether under the Insuring Agreement or any Additional Coverage.  If the words, NOT APPLICABLE are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

| | | |
|---|---|---|
| **A.** | Aggregate Sublimit of liability for all coverage under this endorsement | $44,022,420 |

The following sublimits of liability **VI.B.** through **VI.I.** are subject to **VI.A.** above:

| | | |
|---|---|---|
| **B.** | Loss of **Rental Income** | $NOT COVERED |
| **C.** | Loss of **Gross Earnings** | $NOT COVERED |
| **D.** | **Cyber Loss** | See Item **10.B.7.** of the Declarations |
| **E.** | Ingress & Egress | 15 Calendar Days, subject to maximum of $2,500,000 |
| **F.** | Order of Civil or Military Authority | 15 Calendar Days, subject to maximum of $1,000,000 |
| **G.** | Service Interruption | 15 Calendar Days, subject to maximum of $1,000,000 |
| **H.** | Other:  NOT COVERED | $NOT COVERED |
| **I.** | **Soft Costs/Additional Expenses** | $44,022,420 |

The following sublimits of liability are subject to **VI.I.** above.

| | | |
|---|---|---|
| **1.** | Interim interest expense | $INCLUDED |
| **2.** | Realty taxes/Ground rents | $INCLUDED |
| **3.** | Leasing/Commission expense | $INCLUDED |
| **4.** | Insurance premiums | $INCLUDED |
| **5.** | Advertising and marketing expense | $INCLUDED |
| **6.** | Legal and accounting fees | $INCLUDED |
| **7.** | License and permit fees | $INCLUDED |
| **8.** | Project management fees | $INCLUDED |
| **9.** | Other: Construction Supervision | $INCLUDED |

| **10.** Other: Real State Taxes | $INCLUDED |
|---|---|
| **11.** Other: Loan Fees and Interest | $INCLUDED |
| **12.** Other: Sales Deposit & Bond Interest | $INCLUDED |
| **13.** Other: Project G & A | $INCLUDED |
| **14.** Other: Soft Cost Contingency | $INCLUDED |

No coverage or Additional Coverage shall be provided unless the **delay(s)** exceeds the **anticipated date of completion** and then such coverage shall only be provided for the **delay(s)** that is/are in excess of such **anticipated date of completion**, subject to the applicable **deductible period**. All covered losses and expenses are subject to the applicable **Policy Limit**, sublimits of liability, **period of indemnity** or calendar days as stated in the above Schedule.

**A. INSURING AGREEMENT**

1. Subject to all terms and conditions of this Policy, in the event of:

    a. Direct physical loss of or damage to **covered property, landscaping materials** or **plans and drawings** by a **covered cause of loss**, or

    b. Corruption, erasure or alteration of:

        i. **Electronic data** in the **building or other systems**, due to: **(1)** the introduction of **malicious code** or (2) a **covered cause of loss**,

        ii. **Plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code**, or

    c. **Building or other systems** that are rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems**

    (hereinafter, collectively Subsections **1.b.** and **1.c.** are referred to as **cyber loss**), the Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** sustained during the **period of indemnity** as a result of **delay** in completion of the **insured project**, on an actual loss sustained basis.

2. The Company shall also indemnify the **Named Insured** for reasonable expenses, over and above normal operating expenses, during the **period of indemnity**, that are necessarily incurred for the purpose of reducing any loss covered under this endorsement, but in no event shall the Company be liable for an amount greater than that for which the Company would have been liable had there been no covered **delay**.

**B. ADDITIONAL COVERAGES**

1. **Ingress & Egress**

    The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if ingress to or egress from the **insured project** is prohibited as a result of direct

©American International Group, Inc.
All Rights Reserved.

physical loss or damage by a **covered cause of loss** to property not insured under this Policy, provided that such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the prohibition of ingress or egress to the **insured project** for the lesser of:

a.   The number of calendar days shown for Ingress & Egress in the above Schedule, or

b.   Until the ingress or egress is no longer prohibited,

subject to the Ingress & Egress sublimit of liability shown in the above Schedule.

2.   **Order of Civil or Military Authority**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if an order of civil or military authority prohibits access to the **insured project**, provided that: (1) such order is a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy and (2) such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with such order that prohibits access to the **insured project** for the lesser of:

a.   The number of calendar days shown for Order of Civil or Military Authority in the above Schedule, or

b.   Until access to the **insured project** is no longer prohibited,

subject to the Order of Civil or Military Authority sublimit of liability shown in the above Schedule.

3.   **Service Interruption**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** resulting from the interruption of incoming electricity, steam, gas, fuel or water caused by direct physical loss or damage by a **covered cause of loss** to a service provider's transmission and distribution lines and related plants, substations and equipment located outside of the **insured project**.  Notwithstanding the foregoing, the Company will not pay for any interruption intentionally caused by any **Insured** or any service provider.

If a service provider's transmission and distribution lines and related plants, substations and equipment that sustain loss or damage are part of the **insured project** and included in the **total project value**, the Service Interruption sublimit of liability shown in the above Schedule shall not apply, nevertheless the Aggregate Sublimit of Liability for all coverage under this endorsement shown in **VI.A.** above shall apply.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

 ©American International Group, Inc.
All Rights Reserved.

The Company shall only provide coverage for **delay** associated with the interruption of incoming electricity, steam, gas, fuel, or water to the **insured project** for the lesser of:

a. The number of calendar days shown for Service Interruption in the above Schedule, or

b. Until such incoming utilities are restored,

subject to the Service Interruption sublimit of liability shown in the above Schedule.

## C. ADDITIONAL EXCLUSIONS AND LIMITATIONS

In addition to all other exclusions of this Policy, the Company will not be liable under this endorsement for any loss or increase in **delay** caused by, resulting from or arising out of any of the following:

1. The enforcement of any law, ordinance, governmental directive or standard regulating removal, repair, construction or reconstruction of any property;

2. Changes made in the design, plans, specifications or other contract documents in order to effect the repair or replacement of any property;

3. Non-availability of funds;

4. Import, export or customs restrictions and/or regulations;

5. The breach, suspension, lapse or cancellation of or the failure to obtain, maintain or extend any permit, lease, license, contract or purchase orders;

6. The interference by strikers or other persons directly or indirectly with the completion of the **insured project**, including the transportation of property, the construction, rebuilding, repairing or replacing of any property or the occupancy or use of the premises where the **insured project** is located;

7. The failure to use due diligence and dispatch in restoring any property to the condition existing prior to the loss or damage;

8. Any deviation in the **construction schedule** or a revised **construction schedule** except for a deviation that is the result of covered loss or damage;

9. Any disruption in the normal movement of **covered property** unless such **covered property** is damaged by a **covered cause of loss** during **inland transit**;

10. Re-erection of any tower or pole crane(s), unless such tower or pole crane is specifically covered under Schedule A of the Contractors' Equipment Endorsement. or

11. Loss or damage to that part of the **insured project** which at the time of loss or damage has been put to its intended use or has become operational.

## D. ADDITIONAL LOSS ADJUSTMENT CONDITIONS

In addition to the conditions set forth in the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section of this Policy, the following additional conditions apply to this endorsement:

1. Upon written notification of any loss or damage under the terms and conditions of this Policy, the **Insured** shall provide the Company with all applicable **construction schedules** as requested by the Company.

2. Upon request by the Company, the **Insured** shall make available all other records and information relevant to the determination of any claim for loss, damage and/or expenses or any audit under this endorsement.

3. In the event of payment under this endorsement, the Company may conduct an audit of the **Named Insured's** records for a reasonable period of time, to be determined by the Company, (typically 12 months) after actual commencement of operations to determine the loss under this endorsement, as well as any expenses incurred by the **Named Insured** related to reducing such loss. Due consideration shall be given to seasonal patterns, trends, variations or special circumstances which would have affected the business had the **delay** not occurred, so that the amount adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the **delay**, would have been realized. Any amount saved with respect to labor costs, charges and expenses that have ceased or reduced during the **period of indemnity** and liquidated damages the **Named Insured** is entitled to receive from others, whether collectible or not, shall be deducted from the loss during the **period of indemnity**.

   In the event the amount of loss determined by the audit is less than or exceeds the sum paid by the Company for loss covered under this endorsement during the **period of indemnity**, the difference between the two amounts shall be paid by the Company or to the Company by the **Named Insured**, whichever is applicable.

E. **ADDITIONAL GENERAL CONDITIONS**

   In addition to the conditions set forth in the GENERAL CONDITIONS Section of this Policy, the following additional conditions apply to this endorsement:

1. In the event loss, damage or other circumstances require that the project completion date shown on any critical path, time line, bar chart or other scheduling vehicle is revised to extend such completion date, the **Insured** shall establish a revised **construction schedule** and furnish the same to the Company. The new date established in such revised **construction schedule** shall become the **anticipated date of completion**. The Company shall have the right to change the **anticipated date of completion**, even if the **Insured** has failed to provide such revised **construction schedule**.

   There shall be no amendment to the **anticipated date of completion** in the event any critical path, time line, bar chart or other scheduling vehicle is revised to compress or accelerate the **construction schedule**, without the written notice to the Company and endorsement by the Company hereto.

2. The **Insured** shall take and allow all reasonable measures to minimize the extent of any interference with the **construction schedule** so as to avoid or diminish any potential **delay**. The **Insured** shall begin normal operations as soon as practicable.

F. **ADDITIONAL DEFINITIONS**

   The definitions of this Policy apply to this endorsement. However, the following additional definitions apply to this endorsement and supersede any similar definitions of this Policy to the contrary.

1. **Anticipated date of completion** means: (1) the date as shown in the above Schedule as the Anticipated Date of Completion or (2) the revised **anticipated date of completion** in

accordance with the Subsection **E.1.** of the Additional General Conditions Subsection of this endorsement.   For calculation of loss under this endorsement, the Company shall use the applicable **anticipated date of completion** at the time of the loss or damage.

2. **Construction schedule** means the schedule utilized in the construction management program through software that shows the construction operations, the times for starting and completion of operations, the period of the operations, the interrelationships between the operations and the critical path that identifies the critical operations.

3. **Deductible period** means the applicable number of calendar days shown in Item **V.** of the above Schedule beginning with the **anticipated date of completion**.   Losses are **only** payable in excess of the applicable **deductible period**.

4. **Delay** means the period of time between the **anticipated date of completion** and the actual date on which occupancy or commercial service can commence with respect to the entire **insured project** or the **insured project** as described in Item **II.** of the Schedule, whichever is applicable, with the exercise of due diligence and dispatch.

5. **Gross earnings** means gross revenues from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

6. **Insured project** means the entire **insured project** or the part of the **insured project** as identified in Item **II.** of the above Schedule.   The words, **insured project**, also include the definition in the Completed Value Builders Risk Policy.

7. **Period of indemnity** means the number of calendar days for which coverage is provided under this endorsement, regardless of the number of **occurrences**, not to exceed the number of days shown in Item **III.** of the above Schedule.   For each **occurrence**, such calendar days or remaining calendar days shall commence upon the expiration of the applicable **deductible period**.  The **period of indemnity** shall not be limited by the end of the **policy period.**

8. **Rental income** means revenues from rentals and leases from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

9. **Soft costs/additional expenses** means such expenses as shown in Item **VI.I.1.** through **VI.I.9.** of the above Schedule, inclusive, in relation to the **insured project**.

All other terms and conditions of the Policy remain the same.

ENDORSEMENT #002

This endorsement, effective 12:01 A.M., 12/14/2018
Forms a part of Policy No.: 043820532
Issued to: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
By: NEW HAMPSHIRE INSURANCE COMPANY

## EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

Sublimits of Liability and Deductibles (per occurrence):

A.  The following sublimit of liability is added to Item **10.B.** of the Declarations:

Sublimit for repairing or replacing faulty or defective **covered property**     $433,500,000

B.  The following deductible is added to Item **11.** of Declarations:

Deductible applicable to repairing or replacing faulty or defective **covered property**     $100,000

The above deductible shall apply in addition to the applicable deductible(s) in Item **11.A.** through **11.G.**, inclusive, as shown on the Declarations.

C.  The following sublimit of liability is added as Item **VI.J.** to the Delay In Completion Endorsement:

Provided that Delay In Completion coverage is provided under this Policy, the Sublimit for Delay in Completion resulting from repair or replacement of faulty or defective **covered property**     $44,022,420

The **Deductible Period** shown in the Delay in Completion Endorsement applies to the above coverage in this Subsection **C.**

Additional Premium:     $70,055

In consideration of the Additional Premium shown in the above Schedule, Exclusion **B.10.** of the PERILS EXCLUDED Section is deleted in its entirety and replaced with the following:

**10. a.**  Faulty workmanship, material, construction or installation from any cause; or

**b.**  Any fault, defect, error, deficiency or omission in any design, plans, or specifications,

all unless direct physical loss or damage not otherwise excluded by this Policy ensues.  If direct physical loss or damage not otherwise excluded by this Policy ensues, then the Company shall pay for the following only:

a.  Such ensuing direct physical loss or damage to **covered property**, and/or

b.  Subject to the sublimit(s) of liability shown in the above Schedule, repairing or replacing (whichever is less) with like kind and quality at the time and place of the loss the damaged part of the faulty or defective **covered property**.

However, in no event shall the Company pay any loss, cost, damage or expense to: **(1)** improve the original workmanship, materials, construction, installation, design, plans or specifications or (2) redesign any design, plans or specifications.

No portion of the **covered property** shall be regarded as damaged solely by virtue of the existence of: (1) any faulty workmanship, material, construction or installation, or (2) any fault, defect, error, deficiency or omission in any design, plans, or specifications.

NOTICE:  THIS ENDORSEMENT IS BASED UPON LEG 3 PROVISIONS, BUT MAY DIFFER FROM SUCH CURRENT OR PRIOR LEG 3 PROVISIONS.

All other terms and conditions of the Policy remain the same.

ENDORSEMENT #003

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## LENDER LOSS PAYEE OR LOSS PAYEE ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

**Lender Loss Payee or Loss Payee:**
Bank OZK, its successors and assigns, as their interests may appear
625 Court Street
Clearwater, FL 33756

1. Subject to the terms and conditions of this Policy, the Company will not pay any Lender Loss Payee or Loss Payee more than its financial interest in: (1) **covered property** which is part of the **insured project** or (2) **existing property** (but only if coverage for **existing property** is provided by endorsement) (hereinafter, (1) and (2) are collectively referred to as **covered property).**

2. Any Lender Loss Payee or Loss Payee shown in the above Schedule is a creditor, including a Lender Loss Payee or trustee, whose interest in the **covered property** is established by such written instruments as:

   a. Warehouse receipts;

   b. A contract for deed;

   c. Bills of lading;

   d. Financing statements;

   e. **Contract documents**; or

   f. Mortgages, deeds of trust, or security agreements.

3. For **covered property** for which both the **Insured** and a Lender Loss Payee or Loss Payee have an insurable interest:

   a. The Company will pay for covered loss or damage to each Lender Loss Payee or Loss Payee in their order of precedence, as interests may appear.

   b. The Lender Loss Payee or Loss Payee has the right to receive loss payment even if the Lender Loss Payee or Loss Payee has started foreclosure or similar action on the **covered property.**

   c. If the Company denies the **Insured's** claim because of the **Insured's** acts or because the **Insured** has failed to comply with the terms of this Policy, the Lender Loss Payee or Loss Payee shall still have the right to receive loss payment, if the Lender Loss Payee or Loss Payee:

**125700 (5/17)**        Includes copyrighted information of the Insurance Services Offices,        Page 1 of 2
                              Inc., with its permission.  All rights reserved.

(1) Pays any premium due under this Policy at the Company's request if the **Named Insured** has failed to do so;

(2) Submits a signed, sworn proof of loss within 60 days after receiving notice from the Company of the **Insured's** failure to do so; and

(3) Has notified the Company of any change in ownership, occupancy or substantial change in risk known to the Lender Loss Payee or Loss Payee.

All of the terms of this Policy will then apply directly to the Lender Loss Payee or Loss Payee.

d. If the Company pays the Lender Loss Payee or Loss Payee for any loss or damage and denies payment to the **Insured** because of the **Insured's** acts or because the **Insured** has failed to comply with the terms of this Policy:

(1) The Lender Loss Payee's or Loss Payee's rights will be transferred to the Company to the extent of the amount of the Company's payment; and

(2) The Lender Loss Payee or Loss Payee's rights to recover the remaining amount of the Lender Loss Payee or Loss Payee's claim will not be impaired.

At the Company's option, the Company may pay to the Lender Loss Payee or Loss Payee the whole principal on the debt plus any accrued interest. In this event, the **Insured** will pay the **Insured's** remaining debt to the Company.

e. If the Company cancels this Policy, the Company will give written notice to the Lender Loss Payee or Loss Payee at least:

(1) 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

(2) 30 days before the effective date of cancellation if the Company cancels for any other reason.

All other terms and conditions of the Policy remain the same.

ENDORSEMENT #004

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## PILING, SHEET PILING & CAISSON LIMITATION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

In addition to all other exclusions of the Policy, the Company shall not pay any costs or expenses for:

1. Replacing, repairing, realigning or rectifying casings, piles, sheet piles or caissons which are misplaced, misaligned, jammed, abandoned or damaged during installation, extraction or construction;

2. Replacing, repairing, realigning or rectifying casings, piles, sheet piles or caissons which have become obstructed by: (a) jammed or damaged piling equipment or (b) jammed or damaged casings;

3. Rectifying defective, disconnected or declutched piling, sheet piles or caissons;

4. Rectifying any leakage of any kind or infiltration of any material;

5. Filling voids or replacing lost bentonite;

6. Replacing, repairing, realigning or rectifying profiles and dimensions; or

7. Failure to reach design load bearing capacity or to pass any load bearing test.  No coverage is provided for any loss or damage as a result of any load bearing test, notwithstanding any other provision of this endorsement to the contrary.

However, this endorsement shall not apply:

1. When any of the foregoing are the result of direct physical loss of or damage to other **covered property**, not otherwise excluded by this Policy; or

2. To direct physical loss of or damage to other **covered property** which results from any of the foregoing.

All other terms and conditions of the Policy remain the same.

| 125703 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 1 of 1 |
|---|---|---|

**ENDORSEMENT #005**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## POLICY CHANGES ENDORSEMENT

The following item(s):

| ☐ Insured's Name | ☐ Insured's Mailing Address |
|---|---|
| ☐ Policy Number | ☐ Company |
| ☐ Effective/Expiration Date | ☐ Insured's Legal Status/Business of Insured |
| ☐ Payment Plan | ☐ Premium Determination |
| ☐ Additional Interested Parties | ☐ Coverage Forms and Endorsements |
| ☐ Limits/Exposures | ☐ Deductibles/Waiting Periods |
| ☐ Covered Property/Location Description | ☐ Additional Location(s) |
| ☐ Underlying Insurance | ☒ Special Terms and Conditions |

is (are) changed to read **{See Additional Page(s)}:**

The above amendments result in a change in the premium as follows:

| ☒ NO CHANGES | ☐ ADDITIONAL PREMIUM | RETURN PREMIUM |
|---|---|---|
| | $ | $ |

POLICY CHANGES ENDORSEMENT DESCRIPTION

FLOOD AND NAMED STORM AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

I. Subsection 2. of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and is replaced with the following:

2. Flood, which means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water (other than storm surge or storm tide), overflow or rupture of a dam, levy, dike or other surface containment structure, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.  A tsunami shall not be considered a flood.

II. Subsection 4. of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and is replaced with the following:

4. Named storm, which means:

a A storm that, at any time, has been declared by the United States National Weather Service or another meteorological authority to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm; and

b. Storm surge and storm tide, or the spray therefrom, all whether: (1) driven by wind or not or (2) related to a storm described in Subsection 4.a. above or not.

ENDORSEMENT #006

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## FLORIDA CANCELLATION/NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy, and 2) "you", "your", "named Insured" and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

It is hereby agreed and understood that the cancellation provision of this policy is to be deleted in its entirety and to be replaced with the following:

A.    The Insured shown in the Declarations may cancel this policy by mailing or delivering to the Insurer advance written notice of cancellation.

B.1.   Cancellation for Policies in Effect Ninety (90) Days or Less

If this policy has been in effect ninety (90) days or less the Insurer may cancel this policy by mailing or delivering to the Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

(a)    Ten (10) days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or

(b)    Twenty (20) days before the effective date of cancellation if the Insurer cancels for any other reason, except the Insurer may cancel immediately if there has been:

1.    A material misstatement or misrepresentation; or
2.    A failure to comply with underwriting requirements established by the Insurer.

B.2.   Cancellation for Policies in Effect for More Than Ninety (90) Days

If this policy has been in effect for more than ninety (90) days the Insurer may cancel this policy only for one or more of the following reasons:

(a)    Nonpayment of premium;

(b)    The policy was obtained by a material misstatement;

(c)    There has been a failure to comply with underwriting requirements established by us within ninety (90) days of the date of effectuation of coverage;

(d)    There has been a substantial change in the risk covered by the policy; or

(e)    The cancellation is for all insureds under such policies for a given class of insureds.

If the Insurer cancels this policy for any of these reasons, the Insurer will mail or deliver to the Named Insured written notice of cancellation, accompanied by the reasons for the cancellation at least:

1.    Ten (10) days before the effective date of cancellation if cancellation is for the reason stated in B.2.(a) above; or

2.  Forty-five (45) days before the effective date of cancellation if cancellation is for the reasons stated in B.2.(b), (c), (d) or (e) above.

3.  One hundred twenty days (120) before the effective date of cancellation of a commercial residential property insurance policy if cancellation is for the reasons stated in B.2.(b),(c),(d) or (e) above.

B.3.  If this policy is cancelled, the Insurer will send the Named Insured any premium refund due. If the Insurer cancels, the refund will be pro rata. If the Named Insured cancels, the refund may be less than pro rata, however, such refund will not be less than 90% of the pro rata unearned premium. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect.

It is hereby understood that the Non-renewal provision of this policy is deleted and replaced with the following:

C.1.  Non-Renewal

(a)  If the Insurer decides not to renew this policy the Insurer will mail or deliver to the Insured written notice of nonrenewal, accompanied by the reason for nonrenewal, at least forty-five (45) days prior to the expiration of this policy.   Written notice of nonrenewal will be provided at least one hundred twenty (120) days prior to the expiration of a commercial residential property insurance policy.

(b)  Any notice of nonrenewal will be mailed or delivered to the Insured's last mailing address known to the Insurer.   If notice is mailed, proof of mailing will be sufficient proof of notice.

C.2.  Renewal

The Insurer shall give the named insured at least forty-five (45) days advance written notice of the renewal premium.

**ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN THE SAME.**

## FLORIDA STATE AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided by the Policy.

The following changes apply only to locations covered by the Policy that are in the State of Florida.

**A.** The SETTLEMENT OF CLAIMS Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section is deleted in its entirety and replaced by the following:

**SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable shall be payable:

**1.** Within 20 days after proof of loss, as herein required, is received and agreed to by the Company; or

**2.** Within 30 days after the Company receives the proof of loss and:

    **a.** There is an entry of a final judgment; or

    **b.** The amount of loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

**3.** Within 60 days of receiving notice of claim, unless the Company denies the claim during that time or factors beyond the Company's control reasonably prevent such payment. If a portion of the claim is denied, then the 60-day time period for payment of claim relates to the portion of the claim that is not denied.

    Subsection **3.** applies only to the following:

    **a.** A claim under a Policy covering residential property, if such property is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy; or

    **b.** A claim for building coverage, if such property is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, if the structure is 10,000 square feet or less and the Policy covers only locations in Florida.

    The Company shall have the option to take all, or any part of the structure at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing the **Named Insured** with notice of the Company's intention to do so within 60 days after the Company's receipt of the proof of loss herein required.

**B.** The SUIT AGAINST COMPANY Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section is deleted in its entirety and replaced by the following:

**SUIT AGAINST COMPANY**

No one may bring a legal action against the Company under this Policy unless:

**1.** There has been full compliance with all of the terms of this Policy; and

**2.** Legal action against the Company involving direct physical loss or damage to property must be brought within 5 years from the date the loss occurs.

**125719 (5/17)**    Includes copyrighted material of Insurance Services Office,    **Page 1 of 5**
Inc., with its permission. All rights reserved.

C. If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then with respect to such a building, Subsection **e.** of Subsection **1.** Earth movement of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and replaced with the following :

    **e.** Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, and subsidence.

D. If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then with respect to such a building, Subsection **1.** Earth movement of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is amended to include:

    **Earth movement** does not include **sinkhole loss** or **catastrophic ground cover collapse.**

E. **SINKHOLE LOSS AND CATASTROPHIC GROUND COVER COLLAPSE**

If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then the following provisions are added to the Policy as SPECIFIED COVERED CAUSES OF LOSS with respect to such a building:

1. **Sinkhole loss,** meaning loss or damage to a building when **structural damage** to the covered building, including the foundation, is caused by settlement or systematic weakening of the earth supporting the building, only if the settlement or systematic weakening results from contemporaneous movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

    a. Coverage for **sinkhole loss** includes stabilization of the building (including land stabilization) and repair to the foundation, provided such work is in accordance with the requirements of Florida Insurance Law and in accordance with the recommendation of a professional engineer and with notice to the **Named Insured.** The professional engineer must be selected or approved by the Company. However, until the **Named Insured** or **project owner(s),** whichever is applicable, enters into a contract for performance of building stabilization or foundation repair in accordance with the recommendations of the professional engineer as set forth in a report from the Company:

        **(1)** The Company will not pay for underpinning or grouting or any other repair technique performed below the existing foundation of the building; and

        **(2)** The Company's payment for **sinkhole loss** to the covered building will be limited to the actual cash value of the loss to such property.

    The **Named Insured** or **project owner(s),** whichever is applicable, must enter into a contract for the performance of building stabilization and/or foundation repair in accordance with the aforementioned recommendations, within 90 days after the Company notifies the **Named Insured** that there is coverage for the **sinkhole loss.** After the **Named Insured** or **project owner(s),** whichever is applicable, has entered into such contract, the Company will pay the amounts necessary to begin and perform such repairs as the work is performed and the expenses are incurred.

However, if the professional engineer determines, prior to the **Named Insured** or **project owner(s)**, whichever is applicable, entering into the aforementioned contract or prior to the start of repair work, that the repairs will exceed the applicable **Policy Limit**, the Company must either complete the recommended repairs or pay that **Policy Limit** upon such determination. If the aforementioned determination is made during the course of repair work and the Company has begun making payments for the work performed, the Company must either complete the recommended repairs or pay only the remaining portion of the applicable **Policy Limit** upon such determination. The most the Company will pay for the total of all **sinkhole loss**, including building and land stabilization and foundation repair, is the applicable **Policy Limit** on the affected building.

The stabilization and all other repairs to the covered building must be completed within 12 months after entering into the contract for the performance of these repairs, unless:

(1) There is a mutual agreement between the **Named Insured** and the Company;

(2) The claim is involved with the neutral evaluation process;

(3) The claim is in litigation; or

(4) The claim is under appraisal or mediation.

**b.** **Sinkhole loss** does not include:

(1) Sinking or collapse of land into man-made underground cavities; or

(2) **Earth movement**.

**c.** With respect to a claim for alleged **sinkhole loss**, the following provision is added:

Following receipt by the Company of a report from a professional engineer or professional geologist on the cause of loss and recommendations for land stabilization and repair of property, or if the Company denies the **Insured's** claim, the Company will notify the **Named Insured** or **project owner(s)**, whichever is applicable, of its right to participate in a neutral evaluation program administered by the Florida Department of Financial Services (hereinafter referred to as the "Department"). For alleged **sinkhole loss** to commercial residential or farm residential properties, this program applies instead of any mediation procedure set forth elsewhere in this Policy, but does not invalidate the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

The **Named Insured** or **project owner(s)**, whichever is applicable, or the Company, may file a request with the Department for neutral evaluation; the other party must comply with such request. The Company will pay reasonable costs associated with the neutral evaluation, regardless of which party makes the request. But if a party chooses to hire a court reporter or stenographer to contemporaneously record and document the neutral evaluation, that party must bear the costs of those services. The neutral evaluator will be selected from a list maintained by the Department. The recommendation of the neutral evaluator will not be binding on the **Named Insured** or **project owner(s)**, whichever is applicable, or the Company.

Participation in the neutral evaluation program does not change the **Named Insured's** or **project owner(s)'**, whichever is applicable, right to file suit against the Company in accordance with the SUIT AGAINST COMPANY Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section in this Policy, except that the time for filing suit is extended for a period of 60 days following the conclusion of the neutral evaluation process or five (5) years, whichever is later.

           Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

d.  Coverage for **sinkhole loss** under this endorsement does not increase the **Policy Limit**. Even if the loss or damage qualifies under, or includes, **catastrophic ground cover collapse** (addressed elsewhere in this endorsement) and **sinkhole loss**, only one **Policy Limit** will apply to such loss or damage.

e.  The following provision is added to the REQUIREMENTS IN CASE OF LOSS OR DAMAGE Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section:

A claim for **sinkhole loss**, including but not limited to initial, supplemental and reopened claims is barred unless notice of claim is provided to the Company in accordance with the terms of this Policy within two (2) years after the **Insured** knew or reasonably should have known about the **sinkhole loss**.

f.  If the Company denies the **Insured's** claim for **sinkhole loss** without performing testing under section 627.7072, Florida Statutes, the **Named Insured** or **project owner(s)**, whichever is applicable, may demand testing by communicating such demand to the Company in writing within 60 days after the **Named Insured** receives our denial of the claim. The **Named Insured** or **project owner(s)**, whichever is applicable, is responsible for 50% of the testing costs, or $2,500, whichever is less. If the Company's professional engineer or geologist provides written certification, pursuant to section 627.7073, that there is **sinkhole loss**, the Company will reimburse the **Named Insured** or **project owner(s)**, whichever is applicable, for the testing costs.

g.  The **Insured** may not accept a rebate from any person performing repairs for **sinkhole loss** covered under this endorsement. If the **Insured** receives a rebate, coverage under this endorsement is void and the **Insured** must refund the amount of the rebate to the Company.

h.  If the Company denies the **Insured's** claim for **sinkhole loss** upon receipt of written certification from a professional engineer or geologist, pursuant to section 627.7073, that there is no **sinkhole loss** or that the cause of the damage was not sinkhole activity, and if the sinkhole claim was submitted without good faith grounds for submitting such claim, the **Named Insured** or **project owner(s)**, whichever is applicable, shall reimburse the Company for 50% of the actual costs of the analyses and services provided under sections 627.7072 and 627.7073, or $2,500, whichever is less. The **Named Insured** or **project owner(s)**, whichever is applicable, is not required to pay such reimbursement unless it requested the analysis and services and the Company, before ordering the analysis, informed the **Named Insured** or **project owner(s)**, whichever is applicable, in writing of the potential for reimbursement and gave the **Named Insured** or **project owner(s)**, whichever is applicable, the opportunity to withdraw the claim.

i.  As a precondition to accepting payment for **sinkhole loss**, the **Named Insured** or **project owner(s)**, whichever is applicable, must file with the county clerk of court, a copy of any sinkhole report regarding the property which was prepared on behalf or at the **Named Insured** or **project owner(s)**, whichever is applicable, request. The **Named Insured** or **project owner(s)**, whichever is applicable, will bear the cost of filing and recording the sinkhole report.

2.  **Catastrophic Ground Cover Collapse**

The Company will pay for direct physical loss or damage to a covered building caused by or resulting from **catastrophic ground cover collapse**, meaning geological activity that results in all of the following:

a.  The abrupt collapse of the ground cover;

b.  A depression in the ground cover clearly visible to the naked eye;

c.  **Structural damage** to the building, including the foundation; and

    **d.**  The insured structure being condemned and ordered to be vacated by the governmental agency authorized by law to issue such an order for that structure.

However, damage consisting merely of the settling or cracking of a foundation, structure or building does not constitute loss or damage resulting from a **catastrophic ground cover collapse.**

Coverage for **catastrophic ground cover collapse** does not increase the **Policy Limit.** Regardless of whether loss or damage attributable to **catastrophic ground cover collapse** also qualifies as **sinkhole loss** or **earth movement** (if either or both of those causes of loss are covered under this Policy), only one **Policy Limit** will apply to such loss or damage.

**3.** For the purposes of **Sinkhole Loss** and **Catastrophic Ground Cover Collapse** coverages only, the following definitions are added to the Policy:

  **a.** **Structural damage** means a building, regardless of the date of its construction, has experienced the following:

    **(1)** Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement related damage to the interior such that the interior building structure or members become unfit for service or represent a safety hazard as defined within the Florida Building Code;

    **(2)** Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement related damage to the **primary structural members** or **primary structural systems** and that prevents those members or systems from supporting the loads and forces they were designed to support to the extent that stresses in those **primary structural members** or **primary structural systems** exceed one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location;

    **(3)** Damage that results in listing, leaning, or buckling of the exterior load bearing walls or other vertical **primary structural members** to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

    **(4)** Damage that results in the building, or any portion of the building containing **primary structural members** or **primary structural systems,** being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

    **(5)** Damage occurring on or after October 15, 2005, that qualifies as substantial structural damage as defined in the Florida Building Code.

  **b.** **Primary structural member** means a structural element designed to provide support and stability for the vertical or lateral loads of the overall structure.

  **c.** **Primary structural system** means an assemblage of **primary structural members.**

All other terms and conditions of the Policy remain the same.



# LIBERTY MUTUAL INSURANCE COMPANY

(A New Hampshire Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO 7

| Name Insured: | A3 Development LLC, LPLA Partners, LP, The Trump Group |
|---|---|
| Policy Number: | 4NABQE6J001 |
| Effective Date: | December 14, 2018 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### DISCLOSURE – TERRORISM RISK INSURANCE ACT

**THIS ENDORSEMENT IS MADE PART OF YOUR POLICY PURSUANT TO THE TERRORISM RISK INSURANCE ACT.**

In accordance with the Terrorism Risk Insurance Act, including all amendments, ("TRIA" or the "Act"), we are required to provide you with a notice of the portion of your premium attributable to coverage for "certified acts of terrorism," the federal share of payment of losses from such acts, and the limitation or "cap" on our liability under the Act.

**Disclosure of Premium**

The Company has made available coverage for "certified acts of terrorism" as defined in the Act. If purchased, the portion of your premium attributable to coverage for "certified acts of terrorism" is shown in the Declarations, Declarations Extension Schedule or elsewhere by endorsement in your policy.

**Federal Participation In Payment Of Terrorism Losses**

If an individual insurer's losses from certified acts of terrorism exceed a deductible amount specified in the Act, the federal government will reimburse the insurer for the Federal Share of losses paid in excess of the deductible, but only if aggregate industry losses from such acts exceed the "Program Trigger".

The Federal Share and Program Trigger by calendar year are:

| Calendar Year | Federal Share | Program Trigger |
|---|---|---|
| 2015 | 85% | $100,000,000 |
| 2016 | 84% | $120,000,000 |
| 2017 | 83% | $140,000,000 |
| 2018 | 82% | $160,000,000 |
| 2019 | 81% | $180,000,000 |
| 2020 | 80% | $200,000,000 |

**Cap On Insurer Participation In Payment Of Terrorism Losses**

1  2

TRIA-N004-0315



If aggregate insured losses attributable to "certified acts of terrorism" exceed $100 billion in a calendar year and we have met our deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. Nor shall Treasury make any payment for any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.



## LIBERTY MUTUAL INSURANCE COMPANY

(A Massachusetts Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO 8

| | |
|---|---|
| **Name Insured:** | A3 Development LLC, LPLA Partners, LP, The Trump Group |
| **Policy Number:** | 4NABQE6J001 |
| **Effective Date:** | December 14, 2018 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the above captioned policy.

**A.  Cap on Certified Act of Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.**  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.**  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed

$100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.  Application of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy..

Includes copyrighted material of Insurance Services Office, Inc., with its permission



**Liberty**
**International**
**Underwriters.**
Member of Liberty Mutual Group

## LIBERTY MUTUAL INSURANCE COMPANY
(A Massachusetts Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT N 9

| | |
|---|---|
| **Issued To:** | A3 Development LLC, LPLA Partners, LP, The Trump Group |
| **Policy Number:** | 4NABQE6J001 |
| **Effective Date:** | December 14, 2018 |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.  Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

| | 1 |
|---|---|

OFAC 08/09



## Liberty Mutual Insurance Company

### Notice of Membership in Liberty Mutual Holding Company Inc.
### and
### Notice of Annual Meeting

Liberty Mutual Insurance Company is a Massachusetts stock insurance company subsidiary of Liberty Mutual Holding Company Inc., a Massachusetts mutual holding company. Insurance is provided by Liberty Mutual Insurance Company.  The named insured first named in the declarations is a member of Liberty Mutual Holding Company Inc.

As a member of Liberty Mutual Holding Company Inc., the named insured first named is entitled, among other things, to vote either in person or by proxy at the annual meeting or special meetings of said company.  The Annual Meeting of Liberty Mutual Holding Company Inc. is at its offices located at 175 Berkeley Street,  Boston, Massachusetts, on the second Wednesday in April each year at ten o'clock in the morning.

Members of Liberty Mutual Holding Company Inc. may request a copy of the company's annual financial statements, which are posted on Liberty Mutual's website at www.libertymutual.com, by writing to Liberty Mutual Holding Company Inc., 175 Berkeley Street, Boston, Massachusetts,  02116, Attention: Corporate Secretary.



## LIBERTY MUTUAL INSURANCE COMPANY

(A Massachusetts Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT N 12

| | |
|---|---|
| **Issued To:** | A3 Development LLC, LPLA Partners, LP, The Trump Group |
| **Policy Number:** | 4NABQE6J001 |
| **Effective Date:** | December 14, 2018 |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### AMENDATORY ENDORSEMENT

The following endorsement (12) replaces endorsement number 11 previously issued.

It is hereby agreed that effective December 31st, 2019 the insured project is amended to include the addition of the entirety of the North Tower/Phase 2 of the project, inclusive of the west parking garage located at **17901 Collins Avenue South, Sunny Isles Beach, FL 33160.**

The overall Limit of Liability of the declarations page is amended to read: **$651,115,971**

The additional premium for this endorsement is as per lead AIG endorsement number 10 calculated as follows: Phase 2 Additional Deposit Premium calculation is based on:

(1) $207,300,000 (Phase 2) plus $7,000,000 (West Garage) minus $45,141,189 ($20,141,189 savings and $25,000,000 included within Phase 1 Total Project Value) for the project term, 12/31/19 to 4/1/22; and

(2) Delay in Completion, Terrorism & LEG 3 premiums are the difference between Phase 1 & Phase 2

(3) Delay in Completion Limit for Phase 2 is the values of Phase 1 with the increase of $4,434,740. Total Delay in Completion Limit for the policy is $48,457,160, as noted on the Delay in Completion Endorsement.

Policy Extension Calculations (180 days per phase/per TCO):

• North Tower - to extend to October 1, 2022

− April 1 to May 31: $15,008 per month

− during wind season (June to Nov): $59,997 per month

− Full delay value assumed ($48,457,160)

Furthermore, the anticipated completion dates as part of the Delay in Start Up Section are amended to read:

South Tower – 07/01/2021
Villa – 12/31/2021
North Tower – 04/01/2022

**Total Additional Premium for this endorsement: $702,083 or $70,208.30 (LSM 10% share).**

All other terms and conditions remain unchanged and as per lead AIG endorsement number 10.

| 1 | 1 |
|---|---|

Amendatory 12



**Policy Number:**    **USE00054118**                                                **Endorsement Number**
**Effective Date:**     **December 31, 2019**                                                   **AZ8**

## GENERAL CHANGE ENDORSEMENT

This endorsement modifies insurance provided under the following:


In respect to this policy the attached endorsement applies.


All other terms and conditions remain unchanged.

**ENDORSEMENT #010**

**This endorsement, effective 12:01 A.M.,** 12/31/2019
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## POLICY CHANGES ENDORSEMENT

Endorsement #009, Policy Changes Endorsement is deleted in its entirety and replaced by the following:

The following item(s):

| | | | |
|---|---|---|---|
| ☐ | Insured's Name | ☐ | Insured's Mailing Address |
| ☐ | Policy Number | ☐ | Company |
| ☒ | Effective/Expiration Date | ☐ | Insured's Legal Status/Business of Insured |
| ☐ | Payment Plan | ☐ | Premium Determination |
| ☐ | Additional Interested Parties | ☐ | Coverage Forms and Endorsements |
| ☒ | Limits/Exposures | ☐ | Deductibles/Waiting Periods |
| ☒ | Covered Property/Location Description | ☐ | Additional Location(s) |
| ☐ | Underlying Insurance | ☐ | Special Terms and Conditions |

is (are) changed to read **{See Additional Page(s)}:**

The above amendments result in a change in the premium as follows:

| | | | | | |
|---|---|---|---|---|---|
| ☐ | **NO CHANGES** | ☒ | **ADDITIONAL PREMIUM** | ☐ | **RETURN PREMIUM** |
| | | | $245,729 | | $ |

**POLICY CHANGES ENDORSEMENT DESCRIPTION**

1.  **Item 4.A. Policy Period** of the Declarations is amended to include the following:

    A.  Inception Date:    14 December 2018    Expiration Date:01 April 2022
        (12:01 a.m., Standard Time at the **insured project** location.  The Expiration Date may vary in accordance with Item **4.B.**) (hereinafter, the **Original Policy Period**)

2.  **Item 5. Insured Project** of the Declarations is amended to include the following:

    **Description**: Addition of the entirety of the North Tower/Phase 2 of the project, inclusive of the west parking garage

3.  **Item 8. Deposit Premium** of the Declarations is deleted in its entirety and replaced by the following:

| Phase 1 Coverage | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| **Total Project Value (South Tower)** | 2.5479 years | $373,500,000 | $Various | $1,648,911 |
| **Total Project Value (Villa and Site)** | 3.0493 years | $60,000,000 | $Various | $412,300 |
| **Existing Property** | 3.0493 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| **Contractors Equipment** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Delay In Completion** | 3.0493 years | $44,022,420 | $Various | $343,015 |
| **Hot Testing** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Terrorism** | 3.0493 years | $477,522,420 | $0.0375 of the non-NatCat premium | $26,271 |
| **LEG 3** | 3.0493 years | $477,522,420 | $0.10 of the non-NatCat premium | $70,055 |
| | **Total Deposit Premium:** | | | $2,500,552 |

| Phase 2 Coverage* | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| **Total Project Value (North Tower + West Garage, less credits noted below)** | 2.5521 years | $169,158,811 | $Various | $642,607 |
| **Existing Property** | 2.5521 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| **Contractors Equipment** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Delay In Completion** | 2.5521 years | $48,457,160 | $Various | $36,795 |
| **Hot Testing** | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| **Terrorism** | 2.5521 years | $217,615,971 | $0.0375 of the non-NatCat premium | $6,186 |
| **LEG 3** | 2.5521 years | $217,615,971 | $0.10 of the non-NatCat premium | $16,496 |
| | **Total Additional Deposit Premium*:** | | | $702,083 |

*Phase 2 Additional Deposit Premium calculation is based on:*
*(1) $207,300,000 (Phase 2) plus $7,000,000 (West Garage) minus $45,141,189 ($20,141,189 savings and $25,000,000 included within Phase 1 Total Project Value) for the project term, 12/31/19 to 4/1/22; and*
*(2) Delay in Completion, Terrorism & LEG 3 premiums are the difference between Phase 1 & Phase 2*
*(3) Delay in Completion Limit for Phase 2 is the values of Phase 1 with the increase of $4,434,740.  Total Delay in Completion Limit for the policy is $48,457,160, as noted on the De-*

*lay in Completion Endorsement.*

Policy Extension Calculations (180 days per phase/per TCO):

- North Tower - to extend to October 1, 2022
  - April 1 to May 31: $15,008 per month
  - during wind season (June to Nov): $59,997 per month
  - Full delay value assumed ($48,457,160)

For Audit & Extensions the Annual rates are:

- South Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- Villa: .115 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- North Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- 150% for delay; 3.75% for terrorism (3% base rate * 25% surcharge to remove sunset clause); 10% for LEG 3. Terrorism & LEG 3 premiums are calculated based on the non-Cat premium.

4.  **Item 9. Policy Limit** of the Declarations is deleted in its entirety and replaced with the following:

    **Item 9. Policy Limit:** $651,115,971  The **quota share percentage** (shown in Item **13.** of the Declarations) of the **Policy Limit** is the Company's maximum liability in any one **occurrence** as a result of all covered loss or damage regardless of the number of coverages or **covered causes of loss** under this Policy.

5.  Subsection **(1)** and **(4)** of Subsection **10.A. Sublimits Applicable to Specified Covered Causes of Loss** of the Declarations are deleted in their entirety and replaced with the following:

    **1. Earth Movement:**  $651,115,971 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $651,115,971, for all covered loss or damage arising out of **earth movement**

    **4. Terrorism:**  $651,115,971 for all covered loss or damage arising out of **terrorism**

6.  Subsection **10.B. Sublimits of Liability** of the Declarations is amended as follows:

    **Physical Damage Sublimit of Liability**  $602,658,811 applicable to physical damage to **covered property** at the **insured project**

7.  **Endorsement #001, Delay in Completion Endorsement** is deleted in its entirety and replaced with the following:

    **DELAY IN COMPLETION ENDORSEMENT**

This endorsement modifies insurance provided by the Policy:

**SCHEDULE**

I.  **Named Insured and Address:**
    A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
    17901 COLLINS AVENUE SOUTH
    SUNNY ISLES BEACH FL 33160

    All coverage under this Delay in Completion Endorsement shall only be provided to the Named Insured shown above (hereinafter, the **Named Insured** for purposes of this endorsement only).  No coverage shall be provided under this endorsement to any other person or entity.

**II.** The coverage provided under this Delay in Completion Endorsement is applicable to the entire **insured project** unless otherwise described below:

Not Applicable

**III. Period of Indemnity**:  540 Calendar Days

**IV. Anticipated Date of Completion:**  South Tower – 07/01/2021
Villa – 12/31/2021
North Tower – 04/01/2022

**V. Deductible Period:**

|  | **Deductible Period** (per **occurrence** unless other-wise stated below) |
|---|---|
| **Standard Deductible** | 30 Calendar Days<br>☒per **occurrence** or<br>☐ in the Aggregate, no other **Deductible Periods** apply |
| **Earth Movement, Flood** or **Named Storm** | 30 Calendar Days |
| **Cyber Loss** | 30 Calendar Days |
| **Ingress & Egress** | 30 Calendar Days |
| **Order of Civil or Military Authority** | 30 Calendar Days |
| **Service Interruption** | 30 Calendar Days |
| **Hot Testing** | 30 Calendar Days |
| **LEG 3** | 30 Calendar Days |

If two or more deductible amounts provided above apply to a single **occurrence**, the total to be deducted shall be the largest applicable deductible.  The above deductibles are in addition to any applicable deductibles on the Declarations of this Policy.  If the Standard Deductible applies on a per **occurrence** basis, then such deductible shall apply unless a more specific deductible applies.

**VI. Limits of Liability Applicable to this Endorsement**

The following are subject to and not in addition to the **Policy Limit** and all sublimits of liability shown in Item **10.A.** of the Declarations.  The sublimits of liability stated in this endorsement are per **occurrence** unless otherwise stated.

*If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage, then no coverage is provided for that coverage, whether under the Insuring Agreement or any Additional Coverage.  If the words, NOT APPLICABLE are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

**A.** Aggregate Sublimit of liability for all coverage under this endorsement      $48,457,160

The following sublimits of liability **VI.B.** through **VI.I.** are subject to **VI.A.** above:

**B.** Loss of **Rental Income**      $Not Covered

**C.** Loss of **Gross Earnings**      $Not Covered

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

**D.   Cyber Loss**                            See Item **10.B.7.** of the Declarations

**E.**   Ingress & Egress                       15 Calendar Days, subject to maximum of $2,500,000

**F.**   Order of Civil or Military Authority    15 Calendar Days, subject to maximum of $1,000,000

**G.**   Service Interruption                    15 Calendar Days, subject to maximum of $1,000,000

**H.**   Other: Not Covered                      $Not Covered

**I.**   **Soft Costs/Additional Expenses**      $48,457,160

      The following sublimits of liability are subject to **VI.I.** above.

   **1.**   Interim interest expense              $Included

   **2.**   Realty taxes/Ground rents            $Included

   **3.**   Leasing/Commission expense           $Included

   **4.**   Insurance premiums                   $Included

   **5.**   Advertising and marketing expense    $Included

   **6.**   Legal and accounting fees            $Included

   **7.**   License and permit fees              $Included

   **8.**   Project management fees              $Included

   **9.**   Other:  Construction Supervision     $Included

   **10.**  Other: Real Estate Taxes             $Included

   **11.**  Other: Loan Fees and Interest        $Included

   **12.**  Other: Sales Deposit & Bond Interest $Included

   **13.**  Other: Project G & A                 $Included

   **14.**  Other: Soft Cost Contingency         $Included

---

No coverage or Additional Coverage shall be provided unless the **delay(s)** exceeds the **anticipated date of completion** and then such coverage shall only be provided for the **delay(s)** that is/are in excess of such **anticipated date of completion**, subject to the applicable **deductible period**.  All covered losses and expenses are subject to the applicable **Policy Limit**, sublimits of liability, **period of indemnity** or calendar days as stated in the above Schedule.

**A.  INSURING AGREEMENT**

   **1.**  Subject to all terms and conditions of this Policy, in the event of:

      **a.**  Direct physical loss of or damage to **covered property, landscaping materials** or **plans and draw-**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

ings by a **covered cause of loss**, or

**b.** Corruption, erasure or alteration of:

**i.** **Electronic data** in the **building or other systems**, due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss**,

**ii.** **Plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code**, or

**c.** **Building or other systems** that are rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems**

(hereinafter, collectively Subsections **1.b.** and **1.c.** are referred to as **cyber loss**), the Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** sustained during the **period of indemnity** as a result of **delay** in completion of the **insured project**, on an actual loss sustained basis.

**2.** The Company shall also indemnify the **Named Insured** for reasonable expenses, over and above normal operating expenses, during the **period of indemnity**, that are necessarily incurred for the purpose of reducing any loss covered under this endorsement, but in no event shall the Company be liable for an amount greater than that for which the Company would have been liable had there been no covered **delay**.

## B. ADDITIONAL COVERAGES

**1.** **Ingress & Egress**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if ingress to or egress from the **insured project** is prohibited as a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy, provided that such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the prohibition of ingress or egress to the **insured project** for the lesser of:

**a.** The number of calendar days shown for Ingress & Egress in the above Schedule, or

**b.** Until the ingress or egress is no longer prohibited,

subject to the Ingress & Egress sublimit of liability shown in the above Schedule.

**2.** **Order of Civil or Military Authority**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if an order of civil or military authority prohibits access to the **insured project**, provided that: (1) such order is a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy and (2) such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with such order that prohibits access to the **insured project** for the lesser of:

**a.** The number of calendar days shown for Order of Civil or Military Authority in the above Schedule, or

**b.** Until access to the **insured project** is no longer prohibited,

subject to the Order of Civil or Military Authority sublimit of liability shown in the above Schedule.

**3. Service Interruption**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** resulting from the interruption of incoming electricity, steam, gas, fuel or water caused by direct physical loss or damage by a **covered cause of loss** to a service provider's transmission and distribution lines and related plants, substations and equipment located outside of the **insured project**. Notwithstanding the foregoing, the Company will not pay for any interruption intentionally caused by any **Insured** or any service provider.

If a service provider's transmission and distribution lines and related plants, substations and equipment that sustain loss or damage are part of the **insured project** and included in the **total project value**, the Service Interruption sublimit of liability shown in the above Schedule shall not apply, nevertheless the Aggregate Sublimit of Liability for all coverage under this endorsement shown in **VI.A.** above shall apply.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the interruption of incoming electricity, steam, gas, fuel, or water to the **insured project** for the lesser of:

**a.** The number of calendar days shown for Service Interruption in the above Schedule, or

**b.** Until such incoming utilities are restored,

subject to the Service Interruption sublimit of liability shown in the above Schedule.

**C. ADDITIONAL EXCLUSIONS AND LIMITATIONS**

In addition to all other exclusions of this Policy, the Company will not be liable under this endorsement for any loss or increase in **delay** caused by, resulting from or arising out of any of the following:

**1.** The enforcement of any law, ordinance, governmental directive or standard regulating removal, repair, construction or reconstruction of any property;

**2.** Changes made in the design, plans, specifications or other contract documents in order to effect the repair or replacement of any property;

**3.** Non-availability of funds;

**4.** Import, export or customs restrictions and/or regulations;

**5.** The breach, suspension, lapse or cancellation of or the failure to obtain, maintain or extend any permit, lease, license, contract or purchase orders;

**6.** The interference by strikers or other persons directly or indirectly with the completion of the **insured**

**project**, including the transportation of property, the construction, rebuilding, repairing or replacing of any property or the occupancy or use of the premises where the **insured project** is located;

7. The failure to use due diligence and dispatch in restoring any property to the condition existing prior to the loss or damage;

8. Any deviation in the **construction schedule** or a revised **construction schedule** except for a deviation that is the result of covered loss or damage;

9. Any disruption in the normal movement of **covered property** unless such **covered property** is damaged by a **covered cause of loss** during **inland transit**;

10. Re-erection of any tower or pole crane(s), unless such tower or pole crane is specifically covered under Schedule A of the Contractors' Equipment Endorsement. or

11. Loss or damage to that part of the **insured project** which at the time of loss or damage has been put to its intended use or has become operational.

**D. ADDITIONAL LOSS ADJUSTMENT CONDITIONS**

In addition to the conditions set forth in the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section of this Policy, the following additional conditions apply to this endorsement:

1. Upon written notification of any loss or damage under the terms and conditions of this Policy, the **Insured** shall provide the Company with all applicable **construction schedules** as requested by the Company.

2. Upon request by the Company, the **Insured** shall make available all other records and information relevant to the determination of any claim for loss, damage and/or expenses or any audit under this endorsement.

3. In the event of payment under this endorsement, the Company may conduct an audit of the **Named Insured's** records for a reasonable period of time, to be determined by the Company, (typically 12 months) after actual commencement of operations to determine the loss under this endorsement, as well as any expenses incurred by the **Named Insured** related to reducing such loss. Due consideration shall be given to seasonal patterns, trends, variations or special circumstances which would have affected the business had the **delay** not occurred, so that the amount adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the **delay**, would have been realized. Any amount saved with respect to labor costs, charges and expenses that have ceased or reduced during the **period of indemnity** and liquidated damages the **Named Insured** is entitled to receive from others, whether collectible or not, shall be deducted from the loss during the **period of indemnity**.

   In the event the amount of loss determined by the audit is less than or exceeds the sum paid by the Company for loss covered under this endorsement during the **period of indemnity**, the difference between the two amounts shall be paid by the Company or to the Company by the **Named Insured**, whichever is applicable.

**E. ADDITIONAL GENERAL CONDITIONS**

In addition to the conditions set forth in the GENERAL CONDITIONS Section of this Policy, the following additional conditions apply to this endorsement:

1. In the event loss, damage or other circumstances require that the project completion date shown on any critical path, time line, bar chart or other scheduling vehicle is revised to extend such completion date, the **Insured** shall establish a revised **construction schedule** and furnish the same to the Company. The new date established in such revised **construction schedule** shall become the **anticipated**

Includes copyrighted material of Insurance Services Office, Inc., with its permission. All rights reserved.

**date of completion**.  The Company shall have the right to change the **anticipated date of completion**, even if the **Insured** has failed to provide such revised **construction schedule**.

There shall be no amendment to the **anticipated date of completion** in the event any critical path, time line, bar chart or other scheduling vehicle is revised to compress or accelerate the **construction schedule**, without the written notice to the Company and endorsement by the Company hereto.

2.  The **Insured** shall take and allow all reasonable measures to minimize the extent of any interference with the **construction schedule** so as to avoid or diminish any potential **delay**. The **Insured** shall begin normal operations as soon as practicable.

## F.  ADDITIONAL DEFINITIONS

The definitions of this Policy apply to this endorsement.  However, the following additional definitions apply to this endorsement and supersede any similar definitions of this Policy to the contrary.

1.  **Anticipated date of completion** means: (1) the date as shown in the above Schedule as the Antici-pated Date of Completion or (2) the revised **anticipated date of completion** in accordance with the Subsection **E.1.** of the Additional General Conditions Subsection of this endorsement.  For calcula-tion of loss under this endorsement, the Company shall use the applicable **anticipated date of com-pletion** at the time of the loss or damage.

2.  **Construction schedule** means the schedule utilized in the construction management program through software that shows the construction operations, the times for starting and completion of operations, the period of the operations, the interrelationships between the operations and the critical path that identifies the critical operations.

3.  **Deductible period** means the applicable number of calendar days shown in Item **V.** of the above Schedule beginning with the **anticipated date of completion**.  Losses are only payable in excess of the applicable **deductible period**.

4.  **Delay** means the period of time between the **anticipated date of completion** and the actual date on which occupancy or commercial service can commence with respect to the entire **insured project** or the **insured project** as described in Item **II.** of the Schedule, whichever is applicable, with the exer-cise of due diligence and dispatch.

5.  **Gross earnings** means gross revenues from the planned operation of the **insured project** upon oc-cupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

6.  **Insured project** means the entire **insured project** or the part of the **insured project** as identified in Item **II.** of the above Schedule.  The words, **insured project**, also include the definition in the Completed Value Builders Risk Policy.

7.  **Period of indemnity** means the number of calendar days for which coverage is provided under this endorsement, regardless of the number of **occurrences**, not to exceed the number of days shown in Item **III.** of the above Schedule.  For each **occurrence**, such calendar days or remaining calendar days shall commence upon the expiration of the applicable **deductible period**.  The **period of indemnity** shall not be limited by the end of the **policy period**.

8.  **Rental income** means revenues from rentals and leases from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemni-ty** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

9.  **Soft costs/additional expenses** means such expenses as shown in Item **VI.I.1.** through **VI.I.9.** of the

above Schedule, inclusive, in relation to the **insured project**.

8. **Endorsement #002, Extension for Repairing or Replacing Defective Covered Property ("LEG3")
   Endorsement** is deleted in its entirety and replaced with the following:

## EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

Sublimits of Liability and Deductibles (per **occurrence**):

**A.** The following sublimit of liability is added to Item **10.B.** of the Declarations:

Sublimit for repairing or replacing faulty or defective **covered property**     $602,658,811

**B.** The following deductible is added to Item **11.** of Declarations:

Deductible applicable to repairing or replacing faulty or defective **cov-
ered property**     $100,000

The above deductible shall apply in addition to the applicable deductible(s) in Item **11.A.** through
**11.G.**, inclusive, as shown on the Declarations.

**C.** The following sublimit of liability is added as Item **VI.J.** to the Delay In Completion Endorsement:

Provided that Delay In Completion coverage is provided under this Poli-
cy, the Sublimit for Delay in Completion resulting from repair or re-
placement of faulty or defective **covered property**     $48,457,160

The **Deductible Period** shown in the Delay in Completion Endorsement applies to the above coverage
in this Subsection **C.**

Additional Premium: $86,551

_____

In consideration of the Additional Premium shown in the above Schedule, Exclusion **B.10.** of the PERILS
EXCLUDED Section is deleted in its entirety and replaced with the following:

**10. a.**   Faulty workmanship, material, construction or installation from any cause; or

**b.**   Any fault, defect, error, deficiency or omission in any design, plans, or specifications,

all unless direct physical loss or damage not otherwise excluded by this Policy ensues.  If direct
physical loss or damage not otherwise excluded by this Policy ensues, then the Company shall
pay for the following only:

**a.**   Such ensuing direct physical loss or damage to **covered property**, and/or

**b.**   Subject to the sublimit(s) of liability shown in the above Schedule, repairing or replacing
(whichever is less) with like kind and quality at the time and place of the loss the damaged
part of the faulty or defective **covered property**.

However, in no event shall the Company pay any loss, cost, damage or expense to: (1) improve

the original workmanship, materials, construction, installation, design, plans or specifications or (2) redesign any design, plans or specifications.

No portion of the **covered property** shall be regarded as damaged solely by virtue of the existence of: (1) any faulty workmanship, material, construction or installation, or (2) any fault, defect, error, deficiency or omission in any design, plans, or specifications.

NOTICE:  THIS ENDORSEMENT IS BASED UPON LEG 3 PROVISIONS, BUT MAY DIFFER FROM SUCH CURRENT OR PRIOR LEG 3 PROVISIONS.

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative

Renewal of:    **New**                    Policy No.:  **SICON1000703871**

 **Starr Indemnity & Liability Company**

**Starr Companies**                          **Broker:**    **Willis of Florida, Inc.**
**399 Park Avenue, New York, NY 10022**      **Address:** **1450 Brickell Avenue, Suite 1450**
                                                         **Miami, FL  33131**

## BY THIS POLICY OF INSURANCE

**Named Insured:  A3 Development LLC, LPLA Partners, LP, The Trump Group**

**Address:**        **17901 Collins Avenue South**
                **Sunny Isles Beach, FL  33160**

**Policy Period:    From:  December 14, 2018      To:  December 31, 2021**
                **12:01 AM Standard Time at your mailing address shown above.**

**Business Description:  Condominium Tower**

Commercial Inland Marine Coverage Part:

**Builder's Risk Policy (Starr's Share):  25% being $119,380,605 part of $477,522,420 per occurrence excess of**
                                          **deductibles.**

**Policy Premium: $618,570**

**TRIPRA:       $    6,568**

Total:        **$625,138**

Commission:    **10%**

Subject to all of the terms, conditions and exclusions the form(s) attached hereto:

  **AIG Completed Value Builders Risk Policy Form 125687 (5/17)**
  **Additional Forms and Endorsements as attached**

THIS POLICY IS MADE AND ACCEPTED SUBJECT TO the conditions which are hereby specifically referred to and made part of this Policy, together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto; and no officer, agent or other representative of this Company shall have power to waive or be deemed to have waived any provision or condition of this Policy unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this Policy exist or be claimed by the insured unless so written or attached.

CIMS001 0112

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



Construction Performance®

### NEW HAMPSHIRE INSURANCE COMPANY
### (A CAPITAL STOCK COMPANY)
### 175 Water Street, New York, New York 10038

### COMPLETED VALUE BUILDERS RISK POLICY
### QUOTA SHARE DECLARATIONS

Policy Number:  **043820532**

**Item 1. Named Insured and Address:**

A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
17901 COLLINS AVENUE SOUTH
SUNNY ISLES BEACH FL 33160

**Item 2. Additional Insureds:**

Additional Insured(s) means all project owner(s) and contractors and subcontractors of every tier at the **insured project** location and any other individual or entity, but only to the extent required by the **contract document(s)** or subcontract document(s) with respect to the **insured project** and then only as their respective interests may appear.  Notwithstanding the foregoing sentence, architects, engineers, manufacturers and suppliers shall only be **additional insureds** with respect to their activities at the **insured project** location.

**Item 3. Mortgagees and Loss Payees:**  Per Certificates of Insurance on file with the Company or any endorsement attached to and forming a part of this Policy.

**Item 4. Policy Period:**

**A.** Inception Date:   14 DECEMBER 2018  Expiration Date:  31 DECEMBER 2021
(12:01 a.m., Standard Time at the **insured project** location.  The Expiration Date may vary in accordance with Item 4.B.) (hereinafter, the **Original Policy Period**)

**B.** The Expiration Date shall be the earliest of the following:

 1. The date of formal acceptance of the entire **insured project** by the **project owner(s);**

 2. The date or expiry of the **Named Insured's** interest in the **insured project;**

 3. The effective date of cancellation of this Policy, or

 4. The expiration date as set forth in Item **4.A.**

**C.** Extension of the Policy Period
Provided that coverage has not ended in accordance with Items **4.B.1.** through **4.B.4.**, this Policy will be automatically extended once for up to 180 days per phase / per TCO (see page 7) for a pro rata additional premium upon notification by the **Named Insured** to the Company.  The **Named Insured** may request an additional extension of this Policy subject to the Company's written approval and terms and conditions to be agreed upon.

**Item 5.  Insured Project:**

| Location | 17901 Collins Avenue South<br>Sunny Isles Beach, FL 33160 |
|---|---|
| Description | Ground up construction of a 51 story 154 unit condominium tower (phase I) including a shared foundation which will include the podium for Phase II (a separate tower 91 unit Tower which will be built after completion of Phase I). The site, at 17901 Collins Avenue, has more than 500 feet of oceanfront. It's north of the Mansions at Acqualina, completed in 2015, and Acqualina Resort & Spa, completed in 2006.<br><br>The Estates will feature a lobby designed by Chanel and Fendi creative director Karl Lagerfeld and Villa Acqualina, a 50,000-square-foot building with a slate of amenities that will include a spa and fitness center, restaurant and Circus Maximus, an ice skating rink, bowling lanes and a movie theater, as well as a Wall Street Trader's Club room. The property will also feature landscaped gardens, multiple infinity pools, a FlowRider for surfers, a basketball court, bocce court, dog park, soccer field and a beachfront restaurant.<br><br>First five stories / associated work of the North Tower.<br><br>South Tower will be completed on 07/01/2021 and will roll onto a permanent property policy at that time. Villa construction to continue to 12/31/2021. |
| Project Owner(s) | A3 Development LLC, LPLA Partners, LP, The Trump Group |

**Item 6. Coverage Territory:**

United States, its territories and possessions and Puerto Rico, including their respective coastal waters.  If any coverage is provided on a worldwide basis, such worldwide coverage shall not include any jurisdiction prohibited or restricted under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.  Losses are only covered within the **coverage territory.**

**Item 7. Premium:**

**A. Total Deposit Premium:**        $2,500,552 (See Item 8. below for the calculation)

   **AIG's 35% Share:**            $875,193

**B. Terrorism Premium:**          $26,271 (included within the Total Deposit Premium)

**C. Surcharges:  (If Applicable)**    $866

**D. Engineering Fees: (If Applicable. Not included as part of the premium)**

   $25,000 (includes 1 Site Visit per year and 1 Market Report to be released close to the end date of the project).

**Item 8. Deposit Premiums:**

| Coverage | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| Total Project Value (South Tower) | 2.5479 years | $373,500,000 | $Various | $1,648,911 |
| Total Project Value | 3.0493 years | $60,000,000 | $Various | $412,300 |

| (Villa and Site) | | | | |
|---|---|---|---|---|
| Existing Property | 3.0493 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Delay in Completion | 3.0493 years | $44,022,420 | $Various | $343,015 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 3.0493 years | $477,522,420 | $0.0375 of the non-NatCat premium | $26,271 |
| LEG 3 | 3.0493 years | $477,522,420 | $0.10 of the non-NatCat premium | $70,055 |
| | Total Deposit Premium: | | | $2,500,552 |

**Item 9. Policy Limit:**  $477,522,420   The **quota share percentage** (shown in Item **13.** of the Declarations) of the **Policy Limit** is the Company's maximum liability in any one **occurrence** as a result of all covered loss or damage regardless of the number of coverages or **covered causes of loss** under this Policy.

**Item 10. Sublimits of Liability:**  The sublimits of liability stated in this Policy are part of and not in addition to the **Policy Limit** and any sublimits of liability shown in Item **10.A.** below.  The **quota share percentage** (shown in Item **13.** of the Declarations) of the sublimits of liability are: (1) the maximum amount the Company will pay for all covered loss or damage arising out of the specific perils or coverages and/or (2) the maximum number of days for which the Company will pay for all covered loss or damage for a specific coverage, regardless of the number of coverages or **covered causes of loss** under this Policy.  The sublimits of liability stated in this Policy are per **occurrence** unless otherwise indicated.

Regardless of the number of **occurrences**: (1) any Term Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss** that is applicable to the entire **policy period** regardless of the length of the **policy period**, and (2) any Annual Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss** that is applicable to each annual period with respect to the **policy period**.

If any Annual Aggregate applies and the **policy period** is longer than one year, at the end of each twelve (12) month period (hereinafter, the **annual anniversary date**), such Annual Aggregate shown below shall be reinstated in full, but only with respect to an **occurrence** which first commences on or after 12:01 a.m., Standard Time at the **insured project** location on such **annual anniversary date**.  If the final period is less than twelve (12) months, then such Annual Aggregate shall be reinstated in full for that final period.

*If the words NOT COVERED are shown instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage or Covered Cause of Loss, then no coverage is provided for that coverage or Covered Cause of Loss.  If the words, NOT APPLICABLE (or N/A) are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

    **A.  Sublimits Applicable to Specified Covered Causes of Loss** – Each of these sublimits is part of and not in addition to the **Policy Limit**:

        **1.  Earth Movement:**  $477,522,420 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $477,522,420, for all covered loss or damage arising out of **earth movement**.

        **2.  Flood:**  $100,000,000 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $100,000,000, for all covered loss or damage arising out of **flood**.

3. **Named Storm:** $150,000,000 per **occurrence**, for all covered loss or damage arising out of **named storm.**

For the purpose of the above sublimits of liability, **named storm** includes, but is not limited to, loss or damage from wind, hail, lightning, tornado, rain or water (whether driven by wind or not), **flood**, or any wind driven objects or debris.

In the event that **loss** or damage by **flood** occurs concurrently or in any sequence with a **named storm**, regardless of whether any flood sublimit or remaining aggregate flood sublimit shown in Item **10.A.2.** (hereinafter, the **applicable flood sublimit**) is greater or less than the applicable Named Storm sublimit, the maximum amount the Company will pay per **occurrence** for all such covered loss or damage by **flood** shall be the **applicable flood sublimit**, subject always to the maximum applicable Named Storm sublimit. However, if **flood** is not covered, the maximum amount the Company will pay per **occurrence** for all such covered loss or damage arising out of **named storm** shall exclude loss or damage by **flood**.

4. **Terrorism:** $477,522,420 for all covered loss or damage arising out of **terrorism.**

**B.** **Sublimits of Liability**

Each of the following sublimits is part of, and not in addition to the **Policy Limit** and any other sublimits shown in Item 10.A. of the Declarations:

| | | |
|---|---|---|
| **Physical Damage Sublimit of Liability** | | $433,500,000 applicable to physical damage to **covered property** at the **insured project** |
| 1. | Inland Transit | $50,000,000 |
| 2. | Offsite Temporary Storage | $50,000,000 any one location |
| 3. | Arson, Theft or Vandalism and Malicious Mischief Reward | $100,000 |
| 4. | Claims Preparation Costs | $2,500,000 |
| 5. | Crane Re-Erection Expenses | $1,000,000 |
| 6. | Crisis Management | 30 days, subject to a maximum Term Aggregate of $2,500,000 |
| 7. | Cyber Coverage | $Not Covered  Term Aggregate |
| | The following sublimits of liability **7.a.** through **7.d.**, inclusive, are subject to the Cyber Coverage sublimit of liability shown above: | |
| | a.  Electronic Data | $Not Covered  Term Aggregate |
| | b.  Building or Other Systems | $Not Covered  Term Aggregate |
| | c.  Plans and Drawings | $Not Covered  Term Aggregate |
| | d.  Cyber Extra Expense | $Not Covered  Term Aggregate |
| 8. | Debris Removal | $50,000,000 or 25% of direct physical loss or damage to all **insured property**, whichever is less |
| 9. | Demolition and Increased Cost of Construction | |
| | Demolition Coverage A: | $INCLUDED |
| | Demolition Coverage B: | $25,000,000 |
| | Demolition Coverage C: | $25,000,000 |
| 10. | Expediting Expense and Extra Expense | $25,000,000 |
| 11. | Owner's Extra Expense | NOT APPLICABLE |
| | The following expenses **11.a.** through **11.d.**, inclusive, are subject to the Owner's Extra Expense sublimit of liability shown above: | |
| | a.  Advertising and Marketing Expenses | NOT APPLICABLE |

|      | b. | Legal and Accounting Fees | NOT APPLICABLE |
|      | c. | License and Permit Fees | NOT APPLICABLE |
|      | d. | Project Management Fees | NOT APPLICABLE |
| 12.  |    | Fine Arts | $1,250,000 |
| 13.  |    | Fire Brigade, Extinguishing Expenses and Police Charges | $5,000,000 |
| 14.  |    | Fungus, Mold or Spore | $5,000,000 |
| 15.  |    | Maximum Hot Testing Period | NOT APPLICABLE |
| 16.  |    | Landscaping Materials | $50,000 any one item, subject to a maximum of $2,500,000 per occurrence |
| 17.  |    | Logistics Extra Costs | $NOT COVERED |
| 18.  |    | Plans and Drawings | $5,000,000 |
| 19.  |    | Pollution and Contamination Coverage | $2,500,000 Term Aggregate |
| 20.  |    | Preservation of Property | $2,500,000 |
| 21.  |    | Professional Design Fees | $10,000,000 |

**Item 11. Deductibles:**  The deductibles shown below apply per **occurrence** unless otherwise stated.

**A. Policy Deductible   $50,000**  Applicable to all covered loss or damage unless otherwise stated below or in this Policy.

**B. Earth Movement**

   $50,000

**C. Flood**

   $500,000

**D. Named Storm**

   3% of **total project value** at risk at the time of the loss or damage, subject to a minimum of $250,000 for any one **occurrence** and a maximum of $7,500,000 for any one **occurrence**, for all loss or damage arising out of **named storm**.

**E. Water Damage:**

   $100,000

**F. Hot Testing:**

   $NOT APPLICABLE

**G. Additional Deductibles**

   LEG 3: $100,000

**Special Deductible for Owner's Extra Expense:**     $NOT APPLICABLE

In each case of loss or damage covered by this Policy, the Company shall not be liable unless the **Insured** sustains covered loss or damage in a single **occurrence** greater than any applicable deductible described in this Policy and then only for the amount in excess of such deductible.  As used above, **at risk** includes all **covered property** at the location (including **inland transit**) where the loss occurs, whether such **covered property** sustains damage or not.

If an amount is not shown (or if NOT APPLICABLE or N/A is shown) for any deductible, then that deductible shall not apply.  Also, if an amount is not shown (or if NOT APPLICABLE or N/A is shown) with respect to a part of a deductible, then such part shall not apply, but the rest of the deductible shall apply.

If two or more deductible amounts provided in this Policy apply to a single **occurrence**, the total to be deducted shall not exceed the largest deductible applicable unless otherwise stated in this Policy.  If a Delay in Completion Coverage Endorsement is attached to and made a part of this Policy, then the specified **deductible period** stated in such endorsement shall be applied in addition to the applicable deductible shown in Item **11.A.** through **11.G.** above, inclusive.  The Special Deductible for **owner's extra expense** shall apply in addition to the applicable deductible shown in Item **11.A.** through **11.G.** above, inclusive.

## Item 12. Margin Clause:

If there is any increase in the **total project value**, the **Policy Limit** and the Physical Damage Sublimit of Liability shall be automatically increased by the same percentage of such increase in the **total project value**, subject to a maximum increase of 10% regardless of the number of increases in the **total project value**.  If the cumulative increases in the **total project value** exceed the maximum percentage set forth above, then the **Named Insured** shall report such changes in writing to the Company.

This provision does not apply to any other sublimits of liability, including any other sublimit of liability shown in Item **10.A.** or Item **10.B.** and/or sublimits of liability for any coverage added by endorsement.

## Item 13. Quota Share Participation:

35% is the Company's participation for all coverage provided under this Policy and is the percentage of the **Policy Limit** and sublimits of liability under this Policy that the Company shall pay in excess of the total applicable deductible(s) (herein, the percentage is referred to as the **quota share percentage**).

The Company's liability under this Policy shall not be increased, for any reason, including: (1) the receivership, bankruptcy, insolvency, liquidation, or dissolution of any other **participating insurer**; (2) the denial or reservation of rights with respect to any claim by any other **participating insurer**; (3) the cancellation, non-renewal, or other termination of any policy issued by any other **participating insurer**; or (4) the inability, refusal, or failure, for any reason, of any other **participating insurer** to fulfill its duties or obligations under any policy or program.  The Company's liability is several, but not joint, under this program.

**Participating insurer** shall mean any insurer or other entity including, a captive or entity under a self-insured program, that shares in the liabilities under any policy or program related to the coverage provided under this Policy.

## Item 14. Special Terms and Conditions:

TPA: Mike Kaemph at York (Chicago)

Producer:   Willis of Florida, Inc.
Address:    1450 Brickell Ave, ste 1450
            Miami, FL 33131

**PHASE 2 OPTION (Rate guaranteed for 24 months from binding date of this policy; final premium for Phase 2 determined based on policy period and estimated value at time of binding):** The Additional Premium to include Phase 2 (12/01/19 to 07/01/22) would be as follows:

| Coverage | Original Policy Period | Estimated Value at Inception Date | Deposit Premium |
|---|---|---|---|
| Total Project Value (North Tower + West Garage, less credits noted below) | 2.5836 years | $169,158,811 | $713,189 |
| Existing Property | 2.5836 years | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable |
| Delay in Completion | 2.5836 years | $48,457,160 | $51,094 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 2.5836 years | $217,615,971 | $7,307 |
| LEG 3 | 2.5836 years | $217,615,971 | $19,486 |
| | Total Additional Deposit Premium*: | | $803,306 |
| | AIG's 35% share Additional Deposit Premium: | | $281,157 |

*Phase 2 Additional Deposit Premium calculation is based on:*

> *(1) $207,300,000 (Phase 2) plus $7,000,000 (West Garage) minus $45,141,189 ($20,141,189 savings and $25,000,000 included within Phase 1 Total Project Value) for the project term, 12/1/19 to 7/1/22; and*

> *(2) Delay in Completion, Terrorism & LEG 3 premiums are the difference between Phase 1 & Phase 2*

**PAYMENT TERMS:** *If the insured elects to bind Phase 2, the Additional Premium will be billed at the time AIG is provided with the order to bind. Premium will then be due per the policy payment terms.*

Policy Extension Calculations (180 days per phase/per TCO):

- South Tower – to extend to December 31, 2021
  - during wind season (Jul to Nov): $92,659 per month
  - December (outside wind season): $23,950
  - No delay factored in here
- Villa – to extend to June 30, 2022
  - outside wind season (Jan to May): $10,141 per month
  - June (wind season): $33,414
  - Full delay value assumed here as per your request ($44,022,420)
- North Tower - to extend to December 31, 2022
  - during wind season (July to Nov): $59,997 per month
  - December (outside wind season): $15,508
  - Full delay value assumed here as per your request ($48,457,160)

For Audit & Extensions the Annual rates are:

- South Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- Villa: .115 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- North Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- 150% for delay; 3.75% for terrorism (3% base rate * 25% surcharge to remove sunset clause); 10% for LEG 3. Terrorism & LEG 3 premiums are calculated based on the non-Cat premium.

**IN WITNESS WHEREOF,** the Company has caused this Policy to be signed on the Declarations by the President and Secretary of the Company and its duly authorized representative.

President                                          Secretary

This Policy shall not be valid unless signed at the time of issuance by the Company's authorized representative.

Authorized Representative

Countersignature (if applicable)          Date                    Countersigned At

| 125689 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 8 of 8 |

## FLORIDA ADDENDUM TO THE DECLARATIONS

If you have questions about your insurance policy, or questions about claims relating to your insurance policy, please contact your insurer at the following:

**AIG**
**175 Water Street**
**New York, NY 10038**
**(212) 458-5000**

74825 (01/13)

## FORMS SCHEDULE

Named Insured: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP

Policy No: 043820532                                   Effective Date: 12/14/2018

| Form Number | Edition Date | Endorsement Number | Title |
|---|---|---|---|
| 125689 | 05/17 | | COMPLETED VALUE BUILDERS RISK POLICY QUOTA SHARE DECLARATIONS |
| 125687 | 05/17 | | COMPLETED VALUE BUILDERS RISK POLICY |
| 125696 | 05/17 | 001 | DELAY IN COMPLETION ENDORSEMENT |
| 125699 | 10/17 | 002 | EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT |
| 125700 | 05/17 | 003 | LENDER LOSS PAYEE OR LOSS PAYEE ENDORSEMENT |
| 125703 | 05/17 | 004 | PILING, SHEET PILING & CAISSON LIMITATION ENDORSEMENT |
| 125705 | 05/17 | 005 | POLICY CHANGES ENDORSEMENT |
| 76105 | 06/15 | 006 | FLORIDA CANCELLATION/NONRENEWAL ENDORSEMENT |
| 125719 | 05/17 | | FLORIDA STATE AMENDATORY ENDORSEMENT |

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG).  The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.  You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)

## FLORIDA NOTICE OF LOSS CONTROL SERVICES

Pursuant to Florida Administrative Code ("FAC") 690-166.040, we would like to inform you of the risk management programs that we have developed and that are available to you.

For your consideration, we offer the services of AIG PC Global Services, Inc.  With more than 25 years experience and expertise in assisting with the prevention and mitigation of losses, AIG PC Global Services, Inc. can help address a range of problems related to loss control in various lines of business. Certain risk management programs are available to you, free of charge, as part of your commercial insurance coverage; contact your insurance broker for more details on these plans. Other, more substantive risk management programs can be purchased which include, but are not limited to the following services: surveys/analysis for identifying exposures related to your specific operations, safety management training and counseling for your staff, adoption of relevant testing strategies, and evaluations of current loss control practices.

Upon your written request, we could provide you with specific guidelines for risk management programs as established by FAC 690-166.040. Such guidelines would provide instructions and offer basic criteria to assist you in creating your own risk management plan. Should you request such guidelines and, subsequently, wish to further explore the purchase of a risk management plan, developed by AIG PC Global Services, Inc., which is specific to your company's needs, we would be willing to discuss with you both the availability of such a plan, and if available, its specific content and cost.

Again, we welcome all inquiries regarding the services of AIG PC Global Services, Inc.



Construction Performance®

**NEW HAMPSHIRE INSURANCE COMPANY**
**(A CAPITAL STOCK COMPANY)**
**175 Water Street, New York, New York 10038**

**COMPLETED VALUE BUILDERS RISK POLICY**

Various provisions in this Policy restrict coverage.   Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the word **insured(s)** means the **Named Insured** and the **additional insured(s)**. The word "Company" means the insurance company shown in the header above.   The word "Policy" means this Completed Value Builders Risk Policy including, the Declarations, all endorsements and Schedules.

Other defined words and phrases that appear in boldface type have special meaning.   Refer to: (1) the DEFINITIONS Section, (2) the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section and (3) elsewhere in this Policy.   If such ordinarily boldfaced words and phrases are not bolded then such words and phrases shall include, but not be limited to, the specific meaning set forth in this Policy.

**SECTION I – INSURING AGREEMENT AND COVERED PROPERTY**

**A.  INSURING AGREEMENT**

Subject to the terms and conditions of this Policy, the Company will pay for all risks of direct physical loss or damage by a **covered cause of loss** to **covered property** at the **insured project**, while in offsite temporary storage or during **inland transit** (both as provided in the Additional Coverages), all within the **coverage territory** and occurring during the term of this Policy.

**B.  COVERED PROPERTY**

The Company insures the following property for which the **insured** is contractually responsible, the value of which has been included in the **total project value**:

1.  Permanent works - All materials, supplies, equipment, machinery, and other property of a similar nature all when used or to be used in or incidental to the demolition of existing structures, site preparation, fabrication or assembly, installation or erection or the construction of or alteration, renovation, rehabilitation of the **insured project** (hereinafter, **permanent works**);

2.  Temporary works - All scaffolding, form work, fences, shoring, hoarding, falsework and temporary buildings, construction trailer(s) including such trailers' contents (except **plans and drawings**), all incidental to the **insured project** (hereinafter, **temporary works**); and

3.  Property of others – Property of others for which the **insured** is legally liable (hereinafter, **property of others**);

while at the location of the **insured project**, in transit as set forth in the INLAND TRANSIT Additional Coverage, or at offsite temporary storage as set forth in OFFSITE TEMPORARY STORAGE Additional Coverage.

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 1 of 25 |
|---|---|---|

**C.  SPECIFIED COVERED CAUSES OF LOSS**

Subject to the terms and conditions of this Policy, **covered causes of loss** include the following specified **covered causes of loss**:

1.  **Earth movement**, which means any natural or manmade:

    a.  Earthquake, including any earth sinking, rising or shifting related to such event;

    b.  Landslide, including any earth sinking, rising or shifting related to such event;

    c.  Mine subsidence, meaning subsidence of a manmade mine, whether or not mining activity has ceased;

    d.  Earth sinking, rising or shifting, including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of **covered property**, unless otherwise excluded by this Policy;

    e.  Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, sinkhole collapse, or subsidence, unless otherwise excluded by this Policy; or

    f.  Tsunami arising out of any of the above.

2.  **Flood**, which means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike or other surface containment structure, storm surge, storm tide, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.  A tsunami shall not be considered a **flood**.

3.  **Water damage** means all loss or damage caused by:

    a.  Water, other than water from a **flood** or **named storm**, that enters into a building or structure through an opening;

    b.  Discharge or leakage of water or steam from a plumbing, heating, air conditioning or other system or appliance;

    c.  Discharge or leakage from a sprinkler system, other than discharge due to a fire, explosion or **earth movement**; or

    d.  Water, other than water from a **flood** or **named storm**, that backs-up into the **Insured project** (or **existing property**, if endorsed onto this Policy) from sewers, drains, sumps, and/or pumps.

4.  **Named storm**, which means a storm that, at any time, has been declared by the United States National Weather Service or another meteorological authority to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm.

If **earth movement**, **flood** or **named storm** is not covered, then any cause or event occurring concurrently or in any sequence with such peril(s) is also not covered, except for direct physical loss or damage to **covered property** caused by fire, sprinkler leakage or explosion following **earth movement**, **flood** or **named storm**, whichever is applicable.

Direct physical loss or damage to **covered property** caused by fire, sprinkler leakage or explosion shall not be considered loss or damage by **earth movement**, **flood** or **named storm**, whichever is applicable, within the terms and conditions of this Policy.

5. **Terrorism**, which means the use or threatened use of force or violence against a person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

   a. A government;

   b. The civilian population of a country, state or community; or

   c. Disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002, and any revisions or amendments thereto (the "Act") is in effect, **terrorism** includes a certified act of terrorism defined by Section 102. Definitions of the Act.

Whether or not **terrorism** is covered under this Policy, the Company does not cover loss or damage caused directly or indirectly by **biological and/or chemical terrorism** or **nuclear terrorism** whether controlled or uncontrolled, proximate or remote, sudden or over any length of time, or which is contributed to or aggravated by any other cause or event. Such **biological and/or chemical terrorism** or **nuclear terrorism** is excluded regardless of any other cause or event occurring concurrently or in any sequence with such **biological and/or chemical terrorism** or **nuclear terrorism**. **Biological and/or chemical terrorism** means the dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances in an act(s) of **terrorism**. **Nuclear terrorism** means an act(s) of **terrorism** involving or resulting in nuclear reaction or nuclear radiation or radioactive contamination.

If **terrorism** is covered under this Policy, then a corresponding premium will be shown in Item **7.B.** of the Declarations.

If **terrorism** is not covered then any cause or event occurring concurrently or in any sequence with such **terrorism** is also not covered, including any action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except for direct physical loss or damage to **covered property** caused by fire following **terrorism**. With respect to this exception for fire following **terrorism**, no coverage is provided for: (1) fire following **biological or chemical terrorism** or **nuclear terrorism**, (2) any Additional Coverage, except debris removal under the DEBRIS REMOVAL Additional Coverage, or (3) delay in completion loss. Notwithstanding any other valuation provision of this Policy to the contrary, the Company shall only pay the actual cash value of the **covered property** at the time and place of the loss caused directly by the ensuing fire.

## SECTION II – ADDITIONAL COVERAGES

Subject to the terms and conditions of this Policy, all loss, damage, expenses and/or other payments for the following Additional Coverages and any Additional Coverage(s) added to this Section by endorsement or through the Special Terms and Conditions is subject to the sublimits of liability as shown in Item **10.B.** of the Declarations and sublimits shown elsewhere in this Policy.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 3 of 25 |
|---|---|---|

1. **INLAND TRANSIT**

   The Company will pay for direct physical loss or damage by a **covered cause of loss** to **covered property** during **inland transit**.

   The **Insured** agrees to keep records of all shipments insured hereunder and make them available to the Company upon request.  Failure to keep such records may result in the Company not paying for such **covered property** during **inland transit**.

   This Additional Coverage shall be void if the **Insured** enters into any agreement with carriers, releasing them from their common law or statutory liability or agreeing that this insurance shall in any way inure to the benefit of such carriers; however, the **Insured** may, without prejudice to this Additional Coverage, accept bills of lading, receipts, or contracts of transportation as are ordinarily issued by carriers containing a limitation as to the value of **covered property**.

   As used herein, **inland transit** means the transit of **covered property** from the commencement of loading at the original point of shipment anywhere within the **coverage territory** or Canada until completion of unloading: at the location of the **insured project** or at a temporary offsite location, including shipments on inland or coastal waters, but excluding ocean marine shipments.

2. **OFFSITE TEMPORARY STORAGE**

   The Company will pay for direct physical loss or damage by a **covered cause of loss** to **covered property** while such property is at offsite temporary storage, anywhere within the **coverage territory**.  There is no coverage for such **covered property** while: (1) in the course of manufacturing or processing, (2) at a manufacturer's or supplier's site or warehouse, unless the **Insured** is legally liable for such **covered property**, or (3) in transit.

3. **ARSON, THEFT OR VANDALISM AND MALICIOUS MISCHIEF REWARD**

   The Company covers the reasonable payment of any reward offered by the **Named Insured** or on the **Named Insured's** behalf for information that leads to conviction of the perpetrator(s) of arson, theft or **vandalism and malicious mischief** to covered property.

   Regardless of the number of informants, the Company's maximum liability for any one **occurrence** of arson, theft and/or **vandalism and malicious mischief** is the Arson, Theft or Vandalism and Malicious Mischief Reward sublimit of liability shown in Item **10.B.** of the Declarations.

4. **CLAIMS PREPARATION COSTS**

   The Company will pay reasonable and necessary expenses incurred by the **Named Insured** for its:

   a.  Accountants, architects, auditors, engineers, or other professionals;

   b.  Employees; or

   c.  Insurance agent's or broker's subsidiaries, related or associated entities;

   to prepare and certify particulars or details of the **Named Insured's** claim required by the Company resulting from a covered loss under this Policy for which the Company has accepted liability.

The Company will not pay for expenses incurred by the **Named Insured** to utilize the services of property managers, attorneys, public adjusters, or any of its subsidiaries, related or associated entities or insurance agents or brokers.  The Company will not pay any fees or costs for consultation on coverage or negotiation of claims.

**5.  CRANE RE-ERECTION EXPENSES**

The Company will pay reasonable and necessary expenses incurred by the **Named Insured** to re-erect a tower or pole crane that sustains direct physical loss or damage by a **covered cause of loss.**  However, the Company shall not cover any loss or damage to the tower or pole crane itself.

**6.  CRISIS MANAGEMENT**

The Company shall indemnify the **Named Insured** for the reasonable and necessary costs over and above the total costs that normally would have been incurred to continue the scheduled progress of the **insured project** if an order of civil or military authority limits, restricts or prohibits partial or total access to the **insured project,** provided that such order is a direct result of a violent crime, suicide, attempted suicide, death (not including, disease or sickness resulting in death) or armed robbery at such **insured project.**

Coverage begins on the date and time that the order of civil or military authority limits, restricts or prohibits partial or total access to the **insured project** and ends when access to the **insured project** is no longer limited, restricted or prohibited, but in no event for more than the number of days shown in Item **10.B.** of the Declarations under Crisis Management.

The **Named Insured** must report any loss under this Additional Coverage within 30 days after the effective date of such order of the civil or military authority.

**7.  CYBER COVERAGE**

   **a.**  Electronic Data

   The Company will pay for corruption, erasure or alteration of **electronic data** in the **building or other systems** that are incorporated into the **insured project** due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss.**

   The Company will not pay for any loss under this Additional Coverage for which coverage is provided under the Building or Other Systems Additional Coverage or would be provided under such Additional Coverage but for the exhaustion of the Building or Other Systems sublimit of liability shown in Item **10.B.** of the Declarations.

   **b.**  Building or Other Systems

   The Company will pay for the **building or other systems** that are incorporated into the **insured project** rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems.**

   **c.**  Plans and Drawings

   The Company will pay for corruption, erasure or alteration of **plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code.**

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 5 of 25 |
|---|---|---|

**d. Cyber Extra Expense**

If coverage is provided under Subsections **7.a., 7.b.** or **7.c.** above, the Company will also pay the reasonable and necessary costs, over and above normal operating costs, incurred by the **Named Insured** limited to the following and such costs shall not be considered extra expense under any other Additional Coverage:

   **i.** Conducting an investigation (including a forensic investigation) to determine the cause and scope of the introduction of such **malicious code;** and

   **ii.** Hiring an expert to consult with the **Named Insured** on: (1) the protection of such **electronic data** and (2) the eradication of such **malicious code.**

**e. Additional Exclusions**

The following additional exclusions apply to all Additional Coverages set forth in the CYBER COVERAGE Additional Coverage:

   **i.** The Company will not pay any loss, damage, cost or expense arising out of a breach in confidentiality or privacy of, or release of, any **electronic data** for any reason.

   **ii.** The Company does not cover theft of any **electronic data** unless there has been corruption, erasure or alteration of **electronic data** and then the Company shall only pay the covered loss that is related to the corruption, erasure or alteration of **electronic data.**

   **iii.** The Company will not pay any extortion payments or public relations expenses.

   **iv.** The Company will not pay any loss, damage, cost or expense arising out of **malicious code,** otherwise excluded under this Policy.

The maximum amount the Company will pay for all loss or damage (including corruption, erasure or alteration) under any single Additional Coverage under this CYBER COVERAGE Additional Coverage is the corresponding sublimit of liability for such single Additional Coverage as shown in Item **10.B.** of the Declarations, regardless of any other applicable coverages or Additional Coverages.

For the purposes of the CYBER COVERAGE Additional Coverage, Subsection **7.a., 7.b., 7.c.,** and **7.d.** shall each be treated as a separate Additional Coverage.

**8. DEBRIS REMOVAL**

If **covered property** at the **insured project** sustains direct physical loss or damage by a **covered cause of loss** during the **policy period,** the Company will pay the reasonable and necessary expenses to:

**a.** Remove debris of **covered property** remaining from the **insured project;** and

**b.** Remove debris of uninsured property from the **insured project.**

The Company will not pay the expense to extract **pollutants or contaminants** from land, water and/or debris, or to remove, restore, or replace contaminated or polluted land or water.   In addition, the Company will not cover the cost to remove or transport any property or debris to a site for storage or decontamination required because the property or debris is affected by **pollutants or contaminants,** whether or not such removal, transport or decontamination is required by law, ordinance or regulation nor will the Company cover the cost to remove, transport or decontaminate any property or debris damaged by **fungus, mold or spore.**

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 6 of 25 |
|---|---|---|

**9. DEMOLITION AND INCREASED COST OF CONSTRUCTION**

In the event of direct physical loss or damage by a **covered cause of loss** to **covered property** that results in the enforcement of any law, ordinance, governmental directive or standard (hereinafter, **law or ordinance**) in effect at the time of loss or damage regulating the repair or rebuilding of the damaged portion(s) of the **covered property**, the Company will pay:

**a.** Demolition Coverage A:  In accordance with the VALUATION Section, the cost to replace the undamaged portion of the damaged **covered property** as a consequence of the enforcement of a **law or ordinance** that requires demolition of the undamaged portion of the damaged **covered property**;

**b.** Demolition Coverage B:  For the cost to demolish and clear the site of the undamaged portion of the damaged **covered property**, as a consequence of the enforcement of a **law or ordinance** that requires demolition of the undamaged portion or the damaged **covered property**; and

**c.** Demolition Coverage C:  For the increased cost of repairing or rebuilding the damaged and undamaged portion of the **covered property**, limited to the cost that would have been incurred in order to comply with the minimum requirements of such **law or ordinance** regulating the repair or rebuilding of the damaged **covered property**.

The Company shall not be liable for any loss under this provision, unless and until the damaged or destroyed **covered property** is actually repaired or rebuilt on the same premises with exercise of due diligence and dispatch and in no event, unless repair or rebuilding is completed within two (2) years after the destruction or damage of such **covered property** or within such further time as the Company may allow in writing during the two (2) year period.

The Company shall not be liable for any cost set forth above:

**a.** Necessitated by the enforcement of any **law or ordinance** regulating any form of **pollutant or contaminant**; or

**b.** Incurred due to any **law or ordinance** with which the **Insured** was legally obligated to comply with prior to the time of the direct physical loss or damage.

**10. EXPEDITING EXPENSE AND EXTRA EXPENSE**

The Company will pay reasonable and necessary:

**a.** Expediting expenses to make temporary repairs and to expedite the permanent repair or replacement of **covered property**, that sustains direct physical loss or damage due to a **covered cause of loss**, including additional wages for overtime, night work, and work on public holidays and the extra costs of express and air freight and extra costs of rental equipment; and

**b.** **Extra expense** which is incurred by the **Insured** for the purpose of continuing as nearly as practicable the scheduled progress of undamaged work, but only when such scheduled progress is impaired by direct physical loss or damage by a **covered cause of loss** to the **covered property**.

In order to receive payment under this provision, the **Insured** must exercise due diligence and dispatch to maintain the scheduled progress of the undamaged work.

Notwithstanding the foregoing, the Company will not pay expenses incurred:

| 126687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 7 of 25 |
|---|---|---|

a.  To comply with any **law or ordinance** which regulates removal, repair, demolition, construction or re-construction of the **covered property;**

b.  To overcome delays in the scheduled progress of the work which existed at the time of the loss;

c.  For alterations, additions, improvements or other changes in materials, designs, plans, specifications or the means and methods of construction; or

d.  As **owner's extra expense.**

## 11. OWNER'S EXTRA EXPENSE

The Company will pay reasonable and necessary **owner's extra expense** incurred by the **project owner(s),** prior to the Expiration Date as described in Item 4. of the Declarations, due to direct physical loss or damage by a **covered cause of loss** to **covered property.**

Notwithstanding the foregoing, the Company will not pay expenses incurred:

a.  To comply with any **law or ordinance** which regulates removal, repair, demolition, construction or re-construction of the **covered property;**

b.  To overcome delays in the scheduled progress of the work which existed at the time of the loss;

c.  For alterations, additions, improvements or other changes in materials, designs, plans, specifications or the means and methods of construction; or

d.  As **extra expense** or expediting expenses as set forth under the EXPEDITING EXPENSE AND EXTRA EXPENSE Additional Coverage.

## 12. FINE ARTS

The Company will pay for direct physical loss or damage by a **covered cause of loss** to the **insured's fine arts** at the **insured project** for which the value has been included in the **total project value.**  However, the Company will not pay for loss or damage as a result of restoring, repairing or retouching processes.

## 13. FIRE BRIGADE, EXTINGUISHING EXPENSES AND POLICE CHARGES

The Company will pay the following expenses resulting from a **covered cause of loss** to **covered property** incurred by the **insured:**

a.  Fire brigade charges and extinguishing expenses;

b.  Loss and disposal of fire extinguishing materials expended; and

c.  Police charges to investigate a covered loss.

## 14. FUNGUS, MOLD OR SPORE

The Company will pay for direct physical loss or damage to **covered property** caused by or resulting from **fungus, mold or spore,** when such **fungus, mold or spore** arises out of a **covered cause of loss** that commences during the **policy period.**  This coverage includes reasonable and necessary cost or expense with respect to the **insured project** to:

a.   Clean-up, remove, contain, treat, detoxify or neutralize **fungus, mold or spore**;

b.   Test the indoor air quality for **fungus, mold or spore**;

c.   Test the surfaces and materials for **fungus, mold or spore**;

d.   Develop and implement a remediation plan for **fungus, mold or spore**; and

e.   Remove debris that has been contaminated with **fungus, mold or spore**.

**15. HOT TESTING**

The Company will pay for direct physical loss or damage to **covered property** at the **insured project** due to a **covered cause of loss** arising out of **hot testing** during the **hot testing period**.

The **hot testing period** means the period of time that:

a.   Begins with the introduction into each system of: (1) feedstock or other raw materials or (2) fuel supply, and

b.   Ends on the earliest of the following:

   i.   The Expiration Date or earlier termination date of the Policy;

   ii.  The date of formal acceptance of the **insured project** or any part of the **insured project** undergoing **hot testing** by the **project owner(s)**; or

   iii. The date after the total number days of **hot testing**, whether or not consecutive, as shown in Item **10.B.** of the Declarations (referred to as the Maximum Hot Testing Period), after the commencement of **hot testing**.

**Hot testing** means testing of equipment or machinery through the introduction into a system of: (1) feedstock or other raw materials or (2) fuel supply.  **Hot testing** does not mean testing of building systems including, but not limited to, electrical, mechanical, hydraulic, hydrostatic and pneumatic testing which shall be deemed to be cold testing.

**16. LANDSCAPING MATERIALS**

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **landscaping materials** at the **insured project**, except for loss or damage to **landscaping materials** from infestation, disease, freeze, drought, lack of moisture, hail, weight of ice or snow or any damage caused by insects, vermin, rodents or animals.

As used herein, **landscaping materials** means trees, plants, shrubs, grass and lawns (including fairways, greens and tees) for which the **Insured** is contractually responsible and the value of which has been included in the **total project value**.

For the purpose of applying the sublimit of liability, "one item" shall mean: (1) any one tree, plant, shrub, green or tee, or (2) each separate area of a fairway or grass, bounded by rough vegetation, water, dirt, concrete or paved surfaces on all sides.

**17. LOGISTICS EXTRA COSTS**

The Company will pay the reasonable and necessary extra cost incurred by the **Insured** to temporarily continue, as nearly normal as practicable, the movement of **covered property** directly between the location of the **Insured's** direct supplier and the **insured project**, provided

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 9 of 25 |
| --- | --- | --- |

that the normal movement of such **covered property** is disrupted as a result of direct physical loss or damage by a **covered cause of loss** to bridges, roadways, tunnels, docks, piers, wharves runways, taxiways, tarmacs, terminals, and/or railways (hereinafter, **infrastructure**) located in the **coverage territory**.

Coverage begins:

a.  48 hours after such disruption; or

b.  In the case of disruption caused by **earth movement, flood** or **windstorm or hail**, 168 hours after such disruption;

and ends when, with exercise of due diligence and dispatch, the normal movement of the **covered property** could be resumed (hereinafter, the **waiting period deductible**). Any **waiting period deductible** shall apply in addition to any other deductible(s) applicable to the **covered cause of loss** that resulted in damage to the **infrastructure**. Such other deductible(s) shall be subject to a minimum deductible of the Policy Deductible.

The following additional exclusions apply to this Additional Coverage. The Company will not pay for:

a.  Any loss resulting from disruption of electricity, gas, fuel, water, steam, sewerage, refrigeration, cloud computing service, or any data, voice or video service;

b.  Any costs that would have been incurred during the same period had there been no disruption of normal movement of goods or materials;

c.  Any costs for the repair or replacement of property that has been damaged or destroyed; or

d.  Any costs recoverable elsewhere under this Policy.

## 18. PLANS AND DRAWINGS

The Company will pay for direct physical loss of or damage by a **covered cause of loss** to **plans and drawings**.

## 19. POLLUTION AND CONTAMINATION COVERAGE

The Company will pay the reasonable and necessary expenses incurred by the **insured** to:

a.  Remove, extract, dispose of, or clean-up the actual presence of **pollutants or contaminants** from land or water at the **insured project**;

b.  Remove and transport property or debris at the **insured project** that is affected by **pollutants or contaminants** to a site for storage or decontamination; and

c.  Test for **pollutants or contaminants** during the extraction of **pollutants or contaminants** from land or water at the **insured project**;

but only if the **pollutants or contaminants** originate at the **insured project** due to direct physical loss or damage by a **covered cause of loss** during the **policy period**. There will be no coverage unless such expenses are reported to the Company within 180 days after the date of such direct physical loss or damage.

**20. PRESERVATION OF PROPERTY**

The Company will pay for:

**a.** Reasonable and necessary costs, over and above normal operating costs, incurred by the **Insured** for actions to temporarily protect or preserve **covered property**, and

**b.** Direct physical loss or damage by a **covered cause of loss** to **covered property** removed from the **Insured project**,

provided that such actions or removal is necessary due to imminent direct physical loss or damage by a **covered cause of loss** to **covered property**. If **covered property** is removed to and located at offsite temporary storage in accordance with this provision, then the OFFSITE TEMPORARY STORAGE Additional Coverage shall apply.

**21. PROFESSIONAL DESIGN FEES**

In the event of direct physical loss or damage by a **covered cause of loss** to the **Insured project**, the Company will pay the reasonable and necessary expenses incurred by the **Insured** for architects, engineers or other design professionals to redesign the damaged portion of the **insured project** in accordance with the design as set forth in the **contract documents** on the date of loss.

**SECTION III – VALUATION**

Unless otherwise provided in this Policy, the basis of adjustment of a claim shall be as follows, at the time and place of the loss:

**A.** <u>Permanent Works</u> – The cost to repair or replace (whichever is less) the **permanent works** that sustained loss or damage at the time and place of the loss with material of like kind and quality, less betterment, and including contractor's reasonable profit and overhead in the same proportion as that included in the **contract documents** to the extent declared as part of the **total project value**. If the **permanent works** are not repaired or replaced within 2 years after the date of loss, then the Company shall pay the actual cash value of such **permanent works** at the time and place of the loss.

**B.** <u>Temporary Works</u> – With respect to **temporary works** that sustain loss or damage, the lesser of: (1) the cost to repair or replace (whichever is less) the **temporary works** at the time and place of loss with materials of like kind and quality, but if not repaired or replaced within 2 years after the date of loss, the recovery will not exceed actual cash value or (2) the value that the **Insured** is legally required to pay for the **temporary works** as set forth in the lessor's contract.

**C.** <u>Property of others</u> – The lesser of: (1) the cost to repair or replace (whichever is less) the **property of others** that sustained loss or damage at the time and place of loss with material of like kind and quality, less betterment and/or charges incurred by the contractor prior to the loss and related to such property or (2) the property owner's cost.

**D.** <u>Property in Inland Transit</u> – The invoice cost of property in **inland transit** plus accrued shipping charges less the shipper's liability, if any.

**E.** <u>Plans and Drawings</u> – If replaced, the cost to reproduce the **plans and drawings** (in physical or **electronic data** format) from duplicates, or if no duplicates are available, then the cost to research, gather and/or assemble the information to recreate such **plans and drawings**. If not replaced, the value of the blank material.

**F.** **Landscaping Materials** – (1) The cost to replace **landscaping materials** with property of like kind and quality, and (2) the labor necessary to replace such property.

**G.** **Fine Arts** – The least of the following: (1) the cost to repair or replace the **fine arts**; (2) the appraised value at the time of the loss had no loss or damage occurred or (3) the agreed value, if any, on file with the Company.

**H.** **Electronic Data** – The cost of reproducing **electronic data** from duplicates to the condition that existed prior to the time of the loss, or if no duplicates exist, then the cost to research, gather and/or assemble the **electronic data**. If the **electronic data** is not replaced, then the value of the blank media.

## SECTION IV – PROPERTY NOT COVERED

Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company does not insure the following property:

**A.** Land and land values and the value of cut, fill and backfill materials existing at the location of the **insured project** prior to project commencement; however, to the extent identified in the **contract documents** and included in the **total project value**, fill and backfill materials purchased for use in the completion of the **insured project** are covered. Labor and material charges incurred to excavate land and to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured, are covered to the extent such charges are identified in the **contract documents** and included in the **total project value**;

**B.** **(i)** Contractors' tools, machinery, plant and equipment, including spare parts and accessories, whether owned, loaned, hired or leased, and

**(ii)** Property of a similar nature not intended to be a permanent part of the completed **insured project**,

regardless of ownership, unless specifically provided by endorsement and then only to the extent provided therein;

**C.** Vehicles or equipment licensed for highway use, aircraft including drones or watercraft, except with respect to drones only, if such drones are owned and used by the **Insured** as part of the operations at the **insured project**;

**D.** Railcars and locomotives;

**E.** Water, except water that is contained within any enclosed tank, piping system, or **processing water**;

**F.** Standing timber, growing crops or animals;

**G.** Trees, plants, shrubs, grass or lawns (including fairways, greens or tees) that already exist at the **insured project**;

**H.** Landscaping materials;

**I.** **Plans and drawings**;

**J.** Accounts, bills, stamps, deeds, evidence of debt, checks, bonds, notes, money, **fine arts**, precious metals or precious stones or other property of a similar nature;

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 12 of 25 |
|---|---|---|

K. **Existing property** at the location of the **insured project**, unless specifically provided by endorsement and then only to the extent provided therein;

L. **Used machinery and equipment** while undergoing any form of testing, commissioning or startup, unless specifically provided by endorsement and then only to the extent provided therein;

M. Transmission, distribution or communication lines, except to the extent identified in the **contract documents;**

N. Property not at an **insured project** unless covered under the INLAND TRANSIT Additional Coverage, OFFSITE TEMPORARY STORAGE Additional Coverage or by endorsement; or

O. Electronic data.

## SECTION V – PERILS EXCLUDED

A. Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company does not insure for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage. The following exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:

1. Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or contributed to or aggravated by a **covered cause of loss**. However, if fire or sprinkler leakage not otherwise excluded ensues, the Company shall be liable for direct physical loss or damage by such ensuing fire or sprinkler leakage, but not including any loss or damage due to nuclear reaction, nuclear radiation, or radioactive contamination;

2. a. War, hostile or warlike action in time of peace or war, whether or not declared, including action in hindering, combating, or defending against an actual, impending, or expected attack:

    i. By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces; or

    ii. By military, naval, or air forces; or

    iii. By an agent of any such government, power, authority, or force;

   b. Any weapon employing atomic fission, fusion or radioactive force, or any weapon that disperses radioactive material or a directed-energy or electromagnetic weapon, whether in time of peace or war, whether or not its discharge was accidental; or

   c. Insurrection, rebellion, revolution, civil war, usurped power, seizure or destruction or any action taken by governmental authority in hindering, combating, or defending against such event;

   Including any consequence of Subsection a., b., or c. above;

3. The actual, alleged or threatened release, discharge, escape or dispersal of **pollutants or contaminants**, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any **covered cause of loss** under this Policy.

| | | |
|---|---|---|
| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 13 of 25 |

However, this exclusion shall not apply to direct physical loss or damage to **covered property** from **pollutants or contaminants** caused by a **covered cause of loss** at the **insured project**, including the cost to clean-up **pollutants or contaminants** from **covered property** at the **insured project** resulting from such loss or damage.  No coverage is provided for testing or monitoring for **pollutants or contaminants**.  For the purpose of the exception to this exclusion only, **pollutants or contaminants** do not include radioactive contaminants;

4. Dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances by any cause whatsoever;

5. Asbestos, dioxins or polychlorinated biphenols (hereinafter, **material(s)**) including:

    a. **Material(s)** removal;

    b. Demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating **material(s)**;

    c. Any governmental order or direction declaring that any **material** which is present in or part of or utilized on any portion of the **insured project** must be removed or modified;

6.  a. Any functioning or malfunctioning or lack of the internet or similar facility, or of any intranet or private network, computer system, computer or computing device or similar facility;

    b. Any corruption, destruction, distortion, erasure or other loss or damage to data, coding, program, or software;

    c. Loss of use or functionality whether partial or entire of data, coding, program, software, any computer or computer system or other device and any ensuing liability or failure of the **insured** to conduct business;

all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage at the **insured project**;

7. Error or omission in machine programming or instructions of **electronic data**, including, loss attributable to program design constraints, networking compatibility and original business software; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage at the **insured project**;

8. Lack of incoming electricity, fuel, water, gas, steam, refrigeration, or outgoing sewerage, or incoming or outgoing data, voice or video service; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage, but only if: (1) such ensuing loss or damage is caused by a lack of incoming electricity, fuel, water, gas, steam or refrigeration from an offsite service provider and (2) such ensuing loss or damage is to equipment or machinery that is part of the **permanent works** of the **insured project** and is not operational at the time of the loss. This exception does not apply to **hot testing**.

9. Any loss or damage arising out of **hot testing**;

10. Infidelity, dishonesty or fraudulent activity of any **insured** or any of the **insured's** proprietors, partners, officers, directors, trustees, employees or others with whom the property is entrusted (other than a carrier for hire).  However, a willful act of destruction by the

**Insured's** employee without the knowledge of any of the **Insured's** proprietors, partners, officers, directors or trustees is covered;

11. Any act that: (1) causes corruption, erasure or deletion of **electronic data**, including the rendering of any equipment or machinery useless, or (2) prevents access to or use of computer hardware, software or other components thereof; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage.

12. **Fungus, mold or spore**; or any spores or toxins created or produced by or emanating from such **fungus, mold or spore**; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage;

13. Confiscation, seizure, appropriation, expropriation, nationalization, requisition for use or title, or willful destruction by any government, sovereign power, civil authority or military authority (de jure or de facto); or

14. Loss or damage arising out of any **covered cause of loss** or Additional Coverages for which the words NOT COVERED or for which an amount or number of days is not shown in Item 10. of the Declarations.

B. Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company will not pay for loss or damage caused by or attributable to any of the following:

1. Indirect, remote or consequential loss or damage;

2. Delay, loss of market or loss of use;

3. Delay in completion of the **insured project**, unless specifically provided by endorsement and then only to the extent provided therein;

4. Any business interruption loss, **extra expense, owner's extra expense**, expediting expenses, expenses to reduce loss, loss of rental income and other economic losses;

5. Liquidated damages, performance penalties, penalties for non-completion, late completion or non-compliance with contract conditions;

6. Loss, damage, costs, expenses, fines or penalties incurred or sustained by or imposed on the **Insured** at the order of any government agency, court or other authority arising from any cause whatsoever;

7. Loss, damage, or expense covered under any written or implied guarantee or warranty by any contractor, manufacturer or supplier, whether or not such contractor, manufacturer or supplier is an **Insured**, but only to the extent such loss, damage, or expense should have been recovered under such written or implied guarantee or warranty;

8. Unexplained or mysterious disappearance, loss or shortage disclosed on taking inventory;

9. Normal: subsidence, heave, settling, cracking, expansion, contraction or shrinkage of walls, floors, ceilings, buildings, foundations, patios, walkways, driveways or pavements, all unless direct physical **loss** or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage;

**10. a.** Faulty workmanship, material, construction or installation from any cause; or

**b.** Any fault, defect, error, deficiency or omission in any design, plans, or specifications;

all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage; or

**11.** Wear and tear, erosion, inherent vice, latent defect, corrosion, rust, wet or dry rot, evaporation, shrinkage, or change in color, flavor, texture or finish, extremes or changes of temperature damage, or changes in relative humidity damage, all whether atmospheric or not or gradual deterioration, all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage.

### SECTION VI – CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT

**A. ABANDONMENT**

There can be no abandonment of any property to the Company.

**B. ADJUSTMENT OF LOSSES**

Loss or damage will be adjusted with the **Named Insured** and shall be payable as directed in writing by the **Named Insured** subject to: mortgagee; lender; or similar interests; as their interests may appear as shown on the Certificates of Insurance or any endorsement attached to and forming a part of the Policy. The effective date of any interests will be the issue date of the Certificate of Insurance unless a later date is specified on the Certificate of Insurance.

Notwithstanding the foregoing, if the Company is prohibited from adjusting and making payment in accordance with the preceding paragraph, the Company will adjust and make payment to the **Named Insured**.

**C. APPRAISAL**

If the **Named Insured** and the Company disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In such event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If the appraisers cannot agree on an umpire, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the replacement cost and actual cash value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**1.** Pay its chosen appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, it is without prejudice to the Company's rights under the terms and conditions of this Policy and the Company's right to deny the claim in whole or in part.

**D. PARTIAL PAYMENT OF LOSS**

In the event the amount of loss or damage for which the Company is liable is determined by the Company to be in excess of the applicable deductible, the Company may advance partial payment(s) with respect to any claim, subject to all other terms and conditions of this Policy.

**E. REQUIREMENTS IN CASE OF LOSS OR DAMAGE**

In case of loss or damage, the **Insured** shall:

1. Give written notice of any loss or damage to the Company as soon as practicable after the date of such loss or damage;

2. Promptly contact the applicable authority having jurisdiction in the event a law has been broken, and promptly file a written report with such authority;

3. Protect the property from further loss or damage;

4. Separate the damaged and undamaged property;

5. Maintain such property in the best possible order;

6. Furnish a complete inventory of the lost, destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed;

7. Allow the Company to examine and audit the **Insured's** books and records at any reasonable time for the purpose of investigating or verifying any claim;

8. Furnish all other documents or insurance policies that the Company may reasonably require;

9. Allow the Company to access and inspect any damaged or undamaged property;

10. Submit to examination under oath at such times as the Company reasonably may require concerning any matter relating to this insurance or any claim;

11. Cooperate with the Company in all aspects of any claim and provide the Company with any additional information that the Company requires; and

12. Provide the Company with a proof of loss, signed and sworn to by the **Named Insured** as soon as practicable, but in no event more than 90 days after a loss, stating the **Insured's** knowledge and belief as to the following:

    a. The time and origin of the loss;

    b. The **Insured's** interest and the interest of all others in the property;

    c. The value of each item thereof determined in accordance with the VALUATION Section and the amount of loss thereto and all encumbrances thereon;

    d. All other contracts of insurance, whether collectible or not, covering any of the **covered property**; and

    e. Any changes in the title, use, occupancy, location, possession or exposures of the **covered property** subsequent to the issuance of this Policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss, whether or not it then stood on leased ground.

**F. SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable shall be payable within 30 days after proof of loss, as herein required, is received and agreed to by the Company or the amount of

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 17 of 25 |
|---|---|---|

loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

The Company shall have the option to take all or any part of the property at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing the **Named Insured** with notice of the Company's intention to do so within 60 days after the Company's receipt of the proof of loss herein required.

## G. SUBROGATION

The Company may require from the **Insured** an assignment of all rights of recovery against any party for loss to the extent that payment is made by the Company. However, the **Insured** has the right to waive subrogation, provided such waiver is entered into by the **Insured** in writing prior to the loss. The **Insured** will do nothing after a loss to prejudice such rights of subrogation.

Notwithstanding the foregoing, it is a condition of this Policy that the Company shall be subrogated to all the **Insured's** rights of recovery against:

1. Any architect or engineer, whether named as an **Insured** or not, for any loss or damage arising out of the performance of professional services in their capacity as such and caused by an error, omission, deficiency or act of the architect or engineer, by any person employed by them or by any others for whose acts they are legally liable; and

2. Any manufacturer or supplier of machinery, equipment or other property, whether named as an **Insured** or not, for the cost of making good any loss or damage regardless of any guarantee or warranty, whether express or implied.

Any recovery by the Company as a result of subrogation proceedings arising out of an **occurrence**, after expenses, including the Company's legal fees, incurred in such subrogation proceedings are deducted, shall accrue to the **Insured** in the proportion that the deductible amount and/or any provable uninsured loss amount bears to the entire provable loss amount.

The **Insured** will cooperate with the Company and, upon the Company's request and expense will:

1. Attend hearings and trials;

2. Assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and conducting suits.

## H. SUIT AGAINST COMPANY

No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless the same be commenced within 24 months immediately after the date of the loss, provided however, that if under the laws of the applicable jurisdiction such time limitation is unenforceable, then the period within which such action or proceeding must be commenced shall be the shortest period of time permitted by the laws of such jurisdiction.

## SECTION VII – GENERAL CONDITIONS

**A. ASSIGNMENT**

The **Insured** may not assign this Policy without the Company's prior written consent.

**B. CANCELLATION**

This Policy may be cancelled by the **Named Insured** at any time by surrendering this Policy to the Company or by mailing or delivering to the Company written notice stating when thereafter such cancellation shall take effect.  The Company may cancel this Policy by giving the **Named Insured** written notice stating when, not less than 90 days thereafter, or 10 days thereafter for nonpayment of premium, such cancellation shall be effective.

The Company shall pay return premium to the **Named Insured** on a pro-rata basis if the Company cancels and on a short rate basis (meaning 90% of the unearned premium) if the **Named Insured** cancels.

Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If any specific state amendatory endorsement provides less than 90 days notice of cancellation for reasons other than nonpayment of premium, where permitted by law, the Company shall provide the 90 days notice set forth herein.

**C. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Policy is voidable by the Company if any **Insured**, whether before or after a loss, has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or has committed any act of fraud, attempted fraud or false swearing concerning any matter relating to this insurance or the subject thereof.

**D. CONFORMANCE TO STATUTE**

Any provisions of this Policy which are in conflict with statutes applicable to this Policy are understood, declared and acknowledged by the Company to be amended to conform to such statutes.

**E. ECONOMIC AND TRADE SANCTIONS**

The Company shall not be deemed to provide cover and the Company shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose this Company, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.

**F. ERRORS OR OMISSIONS**

No unintentional errors or omissions in any information required to be reported to the Company will prejudice the **Insured's** rights of recovery, but the **Insured** shall report the correct information to the Company as soon as practicable when discovered and the **Insured** shall pay any additional premium when due.

**G. GOVERNING LAW**

Any interpretation of this Policy or issue relating to its construction, validity or operation shall be determined by the laws of the United States or of any applicable state in the United States. The parties will submit to the exclusive jurisdiction of the applicable court within the United States.

**H. INCREASE IN HAZARD**

If the circumstances in which this insurance was entered into shall be altered or if the risk shall be materially increased, the **Insured** shall as soon as possible give notice in writing to the Company. In the event there is a material increase in the risk, the Company reserves the right to change the terms or conditions of this Policy or cancel this Policy (if allowable by law).

**I. INSPECTION**

The Company shall be permitted, but not obligated, to inspect **covered property** at all reasonable times during the **policy period**. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute any undertaking by the Company, on behalf of or for the benefit of the **Insured** or others, to determine or warrant that such **covered property** is safe or healthful or that such **covered property** complies with any law, rule, regulation, code, engineering or industry standard.

**J. LIBERALIZATION**

If the Company adopts a standard revision to the Company's Completed Value Builders Risk Construction Performance Policy that would broaden the coverage under this Policy within 45 days prior to the inception date of this Policy or during the **policy period** of this Policy and if no additional premium is required for such revision, then the broadened coverage will immediately apply to this Policy.

**K. NAMED INSURED**

If this Policy insures more than one person or organization, the **Named Insured** is authorized to act on behalf of all other **Insureds** with respect to such **Insureds'** rights, obligations, and duties under this Policy including, but not limited to, the giving and receiving of notices under this Policy. Payment of loss or return premium under this Policy to the **Named Insured** shall satisfy the Company's obligations with respect to all **Insureds** under this Policy.

**L. NO BENEFIT TO BAILEE**

No person or organization, other than the **Insured**, having custody of **covered property** will benefit from this insurance.

**M. OTHER INSURANCE**

1.  An **Insured** may have other insurance.  If such **Insured** does have other insurance, the Company will pay its share of the covered loss or damage.  Subject to the exceptions as set forth in **2.** below, the Company's share is the proportion that the applicable limit/sublimit of liability under this Policy bears to the limits/sublimits of liability of all insurance covering the loss or damage.

| ©American International Group, Inc.
All Rights Reserved. |

2. If there is other insurance as described below, the Company will pay under this Policy only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether the **Insured** can collect on it or not:

    a. The property covered under this Policy is also covered under another policy, in which such property is more specifically described; or

    b. The other insurance covers the **Insured's** interest or the interest of others in property which the **Insured** does not own.

## N. PAIR AND SET

In the event of loss or damage to any part of **covered property** consisting, when complete for use, of several parts, the Company will only be liable for the value of the part lost or damaged.

## O. PREMIUM ADJUSTMENT

1. **During the Term of the Policy:**

    a. At the time of any extension of this Policy or if the scope or value of the **insured project** changes beyond the percentage set forth in the Margin Clause shown on the Declarations, the **Named Insured** shall report in writing to the Company the **adjusted total project value** as of the date of such extension or change order.

    b. The adjusted premium shall be calculated by applying the rates as shown in Item **8.** of Declarations used for the purpose of computing the Deposit Premiums to the amended term of coverage and the **adjusted total project value.**

    c. If the adjusted premium so calculated differs from the Total Deposit Premium shown in Item **8.** of the Declarations (or the previous revision of the Total Deposit Premium), such difference shall be due and payable to the Company or the **Named Insured**, whichever is applicable.

2. **Upon Expiration or Cancellation of the Policy:**

    a. At the time of expiration or cancellation of this Policy, the **Named Insured** shall report in writing to the Company the **adjusted total project value** as of the Expiration Date or the effective date of cancellation.

    b. The final earned premium for this Policy shall be calculated by applying the rates as shown in Item **8.** of Declarations used for the purpose of computing the Deposit Premiums to the actual term of coverage and the **adjusted total project value.**

    c. If the premium so calculated differs from the Total Deposit Premium shown in Item **8.** of the Declarations (or the previous revision of the Total Deposit Premium), such difference shall be due and payable to the **Named Insured** or the Company, whichever is applicable.

## P. PRESERVATION OF PROPERTY

In case of imminent loss or damage, the **Insured** must make reasonable efforts to protect property from such loss or damage.

## Q. RECOVERY FROM OTHER PARTIES

No loss or damage in whole or in part shall be paid hereunder to the extent the **Insured** has collected such loss or damage from others.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 21 of 25 |
|---|---|---|

**R. SALVAGE AND RECOVERIES**

All salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this Policy, shall reduce the loss accordingly.

**S. TITLES**

The titles in this Policy are solely for reference and shall not in any way affect the provisions to which they relate.

<div align="center">

**SECTION VIII – DEFINITIONS**

</div>

1. **Additional Insured(s)** means those **Insureds** shown in Item **2.** of the Declarations.

2. **Adjusted total project value** means the **total project value** that may be adjusted during the **insured project** or if previously adjusted, any adjustments to the revised **total project value**.

3. **Building or other system(s)** means:

   a. Equipment and machinery; and/or

   b. Manufacturing or structural system(s), such as a HVAC, instrumentation, electrical, mechanical or control system(s);

   that are incorporated into the **insured project**.

4. **Collapse** means an abrupt falling down or caving in of a building or structure or any part of a building or structure.

5. **Contract documents** means the contract(s) or agreement(s), as may be amended, on file with the **Insured** for the **insured project**.

6. **Coverage territory** means the coverage territory as shown in Item **6.** of the Declarations.

7. **Covered cause(s) of loss** means a peril or other type of loss, not otherwise excluded under this Policy.

8. **Covered property** means property as described in the COVERED PROPERTY Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section which is not otherwise excluded under the PROPERTY NOT COVERED Section, for which the **Insured** is contractually responsible and the value of which has been included in the **total project value**.

9. **Electronic data** means data, messages, information, coding, programs, instructions or software in a form suitable for communications, storage, or processing by electronic, electromechanical, electromagnetic data processing or electronically controlled production equipment. **Electronic data** does not include electronic storage media.

10. **Existing property** means existing buildings and/or permanent structures, including equipment and apparatus used to maintain or service the buildings or structures, that existed prior to the inception date of this Policy and is located at the **insured project**. **Existing property** does not include personal property, any property located outside of the existing buildings and/or permanent structures, and/or any underground utilities of any kind or description.

11. **Extra expense** means the excess costs over and above the total costs that would normally have been incurred to continue the scheduled progress of the undamaged work in the absence of such loss or damage, including:

    a.  Labor, supervision, management and administration costs;

    b.  Equipment rental, temporary use of property;

    c.  Emergency expenses, additional security; and

    d.  Demobilization and remobilization of equipment and facilities;

all when necessarily incurred to reduce time delays in the contract schedule.

12. **Fine arts** means paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; porcelains; and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft and **money.**

13. **Fungus, mold or spore** means:

    a.  **Fungus** including, but not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including **mold**, yeast, rusts, mildews, smuts and mushrooms;

    b.  **Mold** including, but not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and **fungi** that produce **mold**; and/or

    c.  **Spore** including, but not limited to, any dormant or reproductive body produced by or arising or emanating out of any **fungus, mold**, mildew, plants, organisms or microorganisms.

14. **Insured(s)** means the **Named Insured(s)** and the **Additional Insured(s).**

15. **Insured project** means the construction project as described in Item **5.** of the Declarations, for which values have been reported and are included in the **total project value.**

16. **Malicious code** means any unauthorized code designed to cause corruption, erasure or alteration of **electronic data.**

17. **Money** means:

    a.  Currency, coins, bank notes, bullion, traveler checks, registered checks, money orders; and

    b.  Negotiable and non negotiable instruments or contracts representing money including: tokens, tickets, revenue stamps and other stamps (whether represented by actual stamps or unused value in a meter), and evidence of debt issued in connection with credit card or charge cards that are issued to the **Insured.**

18. **Named Insured** means the Named Insured(s) shown in Item **1.** of the Declarations.

19. **Occurrence** means any one accident, loss, disaster, casualty, incident or series of accidents, losses, disasters, casualties or incidents, including all resultant or concomitant insured losses, not otherwise excluded by this Policy and with respect to:

    a.  **Terrorism** (to the extent **terrorism** is covered), arises out of the same or related purpose or cause; or

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 23 of 25 |
|---|---|---|

**b.** Covered perils other than **terrorism**, arises out of a single event or originating cause.

The **occurrence** must occur during the **policy period**.

When the term applies to loss or losses from the perils of **windstorm or hail, named storm, riot, strike or civil commotion, vandalism and malicious mischief, earth movement, flood** or **terrorism**, to the extent any such peril(s) are covered, all losses arising from such peril(s) occurring during a continuous period of 72 hours shall be deemed to be a single **occurrence**. The **Named Insured** may elect the moment at which the 72 hour period shall be deemed to have commenced, which shall not be earlier than the time when the first loss occurs to the **covered property**, but no two such 72 hour periods shall overlap.

If the **occurrence** commences during this **policy period**, then the Company shall treat the entire **occurrence** as occurring during this **policy period**.

20. **Owner's extra expense** means the following expenses:

   **a.** Advertising and marketing expense;

   **b.** Legal and accounting fees;

   **c.** License and permit fees; and

   **d.** Project management fees.

21. **Plans and drawings** means plans, blueprints, drawings, renderings, specifications or other contract documents and models (whether in physical or **electronic data** format) for the **insured project** stored anywhere in the world.  Such **plans and drawings** do not include machine programing instructions including, Building Information Modelling ("BIM").

22. **Policy Limit** means the limit of liability shown in Item **9.** of the Declarations.

23. **Policy period** means the policy period as described in Item **4.A.** and Item **4.B.** of the Declarations.

24. **Pollutants or contaminants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances. Waste includes materials to be recycled, reconditioned or reclaimed.  **Pollutants or contaminants** do not include **fungus, mold or spore.**

25. **Processing water** means water used directly in the **insured's** business process that is contained within any enclosed tank, piping system or any other processing equipment.

26. **Project owner(s)** means the project owner(s) shown in Item **5.** of the Declarations.

27. **Riot, strike or civil commotion** means riot or civil commotion including, but not limited to:

   **a.** Acts of striking employees while occupying an **insured project**; and

   **b.** Pilferage or looting occurring at the time and place of a riot or civil commotion.

28. **Total project value** means the total value of **permanent works** (including **landscaping materials**), **temporary works** and **property of others**; plus labor costs that will be expended to construct the

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 24 of 25 |
| --- | --- | --- |

**insured project**; plus site general conditions, construction management fees, and contractor's profit and overhead as stated in the **contract documents** as the "total project value", "total contract value", or other similar description.

29. **Used machinery and equipment** means any mechanical or electrical machine or equipment, including a pressure or non-pressure vessel, which has been previously installed or refurbished or is no longer under a manufacturer's warranty.

30. **Vandalism and malicious mischief** means willful and malicious damage to, or destruction of, **covered property**.

31. **Windstorm or hail** means the direct action of wind or the direct action of hail, whether accompanied by wind or not.  However, **windstorm or hail** does not mean:

   a.  Loss or damage caused by or resulting from frost or cold weather, ice (other than hail), snow or sleet, whether driven by wind or not;

   b.  Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters; or

   c.  Loss or damage caused when weight of snow, rainwater, ice or sleet is a contributing factor to the fall or **collapse** of a building or structure or any part thereof.

ENDORSEMENT #001

This endorsement, effective 12:01 A.M., 12/14/2018
Forms a part of Policy No.: 043820532
Issued to: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
By: NEW HAMPSHIRE INSURANCE COMPANY

## DELAY IN COMPLETION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

I.  **Named Insured and Address:**

   A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
   17901 COLLINS AVENUE SOUTH
   SUNNY ISLES BEACH FL 33160

   All coverage under this Delay in Completion Endorsement shall only be provided to the Named Insured shown above (hereinafter, the **Named Insured** for purposes of this endorsement only). No coverage shall be provided under this endorsement to any other person or entity.

II. The coverage provided under this Delay in Completion Endorsement is applicable to the entire insured project unless otherwise described below:

   Not Applicable

III. **Period of Indemnity:**            540 Calendar Days
IV. **Anticipated Date of Completion:**   South Tower - 07/01/2021
                                          Villa - 12/31/2021

V.  **Deductible Period:**

| | Deductible Period (per occurrence unless otherwise stated below) |
|---|---|
| **Standard Deductible** | 30 Calendar Days<br>☒ per occurrence or<br>☐ in the Aggregate, no other **Deductible Periods** apply |
| **Earth Movement, Flood or Named Storm** | 30 Calendar Days |
| **Cyber Loss** | 30 Calendar Days |
| **Ingress & Egress** | 30 Calendar Days |
| **Order of Civil or Military Authority** | 30 Calendar Days |
| **Service Interruption** | 30 Calendar Days |
| **Hot Testing** | Not Applicable |
| **LEG 3** | 30 Calendar Days |

If two or more deductible amounts provided above apply to a single **occurrence**, the total to be deducted shall be the largest applicable deductible. The above deductibles are in addition to any applicable deductibles on the Declarations of this Policy. If the Standard Deductible applies on a per **occurrence** basis, then such deductible shall apply unless a more specific deductible applies.

**VI. Limits of Liability Applicable to this Endorsement**

The following are subject to and not in addition to the **Policy Limit** and all sublimits of liability shown in Item **10.A.** of the Declarations.  The sublimits of liability stated in this endorsement are per **occurrence** unless otherwise stated.

*If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage, then no coverage is provided for that coverage, whether under the Insuring Agreement or any Additional Coverage.  If the words, NOT APPLICABLE are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

| | | |
|---|---|---|
| **A.** | Aggregate Sublimit of liability for all coverage under this endorsement | $44,022,420 |

The following sublimits of liability **VI.B.** through **VI.I.** are subject to **VI.A.** above:

| | | |
|---|---|---|
| **B.** | Loss of **Rental Income** | $NOT COVERED |
| **C.** | Loss of **Gross Earnings** | $NOT COVERED |
| **D.** | **Cyber Loss** | See Item **10.B.7.** of the Declarations |
| **E.** | Ingress & Egress | 15 Calendar Days, subject to maximum of $2,500,000 |
| **F.** | Order of Civil or Military Authority | 15 Calendar Days, subject to maximum of $1,000,000 |
| **G.** | Service Interruption | 15 Calendar Days, subject to maximum of $1,000,000 |
| **H.** | Other:  NOT COVERED | $NOT COVERED |
| **I.** | **Soft Costs/Additional Expenses** | $44,022,420 |

The following sublimits of liability are subject to **VI.I.** above.

| | | |
|---|---|---|
| **1.** | Interim interest expense | $INCLUDED |
| **2.** | Realty taxes/Ground rents | $INCLUDED |
| **3.** | Leasing/Commission expense | $INCLUDED |
| **4.** | Insurance premiums | $INCLUDED |
| **5.** | Advertising and marketing expense | $INCLUDED |
| **6.** | Legal and accounting fees | $INCLUDED |
| **7.** | License and permit fees | $INCLUDED |
| **8.** | Project management fees | $INCLUDED |
| **9.** | Other: Construction Supervision | $INCLUDED |

©American International Group, Inc.
All Rights Reserved.

| 10. Other: Real State Taxes | $INCLUDED |
|---|---|
| 11. Other: Loan Fees and Interest | $INCLUDED |
| 12. Other: Sales Deposit & Bond Interest | $INCLUDED |
| 13. Other: Project G & A | $INCLUDED |
| 14. Other: Soft Cost Contingency | $INCLUDED |

No coverage or Additional Coverage shall be provided unless the delay(s) exceeds the anticipated date of completion and then such coverage shall only be provided for the delay(s) that is/are in excess of such anticipated date of completion, subject to the applicable deductible period. All covered losses and expenses are subject to the applicable Policy Limit, sublimits of liability, period of indemnity or calendar days as stated in the above Schedule.

**A. INSURING AGREEMENT**

1. Subject to all terms and conditions of this Policy, in the event of:

   a. Direct physical loss of or damage to covered property, landscaping materials or plans and drawings by a covered cause of loss, or

   b. Corruption, erasure or alteration of:

      i. Electronic data in the building or other systems, due to: (1) the introduction of malicious code or (2) a covered cause of loss,

      ii. Plans and drawings which are stored as electronic data due to the introduction of malicious code, or

   c. Building or other systems that are rendered useless for their intended purpose due to the introduction of malicious code which reprograms the software (including firmware) of such building or other systems

   (hereinafter, collectively Subsections 1.b. and 1.c. are referred to as cyber loss), the Company shall indemnify the Named Insured for soft costs/additional expenses, loss of rental income and/or loss of gross earnings sustained during the period of indemnity as a result of delay in completion of the insured project, on an actual loss sustained basis.

2. The Company shall also indemnify the Named Insured for reasonable expenses, over and above normal operating expenses, during the period of indemnity, that are necessarily incurred for the purpose of reducing any loss covered under this endorsement, but in no event shall the Company be liable for an amount greater than that for which the Company would have been liable had there been no covered delay.

**B. ADDITIONAL COVERAGES**

1. Ingress & Egress

   The Company shall indemnify the Named Insured for soft costs/additional expenses, loss of rental income and/or loss of gross earnings arising out of delay in completion of the insured project if ingress to or egress from the insured project is prohibited as a result of direct

physical loss or damage by a **covered cause of loss** to property not insured under this Policy, provided that such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the prohibition of ingress or egress to the **insured project** for the lesser of:

a.   The number of calendar days shown for Ingress & Egress in the above Schedule, or

b.   Until the ingress or egress is no longer prohibited,

subject to the Ingress & Egress sublimit of liability shown in the above Schedule.

2.   **Order of Civil or Military Authority**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if an order of civil or military authority prohibits access to the **insured project**, provided that: (1) such order is a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy and (2) such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with such order that prohibits access to the **insured project** for the lesser of:

a.   The number of calendar days shown for Order of Civil or Military Authority in the above Schedule, or

b.   Until access to the **insured project** is no longer prohibited,

subject to the Order of Civil or Military Authority sublimit of liability shown in the above Schedule.

3.   **Service Interruption**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** resulting from the interruption of incoming electricity, steam, gas, fuel or water caused by direct physical loss or damage by a **covered cause of loss** to a service provider's transmission and distribution lines and related plants, substations and equipment located outside of the **insured project**.  Notwithstanding the foregoing, the Company will not pay for any interruption intentionally caused by any **Insured** or any service provider.

If a service provider's transmission and distribution lines and related plants, substations and equipment that sustain loss or damage are part of the **insured project** and included in the **total project value**, the Service Interruption sublimit of liability shown in the above Schedule shall not apply, nevertheless the Aggregate Sublimit of Liability for all coverage under this endorsement shown in **VI.A.** above shall apply.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

             ©American International Group, Inc.
All Rights Reserved.

The Company shall only provide coverage for **delay** associated with the interruption of incoming electricity, steam, gas, fuel, or water to the **insured project** for the lesser of:

a.   The number of calendar days shown for Service Interruption in the above Schedule, or

b.   Until such incoming utilities are restored,

subject to the Service Interruption sublimit of liability shown in the above Schedule.

## C.   ADDITIONAL EXCLUSIONS AND LIMITATIONS

In addition to all other exclusions of this Policy, the Company will not be liable under this endorsement for any loss or increase in **delay** caused by, resulting from or arising out of any of the following:

1.   The enforcement of any law, ordinance, governmental directive or standard regulating removal, repair, construction or reconstruction of any property;

2.   Changes made in the design, plans, specifications or other contract documents in order to effect the repair or replacement of any property;

3.   Non-availability of funds;

4.   Import, export or customs restrictions and/or regulations;

5.   The breach, suspension, lapse or cancellation of or the failure to obtain, maintain or extend any permit, lease, license, contract or purchase orders;

6.   The interference by strikers or other persons directly or indirectly with the completion of the **insured project**, including the transportation of property, the construction, rebuilding, repairing or replacing of any property or the occupancy or use of the premises where the **insured project** is located;

7.   The failure to use due diligence and dispatch in restoring any property to the condition existing prior to the loss or damage;

8.   Any deviation in the **construction schedule** or a revised **construction schedule** except for a deviation that is the result of covered loss or damage;

9.   Any disruption in the normal movement of **covered property** unless such **covered property** is damaged by a **covered cause of loss** during **inland transit**;

10. Re-erection of any tower or pole crane(s), unless such tower or pole crane is specifically covered under Schedule A of the Contractors' Equipment Endorsement. or

11. Loss or damage to that part of the **insured project** which at the time of loss or damage has been put to its intended use or has become operational.

## D.   ADDITIONAL LOSS ADJUSTMENT CONDITIONS

In addition to the conditions set forth in the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section of this Policy, the following additional conditions apply to this endorsement:

©American International Group, Inc.
All Rights Reserved.

1. Upon written notification of any loss or damage under the terms and conditions of this Policy, the **Insured** shall provide the Company with all applicable **construction schedules** as requested by the Company.

2. Upon request by the Company, the **Insured** shall make available all other records and information relevant to the determination of any claim for loss, damage and/or expenses or any audit under this endorsement.

3. In the event of payment under this endorsement, the Company may conduct an audit of the **Named Insured's** records for a reasonable period of time, to be determined by the Company, (typically 12 months) after actual commencement of operations to determine the loss under this endorsement, as well as any expenses incurred by the **Named Insured** related to reducing such loss. Due consideration shall be given to seasonal patterns, trends, variations or special circumstances which would have affected the business had the **delay** not occurred, so that the amount adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the **delay**, would have been realized. Any amount saved with respect to labor costs, charges and expenses that have ceased or reduced during the **period of indemnity** and liquidated damages the **Named Insured** is entitled to receive from others, whether collectible or not, shall be deducted from the loss during the **period of indemnity**.

   In the event the amount of loss determined by the audit is less than or exceeds the sum paid by the Company for loss covered under this endorsement during the **period of indemnity**, the difference between the two amounts shall be paid by the Company or to the Company by the **Named Insured**, whichever is applicable.

## E. ADDITIONAL GENERAL CONDITIONS

In addition to the conditions set forth in the GENERAL CONDITIONS Section of this Policy, the following additional conditions apply to this endorsement:

1. In the event loss, damage or other circumstances require that the project completion date shown on any critical path, time line, bar chart or other scheduling vehicle is revised to extend such completion date, the **Insured** shall establish a revised **construction schedule** and furnish the same to the Company. The new date established in such revised **construction schedule** shall become the **anticipated date of completion**. The Company shall have the right to change the **anticipated date of completion**, even if the **Insured** has failed to provide such revised **construction schedule**.

   There shall be no amendment to the **anticipated date of completion** in the event any critical path, time line, bar chart or other scheduling vehicle is revised to compress or accelerate the **construction schedule**, without the written notice to the Company and endorsement by the Company hereto.

2. The **Insured** shall take and allow all reasonable measures to minimize the extent of any interference with the **construction schedule** so as to avoid or diminish any potential **delay**. The **Insured** shall begin normal operations as soon as practicable.

## F. ADDITIONAL DEFINITIONS

The definitions of this Policy apply to this endorsement. However, the following additional definitions apply to this endorsement and supersede any similar definitions of this Policy to the contrary.

1. **Anticipated date of completion** means: (1) the date as shown in the above Schedule as the Anticipated Date of Completion or (2) the revised **anticipated date of completion** in

accordance with the Subsection **E.1.** of the Additional General Conditions Subsection of this endorsement.   For calculation of loss under this endorsement, the Company shall use the applicable **anticipated date of completion** at the time of the loss or damage.

2.  **Construction schedule** means the schedule utilized in the construction management program through software that shows the construction operations, the times for starting and completion of operations, the period of the operations, the interrelationships between the operations and the critical path that identifies the critical operations.

3.  **Deductible period** means the applicable number of calendar days shown in Item **V.** of the above Schedule beginning with the **anticipated date of completion**.  Losses are only payable in excess of the applicable **deductible period**.

4.  **Delay** means the period of time between the **anticipated date of completion** and the actual date on which occupancy or commercial service can commence with respect to the entire **insured project** or the **insured project** as described in Item **II.** of the Schedule, whichever is applicable, with the exercise of due diligence and dispatch.

5.  **Gross earnings** means gross revenues from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

6.  **Insured project** means the entire **insured project** or the part of the **insured project** as identified in Item **II.** of the above Schedule.  The words, **insured project**, also include the definition in the Completed Value Builders Risk Policy.

7.  **Period of indemnity** means the number of calendar days for which coverage is provided under this endorsement, regardless of the number of **occurrences**, not to exceed the number of days shown in Item **III.** of the above Schedule.   For each **occurrence**, such calendar days or remaining calendar days shall commence upon the expiration of the applicable **deductible period**.  The **period of indemnity** shall not be limited by the end of the **policy period**.

8.  **Rental income** means revenues from rentals and leases from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

9.  **Soft costs/additional expenses** means such expenses as shown in Item **VI.I.1.** through **VI.I.9.** of the above Schedule, inclusive, in relation to the **insured project**.

All other terms and conditions of the Policy remain the same.

©American International Group, Inc.
All Rights Reserved.

**ENDORSEMENT #002**

This endorsement, effective 12:01 A.M., 12/14/2018
Forms a part of Policy No.: 043820532
Issued to: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
By: NEW HAMPSHIRE INSURANCE COMPANY

## EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

Sublimits of Liability and Deductibles (per occurrence):

A.  The following sublimit of liability is added to Item **10.B.** of the Declarations:

    Sublimit for repairing or replacing faulty or defective **covered property**    $433,500,000

B.  The following deductible is added to Item **11.** of Declarations:

    Deductible applicable to repairing or replacing faulty or defective    $100,000
    **covered property**

    The above deductible shall apply in addition to the applicable deductible(s) in Item **11.A.** through **11.G.**, inclusive, as shown on the Declarations.

C.  The following sublimit of liability is added as Item **VI.J.** to the Delay In Completion Endorsement:

    Provided that Delay In Completion coverage is provided under this    $44,022,420
    Policy, the Sublimit for Delay in Completion resulting from repair or
    replacement of faulty or defective **covered property**

    The **Deductible Period** shown in the Delay in Completion Endorsement applies to the above coverage in this Subsection **C.**

Additional Premium:    $70,055

In consideration of the Additional Premium shown in the above Schedule, Exclusion **B.10.** of the PERILS EXCLUDED Section is deleted in its entirety and replaced with the following:

**10.** a.   Faulty workmanship, material, construction or installation from any cause; or

    b.   Any fault, defect, error, deficiency or omission in any design, plans, or specifications,

    all unless direct physical loss or damage not otherwise excluded by this Policy ensues.  If direct physical loss or damage not otherwise excluded by this Policy ensues, then the Company shall pay for the following only:

    a.   Such ensuing direct physical loss or damage to **covered property**, and/or

    b.   Subject to the sublimit(s) of liability shown in the above Schedule, repairing or replacing (whichever is less) with like kind and quality at the time and place of the loss the damaged part of the faulty or defective **covered property**.

| | | |
|---|---|---|
| 125699 (10/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 1 of 2 |

However, in no event shall the Company pay any loss, cost, damage or expense to: (1) improve the original workmanship, materials, construction, installation, design, plans or specifications or (2) redesign any design, plans or specifications.

No portion of the **covered property** shall be regarded as damaged solely by virtue of the existence of: (1) any faulty workmanship, material, construction or installation, or (2) any fault, defect, error, deficiency or omission in any design, plans, or specifications.

NOTICE:   THIS ENDORSEMENT IS BASED UPON LEG 3 PROVISIONS, BUT MAY DIFFER FROM SUCH CURRENT OR PRIOR LEG 3 PROVISIONS.

All other terms and conditions of the Policy remain the same.

| 125699 (10/17) | ©American International Group, Inc. All Rights Reserved. | Page 2 of 2 |
|---|---|---|

**ENDORSEMENT #003**

This endorsement, effective 12:01 A.M., 12/14/2018
Forms a part of Policy No.: 043820532
Issued to: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
By: NEW HAMPSHIRE INSURANCE COMPANY

## LENDER LOSS PAYEE OR LOSS PAYEE ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

**Lender Loss Payee or Loss Payee:**
Bank OZK, its successors and assigns, as their interests may appear
625 Court Street
Clearwater, FL 33756

1. Subject to the terms and conditions of this Policy, the Company will not pay any Lender Loss Payee or Loss Payee more than its financial interest in: (1) **covered property** which is part of the **insured project** or (2) **existing property** (but only if coverage for **existing property** is provided by endorsement) (hereinafter, (1) and (2) are collectively referred to as **covered property**).

2. Any Lender Loss Payee or Loss Payee shown in the above Schedule is a creditor, including a Lender Loss Payee or trustee, whose interest in the **covered property** is established by such written instruments as:

   a. Warehouse receipts;

   b. A contract for deed;

   c. Bills of lading;

   d. Financing statements;

   e. **Contract documents**; or

   f. Mortgages, deeds of trust, or security agreements.

3. For **covered property** for which both the **Insured** and a Lender Loss Payee or Loss Payee have an insurable interest:

   a. The Company will pay for covered loss or damage to each Lender Loss Payee or Loss Payee in their order of precedence, as interests may appear.

   b. The Lender Loss Payee or Loss Payee has the right to receive loss payment even if the Lender Loss Payee or Loss Payee has started foreclosure or similar action on the **covered property**.

   c. If the Company denies the **Insured's** claim because of the **Insured's** acts or because the **Insured** has failed to comply with the terms of this Policy, the Lender Loss Payee or Loss Payee shall still have the right to receive loss payment, if the Lender Loss Payee or Loss Payee:

(1) Pays any premium due under this Policy at the Company's request if the **Named Insured** has failed to do so;

(2) Submits a signed, sworn proof of loss within 60 days after receiving notice from the Company of the **Insured's** failure to do so; and

(3) Has notified the Company of any change in ownership, occupancy or substantial change in risk known to the Lender Loss Payee or Loss Payee.

All of the terms of this Policy will then apply directly to the Lender Loss Payee or Loss Payee.

d. If the Company pays the Lender Loss Payee or Loss Payee for any loss or damage and denies payment to the **Insured** because of the **Insured's** acts or because the **Insured** has failed to comply with the terms of this Policy:

(1) The Lender Loss Payee's or Loss Payee's rights will be transferred to the Company to the extent of the amount of the Company's payment; and

(2) The Lender Loss Payee or Loss Payee's rights to recover the remaining amount of the Lender Loss Payee or Loss Payee's claim will not be impaired.

At the Company's option, the Company may pay to the Lender Loss Payee or Loss Payee the whole principal on the debt plus any accrued interest.  In this event, the **Insured** will pay the **Insured's** remaining debt to the Company.

e. If the Company cancels this Policy, the Company will give written notice to the Lender Loss Payee or Loss Payee at least:

(1) 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

(2) 30 days before the effective date of cancellation if the Company cancels for any other reason.

All other terms and conditions of the Policy remain the same.

Includes copyrighted information of the Insurance Services Offices, Inc., with its permission.  All rights reserved.

**ENDORSEMENT #004**

This endorsement, effective 12:01 A.M., 12/14/2018
Forms a part of Policy No.: 043820532
Issued to: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
By: NEW HAMPSHIRE INSURANCE COMPANY

## PILING, SHEET PILING & CAISSON LIMITATION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

In addition to all other exclusions of the Policy, the Company shall not pay any costs or expenses for:

1. Replacing, repairing, realigning or rectifying casings, piles, sheet piles or caissons which are misplaced, misaligned, jammed, abandoned or damaged during installation, extraction or construction;

2. Replacing, repairing, realigning or rectifying casings, piles, sheet piles or caissons which have become obstructed by: (a) jammed or damaged piling equipment or (b) jammed or damaged casings;

3. Rectifying defective, disconnected or declutched piling, sheet piles or caissons;

4. Rectifying any leakage of any kind or infiltration of any material;

5. Filling voids or replacing lost bentonite;

6. Replacing, repairing, realigning or rectifying profiles and dimensions; or

7. Failure to reach design load bearing capacity or to pass any load bearing test. No coverage is provided for any loss or damage as a result of any load bearing test, notwithstanding any other provision of this endorsement to the contrary.

However, this endorsement shall not apply:

1. When any of the foregoing are the result of direct physical loss of or damage to other **covered property**, not otherwise excluded by this Policy; or

2. To direct physical loss of or damage to other **covered property** which results from any of the foregoing.

All other terms and conditions of the Policy remain the same.

| 125703 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 1 of 1 |
|---|---|---|

**ENDORSEMENT #005**

**This endorsement, effective 12:01 A.M., 12/14/2018**
**Forms a part of Policy No.: 043820532**
**Issued to: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP**
**By: NEW HAMPSHIRE INSURANCE COMPANY**

## POLICY CHANGES ENDORSEMENT

The following item(s):

| | | | |
|---|---|---|---|
| ☐ | Insured's Name | ☐ | Insured's Mailing Address |
| ☐ | Policy Number | ☐ | Company |
| ☐ | Effective/Expiration Date | ☐ | Insured's Legal Status/Business of Insured |
| ☐ | Payment Plan | ☐ | Premium Determination |
| ☐ | Additional Interested Parties | ☐ | Coverage Forms and Endorsements |
| ☐ | Limits/Exposures | ☐ | Deductibles/Waiting Periods |
| ☐ | Covered Property/Location Description | ☐ | Additional Location(s) |
| ☐ | Underlying Insurance | ☒ | Special Terms and Conditions |

is (are) changed to read {**See Additional Page(s)**}:

The above amendments result in a change in the premium as follows:

| ☒ | **NO CHANGES** | ☐ | **ADDITIONAL PREMIUM** | **RETURN PREMIUM** |
|---|---|---|---|---|
| | | | $ | $ |

**POLICY CHANGES ENDORSEMENT DESCRIPTION**

### FLOOD AND NAMED STORM AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

I. Subsection 2. of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and is replaced with the following:

2. Flood, which means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water (other than storm surge or storm tide), overflow or rupture of a dam, levy, dike or other surface containment structure, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not. A tsunami shall not be considered a flood.

II. Subsection 4. of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and is replaced with the following:

4. Named storm, which means:

a A storm that, at any time, has been declared by the United States National Weather Service or another meteorological authority to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm; and

b. Storm surge and storm tide, or the spray therefrom, all whether: (1) driven by wind or not or (2) related to a storm described in Subsection 4.a. above or not.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

**ENDORSEMENT #006**

**This endorsement, effective 12:01 A.M., 12/14/2018**
**Forms a part of Policy No.: 043820532**
**Issued to: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP**
**By: NEW HAMPSHIRE INSURANCE COMPANY**

## FLORIDA CANCELLATION/NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy, and 2) "you", "your", "named Insured" and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

It is hereby agreed and understood that the cancellation provision of this policy is to be deleted in its entirety and to be replaced with the following:

A.      The Insured shown in the Declarations may cancel this policy by mailing or delivering to the Insurer advance written notice of cancellation.

B.1.    Cancellation for Policies in Effect Ninety (90) Days or Less

   If this policy has been in effect ninety (90) days or less the Insurer may cancel this policy by mailing or delivering to the Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

   (a)    Ten (10) days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or

   (b)    Twenty (20) days before the effective date of cancellation if the Insurer cancels for any other reason, except the Insurer may cancel immediately if there has been:

      1.      A material misstatement or misrepresentation; or
      2.      A failure to comply with underwriting requirements established by the Insurer.

B.2.    Cancellation for Policies in Effect for More Than Ninety (90) Days

   If this policy has been in effect for more than ninety (90) days the Insurer may cancel this policy only for one or more of the following reasons:

   (a)    Nonpayment of premium;

   (b)    The policy was obtained by a material misstatement;

   (c)    There has been a failure to comply with underwriting requirements established by us within ninety (90) days of the date of effectuation of coverage;

   (d)    There has been a substantial change in the risk covered by the policy; or

   (e)    The cancellation is for all insureds under such policies for a given class of insureds.

   If the Insurer cancels this policy for any of these reasons, the Insurer will mail or deliver to the Named Insured written notice of cancellation, accompanied by the reasons for the cancellation at least:

      1.      Ten (10) days before the effective date of cancellation if cancellation is for the reason stated in B.2.(a) above; or

2.   Forty-five (45) days before the effective date of cancellation if cancellation is for the reasons stated in B.2.(b), (c), (d) or (e) above.

3.   One hundred twenty days (120) before the effective date of cancellation of a commercial residential property insurance policy if cancellation is for the reasons stated in B.2.(b),(c),(d) or (e) above.

B.3.   If this policy is cancelled, the Insurer will send the Named Insured any premium refund due. If the Insurer cancels, the refund will be pro rata. If the Named Insured cancels, the refund may be less than pro rata, however, such refund will not be less than 90% of the pro rata unearned premium. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect.

It is hereby understood that the Non-renewal provision of this policy is deleted and replaced with the following:

C.1.   Non-Renewal

(a)   If the Insurer decides not to renew this policy the Insurer will mail or deliver to the Insured written notice of nonrenewal, accompanied by the reason for nonrenewal, at least forty-five (45) days prior to the expiration of this policy.   Written notice of nonrenewal will be provided at least one hundred twenty (120) days prior to the expiration of a commercial residential property insurance policy.

(b)   Any notice of nonrenewal will be mailed or delivered to the Insured's last mailing address known to the Insurer.   If notice is mailed, proof of mailing will be sufficient proof of notice.

C.2.   Renewal

The Insurer shall give the named insured at least forty-five (45) days advance written notice of the renewal premium.

**ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN THE SAME.**

**ENDORSEMENT #007**

This endorsement, effective 12:01 A.M., 12/14/2018
Forms a part of Policy No.: 043820532
Issued to:  A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
By:  NEW HAMPSHIRE INSURANCE COMPANY

## CLAIMS COOPERATION ENDORSEMENT

This endorsement modifies insurance provided by this Policy:

The following is added to the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section:

For the purpose of this endorsement:

1.  **Assigned adjuster** means the Assigned Adjuster as shown in the Schedule below.

2.  **Policy** means the Policy issued by the Lead Insurer set forth in the Schedule below.

3.  **Program** means all policies issued by the **quota share insurers** participating in the coverage for this insured project.

4.  **Quota share insurers** means the quota share insurers specifically listed in the Schedule below.

### SCHEDULE

| Quota Share Insurers | Quota Share Participation | Insurer Type | Signature |
|---|---|---|---|
| New Hampshire Insurance Company (AIG) | 35% | Lead Insurer | |
| Allianz Global Risks US Insurance Company | 25% | Participating Insurer | |
| Starr Indemnity and Liability Company | 25% | Participating Insurer | |
| Liberty Mutual Insurance Company | 10% | Participating Insurer | |
| General Security Indemnity Company of Arizona | 5% | Participating Insurer | |

The **quota share insurers** may be changed by written endorsement attached to and forming a part of this **policy**. The rights and obligations contained herein shall only apply to the **quota share insurers**.

**Assigned Adjuster:**
Mike Kaemph at York (Chicago)

With respect to any loss or damage that may give rise to a claim under this **program**, the following terms and conditions shall apply:

1.  The **quota share insurers** agree to use the **assigned adjuster** for the adjustment of all claims reported under this **program**.  This assignment may be changed by mutual consent of the **Named Insured** and the **quota share insurers**.

2.  The **assigned adjuster** shall report to the **quota share insurers** and coordinate all activities involving any claim reported under the **program**, including communicating with the **quota share insurers**, in

| | | ©American International Group, Inc. All Rights Reserved. | Page 1 of 2 |
|---|---|---|---|

accordance with the terms and conditions set forth in this **policy**. Notwithstanding the foregoing, the **quota share insurers** shall be the sole determiners of whether coverage is provided for each of their respective policies.

3. The **Named Insured** or Producer as shown in the Declarations shall notify the Lead Insurer and the **assigned adjuster** of such loss or damage that may give rise to a claim under this **program** and in turn, the **assigned adjuster** shall notify the **quota share insurers** of the same as soon as practicable, but in no event later than 48 hours after receiving such notice.

4. The **assigned adjuster** may retain third parties with respect to the handling of the loss adjustment, including accountants, consultants, engineers and other experts as necessary and such third parties shall also report to the **quota share insurers**.

5. The other **quota share insurers** shall have the right, if they so choose, to attend all meetings relating to the investigation, negotiation, adjustment or settlement of the claim, and shall be entitled to receive all information or claim related documentation from the **assigned adjuster** to the same extent that the Lead Insurer obtains such information or participates in such meetings.

6. The Lead Insurer shall cooperate with the other **quota share insurers** with respect to all investigations, negotiations, adjustments and settlements in connection with any such claim.

7. All fees, expenses and other costs incurred in connection with any adjustment shall be shared among all **quota share insurers** in accordance with their respective Quota Share Participation as shown in the above Schedule.

All other terms and conditions of the Policy remain the same.

Authorized Representative

# FLORIDA STATE AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided by the Policy.

The following changes apply only to locations covered by the Policy that are in the State of Florida.

**A.** The SETTLEMENT OF CLAIMS Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section is deleted in its entirety and replaced by the following:

**SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable shall be payable:

1. Within 20 days after proof of loss, as herein required, is received and agreed to by the Company; or

2. Within 30 days after the Company receives the proof of loss and:

    a. There is an entry of a final judgment; or

    b. The amount of loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

3. Within 60 days of receiving notice of claim, unless the Company denies the claim during that time or factors beyond the Company's control reasonably prevent such payment. If a portion of the claim is denied, then the 60-day time period for payment of claim relates to the portion of the claim that is not denied.

    Subsection 3. applies only to the following:

    a. A claim under a Policy covering residential property, if such property is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy; or

    b. A claim for building coverage, if such property is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, if the structure is 10,000 square feet or less and the Policy covers only locations in Florida.

    The Company shall have the option to take all, or any part of the structure at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing the **Named Insured** with notice of the Company's intention to do so within 60 days after the Company's receipt of the proof of loss herein required.

**B.** The SUIT AGAINST COMPANY Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section is deleted in its entirety and replaced by the following:

**SUIT AGAINST COMPANY**

No one may bring a legal action against the Company under this Policy unless:

1. There has been full compliance with all of the terms of this Policy; and

2. Legal action against the Company involving direct physical loss or damage to property must be brought within 5 years from the date the loss occurs.

**C.** If a building is covered as **existing property** under Damage to Existing Property Endorsement, attached to and forming part of this Policy, then with respect to such a building, Subsection **e.** of Subsection **1.** Earth movement of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY  Section is deleted in its entirety and replaced with the following :

    **e.** Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, and subsidence.

**D.** If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then with respect to such a building, Subsection  **1.**  Earth movement of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is amended to include:

    **Earth movement** does not include **sinkhole loss** or **catastrophic ground cover collapse.**

**E.  SINKHOLE LOSS AND CATASTROPHIC GROUND COVER COLLAPSE**

If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then the following provisions are added to the Policy as SPECIFIED COVERED CAUSES OF LOSS with respect to such a building:

**1.** **Sinkhole loss,** meaning loss or damage to a building when **structural damage** to the covered building, including the foundation, is caused by settlement or systematic weakening of the earth supporting the building, only if the settlement or systematic weakening results from contemporaneous movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

    **a.** Coverage for **sinkhole loss** includes stabilization of the building (including land stabilization) and repair to the foundation, provided such work is in accordance with the requirements of Florida Insurance Law and in accordance with the recommendation of a professional engineer and with notice to the **Named Insured.** The professional engineer must be selected or approved by the Company. However, until the **Named Insured** or **project owner(s),** whichever is applicable, enters into a contract for performance of building stabilization or foundation repair in accordance with the recommendations of the professional engineer as set forth in a report from the Company:

        **(1)** The Company will not pay for underpinning or grouting or any other repair technique performed below the existing foundation of the building; and

        **(2)** The Company's payment for **sinkhole loss** to the covered building will be limited to the actual cash value of the loss to such property.

    The **Named Insured** or **project owner(s),** whichever is applicable, must enter into a contract for the performance of building stabilization and/or foundation repair in accordance with the aforementioned recommendations, within 90 days after the Company notifies the **Named Insured** that there is coverage for the **sinkhole loss.** After the **Named Insured** or **project owner(s),** whichever is applicable, has entered into such contract, the Company will pay the amounts necessary to begin and perform such repairs as the work is performed and the expenses are incurred.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

However, if the professional engineer determines, prior to the **Named Insured** or **project owner(s)**, whichever is applicable, entering into the aforementioned contract or prior to the start of repair work, that the repairs will exceed the applicable **Policy Limit**, the Company must either complete the recommended repairs or pay that **Policy Limit** upon such determination. If the aforementioned determination is made during the course of repair work and the Company has begun making payments for the work performed, the Company must either complete the recommended repairs or pay only the remaining portion of the applicable **Policy Limit** upon such determination. The most the Company will pay for the total of all **sinkhole loss**, including building and land stabilization and foundation repair, is the applicable **Policy Limit** on the affected building.

The stabilization and all other repairs to the covered building must be completed within 12 months after entering into the contract for the performance of these repairs, unless:

(1) There is a mutual agreement between the **Named Insured** and the Company;

(2) The claim is involved with the neutral evaluation process;

(3) The claim is in litigation; or

(4) The claim is under appraisal or mediation.

b.   **Sinkhole loss** does not include:

(1) Sinking or collapse of land into man-made underground cavities; or

(2) **Earth movement**.

c.   With respect to a claim for alleged **sinkhole loss**, the following provision is added:

Following receipt by the Company of a report from a professional engineer or professional geologist on the cause of loss and recommendations for land stabilization and repair of property, or if the Company denies the **Insured's** claim, the Company will notify the **Named Insured** or **project owner(s)**, whichever is applicable, of its right to participate in a neutral evaluation program administered by the Florida Department of Financial Services (hereinafter referred to as the "Department"). For alleged **sinkhole loss** to commercial residential or farm residential properties, this program applies instead of any mediation procedure set forth elsewhere in this Policy, but does not invalidate the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

The **Named Insured** or **project owner(s)**, whichever is applicable, or the Company, may file a request with the Department for neutral evaluation; the other party must comply with such request. The Company will pay reasonable costs associated with the neutral evaluation, regardless of which party makes the request. But if a party chooses to hire a court reporter or stenographer to contemporaneously record and document the neutral evaluation, that party must bear the costs of those services. The neutral evaluator will be selected from a list maintained by the Department. The recommendation of the neutral evaluator will not be binding on the **Named Insured** or **project owner(s)**, whichever is applicable, or the Company.

Participation in the neutral evaluation program does not change the **Named Insured's** or **project owner(s)'**, whichever is applicable, right to file suit against the Company in accordance with the SUIT AGAINST COMPANY Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section in this Policy, except that the time for filing suit is extended for a period of 60 days following the conclusion of the neutral evaluation process or five (5) years, whichever is later.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

d.  Coverage for **sinkhole loss** under this endorsement does not increase the **Policy Limit**. Even if the loss or damage qualifies under, or includes, **catastrophic ground cover collapse** (addressed elsewhere in this endorsement) and **sinkhole loss**, only one **Policy Limit** will apply to such loss or damage.

e.  The following provision is added to the REQUIREMENTS IN CASE OF LOSS OR DAMAGE Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section:

A claim for **sinkhole loss**, including but not limited to initial, supplemental and reopened claims is barred unless notice of claim is provided to the Company in accordance with the terms of this Policy within two (2) years after the **Insured** knew or reasonably should have known about the **sinkhole loss.**

f.  If the Company denies the **Insured's** claim for **sinkhole loss** without performing testing under section 627.7072, Florida Statutes, the **Named Insured** or **project owner(s)**, whichever is applicable, may demand testing by communicating such demand to the Company in writing within 60 days after the **Named Insured** receives our denial of the claim. The **Named Insured** or **project owner(s)**, whichever is applicable, is responsible for 50% of the testing costs, or $2,500, whichever is less. If the Company's professional engineer or geologist provides written certification, pursuant to section 627.7073, that there is **sinkhole loss**, the Company will reimburse the **Named Insured** or **project owner(s)**, whichever is applicable, for the testing costs.

g.  The **Insured** may not accept a rebate from any person performing repairs for **sinkhole loss** covered under this endorsement. If the **Insured** receives a rebate, coverage under this endorsement is void and the **Insured** must refund the amount of the rebate to the Company.

h.  If the Company denies the **Insured's** claim for **sinkhole loss** upon receipt of written certification from a professional engineer or geologist, pursuant to section 627.7073, that there is no **sinkhole loss** or that the cause of the damage was not sinkhole activity, and if the sinkhole claim was submitted without good faith grounds for submitting such claim, the **Named Insured** or **project owner(s)**, whichever is applicable, shall reimburse the Company for 50% of the actual costs of the analyses and services provided under sections 627.7072 and 627.7073, or $2,500, whichever is less. The **Named Insured** or **project owner(s)**, whichever is applicable, is not required to pay such reimbursement unless it requested the analysis and services and the Company, before ordering the analysis, informed the **Named Insured** or **project owner(s)**, whichever is applicable, in writing of the potential for reimbursement and gave the **Named Insured** or **project owner(s)**, whichever is applicable, the opportunity to withdraw the claim.

i.  As a precondition to accepting payment for **sinkhole loss**, the **Named Insured** or **project owner(s)**, whichever is applicable, must file with the county clerk of court, a copy of any sinkhole report regarding the property which was prepared on behalf or at the **Named Insured** or **project owner(s)**, whichever is applicable, request. The **Named Insured** or **project owner(s)**, whichever is applicable, will bear the cost of filing and recording the sinkhole report.

2.  **Catastrophic Ground Cover Collapse**

The Company will pay for direct physical loss or damage to a covered building caused by or resulting from **catastrophic ground cover collapse**, meaning geological activity that results in all of the following:

a.  The abrupt collapse of the ground cover;

b.  A depression in the ground cover clearly visible to the naked eye;

c.  **Structural damage** to the building, including the foundation; and

    **d.** The insured structure being condemned and ordered to be vacated by the governmental agency authorized by law to issue such an order for that structure.

However, damage consisting merely of the settling or cracking of a foundation, structure or building does not constitute loss or damage resulting from a **catastrophic ground cover collapse.**

Coverage for **catastrophic ground cover collapse** does not increase the **Policy Limit.** Regardless of whether loss or damage attributable to **catastrophic ground cover collapse** also qualifies as **sinkhole loss** or **earth movement** (if either or both of those causes of loss are covered under this Policy), only one **Policy Limit** will apply to such loss or damage.

**3.** For the purposes of **Sinkhole Loss** and **Catastrophic Ground Cover Collapse** coverages only, the following definitions are added to the Policy:

    **a.** **Structural damage** means a building, regardless of the date of its construction, has experienced the following:

        **(1)** Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement related damage to the interior such that the interior building structure or members become unfit for service or represent a safety hazard as defined within the Florida Building Code;

        **(2)** Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement related damage to the **primary structural members** or **primary structural systems** and that prevents those members or systems from supporting the loads and forces they were designed to support to the extent that stresses in those **primary structural members** or **primary structural systems** exceed one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location;

        **(3)** Damage that results in listing, leaning, or buckling of the exterior load bearing walls or other vertical **primary structural members** to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

        **(4)** Damage that results in the building, or any portion of the building containing **primary structural members** or **primary structural systems,** being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

        **(5)** Damage occurring on or after October 15, 2005, that qualifies as substantial structural damage as defined in the Florida Building Code.

    **b.** **Primary structural member** means a structural element designed to provide support and stability for the vertical or lateral loads of the overall structure.

    **c.** **Primary structural system** means an assemblage of **primary structural members.**

All other terms and conditions of the Policy remain the same.

# Starr Indemnity & Liability Company

| NAMED INSURED: | A3 Development LLC, LPLA Partners, LP, The Trump Group | ENDORSEMENT |
|---|---|---|
| ISSUING COMPANY: | Starr Indemnity & Liability Company | NUMBER |
| POLICY NUMBER: | SICON1000703871 | A |

## BIOLOGICAL OR NUCLEAR EXCLUSION ENDORSEMENT

The following exclusion is added to this policy; supersedes any term, provision or endorsement to the contrary in this policy; and applies notwithstanding such term, provision or endorsement:

- BIOLOGICAL OR NUCLEAR EXCLUSION

    This policy does not insure against any loss, damage, cost or expense caused by or resulting from any of the following, regardless of any other cause or event contributing concurrently or in any sequence thereto:

    1.  The unlawful possession, use, release, discharge, dispersal or disposal of any bacteriological, viral, radioactive or similar agents or material regardless of who is responsible for the act, whether or not the act is certified as an act of terrorism pursuant to the federal Terrorism Risk Insurance Act, and whether war has been declared or not, and regardless of any other cause or event contributing concurrently or in any other sequence thereto; or

    2.  The unlawful possession, use, release, discharge, detonation, dispersal or disposal of any device or material capable of producing a nuclear reaction or the spread of radioactivity, regardless of who is responsible for the act, whether or not the act is certified as an act of terrorism pursuant to the federal Terrorism Risk Insurance Act, and whether war has been declared or not, and regardless of any other cause or event contributing concurrently or in any other sequence thereto.

**Starr Indemnity & Liability Company**

| NAMED INSURED: | A3 Development LLC, LPLA Partners, LP, The Trump Group | ENDORSEMENT |
|---|---|---|
| ISSUING COMPANY: | Starr Indemnity & Liability Company | NUMBER |
| POLICY NUMBER: | SICON1000703871 | B |

### SERVICE OF PROCESS CLAUSE ENDORSEMENT

In the event of failure of the Insurer to pay any amount claimed to be due hereunder, the Insurer, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this condition constitutes or should be understood to constitute a waiver of the Insurer's rights to commence an action in any transfer of a case or another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon counsel at:

**Legal Department**
**Starr Surplus Insurance Company**
**399 Park Avenue**
**New York, NY  10022**

or his or her representative, and that in any suit instituted against the Insurer upon this policy, the Insurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the Insurer hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of this policy remain unchanged.

**Starr Indemnity & Liability Company**

| NAMED INSURED: | A3 Development LLC, LPLA Partners, LP, The Trump Group | ENDORSEMENT |
|---|---|---|
| ISSUING COMPANY: | Starr Indemnity & Liability Company | NUMBER |
| POLICY NUMBER: | SICON1000703871 | C |

### TERRORISM RISK INSURANCE ACT, AS AMENDED, CAP ON LOSSES ENDORSEMENT

With respect to any one or more "certified acts of terrorism" under the TERRORISM RISK INSURANCE ACT of 2002, as amended ("the Act"), the company shall not be liable under this policy for more than the amount that the company would be responsible under the terms of the Act (including subsequent action of Congress) due to the application of any clause which results in a cap of the Company's liability for payment of terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002, as amended. The federal Terrorism Risk Insurance Act of 2002, as amended, sets forth the following criteria for a "certified act of terrorism":

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.


**THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABIITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION.  IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, COVERAGE MAY BE REDUCED.**

Form #61333 (1/15)

**Starr Indemnity & Liability Company**

| NAMED INSURED: | A3 Development LLC, LPLA Partners, LP, The Trump Group | ENDORSEMENT NUMBER |
|---|---|---|
| ISSUING COMPANY: | Starr Indemnity & Liability Company | |
| POLICY NUMBER: | SICON1000703871 | D |

## TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims. All other terms and conditions of policy remain unchanged.

**Starr Indemnity & Liability Company**

## SIGNATURE PAGE

In Witness Whereof, the Company has caused this Policy to be signed by its President and Secretary, but it shall not be valid unless countersigned by a duly authorized representative of the Company.

General Counsel                                        President

Attached to and forming part of Policy No. SICON1000703871 of the Starr Indemnity & Liability Company

**Starr Indemnity & Liability Company**

# Questions About Your Insurance?

Answers to questions about your insurance, coverage information, or assistance in resolving complaints can be obtained by calling Starr Indemnity & Liability Company at (646) 227-6400.

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**Starr Indemnity & Liability Company**

## <u>IMPORTANT</u> <u>NOTICE</u> - TO BE KEPT WITH POLICY

## <u>WHAT TO DO WHEN A LOSS OCCURS</u>

1. Report as soon as practicable, every incident, loss or damage which may become a claim to:

   Mr. Jim Jezewski, Vice President and Claims Manager
   Starr Technical Risks Agency, Inc.
   Property Claims Department
   399 Park Avenue, 9th Floor
   New York, NY  10016
   TEL:       (646) 227-6348
   FAX:       (631) 685-3061
   e-mail: <u>Jim.Jezewski@cvstarrco.com</u>

   (AND)

   Mr. Derrick Bell, Assistant Vice President
   Starr Technical Risks Agency, Inc.
   3353 Peachtree Road, NE
   Suite 1000
   Atlanta, GA 30326
   TEL:       (404) 946-1438
   FAX:       (404) 946-1498
   e-mail: <u>Derrick.Bell@cvstarrco.com</u>

2. Starr Specialty Lines Insurance Agency, Inc. claims <u>CANNOT</u> be processed through any other facility and must be reported as indicated above.

3. Adjusters can <u>ONLY</u> be assigned by Starr Specialty Lines Insurance Agency, Inc. Property Claims Department.

# Starr Indemnity & Liability Company

| NAMED INSURED: | A3 Development LLC, LPLA Partners, LP, The Trump Group | ENDORSEMENT |
|---|---|---|
| ISSUING COMPANY: | Starr Indemnity & Liability Company | NUMBER |
| POLICY NUMBER: | SICON1000703871 | F |

## POLICY CHANGE ENDORSEMENT

Effective December 31, 2019, in consideration of Starr Tech's 25% additional premium of $175,521, the policy is amended as follows:

| POLICY CHANGES ENDORSEMENT DESCRIPTION |
|---|

**1.** Item 5. Insured Project of the Declarations is amended to include the following:

Description: Addition of the North Tower, as detailed in the underwriting file

**2.** Item 8. Deposit Premium of the Declarations is deleted in its entirety and replaced by the following:

| Phase 1 Coverage | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| Total Project Value (South Tower) | 2.5479 years | $373,500,000 | $Various | $1,648,911 |
| Total Project Value (Villa and Site) | 3.0493 years | $60,000,000 | $Various | $412,300 |
| Existing Property | 3.0493 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Delay in Completion | 3.0493 years | $44,022,420 | $Various | $343,015 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 3.0493 years | $477,522,420 | $0.0375 of the non-NatCat premium | $26,271 |
| LEG 3 | 3.0493 years | $477,522,420 | $0.10 of the non-NatCat premium | $70,055 |
| | Total Deposit Premium: | | | $2,500,552 |

| Phase 2 Coverage* | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| Total Project Value (North Tower + West Garage, less credits noted below) | 2.5521 years | $169,158,811 | $Various | $642,607 |
| Existing Property | 2.5521 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Delay in Completion | 2.5521 years | $48,457,160 | $Various | $36,795 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 2.5521 years | $217,615,971 | $0.0375 of the non-NatCat premium | $6,186 |
| LEG 3 | 2.5521 years | $217,615,971 | $0.10 of the non-NatCat premium | $16,496 |
| | Total Additional Deposit Premium*: | | | $702,083 |

*Phase 2 Additional Deposit Premium calculation is based on:*

*(1) $207,300,000 (Phase 2) plus $7,000,000 (West Garage) minus $45,141,189 ($20,141,189 savings and $25,000,000 included within Phase 1 Total Project Value) for the project term, 12/31/19 to 4/1/22; and*

*(2) Delay in Completion, Terrorism & LEG 3 premiums are the difference between Phase 1 & Phase 2*

*(3) Delay in Completion Limit for Phase 2 is the values of Phase 1 with the increase of $4,434,740. Total Delay in Completion Limit for the policy is $48,457,160, as noted on the Delay in Completion Endorsement.*

Policy Extension Calculations (180 days per phase/per TCO):

- North Tower - to extend to October 1, 2022
  - April 1 to May 31: $15,008
  - during wind season (July to Nov): $59,997 per month
  - Full delay value assumed ($48,457,160)

For Audit & Extensions the Annual rates are:

- South Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- Villa: .115 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- North Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- 150% for delay; 3.75% for terrorism (3% base rate * 25% surcharge to remove sunset clause); 10% for LEG 3. Terrorism & LEG 3 premiums are calculated based on the non-Cat premium.

3. **Item 9. Policy Limit of the Declarations is deleted in its entirety and replaced with the following:**

   **Item 9. Policy Limit: $651,115,971** The **quota share percentage** (shown in Item **13.** of the Declarations) of the **Policy Limit** is the Company's maximum liability in any one **occurrence** as a result of all covered loss or damage regardless of the number of coverages or **covered causes of loss** under this Policy.

4. **Subsection (1) and (4) of Subsection 10.A. Sublimits Applicable to Specified Covered Causes of Loss of the Declarations are deleted in their entirety and replaced with the following:**

   **1. Earth Movement:** $651,115,971 per occurrence, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $651,115,971, for all covered loss or damage arising out of **earth movement**

   **4. Terrorism:** $651,115,971 for all covered loss or damage arising out of **terrorism**

5. **Subsection 10.B. Sublimits of Liability of the Declarations is amended as follows:**

   **Physical Damage Sublimit of Liability** $602,658,811 applicable to physical damage to **covered property** at the **insured project**

6. **Endorsement #001, Delay in Completion Endorsement is deleted in its entirety and replaced with the following:**

## DELAY IN COMPLETION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

## SCHEDULE

I. **Named Insured and Address:**
   A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
   17901 COLLINS AVENUE SOUTH
   SUNNY ISLES BEACH FL 33160

   All coverage under this Delay in Completion Endorsement shall only be provided to the Named Insured shown above (hereinafter, the **Named Insured** for purposes of this endorsement only). No coverage shall be provided under this endorsement to any other person or entity.

**II.** The coverage provided under this Delay in Completion Endorsement is applicable to the entire insured project unless otherwise described below:

Not Applicable

**III. Period of Indemnity:** 540 Calendar Days

**IV. Anticipated Date of Completion:** South Tower – 07/01/2021
Villa – 12/31/2021
North Tower – 04/01/2022

**V. Deductible Period:**

| | Deductible Period (per occurrence unless otherwise stated below) |
|---|---|
| Standard Deductible | 30 Calendar Days ☒per occurrence or ☐ in the Aggregate, no other Deductible Periods apply |
| Earth Movement, Flood or Named Storm | 30 Calendar Days |
| Cyber Loss | 30 Calendar Days |
| Ingress & Egress | 30 Calendar Days |
| Order of Civil or Military Authority | 30 Calendar Days |
| Service Interruption | 30 Calendar Days |
| Hot Testing | 30 Calendar Days |
| LEG 3 | 30 Calendar Days |

If two or more deductible amounts provided above apply to a single occurrence, the total to be deducted shall be the largest applicable deductible. The above deductibles are in addition to any applicable deductibles on the Declarations of this Policy. If the Standard Deductible applies on a per occurrence basis, then such deductible shall apply unless a more specific deductible applies.

**VI. Limits of Liability Applicable to this Endorsement**

The following are subject to and not in addition to the **Policy Limit** and all sublimits of liability shown in Item 10.A. of the Declarations. The sublimits of liability stated in this endorsement are per **occurrence** unless otherwise stated.

*If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage, then no coverage is provided for that coverage, whether under the Insuring Agreement or any Additional Coverage. If the words, NOT APPLICABLE are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

**A.** Aggregate Sublimit of liability for all coverage under this endorsement $48,457,160

The following sublimits of liability VI.B. through VI.I. are subject to VI.A. above:

**B.** Loss of Rental Income $Not Covered

**C.** Loss of Gross Earnings $Not Covered

**D.** Cyber Loss See Item 10.B.7. of the Declarations

**E.** Ingress & Egress 15 Calendar Days, subject to maximum of $2,500,000

**F.** Order of Civil or Military Authority 15 Calendar Days, subject to maximum of $1,000,000

**G.** Service Interruption 15 Calendar Days, subject to maximum of $1,000,000

H. Other: Not Covered                    Not Covered

I.   **Soft Costs/Additional Expenses**            $48,457,160

The following sublimits of liability are subject to **VI.I.** above.

| | | |
|---|---|---|
| **1.** Interim interest expense | $Included |
| **2.** Realty taxes/Ground rents | $Included |
| **3.** Leasing/Commission expense | $Included |
| **4.** Insurance premiums | $Included |
| **5.** Advertising and marketing expense | $Included |
| **6.** Legal and accounting fees | $Included |
| **7.** License and permit fees | $Included |
| **8.** Project management fees | $Included |
| **9.** Other: Construction Supervision | $Included |
| **10.** Other: Real Estate Taxes | $Included |
| **11.** Other: Loan Fees and Interest | $Included |
| **12.** Other: Sales Deposit & Bond Interest | $Included |
| **13.** Other: Project G & A | $Included |
| **14.** Other: Soft Cost Contingency | $Included |

No coverage or Additional Coverage shall be provided unless the delay(s) exceeds the **anticipated date of completion** and then such coverage shall only be provided for the **delay(s)** that is/are in excess of such **anticipated date of completion**, subject to the applicable **deductible period**. All covered losses and expenses are subject to the applicable **Policy Limit**, sublimits of liability, **period of indemnity** or calendar days as stated in the above Schedule.

A.  **INSURING AGREEMENT**

1.  Subject to all terms and conditions of this Policy, in the event of:

a.  Direct physical loss of or damage to **covered property, landscaping materials or plans and drawings** by a **covered cause of loss,** or

b.  Corruption, erasure or alteration of:

i.  **Electronic data in the building or other systems**, due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss,**

ii.  **Plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code,** or

c.  **Building or other systems** that are rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems**

(hereinafter, collectively Subsections **1.b.** and **1.c.** are referred to as **cyber loss**), the Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of rental income and/or loss of **gross earnings** sustained during the **period of indemnity** as a result of delay in completion of the **insured project**, on an actual loss sustained basis.

operating expenses, during the **period of indemnity**, that are necessarily incurred for the purpose of reducing any loss covered under this endorsement, but in no event shall the Company be liable for an amount greater than that for which the Company would have been liable had there been no covered **delay**.

## B. ADDITIONAL COVERAGES

### 1. Ingress & Egress

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of rental income and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if ingress to or **egress** from the **insured project** is prohibited as a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy, provided that such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the prohibition of ingress or egress to the **insured project** for the lesser of:

a. The number of calendar days shown for Ingress & Egress in the above Schedule, or

b. Until the ingress or egress is no longer prohibited,

subject to the Ingress & Egress sublimit of liability shown in the above Schedule.

### 2. Order of Civil or Military Authority

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of rental income and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if an order of civil or military authority prohibits access to the **insured project**, provided that: (1) such order is a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy and (2) such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with such order that prohibits access to the **insured project** for the lesser of:

a. The number of calendar days shown for Order of Civil or Military Authority in the above Schedule, or

b. Until access to the **insured project** is no longer prohibited,

subject to the Order of Civil or Military Authority sublimit of liability shown in the above Schedule.

### 3. Service Interruption

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of rental income and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** resulting from the interruption of incoming electricity, steam, gas, fuel or water caused by direct physical loss or damage by a **covered cause of loss** to a service provider's transmission and distribution lines and related plants, substations and equipment located outside of the **insured project**. Notwithstanding the foregoing, the Company will not pay for any interruption intentionally caused by any **insured** or any service provider.

If a service provider's transmission and distribution lines and related plants, substations and equipment that sustain loss or damage are part of the **insured project** and included in the **total project value**, the Service Interruption sublimit of liability shown in the above Schedule shall not apply, nevertheless the Aggregate Sublimit of Liability for all coverage under this endorsement shown in **VI.A.** above shall apply.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above

Schedule.

The Company shall only provide coverage for **delay** associated with the interruption of incoming electricity, steam, gas, fuel, or water to the **insured project** for the lesser of:

   **a.** The number of calendar days shown for Service Interruption in the above Schedule, or

   **b.** Until such incoming utilities are restored,

subject to the Service Interruption sublimit of liability shown in the above Schedule.

## C.  ADDITIONAL EXCLUSIONS AND LIMITATIONS

In addition to all other exclusions of this Policy, the Company will not be liable under this endorsement for any loss or increase in **delay** caused by, resulting from or arising out of any of the following:

   **1.** The enforcement of any law, ordinance, governmental directive or standard regulating removal, repair, construction or reconstruction of any property;

   **2.** Changes made in the design, plans, specifications or other contract documents in order to effect the repair or replacement of any property;

   **3.** Non-availability of funds;

   **4.** Import, export or customs restrictions and/or regulations;

   **5.** The breach, suspension, lapse or cancellation of or the failure to obtain, maintain or extend any permit, lease, license, contract or purchase orders;

   **6.** The interference by strikers or other persons directly or indirectly with the completion of the **insured project**, including the transportation of property, the construction, rebuilding, repairing or replacing of any property or the occupancy or use of the premises where the **insured project** is located;

   **7.** The failure to use due diligence and dispatch in restoring any property to the condition existing prior to the loss or damage;

   **8.** Any deviation in the **construction schedule** or a revised **construction schedule** except for a deviation that is the result of covered loss or damage;

   **9.** Any disruption in the normal movement of **covered property** unless such **covered property** is damaged by a **covered cause of loss** during inland transit;

   **10.** Re-erection of any tower or pole crane(s), unless such tower or pole crane is specifically covered under Schedule A of the Contractors' Equipment Endorsement. or

   **11.** Loss or damage to that part of the **insured project** which at the time of loss or damage has been put to its intended use or has become operational.

## D.  ADDITIONAL LOSS ADJUSTMENT CONDITIONS

In addition to the conditions set forth in the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section of this Policy, the following additional conditions apply to this endorsement:

   **1.** Upon written notification of any loss or damage under the terms and conditions of this Policy, the **Insured** shall provide the Company with all applicable **construction schedules** as requested by the Company.

   **2.** Upon request by the Company, the **Insured** shall make available all other records and information relevant to the determination of any claim for loss, damage and/or expenses or any audit under this endorsement.

   **3.** In the event of payment under this endorsement, the Company may conduct an audit of the **Named Insured's** records for a reasonable period of time, to be determined by the Company, (typically 12 months) after actual commencement of operations to determine the loss under this endorsement, as well as any expenses incurred by the **Named Insured** related to reducing such loss.  Due consideration shall be given to seasonal patterns, trends, variations or special circumstances which would have affected the business had the **delay** not occurred, so that the amount adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the **delay**, would have been realized.  Any amount saved

with respect to labor costs, charges and expenses that have ceased or reduced during the **period of indemnity** and liquidated damages the **Named Insured** is entitled to receive from others, whether collectible or not, shall be deducted from the loss during the **period of indemnity**.

In the event the amount of loss determined by the audit is less than or exceeds the sum paid by the Company for loss covered under this endorsement during the **period of indemnity**, the difference between the two amounts shall be paid by the Company or to the Company by the **Named Insured**, whichever is applicable.

**E. ADDITIONAL GENERAL CONDITIONS**

In addition to the conditions set forth in the GENERAL CONDITIONS Section of this Policy, the following additional conditions apply to this endorsement:

1. In the event loss, damage or other circumstances require that the project completion date shown on any critical path, time line, bar chart or other scheduling vehicle is revised to extend such completion date, the **Insured** shall establish a revised **construction schedule** and furnish the same to the Company. The new date established in such revised **construction schedule** shall become the **anticipated date of completion**. The Company shall have the right to change the **anticipated date of completion**, even if the **Insured** has failed to provide such revised **construction schedule**.

   There shall be no amendment to the **anticipated date of completion** in the event any critical path, time line, bar chart or other scheduling vehicle is revised to compress or accelerate the **construction schedule**, without the written notice to the Company and endorsement by the Company hereto.

2. The **Insured** shall take and allow all reasonable measures to minimize the extent of any interference with the **construction schedule** so as to avoid or diminish any potential **delay**. The **Insured** shall begin normal operations as soon as practicable.

**F. ADDITIONAL DEFINITIONS**

The definitions of this Policy apply to this endorsement. However, the following additional definitions apply to this endorsement and supersede any similar definitions of this Policy to the contrary.

1. **Anticipated date of completion** means: (1) the date as shown in the above Schedule as the Anticipated Date of Completion or (2) the revised **anticipated date of completion** in accordance with the Subsection E.1. of the Additional General Conditions Subsection of this endorsement. For calculation of loss under this endorsement, the Company shall use the applicable **anticipated date of completion** at the time of the loss or damage.

2. **Construction schedule** means the schedule utilized in the construction management program through software that shows the construction operations, the times for starting and completion of operations, the period of the operations, the interrelationships between the operations and the critical path that identifies the critical operations.

3. **Deductible period** means the applicable number of calendar days shown in Item V. of the above Schedule beginning with the **anticipated date of completion**. Losses are only payable in excess of the applicable **deductible period**.

4. **Delay** means the period of time between the **anticipated date of completion** and the actual date on which occupancy or commercial service can commence with respect to the entire **insured project** or the **insured project** as described in Item II. of the Schedule, whichever is applicable, with the exercise of due diligence and dispatch.

5. **Gross earnings** means gross revenues from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

6. **Insured project** means the entire **insured project** or the part of the **insured project** as identified in Item II. of the above Schedule. The words, insured project, also include the definition in the Completed Value Builders Risk Policy.

7. **Period of indemnity** means the number of calendar days for which coverage is provided under this endorsement, regardless of the number of **occurrences**, not to exceed the number of **days** shown in Item

iii. of the above Schedule. For each occurrence, such calendar days or remaining calendar days shall commence upon the expiration of the applicable **deductible period**. The **period of indemnity** shall not be limited by the end of the **policy period**.

8. **Rental income** means revenues from rentals and leases from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the delay had not occurred, less charges and expenses which do not necessarily continue.

9. **Soft costs/additional expenses** means such expenses as shown in Item VI.I.1. through VI.I.9. of the above Schedule, inclusive, in relation to the **insured project**.

7. Endorsement #002, Extension for Repairing or Replacing Defective Covered Property ("LEG3") Endorsement is deleted in its entirety and replaced with the following:

## EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

Sublimits of Liability and Deductibles (per **occurrence**):

A. The following sublimit of liability is added to Item **10.B.** of the Declarations:

Sublimit for repairing or replacing faulty or defective **covered property**     $602,658,811

B. The following deductible is added to Item **11.** of Declarations:

Deductible applicable to repairing or replacing faulty or defective **covered property**     $100,000

The above deductible shall apply in addition to the applicable deductible(s) in Item **11.A.** through **11.G.**, inclusive, as shown on the Declarations.

C. The following sublimit of liability is added as Item **VI.J.** to the Delay in Completion Endorsement:

Provided that Delay in Completion coverage is provided under this Policy,     $48,457,160
the Sublimit for Delay in Completion resulting from repair or replacement
of faulty or defective **covered property**

The **Deductible Period** shown in the Delay in Completion Endorsement applies to the above coverage in this Subsection **C.**

Additional Premium:     $86,551

In consideration of the Additional Premium shown in the above Schedule, Exclusion B.10. of the PERILS EXCLUDED Section is deleted in its entirety and replaced with the following:

10. a.  Faulty workmanship, material, construction or installation from any cause; or

b.  Any fault, defect, error, deficiency or omission in any design, plans, or specifications,

all unless direct physical loss or damage not otherwise excluded by this Policy ensues. If direct physical loss or damage not otherwise excluded by this Policy ensues, then the Company shall pay for the following only:

a.  Such ensuing direct physical loss or damage to **covered property**, and/or

b.  Subject to the sublimit(s) of liability shown in the above Schedule, repairing or replacing (whichever is less) with like kind and quality at the time and place of the loss the damaged part of the faulty or defective **covered property**.

However, in no event shall the Company pay any loss, cost, damage or expense to: (1) improve the original workmanship, materials, construction, installation, design, plans or specifications or (2) redesign any design, plans or specifications.

No portion of the **covered property** shall be regarded as damaged solely by virtue of the existence of: (1) any faulty workmanship, material, construction or installation, or (2) any fault, defect, error, deficiency or omission in any design, plans, or specifications.

NOTICE: THIS ENDORSEMENT IS BASED UPON LEG 3 PROVISIONS, BUT MAY DIFFER FROM SUCH CURRENT OR PRIOR LEG 3 PROVISIONS.

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative



Energy and Engineered Risk Division

## <u>IMPORTANT NOTICE</u> – TO BE KEPT WITH POLICY

## <u>WHAT TO DO WHEN A LOSS OCCURS</u>

Report as soon as practicable, every incident, loss or damage which may become a claim to:

Mr. John E. Roberts
Energy and Engineered Risk Division / Property Claims
2929 Allen Parkway, Suite 1100
Houston, TX 77019
Tel: (713) 342-7376
E-Mail: Report **must** be sent to <u>**both**</u>: <u>JohnE.Roberts@aig.com</u> and
<u>NewLoss-USproperty&energy@aig.com</u>

1. Energy and Engineered Risk Claims **<u>CANNOT</u>** be processed through any other facility and must be reported as indicated.

2. Adjuster can **<u>ONLY</u>** be assigned by the Energy and Engineered Risk Division.

Ed. 5-18

 Construction Performance®

# NEW HAMPSHIRE INSURANCE COMPANY
### (A CAPITAL STOCK COMPANY)
**175 Water Street, New York, New York 10038**

### COMPLETED VALUE BUILDERS RISK POLICY
### QUOTA SHARE DECLARATIONS

Policy Number:  **043820532**

**Item 1.  Named Insured and Address:**

A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
17901 COLLINS AVENUE SOUTH
SUNNY ISLES BEACH FL 33160

**Item 2.  Additional Insureds:**

**Additional insured(s)** means all **project owner(s)** and contractors and subcontractors of every tier at the **insured project** location and any other individual or entity, but only to the extent required by the **contract document(s)** or subcontract document(s) with respect to the **insured project** and then only as their respective interests may appear.  Notwithstanding the foregoing sentence, architects, engineers, manufacturers and suppliers shall only be **additional insureds** with respect to their activities at the **insured project** location.

**Item 3.  Mortgagees and Loss Payees:**  Per Certificates of Insurance on file with the Company or any endorsement attached to and forming a part of this Policy.

**Item 4.  Policy Period:**

**A.**  Inception Date:    14 DECEMBER 2018  Expiration Date:  31 DECEMBER 2021
(12:01 a.m., Standard Time at the **insured project** location.  The Expiration Date may vary in accordance with Item **4.B.**) (hereinafter, the **Original Policy Period**)

**B.**  The Expiration Date shall be the earliest of the following:

**1.**  The date of formal acceptance of the entire **insured project** by the **project owner(s)**;

**2.**  The date or expiry of the **Named Insured's** interest in the **insured project**;

**3.**  The effective date of cancellation of this Policy, or

**4.**  The expiration date as set forth in Item **4.A.**

**C.  Extension of the Policy Period**
Provided that coverage has not ended in accordance with Items **4.B.1.** through **4.B.4.**, this Policy will be automatically extended once for up to 180 days per phase / per TCO (see page 7) for a pro rata additional premium upon notification by the **Named Insured** to the Company.  The **Named Insured** may request an additional extension of this Policy subject to the Company's written approval and terms and conditions to be agreed upon.

| 125689 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 1 of 8 |
|---|---|---|

**Item 5. Insured Project:**

| Location | 17901 Collins Avenue South<br>Sunny Isles Beach, FL 33160 |
|---|---|
| Description | Ground up construction of a 51 story 154 unit condominium tower (phase I) including a shared foundation which will include the podium for Phase II (a separate tower 91 unit Tower which will be built after completion of Phase I). The site, at 17901 Collins Avenue, has more than 500 feet of oceanfront. It's north of the Mansions at Acqualina, completed in 2015, and Acqualina Resort & Spa, completed in 2006.<br><br>The Estates will feature a lobby designed by Chanel and Fendi creative director Karl Lagerfeld and Villa Acqualina, a 50,000-square-foot building with a slate of amenities that will include a spa and fitness center, restaurant and Circus Maximus, an ice skating rink, bowling lanes and a movie theater, as well as a Wall Street Trader's Club room. The property will also feature landscaped gardens, multiple infinity pools, a FlowRider for surfers, a basketball court, bocce court, dog park, soccer field and a beachfront restaurant.<br><br>First five stories / associated work of the North Tower.<br><br>South Tower will be completed on 07/01/2021 and will roll onto a permanent property policy at that time. Villa construction to continue to 12/31/2021. |
| Project Owner(s) | A3 Development LLC, LPLA Partners, LP, The Trump Group |

**Item 6. Coverage Territory:**

United States, its territories and possessions and Puerto Rico, including their respective coastal waters.  If any coverage is provided on a worldwide basis, such worldwide coverage shall not include any jurisdiction prohibited or restricted under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.  Losses are only covered within the **coverage territory**.

**Item 7.  Premium:**

**A.  Total Deposit Premium:**          $2,500,552 (See Item **8.** below for the calculation)

    **AIG's 35% Share:**          $875,193

**B.  Terrorism Premium:**          $26,271 (included within the Total Deposit Premium)

**C.  Surcharges:  (If Applicable)**          $866

**D.  Engineering Fees: (If Applicable. Not included as part of the premium)**

$25,000 (includes 1 Site Visit per year and 1 Market Report to be released close to the end date of the project).

**Item 8. Deposit Premiums:**

| Coverage | Original Policy Period | Estimated Value at Inception Date | Annual Rate Per $100 | Deposit Premium |
|---|---|---|---|---|
| Total Project Value (South Tower) | 2.5479 years | $373,500,000 | $Various | $1,648,911 |
| Total Project Value | 3.0493 years | $60,000,000 | $Various | $412,300 |

©American International Group, Inc.<br>All Rights Reserved.

| (Villa and Site) | | | | |
|---|---|---|---|---|
| Existing Property | 3.0493 years | $Included in above figure per budget | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Delay In Completion | 3.0493 years | $44,022,420 | $Various | $343,015 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 3.0493 years | $477,522,420 | $0.0375 of the non-NatCat premium | $26,271 |
| LEG 3 | 3.0493 years | $477,522,420 | $0.10 of the non-NatCat premium | $70,055 |
| | Total Deposit Premium: | | | $2,500,552 |

**Item 9. Policy Limit:** $477,522,420   The **quota share percentage** (shown in Item **13.** of the Declarations) of the **Policy Limit** is the Company's maximum liability in any one **occurrence** as a result of all covered loss or damage regardless of the number of coverages or **covered causes of loss** under this Policy.

**Item 10. Sublimits of Liability:** The sublimits of liability stated in this Policy are part of and not in addition to the **Policy Limit** and any sublimits of liability shown in Item **10.A.** below.  The **quota share percentage** (shown in Item **13.** of the Declarations) of the sublimits of liability are: (1) the maximum amount the Company will pay for all covered loss or damage arising out of the specific perils or coverages and/or (2) the maximum number of days for which the Company will pay for all covered loss or damage for a specific coverage, regardless of the number of coverages or **covered causes of loss** under this Policy.   The sublimits of liability stated in this Policy are per **occurrence** unless otherwise indicated.

Regardless of the number of **occurrences**: (1) any Term Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss** that is applicable to the entire **policy period** regardless of the length of the **policy period**, and (2) any Annual Aggregate in this Policy is the maximum amount payable for all covered loss or damage for the applicable coverage or **covered cause of loss** that is applicable to each annual period with respect to the **policy period.**

If any Annual Aggregate applies and the **policy period** is longer than one year, at the end of each twelve (12) month period (hereinafter, the **annual anniversary date**), such Annual Aggregate shown below shall be reinstated in full, but only with respect to an **occurrence** which first commences on or after 12:01 a.m., Standard Time at the **insured project** location on such **annual anniversary date**.  If the final period is less than twelve (12) months, then such Annual Aggregate shall be reinstated in full for that final period.

*If the words NOT COVERED are shown instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage or **Covered Cause of Loss**, then no coverage is provided for that coverage or **Covered Cause of Loss**.  If the words, NOT APPLICABLE (or N/A) are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

**A. Sublimits Applicable to Specified Covered Causes of Loss** – Each of these sublimits is part of and not in addition to the **Policy Limit:**

1. **Earth Movement:** $477,522,420 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $477,522,420, for all covered loss or damage arising out of **earth movement.**

2. **Flood:** $100,000,000 per **occurrence**, subject to a ☐ Term Aggregate or ☒ Annual Aggregate of $100,000,000, for all covered loss or damage arising out of **flood.**

©American International Group, Inc.
All Rights Reserved.

**3. Named Storm:**   $150,000,000 per **occurrence**, for all covered loss or damage arising out of **named storm.**

For the purpose of the above sublimits of liability, **named storm** includes, but is not limited to, loss or damage from wind, hail, lightning, tornado, rain or water (whether driven by wind or not), **flood**, or any wind driven objects or debris.

In the event that loss or damage by **flood** occurs concurrently or in any sequence with a **named storm**, regardless of whether any flood sublimit or remaining aggregate flood sublimit shown in Item **10.A.2.** (hereinafter, the **applicable flood sublimit**) is greater or less than the applicable Named Storm sublimit, the maximum amount the Company will pay per **occurrence** for all such covered loss or damage by **flood** shall be the **applicable flood sublimit**, subject always to the maximum applicable Named Storm sublimit.  However, if **flood** is not covered, the maximum amount the Company will pay per **occurrence** for all such covered loss or damage arising out of **named storm** shall exclude loss or damage by **flood**.

**4. Terrorism:** $477,522,420 for all covered loss or damage arising out of **terrorism.**

**B. Sublimits of Liability**

Each of the following sublimits is part of, and not in addition to the **Policy Limit** and any other sublimits shown in Item **10.A.** of the Declarations:

| | | |
|---|---|---|
| **Physical Damage Sublimit of Liability** | | $433,500,000 applicable to physical damage to **covered property** at the **insured project** |
| **1.** | Inland Transit | $50,000,000 |
| **2.** | Offsite Temporary Storage | $50,000,000 any one location |
| **3.** | Arson, Theft or Vandalism and Malicious Mischief Reward | $100,000 |
| **4.** | Claims Preparation Costs | $2,500,000 |
| **5.** | Crane Re-Erection Expenses | $1,000,000 |
| **6.** | Crisis Management | 30 days, subject to a maximum Term Aggregate of $2,500,000 |
| **7.** | Cyber Coverage | $Not Covered  Term Aggregate |
| | The following sublimits of liability **7.a.** through **7.d.**, inclusive, are subject to the Cyber Coverage sublimit of liability shown above: | |
| | **a.**   Electronic Data | $Not Covered  Term Aggregate |
| | **b.**   Building or Other Systems | $Not Covered  Term Aggregate |
| | **c.**   Plans and Drawings | $Not Covered  Term Aggregate |
| | **d.**   Cyber Extra Expense | $Not Covered  Term Aggregate |
| **8.** | Debris Removal | $50,000,000 or 25% of direct physical loss or damage to all **insured property**, whichever is less |
| **9.** | Demolition and Increased Cost of Construction | |
| | Demolition Coverage A: | $INCLUDED |
| | Demolition Coverage B: | $25,000,000 |
| | Demolition Coverage C: | $25,000,000 |
| **10.** | Expediting Expense and Extra Expense | $25,000,000 |
| **11.** | Owner's Extra Expense | NOT APPLICABLE |
| | The following expenses **11.a.** through **11.d.**, inclusive, are subject to the Owner's Extra Expense sublimit of liability shown above: | |
| | **a.**   Advertising and Marketing Expenses | NOT APPLICABLE |

©American International Group, Inc.
All Rights Reserved.

|       |                                                       |                                                                 |
|-------|-------------------------------------------------------|-----------------------------------------------------------------|
| **b.** | Legal and Accounting Fees                            | NOT APPLICABLE                                                  |
| **c.** | License and Permit Fees                              | NOT APPLICABLE                                                  |
| **d.** | Project Management Fees                              | NOT APPLICABLE                                                  |
| **12.** | Fine Arts                                           | $1,250,000                                                      |
| **13.** | Fire Brigade, Extinguishing Expenses and Police Charges | $5,000,000                                                  |
| **14.** | Fungus, Mold or Spore                               | $5,000,000                                                      |
| **15.** | Maximum Hot Testing Period                          | NOT APPLICABLE                                                  |
| **16.** | Landscaping Materials                               | $50,000 any one item, subject to a maximum of $2,500,000 per **occurrence** |
| **17.** | Logistics Extra Costs                               | $NOT COVERED                                                    |
| **18.** | Plans and Drawings                                  | $5,000,000                                                      |
| **19.** | Pollution and Contamination Coverage                | $2,500,000 Term Aggregate                                       |
| **20.** | Preservation of Property                            | $2,500,000                                                      |
| **21.** | Professional Design Fees                            | $10,000,000                                                     |

**Item 11. Deductibles:**  The deductibles shown below apply per **occurrence** unless otherwise stated.

**A. Policy Deductible**   $50,000   Applicable to all covered loss or damage unless otherwise stated below or in this Policy.

**B. Earth Movement**

$50,000

**C. Flood**

$500,000

**D. Named Storm**

3% of **total project value** at risk at the time of the loss or damage, subject to a minimum of $250,000 for any one **occurrence** and a maximum of $7,500,000 for any one **occurrence**, for all loss or damage arising out of **named storm**.

**E. Water Damage:**

$100,000

**F. Hot Testing:**

$NOT APPLICABLE

**G. Additional Deductibles**

**LEG 3:** $100,000

**Special Deductible for Owner's Extra Expense:**          $NOT APPLICABLE

In each case of loss or damage covered by this Policy, the Company shall not be liable unless the **Insured** sustains covered loss or damage in a single **occurrence** greater than any applicable deductible described in this Policy and then only for the amount in excess of such deductible.  As used above, "at risk" includes all **covered property** at the location (including **inland transit**) where the loss occurs, whether such **covered property** sustains damage or not.

If an amount is not shown (or if NOT APPLICABLE or N/A is shown) for any deductible, then that deductible shall not apply.  Also, if an amount is not shown (or if NOT APPLICABLE or N/A is shown) with respect to a part of a deductible, then such part shall not apply, but the rest of the deductible shall apply.

If two or more deductible amounts provided in this Policy apply to a single **occurrence**, the total to be deducted shall not exceed the largest deductible applicable unless otherwise stated in this Policy.  If a Delay in Completion Coverage Endorsement is attached to and made a part of this Policy, then the specified **deductible period** stated in such endorsement shall be applied in addition to the applicable deductible shown in Item **11.A.** through **11.G.** above, inclusive.  The Special Deductible for **owner's extra expense** shall apply in addition to the applicable deductible shown in Item **11.A.** through **11.G.** above, inclusive.

**Item 12. Margin Clause:**

If there is any increase in the **total project value**, the **Policy Limit** and the Physical Damage Sublimit of Liability shall be automatically increased by the same percentage of such increase in the **total project value**, subject to a maximum increase of 10% regardless of the number of increases in the **total project value**.  If the cumulative increases in the **total project value** exceed the maximum percentage set forth above, then the **Named Insured** shall report such changes in writing to the Company.

This provision does not apply to any other sublimits of liability, including any other sublimit of liability shown in Item **10.A.** or Item **10.B.** and/or sublimits of liability for any coverage added by endorsement.

**Item 13. Quota Share Participation:**

35% is the Company's participation for all coverage provided under this Policy and is the percentage of the **Policy Limit** and sublimits of liability under this Policy that the Company shall pay in excess of the total applicable deductible(s) (herein, the percentage is referred to as the **quota share percentage**).

The Company's liability under this Policy shall not be increased, for any reason, including: (1) the receivership, bankruptcy, insolvency, liquidation, or dissolution of any other **participating insurer**; (2) the denial or reservation of rights with respect to any claim by any other **participating insurer**; (3) the cancellation, non-renewal, or other termination of any policy issued by any other **participating insurer**; or (4) the inability, refusal, or failure, for any reason, of any other **participating insurer** to fulfill its duties or obligations under any policy or program.  The Company's liability is several, but not joint, under this program.

**Participating insurer** shall mean any insurer or other entity including, a captive or entity under a self-insured program, that shares in the liabilities under any policy or program related to the coverage provided under this Policy.

**Item 14. Special Terms and Conditions:**

TPA: Mike Kaemph at York (Chicago)

Producer:  Willis of Florida, Inc.
Address:   1450 Brickell Ave, ste 1450
           Miami, FL 33131

| 125689 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 6 of 8 |
|---|---|---|

**PHASE 2 OPTION (Rate guaranteed for 24 months from binding date of this policy; final premium for Phase 2 determined based on policy period and estimated value at time of binding):**   The Additional Premium to include Phase 2 (12/01/19 to 07/01/22) would be as follows:

| Coverage | Original Policy Period | Estimated Value at Inception Date | Deposit Premium |
|---|---|---|---|
| Total Project Value (North Tower + West Garage, less credits noted below) | 2.5836 years | $169,158,811 | $713,189 |
| Existing Property | 2.5836 years | $Included in above figure per budget | $Included in above figure per budget |
| Contractors Equipment | Not Applicable | Not Applicable | Not Applicable |
| Delay In Completion | 2.5836 years | $48,457,160 | $51,094 |
| Hot Testing | Not Applicable | Not Applicable | Not Applicable |
| Terrorism | 2.5836 years | $217,615,971 | $7,307 |
| LEG 3 | 2.5836 years | $217,615,971 | $19,486 |
| | Total Additional Deposit Premium*: | | $803,306 |
| | AIG's 35% share Additional Deposit Premium: | | $281,157 |

*Phase 2 Additional Deposit Premium calculation is based on:*

> *(1) $207,300,000 (Phase 2) plus $7,000,000 (West Garage) minus $45,141,189 ($20,141,189 savings and $25,000,000 included within Phase 1 Total Project Value) for the project term, 12/1/19 to 7/1/22; and*

> *(2) Delay in Completion, Terrorism & LEG 3 premiums are the difference between Phase 1 & Phase 2*

*PAYMENT TERMS:  If the insured elects to bind Phase 2, the Additional Premium will be billed at the time AIG is provided with the order to bind.  Premium will then be due per the policy payment terms.*

Policy Extension Calculations (180 days per phase/per TCO):

- South Tower – to extend to December 31, 2021
    - during wind season (Jul to Nov): $92,659 per month
    - December (outside wind season): $23,950
    - No delay factored in here
- Villa – to extend to June 30, 2022
    - outside wind season (Jan to May): $10,141 per month
    - June (wind season): $33,414
    - Full delay value assumed here as per your request ($44,022,420)
- North Tower - to extend to December 31, 2022
    - during wind season (July to Nov): $59,997 per month
    - December (outside wind season): $15,508
    - Full delay value assumed here as per your request ($48,457,160)

For Audit & Extensions the Annual rates are:

- South Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- Villa: .115 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- North Tower: .07 AOP & flood; .0185 per month for wind (Jun 1 to Nov 30)
- 150% for delay; 3.75% for terrorism (3% base rate * 25% surcharge to remove sunset clause); 10% for LEG 3. Terrorism & LEG 3 premiums are calculated based on the non-Cat premium.

| 125689 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 7 of 8 |
|---|---|---|

**IN WITNESS WHEREOF**, the Company has caused this Policy to be signed on the Declarations by the President and Secretary of the Company and its duly authorized representative.

_____                    _____
President                                           Secretary

This Policy shall not be valid unless signed at the time of issuance by the Company's authorized representative.

_____
Authorized Representative

_____     _____     _____
Countersignature (if applicable)     Date                  Countersigned At

**FLORIDA ADDENDUM TO THE DECLARATIONS**

If you have questions about your insurance policy, or questions about claims relating to your insurance policy, please contact your insurer at the following:

**AIG**
**175 Water Street**
**New York, NY 10038**
**(212) 458-5000**

74825 (01/13)

# FORMS SCHEDULE

Named Insured: A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP

Policy No: 043820532                                    Effective Date: 12/14/2018

| Form Number | Edition Date | Endorsement Number | Title |
|---|---|---|---|
| 125689 | 05/17 | | **COMPLETED VALUE BUILDERS RISK POLICY QUOTA SHARE DECLARATIONS** |
| 125687 | 05/17 | | **COMPLETED VALUE BUILDERS RISK POLICY** |
| 125696 | 05/17 | 001 | **DELAY IN COMPLETION ENDORSEMENT** |
| 125699 | 10/17 | 002 | **EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT** |
| 125700 | 05/17 | 003 | **LENDER LOSS PAYEE OR LOSS PAYEE ENDORSEMENT** |
| 125703 | 05/17 | 004 | **PILING, SHEET PILING & CAISSON LIMITATION ENDORSEMENT** |
| 125705 | 05/17 | 005 | **POLICY CHANGES ENDORSEMENT** |
| 76105 | 06/15 | 006 | **FLORIDA CANCELLATION/NONRENEWAL ENDORSEMENT** |
| 125719 | 05/17 | | **FLORIDA STATE AMENDATORY ENDORSEMENT** |

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG).  The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.  You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)

## **FLORIDA NOTICE OF LOSS CONTROL SERVICES**

Pursuant to Florida Administrative Code ("FAC") 690-166.040, we would like to inform you of the risk management programs that we have developed and that are available to you.

For your consideration, we offer the services of AIG PC Global Services, Inc.  With more than 25 years experience and expertise in assisting with the prevention and mitigation of losses, AIG PC Global Services, Inc. can help address a range of problems related to loss control in various lines of business. Certain risk management programs are available to you, free of charge, as part of your commercial insurance coverage; contact your insurance broker for more details on these plans. Other, more substantive risk management programs can be purchased which include, but are not limited to the following services: surveys/analysis for identifying exposures related to your specific operations, safety management training and counseling for your staff, adoption of relevant testing strategies, and evaluations of current loss control practices.

Upon your written request, we could provide you with specific guidelines for risk management programs as established by FAC 690-166.040. Such guidelines would provide instructions and offer basic criteria to assist you in creating your own risk management plan. Should you request such guidelines and, subsequently, wish to further explore the purchase of a risk management plan, developed by AIG PC Global Services, Inc., which is specific to your company's needs, we would be willing to discuss with you both the availability of such a plan, and if available, its specific content and cost.

Again, we welcome all inquiries regarding the services of AIG PC Global Services, Inc.


Construction Performance®

## NEW HAMPSHIRE INSURANCE COMPANY
### (A CAPITAL STOCK COMPANY)
### 175 Water Street, New York, New York 10038

### COMPLETED VALUE BUILDERS RISK POLICY

Various provisions in this Policy restrict coverage.  Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the word **Insured(s)** means the **Named Insured** and the **additional insured(s)**.  The word "Company" means the insurance company shown in the header above.  The word "Policy" means this Completed Value Builders Risk Policy including, the Declarations, all endorsements and Schedules.

Other defined words and phrases that appear in boldface type have special meaning.  Refer to: (1) the DEFINITIONS Section, (2) the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section and (3) elsewhere in this Policy.  If such ordinarily boldfaced words and phrases are not bolded then such words and phrases shall include, but not be limited to, the specific meaning set forth in this Policy.

### SECTION I – INSURING AGREEMENT AND COVERED PROPERTY

**A. INSURING AGREEMENT**

Subject to the terms and conditions of this Policy, the Company will pay for all risks of direct physical loss or damage by a **covered cause of loss** to **covered property** at the **insured project**, while in offsite temporary storage or during **inland transit** (both as provided in the Additional Coverages), all within the **coverage territory** and occurring during the term of this Policy.

**B. COVERED PROPERTY**

The Company insures the following property for which the **Insured** is contractually responsible, the value of which has been included in the **total project value**:

1. Permanent works - All materials, supplies, equipment, machinery, and other property of a similar nature all when used or to be used in or incidental to the demolition of existing structures, site preparation, fabrication or assembly, installation or erection or the construction of or alteration, renovation, rehabilitation of the **insured project** (hereinafter, **permanent works**);

2. Temporary works - All scaffolding, form work, fences, shoring, hoarding, falsework and temporary buildings, construction trailer(s) including such trailers' contents (except **plans and drawings**), all incidental to the **insured project** (hereinafter, **temporary works**); and

3. Property of others – Property of others for which the **Insured** is legally liable (hereinafter, **property of others**);

while at the location of the **insured project**, in transit as set forth in the INLAND TRANSIT Additional Coverage, or at offsite temporary storage as set forth in OFFSITE TEMPORARY STORAGE Additional Coverage.

## C.  SPECIFIED COVERED CAUSES OF LOSS

Subject to the terms and conditions of this Policy, **covered causes of loss** include the following specified **covered causes of loss**:

1.  **Earth movement**, which means any natural or manmade:

    a.  Earthquake, including any earth sinking, rising or shifting related to such event;

    b.  Landslide, including any earth sinking, rising or shifting related to such event;

    c.  Mine subsidence, meaning subsidence of a manmade mine, whether or not mining activity has ceased;

    d.  Earth sinking, rising or shifting, including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of **covered property**, unless otherwise excluded by this Policy;

    e.  Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, sinkhole collapse, or subsidence, unless otherwise excluded by this Policy; or

    f.  Tsunami arising out of any of the above.

2.  **Flood**, which means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike or other surface containment structure, storm surge, storm tide, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.  A tsunami shall not be considered a **flood**.

3.  **Water damage** means all loss or damage caused by:

    a.  Water, other than water from a **flood** or **named storm**, that enters into a building or structure through an opening;

    b.  Discharge or leakage of water or steam from a plumbing, heating, air conditioning or other system or appliance;

    c.  Discharge or leakage from a sprinkler system, other than discharge due to a fire, explosion or **earth movement**; or

    d.  Water, other than water from a **flood** or **named storm**, that backs-up into the **insured project** (or **existing property**, if endorsed onto this Policy) from sewers, drains, sumps, and/or pumps.

4.  **Named storm**, which means a storm that, at any time, has been declared by the United States National Weather Service or another meteorological authority to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm.

If **earth movement**, **flood** or **named storm** is not covered, then any cause or event occurring concurrently or in any sequence with such peril(s) is also not covered, except for direct physical loss or damage to **covered property** caused by fire, sprinkler leakage or explosion following **earth movement**, **flood** or **named storm**, whichever is applicable.

Direct physical loss or damage to **covered property** caused by fire, sprinkler leakage or explosion shall not be considered loss or damage by **earth movement**, **flood** or **named storm**, whichever is applicable, within the terms and conditions of this Policy.

5.  **Terrorism**, which means the use or threatened use of force or violence against a person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

    a.  A government;

    b.  The civilian population of a country, state or community; or

    c.  Disrupt the economy of a country, state or community.

    So long as the Terrorism Risk Insurance Act of 2002, and any revisions or amendments thereto (the "Act") is in effect, **terrorism** includes a certified act of terrorism defined by Section 102. Definitions of the Act.

    Whether or not **terrorism** is covered under this Policy, the Company does not cover loss or damage caused directly or indirectly by **biological and/or chemical terrorism** or **nuclear terrorism** whether controlled or uncontrolled, proximate or remote, sudden or over any length of time, or which is contributed to or aggravated by any other cause or event.  Such **biological and/or chemical terrorism** or **nuclear terrorism** is excluded regardless of any other cause or event occurring concurrently or in any sequence with such **biological and/or chemical terrorism** or **nuclear terrorism**.  **Biological and/or chemical terrorism** means the dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances in an act(s) of **terrorism**.  **Nuclear terrorism** means an act(s) of **terrorism** involving or resulting in nuclear reaction or nuclear radiation or radioactive contamination.

    If **terrorism** is covered under this Policy, then a corresponding premium will be shown in Item **7.B.** of the Declarations.

    If **terrorism** is not covered then any cause or event occurring concurrently or in any sequence with such **terrorism** is also not covered, including any action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except for direct physical loss or damage to **covered property** caused by fire following **terrorism**.  With respect to this exception for fire following **terrorism**, no coverage is provided for: (1) fire following **biological or chemical terrorism** or **nuclear terrorism**, (2) any Additional Coverage, except debris removal under the DEBRIS REMOVAL Additional Coverage, or (3) delay in completion loss.  Notwithstanding any other valuation provision of this Policy to the contrary, the Company shall only pay the actual cash value of the **covered property** at the time and place of the loss caused directly by the ensuing fire.

## SECTION II – ADDITIONAL COVERAGES

Subject to the terms and conditions of this Policy, all loss, damage, expenses and/or other payments for the following Additional Coverages and any Additional Coverage(s) added to this Section by endorsement or through the Special Terms and Conditions is subject to the sublimits of liability as shown in Item **10.B.** of the Declarations and sublimits shown elsewhere in this Policy.

1. **INLAND TRANSIT**

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **covered property** during **inland transit**.

The **Insured** agrees to keep records of all shipments insured hereunder and make them available to the Company upon request.  Failure to keep such records may result in the Company not paying for such **covered property** during **inland transit**.

This Additional Coverage shall be void if the **Insured** enters into any agreement with carriers, releasing them from their common law or statutory liability or agreeing that this insurance shall in any way inure to the benefit of such carriers; however, the **Insured** may, without prejudice to this Additional Coverage, accept bills of lading, receipts, or contracts of transportation as are ordinarily issued by carriers containing a limitation as to the value of **covered property**.

As used herein, **inland transit** means the transit of **covered property** from the commencement of loading at the original point of shipment anywhere within the **coverage territory** or Canada until completion of unloading: at the location of the **insured project** or at a temporary offsite location, including shipments on inland or coastal waters, but excluding ocean marine shipments.

2. **OFFSITE TEMPORARY STORAGE**

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **covered property** while such property is at offsite temporary storage, anywhere within the **coverage territory**.  There is no coverage for such **covered property** while: (1) in the course of manufacturing or processing, (2) at a manufacturer's or supplier's site or warehouse, unless the **Insured** is legally liable for such **covered property**, or (3) in transit.

3. **ARSON, THEFT OR VANDALISM AND MALICIOUS MISCHIEF REWARD**

The Company covers the reasonable payment of any reward offered by the **Named Insured** or on the **Named Insured's** behalf for information that leads to conviction of the perpetrator(s) of arson, theft or **vandalism and malicious mischief** to **covered property**.

Regardless of the number of informants, the Company's maximum liability for any one **occurrence** of arson, theft and/or **vandalism and malicious mischief** is the Arson, Theft or Vandalism and Malicious Mischief Reward sublimit of liability shown in Item **10.B.** of the Declarations.

4. **CLAIMS PREPARATION COSTS**

The Company will pay reasonable and necessary expenses incurred by the **Named Insured** for its:

**a.** Accountants, architects, auditors, engineers, or other professionals;

**b.** Employees; or

**c.** Insurance agent's or broker's subsidiaries, related or associated entities;

to prepare and certify particulars or details of the **Named Insured's** claim required by the Company resulting from a covered loss under this Policy for which the Company has accepted liability.

The Company will not pay for expenses incurred by the **Named Insured** to utilize the services of property managers, attorneys, public adjusters, or any of its subsidiaries, related or associated entities or insurance agents or brokers.  The Company will not pay any fees or costs for consultation on coverage or negotiation of claims.

**5.  CRANE RE-ERECTION EXPENSES**

The Company will pay reasonable and necessary expenses incurred by the **Named Insured** to re-erect a tower or pole crane that sustains direct physical loss or damage by a **covered cause of loss**.  However, the Company shall not cover any loss or damage to the tower or pole crane itself.

**6.  CRISIS MANAGEMENT**

The Company shall indemnify the **Named Insured** for the reasonable and necessary costs over and above the total costs that normally would have been incurred to continue the scheduled progress of the **insured project** if an order of civil or military authority limits, restricts or prohibits partial or total access to the **insured project**, provided that such order is a direct result of a violent crime, suicide, attempted suicide, death (not including, disease or sickness resulting in death) or armed robbery at such **insured project**.

Coverage begins on the date and time that the order of civil or military authority limits, restricts or prohibits partial or total access to the **insured project** and ends when access to the **insured project** is no longer limited, restricted or prohibited, but in no event for more than the number of days shown in Item **10.B.** of the Declarations under Crisis Management.

The **Named Insured** must report any loss under this Additional Coverage within 30 days after the effective date of such order of the civil or military authority.

**7.  CYBER COVERAGE**

   **a.**  Electronic Data

The Company will pay for corruption, erasure or alteration of **electronic data** in the **building or other systems** that are incorporated into the **insured project** due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss.**

The Company will not pay for any loss under this Additional Coverage for which coverage is provided under the Building or Other Systems Additional Coverage or would be provided under such Additional Coverage but for the exhaustion of the Building or Other Systems sublimit of liability shown in Item **10.B.** of the Declarations.

   **b.**  Building or Other Systems

The Company will pay for the **building or other systems** that are incorporated into the **insured project** rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems.**

   **c.**  Plans and Drawings

The Company will pay for corruption, erasure or alteration of **plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code**.

**d.** Cyber Extra Expense

If coverage is provided under Subsections **7.a.**, **7.b.** or **7.c.** above, the Company will also pay the reasonable and necessary costs, over and above normal operating costs, incurred by the **Named Insured** limited to the following and such costs shall not be considered extra expense under any other Additional Coverage:

**i.** Conducting an investigation (including a forensic investigation) to determine the cause and scope of the introduction of such **malicious code**; and

**ii.** Hiring an expert to consult with the **Named Insured** on: (1) the protection of such **electronic data** and (2) the eradication of such **malicious code**.

**e.** Additional Exclusions

The following additional exclusions apply to all Additional Coverages set forth in the CYBER COVERAGE Additional Coverage:

**i.** The Company will not pay any loss, damage, cost or expense arising out of a breach in confidentiality or privacy of, or release of, any **electronic data** for any reason.

**ii.** The Company does not cover theft of any **electronic data** unless there has been corruption, erasure or alteration of **electronic data** and then the Company shall only pay the covered loss that is related to the corruption, erasure or alteration of **electronic data**.

**iii.** The Company will not pay any extortion payments or public relations expenses.

**iv.** The Company will not pay any loss, damage, cost or expense arising out of **malicious code**, otherwise excluded under this Policy.

The maximum amount the Company will pay for all loss or damage (including corruption, erasure or alteration) under any single Additional Coverage under this CYBER COVERAGE Additional Coverage is the corresponding sublimit of liability for such single Additional Coverage as shown in Item **10.B.** of the Declarations, regardless of any other applicable coverages or Additional Coverages.

For the purposes of the CYBER COVERAGE Additional Coverage, Subsection **7.a.**, **7.b.**, **7.c.**, and **7.d.** shall each be treated as a separate Additional Coverage.

**8. DEBRIS REMOVAL**

If **covered property** at the **insured project** sustains direct physical loss or damage by a **covered cause of loss** during the **policy period**, the Company will pay the reasonable and necessary expenses to:

**a.** Remove debris of **covered property** remaining from the **insured project**; and

**b.** Remove debris of uninsured property from the **insured project**.

The Company will not pay the expense to extract **pollutants or contaminants** from land, water and/or debris, or to remove, restore, or replace contaminated or polluted land or water. In addition, the Company will not cover the cost to remove or transport any property or debris to a site for storage or decontamination required because the property or debris is affected by **pollutants or contaminants**, whether or not such removal, transport or decontamination is required by law, ordinance or regulation nor will the Company cover the cost to remove, transport or decontaminate any property or debris damaged by **fungus, mold or spore**.

**9.  DEMOLITION AND INCREASED COST OF CONSTRUCTION**

In the event of direct physical loss or damage by a **covered cause of loss** to **covered property** that results in the enforcement of any law, ordinance, governmental directive or standard (hereinafter, **law or ordinance**) in effect at the time of loss or damage regulating the repair or rebuilding of the damaged portion(s) of the **covered property**, the Company will pay:

**a.** Demolition Coverage A:  In accordance with the VALUATION Section, the cost to replace the undamaged portion of the damaged **covered property** as a consequence of the enforcement of a **law or ordinance** that requires demolition of the undamaged portion of the damaged **covered property**;

**b.** Demolition Coverage B:  For the cost to demolish and clear the site of the undamaged portion of the damaged **covered property**, as a consequence of the enforcement of a **law or ordinance** that requires demolition of the undamaged portion or the damaged **covered property**; and

**c.** Demolition Coverage C:  For the increased cost of repairing or rebuilding the damaged and undamaged portion of the **covered property**, limited to the cost that would have been incurred in order to comply with the minimum requirements of such **law or ordinance** regulating the repair or rebuilding of the damaged **covered property**.

The Company shall not be liable for any loss under this provision, unless and until the damaged or destroyed **covered property** is actually repaired or rebuilt on the same premises with exercise of due diligence and dispatch and in no event, unless repair or rebuilding is completed within two (2) years after the destruction or damage of such **covered property** or within such further time as the Company may allow in writing during the two (2) year period.

The Company shall not be liable for any cost set forth above:

**a.** Necessitated by the enforcement of any **law or ordinance** regulating any form of **pollutant or contaminant**; or

**b.** Incurred due to any **law or ordinance** with which the **Insured** was legally obligated to comply with prior to the time of the direct physical loss or damage.

**10. EXPEDITING EXPENSE AND EXTRA EXPENSE**

The Company will pay reasonable and necessary:

**a.** Expediting expenses to make temporary repairs and to expedite the permanent repair or replacement of **covered property**, that sustains direct physical loss or damage due to a **covered cause of loss**, including additional wages for overtime, night work, and work on public holidays and the extra costs of express and air freight and extra costs of rental equipment; and

**b.** **Extra expense** which is incurred by the **Insured** for the purpose of continuing as nearly as practicable the scheduled progress of undamaged work, but only when such scheduled progress is impaired by direct physical loss or damage by a **covered cause of loss** to the **covered property**.

In order to receive payment under this provision, the **Insured** must exercise due diligence and dispatch to maintain the scheduled progress of the undamaged work.

Notwithstanding the foregoing, the Company will not pay expenses incurred:

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 7 of 25 |
|---|---|---|

a. To comply with any **law or ordinance** which regulates removal, repair, demolition, construction or re-construction of the **covered property**;

b. To overcome delays in the scheduled progress of the work which existed at the time of the loss;

c. For alterations, additions, improvements or other changes in materials, designs, plans, specifications or the means and methods of construction; or

d. As **owner's extra expense**.

## 11. OWNER'S EXTRA EXPENSE

The Company will pay reasonable and necessary **owner's extra expense** incurred by the **project owner(s)**, prior to the Expiration Date as described in Item **4.** of the Declarations, due to direct physical loss or damage by a **covered cause of loss** to **covered property**.

Notwithstanding the foregoing, the Company will not pay expenses incurred:

a. To comply with any **law or ordinance** which regulates removal, repair, demolition, construction or re-construction of the **covered property**;

b. To overcome delays in the scheduled progress of the work which existed at the time of the loss;

c. For alterations, additions, improvements or other changes in materials, designs, plans, specifications or the means and methods of construction; or

d. As **extra expense** or expediting expenses as set forth under the EXPEDITING EXPENSE AND EXTRA EXPENSE Additional Coverage.

## 12. FINE ARTS

The Company will pay for direct physical loss or damage by a **covered cause of loss** to the **Insured's fine arts** at the **insured project** for which the value has been included in the **total project value**. However, the Company will not pay for loss or damage as a result of restoring, repairing or retouching processes.

## 13. FIRE BRIGADE, EXTINGUISHING EXPENSES AND POLICE CHARGES

The Company will pay the following expenses resulting from a **covered cause of loss** to **covered property** incurred by the **Insured**:

a. Fire brigade charges and extinguishing expenses;

b. Loss and disposal of fire extinguishing materials expended; and

c. Police charges to investigate a covered loss.

## 14. FUNGUS, MOLD OR SPORE

The Company will pay for direct physical loss or damage to **covered property** caused by or resulting from **fungus, mold or spore**, when such **fungus, mold or spore** arises out of a **covered cause of loss** that commences during the **policy period**. This coverage includes reasonable and necessary cost or expense with respect to the **insured project** to:

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 8 of 25 |
|---|---|---|

    **a.**  Clean-up, remove, contain, treat, detoxify or neutralize **fungus, mold or spore**;

    **b.**  Test the indoor air quality for **fungus, mold or spore**;

    **c.**  Test the surfaces and materials for **fungus, mold or spore**;

    **d.**  Develop and implement a remediation plan for **fungus, mold or spore**; and

    **e.**  Remove debris that has been contaminated with **fungus, mold or spore**.

## 15. HOT TESTING

The Company will pay for direct physical loss or damage to **covered property** at the **insured project** due to a **covered cause of loss** arising out of **hot testing** during the **hot testing period**.

The **hot testing period** means the period of time that:

**a.**  Begins with the introduction into each system of: (1) feedstock or other raw materials or (2) fuel supply, and

**b.**  Ends on the earliest of the following:

    **i.**  The Expiration Date or earlier termination date of the Policy;

    **ii.**  The date of formal acceptance of the **insured project** or any part of the **insured project** undergoing **hot testing** by the **project owner(s)**; or

    **iii.**  The date after the total number days of **hot testing**, whether or not consecutive, as shown in Item **10.B.** of the Declarations (referred to as the Maximum Hot Testing Period), after the commencement of **hot testing**.

**Hot testing** means testing of equipment or machinery through the introduction into a system of: (1) feedstock or other raw materials or (2) fuel supply.  **Hot testing** does not mean testing of building systems including, but not limited to, electrical, mechanical, hydraulic, hydrostatic and pneumatic testing which shall be deemed to be cold testing.

## 16. LANDSCAPING MATERIALS

The Company will pay for direct physical loss or damage by a **covered cause of loss** to **landscaping materials** at the **insured project**, except for loss or damage to **landscaping materials** from infestation, disease, freeze, drought, lack of moisture, hail, weight of ice or snow or any damage caused by insects, vermin, rodents or animals.

As used herein, **landscaping materials** means trees, plants, shrubs, grass and lawns (including fairways, greens and tees) for which the **Insured** is contractually responsible and the value of which has been included in the **total project value**.

For the purpose of applying the sublimit of liability, "one item" shall mean: (1) any one tree, plant, shrub, green or tee, or (2) each separate area of a fairway or grass, bounded by rough vegetation, water, dirt, concrete or paved surfaces on all sides.

## 17. LOGISTICS EXTRA COSTS

The Company will pay the reasonable and necessary extra cost incurred by the **Insured** to temporarily continue, as nearly normal as practicable, the movement of **covered property** directly between the location of the **Insured's** direct supplier and the **insured project**, provided

that the normal movement of such **covered property** is disrupted as a result of direct physical loss or damage by a **covered cause of loss** to bridges, roadways, tunnels, docks, piers, wharves runways, taxiways, tarmacs, terminals, and/or railways (hereinafter, **infrastructure**) located in the **coverage territory**.

Coverage begins:

**a.**   48 hours after such disruption; or

**b.**   In the case of disruption caused by **earth movement**, **flood** or **windstorm or hail**, 168 hours after such disruption;

and ends when, with exercise of due diligence and dispatch, the normal movement of the **covered property** could be resumed (hereinafter, the **waiting period deductible**).  Any **waiting period deductible** shall apply in addition to any other deductible(s) applicable to the **covered cause of loss** that resulted in damage to the **infrastructure**.  Such other deductible(s) shall be subject to a minimum deductible of the Policy Deductible.

The following additional exclusions apply to this Additional Coverage.  The Company will not pay for:

**a.**   Any loss resulting from disruption of electricity, gas, fuel, water, steam, sewerage, refrigeration, cloud computing service, or any data, voice or video service;

**b.**   Any costs that would have been incurred during the same period had there been no disruption of normal movement of goods or materials;

**c.**   Any costs for the repair or replacement of property that has been damaged or destroyed; or

**d.**   Any costs recoverable elsewhere under this Policy.

## 18. PLANS AND DRAWINGS

The Company will pay for direct physical loss of or damage by a **covered cause of loss** to **plans and drawings**.

## 19. POLLUTION AND CONTAMINATION COVERAGE

The Company will pay the reasonable and necessary expenses incurred by the **Insured** to:

**a.**   Remove, extract, dispose of, or clean-up the actual presence of **pollutants or contaminants** from land or water at the **insured project**;

**b.**   Remove and transport property or debris at the **insured project** that is affected by **pollutants or contaminants** to a site for storage or decontamination; and

**c.**   Test for **pollutants or contaminants** during the extraction of **pollutants or contaminants** from land or water at the **insured project**;

but only if the **pollutants or contaminants** originate at the **insured project** due to direct physical loss or damage by a **covered cause of loss** during the **policy period**.  There will be no coverage unless such expenses are reported to the Company within 180 days after the date of such direct physical loss or damage.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 10 of 25 |
|---|---|---|

**20. PRESERVATION OF PROPERTY**

The Company will pay for:

**a.** Reasonable and necessary costs, over and above normal operating costs, incurred by the **Insured** for actions to temporarily protect or preserve **covered property**, and

**b.** Direct physical loss or damage by a **covered cause of loss** to **covered property** removed from the **insured project**,

provided that such actions or removal is necessary due to imminent direct physical loss or damage by a **covered cause of loss** to **covered property**. If **covered property** is removed to and located at offsite temporary storage in accordance with this provision, then the OFFSITE TEMPORARY STORAGE Additional Coverage shall apply.

**21. PROFESSIONAL DESIGN FEES**

In the event of direct physical loss or damage by a **covered cause of loss** to the **insured project**, the Company will pay the reasonable and necessary expenses incurred by the **Insured** for architects, engineers or other design professionals to redesign the damaged portion of the **insured project** in accordance with the design as set forth in the **contract documents** on the date of loss.

<div align="center">

**SECTION III – VALUATION**

</div>

Unless otherwise provided in this Policy, the basis of adjustment of a claim shall be as follows, at the time and place of the loss:

**A.** <u>Permanent Works</u> – The cost to repair or replace (whichever is less) the **permanent works** that sustained loss or damage at the time and place of the loss with material of like kind and quality, less betterment, and including contractor's reasonable profit and overhead in the same proportion as that included in the **contract documents** to the extent declared as part of the **total project value**. If the **permanent works** are not repaired or replaced within 2 years after the date of loss, then the Company shall pay the actual cash value of such **permanent works** at the time and place of the loss.

**B.** <u>Temporary Works</u> – With respect to **temporary works** that sustain loss or damage, the lesser of: (1) the cost to repair or replace (whichever is less) the **temporary works** at the time and place of loss with materials of like kind and quality, but if not repaired or replaced within 2 years after the date of loss, the recovery will not exceed actual cash value or (2) the value that the **Insured** is legally required to pay for the **temporary works** as set forth in the lessor's contract.

**C.** <u>Property of others</u> – The lesser of: (1) the cost to repair or replace (whichever is less) the **property of others** that sustained loss or damage at the time and place of loss with material of like kind and quality, less betterment and/or charges incurred by the contractor prior to the loss and related to such property or (2) the property owner's cost.

**D.** <u>Property in Inland Transit</u> – The invoice cost of property in **inland transit** plus accrued shipping charges less the shipper's liability, if any.

**E.** <u>Plans and Drawings</u> – If replaced, the cost to reproduce the **plans and drawings** (in physical or **electronic data** format) from duplicates, or if no duplicates are available, then the cost to research, gather and/or assemble the information to recreate such **plans and drawings**. If not replaced, the value of the blank material.

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 11 of 25 |
|---|---|---|

**F.** **Landscaping Materials** – (1) The cost to replace **landscaping materials** with property of like kind and quality, and (2) the labor necessary to replace such property.

**G.** **Fine Arts** – The least of the following: (1) the cost to repair or replace the **fine arts**; (2) the appraised value at the time of the loss had no loss or damage occurred or (3) the agreed value, if any, on file with the Company.

**H.** **Electronic Data** – The cost of reproducing **electronic data** from duplicates to the condition that existed prior to the time of the loss, or if no duplicates exist, then the cost to research, gather and/or assemble the **electronic data**.  If the **electronic data** is not replaced, then the value of the blank media.

### SECTION IV – PROPERTY NOT COVERED

Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company does not insure the following property:

**A.** Land and land values and the value of cut, fill and backfill materials existing at the location of the **insured project** prior to project commencement; however, to the extent identified in the **contract documents** and included in the **total project value**, fill and backfill materials purchased for use in the completion of the **insured project** are covered.  Labor and material charges incurred to excavate land and to move, remove, place or otherwise handle cut, fill and backfill materials, whether insured or uninsured, are covered to the extent such charges are identified in the **contract documents** and included in the **total project value**;

**B.** **(i)** Contractors' tools, machinery, plant and equipment, including spare parts and accessories, whether owned, loaned, hired or leased, and

 **(ii)** Property of a similar nature not intended to be a permanent part of the completed **insured project**,

 regardless of ownership, unless specifically provided by endorsement and then only to the extent provided therein;

**C.** Vehicles or equipment licensed for highway use, aircraft including drones or watercraft, except with respect to drones only, if such drones are owned and used by the **Insured** as part of the operations at the **insured project**;

**D.** Railcars and locomotives;

**E.** Water, except water that is contained within any enclosed tank, piping system, or **processing water**;

**F.** Standing timber, growing crops or animals;

**G.** Trees, plants, shrubs, grass or lawns (including fairways, greens or tees) that already exist at the **insured project**;

**H.** **Landscaping materials**;

**I.** **Plans and drawings**;

**J.** Accounts, bills, stamps, deeds, evidence of debt, checks, bonds, notes, **money**, **fine arts**, precious metals or precious stones or other property of a similar nature;

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 12 of 25 |
|---|---|---|

**K.** **Existing property** at the location of the **insured project**, unless specifically provided by endorsement and then only to the extent provided therein;

**L.** **Used machinery and equipment** while undergoing any form of testing, commissioning or startup, unless specifically provided by endorsement and then only to the extent provided therein;

**M.** Transmission, distribution or communication lines, except to the extent identified in the **contract documents**;

**N.** Property not at an **insured project** unless covered under the INLAND TRANSIT Additional Coverage, OFFSITE TEMPORARY STORAGE Additional Coverage or by endorsement; or

**O.** **Electronic data**.

<p align="center">**SECTION V – PERILS EXCLUDED**</p>

**A.** Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company does not insure for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage.  The following exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:

   **1.** Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or contributed to or aggravated by a **covered cause of loss**.  However, if fire or sprinkler leakage not otherwise excluded ensues, the Company shall be liable for direct physical loss or damage by such ensuing fire or sprinkler leakage, but not including any loss or damage due to nuclear reaction, nuclear radiation, or radioactive contamination;

   **2.** **a.** War, hostile or warlike action in time of peace or war, whether or not declared, including action in hindering, combating, or defending against an actual, impending, or expected attack:

      **i.** By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces; or

      **ii.** By military, naval, or air forces; or

      **iii.** By an agent of any such government, power, authority, or force;

     **b.** Any weapon employing atomic fission, fusion or radioactive force, or any weapon that disperses radioactive material or a directed-energy or electromagnetic weapon, whether in time of peace or war, whether or not its discharge was accidental; or

     **c.** Insurrection, rebellion, revolution, civil war, usurped power, seizure or destruction or any action taken by governmental authority in hindering, combating, or defending against such event;

     Including any consequence of Subsection **a.**, **b.**, or **c.** above;

   **3.** The actual, alleged or threatened release, discharge, escape or dispersal of **pollutants or contaminants**, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any **covered cause of loss** under this Policy.

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 13 of 25 |
|---|---|---|

However, this exclusion shall not apply to direct physical loss or damage to **covered property** from **pollutants or contaminants** caused by a **covered cause of loss** at the **insured project**, including the cost to clean-up **pollutants or contaminants** from **covered property** at the **insured project** resulting from such loss or damage. No coverage is provided for testing or monitoring for **pollutants or contaminants.** For the purpose of the exception to this exclusion only, **pollutants or contaminants** do not include radioactive contaminants;

4. Dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances by any cause whatsoever;

5. Asbestos, dioxins or polychlorinated biphenols (hereinafter, **material(s)**) including:

   a. **Material(s)** removal;

   b. Demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating **material(s)**;

   c. Any governmental order or direction declaring that any **material** which is present in or part of or utilized on any portion of the **insured project** must be removed or modified;

6. a. Any functioning or malfunctioning or lack of the internet or similar facility, or of any intranet or private network, computer system, computer or computing device or similar facility;

   b. Any corruption, destruction, distortion, erasure or other loss or damage to data, coding, program, or software;

   c. Loss of use or functionality whether partial or entire of data, coding, program, software, any computer or computer system or other device and any ensuing liability or failure of the **Insured** to conduct business;

   all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage at the **insured project**;

7. Error or omission in machine programming or instructions of **electronic data**, including, loss attributable to program design constraints, networking compatibility and original business software; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage at the **insured project**;

8. Lack of incoming electricity, fuel, water, gas, steam, refrigeration, or outgoing sewerage, or incoming or outgoing data, voice or video service; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage, but only if: (1) such ensuing loss or damage is caused by a lack of incoming electricity, fuel, water, gas, steam or refrigeration from an offsite service provider and (2) such ensuing loss or damage is to equipment or machinery that is part of the **permanent works** of the **insured project** and is not operational at the time of the loss. This exception does not apply to **hot testing**.

9. Any loss or damage arising out of **hot testing**;

10. Infidelity, dishonesty or fraudulent activity of any **Insured** or any of the **Insured's** proprietors, partners, officers, directors, trustees, employees or others with whom the property is entrusted (other than a carrier for hire). However, a willful act of destruction by the

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 14 of 25 |
|---|---|---|

**Insured's** employee without the knowledge of any of the **Insured's** proprietors, partners, officers, directors or trustees is covered;

11. Any act that: (1) causes corruption, erasure or deletion of **electronic data**, including the rendering of any equipment or machinery useless, or (2) prevents access to or use of computer hardware, software or other components thereof; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage.

12. **Fungus, mold or spore**; or any spores or toxins created or produced by or emanating from such **fungus, mold or spore**; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage;

13. Confiscation, seizure, appropriation, expropriation, nationalization, requisition for use or title, or willful destruction by any government, sovereign power, civil authority or military authority (de jure or de facto); or

14. Loss or damage arising out of any **covered cause of loss** or Additional Coverages for which the words NOT COVERED or for which an amount or number of days is not shown in Item **10.** of the Declarations.

B. Except as otherwise provided under the Additional Coverages (and in such event, only to the extent provided therein), the Company will not pay for loss or damage caused by or attributable to any of the following:

1. Indirect, remote or consequential loss or damage;

2. Delay, loss of market or loss of use;

3. Delay in completion of the **insured project**, unless specifically provided by endorsement and then only to the extent provided therein;

4. Any business interruption loss, **extra expense**, **owner's extra expense**, expediting expenses, expenses to reduce loss, loss of rental income and other economic losses;

5. Liquidated damages, performance penalties, penalties for non-completion, late completion or non-compliance with contract conditions;

6. Loss, damage, costs, expenses, fines or penalties incurred or sustained by or imposed on the **Insured** at the order of any government agency, court or other authority arising from any cause whatsoever;

7. Loss, damage, or expense covered under any written or implied guarantee or warranty by any contractor, manufacturer or supplier, whether or not such contractor, manufacturer or supplier is an **Insured**, but only to the extent such loss, damage, or expense should have been recovered under such written or implied guarantee or warranty;

8. Unexplained or mysterious disappearance, loss or shortage disclosed on taking inventory;

9. Normal: subsidence, heave, settling, cracking, expansion, contraction or shrinkage of walls, floors, ceilings, buildings, foundations, patios, walkways, driveways or pavements, all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage;

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 15 of 25 |

**10. a.** Faulty workmanship, material, construction or installation from any cause; or

**b.** Any fault, defect, error, deficiency or omission in any design, plans, or specifications;

all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage; or

**11.** Wear and tear, erosion, inherent vice, latent defect, corrosion, rust, wet or dry rot, evaporation, shrinkage, or change in color, flavor, texture or finish, extremes or changes of temperature damage, or changes in relative humidity damage, all whether atmospheric or not or gradual deterioration, all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, the Company shall cover only such ensuing loss or damage.

### SECTION VI – CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT

**A.  ABANDONMENT**

There can be no abandonment of any property to the Company.

**B.  ADJUSTMENT OF LOSSES**

Loss or damage will be adjusted with the **Named Insured** and shall be payable as directed in writing by the **Named Insured** subject to: mortgagee; lender; or similar interests; as their interests may appear as shown on the Certificates of Insurance or any endorsement attached to and forming a part of the Policy.  The effective date of any interests will be the issue date of the Certificate of Insurance unless a later date is specified on the Certificate of Insurance.

Notwithstanding the foregoing, if the Company is prohibited from adjusting and making payment in accordance with the preceding paragraph, the Company will adjust and make payment to the **Named Insured**.

**C.  APPRAISAL**

If the **Named Insured** and the Company disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss.  In such event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire.  If the appraisers cannot agree on an umpire, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the replacement cost and actual cash value of the property and amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding.  Each party will:

**1.** Pay its chosen appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, it is without prejudice to the Company's rights under the terms and conditions of this Policy and the Company's right to deny the claim in whole or in part.

**D.  PARTIAL PAYMENT OF LOSS**

In the event the amount of loss or damage for which the Company is liable is determined by the Company to be in excess of the applicable deductible, the Company may advance partial payment(s) with respect to any claim, subject to all other terms and conditions of this Policy.

**E.  REQUIREMENTS IN CASE OF LOSS OR DAMAGE**

In case of loss or damage, the **Insured** shall:

1.  Give written notice of any loss or damage to the Company as soon as practicable after the date of such loss or damage;

2.  Promptly contact the applicable authority having jurisdiction in the event a law has been broken, and promptly file a written report with such authority;

3.  Protect the property from further loss or damage;

4.  Separate the damaged and undamaged property;

5.  Maintain such property in the best possible order;

6.  Furnish a complete inventory of the lost, destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed;

7.  Allow the Company to examine and audit the **Insured's** books and records at any reasonable time for the purpose of investigating or verifying any claim;

8.  Furnish all other documents or insurance policies that the Company may reasonably require;

9.  Allow the Company to access and inspect any damaged or undamaged property;

10. Submit to examination under oath at such times as the Company reasonably may require concerning any matter relating to this insurance or any claim;

11. Cooperate with the Company in all aspects of any claim and provide the Company with any additional information that the Company requires; and

12. Provide the Company with a proof of loss, signed and sworn to by the **Named Insured** as soon as practicable, but in no event more than 90 days after a loss, stating the **Insured's** knowledge and belief as to the following:

    a.  The time and origin of the loss;

    b.  The **Insured's** interest and the interest of all others in the property;

    c.  The value of each item thereof determined in accordance with the VALUATION Section and the amount of loss thereto and all encumbrances thereon;

    d.  All other contracts of insurance, whether collectible or not, covering any of the **covered property**; and

    e.  Any changes in the title, use, occupancy, location, possession or exposures of the **covered property** subsequent to the issuance of this Policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss, whether or not it then stood on leased ground.

**F.  SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable shall be payable within 30 days after proof of loss, as herein required, is received and agreed to by the Company or the amount of

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 17 of 25 |
|---|---|---|

loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

The Company shall have the option to take all or any part of the property at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing the **Named Insured** with notice of the Company's intention to do so within 60 days after the Company's receipt of the proof of loss herein required.

## G.  SUBROGATION

The Company may require from the **Insured** an assignment of all rights of recovery against any party for loss to the extent that payment is made by the Company.  However, the **Insured** has the right to waive subrogation, provided such waiver is entered into by the **Insured** in writing prior to the loss.   The **Insured** will do nothing after a loss to prejudice such rights of subrogation.

Notwithstanding the foregoing, it is a condition of this Policy that the Company shall be subrogated to all the **Insured's** rights of recovery against:

1.  Any architect or engineer, whether named as an **Insured** or not, for any loss or damage arising out of the performance of professional services in their capacity as such and caused by an error, omission, deficiency or act of the architect or engineer, by any person employed by them or by any others for whose acts they are legally liable; and

2.  Any manufacturer or supplier of machinery, equipment or other property, whether named as an **Insured** or not, for the cost of making good any loss or damage regardless of any guarantee or warranty, whether express or implied.

Any recovery by the Company as a result of subrogation proceedings arising out of an **occurrence**, after expenses, including the Company's legal fees, incurred in such subrogation proceedings are deducted, shall accrue to the **Insured** in the proportion that the deductible amount and/or any provable uninsured loss amount bears to the entire provable loss amount.

The **Insured** will cooperate with the Company and, upon the Company's request and expense will:

1.  Attend hearings and trials;

2.  Assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and conducting suits.

## H.  SUIT AGAINST COMPANY

No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless the same be commenced within 24 months immediately after the date of the loss, provided however, that if under the laws of the applicable jurisdiction such time limitation is unenforceable, then the period within which such action or proceeding must be commenced shall be the shortest period of time permitted by the laws of such jurisdiction.

## SECTION VII – GENERAL CONDITIONS

### A. ASSIGNMENT

The **Insured** may not assign this Policy without the Company's prior written consent.

### B. CANCELLATION

This Policy may be cancelled by the **Named Insured** at any time by surrendering this Policy to the Company or by mailing or delivering to the Company written notice stating when thereafter such cancellation shall take effect.  The Company may cancel this Policy by giving the **Named Insured** written notice stating when, not less than 90 days thereafter, or 10 days thereafter for nonpayment of premium, such cancellation shall be effective.

The Company shall pay return premium to the **Named Insured** on a pro-rata basis if the Company cancels and on a short rate basis (meaning 90% of the unearned premium) if the **Named Insured** cancels.

Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If any specific state amendatory endorsement provides less than 90 days notice of cancellation for reasons other than nonpayment of premium, where permitted by law, the Company shall provide the 90 days notice set forth herein.

### C. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Policy is voidable by the Company if any **Insured**, whether before or after a loss, has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or has committed any act of fraud, attempted fraud or false swearing concerning any matter relating to this insurance or the subject thereof.

### D. CONFORMANCE TO STATUTE

Any provisions of this Policy which are in conflict with statutes applicable to this Policy are understood, declared and acknowledged by the Company to be amended to conform to such statutes.

### E. ECONOMIC AND TRADE SANCTIONS

The Company shall not be deemed to provide cover and the Company shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose this Company, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or the United States of America.

### F. ERRORS OR OMISSIONS

No unintentional errors or omissions in any information required to be reported to the Company will prejudice the **Insured's** rights of recovery, but the **Insured** shall report the correct information to the Company as soon as practicable when discovered and the **Insured** shall pay any additional premium when due.

**G. GOVERNING LAW**

Any interpretation of this Policy or issue relating to its construction, validity or operation shall be determined by the laws of the United States or of any applicable state in the United States. The parties will submit to the exclusive jurisdiction of the applicable court within the United States.

**H. INCREASE IN HAZARD**

If the circumstances in which this insurance was entered into shall be altered or if the risk shall be materially increased, the **Insured** shall as soon as possible give notice in writing to the Company. In the event there is a material increase in the risk, the Company reserves the right to change the terms or conditions of this Policy or cancel this Policy (if allowable by law).

**I. INSPECTION**

The Company shall be permitted, but not obligated, to inspect **covered property** at all reasonable times during the **policy period**. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute any undertaking by the Company, on behalf of or for the benefit of the **Insured** or others, to determine or warrant that such **covered property** is safe or healthful or that such **covered property** complies with any law, rule, regulation, code, engineering or industry standard.

**J. LIBERALIZATION**

If the Company adopts a standard revision to the Company's Completed Value Builders Risk Construction Performance Policy that would broaden the coverage under this Policy within 45 days prior to the inception date of this Policy or during the **policy period** of this Policy and if no additional premium is required for such revision, then the broadened coverage will immediately apply to this Policy.

**K. NAMED INSURED**

If this Policy insures more than one person or organization, the **Named Insured** is authorized to act on behalf of all other **Insureds** with respect to such **Insureds'** rights, obligations, and duties under this Policy including, but not limited to, the giving and receiving of notices under this Policy. Payment of loss or return premium under this Policy to the **Named Insured** shall satisfy the Company's obligations with respect to all **Insureds** under this Policy.

**L. NO BENEFIT TO BAILEE**

No person or organization, other than the **Insured**, having custody of **covered property** will benefit from this insurance.

**M. OTHER INSURANCE**

1. An **Insured** may have other insurance. If such **Insured** does have other insurance, the Company will pay its share of the covered loss or damage. Subject to the exceptions as set forth in **2.** below, the Company's share is the proportion that the applicable limit/sublimit of liability under this Policy bears to the limits/sublimits of liability of all insurance covering the loss or damage.

    **2.** If there is other insurance as described below, the Company will pay under this Policy only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether the **Insured** can collect on it or not:

        **a.** The property covered under this Policy is also covered under another policy, in which such property is more specifically described; or

        **b.** The other insurance covers the **Insured's** interest or the interest of others in property which the **Insured** does not own.

## N.  PAIR AND SET

In the event of loss or damage to any part of **covered property** consisting, when complete for use, of several parts, the Company will only be liable for the value of the part lost or damaged.

## O.  PREMIUM ADJUSTMENT

    **1. During the Term of the Policy:**

        **a.** At the time of any extension of this Policy or if the scope or value of the **insured project** changes beyond the percentage set forth in the Margin Clause shown on the Declarations, the **Named Insured** shall report in writing to the Company the **adjusted total project value** as of the date of such extension or change order.

        **b.** The adjusted premium shall be calculated by applying the rates as shown in Item **8.** of Declarations used for the purpose of computing the Deposit Premiums to the amended term of coverage and the **adjusted total project value.**

        **c.** If the adjusted premium so calculated differs from the Total Deposit Premium shown in Item **8.** of the Declarations (or the previous revision of the Total Deposit Premium), such difference shall be due and payable to the Company or the **Named Insured**, whichever is applicable.

    **2. Upon Expiration or Cancellation of the Policy:**

        **a.** At the time of expiration or cancellation of this Policy, the **Named Insured** shall report in writing to the Company the **adjusted total project value** as of the Expiration Date or the effective date of cancellation.

        **b.** The final earned premium for this Policy shall be calculated by applying the rates as shown in Item **8.** of Declarations used for the purpose of computing the Deposit Premiums to the actual term of coverage and the **adjusted total project value**.

        **c.** If the premium so calculated differs from the Total Deposit Premium shown in Item **8.** of the Declarations (or the previous revision of the Total Deposit Premium), such difference shall be due and payable to the **Named Insured** or the Company, whichever is applicable.

## P.  PRESERVATION OF PROPERTY

In case of imminent loss or damage, the **Insured** must make reasonable efforts to protect property from such loss or damage.

## Q.  RECOVERY FROM OTHER PARTIES

No loss or damage in whole or in part shall be paid hereunder to the extent the **Insured** has collected such loss or damage from others.

**R. SALVAGE AND RECOVERIES**

All salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this Policy, shall reduce the loss accordingly.

**S. TITLES**

The titles in this Policy are solely for reference and shall not in any way affect the provisions to which they relate.

## SECTION VIII – DEFINITIONS

1. **Additional Insured(s)** means those **Insureds** shown in Item **2.** of the Declarations.

2. **Adjusted total project value** means the **total project value** that may be adjusted during the **insured project** or if previously adjusted, any adjustments to the revised **total project value**.

3. **Building or other system(s)** means:

   **a.** Equipment and machinery; and/or

   **b.** Manufacturing or structural system(s), such as a HVAC, instrumentation, electrical, mechanical or control system(s);

   that are incorporated into the **insured project**.

4. **Collapse** means an abrupt falling down or caving in of a building or structure or any part of a building or structure.

5. **Contract documents** means the contract(s) or agreement(s), as may be amended, on file with the **Insured** for the **insured project**.

6. **Coverage territory** means the coverage territory as shown in Item **6.** of the Declarations.

7. **Covered cause(s) of loss** means a peril or other type of loss, not otherwise excluded under this Policy.

8. **Covered property** means property as described in the COVERED PROPERTY Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section which is not otherwise excluded under the PROPERTY NOT COVERED Section, for which the **Insured** is contractually responsible and the value of which has been included in the **total project value**.

9. **Electronic data** means data, messages, information, coding, programs, instructions or software in a form suitable for communications, storage, or processing by electronic, electromechanical, electromagnetic data processing or electronically controlled production equipment. **Electronic data** does not include electronic storage media.

10. **Existing property** means existing buildings and/or permanent structures, including equipment and apparatus used to maintain or service the buildings or structures, that existed prior to the inception date of this Policy and is located at the **insured project. Existing property** does not include personal property, any property located outside of the existing buildings and/or permanent structures, and/or any underground utilities of any kind or description.

11. **Extra expense** means the excess costs over and above the total costs that would normally have been incurred to continue the scheduled progress of the undamaged work in the absence of such loss or damage, including:

    **a.** Labor, supervision, management and administration costs;

    **b.** Equipment rental, temporary use of property;

    **c.** Emergency expenses, additional security; and

    **d.** Demobilization and remobilization of equipment and facilities;

all when necessarily incurred to reduce time delays in the contract schedule.

12. **Fine arts** means paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; porcelains; and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft and **money**.

13. **Fungus, mold or spore** means:

    **a.** **Fungus** including, but not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including **mold**, yeast, rusts, mildews, smuts and mushrooms;

    **b.** **Mold** including, but not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and **fungi** that produce **mold**; and/or

    **c.** **Spore** including, but not limited to, any dormant or reproductive body produced by or arising or emanating out of any **fungus**, **mold**, mildew, plants, organisms or microorganisms.

14. **Insured(s)** means the **Named Insured(s)** and the **Additional Insured(s)**.

15. **Insured project** means the construction project as described in Item **5.** of the Declarations, for which values have been reported and are included in the **total project value**.

16. **Malicious code** means any unauthorized code designed to cause corruption, erasure or alteration of **electronic data.**

17. **Money** means:

    **a.** Currency, coins, bank notes, bullion, traveler checks, registered checks, money orders; and

    **b.** Negotiable and non negotiable instruments or contracts representing money including: tokens, tickets, revenue stamps and other stamps (whether represented by actual stamps or unused value in a meter), and evidence of debt issued in connection with credit card or charge cards that are issued to the **Insured**.

18. **Named Insured** means the Named Insured(s) shown in Item **1.** of the Declarations.

19. **Occurrence** means any one accident, loss, disaster, casualty, incident or series of accidents, losses, disasters, casualties or incidents, including all resultant or concomitant insured losses, not otherwise excluded by this Policy and with respect to:

    **a.** **Terrorism** (to the extent **terrorism** is covered), arises out of the same or related purpose or cause; or

| 125687 (5/17) | ©American International Group, Inc.<br>All Rights Reserved. | Page 23 of 25 |
|---|---|---|

**b.** Covered perils other than **terrorism**, arises out of a single event or originating cause.

The **occurrence** must occur during the **policy period**.

When the term applies to loss or losses from the perils of **windstorm or hail**, **named storm**, **riot, strike or civil commotion**, **vandalism and malicious mischief**, **earth movement**, **flood** or **terrorism,** to the extent any such peril(s) are covered, all losses arising from such peril(s) occurring during a continuous period of 72 hours shall be deemed to be a single **occurrence**.  The **Named Insured** may elect the moment at which the 72 hour period shall be deemed to have commenced, which shall not be earlier than the time when the first loss occurs to the **covered property**, but no two such 72 hour periods shall overlap.

If the **occurrence** commences during this **policy period**, then the Company shall treat the entire **occurrence** as occurring during this **policy period**.

20. **Owner's extra expense** means the following expenses:

    **a.**  Advertising and marketing expense;

    **b.**  Legal and accounting fees;

    **c.**  License and permit fees; and

    **d.**  Project management fees.

21. **Plans and drawings** means plans, blueprints, drawings, renderings, specifications or other contract documents and models (whether in physical or **electronic data** format) for the **insured project** stored anywhere in the world.  Such **plans and drawings** do not include machine programing instructions including, Building Information Modelling ("BIM").

22. **Policy Limit** means the limit of liability shown in Item **9.** of the Declarations.

23. **Policy period** means the policy period as described in Item **4.A.** and Item **4.B.** of the Declarations.

24. **Pollutants or contaminants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances. Waste includes materials to be recycled, reconditioned or reclaimed.  **Pollutants or contaminants** do not include **fungus, mold or spore**.

25. **Processing water** means water used directly in the **Insured's** business process that is contained within any enclosed tank, piping system or any other processing equipment.

26. **Project owner(s)** means the project owner(s) shown in Item **5.** of the Declarations.

27. **Riot, strike or civil commotion** means riot or civil commotion including, but not limited to:

    **a.**  Acts of striking employees while occupying an **insured project**; and

    **b.**  Pilferage or looting occurring at the time and place of a riot or civil commotion.

28. **Total project value** means the total value of **permanent works** (including **landscaping materials**), **temporary works** and **property of others**; plus labor costs that will be expended to construct the

| 125687 (5/17) | ©American International Group, Inc. All Rights Reserved. | Page 24 of 25 |
| --- | --- | --- |

**insured project**; plus site general conditions, construction management fees, and contractor's profit and overhead as stated in the **contract documents** as the "total project value", "total contract value", or other similar description.

29. **Used machinery and equipment** means any mechanical or electrical machine or equipment, including a pressure or non-pressure vessel, which has been previously installed or refurbished or is no longer under a manufacturer's warranty.

30. **Vandalism and malicious mischief** means willful and malicious damage to, or destruction of, **covered property**.

31. **Windstorm or hail** means the direct action of wind or the direct action of hail, whether accompanied by wind or not.  However, **windstorm or hail** does not mean:

   a. Loss or damage caused by or resulting from frost or cold weather, ice (other than hail), snow or sleet, whether driven by wind or not;

   b. Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters; or

   c. Loss or damage caused when weight of snow, rainwater, ice or sleet is a contributing factor to the fall or **collapse** of a building or structure or any part thereof.

**ENDORSEMENT #001**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## DELAY IN COMPLETION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

I.  **Named Insured and Address:**
    A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
    17901 COLLINS AVENUE SOUTH
    SUNNY ISLES BEACH FL 33160

    All coverage under this Delay in Completion Endorsement shall only be provided to the Named Insured shown above (hereinafter, the **Named Insured** for purposes of this endorsement only).  No coverage shall be provided under this endorsement to any other person or entity.

II.  The coverage provided under this Delay in Completion Endorsement is applicable to the entire **insured project** unless otherwise described below:

    Not Applicable

III.  **Period of Indemnity**:              540 Calendar Days
IV.  **Anticipated Date of Completion:**    South Tower - 07/01/2021
                                            Villa - 12/31/2021

V.  **Deductible Period:**

|  | **Deductible Period** (per **occurrence** unless otherwise stated below) |
|---|---|
| **Standard Deductible** | 30 Calendar Days<br>☒ per **occurrence** or<br>☐ in the Aggregate, no other **Deductible Periods** apply |
| **Earth Movement, Flood** or **Named Storm** | 30 Calendar Days |
| **Cyber Loss** | 30 Calendar Days |
| **Ingress & Egress** | 30 Calendar Days |
| **Order of Civil or Military Authority** | 30 Calendar Days |
| **Service Interruption** | 30 Calendar Days |
| **Hot Testing** | Not Applicable |
| **LEG 3** | 30 Calendar Days |

If two or more deductible amounts provided above apply to a single **occurrence**, the total to be deducted shall be the largest applicable deductible.  The above deductibles are in addition to any applicable deductibles on the Declarations of this Policy.  If the Standard Deductible applies on a per **occurrence** basis, then such deductible shall apply unless a more specific deductible applies.

**VI. Limits of Liability Applicable to this Endorsement**

The following are subject to and not in addition to the **Policy Limit** and all sublimits of liability shown in Item **10.A.** of the Declarations.  The sublimits of liability stated in this endorsement are per **occurrence** unless otherwise stated.

*If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage, then no coverage is provided for that coverage, whether under the Insuring Agreement or any Additional Coverage.  If the words, NOT APPLICABLE are shown, instead of a limit, sublimit amount or number of days, then the Company shall not apply the limit, sublimit amount or number of days.*

| | | |
|---|---|---|
| **A.** | Aggregate Sublimit of liability for all coverage under this endorsement | $44,022,420 |

The following sublimits of liability **VI.B.** through **VI.I.** are subject to **VI.A.** above:

| | | |
|---|---|---|
| **B.** | Loss of **Rental Income** | $NOT COVERED |
| **C.** | Loss of **Gross Earnings** | $NOT COVERED |
| **D.** | **Cyber Loss** | See Item **10.B.7.** of the Declarations |
| **E.** | Ingress & Egress | 15 Calendar Days, subject to maximum of $2,500,000 |
| **F.** | Order of Civil or Military Authority | 15 Calendar Days, subject to maximum of $1,000,000 |
| **G.** | Service Interruption | 15 Calendar Days, subject to maximum of $1,000,000 |
| **H.** | Other:  NOT COVERED | $NOT COVERED |
| **I.** | **Soft Costs/Additional Expenses** | $44,022,420 |

The following sublimits of liability are subject to **VI.I.** above.

| | | |
|---|---|---|
| **1.** | Interim interest expense | $INCLUDED |
| **2.** | Realty taxes/Ground rents | $INCLUDED |
| **3.** | Leasing/Commission expense | $INCLUDED |
| **4.** | Insurance premiums | $INCLUDED |
| **5.** | Advertising and marketing expense | $INCLUDED |
| **6.** | Legal and accounting fees | $INCLUDED |
| **7.** | License and permit fees | $INCLUDED |
| **8.** | Project management fees | $INCLUDED |
| **9.** | Other: Construction Supervision | $INCLUDED |

©**American International Group, Inc.**
**All Rights Reserved.**

| | | |
|---|---|---|
| **10.** | Other: Real State Taxes | $INCLUDED |
| **11.** | Other: Loan Fees and Interest | $INCLUDED |
| **12.** | Other: Sales Deposit & Bond Interest | $INCLUDED |
| **13.** | Other: Project G & A | $INCLUDED |
| **14.** | Other: Soft Cost Contingency | $INCLUDED |

No coverage or Additional Coverage shall be provided unless the **delay(s)** exceeds the **anticipated date of completion** and then such coverage shall only be provided for the **delay(s)** that is/are in excess of such **anticipated date of completion**, subject to the applicable **deductible period.** All covered losses and expenses are subject to the applicable **Policy Limit**, sublimits of liability, **period of indemnity** or calendar days as stated in the above Schedule.

**A.   INSURING AGREEMENT**

    **1.**   Subject to all terms and conditions of this Policy, in the event of:

        **a.**   Direct physical loss of or damage to **covered property, landscaping materials** or **plans and drawings** by a **covered cause of loss**, or

        **b.**   Corruption, erasure or alteration of:

            **i.**   **Electronic data** in the **building or other systems**, due to: (1) the introduction of **malicious code** or (2) a **covered cause of loss**,

            **ii.**   **Plans and drawings** which are stored as **electronic data** due to the introduction of **malicious code**, or

        **c.**   **Building or other systems** that are rendered useless for their intended purpose due to the introduction of **malicious code** which reprograms the software (including firmware) of such **building or other systems**

        (hereinafter, collectively Subsections **1.b.** and **1.c.** are referred to as **cyber loss**), the Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** sustained during the **period of indemnity** as a result of **delay** in completion of the **insured project**, on an actual loss sustained basis.

    **2.**   The Company shall also indemnify the **Named Insured** for reasonable expenses, over and above normal operating expenses, during the **period of indemnity**, that are necessarily incurred for the purpose of reducing any loss covered under this endorsement, but in no event shall the Company be liable for an amount greater than that for which the Company would have been liable had there been no covered **delay**.

**B.   ADDITIONAL COVERAGES**

    **1.   Ingress & Egress**

    The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if ingress to or egress from the **insured project** is prohibited as a result of direct

physical loss or damage by a **covered cause of loss** to property not insured under this Policy, provided that such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with the prohibition of ingress or egress to the **insured project** for the lesser of:

**a.**   The number of calendar days shown for Ingress & Egress in the above Schedule, or

**b.**   Until the ingress or egress is no longer prohibited,

subject to the Ingress & Egress sublimit of liability shown in the above Schedule.

**2.   Order of Civil or Military Authority**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** if an order of civil or military authority prohibits access to the **insured project**, provided that: (1) such order is a result of direct physical loss or damage by a **covered cause of loss** to property not insured under this Policy and (2) such property is located outside of the **insured project**.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

The Company shall only provide coverage for **delay** associated with such order that prohibits access to the **insured project** for the lesser of:

**a.**   The number of calendar days shown for Order of Civil or Military Authority in the above Schedule, or

**b.**   Until access to the **insured project** is no longer prohibited,

subject to the Order of Civil or Military Authority sublimit of liability shown in the above Schedule.

**3.   Service Interruption**

The Company shall indemnify the **Named Insured** for **soft costs/additional expenses**, loss of **rental income** and/or loss of **gross earnings** arising out of **delay** in completion of the **insured project** resulting from the interruption of incoming electricity, steam, gas, fuel or water caused by direct physical loss or damage by a **covered cause of loss** to a service provider's transmission and distribution lines and related plants, substations and equipment located outside of the **insured project**. Notwithstanding the foregoing, the Company will not pay for any interruption intentionally caused by any **Insured** or any service provider.

If a service provider's transmission and distribution lines and related plants, substations and equipment that sustain loss or damage are part of the **insured project** and included in the **total project value**, the Service Interruption sublimit of liability shown in the above Schedule shall not apply, nevertheless the Aggregate Sublimit of Liability for all coverage under this endorsement shown in **VI.A.** above shall apply.

Coverage commences after the expiration of the applicable **deductible period** as shown in the above Schedule.

 ©**American International Group, Inc.**
**All Rights Reserved.**

The Company shall only provide coverage for **delay** associated with the interruption of incoming electricity, steam, gas, fuel, or water to the **insured project** for the lesser of:

**a.** The number of calendar days shown for Service Interruption in the above Schedule, or

**b.** Until such incoming utilities are restored,

subject to the Service Interruption sublimit of liability shown in the above Schedule.

## C.  ADDITIONAL EXCLUSIONS AND LIMITATIONS

In addition to all other exclusions of this Policy, the Company will not be liable under this endorsement for any loss or increase in **delay** caused by, resulting from or arising out of any of the following:

**1.**  The enforcement of any law, ordinance, governmental directive or standard regulating removal, repair, construction or reconstruction of any property;

**2.**  Changes made in the design, plans, specifications or other contract documents in order to effect the repair or replacement of any property;

**3.**  Non-availability of funds;

**4.**  Import, export or customs restrictions and/or regulations;

**5.**  The breach, suspension, lapse or cancellation of or the failure to obtain, maintain or extend any permit, lease, license, contract or purchase orders;

**6.**  The interference by strikers or other persons directly or indirectly with the completion of the **insured project**, including the transportation of property, the construction, rebuilding, repairing or replacing of any property or the occupancy or use of the premises where the **insured project** is located;

**7.**  The failure to use due diligence and dispatch in restoring any property to the condition existing prior to the loss or damage;

**8.**  Any deviation in the **construction schedule** or a revised **construction schedule** except for a deviation that is the result of covered loss or damage;

**9.**  Any disruption in the normal movement of **covered property** unless such **covered property** is damaged by a **covered cause of loss** during **inland transit**;

**10.** Re-erection of any tower or pole crane(s), unless such tower or pole crane is specifically covered under Schedule A of the Contractors' Equipment Endorsement. or

**11.** Loss or damage to that part of the **insured project** which at the time of loss or damage has been put to its intended use or has become operational.

## D.  ADDITIONAL LOSS ADJUSTMENT CONDITIONS

In addition to the conditions set forth in the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section of this Policy, the following additional conditions apply to this endorsement:

1.  Upon written notification of any loss or damage under the terms and conditions of this Policy, the **Insured** shall provide the Company with all applicable **construction schedules** as requested by the Company.

2.  Upon request by the Company, the **Insured** shall make available all other records and information relevant to the determination of any claim for loss, damage and/or expenses or any audit under this endorsement.

3.  In the event of payment under this endorsement, the Company may conduct an audit of the **Named Insured's** records for a reasonable period of time, to be determined by the Company, (typically 12 months) after actual commencement of operations to determine the loss under this endorsement, as well as any expenses incurred by the **Named Insured** related to reducing such loss.  Due consideration shall be given to seasonal patterns, trends, variations or special circumstances which would have affected the business had the **delay** not occurred, so that the amount adjusted shall represent as nearly as may be reasonably practicable the amount which, in the absence of the **delay**, would have been realized.  Any amount saved with respect to labor costs, charges and expenses that have ceased or reduced during the **period of indemnity** and liquidated damages the **Named Insured** is entitled to receive from others, whether collectible or not, shall be deducted from the loss during the **period of indemnity**.

    In the event the amount of loss determined by the audit is less than or exceeds the sum paid by the Company for loss covered under this endorsement during the **period of indemnity**, the difference between the two amounts shall be paid by the Company or to the Company by the **Named Insured**, whichever is applicable.

## E.  ADDITIONAL GENERAL CONDITIONS

In addition to the conditions set forth in the GENERAL CONDITIONS Section of this Policy, the following additional conditions apply to this endorsement:

1.  In the event loss, damage or other circumstances require that the project completion date shown on any critical path, time line, bar chart or other scheduling vehicle is revised to extend such completion date, the **Insured** shall establish a revised **construction schedule** and furnish the same to the Company.  The new date established in such revised **construction schedule** shall become the **anticipated date of completion**.  The Company shall have the right to change the **anticipated date of completion**, even if the **Insured** has failed to provide such revised **construction schedule**.

    There shall be no amendment to the **anticipated date of completion** in the event any critical path, time line, bar chart or other scheduling vehicle is revised to compress or accelerate the **construction schedule**, without the written notice to the Company and endorsement by the Company hereto.

2.  The **Insured** shall take and allow all reasonable measures to minimize the extent of any interference with the **construction schedule** so as to avoid or diminish any potential **delay**. The **Insured** shall begin normal operations as soon as practicable.

## F.  ADDITIONAL DEFINITIONS

The definitions of this Policy apply to this endorsement.  However, the following additional definitions apply to this endorsement and supersede any similar definitions of this Policy to the contrary.

1.  **Anticipated date of completion** means: (1) the date as shown in the above Schedule as the Anticipated Date of Completion or (2) the revised **anticipated date of completion** in

©**American International Group, Inc.**
**All Rights Reserved.**

accordance with the Subsection **E.1.** of the Additional General Conditions Subsection of this endorsement.  For calculation of loss under this endorsement, the Company shall use the applicable **anticipated date of completion** at the time of the loss or damage.

2.  **Construction schedule** means the schedule utilized in the construction management program through software that shows the construction operations, the times for starting and completion of operations, the period of the operations, the interrelationships between the operations and the critical path that identifies the critical operations.

3.  **Deductible period** means the applicable number of calendar days shown in Item **V.** of the above Schedule beginning with the **anticipated date of completion**.  Losses are only payable in excess of the applicable **deductible period**.

4.  **Delay** means the period of time between the **anticipated date of completion** and the actual date on which occupancy or commercial service can commence with respect to the entire **insured project** or the **insured project** as described in Item **II.** of the Schedule, whichever is applicable, with the exercise of due diligence and dispatch.

5.  **Gross earnings** means gross revenues from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

6.  **Insured project** means the entire **insured project** or the part of the **insured project** as identified in Item **II.** of the above Schedule.  The words, **insured project**, also include the definition in the Completed Value Builders Risk Policy.

7.  **Period of indemnity** means the number of calendar days for which coverage is provided under this endorsement, regardless of the number of **occurrences**, not to exceed the number of days shown in Item **III.** of the above Schedule.  For each **occurrence**, such calendar days or remaining calendar days shall commence upon the expiration of the applicable **deductible period**.  The **period of indemnity** shall not be limited by the end of the **policy period**.

8.  **Rental income** means revenues from rentals and leases from the planned operation of the **insured project** upon occupancy or commercial service which are not realized during the **period of indemnity** and which would have been earned by the **Named Insured** if the **delay** had not occurred, less charges and expenses which do not necessarily continue.

9.  **Soft costs/additional expenses** means such expenses as shown in Item **VI.I.1.** through **VI.I.9.** of the above Schedule, inclusive, in relation to the **insured project**.

All other terms and conditions of the Policy remain the same.

©American International Group, Inc.<br>All Rights Reserved.

ENDORSEMENT #002

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## EXTENSION FOR REPAIRING OR REPLACING DEFECTIVE COVERED PROPERTY ("LEG3") ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

**SCHEDULE**

Sublimits of Liability and Deductibles (per **occurrence**):

**A.** The following sublimit of liability is added to Item **10.B.** of the Declarations:

Sublimit for repairing or replacing faulty or defective **covered property**        $433,500,000

**B.** The following deductible is added to Item **11.** of Declarations:

Deductible applicable to repairing or replacing faulty or defective        $100,000
**covered property**

The above deductible shall apply in addition to the applicable deductible(s) in Item **11.A.** through **11.G.**, inclusive, as shown on the Declarations.

**C.** The following sublimit of liability is added as Item **VI.J.** to the Delay In Completion Endorsement:

Provided that Delay In Completion coverage is provided under this        $44,022,420
Policy, the Sublimit for Delay in Completion resulting from repair or
replacement of faulty or defective **covered property**

The **Deductible Period** shown in the Delay in Completion Endorsement applies to the above coverage in this Subsection **C.**

Additional Premium:    $70,055
_____

In consideration of the Additional Premium shown in the above Schedule, Exclusion **B.10.** of the PERILS EXCLUDED Section is deleted in its entirety and replaced with the following:

**10. a.** Faulty workmanship, material, construction or installation from any cause; or

**b.** Any fault, defect, error, deficiency or omission in any design, plans, or specifications,

all unless direct physical loss or damage not otherwise excluded by this Policy ensues.  If direct physical loss or damage not otherwise excluded by this Policy ensues, then the Company shall pay for the following only:

**a.** Such ensuing direct physical loss or damage to **covered property**, and/or

**b.** Subject to the sublimit(s) of liability shown in the above Schedule, repairing or replacing (whichever is less) with like kind and quality at the time and place of the loss the damaged part of the faulty or defective **covered property**.

| 125699 (10/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 1 of 2 |
|---|---|---|

However, in no event shall the Company pay any loss, cost, damage or expense to: (1) improve the original workmanship, materials, construction, installation, design, plans or specifications or (2) redesign any design, plans or specifications.

No portion of the **covered property** shall be regarded as damaged solely by virtue of the existence of: (1) any faulty workmanship, material, construction or installation, or (2) any fault, defect, error, deficiency or omission in any design, plans, or specifications.

NOTICE:   THIS ENDORSEMENT IS BASED UPON LEG 3 PROVISIONS, BUT MAY DIFFER FROM SUCH CURRENT OR PRIOR LEG 3 PROVISIONS.

All other terms and conditions of the Policy remain the same.

## ENDORSEMENT #003

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## LENDER LOSS PAYEE OR LOSS PAYEE ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

### SCHEDULE

**Lender Loss Payee or Loss Payee:**
Bank OZK, its successors and assigns, as their interests may appear
625 Court Street
Clearwater, FL 33756

_____

1. Subject to the terms and conditions of this Policy, the Company will not pay any Lender Loss Payee or Loss Payee more than its financial interest in: (1) **covered property** which is part of the **insured project** or (2) **existing property** (but only if coverage for **existing property** is provided by endorsement) (hereinafter, (1) and (2) are collectively referred to as **covered property**).

2. Any Lender Loss Payee or Loss Payee shown in the above Schedule is a creditor, including a Lender Loss Payee or trustee, whose interest in the **covered property** is established by such written instruments as:

   a. Warehouse receipts;

   b. A contract for deed;

   c. Bills of lading;

   d. Financing statements;

   e. **Contract documents**; or

   f. Mortgages, deeds of trust, or security agreements.

3. For **covered property** for which both the **Insured** and a Lender Loss Payee or Loss Payee have an insurable interest:

   a. The Company will pay for covered loss or damage to each Lender Loss Payee or Loss Payee in their order of precedence, as interests may appear.

   b. The Lender Loss Payee or Loss Payee has the right to receive loss payment even if the Lender Loss Payee or Loss Payee has started foreclosure or similar action on the **covered property**.

   c. If the Company denies the **Insured's** claim because of the **Insured's** acts or because the **Insured** has failed to comply with the terms of this Policy, the Lender Loss Payee or Loss Payee shall still have the right to receive loss payment, if the Lender Loss Payee or Loss Payee:

**(1)** Pays any premium due under this Policy at the Company's request if the **Named Insured** has failed to do so;

**(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from the Company of the **Insured's** failure to do so; and

**(3)** Has notified the Company of any change in ownership, occupancy or substantial change in risk known to the Lender Loss Payee or Loss Payee.

All of the terms of this Policy will then apply directly to the Lender Loss Payee or Loss Payee.

**d.** If the Company pays the Lender Loss Payee or Loss Payee for any loss or damage and denies payment to the **Insured** because of the **Insured's** acts or because the **Insured** has failed to comply with the terms of this Policy:

**(1)** The Lender Loss Payee's or Loss Payee's rights will be transferred to the Company to the extent of the amount of the Company's payment; and

**(2)** The Lender Loss Payee or Loss Payee's rights to recover the remaining amount of the Lender Loss Payee or Loss Payee's claim will not be impaired.

At the Company's option, the Company may pay to the Lender Loss Payee or Loss Payee the whole principal on the debt plus any accrued interest.  In this event, the **Insured** will pay the **Insured's** remaining debt to the Company.

**e.** If the Company cancels this Policy, the Company will give written notice to the Lender Loss Payee or Loss Payee at least:

**(1)** 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if the Company cancels for any other reason.

All other terms and conditions of the Policy remain the same.

ENDORSEMENT #004

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## PILING, SHEET PILING & CAISSON LIMITATION ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

In addition to all other exclusions of the Policy, the Company shall not pay any costs or expenses for:

1. Replacing, repairing, realigning or rectifying casings, piles, sheet piles or caissons which are misplaced, misaligned, jammed, abandoned or damaged during installation, extraction or construction;

2. Replacing, repairing, realigning or rectifying casings, piles, sheet piles or caissons which have become obstructed by: (a) jammed or damaged piling equipment or (b) jammed or damaged casings;

3. Rectifying defective, disconnected or declutched piling, sheet piles or caissons;

4. Rectifying any leakage of any kind or infiltration of any material;

5. Filling voids or replacing lost bentonite;

6. Replacing, repairing, realigning or rectifying profiles and dimensions; or

7. Failure to reach design load bearing capacity or to pass any load bearing test.  No coverage is provided for any loss or damage as a result of any load bearing test, notwithstanding any other provision of this endorsement to the contrary.

However, this endorsement shall not apply:

1. When any of the foregoing are the result of direct physical loss of or damage to other **covered property**, not otherwise excluded by this Policy; or

2. To direct physical loss of or damage to other **covered property** which results from any of the foregoing.

All other terms and conditions of the Policy remain the same.

| 125703 (5/17) | ©**American International Group, Inc.**<br>**All Rights Reserved.** | Page 1 of 1 |
| --- | --- | --- |

**ENDORSEMENT #005**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## POLICY CHANGES ENDORSEMENT

The following item(s):

| | | | |
|---|---|---|---|
| ☐ | Insured's Name | ☐ | Insured's Mailing Address |
| ☐ | Policy Number | ☐ | Company |
| ☐ | Effective/Expiration Date | ☐ | Insured's Legal Status/Business of Insured |
| ☐ | Payment Plan | ☐ | Premium Determination |
| ☐ | Additional Interested Parties | ☐ | Coverage Forms and Endorsements |
| ☐ | Limits/Exposures | ☐ | Deductibles/Waiting Periods |
| ☐ | Covered Property/Location Description | ☐ | Additional Location(s) |
| ☐ | Underlying Insurance | ☒ | Special Terms and Conditions |

is (are) changed to read **{See Additional Page(s)}:**

The above amendments result in a change in the premium as follows:

| ☒ | **NO CHANGES** | ☐ | **ADDITIONAL PREMIUM** | **RETURN PREMIUM** |
|---|---|---|---|---|
| | | | $ | $ |

Includes copyrighted material of Insurance Services Office, Inc., with its permission.  All rights reserved.

**POLICY CHANGES ENDORSEMENT DESCRIPTION**

**FLOOD AND NAMED STORM AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided by the Policy:

I. Subsection 2. of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and is replaced with the following:

2. Flood, which means, whether natural or manmade, flood waters, surface water, waves, tide or tidal water (other than storm surge or storm tide), overflow or rupture of a dam, levy, dike or other surface containment structure, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not.  A tsunami shall not be considered a flood.

II. Subsection 4. of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is deleted in its entirety and is replaced with the following:

4. Named storm, which means:

a A storm that, at any time, has been declared by the United States National Weather Service or another meteorological authority to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression, including any status or designation change with respect to such storm; and

b. Storm surge and storm tide, or the spray therefrom, all whether: (1) driven by wind or not or (2) related to a storm described in Subsection 4.a. above or not.

**ENDORSEMENT #006**

**This endorsement, effective 12:01 A.M.,** 12/14/2018
**Forms a part of Policy No.:** 043820532
**Issued to:** A3 DEVELOPMENT LLC, LPLA PARTNERS, LP, THE TRUMP GROUP
**By:** NEW HAMPSHIRE INSURANCE COMPANY

## FLORIDA CANCELLATION/NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy, and 2) "you", "your", "named Insured" and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

It is hereby agreed and understood that the cancellation provision of this policy is to be deleted in its entirety and to be replaced with the following:

A.    The Insured shown in the Declarations may cancel this policy by mailing or delivering to the Insurer advance written notice of cancellation.

B.1.    Cancellation for Policies in Effect Ninety (90) Days or Less

If this policy has been in effect ninety (90) days or less the Insurer may cancel this policy by mailing or delivering to the Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

(a)    Ten (10) days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or

(b)    Twenty (20) days before the effective date of cancellation if the Insurer cancels for any other reason, except the Insurer may cancel immediately if there has been:

1.    A material misstatement or misrepresentation; or
2.    A failure to comply with underwriting requirements established by the Insurer.

B.2.    Cancellation for Policies in Effect for More Than Ninety (90) Days

If this policy has been in effect for more than ninety (90) days the Insurer may cancel this policy only for one or more of the following reasons:

(a)    Nonpayment of premium;

(b)    The policy was obtained by a material misstatement;

(c)    There has been a failure to comply with underwriting requirements established by us within ninety (90) days of the date of effectuation of coverage;

(d)    There has been a substantial change in the risk covered by the policy; or

(e)    The cancellation is for all insureds under such policies for a given class of insureds.

If the Insurer cancels this policy for any of these reasons, the Insurer will mail or deliver to the Named Insured written notice of cancellation, accompanied by the reasons for the cancellation at least:

1.    Ten (10) days before the effective date of cancellation if cancellation is for the reason stated in B.2.(a) above; or

2.     Forty-five (45) days before the effective date of cancellation if cancellation is for the reasons stated in B.2.(b), (c), (d) or (e) above.

3.     One hundred twenty days (120) before the effective date of cancellation of a commercial residential property insurance policy if cancellation is for the reasons stated in B.2.(b),(c),(d) or (e) above.

B.3.   If this policy is cancelled, the Insurer will send the Named Insured any premium refund due. If the Insurer cancels, the refund will be pro rata. If the Named Insured cancels, the refund may be less than pro rata, however, such refund will not be less than 90% of the pro rata unearned premium. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will mail the refund within 15 working days after the date cancellation takes effect.

It is hereby understood that the Non-renewal provision of this policy is deleted and replaced with the following:

C.1.   Non-Renewal

(a)     If the Insurer decides not to renew this policy the Insurer will mail or deliver to the Insured written notice of nonrenewal, accompanied by the reason for nonrenewal, at least forty-five (45) days prior to the expiration of this policy.   Written notice of nonrenewal will be provided at least one hundred twenty (120) days prior to the expiration of a commercial residential property insurance policy.

(b)     Any notice of nonrenewal will be mailed or delivered to the Insured's last mailing address known to the Insurer.   If notice is mailed, proof of mailing will be sufficient proof of notice.

C.2.   Renewal

The Insurer shall give the named insured at least forty-five (45) days advance written notice of the renewal premium.

**ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS OF THE POLICY REMAIN THE SAME.**

# FLORIDA STATE AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided by the Policy.

The following changes apply only to locations covered by the Policy that are in the State of Florida.

**A.** The SETTLEMENT OF CLAIMS Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section is deleted in its entirety and replaced by the following:

**SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable shall be payable:

**1.** Within 20 days after proof of loss, as herein required, is received and agreed to by the Company; or

**2.** Within 30 days after the Company receives the proof of loss and:

    **a.** There is an entry of a final judgment; or

    **b.** The amount of loss is determined by appraisal in accordance with the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

**3.** Within 60 days of receiving notice of claim, unless the Company denies the claim during that time or factors beyond the Company's control reasonably prevent such payment. If a portion of the claim is denied, then the 60-day time period for payment of claim relates to the portion of the claim that is not denied.

    Subsection **3**. applies only to the following:

    **a.** A claim under a Policy covering residential property, if such property is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy; or

    **b.** A claim for building coverage, if such property is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, if the structure is 10,000 square feet or less and the Policy covers only locations in Florida.

    The Company shall have the option to take all, or any part of the structure at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, upon providing the **Named Insured** with notice of the Company's intention to do so within 60 days after the Company's receipt of the proof of loss herein required.

**B.** The SUIT AGAINST COMPANY Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section is deleted in its entirety and replaced by the following:

**SUIT AGAINST COMPANY**

No one may bring a legal action against the Company under this Policy unless:

**1.** There has been full compliance with all of the terms of this Policy; and

**2.** Legal action against the Company involving direct physical loss or damage to property must be brought within 5 years from the date the loss occurs.

**C.** If a building is covered as **existing property** under Damage to Existing Property Endorsement, attached to and forming part of this Policy, then with respect to such a building, Subsection **e.** of Subsection **1.** Earth movement of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY  Section is deleted in its entirety and replaced with the following :

   **e.** Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, and subsidence.

**D.** If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then with respect to such a building, Subsection  **1.**  Earth movement of the SPECIFIED COVERED CAUSES OF LOSS Subsection of the INSURING AGREEMENT AND COVERED PROPERTY Section is amended to include**:**

   **Earth movement** does not include **sinkhole loss** or **catastrophic ground cover collapse.**

**E.  SINKHOLE LOSS AND CATASTROPHIC GROUND COVER COLLAPSE**

   If a building is covered as **existing property** under a Damage to Existing Property Endorsement, attached to and forming part of this Policy, then the following provisions are added to the Policy as SPECIFIED COVERED CAUSES OF LOSS with respect to such a building:

   **1.  Sinkhole loss,** meaning loss or damage to a building when **structural damage** to the covered building, including the foundation, is caused by settlement or systematic weakening of the earth supporting the building, only if the settlement or systematic weakening results from contemporaneous movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

   **a.** Coverage for **sinkhole loss** includes stabilization of the building (including land stabilization) and repair to the foundation, provided such work is in accordance with the requirements of Florida Insurance Law and in accordance with the recommendation of a professional engineer and with notice to the **Named Insured**. The professional engineer must be selected or approved by the Company. However, until the **Named Insured** or **project owner(s)**, whichever is applicable, enters into a contract for performance of building stabilization or foundation repair in accordance with the recommendations of the professional engineer as set forth in a report from the Company:

   **(1)** The Company will not pay for underpinning or grouting or any other repair technique performed below the existing foundation of the building; and

   **(2)** The Company's payment for **sinkhole loss** to the covered building will be limited to the actual cash value of the loss to such property.

   The **Named Insured** or **project owner(s)**, whichever is applicable, must enter into a contract for the performance of building stabilization and/or foundation repair in accordance with the aforementioned recommendations, within 90 days after the Company notifies the **Named Insured** that there is coverage for the **sinkhole loss**. After the **Named Insured** or **project owner(s)**, whichever is applicable, has entered into such contract, the Company will pay the amounts necessary to begin and perform such repairs as the work is performed and the expenses are incurred.

However, if the professional engineer determines, prior to the **Named Insured** or **project owner(s)**, whichever is applicable, entering into the aforementioned contract or prior to the start of repair work, that the repairs will exceed the applicable **Policy Limit**, the Company must either complete the recommended repairs or pay that **Policy Limit** upon such determination. If the aforementioned determination is made during the course of repair work and the Company has begun making payments for the work performed, the Company must either complete the recommended repairs or pay only the remaining portion of the applicable **Policy Limit** upon such determination. The most the Company will pay for the total of all **sinkhole loss**, including building and land stabilization and foundation repair, is the applicable **Policy Limit** on the affected building.

The stabilization and all other repairs to the covered building must be completed within 12 months after entering into the contract for the performance of these repairs, unless:

**(1)** There is a mutual agreement between the **Named Insured** and the Company;

**(2)** The claim is involved with the neutral evaluation process;

**(3)** The claim is in litigation; or

**(4)** The claim is under appraisal or mediation.

b. **Sinkhole loss** does not include:

   **(1)** Sinking or collapse of land into man-made underground cavities; or

   **(2) Earth movement**.

c. With respect to a claim for alleged **sinkhole loss**, the following provision is added:

   Following receipt by the Company of a report from a professional engineer or professional geologist on the cause of loss and recommendations for land stabilization and repair of property, or if the Company denies the **Insured's** claim, the Company will notify the **Named Insured** or **project owner(s)**, whichever is applicable, of its right to participate in a neutral evaluation program administered by the Florida Department of Financial Services (hereinafter referred to as the "Department"). For alleged **sinkhole loss** to commercial residential or farm residential properties, this program applies instead of any mediation procedure set forth elsewhere in this Policy, but does not invalidate the APPRAISAL Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section.

   The **Named Insured** or **project owner(s)**, whichever is applicable, or the Company, may file a request with the Department for neutral evaluation; the other party must comply with such request. The Company will pay reasonable costs associated with the neutral evaluation, regardless of which party makes the request. But if a party chooses to hire a court reporter or stenographer to contemporaneously record and document the neutral evaluation, that party must bear the costs of those services. The neutral evaluator will be selected from a list maintained by the Department. The recommendation of the neutral evaluator will not be binding on the **Named Insured** or **project owner(s)**, whichever is applicable, or the Company.

   Participation in the neutral evaluation program does not change the **Named Insured's** or **project owner(s)'**, whichever is applicable, right to file suit against the Company in accordance with the SUIT AGAINST COMPANY Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section in this Policy, except that the time for filing suit is extended for a period of 60 days following the conclusion of the neutral evaluation process or five (5) years, whichever is later.

d. Coverage for **sinkhole loss** under this endorsement does not increase the **Policy Limit**. Even if the loss or damage qualifies under, or includes, **catastrophic ground cover collapse** (addressed elsewhere in this endorsement) and **sinkhole loss**, only one **Policy Limit** will apply to such loss or damage.

e. The following provision is added to the REQUIREMENTS IN CASE OF LOSS OR DAMAGE Subsection of the CONDITIONS APPLICABLE TO LOSS ADJUSTMENT AND SETTLEMENT Section:

A claim for **sinkhole loss**, including but not limited to initial, supplemental and reopened claims is barred unless notice of claim is provided to the Company in accordance with the terms of this Policy within two (2) years after the **Insured** knew or reasonably should have known about the **sinkhole loss**.

f. If the Company denies the **Insured's** claim for **sinkhole loss** without performing testing under section 627.7072, Florida Statutes, the **Named Insured** or **project owner(s)**, whichever is applicable, may demand testing by communicating such demand to the Company in writing within 60 days after the **Named Insured** receives our denial of the claim. The **Named Insured** or **project owner(s)**, whichever is applicable, is responsible for 50% of the testing costs, or $2,500, whichever is less. If the Company's professional engineer or geologist provides written certification, pursuant to section 627.7073, that there is **sinkhole loss**, the Company will reimburse the **Named Insured** or **project owner(s)**, whichever is applicable, for the testing costs.

g. The **Insured** may not accept a rebate from any person performing repairs for **sinkhole loss** covered under this endorsement. If the **Insured** receives a rebate, coverage under this endorsement is void and the **Insured** must refund the amount of the rebate to the Company.

h. If the Company denies the **Insured's** claim for **sinkhole loss** upon receipt of written certification from a professional engineer or geologist, pursuant to section 627.7073, that there is no **sinkhole loss** or that the cause of the damage was not sinkhole activity, and if the sinkhole claim was submitted without good faith grounds for submitting such claim, the **Named Insured** or **project owner(s)**, whichever is applicable, shall reimburse the Company for 50% of the actual costs of the analyses and services provided under sections 627.7072 and 627.7073, or $2,500, whichever is less. The **Named Insured** or **project owner(s)**, whichever is applicable, is not required to pay such reimbursement unless it requested the analysis and services and the Company, before ordering the analysis, informed the **Named Insured** or **project owner(s)**, whichever is applicable, in writing of the potential for reimbursement and gave the **Named Insured** or **project owner(s)**, whichever is applicable, the opportunity to withdraw the claim.

i. As a precondition to accepting payment for **sinkhole loss**, the **Named Insured** or **project owner(s)**, whichever is applicable, must file with the county clerk of court, a copy of any sinkhole report regarding the property which was prepared on behalf or at the **Named Insured** or **project owner(s)**, whichever is applicable, request. The **Named Insured** or **project owner(s)**, whichever is applicable, will bear the cost of filing and recording the sinkhole report.

2. **Catastrophic Ground Cover Collapse**

The Company will pay for direct physical loss or damage to a covered building caused by or resulting from **catastrophic ground cover collapse**, meaning geological activity that results in all of the following:

a. The abrupt collapse of the ground cover;

b.  A depression in the ground cover clearly visible to the naked eye;

c. **Structural damage** to the building, including the foundation; and

    **d.**  The insured structure being condemned and ordered to be vacated by the governmental agency authorized by law to issue such an order for that structure.

However, damage consisting merely of the settling or cracking of a foundation, structure or building does not constitute loss or damage resulting from a **catastrophic ground cover collapse**.

Coverage for **catastrophic ground cover collapse** does not increase the **Policy Limit**. Regardless of whether loss or damage attributable to **catastrophic ground cover collapse** also qualifies as **sinkhole loss** or **earth movement** (if either or both of those causes of loss are covered under this Policy), only one **Policy Limit** will apply to such loss or damage.

**3.**  For the purposes of **Sinkhole Loss** and **Catastrophic Ground Cover Collapse** coverages only, the following definitions are added to the Policy:

    **a.**  **Structural damage** means a building, regardless of the date of its construction, has experienced the following:

        **(1)**  Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement related damage to the interior such that the interior building structure or members become unfit for service or represent a safety hazard as defined within the Florida Building Code;

        **(2)**  Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement related damage to the **primary structural members** or **primary structural systems** and that prevents those members or systems from supporting the loads and forces they were designed to support to the extent that stresses in those **primary structural members** or **primary structural systems** exceed one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location;

        **(3)**  Damage that results in listing, leaning, or buckling of the exterior load bearing walls or other vertical **primary structural members** to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

        **(4)**  Damage that results in the building, or any portion of the building containing **primary structural members** or **primary structural systems**, being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

        **(5)**  Damage occurring on or after October 15, 2005, that qualifies as substantial structural damage as defined in the Florida Building Code.

    **b.**  **Primary structural member** means a structural element designed to provide support and stability for the vertical or lateral loads of the overall structure.

    **c.**  **Primary structural system** means an assemblage of **primary structural members**.

All other terms and conditions of the Policy remain the same.

Exhibit "Q"



# Starr Indemnity & Liability Company

| Starr Indemnity & Liability Company Excess Commercial Construction Impairment Liability Program Claim Reporting Guidelines |
|---|

**Please Send All Excess Commercial Construction Impairment Loss Notices To:**

> **York**
> **PO Box 183188**
> **Columbus, OH 43218**

> **Claims E-mail:**   4647starrindemnity@yorkisg.com
> **Claims Fax:**   (866) 695-3651
> **After hours emergency call service:**
>              (866) 391-9675

Our preferred method of reporting is by email but Loss Notices may be submitted via certified mail or faxed. If immediate attention is needed, e-mailing or faxing the Loss Notice and/or Claim or Litigation information is strongly recommended. If you have a claim related question and need to contact York by telephone, please do so at (866) 391-9675.

**Consult Your Policy For Loss Reporting Requirements**

Your policy states when to report a loss and details the information to be submitted with a First Notice of Loss. This is often found in the General Conditions section, although it may be changed by an endorsement. Additionally, the following information/documentation will always be helpful in assisting us with our evaluation.

- Citing Starr Indemnity & Liability Company policy, or claim number, in all correspondence.
- Providing a copy of any suit, demand for arbitration or mediation, a governmental agency notice, claim letter or any similar notice.
- Sending a copy of any internal reports related to the loss.
- Forwarding copies of status reports prepared by your defense counsel and/or your claim handler, if the case has been pending for a period of time.

Our claim's administrator will always acknowledge each First Notice of Loss, initiate contact to open lines of communication, and will request any additional information that may be needed. Our formal claims acknowledgment will identify the person responsible for handling your reported Claim, and their specific contact information.

If you have questions or would like to discuss a specific loss with one of our Claims Team members, please feel free to contact us. Thank you.

# EXCESS LIABILITY DECLARATIONS

## Starr Indemnity & Liability Company
### Dallas, Texas
#### Administrative Office: 399 Park Avenue 8th Floor New York, NY 10022

**POLICY NUMBER:** 1000584589191          **RENEWAL OF:** 1000584589181

**PRODUCER NAME:**   AmWINS Brokerage of New England
**ADDRESS:**   308 Farmington Avenue
Farmington  CT  06032

**ITEM 1.**   **NAMED INSURED:**   Suffolk Construction Company, Inc.
**ADDRESS:**      65 Allerton St
Boston  MA  02119

**ITEM 2:**   **POLICY PERIOD:  FROM**      August 31, 2019      **TO**      August 31, 2020
12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE.

**ITEM 3.**      **COVERAGE:**   Commercial Excess Liability

**ITEM 4.**   **LIMITS OF INSURANCE:**
The Limits of Insurance, subject to all the terms of this Policy, are:
**A.**   $         10,000,000  Each Occurrence
**B.**   $         10,000,000  Other Aggregate(s), Where Applicable
**C.**   $         10,000,000  Products-Completed Operations Aggregate

**ITEM 5.**      **"UNDERLYING INSURANCE"**

| **A. First Underlying Insurance Policy(ies)** | | |
|---|---|---|
| **Insurer** | **Policy No.** | **Policy Period** |
| See attached Schedule of Underlying Insurance | | |

| **B. Additional Underlying Insurance Policy(ies)** | | |
|---|---|---|
| **Insurer** | **Policy No.** | **Policy Period** |
| See attached Schedule of Underlying Insurance | | |

XS 101 D (10/08)                                                                                                    Page 1 of 2

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**ITEM 6.**     **POLICY PREMIUM:**

| Advanced Premium | Minimum Premium | Minimum Earned Premium |
|---|---|---|
| ██████ | ██████ | ██████ |

| Estimated Exposure | Rate Per | Audit Period |
|---|---|---|
| N/A | N/A | N/A |

**ITEM 7.**     **NOTICES**

In the event of an accident, occurrence, wrongful act, claim or suit, that is reasonably likely to involve this Policy, send all pertinent facts to:

**York**
PO Box 183188
Columbus  OH  43218
4869excessclaims@yorkrsg.com
Fax: (866) 695-3651
Phone : (866) 391-9675
**After hours emergency call service:**
(866) 391-9675

**ITEM 8.**     **ENDORSEMENTS ATTACHED:**

| Title | Form Number |
|---|---|
| Claim Reporting Guidelines | CLAIMS RPT (00/00) |
| Excess Liability Declarations | XS 101 D (10/08) |
| U.S. Treasury Department's Office Of Foreign Assets Control (OFAC) Advisory Notice To Policyholders | IL P 001 01 04 |
| Excess Liability Policy Schedule Of Underlying Insurance | XS 102 (10/08) |
| Excess Liability Policy Form | XS 100 (10/08) |
| Defense Condition Amendment | XS 143 (10/08) |
| Earlier Notice Of Cancellation Provided By Us | XS 147 (10/08) |
| Waiver Of Transfer Of Rights Of Recovery Against Others To Us | XS 233 (10/08) |
| Auto Coverage - Exclusion Of Terrorism | XS 341 (10/08) |
| Cap On Losses From Certified Acts Of Terrorism | XS 342 (01/15) |
| Certified Acts Of Terrorism Coverage Excess Of Retained Amount With Cap On Losses | XS 343 (01/15) |
| Disclosure Pursuant To Terrorism Risk Insurance Act | XS 344 (01/15) |
| Other Insurance Primary and NonContributory for AI | MANUSCRIPT (06/10) |

The foregoing discloses all hazards insured hereunder known to exist at the inception date of this Policy, unless otherwise stated herein by endorsement on this Policy.

COUNTERSIGNED _____October 01, 2019_____  BY  _Richard Berry_ _____
                                      DATE                                    AUTHORIZED REPRESENTATIVE

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**IL P 001 01 04**

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

# Excess Liability Policy
# Schedule of Underlying Insurance

| Policy Number: | 1000584589191 | Effective Date: | August 31, 2019 |
|---|---|---|---|
| Named Insured: | Suffolk Construction Company, Inc. | Issuing Company: | **Starr Indemnity & Liability Company** |

The Declarations, Schedule(s), and all terms and conditions complete this insurance Policy.

| Type of Policy or Coverage and Insurer, Policy Number and Policy | Limits of Insurance |
|---|---|
| **A.   First Underlying Insurance Policy(ies)** | |
| Coverage:   General Liability<br>Carrier:  Liberty Mutual Fire Ins Co.<br>Policy No.:   TB2-641-444149-049<br>Policy Period:   08/31/2019 - 08/31/2020 | $2,000,000  Each Occurrence Limit<br>$4,000,000  Other Aggregate Limit<br>$4,000,000  Products-Completed Operations Aggregate Limit |
| Coverage:   Automobile Liability<br>Carrier:  Liberty Mutual Fire Ins Co.<br>Policy No.:   AS2-641-444149-059<br>Policy Period:  08/31/2019 - 08/31/2020 | $1,000,000  Each Occurrence Limit |
| Coverage:   Employers Liability<br>Carrier:  Liberty Mutual Fire Ins Co.<br>Policy No.:   WC2-641-444149-079<br>Policy Period:  08/31/2019 - 08/31/2020 | $1,000,000  Each Occurrence Limit<br>$1,000,000  Disease - Each Employee Limit<br>$1,000,000  Disease - Policy Limit |
| Coverage:   Other Liability Drone Policy<br>Carrier:  American Alternative Ins Corp.<br>Policy No.:   8000693<br>Policy Period:  08/31/2019 - 08/31/2020 | $5,000,000  Each Occurrence Limit<br>$0  Aggregate Limit |

**B.   Additional Underlying Insurance Policy(ies)**

| Date of Issue:   October 01, 2019 | Authorized Representative: | *Richard Berry* |
|---|---|---|

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

# Starr Indemnity & Liability Company
## Dallas, Texas
### Administrative Office: 399 Park Avenue 8ᵗʰ Floor New York, NY 10022

**Excess Liability Policy**

| | |
|---|---|
| **Named Insured:** | **Suffolk Construction Company, Inc.** |
| **Policy Number:** | **1000584589191** |
| **Effective Date:** | **August 31, 2019 at 12:01 A.M.** |

This Policy is a legal contract between the Named Insured and Starr Indemnity & Liability Company (herein referenced as "the Company"). The Company agrees to provide insurance to the Named Insured, in exchange for the payment of the required premium. Coverage is subject to the terms and conditions described in this Policy.

This Policy and the coverage provided by it become effective at 12:01 A.M. at the address of the Named Insured on the Policy Effective Date shown above. It continues in effect in accordance with the provisions set forth in this Policy.

This Policy is governed by the laws of the state where it was delivered.

Signed for the Company as of the Effective Date above:

_____
**Steve Blakey,  President**

_____
**Nehemiah E. Ginsburg, General Counsel**

XS 100 (10/08)                                                                    Page 1 of 10

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

## TABLE OF CONTENTS

**Title**                                               **Page**

**SECTION I. COVERAGE**…....………………………………………………..[3]

**SECTION II. LIMITS OF  INSURANCE**……………………………………………..[3]

**SECTION III. DEFINITIONS**…………………………………………………...[4]

**SECTION IV. CONDITIONS**…………………………………………………[5]

**SECTION V. EXCLUSIONS**……………………………..……………...…… .[8]

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

# EXCESS LIABILITY POLICY FORM

Various provisions in this Policy restrict coverage.  Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the words you and your refer to the Named Insured as shown in **ITEM 1.** of the Declarations. The words we, us and our refer to the Company shown in the Declaration providing this insurance.

The word Insured means the Named Insured and any person or organization qualifying as an Insured in the First Underlying Insurance Policy(ies), but only to the extent to which such person(s) or organization(s) qualify as an Insured in the First Underlying Insurance Policy(ies) at the inception date of this Policy. Newly acquired or formed organizations must comply with **SECTION IV. CONDITIONS, D. Changes** in order to qualify for coverage.

Words and phrases that appear in quotation marks have special meaning. Refer to **SECTION III. DEFINITIONS**, or to the specific section, of this Policy where such words appear.

## SECTION I. COVERAGE

**A.**   We will pay on behalf of the Insured, the "Ultimate Net Loss" in excess of the "Underlying Insurance" as shown in **ITEM 5.** of the Declarations, that the Insured becomes legally obligated to pay for loss or damage to which this insurance applies and that takes place in the Coverage Territory. Except for the terms, definitions, conditions and exclusions of this Policy, the coverage provided by this Policy shall follow the terms, definitions, conditions and exclusions of the applicable First Underlying Insurance Policy(ies) shown in **ITEM 5.A.** of the Declarations.

**B.**   Regardless of any other warranties, terms, conditions, exclusions or limitations of this Policy, if any applicable Underlying Insurance Policy(ies) does not cover "Ultimate Net Loss" for reasons other than exhaustion of its limit of liability by payment of claims or suits, then this Policy will not cover such "Ultimate Net Loss".

**C.**   The amount we will pay for the "Ultimate Net Loss" is limited as described in **SECTION II. LIMITS OF INSURANCE.**

## SECTION II. LIMITS OF INSURANCE

**A.**   The Limits of Insurance shown in the Declarations and the rules below describe the most we will pay regardless of the number of:

   **1.**   Insureds;
   **2.**   Claims made or suits brought; or
   **3.**   Persons or organizations making claims or bringing suits.

**B.**   The Limits of Insurance of this Policy will apply as follows:

   **1.**   This Policy applies only in excess of the "Underlying Insurance" scheduled in **ITEM 5.** of the Declarations.

   **2.**   If our Limits of Insurance stated in **ITEM 4.** of the Declarations are less than the total Limits of Insurance stated in **ITEM 4.** of the Declarations, then our Limits of Insurance shall be that proportion of the "Ultimate Net Loss" to which our Limits of Insurance apply to the total Limits of Insurance stated in **ITEM 4.** of the Declarations and apply only in excess of the total Limits of "Underlying Insurance" scheduled in **ITEM 5.** of the Declarations.

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

3. Subject to Paragraph **B.2.** above, the Each Occurrence limit stated in **ITEM 4.A.** of the Declarations is the most we will pay for the "Ultimate Net Loss" for loss or damages arising out of any one occurrence to which this insurance applies.

4. Subject to Paragraphs **B.2.** and **B.3.** above, the limit stated in **Item 4.C.** of the Declarations for the Products-Completed Operations Aggregate is the most we will pay for all "Ultimate Net Loss" under the products-completed operations hazard**.**

5. Subject to Paragraphs **B.2.** and **B.3.** above, the Other Aggregate Limit stated in Item **4.B.** of the Declarations is the most we will pay for all "Ultimate Net Loss" except "Ultimate Net Loss" covered under the products-completed operations hazard, that is subject to an aggregate limit provided by the First Underlying Insurance Policy(ies). The Other Aggregate Limit stated in **ITEM 4.B.** applies separately and in the same manner as the aggregate limits provided by the First Underlying Insurance Policy(ies)**.**

6. Subject to Paragraphs **B.2., B.3., B.4.** and **B.5**. above, if the total applicable Limits of Insurance of "Underlying Insurance" scheduled in **ITEM 5.** of the Declarations are:

   a. Exhausted by payment of "Ultimate Net Loss" arising solely out of a claim first made, or occurrence(s) which first took place, during the Policy Period shown in the Declarations and would be covered under the provisions of this Policy, this insurance applies in excess of such exhausted limit(s); or

   b. Reduced or exhausted by payment of "Ultimate Net Loss" arising out of a claim which was not first made during the Policy Period shown in the Declarations, or occurrence(s) which took place before or after the Policy Period shown in the Declarations or would not be covered under the provisions of this Policy, this insurance applies as if such payments had not been made.

7. The Limits of Insurance shown in **ITEM 4**. of the Declarations apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the Policy Period shown in the Declarations, unless the Policy Period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the preceding period for purposes of determining the Limits of Insurance.

## SECTION III. DEFINITIONS

**A.** "Ultimate Net Loss"

"Ultimate Net Loss" means the total sum, after reduction for all recoveries including other valid and collectible insurance, excepting only the "Underlying Insurance" scheduled under **ITEM 5.** of the Declarations, actually paid or payable due to a claim or suit for which you or an Insured are liable either by a settlement to which we agreed or a final judgment.

The term "Ultimate Net Loss" shall also include defense costs when such defense costs are included within the limits of insurance of any applicable "Underlying Insurance".

**B.** "Underlying Insurance"

"Underlying Insurance" means the Policy(ies) and/or self-insured retention identified in **ITEM 5.** of the Declarations. "Underlying Insurance" shall include:

1. The First Underlying Insurance Policy(ies) scheduled in **ITEM 5.A.** of the Declarations;

2. Any Additional Underlying Insurance Policy(ies) scheduled in **ITEM 5.B.** of the Declarations; and

3. Any renewal or replacement of such Policy(ies).

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

## SECTION IV. CONDITIONS

**A.    Appeals**

If the Insured or underlying insurer elects not to appeal a judgment or award in excess of the limits of the "Underlying Insurance," we may do so at our expense. We will not be liable for any judgment or award that exceeds the Limits of Insurance stated in **ITEM 4**. of the Declarations.

**B.    Bankruptcy or Insolvency**

Your or an Insured's bankruptcy, insolvency or inability to pay will not relieve us from our obligations under this Policy.

In the event of bankruptcy, insolvency or refusal or inability to pay, of any underlying insurer or insurer providing other insurance, the insurance afforded by this Policy will not drop down or replace such "Underlying Insurance" or other insurance, but will apply as if all limits of any "Underlying Insurance" or other insurance are fully available and collectible.

**C.    Cancellation**

1. You may cancel this Policy.  You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2. We may cancel this Policy.  If we cancel because of non-payment of premium, we must mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than thirty (30) days advance written notice stating when the cancellation is to take effect.  Mailing that notice to you at your mailing address shown in **ITEM 1.** of the Declarations will be sufficient to prove notice.

3. The Policy Period will end on the day and hour stated in the cancellation notice.

4. If we cancel, earned premium will be calculated pro rata based on the time this Policy was in force.

5. If you cancel, earned premium will be more than a pro rata of the Advanced Premium as shown on **ITEM 6.** of the Declarations; it will be based on the time this Policy was in force and increased by the applicable short rate cancellation table and procedure.

6. Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter but the cancellation will be effective even if we have not made or offered any refund due you.  Our check or our representative's check, mailed or delivered, shall be sufficient tender of any refund due you.

7. The first Named Insured in **ITEM 1.** of the Declarations shall act on behalf of all other Insured(s) with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this Policy.

8. Any of these provisions that conflict with a law that controls the cancellation of the insurance in this Policy is changed by this statement to comply with that law.

**D.    Changes**

You must promptly notify us of any newly acquired or formed organizations, or coverage or limit changes made after the inception date of this Policy to the First Underlying Insurance Policy(ies) as scheduled in **ITEM 5.A**. of the Declarations.

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

Coverage under this Policy will apply to newly acquired or formed organizations only if we endorse the organization as an Insured onto this Policy. Any newly acquired or formed organizations endorsed onto this Policy may be subject to an additional premium and to a premium audit.

**E.    Coverage Territory**

Any claim or suit for loss or damage occurring within the Coverage Territory must be brought within the United States of America.

Coverage Territory shall be deemed to be anywhere in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

Payments under this Policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

**F.    Defense**

We have no duty to defend any claim or suit and will not be obligated to assume charge of the investigation, settlement or defense of any claim, suit or proceeding instituted against you or any Insured for loss or damages to which this insurance may apply.  We will have the right and opportunity to participate or associate in the investigation, settlement or defense of any claim, suit or proceeding against you or an Insured for loss or damage to which this insurance may apply. If you exercise such right, which is at our sole discretion, we will do so at our own expense.

**G.    Maintenance of "Underlying Insurance"**

You agree to maintain all "Underlying Insurance" in full force and effect during our Policy Period stated in **ITEM 2.** of the Declarations, except for the reduction of the aggregate limits of the "Underlying Insurance" due to payment of claim(s) or suit(s) for loss or damage to which this insurance may apply. If you fail to comply with this condition precedent, then the insurance provided by this Policy shall only apply as though such "Underlying Insurance" had been in full force and effect by you.

**H.    Notification of Accidents or Occurrences**

**1.**  You or an Insured must see to it that we are notified as soon as practicable of an accident, occurrence or wrongful act which is reasonably likely to result in a claim or suit to which this insurance may apply.

To the extent possible, notice will include:

**a.**    How, when and where the accident, occurrence or wrongful act took place;

**b.**    The names and addresses of any injured persons and witnesses;

**c.**    The nature and location of any loss, injury or damage arising out of the accident, occurrence or wrongful act.

**2.**  If a claim is made or a suit is brought against an Insured that is reasonably likely to involve this Policy, you or an Insured must notify us in writing as soon as practicable.

**3.**  You and an Insured must:

**a.** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;.

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**b.** Authorize us to obtain records and other information;

**c.** Cooperate with us in the investigation, settlement or defense of the claim or suit; and

**d.** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of loss or damage to which this insurance may also apply.

**4.** No Insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**I.   Other Insurance**

If other insurance applies to "Ultimate Net Loss" that is also covered by this Policy, this Policy will apply excess of, and will not contribute to, the other insurance. Nothing herein will be construed to make this Policy subject to the terms, conditions and limitations of such other insurance. However, other insurance does not include:

**1.** "Underlying Insurance";

**2.** Insurance that is specifically written as excess over this Policy; or

**3.** Insurance held by a person(s) or organization(s) qualifying as an additional insured in "Underlying Insurance", but only when the written contract or agreement between you and the additional insured requires a specific limit of insurance that is in excess of the Underlying Limits of Insurance. However, the Limits of Insurance afforded the additional insured in this paragraph shall be the lesser of the following:

    **a.** The minimum limits of insurance required in the contract or agreement between you and the additional insured; or

    **b.** The Limits of Insurance shown in the Declarations of this Policy.

Other insurance includes any type of self-insurance or other mechanism by which an Insured arranges for the funding of legal liabilities.

**J.   Premium**

The first Named Insured shown in **ITEM 1.** of the Declarations shall be responsible for payment of all premiums when due.

The Advanced Premium shown in **ITEM 6.** of the Declarations is a flat premium for this Policy Period, unless Estimated Exposure, Rate Per and Audit Period are completed on the Declarations. In that case a Premium Audit Endorsement will be attached to the Policy.

Earned Premium in a Policy Period shall be subject to the Minimum Premium and the Minimum Earned Premium as stated in the Declarations, if applicable.

**K.   Transfer of Rights of Recovery Against Others to Us**

If the Insured has rights to recover all or part of any payment we have made under this Policy, those rights are transferred to us. The Insured must do nothing after loss to impair them. At our request, the Insured will bring suit or transfer those rights to us and help us enforce them. Reimbursement of recovery(ies), minus expenses incurred by us in the process of recovery, will be first made to any interest (including the Insured) who has paid any amounts in excess of the limits of this Policy; then next to us; and then finally to all other interests (including the Insured and the underlying insurer) with respect to the remaining amounts, if any.

XS 100 (10/08)                                                                                          **Page 7 of 10**

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**L.     Unintentional Errors or Omissions**

Your failure to disclose all hazards existing as of the inception date of this Policy shall not prejudice you with respect to the coverage afforded by this Policy provided such failure or any omission is not intentional.

**M.     When "Ultimate Net Loss" is Payable**

Coverage under this Policy will not apply unless and until the Insured or the Insured's "Underlying Insurance" has paid or is obligated to pay the full amount of the limits of the "Underlying Insurance" scheduled in **ITEM 5.** of the Declarations.  If other insurance applies, coverage under this Policy will not apply until the other insurance has paid or is obligated to pay the full amount of its limit of insurance.

When the "Ultimate Net Loss" is determined, we will pay on behalf of the Insured the amount of "Ultimate Net Loss" to which this insurance applies.

## SECTION V. EXCLUSIONS

This insurance shall not apply to:

**A.     Asbestos**

   **1.**   "Ultimate Net Loss" arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

   **2.**   Any obligation of the Insured to indemnify any party because of damages arising out of such "Ultimate Net Loss" as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust; or

   **3.**   Any obligation to defend any suit or claim against the Insured seeking damages, if such suit or claim arises from "Ultimate Net Loss" as a result of the manufacture of, mining of, use of, sales of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

**B.     Auto Coverages**

"Ultimate Net Loss" arising out of or resulting from any first party physical damage coverage; no-fault law; personal injury protection or auto medical payments coverage; or uninsured or underinsured motorist law.

**C.     Nuclear**

"Ultimate Net Loss":

**1.   a.**   With respect to which the Insured is also an Insured under a  nuclear energy liability policy issued by Nuclear Energy Liability-Property Insurance Assoc., Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   **b.**   Resulting from the "hazardous properties" of "Nuclear Material" and with respect to which **(1)** any person or any organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(2)** the Insured is, or had this Policy not been available would be, entitled to indemnity from the United States of America or any agency thereof,

XS 100 (10/08)                                                                                                                    Page 8 of 10

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

under any agreement entered into by the United States of America or any agency thereof, with any person or organization.

2.  "Ultimate Net Loss"" resulting from the hazardous properties of "Nuclear Material", if:

   a.  The "Nuclear Material" **(1)** is at any "nuclear facility" owned by the Insured or operated by the Insured or on the Insured's behalf, or **(2)** has been discharged or dispensed therefrom;

   b.  The "Nuclear Material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by the Insured or on the Insured's behalf; or

   c.  The "Ultimate Net Loss" arises out of the furnishing by the Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "Nuclear Facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion c. applies only to property damage to such "Nuclear Facility" and any property thereat.

3.  As used in this exclusion:

   a.  "Hazardous Properties" includes radioactive, toxic or explosive properties;

   b.  "Nuclear Material" means "Source Material", "Special Nuclear Material" or "By-Product Material;"

   c.  "Source Material", "Special Nuclear Material" and "By-product Material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof;

   d.  "Spent Fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

   e.  "Waste" means any waste material **(1)** containing "By-Product Material" and **(2)** resulting from the operation by any person or organization of a "Nuclear Facility" included within the definition of "Nuclear Facility" below;

   f.  "Nuclear Facility" means:

      **(1)**  Any nuclear reactor;

      **(2)**  Any equipment or device designed or used for **(i)** separating the isotopes of uranium or plutonium, **(ii)** processing or utilizing "Spent Fuel", or **(iii)** handling, processing or packaging wastes;

      **(3)**  Any equipment or device used for the processing, fabricating, or alloying of "Special Nuclear Material" if at any time the total amount of such material in the Insured's custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

      **(4)**  Any structure, basin, excavation, premises or place prepared or used for storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

   g.  "Nuclear Reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

   h.  "Ultimate Net Loss" includes all forms of radioactive contamination of property.

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**D.    Pollution**

    **1.**    "Ultimate Net Loss" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

    **2.**    Loss, cost or expense arising out of any:

        **a.**    Request, demand, order or statutory or regulatory requirement that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

        **b.**    Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

    This exclusion does not apply if valid "Underlying Insurance" for the pollution liability risks described above exists or would have existed but for the exhaustion of the applicable limits of the Underlying Insurance. Coverage provided under this Policy will follow the terms, definitions, conditions, exclusions and limitations of the First Underlying Insurance Policy(ies).

**E.    Workers Compensation and Similar Laws**

    "Ultimate Net Loss" for any obligation of the Insured under any worker's compensation, disability benefits or unemployment compensation law or any similar law.

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

# Defense Condition Amendment

**Policy Number:** 1000584589191          **Effective Date:** August 31, 2019 at 12:01 A.M.
**Named Insured:** Suffolk Construction Company, Inc.

**SECTION IV.  CONDITIONS,** condition **F. Defense** is deleted in its entirety and replaced with the following:

**F.  Defense**

1.  At our discretion, we may:
    a.  Investigate any occurrence, claim or suit;
    b.  Settle any claim or suit of which we assume control of the settlement or defense.

2.  We have the right, but not the duty, to associate with any underlying insurer or other insurers in the defense and control of any claim or suit seeking damages to which this insurance may apply.

3.  We have the right and duty to defend any claim or suit against any Insured seeking damages to which this insurance applies when "Underlying Insurance" ceases to apply because of exhaustion of its limits of insurance solely by payment of claims, settlements, judgments, or defense costs subject to such limits, for damages to which this insurance also applies.

4.  We will pay, with respect to any claim we investigate or settle, or any suit against an Insured we defend, when the duty to defend exists:

    a.  All expenses we incur.
    b.  Up to $2000 for cost of bail bonds (including bonds for related traffic law violations) required because of an occurrence we cover. We do not have to furnish these bonds.
    c.  The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.
    d.  All reasonable expenses incurred by the Insured at our request to assist us in the investigation or defense of the claim or suit, including actual loss of earnings up to $250 a day because of time off from work.
    e.  All court costs taxed against the Insured in the suit. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the Insured.
    f.  Prejudgment interest awarded against the Insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.
    g.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

5.  If we exercise our rights or duties as stated in paragraphs **2.** and **3.** above, any expense related to such right or duty will be defense costs under this Policy.

6.  After the Limits of Insurance of this policy are used up in the payment of:

    a.  Judgments;
    b.  Settlements; or
    c.  Defense costs,  if defense costs are included within and erode the limits of insurance of the applicable "Underlying Insurance", we will not provide any defense under this Policy.

XS 143 (10/08)                                                                                                    Page 1 of 2

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

## Starr Indemnity & Liability Company

Dallas, TX 1-866-519-2522

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

| | |
|---|---|
| **Steve Blakey,  President** | **Nehemiah E. Ginsburg, General Counsel** |

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

## Starr Indemnity & Liability Company

Dallas, TX 1-866-519-2522

# Earlier Notice of Cancellation Provided by US

**Policy Number:** 1000584589191          **Effective Date:** August 31, 2019 at 12:01 A.M.
**Named Insured:** Suffolk Construction Company, Inc.

**SCHEDULE**

| Number Of Days' Notice | |
|---|---|
| | 90 |

For any statutorily permitted reason other than nonpayment of premium, the number of days required for notice of cancellation, as provided in Paragraph **2.** of either the **Cancellation** Condition or as amended by an applicable state cancellation endorsement, is increased to the number of days shown in the Schedule above.

All other terms and conditions of this Policy remain unchanged.

Signed for the company as of the Effective Date above:

_____          _____
**Steve Blakey,  President**                **Nehemiah E. Ginsburg, General Counsel**

XS 147 (10/08)                                                                                    Page 1 of 1

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

# Waiver of Transfer of Rights of Recovery Against Others to Us

**Policy Number:** 1000584589191          **Effective Date:** August 31, 2019 at 12:01 A.M.
**Named Insured:** Suffolk Construction Company, Inc.

**SCHEDULE**

| Name Of Person Or Organization: |
|---|
| As required by written contract. |

**SECTION IV. CONDITIONS**, condition **K. Transfer of Rights of Recovery Against Others to Us** is amended to include the following:

We waive any right of recovery we may have against the person or organization shown in the Schedule of this endorsement because of payments we make for injury or damage arising out of your ongoing operations or your work done under a contract with that person or organization and included in the products-completed operations hazard. This waiver applies only to the person or organization shown in the Schedule of this endorsement.

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

_____          _____
**Steve Blakey,  President**                        **Nehemiah E. Ginsburg, General Counsel**

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

# Auto Coverage – Exclusion of Terrorism

**Policy Number:** 1000584589191          **Effective Date:** August 31, 2019 at 12:01 A.M.
**Named Insured:** Suffolk Construction Company, Inc.

Any endorsement addressing acts of terrorism (however defined) in any "Underlying Insurance" does not apply to this Policy.

**A.** The provisions of this endorsement:

   **1.** Apply only to loss or damage arising out of the ownership, maintenance or use of any auto that is a covered auto under this Policy; and

   **2.** Supersede the provisions of any other endorsement addressing terrorism attached to this Policy only with respect to injury or damage arising out of the ownership, maintenance or use of any auto that is a covered auto.

**B.** The following definition is added to **SECTION III. DEFINITIONS** and applies under this endorsement wherever the term terrorism is enclosed in quotation marks:

   **1.** "Terrorism" means activities against persons, organizations or property of any nature:

      **a.** That involve the following or preparation for the following:

         **(1)** Use or threat of force or violence; or

         **(2)** Commission or threat of a dangerous act; or

         **(3)** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

      **b.** When one or both of the following applies:

         **(1)** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

         **(2)** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

**C.** The following exclusion is added to **SECTION V. EXCLUSIONS:**

**Exclusion of Terrorism**

This insurance shall not apply to loss or damage caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". Any loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such

injury or damage. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

1. The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

3. The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

5. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

6. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraph **C.5.** or **C.6.** above are exceeded.

With respect to this exclusion, Paragraphs **C.5.** and **C.6.** above describe the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this exclusion will apply to that incident. When the exclusion applies to an incident of "terrorism", there is no coverage under this Policy.

In the event of any incident of "terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Policy.

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

## Starr Indemnity & Liability Company

Dallas, TX 1-866-519-2522

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

_____
**Steve Blakey,  President**

_____
**Nehemiah E. Ginsburg, General Counsel**

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

## Starr Indemnity & Liability Company

Dallas, TX 1-866-519-2522

# Cap on Losses From Certified Acts of Terrorism

**Policy Number:** 1000584589191        **Effective Date:** August 31, 2019 at 12:01 A.M.

**Named Insured:** Suffolk Construction Company, Inc.

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

**A.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year  and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to  such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss or damage that is otherwise excluded under this Policy.

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

**Steve Blakey,  President**          **Nehemiah E. Ginsburg, General Counsel**

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

# Certified Acts of Terrorism Coverage
# Excess of Retained Amount With Cap on Losses

**Policy Number:** 1000584589191          **Effective Date:** August 31, 2019 at 12:01 A.M.

**Named Insured:** Suffolk Construction Company, Inc.

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY POLICY

SCHEDULE

| |
|---|
| **Certified Acts of Terrorism Retained  $2,000,000 Amount** |

**A.  Coverage provided by this Policy for "Ultimate Net Loss" arising out of a "certified act of terrorism" applies in excess of the Certified Acts of Terrorism Retained Amount described in paragraph B. below.**

**B.  SECTION II. LIMITS OF INSURANCE is amended to include the following:**

The Certified Acts of Terrorism Retained Amount refers to the amount stated in the Schedule of this endorsement.  This amount may consist of a self-insured retention, "Underlying Insurance" or a combination thereof.

The Certified Acts of Terrorism Retained Amount applies:

**1.  Only to "Ultimate Net Loss" arising out of a "certified act of terrorism" covered under this Policy; and**

**2.  Separately to each "certified act of terrorism".**

We will pay those sums covered under this Policy only after your Certified Acts of Terrorism Retained Amount has been exhausted by means of payments for judgments or settlements. Defense expenses shall not erode the Certified Acts of Terrorism Retained Amount.

**C.  SECTION IV. CONDITIONS,** is amended to include the following condition:

**Cap on Losses From Certified Acts of Terrorism**

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**D.  SECTION III. DEFINITIONS, is amended to include the following definition:**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.**  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.**  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

XS 343 (01/15)                                                                                                    Page 1 of 2

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

## Starr Indemnity & Liability Company

Dallas, TX 1-866-519-2522

**E.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss or damage that is otherwise excluded under this Policy.

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

_____
**Steve Blakey,  President**

_____
**Nehemiah E. Ginsburg, General Counsel**

XS 343 (01/15)                                                                                                   Page 2 of 2

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

# Disclosure Pursuant to Terrorism Risk Insurance Act

**Policy Number:** 1000584589191          **Effective Date:** August 31, 2019 at 12:01 A.M.

**Named Insured:** Suffolk Construction Company, Inc.

**SCHEDULE**

| SCHEDULE – PART I |
| --- |
| **Terrorism Premium (Certified Acts)** ███████ |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):** |
| All coverages under this policy except Commercial Automobile Liability |
| **Additional information, if any, concerning the terrorism premium:** |
| . |

| SCHEDULE – PART II |
| --- |
| **Federal share of terrorism losses       85 %          Year: 2015** |
| (Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses       84 %          Year: 2016** |
| (Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses       83 %          Year: 2017** |
| (Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses       82 %          Year: 2018** |
| (Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses       81 %          Year: 2019** |
| (Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses       80 %          Year: 2020** |
| (Refer to Paragraph **B.** in this endorsement.) |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
| --- |

**A.** Disclosure Of Premium

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the Policy Declarations.

**B.** Disclosure Of Federal Participation In Payment Of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds

XS 344 (01/15)                                                                                                                            Page 1 of 2

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

## Starr Indemnity & Liability Company

Dallas, TX 1-866-519-2522

the applicable insurer deductible. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year , the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C.** Cap On Insurer Participation In Payment Of Terrorism Losses

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

**Steve Blakey,  President**

**Nehemiah E. Ginsburg, General Counsel**

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

# Other Insurance Primary and NonContributory for AI

**Policy Number:** 1000584589191          **Effective Date:** August 31, 2019 at 12:01 A.M.

**Named Insured:** Suffolk Construction Company, Inc.

Amendatory Endorsement for PNC

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

_____          _____
**Steve Blakey,  President**                    **Nehemiah E. Ginsburg, General Counsel**

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

POLICY NUMBER:1000584589191                                       **EXCESS LIABILITY POLICY**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# POLICY CHANGES

This endorsement modifies insurance provided under the following:

**EXCESS LIABILITY POLICY FORM**

Effective Date of Change:   08/31/2019
Change Endorsement No.:   1
Named Insured:   Suffolk Construction Company, Inc.

The following item(s):

| | |
|---|---|
| ☐ Insured's Name | ☐ Insured's Mailing Address |
| ☐ Policy Number | ☐ Company |
| ☐ Effective/Expiration Date | ☐ Insured's Legal Status/Business of Insured |
| ☐ Payment Plan | ☐ Premium Determination |
| ☐ Additional Interested Parties: | ☐ Coverage Forms and Endorsements |
| ☐ Limits/Exposures | ☐ Self-Insured Retention |
| ☐ Covered Property/Located Description | ☐ Classification/Class Codes |
| ☐ Rates | ☐ Underlying Insurance |

is (are) changed to read **{See Additional Page(s)}:**

The above amendments result in a change in the premium as follows:

[X]   NO CHANGES        ☐   TO BE ADJUSTED        ADDITIONAL PREMIUM        RETURN PREMIUM
                              AT AUDIT

Endorsement Effective: 08/31/2019

Named Insured:   Suffolk Construction Company, Inc.

Countersigned By:

*Rachel Berry*

(Authorized Representative)

XS 103 (10/08)                                                                 Page 1 of 2

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

## Starr Indemnity & Liability Company

Dallas, TX 1-866-519-2522

| POLICY CHANGES ENDORSEMENT DESCRIPTION |
|---|
| It is agreed the Manuscript  (06/10) form has been deleted in its entirety and replaced with the Manuscript PNC (06/10) form.  It is further agreed form XS 233 (10/08), Waiver of Transfer of Rights of Recovery Against Others to Us has been amended to include ICCNE I LLC c/o Cargo Ventures. |

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

_____
**Steve Blakey,  President**

_____
**Nehemiah E. Ginsburg, General Counsel**

XS 103 (10/08)                                                                                                          Page 2 of 2

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

# Waiver of Transfer of Rights of Recovery Against Others to Us

**Policy Number:** 1000584589191                **Effective Date:** August 31, 2019 at 12:01 A.M.
**Named Insured:** Suffolk Construction Company, Inc.

**SCHEDULE**

| Name Of Person Or Organization: |
| --- |
| ICCNE I LLC c/o Cargo Ventures |

**SECTION IV. CONDITIONS**, condition **K. Transfer of Rights of Recovery Against Others to Us** is amended to include the following:

We waive any right of recovery we may have against the person or organization shown in the Schedule of this endorsement because of payments we make for injury or damage arising out of your ongoing operations or your work done under a contract with that person or organization and included in the products-completed operations hazard. This waiver applies only to the person or organization shown in the Schedule of this endorsement.

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

_____                _____
**Steve Blakey,  President**                **Nehemiah E. Ginsburg, General Counsel**

Copyright © C. V. Starr & Company and Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of ISO Properties, Inc., used with its permission.

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

# Policy Change add Additional Insured

**Policy Number:** 1000584589191          **Effective Date:** August 31, 2019 at 12:01 A.M.

**Named Insured:** Suffolk Construction Company, Inc.

It is agreed the following have been added as additional insured:

MAPLE 49TH AVENUE OWNER II, LLC, SSGA FUNDS MANAGEMENT, INC., GENERAL ELECTRIC PENSION TRUST, DEUTSCHE BANK AG, NEW YORK BRANCH ISAOA, ATIMA, NORMANDY DEVELOPMENT MANAGEMENT CO., LLC, NORMANDY DEVELPMENT AND CONSTRUCTION SERVICES, LLC, STUDIOS ARCHITECTURE, DC PC, AND LOCATION : 49TH AVE PROJECT (NORMANDY).

Also included: ICCNE I LLC c/o Cargo Ventrures Specific Project that this Schedule Additional Insured Applies: BFT Renovations Project 1 Harbor Street Boston, MA  02110.

All other terms and conditions of this Policy remain unchanged.

Signed for the Company as of the Effective Date above:

_____                    _____
**Steve Blakey,  President**                              **Nehemiah E. Ginsburg, General Counsel**

**Starr Indemnity & Liability Company**

Dallas, TX 1-866-519-2522

# Other Insurance – Primary and Noncontributory for Additional Insured Amendatory Endorsement

**Policy Number:** 1000584589191           **Effective Date:** August 31, 2018   at 12:01 A.M.
**Named Insured:** Suffolk Construction Company

This endorsement modifies insurance provided under the following:

**EXCESS LIABILITY POLICY**

It is hereby agreed that **SECTION IV. CONDITIONS**, **I. Other Insurance** is deleted in its entirety and replaced by the following:

    **I.    Other Insurance**

        If other insurance applies to "Ultimate Net Loss" that is also covered by this Policy, this Policy will apply excess of, and will not contribute to, the other insurance.  Nothing herein will be construed to make this Policy subject to the terms, conditions and limitations of such other insurance.  However, other insurance does not include:

        **1.**    "Underlying Insurance";

        **2.**    Insurance that is specifically written as excess over this Policy; or

        **3.**    Insurance held by a person(s) or organization(s) qualifying as an additional insured in "Underlying Insurance," but only when the written contract or agreement that mandates such additional insured status:

            **a.**    Requires a specific limit of insurance that is in excess of the Underlying Limits of Insurance;
            **b.**    Requires that your insurance be primary and not contribute with that of the additional insured; and
            **c.**    Is executed prior to the loss.

        In such case as described in subparagraph **3.** above, we shall not seek contribution from the additional insured's primary or excess insurance for which they are a named insured for amounts payable under this insurance.

**Manuscript**                                                                                                      Page 1 of 2

**Copyright © Starr Indemnity & Liability Company.  All rights reserved.**
**Includes copyrighted material of Insurance Services Office, Inc., with its permission.**

The Limits of Insurance afforded the additional insured pursuant to subparagraph **3.** above shall be the lesser of the following:

    **a.**  The minimum limits of insurance required in the contract or agreement; or
    **b.**  The Limits of Insurance shown in the Declarations of this Policy.

Other insurance includes any type of self-insurance or other mechanism by which an Insured arranges for the funding of legal liabilities.

All other terms and conditions of this Policy remain unchanged.

## Signed for STARR INDEMNITY & LIABILITY COMPANY

| | |
|---|---|
| **Steven Blakey,  President and Chief Executive Officer** | **Nehemiah E. Ginsburg, General Counsel and Secretary** |

Copyright © Starr Indemnity & Liability Company.  All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.



**XL Insurance**

# Policy

## NOTICE TO POLICYHOLDERS

**FRAUD NOTICE**

| Alabama | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof. |
|---|---|
| Arkansas | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| Colorado | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| District of Columbia | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| Florida | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| Kansas | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| Kentucky | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| Louisiana | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| Maine | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| Maryland | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| New Jersey | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |
| **New York** | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.<br><br>**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.<br><br>**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.<br><br>The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| **Oklahoma** | **WARNING**:  Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.<br><br>**WARNING**: **All Workers Compensation Insurance**:<br>Any person or entity who makes any material false statement or representation, who willfully and knowingly omits or conceals any material information, or who employs any device, scheme, or artifice, or who aids and abets any person for the purpose of:<br>1.   obtaining any benefit or payment,<br>2.   increasing any claim for benefit or payment, or<br>3.   obtaining workers' compensation coverage under this act, shall be guilty of a felony punishable pursuant to Section 1663 of Title 21 of the Oklahoma Statutes. |
| **Pennsylvania** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.<br><br>**Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Workers' Compensation:**  It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:**  Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.  (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

NOTICE TO POLICYHOLDERS

**PRIVACY POLICY**

The AXA XL insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality.  For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies.  For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way.  In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

<u>Our Privacy Promise</u>

Your privacy and the confidentiality of your business records are important to us.  Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products.  We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you.  Accordingly, we promise that:

1.  We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2.  We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3.  We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4.  We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5.  We will not disclose information about you or your business to any organization outside the AXA XL insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6.  We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7.  We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8.  We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

<u>Collection and Sources of Information</u>

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services.  The information we collect generally comes from the following sources:

•  Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
•  Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you.  The information we collect will vary with the type of insurance you seek;

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;
- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies. The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you. We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so. The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim. In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit. We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

<u>Retention and Correction of Personal Information</u>

We retain personal information only as long as required by our business practices and applicable law. If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

<u>Storage of Personal Information</u>

We have in place safeguards to protect data and paper files containing personal information.

<u>Sharing/Disclosing of Personal Information</u>

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law. Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party. Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment. "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc. We also do not disclose to any unaffiliated third party a policy or account number for use in marketing. We may share with our affiliated companies information that relates to our experience and transactions with the customer.

<u>Policy for Personal Information Relating to Nonpublic Personal Health Information</u>

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed. However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you.  We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

Violation of the Privacy Policy

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

PN CW 02 0119                                                                                     Page 3 of 3

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

NOTICE TO POLICYHOLDERS

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to the impact of U.S. Trade Sanctions[1].  Please read this Policyholder Notice carefully.

In accordance with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") regulations, or any other U.S. Trade Sanctions embargoes or export controls applied by any regulatory body, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions, embargoes or export controls law, is a Specially Designated National and Blocked Person ("SDN"), or is owned or controlled by an SDN, this insurance will be considered a blocked or frozen contract. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC or the applicable regulator.  Other limitations on the premiums and payments also apply.

[1] "U.S Trade Sanctions" may be promulgated by Executive Order, act of Congress, regulations from the U.S. Departments of State, Treasury, or Commerce, regulations from the State Insurance Departments, etc.

PN CW 05 0519

©2019 X.L. America, Inc.  All rights reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**POLICYHOLDER DISCLOSURE**
**NOTICE OF TERRORISM**
**INSURANCE COVERAGE**

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States —to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is **$2,282**, and does not include any charges for the portion of losses covered by the United States government under the Act.

© 2015 X.L. America, Inc.
Includes copyrighted material of National Association of Insurance Commissioners, with its permission.




**Regulatory Office**
505 Eagleview Blvd. Suite 100
Dept: Regulatory
Exton, PA 19341-1120
Telephone 800-688-1840

**Issuing Company and Address**
XL Insurance America, Inc.
60 State Street
Suite 2225
Boston, MA  02109

# Excess Liability Policy Declarations

**Policy Number:**   US00035484LI19A          **Renewal or Replacement of:**   US00035484LI18A

**Date Issued:**   October 11, 2019

**Item 1.**   **Named Insured:**   Suffolk Construction Company, Inc.
            **Address:**          65 Allerton Street
                                 Boston, MA, 02119

**Item 2.**   **Policy Period:**   From:   _August 31, 2019_          To:   _August 31, 2020_
                                 12:01A.M. Standard time at the Named Insured's address stated above.

**Item 3.**   **Limits of Insurance:**   $          15,000,000   Each Occurrence
                                       $          15,000,000   Aggregate Limit(s) (where applicable)

**Item 4.**   **Underlying Insurance:**   *Please see attached Schedule of Underlying Insurance.*

**Item 5.**   **Premium is Payable:**   $ _____   Policy Premium
                                       $ _____   Premium for Certified Acts of Terrorism
                                       $ _____   Total Policy Premium
                                       $ _____   **Total Amount Due**

                                       $ _____   **Minimum Premium Due**

**Item 6.**   **Policy jacket, forms and endorsements attached to this policy at inception**
            **(number and edition date):**   *Please see attached Schedule of Forms and Endorsements.*

**Item 7.**   **Producer Name:**   AmWINS Brokerage of New England
            **Address:**          308 Farmington Avenue
                                 Farmington, CT 06032

                                 _____
                                         Authorized Representative

# IN WITNESS

## XL INSURANCE AMERICA, INC.

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

_____          _____
Joseph Tocco                                                   Toni Ann Perkins
President                                                          Secretary

IL MP 9104 0314 XLIA
©2014 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

| | | |
|---|---|---|
| Effective Date: | **August 31, 2019** | Issue Date: |
| Attached to and forming part of Policy No.: | | **US00035484LI19A** |
| Issued To: | **Suffolk Construction Company Inc** | |
| By: | **XL Insurance America, Inc.** | |

# Schedule of Forms and Endorsements

### Excess Liability Policy

Item 6 of the Declarations is completed to read as follows regarding the forms and endorsements attached to this policy at inception:

| Endorsement Number | Form Number | Form Title |
|---|---|---|
| --- | CXU 001 0119 | Excess Liability Policy Declarations |
| --- | CXU 050 0509 | Excess Liability Policy |
| --- | CXU 300 0116 | Schedule of Underlying Insurance |
| --- | IL MP 9104 0314 XLIA | In Witness |
| 1 | CXU 416 0715 | Waiver of Subrogation Endorsement |
| 2 | CXU 421 0813 | Amendment to Defense Provisions Endorsement |
| 3 | CXU 422 0813 | Amendment to Insuring Agreement Endorsement |
| 4 | CXU 424 0119 | Duties in the Event of an Occurrence, Claim or Suit Amendatory Endorsement |
| 5 | CXU 434 0715 | Additional Insured Endorsement |
| 6 | CXU 439 0715 | Indiana Amendatory Endorsement – Definition of Pollutants |
| 7 | CXU 446 0715 | Waiver of Subrogation Endorsement – Additional Insured |
| 8 | CXU 452 0119 | Amendment to Condition A. Duties in the Event of an "Occurrence", Claim or Suit |
| 9 | CXU 667 0715 | Electronic Data Liability Exclusion |
| 10 | CXU 671 0414 | Access or Disclosure of Confidential or Personal Information and Data-Related Liability Exclusion - With Limited Bodily Injury Exception |
| 11 | CXU 900 0115 | Cap on Losses from Certified Acts of Terrorism |
| 12 | Manuscript | Amendment to Condition J. Other Insurance Endorsement |

All other terms and conditions remain the same.

---

©2009 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

Effective Date:  **August 31, 2019**            Issue Date:

Attached to and forming part of Policy No.:      **US00035484LI19A**

Issued To:     **Suffolk Construction Company Inc**

By:     **XL Insurance America, Inc.**

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

# Schedule of Underlying Insurance

**Excess Liability Policy**

It is agreed that Item 4. Underlying Insurance, of the Declarations is completed as follows:

**Item A.  CONTROLLING UNDERLYING POLICY**

Coverage:     **Excess Liability**
Insurer:      Starr Indemnity & Liability Company
Policy Number: 1000584589191
Policy Period: August 31, 2019 to August 31, 2020
$   10,000,000     Each Occurrence
$   10,000,000     Other Aggregate(s), Where Applicable
$   10,000,000     Products-Completed Operations Aggregate

**Item B.  ALL UNDERLYING INSURANCE**

Coverage:     **Excess Liability (Controlling Layer)**
Insurer:      Starr Indemnity & Liability Company
Policy Number: 1000584589191
Policy Period: August 31, 2019 to August 31, 2020
$   10,000,000     Each Occurrence
$   10,000,000     Other Aggregate(s), Where Applicable
$   10,000,000     Products-Completed Operations Aggregate
Defense expenses are in addition to the limits

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

# Excess Liability Policy

**Various provisions in this policy restrict coverage.  Please read the entire policy carefully to determine your rights, duties and what is and is not covered.  Where used in this policy the words "you" and "your" refer to the Named Insured as shown in Item 1 of the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance coverage as shown in the box marked "Issuing Company" at the top of the Declarations.  Other words and phrases that are in quotation marks have special meaning.  Please refer to the SECTION VI - DEFINITIONS for explanations**

In consideration of the payment of premium and in reliance upon the statements in the Declarations and subject to the Limits of Insurance, Exclusions, Conditions, Definitions and other terms of this policy, we agree with you to provide coverage as follows:

**SECTION I – INSURING AGREEMENT**

A.  We will pay on your behalf all "Loss" that you become legally obligated to pay in excess of all "Underlying Insurance" as shown in Item 4. of the Declarations providing that:

    1.  Such "Loss" is insured by all of the policies shown in our Schedule of "Underlying Insurance".  If any "Underlying Insurance" does not pay damages, for reasons other than exhaustion of the aggregate limit of insurance, then we shall not pay such damages;

    2.  Such "Loss" arises from an injury or damage that occurs, or from an offense committed, during the Policy Period;

    3.  "Underlying Insurance" has been reduced or exhausted by payment of "Loss" to which this policy applies. In the event of a reduction or exhaustion in the underlying limit due to payment of such "Loss" we will:

        a.  Pay excess over the reduced underlying limit of the "Underlying Insurance; or

        b.  Continue in force should the "Underlying Insurance" be completely depleted.

B.  The terms, conditions, definitions, limitations and exclusions of the "Controlling Underlying Policy", as shown in the Schedule of "Underlying Insurance", in effect at the inception date of this policy, apply to this policy unless they are inconsistent with the provisions of this policy. Insurance provided by this policy will not be broader than the insurance provided by the "Underlying Insurance".

C.  If we are prevented by law or statute from paying on behalf of the "Insured" for any "Loss", to which this policy applies, then we will indemnify the "Insured" for those sums.

D.  The amount we will pay for "Loss" is limited as described in **SECTION III – LIMITS OF INSURANCE**.

**SECTION II – DEFENSE PROVISIONS**

A.  We have no duty to assume control of the investigation, defense or settlement of any claim, suit or proceeding; however, we will assume the defense of a suit brought against the "Insured" seeking damages to which this policy applies:

    1.  If all insurers providing the "Underlying Insurance" were obligated by the terms and conditions of their policies to assume the defense of such suit; and

---

**CXU 050 0509**                                    Page 1 of 7

©2009 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

2.  After all the applicable limits of insurance of the "Underlying Insurance" have been exhausted by the actual payment of "Loss" to which this policy applies.

B.  Any assumption of defense by us will end when we have used up the applicable Limit of Insurance in payment of judgments or settlements under this policy.

C.  We will have the right, but not the duty, to be associated with you or your underlying insurers in the investigation or settlement of any claim or the defense of any suit or proceeding which, in our opinion, may create liability on our part for payment under this policy.

D.  If "Defense Expenses" and/or supplementary payment expenses are included within the limit of insurance of any "Underlying Insurance", then any payment for such expenses we make shall also reduce the Limit of Insurance of this policy.

## SECTION III – LIMITS OF INSURANCE

A.  The Limits of Insurance shown in Item 3 of the Declarations of this policy and the rules below state the most we will pay for "Loss" under this policy regardless of the number of:

1.  "Insureds";

2.  Claims made or suits brought or number of vehicles involved;

3.  Persons or organizations making claims or who bring suits.

B.  The Aggregate Limit(s) shown in Item 3 of the Declarations of this policy are the most we will pay under the policy for all "Loss" during the Policy Period. However, the Aggregate Limit(s) of Insurance:

1.  will not apply when the " Controlling Underlying Insurance" does not apply an aggregate limit(s), provided that all other "Underlying Insurance" also does not apply an Aggregate Limit(s);

2.  will apply in the same manner that the Aggregate Limit(s) of the "Controlling Underlying Insurance" applies, provided all other "Underlying Insurance" also applies an Aggregate Limit(s) in the same manner as the "Controlling Underlying Insurance";

C.  Subject to A. and B. above, the Each Occurrence limit shown in Item 3 of the Declarations of this policy is the most we will pay for "Loss" arising out of any one "Occurrence."

## SECTION IV - EXCLUSIONS

A.  **Asbestos**

This insurance does not apply to any liability arising out of:

1.  The manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

2.  Any obligation of the "Insured" to indemnify a party because of damages arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust; or

3.  Any obligation to defend any suit or claim against the "Insured" that seeks damages if such suit or claim arises as the result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products,  asbestos fibers or asbestos dust.

©2009 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

B.     **Nuclear Liability**

This insurance policy does not apply to any liability:

1.   With respect to which an "Insured" under this policy is also an Insured under a nuclear energy insurance policy issued by the Nuclear Energy Insurance Property Insurance Association, Mutual Atomic Energy Insurance Underwriters or the Nuclear Insurance Association of Canada or any of their successors, or would be insured under any such policy but for its termination upon exhaustion of its limits of insurance.

2.   Resulting from the "hazardous properties" of "nuclear material" and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the "Insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America or any agency thereof under any agreement entered into by the United States of America or any agency thereof with any person or organization; or

3.   Resulting from the "hazardous properties" of "nuclear material" if

     a.   The "nuclear material" (1) is at any "nuclear facility" owned by the "Insured" or operated by or on behalf of the "Insured" or (2) has been discharged or dispensed therefrom;

     b.   The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the "Insured"; or

     c.   The injury or damage arises out of the furnishing by the "Insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this            exclusion 'c.' applies only to "Property damage" to such nuclear facility and any property thereat.

As used in this exclusion:

(1)   "Hazardous properties" includes radioactive, toxic or explosive properties;

(2)   "Nuclear material" means "source material", "special nuclear material" or "by-product material";

(3)   "Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof;

(4)   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

(5)   "Waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of a "nuclear facility" included within the definition of "nuclear facility" below;

(6)   "Nuclear facility" means:

      (a)   any nuclear reactor;

---

**CXU 050 0509**                           Page 3 of 7

©2009 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

(b) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel or (iii) handling, processing or packaging wastes;

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the "Insured's" custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

(d) any structure, basin, excavation, premises or place prepared or used for storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

(7) "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material; and

(8) "Property Damage" includes all forms of radioactive contamination of property.

## SECTION V - CONDITIONS

A.   **Duties in the Event of an "Occurrence", Claim, or Suit**

1.   You must see to it that we receive prompt written notice of an "Occurrence" that may result in a claim or suit under this policy.  To the extent possible, notice should include:

a.   How, when and where the "Occurrence" took place;

b.   The names and addresses of any injured persons and any witnesses; and

c.   The nature and location of any injury or damage arising out of the "Occurrence".

2.   If a claim is made or suit is brought against any "Insured" which may involve this policy, then You must notify us in writing as soon as practicable.  Written notice should be mailed or delivered to us at the following address:

> XL Insurance
> One World Financial Center
> 200 Liberty Street, 22nd Floor
> New York, New York  10281
> Attention:   Excess Casualty Claims Manager

3.   You and any other "Insured" must:

a.   Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

b.   Authorize us to obtain records and other information;

c.   Cooperate with us in the investigation or settlement of the claim or defense against the suit;

d. Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the "Insured" because of injury or damage to which this insurance may also apply; and

e. Not voluntarily make a payment, assume any obligation, or incur any expense, other than first aid, without our consent, unless it is at your own expense.

B.  **Changes to Policy**

This policy can only be changed with our consent by written endorsement and you must notify us of any coverage or limit changes made to the "Underlying Insurance" as soon as practicable.

C.  **Maintenance of "Underlying Insurance"**

During the Policy Period, you agree:

1. To keep "Underlying Insurance" in full force and effect;

2. That the terms, definitions, conditions and exclusions of "Underlying Insurance" will not change from what was scheduled at the time of inception of this policy;

3  That the total applicable limits of "Underlying Insurance" shall not decrease, except for any reduction or exhaustion of aggregate limits by payment of "Loss"; and

4. That any renewals or replacements of "Underlying Insurance" will provide equivalent coverage to and afford limits of insurance equal to or greater than the policy being renewed or replaced.

If you fail to comply with these requirements, we will be liable only to the same extent that we would have had you fully complied with these requirements.

D.  **Bankruptcy and Insolvency**

In the event of bankruptcy, liquidation, insolvency, or unwillingness of the insurer providing "Underlying Insurance" to pay "Loss" covered by "Underlying Insurance", we will be liable only to the same extent we would have had the "Underlying Insurance" been applicable and collectible.

E.  **Voluntary Payments**

You may not, without our consent which will not be unreasonably withheld, incur any expense or make any payment which may involve this policy.  Any such unauthorized expense or payment will be at your own cost.

F.  **Legal Action Against Us**

No person or organization has a right under this policy to:

1. Join us as a party or otherwise bring us into a suit asking for damages from you;

2. Sue us, unless all of the terms of this policy have been fully complied with.

---

©2009 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against you obtained after trial.  We will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of this policy.  An agreed settlement means a settlement and release of liability signed by us, you and the claimant or the claimant's legal representative.

G.      **First Named Insured Responsibilities and Duties**

The Named Insured first listed in Item 1 of the Declarations will be responsible for and act on behalf of all "Insureds" with respect to the payment of any premiums and determination and receipt of payments of "Loss" due under this policy.

H.      **Underlying Insurance**

The "Insured' represents that the applicable limit of the "Underlying Insurance" will be unimpaired as of the effective date of this policy.  In the event of non-concurrent policy   periods between this policy and any "Underlying Insurance", only covered "Occurrences" taking place during the Policy Period of this policy will be considered in determining the extent of any erosion or exhaustion of the applicable limit of "Underlying Insurance".

I.      **Cancellation and Non-Renewal**

The cancellation and non-renewal provisions of this policy will follow the cancellation and non-renewal provisions of the "Controlling Underlying Insurance" except as provided by endorsement to this policy.

J.      **Other Insurance**

If other valid and collectible insurance is available to you covering a "Loss" also covered by this policy, other than a policy that is specifically written to apply in excess of this policy, the insurance afforded by this policy shall apply in excess of and will not contribute with such "Other Insurance".


**SECTION VI - DEFINITIONS**

A.      "Controlling Underlying Policy" means the policy shown in Item A. of the Schedule of "Underlying Insurance" of this policy.

B.      "Defense Expenses" will have the same definition as such term or the equivalent term in the "Controlling Underlying Policy". If not defined in the "Controlling Underlying Policy", "Defense Expenses" will mean reasonable and necessary expenses and costs incurred in investigating and defending against any claim, suit or other proceeding, and will include, without limitation, attorneys' fees.

C.      "Insured" means each entity or person which is insured under all "Underlying Insurance" in the same capacity as which such insurance is afforded.

D.      "Loss" will have the same definition as such term or the equivalent term in the "Controlling Underlying Policy". If there is no definition of "Loss" or equivalent term in the "Controlling Underlying Policy" then "Loss" shall mean:

---

©2009 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

The total sum, after reduction for recoveries, or salvages collectible, that the "Insured" becomes legally obligated to pay as damages by reason of:

1.   Settlements, judgments, binding arbitration; or

2.   Other binding alternate dispute resolution proceedings entered into with our consent.

"Loss" includes "Defense Expenses" if all of the "Underlying Insurance" specifies that limits are reduced by "Defense Expenses".

E.   "Occurrence" will have the same definition as in the "Controlling Underlying Policy." To the extent that this term is not used in the "Controlling Underlying Policy" then "Occurrence" will have the same meaning as the equivalent term in the "Controlling Underlying Policy".

F.   "Other Insurance" means insurance, other than "Underlying Insurance", which has been provided to you and affords coverage with respect to injury or damage to which this policy applies. Other Insurance does not include any policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

G.   "Underlying Insurance" means the policy or policies of insurance as described in Item 4 of the Declarations and the Schedule of Underlying Insurance forming a part of this policy.

©2009 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

| Endorsement No.: | **1** | Form: | **CXU 416 0715** | Rev. | Page: | 1 |

Effective Date:     **August 31, 2019**          Issue Date:

Attached to and forming part of Policy No.:          **US00035484LI19A**

Issued To:     **Suffolk Construction Company, Inc.**

By:     **XL Insurance America, Inc.**

# Waiver of Subrogation Endorsement

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

**I.**   This policy is amended as follows:

> If prior to the time of an "Occurrence", you and the insurer(s) of the "Underlying Insurance" waived the right of recovery against a specific person or organization in a written "Insured Contract", we hereby also agree to waive our right of recovery in the same manner.  This waiver shall apply only with respect to a "Loss" occurring due to operations undertaken as per the specific contract in which you waived the right of recovery.

**II.**   Solely with respect to this endorsement, **SECTION VI – DEFINITIONS** is amended to add the following:

> "Insured Contract" will have the same definition as such term or equivalent term in the "Controlling Underlying Policy".

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Endorsement No.: | **2** | Form: | **CXU 421 0813** | Rev. | | Page: | 1 |
| Effective Date: | **August 31, 2019** | | Issue Date: | | | | |

Attached to and forming part of Policy No.:  **US00035484LI19A**

Issued To:  **Suffolk Construction Company, Inc.**

By:  **XL Insurance America, Inc.**

# Amendment to Defense Provisions Endorsement

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

I.  **SECTION II – DEFENSE PROVISIONS** is deleted in its entirety and replaced by the following:

   A.  We will have the right and duty to defend any "Suit" against the "Insured" that seeks damages to which this policy applies even if the "Suit" is groundless, false or fraudulent when:

      1.  The total applicable limits of "Underlying Insurance" have been exhausted by the payment of "Loss" to which this policy applies and the total applicable limits of "Other Insurance" have been exhausted.

      If any law or statute prevents us from complying with this agreement, we will reimburse the "Insured" for the expenses incurred to meet those obligations if we have given our written consent.

   B.  Except as provided in A. above, we will have no duty to defend any "Suit" against the "Insured". We will, however, have the right, but not the duty, to be associated with you or your underlying insurer(s) in the investigation or settlement of any claim or the defense of any "Suit" or proceeding which, in our opinion, may create liability on our part for payment under this policy. If we exercise this right, we will do so at our own expense.

   C.  We have no duty to defend the "Insured" against any "Suit" seeking damages to which this insurance does not apply.

   D.  Any assumption of defense by us will end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under this policy.

   E.  When we assume the defense of any "Suit" against the "Insured" that seeks damages to which this policy applies, we will:

      1.  Investigate, negotiate and settle the "Suit" as we deem expedient; and

      2.  Pay the following supplementary payments to the extent that such payments are not covered by "Underlying Insurance" or any applicable "Other Insurance":

         a.  Premiums on bonds to release attachments for amounts not exceeding the Limits of Insurance of this policy, but we are not obligated to apply for or furnish those bonds;

© 2013 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

b.   Premiums for all appeal bonds required by law to appeal a judgment in a "Suit" for amounts not exceeding the applicable Limits of Insurance of this policy, but we are not obligated to apply for or furnish any such bond;

c.   All court costs taxed against the "Insured" in a "Suit" that relates to claims to which this insurance applies;

d.   Pre-judgment interest awarded against the "Insured" on that part of the judgment within the applicable Limits of Insurance of this policy.  If we make an offer to pay the applicable Limits of Insurance, we will not pay any pre-judgment interest accruing after we make such offer;

e.   All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limits of Insurance of this policy; and

f.   The "Insured's" expenses incurred at our request or with our consent.

**F.**   Expenses incurred to defend any "Suit" or to investigate any claim as provided in Section II will be in addition to the applicable Limits of Insurance of this policy.  Provided, however, that if such expenses reduce the applicable limits of "Underlying Insurance", then such expenses will reduce the applicable Limits of Insurance of this policy.

**II.**   For the purposes of this endorsement, **SECTION VI – DEFINITIONS** is amended to include the following:

"Suit" will have the same definition as such term or equivalent term in the "Controlling Underlying Policy".  If there is no definition of "Suit" in the "Controlling Underlying Policy" then "Suit" will mean a civil proceeding in which damages to which this policy applies are alleged.

"Suit" includes:

1.   An arbitration proceeding in which such damages are claimed and to which the "Insured" must submit with our consent; or

2.   Any other alternative dispute resolution proceeding in which such damages are claimed and to which the "Insured" submits with our expressed consent.

"Suit does not include any injunction, demand or order from a governmental agency or body requesting action from any "Insured".

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

| | | | | | | |
|---|---|---|---|---|---|---|
| Endorsement No.: | **3** | Form: | **CXU 422 0813** | Rev. | Page: | 1 |

Effective Date:    **August 31, 2019**         Issue Date:

Attached to and forming part of Policy No.:        **US00035484LI19A**

Issued To:    **Suffolk Construction Company, Inc.**

By:    **XL Insurance America, Inc.**

# Amendment to Insuring Agreement Endorsement

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

**SECTION I – INSURING AGREEMENTS,** A. and B. are deleted in their entirety and replaced by:

A.    We will pay on your behalf all "Loss" that you become legally obligated to pay in excess of all "Underlying Insurance" as shown in Item 4. of the Declarations providing that:

1.    Such "Loss" is insured by all of the policies shown in our Schedule of "Underlying Insurance".  If any "Underlying Insurance" does not pay damages, for reasons other than exhaustion of the aggregate limit of insurance, then we shall not pay such damages;

2.    "Underlying Insurance" has been reduced or exhausted by payment of "Loss" to which this policy applies.  In the event of a reduction or exhaustion in the underlying limit due to payment of such "Loss" we will:

a.    Pay excess over the reduced underlying limit of the "Underlying Insurance"; or

b.    Continue in force should the "Underlying Insurance" be completely depleted.

B.    The terms, conditions, definitions, limitations and exclusions of the "Controlling Underlying Policy", as shown in the Schedule of "Underlying Insurance", apply to this policy unless they are inconsistent with the provisions of this policy.  Insurance provided by this policy will not be broader than the insurance provided by the "Underlying Insurance".

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

Endorsement No.:    **4**

Effective Date:    **August 31, 2019**          Issue Date:

Attached to and forming part of Policy No.:    **US00035484LI19A**

Issued To:    **Suffolk Construction Company, Inc.**

By:    **XL Insurance America, Inc.**

# Duties in the Event of an Occurrence, Claim or Suit Amendatory Endorsement

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

**SECTION V - CONDITIONS**, A. is deleted in its entirety and replaced by the following:

A.    **Duties in the Event of an Occurrence, Claim or Suit:**

1.    You must see to it that we are notified as soon as practicable of an "Occurrence" that may result in a claim or suit under this policy.  To the extent possible, notice should include:

a.    How, when and where the "Occurrence" took place;

b.    The names and addresses of any injured persons and any witnesses; and

c.    The nature and location of any injury or damage arising out of the "Occurrence".

2.    If a claim is made or suit is brought against any "Insured" which is reasonably likely to involve this policy, you must notify us in writing as soon as practicable. Written notice should be mailed or emailed to us at the following address:

Mail:    AXA XL Claims
P.O. Box 211547
Dallas, TX  75211

Email:  napropcasclaimnewnotices@axaxl.com

3.    You and any other involved "Insured(s)" must:

a.    Immediately send us copies of any demands, notices, summonses, legal papers or reports received in connection with the claim or suit;

b.    Authorize us to obtain records and other information;

c.    Cooperate with us in the investigation, settlement or defense of the claim or suit; and

d.    Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the "Insured" because of injury or damage to which this insurance may also apply.

           © 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

4.      For any "Occurrence" where notice has been given to us, no "Insured" will, except at their own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our expressed consent.


All other terms, conditions, definitions and exclusions of this policy remain unchanged.

© 2019 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

Endorsement No.:        **5**

Effective Date:    **August 31, 2019**        Issue Date:

Attached to and forming part of Policy No.:    **US00035484LI19A**

Issued To:    **Suffolk Construction Company, Inc.**

By:    **XL Insurance America, Inc.**

# Additional Insured Endorsement

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

Subject to the terms and conditions of this policy, this insurance will apply to the below named additional "Insured", but only:

1.  If such additional "Insured" is insured in all "Underlying Insurance" for the full limits of liability of such "Underlying Insurance"; and

2.  for the hazards for which coverage is afforded under such "Underlying Insurance".

**ADDITIONAL INSURED**

Project: 49th Ave Project (Normandy)

MAPLE 49TH AVENUE OWNER II, LLC,
• SSGA FUNDS MANAGEMENT, INC.,
• GENERAL ELECTRIC PENSION TRUST,
• DEUTSCHE BANK AG, NEW YORK BRANCH, ISAOA,

ATIMA,
• NORMANDY FUNDSUB MANAGEMENT CO., LLC,
• NORMANDY DEVELOPMENT AND CONSTRUCTION

SERVICES, LLC
• STUDIOS ARCHITECTURE, DC PC

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

Endorsement No.:    **6**

Effective Date:    **August 31, 2019**        Issue Date:

Attached to and forming part of Policy No.:    **US00035484LI19A**

Issued To:    **Suffolk Construction Company, Inc.**

By:    **XL Insurance America, Inc.**

# Indiana Amendatory Endorsement – Definition of Pollutants

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

---
**WHEN INDIANA LAW GOVERNS THE INTERPRETATION OF THIS POLICY OR IS APPLIED IN A CIVIL PROCEEDING TO WHICH THIS INSURANCE APPLIES, THE DEFINITION OF POLLUTANTS IN THIS ENDORSEMENT SHALL APPLY.**

---

**I.    SECTION VI – DEFINITIONS** is amended to include the following:

The following definition will supersede any definition of "Pollutants" in the "Controlling Underlying Policy".

"Pollutants" means any substance or material that is a solid, liquid, gaseous or thermal irritant or contaminant including but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste and any substances or materials identified in the Schedule of this endorsement.   Waste includes materials to be recycled, reconditioned or reclaimed.

The definition of "Pollutants" applies whether or not such irritant or contaminant has any function in your business, product(s), operations, premises, site or location.  The definition of "Pollutants" also applies whether or not such irritant or contaminant is "Your Product" or products used by or for you.

"Pollutants" include any substance or material that can be toxic or hazardous, cause irritation to persons or animals and/or cause contamination to property and the environment and include but are not limited to:

1.    Any substance or material specifically identified as a "Pollutant" in the "Controlling Underlying Policy";

2.    Diesel, kerosene, and other fuel oils, gasoline, butane, propane, natural gas, and other fuels, brake fluid, transmission fluid, and other hydraulic fluids, ethylene glycol, methyltertbutylether (MTBE), methanol, ethanol, isopropyl alcohol, and propylene glycol, and other fuel and antifreeze additives, grease, tar, petroleum distillates, lubrication oils, adjuvant oils, crop oils and other petroleum products and petroleum hydrocarbons, carbon monoxide, and other exhaust gases, stoddard solvent, mineral spirits, and other solvents, chromium compounds, emulsions/emulsifiers, naphtha tetrachloroethylene (PCE), perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals, methyl isobutyl ketone, methyl ethyl ketone, n-butyl acetate, 2-butoxyethanol, hexylene glycol, peroxides, freon, polychlorinated biphenyl (PCB), CFC113, chlorofluorocarbons, chlorinated hydrocarbons, adhesives, pesticides, insecticides, fungicides, fertilizer, animal or bird waste, barium, 1,2-dichloroethylene, ethylene dichloride, dichloromethane, methylene chloride, ethylbenzene, lead, mercury, selenium, sulfate, xylene, silica, sewage, and industrial waste materials; or

3. All substances, materials, constituents, derivatives or degradative byproducts, or additives specifically listed, identified, or described by one or more of the following references:

   a. Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Priority List Hazardous Substances (1997 and all subsequent editions);

   b. Agency for Toxic Substances And Disease Registry ToxFAQs™;

   c. Clean Air Act's List of 188 Air Toxics And Diesel Particulate Matter;

   d. U.S. Environmental Protection Agency EMCI Chemical References Complete Index;

   e. U.S. Environmental Protection Agency Persistent, Bioaccumulative, and Toxic Chemical List;

   f. Indiana Department of Environmental Management, Remediation Closure Guide, March 22, 2012 edition, Table A-6 Screening Level Summary Table - 2012; and

   g. Indiana Department of Environmental Management, Risk Integrated System of Closure Technical Guide, Default Closure Tables, January 31, 2006 Appendix 1 (Revised May 1, 2009).

II. Solely with respect to this endorsement, **SECTION VI – DEFINITIONS** is amended to include the following:

"Your Product" will have the same definition as such term or equivalent term in the "Controlling Underlying Policy".  If there is no definition of "Your Product" or equivalent term in the "Controlling Underlying Policy" then "Your Product" shall mean:

1. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   a. You;

   b. Others trading under your name; or

   c. A person or organization whose business or assets you have acquired; and

2. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your Product" includes:

1. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "Your Product"; and

2. The providing of or failure to provide warnings or instructions.

"Your Product" does not include vending machines or other property rented to or located for the use of others but not sold.

 © 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**SCHEDULE**

**Additional specifically identified substance(s) or material(s):**

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Endorsement No.:     **7**

Effective Date:     **August 31, 2019**                    Issue Date:

Attached to and forming part of Policy No.:     **US00035484LI19A**

Issued To:     **Suffolk Construction Company, Inc.**

By:     **XL Insurance America, Inc.**

# Waiver of Subrogation Endorsement – Additional Insured

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

**I.**   This policy is amended as follows:

If prior to the time of an "Occurrence", you and the insurer(s) of the "Underlying Insurance" waived the right of recovery against a specific person or organization in a written "Insured Contract", we hereby also agree to waive our right of recovery in the same manner.  This waiver shall apply only with respect to a "Loss" occurring due to operations undertaken as per the specific contract in which you waived the right of recovery.

This waiver applies to the entity(ies) shown in the Schedule below.

<div align="center">

**SCHEDULE**

</div>

**II.**   Solely with respect to this endorsement, **SECTION VI – DEFINITIONS** is amended to add the following:

"Insured Contract" will have the same definition as such term or equivalent term in the "Controlling Underlying Policy".

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

Endorsement No.:  **8**

Effective Date:  **August 31, 2019**          Issue Date:

Attached to and forming part of Policy No.:  **US00035484LI19A**

Issued To:   **Suffolk Construction Company, Inc.**

By:    **XL Insurance America, Inc.**

# Amendment to Condition A. Duties in the Event of an "Occurrence", Claim or Suit

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

**SECTION V – CONDITIONS**, A. 2. is deleted in its entirety and replaced by the following:

2.      If a claim is made or suit is brought against any "Insured" which may involve this policy, you must notify us in writing as soon as practicable.  Written notice should be mailed or emailed to us at the following address:

|  |  |
|---|---|
| Mailed: | AXA XL Claims<br>P.O. Box 211547<br>Dallas, TX  75211 |
| Emailed: | napropcasclaimnewnotices@axaxl.com |

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

Endorsement No.:       **9**

Effective Date:       **August 31, 2019**              Issue Date:

Attached to and forming part of Policy No.:       **US00035484LI19A**

Issued To:       **Suffolk Construction Company, Inc.**

By:       **XL Insurance America, Inc.**

# Electronic Data Liability Exclusion

*This endorsement changes the policy. Please read it carefully*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

**SECTION IV – EXCLUSIONS** is amended to include the following:

**Electronic Data**

This insurance does not apply to any liability arising out of:

The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "Electronic Data".

It is further agreed that in no event shall this policy recognize or be impacted by the erosion or exhaustion of any "Underlying Insurance" by payment of "Loss" arising out of or in connection with any injury or damage excluded by this endorsement.

**SECTION VI – DEFINITIONS** is amended to add the following:

"Electronic Data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically-controlled equipment.

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

Endorsement No.:       **10**

Effective Date:        **August 31, 2019**            Issue Date:

Attached to and forming part of Policy No.:      **US00035484LI19A**

Issued To:       **Suffolk Construction Company, Inc.**

By:       **XL Insurance America, Inc.**

# Access or Disclosure of Confidential or Personal Information and Data-Related Liability Exclusion - With Limited Bodily Injury Exception

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

I.       **SECTION IV – EXCLUSIONS** is amended to add the following;

   **Access or Disclosure of Confidential or Personal Information and Data-Related Liability**

   This insurance does not apply to liability arising out of:

   1.      Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

   2.      The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "Electronic Data".

   This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other "Loss", cost or expense incurred by you or others arising out of that which is described in Paragraph 1. or 2. above.

   However, unless Paragraph 1. above applies, this exclusion does not apply to damages because of Bodily Injury.

   It is further agreed that in no event shall this policy recognize or be impacted by the erosion or exhaustion of any "Underlying Insurance" by payment of "Loss" arising out of or in connection with any injury or damage excluded by this endorsement.

II.      **SECTION VI – DEFINITIONS** is amended to add the following:

   "Electronic Data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically-controlled equipment.

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

Endorsement No.:      **11**

Effective Date:      **August 31, 2019**          Issue Date:

Attached to and forming part of Policy No.:      **US00035484LI19A**

Issued To:      **Suffolk Construction Company, Inc.**

By:      **XL Insurance America, Inc.**


# Cap on Losses from Certified Acts of Terrorism

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

I.   Cap on Losses from Certified Acts of Terrorism

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

II.   **SECTION VI - DEFINITIONS** is amended to add the following:

For the purposes of this endorsement:

"Certified Act of Terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act and any amendment thereto. The criteria contained in the federal Terrorism Risk Insurance Act for a "Certified Act of Terrorism" include the following:

1.   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

III.   The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any "Loss" which would otherwise be excluded under this policy.


All other terms, conditions, definitions and exclusions of this policy remain unchanged.

Endorsement No.: **12**

Effective Date: **August 31, 2019** Issue Date:

Attached to and forming part of Policy No.: **US00035484LI19A**

Issued To: **Suffolk Construction Company, Inc.**

By: **XL Insurance America, Inc.**

# Amendment to Condition J. Other Insurance Endorsement

*This endorsement changes the policy. Please read it carefully.*

This endorsement modifies insurance provided under the following:

**Excess Liability Policy**

**SECTION V** – **CONDITIONS**, Condition J. is deleted in its entirety and replaced by the following:

J. **Other Insurance**

1. If other valid and collectible insurance is available to you or any other qualifying Named Insured on the Underlying Insurance covering a "Loss" also covered by this policy, other than a policy that is specifically written to apply in excess of this policy, the insurance afforded by this policy shall apply in excess of and will not contribute with such "Other Insurance".

2. However, if you have agreed in a written contract that this policy shall be primary and non-contributory, then this policy will respond as primary and non-contributory but only with respect to damage arising out of insured operations or work on your behalf performed under such written contract. When this provision applies, the coverage available to the other person or organization will be the lesser of this policy's Limits of Insurance or the minimum limits required by such written contract but only if such person or organization is included under the coverage provided by a policy shown in Item 4. Underlying Insurance of the Declarations.

All other terms, conditions, definitions and exclusions of this policy remain unchanged.

© 2018 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.

## Your Great American Insurance Policy℠

301 E. Fourth St., Cincinnati, OH 45202



800-545-4269

GAIG.com

© 2017 Great American Insurance Company

0790-C (10/17)

Great American Assurance Company

**PLEASE READ THIS CAREFULLY.**

## POLICYHOLDER NOTIFICATION - MASSACHUSETTS

**THE POLICY APPLIED FOR IS NOT SUBJECT TO ALL INSURANCE LAWS THAT APPLY TO OTHER COMMERCIAL LINES PRODUCTS AND MAY CONTAIN SIGNIFICANT DIFFERENCES FROM A POLICY THAT IS SUBJECT TO MASSACHUSETTS INSURANCE LAWS. SUCH DIFFERENCES MAY INCLUDE BUT ARE NOT LIMITED TO DIFFERENCES IN POLICY CONDITIONS, ENDORSEMENTS AND EXCLUSIONS AS COMPARED TO A POLICY THAT IS SUBJECT TO ALL OF THE PROVISIONS OF THE MASSACHUSETTS INSURANCE LAWS. BY WAY OF EXAMPLE THIS POLICY MAY CONTAIN CLAIMS-MADE PROVISIONS, LANGUAGE BRINGING DEFENSE PAYMENTS WITHIN THE POLICY LIMIT OF LIABILITY AND LIMITATIONS AS TO THE TERRITORY IN WHICH COVERAGE CAN APPLY.**

I hereby acknowledge that I have read the above disclosure notice and have received a copy of the same.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _         _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
Signature of Authorized Representative                    Date


_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
Printed Name of Authorized Representative


_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
Name of Commercial Insured

SDM-701 (Ed. 05/08) XS

Great American Assurance Company

GAI 6600 (Ed. 06/97)

| | |
|---|---|
| **Policy No.** | EXC3161438 |
| **Renewal Of** | EXC2275587 |

## COMMERCIAL EXCESS LIABILITY DECLARATIONS PAGE

| **1.  NAMED INSURED AND ADDRESS:** | **2.  POLICY PERIOD:** |
|---|---|
| Suffolk Construction Company, Inc.<br>(Per Underlying Insurance)<br>65 Allerton Street<br>Boston, MA 02119-2901 | 12:01 A.M. Standard Time at the address of the Named Insured shown at left.<br>From 08/31/2019          To 08/31/2020 |

| IN RETURN FOR PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY. | PRODUCER'S NAME AND ADDRESS:<br>AmWins Brokerage of New England  (CT)<br>308 Farmington Avenue<br>Farmington, CT 06032 |
|---|---|

Insurance is afforded by: Great American Assurance Company

**3.  PREMIUM:**

| | | |
|---|---|---|
| Total Advance Premium | $ | ■■■■ |
| Service Charge | $ | |
| Taxes | $ | |
| Surcharge | $ | |
| Total | $ | ■■■■ |

**BASIS OF PREMIUM:**          Non-Auditable          (   X   )                    Auditable   (        )

In the event of cancellation by the Named Insured, the company will receive and retain no less than $  as a policy minimum premium.

**4.  LIMITS OF INSURANCE:**

| | | |
|---|---|---|
| $ | 25,000,000 | Each Occurrence |
| $ | 25,000,000 | Aggregate Limit (Where Applicable) |

These Limits of Insurance apply in excess of the Underlying Limits of Insurance indicated in Item **5.** of the Declarations.

**5. UNDERLYING INSURANCE:**

| Carrier Information | Type of Coverage | Limits of Insurance |
|---|---|---|
| See GAI 6008 - Schedule A - Schedule of Underlying Insurance (Supplemental) | | |

**6.  FORMS AND ENDORSEMENTS** applicable to all Coverage Forms and made part of this Policy at time of issue are listed on the attached Forms and Endorsements Schedule, GAI 6013 (Ed.06/97).

Great American Assurance Company

GAI 6013 (Ed. 06/97)

# FORMS AND ENDORSEMENTS SCHEDULE

It is hereby understood and agreed the following forms and endorsements are attached to and are a part of this policy:

| | Form and Edition | ST | Date Added* or Date Deleted | Form  Description |
|---|---|---|---|---|
| 1 | GAI6600 06/97 | MA | | Commercial Excess Liability Declarations Page |
| 2 | GAI6008 06/97 | MA | | Schedule A - Schedule of Underlying Insurance (Supplemental) |
| 3 | GAI6964 11/10 | MA | | Crisis Response or Crisis Communication Management Insurance Exclusion |
| 4 | GAI6533 06/97 | MA | | Exclusion - Liability Arising Out of Lead |
| 5 | GAI6965 10/14 | MA | | Following Form Endorsement |
| 6 | GAI6966 10/14 | MA | | Pollution Liability Coverage - Follow Form |
| 7 | GAI6566 06/97 | MA | | Professional Liability Exclusion |
| 8 | GAI6650 03/03 | MA | | War Liability Exclusion |
| 9 | GAI6011 06/97 | MA | | Additional Insured Limitation |
| 10 | GAI6011 06/97 | MA | | Additional Insured Limitation |
| 11 | GAI7354 08/17 | MA | | Advance Notice of Cancellation and Nonrenewal Provided by Us |
| 12 | GAI6011 06/97 | MA | | Amendment of Duty to Defend Endorsement |
| 13 | IL7324 08/12 | MA | | Economic and Trade Sanctions Clause |
| 14 | GAI6594 06/97 | MA | | Transfer of Your Rights and Duties Under This Policy |
| 15 | GAI6452 04/15 | MA | | Cap On Losses From Certified Acts Of Terrorism |
| 16 | GAI6472 04/15 | MA | | Disclosure Pursuant to Terrorism Risk Insurance Act |
| 17 | GAI6524 06/97 | MA | | Excess Liability Coverage Form |
| 18 | IL7268 09/09 | MA | | In Witness Clause |

*If not at inception

Great American Assurance Company

GAI 6008 (Ed. 06/97)

## SCHEDULE A - SCHEDULE OF UNDERLYING INSURANCE (SUPPLEMENTAL)

| Carrier, Policy Number and Period | Type of Coverage | Limits of Insurance |
|---|---|---|
| 1. First Underlying Insurance Policy<br><br>Starr Indemnity & Liability Company<br>Pol.# 1000584589191<br>08/31/2019 to 08/31/2020 | Excess Liability | $10,000,000 Each Occurrence<br>$10,000,000 Aggregate Limit<br>        (Where Applicable)<br>in excess of Primary Limits |
| 2. Other Underlying Insurance Policy<br><br>XL Insurance America, Inc.<br>Pol.# US00035484LI19A<br>08/31/2019 to 08/31/2020 | Controlling Excess Liability | $15,000,000 Each Occurrence<br>$15,000,000 Aggregate Limit<br>        (Where Applicable)<br>in excess of Item 1. above |

Great American Assurance Company

**GAI 6964**
(Ed. 11 10)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**CRISIS RESPONSE OR CRISIS COMMUNICATION MANAGEMENT INSURANCE EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA COVERAGE FORM
EXCESS LIABILITY COVERAGE FORM

It is agreed that this insurance shall not become excess of Crisis Response Costs or Crisis Communication Management Insurance as may be specifically covered by and defined in the "underlying insurance".

**This endorsement does not change any other provision of this policy.**

GAI 6964 (Ed. 11/10)

Great American Assurance Company

**GAI 6533**
(Ed. 06 97)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION - LIABILITY ARISING OUT OF LEAD

The following exclusion is added to Section **IV - EXCLUSIONS:**

1. any liability arising out of, resulting from, or in any way caused by or related to any actual, alleged or threatened ingestion, inhalation, absorption, or exposure to lead, in any form and from any source; or

2. any "loss," cost, expense, liability or other type of obligation arising out of, resulting from, or in any way related to, any:

   a. claim, suit, request, demand, directive, or order by or on behalf of any person, entity, or governmental authority that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of lead in any form from any source, or to any

   b. claim or suit by or on behalf of any person, entity, or governmental authority for damages or any other relief or remedy because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of lead in any form.

This endorsement does not change any other provision of the policy.

GAI 6533 (Ed. 06/97) XS

Great American Assurance Company

GAI 6965 (Ed. 10/14)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## FOLLOWING FORM ENDORSEMENT

This endorsement modifies insurance provided under the following

EXCESS LIABILITY COVERAGE FORM

**INSURING AGREEMENTS I. COVERAGE** of this policy is deleted in its entirety and is replaced with the following:

We will pay on behalf of the Insured the amount of "loss" covered by this insurance in excess of the "Underlying Limits of Insurance" shown in Item **5.** of the Declarations, subject to **INSURING AGREEMENT** Section II., **Limits of Insurance**. Except for Items **1.** through **8.** listed below, the coverage provided by this policy shall follow form and be in accordance with the insuring agreements, exclusions, definitions and conditions contained in the "first underlying insurance" identified below.

Insurance Company: XL Insurance America, Inc.

Policy Number:          US00035484LI19A

**1.**   Limits of Insurance

**2.**   Policy Period

**3.**   Premium

**4.**   Schedule of Underlying Insurance

**5.**   Asbestos Exclusion

**6.**   Nuclear Energy Liability Exclusion

**7.**   Any other endorsement agreed upon by us and the Named Insured, and endorsed to this policy

**8.**   Cancellation provision

If any provisions of the "first underlying insurance" are more restrictive than items identified as **1.** through **8.** in this Endorsement, the provisions of the "first underlying insurance" shall apply.

In addition, the coverage provided by this policy will follow form and be in accordance with the limitations, exclusions or restrictions of coverage in any other "underlying insurance" to the extent coverage is further limited or restricted by a policy or endorsement of "underlying insurance."

In no event will this policy provide broader coverage in any respect than would be provided by any of the "underlying insurance."

**This endorsement does not change any other provision of the policy.**

Great American Assurance Company

GAI 6966 (Ed. 10/14)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**POLLUTION LIABILITY COVERAGE - FOLLOW FORM**

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY COVERAGE FORM

**Section IV Exclusions** - Exclusion **B.** is deleted in its entirety and replaced by the following:

**B.** Any liability, including, but not limited to settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants arising

1. directly or indirectly out of the actual, alleged or threatened existence, discharge, seepage, migration, disposal, release or escape of pollutants.

2. **a.** from any request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

   **b.** from any claim or suit by or on behalf of governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

As used in this endorsement "pollutants" means "pollutants" as defined in the "underlying insurance".

However, it is agreed that this exclusion does not apply to any liability, damage, loss or expense as described herein for which coverage is afforded under XL Insurance America, Inc.,

Policy Number US00035484LI19A,

and then for no broader coverage than is afforded by such insurance (hereafter referred to as the Underlying Pollution Coverage). In the event that Underlying Pollution Coverage is amended or deleted after the inception date of this policy, we must be so advised within 14 days after the effective date of such amendment or deletion.

Any amendment which deletes in part or in whole the Underlying Pollution Coverage shall in like manner delete the coverage provided by this endorsement.

Any amendment which broadens coverage under the Underlying Pollution Coverage shall not be binding upon us unless our agreement is acknowledged in writing by an authorized representative of the Company.

In no event will this policy provide broader coverage in any respect than would be provided by any of the "underlying insurance."

**This endorsement does not change any other provision of the policy.**

Great American Assurance Company

**GAI 6566**
(Ed. 06 97)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PROFESSIONAL LIABILITY EXCLUSION**

The following exclusion is added to Section **IV - EXCLUSIONS:**

Any liability for, caused by, arising out of, or in connection with the rendering of or failure to render any professional service.

This endorsement does not change any other provision of the policy.

GAI 6566 (Ed. 06/97) XS

Great American Assurance Company

GAI 6650
(Ed. 03 03)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**WAR LIABILITY EXCLUSION**

The following exclusion is added to **SECTION IV - EXCLUSIONS**:

This insurance does not apply to:

**War**

"Any injury or damage," however caused, arising, directly or indirectly, out of:

(1) war, including undeclared or civil war; or

(2) warlike action by military force, including action of hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

As used in this exclusion:

**"Any injury or damage"** means any injury or damage covered under any policy, Coverage Part, or "underlying insurance" to which this endorsement is applicable, and includes but is not limited to "bodily injury," "property damage," "personal and advertising injury," "loss," "injury" or "environmental damage" as may be defined in any applicable policy, Coverage Part, or "underlying insurance."

**This endorsement does not change any other provision of the policy.**

GAI 6650  (Ed. 03/03)  XS

Great American Assurance Company

GAI 6011 (Ed. 06/97)

# GENERAL ENDORSEMENT

## Additional Insured Limitation

It is agreed that the insurance afforded by this policy to any person or organization as an Additional "Insured" is hereby limited to the extent set forth below:

1. The Limits of Insurance afforded by this policy to such person or organization included hereunder when combined with the Limits of Insurance provided the person or organization by the underlying insurance shall not exceed the Limits of Insurance required by the terms and provisions of the "insured contract" between the person or organization and the Named Insured.

2. The inclusion of any person or organization as an Additional "Insured" shall not operate to increase the Company's Limits of Insurance set forth in this policy.


Project:  49th Ave Project (Normandy)

Additional Insureds:
1. MAPLE 49TH AVENUE OWNER II, LLC,
2. SSGA FUNDS MANAGEMENT, INC.,
3. GENERAL ELECTRIC PENSION TRUST,
4. DEUTSCHE BANK AG, NEW YORK BRANCH, ISAOA, ATIMA,
5. NORMANDY FUNDSUB MANAGEMENT CO., LLC,
6. NORMANDY DEVELOPMENT AND CONSTRUCTION SERVICES, LLC
7. STUDIOS ARCHITECTURE, DC PC

Great American Assurance Company

GAI 6011 (Ed. 06/97)

## GENERAL ENDORSEMENT

## Additional Insured Limitation

It is agreed that the insurance afforded by this policy to any person or organization as an Additional "Insured" is hereby limited to the extent set forth below:

1.  The Limits of Insurance afforded by this policy to such person or organization included hereunder when combined with the Limits of Insurance provided the person or organization by the underlying insurance shall not exceed the Limits of Insurance required by the terms and provisions of the "insured contract" between the person or organization and the Named Insured.

2.  The inclusion of any person or organization as an Additional "Insured" shall not operate to increase the Company's Limits of Insurance set forth in this policy.


Project:
BFT Renovations Project
1 Harbor Street
Boston, MA  02210

Additional Insured:
ICCNE I LLC c/o Cargo Ventures

Great American Assurance Company

GAI 7354 (Ed. 08/17)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## ADVANCE NOTICE OF CANCELLATION AND NONRENEWAL PROVIDED BY US

This endorsement modifies insurance provided under the following:

EXCESS LIABILITY COVERAGE FORM

**Schedule**

Number of Days Notice - Cancellation     90

Number of Days Notice - Nonrenewal     90

If we cancel this Policy for any reason other than nonpayment of premium, the minimum number of days required for notice of cancellation, as provided in Paragraph **D. 2. Cancellation** of **SECTION VI. CONDITIONS** or as amended by an applicable state cancellation endorsement, is increased to the number of days shown in the Schedule above.

The number of days required for notice of nonrenewal, as amended by an applicable state cancellation and nonrenewal endorsement, is increased to the number of days shown in the Schedule above.

**All other Policy terms and conditions remain unchanged.**

Great American Assurance Company

GAI 6011 (Ed. 06/97)

## GENERAL ENDORSEMENT

## Amendment of Duty to Defend Endorsement

It is hereby understood and agreed that Excess Liability Coverage Form GAI 6524, Paragraph III. A. - DEFENSE, is deleted and replaced by the following:

A.  We will have the right and duty to investigate any "claim" and defend any "suit" seeking damages covered by the terms and conditions of this policy when the applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other insurance providing coverage to the "Insured" have been exhausted by actual payment of "claims" for any "occurrence" to which this policy applies.

This endorsement does not change any other provision of the policy.

Great American Assurance Company

IL 73 24 (Ed. 08 12)

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

**ECONOMIC AND TRADE SANCTIONS CLAUSE**

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance.

IL 73 24 (Ed. 08/12)

Great American Assurance Company

**GAI 6594**
(Ed. 06 97)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY**

**The following condition is added to SECTION VI - CONDITIONS:**

This insurance will not be invalidated should the Insured waive in writing prior to "loss" any and all rights of recovery against all subsidiary and affiliated organizations of the Named Insured for "loss" occurring to any and all coverages provided by this policy.

This endorsement does not change any other provision of the policy.

GAI 6594 (Ed. 06/97) XS

Great American Assurance Company

GAI 6452  (Ed. 04/15)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

This endorsement modifies insurance provided under the following:

    COMMERCIAL UMBRELLA
    EXCESS LIABILITY

The following is added to **SECTION II. LIMITS OF INSURANCE**:

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**"Certified act of terrorism"** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

  **1.** the act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

  **2.** the act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**This endorsement does not change any other provision of the policy.**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
GAI 6452 (Ed. 04/15)

Great American Assurance Company

GAI 6472 (Ed. 04/15)

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA
EXCESS LIABILITY

**Schedule\***

**Terrorism Premium (Certified Acts) $** 0

\* Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.  Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B.  Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in paragraph D. below) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C.  Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**D.  Federal Share of Losses Under the Terrorism Risk Insurance Act**

85% Year: 2015
84% Year: 2016
83% Year: 2017
82% Year: 2018
81% Year: 2019
80% Year: 2020

**This endorsement does not change any other provision of the policy.**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Great American Assurance Company

**GAI 6524**
(Ed. 06 97)

# EXCESS LIABILITY COVERAGE FORM

There are provisions in this policy that restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured. The words "we," "us" and "our" refer to the Company providing this insurance. The word Insured means any person or organization qualifying as such in the "first underlying insurance." Other words and phrases that appear in quotation marks have special meaning and can be found in the **DEFINITIONS** Section or the specific policy provision where they appear.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations we agree with you to provide the coverage as follows:

## INSURING AGREEMENTS

### I. COVERAGE

We will pay on behalf of the Insured the amount of "loss" covered by this insurance in excess of the "Underlying Limits of Insurance" shown in Item **5.** of the Declarations, subject to **INSURING AGREEMENT** Section **II., Limits of Insurance.** Except for the terms, conditions, definitions and exclusions of this policy, the coverage provided by this policy will follow the "first underlying insurance."

### II. LIMITS OF INSURANCE

**A.** The Limits of Insurance shown in the Declarations and the rules below describe the most we will pay under the terms of this insurance regardless of the number of:

    **1.** Insureds;

    **2.** claims made or suits brought;

    **3.** persons or organizations making claims or bringing suits.

**B.** The Limits of Insurance of this policy will apply as follows:

    **1.** This policy applies only in excess of the "Underlying Limits of Insurance" shown in Item **5.** of the Declarations.

    **2.** The aggregate limit shown in Item **4.** of the Declarations is the most we will pay for all "loss" that is subject to an aggregate limit provided by the "first underlying insurance." The aggregate limit applies separately and in the same manner as the aggregate limits provided by the "first underlying insurance," provided that all "underlying insurance" applies their aggregate limit in the same manner as the "first underlying insurance."

    **3.** Subject to **B.2.,** the occurrence limit stated in Item **4.** of the Declarations is the most we will pay for all "loss" arising out of any one occurrence to which this policy applies.

    **4.** Subject to Paragraphs **B.2.** and **B.3.** above, if the "Underlying Limits of Insurance" described in Item **5.** of the Declarations are either reduced or exhausted solely by payment of "loss," such insurance provided by this policy will apply in excess of the reduced underlying limit or, if all underlying limits are exhausted, will apply as "underlying insurance" subject to the same terms, conditions, definitions and exclusions of the "first underlying insurance," except for the terms, conditions, definitions and exclusions of this policy.

However, we will not pay that portion of a "loss" that is within the "Underlying Limits of Insurance" which the Insured has agreed to fund by self-insurance or means other than insurance.

5. The limits of this policy apply separately to each consecutive annual period, and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations unless the policy period is extended after issuance for an additional period of less than 12 months. In that case the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## III. DEFENSE

**A.** We will not be required to assume charge of the investigation of any claim or defense of any suit against you.

**B.** We will have the right, but not the duty, to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for "loss." If we exercise such right, we will do so at our own expense, but not after the limits of this policy are exhausted.

## IV. EXCLUSIONS

This policy does not apply to:

**A.** Any liability, including, but not limited to settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants arising out of or related in any way, either directly or indirectly, to:

1. asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust, including, but not limited to, manufacture, mining, use, sale, installation, removal, or distribution activities;

2. exposure to testing for, monitoring of, cleaning up, removing, containing or treating of asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust; or

3. any obligation to investigate, settle or defend, or indemnify any person against any claim or suit arising out of or related in any way, either directly or indirectly, to asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust.

**B.** Any liability, including, but not limited to settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants arising out of or in any way related to:

1. the actual, alleged or threatened presence, discharge, dispersal, seepage, migration, release or escape of "pollutants," however caused;

2. any request, demand, or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the effects of "pollutants." This includes demands, directives, complaints, suits, orders or requests brought by any governmental entity or by any person or group of persons;

3. steps taken or amounts incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or assess the effects of "pollutants."

This exclusion will apply to any liability, costs, charges or expenses, or any judgments or settlements, arising directly or indirectly out of pollution whether or not the pollution was sudden, accidental, gradual, intended, expected, unexpected, preventable or not preventable.

As used in this exclusion "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste material includes materials which are intended to be or have been recycled, reconditioned or reclaimed.

**C.** Any liability excluded by the Nuclear Energy Liability Exclusion attached to this policy.

## V. DEFINITIONS

**A.** "First underlying insurance" means the policy or policies of insurance stated as such in Item **5.** of the Declarations.

**B.** "Loss" means those sums actually paid in the settlement or satisfaction of a claim which you are legally obligated to pay as damages after making proper deductions for all recoveries and salvage.

**C.** "Underlying insurance" means "first underlying insurance" and all policies of insurance listed in Item **5.** of the Declarations.

**D.** "Underlying Limits of Insurance" means the total sum of the limits of all applicable "underlying insurance" stated in Item **5.** of the Declarations, including self-insurance, or means other than insurance.

## VI. CONDITIONS

### A. Appeals

In the event you or any underlying insurer elects not to appeal a judgment in excess of the amount of the "Underlying Limits of Insurance," we may elect to appeal at our expense. If we do so elect, we will be liable for the costs and interest incidental to this appeal. In no event will this provision increase our liability beyond the applicable Limits of Insurance described in Section **II.** of this policy.

### B. Bankruptcy or Insolvency

The bankruptcy, insolvency or inability to pay of any Insured or the bankruptcy, insolvency or inability to pay of any of the underlying insurers will not relieve us from the payment of any claim or suit covered by this policy.

In the event of bankruptcy or insolvency of any underlying Insurer, the insurance afforded by this policy will not replace such "underlying insurance," but will apply as if the "underlying insurance" was available and collectible.

### C. Changes

Notice to any agent or knowledge possessed by any agent or any other person will not effect a waiver or change in any part of this policy. This policy can only be changed by a written endorsement that becomes a part of this policy and that is signed by one of our authorized representatives.

### D. Cancellation

**1.** You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

**2.** We may cancel this policy. If we cancel because of nonpayment of premium, we must mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than thirty (30) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item **1.** of the Declarations will be sufficient to prove notice.

**3.** The policy period will end on the day and hour stated in the cancellation notice.

**4.** If we cancel, final premium will be calculated pro rata based on the time this policy was in force.

**5.** If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure.

**6.** Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's check, mailed or delivered, will be sufficient tender of any refund due you.

**7.** The first Named Insured in Item **1.** of the Declarations will act on behalf of all other Insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

Great American Assurance Company

8. Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with the law.

## E. First Named Insured Duties

The person or organization first named in Item **1.** of the Declarations is responsible for the payment of all premiums. The first Named Insured will act on behalf of all other Named Insureds for the giving and receiving of notice of cancellation or the receipt of any return premium that may become payable.

We will be furnished a complete copy of the "first underlying insurance" described in Item **5.** of the Declarations and any subsequently issued endorsements which may in any way affect this insurance.

## F. Legal Actions Against Us

There will be no right of action against us under this insurance unless:

1. you have complied with all the terms of this policy; and

2. the amount you owe has been determined by settlement with our consent or by actual trial and final judgment.

This insurance does not give anyone the right to add us as a party in an action against you to determine your liability.

## G. Maintenance of Underlying Insurance

During the period of this policy, you agree:

1. to keep the policies listed in Item **5.** of the Declarations in full force and effect;

2. that the Limits of Insurance of the "underlying insurance" policies listed in Item **5.** of the Declarations will be maintained except for any reduction or exhaustion of aggregate limits by payment of claims or suits for "losses" covered by "underlying insurance."

If you fail to comply with these requirements, we will only be liable to the same extent that we would have been had you fully complied with these requirements.

## H. Notice of Occurrence

1. You must see to it that we are notified as soon as practicable of an occurrence which may result in a claim or suit which may involve this policy. To the extent possible, notice will include:

   a. how, when and where the occurrence took place;

   b. the names and addresses of any injured persons and witnesses;

   c. the nature and location of any injury or damage arising out of the occurrence.

2. If a claim or suit against any Insured is reasonably likely to involve this policy you must notify us in writing as soon as practicable.

3. You and any other involved Insured must:

   a. immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

   b. authorize us to obtain records and other information;

   c. cooperate with us in the investigation, settlement or defense of the claim or suit; and

   d. assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may also apply.

4. If the "Underlying Limits of Insurance" are exhausted solely by payment of "loss," no Insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**I. Other Insurance**

If other insurance applies to a "loss" that is also covered by this policy, this policy will apply excess of the other insurance. Nothing herein will be construed to make this policy subject to the terms, conditions and limitations of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

Other insurance includes any type of self-insurance or other mechanism by which an Insured arranges for funding of legal liabilities.

**J. Premium**

Unless otherwise provided, the premium for this policy is a flat premium and is not subject to adjustment except as provided herein or amended by endorsement. If any additional premium charge is made to the "underlying insurance" during the policy period or if there is an increase in the risk assumed by us, our premium may be adjusted accordingly.

**K. Terms Conformed to Statute**

The terms of this policy which are in conflict with the statutes of the state where this policy is issued are amended to conform to such statutes.

If we are prevented by law or statute from paying on behalf of the Insured, then we will, where permitted by law or statute, indemnify the Insured.

**L. When "Loss" is Payable**

Coverage under this policy will not apply unless and until the Insured or the Insured's "underlying insurance" is obligated to pay the full amount of the "Underlying Limits of Insurance."

When the amount of "loss" has finally been determined, we will promptly pay on behalf of the Insured the amount of "loss" falling within the terms of this policy.

## NUCLEAR ENERGY LIABILITY EXCLUSION

This policy does not apply to:

**A.** Any liability, injury or damage:

  **1.** with respect to which any Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic, Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an Insured under any such policy but for its termination upon exhaustion of its Limits of Insurance; or

  **2.** resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** a person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** any Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Any injury or "nuclear property damage" resulting from the "hazardous properties" of "nuclear material," if:

  **1.** the "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, any Insured or **(b)** has been discharged or dispersed therefrom;

  **2.** the "nuclear material" is contained in "spent fuel" or "nuclear waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any Insured; or

  **3.** the injury or "nuclear property damage" arises out of the furnishing by any Insured of services, materials, parts of equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America,

Great American Assurance Company

its territories or possessions or Canada, this Exclusion **B.3.** applies only to "nuclear property damage" to such "nuclear facility" and any property therein.

**C.** As used in this exclusion:

**1.** "Hazardous properties" includes radioactive, toxic or explosive properties.

**2.** "Nuclear facility" means:

**a.** any "nuclear reactor";

**b.** any equipment or device designed or used for

(1) separating the isotopes of uranium or plutonium,

(2) processing or utilizing "spent fuel" or

(3) handling, processing or packaging "nuclear waste";

**c.** any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of any Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**d.** any structure, basin, excavation, premises or place prepared or used for the storage or disposal of, "nuclear waste," and includes the site on which

any of the foregoing is located, all operations considered on such site and all premises used for such operations.

**3.** "Nuclear material" means "source material," "special nuclear material" or by-product material.

**4.** "Nuclear property damage" includes all forms of radioactive contamination of property.

**5.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**6.** "Nuclear waste" means any "nuclear waste" material **(a)** containing "by-product material" other than the tailings of "nuclear waste" produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included within the definition of "nuclear facility" under Paragraph **C.2.a.** or **C.2.b.**

**7.** "Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**8.** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

This endorsement does not change any other provision of the policy.

Great American Assurance Company

**IL 72 68**
(Ed. 09 09)

### In Witness Clause

In Witness Whereof, we have caused this Policy to be executed and attested, and, if required by state law, this Policy shall not be valid unless countersigned by our authorized representative.

**President**                                   **Secretary**

IL7268GG (09/09)
IL 72 68 (Ed. 09/09)                    Copyright Great American Insurance Co., 2009

SCOR

# General Security National Insurance Company
## (THE "COMPANY")

| HOME OFFICES | ADMINISTRATIVE OFFICES |
|---|---|
| One Seaport Plaza | One Seaport Plaza |
| 199 Water Street, 21st Floor | 199 Water Street, 21st Floor |
| New York, New York 10038-3526 | New York, New York 10038-3526 |
| Telephone No: +(1) 212-480-1900 | Telephone No: +(1) 212-480-1900 |
| U.S. Toll-Free (outside NY) 800-326-3299 | U.S. Toll-Free (outside NY) 800-326-3299 |

## *CASUALTY DECLARATIONS*

### NOTICES

1) <u>Duty to Defend or Investigate</u>:  The Company shall have no duty to defend or investigate any claim or suit unless and until all limits of the Controlling Underlying Insurance and all Other Underlying Insurance policies have been exhausted by payment of judgments, claims or settlements.

2) <u>Duty to Pay Claims</u>: If the Controlling Underlying Insurance or any Other Underlying Insurance policy has no duty to pay a claim for injury or damage for a reason other than exhaustion of an aggregate limit of insurance, then Company shall have no obligation to make any payment under this policy.

3) Coverage is excluded in any country and for any transaction where such coverage is unlawful as determined by the Government of the United States of America or its agencies.

4) Assignment of the Policy shall not be valid except with the written consent of the Company.

POLICY NUMBER:  FA0048286-2019-1          RENEWAL OF POLICY NUMBER: FA0048286-2018-1

ITEM 1          NAMES AND ADDRESSES

Insured's Name:          SUFFOLK CONSTRUCTION COMPANY, INC.

Insured's Address:          Street: 65 ALLERTON ST., BOSTON, MA 02119

City, State, Zip: BOSTON, MA 02119

Country: USA

Broker's Name:          ALLIANT INSURANCE SERVICES, INC

Broker's Address:          Street: 131 OLIVER STREET, 4TH FLOOR

City, State, Zip: BOSTON MA 02110

Country: USA

ITEM 2 A.          POLICY PERIOD   From  08/31/2019   To   08/31/2020          at 12:01 AM standard time at the address of the Insured

ITEM 2 B.          RETROACTIVE DATE          N/A          *(Mandatory if Liability Policy in Claims Made Form).*

The insurance provided is only for coverages selected in ITEM 3, below.

| ITEM 3   POLICY FORM | ITEM 4   TYPE OF COVERAGE | ITEM 5 | TYPE OF PROGRAM |
|---|---|---|---|
| [X] OCCURRENCE | [X] GENERAL LIABILITY & COMPLETED OPERATIONS | | [ ] EXCESS |
| [ ] OCCURRENCE REPORTED | [X] PRODUCTS COMPLETED OPERATIONS | | [X] EXCESS UMBRELLA |
| [ ] CLAIMS MADE | [ ] PREMISES LIABILITY ONLY | | [ ] STAND-ALONE EXCESS |
| [ ] MANUSCRIPT POLICY | [ ] AUTOMOBILE LIABILITY | | [ ] QUOTA SHARE |
| OTHER: _____ | [ ] E & O | | [ ] MULTI-LINES |
| | [X] TRIA   Covered | | [ ] OTHER _____ |
| | [X] OTHER Personal and Advertising Injury | | |

SCOR

# General Security National Insurance Company
### (THE "COMPANY")

| HOME OFFICES | ADMINISTRATIVE OFFICES |
|---|---|
| One Seaport Plaza | One Seaport Plaza |
| 199 Water Street, 21st Floor | 199 Water Street, 21st Floor |
| New York, New York 10038-3526 | New York, New York 10038-3526 |
| Telephone No: +(1) 212-480-1900 | Telephone No: +(1) 212-480-1900 |
| U.S. Toll-Free (outside NY) 800-326-3299 | U.S. Toll-Free (outside NY) 800-326-3299 |

ITEM 6    LIMIT (S) OF INSURANCE

Layer#_____

| Coverage | Each and Every Occurrence | Policy Aggregate | Share % | Company Limit | Excess Of[1] | Premium for coverage provided by Company |
|---|---|---|---|---|---|---|
| EXCESS LIABILITY | $25,000,000 | $25,000,000 | 100% | $25,000,000 | $50,000,000 | ████ |
| UMBRELLA LIABILITY | | | | | | |
| GENERAL LIABILITY & COMPLETED OPERATIONS | | | | | | |
| AUTOMOBILE | | | | | | |
| ERRORS & OMISSIONS | | | | | | |
| TRIA (TRIA Premium must always be entered) | | | | | | ████ |
| OTHER | | | | | | |
| | | | | | Layer Premium | ████ |

ITEM 7   PREMIUM FOR COVERAGE PROVIDED BY COMPANY

Coverage

 

ITEM 8    UNDERLYING INSURANCE

**A. CONTROLLING UNDERLYING INSURANCE**

| Company | Policy Number | Type of Coverage | Policy Period | Limits of Insurance | |
|---|---|---|---|---|---|
| | | | | Each and Every Occurrence | Policy Aggregate. |
| STARR INDEMNITY & LIABILITY COMPANY | 1000584589191 | EXCESS LIABILITY | 08/31/2019 - 08/31/2020 | $10,000,000 | $10,000,000 |

**B. OTHER UNDERLYING INSURANCE**

| Company | Policy Number | Type of Coverage | Policy Period | Limits of Insurance | |
|---|---|---|---|---|---|
| | | | | Each and Every Occurrence | Policy Aggregate |
| XL INSURANCE AMERICA, INC. | US00035484LI19A | EXCESS LIABILITY | 08/31/2019 - 08/31/2020 | $15,000,000 | $15,000,000 |

---

[1] Coverage is excess of the dollar amount listed, each and every loss and/or in the policy aggregate, where applicable, and is excess of all the amounts specified in all Other Underlying Insurance policies, as more fully set out in the Controlling Underlying Insurance.

SCOR

# General Security National Insurance Company
## (THE "COMPANY")

| **HOME OFFICES** | **ADMINISTRATIVE OFFICES** |
|---|---|
| One Seaport Plaza | One Seaport Plaza |
| 199 Water Street, 21st Floor | 199 Water Street, 21st Floor |
| New York, New York 10038-3526 | New York, New York 10038-3526 |
| Telephone No: +(1) 212-480-1900 | Telephone No: +(1) 212-480-1900 |
| U.S. Toll-Free (outside NY) 800-326-3299 | U.S. Toll-Free (outside NY) 800-326-3299 |

| GREAT AMERICAN ASSURANCE COMPANY | EXC 3161438 | EXCESS LIABILITY | 08/31/2019 - 08/31/2020 | $25,000,000 | $25,000,000 |
|---|---|---|---|---|---|
| STARR INDEMNITY & LIABILITY COMPANY | 1000584589191 | EXCESS LIABILITY | 08/31/2019 - 08/31/2020 | $25,000,000 | $25,000,000 |

| COVERAGE | CARRIER; POLICY NUMBER | INCEPTION | EXPIRATION | LIMITS | |
|---|---|---|---|---|---|
| GENERAL LIABILITY | Liberty Mutual Fire Ins Co. | 08/31/2019 | 08/31/2020 | $2,000,000 | Each Occurrence Limit |
| | | | | $4,000,000 | Products-Completed Operations Aggregate Limit |
| | | | | $4,000,000 | Other Aggregate Limit |
| AUTOMOBILE LIABILITY | Liberty Mutual Fire Ins Co. | 08/31/2019 | 08/31/2020 | $1,000,000 | Each Occurrence Limit |
| EMPLOYERS LIABILITY | Liberty Mutual Fire Ins Co. | 08/31/2019 | 08/31/2020 | $1,000,000 | Each Accident |
| | | | | $1,000,000 | Disease - Policy Limit |
| | | | | $1,000,000 | Disease - Each Employee Limit |
| OTHER LIABILITY | American Alternative Ins Corp. | 08/31/2019 | 08/31/2020 | $5,000,000 | Each Occurrence Limit |

**ITEM 9**  FOLLOWING FORM AGREEMENT

Subject to the applicable limits of insurance, we will pay on behalf of the insured as follows:

(i)  Whenever this insurance operates on an excess of loss or umbrella basis: all sums in excess of the amount payable by all the Controlling Primary Policy and/or all the underlying policies described in the Schedule of Underlying Insurance;

(ii)  Whenever this insurance operates on a stand-alone basis: as per the stand-alone terms and conditions.

(iii)  Whatever the case above in (i) or (ii) this insurance will follow the terms and conditions of the policy number  CONTROLLING UNDERLYING INSURANCE POLICY in effect at the inception date of this policy.

In no event shall this insurance be construed in any way to provide coverage outside the terms, conditions, agreements, exclusions and definitions as the set-forth in the policy here-above mentioned in (iii).

Any modification under the **CONTROLLING UNDERLYING INSURANCE POLICY** must be agreed in writing by an Officer of GSNIC.

**ITEM 10**  ENDORSEMENTS TO BE ATTACHED AT INCEPTION
POLICYHOLDER NOTICE TERRORISM RISK INSURANCE ACT
1.  SANCTION LIMITATION AND EXCLUSION CLAUSE

**ITEM 11**  CLAIMS NOTIFICATION

Any notification under this policy should be made to the following:

CLAIMS DEPARTMENT
GENERAL SECURITY NATIONAL INSURANCE COMPANY
ONE SEAPORT PLAZA
199 WATER STREET, SUITE 2100
NEW YORK, NEW YORK 10038-3526 - USA
SBSAmericasClaims@Scor.com

SCOR

# General Security National Insurance Company
## (THE "COMPANY")

| **HOME OFFICES** | **ADMINISTRATIVE OFFICES** |
|---|---|
| One Seaport Plaza | One Seaport Plaza |
| 199 Water Street, 21st Floor | 199 Water Street, 21st Floor |
| New York, New York 10038-3526 | New York, New York 10038-3526 |
| Telephone No: +(1) 212-480-1900 | Telephone No: +(1) 212-480-1900 |
| U.S. Toll-Free (outside NY) 800-326-3299 | U.S. Toll-Free (outside NY) 800-326-3299 |

IN WITNESS WHEREOF, General Security National Insurance Company has caused the Policy to be executed by its duly authorized representative:

Signed at:  New York, NY

Date:  October 23, 2019

Signature:

Print name & Title:

Tittle

SCOR

# General Security National Insurance Company
## (THE "COMPANY")

| HOME OFFICES | ADMINISTRATIVE OFFICES |
|---|---|
| One Seaport Plaza | One Seaport Plaza |
| 199 Water Street, 21st Floor | 199 Water Street, 21st Floor |
| New York, New York 10038-3526 | New York, New York 10038-3526 |
| Telephone No: +(1) 212-480-1900 | Telephone No: +(1) 212-480-1900 |
| U.S. Toll-Free (outside NY) 800-326-3299 | U.S. Toll-Free (outside NY) 800-326-3299 |

## POLICYHOLDER NOTICE
## TERRORISM RISK INSURANCE ACT

This Notice addresses requirements of the Terrorism Risk Insurance Act of 2002, and any amendments or extensions thereto, including the Terrorism Risk Insurance Program Reauthorization Act of 2015 (hereinafter "Act").

**Definitions**

"Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States: to be an act of terrorism; to be an act that is violent or dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside of the United States in the case of United States missions or certain air carriers or vessels; to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Insured terrorism loss" means any loss resulting from an "act of terrorism" (including an act of war, in the case of workers compensation) that is covered by primary or excess or umbrella property and casualty insurance issued by an insurer if the loss occurs in the United States or at United States missions or to certain air carriers or vessels.

"Insurer deductible" means the amount established in the Act that must be paid by the insurer issuing your policy before the federal government can pay its share of the compensation for insured terrorism losses.

**Notice of Federal Share of Losses, Premium Charge, and potential reduction in coverage under your Policy**

YOU SHOULD KNOW THAT COVERAGE WHICH MAY BE PROVIDED BY THIS POLICY FOR INSURED TERRORISM LOSSES IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR, BIOLOGICAL OR CHEMICAL EVENTS. UNDER THIS FORMULA, THE UNITED STATES PAYS 85% OF INSURED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020. YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS

SCOR

# General Security National Insurance Company
### (THE "COMPANY")

| **HOME OFFICES** | **ADMINISTRATIVE OFFICES** |
|---|---|
| One Seaport Plaza | One Seaport Plaza |
| 199 Water Street, 21st Floor | 199 Water Street, 21st Floor |
| New York, New York 10038-3526 | New York, New York 10038-3526 |
| Telephone No: +(1) 212-480-1900 | Telephone No: +(1) 212-480-1900 |
| U.S. Toll-Free (outside NY) 800-326-3299 | U.S. Toll-Free (outside NY) 800-326-3299 |

OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, **YOUR COVERAGE MAY BE REDUCED**.

If you elected to purchase coverage for insured terrorism losses, the premium charge for this coverage is shown in the Declarations or an extension to the Declarations.

If you rejected this offer of coverage, coverage for statutorily mandated fire coverage resulting from such acts, if applicable to your coverage, is provided at no additional premium charge

SCOR

# General Security National Insurance Company
## (THE "COMPANY")

| **HOME OFFICES** | **ADMINISTRATIVE OFFICES** |
|---|---|
| One Seaport Plaza | One Seaport Plaza |
| 199 Water Street, 21st Floor | 199 Water Street, 21st Floor |
| New York, New York 10038-3526 | New York, New York 10038-3526 |
| Telephone No: +(1) 212-480-1900 | Telephone No: +(1) 212-480-1900 |
| U.S. Toll-Free (outside NY) 800-326-3299 | U.S. Toll-Free (outside NY) 800-326-3299 |

**Endorsement #1**

This Endorsement, effective 12:01 am 08/31/2019

Form part of Policy Number: FA0048286-2018-1

Issued to: Suffolk Construction Company, Inc.

By: General Security National Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**Sanction Limitation and Exclusion Clause**

General Security National Insurance Company (hereafter GSNIC) shall not be deemed to provide cover, be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose GSNIC to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions laws or regulations of the European Union, United Kingdom or United States of America.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
Authorized Representative

**Liberty**
International
Underwriters.

## LIBERTY INTERNATIONAL UNDERWRITERS

## EXCESS INSURANCE POLICY

In Witness Whereof, we have caused this policy to be signed by its President and Secretary.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

Liberty Insurance Underwriters Inc.
175 Berkeley Street,   Boston, MA 02116   Toll-free number: 1-800-677-9163

LIUIPOLJKT Ed. 2012



**Excess Insurance Policy**

## Liberty Insurance Underwriters Inc.

(A Stock Insurance Company, hereinafter the "Insurer")

### NOTICE OF CLAIM

You may mail or deliver notice of a claim or suit in writing by regular mail or e-mail at the following address:

Mailing Address:  Liberty International Underwriters
55 Water Street, 23rd Floor, New York, NY 10041
Attention:  Casualty Claims

Email Address:  CASClaims@libertyiu.com

## Excess Insurance Policy



# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")
175 Berkeley Street,  Boston, MA 02116
Toll-free number: 1-800-677-9163

## EXCESS LIABILITY POLICY DECLARATIONS

**Policy Number:** 1000362748-01
**Broker:** AMWINS BROKERAGE OF NEW ENGLAND, LLC
308 Farmington Avenue
Farmington, CT 06032

---

**Item 1:    NAMED INSURED AND MAILING ADDRESS**

**Suffolk Construction Company, Inc.**
**65 Allerton Street**
**Boston, MA 02119**

(as per First Underlying Insurance Policy)

---

**Item 2:    POLICY PERIOD**

From: **August 31, 2019**                     To: **August 31, 2020**
12:01 A.M. Standard Time at the address of the Named Insured shown.

---

**Item 3:    POLICY PREMIUM:**                **POLICY MINIMUM PREMIUM:**  25.00%

TRIA Premium:                              $0
**Total Annual Premium:**

Premium Basis:          (x) Flat                    ( ) Auditable

---

**Item 4:    LIMITS OF LIABILITY**

Our liability under this policy will not exceed the following limit: 100.00% percent of "loss" excess of the
Underlying Insurance stated in Item 5 of the Declarations, but for no greater than:

$25,000,000 – Each Occurrence

$25,000,000 – Aggregate Limit (where applicable)

---

**Item 5:    SCHEDULE OF UNDERLYING INSURANCE**

See Schedule of Underlying Policies – Excess

---

**Item 6:    FORMS AND ENDORSEMENTS ATTACHED** attached hereto:

See Forms and Endorsements Schedule – 104-XS (Ed. 03 00)

---

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS IN THE
DECLARATIONS, AND SUBJECT TO ALL TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE
COVERAGE AS STATED IN THIS POLICY.

## Excess Insurance Policy



PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

September 20, 2019
Issuance Date



**Excess Insurance Policy**

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

### EXCESS FORMS AND ENDORSEMENTS SCHEDULE

It is hereby understood and agreed the following forms and endorsements are attached to and are a part of this policy:

| Form Number | Form Name | Endorsement No. |
|---|---|---|
| 100-XS (Ed. 03 00) | Excess Liability Policy Declarations | |
| 104-XS (Ed. 03 00) | Forms and Endorsements Schedule | |
| 232-XS (Ed. 04 07) | Schedule of Underlying Policies - Excess | 1 |
| 188-XS (Ed. 03 00) | Asbestos Exclusion | 2 |
| 210-XS (Ed. 04 07) | Discrimination Exclusion | 3 |
| 125-XS (Ed. 03 00) | Employment Related Practices Exclusion | 4 |
| 251-XS (Ed. 04 07) | Exclusion - Violation of Statutes that Govern Emails, Faxes, Phone Calls or Other Methods of Sending Information | 5 |
| 102-XS (Ed. 03 00) | Nuclear Energy Liability Exclusion Endorsement | 6 |
| OFAC 08/09 | U.S. Economic and Trade Sanctions Clause | 7 |
| Excess 4011 (05 06) | War Liability  Exclusion Endorsement | 8 |
| 252-XS (Ed. 04 07) | Cancellation Amendment | 9 |
| E-MA-XS (Ed. 10 00) | Massachusetts Amendatory Endorsement | 10 |
| 231-XS (Ed. 01 13) | Waiver of Subrogation | 11 |
| 187-XS (Ed. 03 00) | Manuscript Endorsement - OTHER INSURANCE AMENDMENT – PRIMARY AND NON-CONTRIBUTORY | 12 |
| TRIA-E002-0315 | Cap on Losses from Certified Acts of Terrorism | 13 |

**Excess Insurance Policy** 

| | | |
|---|---|---|
| TRIA-N004-0315 | Disclosure - Terrorism Risk Insurance Act | 14 |
| TRIA-EX-003-0315 | Underlying Coverage Warranty For Certified Acts of Terrorism | 15 |
| 101-XS (Ed. 03 00) | Excess Liability Policy | |



**Excess Insurance Policy**

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 1

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### SCHEDULE OF UNDERLYING POLICIES – EXCESS

| Carrier, Policy Number and Policy Period | Type of Coverage | Limits of Insurance |
|---|---|---|
| **Starr Indemnity & Liability** 1000584589191 8/31/2019 to 8/31/2020 | Commercial Umbrella Liability First Underlying Insurance | $10,000,000 – Each Occurrence $10,000,000 – Aggregate (where applicable) |
| **XL Insurance America, Inc.** US00035484LI19A 8/31/2019 to 8/31/2020 | Commercial Excess Liability First Underlying Insurance | $15,000,000 – Each Occurrence $15,000,000 – Aggregate (where applicable) |
| **Great American Assurance Company** EXC 3161438 8/31/2019 to 8/31/2020 | Commercial Excess Liability | $25,000,000 – Each Occurrence $25,000,000 – Aggregate (where applicable) |
| **General Security National Insurance** FA004828620191 8/31/2019 to 8/31/2020 | Commercial Excess Liability | $25,000,000 – Each Occurrence $25,000,000 – Aggregate (where applicable) |

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey



**Excess Insurance Policy**

## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 2

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ASBESTOS EXCLUSION**

This policy does not apply to:

Any "loss", including, but not limited to settlements, judgments, costs, charges, expenses, costs of investigations or the fees of attorneys, experts, or consultants arising out of or related in any way, whether directly or indirectly to:

(1)  asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust, including, but not limited to, manufacture, mining, use, sale, installation, removal, or distribution activities;

(2)  exposure to testing for, monitoring of, cleaning up, removing, containing or treating of asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust; or

(3)  any obligation to investigate, settle or defend, or indemnify any person against any claim or suit arising out of, or related in any way, either directly or indirectly, to asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust.

This endorsement does not change any other provision of the policy.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

| 1 | 1 |
|---|---|

188-XS (Ed. 03 00)

**Excess Insurance Policy**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 3

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

### DISCRIMINATION EXCLUSION

This insurance does not apply to:

Any "loss" including but not limited to settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants arising out of or related in any way, either directly or indirectly, to any actual or alleged "discrimination", humiliation, harassment or misconduct.

For purposes of this endorsement "discrimination" includes, but is not limited to discrimination on the basis of age, gender, ethnic origin, marital status, pregnancy, physical or mental hardship, disability, race, color, religious affiliation, sex, sexual orientation or preference, or any other protected class.

All other terms, conditions and exclusions of the Policy remain unchanged.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

210-XS (Ed. 04 07)

**Excess Insurance Policy**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 4

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

### EXCESS EMPLOYMENT RELATED PRACTICES EXCLUSION

This insurance does not apply to:

Any "loss" arising out of any:

1.  refusal to employ or promote;

2.  termination of employment;

3.  coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, molestation, humiliation, discrimination or other employment related practices, policies, acts or omissions; or

4.  consequential injury as a result of 1. through 3.

This exclusion applies whether the Insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

125-XS (Ed. 03 00)



**Excess Insurance Policy**

## LIBERTY INSURANCE UNDERWRITERS INC.
(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 5

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EXCLUSION – VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION**

This policy does not apply to:

**Distribution of Material in Violation of Statutes**

Any "loss" or liability, arising directly or indirectly out of any action or omission that violates or is alleged to violate:

1.  The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

2.  The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

3.  Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communication or distribution of material or information.

All other terms, conditions and exclusions of the Policy remain unchanged.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

**Excess Insurance Policy**



## LIBERTY INSURANCE UNDERWRITERS INC.
(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 6

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

#### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

#### NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

This endorsement changes the policy as follows:

This policy does not apply to:

A. Any "loss":

    1. with respect to which any Insured under this policy is also an Insured under a Nuclear Energy Liability Policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic, Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an Insured under any such policy but for its Limit of Liability; or

    2. resulting from the "hazardous properties" of "nuclear material" and with respect to which:

        a) a person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

        b) any Insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Any injury or "nuclear property damage" resulting from the "hazardous properties" of "nuclear material", if:

    1. The "nuclear material"

        a) is at any "nuclear facility" owned by, or operated by or on behalf of, any Insured; or

        b) has been discharged or dispersed therefrom;

    2. the "nuclear material" is contained in "spent fuel" or "nuclear waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any Insured; or

    3. the injury or "nuclear property damage" arises out of the furnishing by any Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion B. 3. applies only to "nuclear property damage" to such "nuclear facility" and any property therein.

As used in this exclusion:

    1. "Hazardous properties" include radioactive, toxic or explosive properties.

    2. "Nuclear facility" means:

        a) any "nuclear reactor";



**Excess Insurance Policy**

    b)   any equipment or device designed or used for:

        (1)   separating the isotopes of uranium or plutonium,

        (2)   processing or utilizing "spent fuel", or

        (3)   handling, processing or packaging "nuclear waste";

    c)   any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    d)   any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "nuclear waste", and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

3.   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

4.   "Nuclear property damage" includes all forms of radioactive contamination of property.

5.   "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

6.   "Nuclear Waste" means any "nuclear waste" material:

    a)   containing "by-product material" other than the tailings of "nuclear wastes" produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content; and

    b)   resulting from the operation by any person or organization of any "nuclear facility" included within the definition of "nuclear facility" under Paragraph 2(a) or 2(b).

7.   "Source material,", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

8.   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

This endorsement does not change any other provision of the policy.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

**Excess Insurance Policy**



## LIBERTY INSURANCE UNDERWRITERS INC.
(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 7

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

OFAC 08/09

**Excess Insurance Policy**



## LIBERTY INSURANCE UNDERWRITERS INC.
(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 8

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**WAR LIABILITY EXCLUSION ENDORSEMENT
COMMERCIAL EXCESS COVERAGE FORM**

It is hereby agreed that the Policy shall be amended as follows:

This Policy does not apply to any "loss", however caused, arising, directly or indirectly, out of:

1.  War, including undeclared or civil war; or

2.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

All other terms, conditions, and exclusions of this Policy remain unchanged.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

Excess 4011 (05 06)



## Excess Insurance Policy

# LIBERTY INSURANCE UNDERWRITERS INC.
(A Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 9

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### CANCELLATION AMENDMENT

Section V - Conditions: C.2 – Cancellation, is amended to read as shown below:

We may cancel this policy.  If we cancel because of non-payment of premium, we must mail or deliver to you not less than 10(ten) days advance written notice stating when the cancellation is to take effect.  If we cancel for any other reason, we must mail or deliver to you not less than 90(ninety) days advance written notice stating when the cancellation is to take effect.  Mailing that notice to you at your mailing address shown in Item 1 of the Declarations will be sufficient to prove notice.

All other terms, conditions and exclusions of the Policy remain unchanged.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

**Excess Insurance Policy**



# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 10

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### MASSACHUSETTS AMENDATORY ENDORSEMENT

It is agreed that Section V., Condition C., is amended by deleting the last sentence of paragraph 2 and inserting the following:

> Notice of cancellation by us will be delivered or mailed to the Named Insured at address last known to us.  If notice of cancellation is mailed, a certificate of mailing receipt from the United States Postal Service will be sufficient to prove notice.

It is further agreed that Section V., Condition C., is amended by deleting paragraph 6 and inserting the following:

6.   The return of any unearned premium will accompany the notice of cancellation.  Our check or our representative's check, mailed or delivered, will be sufficient tender of any refund due to you.

This endorsement does not change any other provision of the policy.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

E-MA-XS (Ed. 10 00)

**Excess Insurance Policy**



# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 11

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### WAIVER OF SUBROGATION

In the event of any payment under this policy for a "loss" for which you have waived the right of recovery in a written contract entered into prior to the "loss", we hereby agree to also waive our right of recovery.  This waiver shall only apply with respect to a "loss" occurring due to operations undertaken as per the specific contract in which you waived the right of recovery.

This endorsement does not change any other provision of the policy.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

**Excess Insurance Policy**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 12

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 08/31/2019 |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### OTHER INSURANCE AMENDMENT – PRIMARY AND NON-CONTRIBUTORY

Paragraph F. **Other Insurance** under Section **VI. CONDITIONS** of this policy is deleted and replaced by the following:

F.      **Other Insurance**

If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of such other insurance.  Nothing herein will be construed to make this policy subject to the terms, conditions and limitations of such other insurance. However:

1.      This provision will not apply if the other insurance is specifically written to be excess of this policy.

2.      If a written contract requires that this insurance be primary and non-contributory with respect to an additional insured covered by this insurance, we will not seek contribution from any other insurance where that additional insured is a Named Insured under such other insurance.

This endorsement does not change any other provision of the policy.

_cl = 2 Pe_

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

| 1 | 1 |
|---|---|

187-XS (Ed. 03 00)



**Excess Insurance Policy**

## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 13

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 8/31/2019 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the above captioned policy.

**A.   Cap on Certified Act of Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1.   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.   Application of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

Includes copyrighted material of Insurance Services Office, Inc., with its permission

**Excess Insurance Policy**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

### ENDORSEMENT NO. 14

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 8/31/2019 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### DISCLOSURE – TERRORISM RISK INSURANCE ACT

**THIS ENDORSEMENT IS MADE PART OF YOUR POLICY PURSUANT TO THE TERRORISM RISK INSURANCE ACT.**

In accordance with the Terrorism Risk Insurance Act, including all amendments, ("TRIA" or the "Act"), we are required to provide you with a notice of the portion of your premium attributable to coverage for "certified acts of terrorism," the federal share of payment of losses from such acts, and the limitation or "cap" on our liability under the Act.

**Disclosure of Premium**

The Company has made available coverage for "certified acts of terrorism" as defined in the Act. If purchased, the portion of your premium attributable to coverage for "certified acts of terrorism" is shown in the Declarations, Declarations Extension Schedule or elsewhere by endorsement in your policy.

**Federal Participation In Payment Of Terrorism Losses**

If an individual insurer's losses from certified acts of terrorism exceed a deductible amount specified in the Act, the federal government will reimburse the insurer for the Federal Share of losses paid in excess of the deductible, but only if aggregate industry losses from such acts exceed the "Program Trigger".

The Federal Share and Program Trigger by calendar year are:

| Calendar Year | Federal Share | Program Trigger |
|---|---|---|
| 2015 | 85% | $100,000,000 |
| 2016 | 84% | $120,000,000 |
| 2017 | 83% | $140,000,000 |
| 2018 | 82% | $160,000,000 |
| 2019 | 81% | $180,000,000 |
| 2020 | 80% | $200,000,000 |

**Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to "certified acts of terrorism" exceed $100 billion in a calendar year and we have met our deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. Nor shall Treasury make any payment for any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

| 1 | 2 |
|---|---|

**Excess Insurance Policy**



PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

**Excess Insurance Policy**



## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 15

| | |
|---|---|
| **Named Insured:** | Suffolk Construction Company, Inc. |
| **Policy Number:** | 1000362748-01 |
| **Effective Date:** | 8/31/2019 |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### UNDERLYING COVERAGE WARRANTY FOR CERTIFIED ACTS OF TERRORISM

With respect to any one or more "Certified Acts of Terrorism," we will be liable only for that portion of damages, subject to the Each Occurrence Limit stated in the Declarations, in excess of the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other insurance providing coverage to the "Insured" during the Policy Period.

If you fail to comply with this Underlying Coverage Warranty for Certified Acts of Terrorism and you do not maintain your underlying limits as scheduled, we will only be liable to the same extent that we would have been had you fully complied with this warranty.

Certified Act of Terrorism means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the Federal Terrorism Risk Insurance Act, including all amendments. The Federal Terrorism Risk Insurance Act sets forth the following criteria for a "Certified Acts of Terrorism":

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

This exclusion does not apply to the extent that insurance is provided by a policy listed in the Schedule of Underlying Insurance, and for no broader coverage than is provided by such policy.

This endorsement does not change any other provision of the policy.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

TRIA-EX-003-0315



**Excess Insurance Policy**

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Insurer")

## EXCESS LIABILITY POLICY

There are provisions in this policy that restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Words and phrases in quotation marks have special meaning and can be found in the Definitions or the specific policy provision where they appear.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations, and subject to all terms of this policy, we agree with you to provide coverage as follows:

INSURING AGREEMENTS

### I. COVERAGE

We will pay on behalf of the Insured "loss" that results from an occurrence during the "policy period." We will pay "loss" in excess of the Underlying Insurance shown in Item 5. of the Declarations, but only up to an amount not exceeding our Limits of Liability as shown in Item 4. of the Declarations. Except for any definitions, terms, conditions and exclusions of this policy, the coverage provided by this policy is subject to the terms and conditions of the First Underlying Insurance Policy, as shown in Item 5. of the Declarations.

The inclusion or addition hereunder of more than one Insured shall not operate to increase our Limits of Liability beyond that shown in Item 4. of the Declarations.

We will be furnished a complete copy of the First Underlying Insurance Policy described in Item 5. of the Declarations.

### II. LIMITS OF LIABILITY

A. The Limits of Liability shown in Item 4. of the Declarations and the rules below describe the most we will pay regardless of the number of:

1. Insureds;

2. claims made or suits brought; or

3. persons or organizations making claims or bringing suits.

B. The Limits of Liability of this policy will apply as follows:

1. This policy applies only in excess of the Underlying Insurance shown in Item 5. of the Declarations.

2. The aggregate limit shown in Item 4. of the Declarations is the most we will pay for all "loss" that is subject to an aggregate limit provided by the First Underlying Insurance Policy. The aggregate limit applies separately and in the same manner as the aggregate limits provided by the First Underlying Insurance Policy.

3. Subject to Paragraph B.2. above, the occurrence limit shown in Item 4. of the Declarations is the most we will pay for all "loss" arising out of any one occurrence to which this policy applies.

4. Subject to Paragraphs B.2. and B.3. above, if the limits of liability of the Underlying Insurance shown in Item 5. of the Declarations are reduced or exhausted solely by payment of "loss", such insurance provided by this policy will apply in excess of the reduced Underlying Insurance or, if all such coverage is exhausted, will apply as underlying insurance subject to the same terms, conditions, definitions and exclusions of the

101-XS (Ed. 03 00)



## Excess Insurance Policy

First Underlying Insurance Policy, except for any definitions, terms, conditions and exclusions of this policy.

5. The Limits of Liability of this policy apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Liability.

## III. DEFENSE

A. We will not be required to assume charge of the investigation of any claim or defense of any suit against you.

B. We will have the right, but not the duty, to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for "loss" under this policy. If we exercise such right, we will do so at our own expense.

C. If the limits of liability of the Underlying Insurance shown in Item 5. of the Declarations are exhausted solely by payment of "loss", we shall have the right but not the duty to investigate and settle any claim or assume the defense of any suit which, in our opinion, may give rise to a "loss" under this policy. Such investigation or defense shall be at our own expense. We may, however, withdraw from the defense of such suit and tender the continued defense to you if our applicable Limits of Liability shown in Item 4. of the Declarations are exhausted by payment of "loss."

## IV. DEFINITIONS

"Loss" means those sums which you are legally obligated to pay as damages, after making proper deductions for all recoveries and salvage, which damages are covered by the First Underlying Insurance Policy.

"Policy period" means the period from the inception date of this policy to the expiration date stated in the Declarations, or any earlier date of cancellation or termination.

## V. CONDITIONS

### A. Appeals

In the event you or the insurer(s) of the Underlying Insurance shown in Item 5. of the Declarations elects not to appeal a judgment in excess of the amount of the Underlying Insurance, we may elect to appeal at our expense. If we do so elect, we will be liable for the costs and additional interest accruing during this appeal. In no event will this provision increase our liability beyond the applicable Limits of Liability as set forth in Section II. of this policy and as shown in Item 4. of the Declarations.

### B. Bankruptcy or Insolvency

The bankruptcy, insolvency or inability to pay of any Insured will not relieve us from our obligation to pay "loss" covered by this policy.

In the event of bankruptcy, insolvency or refusal or inability to pay, of the insurer(s) of the Underlying Insurance shown in Item 5. of the Declarations, the insurance afforded by this policy will not replace such Underlying Insurance, but will apply as if the Underlying Insurance was fully available and collectible.

### C. Cancellation

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect

2. We may cancel this policy. If we cancel because of non-payment of premium, we will mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we will mail or deliver to you not less than thirty (30) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1. of the Declarations will be sufficient to prove notice.



## Excess Insurance Policy

3. The "policy period" will end on the day and hour stated in the cancellation notice.

4. If we cancel, final premium will be calculated pro rata based on the time this policy was in force.

5. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure.

6. Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter, but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's check, mailed or delivered, will be sufficient tender of any refund due you.

7. The Named Insured shown in Item 1. of the Declarations will act on behalf of all other Insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

8. Any of these provision that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with the law.

**D. Maintenance of Underlying Insurance**

During the "policy period", you agree:

1. To keep the policies listed in the Schedule of Underlying Insurance as shown in Item 5. of the Declarations in full force and effect;

2. That the Limits of Liability of the policies listed in the Schedule of Underlying Insurance as shown in Item 5. of the Declarations will be maintained except for any reduction or exhaustion of aggregate limits by payment of "loss" in claims or suits covered by the Underlying Insurance.

If you fail to comply with these requirements, we will only be liable to the same extent that we would have been had you fully complied with these requirements.

**E. Notice of Occurrence**

1. You must see to it that we are notified as soon as practicable of an occurrence which may result in a "loss" covered under this policy. To the extent possible, notice will include:

   a) how, when and where the occurrence took place;

   b) the names and addresses of any injured persons and witnesses;

   c) the nature and location of any injury or damage arising out of the occurrence.

2. If a claim or suit against any Insured is reasonably likely to involve this policy, you must notify us in writing as soon as practicable.

3. You and any other involved Insured must:

   a) immediately send us copies of any demands, notices, summonses or legal documentation received in connection with a claim or suit;

   b) authorize us to obtain records and other information;

   c) cooperate with us in the investigation, settlement or defense of the claim or suit; and

   d) assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may also apply.



## Excess Insurance Policy

    4.   The Insureds will not, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**F.   Other Insurance**

If other insurance applies to a "loss" that is also covered by this policy, this policy will apply excess of such other insurance. Nothing herein will be construed to make this policy subject to the definitions, terms, conditions and exclusions of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

Other insurance includes any type of self-insurance, indemnification or other mechanism by which an Insured arranges for funding of legal liabilities.

**G.   Terms Conformed to Statute**

The terms of this policy which are in conflict with the statutes of the state where this policy is issued are amended to conform to such statutes. If we are prevented by law or statute from paying on behalf of the Insured, then we will, where permitted by law or statute, indemnify the Insured.

**H.   When "Loss" is Payable**

Coverage under this policy will not apply unless and until you or the insurer(s) of the Underlying Insurance shown in Item 5. of the Declarations has paid or is obligated to pay the full amount of such Limits of Liability.

When the amount of "loss" has finally been determined, we will promptly pay on your behalf the amount of "loss" covered under this policy.

**In Witness Whereof, the Insurer has caused this policy to be executed and attested, but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the Insurer.**

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

ATTN JAMES HAMEL
ALLIANT INS SERVICES INC
131 OLIVER ST
4TH FLOOR
BOSTON MA 02110-2785

**CNI 90 05 01 12**
Producer

**Suffolk Construction Company, Inc.**
65 Allerton Street
Boston MA 02119

### FLORIDA CONTRACTING CLASSIFICATION PREMIUM ADJUSTMENT PROGRAM
### WORKERS COMPENSATION PREMIUM CREDIT APPLICATION

The Florida Contracting Classification Premium Adjustment Program is applicable to qualifying employers engaged in contracting operations.

A special premium calculation, which may result in a premium credit for you, will be based on average hourly pay rates for each classification of contracting operations.  In order that your premium may be correctly established, please return the completed premium credit application, as set out on the reverse side of this letter, to the:

> National Council on Compensation Insurance, Inc.
> Customer Service Center
> 901 Peninsula Corporate Circle
> Boca Raton FL 33487-1362

They will advise us of any premium credit applicable.

**If NCCI does not receive this application during the policy period or within three (3) years after the policy period ends, your premium calculation will not reflect any possible premium credit.**

For each applicable classification (both contracting and noncontracting) covering your company's operations in the state of Florida, report the *total* Florida payroll (excluding overtime premium pay, pay in excess of the maximum individual payroll for executive officers or the pay in excess of payroll amount charged to partners and sole proprietors as shown on the state rate pages, as well as the entire pay for any exempt sole proprietor, partner, or officer) and the corresponding *total* number of hours worked, *for the third calendar quarter (July, August, September) of the prior calendar year as reported to taxing authorities.*

Note 1.   If you did not engage in contracting operations during the third quarter of the prior calendar year, the requested information should then be for the last complete calendar quarter prior to the effective date of your workers compensation policy.

Note 2.   If you are a new business, submit the requested information, *for the first complete calendar quarter following the effective date of your workers compensation policy* when available.

Note 3.   In the absence of specific records for salaried employees, you should assume that each individual worked forty (40) hours per week.

Please preserve your payroll records that formed the basis for this declaration as we will be required to verify the reported information in order for any premium credit to be applied.

Thank you for your cooperation.

Sincerely,

### TURN PAGE OVER FOR PREMIUM CREDIT APPLICATION

Issued 09/23/2019

---

**FORM 09-4D (CCPAP)**
Ed. 01/01/2017

© Copyright 2015 National Council on Compensation Insurance, Inc.
All Rights Reserved.

## WORKERS COMPENSATION - PREMIUM CREDIT APPLICATION

INSURED:   Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

POLICY NO.: WC2-641-444149-079          EFFECTIVE DATE: 08 / 31 / 2019

CARRIER NAME:   Liberty Mutual Fire Insurance Company
1775 Lisbon Rd
Ste 1
Lewiston ME 04240

**Notice:** Unless code(s), total wages paid, total hours worked, and calendar quarter reported are indicated and application is signed, it cannot be processed. **Contact your agent** if assistance is desired.

**Is this a new business?**          ( ) No          ( ) Yes

**If no,**   submit information for the **THIRD** calendar quarter (July, August, September) of the prior calendar year as reported to taxing authorities.

**If yes,**  submit information for the **FIRST** complete calendar quarter following the effective date of your workers compensation policy.

The following is based on actual wages and hours worked, as reflected in our payroll records, for the complete calendar quarter ending _____

"Contracting classifications" are those classifications subject to the following code numbers:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 0042 | 5037 | 5190 | 5443 | 5506 | 5645 | 6206 | 6251 | 9534 |
| 0050 | 5040 | 5213 | 5445 | 5507 | 5651 | 6213 | 6252 | 9554 |
| 1322 | 5057 | 5215 | 5462 | 5508 | 5703 | 6214 | 6306 | |
| 2799 | 5059 | 5221 | 5472 | 5509 | 5705 | 6216 | 6319 | |
| 3365 | 5069 | 5222 | 5473 | 5535 | 6004 | 6217 | 6325 | |
| 3719 | 5102 | 5223 | 5474 | 5537 | 6006F | 6229 | 6400 | |
| 3724 | 5146 | 5348 | 5478 | 5551 | 6017 | 6233 | 7538 | |
| 3726 | 5160 | 5402 | 5479 | 5606 | 6018 | 6235 | 7605 | |
| 5020 | 5183 | 5403 | 5480 | 5610 | 6045 | 6236 | 7855 | |
| 5022 | 5188 | 5437 | 5491 | 5613 | 6204 | 6237 | 8227 | |

| CLASSIFICATION | CODE | TOTAL FLORIDA WAGES PAID[1] | TOTAL HOURS WORKED[2] |
|---|---|---|---|
| **Example: Electrical Wiring** | 5190 | $8,000 | 520 |
| **Contracting Classifications:** | | | |
| | | | |
| | | | |
| | | | |
| **Noncontracting Classifications:** | | | |
| | | | |
| | | | |

[1]   These figures are to exclude overtime premium pay (e.g., employee makes $16/hour and is paid time and one-half, only report the payroll based upon the $16/hour), pay in excess of the maximum individual payroll for executive officers or the pay in excess of payroll amount charged to partners and sole proprietors as shown on the state rate pages, and the entire pay for any exempt sole proprietor, partner, or officer.  For each classification code, combine all wages for that code in a single entry. Employee names are not required.

[2]   Including overtime hours.

Any person who knowingly, and with intent to injure, defraud, or deceive any insurer, files a statement or claim or an application containing any false, incomplete, or misleading information, is guilty of a felony of the third degree.

SIGNATURE:_____   POSITION:_____   DATE: _____

**FORM 09-4D (CCPAP)**        © Copyright 2015 National Council on Compensation Insurance, Inc.         Page 2 of 2
Ed. 01/01/2017                                All Rights Reserved.

Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

**MARYLAND CONSTRUCTION CLASSIFICATION PREMIUM REDUCTION PROGRAM (CCPRP)**
**WORKERS COMPENSATION PREMIUM CREDIT APPLICATION**

The Maryland Construction Classification Premium Reduction Program (Program) is applicable to qualifying employers engaged in contracting operations. In order to qualify for the Program, a policy must have more than 50% of manual premium attributable to one or more contracting classifications (as designated by the Program) and be experience rated.

A special premium calculation, which may result in a premium credit for you, will be based on hourly pay rates for each classification of contracting operations. In order that your premium may be correctly established, please return the completed premium credit application, as set out on the reverse side of this letter, to:

> NCCI
> Customer Service Center
> 901 Peninsula Corporate Circle
> Boca Raton, Florida 33487-1362
> ATTN: EXPERIENCE RATING-MD

NCCI will advise us of any premium credit applicable.

**If NCCI does not receive this application within 180 days after policy inception or receipt of notification, your premium calculation will not reflect any possible premium credit.**

For each applicable classification (both contracting and noncontracting) covering your company's operations in the state of Maryland, report the total Maryland payroll. (Exclude overtime premium pay, vacation pay, unanticipated bonuses, and Davis Bacon fringe benefits you pay into any ERISA qualified third party pension plan, as well as the entire pay for any exempt sole proprietor, partner, or officer.) Also report the corresponding total number of hours worked for the third calendar quarter (July, August, September) of the year preceding your policy effective date as reported to taxing authorities.

Note 1:   If you did not engage in contracting operations during the third calendar quarter, provide the requested information for the last complete calendar quarter prior to the policy effective date of your workers compensation policy

Note 2:   If you are a new business (no prior operations), submit the requested information for the first complete calendar quarter following the policy effective date of your workers compensation policy when available.

Note 3:   In the absence of specific records for salaried employees, you should assume that each individual worked 40 hours per week. Payroll for partners, sole proprietors, and corporate officers subject to contracting classifications will be allocated according to appropriate *Basic Manual* minimum and maximum payroll limitations.

You must preserve your payroll records, which formed the basis for this declaration, because we are required to verify the reported information before applying for any premium credit.

Thank you for your cooperation.

Sincerely,                                                                                              Issued 09/23/2019

TURN PAGE OVER FOR PREMIUM CREDIT APPLICATION

© Copyright 2015 National Council on Compensation Insurance, Inc.
All Rights Reserved.

**CONTRACTING CLASSIFICATION-PREMIUM CREDIT APPLICATION**

**INSURED :**   Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

**STATE CREDIT BEING APPLIED FOR**
**(NOTE: one state per application)**   Maryland

**POLICY NUMBER:** WC2-641-444149-079                **POLICY EFFECTIVE DATE:** 08/31/2019

**CARRIER:**   Liberty Mutual Fire Insurance Company
1775 Lisbon Rd
Ste 1
Lewiston ME 04240

**NOTE:** Unless code(s), total wages paid, total hours worked, calendar quarter reported are indicated and application is signed and dated, it cannot be processed. Contact your agent or carrier if assistance is desired.

| CLASSIFICATION | CODE | TOTAL WAGES PAID | TOTAL HOURS WORKED |
|---|---|---|---|
| **Example: Electrical Wiring** | 5190 | $8,000 | 520 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **Noncontracting Classifications:** | | | |
| | | | |
| | | | |
| | | | |

**The foregoing is based on actual wages** (excluding overtime premium pay, pay in excess of payroll amount charged to partners and sole proprietors as shown on the state loss costs pages, as well as the entire pay for any exempt sole proprietor, partner, or officer) **and hours worked as reflected in our payroll records for the complete calendar quarter.**

**COMPLETE CALENDAR QUARTER (please circle one):**

| 1st (1/1-3/31) | 2nd (4/1-6/30) |
|---|---|
| 3rd (7/1-9/30) | 4th (10/1-12/31) |

**CALENDAR YEAR:**_____

**SIGNATURE:**_____   **POSITION:**_____   **DATE:** _____

This application must be completed and signed or it will not be processed.

"Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly and willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison."

© Copyright 2015 National Council on Compensation Insurance, Inc.
All Rights Reserved.

Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

### VIRGINIA CONTRACTING CLASSIFICATION PREMIUM ADJUSTMENT PROGRAM (CCPAP) WORKERS COMPENSATION PREMIUM CREDIT APPLICATION

The Virginia Contracting Classification Premium Adjustment program is applicable to qualifying employers engaged in contracting operations and is applicable to policies with effective dates on or after January 1, 1997. In order to qualify for the program, more than 50% of your manual premium must be attributable to one or more contracting classifications (as designated in the program) and you must be experience rated.

A special premium calculation, which may result in a premium credit for you, will be based on average hourly pay rates for each contracting classification. In order that your premium may be correctly established, please return the completed premium credit application, as set out on the reverse side of this letter, to:

> NCCI
> Customer Service Center
> 901 Peninsula Corporate Circle
> Boca Raton, Florida 33487-1362

NCCI will advise of any premium credit applicable.

**If NCCI does not receive this application within 180 days after policy inception or receipt of notification, your premium calculation will not reflect any possible premium credit.**

For each applicable classification (both contracting and noncontracting) covering your company's operations in the Commonwealth of Virginia, report the total Virginia payroll reported to the Virginia Employment Commission and the corresponding total number of hours worked, for the third calendar quarter (July, August, September) of the year preceding your policy effective date as reported to taxing authorities.

Note 1:  If you did not engage in contracting operations during the third calendar quarter, provide the requested information for the last complete calendar quarter prior to the policy effective date of your workers compensation policy.

Note 2:  If you are a new business (no prior operations), submit the requested information for the first complete calendar quarter following the policy effective date of your workers compensation policy when available.

Note 3:  In the absence of specific records for salaried employees, you should assume that each individual worked 40 hours a week. Payroll for partners, sole proprietors, and corporate officers subject to contracting classifications will be allocated according to appropriate *Basic Manual* minimum and maximum payroll limitations.

You must preserve your payroll records that formed the basis for this declaration because we are required to verify the reported information in order to apply any premium credit.

Thank you for your cooperation.

Sincerely,

Issued     09/23/2019

**FORM 45-3E**
Ed. 04/01/2018

© Copyright 2017 National Council on Compensation Insurance, Inc.
All Rights Reserved.

Page 1 of 2

## WORKERS COMPENSATION - PREMIUM CREDIT APPLICATION

**INSURED**   Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

**POLICY NUMBER:** WC2-641-444149-079          **POLICY EFFECTIVE DATE:** 08/31/2019

**CARRIER NAME:** Liberty Mutual Fire Insurance Company
1775 Lisbon Rd
Ste 1
Lewiston ME 04240

**Note: Unless code(s), total wages paid, total hours worked, and calendar quarter reported are indicated and application is signed and dated, it cannot be processed. Contact your agent or carrier if assistance is desired.**

Is this a new business?          No ☐          Yes ☐

If no,   submit information for the third calendar quarter (July, August, September) of the year preceding the policy effective date as reported to taxing authorities.

If yes,   submit information for the first complete calendar quarter following the effective date of your workers compensation policy.

The following is based on actual wages and hours worked, as reflected in our payroll records, for the complete calendar quarter ending _____ .

"Contracting classifications" are those classifications subject to the following code numbers:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 0042 | 5037 | 5213 | 5445 | 5507 | 5705 | 6217 | 6325 | 9534 |
| 0050 | 5040 | 5215 | 5462 | 5508 | 6003 | 6229 | 6400 | 9554 |
| 1322 | 5057 | 5221 | 5472 | 5535 | 6005 | 6233 | 7538 | |
| 2799 | 5059 | 5222 | 5473 | 5537 | 6018 | 6235 | 7601 | |
| 3365 | 5102 | 5223 | 5474 | 5551 | 6045 | 6236 | 7605 | |
| 3719 | 5146 | 5348 | 5478 | 5606 | 6204 | 6237 | 7611 | |
| 3724 | 5160 | 5402 | 5479 | 5610 | 6206 | 6251 | 7612 | |
| 3726 | 5183 | 5403 | 5480 | 5645 | 6213 | 6252 | 7613 | |
| 5020 | 5188 | 5437 | 5491 | 5651 | 6214 | 6306 | 7855 | |
| 5022 | 5190 | 5443 | 5506 | 5703 | 6216 | 6319 | 8227 | |

| CLASSIFICATION | CODE | TOTAL VIRGINIA WAGES PAID* | TOTAL HOURS WORKED |
|---|---|---|---|
| **Example: Electrical Wiring** | 5190 | $8,000 | 520 |
| **Contracting Classifications:** | | | |
| | | | |
| | | | |
| | | | |
| | | | |

* For each classification code, combine all wages for that code in a single entry. Employee names are not required.

For each applicable classification (both contracting and noncontracting) covering your employer's operations in the Commonwealth of Virginia, report the total Virginia payroll reported to the Virginia Employment Commission, as well as the entire pay for any exempt sole proprietor, partner, or officer), and the corresponding total number of hours worked, for the third calendar quarter (July, August, September) of the year preceding your policy effective date as reported to taxing authorities.

SIGNATURE:_____          POSITION:_____          DATE:_____

This application must be completed and signed or it will not be processed.

**FORM 45-3E**          © Copyright 2017 National Council on Compensation Insurance, Inc.          Page 2 of 2
Ed. 04/01/2018          All Rights Reserved.

**Suffolk Construction Company, Inc.**
65 Allerton Street
Boston MA 02119

<div align="center">

**CONTRACTING CLASSIFICATION PREMIUM ADJUSTMENT PROGRAM
WORKERS COMPENSATION PREMIUM CREDIT APPLICATION (CONNECTICUT)**

</div>

The Contracting Classification Premium Adjustment Program is applicable to qualifying employers engaged in contracting operations.

A special premium calculation, which may result in a premium credit for you, will be based on average hourly pay rates for each classification of contracting operations. In order that your premium may be correctly established, please return the completed premium credit application, as set out on the reverse side of this letter, to:

> NCCI
> Customer Service Center
> 901 Peninsula Corporate Circle
> Boca Raton, FL 33487-1362

NCCI will advise us of any premium credit applicable.

**If NCCI does not receive this application within 180 days after policy inception, your premium calculation will not reflect any possible premium credit.**

For each applicable classification (both contracting and noncontracting) covering your company's operations in the state that this credit is being applied for (please note that each state that offers this credit requires a separate application), report the total payroll (excluding overtime premium pay, pay in excess of payroll amount charged to partners and sole proprietors as shown on the state rate pages, as well as the entire pay for any exempt sole proprietor, partner, or officer), and the corresponding total number of hours worked for the third calendar quarter (July, August, September) of the year preceding your policy effective date.

Note 1:   If you did not engage in contracting operations during the third calendar quarter, the requested information to be provided should, then, be for the last complete calendar quarter prior to the policy effective date of your workers compensation policy.

Note 2:   If you are a new business (no prior operations), submit the requested information for the first complete calendar quarter following the policy effective date of your workers compensation policy when available.

Note 3:   In the absence of specific records for salaried employees, you should assume that each individual worked 40 hours per week.

Please preserve your payroll records that formed the basis for this declaration, because we will be required to verify the reported information in order for any premium credit to be applied.


Thank you for your cooperation.

Sincerely,

<div align="right">09/23/2019</div>

**Form NC-5000 D**          © Copyright 2019 National Council on Compensation Insurance, Inc.          Page 1 of 2
Ed. 08/01/2019                                All Rights Reserved.

## CONTRACTING CLASSIFICATION-PREMIUM CREDIT APPLICATION

**Insured :**      Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

**STATE CREDIT BEING APPLIED FOR**
**(NOTE: one state per application):** Connecticut

**POLICY NUMBER:** WC2-641-444149-079          **POLICY EFFECTIVE DATE:** 08/31/2019

**CARRIER:**      Liberty Mutual Fire Insurance Company
1775 Lisbon Rd
Ste 1
Lewiston ME 04240

**NOTE:** Unless code(s), total wages paid, total hours worked, and calendar quarter reported are indicated and application is signed and dated, it cannot be processed. Contact your agent or carrier if assistance is desired.

| CLASSIFICATION | CODE | TOTAL WAGES PAID | TOTAL HOURS WORKED |
|---|---|---|---|
| **Example: Electrical Wiring** | **5190** | **$8,000** | **520** |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **Noncontracting Classifications:** |  |  |  |
|  |  |  |  |
|  |  |  |  |

The foregoing is based on actual wages (excluding overtime premium pay, pay in excess of payroll amount charged to partners and sole proprietors as shown on the state rate pages, as well as the entire pay for any exempt sole proprietor, partner, or officer) and hours worked as reflected in our payroll records for the complete calendar quarter.

**Complete Calendar Quarter (please circle one):**

| 1st (1/1-3/31) | 2nd (4/1-6/30) |
|---|---|
| 3rd (7/1-9/30) | 4th (10/1-12/31) |

**Calendar Year:** _____

**SIGNATURE:**_____      **POSITION:**_____      **DATE:**_____

**Form NC-5000 D**
Ed. 08/01/2019

© Copyright 2019 National Council on Compensation Insurance, Inc.
All Rights Reserved.

Page 2 of 2

**Suffolk Construction Company, Inc.**
65 Allerton Street
Boston MA 02119

<div align="center">

**CONTRACTING CLASSIFICATION PREMIUM ADJUSTMENT PROGRAM**
**WORKERS COMPENSATION PREMIUM CREDIT APPLICATION (MONTANA)**

</div>

The Contracting Classification Premium Adjustment Program is applicable to qualifying employers engaged in contracting operations.

A special premium calculation, which may result in a premium credit for you, will be based on average hourly pay rates for each classification of contracting operations. In order that your premium may be correctly established, please return the completed premium credit application, as set out on the reverse side of this letter, to:

> NCCI
> Customer Service Center
> 901 Peninsula Corporate Circle
> Boca Raton, FL 33487-1362

NCCI will advise us of any premium credit applicable.

**If NCCI does not receive this application within 180 days after policy inception, your premium calculation will not reflect any possible premium credit.**

For each applicable classification (both contracting and noncontracting) covering your company's operations in the state that this credit is being applied for (please note that each state that offers this credit requires a separate application), report the total payroll (excluding overtime premium pay, pay in excess of payroll amount charged to partners and sole proprietors as shown on the state rate pages, as well as the entire pay for any exempt sole proprietor, partner, or officer), and the corresponding total number of hours worked for the third calendar quarter (July, August, September) of the year preceding your policy effective date.

Note 1:     If you did not engage in contracting operations during the third calendar quarter, the requested information to be provided should, then, be for the last complete calendar quarter prior to the policy effective date of your workers compensation policy.

Note 2:     If you are a new business (no prior operations), submit the requested information for the first complete calendar quarter following the policy effective date of your workers compensation policy when available.

Note 3:     In the absence of specific records for salaried employees, you should assume that each individual worked 40 hours per week.

Please preserve your payroll records that formed the basis for this declaration, because we will be required to verify the reported information in order for any premium credit to be applied.

Thank you for your cooperation.

Sincerely,

<div align="right">09/23/2019</div>

**CONTRACTING CLASSIFICATION - PREMIUM CREDIT APPLICATION**

**Insured :** Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

**STATE CREDIT BEING APPLIED FOR**
**(NOTE: one state per application):** Montana

**POLICY NUMBER:** WC2-641-444149-079     **POLICY EFFECTIVE DATE:** 08/31/2019

**CARRIER:** Liberty Mutual Fire Insurance Company
1775 Lisbon Rd
Ste 1
Lewiston ME 04240

**NOTE:** Unless code(s), total wages paid, total hours worked, and calendar quarter reported are indicated and application is signed and dated, it cannot be processed. Contact your agent or carrier if assistance is desired.

| CLASSIFICATION | CODE | TOTAL WAGES PAID | TOTAL HOURS WORKED |
|---|---|---|---|
| **Example: Electrical Wiring** | **5190** | **$8,000** | **520** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **Noncontracting Classifications:** | | | |
| | | | |
| | | | |

The foregoing is based on actual wages (excluding overtime premium pay, pay in excess of payroll amount charged to partners and sole proprietors as shown on the state rate pages, as well as the entire pay for any exempt sole proprietor, partner, or officer) and hours worked as reflected in our payroll records for the complete calendar quarter.

**Complete Calendar Quarter (please circle one):**

| 1st (1/1-3/31) | 2nd (4/1-6/30) |
|---|---|
| 3rd (7/1-9/30) | 4th (10/1-12/31) |

**Calendar Year:** _____

**SIGNATURE:** _____ **POSITION:** _____ **DATE:** _____

**Form NC-5000 D**
**Ed. 08/01/2019**

© Copyright 2019 National Council on Compensation Insurance, Inc. All Rights Reserved.

Page 2 of 2

# NEW JERSEY - NOTICE

The Information Page of your Workers Compensation and Employers Liability Insurance Policy contains line items for (1) a Second Injury Fund Surcharge and (2) an Uninsured Employer's Fund Surcharge. Each surcharge amount represents a percentage of your total estimated standard premium and will be subject to adjustment when the final audited standard premium is determined. Explanations of these surcharges are provided below.

## SECOND INJURY FUND

The New Jersey Workers Compensation Law established the Second Injury Fund to provide benefits to workers who become permanently and totally disabled as a result of work-related injury or occupational disease when that worker had been previously partially disabled. The Law also requires that the Fund provide annual adjustments to certain persons permanently and totally disabled and to certain dependents of deceased workers.

Through 1988, the Second Injury Fund was financed by an annual assessment upon insurance carriers. Such assessment was included in your standard premium via the manual premium rate(s) shown in your policy Information Page.

Effective January 1, 1989 an amendment to the Law requires that the present financing be replaced by a direct surcharge shown as a separate "Second Injury Fund Surcharge" line on your policy Information Page. It will no longer be included in the manual premium rate. This new system will discourage other states from imposing retaliatory taxes on New Jersey based insurance companies and ultimately aid cost containment efforts.

## UNINSURED EMPLOYERS FUND

The New Jersey Workers Compensation Law requires every employer to provide workers compensation coverage through purchase of a workers compensation and employers liability insurance policy. Failure to provide such coverage results in a fine and/or criminal action by the Department of Labor as well as continued liability for benefit payments to an injured worker.

The Uninsured Employers Fund was established by Law to provide benefits to an injured worker when the employer has failed to comply with the insurance provisions of the Law and is unable to provide the required benefits. Through 1988 total financing of the Fund was derived from fines imposed upon uninsured employers.

Effective January 1, 1989 an amendment to the Law, requires that the present financing be supplemented by a direct surcharge shown as a separate "Uninsured Employers Fund Surcharge" line on your policy Information Page. This method will assure the delivery of benefits to injured workers and the surcharge will cease whenever the year end balance of the Fund exceeds $500,000.

GPO4098
Page 1 of 1
Ed. 06/05/2001

## NOTICE TO MARYLAND EMPLOYERS

Any minor employee of the insured employer must possess a work permit as required by state law.

All compensation and death benefits provided under the Workers Compensation Laws may be doubled in the case of any minor employed without a work permit (MD Code Insurance Statute 19-405.)

The employer is solely liable for the increased amount of compensation or death benefits for a minor employee who does not possess a work permit (MD Code Insurance Statute 19-405.)

**GPO 4908**
Page 1 of 1
Ed. 03/01/2006

## CALIFORNIA ASSESSMENTS AND SURCHARGE

Your policy contains the following assessments and surcharge applicable to your California premium:

Fraud Investigation/Prosecution Surcharge

Occupational Safety & Health Fund Assessment

Subsequent Injuries Benefits Trust Fund Assessment

Uninsured Employers Benefit Trust Fund Assessment

User Fund/WC Administrative Revolving Fund

Labor Enforcement & Compliance Fund

The Director of the Department of Industrial Relations determines the amount of these assessments and surcharges. Insurance companies are required to pay these assessments and surcharge and recover them from California policyholders based on their policy premium.

**GPO 4983 R1**
Page 1 of 1
Ed. 01/01/2010

**VIRGINIA IMPORTANT INFORMATION REGARDING YOUR INSURANCE**

In the event you need to contact someone about this insurance for any reason, please contact your agent.  If no agent was involved in the sale of this insurance, or if you have additional questions you may contact the insurance company issuing this insurance at the following address and telephone number:

> PRESIDENTIAL SERVICE TEAM
> LIBERTY MUTUAL GROUP
> 175 BERKELEY ST – MS 10B
> BOSTON MA 02116
> 1-800-344-0197

If you are unable to contact or obtain satisfaction from the company or the agent, you may contact the Virginia State Corporation Commissions Bureau of Insurance at:

> STATE CORPORATION COMMISSION
> VIRGINIA BUREAU OF INSURANCE
> PO BOX 1157
> RICHMOND VA 23218
>
> In state toll free calls:
> > 1-877-310-6560
> > Or
> Out of state calls:
> > 1-804-371-9185

Written correspondence is preferable so that a record of your inquiry is maintained.  When contacting your agent, company or the Bureau of Insurance, have your policy number available.

**SNI 45 01 12 10**          © 2010, Liberty Mutual Group.  All Rights Reserved.          Page 1 of  1
Ed. 12/01/2010

**POLICYHOLDER NOTICE - COMPANY CONTACT INFORMATION**

In the event you need to contact someone about this policy for any reason, please contact your Sales Representative or Producer of Record as shown on the policy Declarations or Information Page.

If you have additional questions, you may contact the company at the following address:

**Liberty Mutual Insurance**
**175 Berkeley Street**
**Boston, MA 02116**
**+1 (800) 344-0197**

## CALIFORNIA INSURANCE GUARANTEE ASSOCIATION (CIGA) SURCHARGE

Companies writing property and casualty insurance business in California are required to participate in the California Insurance Guarantee Association.   If a company becomes insolvent, the California Insurance Guarantee Association settles unpaid claims and assesses each insurance company for its fair share.

California law requires all companies to surcharge policies to recover these assessments.   If your policy is surcharged, "CA Surcharge" or "CA Surcharge (CIGA Surcharge)" with an amount will be displayed on your premium notice.

This notice does not change the policy to which it is attached.

2010 Liberty Mutual Group of Companies.  All Rights Reserved

**CALIFORNIA WORKERS' COMPENSATION**

**NOTICE TO POLICYHOLDERS**

**INSURANCE RATING LAWS**

Pursuant to Section 11752.8 of the California Insurance Code, we are providing you with an explanation of the California workers' compensation rating laws.

1. We establish our own rates for workers' compensation. Our rates, rating plans, and related information are filed with the Insurance Commissioner and are open for public inspection.

2. The Insurance Commissioner can disapprove our rates, rating plans, or classifications only if he or she has determined after public hearing that our rates might jeopardize our ability to pay claims or might create a monopoly in the market. A monopoly is defined by law as a market where one insurer writes 20% or more of that part of the California worker's compensation insurance that is not written by the State Compensation Insurance Fund. If the Insurance Commissioner disapproves our rates, rating plans, or classifications, he or she may order an increase in the rates applicable to outstanding policies.

3. Rating organizations may develop pure premium rates that are subject to the Insurance Commissioner's approval. A pure premium rate reflects the anticipated cost and expenses of claims per $100 of payroll for a given classification. Pure premium rates are advisory only, as we are not required to use the pure premium rates developed by any rating organization in establishing our own rates.

4. We must adhere to a single, uniform experience rating plan. If you are eligible for experience rating under the plan, we will be required to adjust your premium to reflect your claim history. A better claim history generally results in a lower experience rating modification; more claims, or more expensive claims, generally result in a higher experience rating modification. The uniform experience rating plan, which is developed by the insurance rating organization designated by the Insurance Commissioner, is subject to the approval of the Insurance Commissioner.

5. A standard classification system, developed by the insurance rating organization designated by the Insurance Commissioner, is subject to approval by the Insurance Commissioner. The standard classification system is a method of recognizing and separating policyholders into industry or occupational groups according to their similarities and/or differences. We can adopt and apply the standard classification system or develop and apply our own classification system, provided we can report the payroll, expenses, and other costs of claims in a way that is consistent with the uniform statistical plan or the standard classification system.

6. Our rates and classifications may not violate the Unruh Civil Rights Act or be unfairly discriminatory.

7. We will provide an appeal process for you to appeal the way we rate your insurance policy. The process requires us to respond to your written appeal within 30 days. If you are not satisfied with the result of your appeal, you may appeal our decision to the Insurance Commissioner.

© 2019 Workers Compensation Insurance Rating Bureau of California.  All rights reserved

**NOTICE OF NONRENEWAL**

Section 11664 of the California Insurance Code requires us, in most instances, to provide you with a notice of nonrenewal. Except as specified in paragraphs 1 through 6 below, if we elect to nonrenew your policy, we are required to deliver or mail to you a written notice stating the reason or reasons for the nonrenewal of the policy. The notice is required to be sent to you no earlier than 120 days before the end of the policy period and no later than 30 days before the end of the policy period. If we fail to provide you the required notice, we are required to continue the coverage under the policy with no change in the premium rate until 60 days after we provide you with the required notice.

We are not required to provide you with a notice of nonrenewal in any of the following situations:

1.  Your policy was transferred or renewed without a change in its terms or conditions or the rate on which the premium is based to another insurer or other insurers who are members of the same insurance group as us.

2.  The policy was extended for 90 days or less and the required notice was given prior to the extension.

3.  You obtained replacement coverage or agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

4.  The policy is for a period of no more than 60 days and you were notified at the time of issuance that it may not be renewed.

5.  You requested a change in the terms or conditions or risks covered by the policy within 60 days prior to the end of the policy period.

6.  We made a written offer to you to renew the policy at a premium rate increase of less than 25 percent.

    A.  If the premium rate in your governing classification is to be increased 25 percent or greater and we intend to renew the policy, we shall provide a written notice of a renewal offer not less than 30 days prior to the policy renewal date. The governing classification shall be determined by the rules and regulations established in accordance with California Insurance Code Section 11750.3(c).

    B.  For purposes of this notice, "premium rate" means the cost of insurance per unit of exposure prior to the application of individual risk variations based on loss or expense considerations such as scheduled rating and experience rating.

This notice does not change the policy to which it is attached.

© 2019 Workers Compensation Insurance Rating
Bureau of California.  All rights reserved

**YOUR RIGHT TO RATING AND DIVIDEND INFORMATION**

I.   **Information Available To You**

    A.   Information Available from Us **- Liberty Mutual Fire Insurance Company**

        1.   General questions regarding your policy should be directed to

            **Liberty Mutual Insurance**
            **Attn Corporate Underwriting**
            **1615 Murray Canyon Road, Suite 300**
            **San Diego, CA 92108**
            **(Telephone) 619-744-6000**

        2.   Dividend Calculation. If this is a participating policy (a policy on which a dividend may be paid), upon payment or non-payment of a dividend, we shall provide a written explanation to you that sets forth the basis of the dividend calculation. The explanation will be in clear, understandable language and will express the dividend as a dollar amount and as a percentage of the earned premium for the policy year on which the dividend is calculated.

        3.   Claims Information. Pursuant to Sections 3761 and 3762 of the California Labor Code, you are entitled to receive information in our claim files that affects your premium. Copies of documents will be supplied at your expense during reasonable business hours.

            For claims covered under this policy, we will estimate the ultimate cost of unsettled claims for statistical purposes eighteen months after the policy becomes effective and will report those estimates to the Workers' Compensation Insurance Rating Bureau of California (WCIRB) no later than twenty months after the policy becomes effective. The cost of any settled claims will also be reported at that time. At twelve-month intervals thereafter, we will update and report to the WCIRB the estimated cost of any unsettled claims and the actual final cost of any claims settled in the interim. The amounts we report will be used by the WCIRB to compute your experience modification if you are eligible for experience rating.

    B.  Information Available from the Workers' Compensation Insurance Rating Bureau of California

        1.   The WCIRB is a licensed rating organization and the California Insurance Commissioner's designated statistical agent. As such, the WCIRB is responsible for administering the *California Workers' Compensation Uniform Statistical Reporting Plan—1995* (USRP) and the *California Workers' Compensation Experience Rating Plan—1995* (ERP). WCIRB contact information is: WCIRB, 1221 Broadway, Suite 900, Oakland, CA 94612, Attn: Customer Service; 888.229.2472 (phone); 415.778.7272 (fax); and customerservice@wcirb.com (email). The regulations contained in the USRP and ERP are available for public viewing through the WCIRB's website at wcirb.com.

        2.   Policyholder Information. Pursuant to California Insurance Code (CIC) Section 11752.6, upon written request, you are entitled to information relating to loss experience, claims, classification assignments, and policy contracts as well as rating plans, rating systems, manual rules, or other information impacting your premium that is maintained in the records of the WCIRB. Complaints and Requests for Action requesting policyholder information should be forwarded to: WCIRB, 1221 Broadway, Suite 900, Oakland, CA 94612, Attn: Custodian of Records. The Custodian of Records can be reached at 415.777.0777 (phone) and 415.778.7272 (fax).

3. Experience Rating Form. Each experience rated risk may receive a single copy of its current Experience Rating Form/Worksheet free of charge by completing a Policyholder Experience Rating Worksheet Request Form on the WCIRB's website at wcirb.com/ratesheet. The Experience Rating Form/Worksheet will include a Loss-Free Rating, which is the experience modification that would have been calculated if $0 (zero) actual losses were incurred during the experience period. This hypothetical rating calculation is provided for informational purposes only.

## II. Dispute Process

You may dispute our actions or the actions of the WCIRB pursuant to CIC Sections 11737 and 11753.1.

A. Our Dispute Resolution Process. If you are aggrieved by our decision adopting a change in a classification assignment that results in increased premium, or by the application of our rating system to your workers' compensation insurance, you may dispute these matters with us. If you are dissatisfied with the outcome of the initial dispute with us, you may send us a written Complaint and Request for Action as outlined below.

You may send us a written Complaint and Request for Action requesting that we reconsider a change in a classification assignment that results in an increased premium and/or requesting that we review the manner in which our rating system has been applied in connection with the insurance afforded or offered you. Written Complaints and Requests for Action should be forwarded to: **Liberty Mutual Insurance, Attn Corporate Underwriting, 1615 Murray Canyon Road, Suite 300, San Diego, CA 92108, (Telephone) 619-744-6000**

After you send your Complaint and Request for Action, we have 30 days to send you a written notice indicating whether or not your written request will be reviewed. If we agree to review your request, we must conduct the review and issue a decision granting or rejecting your request within 60 days after sending you the written notice granting review. If we decline to review your request, if you are dissatisfied with the decision upon review, or if we fail to grant or reject your request or issue a decision upon review, you may appeal to the Insurance Commissioner as described in paragraph II.C., below.

B. Disputing the Actions of the WCIRB. If you have been aggrieved by any decision, action, or omission to act of the WCIRB, you may request, in writing, that the WCIRB reconsider its decision, action, or omission to act. You may also request, in writing, that the WCIRB review the manner in which its rating system has been applied in connection with the insurance afforded or offered you. For requests related to classification disputes, the reporting of experience, or coverage issues, your initial request for review must be received by the WCIRB within 12 months after the expiration date of the policy to which the request for review pertains, except if the request involves the application of the Revision of Losses rule. For requests related to your experience modification, your initial request for review must be received by the WCIRB within 6 months after the issuance, or 12 months after the expiration date, of the experience modification to which the request for review pertains, whichever is later, except if the request for review involves the application of the Revision of Losses rule. If the request involves the Revision of Losses rule, the time to state your appeal may be longer. (See Section VI, Rule 7 of the ERP).

You may commence the review process by sending the WCIRB a written Inquiry. Written Inquiries should be sent to: WCIRB, 1221 Broadway, Suite 900, Oakland, CA 94612, Attn: Customer Service. Customer Service can be reached at 888.229.2472 (phone), 415.778.7272 (fax) and customerservice@wcirb.com (email).

© 2019 Workers Compensation Insurance Rating Bureau of California. All rights reserved

If you are dissatisfied with the WCIRB's decision upon an Inquiry, or if the WCIRB fails to respond within 90 days after receipt of the Inquiry, you may pursue the subject of the Inquiry by sending the WCIRB a written Complaint and Request for Action. After you send your Complaint and Request for Action, the WCIRB has 30 days to send you written notice indicating whether or not your written request will be reviewed. If the WCIRB agrees to review your request, it must conduct the review and issue a decision granting or rejecting your request within 60 days after sending you the written notice granting review. If the WCIRB declines to review your request, if you are dissatisfied with the decision upon review, or if the WCIRB fails to grant or reject your request or issue a decision upon review, you may appeal to the Insurance Commissioner as described in paragraph II.C., below. Written Complaints and Requests for Action should be forwarded to: WCIRB, 1221 Broadway, Suite 900, Oakland, CA 94612, Attn: Complaints and Reconsideration. The WCIRB's contact information is 888.229.2472 (phone), 415.371.5204 (fax) and customerservice@wcirb.com (email).

C.   California Department of Insurance – Appeals to the Insurance Commissioner. After you follow the appropriate dispute resolution process described above, if (1) we or the WCIRB decline to review your request, (2) you are dissatisfied with the decision upon review, or (3) we or the WCIRB fail to grant or reject your request or issue a decision upon review, you may appeal to the Insurance Commissioner pursuant to CIC Sections 11737, 11752.6, 11753.1 and Title 10, California Code of Regulations, Section 2509.40 et seq. You must file your appeal within 30 days after we or the WCIRB send you the notice rejecting review of your Complaint and Request for Action or the decision upon your Complaint and Request for Action. If no written decision regarding your Complaint and Request for Action is sent, your appeal must be filed within 120 days after you sent your Complaint and Request for Action to us or to the WCIRB. The filing address for all appeals to the Insurance Commissioner is:

> Administrative Hearing Bureau
> California Department of Insurance
> 45 Fremont Street, 22nd Floor
> San Francisco, CA 94105
> 415.538.4102

You have the right to a hearing before the Insurance Commissioner, and our action, or the action of the WCIRB, may be affirmed, modified or reversed.

## III. Resources Available To You In Obtaining Information And Pursuing Disputes

A.   Policyholder Ombudsman. Pursuant to California Insurance Code Section 11752.6, a policyholder ombudsman is available at the WCIRB to assist you in obtaining and evaluating the rating, policy, and claims information referenced in I.A. and I.B., above. The ombudsman may advise you on any dispute with us, the WCIRB, or on an appeal to the Insurance Commissioner pursuant to Section 11737 of the Insurance Code. The address of the policyholder ombudsman is WCIRB, 1221 Broadway, Suite 900, Oakland, CA 94612, Attn: Policyholder Ombudsman. The policyholder ombudsman can be reached at 415.778.7159 (phone), 415.371.5288 (fax) and ombudsman@wcirb.com (email).

B.   California Department of Insurance – Information and Assistance. Information and assistance on policy questions can be obtained from the Department of Insurance Consumer HOTLINE, 800.927.HELP (4357) or insurance.ca.gov. For questions and correspondence regarding appeals to the Administrative Hearing Bureau, see the contact information in paragraph II.C.

This notice does not change the policy to which it is attached.

**POLICYHOLDER NOTICE**
**CALIFORNIA Assembly Bill (AB)  2883 and Senate Bill (SB) 189**

<u>Effective January 1, 2017</u>

California AB 2883 revised allowable exemptions from the definition of an "employee" to only apply to

- an officer or member of the board of directors, if he or she owns at least 15% of the issued and outstanding stock of the corporation
- an individual who is a general partner of a partnership; and
- a managing member of a limited liability company

In order for an exemption to apply, a person must elect to be excluded by executing a written waiver of his or her rights under the laws governing workers' compensation, stating under penalty of perjury that he or she is a qualifying officer or director, or a qualifying general partner or managing member, as applicable.

This bill applied to all in force, new and renewing policies.


<u>Effective July 1, 2018</u>

California SB 189 makes additional changes to the allowable exemptions, including:

- a person holding the power to revoke a trust with respect to share of a private corporation, general partnership or limited liability company, but only if the person meets the criteria described in Labor Code section 3352.;
- an officer or member of the board of directors, if either:
  - he or she owns at least<u>10%</u> of the issued and outstanding stock, or
  - he or she owns at least 1% of the issued and outstanding stock of the corporation if his or her parent, grandparent, sibling, spouse or child owns at least 10% of the issued and outstanding stock and is covered by a health insurance policy
- a general partner or managing member of a limited liability company;
- an owner of a professional corporation, who is rendering professional services for which the professional corporation is organized who is covered by a health care service plan or health insurance policy;
- an officer or member of the board of directors of a cooperative corporation who is covered by a health care service plan or health insurance policy, and a disability insurance policy that is comparable in scope and coverage to a workers compensation policy;

All of the employees mentioned above may <u>be excluded by executing a written waiver of his or her rights under the laws governing workers' compensation, stating under penalty of perjury, that they are a qualifying officer, director, general partner, or managing member. The insurer, with the consent of the employee executing the waiver, may elect to backdate the acceptance of the waiver up to 15 days prior to the date of receipt of the waiv</u>er.


In addition an officer or director of a private corporation who is the sole shareholder of the private corporation is excluded from the definition of an employee, but may elect to be subject to workers compensation coverage.

Please contact your agent, broker or underwriter for additional information.

© 2018 Liberty Mutual Insurance

**CORPORATE OFFICERS / DIRECTORS - WAIVER OF WORKERS' COMPENSATION COVERAGE**

Insured Name:   Suffolk Construction Company, Inc.

Insurer:        Liberty Mutual Fire Insurance Company

Policy Number:  WC2-641-444149-079

Pursuant to California Labor Code sections 3351 and 3352, I hereby certify, under penalty of perjury, that I am an officer or director of the above-named insured, which is a quasi-public or private corporation, and that

- I own at least 10 percent (10%) of the issued and outstanding stock of the above-named insured corporation; or
- I own at least 1 percent (1%) of the issued and outstanding stock of the corporation if my parent, grandparent, sibling, spouse or child owns at least 10 percent (10%) of the issued and outstanding stock and is covered by a health insurance policy or health care service plan; or
- I am an officer or member of the board of directors of a cooperative corporation organized pursuant to the Cooperative Corporation Law, and have coverage under a health care service plan or health insurance policy and a disability insurance policy that is comparable in scope and coverage to a workers' compensation policy; or
- I hold the power to revoke a trust with respect to shares of a private corporation held in trust.

As a qualifying officer or director, I elect to be excluded from the corporation's workers' compensation insurance policy with the above-referenced insurer. I understand and agree that this written waiver will be effective upon the date of receipt and acceptance by the corporation's insurer. The insurer, with my consent, may elect to backdate the acceptance of the waiver up to 15 days prior to the date of receipt of the waiver. It shall remain in effect until I provide the insurer with a written withdrawal of this waiver. I understand and agree that by signing this waiver, I will not be entitled to coverage under the insured's workers' compensation policy with the above-referenced insurer if an employment-related injury occurs.

☐ I consent to allow this waiver to be backdated up to 15 days prior to receipt.

_____        _____
PRINT OFFICER'S/DIRECTOR'S/TRUSTEE'S                        TITLE
            FULL NAME

_____        _____
OFFICER/DIRECTOR/TRUSTEE SIGNATURE                          DATE

ACCEPTED:

_____        _____
[COMPANY REPRESENTATIVE/AGENT]                              DATE
            SIGNATURE

**NOTE TO EMPLOYER: The exclusion will be endorsed to the policy upon our receipt and acceptance of a signed and properly completed form. The person electing exclusion must sign this form. Company representatives may not sign on behalf of the individual. One exclusion per form. Submit additional forms if needed.**

**Please submit the completed form to your agent/broker.**

SNW 04 09 07 18               © 2018 Liberty Mutual Insurance                    Page 1 of 1
Ed. 07/01/2018

**POLICYHOLDER NOTICE**
**CALIFORNIA SENATE BILL (SB) 1160 - MANAGED CARE NOTIFICATION**

Pursuant to California Labor Code Section 4610(g)(3)(B), this is to notify you that Liberty Mutual Managed Care LLC, which performs utilization review in the State of California, is a corporate affiliate of the following companies (and performs utilization review on their behalf):

- American Economy Insurance Company
- American Fire and Casualty Company
- American States Insurance Company
- American States Insurance Company of Texas
- Employers Insurance Company of Wausau
- First National Insurance Company of America
- General Insurance Company of America
- Golden Eagle Insurance Corporation
- Helmsman Management Services LLC
- Liberty Insurance Corporation
- Liberty Insurance Underwriters Inc.
- Liberty Mutual Fire Insurance Company
- Liberty Mutual Insurance Company
- Liberty Northwest Insurance Corporation
- LM Insurance Corporation
- LM Property and Casualty Insurance Company
- Ohio Security Insurance Company
- Peerless Indemnity Insurance Company
- Peerless Insurance Company
- Safeco Insurance Company of America
- Safeco Insurance Company of Illinois
- San Diego Insurance Company
- The First Liberty Insurance Corporation
- The Netherlands Insurance Company
- The Ohio Casualty Insurance Company
- Wausau Business Insurance Company
- Wausau Underwriters Insurance Company
- West American Insurance Company

Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

**MASSACHUSETTS CONSTRUCTION CLASSIFICATION PREMIUM ADJUSTMENT PROGRAM**
**WORKERS' COMPENSATION PREMIUM CREDIT APPLICATION**

The Massachusetts Construction Classification Premium Adjustment Program has been proposed for employers engaged in construction operations and is applicable to policies eligible for experience rating.

A special premium calculation, which may result in a premium credit for you, will be based on average hourly pay rates for each classification of construction operations.  In order that your premium may be correctly established, please return the completed premium credit application, as shown on the reverse side of this letter to:   **The Workers' Compensation Rating and Inspection Bureau of Massachusetts, P.O. Box 55005, Boston, Massachusetts 02205, Attention:  Customer Services**

*Construction Credit Applications may be submitted by mail, fax (617-439-6055) or electronically through the WCRIBMA's website at* www.wcribma.org *using online MCCPAP, located under the Products and Services menu.*

They will advise us of any premium credit applicable.

> *IMPORTANT*:  *Initial written notice of possible credit under this Program is given to you at policy inception or during the policy term.  If you have not already submitted an application for credit prior to policy audit, you will be requested to sign a form acknowledging receipt of notice and, at the same time, requested to indicate whether you will apply for a credit.  If you apply for a credit, you must submit a completed and signed application to the Bureau before the completion of the audit of the affected policy.  In any event, the completed and signed application must be received by the Bureau within six months of the expiration date of the affected policy, or within one month of the time you receive written notice of the Program, whichever is later*

For each applicable classification (both construction and non-construction) covering your company's operations in the State of Massachusetts, report the total Massachusetts payroll (excluding overtime premium pay) and the corresponding total number of hours worked for the third calendar quarter (July, August, September) as reported to taxing authorities.

Note 1:     If you did not engage in construction operations during the most recent third calendar quarter, the requested information to be provided should then be for the last complete calendar quarter prior to the effective date of your workers' compensation policy.

Note 2:     If you are a new business (no prior operations), or an existing business engaged in construction operations for the first time, submit the requested information for the first complete calendar quarter following the effective date of your workers' compensation policy when available.

Note 3:     In the absence of specific records for salaried employees, you should assume that each individual worked forty (40) hours per week.

Please preserve your payroll records which formed the basis for this declaration as we will be required to verify the reported information in order for any premium credit to be applied.

Thank you for your cooperation.

Sincerely,

**Turn Page Over For Premium Credit Application**

Issued 09/23/2019

**WORKERS' COMPENSATION**
**MASSACHUSETTS CONSTRUCTION CLASSIFICATION PREMIUM ADJUSTMENT**
**PROGRAM  APPLICATION**

INSURED     Suffolk Construction Company, Inc.
            65 Allerton Street
            Boston MA 02119

FEDERAL EMPLOYERS ID NO. 04-2776356

POLICY NO.  WC2-641-444149-079            EFFECTIVE DATE  08 / 31 / 2019

ISSUING OFFICE     Liberty Mutual Fire Insurance Company
                   1775 Lisbon Rd
                   Ste 1
                   Lewiston ME 04240

Notice:    Unless Code(s), total wages paid, total hours worked, and calendar quarter reported are indicated and
           application is signed, it cannot be processed.  Contact your agent if assistance is desired.

| CLASSIFICATION(S) | CODE | TOTAL MASSACHUSETTS WAGES PAID* | TOTAL HOURS WORKED |
|---|---|---|---|
| Example:  Concrete Construction | 5213 | $46,176 | 2080 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The foregoing is based on actual wages and hours worked, as reflected in our payroll records, for the complete
calendar quarter ending _____.

SIGNATURE_____POSITION_____DATE _____

*EXCLUDING OVERTIME PREMIUM PAY.

**WORKERS' COMPENSATION**
**MASSACHUSETTS CONSTRUCTION CLASSIFICATION  PREMIUM  ADJUSTMENT**
**PROGRAM  APPLICATION**

INSURED      Suffolk Construction Company, Inc.
             65 Allerton Street
             Boston MA 02119


FEDERAL EMPLOYERS ID NO. 04-2776356

POLICY NO.  WC2-641-444149-079            EFFECTIVE DATE 08 /31 /2019

ISSUING OFFICE      Liberty Mutual Fire Insurance Company
                    1775 Lisbon Rd
                    Ste 1
                    Lewiston ME 04240

**IMPORTANT NOTICE**

**PLEASE READ CAREFULLY**

**THIS NOTICE FORM AND THE APPLICATION MUST**
**BE RETURNED BEFORE YOUR AUDIT CAN BE PROCESSED**

---

**MASSACHUSETTS CONSTRUCTION CLASSIFICATION**
**PREMIUM ADJUSTMENT PROGRAM**

**ACKNOWLEDGMENT OF RECEIPT OF NOTICE FORM**

I, the undersigned, acknowledge receipt of Massachusetts Workers' Compensation Premium Credit Application.

I understand that in order to receive a credit under this Program, I must submit a complete and signed original application, which must be received within the time frame stated in the application, to:

**The Workers' Compensation Rating and Inspection Bureau**
**Of Massachusetts**
**P.O. Box 55005**
**Boston, Massachusetts  02205**

**Attention: Customer Services**


Signature and Title                    Employer's Name
(Corporate Officer,
General Partner, or
Sole Proprietor)

**Retain a copy of this form in your file**

**NEW YORK WORKERS COMPENSATION SECURITY FUND RECOUPMENT**

Companies writing workers' compensation insurance business in New York are required to participate in the New York Workers' Compensation Security Fund.  If a company becomes insolvent, the security fund settles unpaid claims and assesses each insurance company for its fair share.

New York law requires all companies to surcharge policies to recover these assessments.  If your policy is surcharged 'NY Surcharge', an amount will be displayed on your premium notice.

**TENNESSEE POLICYHOLDER NOTICE**
**RATE REVIEW REQUESTS**

In the event that you would like to request that we review the application of our rating system to your insurance coverage, please send a written request to us at the address indicated below and include the following:

    (a) Your name, address, daytime telephone number, policy number and your Federal Employer Identification Number (FEIN);

    (b) An explanation of what you are disputing; and

    (c) A statement of the relief you are seeking.

Please feel free to include any other information or copies of any other documentation you think is relevant or supports your position.

    Upon receipt of your written request we will review, consider and respond in writing within 30 days. Our response will inform you of our decision on the merits of the request and explain the reason(s) for that decision. If our decision remains adverse to you, any further appeal of the rate review shall be filed timely and pursuant to the procedures set forth at T.C.A. § 56-5-309 and all rules and regulations related to this statute or otherwise adopted in Tennessee.

Requests for a review of our rating system should be sent to:

**Liberty Mutual Insurance**
**175 Berkeley Street**
**Boston, MA 02116**
**Attention:**
**Presidential Service Team**

**MAINE EMPLOYER PENALTIES FOR LATE REPORT OF INJURY**

Maine law requires an employer that has knowledge of any lost time employee injury to give timely notice to its insurer and to reimburse the insurer for any penalty it pays as a result of the employer's late filing of the report of injury to the insurer. 39-A M.R.S.A. § 303

**LIBERTY MUTUAL WORKERS COMPENSATION, GROUP BENEFITS, AND HELMSMAN MANAGEMENT SERVICES, LLC
PRIVACY PRACTICES DISCLOSURE NOTICE**

This Privacy Practices Disclosure Notice outlines the privacy practices for Liberty Mutual Insurance and its subsidiaries and affiliates listed below (collectively referred to as "Liberty Mutual"):

- Liberty Mutual Fire Insurance Company
- LM Insurance Corporation
- Liberty Insurance Company of America
- Liberty Life Assurance Company of Boston
- Employers Insurance Company of Wausau
- Wausau Business Insurance Company

- Liberty Insurance Corporation
- The First Liberty Insurance Corporation
- Liberty Northwest Insurance Corporation
- Helmsman Management Services, LLC
- Wausau General Insurance Company
- Wausau Underwriters Insurance Company

This Notice tells you:

- The categories of nonpublic personal information (NPPI) we collect from you or from a third party about you or about participants, beneficiaries or claimants under your workers compensation and/or group benefit coverage, or your employee benefit programs or plans;

- How we use NPPI;

- The categories of affiliates and non-affiliate third parties with whom we share NPPI;

- The security policies and procedures in place to protect the confidentiality and security of NPPI provided to us.

If you have questions regarding this Privacy Practices Disclosure Notice, contact us by sending an email to pstprivacy@libertymutual.com or write to us at:

**Presidential Service Team
Liberty Mutual Insurance
175 Berkeley Street
Boston, MA 02116**

If applicable, please include your policy number or contract number with any correspondence.

1.    <u>INFORMATION WE MAY COLLECT</u>

We want you to conduct business with us knowing that we protect NPPI. We collect NPPI from you or from third parties about you or about participants, beneficiaries or claimants under your insurance coverage. We collect NPPI from:

- Applications or other forms which may include policyholder, participant, beneficiary or claimant name, address, phone number, social security number, household information, vehicle and driver information, date of birth, medical information related to underwriting and claims, insurance coverage, and employee benefit programs or plan information;

- Your business dealings with us, our affiliates, or others, such as prior claims or accidents, medical information related to claims, information about your accident or injury (if applicable), and the names of witnesses and other contact information; and

- Consumer reporting agencies, motor vehicle departments, and inspection services.

© 2012 Liberty Mutual Insurance. All rights reserved.

2.   **HOW THE INFORMATION IS USED**

We use NPPI:

- To provide policy and premium quotes;

- To underwrite applications, administer claims, and answer questions about our insurance products and services;

- For account administration and processing premium billings payments;

- To process and defend insurance claims, and administer insurance benefits (including utilization review activities);

- To report, investigate, or prevent fraud or material misrepresentation; and

- As otherwise required or permitted by federal or state law.

3.   **TO WHOM INFORMATION IS DISCLOSED**

We do not disclose NPPI about you or about participants, beneficiaries or claimants under your insurance policy, employee benefit programs or plans to anyone, unless allowed by law.  We are allowed by law to provide NPPI to:

- A third party that performs services for us, such as claims investigations or medical examinations;

- Our affiliated companies and reinsurers;

- Insurance regulators, reporting agencies or, if applicable, involuntary market administrators;

- State Motor Vehicle Departments to obtain a report of any accidents or convictions;

- Law enforcement agencies or other governmental authorities to report suspected illegal activities;

- Persons or organizations conducting insurance actuarial or research studies, subject to appropriate confidentiality agreements;

- Companies that provide marketing services on our behalf, or as part of a joint marketing agreement; and,

- As otherwise permitted or required by law.

4.   **HOW WE PROTECT INFORMATION**

We maintain physical, electronic, and procedural safeguards to guard NPPI.  These safeguards comply with applicable laws.  We retain NPPI for as long as required by law or regulation.  The only employees or agents who have access to your NPPI are those who must have it to provide products or services to you. We do not sell your NPPI to mass marketing or telemarketing companies.

**RISK CONTROL SERVICES**
**IMPORTANT INFORMATION TO POLICYHOLDERS**

**CALIFORNIA**

**Liberty Mutual Insurance offers its policyholders risk control tools, resources, and services that we have found to be consistent with your workplace hazards.**

**Services available include workplace surveys to help identify health and safety problems; review of employer injury records; and development of plans to help improve employer health and safety loss records, including risk control programs pursuant to Section 6401.7 of the Labor Code.**

**Services required under this code are available at no additional charge. To request these services, contact our Risk Control Consulting Center weekdays 8 a.m. to 8 p.m. ET, at 866-757-7324 or RCConsultingcenter@libertymutual.com.**

**Policyholders may register comments about the insurer's risk control consultation services by writing to:  State of California, Department of Industrial Relations, Division of Occupational Safety and Health, P.O. Box 420603, San Francisco, CA 94142 [Rule T.8, Ch.3.2, Section 339.4(b)].**

WC2-641-444149-079
Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

## IMPORTANT INFORMATION TO POLICYHOLDERS
## MAINE

**Workplace health and safety consultations are available to our policyholders. These services are to advise and assist you in the identification, evaluation and control of existing and potential accident and occupational health problems.**

**To obtain further information about these services, please contact our Risk Control Consulting Center at 1-866-757-7324 or email RCConsultingCenter@LibertyMutual.com. You may also write us at Liberty Mutual Insurance, Risk Control Services, 157 Berkeley Street, Mailstop T07C, Boston, MA 02116.**

**THE FOLLOWING LIMITS OUR LIABILITY**
**We, the insurance company, our agents, employees, or service contractors, are not liable for damages from injury, death or loss occurring as a result of any act or omission in the furnishing of or the failure to furnish insurance inspection services related to, in connection with or incidental to the issuance or renewal of a policy of property or casualty insurance.**

**This exemption from liability does not apply:**
**A. If the injury, loss or death occurred during the actual performance of inspection services and was proximately caused by our negligence or by the negligence of our agents, employees or service contractors;**
**B. To any inspection services required to be performed under the provisions of a written contract or defined loss prevention program;**
**C. In any action against us, our agents, employees, or service contractors for damages proximately caused by our acts or omissions which are determined to constitute a crime, actual malice or gross negligence; or**
**D. If we fail to provide this written notice to the insured whenever a policy is issued or when new policy forms are issued upon renewal.**

## LOSS CONTROL SERVICES
## IMPORTANT INFORMATION TO POLICYHOLDERS
## MONTANA

**Through its Loss Control Advisory Services department, Liberty Mutual Insurance has available to our policyholders safety consultation services, which we have found to be consistent with your workplace hazards.  These services may be available to you as our policyholder at no additional cost.**

**To obtain further information about our loss control consultation services, please contact our Loss Control Consulting Center at 1-866-757-7324 or email <u>LCASConsultingCenter@LibertyMutual.com</u>.**

WC2-641-444149-079
Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

© 2012 Liberty Mutual Insurance.  All rights reserved.

**LOSS CONTROL SERVICES**
**IMPORTANT INFORMATION TO POLICYHOLDERS**
**PENNSYLVANIA**

**Through its Loss Control Advisory Services department, Liberty Mutual Insurance has available to our policyholders safety consultation services, which we have found to be consistent with your workplace hazards.  These services may be available to you as our policyholder at no additional cost.**

**If the employer has received a certificate from the Pennsylvania Department of Labor and Industry specifying that the employer has established a workplace safety committee in conformance with the Department's criteria, the policy is subject to a 5% premium discount to recognize the certification of the workplace safety committee.**

**To obtain further information about our loss control consultation services, please contact our Loss Control Consulting Center at 1-866-757-7324, or email LCASConsultingCenter@LibertyMutual.com, or by writing to Liberty Mutual Insurance, Loss Control Consulting Center, 2000 Westwood Dr, Wausau, WI  54401.**

WC2-641-444149-079
Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

# Cover Page

**RISK CONTROL SERVICES**
**IMPORTANT INFORMATION TO POLICYHOLDERS**
**TEXAS WORKERS COMPENSATION**

**Pursuant to Texas Labor Code §411.066, Liberty Mutual Insurance is required to notify its policyholders that accident prevention services are available from Liberty Mutual Insurance at no additional charge. These services may include surveys, recommendations, training programs, consultations, analyses of accident causes, industrial hygiene, and industrial health services. Liberty Mutual Insurance is also required to provide return-to-work coordination services as required by Texas Labor Code §413.021 and to notify you of the availability of the return-to-work reimbursement program for employers under Texas Labor Code §413.022. If you would like more information, contact Liberty Mutual Insurance at 1-866-757-7324 and RCConsultingCenter@LibertyMutual.com for accident prevention services, or 1-877-397-2255 and RTWTexas@LibertyMutual.com for return-to-work coordination services. For information about these requirements call the Texas Department of Insurance, Division of Workers' Compensation (TDI-DWC) at 1-800-687-7080 or for information about the return-to-work reimbursement program for employers call the TDI-DWC at (512) 804-5000. If Liberty Mutual Insurance fails to respond to your request for accident prevention services or return-to-work coordination services, you may file a complaint with the TDI-DWC in writing at http://www.tdi.texas.gov or by mail to Texas Department of Insurance, Division of Workers' Compensation, MS-8, at 7551 Metro Center Drive, Austin, Texas 78744-1645.**

WC2-641-444149-079
Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119



# WORKERS COMPENSATION AND
# EMPLOYERS LIABILITY INSURANCE POLICY

**Policy Number:** WC2-641-444149-079

Suffolk Construction Company, Inc.
65 Allerton Street
Boston MA 02119

Liberty Mutual Insurance is the marketing name for the property and casualty insurance operations. Products may be written in the following stock insurance company subsidiaries of Liberty Mutual Insurance.

Liberty Mutual Insurance Company
Liberty Mutual Fire Insurance Company
Liberty Insurance Corporation
LM Insurance Corporation
The First Liberty Insurance Corporation
Employers Insurance Company of Wausau
Wausau Underwriters Insurance Company
Wausau Business Insurance Company
Wausau General Insurance Company

Not all products and coverages are available in all companies and jurisdictions.

**ANNUAL MEETING NOTICE**

Your policy includes a statement regarding membership rights in the Liberty Mutual Holding Company Inc. **Liberty Mutual Fire Insurance Company** is a Massachusetts stock insurance company subsidiary of the Liberty Mutual Holding Company Inc., a Massachusetts mutual holding company. Insurance is provided by **Liberty Mutual Fire Insurance Company**. The named insured first named in the Information Page is a member of Liberty Mutual Holding Company Inc.

As a member of Liberty Mutual Holding Company Inc., the named insured first named is entitled, among other things, to vote either in person or by proxy at the annual meeting or special meetings of said company. The Annual Meeting of Liberty Mutual Holding Company Inc. is at its offices located at 175 Berkeley Street, Boston, Massachusetts, on the second Wednesday in April each year at ten o'clock in the morning.

Members of Liberty Mutual Holding Company Inc. may request a copy of the company's annual financial statements, which are posted on Liberty Mutual's website at www.libertymutual.com or by writing to Liberty Mutual Holding Company Inc., 175 Berkeley Street, Boston, Massachusetts, 02116, Attention: Corporate Secretary.

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**
**QUICK REFERENCE**

|  | Beginning on Page |
|---|---|
| **General Section** | |
| A. The Policy | 2 |
| B. Who is Insured | 2 |
| C. Workers Compensation Law | 2 |
| D. State | 2 |
| E. Locations | 2 |
| **Part One – Workers Compensation Insurance** | |
| A. How This Insurance Applies | 2 |
| B. We Will Pay | 2 |
| C. We Will Defend | 2 |
| D. We Will Also Pay | 2 |
| E. Other Insurance | 3 |
| F. Payments You Must Make | 3 |
| G. Recovery From Others | 3 |
| H. Statutory Provisions | 3 |
| **Part Two – Employers Liability Insurance** | |
| A. How This Insurance Applies | 3 |
| B. We Will Pay | 4 |
| C. Exclusions | 4 |
| D. We Will Defend | 4 |
| E. We Will Also Pay | 5 |
| F. Other Insurance | 5 |
| G. Limits of Liability | 5 |
| H. Recovery From Others | 5 |
| I. Actions Against Us | 5 |
| **Part Three – Other States Insurance** | |
| A. How This Insurance Applies | 6 |
| B. Notice | 6 |
| **Part Four – Your Duties If Injury Occurs** | 6 |
| **Part Five - Premium** | |
| A. Our Manuals | 6 |
| B. Classifications | 6 |
| C. Remuneration | 6 |
| D. Premium Payments | 7 |
| E. Final Premium | 7 |
| F. Records | 7 |
| G. Audit | 7 |
| **Part Six - Conditions** | |
| A. Inspection | 7 |
| B. Long Term Policy | 7 |
| C. Transfer of Your Rights and Duties | 7 |
| D. Cancellation | 8 |
| E. Sole Representative | 8 |

Important:   This Quick Reference is not part of the Workers Compensation and Employers Liability Policy and does not provide coverage.  Refer to the Workers Compensation and Employers Liability Policy itself for actual contractual provisions.

PLEASE READ THE WORKERS COMPENSATION AND EMPLOYERS LIABILITY POLICY CAREFULLY.

**WC 00 00 00 C**
Ed. 01/01/2015

© 2013 Liberty Mutual Insurance
Contains copyrighted materials of the National Council on Compensation Insurance, Inc., used with its permission.

**WC 99 50 04**
Page 1 of 8

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**

In return for the payment of the premium and subject to all terms of this policy, we agree with you as follows:

**GENERAL SECTION**

**A.  The Policy**
This policy includes at its effective date the Information Page and all endorsements and schedules listed there. It is a contract of insurance between you (the employer named in Item 1 of the Information Page) and us (the insurer named on the Information Page). The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy.

**B.  Who is Insured**
You are insured if you are an employer named in Item 1 of the Information Page. If that employer is a partnership, and if you are one of its partners, you are insured, but only in your capacity as an employer of the partnership's employees.

**C.  Workers Compensation Law**
Workers Compensation Law means the workers or workmen's compensation law and occupational disease law of each state or territory named in Item 3.A. of the Information Page. It includes any amendments to that law which are in effect during the policy period. It does not include any federal workers or workmen's compensation law, any federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

**D.  State**
State means any state of the United States of America, and the District of Columbia.

**E.  Locations**
This policy covers all of your workplaces listed in Items 1 or 4 of the Information Page; and it covers all other workplaces in Item 3.A. states unless you have other insurance or are self-insured for such workplaces.

**PART ONE – WORKERS COMPENSATION INSURANCE**

**A.  How This Insurance Applies**
This workers compensation insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.
1.  Bodily injury by accident must occur during the policy period.
2.  Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

**B.  We Will Pay**
We will pay promptly when due the benefits required of you by the workers compensation law.

**C.  We Will Defend**
We have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance. We have the right to investigate and settle these claims, proceedings or suits.
We have no duty to defend a claim, proceeding or suit that is not covered by this insurance.

**D.  We Will Also Pay**
We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding or suit we defend:
1.  reasonable expenses incurred at our request, but not loss of earnings;
2.  premiums for bonds to release attachments and for appeal bonds in bond amounts up to the amount payable under this insurance;
3.  litigation costs taxed against you;

WC 00 00 00 C                              © 2013 Liberty Mutual Insurance                              WC 99 50 04
Ed. 01/01/2015              Contains copyrighted materials of the National Council on Compensation              Page 2 of 8
                                   Insurance, Inc., used with its permission.

    4.   interest on a judgment as required by law until we offer the amount due under this insurance; and

    5.   expenses we incur.

**E. Other Insurance**

We will not pay more than our share of benefits and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that may apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance will be equal until the loss is paid.

**F. Payments You Must Make**

You are responsible for any payments in excess of the benefits regularly provided by the workers compensation law including those required because:

1. of your serious and willful misconduct;
2. you knowingly employ an employee in violation of law;
3. you fail to comply with a health or safety law or regulation; or
4. you discharge, coerce or otherwise discriminate against any employee in violation of the workers compensation law.

If we make any payments in excess of the benefits regularly provided by the workers compensation law on your behalf, you will reimburse us promptly.

**G. Recovery From Others**

We have your rights, and the rights of persons entitled to the benefits of this insurance, to recover our payments from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them.

**H. Statutory Provisions**

These statements apply where they are required by law.

1. As between an injured worker and us, we have notice of the injury when you have notice.
2. Your default or the bankruptcy or insolvency of you or your estate will not relieve us of our duties under this insurance after an injury occurs.
3. We are directly and primarily liable to any person entitled to the benefits payable by this insurance. Those persons may enforce our duties; so may an agency authorized by law. Enforcement may be against us or against you and us.
4. Jurisdiction over you is jurisdiction over us for purposes of the workers compensation law. We are bound by decisions against you under that law, subject to the provisions of this policy that are not in conflict with that law.
5. This insurance conforms to the parts of the workers compensation law that apply to:
   a. benefits payable by this insurance;
   b. special taxes, payments into security or other special funds, and assessments payable by us under that law.
6. Terms of this insurance that conflict with the workers compensation law are changed by this statement to conform to that law.

Nothing in these paragraphs relieves you of your duties under this policy.

## PART TWO – EMPLOYERS LIABILITY INSURANCE

**A. How This Insurance Applies**

This employers liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. The bodily injury must arise out of and in the course of the injured employee's employment by you.
2. The employment must be necessary or incidental to your work in a state or territory listed in Item 3.A. of the Information Page.
3. Bodily injury by accident must occur during the policy period.

© 2013 Liberty Mutual Insurance
Contains copyrighted materials of the National Council on Compensation
Insurance, Inc., used with its permission.

4.  Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.
5.  If you are sued, the original suit and any related legal actions for damages for bodily injury by accident or by disease must be brought in the United States of America, its territories or possessions, or Canada.

**B.  We Will Pay**

We will pay all sums that you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.

The damages we will pay, where recovery is permitted by law, include damages:

1.  For which you are liable to a third party by reason of a claim or suit against you by that third party to recover the damages claimed against such third party as a result of injury to your employee;
2.  For care and loss of services; and
3.  For consequential bodily injury to a spouse, child, parent, brother or sister of the injured employee; provided that these damages are the direct consequence of bodily injury that arises out of and in the course of the injured employee's employment by you; and
4.  Because of bodily injury to your employee that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

**C.  Exclusions**

This insurance does not cover:

1.  Liability assumed under a contract. This exclusion does not apply to a warranty that your work will be done in a workmanlike manner;
2.  Punitive or exemplary damages because of bodily injury to an employee employed in violation of law;
3.  Bodily injury to an employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your executive officers;
4.  Any obligation imposed by a workers compensation, occupational disease, unemployment compensation, or disability benefits law, or any similar law;
5.  Bodily injury intentionally caused or aggravated by you;
6.  Bodily injury occurring outside the United States of America, its territories or possessions, and Canada. This exclusion does not apply to bodily injury to a citizen or resident of the United States of America or Canada who is temporarily outside these countries;
7.  Damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions;
8.  Bodily injury to any person in work subject to the Longshore and Harbor Workers' Compensation Act (33 U.S.C. Sections 901 et seq.), the Nonappropriated Fund Instrumentalities Act (5 U.S.C. Sections 8171 et seq.), the Outer Continental Shelf Lands Act (43 U.S.C. Sections 1331 et seq.), the Defense Base Act (42 U.S.C. Sections 1651–1654), the Federal Mine Safety and Health Act (30 U.S.C. Sections 801 et seq. and 901–944), any other federal workers or workmen's compensation law or other federal occupational disease law, or any amendments to these laws;
9.  Bodily injury to any person in work subject to the Federal Employers' Liability Act (45 U.S.C. Sections 51 et seq.), any other federal laws obligating an employer to pay damages to an employee due to bodily injury arising out of or in the course of employment, or any amendments to those laws;
10.  Bodily injury to a master or member of the crew of any vessel, and does not cover punitive damages related to your duty or obligation to provide transportation, wages, maintenance, and cure under any applicable maritime law;
11.  Fines or penalties imposed for violation of federal or state law; and
12.  Damages payable under the Migrant and Seasonal Agricultural Worker Protection Act (29 U.S.C. Sections 1801 et seq.) and under any other federal law awarding damages for violation of those laws or regulations issued thereunder, and any amendments to those laws.

**D.  We Will Defend**

We have the right and duty to defend, at our expense, any claim, proceeding or suit against you for damages payable by this insurance. We have the right to investigate and settle these claims, proceedings and suits.

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance. We have no duty to defend or continue defending after we have paid our applicable limit of liability under this insurance.

WC 00 00 00 C
Ed. 01/01/2015

© 2013 Liberty Mutual Insurance
Contains copyrighted materials of the National Council on Compensation
Insurance, Inc., used with its permission.

WC 99 50 04
Page 4 of 8

**E.  We Will Also Pay**

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding, or suit we defend:

1.  Reasonable expenses incurred at our request, but not loss of earnings;
2.  Premiums for bonds to release attachments and for appeal bonds in bond amounts up to the limit of our liability under this insurance;
3.  Litigation costs taxed against you;
4.  Interest on a judgment as required by law until we offer the amount due under this insurance; and
5.  Expenses we incur.

**F.  Other Insurance**

We will not pay more than our share of damages and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance and self-insurance will be equal until the loss is paid.

**G.  Limits of Liability**

Our liability to pay for damages is limited. Our limits of liability are shown in Item 3.B. of the Information Page. They apply as explained below.

1.  Bodily Injury by Accident. The limit shown for "bodily injury by accident—each accident" is the most we will pay for all damages covered by this insurance because of bodily injury to one or more employees in any one accident.

    A disease is not bodily injury by accident unless it results directly from bodily injury by accident.

2.  Bodily Injury by Disease. The limit shown for "bodily injury by disease—policy limit" is the most we will pay for all damages covered by this insurance and arising out of bodily injury by disease, regardless of the number of employees who sustain bodily injury by disease. The limit shown for "bodily injury by disease—each employee" is the most we will pay for all damages because of bodily injury by disease to any one employee.

    Bodily injury by disease does not include disease that results directly from a bodily injury by accident.

3.  We will not pay any claims for damages after we have paid the applicable limit of our liability under this insurance.

**H.  Recovery From Others**

We have your rights to recover our payment from anyone liable for an injury covered by this insurance. You will do everything necessary to protect those rights for us and to help us enforce them.

**I.  Actions Against Us**

There will be no right of action against us under this insurance unless:

1.  You have complied with all the terms of this policy; and
2.  The amount you owe has been determined with our consent or by actual trial and final judgment.

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability. The bankruptcy or insolvency of you or your estate will not relieve us of our obligations under this Part.

WC 00 00 00 C
Ed. 01/01/2015

© 2013 Liberty Mutual Insurance
Contains copyrighted materials of the National Council on Compensation
Insurance, Inc., used with its permission.

WC 99 50 04
Page 5 of 8

## PART THREE – OTHER STATES INSURANCE

**A. How This Insurance Applies**
1. This other states insurance applies only if one or more states are shown in Item 3.C. of the Information Page.
2. If you begin work in any one of those states after the effective date of this policy and are not insured or are not self-insured for such work, all provisions of the policy will apply as though that state were listed in Item 3.A. of the Information Page.
3. We will reimburse you for the benefits required by the workers compensation law of that state if we are not permitted to pay the benefits directly to persons entitled to them.
4. If you have work on the effective date of this policy in any state not listed in Item 3.A. of the Information Page, coverage will not be afforded for that state unless we are notified within thirty days.

**B. Notice**
Tell us at once if you begin work in any state listed in Item 3.C. of the Information Page.

## PART FOUR – YOUR DUTIES IF INJURY OCCURS

Tell us at once if injury occurs that may be covered by this policy. Your other duties are listed here.
1. Provide for immediate medical and other services required by the workers compensation law.
2. Give us or our agent the names and addresses of the injured persons and of witnesses, and other information we may need.
3. Promptly give us all notices, demands and legal papers related to the injury, claim, proceeding or suit.
4. Cooperate with us and assist us, as we may request, in the investigation, settlement or defense of any claim, proceeding or suit.
5. Do nothing after an injury occurs that would interfere with our right to recover from others.
6. Do not voluntarily make payments, assume obligations or incur expenses, except at your own cost.

## PART FIVE – PREMIUM

**A. Our Manuals**
All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

**B. Classifications**
Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

**C. Remuneration**
Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:
1. all your officers and employees engaged in work covered by this policy; and
2. all other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

WC 00 00 00 C
Ed. 01/01/2015

© 2013 Liberty Mutual Insurance
Contains copyrighted materials of the National Council on Compensation
Insurance, Inc., used with its permission.

WC 99 50 04
Page 6 of 8

**D. Premium Payments**

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid.

**E. Final Premium**

The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is canceled, final premium will be determined in the following way unless our manuals provide otherwise:

1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.
2. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short-rate cancelation table and procedure. Final premium will not be less than the minimum premium.

**F. Records**

You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them.

**G. Audit**

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.

## PART SIX – CONDITIONS

**A. Inspection**

We have the right, but are not obliged to inspect your workplaces at any time. Our inspections are not safety inspections. They relate only to the insurability of the workplaces and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public. We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards. Insurance rate service organizations have the same rights we have under this provision.

**B. Long Term Policy**

If the policy period is longer than one year and sixteen days, all provisions of this policy will apply as though a new policy were issued on each annual anniversary that this policy is in force.

**C. Transfer of Your Rights and Duties**

Your rights or duties under this policy may not be transferred without our written consent.

If you die and we receive notice within thirty days after your death, we will cover your legal representative as insured.

WC 00 00 00 C
Ed. 01/01/2015

© 2013 Liberty Mutual Insurance
Contains copyrighted materials of the National Council on Compensation
Insurance, Inc., used with its permission.

WC 99 50 04
Page 7 of 8

**D. Cancelation**

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancelation is to take effect.
2. We may cancel this policy. We must mail or deliver to you not less than ten days advance written notice stating when the cancelation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.
3. The policy period will end on the day and hour stated in the cancelation notice.
4. Any of these provisions that conflict with a law that controls the cancelation of the insurance in this policy is changed by this statement to comply with the law.

**E. Sole Representative**

The insured first named in Item 1 of the Information Page will act on behalf of all insureds to change this policy, receive return premium, and give or receive notice of cancelation.

In witness whereof, Liberty Mutual Fire Insurance Company has caused this policy to be signed by its President and its Secretary.

SECRETARY                    PRESIDENT

**WC 00 00 00 C**
Ed. 01/01/2015

© 2013 Liberty Mutual Insurance
Contains copyrighted materials of the National Council on Compensation
Insurance, Inc., used with its permission.

**WC 99 50 04**
Page 8 of 8

## WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY



**Liberty Mutual.**
INSURANCE
175 Berkeley Street  Boston, MA 02116

### INFORMATION PAGE

Issued by Liberty Mutual Fire Insurance Company (a stock company) 16586

| | | |
|---|---|---|
| Policy Number | WC2-641-444149-079 | Issuing Office  Lewiston, ME |
| | WC2-641-444149-078 | Issue Date  09/23/2019 |
| Renewal Of | | Sub Account  0004 |
| Account Number | 4-444149 | |

1.  Insured and Mailing Address
    Suffolk Construction Company, Inc.
    65 Allerton Street
    Boston MA 02119

FEIN  ▉
NJ TIN
Risk ID

Status Corporation
Other workplaces not shown above: See Item 4. Premium - Extension of Information Page

2.  Policy Period: The policy period is from 08/31/2019 to 08/31/2020 12:01 A.M. standard time at the Insured's mailing address.

3.  Coverage
    A.  Workers Compensation Insurance: Part One of the policy applies to the Workers Compensation Law of the states listed here:   CA CT DC FL ME MD MA MT NH NJ NY NC PA RI TN TX VA

    B.  Employers Liability Insurance: Part Two of the policy applies to work in each state listed in Item 3.A.  The limits of our liability under Part Two are:

    | | | |
    |---|---|---|
    | Bodily Injury by Accident $ | 1,000,000 | each accident |
    | Bodily Injury by Disease $ | 1,000,000 | policy limit |
    | Bodily Injury by Disease $ | 1,000,000 | each employee |

    C.  Other States Insurance: Part Three of the policy applies to the states, if any, listed here:
        All States except those listed in Item 3.A and the States of:
        ND OH WA WY

    D.  This policy includes these endorsements and schedules: See Item 3. Coverage D - Extension of Information Page

4.  Premium:  The premium for this policy will be determined by our Manuals of Rules, Classifications, Rates and Rating Plans.  All information required below is subject to verification and change by audit.

| Classifications | Code Number | Premium Basis Total Estimated Annual Remuneration | Rate per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| | | See Extension of Information Page | | |

| | | |
|---|---|---|
| Minimum Premium  ▉ | Total Estimated Annual Premium $ | ▉ |
| Premium will be billed Monthly | Deposit Premium $ | |
| | Deposit Tax/Surcharge/Assessment $ | |

Producer 0002 013622
ALLIANT INS SERVICES INC
131 OLIVER ST
4TH FLOOR
BOSTON MA 02110-2785

Countersigned by Authorized Rep. (FL)

*Judy Struchacz*

WC 00 00 01 A
Ed. 07/01/2011

© 1987 National Council on Compensation Insurance, Inc.
All Rights Reserved

WC 00 00 01 B (CA)
Page 1 of 1

Liberty Mutual Fire Insurance Company

Item 3. Coverage D – Extension of Information Page

**Miscellaneous Form and Endorsement Schedule**

| Policy Notices and Applications |
|---|

| Form Number | Form Name |
|---|---|
| FORM 09-4D CCPAP | Florida Contracting Classification Premium Adjustment Program; Workers Compensation Premium Credit Application |
| Form 19-1D | Maryland Construction Classification Premium Reduction Program (CCPRP) Workers Compensation Premium Credit Application |
| FORM 45-3E | Virginia Contracting Classification Premium Adjustment Program (CCPAP) Workers Compensation Premium Credit Application |
| Form NC-5000 D | Contracting Classification Premium Adjustment Program Workers Compensation Premium Credit Application - Connecticut |
| Form NC-5000 D | Contracting Classification Premium Adjustment Program Workers Compensation Premium Credit Application - Montana |
| GPO 4098 | Notice |
| GPO 4908 | Notice to Maryland Employers |
| GPO 4983 R1 | California Assessments and Surcharge |
| SNI 45 01 12 10 | Virginia Important Information Regarding Your Insurance |
| SNI 90 01 12 18 | Policyholder Notice - Company Contact Information |
| SNW 04 01 09 10 | California Insurance Guarantee Association (CIGA) Surcharge |
| SNW 04 03 03 19 | California Workers Compensation Notice to Policyholders |
| SNW 04 08 07 18 | Policyholder Notice - California AB 2883 and SB 189 |
| SNW 04 09 07 18 | Corporate Officers / Directors - Waiver of Workers' Compensation Coverage |
| SNW 04 13 01 18 | Policyholder Notice - California Senate Bill (SB) 1160 - Managed Care Notification |
| SNW 20 01 10 12 | MA Construction Classification Premium Adjustment Program; WC Credit Application |
| SNW 31 03 03 15 | New York Workers Compensation Security Fund Recoupment |
| SNW 41 03 05 14 | Tennessee Policyholder Notice Rate Review Requests |
| CNW 90 07 09 13 | Maine Employer Penalties for Late Report of Injury |
| GPO 4756 R5 | Liberty Mutual WC Privacy Practices Disclosure Notice |
| SNW 04 02 04 18 | Risk Control Services Important Information to Policyholders - California |
| SNW 18 01 05 15 | Important Information to Policyholders - Maine |
| SNW 25 01 07 12 | Montana Loss Control Services |
| SNW 37 01 07 12 | Pennsylvania Loss Control Services |
| SNW 42 01 10 13 | Texas Risk Control Services |

Policy No. WC2-641-444149-079

GPO 4741
Ed.01/01/2001

WC 00 00 01 A

Liberty Mutual Fire Insurance Company

Item 3. Coverage D - Extension of Information Page

**Miscellaneous Form and Endorsement Schedule**

Continued:

| Policy Schedules | |
|---|---|
| **Form Number** | **Form Name** |
| CNI 90 02 07 11 | Notice |
| WC 00 00 00 C | Workers Compensation And Employers Liability Insurance Policy Jacket |
| WC 00 00 01 A | Information Page |
| GPO 4741 | Miscellaneous Form and Endorsement Schedule |
| PA 505 | Premium Summary Report by State |
| GPO 2923 | Item 4. Premium - Extension of Information Page |
| GPO 2926 | U.S.L. and H.W. Compensation Act Schedule |
| GPO 4162 R1 | Named Insured Link Schedule |

| Policy Endorsements | | |
|---|---|---|
| **Form Number** | **Form Name** | **Comments** |
| WC 99 20 16 | Named Insured Endorsement | |
| WC 99 20 57 | California - Application of Endorsements | |
| WC 00 01 06 A | Longshore and Harbor Workers' Compensation Act Coverage | |
| WC 00 02 01 B | Maritime Coverage Endorsement | |
| WC 00 03 01 | Alternate Employer Endorsement | |
| WC 00 03 01 A | Alternate Employer Endorsement | |
| WC 00 03 02 | Designated Workplaces Exclusion Endorsement | |
| WC 00 03 03 C | Employers Liability Coverage | |
| WC 00 03 10 | Sole Proprietors, Partners, Officers and Others Coverage Endorsement | |
| WC 00 03 11 A | Voluntary Compensation and Employers Liability Coverage Endorsement | |
| WC 00 03 13 | Waiver of Our Right to Recover From Others Endorsement | |
| WC 00 03 13 | Waiver of Our Right to Recover From Others Endorsement | |
| WC 00 04 14 | Notification of Change in Ownership Endorsement | |
| WC 00 04 14 A | 90-Day Reporting Requirement - Notification of Change in Ownership | |
| WC 00 04 19 | Premium Due Date Endorsement | |

Policy No. WC2-641-444149-079

GPO 4741
Ed.01/01/2001

Liberty Mutual Fire Insurance Company

Item 3. Coverage D - Extension of Information Page
**Miscellaneous Form and Endorsement Schedule**

Continued:

| Policy Endorsements | | |
|---|---|---|
| **Form Number** | **Form Name** | **Comments** |
| WC 00 04 21 D | Catastrophe (Other Than Certified Acts of Terrorism) Premium Endorsement | |
| WC 00 04 22 B | Terrorism Risk Insurance Program Reauthorization Act Disclosure Endorsement | |
| WC 00 04 24 | Audit Noncompliance Charge | |
| WC 00 04 25 | Experience Rating Modification Factor Revision | |
| WC 00 05 16 | Retrospective Rating Plan Premium Large Risk Alternative Rating Option-LRARO | |
| WC 04 01 01 A | Longshore and Harbor Workers' Compensation Act Coverage - California | |
| WC 04 03 01 D | Policy Amendatory Endorsement - California | |
| WC 04 03 05 | Voluntary Compensation and Employers Liability Coverage Endorsement - California | |
| WC 04 03 06 | Waiver of Our Right to Recover From Others - California | |
| WC 04 03 06 | Waiver of Our Right to Recover From Others - California | |
| WC 04 03 06 | Waiver of Our Right to Recover From Others - California | |
| WC 04 03 17 B | Endorsement Agreement Limiting and Restricting This Insurance - Employee Insured by General Employer Excluded | |
| WC 04 03 60 B | Employers' Liability Coverage Amendatory Endorsement - California | |
| WC 04 04 21 | Optional Premium Increase Endorsement - California | |
| WC 04 06 01 A | California Cancellation Endorsement | |
| WC 06 03 01 | Connecticut Application of Workers Compensation Insurance Endorsement | |
| WC 06 03 03 C | Connecticut Workers Compensation Funds Endorsement | |
| WC 06 06 01 A | Connecticut Nonrenewal and Renewal | |
| WC 08 06 01 | District of Columbia Cancelation Endorsement | |

Policy No. WC2-641-444149-079

GPO 4741
Ed.01/01/2001

WC 00 00 01 A

Liberty Mutual Fire Insurance Company

Item 3. Coverage D — Extension of Information Page

## Miscellaneous Form and Endorsement Schedule

Continued:

| Policy Endorsements | | |
|---|---|---|
| **Form Number** | **Form Name** | **Comments** |
| WC 09 03 03 | Florida Employers Liability Coverage Endorsement | |
| WC 09 04 01 | Florida Contracting Classification Premium Adjustment | |
| WC 09 04 03 B | Florida Terrorism Risk Insurance Program Reauthorization Act Endorsement | |
| WC 09 04 07 | Florida Non-Cooperation with Premium Audit | |
| WC 09 05 05 A | Florida Retrospective Rating Plan Premium Endorsement - Large Risk Alternative Rating Option (LRARO) | |
| WC 09 06 06 | Florida Employment and Wage Information Release | |
| WC 18 06 01 | Maine Inspection Immunity | |
| WC 18 06 03 A | Maine Cancellation and Nonrenewal | |
| WC 18 06 04 | Maine Final Premium Audit | |
| WC 18 06 06 | Maine Notice of Filing of First Reports of Injury within Seven Days | |
| WC 18 06 07 A | Maine Supplemental Benefits Fund Endorsement | |
| WC 19 04 01 | Maryland Construction Classification Premium Reduction Program Endorsement | |
| WC 19 06 01 G | Maryland Cancellation and Nonrenewal | |
| WC 20 03 01 | Massachusetts Limits of Liability Endorsement | |
| WC 20 03 02 A | Massachusetts - Assessment Charge | |
| WC 20 03 03 D | Massachusetts Notice to Policyholder Endorsement | |
| WC 20 04 01 | Massachusetts Pending Premium Change | |
| WC 20 04 03 | Massachusetts Construction Classification Premium Adjustment Endorsement | |
| WC 20 04 05 | Massachusetts Premium Due Date Endorsement | |
| WC 20 06 01 A | Massachusetts Cancellation Endorsement | |

Policy No. WC2-641-444149-079

GPO 4741
Ed.01/01/2001

WC 00 00 01 A

Liberty Mutual Fire Insurance Company

Item 3. Coverage D — Extension of Information Page

**Miscellaneous Form and Endorsement Schedule**

Continued:

| Policy Endorsements | | |
|---|---|---|
| **Form Number** | **Form Name** | **Comments** |
| WC 25 03 05 | Montana Intentional Injury Exclusion Endorsement | |
| WC 25 04 01 A | Montana Audit Noncompliance Charge | |
| WC 25 06 01 B | Montana Amendatory | |
| WC 25 06 02 | Montana Safety Endorsement | |
| WC 28 06 01 | New Hampshire Sole Representative | |
| WC 28 06 04 | New Hampshire Amendatory | |
| WC 29 03 06 B | New Jersey Part Two Employers Liability Endorsement | |
| WC 29 03 07 | New Jersey Sole Proprietors and Partners Coverage | |
| WC 29 04 10 | New Jersey Construction Classification Premium Adjustment | |
| WC 29 06 03 | New Jersey Participating Provision | |
| WC 31 03 08 | New York Limit of Liability | |
| WC 31 03 19 I | New York Construction Classification Premium Adjustment Program Explanatory | |
| WC 31 04 04 A | New York Pending Payroll Limitation and Premium Differential | |
| WC 31 04 05 | New York Safe Patient Handling Act Program Explanatory | |
| WC 31 06 18 | New York Workers Compensation Policyholder Notice of Right to Appeal | |
| WC 32 03 01 D | North Carolina Amended Coverage | |
| WC 34 03 01 C | Ohio Employers Liability Coverage | |
| WC 37 04 01 | Pennsylvania Audit Noncompliance Charge | |
| WC 37 04 05 | Pennsylvania Merit Rating Plan | |
| WC 37 06 01 | Special Pennsylvania Endorsement - Inspection of Manuals | |
| WC 37 06 02 | Pennsylvania Notice | |
| WC 37 06 03 A | PA Act 86-1986 - Nonrenewal, Notice of Increase, and Return of Unearned Premium | |

Policy No. WC2-641-444149-079

Page  5 of  6

GPO 4741
Ed.01/01/2001

WC 00 00 01 A

Liberty Mutual Fire Insurance Company

Item 3. Coverage D - Extension of Information Page

## Miscellaneous Form and Endorsement Schedule

Continued:

| Policy Endorsements | | |
|---|---|---|
| | | Comments |
| **Form Number** | **Form Name** | |
| WC 37 06 04 | Pennsylvania Employer Assessment Endorsement | |
| WC 38 04 01 B | Rhode Island Short Rate Cancellation Endorsement | |
| WC 38 06 01 | Rhode Island Direct Liability Statute | |
| WC 38 06 02 | Rhode Island Safety Inspection Endorsement | |
| WC 42 03 01 I | Texas Amendatory | |
| WC 42 03 04 B | Texas Waiver of Our Right to Recover From Others | |
| WC 42 04 07 | Texas - Audit Premium and Retrospective Premium Endorsement | |
| WC 45 06 02 | Virginia Amendatory | |
| WC 45 06 04 | Virginia Contracting Classification Premium Adjustment | |
| WC 99 16 69 | Knowledge and Notice of Occurrence Endorsement | |
| WC 99 16 71 | Unintentional Errors and Omissions Endorsement | |
| WC 99 20 13 | Notice of Cancellation (System Generated) | |
| WC 99 20 15 | Notice of Material Change | |
| WC 99 20 39 A | Washington Amendatory | |
| WC 99 20 53 | Foreign Voluntary Compensation and Repatriation Expense Coverage | |
| WC 99 20 54 | Participating Provision | |
| WC 99 20 63 | North Dakota Amendatory | |
| WC 99 20 75 | Notice of Cancellation to Third Parties | |
| WC 99 20 75 | Notice of Cancellation to Third Parties | |
| WC 99 20 75 | Notice of Cancellation to Third Parties | |
| WC 99 20 75 | Notice of Cancellation to Third Parties | |
| WC 99 20 75 | Notice of Cancellation to Third Parties | |
| WC 99 20 85 | Wyoming Amendatory | |

Policy No. WC2-641-444149-079

Page   6 of   6

## State Premium Summary

| State | Payroll Exposure | Total Premium | Assessment & Surcharge |
|---|---|---|---|
| California | | | |
| Connecticut | | | |
| District Of Columbia | | | |
| Florida | | | |
| Maine | | | |
| Maryland | 0 | | |
| Massachusetts | 0 | | |
| Montana | | | |
| New Hampshire | | | |
| New Jersey | | | |
| New York | | | |
| North Carolina | | | |
| North Dakota | | | |
| Ohio | | | |
| Pennsylvania | | | |
| Rhode Island | | | |
| Tennessee | | | |
| Texas | | | |
| Virginia | | | |
| Washington | | | |
| Wyoming | | | |
| | | | |
| Totals | | | |

Item 4. Premium - Extension of Information Page

| Classification of Operations | Class Code | Premium Basis | Rate | Estimated Premium |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | | Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Payroll - Per $100 | Estimated Premium |

**Suffolk Construction Company, Inc.**

  **California**

  San Diego: 1615 Murray Canyon Rd 92108

| | | | | |
|---|---|---|---|---|
| Contractors - Construction or Erection - Executive Level Supervisors | 5606 | ■ | ■ | ■ |
| Salespersons - Outside | 8742 | ■ | | ■ |
| Clerical Office Employees - NOC | 8810 | | ■ | |
| Office Machine Installation, Inspection, Adjustment or Repair - NOC - Shop and Outside | 5191 | | | |
| Subject to<br>**Foreign Coverage Endorsement**<br>Contractors - Construction or Erection - Executive Level Supervisors | 5606 | ■ | ■ | ■ |
| **Manual Premium** | | | | ■ |
| Waiver of Subrogation Premium | 0930 | | | ■ |
| Employers Liability Increased Limits Premium | 9812 | | ■ | ■ |
| Experience Modification(.55 FNL) | 9898 d) | ■ | | ■ |
| **Modified Premium** | | | | ■ |
| Foreign Coverage Minimum Premium Adjustment | | | | ■ |
| **Standard Premium** | | | | ■ |
| Terrorism | 9740 | | ■ | ■ |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | ■ | ■ | ■ |
| **Estimated Premium** | | | | ■ |
| California Insurance Guarantee Association | 0936 d) | ■ | ■ | ■ |

Policy No. WC2-641-444149-079

GPO 2923
Ed. 01/01/2001

Page No.   1

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations | | Premium Basis | Rate | |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | Class Code | Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Payroll - Per $100 | Estimated Premium |
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **California** | | | | |
| **San Diego: 1615 Murray Canyon Rd 92108** | | | | |
| California User Fund/WC Administrative Revolving Fund | 0935 | d) ▮ | ▮ | ▮ |
| California Uninsured Employers Benefit Trust Fund Assessment | 0937 | d) ▮ | ▮ | |
| California Subsequent Injuries Benefits Trust Fund Assessment | 0938 | d) ▮ | ▮ | |
| California Occupational Safety & Health Fund Assessment | 0939 | d) ▮ | ▮ | |
| California Labor Enforcement & Compliance Fund Assessment | 0992 | d) ▮ | ▮ | |
| California Fraud Investigation/Prosecution Surcharge | 9703 | d) ▮ | ▮ | |
| **Connecticut** | | | | |
| Contractor - Project Manager, Construction Executive, Construction Manager or Construction Superintendent | 5606 | ▮ | ▮ | |
| Salespersons or Collectors - Outside | 8742 | If Any | ▮ | |
| Clerical Office Employees NOC | 8810 | If Any | | |
| Office Machine Installation, Inspection, Adjustment or Repair | 5191 | If Any | | |
| **Manual Premium** | | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Employers Liability Increased Limits Premium | 9812 | | ▮ | ▮ |
| Experience Modification(.74 FNL) | 9898 | d) ▮ | | ▮ |

Policy No. WC2-641-444149-079

Page No.   2

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations | | Premium Basis | Rate | |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | Class Code | Payroll - Unless otherwise indicated a) Flat Charge b) Per Capita c) Passenger Seat d) Premium e) Other | Payroll - Per $100 | Estimated Premium |
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **Connecticut** | | | | |
| **Modified Premium** | | | | ▓ |
| **Standard Premium** | | | | |
| Terrorism | 9740 | ▓ | ▓ | |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | | | |
| **Estimated Premium** | | | | |
| Connecticut WC Fund Assessment | 0936 | d) | | |
| Connecticut Second Injury Fund Surcharge | 0935 | d) | | |
| **District Of Columbia** | | | | |
| Contractor - Project Manager, Construction Executive, Construction Manager or Construction Superintendent | 5606 | | | |
| Salespersons or Collectors - Outside | 8742 | | | |
| Clerical Office Employees NOC | 8810 | | | |
| **Manual Premium** | | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Employers Liability Increased Limits Premium | 9812 | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | |
| **Modified Premium** | | | | ▓ |
| **Standard Premium** | | | | |
| Terrorism | 9740 | ▓ | ▓ | ▓ |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | | | |

Policy No. WC2-641-444149-079

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations | Class Code | Premium Basis | Rate | Estimated Premium |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | | Payroll - Unless otherwise indicated a) Flat Charge b) Per Capita c) Passenger Seat d) Premium e) Other | Payroll - Per $100 | Estimated Premium |
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **District Of Columbia** | | | | |
| **Estimated Premium** | | | | ▉ |
| DC Special Fund Surcharge | 0935 | d) ▉ | ▉ | |
| **Florida** | | | | |
| **Miami: 701 Waterford Way 33126** | | | | |
| Carpentry NOC | 5403 | | | |
| Contractor - Project Manager, Construction Executive, Construction Manager or Construction Superintendent | 5606 | | | |
| Salespersons or Collectors - Outside | 8742 | | | |
| Clerical Office Employees NOC | 8810 | | | |
| Office Machine Installation, Inspection, Adjustment or Repair | 5191 | | | |
| **Manual Premium** | | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Employers Liability Increased Limits Premium | 9812 | | | |
| Experience Modification(.74 FNL) | 9898 | d) ▉ | | |
| **Modified Premium** | | | | |
| **Standard Premium** | | | | |
| Terrorism | 9740 | | | |
| **Estimated Premium** | | | | ▉ |
| **Maine** | | | | |
| Contractor - Project Manager, Construction Executive, Construction Manager or Construction Superintendent | 5606 | ▉ | ▉ | ▉ |
| Salespersons or Collectors - Outside | 8742 | | | |

Policy No. WC2-641-444149-079                                    Page No.   4

GPO 2923                                                          WC 00 00 01 A
Ed. 01/01/2001

Item 4. Premium - Extension of Information Page

| Classification of Operations | Class Code | Premium Basis | Rate | |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | | Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Payroll - Per $100 | Estimated Premium |

Continued:

**Suffolk Construction Company, Inc.**

  **Maine**

    Clerical Office Employees NOC    8810

Waiver of Subrogation Premium    0930

Experience Modification(.74 FNL)    9898 d)
                  **Modified Premium**

                  **Standard Premium**

Terrorism    9740

Catastrophe (other than Certified    9741
Acts of Terrorism)
             **Estimated Premium**

Maine WC Board Administrative Fund    0936 d)
Assessment

Maine Supplemental Benefits Fund    0937 d)
Surcharge

Maine WC Deficit Resolution/Recovery    0935 d)
Surcharge

  **Maryland**

    Contractor - Project Manager,    5606
    Construction Executive,
    Construction Manager or
    Construction Superintendent
    Salespersons or Collectors - Outside    8742
    Clerical Office Employees NOC    8810

    **Subject to**
    **Voluntary Compensation Endorsement**
    Clerical Office Employees NOC    8810

Waiver of Subrogation Premium    0930

Policy No. WC2-641-444149-079

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations | Class Code | Premium Basis | Rate | Estimated Premium |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | | Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Payroll-<br>Per $100 | |
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **Maryland** | | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | |
| **Modified Premium** | | | | |
| **Standard Premium** | | | | |
| Terrorism | 9740 | | | |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | | | |
| **Estimated Premium** | | | | |
| Maryland WC Commission Tax | 0935 | d) | | |
| **Massachusetts** | | | | |
| **Boston: 65 Allerton Street 02119** | | | | |
| Carpentry - Construction Of Residential Dwellings Exceeding Three Stories In Height Or Commercial Buildings And Structures | 5403 | | | |
| Contractor - Executive Supervisor or Construction Superintendent | 5606 | | | |
| Salespersons, Collectors or Messengers - Outside | 8742 | | | |
| Clerical Office Employees NOC | 8810 | | | |
| College: Professional Employees & Clerical | 8868 | | | |
| Office Machine or Appliance Installation, Inspection, Adjustment or Repair | 5191 | | | |
| **Manual Premium** | | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Employers Liability Increased Limits Premium | 9812 | | | |

Policy No. WC2-641-444149-079

Page No.   6

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations | Class Code | Premium Basis<br>Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Rate<br>Payroll -<br>Per $100 | Estimated Premium |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | | | | |
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **Massachusetts** | | | | |
| **Boston: 65 Allerton Street 02119** | | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | ▮ |
| **Modified Premium** | | ▮ | | |
| **Standard Premium** | | ▮ | | |
| Massachusetts All Risk Adjustment Program Premium | 0277 | | | |
| Expense Constant | 0900 | | | |
| Terrorism | 9740 | | | |
| **Estimated Premium** | | | | |
| Massachusetts DIA Assessment | 0935 | d) | | |
| **Montana** | | | | |
| **Big Sky: 995 Settlement Trail 59716** | | | | |
| Contractors - Executive Supervisor or Construction Superintendent | 5606 | | | |
| Clerical Office Employees NOC | 8810 | | | |
| Salespersons or Collectors - Outside | 8742 | | | |
| **Manual Premium** | | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Employers Liability Increased Limits Premium | 9812 | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | |
| **Modified Premium** | | | | |
| **Standard Premium** | | | | |
| Terrorism | 9740 | ▮ | ▮ | ▮ |

Policy No. WC2-641-444149-079

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations | Class Code | Premium Basis | Rate | |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | | Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Payroll-<br>Per $100 | Estimated Premium |
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **Montana** | | | | |
| **Big Sky: 995 Settlement Trail 59716** | | | | |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | ███████ | ████ | ████ |
| **Estimated Premium** | | | | |
| Montana Subsequent Injury Fund Surcharge | 0935 | d) | | |
| Montana WC Regulatory Assessment Surcharge | 0939 | d) | | |
| Montana Stay At Work/Return To Work Surcharge | 0934 | d) | | |
| MT Occupational Safety and Health Regulatory Assessment Surcharge | 9616 | d) | | |
| **New Hampshire** | | | | |
| Contractor - Project Manager, Construction Executive, Construction Manager or Construction Superintendent | 5606 | | | |
| Salespersons or Collectors - Outside | 8742 | | | |
| Clerical Office Employees NOC | 8810 | | | |
| Office Machine Installation, Inspection, Adjustment or Repair | 5191 | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | |
| Terrorism | 9740 | | ████ | ████ |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | | | |
| **New Jersey** | | | | |

Policy No. WC2-641-444149-079

Page No.   8

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations | Class Code | Premium Basis | Rate | Estimated Premium |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | | Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Payroll-<br>Per $100 | |

Continued:

**Suffolk Construction Company, Inc.**

  **New Jersey**

| | | | | |
|---|---|---|---|---|
| Contractor - Executive Supervisor | 5606 | | | |
| Salespersons - Outside | 8742 | | | |
| Clerical Office Employees NOC | 8810 | | | |
| Office Machine or Appliance Installation, Inspection, Adjustment or Repair | 5191 | | | |
| **Manual Premium** | | | | |
| Employers Liability Increased Limits Premium | 6199 | | | |
| Experience Modification(.92 FNL) | 9898 | d) | | |
| **Modified Premium** | | | | |
| **Standard Premium** | | | | |
| Terrorism | 9740 | | | |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | | | |
| **Estimated Premium** | | | | |
| New Jersey Second Injury Fund Surcharge | 0935 | d) | | |
| New Jersey Uninsured Employers Fund | 0936 | d) | | |

  **New York**

| | | | | |
|---|---|---|---|---|
| Contractor - Executive Supervisor, Construction Executive, Construction Manager, Construction Superintendent or Project Manager | 5606 | | | |
| Salespersons, Collectors or Messengers - Outside | 8742 | | | |
| Clerical Office Employees NOC | 8810 | | | |
| Office Machine Installation, Inspection, Adjustment or Repair | 5191 | | | |
| **Manual Premium** | | | | |

Policy No. WC2-641-444149-079

Page No.   9

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations | Premium Basis | | Rate | |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this item, do not modify any of the other provisions of this policy. | Class Code | Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Payroll - Per $100 | Estimated Premium |
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **New York** | | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | |
| **Modified Premium** | | | | |
| **Standard Premium** | | | | |
| Terrorism | 9740 | | | |
| Terrorism(.034) | 9740 | | | |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | | | |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | | | |
| **Estimated Premium** | | | | |
| New York State Assessment | 0932 | d) | | |
| NY WC Security Fund Surcharge | 9749 | d) | | |
| **North Carolina** | | | | |
| Contractor - Project Manager, Construction Executive, Construction Manager or Construction Superintendent | 5606 | | | |
| Salespersons or Collectors - Outside | 8742 | | | |
| Clerical Office Employees NOC | 8810 | | | |
| **Manual Premium** | | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Employers Liability Increased Limits Premium | 9812 | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | |
| **Modified Premium** | | | | |

Policy No. WC2-641-444149-079

Page No.   10

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations | | Premium Basis | Rate | |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | Class Code | Payroll - Unless otherwise indicated a) Flat Charge b) Per Capita c) Passenger Seat d) Premium e) Other | Payroll- Per $100 | Estimated Premium |
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **North Carolina** | | | | |
| **Standard Premium** | | ■ | ■ | ■ |
| Terrorism | 9740 | | | |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | | | |
| **Estimated Premium** | | | | |
| **North Dakota** | | | | |
| **Subject to Supplemental Employers Liability Endorsement** Total Payroll | 0003 | | | |
| Terrorism | 9740 | | | |
| **Ohio** | | | | |
| **Subject to Supplemental Employers Liability Endorsement** Total Payroll | 0003 | | | |
| Terrorism | 9740 | | | |
| **Pennsylvania** | | | | |
| Clerical Office Employees | 953 | | | |
| Salesperson Outside | 951 | | | |
| **Manual Premium** | | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Employers Liability Increased Limits Premium | 9812 | | | |
| **Standard Premium** | | | | |
| Terrorism | 9740 | | | |

Policy No. WC2-641-444149-079

Page No.  11

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations | Class Code | Premium Basis | Rate | |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | | Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Payroll - Per $100 | Estimated Premium |
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **Pennsylvania** | | | | |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | ███ | ███ | ███ |
| **Estimated Premium** | | | | |
| PA Employers Assessment | 0938 | d) | | |
| **Rhode Island** | | | | |
| Contractor - Project Manager, Construction Executive, Construction Manager or Construction Superintendent | 5606 | | | |
| Salespersons or Collectors - Outside | 8742 | | | |
| Clerical Office Employees NOC | 8810 | | | |
| Office Machine Installation, Inspection, Adjustment or Repair | 5191 | | | |
| **Manual Premium** | | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Employers Liability Increased Limits Premium | 9812 | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | |
| **Modified Premium** | | | | |
| **Standard Premium** | | | | |
| Terrorism | 9740 | | | |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | | | |
| **Estimated Premium** | | | | |
| Rhode Island Administration Fund | 0935 | d) | | |
| **Tennessee** | | | | |

Policy No. WC2-641-444149-079

Page No.   12

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

| Classification of Operations<br><br>Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | Class Code | Premium Basis<br><br>Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Rate<br><br>Payroll-<br>Per $100 | Estimated Premium |
|---|---|---|---|---|
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **Tennessee** | | | | |
| Contractor - Project Manager, Construction Executive, Construction Manager or Construction Superintendent | 5606 | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | |
| **Modified Premium** | | | | |
| **Standard Premium** | | | | |
| Terrorism | 9740 | | | |
| Catastrophe (other than Certified Acts of Terrorism) | 9741 | | | |
| **Estimated Premium** | | | | |
| **Texas** | | | | |
| **Dallas: 1445 Ross Avenue, Suite 5050, Fountain Place 75202** | | | | |
| Clerical Office Employees NOC | 8810 | | | |
| Contractor - Executive Supervisor or Construction Superintendent | 5606 | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | |
| Terrorism | 9740 | | | |
| **Virginia** | | | | |
| Contractor - Project Manager, Construction Executive, Construction Manager or Construction Superintendent | 5606 | | | |
| Salespersons or Collectors - Outside | 8742 | | | |
| Clerical Office Employees NOC | 8810 | | | |

Policy No. WC2-641-444149-079

Page No.   13

WC 00 00 01 A

GPO 2923
Ed. 01/01/2001

Item 4. Premium - Extension of Information Page

| Classification of Operations | | Premium Basis | Rate | |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | Class Code | Payroll - Unless otherwise indicated<br>a) Flat Charge<br>b) Per Capita<br>c) Passenger Seat<br>d) Premium<br>e) Other | Payroll - Per $100 | Estimated Premium |
| Continued: | | | | |
| **Suffolk Construction Company, Inc.** | | | | |
| **Virginia** | | | | |
| Waiver of Subrogation Premium | 0930 | | | |
| Experience Modification(.74 FNL) | 9898 | d) | | |
| **Modified Premium** | | | | |
| **Standard Premium** | | | | |
| Terrorism | 9740 | | | |
| **Estimated Premium** | | | | |
| **Washington** | | | | |
| **Subject to**<br>**Supplemental Employers Liability**<br>**Endorsement**<br>Total Payroll | 0003 | | | |
| Terrorism | 9740 | | | |
| **Wyoming** | | | | |
| **Subject to**<br>**Supplemental Employers Liability**<br>**Endorsement**<br>Total Payroll | 0003 | | | |
| Terrorism | 9740 | | | |
| **Total Premium for Suffolk**<br>**Construction Company, Inc.** | | | | |
| **Total Surcharges and Assessments for**<br>**Suffolk Construction Company, Inc.** | | | | |

Policy No. WC2-641-444149-079

GPO 2923
Ed. 01/01/2001

WC 00 00 01 A

Item 4. Premium - Extension of Information Page

### UNITED STATES LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT - INCIDENTAL

| States | Percent of increase - non-Federal rates | States | Percent of increase - non-Federal rates |
|---|---|---|---|
| California | ■ | North Carolina | ■ |
| Connecticut | | North Dakota | |
| District Of Columbia | | Ohio | |
| Florida | | Pennsylvania | |
| Maine | | Rhode Island | |
| Maryland | | Tennessee | |
| Massachusetts | | Texas | |
| Montana | | Virginia | |
| New Hampshire | | Washington | |
| New Jersey | | Wyoming | |
| New York | | | |

Policy No. WC2-641-444149-079

Page No.   1

GPO 2926
Ed. 01/01/2001

WC 00 00 01 A

## NAMED INSURED LINK SCHEDULE

| Name Link Code | Insured Name/Location | City | State | Zip |
|---|---|---|---|---|
| 001 | Suffolk Construction Company, Inc. | | | |
| 001 | Telephone Number: (617) 445-3500 | | | |
| 001 | FEIN: 04-2776356 | | | |
| 001 | Legal Status: Corporation | | | |
| 001 | ME UIA: 0245487002 | | | |
| 001 | NJ TIN: 042776356000 | | | |
| 001 | RI DOL: 0001947516 | | | |
| 001 | No Specific Location | | CT | |
| 001 | No Specific Location | | DC | |
| 001 | No Specific Location | | MD | |
| 001 | No Specific Location | | ME | |
| 001 | No Specific Location | | NC | |
| 001 | No Specific Location | | ND | |
| 001 | No Specific Location | | NH | |
| 001 | No Specific Location | | NJ | |
| 001 | No Specific Location | | NY | |
| 001 | No Specific Location | | OH | |
| 001 | No Specific Location | | PA | |
| 001 | No Specific Location | | RI | |
| 001 | NAIC Code: 236220 | | | |
| 001 | No. of Employees: 26 | | | |
| 001 | No Specific Location | | TN | |
| 001 | NAIC Code: 236220 | | | |
| 001 | No. of Employees: 26 | | | |
| 001 | No Specific Location | | VA | |
| 001 | No Specific Location | | WA | |
| 001 | No Specific Location | | WY | |
| 001 | 1615 Murray Canyon Rd | San Diego | CA | 92108 |
| 001 | 65 Allerton Street | Boston | MA | 02119 |
| 001 | 1445 Ross Avenue, Suite 5050, Fountain Place | Dallas | TX | 75202 |
| 001 | 701 Waterford Way | Miami | FL | 33126 |
| 001 | NAIC Code: 236220 | | | |
| 001 | No. of Employees: 26 | | | |
| 001 | 995 Settlement Trail | Big Sky | MT | 59716 |
| 002 | America Construction Equipment & Supply LLC | | | |
| 002 | Telephone Number: (617) 445-3500 | | | |
| 002 | FEIN: 27-3505492 | | | |
| 002 | Legal Status: Limited Liability Company | | | |

Policy No. WC2-641-444149-079

**GPO 4162 R1**
Page   1 of   7
Ed. 11/01/2004

## NAMED INSURED LINK SCHEDULE

Continued:

| Name Link Code | Insured Name/Location | City | State | Zip |
|---|---|---|---|---|
| 002 | 65 Allerton Street | Boston | MA | 02119 |
| 003 | Roel-Consulting Services, Inc. | | | |
| 003 | Telephone Number: (617) 445-3500 | | | |
| 003 | FEIN: 27-5198971 | | | |
| 003 | Legal Status: Corporation | | | |
| 003 | RI DOL: 0001947516 | | | |
| 003 | 65 Allerton Street | Boston | MA | 02119 |
| 004 | Suffolk Building Corporation | | | |
| 004 | Telephone Number: (617) 445-3500 | | | |
| 004 | FEIN: 04-3201847 | | | |
| 004 | Legal Status: Corporation | | | |
| 004 | 65 Allerton Street | Boston | MA | 02119 |
| 005 | Suffolk California, Inc. | | | |
| 005 | Telephone Number: (617) 445-3500 | | | |
| 005 | FEIN: 01-0816900 | | | |
| 005 | Legal Status: Corporation | | | |
| 005 | 1615 Murray Canyon Rd | San Diego | CA | 92108 |
| 006 | Suffolk Construction Trust | | | |
| 006 | Telephone Number: (617) 445-3500 | | | |
| 006 | FEIN: 04-6941091 | | | |
| 006 | Legal Status: Trust | | | |
| 006 | 65 Allerton Street | Boston | MA | 02119 |
| 007 | Suffolk Florida LLC | | | |
| 007 | Telephone Number: (617) 445-3500 | | | |
| 007 | FEIN: 20-1908128 | | | |
| 007 | Legal Status: Limited Liability Company | | | |
| 007 | 701 Waterford Way | Miami | FL | 33126 |
| 007 | NAIC Code: 236220 | | | |
| 007 | No. of Employees: 26 | | | |
| 008 | Suffolk Roel, Inc. | | | |
| 008 | Telephone Number: (617) 445-3500 | | | |
| 008 | FEIN: 27-4438384 | | | |
| 008 | Legal Status: Corporation | | | |
| 008 | 65 Allerton Street | Boston | MA | 02119 |

Policy No. WC2-641-444149-079

**GPO 4162 R1**
Page    2 of   7
Ed. 11/01/2004

## NAMED INSURED LINK SCHEDULE

Continued:

| Name Link Code | Insured Name/Location | City | State | Zip |
|---|---|---|---|---|
| 009 | Suffolk/Berry LLC | | | |
| 009 | Telephone Number: (617) 445-3500 | | | |
| 009 | FEIN: 27-1095684 | | | |
| 009 | Legal Status: Limited Liability Company | | | |
| 009 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 010 | Scholar Athletes, Inc | | | |
| 010 | Telephone Number: (617) 445-3500 | | | |
| 010 | FEIN: 27-3987854 | | | |
| 010 | Legal Status: Corporation | | | |
| 010 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 011 | Allerton Development Group LLC | | | |
| 011 | Telephone Number: (617) 445-3500 | | | |
| 011 | FEIN: 26-0573268 | | | |
| 011 | Legal Status: Limited Liability Company | | | |
| 011 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 012 | The Giving Circle | | | |
| 012 | Telephone Number: (617) 445-3500 | | | |
| 012 | FEIN: 04-3484211 | | | |
| 012 | Legal Status: Corporation | | | |
| 012 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 013 | J&E Building Associates Limited Partnership | | | |
| 013 | Telephone Number: (617) 445-3500 | | | |
| 013 | FEIN: 04-2995802 | | | |
| 013 | Legal Status: Limited Partnership | | | |
| 013 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 014 | J&E Building Corp. | | | |
| 014 | Telephone Number: (617) 445-3500 | | | |
| 014 | FEIN: 04-2976114 | | | |
| 014 | Legal Status: Corporation | | | |
| 014 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 015 | Magazine Street LLC | | | |
| 015 | Telephone Number: (617) 445-3500 | | | |
| 015 | FEIN: 20-3745452 | | | |

Policy No. WC2-641-444149-079

## NAMED INSURED LINK SCHEDULE

Continued:

| Name Link Code | Insured Name/Location | City | State | Zip |
|---|---|---|---|---|
| 015 | Legal Status: Limited Liability Company | | | |
| 015 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 016 | Newmarket Square Associates I LLC | | | |
| 016 | Telephone Number: (617) 445-3500 | | | |
| 016 | FEIN: 26-2698170 | | | |
| 016 | Legal Status: Limited Liability Company | | | |
| 016 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 017 | Newmarket Square Associates II LLC | | | |
| 017 | Telephone Number: (617) 445-3500 | | | |
| 017 | FEIN: 26-3073322 | | | |
| 017 | Legal Status: Limited Liability Company | | | |
| 017 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 018 | One Harvard Circle LLC | | | |
| 018 | Telephone Number: (617) 445-3500 | | | |
| 018 | FEIN: 34-2064757 | | | |
| 018 | Legal Status: Limited Liability Company | | | |
| 018 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 019 | Suffolk Construction Company, Inc. dba Suffolk of Boston Co. | | | |
| 019 | Telephone Number: (617) 445-3500 | | | |
| 019 | FEIN: 04-2776356 | | | |
| 019 | Legal Status: Corporation | | | |
| 019 | NJ TIN: 042776356000 | | | |
| 019 | No Specific Location | | NJ | |
| 019 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 020 | Suffolk Ventures LLC | | | |
| 020 | Telephone Number: (617) 445-3500 | | | |
| 020 | FEIN: 20-1708545 | | | |
| 020 | Legal Status: Limited Liability Company | | | |
| 020 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 021 | Suffolk WPB Property LLC | | | |
| 021 | Telephone Number: (617) 445-3500 | | | |
| 021 | FEIN: 20-1578670 | | | |
| 021 | Legal Status: Limited Liability Company | | | |
| 021 | 65 Allerton Street | Boston | MA | 02119 |

Policy No. WC2-641-444149-079

**GPO 4162 R1**
Page    4 of    7
Ed. 11/01/2004

## NAMED INSURED LINK SCHEDULE

Continued:

| Name Link Code | Insured Name/Location | City | State | Zip |
|---|---|---|---|---|
| 022 | Clark/Suffolk, A Joint Venture | | | |
| 022 | Telephone Number:  (617) 445-3500 | | | |
| 022 | FEIN:  75-2974512 | | | |
| 022 | Legal Status:  Joint Venture | | | |
| 022 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 023 | Cruz/Suffolk Mission Main, A Joint Venture | | | |
| 023 | Telephone Number:  (617) 445-3500 | | | |
| 023 | FEIN:  04-3254525 | | | |
| 023 | Legal Status:  Joint Venture | | | |
| 023 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 024 | Cruz/Suffolk BPDHQ, A Joint Venture | | | |
| 024 | Telephone Number:  (617) 445-3500 | | | |
| 024 | FEIN:  04-3277600 | | | |
| 024 | Legal Status:  Joint Venture | | | |
| 024 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 025 | John B. Cruz Construction Comp., Inc/ Suffolk Construction Comp., Inc., A Joint Venture | | | |
| 025 | Telephone Number:  (617) 445-3500 | | | |
| 025 | FEIN:  04-3211447 | | | |
| 025 | Legal Status:  Joint Venture | | | |
| 025 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 026 | M.J. Anderson/ Suffolk Construction Comp., Inc., A Joint Venture | | | |
| 026 | Telephone Number:  (617) 445-3500 | | | |
| 026 | FEIN:  04-3249603 | | | |
| 026 | Legal Status:  Joint Venture | | | |
| 026 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 027 | Dietze Suffolk Joint Venture | | | |
| 027 | Telephone Number:  (617) 445-3500 | | | |
| 027 | FEIN:  27-1799520 | | | |
| 027 | Legal Status:  Joint Venture | | | |
| 027 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 028 | SD Acquisition LLC | | | |
| 028 | Telephone Number:  (617) 445-3500 | | | |
| 028 | FEIN:  27-5434285 | | | |

Policy No. WC2-641-444149-079

## NAMED INSURED LINK SCHEDULE

Continued:

| Name Link Code | Insured Name/Location | City | State | Zip |
|---|---|---|---|---|
| 028 | Legal Status: Limited Liability Company | | | |
| 028 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 029 | SD LLC | | | |
| 029 | Telephone Number: (617) 445-3500 | | | |
| 029 | FEIN: 27-5434285 | | | |
| 029 | Legal Status: Limited Liability Company | | | |
| 029 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 030 | Suffolk/Eckman Joint Venture | | | |
| 030 | Telephone Number: (617) 445-3500 | | | |
| 030 | FEIN: 26-2777726 | | | |
| 030 | Legal Status: Joint Venture | | | |
| 030 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 031 | Suffolk/Fish, A Joint Venture | | | |
| 031 | Telephone Number: (617) 445-3500 | | | |
| 031 | FEIN: 10-0125695 | | | |
| 031 | Legal Status: Joint Venture | | | |
| 031 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 032 | Suffolk/Kraft, A Joint Venture | | | |
| 032 | Telephone Number: (617) 445-3500 | | | |
| 032 | FEIN: 20-0156471 | | | |
| 032 | Legal Status: Joint Venture | | | |
| 032 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 033 | Suffolk/NER, A Joint Venture | | | |
| 033 | Telephone Number: (617) 445-3500 | | | |
| 033 | FEIN: 04-3519085 | | | |
| 033 | Legal Status: Joint Venture | | | |
| 033 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 034 | The Commonwealth Group, LLC | | | |
| 034 | Telephone Number: (617) 445-3500 | | | |
| 034 | FEIN: 20-3734640 | | | |
| 034 | Legal Status: Limited Liability Company | | | |
| 034 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 035 | Suffolk Construction Company, Inc. - Prive | | | |

Policy No. WC2-641-444149-079

GPO 4162 R1
Page    6 of    7
Ed. 11/01/2004

## NAMED INSURED LINK SCHEDULE

Continued:

| Name Link Code | Insured Name/Location | City | State | Zip |
|---|---|---|---|---|
| 035 | Telephone Number: (617) 445-3500 | | | |
| 035 | FEIN: 04-2776356 | | | |
| 035 | Legal Status: Corporation | | | |
| 035 | RI DOL: 0001947516 | | | |
| 035 | 65 Allerton Street | Boston | MA | 02119 |
| | | | | |
| 036 | Suffolk Cares, Inc., F/K/A Red & Blue Foundation, Inc. | | | |
| 036 | Telephone Number: (617) 445-3500 | | | |
| 036 | FEIN: 20-5409073 | | | |
| 036 | Legal Status: Corporation | | | |
| 036 | RI DOL: 0001947516 | | | |
| 036 | 65 Allerton Street | Boston | MA | 02119 |

Policy No. WC2-641-444149-079

GPO 4162 R1
Page    7 of    7
Ed. 11/01/2004

## NAMED INSURED ENDORSEMENT

Item 1 of the Information Page includes the following firms or organizations as insureds.

| Insured Name | FEIN No. | Dept. of Labor No. |
|---|---|---|
| Suffolk Construction Company, Inc. | 04-2776356 | 0245487002<br>042776356000<br>0001947516 |
| America Construction Equipment & Supply LLC | 27-3505492 | |
| Roel-Consulting Services, Inc. | 27-5198971 | 0001947516 |
| Suffolk Building Corporation | 04-3201847 | |
| Suffolk California, Inc. | 01-0816900 | |
| Suffolk Construction Trust | 04-6941091 | |

Suffolk Florida LLC                                    20-1908128

Suffolk Roel, Inc.                                     27-4438384

Suffolk/Berry LLC                                      27-1095684

Scholar Athletes, Inc                                  27-3987854

Allerton Development Group LLC                          26-0573268

The Giving Circle                                      04-3484211

J&E Building Associates Limited Partnership             04-2995802

| | | |
|---|---|---|
| J&E Building Corp. | 04-2976114 | |
| Magazine Street LLC | 20-3745452 | |
| Newmarket Square Associates I LLC | 26-2698170 | |
| Newmarket Square Associates II LLC | 26-3073322 | |
| One Harvard Circle LLC | 34-2064757 | |
| Suffolk Construction Company, Inc. dba Suffolk of Boston Co. | 04-2776356 | 042776356000 |
| Suffolk Ventures LLC | 20-1708545 | |

Suffolk WPB Property LLC                                    20-1578670

Clark/Suffolk, A Joint Venture                             75-2974512

Cruz/Suffolk Mission Main, A Joint Venture                 04-3254525

Cruz/Suffolk BPDHQ, A Joint Venture                        04-3277600

John B. Cruz Construction Comp., Inc/ Suffolk             04-3211447
Construction Comp., Inc., A Joint Venture

M.J. Anderson/ Suffolk Construction Comp., Inc., A        04-3249603
Joint Venture

Dietze Suffolk Joint Venture                               27-1799520

| | |
|---|---|
| SD Acquisition LLC | 27-5434285 |
| SD LLC | 27-5434285 |
| Suffolk/Eckman Joint Venture | 26-2777726 |
| Suffolk/Fish, A Joint Venture | 10-0125695 |
| Suffolk/Kraft, A Joint Venture | 20-0156471 |
| Suffolk/NER, A Joint Venture | 04-3519085 |
| The Commonwealth Group, LLC | 20-3734640 |

| | | |
|---|---|---|
| Suffolk Construction Company, Inc. - Prive | 04-2776356 | 0001947516 |
| Suffolk Cares, Inc., F/K/A Red & Blue Foundation, Inc. | 20-5409073 | 0001947516 |

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079      Effective Date            Premium $

Issued to    Suffolk Construction Company, Inc.

© 2010, Liberty Mutual Group of Companies.  All Rights Reserved.

**WC 89 06 01**
Ed. 09/01/2010

**WC 99 20 16**
Page 6 of 6

## CALIFORNIA – APPLICATION OF ENDORSEMENTS

Endorsements that indicate that they are specific to other states and the endorsement(s) listed in the Schedule below, if any, are not applicable to the insurance provided by the policy when the Workers Compensation Law of California applies because California is listed in Item 3.A. of the Information Page.

### Schedule

| Form Number | Form Name |
|---|---|
| WC 00 01 06 A | Longshore and Harbor Workers' Compensation Act Coverage |
| WC 00 03 01 | Alternate Employer Endorsement |
| WC 00 03 02 | Designated Workplaces Exclusion Endorsement |
| WC 00 03 10 | Sole Proprietors, Partners, Officers and Others Coverage Endorsement |
| WC 00 03 11 A | Voluntary Compensation and Employers Liability Coverage Endorsement |
| WC 00 03 13 | Waiver Of Our Right To Recover From Others Endorsement |
| WC 00 04 14 | Notification of Change in Ownership Endorsement |
| WC 00 04 14 A | 90 Day Reporting Requirement - Notification of Change in Ownership Endorsement |
| WC 00 04 25 | Experience Rating Modification Factor Revision |

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date              Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 99 20 57**            © 2011, Liberty Mutual Group of Companies.  All Rights Reserved.        Page 1 of  1
Ed. 11/01/2011

## LONGSHORE AND HARBOR WORKERS'
## COMPENSATION ACT COVERAGE ENDORSEMENT

This endorsement applies only to work subject to the Longshore and Harbor Workers' Compensation Act in a state shown in the Schedule. The policy applies to that work as though that state were listed in Item 3.A. of the Information Page.

General Section C. **Workers' Compensation Law** is replaced by the following:

**C. Workers' Compensation Law**

Workers' Compensation Law means the workers or workmen's compensation law and occupational disease law of each state or territory named in Item 3.A. of the Information Page and the Longshore and Harbor Workers' Compensation Act (33 USC Sections 901-950). It includes any amendments to those laws that are in effect during the policy period. It does not include any other federal workers or workmen's compensation law, other federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

Part Two (Employers Liability Insurance), C. Exclusions., exclusion 8, does not apply to work subject to the Longshore and Harbor Workers' Compensation Act.

This endorsement does not apply to work subject to the Defense Base Act, the Outer Continental Shelf Lands Act, or the Nonappropriated Fund Instrumentalities Act.

### Schedule

| State | Longshore and Harbor Workers' Compensation Act Coverage Percentage |
|-------|---------------------------------------------------------------------|

REFER TO SCHEDULE GPO 2926 FOR STATES AND PERCENTAGES

The rates for classifications with code numbers not followed by the letter "F" are rates for work not ordinarily subject to the Longshore and Harbor Workers' Compensation Act. If this policy covers work under such classifications, and if the work is subject to the Longshore and Harbor Workers' Compensation Act, those non-F classification rates will be increased by the Longshore and Harbor Workers' Compensation Act Coverage Percentage shown in the Schedule.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079      Effective Date              Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 00 01 06 A**                    © 1983, 1991 National Council on Compensation Insurance              Page 1 of 1
Ed. 04/1992

## MARITIME COVERAGE ENDORSEMENT

This endorsement changes how insurance provided by Part Two (Employers Liability Insurance) applies to bodily injury to a master or member of the crew of any vessel.

A. **How This Insurance Applies** is replaced by the following:

   A. **How This Insurance Applies**

   This insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

   1. The bodily injury must arise out of and in the course of the injured employee's employment by you.

   2. The employment must be necessary or incidental to work described in Item 1 of the Schedule of the Maritime Coverage Endorsement.

   3. The bodily injury must occur in the territorial limits of, or in the operation of a vessel sailing directly between the ports of, the continental United States of America, Alaska, Hawaii or Canada.

   4. Bodily injury by accident must occur during the policy period.

   5. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

   6. If you are sued, the original suit and any related legal actions for damages for bodily injury by accident or by disease must be brought in the United States of America, its territories or possessions, or Canada.

C. **Exclusions** is changed by removing exclusion 10 and by adding exclusions 13 and 14.

   This insurance does not cover:

   13. Bodily injury covered by a Protection and Indemnity Policy or similar policy issued to you or for your benefit. This exclusion applies even if the other policy does not apply because of another insurance clause, deductible or limitation of liability clause, or any similar clause.

   14. Your duty or obligation to provide transportation, wages, maintenance, and cure. This exclusion does not apply if a premium entry is shown in Item 2 of the Schedule, except that punitive damages related to your duty or obligation to provide transportation, wages, maintenance, and cure under any applicable maritime law are excluded even if a premium is paid for transportation, wages, maintenance, and cure coverage.

D. **We Will Defend** is changed by adding the following statement:

   We will treat a suit or other action in rem against a vessel owned or chartered by you as a suit against you.

G. **Limits of Liability**

   Our liability to pay for damages is limited. Our limits of liability are shown in the Schedule. They apply as explained below.

**WC 00 02 01 B**
Ed. 01/01/2015

© Copyright 1983-2013 National Council on Compensation Insurance, Inc.
All Rights Reserved.

Page 1 of 2

1. Bodily Injury by Accident. The limit shown for "bodily injury by accident-each accident" is the most we will pay for all damages covered by this insurance because of bodily injury to one or more employees in any one accident.

   A disease is not bodily injury by accident unless it results directly from bodily injury by accident.

2. Bodily Injury by Disease. The limit shown for "bodily injury by disease-aggregate" is the most we will pay for all damages covered by this insurance because of bodily injury by disease to one or more employees. The limit applies separately to bodily injury by disease arising out of work in each state shown in Item 3.A. of the Information Page.  Bodily injury by disease will be deemed to occur in the state of the vessel's home port.

   Bodily injury by disease does not include disease that results directly from a bodily injury by accident.

3. We will not pay any claims for damages after we have paid the applicable limit of our liability under this insurance.

<p align="center">Schedule</p>

1. Description of work:

   If Any

2. Transportation, Wages, Maintenance, and Cure Premium  $Included

   **Exclusion:** This insurance does not cover punitive damages  related  to your duty or obligation to provide transportation, wages, maintenance, and cure under any applicable maritime law even if a premium is paid for transportation, wages, maintenance, and cure coverage.

3. Limits of Liability

| | | |
|---|---|---|
| Bodily Injury by Accident | $1,000,000 | each accident |
| Bodily Injury by Disease | $1,000,000 | aggregate |

Issued by     Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079      Effective Date                    Premium $

Issued to     Suffolk Construction Company, Inc.

**WC 00 02 01 B**            © Copyright 1983-2013 National Council on Compensation Insurance, Inc.            Page 2 of 2
Ed. 01/01/2015                                All Rights Reserved.

**ALTERNATE EMPLOYER ENDORSEMENT**

This endorsement applies only with respect to bodily injury to your employees while in the course of special or temporary employment by the alternate employer in the state named in the Schedule.  Part One (Workers Compensation Insurance) and Part Two (Employers Liability Insurance) will apply as though the alternate employer is insured.

Under Part One (Workers Compensation Insurance) we will reimburse the alternate employer for the benefits required by the workers compensation law if we are not permitted to pay the benefits directly to the persons entitled to them.

The insurance afforded by this endorsement is not intended to satisfy the alternate employer's duty to secure its obligations under the workers compensation law.  We will not file evidence of this insurance on behalf of the alternate employer with any government agency.

We will not ask any other insurer of the alternate employer to share with us a loss covered by this endorsement.

Premium will be charged for your employees while in the course of special or temporary employment by the alternate employer.

The policy may be canceled according to its terms without sending notice to the alternate employer.

Part Four (Your Duties If Injury Occurs) applies to you and the alternate employer.  The alternate employer will recognize our right to defend under Parts One and Two and our right to inspect under Part Six.

**See Attached Schedule**

**Schedule**

| Alternate Employer | Address | State of Special or Temporary Employment |
|---|---|---|
| If Any | | Applicable in TX only |

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079          Effective Date          Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 00 03 01**
Ed. 04/01/1984                                                   Page 2 of  2

**ALTERNATE EMPLOYER ENDORSEMENT**

This endorsement applies only with respect to bodily injury to your employees while in the course of special or temporary employment by the alternate employer in the state named in Item 2 of the Schedule. Part One (Workers Compensation Insurance) and Part Two (Employers Liability Insurance) will apply as though the alternate employer is insured. If an entry is shown in Item 3 of the Schedule the insurance afforded by this endorsement applies only to work you perform under the contract or at the project named in the Schedule.

Under Part One (Workers Compensation Insurance) we will reimburse the alternate employer for the benefits required by the workers compensation law if we are not permitted to pay the benefits directly to the persons entitled to them.

The insurance afforded by this endorsement is not intended to satisfy the alternate employer's duty to secure its obligations under the workers compensation law. We will not file evidence of this insurance on behalf of the alternate employer with any government agency.

We will not ask any other insurer of the alternate employer to share with us a loss covered by this endorsement.

Premium will be charged for your employees while in the course of special or temporary employment by the alternate employer.

The policy may be canceled according to its terms without sending notice to the alternate employer.

Part Four (Your Duties If Injury Occurs) applies to you and the alternate employer. The alternate employer will recognize our right to defend under Parts One and Two and our right to inspect under Part Six.

Schedule

1. **Alternate Employer**                                    **Address**
   Noble/Suffolk, A Joint Venture LLC

2. **State of Special or Temporary Employment**
   Any except TX

3. **Contract or Project**

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date              Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 00 03 01 A**                © 1984, 1988 National Council on Compensation Insurance.              Page 1 of 1
Ed. 02/01/1989

**DESIGNATED WORKPLACES EXCLUSION ENDORSEMENT**

This policy does not cover work conducted at or from

Any wrap-up where you are an insured

Issued by     Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079          Effective Date                    Premium $

Issued to     Suffolk Construction Company, Inc.

**WC 00 03 02**                    © 1983 National Council on Compensation Insurance.                    Page 1 of 1
Ed. 04/1984

**EMPLOYERS LIABILITY COVERAGE ENDORSEMENT**

This endorsement applies only to work in the states shown in the Schedule.

A.  Part One (Workers Compensation Insurance) does not apply to work in a state shown in the Schedule.

B.  Part Two (Employers Liability Insurance) applies to work in states shown in the Schedule as though they were shown in Item 3.A. of the Information Page.

C.  Part Two (Employers Liability Insurance), C. Exclusions is changed by adding these exclusions.

   This insurance does not cover
   13.  bodily injury to an employee when you are deprived of common law defenses or are subject to penalty because of your failure to secure your obligations under the workers compensation law of any state shown in the Schedule or otherwise fail to comply with that law.

Schedule

**States**
ND, WA, WY

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079    Effective Date            Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 00 03 03 C**          © 2004 National Council on Compensation Insurance, Inc.          Page 1 of 1
Ed. 10/01/2004

## SOLE PROPRIETORS, PARTNERS, OFFICERS AND OTHERS COVERAGE ENDORSEMENT

An election was made by or on behalf of each person described in the Schedule to be subject to the workers compensation law of the state named in the Schedule.  The premium basis for the policy includes the remuneration of such persons.

### Schedule

**Persons**                                                                                          **State**

Sole Proprietor:




Partners:
All Partners




Officers:
All Officers




Others:








Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079      Effective Date              Premium $

Issued to    Suffolk Construction Company, Inc.



**WC 00 03 10**            © Copyright 1983 National Council on Compensation Insurance.            Page 1 of 1
Ed. 04/01/1984

**VOLUNTARY COMPENSATION AND EMPLOYERS LIABILITY
COVERAGE ENDORSEMENT**

This endorsement adds Voluntary Compensation Insurance to the policy.

**A. How This Insurance Applies**

This insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. The bodily injury must be sustained by an employee included in the group of employees described in the Schedule.

2. The bodily injury must arise out of and in the course of employment necessary or incidental to work in a state listed in the Schedule.

3. The bodily injury must occur in the United States of America, its territories or possessions, or Canada, and may occur elsewhere if the employee is a United States or Canadian citizen temporarily away from those places.

4. Bodily injury by accident must occur during the policy period.

5. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

**B. We Will Pay**

We will pay an amount equal to the benefits that would be required of you if you and your employees described in the Schedule were subject to the workers compensation law shown in the Schedule. We will pay those amounts to the persons who would be entitled to them under the law.

**C. Exclusions**

This insurance does not cover:

1. any obligation imposed by a workers compensation or occupational disease law, or any similar law.

2. bodily injury intentionally caused or aggravated by you.

**D. Before We Pay**

Before we pay benefits to the persons entitled to them, they must:

1.  Release you and us, in writing, of all responsibility for the injury or death.

2.  Transfer to us their right to recover from others who may be responsible for the injury or death.

3.  Cooperate with us and do everything necessary to enable us to enforce the right to recover from others.

If the persons entitled to the benefits of this insurance fail to do those things, our duty to pay ends at once. If they claim damages from you or from us for the injury or death, our duty to pay ends at once.

**E. Recovery From Others**

If we make a recovery from others, we will keep an amount equal to our expenses of recovery and the benefits we paid. We will pay the balance to the persons entitled to it. If the persons entitled to the benefits of this insurance make a recovery from others, they must reimburse us for the benefits we paid them.

**F. Employers Liability Insurance**

Part Two (Employers Liability Insurance) applies to bodily injury covered by this endorsement as though the State of Employment shown in the Schedule were shown in Item 3.A. of the Information Page.

**Schedule**

| Employees | State of Employment | Designated Workers' Compensation Law |
|---|---|---|
| All employees not subject to the Workers Compensation law. | All states except CA, HI, NJ, WI & WY | State of Hire |

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date        Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 00 03 11 A**                    © 1991 National Council on Compensation Insurance                    Page 3 of 3

**WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT**

We have the right to recover our payments from anyone liable for an injury covered by this policy.  We will not enforce our right against the person or organization named in the Schedule.  (This agreement applies only to the extent that you perform work under a written contract that requires you to obtain this agreement from us.)

This agreement shall not operate directly or indirectly to benefit anyone not named in the Schedule.

Not Applicable in New Hampshire and New Jersey

Schedule

Where required by contract or written agreement prior to loss and allowed by law.

In the states of Connecticut, Florida, Maryland, the premium charge is 1% of the total manual premium, subject to a minimum premium of $250 per policy.

In the states of District of Columbia, Maine, Montana, North Carolina, Pennsylvania, Rhode Island, the premium charge is 2% of the total manual premium, subject to a minimum premium of $100 per policy.

In the state of Massachusetts, the premium charge is 1% of the total manual premium.

In the states of New York, Tennessee, the premium charge is 2% of the total manual premium, subject to a minimum premium of $250 per policy.

In the state of Virginia, the premium charge is 5% of the total manual premium, subject to a minimum premium of $250 per policy.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079       Effective Date                    Premium $

Issued to     Suffolk Construction Company, Inc.

**WC 00 03 13**                            © 1983 National Council on Compensation Insurance.                    Page 1 of 1
Ed. 04/01/1984

**WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT**

We have the right to recover our payments from anyone liable for an injury covered by this policy.  We will not enforce our right against the person or organization named in the Schedule.  (This agreement applies only to the extent that you perform work under a written contract that requires you to obtain this agreement from us.)

This agreement shall not operate directly or indirectly to benefit anyone not named in the Schedule.

Schedule

Bank of the Ozarks, ISAOA, ATIMA
625 Court Street
Clearwater, FL 33756

Premium is included in the Florida blanket waiver's premium charge.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date              Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 00 03 13**                   © 1983 National Council on Compensation Insurance.                Page 1  of  1
Ed. 04/01/1984

**NOTIFICATION OF CHANGE IN OWNERSHIP ENDORSEMENT**

Experience rating is mandatory for all eligible insureds.  The experience rating modification factor, if any, applicable to this policy, may change if there is a change in your ownership or in that of one or more of the entities eligible to be combined with you for experience rating purposes.  Change in ownership includes sales, purchases, other transfers, mergers, consolidations, dissolutions, formations of a new entity and other changes provided for in the applicable experience rating plan manual.

You must report any change in ownership to us in writing within 90 days of such change.  Failure to report such changes within this period may result in revision of the experience rating modification factor used to determine your premium.

Not Applicable in California,
New Jersey

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date            Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 00 04 14**              © Copyright 1990 National Council on Compensation Insurance, Inc.            Page 1 of 1
Ed. 07/01/1990

**90-DAY REPORTING REQUIREMENT—**
**NOTIFICATION OF CHANGE IN OWNERSHIP ENDORSEMENT**

You must report any change in ownership to us in writing within 90 days of the date of the change. Change in ownership includes sales, purchases, other transfers, mergers, consolidations, dissolutions, formations of a new entity, and other changes provided for in the applicable experience rating plan. Experience rating is mandatory for all eligible insureds. The experience rating modification factor, if any, applicable to this policy, may change if there is a change in your ownership or in that of one or more of the entities eligible to be combined with you for experience rating purposes.

Failure to report any change in ownership, regardless of whether the change is reported within 90 days of such change, may result in revision of the experience rating modification factor used to determine your premium.

This reporting requirement applies regardless of whether an experience rating modification is currently applicable to this policy.

Not Applicable in California and New Jersey

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079       Effective Date                 Premium $

Issued to    Suffolk Construction Company, Inc.                                    Endorsement No.

**WC 00 04 14 A**              © Copyright 2017 National Council on Compensation Insurance, Inc.              Page 1 of 1
Ed. 01/01/2019                              All Rights Reserved.

**PREMIUM DUE DATE ENDORSEMENT**

This endorsement is used to amend:

Section D. of Part Five of the policy is replaced by this provision.

**PART FIVE
PREMIUM**

D.   **Premium** is amended to read:
     You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid. **The due date for audit and retrospective premiums is the date of the billing.**

     Not Applicable in Arizona, Massachusetts, Oregon and Texas

Issued by      Liberty Mutual Fire Insurance Company 16586

For attachment to Policy No. WC2-641-444149-079      Effective Date              Premium $

Issued to      Suffolk Construction Company, Inc.

**WC 00 04 19**            © Copyright 2000 National Council on Compensation Insurance, Inc.              Page 1 of 1
Ed. 01/01/2001                              All Rights Reserved.

**CATASTROPHE (OTHER THAN CERTIFIED ACTS OF TERRORISM)
PREMIUM ENDORSEMENT**

This endorsement is notification that your insurance carrier is charging premium to cover the losses that may occur in the event of a Catastrophe (other than Certified Acts of Terrorism) as that term is defined below.  Your policy provides coverage for workers compensation losses caused by a Catastrophe (other than Certified Acts of Terrorism).  This premium charge does not provide funding for Certified Acts of Terrorism contemplated under the Terrorism Risk Insurance Program Reauthorization Act Disclosure Endorsement (WC 00 04 22 B), attached to this policy.

For purposes of this endorsement, the following definitions apply:

- Catastrophe (other than Certified Acts of Terrorism): Any single event, resulting from an Earthquake, Noncertified Act of Terrorism, or Catastrophic Industrial Accident, which results in aggregate workers compensation losses in excess of $50 million.

- Earthquake: The shaking and vibration at the surface of the earth resulting from underground movement along a fault plane or from volcanic activity.

- Noncertified Act of Terrorism: An event that is not certified as an Act of Terrorism by the Secretary of Treasury pursuant to the Terrorism Risk Insurance Act of 2002 (as amended) but that meets all of the following criteria:
  a. It is an act that is violent or dangerous to human life, property, or infrastructure;
  b. The act results in damage within the United States, or outside of the United States in the case of the premises of United States missions or air carriers or vessels as those terms are defined in the Terrorism Risk Insurance Act of 2002 (as amended); and
  c. It is an act that has been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

- Catastrophic Industrial Accident: A chemical release, large explosion, or small blast that is localized in nature and affects workers in a small perimeter the size of a building.

The premium charge for the coverage your policy provides for workers compensation losses caused by a Catastrophe (other than Certified Acts of Terrorism) is shown in Item 4 of the Information Page or in the Schedule below.

**Schedule**

| State | Rate | Premium |
|-------|------|---------|

See Attached Premium Schedule GPO 2923

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date              Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 00 04 21 D**              © Copyright 2015 National Council on Compensation Insurance, Inc.              Page 1 of 1
Ed. 01/01/2015                              All Rights Reserved.

**TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION ACT DISCLOSURE ENDORSEMENT**

This endorsement addresses the requirements of the Terrorism Risk Insurance Act of 2002 as amended and extended by the Terrorism Risk Insurance Program Reauthorization Act of 2015. It serves to notify you of certain limitations under the Act, and that your insurance carrier is charging premium for losses that may occur in the event of an Act of Terrorism.

Your policy provides coverage for workers compensation losses caused by Acts of Terrorism, including workers compensation benefit obligations dictated by state law. Coverage for such losses is still subject to all terms, definitions, exclusions, and conditions in your policy, and any applicable federal and/or state laws, rules, or regulations.

**Definitions**
The definitions provided in this endorsement are based on and have the same meaning as the definitions in the Act. If words or phrases not defined in this endorsement are defined in the Act, the definitions in the Act will apply.

"Act" means the Terrorism Risk Insurance Act of 2002, which took effect on November 26, 2002, and any amendments thereto, including any amendments resulting from the Terrorism Risk Insurance Program Reauthorization Act of 2015.

"Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States as meeting all of the following requirements:
   a.   The act is an act of terrorism.
   b.   The act is violent or dangerous to human life, property, or infrastructure.
   c.   The act resulted in damage within the United States, or outside of the United States in the case of the premises of United States missions or certain air carriers or vessels.
   d.   The act has been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Insured Loss" means any loss resulting from an act of terrorism (and, except for Pennsylvania, including an act of war, in the case of workers compensation) that is covered by primary or excess property and casualty insurance issued by an insurer if the loss occurs in the United States or at the premises of United States missions or to certain air carriers or vessels.

"Insurer Deductible" means, for the period beginning on January 1, 2015, and ending on December 31, 2020, an amount equal to 20% of our direct earned premiums, during the immediately preceding calendar year.

**Limitation of Liability**
The Act limits our liability to you under this policy. If aggregate Insured Losses exceed $100,000,000,000 in a calendar year and if we have met our Insurer Deductible, we are not liable for the payment of any portion of the amount of Insured Losses that exceeds $100,000,000,000; and for aggregate Insured Losses up to $100,000,000,000, we will pay only a pro rata share of such Insured Losses as determined by the Secretary of the Treasury.

**Policyholder Disclosure Notice**

1. Insured Losses would be partially reimbursed by the United States Government. If the aggregate industry Insured Losses exceed:

   a. $100,000,000, with respect to such Insured Losses occurring in calendar year 2015, the United States Government would pay 85% of our Insured Losses that exceed our Insurer Deductible.

   b. $120,000,000, with respect to such Insured Losses occurring in calendar year 2016, the United States Government would pay 84% of our Insured Losses that exceed our Insurer Deductible.

   c. $140,000,000, with respect to such Insured Losses occurring in calendar year 2017, the United States Government would pay 83% of our Insured Losses that exceed our Insurer Deductible.

   d. $160,000,000, with respect to such Insured Losses occurring in calendar year 2018, the United States Government would pay 82% of our Insured Losses that exceed our Insurer Deductible.

   e. $180,000,000, with respect to such Insured Losses occurring in calendar year 2019, the United States Government would pay 81% of our Insured Losses that exceed our Insurer Deductible.

   f. $200,000,000, with respect to such Insured Losses occurring in calendar year 2020, the United States Government would pay 80% of our Insured Losses that exceed our Insurer Deductible.

2. Notwithstanding item 1 above, the United States Government will not make any payment under the Act for any portion of Insured Losses that exceed $100,000,000,000.

3. The premium charge for the coverage your policy provides for Insured Losses is included in the amount shown in Item 4 of the Information Page or in the Schedule below.

### Schedule

| State | Rate | Premium |
|-------|------|---------|
|       |      |         |

Not applicable in Florida.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079      Effective Date            Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 00 04 22 B**
Ed. 01/01/2015

© Copyright 2015 National Council on Compensation Insurance, Inc.
All Rights Reserved.

Page 2 of 2

**AUDIT NONCOMPLIANCE CHARGE ENDORSEMENT**

Part Five—Premium, Section G. (Audit) of the Workers Compensation and Employers Liability Insurance Policy is revised by adding the following:

If you do not allow us to examine and audit all of your records that relate to this policy, and/or do not provide audit information as requested, we may apply an Audit Noncompliance Charge. The method for determining the Audit Noncompliance Charge by state, where applicable, is shown in the Schedule below.

If you allow us to examine and audit all of your records after we have applied an Audit Noncompliance Charge, we will revise your premium in accordance with our manuals and Part 5—Premium, E. (Final Premium) of this policy.

Failure to cooperate with this policy provision may result in the cancellation of your insurance coverage, as specified under the policy.

**Note:**
For coverage under state-approved workers compensation assigned risk plans, failure to cooperate with this policy provision may affect your eligibility for coverage.

**Schedule**

| States(s) | Basis of Audit Noncompliance Charge | Maximum Audit Noncompliance Charge Multiplier | States(s) | Basis of Audit Noncompliance Charge | Maximum Audit Noncompliance Charge Multiplier |
|---|---|---|---|---|---|
| AL | Est. Annual Prem. | 2 | NC | Est. Annual Prem. | 2 |
| AR | Est. Annual Prem. | 2 | NE | Est. Annual Prem. | 2 |
| AZ | Est. Annual Prem. | 2 | NH | Est. Annual Prem. | 2 |
| CO | Est. Annual Prem. | 2 | NJ | Est. Annual Prem. | 2 |
| CT | Est. Annual Prem. | 2 | NM | Est. Annual Prem. | 2 |
| DC | Est. Annual Prem. | 2 | NV | Est. Annual Prem. | 1 |
| DE | Est. Annual Prem. | 2 | | | |
| GA | Est. Annual Prem. | 2 | OK | Est. Annual Prem. | 2 |
| HI | Est. Annual Prem. | 2 | OR | Est. Annual Prem. | 2 |
| IA | Est. Annual Prem. | 2 | RI | Est. Annual Prem. | 2 |
| ID | Est. Annual Prem. | 2 | SC | Est. Annual Prem. | 2 |
| IL | Est. Annual Prem. | 2 | SD | Est. Annual Prem. | 2 |
| KS | Est. Annual Prem. | 2 | TN | Est. Annual Prem. | 2 |
| KY | Est. Annual Prem. | 2 | UT | Est. Annual Prem. | 2 |
| | | | VA | Est. Annual Prem. | 2 |
| MD | Est. Annual Prem. | 2 | VT | Est. Annual Prem. | 2 |
| ME | Est. Annual Prem. | 2 | WV | Est. Annual Prem. | 2 |
| MI | Est. Annual Prem. | 2 | WI | Est. Annual Prem. | 2 |
| MN | Est. Annual Prem. | 2 | | | |
| MS | Est. Annual Prem. | 2 | | | |

Issued by     Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079          Effective Date                    Premium $

Issued to     Suffolk Construction Company, Inc.

**EXPERIENCE RATING MODIFICATION FACTOR REVISION ENDORSEMENT**

This endorsement is added to Part Five—Premium of the policy.

The premium for the policy is adjusted by an experience rating modification factor. The factor shown on the Information Page may be revised and applied to the policy in accordance with our manuals and endorsements. We will issue an endorsement to show the revised factor, if different from the factor shown, when it is calculated.

Issued by     Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079          Effective Date          Premium $

Issued to     Suffolk Construction Company, Inc.

**WC 00 04 25**
Ed. 05/01/2017

© Copyright 2016 National Council on Compensation Insurance, Inc.
All Rights Reserved.

**RETROSPECTIVE RATING PLAN PREMIUM ENDORSEMENT- LARGE RISK
ALTERNATIVE RATING OPTION (LRARO)**

This endorsement is issued because you chose to have the cost of the insurance rated retrospectively.  This endorsement applies only to workers compensation and employers liability insurance when rated under the provisions of the Large Risk Alternative Rating Option that we have negotiated with you.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079      Effective Date          Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 00 05 16**          © 2009 National Council on Compensation Insurance, Inc.  All Rights Reserved.          Page 1 of 1
Ed. 01/01/2010

**LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT**
**COVERAGE ENDORSEMENT - CALIFORNIA**

This endorsement applies only to work subject to the Longshore and Harbor Workers' Compensation Act in California.  The policy applies to that work as though California were listed in item 3.A of the information Page.

General Section C. Workers' Compensation Law is replaced by the following:

**C. Workers' Compensation Law**
Workers' Compensation Law means the Workers' or Workmen's Compensation Law and occupational disease law of each state or territory named in Item 3.A of the Information Page and the Longshore and Harbor Workers' Compensation Act (33 USC Section 901-950).  It includes any amendments to those laws that are in effect during the policy period.  It does not include any other federal Workers' or Workmen's Compensation Law, other federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

Part Two (Employers Liability Insurance), C. Exclusions., exclusion 8, does not apply to work subject to the Longshore and Harbor Workers' Compensation Act.

This endorsement does not apply to work subject to the Defense Base Act, the Outer Continental Shelf Lands Act, or the Nonappropriated Fund Instrumentalities Act.

The estimated premium for the Longshore and Harbor Workers' Compensation Act coverage provided by this endorsement is as shown in the Schedule below or Item 4 of the Information Page.

<div align="center">

**Schedule**

</div>

| Code No. | Classification | Estimated Annual Remuneration | Rate Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|

Refer to Schedule GPO 2926

Total Estimated Annual Premium $ _____

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079       Effective Date                    Premium $

Issued to    Suffolk Construction Company, Inc.                              Endorsement No.

WC 04 01 01 A                                                                       Page 1 of 1
Ed. 04/1992  V.1.0

## POLICY AMENDATORY ENDORSEMENT--CALIFORNIA

It is agreed that, anything in the policy to the contrary notwithstanding, such insurance as is afforded by this policy by reason of the designation of California in Item 3 of the Information Page is subject to the following provisions:

1. **Minors Illegally Employed -- Not Insured.** This policy does not cover liability for additional compensation imposed on you under Section 4557, Division IV, Labor Code of the State of California, by reason of injury to an employee under sixteen years of age and illegally employed at the time of injury.

2. **Punitive or Exemplary Damages -- Uninsurable.** This policy does not cover punitive or exemplary damages where insurance of liability therefor is prohibited by law or contrary to public policy.

3. **Increase in Indemnity Payment -- Reimbursement.** You are obligated to reimburse us for the amount of increase in indemnity payments made pursuant to Subdivision (d) of Section 4650 of the California Labor Code, if the late indemnity payment which gives rise to the increase in the amount of payment is due less than seven (7) days after we receive the completed claim form from you. You are obligated to reimburse us for any increase in indemnity payments not covered under this policy and will reimburse us for any increase in indemnity payment not covered under the policy when the aggregate total amount of the reimbursement payments paid in a policy year exceeds one hundred dollars ($100).

   If we notify you in writing, within 30 days of the payment, that you are obligated to reimburse us, we will bill you for the amount of increase in indemnity payment and collect it no later than the final audit. You will have 60 days, following notice of the obligation to reimburse, to appeal the decision of the insurer to the Department of Insurance.

4. **Application of Policy.** Part One, "Workers Compensation Insurance", A, "How This Insurance Applies", is amended to read as follows:

   This workers compensation insurance applies to bodily injury by accident or disease, including death resulting therefrom. Bodily injury by accident must occur during the policy period. Bodily injury by disease must be caused or aggravated by the conditions of your employment. Your employee's exposure to those conditions causing or aggravating such bodily injury by disease must occur during the policy period.

5. **Rate Changes.** The premium and rates with respect to the insurance provided by this policy by reason of the designation of California in Item 3 of the Information Page are subject to change if ordered by the Insurance Commissioner of the State of California pursuant to Section 11737 of the California Insurance Code.

6. **Long Term Policy.** If this policy is written for a period longer than one year, all the provisions of this policy shall apply separately to each consecutive twelve-month period or, if the first or last consecutive period is less than twelve months, to such period of less than twelve months, in the same manner as if a separate policy had been written for each consecutive period.

7. **Statutory Provision.** Your employee has a first lien upon any amount which becomes owing to you by us on account of this policy, and in the case of your legal incapacity or inability to receive the money and pay it to the claimant, we will pay it directly to the claimant.

8. Part Five, "Premium", E, "Final Premium", is amended to read as follows:

   The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is canceled, final premium will be determined in the following way unless our manuals provide otherwise:

   a.  If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.

   b.  If you cancel, final premium may be more than pro rata; it will be based on the time this policy was in force, and may be increased by our short-rate cancelation table and procedure. Final premium will not be less than the pro rata share of the minimum premium.

It is further agreed that this policy, including all endorsements forming a part thereof, constitutes the entire contract of insurance. No condition, provision, agreement, or understanding not set forth in this policy or such endorsements shall affect such contract or any rights, duties, or privileges arising therefrom.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079    Effective Date    Premium $

Issued to    Suffolk Construction Company, Inc.    Endorsement No.

**WC 04 03 01 D**
Ed. 02/01/2018

**VOLUNTARY COMPENSATION AND EMPLOYERS LIABILITY COVERAGE**
**ENDORSEMENT - CALIFORNIA**

If the employer named in item 1 of the Information Page has in his employment persons not entitled to compensation under Division 4 of the Labor Code of the State of California, this policy shall operate as an election on the part of the employer to come under the compensation provisions of Division 4 with respect to those persons described in the Schedule below.

This policy applies to those persons described in the Schedule below as employees.

**Schedule**

All employees not subject to the Workers Compensation law.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date                Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 04 03 05**
Ed. 01/01/1985

Page 1 of 1

### WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT - CALIFORNIA

We have the right to recover our payments from anyone liable for an injury covered by this policy.  We will not enforce our right against the person or organization named in the Schedule. (This agreement applies only to the extent that you perform work under a written contract that requires you to obtain this agreement from us.)

You must maintain payroll records accurately segregating the remuneration of your employees while engaged in the work described in the Schedule.

The additional premium for this endorsement shall be 2% of the California workers' compensation premium otherwise due on such remuneration.

### Schedule

Additional premium is a percent of the California Manual Workers Compensation premium.  Subject to a minimum premium charge of $ 250

| Person or Organization | Job Description |
|---|---|
| Where required by contract or written agreement prior to loss and allowed by law. | |

Issued by     Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date              Premium $

Issued to     Suffolk Construction Company, Inc.

**WC 04 03 06**
Ed: 04/1984

Page 1 of 1

**WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT - CALIFORNIA**

We have the right to recover our payments from anyone liable for an injury covered by this policy. We will not enforce our right against the person or organization named in the Schedule. (This agreement applies only to the extent that you perform work under a written contract that requires you to obtain this agreement from us.)

You must maintain payroll records accurately segregating the remuneration of your employees while engaged in the work described in the Schedule.

The additional premium for this endorsement shall be 0% of the California workers' compensation premium otherwise due on such remuneration.

**Schedule**

Additional premium is a percent of the California Manual Workers Compensation premium. Subject to a minimum premium charge of $ 0

| Person or Organization | Job Description |
|---|---|
| Lennar Corporation, Owner Parties and Agency Parties, as defined in the Agreements for HPS1 Block 48-1A, HPS1 Block 48-1B, HPS1 Block 48-2A, HPS1 Block 48-2B, HPS1 Block 48-3A, and HPS1 Block 48-3B | Premium is included in the California blanket waiver's premium charge |

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079       Effective Date              Premium $

Issued to    Suffolk Construction Company, Inc.

WC 04 03 06                                                                                      Page 1 of 1
Ed: 04/1984

## WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT - CALIFORNIA

We have the right to recover our payments from anyone liable for an injury covered by this policy.  We will not enforce our right against the person or organization named in the Schedule. (This agreement applies only to the extent that you perform work under a written contract that requires you to obtain this agreement from us.)

You must maintain payroll records accurately segregating the remuneration of your employees while engaged in the work described in the Schedule.

The additional premium for this endorsement shall be 0% of the California workers' compensation premium otherwise due on such remuneration.

### Schedule

Additional premium is a percent of the California Manual Workers Compensation premium.  Subject to a minimum premium charge of $ 0

| Person or Organization | Job Description |
|---|---|
| San Francisco Bay Area Rapid Transit District<br>Department Manager, Insurance | PO Box 12688<br>Oakland, CA 94604 |
| Where required by contract or written agreement prior to loss and allowed by law. | Premium is included in the California blanket waiver's premium charge. |

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date            Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 04 03 06**
Ed: 04/1984                                                                                  Page 1 of 1

**ENDORSEMENT AGREEMENT LIMITING AND RESTRICTING THIS INSURANCE**
**Employee Insured by General Employer Excluded**

The insurance under this policy is limited as follows: It is AGREED that, anything in this policy to the contrary notwithstanding, this policy DOES NOT INSURE:

**NO LIABILITY FOR EMPLOYEE INSURED BY GENERAL EMPLOYER**

Any liability you may have as the special employer of an employee who is not on your payroll at the time of injury, based upon your representation that: (1) you have entered into a valid and enforceable agreement pursuant to Labor Code Section 3602(d) with the employee's general employer under which the general employer agrees to secure the payment of compensation for such employee and (2) the general employer has obtained workers' compensation coverage for the employee.

This policy will be deemed unlimited to the extent that any of the following requirements are not met: (1) the employer actually obtains coverage for the excluded liability and (2) such coverage remains in effect for the term of this policy.

Nothing in this endorsement shall be held to vary, alter, waive or extend any of the terms, conditions, agreements, or limitations of this policy other than as above stated. Nothing elsewhere in this policy shall be held to vary, alter, waive or limit the terms, conditions, agreements or limitations in this endorsement.

It is further agreed that "remuneration" when used as a premium basis for such insurance as is afforded by this policy shall not include the remuneration of any person excluded from coverage in accordance with the foregoing.

**FAILURE TO SECURE THE PAYMENT OF FULL COMPENSATION BENEFITS FOR ALL EMPLOYEES AS REQUIRED BY LABOR CODE SECTION 3700 IS A VIOLATION OF LAW AND MAY SUBJECT THE EMPLOYER TO THE IMPOSITION OF A WORK STOP ORDER, LARGE FINES, AND OTHER SUBSTANTIAL PENALTIES (Labor Code Section 3710.1, et seq.).**

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079      Effective Date          Premium $

Issued to    Suffolk Construction Company, Inc.

WC 04 03 17 B
Ed. 10/20/2016

Page 1 of 1

**EMPLOYERS' LIABILITY COVERAGE AMENDATORY
ENDORSEMENT - CALIFORNIA**

The insurance afforded by Part Two (Employers' Liability Insurance) by reason of designation of California in item 3 of the information page is subject to the following provisions:

A.  **"How This Insurance Applies"** is amended to read as follows:

A.  How This Insurance Applies

This employers' liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury means a physical injury, including resulting death.

1.  The bodily injury must arise out of and in the course of the injured employee's employment by you.

2.  The employment must be necessary or incidental to your work in California.

3.  Bodily injury by accident must occur during the policy period.

4.  Bodily injury by disease must be caused or aggravated by the conditions of your employment.  The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

5.  If you are sued, the original suit and any related legal actions for damages for bodily injury by accident or by disease must be brought in the United States of America, its territories or possessions, or Canada.

C.  The **"Exclusions"** section is modified as follows (all other exclusions in the **"Exclusions"** section remain as is):

1.  Exclusion 1 is amended to read as follows:

1.  liability assumed under a contract.

2.  Exclusion 2 is deleted.

3.  Exclusion 7 is amended to read as follows:

7.  damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, termination of employment, or any personnel practices, policies, acts or omissions.

© 2014 by the Workers' Compensation Insurance Rating Bureau of California.
All Rights Reserved.

4.   The following exclusions are added:

1.   bodily injury to any member of the flying crew of any aircraft.

2.   bodily injury to an employee when you are deprived of statutory or common law defenses or are subject to penalty because of your failure to secure your obligations under the workers' compensation law(s) applicable to you or otherwise fail to comply with that law.

3.   liability arising from California Labor Code Section 2810.3 which relates to labor contracting.

Issued by     Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079     Effective Date          Premium $

Issued to     Suffolk Construction Company, Inc.

## OPTIONAL PREMIUM INCREASE ENDORSEMENT - CALIFORNIA

You must provide us, or our authorized representative, access to records necessary to perform a payroll verification audit. If you fail to provide access within 90 days after expiration of the policy, you are liable to pay a total premium equal to 3 times our current estimate of the annual premium for your policy. In addition, if you fail to provide access after our third request within a 90 day or longer period, you are also liable for our costs in attempting to perform the audit unless you provide a compelling business reason for your failure.

We will contact you to schedule appointments during normal business hours.

We will notify you of your failure to provide access by mailing a certified, return-receipt document stating the increased premium and the total amount of our costs incurred in our attempt(s) to perform an audit. In addition to any other obligations under this contract, 30 days after you receive the notification, you will be obligated to pay the total premium and costs referenced above.  If, thereafter, you provide access to your records within three years after the policy expires, or within another mutually agreed upon time, and we succeed in performing the audit to our satisfaction, we will revise your total premium and the costs due to reflect the results of the audit.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079    Effective Date    Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 04 04 21**
Ed. 01/01/2008

© 2008 Workers' Compensation Insurance Rating Bureau of California.
All Rights Reserved.

Page  1 of 1

## CALIFORNIA CANCELLATION ENDORSEMENT

This endorsement applies only to the insurance provided by the policy because California is shown in Item 3.A. of the Information Page.

The cancellation condition in Part Six (Conditions) of the policy is replaced by these conditions:

**Cancellation**

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2. We may cancel this policy for one or more of the following reasons:

   a. Non-payment of premium;

   b. Failure to report payroll;

   c. Failure to permit us to audit payroll as required by the terms of this policy or of a previous policy issued by us;

   d. Failure to pay any additional premium resulting from an audit of payroll required by the terms of this policy or any previous policy issued by us;

   e. Material misrepresentation made by you or your agent;

   f. Failure to cooperate with us in the investigation of a claim;

   g. Failure to comply with Federal or State safety orders;

   h. Failure to comply with written recommendations of our designated loss control representatives;

   i. The occurrence of a material change in the ownership of your business;

   j. The occurrence of any change in your business or operations that materially increases the hazard for frequency or severity of loss;

   k. The occurrence of any change in your business or operation that requires additional or different classification for premium calculation;

   l. The occurrence of any change in your business or operation which contemplates an activity excluded by our reinsurance treaties.

3.  If we cancel your policy for any of the reasons listed in (a) through (f), we will give you 10 days advance written notice, stating when the cancellation is to take effect.  Mailing that notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.  If we cancel your policy for any of the reasons listed in Items (g) through (l), we will give you 30 days advance written notice; however, we agree that in the event of cancellation and reissuance of a policy effective upon a material change in ownership or operations, notice will not be provided.

4.  The policy period will end on the day and hour stated in the cancellation notice.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date              Premium $

Issued to    Suffolk Construction Company, Inc.

WC 04 06 01 A
Ed. 12/01/1993

Page  2 of  2

## CONNECTICUT APPLICATION OF WORKERS COMPENSATION INSURANCE ENDORSEMENT

This endorsement applies only to the insurance provided by Part One (Workers Compensation Insurance) because Connecticut is shown in Item 3.A. of the Information Page.

Section A, "How This Insurance Applies", of Part One, "Workers Compensation Insurance", is amended to read as follows:

This workers compensation insurance applies to injury by accident or injury by disease.  Injury includes resulting death.

1.  Injury by accident must occur during the policy period.

2.  Injury by disease must be caused or aggravated by exposure during the policy period to conditions of your employment.

Issued by      Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079      Effective Date      Premium $

Issued to      Suffolk Construction Company, Inc.

**WC 06 03 01**
Ed. 04/01/1984                  © 1984 National Council on Compensation Insurance                  Page 1 of 1

**CONNECTICUT WORKERS COMPENSATION FUNDS ENDORSEMENT**

This endorsement applies only to the insurance provided by Part One (Workers Compensation Insurance) because Connecticut is shown in Item 3.A. of the Information Page.

The amount shown on the Information Page for the Connecticut workers compensation fund assessment is required of you under Section 31-345 of the Connecticut General Statutes. We will pay these assessments to the Connecticut State Treasurer. The purpose of the assessment is to finance the expenses of administering the workers compensation laws.

THE AMOUNT SHOWN ON THE INFORMATION PAGE FOR THE CONNECTICUT SECOND INJURY FUND SURCHARGE IS REQUIRED OF YOU UNDER CONNECTICUT REGULATIONS TO FINANCE THE CONNECTICUT SECOND INJURY FUND. WE WILL PAY THIS SURCHARGE TO THE CONNECTICUT STATE TREASURER.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date              Premium $

Issued to    Suffolk Construction Company, Inc.

**CONNECTICUT NONRENEWAL AND RENEWAL ENDORSEMENT**

This endorsement applies because Connecticut is shown in Item 3.A. of the Information Page.

Part Six—Conditions, of the policy is revised by adding the following:

F.  **Nonrenewal**
We may elect not to renew the policy. Unless otherwise provided by Connecticut General Statutes Annotated Section 38a-323, we will provide you at least 60 days' advance notice of our intention not to renew. Advance notice will be provided to you by one of the following methods:
1.  Registered mail
2.  Certified mail
3.  Mail evidenced by a certificate of mailing
4.  Delivered to the named insured at the address shown in the policy

Mailing such notice to you at your address, shown in Item 1., of the Information Page, will be deemed sufficient notice under this section.

The notice of intent not to renew will state or be accompanied by a statement specifying the reason for such nonrenewal.

G.  **Renewal**
We may elect to renew the policy. In accordance with Connecticut General Statutes Annotated Section 38a-323, we will provide you at least 60 days' advance notice of our intent to renew if, compared to this policy, the terms or conditions of the renewal policy include any reduction in coverage limits, coverage provisions added or revised that reduce coverage or increases in deductibles.

This conditional renewal notice will be provided to you by one of the following methods:
1.  Registered mail
2.  Certified mail
3.  Mail evidenced by a certificate of mailing
4.  Delivered to the named insured at the address shown in the policy

Mailing such notice to you at your address, shown in Item 1., of the Information Page, will be deemed sufficient notice under this section.

This conditional renewal notice will include or be accompanied by a statement clearly identifying any reduction in coverage limits, coverage provisions added or revised that reduce coverage or increases in deductibles, under the renewal policy.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date        Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 06 06 01 A**        © 2017 National Council on Compensation Insurance, Inc.  All Rights Reserved.        Page 1 of 1
Ed. 10/01/2017

## DISTRICT OF COLUMBIA CANCELATION ENDORSEMENT

This endorsement applies only to the insurance provided by the policy because District of Columbia is shown in Item 3.A. of the Information Page.

The **Cancelation** Condition of the policy is replaced by this Condition:

D. **Cancelation**

1. You may cancel this policy. You must mail or deliver advance notice to us stating when the cancelation is to take effect.

2. We may cancel this policy. We will mail or deliver to you and the Mayor not less than 30 days advance written notice stating when the cancelation is to take effect. Mailing this notice to you at your mailing address last known to us will be sufficient to prove notice.

3. The policy period will end on the day and hour stated in the cancelation notice.

Issued by     Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079     Effective Date          Premium $

Issued to     Suffolk Construction Company, Inc.

**WC 08 06 01**                    © 1984 National Council on Compensation Insurance.                    Page 1 of 1
Ed. 04/01/1984

**FLORIDA EMPLOYERS LIABILITY COVERAGE ENDORSEMENT**

**C.** Exclusion 5, Section C. of Part Two of the policy is replaced by the following:

This insurance does not cover
**5.** bodily injury intentionally caused or aggravated by you or which is the result of your engaging in conduct equivalent to an intentional tort, however defined, or other tortious conduct, such that you lose your immunity from civil liability under the workers compensation laws.

Issued by     Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079     Effective Date     Premium $

Issued to     Suffolk Construction Company, Inc.

**WC 09 03 03**
Ed. 08/01/2005                © 2005 National Council on Compensation Insurance, Inc.                Page 1 of 1

**FLORIDA CONTRACTING CLASSIFICATION PREMIUM ADJUSTMENT ENDORSEMENT**

The premium for the policy may be adjusted by a Florida Contracting Classification Premium Adjustment factor. The factor was not available when the policy was issued.  If you qualify, we will issue an endorsement to show the premium adjustment factor after it is calculated.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date                Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 09 04 01**                    © 1987 National Council on Compensation Insurance                    Page 1 of 1
Ed. 06/01/1987

**FLORIDA TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION
ACT ENDORSEMENT**

This endorsement addresses requirements of the Terrorism Risk Insurance Act of 2002 as amended by the Terrorism Risk Insurance Program Reauthorization Act of 2015.

**Definitions**
The definitions provided in this endorsement are based on and have the same meaning as the definitions in the Act. If words or phrases not defined in this endorsement are defined in the Act, the definitions in the Act will apply.

1. "Act" means the Terrorism Risk Insurance Act of 2002, which took effect on November 26, 2002, and any amendments, including any amendments resulting from the Terrorism Risk Insurance Program Reauthorization Act of 2015.

2. "Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States as meeting all of the following requirements:
   a. The act is an act of terrorism.
   b. The act is violent or dangerous to human life, property or infrastructure.
   c. The act resulted in damage within the United States, or outside of the United States in the case of the premises of United States missions or certain air carriers or vessels.
   d. The act has been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Insured Loss" means any loss resulting from an act of terrorism (including an act of war, in the case of workers compensation) that is covered by primary or excess property and casualty insurance issued by an insurer if the loss occurs in the United States or at the premises of United States missions or to certain air carriers or vessels.

4. "Insurer Deductible" means, for the period beginning on January 1, 2015, and ending on December 31, 2020, an amount equal to 20% of our direct earned premiums, during the immediately preceding calendar year.

**Limitation of Liability**
The Act may limit our liability to you under this policy. If aggregate Insured Losses exceed $100,000,000,000 in a calendar year and if we have met our Insurer Deductible, we may not be liable for the payment of any portion of the amount of Insured Losses that exceeds $100,000,000,000; and for aggregate Insured Losses up to $100,000,000,000, we may only have to pay a pro rata share of such Insured Losses as determined by the Secretary of the Treasury.

© Copyright 2015 National Council on Compensation Insurance, Inc.
All Rights Reserved.

**Policyholder Disclosure Notice**

1. Insured Losses would be partially reimbursed by the United States Government. If the aggregate industry Insured Losses exceed:

   a. $100,000,000, with respect to such Insured Losses occurring in calendar year 2015, the United States Government would pay 85% of our Insured Losses that exceed our Insurer Deductible.

   b. $120,000,000, with respect to such Insured Losses occurring in calendar year 2016, the United States Government would pay 84% of our Insured Losses that exceed our Insurer Deductible.

   c. $140,000,000, with respect to such Insured Losses occurring in calendar year 2017, the United States Government would pay 83% of our Insured Losses that exceed our Insurer Deductible.

   d. $160,000,000, with respect to such Insured Losses occurring in calendar year 2018, the United States Government would pay 82% of our Insured Losses that exceed our Insurer Deductible.

   e. $180,000,000, with respect to such Insured Losses occurring in calendar year 2019, the United States Government would pay 81% of our Insured Losses that exceed our Insurer Deductible.

   f. $200,000,000, with respect to such Insured Losses occurring in calendar year 2020, the United States Government would pay 80% of our Insured Losses that exceed our Insurer Deductible.

2. Notwithstanding item 1 above, the United States Government may not have to make any payment under the Act for any portion of Insured Losses that exceeds $100,000,000,000.

3. The premium charged for the coverage for Insured Losses under this policy is included in the amount shown in item 4 of the Information Page or the Schedule below.

### Schedule

Rate per $100 of Remuneration
See Attached Premium Schedule GPO 2923.

Issued by     Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079          Effective Date                    Premium $

Issued to     Suffolk Construction Company, Inc.

**WC 09 04 03 B**
Ed. 01/01/2015                    © Copyright 2015 National Council on Compensation Insurance, Inc.
                                   All Rights Reserved.                                    Page 2 of 2

**FLORIDA NON-COOPERATION WITH PREMIUM AUDIT ENDORSEMENT**

This endorsement applies only to the insurance provided by the policy because Florida is shown in Item 3.A. of the Information Page.

This endorsement adds the following provisions to Part Five—Premium, G. Audit, of the policy:

We are required to complete the premium audit process no later than 90 days after policy termination. If you fail to return voluntary audit requests or refuse to cooperate in completing a final physical audit, you must pay a premium to us not to exceed three times the most recent estimated annual premium on this policy subject to the following conditions:

1. We make two good faith efforts to obtain the voluntary audit report or complete the physical audit.

2. We document the audit file regarding the above attempts to obtain the required audit information.

3. After the two good faith attempts to obtain records, we send a letter by certified mail to you advising you of the specific records that are required and the premium that will be charged if you continue to refuse access to the records.

If you do not provide all of the specific records required and if we satisfy the conditions above on or before 90 days from the date of policy termination, we may continue to try and conduct the audit and/or re-open the audit for up to three years from the date of policy termination. Alternatively, we may immediately bill you a premium not to exceed three times the most recent estimated annual premium on this policy. If you provide all of the specific records required to complete the premium audit process within the three year period, we will determine your final premium in accordance with Part Five—Premium, E. Final Premium of the policy.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079    Effective Date    Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 09 04 07**
Ed. 07/01/2013

© Copyright 2013 National Council on Compensation Insurance, Inc.
All Rights Reserved.

Page 1 of 1

## FLORIDA RETROSPECTIVE RATING PLAN PREMIUM ENDORSEMENT — LARGE RISK ALTERNATIVE RATING OPTION (LRARO)

This endorsement is added to Part Five (Premium) because you chose to have the cost of the insurance rated retrospectively. This endorsement explains the rating plan and how the retrospective rating plan premium will be determined.

In this endorsement "you" and "your" means and includes the Named Insured of this policy or any other policies listed in Item 2. of the Schedule of this endorsement and each of their affiliates, divisions, subsidiaries, general partners and/or limited partners (or any other person or organization) who are named insureds on any of these policies and/or who are employers referenced in Item 1 of the Information Pages of those policies. We and you have agreed that your payment obligations and other duties under this policy and under any other policies listed in Item 2. of the Schedule of this endorsement are joint and several in nature.

This endorsement applies only in Florida. It determines the retrospective rating plan premium for the insurance provided by this policy and any other workers compensation policy listed in Item 2. of the Schedule.

This endorsement applies only to workers compensation and employers liability insurance when rated under the provisions of the Large Risk Alternative Rating Option ("LRARO") that we have negotiated with you. Under LRARO, we and you have negotiated the components of your retrospective rating plan in accordance with your individual risk needs.

The amount of retrospective rating plan premium depends on various elements.

A. **Retrospective Rating Plan Premium Standard Elements**
   The standard elements are explained here.
   1. Standard premium is the premium we would charge during the policy period if you had not chosen a retrospective rating plan. Standard premium does not include the following elements:
      a. Expense constant
      b. Premium resulting from the nonratable element codes in a rate or a nonratable catastrophe surcharge required by our manuals
      c. Premium developed by the occupational disease rates for employers subject to the Federal Mine Safety and Health Act
      d. Premium developed by the Terrorism provisions as outlined in our manuals
      e. Premium discount

      If this endorsement applies to more than one workers compensation policy, the standard premium will be the sum of the standard premiums for each workers compensation policy.

   2. Basic premium is less than standard premium. You have agreed to have your basic premium calculated either as (a.) a percentage of standard premium, (b.) a rate times an exposure base, or (c.) a flat amount. The method of calculating your basic premium is shown in Item 4. of the Schedule. We have estimated your basic premium and it is shown in Item 4. of the Schedule. The final basic premium will be determined when we calculate your retrospective rating plan premium, after your policy is audited.

      The basic premium typically includes our general administration costs, related loss control service cost, and net aggregate loss factor. Basic premium may also include premium taxes and/or assessments, depending upon the option selected by you, as indicated in Item 7. of the Schedule. A tax multiplier, including a Federal Tax Multiplier if applicable, may apply if premium taxes and/or assessments are not included in the basic premium.

      The basic premium does not cover the portion of claims adjustment expenses that are accounted for in the Claim Handling Charges, as shown in Item 6. of the Schedule.

© Copyright 2017 National Council on Compensation Insurance, Inc.
All Rights Reserved.

3. Incurred losses are all amounts we pay or estimate we will pay for losses, interest on judgments, expenses to recover against third parties, and employers liability loss adjustment expenses. This includes paid and outstanding losses (including any reserves set on open claims).

   a. Incurred losses do not include:

     (1) The cost in excess of the two most costly claims arising out of an accident involving two or more persons under a classification for which our manuals contain a non-ratable catastrophe surcharge required by our manuals

     (2) The disease-related portion of losses covered under the Federal Mine Safety and Health Act

     (3) Losses for acts of terrorism

     (4) Losses reported as fully fraudulent

     (5) Losses reported as noncompensable

   b. Allocated Loss Adjustment Expense (ALAE) may be included in incurred losses, depending on the option selected by you, as indicated in Item 5. of the Schedule. ALAE encompasses the following costs to us, which can be directly allocated to a particular claim:

     (1) Fees of attorneys or other authorized representatives where permitted for legal services, whether by outside vendors or staff representatives

     (2) Court, Alternate Dispute Resolution, and other specific items of expense such as:

       (a) Medical examinations of a claimant to determine the extent of our liability, degree of permanency, or length of disability

       (b) Expert medical or other testimony

       (c) Autopsy

       (d) Witnesses and summonses

       (e) Copies of documents such as birth and death certificates, and medical treatment records

       (f) Arbitration fees

       (g) Surveillance

       (h) Appeal bond costs and appeal filing fees

     (3) Medical cost containment expenses incurred with respect to a particular claim, whether by an outside vendor or done internally by a staff representative for the purpose of controlling losses, to ensure that only reasonable and necessary costs of services are paid. The expenses include:

       (a) Bill-auditing expenses for any medical or vocational services rendered, including hospital bills (inpatient or outpatient), nursing home bills, physician bills, chiropractic bills, medical equipment charges, pharmacy charges, physical therapy bills, and medical or vocational rehabilitation vendor bills

       (b) Hospital and other treatment utilization reviews, including precertification/preadmission, and concurrent or retrospective reviews

       (c) Preferred provider network/organization expenses

       (d) Medical fee review panel expenses

     (4) Expenses that are not defined as losses and are directly related to and directly allocated to the handling of a particular claim for services that are required to be performed by statute or regulation.

     (5) Rehabilitation Costs

       Voluntary vocational rehabilitation costs (e.g., medical care coordination costs over the limitation) must be reported as ALAE for injuries other than traumatic brain, spinal cord, amputation (including loss of eye(s)), and burns greater than 5% of the total body surface. Medical care coordination includes activities undertaken in order to assist in the containment of medical costs.

4. Claim handling charges cover the cost of our claim services (e.g. investigation of claims and filing claim reports) typically associated with Allocated Loss Adjustment Expense (ALAE) and Unallocated Loss Adjustment Expense (ULAE) and may be calculated either as (a.) a loss conversion factor (percentage) applied to incurred losses, depending on the option selected by you as shown in Item 5. of the Schedule, (b.) a flat amount per claim, or (c.) a flat amount against the policy. If ALAE is included in Incurred Losses, the claim handling charges will be adjusted to exclude ALAE. The Claim handling charges we have negotiated are shown in Item 6. of the Schedule.

© Copyright 2017 National Council on Compensation Insurance, Inc.
All Rights Reserved.

5. Converted incurred losses include the claim handling charges as shown in Item 6. of the Schedule and the incurred losses as shown in Item 5. of the Schedule, to which the retrospective rating plan applies.

6. Taxes and assessments are a part of the premium we collect. Taxes and assessments may be determined as a percentage of basic premium, converted incurred losses, and any elective elements. This percentage is called the tax multiplier. The tax multiplier is shown in Item 7. of the Schedule. The insured and insurer may agree to include taxes and/or assessments as part of the basic premium.

B. **Retrospective Rating Plan Premium Elective Elements**
Two other elements are included in determining retrospective rating plan premium, if elected and agreed upon. They are the excess loss premium for the loss limitation and the retrospective development premium. They are explained here.

1. The election of a loss limitation means that the amount of incurred loss to be included in the retrospective rating plan premium calculation is limited to an amount called the loss limitation. The loss limitation applies separately to each person who sustains bodily injury by disease and separately to all bodily injury arising out of any one accident.

    The charge for this loss limitation is called excess loss premium and may be calculated either as (a.) a percentage of standard premium, (b.) a rate times an exposure base, or (c.) a flat amount. The rate and basis used to calculate your excess loss premium is shown in Item 9. of the Schedule. We have estimated your excess loss premium and it is shown in Item 9. of the Schedule. The final excess loss premium will be determined when we calculate your retrospective rating plan premium, after your policy is audited.

2. The election of retrospective development factors used to stabilize premium adjustments means that the retrospective rating plan premium is increased by the addition of a retrospective development premium element. The retrospective development premium may be calculated either as (a.) a factor multiplied by converted incurred losses, (b.) incurred losses, or (c.) as a factor multiplied by standard premium. If this elective element is utilized, the retrospective development factors and basis used to calculate the retrospective development premium will be shown in Item 10. of the Schedule.

C. **Retrospective Rating Plan Premium Formula**
Workers compensation insurance policies listed in Item 2. of the Schedule will be combined with this policy to calculate the retrospective rating plan premium. If the policies provide insurance for more than one insured, the retrospective rating plan premium will be determined for all insureds who are eligible to be combined, not separately for each insured.

1. Retrospective rating plan premium is the sum of basic premium, incurred losses (subject to a maximum, if applicable), claim handling charges, retrospective development premium (if applicable), taxes, and assessments, plus the excess loss premium elective element, depending on the options that we have negotiated with you.

2. The retrospective rating plan premium will not be less than the minimum, nor more than the maximum retrospective rating plan premium agreed to by you and us. The method of calculating the minimum and maximum retrospective rating plan premium amounts is shown in Items 11. and 12. of the Schedule.

    As an alternative to a maximum retrospective rating plan premium, we and you may agree to a maximum loss content. Under this arrangement the maximum amount of payments by you for any reimbursement for loss, must be limited to the amount specified as the maximum loss content in Item 13. of the Schedule. The maximum loss content may include ALAE, depending on the option selected by you, as indicated in Item 5. of the Schedule. Your negotiated maximum loss content may be calculated either as (a) a rate times an exposure base, (b.) a percentage of standard premium, or (c.) a flat amount. The method of calculating your Maximum Loss Content is shown in Item 13. of the Schedule.

© Copyright 2017 National Council on Compensation Insurance, Inc.
All Rights Reserved.

D. **Calculation of Retrospective Rating Plan Premium**
1. We will calculate the retrospective rating plan premium using all loss information we have as of a date six months after the policy period ends and annually thereafter.

   We may make a special valuation of a retrospective rating plan premium as of any date that you are declared bankrupt or insolvent, make an assignment for the benefit of creditors, are involved in reorganization, receivership, or liquidation, or dispose of all your interest in work covered by the insurance.

2. After any calculation of retrospective rating plan premium, you and we may agree that it is the final calculation.

3. After each calculation of the retrospective rating plan premium, you will pay promptly the amount due us, or we will refund promptly the amount due you.

4. If you fail to meet any payment obligation, or fail to satisfy any other requirement under this policy or any policy listed in Item 2. of the Schedule to this endorsement, we may, among other remedies, immediately bill you for all of your payment obligations, and you will pay any such bill upon receipt.

E. **Cancellation of a Policy Under a Retrospective Rating Plan**
1. If any policy listed in Item 2. of the Schedule of this endorsement is cancelled, making the Florida coverage under this policy ineligible for the LRARO, this policy will be endorsed to remove Florida from Item 3.A. of the Information Page. Coverage for Florida under this policy will end on the cancellation effective date. The retrospective rating plan premium for the coverage period will be determined in accordance with Section E.3. below. At our option, we may issue a new policy to provide Florida workers compensation and employers liability insurance effective as of the cancellation effective date.

2. If the policy to which this endorsement is attached or any policy listed in Item 2. of the Schedule is cancelled, we may, at our option, cancel all of the policies listed in Item 2. of the Schedule as of the cancellation effective date.

3. If we cancel for nonpayment of premium, the maximum retrospective rating plan premium or maximum loss content (if applicable) will be calculated using the exposure basis indicated in Item 12. or 13. of the Schedule, increased pro-rata to 365 days.

   The retrospective rating plan premium elements for the policy period will be calculated using the applicable exposure basis indicated in Items 4., 6.c., 9. and 11. of the Schedule, adjusted on a short-rate basis.

4. If we cancel for reasons other than nonpayment of premium, the maximum retrospective rating plan premium or maximum loss content (if applicable) will be calculated using the exposure basis indicated in Item 12. or 13. of the Schedule, adjusted on a pro-rata basis.

   The retrospective rating plan premium elements for the policy period will be calculated using the applicable exposure basis indicated in Items 4., 6.c., 9. and 11. of the Schedule, adjusted on a pro-rata basis.

5. If you cancel, the maximum retrospective rating plan premium or maximum loss content (if applicable) will be calculated using the exposure basis indicated in Item 12. or 13. of the Schedule, increased pro-rata to 365 days.

   The retrospective rating plan premium elements for the policy period will be calculated using the applicable exposure basis indicated in Items 4., 6.c., 9. and 11. of the Schedule, adjusted on a short-rate basis.

6. Section E.5 will not apply if you cancel because:
   (a) All work covered by the insurance is completed
   (b) All interest in the business covered by insurance is sold
   (c) You retire from all business covered by the insurance

**WC 09 05 05 A**
**Ed. 01/01/2019**

© Copyright 2017 National Council on Compensation Insurance, Inc.
All Rights Reserved.

If you cancel for any of the above reasons, the maximum retrospective rating plan premium or maximum loss content (if applicable) will be calculated using the exposure basis indicated in Item 12. or 13. of the Schedule, adjusted on a pro-rata basis.

The retrospective rating plan premium elements for the policy period will be calculated using the applicable exposure basis indicated in Items 4., 6.c., 9. and 11. of the Schedule, adjusted on a pro-rata basis.

The negotiated LRARO components used to calculate the retrospective rating plan premium for your policy may not have been filed with, or approved by, the Florida Office of Insurance Regulation. Any grievance regarding the negotiated LRARO components used to calculate the Florida retrospective rating plan premium on your policy that have not been filed with, or approved by, the Florida Office of Insurance Regulation are not subject to the rating organization's dispute resolution process for Florida.

<div align="center">SCHEDULE</div>

1. Effective Date of Policy Period: 08/31/2019

2. Other policies subject to this Retrospective Rating Plan Premium Endorsement:

3. Total Estimated Standard Premium:  a.  $                    Florida
   b.  $                    All States

4. Basic Premium: (selected option indicated by 'X')
   a. ☐  Negotiated percentage of Standard Premium:        %
   b. ☐  Negotiated rate of              per $100 of
          subject to a minimum of $
   c. ☐  Negotiated amount of $                  , not subject to audit
   Estimated Basic Premium $

5. Incurred Losses include ALAE: (option that applies is indicated by 'X')
   a. ☐  Yes
   b. ☐  No

6. Claim Handling Charges: (selected option indicated by 'X')
   a. ☐  Negotiated loss conversion factor of          applies to the
          first $                of each loss
   b. ☐  Negotiated per claim charge(s) of $              per claim
   c. ☐  Negotiated amount of $              , not subject to audit

7. Tax Mulitplier:          applies to (option that applies is indicated by 'X')
   a. ☐  Basic premium and converted incurred losses and excess loss premium (if applicable) and retrospective development premium (if applicable)
   b. ☐  Converted incurred losses and retrospective development premium (if applicable)
   c. ☐  Included in the Basic Premium

8. Loss Limitation Amount: $

9. Excess Loss Premium: (if applicable; option that applies is indicated by 'X' )
   a. ☐  Negotiated percentage of Standard Premium:        %
   b. ☐  Negotiated rate of              per $100 of
          subject to a minimum of $
   c. ☐  Negotiated amount of $                  , not subject to audit
   Estimated Excess Loss Premium $

10. Retrospective Development Factors: (if applicable)

| | |
|---|---|
| 1st valuation | 18 months |
| 2nd valuation | 30 months |
| 3rd valuation | 42 months |
| 4th valuation | 54 months |
| 5th valuation | 66 months |
| 6th valuation | 78 months |
| 7th valuation | 90 months |

Applies to (option that applies is indicated by 'X')

a. ☐  Converted Incurred Losses

b. ☐  Incurred Losses

c. ☐  Standard Premium

11. Minimum Retrospective Rating Plan Premium: (option that applies is indicated by 'X')

a. ☐  Basic Premium plus Tax plus Excess Loss Premium, if selected

b. ☐  Negotiated percentage of Standard Premium:      %

c. ☐  Negotiated rate of        per $100 of
       subject to a minimum of $

d. ☐  Negotiated amount of $               , not subject to audit

12. Maximum Retrospective Rating Plan Premium: (option that applies is indicated by 'X')

a. ☐  Negotiated percentage of Standard Premium:      %

b. ☐  Negotiated rate of        per $100 of
       subject to a minimum of $

c. ☐  Negotiated amount of $               , not subject to audit

d. ☐  No Maximum Retrospective Rating Plan Premium applies

13. Maximum Loss Content: (applicable only if 12.d. of this Schedule is selected)

a. ☐  Negotiated rate of        per $100 of
       subject to a minimum of $

b. ☐  Negotiated percentage of Standard Premium:      %
       subject to a minimum of $

c. ☐  Negotiated amount of $               , not subject to audit

d. ☐  No Maximum Loss Content applies

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date                Premium $

Issued to    Suffolk Construction Company, Inc.                                 Endorsement No.

**WC 09 05 05 A**        © Copyright 2017 National Council on Compensation Insurance, Inc.        Page 6  of  6
Ed. 01/01/2019                          All Rights Reserved.

**FLORIDA EMPLOYMENT AND WAGE INFORMATION RELEASE ENDORSEMENT**

This policy requires you to release certain employment and wage information maintained by the State of Florida pursuant to federal and state unemployment compensation laws except to the extent prohibited or limited under federal law. By entering into this policy, you consent to the release of the information.

We will safeguard the information and maintain its confidentiality. We will limit use of the information to verifying compliance with the terms of the policy.

Issued by     Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079     Effective Date          Premium $

Issued to     Suffolk Construction Company, Inc.

**WC 09 06 06**                                                      Page 1 of 1
Ed. 10/1998

**MAINE INSPECTION IMMUNITY ENDORSEMENT**
**(TITLE 14 MAINE REVISED STATUTES ANNOTATED SECTION 167)**

**THE FOLLOWING LIMITS OUR LIABILITY**

We, the insurance company, our agents, employees, or service contractors, are not liable for damages from injury, death or loss occurring as a result of any act or omission in the furnishing of or the failure to furnish insurance inspection services related to, in connection with or incidental to the issuance or renewal of a policy of property or casualty insurance.

This exemption from liability does not apply:

A.    If the injury, loss or death occurred during the actual performance of inspection services and was proximately caused by our negligence or by the negligence of our agents, employees or service contractors;

B.    To any inspection services required to be performed under the provisions of a written service contract or defined loss prevention program;

C.    In any action against us, our agents, employees, or service contractors for damages proximately caused by our acts or omissions which are determined to constitute a crime, actual malice or gross negligence; or,

D.    If we fail to provide this written notice to the insured whenever a policy is issued or when new policy forms are issued upon renewal.

Issued by    Liberty Mutual Fire Insurance Company16586

For attachment to Policy No.WC2-641-444149-079        Effective Date                Premium $

Issued to    Suffolk Construction Company, Inc.

**WC 18 06 01**            © Copyright 1983 National Council on Compensation Insurance.            Page 1 of 1
Ed. 04/01/1984